IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TruePosition Inc. ) | |
| ) | |
| **Plaintiff/,** ) | |
| **Counterclaim-Defendant,** ) | |
| ) | |
| **v.** ) | Civil Action No.  05-00747-SLR |
| ) | |
| Andrew Corporation, ) | |
| ) | |
| **Defendant/.** ) | |
| **Counterclaim-Plaintiff.** ) | |
| ————————————————) | |

## TRUEPOSITION'S FIRST SET OF
## INTERROGATORIES TO ANDREW CORPORATION (NOS. 1-15)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff TruePosition, Inc.

("TruePosition") requests that Defendant Andrew Corporation ("Andrew"), answer under oath

the following interrogatories within thirty (30) days of the service date hereof.

**A92**

**Interrogatory No. 7**

      State the factual basis for the allegations in the First Affirmative Defense and paragraph 9 in the Counterclaims section of Andrew's Answer that the "144 Patent and each of its claims are invalid and/or unenforceable under one or more sections of Title 35 of the United States Code, including §§ 101, 102, 103, and/or 112," including the identity of each section of Title 35 of the United States Code under which the 144 Patent and each of its claims are allegedly invalid and/or unenforceable, which claims of the 144 Patent are allegedly invalid and/or unenforceable under each section of Title 35 identified, the prior art, if any, that allegedly renders each claim of the 144 Patent invalid and/or unenforceable under each section of Title 35 identified, and how such prior art allegedly renders each claim of the 144 Patent invalid and/or unenforceable under each section of Title 35 identified.

**Response:**

**Interrogatory No. 8**

      State the factual basis for the allegation in the Third Affirmative Defense of Andrew's Answer that "TruePosition is barred from maintaining its claims for infringement by the defense of equitable estoppel."

**Response:**

**Interrogatory No. 9**

      Sate the factual basis for the allegation in the Fourth Affirmative Defense of Andrew's Answer that "TruePosition is not entitled to any relief by reason of its coming into this Court with unclean hands."

**Response:**

**A93**

**Interrogatory No. 15**

Explain in detail why Andrew decided to participate in the efforts to include Uplink Time Difference of Arrival (U-TDOA) as a means or method of locating mobile telephones or units in 3GPP and/or ETSI technical specifications or other deliverables, including whether Andrew's relationship with any Wireless Provider, including but not limited to AT&T Wireless and Cingular Wireless, and/or any other customer of Andrew, foreign or domestic, influenced or played any role in the decision to initially participate in such efforts, or to continue participating in such efforts, how any such relationship, individually, influenced or played a role in the decisions to initially participate or continue participating in such efforts, and state the substance of any communications between Andrew and such Wireless Provider and/or customer relating to the issue of whether Andrew should initially participate or continue participating in the efforts to include U-TDOA as a means or method of locating mobile telephones or units in 3GPP and/or ETSI technical specifications or other deliverables, including the date(s) on which such communications occurred and the Persons involved in such communications.

**Response:**

Dated: February 6, 2006

_(signature)_

**CONNOLLY BOVE LODGE & HUTZ LLP**
Rudolf E. Hutz, Esq. (#484)
James D. Heisman, Esq. (#2746)
Scott G. Wilcox, Esq. (#3882)
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

**WOODCOCK WASHBURN LLP**
Paul B. Milcetic, Esq.
Gary H. Levin, Esq.
David L. Marcus, Esq.
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100
_Attorneys for Plaintiff, TruePosition Inc._

- 11 -

**A94**

## CERTIFICATE OF SERVICE

I, Scott G. Wilcox, hereby certify that on this 6th day of February, 2006, I served the foregoing **TruePosition's First Set of Interrogatories to Andrew Corporation (Nos. 1-15)** as indicated below:

*Via Hand-Delivery*
Matt Neiderman, Esquire
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801

*Via Electronic Mail*
Patrick D. McPherson, Esquire
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

John Kiernan, Esquire
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
JSkiernan@debevoise.com

Carl Riehl, Esquire
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022
CRiehl@debevoise.com

Scott G. Wilcox (#3882)

**A95**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

       Plaintiff/Counterclaim-Defendant

  vs.            CA No. 05-00747-SLR

ANDREW CORPORATION,

       Defendant/Counterclaim-Plaintiff


VIDEOTAPED DEPOSITION OF DR. DAVID GOODMAN

New York, New York

Monday, January 15, 2007


Reported by:
Adrienne M. Mignano
JOB NO. 190791

## Page 2

```
1
2        January 15, 2007
3        9:00 a.m.
4
5        Deposition of DR. DAVID GOODMAN,
6     held at the offices of Kirkland &
7     Ellis, 153 E. 53rd Street, New York,
8     New York, pursuant to Notice, before
9     Adrienne M. Mignano, a Notary Public of
10    the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1        IT IS HEREBY STIPULATED AND AGREED,
2
3     by and between counsel for the respective
4     parties hereto, that the filing, sealing and
5     certification of the within deposition shall
6     be and the same are hereby waived;
7        IT IS FURTHER STIPULATED AND AGREED
8     that all objections, except as to the form
9     of the question, shall be reserved to the
10    time of the trial;
11       IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be signed
13    before any Notary Public with the same force
14    and effect as if signed and sworn to before
15    the Court.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2     A P P E A R A N C E S :
3
4     WOODCOCK WASHBURN
        Attorneys for Plaintiff
5        Circa Centre, 12th Floor
         2929 Arch Street
6        Philadelphia, PA 19104-2891
7     BY: PAUL B. MILCETIC, ESQ.
8
9     KIRKLAND & ELLIS
        Attorneys for Defendants and The Witness
10       200 east Randolph Drive
         Chicago, Ill 60601
11
      BY: RACHEL PERNIC WALDRON, ESQ.
12
13
14
15
16    ALSO PRESENT:
17    PAUL JANSEN, Videographer
18
19
20
21
22
23
24
25
```

## Page 5

```
1
2        THE VIDEOGRAPHER: Good morning.
3        Here begins videotape number one
4     in the deposition of David Goodman in
5     the matter of TruePosition,
6     Incorporated versus Andrew Corporation
7     in the U.S. District Court for the
8     District of Delaware. Case number
9     05-00747-SLR.
10       Today's date is January the 15th
11    2007. The time is 9:05 a.m. This
12    deposition is being taken at the law
13    offices of Kirkland & Ellis, 153 East
14    53rd Street, New York, New York, and
15    was made at the request of Paul B.
16    Milcetic of the law offices of
17    Woodcock and Washburn of Philadelphia,
18    Pennsylvania.
19       The court reporter is Adrienne
20    Mignano. The videographer is Paul
21    Jansen here on behalf of Esquire
22    Deposition Services, located at 216
23    East 45th Street, New York, New York.
24       Would counsel and all present
25    please state their appearances for the
```

2 (Pages 2 to 5)

Page 6

Goodman

1        Goodman
2    record.
3        MR. MILCETIC: Paul Milcetic,
4    Woodcock and Washburn. I represent
5    TruePosition.
6        MS. WALDRON: Rachel Waldron of
7    Kirkland & Ellis for Andrew
8    Corporation.
9        THE VIDEOGRAPHER: Will the court
10    reporter please swear in the witness.
11    D A V I D   G O O D M A N,  called as a
12    witness, having been duly sworn by a
13    Notary Public, was examined and
14    testified as follows:
15        MS. WALDRON: Before we get
16    started, I just wanted to state for
17    the record that I'm under the
18    impression that Dr. Goodman would like
19    to tell you about some small typos and
20    contributions that he would like to
21    make regarding his report.
22    EXAMINATION BY
23    MR. MILCETIC:
24    Q.   Typos and corrections; is that
25    correct, Dr. Goodman?

