**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TruePosition, Inc., | ) | |
| | ) | |
| **Plaintiff/** | ) | |
| **Counterclaim-Defendant,** | ) | |
| | ) | **Civil Action No. 05-747-SLR** |
| **v.** | ) | |
| | ) | |
| Andrew Corporation, | ) | |
| | ) | |
| **Defendant/** | ) | |
| **Counterclaim-Plaintiff.** | ) | |
| _____ | ) | |

**TRUEPOSITION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT ON ANDREW'S COUNTERCLAIMS II-VI
AND AFFIRMATIVE DEFENSES III-V**

CONNOLLY BOVE LODGE & HUTZ LLP
Francis DiGiovanni (# 3189)
James D. Heisman (# 2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (212) 558-3588

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (*pro hac vice*)
Dale M. Heist, Esq. (*pro hac vice*)
David L. Marcus, Esq. (*pro hac vice*)
Kathleen A. Milsark, Esq. (*pro hac vice*)
Daniel J. Goettle, Esq. (*pro hac vice*)
Cira Center, 12th Floor
2929 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

## TABLE OF CONTENTS

I.     NATURE AND STAGE OF THE PROCEEDINGS.......................................................1

II.    SUMMARY OF ARGUMENT .............................................................................1

III.   STATEMENT OF FACTS ...................................................................................3

       A.    The Parties....................................................................................................3

       B.    TruePosition's 144 Patent ...........................................................................3

       C.    The Prior Litigation Between the Parties ...................................................5

       D.    Andrew's Willful Infringement of TruePosition's 144 Patent..............................7

       E.    3GPP, ETSI, and "Essential IPR" .........................................................8

       F.    Andrew's Counterclaim Allegations .................................................11

IV.    ARGUMENT ...................................................................................................13

       A.    Andrew's State Law Counterclaims (II, III, and VI) Are Preempted by
             Federal Patent Law ..................................................................................13

       B.    TruePosition Is Entitled to Summary Judgment on Andrew's Fraud Claim
             (Counterclaim II) ......................................................................................15

             1.    The Legal Standard ........................................................................15

             2.    Andrew Lacks Evidence that TruePosition Had a Duty to Declare
                   the 144 Patent to Any Standards Body.....................................16

             3.    Andrew Lacks Evidence of TruePosition's Intent to Mislead..................20

             4.    Andrew Lacks Evidence that It Reasonably Relied upon Any
                   TruePosition Misrepresentations or Omissions ......................................22

       C.    TruePosition Is Entitled to Summary Judgment on Andrew's
             Counterclaim IV and Third Affirmative Defense Asserting Equitable
             Estoppel........................................................................................................27

       D.    TruePosition Is Entitled to Summary Judgment on Andrew's
             Counterclaim VI and Fifth Affirmative Defense Asserting Promissory
             Estoppel........................................................................................................29

E.    TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim V and Fourth Affirmative Defense Asserting Implied License .......................................................................................................... 30

F.    TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim III Asserting Unfair Competition under California Business and Professional Code §§ 17200 *et seq.* ............................................... 32

G.    TruePosition Is Entitled to Partial Summary Judgment that Andrew Is Not Entitled to Damages on Any of Counterclaims II-VI ......................................... 33

V.    CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)................................................................. 27, 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................. 13

*Associated/ACC Internat'l, Ltd. v. Dupont Flooring Syst. Franchise Co.*,
   2002 U.S. Dist. LEXIS 6464 (D. Del. March 28, 2002), *aff'd, 89 Fed. Appx. 758*
   *(3d Cir. 2004)*......................................................................................... 25

*Avia Group International, Inc. v. L.A. Gear California, Inc.*,
   853 F.2d 1557 (Fed. Cir. 1988).................................................................. 13

*Brooks v. Fiore*,
   2001 U.S. Dist. LEXIS 165345 (D. Del. Oct. 11, 2001), *aff'd, 53 Fed. Appx. 662*
   *(3d Cir. 2002)*......................................................................................... 29

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................. 13

*Chip-Mender, Inc. v. The Sherwin-Williams Co.*,
   2006 U.S. Dist. LEXIS 2176 (N.D. Cal. January 3, 2006)............................. 32

*Czarnik v. Illumina, Inc.*,
   437 F. Supp. 2d 252 (D. Del. 2006) ....................................................... 15, 34

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ...................................................................... 32

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
   362 F.3d 1367 (Fed. Cir. 2004).............................................................. 13, 14

*In re HP Inkjet Printer Litigation*,
   2006 U.S. Dist. LEXIS 12848 (N.D. Cal. March 7, 2006)............................. 32

*Honeywell International, Inc. v. Universal Avionics Systems Corp.*,
   398 F. Supp. 2d 305 (D. Del. 2005) ...................................................... 27, 28

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................. 13

*Meyers v. Asics Corp.*,
    974 F.2d 1304 (Fed. Cir. 1992)..................................................................................27

*Phillips v. Daimlerchrysler Corp.*,
    2003 U.S. Dist. LEXIS 23941 (D. Del. March 27, 2003), *aff'd, 112 Fed. Appx.*
    *867 (3d Cir. 2004)*...............................................................................................29

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industrial, Inc.*,
    508 U.S. 49 (1993) ..............................................................................................14

*Rambus, Inc. v. Infineon Technologies AG*,
    318 F.3d 1081 (Fed. Cir. 2003).................................................................... 16, 17, 19

*Serio-US Industries, Inc. v. Plastic Recovery Technologies Corp.*,
    459 F.3d 1311 (Fed. Cir. 2006)..............................................................................13

*Symbol Technologies, Inc. v. Proxim Inc.*,
    2004 U.S. Dist. LEXIS 14949 (D. Del. July 28, 2004).............................................. 27, 28

*Tenneco Automotive Operating Co. v. Visteon Corp.*,
    375 F. Supp. 2d 375 (D. Del. 2005) ..................................................................... 30, 31

*In re U.S. West, Inc. Securities Litigation*,
    201 F. Supp. 2d 302 (D. Del. 2002) ........................................................................29

*Underwater Devices, Inc. v. Morrison-Knudsen Co.*,
    717 F.2d 1380 (Fed. Cir. 1983)..............................................................................26

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,
    103 F.3d 1571 (Fed. Cir. 1997)..............................................................................30

*Winbond Electronics Corp. v. ITC*,
    2001 U.S. App. LEXIS 25113 (Fed. Cir. Aug. 22, 2001) ...............................................30

*Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999).............................. 13, 14

## STATE CASES

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telegraph Co.*,
    20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999) ...........................................32

*Great Lakes Chemical Corp. v. Pharmacia Corp.*,
    788 A.2d 544 (Del. Ch. Ct. 2001) ...........................................................................26

*ITT Hartford Group, Inc. v. Va. Finance Associates, Inc.*,
    520 S.E.2d 355 (Va. 1999) ...................................................................................16

*Lord v. Souder*,
    748 A.2d 393 (Del. 2000) ................................................................................ 15

*Nye Odorless Incinerator Corp. v. Felton*,
    35 Del. 236, 162 A. 504 (Del. Super. Ct. 1931) .......................................... 15

*Travelers Indemnity Co. v. Lake*,
    594 A.2d 38 (Del. 1991) .................................................................................. 16

*Stephenson v. Capano Development, Inc.*,
    462 A.2d 1069 (Del. 1983) ..................................................................... 15, 16

*Van Deusen v. Snead*,
    441 S.E.2d 207 (Va. 1994) ............................................................................ 16

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) .......................................................................................... 13

I.      **NATURE AND STAGE OF THE PROCEEDINGS**

This is a patent infringement action involving TruePosition's U.S. Patent No. 5,327,144, issued in July, 1994 ("144 patent") (A1-A30).  The 144 patent relates to the location of cellular telephones.

On October 25, 2005, TruePosition, Inc. ("TruePosition") filed its original Complaint against Andrew Corporation ("Andrew") alleging infringement of the 144 patent (D.I. 1). Various pleadings followed, culminating in the filing of TruePosition's Second Amended Complaint for Patent Infringement (D.I. 45) and Andrew's Answer and Counterclaim to Second Amended Complaint (D.I. 48).  In addition to the usual non-infringement and invalidity counterclaims, Andrew asserted five standards-based counterclaims (D.I. 48 at pp. 9-19).  It is the standards-based counterclaims that are the subject of this motion, together with three affirmative defenses that mirror certain of them.

The pleadings closed on July 5, 2003 (D.I. 53).  Fact discovery is complete and expert reports have been exchanged.  Andrew served no expert reports relating to its counterclaims, either with respect to liability or with respect to damages.

On January 31, 2006, TruePosition filed a motion for partial summary judgment that the 144 patent is not invalid.  The parties are today filing opening claim construction briefs, and argument on all summary judgment motions and claim construction issues is scheduled for April 13, 2007 (D.I. 23 at ¶ 7).  The Pretrial Conference is scheduled for August 23, 2007, with trial to begin on September 4, 2007 (D.I. 23 at ¶ 10).

