# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION, INC. and<br>KSI, INC., | : |
| | : |
| Plaintiffs/<br>Counterclaim Defendants, | : |
| | : |
| v. | :     C.A. No. 01-0823-GMS |
| | : |
| ALLEN TELECOM INC., | : |
| | : |
| Defendant/<br>Counterclaim Plaintiff. | : |

## DEFENDANT ALLEN TELECOM INC.'S MOTION FOR SUMMARY JUDGMENT DECLARING THE '192 PATENT INVALID AS ANTICIPATED BY THE STILP '144 PATENT

Defendant Allen Telecom Inc. ("Allen") hereby moves pursuant to F.R.C.P. 56

for an Order declaring U.S. Patent No. 6,047,192 invalid. The reasons supporting this

motion are set forth in Allen's Opening Brief filed contemporaneously herewith.

DATED:     May 30, 2003

DUANE MORRIS LLP

John L. Reed (Del. I.D. No. 3023)
Timothy R. Dudderar (Del. I.D. No. 3890)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
302.657.4900

**A33**

- and -

Patrick Dennis McPherson
L. Lawton Rogers, III
**DUANE MORRIS LLP**
1667 K Street, NW, Suite 700
Washington, DC 20006-1608
202.776.7800

**A34**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **TRUEPOSITION, INC.** and **KSI, INC.,** | : | |
| | : | |
| Plaintiffs/ Counterclaim Defendants, | : | |
| | : | |
| v. | : | C.A. No. 01-0823-GMS |
| | : | |
| **ALLEN TELECOM INC.,** | : | |
| | : | |
| Defendant/ Counterclaim Plaintiff. | : | |

## ORDER

AND NOW, this _____ day of _____, 2003, upon consideration of "Defendant Allen Telecom Inc.'s Motion For Summary Judgment Declaring The '192 Patent Invalid As Anticipated By The Stilp '144 Patent," all papers in support thereof, and in opposition thereto, and GOOD CAUSE appearing therefor, it is hereby:

ORDERED that said motion be and hereby is GRANTED. U.S. Patent No. 6,047,192 (the "'192 Patent") is hereby declared invalid and any causes of action asserted by plaintiffs against defendant based upon the '192 Patent are hereby DISMISSED WITH PREJUDICE.

_____

United States District Judge

**A35**

## CERTIFICATE OF SERVICE

I, John L. Reed, Esquire, hereby certify that on May 30, 2003, true and correct

copies of the foregoing "Defendant Allen Telecom Inc.'s Motion For Summary

Judgment Declaring The '192 Patent Invalid As Anticipated By The Stilp '144 Patent"

were served by hand upon the following counsel:

Dale M. Heist, Esq.
Woodcock Washburn LLP
One Liberty Place – 46th Floor
Philadelphia, PA 19103

Donald F. Parsons, Esq.
Morris, Nichols, Arsht & Tunnell
P.O. Box 1347
Wilmington, DE 19899

John L. Reed

WLM\183164.1

A36

## SETTLEMENT AGREEMENT

This Settlement Agreement is made as of January 16, 2004, by and among TruePosition, Inc. ("TruePosition"), KSI, Inc. ("KSI"), Allen Telecom L.L.C. ("Allen"), and Andrew Corporation ("Andrew"). TruePosition and KSI are referred to herein collectively as "TruePosition" or "the plaintiffs." Allen and Andrew are referred to herein collectively as "Andrew" or "the defendant."

WHEREAS the plaintiffs filed a lawsuit entitled <u>TruePosition, Inc. and KSI, Inc. v. Allen Telecom Inc.</u>, Civil Action No. 01-0823 GMS, in the United States District Court for the District of Delaware ("the Action") against Allen Telecom Inc., the predecessor to Allen Telecom, L.L.C., alleging infringement of U.S. Patents 4,728,959; 6,108,555; 6,119,013; 6,047,192; 6,184,829; 6,281,834; and 6,317,081;

WHEREAS the defendant filed counterclaims seeking a declaratory judgment that TruePosition's patents are invalid, unenforceable, and/or not infringed; alleging infringement of Andrew's U.S. Patent 5,317,323; and asserting antitrust and state law tort claims;

WHEREAS Allen Telecom, Inc. subsequently merged with and into Allen Telecom L.L.C., a wholly-owned subsidiary of Andrew Corporation;

WHEREAS the parties hereto desire to settle and resolve the Action;

WHEREAS to arrive at such a settlement the parties agreed to mediate their dispute;

WHEREAS as a result of the mediation the parties agreed upon settlement terms and, on January 16, 2004, signed a legally binding term sheet reflecting those settlement terms; and

WHEREAS the parties agreed to memorialize their settlement agreement in this formal Settlement Agreement;



CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, intending to be legally bound, the parties hereto agree as follows:

1)   In conjunction with the other consideration provided for in this Settlement Agreement, Andrew shall pay to TruePosition, in cash or its equivalent, in full and complete settlement of the Action, the sum of thirty-five million U.S. dollars ($35,000,000), as follows:

a)   The sum of twenty-five million U.S. dollars ($25,000,000), on the earlier of February 6, 2004, or five business days after the date written on the last page hereof immediately above the signature blocks (the "Signature Date");

b)   The sum of four million U.S. dollars ($4,000,000), on the earlier of February 6, 2004, or five business days after the Signature Date;

c)   The sum of three million U.S. dollars ($3,000,000), on or before October 1, 2004;

d)   The sum of two million U.S. dollars ($2,000,000), on or before October 1, 2005;

e)   The sum of one million U.S. dollars ($1,000,000), on or before October 1, 2006.

2)   The payments set forth in paragraph 1 shall be made by wire transfer according to wire instructions that TruePosition shall provide to Andrew prior to each payment date.

3)   Andrew's obligation to make each of the payments set forth in paragraph 1 above is unconditional and binding, and without regard to whether or to what extent Andrew manufactures or makes sales of geolocation equipment in the time periods described.

4)   Andrew hereby issues to TruePosition warrants to purchase one million shares of Andrew's common stock, in the form of the instrument attached hereto as Exhibit A and

- 2 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035396

A38

delivered to TruePosition concurrent with the signing of this Settlement Agreement. The warrants may be exercised, in whole or in part, by TruePosition at any time and from time to time between January 16, 2004 and January 16, 2008 at a price of $ 17.70 per share, the closing price for Andrew stock on January 16, 2004.

5)     In the event that Andrew and TruePosition sign a business combination agreement (whether relating to the Grayson Wireless business or otherwise, but not including any contract for goods or services as contemplated by paragraph 15 below), within one year of the date hereof, Andrew shall pay to TruePosition five million U.S. dollars ($5,000,000).

6)     TruePosition hereby grants to Andrew a worldwide non-exclusive license to make, use, offer to sell, sell, and import geolocation equipment under the patents and patent applications listed in Exhibit B hereto, and under all geolocation patents which may issue at any time as a result of any patent application filed by TruePosition within one year of January 16, 2004, including all divisionals, reissues, continuations in part, continuations, and foreign counterparts of such patents.  Andrew shall have no right to sublicense under this paragraph, except that Andrew may sublicense its carrier end user customers (which shall include such customers' subcontractors, agents, or contractors, solely for the purpose of performing services for such customers for E-911 purposes) to facilitate their operation of E-911 hardware or systems they purchase from Andrew, it being understood that TruePosition is not authorizing Andrew to authorize sublicensing by its customers, is not licensing Andrew to sublicense its customers to share geolocation equipment with other carriers, and is not authorizing Andrew to grant sublicenses that can be transferred by its customers to unaffiliated entities.. Andrew shall not be precluded from distributing its product through resellers (which does not include infrastructure suppliers as listed in paragraph 11 and others engaged in substantially the same business or

- 3 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035397

A39

others that develop or manufacture wireless geolocation technologies), so long as any licenses granted to end users shall be consistent with the terms of this paragraph. TruePosition represents that the patents and patent applications listed in Exhibit B hereto include all of its patents and patent applications except for the 144 and 410 patents identified in paragraph 8 below and their foreign counterparts. The license granted by this paragraph does not extend to patents TruePosition may otherwise acquire. "Geolocation patents" for purposes of this paragraph means patents that claim equipment (including hardware and software) and methods for determining the latitude and longitude of wireless telephones. For purposes of this paragraph a "wireless telephone" is a two-way voice communication device. Geolocation patents do not include (i) patents specifically directed to applications relating to the subsequent use of the determined locations other than for E-911 purposes or (ii) patents specifically directed to wireless telephone functionality and not specifically directed to the generation of the latitude and longitude of wireless telephones.

7)    Upon completion of the payments set forth in paragraph 1 above, the license to Andrew set forth in paragraph 6 shall be fully paid up and shall extend for the full life of the respective patents. If Andrew fails to make payments in full in accordance with paragraph 1, or to cure a failure of payment within five business days of receiving notice of such failure by TruePosition, then the license set forth in paragraph 6 shall terminate upon the earlier of (i) Andrew's failure to make any such payment in full in accordance with paragraph 1, or (ii) October 1, 2006.

8)    TruePosition hereby covenants not to sue Andrew for infringement of U.S. Patents 5,327,144 ("the 144 patent") and 5,608,410 ("the 410 patent") for domestic applications by Andrew relating solely to tasking E-911 geolocation (*i.e.*, determining the latitude and

- 4 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035398

A40

longitude of wireless telephones from which a "911" call has been placed), so long as said

applications do not enable or permit locations to be performed for any task other than E-911,

including without limitation the provision of location related commercial services, and so long as

all licenses granted by Andrew for such domestic E-911 applications are limited to use for E-911

geolocation only. TruePosition represents that no applications are pending based on the 144 or

410 patents, and that no divisionals, continuations, or continuations in part may be filed which

claim priority therefrom.

    9)    TruePosition hereby covenants not to sue Andrew for infringement of any patents

whatsoever, except as is set forth in the following sentence, for Andrew's manufacture, use, offer

for sale or sale of Andrew's existing wireless network overlay "Geometrix" geolocation system.