Page 7

Goodman

1        Goodman
2    A.   Yes.
3    Q.   Well, before we begin then, why
4    don't you just tell me your name for the
5    record.
6    A.   Sure. David Joel Goodman.
7    Q.   Did there come a time, Dr. Goodman,
8    that you were contacted by anyone from
9    Kirkland & Ellis in connection with this
10    case?
11    A.   Yes.
12    Q.   When?
13    A.   It was sometime in the summer,
14    perhaps July.
15    Q.   Who contacted you?
16    A.   Mr. Parks, Michael Parks.
17    Q.   What did he say?
18    A.   He said that there was some matter
19    that he thought I might be able to help the
20    court decide some issues in a patent lawsuit.
21    And then he told me some details about who
22    the parties were and the technology.
23    Q.   What do you understand the
24    technology to be in this case?
25        MS. WALDRON: Objection. Vague.

Page 8

Goodman

1        Goodman
2    A.   I understand the technology to be
3    operations within a cellular telephone
4    network.
5    Q.   Did Mr. Parks say anything else?
6    A.   I don't recall. We've had many
7    conversations since then, but initially he
8    just introduced the dispute to me, and asked
9    if I would have the availability or
10    interested in serving as an expert.
11    Q.   Have you had any conversations with
12    anyone other than Mr. Parks at Kirkland &
13    Ellis?
14    A.   Yes.
15    Q.   Who?
16    A.   Well, Ms. Waldron here. Ms.
17    Kaplan, and I met Ms. Frye.
18        Can I ask for a clarification?
19    That has to do with this case? You don't
20    mean any conversations at all with Kirkland &
21    Ellis?
22    Q.   Correct.
23    A.   With regard to this case, I think
24    those were the only people at Kirkland.
25    Q.   What were your discussions with Ms.

Page 9

Goodman

1        Goodman
2    Waldron about?
3        MS. WALDRON: Objection. Vague.
4    Overbroad.
5    A.   Well, mainly about the issues in
6    the lawsuit. There were some discussions of
7    scheduling, when could we meet, who is
8    available on the phone. Things like that.
9    Various procedural things, but mainly
10    discussions about the matters in the dispute.
11    Q.   Now, before we started asking
12    questions, Ms. Waldron mentioned that there
13    were some typos in your report.
14        Do you remember that?
15    A.   Yes.
16    Q.   Which report are you referring to?
17    A.   I submitted two reports in this
18    case, and actually I have about three or four
19    places where I think readers would be helped
20    if I corrected them. There are probably
21    other typos that are pretty obvious. So I
22    think there is one matter in the invalidity
23    report, and three little things in the money
24    infringement report.
25    Q.   I'll give you the opportunity to

3  (Pages 6 to 9)

Page 70

```
1              Goodman
2    transceivers 12A to 12N should read shared
3    channel receivers 16A through 16N?
4        A.   Correct.
5        Q.   Is it your understanding if we look
6    at page 17, just two rows down where it says
7    control channel transceivers, do you see
8    that?
9        A.   Yes.
10       Q.   Is that still accurate in your
11   view?
12       A.   Yes.
13       Q.   If we look at the claim phrase
14   "equipped to receive signals sent by multiple
15   mobile cellular telephones," in that same
16   page 17 of your report, do you see that in
17   block 3 of claim 22?
18       A.   Yes.
19       Q.   Doesn't that equipment refer to the
20   same equipment that's received in the reverse
21   control channels in the claim?
22           MS. WALDRON:  Object to the form.
23   Vague.
24       Q.   Let me tell you what I'm trying to
25   get at.  I want to make sure --
```

Page 71

```
1              Goodman
2        A.   Thank you, I think you're helping
3    me if I have been too quick to -- yes, I want
4    to make everything consistent.  So I
5    appreciate your help with this.  So let me --
6           Mr. Milcetic, thank you.  I think
7    the fifth row, it should be 16A and it should
8    be shared transceivers, so I don't know if I
9    have to share my fee with you.
10       Q.   Not at all.
11       A.   So that would make it entirely
12   consistent.  So we want to change 12 to 16
13   twice and control to shared.
14       Q.   And this would be in the fifth
15   block of claim 22?
16       A.   Yes, yes, thank you very much.
17       Q.   Just along the same lines, to make
18   sure we have a final report that we can talk
19   about.
20       A.   Thank you.  I'm losing points on
21   this exam.
22       Q.   No, it's okay.  It's not an exam.
23   We're trying to get what your opinions are
24   right now.
25       A.   Thank you, I understand.  I
```

Page 72

```
1              Goodman
2    appreciate your help.  I really do.
3        Q.   If you look on page 18 of this
4    report under claim 31, you see again claim
5    phrase receiving said reverse claim signals,
6    and then again you refer to the control
7    channel transceivers 12A through 12N.
8            I still want to make sure that's
9    still your opinion?
10       A.   Let's me think about it, please.
11       Q.   Certainly.
12       A.   To accurately reflect my -- to
13   accurately convey my opinion, we have to make
14   the same adjustment here as well.
15       Q.   Just so --
16       A.   Should I say exactly --
17       Q.   I think the clearest way to make
18   this record is to allow you to mark up your
19   version of the report, which is an exhibit.
20   And make the changes there, wherever you
21   think it is appropriate.
22       A.   I have been doing that without
23   asking you beforehand.
24       Q.   So go ahead and mark the change
25   that you think would make your report
```

Page 73

```
1              Goodman
2    accurate on Exhibit 301.
3        A.   Thank you very much for the
4    opportunity.
5            MS. WALDRON:  Just so the record
6        is clear, we're talking about Exhibit
7        300, right?
8            MR. MILCETIC:  Excuse me, Exhibit
9        300, the invalidity report.
10   BY MR. MILCETIC:
11       Q.   Are there any other changes that
12   you know of at the moment that you would like
13   to make to Exhibit 300 to correct your
14   report?
15       A.   I don't know of any others in
16   Exhibit 300.
17       Q.   The court reporter is about to hand
18   you what's been marked already as Exhibit
19   466.  It's a document titled Draft
20   Translation of Japanese Patent Application.
21   It's AND0080497 to AND00503.
22           (Plaintiff's Exhibit 466, Draft
23   Translation of Japanese Patent
24   Application, Bates Stamped AND0080497
25   to AND00503, marked for identification,
```

19  (Pages 70 to 73)

Page 74

Goodman

1
2    as of this date.)
3        A.    I have that.
4        Q.    Do you recognize Exhibit 466?
5        A.    Yes.
6        Q.    What is it?
7        A.    It's an English translation of
8    Japanese laid open patent application. It's
9    a draft translation.
10       Q.    Did you rely on this Exhibit 466 in
11   rendering your invalidity report?
12       A.    Yes.
13       Q.    Do you speak Japanese yourself?
14       A.    No, I don't.
15       Q.    Without the translation, would you
16   be able to understand the Japanese reference?
17       A.    No.
18       Q.    Now, what I would like to do, and
19   I'm going to tell you what I'm going to do.
20   You have got Exhibit 466 in front of you,
21   correct, the Japanese translation?
22       A.    Yes.
23       Q.    And you have got in front of you
24   your invalidity report, which is Exhibit 300,
25   which you have now made some corrections to,

Page 75

Goodman

1
2    correct?
3        A.    Yes.
4        Q.    Feel free to refer to that. And
5    there is also, I believe you also have the
6    patent in front of you?
7        A.    I do.
8        Q.    Which is --
9        A.    462.
10       Q.    What I'm going to ask you now is a
11   series of questions, and I'm going to go down
12   the summary chart reflecting your opinions
13   for various elements in that chart, I'm going
14   to ask you where you found those elements in
15   the draft translation and why you believe
16   those elements are disclosed in the draft
17   translation of Kono. Is that all right with
18   you?
19       So we'll go through your report in
20   a little more detail essentially.
21       A.    Of course.
22       Q.    Now, let's start with page 15 of
23   your invalidity report. The first row.
24       A.    I have that.
25       Q.    The phrase is "a cellular location

Page 76

Goodman

1
2    system for determining the locations of
3    multiple cellular telephones."
4        Do you see that?
5        A.    Yes.
6        Q.    And your opinion is that that is
7    disclosed in Kono, correct?
8        A.    Correct.
9        Q.    And in particular in the draft
10   translation of Kono that's Exhibit 466,
11   correct?
12       A.    Yes.
13       Q.    Feel free to refer to your report
14   for this.
15       Where in Kono is that claim element
16   disclosed?
17       A.    With your permission, I might mark
18   up some or all of these exhibits just to help
19   me out with your questions, is that --
20       Q.    I think that's a perfect idea. If
21   I were you, I would leave your report alone.
22       A.    I won't mark up my report.
23       Q.    Other than that, that's fine.
24       MS. WALDRON:  Sure.  Whatever
25   helps you.