II.     **SUMMARY OF ARGUMENT**

This motion seeks summary judgment on all of Andrew's standards-based counterclaims and the three affirmative defenses that parallel those counterclaims.  Andrew's counterclaims are all premised on the notion that TruePosition must have believed and therefore should have

disclosed its 144 patent as "essential IPR" in connection with certain standards-related activities, and that TruePosition's nondisclosure misled Andrew into believing it was free to practice the 144 patent. But Andrew cannot sustain its burden of proving any of its counterclaims.

First, Andrew's state law counterclaims are preempted by federal patent law. By all of Andrew's counterclaims, Andrew seeks to render TruePosition's 144 patent unenforceable. To do so, it must show that TruePosition's actions in enforcing its patent are both subjectively and objectively baseless. But Andrew has not alleged, and cannot prove, that TruePosition's claims are objectively or subjectively baseless.

Andrew cannot carry its burden of proving its fraud counterclaim for at least three reasons. First, it has no evidence that TruePosition had any duty to disclose the 144 patent in connection with any standards-related activity. Absent a breach of such a duty, Andrew cannot prove fraud. Second, Andrew has no evidence that TruePosition believed the 144 patent was essential or intended to mislead Andrew in connection with any standards-related activity. The only evidence of record shows the contrary. And third, Andrew cannot show that it reasonably relied upon TruePosition's nondisclosure of its 144 patent, particularly in light of the express provisions of the settlement agreement between the parties reached in the prior litigation. For the same reasons, Andrew cannot prove its equitable estoppel, promissory estoppel, and implied license counterclaims. Further, Andrew cannot prove its California unfair competition claim for the additional reason that there was nothing TruePosition did (or did not do) in California that could have deceived the California public or harmed Andrew.

Finally, Andrew cannot prove damages as a result of any of the claims pleaded in its counterclaims because it has proffered no evidence whatever of such damages.

In short, Andrew has no evidence with which to create a genuine issue of material fact as to any of its counterclaims. TruePosition is entitled to summary judgment on all of them.

### III.    STATEMENT OF FACTS

#### A.    The Parties

TruePosition is a Delaware corporation based in King of Prussia, Pennsylvania. Andrew is also a Delaware corporation, headquartered in Illinois. Both TruePosition and Andrew's Network Solutions Group, based in Virginia (formerly the Grayson Wireless division of Allen Telecom, Inc.),[1] manufacture, market, and sell equipment and software used to locate cellular telephones. TruePosition and Andrew compete directly in both domestic and foreign markets for the products at issue in this lawsuit.

#### B.    TruePosition's 144 Patent

In the early 1990's, TruePosition's founder and two other inventors conceived and developed a system that allowed the position of a cell phone user to be located from the transmissions normally emitted by the user's cell phone. TruePosition's system is overlaid on equipment that already exists in a cellular telephone network. It determines the cell phone's position from transmissions the phone sends to the cellular network as part of the phone's normal operation (A18 (col. 4, ll. 16-23)). Many other cell phone location systems require that the phone be specially configured, for example, to include a GPS receiver that determines the phone's position.

Cellular telephone networks use two types of "channels" to communicate information, "control channels" and "voice channels" (A17 (col. 1, l. 68-col. 2, l. 8)). "Control channels" typically carry control information for establishing a voice communication link between the

---

[1]    To avoid confusion, Andrew's predecessors Grayson and Allen will both be referred to as "Andrew."

phone and the cellular network.  "Voice channels" (also referred to as "traffic channels") typically carry the voice signals that a user generates or receives during a call.  The inventions claimed in TruePosition's 144 patent use "Time Difference of Arrival" (TDOA) on the control channel transmissions that cell phones make during normal operation of the cellular networks (A23 (col. 14, ll. 15-21)).[2]

In TruePosition's TDOA system, receivers are installed at a minimum of three "cell sites," such as the base station antenna towers within a cellular network (A19 (col. 5, ll. 5-7)).  The receivers receive and process a signal that the cell phone transmits and calculate the time that the signal arrived at the cell site (A24 (col. 15, ll. 32-35)).  The receivers then send this time of arrival information to a central site computer which calculates the difference in time of arrival at pairs of the cell sites (A24 (col. 15, ll. 35-38)).  The central site computer can then estimate the phone's location based on the differences in the signal's arrival time at the different cell sites (A24 (col. 15, ll. 51-53)).

The inventions allow cell phones to be located both by their users (so, for example, the user can find the nearest coffee shop) and by others (for example, for 911 purposes, or so one can track a child) (A26 (col. 19, ll. 5-49)).  They even allow phones to be located when no voice call is being made at all (that is, when the phone is in "idle mode") (A18 (col. 4, ll. 12-45)).  So long as a cellular telephone is on, the inventions claimed in TruePosition's 144 patent allow the phones to be located with a high degree of reliability and accuracy.  This latter characteristic is of particular interest to government safety and security agencies interested in tracking terrorists or

---

[2]    Transmissions *by* cell phones are always in the "reverse" direction – that is, from the telephone to the cellular network equipment.  That "reverse" direction is also referred to as the "uplink" direction.  Therefore, performing TDOA on transmissions from the phone to the equipment – reverse direction transmissions – is often referred to as "uplink TDOA" or "UTDOA."  From a technical standpoint there is no difference between TDOA and UTDOA.

other crime suspects or victims. For this reason, TruePosition considers the 144 patent one of the most important patents in its intellectual property portfolio.

### C.     The Prior Litigation Between the Parties

In the mid-1990's, Andrew's predecessor, Grayson Wireless, began marketing and promoting a TDOA-based cellular telephone location system called "Geometrix." At that time Geometrix was used exclusively for "E-911" purposes.[3] In December, 2000, TruePosition notified Joseph Kennedy (who until recently served as the Andrew's Vice President of Business Development) that "it appears you may be in need of a license" under a number of TruePosition patents, including the 144 patent (A31-A32).

In December 2001, after Andrew ignored TruePosition's offer to discuss a license, TruePosition sued Andrew in Delaware for infringement of several TruePosition patents, but not the 144 patent. At that time, Andrew was not infringing the 144 patent because its Geometrix system located cell phones using transmissions only on the voice channel, not on the control channel as claimed in the 144 patent. Andrew had no need to use the control channel for "E-911" applications because a cellular telephone that was in use for a "911" call would necessarily be transmitting on the voice channel. Although TruePosition did not assert the 144 patent in the 2001 lawsuit, Andrew nonetheless relied on the patent heavily as a primary prior art reference in support of its invalidity defenses (A33-A36).

In early 2004, the parties settled the 2001 lawsuit. Pursuant to the Settlement Agreement (A37-A70), Andrew agreed to pay TruePosition $35,000,000 and certain other consideration in exchange for the settlement of TruePosition's patent infringement claims, as well as for various patent licenses (A38-A49, A64-A68).

---

[3]     "E-911" refers to cell phone location applications that automatically send the cell phone user's location to an emergency dispatcher when a user dials "911."

The settlement was reached as a result of a private mediation. TruePosition and Andrew, which was then represented by the law firm of Debevoise & Plimpton, mediated their dispute before James Amend, Esq., a partner in Kirkland & Ellis, the firm that is now Andrew's litigation counsel. During the negotiations, Andrew initially sought a license under all of TruePosition's patents, but TruePosition would not agree to license its key control channel intellectual property. Thus, the mediated settlement explicitly excluded the 144 patent from the licenses otherwise granted to Andrew. To memorialize the settlement, Mr. Amend drafted a handwritten agreement dated January 16, 2004, which the parties executed during the mediation session (A210-A218). It specified, among other terms, that "Andrew is not licensed under TP's 144 Patent . . . ." (A211).[4]

The parties formalized the provisions of this handwritten agreement in a final Settlement Agreement, which was dated February 1, 2004, but which was effective as of the date of the final mediation session and the handwritten agreement (A37). The formal Settlement Agreement reaffirmed that Andrew was not licensed under the 144 patent (A39-A40 at ¶ 6). The Settlement Agreement did contain a promise from TruePosition not to sue Andrew for infringement of the 144 patent, *but* that promise was limited to domestic applications relating solely to E-911 applications:

> TruePosition hereby covenants not to sue Andrew for infringement
> of U.S. Patents 5,327,144 ("the 144 patent") and 5,608,410 ("the
> 410 patent") for domestic applications by Andrew relating solely
> to tasking E-911 geolocation (*i.e.,* determining the latitude and
> longitude of wireless telephones from which a '911' call has been

---

[4]     Prior to entering into the mediation, the parties executed a Mediation Agreement, which provided that neither Mr. Amend "nor his law firm shall undertake any work for or against a party regarding the subject matter of the mediation." TruePosition therefore believes that Kirkland & Ellis's representation of Andrew in this litigation is inappropriate and improper, but has refrained from engaging in motion practice in the interest of moving this matter forward (D.I. 37).