This covenant does not apply to patents TruePosition may acquire by way of business

combination or merger or otherwise acquire from a third party (i) after October 1, 2005, provided

that in the event of any such acquisition of a patent after October 1, 2005, TruePosition shall not

be entitled to obtain damages, an injunction, or any other remedy with respect to any Geometrix

system as defined in this paragraph 9 sold by Andrew before such date, or (ii) for which Andrew

is currently under license or has licensed in the past. TruePosition represents that it has no

current awareness of any patent owned by a third party that it believes is being infringed without

license by Andrew's existing wireless network overlay "Geometrix" geolocation system.

    a)    For purposes of the covenant not to sue set forth in this paragraph,

"Andrew's existing wireless network overlay 'Geometrix' geolocation system" refers to

the wireless telephone location equipment sold by Allen Telecom, Inc. and Andrew

Corporation between July 2001 and January 2004, and means Andrew's wireless

telephone location equipment (*i.e.*, TDOA-2, TDOA-4, and AOA Wireless Location

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035399

A41

Sensors (WLS's) having the hardware set forth in the WLS Installation and Maintenance Manual bearing Bates numbers 0424-0445 and WLS algorithms/source code set forth in source code versions 5.2, 5.3, or 5.4; WLS source code bearing Bates numbers 33160-33352; and the WLS hardware accelerator code bearing Bates numbers 33799-38000; Geolocation Control Systems (GCS's) having the hardware set forth in the GCS Installation and Maintenance Manual bearing Bates numbers 0390-0423 with the GCS algorithms/source code set forth in source code versions 5.2, 5.3, or 5.4; and Abis Monitoring Units (AMU's), all installed in an overlay fashion), that determine the latitude and longitude of wireless telephones, by determining TOA, AOA, and/or TDOA of a signal transmitted by a wireless telephone's voice or traffic channel (but not the control channel or access channel signals), that uses any of the AMPS (800 MHz Band), IDEN (800 MHz Band), TDMA (800 and 1900 MHz Bands), CDMA (800 and 1900 MHz Bands) or GSM (800 and 1900 MHz Bands) air interfaces, but not others.    The term "Andrew's existing wireless network overlay 'Geometrix' geolocation system" also includes routine software maintenance patches, but does not include any other hardware or software changes or the addition of other functionality, or changes to create additional capacity.

b)    For purposes of the covenant not to sue set forth in this paragraph, "Andrew's existing wireless network overlay 'Geometrix' geolocation system" does not include an integrated geolocation system (e.g., a geolocation system whose hardware or software is incorporated into a carrier's non-geolocation hardware and software, such as plug-ins (e.g., circuit boards) that are incorporated into base station equipment and/or switches and/or a mobile station component) or other embedded usages.

- 6 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035400

A42

c)        TruePosition's counsel, Woodcock Washburn LLP, shall maintain a copy of Andrew's existing wireless network overlay "Geometrix" geolocation system source code versions 5.2, 5.3, and 5.4, documents identified above, and other documents describing Andrew's existing wireless network overlay "Geometrix" geolocation system which are now in their possession, under the terms set forth in the Protective Order filed in the Action for use in resolution of any dispute that may arise regarding whether an Andrew wireless network overlay geolocation system is subject to the covenant not to sue contemplated by this Settlement Agreement.

d)        The parties agree to mediate any dispute concerning whether an Andrew wireless network overlay geolocation system is subject to the covenant not to sue for purposes of this paragraph. Upon notification of a dispute, the parties shall each suggest the names of three persons to act as mediator within three business days of such notification, and shall agree upon a mediator within five business days. The mediation shall be conducted within fourteen calendar days of the acceptance of the dispute by the mediator. If no resolution has been reached within one month of acceptance of the dispute by the mediator, TruePosition shall be free to bring such infringement action as it may otherwise be entitled to bring in the absence of this paragraph.

10)       Andrew hereby grants to TruePosition a perpetual worldwide non-exclusive license to make, use, offer to sell, sell, and import geolocation equipment under the patents and patent applications listed in Exhibit C hereto, and under all geolocation patents which may issue at any time as a result of any patent application filed by Andrew within one year of January 16, 2004, including all divisionals, reissues, continuations in part, continuations, and foreign counterparts of such patents. TruePosition shall have no right to sublicense under this paragraph,

- 7 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035401

A43

except that TruePosition may sublicense its carrier end user customers (which shall include such customers' subcontractors, agents, or contractors solely for the purpose of performing services for such customers for E-911 purposes) to facilitate their operation of E-911 hardware or systems they purchase from TruePosition, it being understood that Andrew is not authorizing TruePosition to authorize sublicensing by its customers, is not licensing TruePosition to sublicense its customers to share geolocation equipment with other carriers, and is not authorizing TruePosition to grant sublicenses that can be transferred by its customers to unaffiliated entities. TruePosition shall not be precluded from distributing its product through resellers (which does not include infrastructure suppliers as listed in paragraph 11 and others engaged in substantially the same business), so long as any licenses granted to end users shall be consistent with the terms of this paragraph. Andrew represents that the patents listed in Exhibit C include all of its geolocation patents and patent applications. The license granted by this paragraph does not extend to patents Andrew may otherwise acquire. "Geolocation patents" for purposes of this paragraph has the meaning assigned to it in paragraph 6 above.

11)    The licenses granted in paragraphs 6 and 10 may not be assigned by the licensees; provided, however, that either such license may be transferred in connection with the sale of all or substantially all of the business of Andrew or TruePosition, respectively, but shall terminate upon any transfer or assignment to any of the following companies, unless prior written permission of the licensor is obtained: Lucent Technologies Inc., NEC Corp., Huawei Technologies Co., Ltd., Telefon AB LM Ericsson, Nokia Oyj, Nortel Networks Corp., Motorola Inc, and Siemens AG, or any successor of any of the foregoing.

12)    In the event that Andrew makes sales of or enters into a contract to supply geolocation goods and/or services to or for the use of T-Mobile USA, Inc. or Cingular Wireless

- 8 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035402

A44

LLC, or any entity owned or controlled by either of them, within eighteen months of the date hereof:

    a)    Andrew shall pay to TruePosition a royalty of 20% of its gross revenue on such sales and any revenue generated in connection with such sales, including but not limited to related software license fees, warranty fees, maintenance and service fees, regardless of whether such revenue is received by Andrew within the eighteen-month period, such royalty to be payable within thirty days of Andrew's receipt of such revenue, and in any event in full on or before July 17, 2005.

    b)    The royalty payment shall be accompanied by a report disclosing the goods and/or services provided to T-Mobile or Cingular and the revenue received as a result.

    c)    Andrew shall keep records, consistent with the record-keeping systems used in the ordinary course of its business, showing the goods and/or services provided to T-Mobile or Cingular between the date of this Agreement and July 16, 2005, in sufficient detail to enable the royalty payable to TruePosition to be determined. Andrew shall maintain such books and records until July 16, 2006.

    d)    Andrew shall permit its books and records pertinent to its sale of equipment to T-Mobile or Cingular to be examined from time to time and, to the extent reasonably necessary, to verify the report provided by Andrew, such examination to be made at the expense of TruePosition upon reasonable notice to Andrew, by an auditor appointed by TruePosition from a firm of certified public accountants of national standing and obligated to confidentiality, who shall report to TruePosition only the amount of royalty payable for the eighteen-month period applicable to this paragraph. In

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035403

A45

the event that it is determined that Andrew owes additional payments to TruePosition under this paragraph, and Andrew's underpayment is greater than 10% of the total amount owing for any calendar year period, then, in addition to such additional payment, Andrew shall also reimburse TruePosition for TruePosition's costs with respect to such audit.

e)    The royalty obligations set forth in this paragraph shall not be applicable to sales by Andrew to T-Mobile or Cingular if either of those entities acquires AT&T Wireless, Inc. or any other current customer of Andrew to the extent that such sales by Andrew are in the nature of continuing sales to its pre-existing customer. Sales are in the nature of continuing sales to a pre-existing Andrew customer when they are (i) made to fulfill an acquired customer's FCC 's E-911 location requirements, (ii) made into a market that has been partially deployed by Andrew or Andrew's customer using Andrew equipment prior to the date of such acquisition; and (iii) made pursuant to an Andrew customer contract entered into prior to the acquisition.

13)    Except with respect to any breach of this Settlement Agreement, the parties hereby release, remise, and forever discharge one another, their predecessors, successors, parents, subsidiaries, officers, directors, agents, employees, assigns, and attorneys, and all persons who may be jointly and severally liable with any of them, from any and all claims, demands, liabilities, causes of action, damages, legal fees, costs, expenses, and claims for compensation of whatever nature or description, arising out of or relating to the Action, and/or which have been or could have been asserted in the Action.

14)    The parties agree that they will execute and file, within five business days of the Signature Date, any and all necessary documents to discontinue the prosecution of the Action,

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035404

A46

including all counterclaims, with prejudice, and that each party shall bear its own costs and fees incurred in connection with the Action.

15)    TruePosition agrees to offer to purchase at least twenty million U.S. dollars ($20,000,000) worth of geolocation hardware and/or related goods and services from Andrew between the date hereof and October 1, 2006, provided that Andrew shall match prices and other material terms and conditions offered to TruePosition by its other suppliers of such geolocation hardware and/or goods and services, without regard to quantity commitments.

a)    Nothing herein shall require either party to disclose confidential, competitively sensitive documents or information to each other, such as, by way of example, price and cost information, and disclosure of such information is expressly prohibited. Notwithstanding the foregoing, TruePosition shall provide Andrew with such technical information as is necessary to permit Andrew to provide the requested goods and/or services and that is made available to other contract manufacturers in connection with soliciting bids or proposals for provision of such goods or services.

b)    In the event that one party believes the other party's representations regarding competitive prices or terms and conditions are inaccurate or incomplete, that party may request a review of such prices or terms and conditions by a neutral third-party arbitrator, to be selected by the party requesting review in accordance with subparagraph (c) below and at the expense of the party requesting review. Within five business days of the arbitrator's acceptance of appointment the parties shall provide to the arbitrator the documents and information necessary to permit him to make a determination whether the prices or material terms and conditions proposed or challenged match those of TruePosition's other suppliers of the pertinent goods or services. The arbitrator's

- 11 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035405

decision shall be rendered to both parties in writing within five business days of having received the last of the information necessary to make a determination. The arbitrator's decision is final, binding, and not subject to appeal. Upon rendering his decision, the arbitrator shall return the documents and all copies thereof to the party that provided them.

c) The arbitrator shall be a certified public accountant with at least ten (10) years of professional experience in cost accounting. Neither the arbitrator himself nor his firm shall have provided professional services to TruePosition, Andrew, or any of their respective subsidiaries or affiliates within the five (5) years preceding the request for review. Neither the arbitrator himself nor his firm shall be employed by TruePosition, Andrew, or any of their respective subsidiaries or affiliates for one year following the rendering of a decision pursuant to this paragraph.

d) Any business offered by TruePosition which Andrew does not accept or which TruePosition does not award to Andrew because of Andrew's failure to match the prices and other material terms and conditions offered by TruePosition's other suppliers shall nevertheless be counted for purposes of determining the amount of business that TruePosition has offered Andrew pursuant to this paragraph.