Page 77

Goodman

1
2        A.    Excuse me, Mr. Milcetic, before I
3    answer your question, I want to point out
4    that figures in the patent application aren't
5    included in Exhibit 466.
6        Q.    Were they included in the version
7    that you prepared in rendering your report?
8        A.    Yes.
9        Q.    I believe this is the only version
10   that we have.
11       MS. WALDRON:  Do you mean that
12   there were figures in that or that you
13   also relied on the original Japanese
14   figures?
15       THE WITNESS:  That's true.  I
16   relied on the figures.  Anyway, I
17   had -- it says Figure 1, and I had a
18   copy of Figure 1 that I attached to
19   this, and I suppose maybe the
20   translator didn't attach it.
21       Q.    Would it be helpful if I gave you
22   the figures in the original Japanese
23   translation?
24       A.    Yes, please.
25       MS. WALDRON:  I believe there are

20 (Pages 74 to 77)

Esquire Deposition Services
(215) 988-9191

A100

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 78

Goodman

1
2   also some in the report.
3       THE WITNESS: Thanks.
4       A.   For the moment, Mr. Milcetic, Ms.
5   Waldron showed me that I incorporated it in
6   my report, so --
7       Q.   Go ahead.
8       A.   I don't need you to give me Figure
9   1 right now. Maybe all of them that I
10  referred to, if you remember that.
11      What's the question, please?
12      Q.   Referring to page 15 of your
13  report, where in the Kono disclosure is a
14  cellular telephone location system for
15  determining the location of multiple mobile
16  telephones disclosed?
17      A.   Okay.
18      And my answer is in the sentence in
19  the right-hand column of row 1 that appears
20  on page 3 of the translation, the working
21  example of this invention is described below,
22  and then it says Figure 1 shows a
23  configuration of a moving body position
24  location apparatus.
25      Q.   And it's your interpretation that

Page 79

Goodman

1
2   the moving body refers to a cellular
3   telephone?
4       A.   That's my interpretation.
5       Q.   The next block down on page 15 of
6   your report, do you see that?
7       A.   Yes.
8       Q.   The phrase is "each initiating
9   periodic signal transmission over one of a
10  prescribed set of reverse control channels
11  comprising."
12      Do you see that?
13      A.   Yes.
14      Q.   Where in the Kono disclosure is
15  that claim element disclosed?
16      A.   It says on page 3, at the beginning
17  of the section that's headed operation of the
18  invention, it says, "in this invention, a
19  moving body transmits position locating
20  signals using shared terminals."
21      Q.   Is it your understanding that
22  shared channels are the same as a prescribed
23  set of reverse control channels?
24      A.   It's my understanding that to the
25  extent that Andrew system using a prescribed

Page 80

Goodman

1
2   set of reverse control channels, Kono
3   discloses -- in other words, if somebody
4   decides that Andrew equipment is using a
5   prescribed set of reverse control channels,
6   then they would be forced to say that Kono is
7   also using a prescribed set of reverse
8   control channels.
9       Q.   So is it correct that you're not
10  really saying that the '144 patent isn't
11  valid, so much that it may be invalid under
12  some interpretation of the patent?
13      MS. WALDRON: Objection.
14      Mischaracterizes.
15      A.   What am I supposed to say yes or no
16  to?
17      Q.   Let me ask a different question.
18      A.   You're putting words into my --
19  that I didn't write into this report. Maybe
20  I should read how I described the situation.
21      Q.   The question I have is: Is it your
22  opinion that the '144 patent is invalid?
23      A.   Yes.
24      Q.   Is it your opinion that the '144
25  patent is invalid even if Andrew's product is

Page 81

Goodman

1
2   not encompassed -- is not encompassed within
3   the '144 patent claims?
4       MS. WALDRON: Object to the form.
5       Q.   Let me repeat it.
6       Is it your opinion that the '144
7   patent is invalid even if Andrew's geometrics
8   is not encompassed within the '144 patent
9   claims?
10      MS. WALDRON: Objection.
11      A.   I don't have an opinion about that.
12      Q.   As to whether under that set of
13  circumstances, the '144 patent is invalid?
14      A.   I haven't done that analysis at
15  all.
16      Q.   What is it about the phrase shared
17  channels in Kono that makes you believe that
18  it is similar or that it corresponds to
19  anything in Andrew's product?
20      MS. WALDRON: Object to the form.
21      Compound.
22      A.   I think these channels are carrying
23  information in two directions, as a way that
24  the channels used in the Andrew's product.
25      Q.   Specifically stand-alone dedicated

21  (Pages 78 to 81)

Page 82

```
              Goodman
 1
 2    channels you mean?
 3      A.   Yes.
 4      Q.   In Andrew's product?
 5      A.   Yes.
 6      Q.   What makes you think that in Kono,
 7    the shared channels are being transmitted in
 8    two directions?
 9      A.   Well, because Kono disclosing a
10    transceiver at the cell site, or whatever he
11    calls the cell site, and transceiver includes
12    transmitter and receiver.
13          Also, it seems that Kono technology
14    allocates this shared channel to one cell
15    phone at a time. Just as Andrew -- just as a
16    stand-alone dedicated control channel carries
17    in any particular time interval information
18    from between one cell phone and one base
19    station.
20      Q.   Is it your understanding that the
21    shared channels in Kono are channels that are
22    emitted as part of the normal operation as
23    part of at telephone location system?
24          MS. WALDRON:   Objection. Vague.
25      A.   I think they are emitted. The
```

Page 83

```
              Goodman
 1
 2    shared channels are emitted.
 3          Would you read the question again?
 4          (Record read)
 5      Q.   Actually, I'll rephrase it.
 6          Is it your understanding that the
 7    position locating signals transmitted over
 8    the shared channels are signals that are sent
 9    in the context of a normal cellular telephone
10    system?
11          MS. WALDRON:   Objection. Vague.
12      A.   I suppose normal -- I'm not sure
13    what normal means in this question. If you
14    could explain it further, I can answer it
15    certainly.
16      Q.   Is it your understanding that the
17    position locating signals in Kono are part of
18    the signals that are sent in any cellular
19    telephone system as part of its everyday
20    operation.
21          MS. WALDRON:   Objection. Vague.
22      A.   Yes.
23          MS. WALDRON:   While there is no
24          question pending, are we still
25          breaking for lunch at 12:30?
```

Page 84

```
              Goodman
 1
 2          THE WITNESS:   If it is fine with
 3      you. We just said that. I could stop
 4      now.
 5          THE VIDEOGRAPHER:   We're off the
 6      video record at 12:29 p.m.
 7          (Thereupon, a recess was taken,
 8      and then the proceedings continued as
 9      follows:)
10          THE VIDEOGRAPHER:   We're back on
11      the video record at 1:34 p.m.
12        A F T E R N O O N   S E S S I O N
13    D A V I D   G O O D M A N,   resumed and
14      testified as follows:
15    EXAMINATION BY (Cont'd.)
16    MR. MILCETIC:
17      Q.   Dr. Goodman, when we left we were
18    talking about a page of your invalidity
19    report.
20          Do you remember that?
21      A.   I think so. Yes, okay, now, I
22    remember.
23      Q.   And we were discussing the summary
24    chart, and in particular the second row of
25    the summary chart on page 15.
```