> placed), so long as said applications do not enable or permit
> locations to be performed for any task other than E-911, including
> without limitation the provision of location related commercial
> services, and so long as all licenses granted by Andrew for such
> domestic E-911 applications are limited to use for E-911
> geolocation only . . . .

(A40-A41 at ¶ 8).  The settlement further provided that TruePosition would not sue Andrew for

infringement of any patents, *so long as Andrew* did not substantially modify the functionality of

its existing Geometrix product and *continued to locate cell phones using only the "voice or*

*traffic channel (but not the control or access channel)*" (A41-A42 at ¶ 9(a)) (emphasis added).

Finally, the parties agreed to an integration clause providing that:

> no promise, representation or agreement not herein expressed has
> been made, and this Settlement Agreement . . . contains the entire
> agreement between the parties with respect to its subject matter,
> superseding all other prior agreements, written or oral, including
> without limitation the term sheet dated January 16, 2004.

(A50 at ¶22).

### D.    Andrew's Willful Infringement of TruePosition's 144 Patent

The ink was barely dry on the parties' Settlement Agreement when Andrew began

considering adding a control channel location feature to Geometrix, despite the express

provisions of the Settlement Agreement to the contrary (A219-A220).  Although TruePosition

was not certain of it at the time, by December 2004, Andrew began infringing the 144 patent by

offering to sell a cell phone location system with control channel functionality to Saudi Telecom

Co. ("STC"), the principal cell phone operator in Saudi Arabia, for use in its "GSM" cell phone

network.[5]  STC had previously issued a request for proposals, seeking bids for a TDOA system

with "idle mode" location capabilities because the Saudi Ministry of the Interior ("MOI") wanted

---

[5]      "GSM" stands for Global System for Mobile Communications.  In GSM cellular
networks, control channels are called "Standalone Dedicated Control Channels" ( or "SDCCH")
and voice channels are called "Traffic Channels" (or "TCH") (A223-A224 (45:22-46:7)).  That
STC has a GSM network is not in dispute (A229 (36:20-23), A232 (51:22-52:2)).

to track suspect individuals, or "persons of interest," whether or not those persons were talking on their phones.

In about August, 2005, Andrew began testing and demonstrating the system that it offered to STC at Andrew's Ashburn, Virginia lab facility.  At about the same time, TruePosition obtained solid information that Andrew was bidding on the STC project and, in letters dated September 30 (A71-A72) and October 13 (A73-A76), promptly requested that Andrew discontinue its infringement of the 144 patent.  Andrew ignored TruePosition's requests, and this lawsuit ensued.  Andrew has continues to offer Geometrix with control channel location capability.

### E.     3GPP, ETSI, and "Essential IPR"

The Third Generation Partnership Project, or "3GPP," is an international standardization body in the cellular telephone area.  Established in 1998, it is comprised of five officially recognized telecommunications standardization organizations from around the world, called "Organizational Partners" (A82).  One of the five Organizational Partners is the European Telecommunications Standards Institute (known as "ETSI") (*id.*).  Both TruePosition and Andrew have participated in 3GPP through ETSI.

Cellular telephone technology has evolved in stages.  Initially, 3GPP's mission was to prepare, approve and maintain "Technical Specifications" and "Technical Reports" – colloquially referred to as "standards" -- for the first phase of a *third* generation cell system, which was originally called "3rd Generation Mobile System" but is now referred to as the "Universal Mobile Telecommunications System (UMTS)" (A77; *see also* A78-A98 (Third Generation Partnership Project Agreement), A99-127 (Third Generation Partnership Project Working Procedures)).  3GPP's mission was later expanded to include the maintenance and further development of the earlier, *second* generation GSM Technical Specifications and

Technical Reports as well (*id*.).  But GSM and UMTS are separate and distinct cellular telephone systems that utilize different, largely incompatible technologies (A233 (54:11-57:23), A239 (150:3-151:24)).  GSM and UMTS cell systems also have separate and distinct sets of 3GPP Technical Specifications and Reports that define the technical aspects and operation of those systems (*id*.).  The Andrew product in this case was sold for use in a GSM network, and Andrew has not yet developed a product for use in a UMTS system (A228 (23:6-24:23), A251-A252 (149:10-150:10)).  Thus, the only 3GPP activities that are even arguably relevant to this action are those relating to standardization of GSM systems, not UMTS.

3GPP procedures are convoluted and bureaucratic.[6]  To add a feature to or change a Technical Specification or Report in any way, a company must first be an Individual Member of one of the five Organizational Partners and must first obtain permission open a "Work Item" addressing the proposed changes (A116 at Art. 39; A236 (111:7-23)).  After a Work Item is open, the proponent of the feature or changes may then submit proposed "Change Requests (CRs)" (A117 at Art. 44).  If consensus is reached among all relevant group members, the change requests are formally approved and the relevant Technical Specification(s) and/or Report(s) are officially amended (A117 at Art. 43).  But 3GPP Technical Specifications and

---

[6]     3GPP is structured as a single "Project Co-ordination Group (PCG)" with four "Technical Specification Groups (TSGs)" reporting to it (A79, A108-A110, A129).  The TSGs, in turn, have various "Working Groups (WGs)" that report into them (*id*.).  The Technical Specification Groups and Working Groups are responsible for the detailed technical work on the Technical Specifications and Reports (A110).  The "GERAN" Technical Specification Group maintains and approves changes to the GSM "Radio Access Network" Technical Specifications and Reports (A129, A130).  The "RAN" Technical Specification Group – an abbreviation for "UTRAN," or Universal Terrestrial Radio Access Network" – maintains and approves changes to the UMTS Radio Access Network Technical Specifications and Reports (A129, A131, A241 (163:13-22), A242 (167:19-23), A222 (34:14-35:10).  Thus activities of the "RAN" group, which dealt exclusively with UMTS systems, are not relevant to this case (*id*).

Reports themselves have no legal standing.  They become "official" only when converted into national publications by the corresponding partner organizations (A132).

3GPP procedures provide that, with respect to the treatment of intellectual property rights in 3GPP Technical Specifications and Reports, "Individual Members . . . are bound by the IPR Policies of their respective Organizational Partner" (A119 at Art. 55).  Because TruePosition and Andrew participated in 3GPP by way of their memberships in ETSI, ETSI's IPR Policy governed their obligations with respect to intellectual property while working in 3GPP (D.I. 48 at ¶ 16-17).

Article 4.1 of ETSI's IPR Policy specifies members' obligations with respect to the disclosure of "Intellectual Property Rights (IPR)."  It states:

> 4.1    Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(A142 at ¶ 4.1 (ETSI Intellectual Property Rights Policy)).  And "Essential" is a term defined by ETSI as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(A146 at ¶ 15.6).

### F.    Andrew's Counterclaim Allegations

Despite the clear and explicit provisions of the Settlement Agreement relating to the 144 patent, Andrew has asserted five separate but related standards-based counterclaims in an attempt to justify its willful infringement of the 144 patent (D.I. 48 at pp. 11-19). The counterclaims, which all relate to activities in 3GPP, assert claims for fraud (Counterclaim II), unfair competition under the California Business and Professional Code (Counterclaim III), equitable and promissory estoppel (Counterclaims IV and VI), and implied license (Counterclaim V).[7]

Andrew's counterclaims all rely on the same factual allegations. TruePosition and Andrew are both members of ETSI, and both participated in submitting proposals to 3GPP requesting the adoption of a standard for locating mobile phones using U-TDOA (D.I. 48 at p. 12, ¶ 18).

Members of ETSI are bound by ETSI's IPR policy in connection with ETSI and 3GPP activities (*id.* at p. 11, ¶ 13). Under ETSI's IPR policy, a member that submits a technical proposal for a "standard" is required to declare any patent that it considers to be "essential" if the proposal is adopted (*id.* at p.12, ¶ 15). As even Andrew recognizes, intellectual property is "essential" as defined by ETSI only when it is not *technically* possible to implement the standard *without infringing* that intellectual property (*id*).