16) Andrew agrees that it will not contest the validity or enforceability of U.S. Patents 4,728,959; 6,108,555; 6,119,013; and 6,047,192 or their foreign counterparts.

17) The parties agree that their sole remedy for breach of this Settlement Agreement shall be an action therefor. Before either party brings such an action for breach of this Settlement Agreement, the parties shall engage in mediation in a good faith attempt to resolve their dispute. Upon notification of a dispute, the parties shall each suggest the names of three

- 12 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035406

A48

persons to act as mediator within three business days of such notification, and shall agree upon a mediator within five business days. The mediation shall be conducted within fourteen calendar days of the mediator's acceptance of the mediation. If no resolution has been reached within one month of notification of the mediator's acceptance of the mediation, the parties may seek other relief.

18)     This Settlement Agreement shall be governed by the laws of the State of Delaware, without regard to principles of conflicts of laws. Disputes arising hereunder or in connection herewith shall be tried solely in the state and federal courts of Delaware, and both parties hereby consent to the exclusive personal jurisdiction thereof.

19)     The parties agree to maintain the terms and provisions of this Settlement Agreement confidential, and shall not, without the other party's prior written consent in each instance, which consent may not be unreasonably withheld, disclose to any third party, the terms or provisions of this Settlement Agreement, unless such disclosure is required under applicable law or in connection with the legal enforcement of this agreement. In the event such disclosure is required, the disclosing party shall, prior to making such disclosure, cooperate with the other party in an effort to limit and/or obtain confidentiality treatment for such disclosure. Paragraph 20 below constitutes the respective parties' prior written consent regarding the parties' respective press releases. The prohibition against disclosure set forth in this paragraph does not prohibit disclosure to the parties' respective parents or affiliates.

20)     The parties have agreed upon the terms of their respective press releases announcing the settlement memorialized by this Settlement Agreement. Each party agrees not to disparage the other party or its products in connection with descriptions of this Settlement Agreement.

- 13 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035407

A49

21)     All notices under this Settlement Agreement shall be in writing and shall be deemed to have been given when received by the intended recipient at the following address (or at such other address as the intended recipient shall have specified in a written notice given to the other party):

**To TruePosition and KSI:**

Frederic Beckley
Senior Vice President and General Counsel
TruePosition, Inc.
780 Fifth Avenue
King of Prussia, Pa 19406
Fax: 610-680-1074

**To Allen and Andrew:**

James F. Petelle, Esq.
Vice President, Law & Secretary
Andrew Corporation
10500 West 153rd Street
Orland Park, IL 60462
Fax: 708-873-2571

22)     The parties agree that no promise, representation or agreement not herein expressed has been made, and this Settlement Agreement (including the Exhibits hereto) contains the entire agreement between the parties with respect to its subject matter, superseding all other prior agreements, written or oral, including without limitation the term sheet dated January 16, 2004.

23)     If for any reason any provision of this Settlement Agreement is held invalid, illegal, or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement, all of which shall remain in full force and effect and be binding upon the parties hereto.

- 14 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035408

**A50**

24)     This Settlement Agreement may be executed by the parties in counterparts, each of which shall be deemed to be an original, and all of which shall constitute together but one and the same agreement. Upon signing at the time agreed, the parties shall exchange signature pages by facsimile transmission, with an original signature to follow by overnight mail, addressed to the persons listed in paragraph 21 above. Andrew's signature page shall be accompanied by the warrant instrument described in paragraph 4 above, the form of which is Exhibit A hereto.


February 1, 2004

TruePosition, Inc.                              Allen Telecom, LLC


By_____              By_____


KSI, Inc.                                        Andrew Corporation


By_____              By_____

- 15 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035409

A51

FEB .004 10:24AM HP ASERJET 3200 

24)   This Settlement Agreement may be executed by the parties in counterparts, each of which shall be deemed to be an original, and all of which shall constitute together but one and the same agreement.  Upon signing at the time agreed, the parties shall exchange signature pages by facsimile transmission, with an original signature to follow by overnight mail, addressed to the persons listed in paragraph 21 above.  Andrew's signature page shall be accompanied by the warrant instrument described in paragraph 4 above, the form of which is Exhibit A hereto.

February 1, 2004

TruePosition, Inc.                                          Allen Telecom, LLC

By_____                      By_____
Fred Beckley
SVP - GC

KSI, Inc.                                                        Andrew Corporation

By_____                      By_____
Fred Beckley
SVP - GC

- 15 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035410

A52

February 1,
January __ 2004

TruePosition, Inc.                              Allen Telecom, LLC

By_____                    By_____
                                              Terry N. Garner  Vice President

KSI, Inc.                                       Andrew Corporation

By_____                    By_____
                                                        VP

- 13 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035411

A53

THIS WARRANT AND THE COMMON STOCK RECEIVABLE UPON THE EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), OR ANY STATE SECURITIES LAWS. THEY MAY NOT BE TRANSFERRED OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL, REASONABLY SATISFACTORY TO THE COMPANY, TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED.

Void after 5:00 P.M., Central Time, on January 16, 2008

## WARRANT TO PURCHASE COMMON STOCK

## ANDREW CORPORATION

WARRANT NO. W-1                    ORIGINAL ISSUE DATE:  January 16, 2004

This is to certify that, **FOR VALUE RECEIVED**, TruePosition, Inc. ("**Holder**") is entitled to purchase, subject to the provisions of this Warrant (as defined herein), from **ANDREW CORPORATION** (the "**Company**"), at any time until 5:00 P.M., Central Time, on January 16, 2008 ("**Expiration Date**"), One Million (1,000,000) shares ("**Shares**") of the Company's Common Stock, $.01 par value per share ("**Common Stock**"). The exercise price of the Warrant shall be $17.70 per Share ("**Exercise Price**").

1.    Exercise of Warrant.  This Warrant may be exercised, in whole or in part at any time or from time to time until the Expiration Date or if the Expiration Date is a day on which banking institutions are authorized by law to close, then on the next succeeding day which shall not be such a day, by presentation and surrender hereof to the Company or at the office of its stock transfer agent, if any, with the Purchase Form annexed hereto as Exhibit A duly executed and accompanied by payment of the Exercise Price for the number of Shares specified in such form (i) in the form of cash, certified check, or bank draft payable to the order of the Company, or other form of payment acceptable to the Company, for an amount of United States dollars equal to the Exercise Price of such Shares; (ii) by tendering previously acquired Shares of the Corporation valued at such Shares' Fair Market Value on the date of tender; (iii) in the manner described in Section 12; or (iv) a combination of (i), (ii), and (iii). The Shares so purchased shall be deemed to be issued to the Holder or the Holder's designee, as the record owner of such shares, as of the close of business on the date on which this Warrant shall have been surrendered and the completed Exhibit A shall have been delivered and payment shall have been made for such Shares as set forth above or, if such day is not a business day, on the next succeeding business day. The Shares so purchased, representing the aggregate number of shares specified in the executed Exhibit A, shall be delivered to the holder hereof within a reasonable time, not exceeding 10 business days, after this Warrant shall have been so exercised. If (a) the Company's transfer agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer program, and (b) the certificates therefor are not required to bear a legend and the Holder is not obligated to return such certificate for the placement of a legend thereon, the Company, upon request of the Holder, shall cause its transfer agent to electronically transmit the Shares so purchased to the Holder by crediting the account of the holder or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("**DTC Transfer**").   If the aforementioned conditions to a DTC Transfer are not satisfied or such transfer is not so requested by the

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035412

A54

Holder, the Company shall deliver physical certificates representing the Shares so purchased to the Holder.

If this Warrant is exercised in part only, the Company shall, upon surrender of this Warrant for cancellation, execute and deliver a new Warrant evidencing the right of the Holder to purchase the balance of the Shares purchasable hereunder. Upon receipt by the Company of this Warrant at the office of the Company, in proper form for exercise and accompanied by the Exercise Price, the Holder shall be deemed to be the holder of record of the Shares issuable upon such exercise, notwithstanding that the stock transfer books of the Company shall then be closed or that certificates representing such Shares shall not then be actually delivered to the Holder.

As used herein, "Fair Market Value" as of any date shall mean if the Company's Common Stock is traded on an established market which reports last sale information, the price of the Common Stock as of the close on the day before such date (or if no sales occurred that day the most recent day sales occurred preceding such date); if the Company's Common Stock is quoted on the NASDAQ Stock Market, the closing bid price per share on such date; or if the Company's Common Stock is publicly held but not traded on an established market which reports last sale information or quoted on the NASDAQ Stock Market, the fair market value of such Common Stock as determined by the Board of Directors of the Company in good faith and in their sole discretion. If the Common Stock is not publicly held, Fair Market Value shall be determined by the Board of Directors of the Company in good faith and in its sole discretion.

2.     Registration of Shares. The Company shall use its reasonable best efforts to prepare and file as promptly as practicable after the date hereof with the SEC a registration statement on Form S-3 with respect to the Shares issuable upon the exercise of this Warrant (the **"Registration Statement"**) and to effect all such registrations, qualifications and compliances (including, without limitation, obtaining appropriate qualifications under applicable state securities or "blue sky" laws and compliance with any other applicable governmental requirements or regulations) as the Holder hereof may reasonably request and that would permit or facilitate the sale of such Shares in the open market (provided, however, that the Company shall not be required in connection therewith to qualify to do business or to file a general consent to service of process in any such state or jurisdiction), and shall use its reasonable best efforts so that such Registration Statement and all other such registrations, qualifications and compliances may become effective no later than 120 days following the date hereof. Notwithstanding the foregoing, the Company shall not be obligated to effect an underwritten registration statement.