Page 85

```
              Goodman
 1
 2          Do you remember that?
 3      A.   Yes, I recall.
 4      Q.   Is it your view that the claim
 5    phrase prescribe set of a reverse control --
 6    let me step back.
 7          Let me redo that one, if that's
 8    okay with you.
 9      A.   Oh, of course.
10      Q.   Is it your opinion that the phrase
11    "prescribed set of reversed control channels"
12    is disclosed in Kono under the construction
13    that you provided this morning?
14      A.   To the extent that it is practiced
15    by Andrew, so if it is interpreted in such a
16    way that you can find it in Andrew's
17    technology, you would be compelled to say
18    that Andrew has it as well.
19      Q.   When you say that it is
20    interpreted, you mean to the extent that your
21    construction is interpreted?
22      A.   Yes.
23      Q.   I believe your construction this
24    morning of reverse control channel included
25    the requirement of a particular signal format
```

                                    22 (Pages 82 to 85)

Page 86

```
 1            Goodman
 2   according to certain cellular telephone
 3   standards; is that right?
 4       A.   Yes.
 5       Q.   Does Kono disclose that signal
 6   format?
 7       A.   I think to the same extent that
 8   Andrew does, yes.  To the same extent that
 9   Andrew uses that format, I think Kono uses it
10   the same way Andrew does.
11       Q.   Is it fair to say that both Kono
12   and Andrew do not use that signal format?
13          MS. WALDRON:  Objection.  Form.
14       A.   I guess depending on the context,
15   somebody might say that.
16       Q.   Well, do you believe that Andrew
17   uses that signal format?
18       A.   No.
19       Q.   Then does it follow that Kono
20   doesn't use that signal format as well?
21          MS. WALDRON:  Objection to the
22      form.
23       A.   I think I answered that as well.
24   In the same way that Andrew uses it or
25   doesn't use it, Kono -- I think I explained
```

Page 87

```
 1            Goodman
 2   that before lunch.
 3       Q.   But you testified that Andrew
 4   doesn't use that signal format, right, the
 5   signal format in the cellular telephone
 6   standards that define reverse control channel
 7   in a way that you are interpreting it, right?
 8       A.   Yes.
 9       Q.   And you also testified that Kono
10   discloses that element to the same extent as
11   Andrew practices that element, correct?
12       A.   Yes.
13          MS. WALDRON:  Objection.
14       Q.   Doesn't it follow then that Kono
15   doesn't then disclose that element?
16       A.   I think to give a complete opinion,
17   I'd have to say that somebody who would find
18   that element in Andrew would have to find it
19   in Kono.  So if somebody doesn't find it in
20   Andrew, I don't know, but -- I think
21   that's -- that sentence is my opinion.
22       Q.   And what is the basis for that
23   opinion?
24       A.   The basis for that opinion is that
25   the shared channel in the Kono application
```

Page 88

```
 1            Goodman
 2   has similar properties to the stand-alone
 3   dedicated control channel that I understand
 4   is TruePosition's.  It conforms to the
 5   prescribed set of reverse control channels,
 6   because, as you know, I have done the
 7   infringement analysis as well as the
 8   invalidity analysis, so I'm aware of how
 9   TruePosition interprets this and I think they
10   are compelled to say.  I know you have had
11   different experts for the two things.  I
12   think if you ask Dr. Gottesman, he would have
13   to say, oh, yeah, it's in Kono too because of
14   the way he found it in Andrew.  I don't agree
15   with him.
16       Q.   When did you first learn how
17   TruePosition contends that Geometrix
18   infringes the patent?
19       A.   I suppose it was in the summer when
20   Mr. Parks told me about the lawsuit.
21       Q.   When did you start learning about
22   how Geometrix works in terms of its
23   operation?
24       A.   I think it was in October, towards
25   the middle or end of October.
```

Page 89

```
 1            Goodman
 2       Q.   Do you know when you first formed
 3   an opinion that the '144 patent was invalid
 4   if the claims are construed to cover
 5   Geometrix?
 6       A.   Yes.
 7       Q.   When?
 8       A.   I think the first week in November.
 9   Within that time frame.
10       Q.   Do you remember when you first came
11   to the opinion that Geometrix doesn't
12   infringe the '144 patent?
13       A.   I'm trying to synchronize these
14   dates here, but I think early in December I
15   came to the opinion that Dr. Gottesman didn't
16   prove that Geometrix infringes the '144
17   patent, so that's the opinion I want to offer
18   to the court.
19          I was asked by Kirkland & Ellis to
20   find out whether Dr. Gottesman proved it, and
21   it's my opinion that he did not.
22       Q.   Is it your understanding that the
23   Kono disclosure discloses an AMPS cellular
24   telephone system?
25       A.   Sorry, I haven't been asked for
```

23 (Pages 86 to 89)

Page 102

```
1              Goodman
2      Q.  I noticed in your invalidity
3   report, Exhibit 300, at the end of the
4   report, there is a listing of material to be
5   considered in forming your opinion relating
6   to the invalidity of the '144 patent,
7   correct?
8      A.  Yes.
9      Q.  And I also noticed that nothing in
10  that report, the invalidity report, none of
11  those materials seem to relate to the
12  operations of Geometrix.
13     Am I right about that?
14     MS. WALDRON:  Objection.  Form.
15     Assumes a fact.
16     A.  I agree with you about -- well, I'd
17  like to see.  I just don't remember what's in
18  references 5, 6 and 7 in Andrew, documents
19  prepared by Andrew Corporation.  Those are, I
20  think, the only ones that talk about how
21  their Geometrix system works.  I
22  don't remember what's in them.
23     Q.  Did you, for purposes of rendering
24  your invalidity report, did you consider the
25  operation of Geometrix?
```

Page 103

```
1              Goodman
2      A.  Yes.
3      Q.  What were the sources that you
4   used?
5      A.  To my recollection, there is one
6   source that I didn't list here, and that was
7   a phone conversation with Mr. Kennedy, who is
8   an employee of Andrew.
9      Q.  When was the phone conversation?
10     A.  If I recall correctly, I spoke to
11  him before I wrote the invalidity report.  I
12  just don't know.
13     Q.  Do you think to make your
14  invalidity report accurate, it would be worth
15  correcting it to add the Joseph Kennedy
16  conversation?
17     A.  I think so.  If that's true, I
18  would like to ask Ms. Waldron because she
19  participated in the phone conversation if it
20  actually occurred.
21     MS. WALDRON:  I'm not allowed to
22     testify right now.
23     A.  As I recall now, I think that would
24  improve the report to say that I had a phone
25  conversation with Mr. Kennedy.
```

Page 104

```
1              Goodman
2      Q.  Would you prefer to make that
3   change?
4      A.  Yes.
5      Q.  Please go ahead since we're keeping
6   a master copy of what the report is
7   reflecting your opinions today.
8      A.  Yes.
9      Q.  Just for the record, you're writing
10  on Exhibit 300, correct?
11     A.  That's correct.  I'm writing on
12  page 3 of Exhibit B.
13     Q.  Apart from Ms. Waldron and
14  Mr. Kennedy, was there anyone else on the
15  conversation?
16     A.  I don't remember.  There might have
17  been another Kirkland attorney, but I don't
18  know.
19     Q.  What exactly did you discuss?
20     MS. WALDRON:  Objection.  Vague.
21     A.  As best as I can recall about that
22  particular conversation, I think he kind of
23  talked me through the -- talked me --
24  explained step by step how Geometrix system
25  finds out where a mobile phone is.  Finds the
```