It is undisputed that TruePosition did not declare the 144 patent as essential to any 3GPP standard. Andrew alleges that TruePosition believed that the 144 patent *was* essential within the meaning of the ETSI IPR policy, and that its failure to declare it was a material omission (*id.* at

---

[7]    Andrew also pleaded equitable and promissory estoppel and implied license as its third through fifth affirmative defenses, which is all they legally are (D.I. 48 at pp. 9-10).

p.14, ¶¶ 25-26).  Referring to TruePosition's September 30, 2005 infringement notice letter, Andrew points to TruePosition's alleged assertion that "equipment 'using reverse control channel signal data to implement TDOA' necessarily infringes the 144 patent" and contends that if that assertion is correct, then the 144 patent must be essential IPR (*id.* at p. 13, ¶ 24, p. 14, ¶ 30).  Andrew claims to have justifiably relied on TruePosition's non-declaration in urging adoption of the 3GPP "standards," going forward with its product development, and bidding on the STC contract, all while believing that it would not be sued if it provided a U-TDOA system (*id.* at pp. 13-14, ¶¶ 23, 28-29).  As a result, Andrew claims to have been harmed and seeks both damages and an injunction barring enforcement of the 144 patent (*id.* at pp. 14-15, ¶¶ 31-32).

Andrew asserts these same "facts" in support of each of its standards-based counterclaims.  In counterclaim II, it claims that it was defrauded by TruePosition's failure to declare the 144 patent to ETSI (*id.* at pp. 11-15, ¶¶ 10-32).  In counterclaim III, it claims that TruePosition has violated the California Business & Professions Code (California's unfair competition law) because certain of the meetings at which TruePosition did not disclose that it considered the 144 patent essential were held in California (*id.* at pp. 15-16, ¶¶ 33-43).  In counterclaims IV and VI, it contends that TruePosition is estopped from asserting the 144 patent as a result of its non-declaration of the patent as essential (*id.* at pp. 17, 18-19, ¶¶ 44, 45, 51-56).  And in its counterclaim V, it claims it has an implied license as a result of TruePosition's non-declaration of the patent (*id.* at pp. 17-18, ¶¶ 46-50).

Andrew's counterclaims all fail, for any number of reasons, both factual and legal.  There is simply no evidence in the record to support any of them.  Therefore, there are no material

factual issues.  TruePosition is entitled to summary judgment on each of Andrew's counterclaims

II-VI and its parallel affirmative defenses III-V.[8]

## IV.    ARGUMENT

### A.    Andrew's State Law Counterclaims (II, III, and VI) Are Preempted by Federal Patent Law[9]

By all of its counterclaims, Andrew seeks to render TruePosition's 144 patent

unenforceable.  According to Andrew, TruePosition was required to declare the 144 patent to

3GPP/ETSI as "essential" and make it freely available on reasonable terms.  Thus, what

Andrew's counterclaims assert at root is that TruePosition is improperly maintaining this patent

infringement action against Andrew when it should have provided a license instead.

But the federal patent law preempts state tort law for a patentholder's good faith conduct

in asserting its patent rights.  *Serio-US Industries, Inc. v. Plastic Recovery Technologies Corp.*,

459 F.3d 1311, 1320 (Fed. Cir. 2006); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,

362 F.3d 1367, 1374 (Fed. Cir. 2004); *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340,

---

[8]    Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Once TruePosition makes an initial showing that it is entitled to summary judgment, the burden shifts to Andrew to show that there are genuine issues of material fact precluding summary judgment.  *Celotex*, 477 U.S. at 322-23.  To create a genuine issue of fact, Andrew "must do more than present *some* evidence on an issue it asserts is disputed."  *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988) (emphasis in original).  There is no issue for trial unless there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party.  *Anderson*, 477 U.S. at 249-50 ("If the evidence [of the nonmovant] is merely colorable, . . . or is not significantly probative, summary judgment may be granted.") (citations omitted); *see also Celotex*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

[9]    Andrew does not plead what law it contends should apply to any of its counterclaims. Because equitable estoppel and implied license in the patent context are typically decided as a matter of Federal Circuit law, we have assumed for purposes of this motion that Andrew's Counterclaims IV and V are intended to arise under federal law.

1355 (Fed. Cir. 1999).  This is true even where bad faith is not otherwise an element of the state

law cause of action.  *Zenith*, 183 F.3d at 1355.

To show that a patentholder's assertion of its patent is not in good faith, an infringer must

show that the patentholder's actions are both objectively and subjectively baseless.  *Globetrotter*,

362 F.3d at 1377*; see Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*

508 U.S. 49, 57, 60 (1993).  There must be evidence that there is no reasonable basis to believe

that the enforcement activity is appropriate.  *Globetrotter*, 362 F.3d at 1377.

Thus Andrew must allege (and prove) that TruePosition's actions in enforcing its patent

are both objectively and subjectively baseless.  To do so, Andrew must show both that

TruePosition's patent infringement suit has no merit whatever and that TruePosition had no

reasonable basis to believe that it was properly brought.

But Andrew has nowhere alleged or even suggested that TruePosition's enforcement of

its 144 patent against Andrew is either objectively or subjectively baseless.  Nor has Andrew

alleged that TruePosition's decision not to declare the 144 patent as essential IPR to 3GPP/ETSI

was objectively or subjectively baseless.  And Andrew has not alleged that this lawsuit is totally

without merit or that TruePosition had no reasonable basis to bring it or to believe that the 144

patent is not "essential" IPR within the meaning of the ETSI IPR policy.

The evidence is to the contrary.  Andrew does not even believe the 144 patent is

"essential IPR" (A255, A256 (62:11-12 & 66:12-19), A200-A202).  Andrew's conduct

throughout this litigation reflects its recognition that TruePosition's claims have significant

merit.  At most, Andrew has alleged "fraud" in conclusory terms arguably insufficient to meet

the pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure.

In fact, as TruePosition will show at trial, the evidence is overwhelming that the

Geometrix system Andrew sold to STC infringes the 144 patent and that Andrew's infringement

was willful.  If any claims in this lawsuit are baseless, it is Andrew's counterclaims, for the

reasons set forth in the following sections.  Because Andrew has not alleged, and cannot show,

that TruePosition's claims are objectively and subjectively baseless, its state law counterclaims

are preempted, and TruePosition is entitled to summary judgment on those counterclaims.

**B.**    **TruePosition Is Entitled to Summary Judgment on Andrew's Fraud Claim (Counterclaim II)**

     **1.**    **The Legal Standard**

The elements of a fraud claim are well-settled.  Andrew must prove, by clear and

convincing evidence:

1)  a false representation, usually one of fact, made by the TruePosition;

2)  TruePosition's knowledge or belief that the representation was false, or that it was made with reckless indifference to the truth;

3)  an intent by TruePosition to induce Andrew to act or to refrain from acting;

4)  Andrew's action or inaction taken in justifiable reliance upon the representation; and

5)  damage as a result of such reliance.

*See, e.g.*, *Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 259 (D. Del. 2006); *Lord v. Souder*, 748

A.2d 393, 402 (Del. 2000); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983),

(citing *Nye Odorless Incinerator Corp. v. Felton*, 35 Del. 236, 162 A. 504, 510-11 (Del. Super.

Ct. 1931).

     While fraud does not necessarily require an overt misrepresentation, a party may commit

fraud by omission only when it deliberately conceals a material fact or when it remains silent

when it has a duty to speak. *Stephenson,* 462 A.2d at 1074. Put differently, "silence or withholding of information does not constitute fraud in the absence of a duty to disclose that information." *Rambus, Inc. v. Infineon Technologies AG,* 318 F.3d 1081, 1096 (Fed. Cir. 2003) (applying analogous Virginia law); *see also Stephenson*, 462 A.2d at 1074.[10]

### 2.    Andrew Lacks Evidence that TruePosition Had a Duty to Declare the 144 Patent to Any Standards Body

Andrew does not allege any affirmative misrepresentations by TruePosition. Instead, it relies on alleged omissions – TruePosition's alleged "failure" to declare the 144 patent as essential IPR to 3GPP/ETSI. Therefore, to prevail on its fraud claim, Andrew must prove that TruePosition was under a duty to disclose the 144 Patent. *Stephenson*, 462 A.2d at 1074; *Rambus*, 318 F.3d at 1096. But the uncontradicted evidence is clear that TruePosition had no such duty.

3GPP has no intellectual property policy of its own, but members are bound by the IPR policies of their respective organizations, in this case, ETSI (A119 at Art. 55). Under ETSI's IPR Policy, a disclosure duty attaches only to IPRs that are "essential" to practicing the subject matter of an ETSI standard:

---

[10]     We have assumed that Delaware law will apply to Andrew's fraud claim. Under Delaware choice of law rules, a tort claim is decided according to the law of the state with the "most significant relationship" to the parties and the alleged conduct, evaluated using the general principles set forth in the *Restatement (Second) of Conflict of Laws. Travelers Indem. Co. v. Lake,* 594 A.2d 38, 46-47 (Del. 1991). Here, both parties are Delaware corporations. The alleged conduct involved non-events: TruePosition's alleged failure to disclose the 144 patent at various meetings held in various cities around the globe. Non-events at multiple locations cannot create any single "significant relationship" to the parties or the alleged conduct. The Andrew business unit that allegedly relied on the non-events and was allegedly harmed thereby is located in Virginia, making Virginia law a candidate for application. But the Court need not reach the issue, because Virginia and Delaware apply the same standards. *See, e.g., Rambus, Inc. v. Infineon Technologies AG,* 318 F.3d 1081, 1096 (Fed. Cir. 2003) (setting forth elements of fraud claim under Virginia law); *ITT Hartford Group, Inc. v. Va. Fin. Assocs., Inc.,* 520 S.E.2d 355, 361 (Va. 1999); *Van Deusen v. Snead,* 441 S.E.2d 207, 209 (Va. 1994).