The Company will use its reasonable best efforts to maintain the effectiveness of the Registration Statement and other applicable registrations, qualifications and compliances for a period of eighteen months following the earlier of Expiration Date or the date upon which Holder has fully exercised this Warrant (the **"Registration Effective Period"**), and from time to time will amend or supplement the Registration Statement and the prospectus contained therein as and to the extent necessary to comply with the Securities Act of 1933, as amended (the **"Act"**), the Securities and Exchange Act of 1934, as amended and any applicable state securities statute or regulation, subject to the following limitations and qualifications.

Upon the exercise of this Warrant following the date on which the Registration Statement is first declared effective, the Holders will be permitted (subject in all cases to compliance with the prospectus delivery requirements of the Act) to offer and sell the Shares issued upon the exercise of this Warrant during the Registration Effective Period in the manner described in the Registration Statement, provided that the Registration Statement remains effective and has not been suspended.

Notwithstanding any other provision of this Warrant, the Company shall have the right at any

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035413

A55

time (but only five times during the term of this Agreement and no more than three times in any twelve-month period) to require that the Holder hereof suspend further open market offers and sales of the Shares issued upon exercise of this Warrant whenever, and only if, in the reasonable good faith judgment of the Company after receipt of advice from outside counsel there is or there is reasonably likely to be in existence material undisclosed information or events with respect to the Company (the "**Suspension Right**"). In the event the Company exercises the Suspension Right such suspension will continue only for the period of time reasonably necessary for disclosure to occur at a time that is not detrimental to the Company or its stockholders or until such time as the information or event is no longer material (but in no event more than 30 days), each as determined in good faith by the Company after receipt of advice from outside counsel. The Company will promptly give the Holders notice of any such suspension and will use all reasonable efforts to minimize the length of the suspension.

3.    Reservation and Listing of Shares. The Company hereby agrees that at all times that this Warrant remains outstanding, there shall be reserved for issuance and/or delivery upon exercise of this Warrant such number of Shares as shall be required for issuance or delivery upon exercise of this Warrant. Not later than 30 days after the date hereof, the Company shall list the Shares on the NASDAQ Stock Market.

4.    Limit on Fractional Shares. No fractional Shares shall be issued in connection with any exercise hereof, but in lieu of such fractional Shares, the Company shall make a cash payment therefor equal in amount to the product of the applicable fraction multiplied by the amount by which the Fair Market Value of a Share of Common Stock on the date of such exercise exceeds the Exercise Price then in effect. All computations in connection with the adjustment of the Exercise Price shall be rounded to the fourth decimal place.

5.    Shares To Be Fully Paid. All Shares will, upon issuance in accordance with the terms of this Warrant, be validly issued, fully paid and non-assessable and free from all taxes, liens, claims and encumbrances.

6.    Exchange, Assignment or Loss of Warrant. This Warrant is exchangeable, without expense, at the option of the Holder, upon presentation and surrender hereof to the Company for other Warrants of different denominations entitling the Holder thereof to purchase (under the same terms and conditions as provided by this Warrant) in the aggregate the same number of Shares purchasable hereunder. Subject to Section 11, any transfer or assignment shall be made by surrender of this Warrant to the Company with the Assignment Form annexed hereto as Exhibit B duly executed and with funds sufficient to pay any transfer tax; whereupon the Company shall, without charge, execute and deliver a new Warrant in the name of the assignee named in such instrument of assignment and this Warrant shall promptly be canceled. The Holder hereof shall be entitled to transfer this Warrant without the consent of the Company. This Warrant may be divided or combined with other Warrants that carry the same rights upon presentation hereof at the office of the Company or at the office of its stock transfer agent, if any, together with a written notice specifying the names and denominations in which new Warrants are to be issued and signed by the Holder hereof. The term "Warrant" as used herein includes any warrants issued in substitution for or replacement of this Warrant, or into which this Warrant may be divided or exchanged. Upon receipt by the Company of evidence satisfactory to it of the loss, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) of reasonably satisfactory indemnification, and upon surrender and cancellation of this Warrant, if mutilated, the Company will execute and deliver a new Warrant of like tenor and date. Subject to such right of indemnification, any such new Warrant executed and delivered shall constitute an additional contractual obligation on the part of the Company, whether or not this Warrant so lost, stolen, destroyed, or mutilated shall be at any time enforceable by anyone.

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035414

A56

7.    Rights of the Holder.  The Holder shall not, by virtue hereof, be entitled to any rights of a shareholder in the Company, either at law or equity, and the rights of the Holder are limited to those expressed in the Warrant and are not enforceable against the Company except to the extent set forth herein.

8.    Adjustment Provisions.  The number and type of shares issuable upon exercise of this Warrant shall be subject to adjustment from time to time as follows:

(a)    If the number of Shares of Common Stock outstanding is increased by a stock dividend payable in Shares of Common Stock or by a subdivision or split-up of Shares of Common Stock, then, following the record date for the determination of Holders of Common Stock entitled to receive such stock dividend, subdivision or split-up, the number of Shares of Common Stock for which this Warrant is exercisable and the Exercise Price shall be appropriately adjusted so that the number of Shares of Common Stock issuable on exercise of this Warrant shall be increased, and the Exercise Price shall be decreased, in proportion to such increase in outstanding Shares.

(b)    If the number of Shares of Common Stock outstanding is decreased by a combination of the outstanding Shares of Common Stock, then, following the record date for such combination, the number of Shares of Common Stock for which this Warrant is exercisable and the Exercise Price shall be appropriately adjusted so that the number of Shares of Common Stock issuable on exercise of this Warrant shall be decreased, and the Exercise Price increased, in proportion to such decrease in outstanding Shares.

(c)    In the event of any capital reorganization of the Company, any reclassification of the stock of the Company (other than a change in par value, or a change from no par value to par value, or a change from par value to no par value, or as a result of a stock dividend or subdivision, split-up or combination of shares), any consolidation or merger of the Company, or any sale, lease, or conveyance to another person of the property of the Company pursuant to which the Company's Common Stock is converted into other securities, cash or assets, each Warrant shall, after such reorganization, reclassification, consolidation, merger or conveyance, be exercisable into the kind and number of shares of stock or other securities or property of the Company or of the corporation resulting from such consolidation or surviving such merger to which the holder of the number of shares of Common Stock is deliverable (immediately prior to the time of such reorganization, reclassification, consolidation or merger) upon exercise of such Warrant would have been entitled upon such reorganization, reclassification, consolidation, merger or conveyance.  The provisions of this clause shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers or conveyances.

(d)    If at any time the Company shall take a record of the holders of its Shares of Common Stock for the purpose of entitling them to receive any dividend or other distribution of:

(i)    cash (other than a cash dividend payable out of earnings or earned surplus legally available for the payment of dividends under the laws of the jurisdiction of incorporation of the Company),

(ii)    any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock), or

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035415

A57

(iii)    any warrants or other rights to subscribe for or purchase any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock),

then (1) the number of shares of Common Stock for which this Warrant is exercisable shall be adjusted to equal the product of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the per share Fair Market Value of Common Stock at the date of taking such record and (B) the denominator of which shall be such per share Fair Market Value minus the amount allocable to one share of Common Stock of any such cash so distributable and of the fair value (as determined in good faith by the Board of Directors of the Company and supported by an opinion from an investment banking firm of recognized national standing acceptable to the Holder) of any and all such evidences of indebtedness, shares of stock, other securities or property or warrants or other subscription or purchase rights so distributable, and (2) the Exercise Price then in effect shall be adjusted to equal (A) the Exercise Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment.  A reclassification of the Common Stock (other than a change in par value, or from par value to no par value or from no par value to par value) into shares of Common Stock and shares of any other class of stock shall be deemed a distribution by the Company to the holders of its Common Stock of such shares of such other class of stock within the meaning of this Section 8(d) and, if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock within the meaning of Section 8(a).  "**Common Stock Equivalent**" means any Convertible Security or warrant, option or other right to subscribe for or purchase any Additional Shares of Common Stock or any Convertible Security.  "**Convertible Securities**" means evidences of indebtedness, shares of capital stock or other securities that are or may be at any time convertible into or exchangeable for shares of Common Stock.  "**Additional Shares of Common Stock**" means all shares of Common Stock issued by the Company after the Original Issue Date (as first above written), and all shares of Other Common, if any, issued by the Issuer after the Original Issue Date, except (i) the Shares; (ii) shares of Common Stock to be issued to strategic partners and/or in connection with a strategic merger or acquisition; (iii) shares of Common Stock or the issuance of options to purchase shares of Common Stock to employees, officers, directors, consultants and vendors in accordance with the Company's equity incentive policies; and (iv) the issuance of securities pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding prior to the date hereof.  "**Other Common**" means any other ownership interest of the Company of any class which shall be authorized at any time after the Original Issue Date (other than Common Stock) and which shall have the right to participate in the distribution of earnings and assets of the Company without limitation as to amount.

(e)    Prior to any offer by the Company that gives holders of the Company's Common Stock the option to exchange or tender shares of Common Stock for any assets or securities of the Company or of any other entity, the Company shall give the Holder the option to convert all or a portion of its right to purchase Shares hereunder into the amount of such other assets or securities of the Company or of any other entity that the Holder would have been entitled to receive had it been the holder of record of the Shares receivable upon exercise of this Warrant on the date of any record date of any such exchange or tender offer.  The Company shall provide the Holder twenty (20) days prior written notice of any such exchange or tender offer and the Holder's right

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035416

A58



to exercise its right pursuant to the immediately foregoing sentence shall terminate after the expiration of such twenty (20) day period unless the Holder has notified the Company in writing that it is exercising such rights.

(f)  The Company shall provide the Holder with not less than twenty (20) days written notice prior to the applicable record date or effective date of the occurrence of any of the events described in this Section 8, which notice shall set forth in detail all material facts and circumstances surrounding and relating to such event. The Company shall also provide the Holder with such notice if any event occurs of the type contemplated by the adjustment provisions of this Section 8 but not expressly provided for by such provisions, and the Company's Board of Directors will make an appropriate adjustment in the Exercise Price and the number of Shares of Common Stock acquirable upon exercise of this Warrant so that the rights of the Holder shall be neither enhanced nor diminished by such event.

9.  Statement of Adjustment. Whenever the Exercise Price shall be adjusted as provided in Section 8, the Company shall make available for inspection by the Holder, during regular business hours, at its principal executive offices or at such other place as may be designated by the Company, a statement, signed by its chief executive officer or president, showing in detail the facts requiring such adjustment and the Exercise Price that shall be in effect after such adjustment. The Company shall also cause a copy of such statement to be sent by first-class certified mail, return receipt requested and postage prepaid, to Holder at such Holder's address appearing on the Company's records.