Page 105

```
1              Goodman
2   location of a mobile phone.
3      Q.  Apart from -- let me step back.
4      What did Ms. Waldron say on the
5   conversation?
6      MS. WALDRON:  Objection.  Vague.
7      Overbroad.
8      A.  I don't recall that she said
9   anything.  I was visiting Kirkland & Ellis'
10  office at the time, and as I said, Ms.
11  Waldron was there, maybe Mr. Parks.
12     Q.  Where were you exactly?
13     A.  At the Kirkland & Ellis office in
14  Chicago.
15     Q.  About when did the conversation
16  take place?
17     A.  Early November.
18     Q.  Other than the early November
19  conversation between yourself, Joe Kennedy
20  and Ms. Waldron, did you have any other
21  source of understanding of how Geometrix
22  works at the time that you rendered your
23  invalidity report?
24     A.  I don't recall any other sources.
25     Q.  At that time, had you looked at any
```

27 (Pages 102 to 105)

Page 106

```
1            Goodman
2   Geometrix source code?
3      A.   No.
4      Q.   At that time, had you looked at any
5   technical documentation relating to the
6   operation of Geometrix?
7      A.   I don't think so.
8      Q.   Let me explain where I'm going with
9   this.
10        As I understand it, correct me if
11  I'm wrong, you were -- your opinion in your
12  invalidity report in summary is that the Kono
13  disclosure discloses each element of the
14  claims and corresponds to each element of the
15  '144 patent claims to the same extent that
16  Geometrix does, correct?
17     A.   Yes, almost correct.
18        Maybe not to the same extent, but
19  if Geometrix conforms to the claims, then
20  Kono conforms to the claims, and I don't know
21  how to measure extent.  It seems like a
22  binary thing, it either conforms or it
23  doesn't.
24     Q.   It follows then at the time that
25  you rendered your invalidity opinion, you
```

Page 107

```
1            Goodman
2   must have had some working knowledge of the
3   Geometrix product, correct?
4      A.   Yes.
5      Q.   To render that opinion?
6      A.   Yes.
7      Q.   And that understanding of the
8   Geometrix product at the time that you
9   rendered your invalidity report would have
10  been based, at least in part, on the
11  conversation between you and Mr. Kennedy in
12  early November, correct?
13     A.   Yes.
14     Q.   And thus far, you haven't been able
15  to recall any other sources of information,
16  right?
17        MS. WALDRON:  Objection.
18        Misstates.
19     A.   At the moment, I don't recall.
20     Q.   Do you want to think about it and
21  think of some other potential sources?
22     A.   Well, I was just going to explain
23  my answer a little more.  That I have, by now
24  I have a pile of documents relating to the
25  Geometrix system, and I have read a lot of
```

Page 108

```
1            Goodman
2   them, and I just don't remember when I
3   received them and when I read them relative
4   to preparing this report.  But I think the
5   information that I used was what I heard
6   Mr. Kennedy tell me about.
7      Q.   When Mr. Kennedy explained the
8   operation of the Geometrix system to you, did
9   he go through each element of the claims and
10  discuss how Geometrix relates to those
11  elements?
12        MS. WALDRON:  Objection.  Vague.
13        Assumes a fact.
14     A.   As best as I can recall from two,
15  two-and-a-half months ago from a phone
16  conversation, he really didn't analyze the
17  '144 patent.  You know, I asked him
18  questions, tell me how it works, he told me
19  how it worked, and we didn't get very far
20  into the patent claims.  I just wanted to
21  know how does your stuff find out where a
22  cell phone is located.
23     Q.   Next claim element on page 16 of
24  your invalidity report is timing signal
25  receiver.
```

Page 109

```
1            Goodman
2        Do you see that?
3      A.   Yes.
4      Q.   It's your opinion that the timing
5   signal receiver limitation in claim 1, the
6   second row of the chart on claim 16, is
7   disclosed in Kono?
8      A.   Yes.
9      Q.   What's the basis of that
10  understanding?
11     A.   My basis for that understanding is
12  that there is a high precision clock within
13  each of the shared channel receivers labeled
14  54 in the Kono patent, and that this -- the
15  high precision clocks at all of the base
16  stations are corrected by the switching
17  station.
18     Q.   Is it your understanding that the
19  Kono disclosure discloses a GPS clock?
20     A.   That's not my understanding.  I
21  don't subscribe to that.
22     Q.   Is it your belief that Kono
23  discloses a GPS receiver?
24     A.   It's my belief that Kono does not
25  say anything about a GPS receiver.  Sorry,
```

28  (Pages 106 to 109)

Page 114

Goodman

1
2       Q.   Are any of the documents that one
3   would look to in 1993 for the GPS receiver
4   disclosure mentioned in your report?
5       A.   Not explicitly.
6       Q.   If you go back to page five of your
7   invalidity report, please.
8       A.   Five?
9       Q.   Yes.
10      A.   Yes, I'm there.
11      Q.   There is a legal standard on page 5
12   relating to obviousness that you read
13   earlier, correct?
14      A.   Yes.
15      Q.   Is that essentially what the
16   attorneys explained to you about how you go
17   about showing whether something is obvious?
18      A.   Yes.
19      Q.   Did they use any kind of
20   terminology relating to motivations to
21   combined prior art references?
22      A.   I have heard that expression, and I
23   don't remember if I heard it in my discussion
24   of this patent, but I have heard it in other
25   context. So I know that that is a

Page 115

Goodman

1
2   consideration.
3       Q.   Turning back to page 17, the claim
4   element wherein said timing receiver
5   comprising a global positioning system
6   receiver.
7       A.   Yes.
8       Q.   Do you believe your report is
9   accurate as it is written in that -- under
10   the question present in Kono, it says yes?
11      A.   I'm having a problem with that word
12   inherently.
13      Q.   You're not sure --
14      A.   In my instruction. So it's my
15   opinion if -- so I was informed by Kirkland &
16   Ellis that it has to be there either
17   expressly or inherently, and I certainly
18   don't have the opinion that it is there
19   expressly, and sitting here I forgot what
20   they told me about inherently. I'm sure we
21   discussed it. I think that's why I wrote yes
22   at the time.
23          If you would give me a definition
24   of inherently, I would tell you whether
25   sitting here I think it fits your definition.

Page 116

Goodman

1
2   But it is the sort of thing that's a little
3   obscure to an engineer.
4       Q.   Reading Kono, the Kono disclosure,
5   will you conclude that what's disclosed there
6   must be implemented using a GPS receiver?
7       A.   No.
8       Q.   Can we go back to claim 15 of your
9   report now?
10      A.   Of course.
11      Q.   Back to the earlier claim elements.
12   Actually it's page 60.
13      A.   Page 60.
14      Q.   Yes.
15          This all started with the timing
16   signal receiver?
17      A.   Yes.
18      Q.   Next claim element is a sampling
19   subsystem.
20          Do you see that?
21      A.   Yes, I do.
22      Q.   It's in the third row of the chart
23   on page 16 of your invalidity report.
24          Do you see that?
25      A.   Yes.

Page 117

Goodman

1
2       Q.   Since that's a long one, can you
3   read that limitation into the record?
4       A.   "And a sampling sub, system
5   operatively coupled to set timing signal
6   receiver and said baseband converter for
7   sampling baseband converter at a prescribed
8   frequency and formatting the sample signal
9   into frames of digital data each frame
10   comprising of a prescribed number of data
11   bits, said time stamp bits representing the
12   time which said cellular telephone signals
13   were received."
14      Q.   Is it your opinion that Kono
15   discloses that claim limitation?
16      A.   It's my opinion that if someone
17   asserted that Andrew Geometrix product has a
18   sampling subsystem as described here, that
19   same person would be compelled to say that
20   Kono also has it.
21      Q.   Why do you say that?
22          MS. WALDRON: Objection. Vague.
23   Form.
24      A.   It's based on my understanding of
25   the patent and my understanding of Kono's

30 (Pages 114 to 117)

Goodman
application and my understanding of how the Geometrix system works.
Q. Would you agree that the Kono disclosure discloses no particular algorithm of any kind?
MS. WALDRON: Objection. Vague. Ambiguous.
A. Would you read the question, please?
(Record read)
A. I disagree.
Q. Where does Kono disclose an algorithm?
A. On page 4, there is a long middle paragraph of this translation. There is a mistake, I assume it is a mistake in the translation or typo here, but I'll tell you.
I just have to narrow it down.
So if we say the word reports, which is -- it's about six lines, maybe the seventh line from the bottom of that long paragraph, at the end of the line, it says and reports to, and I think the thing that's doing the reporting is the base stations.