> 4.1    Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(A142 at ¶ 4.1). "Essential" is a defined term:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(A146 at ¶ 15.6).

Rambus confirms that the ETSI policy governs whether TruePosition was required to disclose the 144 patent to any standards body. In that case, the plaintiff accused Rambus of fraud in failing to disclose a patent to a standards body. The Court found that in such circumstances, a finding of fraud depends on the extent of the duty to disclose. That duty, in turn, can only arise out of the specific policy of the standards-making organization. Rambus, 318 F.3d at 1098-1104. There must be a reasonable expectation by a competitor that a license is needed to implement the standard. Id. at 1100-01. The standard is an objective one; what the patentholder actually believed is not germane. Id. at 1104. Moreover, significantly, the Court stated that an IPR policy that does not clearly define what must be disclosed (or when, how, or to whom) "does not provide a firm basis for the disclosure duty necessary for a fraud verdict." Id. at 1102.

Thus to sustain its burden, Andrew must show that the 144 patent was "essential" within the meaning of ETSI's IPR policy. ETSI's policy requires that Andrew show that it "is not

possible on technical" grounds to provide location services in a GSM network "without

infringing" the 144 patent.  Andrew has no such evidence.  The analysis required by ETSI's

policy is technical in nature, involving the equivalent of a showing of infringement.  But Andrew

never attempted to compare the 144 patent to the relevant Technical Specifications to make such

a determination.  Indeed, it has provided no expert report on the topic at all.  It simply has no

evidence from which a reasonable jury could conclude that the 144 patent is "essential" with

respect to performance of the relevant standards.[11]

In fact, all of the evidence is to the contrary, confirming that TruePosition had no duty to

disclose the 144 patent to ETSI because the patent is not "essential" within the meaning of the

relevant definition.  First, the relevant "standard" includes several positioning methods, none of

which are mandatory in GSM cellular systems (A166l A172).  However, if an operator of a GSM

system decides it wants cell phone location capability, and wants such capability to comply with

the GSM Technical Specifications, it has several technology options to choose from (*id.*).  In

January, 2002, when TruePosition began participating in 3GPP, the GSM Technical

Specifications already contained a number of positioning methods for locating cellular

telephones, including methods known as "TA," "E-OTD" and "GPS" (*id.*; A215 (83:21-85:14)).

TruePosition and, later, Andrew both sought (successfully) to encourage inclusion of an

additional location method -- U-TDOA --  in the GSM specifications.  A company implementing

the GSM Location Services specifications using one of these methods *other* than UTDOA cannot

---

[11]    Although TruePosition has asked, both in interrogatories and in depositions, Andrew has
never identified the "standards" upon which it relies as the basis for its counterclaims.  We have
assumed that the pertinent standard is the 3GPP GSM Location Services Technical
Specifications (A200-A202); A231 (34:4-36:8)).  It is undisputed that the STC network is a
GSM system (A229 (36:20-23), A232 (51:22-52:2)).

be infringing the 144 Patent.  The 144 patent is therefore not essential within the meaning of the ETSI IPR policy.

The GSM Location Services specifications also state that a company choosing to implement the U-TDOA method can do so "*either* on the SDCCH [control channel] *or* TCH [traffic channel]…" (A172 at ¶ 4.2.4; A225-226 (53:20-54:9); A250 (88:12-17))(emphasis added).[12]  Thus, even if a company chooses to implement GSM's U-TDOA approach to locating cell phones, it still has two options under the relevant standard (*id).*  And one can even perform "idle mode" UTDOA location in GSM networks using the traffic channel as well, instead of the control channel (A259-A260 (25:24-26:21), (A272 (178:23-180:20), A186, A188 (early assignment), A187, 189 (very early assignment)).  The voice channel option is in wide use for E-911 purposes, and to the extent TruePosition has intellectual property in that area, Andrew is already licensed (A39-43 at ¶¶ 6, 8-9).  Only the control channel option is encompassed by the 144 patent.

Andrew's own witnesses do not believe that the 144 patent is essential within the meaning of ETSI's policy, either (A255, A256 (62:11-12, 66:12-19)).  Its president did not even have a view of what "essential IPR" meant (A274-A275 (17:25-18:14).  Instead, Andrew claims that because TruePosition contends that Andrew is infringing, *TruePosition* must consider the patent essential (D.I. 48 at p. 14, ¶¶ 25-26, 30; A236 (62:11-24); A230 (34:5-18)).  Even if that were true – which it is not – TruePosition's subjective belief is irrelevant, because the existence of a duty to disclose is determined as an objective matter.  *Rambus,* 318 F.3d at 1104.

Thus no 3GPP or ETSI "standard" requires that cell phone location be performed using U-TDOA, and no such "standard" requires that, if the U-TDOA option is used, it be performed

---

[12]     Ironically, Andrew's standards representative drafted this provision (A225-A226 (53:20-54:9)).

on the control channel. Therefore, TruePosition had no duty to disclose the 144 patent. There are no disputed issues of material fact. Andrew's fraud claim must fail.[13]

### 3.    Andrew Lacks Evidence of TruePosition's Intent to Mislead

A second essential element of Andrew's fraud claim is intent. Andrew must prove that TruePosition intended to mislead Andrew by not declaring the 144 patent as essential IPR to ETSI.

But the evidence is unambiguous and uncontradicted: TruePosition's President and Chief Technical Officer – the only two employees with sufficient knowledge or authority to decide whether any patent should or should not be declared to a standards body – both firmly believe, and have always believed, that the 144 patent is not essential to implementing GSM's Location Services standards (A281-A282 (45:1-47:9), A279 (58:22-61:13). Indeed, they specifically considered the issue and concluded that the 144 patent was *not* essential (A258-A259 (19:19-22:7)).

Andrew points to an email from TruePosition's Bob Gross as evidence of TruePosition's supposed belief that the 144 patent was essential (D.I. 48 at ¶ 21 and Ex. A). The email advises that TruePosition does "have blocking IP" but that Andrew has access to that IP under the earlier Settlement Agreement between the parties (*id.*). The testimony is undisputed, however, that the email did not relate to the GSM standards, but to the third generation UMTS standards, and that the email had nothing whatever to do with the 144 patent (A267 (115:10-117:9), A222 (163:3-

---

[13]    Andrew suggests that TruePosition should have disclosed that the 144 patent was essential at any number of 3GPP meetings. But the evidence is also uncontradicted that discussion of intellectual property at meetings was forbidden by 3GPP policy (A247 (196:2-12), A261-A266 (30:5-20, 34:10-17, 43:7-16, 47:19-49:21, 74:4-78:24). This prophylactic practice was apparently instituted to avoid the antitrust concerns inherent when any group of competitors gathers and might be tempted to discuss innovation (A264). Instead, IP is declared to the appropriate member organization – in this case, ETSI – in the appropriate format (A247 (196:2-12), A119 at Art. 55).

165:15)).[14]  Indeed, the patent it *did* relate to – U.S. patent 6,047,192 – was included among those already licensed to Andrew as part of the prior settlement, just as Mr. Gross stated in the email (A283 (143:2-145:24), A64-A68).  Andrew has no contrary evidence.

Andrew argues that because TruePosition's letter putting Andrew on notice of possible infringement stated "that equipment 'using reverse control channel signal data to implement TDOA' necessarily infringes the 144 patent," TruePosition must have believed that the 144 patent was essential (D.I. 48 at pp. 13-14, ¶ 24-25; D.I. 45 at Ex. C).  But TruePosition never said in its letter that using the reverse control channel to implement TDOA necessarily infringes the 144 patent.  To the contrary, TruePosition stated that compliance with the *STC RFP* "may" constitute infringement (A71).  Moreover, the fact that TruePosition may have believed that using the reverse control channel to perform TDOA locations infringed the 144 patent does not lead to the conclusion or even imply that TruePosition believed the 144 patent was essential to any 3GPP standard.  Those are two entirely different questions.  For reasons already explained, there are numerous ways to perform cell phone locations in a GSM system and be in compliance with the 3GPP standards.  Only one of those ways – the method chosen by Andrew – infringes TruePosition's 144 patent.