10.  Notices. Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party shall be in writing and delivered in person or by courier or by facsimile transmission (followed by mailing certified mail, postage prepaid, return receipt requested) or mailed by certified mail, postage prepaid, return receipt requested, as follows: (a) to the Holder at the Holder's address as it appears in the records of the Company or at such other address as the Holder may otherwise indicate in a written notice delivered to the Company; or (b) to the Company, at its principal place of business, Attn: President, or at such other address as the Company may otherwise indicate in a written notice delivered to Holder.  All such notices, requests, instructions, documents and other communications will: (i) if delivered personally to the address as provided in this Section 10, be deemed given upon delivery; (ii) if delivered by facsimile transmission, be deemed given upon receipt and (iii) if delivered by mail in the manner described above, be deemed given 5 days after being placed in the mail.

11.  Transfer to Comply with the Securities Act of 1933. Until such time as the Registration Statement is declared effective, the Company may cause the following legend, or one similar thereto, to be set forth on each certificate representing the Shares or any other security issued or issuable upon exercise of this Warrant:

The securities represented by this certificate may not be offered for sale, sold or otherwise transferred in the absence of an effective registration statement under the Securities Act of 1933 (the "Act"), and under any applicable state securities law, an opinion of counsel satisfactory to the Company that such registration is not, in the circumstances required, or evidence satisfactory to the Company that the Shares have been sold in compliance with Rule 144 promulgated under the Act.

Neither this Warrant nor any Shares issued upon the exercise hereof shall be transferred other than pursuant to an effective registration statement under the Act or an exemption from the registration provisions thereof. Notwithstanding the foregoing, following the date on which the Shares have been registered under the Act or otherwise may be sold by the holder pursuant to Rule 144(k) promulgated under the Act (or a successor rule), the Shares shall not bear any restrictive legend.

CH02/22289907.2

6

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035417

A59

12.    Additional Right to Exercise. The Holder shall have the right to require the Company to convert this Warrant ("**Conversion Right**"), at any time after it is exercisable, or the portion then exercisable, but prior to its expiration, into Shares as provided in this Section 12. Upon exercise of the Conversion Right, the Company shall deliver to the Holder (without payment by him of the Exercise Price) that number of Shares equal to the quotient obtained by dividing (i) the value of this Warrant with respect to the exercised Shares at the time of the exercise of the Conversion Right (determined by subtracting the aggregate Exercise Price for the exercised Shares immediately before the time of the closing of the Conversion Right from the aggregate Fair Market Value of the exercised Shares at such time) by (ii) the Fair Market Value of one Share immediately before the time of the closing of the Conversion Right.

(a)    The Conversion Right may be exercised by the Holder, at any time or from time to time, prior to its expiration, on any business day by delivering a written notice in the form attached hereto as Exhibit C ("**Conversion Notice**") to the Company at the Company's offices exercising the Conversion Right and specifying (i) the total number of Shares he desires to purchase pursuant to such conversion and (ii) a date not less than one and not more than 20 business days from the date of the Conversion Notice for the closing of such purchase.

(b)    At the closing of the Conversion Right: (i) the Holder will surrender this Warrant; (ii) the Company will deliver to the Holder a certificate or certificates for the number of Shares issuable upon such conversion; and (iii) the Company will deliver to the Holder a new Warrant representing the number of Shares, if any, with respect to which this Warrant shall not have been exercised.

13.    Exemption from Registration for Warrant Exercise. The Company and the Holder acknowledge that the Company will be relying on an exemption from the registration requirements of the Act to deliver Shares to the Holder upon the exercise of the Warrant. The Holder agrees to provide the Company with such information and representations as may be requested by the Company in order to establish a claim to an exemption from the registration requirements of the Act and any applicable state securities laws, including, a representation that the Holder is taking the Shares for investment, and not with a view to distribution.

14.    Governing Law; Jurisdiction. This Warrant shall be governed by and construed in accordance with the laws of the State of Delaware. Each of the Company and the Holder irrevocably consents to the nonexclusive jurisdiction of the United States federal courts and state courts located in Wilmington, Delaware in any suit or proceeding based on or arising under this Warrant. Each of the Company and the Holder irrevocably waives any objection to the laying of venue and the defense of an inconvenient forum to the maintenance of such suit or proceeding in such courts. Each of the Company and the Holder further agrees that service of process upon it mailed by certified or registered mail to the address set forth in Section 10 shall be deemed in every respect effective service of process upon it in any such suit or proceeding. Nothing herein shall affect the Holder's right to serve process in any other manner permitted by law. Each of the Company and the Holder agrees that a final nonappealable judgment in any such suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on such judgment or in any other lawful manner.

15.    Successors and Assigns. The rights evidenced hereby shall inure to the benefit of and be binding upon the successors of the Company and the successors and permitted assigns of the Holder hereof. The provisions of this Warrant are intended to be for the benefit of all Holders from time to time of this Warrant and shall be enforceable by any such Holder.

CH02/22289907.2

7

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035418

A60

16.    Amendment.  This Warrant may not be modified or amended or the provisions hereof waived except by the written consent of the Company and the Holder.

17.    Other Actions.  The Company will not avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by it hereunder, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may reasonably be requested by the Holder of this Warrant in order to protect the economic benefit inuring to the Holder hereof and the exercise privilege of the Holder of this Warrant against dilution or other impairment, consistent with the tenor and purpose of this Warrant.

ANDREW CORPORATION

By: _____

Name:  Marty R. Kiffrell

Title:  Vice President and CFO

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035419

A61

EXHIBIT A

<u>PURCHASE FORM</u>

Dated: _____, 200__

The undersigned hereby irrevocably elects to exercise the Warrant to the extent of purchasing _____ shares of Common Stock of Andrew Corporation, and hereby makes payment of $_____ in payment of the actual Exercise Price thereof.

[_] The undersigned requests that the Company cause its transfer agent to electronically transmit the Common Stock being acquired hereby to the account of the undersigned or its nominee (which is _____) with DTC through its Deposit Withdrawal Agent Commission System ("**DTC Transfer**").

<u>INSTRUCTIONS FOR REGISTRATION OF SHARES</u>

Name: _____

(Please typewrite or print in block letters)

Address: _____

Signature: _____

CH02/22289907.2

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035420

A62

## EXHIBIT B

### ASSIGNMENT FORM

Dated: _____, 200_

FOR VALUE RECEIVED, _____

hereby sells, assigns and transfers unto

Name: _____
(Please typewrite or print in block letters)

Address: _____

the right to purchase Shares represented by this Warrant to the extent of _____ shares of Common Stock as to which such right is exercisable and does hereby irrevocably constitute and appoint _____, attorney, to transfer the same on the books of the Company with full power of substitution in the premises.

Signature: _____

CH02/22289907.2

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035421

A63

# EXHIBIT B

## ISSUED PATENTS

| PATENT NO. | TITLE | ISSUE DATE | COUNTRY |
|---|---|---|---|
| 6,184,829 B1 | Calibration for Wireless Location System | 02/06/01 | US |
| 6,266,013 B1 | Architecture for a Signal Collection System of a Wireless Location System | 07/24/01 | US |
| 6,091,362 | Bandwidth Synthesis for a Wireless Location System | 07/18/00 | US |
| 6,172,644 B1 | Emergency Location Method for a Wireless Location System | 01/09/01 | US |
| 6,097,336 | Method for Improving the Accuracy of a Wireless Location System | 08/01/00 | US |
| 6,115,599 | Directed Retry Method for Use in a Wireless Location System | 09/05/00 | US |
| 6,281,834 B1 | Calibration for Wireless Location System | 08/28/01 | US |
| 6,351,235 B1 | Method and System for Synchronizing Receiver Systems of a Wireless Location System | 02/26/02 | US |
| 6,317,081 B1 | Internal Calibration Method for Receiver System of a Wireless Location System | 11/13/01 | US |
| 6,388,618 B1 | Signal Collection System for a Wireless Location System | 05/14/02 | US |
| 6,317,604 B1 | Centralized Database System for a Wireless Location System | 11/13/01 | US |
| 6,285,321 B1 | Station Based Processing Method for a Wireless Location System | 09/04/01 | US |
| 6,400,320 B1 | Antenna Selection Method for a Wireless Location System | 06/4/02 | US |
| 6,492,944 B1 | Internal Calibration Method for Receiver System of a Wireless Location System | 12/10/02 | US |
| 4,728,959 | Direction Finding Localization System | 03/01/88 | US |
| 6,127,975 | Communications Localization System | 10/03/00 | US |
| 6,288,675 B1 | Single Station Communications Localization System | 09/11/01 | US |
| 6,119,013 | Enhanced Time-Difference Localization System | 09/12/00 | US |
| 6,108,555 | Enhanced Time-Difference Localization System | 08/22/00 | US |

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

| PATENT NO. | TITLE | ISSUE DATE | COUNTRY |
|---|---|---|---|
| 6,047,192 | Robust, Efficient, Localization System | 04/04/00 | US |
| 6,546,256 B1 | Robust, Efficient, Location-Related System | 04/08/03 | US |
| 6,101,178 | Pseudolite-Augmented GPS for Wireless Telephones | 08/08/00 | US |
| 6,288,676 B1 | Apparatus and Method for Single Station Communications Localization | 09/11/01 | US |
| 6,366,241 B1 | Enhanced Determination of Position-Dependant Signal Characteristics of a Wireless Transmitter | 04/02/02 | US |
| 6,483,460 B2 | Baseline Selection Method for Use in a Wireless Location System | 11/19/02 | US |
| 6,563,460 B2 | Collision Recovery in a Wireless Location System | 05/13/03 | US |
| 6,646,604 B2 | Automatic Synchronous Tuning of Narrowband Receivers of a Wireless Location System for Voice/Traffic Channel Tracking | 11/11/03 | US |
| 6,603,428 B2 | Multiple Pass Location Processing | 08/05/03 | US |
| 6,661,379 B2 | Antenna Selection Method for a Wireless Location System | 12/09/03 | US |
| 6,334,059 B1 | Modified transmission method for improving accuracy for e-911 calls | 12/25/01 | US |
| 6,463,290 B1 | Mobile-assisted network based techniques for improving accuracy of wireless location system | 10/08/02 | US |
| 6,519,465 B2 | Modified transmission method for improving accuracy for E-911 calls | 02/11/03 | US |
| 95196005.9 | Communications Location System | 02/26/03 | China |
| 0789847 | Communications Location System | 03/05/03 | France |
| 0789847 | Communications Location System | 03/05/03 | Great Britain |
| 695298356-08 | Communications Location System | 03/05/03 | Germany |
| 0789847 | Communications Location System | 03/05/03 | Italy |
| 505953 | Communications Localization System | 10/6/03 | New Zealand |
| 0789847 | Communications Location System | 03/05/03 | Sweden |
| 757840 | Communications Localization System | 12/20/02 | Australia |
| 1048179 | Communications Localization System | 11/02/00 | EP |