Goodman
But anyway, reports to the switching stations data such as difference in arrival time position locating signals. And then the base station forwards these data to the position location calculating device.
And I think to make sense, this would have to be the switching station because one is a reference to switching station. So -- and then it says the position of the mobile equipment is calculated, and I think someone of skill in the art would know that there are many algorithms that would use time difference of arrival to calculate position.
Q. Is it your view that Kono then discloses each one of those algorithms?
A. Yes. I'm not a lawyer, but I think so. I mean, if Kono is valid, then anyone using -- I just think so. As an engineer.
MS. WALDRON: Is this an okay time for a break?
MR. MILCETIC: Any time.
THE WITNESS: We're running out of tape.

Goodman
THE VIDEOGRAPHER: We're off the video record at 2:43 p.m.
(Thereupon, a recess was taken, and then the proceedings continued as follows:)
THE VIDEOGRAPHER: We're back on the video record at 3:01 p.m.
BY MR. MILCETIC:
Q. Dr. Goodman, when we left, we were talking about page 16 of your invalidity report, and particularly the sampling subsystem limitation.
A. Yes.
Q. What is a sampling subsystem?
MS. WALDRON: Objection. Calls for a legal conclusion.
A. I think for someone to understand the meaning of sampling subsystem in this patent, they would read the entire claim limitation, and say a sampling subsystem is the thing that does all of the stuff that is in all of the -- performs all of the operations.
I withdraw my answer for the

Goodman
moment. Let me think about it.
I'll reinstate my answer. It's some sort of apparatus that works in connection with a timing signal receiver and a baseband converter, and the things that it does in these operations is sample the baseband signal in a certain way. It formats the sample signal into claims of data, and these frames have particular properties as described here. And the frames consist of data bits and time stamp bits. And each of those bits have prescribed properties.
Q. Before you ever read the '144 patent, have you ever seen a sampling subsystem before?
MS. WALDRON: Objection. Overbroad.
A. I don't remember.
Q. Would you say that the phrase sampling subsystem is a term of art in your field?
MS. WALDRON: Objection. Vague.
A. No, I wouldn't.
Q. Let's move on to the next element

Page 122

```
1          Goodman
2    now on page 16.
3          Do you see the central site system
4    element?
5     A.  Yes.
6     Q.  So on page 16 of your report at the
7    fourth row of the chart, there is a central
8    site system limitation cited, correct?
9     A.  Yes.
10    Q.  That's in claim 1 of the '144
11   patent claims?
12    A.  Yes.
13    Q.  It's your opinion that that is
14   disclosed by the switching station and
15   position location calculating device?
16    A.  Yes.
17    Q.  Are you saying both of them
18   together disclose a central site system.
19         Is your understanding that the
20   position location calculating device is just
21   a computer in Kono?
22    A.  I think someone of skill in the art
23   would recognize that it could be realized --
24   I'm not sure what a computer means, but it
25   could be realized by a microprocessor or a
```

Page 123

```
1          Goodman
2    digital microprocessor.  There are all forms
3    of computers.  I don't know about a laptop or
4    a desktop.
5          So that would be part of it, and
6    the remainder of it would be some sort of
7    communication resources for transferring
8    information to and from the switching
9    station.
10    Q.  The next claim element on page 16
11   is "means for processing said frames of data
12   from said cell site systems."
13         Do you see that?
14    A.  Yes.
15    Q.  Is it your opinion that that claim
16   term is disclosed in Kono?
17    A.  It's my opinion that if somebody
18   found it in the Geometrix equipment, they
19   would be compelled to say that it is also in
20   Kono.
21    Q.  In your view, does Kono disclose a
22   means for processing that's in some way
23   similar to a means for processing in
24   Geometrix?
25    MS. WALDRON:  Objection.  Vague.
```

Page 124

```
1          Goodman
2    A.  May I look at my claims
3    construction that are in these exhibits?
4    Q.  Certainly.  I believe your claim
5    construction is Exhibit --
6    A.  So somewhere I defined means for
7    processing.  So it might help me to --
8    Q.  Yes.  I think it is 463 or 464 that
9    you did that.
10    A.  Yes, I see something on 463.  I'd
11   like also to look at one of the other
12   exhibits, which was Andrew's proposed claim
13   construction from November 22nd.
14    Q.  That's Exhibit 301.
15    A.  301.  Thank you.  I'm going to
16   refer to Exhibit 301.
17         Just to be absolutely certain,
18   would you read the question, please, just so
19   I know what I'm answering.
20    (Record read)
21    Q.  I can clarify if you like.
22    A.  I want to make sure I'm answering
23   the right question.  It wasn't that it was
24   unclear.
25    Q.  Under your construction today, you
```

Page 125

```
1          Goodman
2    just looked it up --
3    A.  It's actually 465, I think.
4    Q.  In Exhibit 465.  Does Kono disclose
5    the means for processing limitation?
6    A.  It's --
7    MS. WALDRON:  Objection.  Vague.
8         Calls for legal conclusion.
9    A.  It's my opinion that someone of
10   skill in the art who finds that claim element
11   in Geometrix equipment would be compelled to
12   say that it also exists in Kono.
13    Q.  What's the basis for your opinion?
14    A.  The basis for my opinion is this
15   statement in Exhibit 466 that something
16   reports to the switching station data such as
17   the difference in arrival time of position
18   locating signals with respect to the
19   different base stations.
20    Q.  The construction that you laid out
21   this morning for means for processing
22   encompassed Figure 6A and Figure 7, correct?
23    A.  Yes.
24    Q.  If I went through those figures on
25   a block by block basis, would you be able to
```

32 (Pages 122 to 125)

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 126

Goodman

1    find a disclosure in Kono that corresponds to
2    those figures?
3        MS. WALDRON: Objection.
4        Compound. Overbroad.
5    A.   It's my opinion that if somebody
6    performed this exercise with respect to the
7    Geometrix equipment, and came to the
8    conclusion that you suggest, that all of
9    those things exist in the Geometrix
10   equipment, they would also have to say that
11   it exists in Kono.
12   Q.   Is the disclosure in Kono, does
13   that essentially describe in your view the
14   Geometrix equipment?
15       MS. WALDRON: Objection. Vague.
16       Ambiguous.
17   A.   I haven't performed this analysis,
18   but I'll just stop there. I haven't advised
19   anyone whether Geometrix has to pay royalties
20   to Kono if that's what you're asking me.
21   That might be another infringement.
22   Q.   When you were rendering your
23   invalidity report, did anyone explain to you
24   how means plus function claims elements were

Page 127

Goodman

1    construed?
2    A.   I think so. I have heard
3    explanations before I got involved in this
4    lawsuit, and I assume -- I would imagine that
5    I heard the same explanations, but I don't
6    remember specifically.
7    Q.   What is your understanding about
8    means plus function claim elements are
9    construed?
10   A.   My understanding is that in order
11   to construe the claims, you have to read the
12   claim itself and find out what function is
13   being claimed, and then read the patent
14   specification to find out the structure that
15   performs that function.
16   Q.   Is it your understanding that the
17   structure can be found in the prior art if an
18   equivalent of the structure is disclosed?
19       MS. WALDRON: Objection. Legal
20       conclusion. Compound.
21   A.   I have no understanding of whether
22   that's true or not.
23   Q.   How about with respect to
24   infringement?