Andrew has no contrary evidence of intent.[15]  There is no genuine issue of material fact. TruePosition never believed – and does not now believe – that the 144 patent is "essential" to the

---

[14]     The subject line of the Gross email is "UTRAN IP."  UTRAN is a 3GPP abbreviation applicable only to the third generation UMTS system (A129, A131, A241 (163:13-22), A242 (167:19-23), A222 (34:14-35:10)).  The Gross email also stated that the "blocking IP" applies to CDMA systems.  CDMA is used only in UMTS systems, not GSM systems (*id.*).  Andrew's Rule 30(b)(6) witness and 3GPP standards representative to whom the email was addressed admitted that the email dealt only with UMTS, not GSM (A241 (163:3-165:15)).  It is thus unreasonable for Andrew to rely on the Gross email as evidence of TruePosition's intent with respect to GSM networks such as STC's.  Nor would it be reasonable for Andrew to suggest it relied on the email in going forward with its GSM product development.

performance of any 3GPP or ETSI standard.  TruePosition is entitled to summary judgment on Andrew's fraud claim.

### 4.    Andrew Lacks Evidence that It Reasonably Relied upon Any TruePosition Misrepresentations or Omissions

Even assuming Andrew could prove that TruePosition had a duty to disclose the 144 patent to 3GPP/ETSI and intentionally chose not to do so, which it cannot, Andrew still must prove that it reasonably relied on TruePosition's non-disclosure.  But the record shows otherwise.  There is simply no evidence that Andrew relied in any way upon TruePosition's standards-related activities.  And there is plenty of evidence to the contrary.

Andrew cannot claim that it was unaware of the 144 patent, or that it was unaware that the 144 patent related to U-TDOA location performed on a cell phone's control channel.  The VP of Business Development for Andrew's Network Solutions Group has known of the 144 patent since it issued, and he received TruePosition's invitation to discuss a license under that patent (and others) in December 2000 (A31-A32, A192-A193.  Andrew then thoroughly analyzed and relied upon that very patent as alleged prior art in the previous lawsuit (A33-A36).

Nor can Andrew claim that it included U-TDOA in its Geometrix product, or that it promoted U-TDOA in any standards body, or elsewhere, in reliance upon TruePosition's standards-related activities.  It is undisputed that Andrew included U-TDOA in Geometrix and

---

[15]    In depositions, Andrew has suggested as evidence of TruePosition's intent to mislead that Rhys Robinson, a former TruePosition employee involved in the standards-setting meetings, believed that the 144 patent should be declared and repeatedly so advised management.  Mr. Robinson testified, however, that he did not have the technical expertise to assess whether a patent should be declared essential within the meaning of the ETSI IPR policy, that he had performed no analysis of whether the 144 patent was essential, and that he lacked the authority to make such a decision on TruePosition's behalf (A285-A286 (202:24-206:14)).  While Mr. Robinson produced a number of emails relating to declaration of IP to ETSI, none of them stated or suggested that the 144 patent was essential or should be declared (A287 (263:4-265:2)).

began promoting it in the mid-1990's, seven years before TruePosition's involvement in 3GPP (A254 (21:13-18)).

Nor can Andrew claim that 3GPP's adoption of any standard forced Andrew to propose a U-TDOA based location system to STC. It was Andrew that pressured STC to purchase its U-TDOA system (A208-A209, A289-A290 (112:22-114:9), A291, A292-298). In fact, Andrew employed its local Saudi sales agent in part to "lobby Saudi government officials to mandate the implementation of U-TDOA in the Kingdom" of Saudi Arabia (A299).

Moreover, the undisputed evidence shows that the cell phone location system Andrew offered and sold to STC does not even implement the 3GPP standards that are the subject of Andrew's counterclaims. It is undisputed that the system Andrew offered and installed at STC implemented an "Lbis" architecture (A305, A309-A310, A311-A317, A319-A321, A327, A329. And Andrew's Rule 30(b)(6) witness (and long-time 3GPP representative) admitted that the "Lbis" technical specifications were developed *outside* of 3GPP and do *not* comprise 3GPP standards (A244 (175:4-16), A245-A246 (180:18-183:19), A209.1-A209.13, A209.14-A209.25). TruePosition's long-time 3GPP representative agreed (A269-A270 (124-128)). Thus, there is no way that Andrew can claim it "reasonably relied" on anything TruePosition allegedly did or did not do in 3GPP when it decided to develop, offer and install its infringing system at STC.

Even if there were evidence that Andrew relied on TruePosition's standards-based activities, Andrew's reliance would be wholly unreasonable in view of the settlement reached in the prior litigation. Both the handwritten document prepared by the Kirkland & Ellis mediator memorializing the parties' agreement, which was signed by the parties, and three separate clauses of the formal Settlement Agreement contradict any suggestion that Andrew could have

relied at all – and certainly not reasonably relied -- on TruePosition's nondisclosure of the 144 patent to 3GPP/ETSI.

The handwritten settlement document  prepared during the mediation (which was superseded by the later formal Settlement Agreement) expressly reflects the parties' intent.  It states, on the very first page, that "Andrew is not licensed under [TruePosition]'s '144 patent" (A211).  The formal Settlement Agreement, signed as of January 16, 2004, contains at least three inter-related provisions relating to the 144 patent.

First, the Agreement reaffirmed that Andrew was not licensed under the 144 patent. Paragraph 6 of the agreement granted Andrew a license to intellectual property listed in Exhibit B to the Agreement, and represented that Exhibit B contained all of TruePosition's patents and applications "except for the 144 and 410 patents identified in paragraph 8 below and their foreign counterparts . . . ." (A39 at ¶6).

Second, in the referred-to paragraph 8, TruePosition promised not to sue Andrew for infringement of the 144 patent, but expressly limited that promise to domestic applications relating solely to E-911 applications:

> TruePosition hereby covenants not to sue Andrew for infringement of U.S. Patents 5,327,144 ("the 144 patent") and 5,608,410 ("the 410 patent") for domestic applications by Andrew relating solely to tasking E-911 geolocation (*i.e.,* determining the latitude and longitude of wireless telephones from which a '911' call has been placed), so long as said applications do not enable or permit locations to be performed for any task other than E-911, including without limitation the provision of location related commercial services, and so long as all licenses granted by Andrew for such domestic E-911 applications are limited to use for E-911 geolocation only . . . .

(A40-A41 at ¶8).

- 24 -

Third, for avoidance of doubt, the settlement further provided that TruePosition would not sue Andrew so long as Andrew did not substantially modify the functionality of Geometrix and continued to locate cell phones using *only the "voice or traffic channel (but not the control or access channel)"* (A41-A42 at ¶9(a)) (emphasis added).

And finally, the parties agreed to an integration clause:

> The parties agree that no promise, representation or agreement not herein expressed has been made, and this Settlement Agreement (including the Exhibits hereto) contains the entire agreement between the parties with respect to its subject matter, superseding all other prior agreements, written or oral, including without limitation the term sheet dated January 16, 2004.

(A50 at ¶22).

The Settlement Agreement could not be clearer: (1) Andrew has no license under the 144 patent; (2) TruePosition would not sue Andrew on the 144 patent for *domestic* use for *E-911 purposes only*; and (3) TruePosition was not providing a license for locations transmitted on the control channel. There is simply no way Andrew can contend it reasonably believed it was free to perform control channel locations using the 144 patent in light of the Settlement Agreement's express provisions.[16]

When sophisticated parties enter into agreements, particularly when assisted by counsel, the parties are precluded from justifiable reliance on representations made outside, or inconsistent with, the agreement. *See Associated/ACC Internat'l, Ltd. v. Dupont Flooring Syst. Franchise Co.,* 2002 U.S. Dist. LEXIS 6464 at *18 (D. Del. March 28, 2002), *aff'd,* 89 Fed. Appx. 758 (3d Cir. 2004) (not justifiable to rely on statement inconsistent with contract). An integration clause in an agreement, such as that in the Settlement Agreement between Andrew

---

[16]    If Andrew *did* believe it was free to perform control channel locations using the 144 patent, as it now asserts, it should have said so during the settlement negotiations.

and TruePosition, similarly precludes any such reasonable reliance.  *Great Lakes Chemical Corp. v. Pharmacia Corp.,* 788 A.2d 544, 555 (Del. Ch. Ct. 2001).

*Great Lakes Chemical* involved, among other things, a claim of fraud in the inducement of a contract for the purchase of a business.  The contract included an integration clause similar to the one here.  In rejecting the fraud claim, the Court observed:

> To allow Great Lakes to assert, under the rubric of fraud, claims
> that are explicitly precluded by contract, would defeat the
> reasonable commercial expectations of the contracting parties and
> eviscerate the utility of written contractual agreements.