-2-

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035423

A65

| PATENT NO. | TITLE | ISSUE DATE | COUNTRY |
|---|---|---|---|
| 137291 | Communications Localization System | 01/16/98 | Israel |
| 98/0330 | Robust, Efficient, Localization System | 11/25/98 | South Africa |
| 139796 | Robust, Efficient, Localization System | 08/11/01 | Taiwan |
| 2,363,293 | Calibration for Wireless Location System | 09/03/03 | Great Britain |
| GB 2362072 | Bandwidth Synthesis for Wireless Location System | 03/12/03 | Great Britain |
| GB2362530 | Method for Improving the Accuracy of a Wireless Location System | 10/08/03 | Great Britain |
| GB2387084 | Calibration for Wireless Location System | 12/10/03 | Great Britain |
| 98813131.5 | Communications Localization System | 1/2/04 | China |

## PENDING APPLICATIONS

| SERIAL NO. | FILING DATE | COUNTRY |
|---|---|---|
| 09/909,221 | 07/18/01 | US |
| 09/908,998 | 07/18/01 | US |
| 10/217,782 | 08/13/02 | US |
| 10/154,176 | 05/21/02 | US |
| 10/234,363 | 09/03/02 | US |
| 10/347,471 | 01/17/03 | US |
| 10/414,982 | 04/15/03 | US |
| 10/748,367 | 12/30/03 | US |
| N/A | 1/29/04 | US |
| 99/911490.3 | 03/22/99 | EP |
| 2,204,125 | 11/03/95 | Canada |
| 973201 | 11/03/95 | Mexico |
| 8-515416 | 11/03/95 | Japan |
| PI9714938.1 | 12/23/97 | Brazil |
| 2,316,170 | 12/23/97 | Canada |
| 97182490.8 | 12/23/97 | China |
| 97952638.1 | 12/23/97 | EP |
| 01100162.1 | 01/08/97 | Hong Kong |
| 136934 | 12/23/97 | Israel |
| 2000-590,453 | 12/23/97 | Japan |

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035424

A66

| SERIAL NO. | FILING DATE | COUNTRY |
|---|---|---|
| 006301 | 12/23/97 | Mexico |
| PI9814250-0 | 01/16/98 | Brazil |
| 2,317,414 | 01/16/98 | Canada |
| 01100163.0 | 01/08/01 | Hong Kong |
| 2000-593,879 | 01/16/98 | Japan |
| 006951 | 01/16/98 | Mexico |
| PCT/US01/09078 | 03/22/01 | PCT |
| PI 9917166.0 | 12/13/99 | Brazil |
| 2,359,797 | 12/13/99 | Canada |
| 99815519.5 | 12/13/99 | China |
| 99967282.7 | 12/13/99 | EP |
| 144134 | 12/13/99 | Israel |
| 10-2001-7008675 | 12/13/99 | South Korea |
| 2001-006908 | 12/13/99 | Mexico |
| PI-9917164.3 | 12/13/99 | Brazil |
| 2,360,130 | 12/13/99 | Canada |
| 99815517.9 | 12/13/99 | China |
| 99965230.8 | 12/13/99 | EP |
| 144133 | 12/13/99 | Israel |
| 10-2001-7008669 | 12/13/99 | South Korea |
| 2001-006907 | 12/13/99 | Mexico |
| PI 9917165-1 | 12/13/99 | Brazil |
| 2,360,136 | 12/13/99 | Canada |
| 99815520.9 | 12/13/99 | China |
| 99965231.6 | 12/13/99 | EP |
| 144132 | 12/13/99 | Israel |
| 10-2001-7008666 | 12/13/99 | South Korea |
| 2001-006906 | 12/13/99 | Mexico |
| PCT/US02/00754 | 01/10/02 | PCT |
| PCT/US02/22390 | 07/15/02 | PCT |
| PI 0107538-1 | 03/22/01 | Brazil |
| 2,403,039 | 03/22/01 | Canada |
| 01 8 07674.2 | 03/22/01 | China |
| 01918894.5 | 03/22/01 | EP |
| 0222646.2 | 03/22/01 | Great Britain |
| 151754 | 03/22/01 | Israel |
| 10-2002-7013100 | 03/22/01 | South Korea |
| S/N 2002-009450 | 03/22/01 | Mexico |
| PCT/US03/08896 | 03/21/03 | PCT |
| PI0114518-5 | 06/27/01 | Brazil |
| 2,423,913 | 06/27/01 | Canada |
| 01816789.6 | 06/27/01 | China |

-4-

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035425

| SERIAL NO. | FILING DATE | COUNTRY |
|---|---|---|
| 01948807.1 | 06/27/01 | EP |
| 0307730.2 | 06/27/01 | Great Britain |
| 154972 | 06/27/01 | Israel |
| 2002-533578 | 06/27/01 | Japan |
| 10-2003-7004794 | 06/27/01 | Korea |
| 2003-002810 | 06/27/01 | Mexico |
| PCT/US03/25168 | 08/11/03 | PCT |
| N/A | 01/10/02 | Brazil |
| N/A | 01/10/02 | Canada |
| N/A | 01/10/02 | China |
| N/A | 01/10/02 | EP |
| N/A | 01/10/02 | Great Britain |
| N/A | 01/10/02 | Israel |
| N/A | 01/10/02 | Japan |
| 10-2004-7000688 | 01/10/02 | South Korea |
| N/A | 01/10/02 | Mexico |
| N/A | 07/15/02 | Brazil |
| N/A | 07/15/02 | Canada |
| N/A | 07/15/02 | China |
| N/A | 07/15/02 | EP |
| N/A | 07/15/02 | Great Britain |
| N/A | 07/15/02 | Israel |
| N/A | 07/15/02 | Japan |
| 10-2004-7000689 | 07/15/02 | South Korea |
| N/A | 07/15/02 | Mexico |

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035426

A68

# EXHIBIT C

## ISSUED PATENTS

| PATENT NO. | TITLE | ISSUE DATE | COUNTRY |
|---|---|---|---|
| 4,888,593 | Time Difference of Arrival Geolocation Method | 12/19/89 | US |
| 5,317,323 | Passive High Accuracy Geolocation System and Method | 05/31/94 | US |
| 5,465,289 | Cellular Based Traffic Sensor System | 11/07/95 | US |
| 5,559,864 | Cellular Based Traffic Sensor System | 09/24/96 | US |
| 6,233,459 | System for Providing Geolocation of a Mobile Transceiver | 05/15/01 | US |
| 6,665,332 | CDMA Geolocation System | 12/16/03 | US |

WSH\08266.1

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035427

A69

## PENDING APPLICATIONS

| SERIAL NO. | FILING DATE | COUNTRY |
|---|---|---|
| 10/230,333 | 08/29/02 | US |
| 10/739,023 | 12/19/03 | US |
| 10/004,449 | 12/06/01 | US |
| 10/011,783 | 12/11/01 | US |
| 09/971,680 | 10/09/01 | US |
| 10/046,284 | 01/16/02 | US |
| PCT/US03/26972 | 08/28/03 | PCT |
| PCT/US03/34147 | 10/27/03 | PCT |
| PCT/US03/32583 | 10/16/03 | PCT |
| PCT/US03/17470 | 06/04/03 | PCT |
| PCT/US03/32584 | 10/16/03 | PCT |
| PCT/US03/32578 | 10/16/03 | PCT |
| PCT/US03/32580 | 10/16/03 | PCT |
| PCT/US03/32579 | 10/16/03 | PCT |

WSH\08266.1

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035428

**A70**



PHILADELPHIA
One Liberty Place, 46th Floor
Philadelphia, PA 19103
215-568-3100
Fax: 215-568-3439
SEATTLE
999 Third Avenue, Suite 1606
Seattle, WA 98104
206-332-1360
Fax: 206-624-7317

PAUL B. MILCETIC
PHILADELPHIA OFFICE
215-988-2069
milcetic@woodcock.com

September 30, 2005

<u>**VIA FACSIMILE 708-873-2571**</u>

James F. Petelle, Esq.
Vice President, Law & Secretary
Andrew Corporation
10500 West 153rd Street
Orland Park, IL 60462

      Re:   **STC RFP ID: GSME7 VAS&IN Location-Based Services and U.S. 5,327,144**

Mr. Petelle:

      As you are aware, we represent TruePosition, Inc. in intellectual property matters. It has come to TruePosition's attention that Andrew has responded to STC RFP ID: GSME7 VAS&IN Location-Based Services (LBS) (the "RFP").

      Certain requirements set forth in the RFP contemplate products that may be within the scope of the claims of TruePosition's U.S. Patent No. 5,327,144 (the "144 Patent"). In particular, certain of the RFP's requirements contemplate use of cellular telephone location equipment to locate mobile telephones using reverse control channel signal data to implement TDOA (Time Difference of Arrival) location.

      TruePosition has not licensed the 144 Patent to Andrew, or anyone else. Further, TruePosition does not intend to grant a license to Andrew or any third-party vendor with respect to fulfillment of the RFP.

      TruePosition is concerned that Andrew is or may in the future be supplying geolocation equipment from the United States to Saudi Arabia or elsewhere in violation of its 144 Patent.

WOODCOCK WASHBURN LLP
A Partnership Including Professional Corporations
www.woodcock.com

PLAINTIFF'S
EXHIBIT
44
9/27/06 JC

A71

**WOODCOCK WASHBURN**

James F. Petelle, Esq.
September 30, 2005
Page 2

Such supply may constitute an unauthorized infringement under 35 U.S.C. §271(f)[1] and could result in substantial penalties and preclude Andrew's ability to fulfill certain requirements of the RFP. Thus, TruePosition asks that Andrew discontinue immediately any offer to supply equipment from the United States that will locate mobile telephones using reverse control channel signal data to implement the TDOA, and that Andrew inform TruePosition in writing that Andrew has done so.