Page 128

Goodman

1        MS. WALDRON: Objection. Form.
2        Legal conclusion.
3    A.   Would you state a complete question
4    about infringement?
5    Q.   With respect to infringement, is it
6    your understanding that means plus function
7    elements are construed to cover the
8    corresponding structure plus equivalents?
9        MS. WALDRON: Objection. Calls
10       for a legal conclusion.
11   A.   I understand that the claim may be
12   drafted in means plus function format. I
13   understand that for an accused product to
14   literally meet a means plus function claim
15   limitation, an element in the accused product
16   must, one, perform the same function recited
17   in the means plus function claim limitation,
18   and, two, use the same structure disclosed in
19   the patent specification or its equivalent
20   structure to perform the recited function.
21       I understand that an accused
22   structure may be equivalent to the disclosed
23   structure in the patent specification if it
24   performs the same function in the same way to

Page 129

Goodman

1    achieve the same result.
2    Q.   When you were doing your validity
3    analysis for Kono, did you also understand
4    that means plus function claim elements
5    encompass corresponding structure and
6    equivalent structure?
7        MS. WALDRON: Objection. Legal
8        conclusion. Assumes a fact.
9    A.   Would you read the question again?
10       (Record read)
11   A.   I didn't use that legal rule in my
12   validity analysis. I understood what it
13   meant in terms of infringement, but I didn't
14   use it in my validity analysis.
15   Q.   Correct me if I'm wrong, your
16   testimony is that this means for processing
17   limitation is disclosed in Kono to the same
18   extent that one would claim it's found in
19   Geometrix; is that correct?
20   A.   Again, I won't subscribe to same
21   extent, either it's found there or not. I
22   don't know what an extent of finding it. So
23   it's my opinion that if somebody were to
24   analyze the Geometrix technology and apply

33 (Pages 126 to 129)

Page 130

Goodman

1  this claim construction and then find in the
2  Geometrix technology that the claim
3  limitation is met, that same person would be
4  compelled to say that it is also met in Kono.
5  Or that Kono discloses it.
6      Q.  But that's not necessarily because
7  the algorithms in Kono and in Geometrix are
8  the same; is that right?
9      MS. WALDRON:  Objection.  Vague.
10     Form.
11     A.  As I've said before, Geometrix --
12  sorry, as I've said before, Kono discloses a
13  large universe of algorithms, and it is my
14  opinion that those algorithms are included in
15  the patent and also in Geometrix.
16     Q.  Are there any flow charts in Kono?
17     A.  I don't remember seeing any flow
18  charts.
19     Q.  Is there any code appended to the
20  Kono disclosure?
21     A.  I don't remember seeing that
22  either.
23     Q.  Do you know whether the word
24  software is mentioned in Kono?

Page 131

Goodman

1      A.  I don't recall seeing the word
2  software in Kono.
3      Q.  Is the word algorithm mentioned in
4  Kono?
5      A.  I don't recall seeing that.
6      Q.  How do you know that if the means
7  for processing limitation is found in Kono,
8  then it must also be --
9      MR. MILCETIC:  Scratch that.
10     Q.  How do you know that if the means
11  for processing limitation is found in
12  Geometrix, then it must also be found in
13  Kono?
14     MS. WALDRON:  Objection.  It
15     assumes a fact.
16     A.  I know that because Kono discloses
17  using data such as the difference in arrival
18  time in order to calculate location, and the
19  means for processing limitation also requires
20  the same words for virtually differences in
21  times of arrival.  So that is the basis of --
22  and then someone recognized that there are a
23  lot of algorithms for using differences of
24  times of arrival for determining location.

Page 132

Goodman

1      Q.  I believe for this means for
2  processing element, you construed it to
3  include some structure that included Figure 7
4  of the patent; is that right?
5      A.  Yes.
6      Q.  Could we turn to Figure 7 of the
7  patent.  I believe that's Exhibit 462.  And
8  let me know when you're there.
9      A.  Exhibit 462, yes.  And anyplace in
10  particular?  I found the patent.
11     Q.  Yes, Figure 7.  Let me know when
12  you're there.
13     A.  Thanks.
14         I have Figure 7.
15     Q.  This is part of the means for
16  processing in your view, right?
17     A.  Yes.
18     Q.  The first block, do you see what it
19  says?
20     A.  Yes.
21     Q.  Can you read that into the record?
22     A.  Yes.  The first block says,
23  "Receive one frame of data from all cell
24  sites."

Page 133

Goodman

1      Q.  Does Kono disclose receiving a
2  frame of data from all cell sites?
3      A.  Yes.
4      Q.  It does?
5      A.  Yes.
6      Q.  Does did happen in Geometrix?
7      MS. WALDRON:  Objection.  Vague.
8      Calls for a legal conclusion.
9      A.  In my opinion, it doesn't happen in
10  Geometrix.
11     Q.  So this is one instance where Kono
12  might disclose something that is present in
13  Kono irrespective of whether one would
14  construe the claim to cover Geometrix, right?
15     A.  Would you read that question?  I
16  didn't understand it.
17         (Record read)
18     A.  I'm sorry, I have to hear that
19  again.
20         Are you saying that something is
21  present or a claim limitation?
22     Q.  Well, I believe that you said that
23  receiving one frame of data from all the cell
24  sites is in Kono, right?

34  (Pages 130 to 133)

Esquire Deposition Services
(215) 988-9191

A110

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 170

Goodman
It's argumentative and compound. Dr. Goodman has been explaining his positions to you all day.
Q. Can you go ahead and write on the exhibits?
A. Sure.
Q. The court reporter is going to show you what's been going to be marked as Exhibits 471 and 472. Two blank pieces of paper.
(Plaintiff's Exhibit 471, Blank Piece of Paper, marked for identification, as of this date.)
(Plaintiff's Exhibit 472, Blank Piece of Paper, marked for identification, as of this date.)
MS. WALDRON: I don't understand if there is a question pending. I think that this whole exercise is compound, calls for speculation, calls for a legal conclusion. It's an improper hypothetical, and I don't understand how he is supposed to do this on the fly sitting at this

Page 171

Goodman
deposition.
Q. Dr. Goodman, just recall the construction that you used to render your invalidity report. Write that down for us.
A. Okay.
MS. WALDRON: Just so it's clear, Andrew Corporation still has all the same objections.
This whole line of questioning is improper. You're asking him to assume that Andrew infringes.
MR. MILCETIC: Coaching.
Q. You can continue.
MR. MILCETIC: Why don't we go off the record and change the tape while Dr. Goodman is working.
THE VIDEOGRAPHER: We're off the video record at 5:09 p.m.
(Thereupon, a recess was taken, and then the proceedings continued as follows:)
THE VIDEOGRAPHER: We're back on the video record at 5:21 p.m.
MS. WALDRON: I also on that,

Page 172

Goodman
Dr. Goodman is here as a technical expert and is not being put up as a claim construction expert.
MR. MILCETIC: Andrew will be using Dr. Goodman to support its construction claims.
MS. WALDRON: Is that a question?
MR. MILCETIC: A question to you.
MS. WALDRON: As you know, Dr. Goodman submitted an infringement report and an invalidity report, not an expert report on claim construction.
A. May I have one more sheet of paper, please?
Q. This sheet of paper is going to be marked as --
A. I beg your pardon. I have it already.
Mr. Milcetic, what would you like me to do with Exhibit 469 and 470, can I just write down that I changed my mind or --
Q. In fact, since that was an effort that didn't work out, you can cross it out if

Page 173

Goodman
you think that's inaccurate.
A. If you don't mind, I'll draw a line through it and I'll state for the record that it doesn't represent the response to your request.
Q. Okay, fair enough.
A. So I'm crossing out 469 and 470. And I'm submitting 471 and 472.
Q. How would you characterize what you have written on 471 and 472, Exhibits?
MS. WALDRON: Objection. Calls for a narrative.
A. Oh, what I have written on my exhibit is what the claim construction that TruePosition would need to get to prove infringement of the Geometrix band.
Q. Is it also the claim construction that you used to render your invalidity opinion?
A. Yes.
Q. Just so the record is clear, you do not agree with the construction written on Exhibit 471 and 472, correct?
A. That's correct.