*Id.*  Referring to the contract's integration clause, the Court held that the "parties' contractually agreed-to disclaimers extinguish the fraud claims being asserted here."  *Id* at 556.[17]

So it is here.  Andrew was intimately familiar with the 144 patent and its coverage when it negotiated the Settlement Agreement, for it had relied upon that patent as its principal piece of alleged prior art during the litigation.   It simply cannot now play dumb.[18]  Any alleged reliance on any TruePosition inactions in any standards body is simply not reasonable under the circumstances.  Andrew cannot meet its burden of proving that it reasonably relied on any TruePosition omission.  TruePosition is entitled to summary judgment on Andrew's Counterclaim II alleging fraud.

---

[17]    Ironically, the law firm that had assisted the party claiming the fraud in the underlying transaction in *Great Lakes Chemical* was Kirkland & Ellis, the same firm that mediated the Settlement Agreement between Andrew and TruePosition and that now represents Andrew.

[18]    Indeed, Andrew had an affirmative duty of due care to avoid infringement.  *Underwater Devices, Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1389-1390 (Fed. Cir. 1983).  Yet Andrew admits it received no legal advice relating to the 144 patent and it performed no analysis or study of whether that patent was "essential IPR" before engaging in its infringing activity (A194, A200-A202).

**C.    TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim IV and Third Affirmative Defense Asserting Equitable Estoppel**

Andrew's equitable estoppel claim must fail for the same reasons.[19]

The Federal Circuit has enumerated the elements necessary to bar a patentee's suit by reason of equitable estoppel.  Andrew must show that (1) TruePosition, through misleading conduct, led Andrew to reasonably infer that TruePosition did not intend to enforce the 144 patent against it; (2) Andrew relied on that misleading conduct; and (3) due to its reliance, Andrew will be materially prejudiced if TruePosition is allowed to proceed with its infringement claim.  *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020, 1028 (Fed. Cir. 1992) (reversing grant of summary judgment holding patentee to be equitably estopped for assertion of infringement); *see Symbol Technologies, Inc. v. Proxim Inc.,* 2004 U.S. Dist. LEXIS 14949, at *22-23 (D. Del. July 28, 2004) (infringer failed to prove equitable estoppel defense in absence of evidence that standards board members had duty to disclose patent rights).  Silence alone does not give rise the equitable estoppel unless there was a "clear duty to speak." *Auckerman,* 960 F.2d at 1042; *Meyers v. Asics Corp.,* 974 F.2d 1304, 1308 (Fed. Cir. 1992) (reversing summary judgment of equitable estoppel); *Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.,* 398 F. Supp. 2d 305, 317 (D. Del. 2005) (finding insufficient evidence to support equitable estoppel where it was possible to comply with standard without infringing).  To show reliance, the infringer must have had "a relationship or communication" with the patentee "which

---

[19]    Although Andrew has pleaded equitable estoppel both as an affirmative defense and as an independent counterclaim, equitable estoppel in the patent context is really a defense to infringement that may serve to prevent enforcement of the patent at issue in the particular circumstances.

lulls the infringer into a sense of security in going ahead with" the infringing activity.

*Aukerman*, 960 F.2d at 1043; *Honeywell,* 398 F. Supp 2d at 315.

Thus Andrew's proof in support of its equitable estoppel claim must be almost identical to that in support of its fraud claim: to withstand summary judgment, Andrew must come forward with evidence sufficient to create a material issue of fact that TruePosition had a duty to disclose the 144 patent, that it misleadingly failed to do so, that Andrew reasonably inferred that TruePosition would not enforce the 144 patent against it, that Andrew relied on TruePosition's conduct, and that it is prejudiced as a result.

*Symbol* and *Honeywell* are both directly on point.  The infringer in *Symbol* alleged that Symbol had a duty to disclose its patents to a standards body, and that Symbol's failure to do so misled it into believing Symbol held no patents "relating to" a particular standard.  Accordingly, the infringer asked that Symbol be estopped from enforcing the patent against it.  This Court found insufficient evidence that the policies of the pertinent standards organization gave rise to a duty to speak.  Therefore, "Symbol's silence cannot constitute the basis for a charge of equitable estoppel as a matter of law."  2004 U.S. Dist. LEXIS 14949, at *22-23.  Similarly, in *Honeywell,* based on analogous allegations, Magistrate Judge Thynge found that, because compliance with the particular technical standard at issue did not require infringement of the patent in dispute, silence during the standards-making proceedings could not create an estoppel.  398 F. Supp. 2d at 316-17.

Here, for the reasons already discussed, Andrew has no evidence, and certainly not enough to create a material factual issue, to show that TruePosition had any duty to disclose the 144 patent as "essential IPR."  Furthermore, also for reasons already discussed, Andrew has no evidence, and certainly not enough to create a material factual issue, to show that it justifiably

relied on any TruePosition omission.[20]  TruePosition is entitled to summary judgment on

Andrew's Counterclaim IV and its Third Affirmative Defense alleging equitable estoppel.

> **D.    TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim VI and Fifth Affirmative Defense Asserting Promissory Estoppel**

The same result flows, for the same reasons, with respect to Andrew's promissory

estoppel claim.  While equitable estoppel in the patent context generally implicates federal law,

promissory estoppel is a creature of state law.  Nevertheless, the elements of the two defenses are

analogous.  Under Delaware law, to succeed on a claim of promissory estoppel, Andrew must

show, by clear and convincing evidence (1) that TruePosition made a promise;  (2) with intent to

induce action or forbearance based on the promise;  (3) Andrew's reasonable reliance; and (4)

injury.  *Phillips v. Daimlerchrysler Corp.,* 2003 U.S. Dist. LEXIS 23941 at *28 (D. Del. March

27, 2003), *aff'd,* 112 Fed. Appx. 867 (3d Cir. 2004); *Brooks v. Fiore,* 2001 U.S. Dist. LEXIS

165345 at *15 (D. Del. Oct. 11, 2001), *aff'd,* 53 Fed. Appx. 662 (3d Cir. 2002).  The promise

must be definite and certain.  *Phillips* at *28.  "'[I]mplied' statements cannot form the basis of

promissory estoppel because of their inherent uncertainty."  *In re U.S. West, Inc. Securities

Litigation,* 201 F. Supp. 2d 302, 309 n.1 (D. Del. 2002).

Here, Andrew points to no "definite and certain" promise by TruePosition, and there is no

evidence of any such promise.  Andrew's promissory estoppel claim must fail for that reason

---

[20]     To support its equitable estoppel claim, Andrew has pointed to a clause in a draft
feasibility study that TruePosition submitted to 3GPP that states that TruePosition "may" hold
patents that "cover information contained in this document" and that, if so, a license would be
made available (A195-A199).  First, the statement on its face is not a promise of anything.
Second, the evidence is undisputed that 3GPP instructed TruePosition to remove the statement
(along with other material) from the next draft of the document (A264 (47:19-48:19)).  Third,
because the 144 patent is not "essential IPR" for purposes of performing the UTDOA locations
proposed in the draft for reasons already discussed, it does not "cover information" contained in
the feasibility study.  Finally, even if the snippet could be viewed as a promise, it is superseded
by the integration clause in the parties' settlement agreement (A50 at ¶ 22).

alone.  Furthermore, because Andrew cannot show that TruePosition intended any promise to induce action by Andrew, and because it cannot show reasonable reliance on any promise by TruePosition in light of the clear provisions of the Settlement Agreement between the parties for reasons already discussed, Andrew cannot meet its burden of proving its promissory estoppel claim.  TruePosition is entitled to summary judgment on Andrew's counterclaim VI and its Fifth Affirmative Defense alleging promissory estoppel.

### E.    TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim V and Fourth Affirmative Defense Asserting Implied License

Implied license, too, requires similar proof.  An implied license is a patentee's waiver of its statutory right to sue for patent infringement.  *See Tenneco Automotive Operating Co. v. Visteon Corp.,* 375 F. Supp. 2d 375, 383-84 (D. Del. 2005).  "The Federal Circuit has recognized implied licenses through:  (1) equitable estoppel; (2) legal estoppel; (3) acquiescence; and (4) conduct.  *Id.* at 384.  These are not different types of implied licenses, but different categories of conduct that can lead to a conclusion of implied license.  *Id.*

Andrew's pleading and interrogatory responses do not specify which route to a finding of implied license it intends for the Court to take.  If the first, Andrew must come forth with essentially the same proof in support of its implied license defense as for its equitable estoppel defense.  "The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell:  i.e., a license."  *Wang Labs, Inc. v. Mitsubishi Electronics America, Inc.,* 103 F.3d 1571, 1581 (Fed. Cir. 1997).  Andrew must prove that (1) TruePosition, through statements or conduct, affirmatively granted permission to use the 144 patent; (2) Andrew relied on that statement or conduct; and (3) Andrew would be materially prejudiced if TruePosition were allowed to proceed with its infringement suit.  *Winbond*

*Electronics Corp. v. ITC,* 2001 U.S. App. LEXIS 25113, at *27 (Fed. Cir. Aug. 22, 2001). This first route is not available to Andrew, for it has not even alleged any affirmative grant of permission to use the 144 patent.