Please give this matter your prompt attention. TruePosition looks forward to a response by October 7, 2005.

Respectfully,

Paul B. Milcetic

cc: Fred Beckley, Esq. (via facsimile and electronic mail)
    Eng. Khalid Bin Abdullah Al-Molhem, STC (via facsimile and electronic mail)
    Eng. Saud Bin Majid Al-Dowaish, STC (via facsimile and electronic mail)
    Chief Counsel, STC (via facsimile)

---

[1] That section of the Patent Statute reads as follows:

(f) (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

**A72**



**PHILADELPHIA**
One Liberty Place, 46th Floor
Philadelphia, PA 19103
215-568-3100
Fax: 215-568-3439
**SEATTLE**
999 Third Avenue, Suite 1606
Seattle, WA 98104
206-332-1380
Fax: 206-624-7317

PAUL B. MILCETIC
PHILADELPHIA OFFICE
215-988-2063
milcetic@woodcock.com

October 13, 2005

**VIA FACSIMILE 202-776-7801**

Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street
N.W., Suite 700
Washington, D.C. 20006-1608

     Re:    **STC RFP ID: GSME7 VAS&IN Location-Based Services and U.S. 5,327,144**

Dear Pat:

     We write to express our disappointment with Andrew's October 6 communication and to repeat TruePosition's request that Andrew provide written notification that it will terminate any offers to supply infringing equipment to STC.

     Your letter response of October 6 was disconcerting. In particular, Andrew has failed to assure TruePosition that it will discontinue any infringing acts, although Andrew was specifically requested to do so. Furthermore, while ignoring TruePosition's request for assurances of non-infringement, Andrew demands that TruePosition explain to Andrew the particulars of its own infringement. As you know, while Andrew knows the complete scope of its activities with its customers, including STC, TruePosition does not.

     Nevertheless, TruePosition has set forth in Attachment A its comparison between the inventions of Claims 22, 23, 25, 26, 28 and 30 of the 144 Patent, on the one hand, and Andrew's apparent or contemplated activities with STC, as indicated by the STC RFP, on the other. Other claims of the 144 Patent may be at issue as well. If you have any questions about the charts in Attachment A, please let me know.

     We trust that the charts in Attachment A address Andrew's concerns.

WOODCOCK WASHBURN LLP
A Partnership Including Professional Corporations
www.woodcock.com



EXHIBIT
90
9-29-06

**A73**



Patrick D. McPherson, Esq.
October 13, 2005
Page 2


Now please address TruePosition's concerns.  Please confirm, in writing, by October 18, that Andrew will discontinue any offer to supply equipment from the United States that will locate mobile telephones using reverse control channel signal data to implement TDOA.

Very Truly Yours,

Paul B. Milcetic

cc: Fred Beckley, Esq. (via facsimile and electronic mail)

**A74**



Patrick D. McPherson, Esq.
October 13, 2005
Page 3

## ATTACHMENT A

### Claim 22

| 22. A ground-based cellular telephone system serving a plurality of subscribers possessing mobile cellular telephones, comprising: | The RFP contemplates a ground-based cellular telephone system serving a plurality of subscribers possessing mobile cellular telephones.<br><br>*See, e.g.,* RFP §§ Title Page; 2.3.2; 2.7; 2.8; 13.1.1. |
| --- | --- |
| •   (a) at least three cell sites equipped to receive signals sent by multiple mobile cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels; | The RFP contemplates using at least three cell sites equipped to receive signals sent by multiple mobile cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels.<br><br>*See, e.g.,* RFP §§ 2.5.1; 2.5.3; 2.6.1; 2.6.2.4; 2.7.9; 2.7.13; 2.8; 20.1.4. |
| •   (b) locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions; and | The RFP contemplates locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions.<br><br>*See, e.g.,* RFP §§ 2.5.1; 2.5.3; 2.6.1; 2.6.2.4; 2.7.9; 2.7.13; 2.8; 20.1.4. |
| •   (c) database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations. | The RFP contemplates database means for storing location data identifying the cellular telephones and their respective locations, and for providing access top said database to subscribers at remote locations.<br><br>*See, e.g.,* RFP §§ 2.5.4; 2.7.4; 2.7.5; 2.7.6. |

### Claim 23

| 23. A ground-based cellular telephone system as recited in claim 22, further comprising means for providing location data to a specific one of said cellular telephones upon request by the specific telephone. | The RFP contemplates ground-based cellular telephone system comprising means for providing location data to a specific one of said cellular telephones upon request by the specific telephone.<br><br>*See, e.g.,* RFP § 2.75. |
| --- | --- |



Patrick D. McPherson, Esq.
October 13, 2005
Page 4

Claim 25

| 25. A ground-based cellular telephone system as recited in claim 22, further comprising means for transmitting a signal to a selected cellular telephone to cause said selected telephone to transmit a signal over a control channel. | The RFP contemplates a ground-based cellular telephone system comprising means for transmitting a signal to a selected cellular telephone to cause said selected telephone to transmit a signal over a control channel. *See, e.g.*, RFP §§ 2.7.4, 2.7.5, 2.7.6, 2.7.7. |
| --- | --- |

Claim 26

| 26. A ground-based cellular telephone system as recited in claim 22, further comprising means for automatically sending location information to a prescribed receiving station in response to receiving distress signal from a cellular telephone, whereby emergency assistance may be provided to a subscriber in distress. | The RFP contemplates a ground-based cellular telephone system comprising means for automatically sending location information to a prescribed receiving station in response to receiving distress signal from a cellular telephone, whereby emergency assistance may be provided to a subscriber in distress. *See, e.g.*, RFP § 2.53. |
| --- | --- |

Claim 28

| 28. A ground-based cellular telephone system as recited in claim 22, further comprising means for detecting a lack of signal transmissions by a given telephone and in response thereto automatically paging said given telephone to cause said given telephone to initiate a signal transmission. | The RFP contemplates a ground-based cellular telephone system comprising means for detecting a lack of signal transmissions by a given telephone and in response thereto automatically paging said given telephone to cause said given telephone to initiate a signal transmission. *See, e.g.*, RFP §§ 2.5.4; 2.7.4, 2.7.5, 2.7.6, 2.7.7. |
| --- | --- |

Claim 30

| 30. A ground-based cellular telephone system as recited in claim 22, further comprising means for continuously tracking a given telephone by receiving voice signals transmitted by said given telephone over a voice channel and determining the location of said given telephone on the basis of said voice signals. | The RFP contemplates a ground-based cellular telephone system comprising means for continuously tracking a given telephone by receiving voice signals transmitted by said given telephone over a voice channel and determining the location of said given telephone on the basis of said voice signals. *See, e.g.*, RFP § 2.7.13. |
| --- | --- |

**A76**



| Project Management | Technical Bodies | Delegates Corner | Project Support | Contact 3GPP | Quick |
| About 3GPP | Specifications | Membership | Meetings | Email Lists | FAQ |

| | Google Search |
| ☑ only search 3GPP site |

## About 3GPP

Conferences | Structure | Legal Issues | 3GPP Working Procedures

The 3rd Generation Partnership Project (3GPP) is a collaboration agreement that was established in December 1998. The collaboration agreement brings together a number of telecommunications standards bodies which are known as "Organizational Partners". The current Organizational Partners are ARIB, CCSA, ETSI, ATIS, TTA, and TTC.

The establishment of 3GPP was formalized in December 1998 by the signing of the "The 3rd Generation Partnership Project Agreement".

The original scope of 3GPP was to produce globally applicable Technical Specifications and Technical Reports for a 3rd Generation Mobile System based on evolved GSM core networks and the radio access technologies that they support (i.e., Universal Terrestrial Radio Access (UTRA) both Frequency Division Duplex (FDD) and Time Division Duplex (TDD) modes). The scope was subsequently amended to include the maintenance and development of the Global System for Mobile communication (GSM) Technical Specifications and Technical Reports including evolved radio access technologies (e.g. General Packet Radio Service (GPRS) and Enhanced Data rates for GSM Evolution (EDGE)).

The discussions that led to the signing of the 3GPP Agreement were recorded in a series of slides called the "Partnership Project Description" that describes the basic principles and ideas on which the project is based. The Partnership Project Description has not been maintained since it's first creation but the principles of operation of the project still remain valid.

In order to obtain a consolidated view of market requirements a second category of partnership was created within the project called "Market Representation Partners".

"Observer" status is also possible within 3GPP for those telecommunication standards bodies which have the potential to become Organizational Partners but which, for various reasons, have not yet done so.

A permanent project support group called the "Mobile Competence Centre (MCC)" has been established to ensure the efficient day to day running of 3GPP. The MCC is based at the ETSI headquarters in Sophia Antipolis, France.

If you require any further information, this may be obtained from "3GPP Contact"

Last update:
2006-04-24: link to Structure page corrected, link to obsolete TB Officials page deleted; direct link to zip file of Working Procedures removed
2004-04-13

**A77**

## Third Generation Partnership Project Agreement

Officially recognized Standardization Organizations have agreed to work collaboratively for the production of Third Generation Mobile System specifications. The means for this collaborative activity has been provided in the form of a Partnership Project. The Partners in the Partnership Project are signatories to this Third Generation Partnership Project Agreement, hereinafter referred to as the Agreement.

## CONSIDERING THAT:

- The Partners have agreed to co-operate in the production of globally applicable Technical Specifications and Technical Reports for a 3rd Generation Mobile System based on evolved GSM core networks and the radio access technologies that they support (i.e., Universal Terrestrial Radio Access (UTRA) both Frequency Division Duplex (FDD) and Time Division Duplex (TDD) modes).

- 3GPP is established for the preparation, approval, and maintenance of the above mentioned Technical Specifications and Technical Reports.

- 3GPP is not to be construed as a legal entity.

## FURTHER CONSIDERING THAT:

The 3GPP partnership is characterized by the following attributes:

- uses minimum production time for Technical Specifications and Technical Reports from conception to approval;

- uses fast, electronic based approval processes;

- makes maximum use of modern (electronic) working methods; and

- ensures that decision making takes place at the lowest appropriate levels.