Page 174

Goodman

1        Goodman
2    Q.  Do you mind telling me what you
3  wrote, reading it for me?
4    A.  Okay.  I'll start with Exhibit 471.
5        It says, "Claim construction that
6  would be used to improve the infringement of
7  the '144 patent by Andrew Geometrix
8  technology."
9    Q.  Just to be clear, that's also the
10  construction that you used for rendering your
11  invalidity report, correct?
12    A.  Yes.
13    Q.  Go ahead.
14    A.  "Claim 22, a ground based ...
15  possessing multiple cellular telephones
16  equals any cellular telephone system."
17    Q.  And you disagree with that
18  construction, correct?
19    A.  Yes.
20    Q.  Go on.
21    A.  Then there is a line, kind of a
22  squiggly line separating that from the next
23  claim element.  And the next claim element is
24  represented by these words, "At least three
25  cell sites equipped with ... channels

Page 175

1        Goodman
2  equals", and then it says, "the cellular
3  system has at least three base stations that
4  receive signals from cell phones."
5        And then there is a squiggly line,
6  "locating means ... transmissions equals",
7  and it says "the cellular system estimates
8  the locations of subscribers.  And" -- should
9  I continue?
10    Q.  And you disagree with that
11  construction as well, correct?
12    A.  Yes.  It's quite different from the
13  construction I think is correct that you
14  asked me for before.
15    Q.  Fair enough.  You can continue.
16    A.  It says "database means ...
17  locations.  The cell phone system has the
18  location information in its memory.  It also
19  has a code in memory that is specific to one
20  instance of performing the locating means.
21  If it performs locating means again for the
22  same cell phone, it will have a different
23  code in its memory."
24    Q.  You disagree with that
25  construction?

Page 176

1        Goodman
2    A.  Yes.
3    Q.  Is there any reasonable -- first of
4  all, thanks for going through that exercise
5  with me.
6        Is there any reasonable
7  interpretation of the claims that you are
8  aware of under which Geometrix would infringe
9  the '144 patent?
10    MS. WALDRON:  Objection.
11  Improper hypothetical.  Legal
12  conclusion.
13    A.  I haven't done that analysis, but
14  I'm certainly not -- the answer is no.
15    Q.  You're not aware of any?
16    A.  I'm not aware of any.
17    Q.  Reasonable interpretation?
18    A.  That's correct.
19    Q.  Are you aware of any reasonable
20  interpretation of the '144 patent claims
21  under which Kono would invalidate the '144
22  patent?
23    A.  I think --
24    MS. WALDRON:  Same objections.
25    A.  I did this on the fly, but I think

Page 177

1        Goodman
2  this interpretation would -- the
3  interpretation of the claims that I just
4  read.
5    Q.  Which would be in Exhibit 47 --
6    A.  471 and 472.
7    Q.  Do you consider that a reasonable
8  interpretation of the claims, 471 and 472?
9    A.  Oh, a reasonable interpretation of
10  the claims under which -- I think it is the
11  interpretation -- I didn't -- I performed my
12  validity analysis using this interpretation
13  of the claims, and I really don't agree with
14  it, so maybe I can say anything I don't agree
15  with is unreasonable.  I don't know.

(Continued on the following
page to include the jurat.)

45 (Pages 174 to 177)

Esquire Deposition Services
(215) 988-9191

A112

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    _____

4    TRUEPOSITION, INC.,

5              Plaintiff/Counterclaim-Defendant

6         vs.                    CA No. 05-00747-SLR

7    ANDREW CORPORATION,

8              Defendant/Counterclaim-Plaintiff

9    _____

10

11

12            CONTINUED VIDEOTAPED DEPOSITION

13                 OF DR. DAVID GOODMAN

14                New York, New York

15            Tuesday, January 16, 2007

16

17

18

19

20

21

22

23

24   Reported by:
     Adrienne M. Mignano
25   JOB NO. 190793

Page 182

1
2
3
4       January 16, 2007
5       9:45 a.m.
6
7       Continued Deposition of DR. DAVID
8    GOODMAN, held at the offices of
9    Kirkland & Ellis, 153 E. 53rd Street,
10   New York, New York, pursuant to Notice,
11   before Adrienne M. Mignano, a Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 183

1
2    A P P E A R A N C E S:
3
4    WOODCOCK WASHBURN
     Attorneys for Plaintiff
5       Circa Centre, 12th Floor
        2929 Arch Street
6       Philadelphia, PA 19104-2891
7    BY: PAUL B. MILCETIC, ESQ.
8
9    KIRKLAND & ELLIS
     Attorneys for Defendants and The Witness
10      200 east Randolph Drive
        Chicago, Ill 60601
11
     BY: RACHEL PERNIC WALDRON, ESQ.
12
13
14
15
16   ALSO PRESENT:
17   PAUL JANSEN, Videographer
18
19
20
21
22
23
24
25

Page 184

1               Goodman
2       THE VIDEOGRAPHER:  Good morning.
3       Here begins videotape number five
4    in the continuing deposition of
5    Dr. David Goodman in the matter of
6    TruePosition Incorporated versus
7    Andrew Corporation.
8       Today's date is January the 16th,
9    2007.  The time is 9:45 a.m.  You may
10   proceed.
11   D A V I D   G O O D M A N,   resumed as a
12       witness, having been previously sworn
13       by the Notary Public, was examined and
14       testified further as follows:
15   EXAMINATION BY
16   MR. MILCETIC:
17       Q.   Dr. Goodman, yesterday we were
18   talking about your invalidity report and I'd
19   like to move on to your non-infringement
20   rebuttal report, if you don't mind.
21       Before we do, I would like to sort
22   of ask some questions that I think might
23   recap yesterday.
24       Is that all right with you?
25       A.   Of course.

Page 185

1               Goodman
2       Q.   If I understand you correctly, your
3    opinion is that claim 1 of the '144 patent is
4    invalid jf that claim is construed to cover
5    Geometrix, correct?
6       A.   Yes.
7       Q.   But you haven't formed an opinion
8    as to whether claim 1 is invalid if Geometrix
9    is not encompassed by claim 1?
10      A.   That's correct.
11      Q.   Is that also true for claim 2 of
12   the '144 patent?
13      A.   Yes.
14      Q.   Claim 22?
15      A.   Yes.
16      Q.   Claim 31?
17      A.   Yes.
18      Q.   Claim 32?
19      A.   Yes.
20      Q.   Let's move on to your rebuttal
21   report.  Is that all right with you?
22      A.   Yes.
23      Q.   I believe it's Exhibit 467.
24      A.   I'll park these documents.
25      Q.   Yesterday I think you mentioned

2 (Pages 182 to 185)

CLAIM CONSTRUCTION
THAT WOULD BE
USED TO PROVE
INFRINGEMENT OF THE '144
PATENT BY ANDREW GEOMETRIX
TECHNOLOGY

EXHIBIT
491
1/15/07

## CLAIM 22

A ground-based ... possessing
mobile cellular telephones =

Any cellular telephone system

At least three cell sites equipped
---- channels =

The cellular system has at least
3 base stations that receive
signals from cellphones

locating means ... transmissions =

The cellular system estimates the locations
of subscribers

database means ... locations

**A115**



the cellphone system has the location information in its memory. It also has a code in memory that is specific to one ~~location estimation procedu~~ instance of performing the locating means. If it performs the locating means again for the same cellphone it will ~~stor~~ have a different code in its memory.

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 31st day of January, 2007, I caused a true and correct copy of the foregoing **Appendix A to TruePosition's Memorandum in Support of its Motion for Partial Summary Judgment that Andrew Cannot Provide its Claims of Invalidity** upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

*/s/ James D. Heisman*
James D. Heisman (# 2746)