Implied license by legal estoppel is even narrower: Andrew must establish that TruePosition expressly licensed the 144 patent, received consideration for that license, and then sought to derogate from the right granted. *Tenneco,* 375 F. Supp. 2d at 384 and n.13. Andrew is foreclosed from this route to establishing an implied license for the same reason: there is no contention that TruePosition expressly licensed the 144 patent. All of the evidence is to the contrary. Indeed, Andrew's witnesses have conceded that they were not licensed (A276-A277 (153:2-154:10)).

Andrew must be attempting to show implied license through conduct or acquiescence. To do so, Andrew must show that (1) a relationship existed between Andrew and TruePosition; (2) within that relationship, TruePosition granted Andrew a right to use the 144 patent; (3) TruePosition received valuable consideration for the license; (4) TruePosition's statements and conduct created the impression that it consented to Andrew's use of the 144 patent; and (5) TruePosition denied that Andrew had an implied license. *Tenneco* at 383. In addition, a finding of implied license requires a nexus between TruePosition's purported waiver of its right to enforce the 144 patent against Andrew and Andrew's infringing action. *Id.*

But Andrew cannot prove its implied license claim for the same reasons that doom its fraud claim. Given the Settlement Agreement between the parties, Andrew cannot show that it reasonably relied on any TruePosition standards activity. TruePosition is entitled to summary judgment on Andrew's Counterclaim V and Affirmative Fourth Affirmative Defense alleging implied license.

**F.     TruePosition Is Entitled to Summary Judgment on Andrew's Counterclaim III Asserting Unfair Competition under California Business and Professional Code §§ 17200 *et seq.***

Finally, Andrew purports to assert a claim for unfair competition under the California Business and Professional Code.  The California Code prohibits "any unlawful, unfair or fraudulent business act or practice."  CAL. BUS. PROF. CODE § 17200 (2006).  The California Supreme Court has explained that, in cases between competitors, "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 187, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999); *see Chip-Mender, Inc. v. The Sherwin-Williams Co.,* 2006 U.S. Dist. LEXIS 2176 at *28 (N.D. Cal. January 3, 2006).  Furthermore, Andrew must show that "members of the public are likely to be deceived."  *In re HP Inkjet Printer Litigation,* 2006 U.S. Dist. LEXIS 12848 at *10 (N.D. Cal. March 7, 2006) (quoting *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir. 1995).  Finally, to have standing under the California unfair competition statute, Andrew must show both that it suffered injury in fact and that it lost money or property as a result of the alleged unfair conduct. *Chip-Mender* at *28.

Andrew alleges that the California unfair competition statute applies because three of the standards meetings at which TruePosition did not disclose the 144 patent were held in California. (D.I. 40 at ¶¶ 35-40).  But Andrew was not even a member at the time of the first of those three meetings (A235 (109:11-19)), and the third California meeting did not involve the GSM standards at issue here at all, but later-generation UMTS specifications (A239 (150:11-151:18)). Moreover, it is undisputed that IP matters are not allowed to be discussed at 3GPP meetings of the type held in California (A247 (196:2-12), A261-A266 (30:5-20, 34:10-17, 43:7-16, 47:19-

49:21, 74:4-78:24)).  Therefore, TruePosition would not have been permitted to disclose its

patent during any of the California meetings.  There could have been nothing that TruePosition

did, or did not do, in California that could have harmed Andrew (or anyone else).

In any event, there is nothing "unfair" – and certainly nothing unfair that implicates the

antitrust laws – about TruePosition's failure to disclose a patent (in California) that it had no duty

to disclose.  And it makes no sense at all to contend that the California public would be deceived

by TruePosition's failure to disclose a patent to an international standards body that held a small

proportion of its meetings in California.[21]  This is simply not the kind of action the California

unfair competition law is meant to redress.[22]  TruePosition is entitled to summary judgment on

Andrew's Counterclaim III.

### G.    TruePosition Is Entitled to Partial Summary Judgment that Andrew Is Not Entitled to Damages on Any of Counterclaims II-VI

Even if Andrew were to concoct a factual issue sufficient to preclude summary judgment

on one or more of its counterclaims, TruePosition is still entitled to partial summary judgment

that Andrew is entitled to no damages on any of its counterclaims.  Andrew has no evidence

whatsoever of any such damage.

In its answer to TruePosition's interrogatory seeking information relating to its allegation

of counterclaim damages, Andrew said:

> [T]he factual basis for this allegation is that it may develop that
> Andrew has incurred costs in supplying and bidding to supply
> location equipment to Saudi Telecom Co. and in preparing and
> submitting 3GPP change requests concerning U-TDOA, and that

---

[21]    For example, other meetings were held in France, Germany, Korea, Cancun, Sweden, and Seattle, among other cities (A260-A261 (28:18-19, 31:21-33:10) & A237, A238, A240 (114:2-5, 124:15-125:12, 154:4-155:24)).

[22]    For reasons set forth in the following section, Andrew has no evidence that it was damaged by TruePosition's actions, either.  Thus, it lacks standing under the California statute in any event.

> Andrew has incurred costs in defending this suit, that would have
> been avoided but for TruePosition's fraud and other misconduct,
> and that Andrew faces a potential loss of profits from loss of other
> business opportunities as a result of TruePosition's fraud and other
> misconduct. The documents Andrew produces in response to
> TruePosition's document requests will include documents
> concerning these damages.
>
> Andrew is still in the process of conducting its inquiry into the
> facts and circumstances at issue in the present litigation and
> reserves the right to continue to supplement its response to this
> Interrogatory as the litigation progresses.

Andrew's Supplemental Responses to TruePosition's First Set of Interrogatories (A203-A204).

Andrew never supplemented this interrogatory answer. It never produced any of its legal bills or

other documents showing costs of suit. It never produced documents detailing its costs in

bidding on the contract with STC. It never produced documents showing its costs of

participating in 3GPP. It never produced any information regarding the alleged loss of business

opportunity.

Indeed, as of the final week of discovery, Andrew's 30(b)(6) witness on damages was

unable to quantify Andrew's counterclaim damages in any respect (A331-A334 (8:22-18:23)).[23]

Although Andrew's counsel objected that certain of TruePosition's questions sought expert

opinion (*id.* at 12) and that the appropriate documents would be provided during the expert phase

of discovery (*id.* at 14), no such documents were produced during expert discovery, and Andrew

submitted no expert report on its counterclaim damages.

Discovery is over. Andrew has provided no evidence whatever of its counterclaim

damages. It is too late for Andrew to come forward with any such evidence now. Proof of

damage is an essential element of at least Andrew's fraud counterclaims. *See, e.g., Czarnick,*

---

[23]    The 30(b)(6) testimony added some new theories of damage that had not been disclosed
in Andrew's interrogatory answers, but the witness could not provide any details about those
new theories either.

437 F. Supp. 2d at 259.  Accordingly, TruePosition is entitled to partial summary judgment that Andrew is not entitled to a damage award on any of its counterclaims.

## V.    CONCLUSION

Andrew's counterclaims are nothing but a stratagem to attempt to balance the scales and draw the Court's attention away from the real issue in this case:  Andrew's deliberate, willful infringement of the 144 patent.  For all of the reasons set forth above, TruePosition is entitled to summary judgment on Andrew's Counterclaims II-VI and its Third through Fifth Affirmative Defenses.

Respectfully submitted,

DATED: February 2, 2007         By:    /s/ Francis DiGiovanni
                                       CONNOLLY BOVE LODGE & HUTZ LLP
                                       Francis DiGiovanni (# 3189)
                                       James D. Heisman (# 2746)
                                       1007 N. Orange Street
                                       P.O. Box 2207
                                       Wilmington, DE 19899
                                       Telephone: (302) 658-9141
                                       Facsimile: (212) 558-3588

                                       WOODCOCK WASHBURN LLP
                                       Paul B. Milcetic, Esq. (*pro hac vice*)
                                       Dale M. Heist, Esq. (*pro hac vice*)
                                       David L. Marcus, Esq. (*pro hac vice*)
                                       Kathleen A. Milsark, Esq. (*pro hac vice*)
                                       Daniel J. Goettle, Esq. (*pro hac vice*)
                                       Cira Center, 12th Floor
                                       2929 Arch Street
                                       Philadelphia, PA 19103
                                       Telephone: (215) 568-3100
                                       Facsimile: (215) 568-3439

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on this 2nd day of February, 2007, I caused a true and correct copy of the foregoing **TruePosition's Memorandum in Support of its Motion for Summary Judgment on Andrew's Counterclaims II – VI and Affirmative Defenses III-V** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

_____*/s/ Francis DiGiovanni*_____
Francis DiGiovanni (# 3189)