## THE PARTNERS THEREFORE AGREE TO THE FOLLOWING:

## 1    DEFINITIONS

### 1.1    3GPP

The acronym "3GPP" shall mean the Third Generation Partnership Project.

### 1.2    Organizational Partner

An Organizational Partner is any open Standardization Organization, irrespective of geographical location, which has:

- a national, regional or other officially recognized status and the capability and authority to define, publish and set standards within the 3GPP scope, in that nation or region;

- committed itself to all or part of the 3GPP scope; and

- signed this Agreement.

A78

### 1.3     Market Representation Partner

A Market Representation Partner is any organization which has been invited by the Organizational Partners to take part in 3GPP, irrespective of geographical location, which:

- has the ability to offer advice to 3GPP and to bring into 3GPP a consensus view of market requirements (e.g., services, features and functionality) falling within the 3GPP scope;

- does not have the capability and authority to define, publish and set standards within the 3GPP scope, nationally or regionally;

- has committed itself to all or part of the 3GPP scope; and

- has signed this Agreement.

### 1.4     Partners

The term "Partners" shall be used in this Agreement to describe Organizational Partners and Market Representation Partners when referred to collectively.

## 2     GENERAL

### 2.1     Purpose of 3GPP

The purpose of 3GPP is to prepare, approve and maintain globally applicable Technical Specifications and Technical Reports for a 3rd Generation Mobile System based on the evolved GSM core networks, and the radio access technologies supported by the Partners (i.e., UTRA both FDD and TDD modes), to be transposed by the Organizational Partners into appropriate deliverables (e.g., standards).

### 2.2     Structure of 3GPP

3GPP shall consist of:

- A Project Co-ordination Group (PCG); and
- Technical Specification Groups (TSGs).

The Technical Specification Groups may establish Working Groups if required.

The Organizational Partners of 3GPP shall hold regular meetings.

The Organizational Partners may decide to call a meeting of the full 3GPP membership if required.

### 2.3     Scope and objectives of 3GPP

Initially, 3GPP shall prepare, approve and maintain the necessary set of Technical Specifications and Technical Reports for the first phase of a 3rd Generation Mobile System including:

- UTRAN (including UTRA, W-CDMA in Frequency Division Duplex (FDD) mode and TD-CDMA in Time Division Duplex (TDD) mode);

- 3GPP Core Network (Third Generation networking capabilities evolved from GSM. These capabilities include mobility management and global roaming);

- Terminals for access to the above (including specifications for a UIM); and

- System and service aspects.

**A79**

The Technical Specifications and Technical Reports shall be developed in view of global roaming and circulation of terminals.

The set of 3GPP Technical Specifications and Technical Reports for the first phase of the 3GPP core network and the specifications for the GSM core network should be common to the greatest extent possible and should not be unnecessarily different.

The results of the 3GPP work shall form the basis of member contributions to the ITU in accordance with existing procedures.

3GPP shall take account of emerging ITU recommendations on interworking between IMT-2000 family members.

In the framework of agreed relationships, the 3GPP Technical Specifications and Technical Reports will form the basis of standards, or parts of standards, of the Organizational Partners.

### 2.4    Additional documentation applicable to 3GPP

The following additional documentation form part of 3GPP:

- the Third Generation Partnership Project Description; and
- the Third Generation Partnership Project Working Procedures.

## 3    ORGANIZATIONAL PARTNERS

### 3.1    Undertakings of Organizational Partners.

The Organizational Partners shall undertake to:

- encourage their members to contribute to the common set of Technical Specifications and Technical Reports and to avoid duplication of work;

- convert / transpose / adopt all relevant Technical Specifications and Technical Reports resulting from 3GPP into their own relevant deliverables through their normal processes;

- identify as early as possible, any national / regional regulatory requirements that may lead to options within the Technical Specifications and Technical Reports;

- make their IPR Policy available for consideration by the other Organizational Partners;

- encourage that their IPR Policies are respected by their members (i.e., encourage their members to declare at the earliest opportunity any Intellectual Property Rights which they may have and believe to be essential, or potentially essential, to any ongoing work within 3GPP);

- encourage their respective members to declare their willingness to grant licences on fair, reasonable terms and conditions on a non discriminatory basis, and consistent with their IPR Policy; and

- contribute to the resources necessary for the operation of 3GPP.

**A80**

NH    3

**3.2      Rights of the Organizational Partners**

**3.2.1      Participation in the 3GPP work**

Organizational Partners have the right to participate in the work of the Project Co-ordination Group.

Organizational Partners have the right to participate in the work of the Technical Specification Groups.

Members of Organizational Partners (Individual Members) have the right to participate in the work of the Technical Specification Groups. They shall act in their own right and shall carry the full responsibility for their contributions.

**3.2.2      Joint Copyright**

The Organizational Partners shall jointly own copyright on the Technical Specifications and Technical Reports approved by 3GPP. For candidate Organizational Partners, their copyright on work already ongoing or completed within 3GPP shall be decided by the Organizational Partners on a case-by-case basis.

## 4      MARKET REPRESENTATION PARTNERS

**4.1      Undertakings of the Market Representation Partners**

The Market Representation Partners shall undertake to:

- commit themselves to the promotion of 3GPP;
- encourage their members to contribute to the common objectives of the 3GPP and to avoid duplication of work;
- offer advice to 3GPP and to bring into 3GPP a consensus view of market requirements (e.g., services, features and functionality) falling within the 3GPP scope; and
- define the 3GPP system and service scenarios;

**4.2      Rights of the Market Representation Partners**

**4.2.1      Participation in the 3GPP work**

Market Representation Partners have the right to participate in the work of the Project Co-ordination Group.

Market Representation Partners have the right to participate in the work of the Technical Specification Groups.

## 5      MODIFICATIONS

The present Agreement may only be modified by consensus agreement amongst the signatories. The signatories shall be given at least 30 days written notice of the proposed modifications. Any assignment of rights (e.g., participation, copyright ownership) under this Agreement shall be considered as a modification to this Agreement.

**A81**

**6     TERMINATION**

If a Partner desires to withdraw from 3GPP it shall give 6 months written notice.

**7     DURATION**

This Agreement shall remain valid until the Organizational Partners decide otherwise.

**8     DISSOLUTION**

In the event of a voluntary dissolution of 3GPP, the Organizational Partners shall determine the terms of dissolution by consensus. All issues shall be documented and distributed at least 30 days in advance of the agreement.

**9     DISPUTE SETTLEMENT**

In the event of a dispute arising between Partners, related to this Partnership Project, the Partners concerned shall use all means at their disposal to endeavour to resolve the dispute by internal arbitration and conciliation.

**10     ADDITIONAL PARTNERSHIPS**

Partnership in 3GPP, as defined in the definition section and in clauses 3 and 4 of the present Agreement, is open to organizations irrespective of their geographical location.

Any additional Partnership in 3GPP shall be approved, on a consensus basis, by the existing Organizational Partners.

The consensus decision from the Organizational Partners with the Name, Title, Organization, Address, Signature of the new Partner and the Date of signature shall be annexed to this Agreement.

Annexes shall be considered as an integral part of this Agreement.

**11     PARTICIPATION IN OTHER STANDARDIZATION ACTIVITIES**

Signatories to this Agreement shall not be excluded from participation in other partnership projects or other standardization activities.

**This Agreement is entered into by and between the following Organizational Partners:**

| ARIB | ETSI |
|---|---|
| Mr Hiroshi Furukawa<br>Senior Managing Director<br>ARIB<br>Association of Radio Industries and Businesses<br>Nittochi Building 14F, 1-4-1 Kasumigaseki<br>Chiyoda-ku, Tokyo 100-0013<br>JAPAN<br><br>Signature<br><br>*Hiroshi Furukawa*<br><br>Date  4 December 1998 | Mr Karl Heinz Rosenbrock<br>Director General<br>ETSI<br>European Telecommunication Standards Institute<br>650, route des lucioles<br>F-06921 Sophia Antipolis Cedex<br>FRANCE<br><br>Signature<br><br>*Karl Heinz Rosenbrock*<br><br>Date  4 December 1998 |
| **T1** | **TTA** |
| Dr Asok Chatterjee<br>Head of T1 3GPP delegation as authorized by Mr Gerald Peterson, Committee T1 Chairman<br>T1 Secretariat<br>1200 G Street<br>NW, Suite 500<br>Washington, DC<br>USA<br><br>Signature<br><br>*A Chatterjee*<br><br>Date  4 December 1998 | Dr Kyu-Jin Wee<br>Chairman SC-7<br>TTA<br>Telecommunications Technology Association<br>13th Floor Sejongro Daewoo Building<br>167 Naesoo-dong chongro<br>Seoul<br>KOREA<br><br>Signature<br><br>위 규 진<br><br>Date  4 December 1998 |
| **TTC** | |
| Mr Nobuhiro Horisaki<br>Executive Managing Director<br>TTC<br>Telecommunications Technology Committee<br>1-2-11, Hamamatsu-cho, Minato-ku,<br>Tokyo, 105-0013<br>JAPAN<br><br>Signature<br><br>Nob Horisaki<br><br>Date  4 December 1998 | |

Executed in 5 originals

*H. F.*

**A83**

**Annex 1**    **This Agreement is entered into by the following Market Representation Partner:**

UMTS Forum

Name:    *Thomas Beijer*

Title:    *Chairman*

Address:    *UMTS Forum*
*Russel Square House*
*10-12 Russel Square*
*London, WC1B 5EE        UK*

Signature

Date    *9*    December 1998

*Thomas Beijer*

Authorised by the existing Partners

| **ARIB** | **ETSI** |
|---|---|
| Mr Hiroshi Furukawa<br>Signature   *Hiroshi Furukawa*<br>Date   4 December 1998 | Mr Karl Heinz Rosenbrock<br>Signature   *Karl Heinz Rosenbrock*<br>Date   4 December 1998 |
| **T1** | **TTA** |
| Dr Asok Chatterjee<br>Signature   *A Chatterjee*<br>Date   4 December 1998 | Dr Kyu-Jin Wee<br>Signature   *위  규  진*<br>Date   4 December 1998 |
| **TTC** | |
| Mr Nobuhiro Horisaki<br>Signature   *Nob Horisaki*<br>Date   4 December 1998 | |

**A84**