IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TruePosition, Inc., | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | Civil Action No. 05-747-SLR |
| v. | ) | |
| | ) | |
| Andrew Corporation, | ) | |
| | ) | |
| Defendant/ | ) | |
| Counterclaim-Plaintiff. | ) | |

---

## APPENDIX C
## TO
## TRUEPOSITION'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT THAT ANDREW
## CANNOT PROVIDE ITS CLAIMS OF INVALIDITY
## C1-C24

CONNOLLY BOVE LODGE & HUTZ LLP
Francis DiGiovanni (# 3189)
James D. Heisman (# 2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 252-4208

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
David L. Marcus, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Cira Center, 12th Floor, 2929 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

# APPENDIX C

# TO

# TRUEPOSITION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT THAT ANDREW CANNOT PROVE ITS CLAIMS OF INVALIDITY

# C1 – C24

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

TruePosition, Inc.,      )
      )
     **Plaintiff/**    )
     **Counterclaim-Defendant,**  )
      )    **Civil Action No. 05-747-SLR**
     **v.**    )
      )
**Andrew Corporation,**  )
      )
     **Defendant/**    )
     **Counterclaim-Plaintiff.**  )
      )

### TRUEPOSITION'S RESPONSE TO
### ANDREW'S REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, TruePosition, Inc.,

hereby responds and objects to Andrew Corporation's Requests for Admission. TruePosition

reserves all objections to the competency, relevancy, materiality, or admissibility at trial of any

response to the propounded interrogatories, or to any document produced in response thereto,

and reserves the right to amend, modify, or supplement its responses or objections herein, or to

move for a protective order.

**C1**

68.    TruePosition never declared the `144 patent essential IPR to any ETSI or 3GPP specification or standard.

**RESPONSE:**

TruePosition objects to this request because the phrase "essential IPR" is undefined.

To the extent an answer is required, TruePosition admits that it has never asserted that that the 144 Patent is "Essential IPR" within the meaning of ETSI's IPR Policy, to ETSI, 3GPP or anyone else, and otherwise denies this request.

69.    TruePosition never declared the `144 patent to ETSI or 3GPP as essential IPR to the practice of U-TDOA.

**RESPONSE:**

TruePosition objects to this request because the phrase "essential IPR" is undefined.

To the extent an answer is required, TruePosition admits that it has never asserted that that the 144 Patent is "Essential IPR" within the meaning of ETSI's IPR Policy, to ETSI, 3GPP or anyone else, and otherwise denies this request.

70.    Exhibit E is a Japanese reference bearing reference number 3-239091 (the "Kono reference").

**RESPONSE:**

TruePosition admits that Andrew has attached as Exhibit E to these requests a copy of a document written in Japanese, and otherwise denies this request.

71.    Exhibit F is a true and correct English translation of Exhibit E.

**RESPONSE:**

Denied.

**C2**

72.    The Kono reference's Application Filing Date was February 16, 1990 (see Exhibit F).

**RESPONSE:**

Admitted.  For clarity, TruePosition avers that it does not agree that Exhibit F is an accurate English translation of Exhibit E.

73.    The Kono reference's Laid-Open Publication Date was October 24, 1991 (see Exhibit F).

**RESPONSE:**

Admitted.  For clarity, TruePosition avers that it does not agree that Exhibit F is accurate English translation of Exhibit E.

Dated:  October 30, 2006            */s/ Daniel J. Goettle*

Dale M. Heist (pro hac vice)
Paul B. Milcetic, Esq. (pro hac vice)
David L. Marcus, Esq. (pro hac vice)
Kathleen A. Milsark (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
**WOODCOCK WASHBURN LLP**
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100

Rudolf E. Hutz, Esq. (#484)
James D. Heisman, Esq. (#2746)
**CONNELLY BOVE LODGE & HUTZ LLP**
The Nemours Building
1007 North Orange St.
PO Box 2207
Wilmington, Delaware 19899
(302) 658-9141

*Attorneys for Plaintiff TruePosition, Inc.*

-24-

**C3**

## CERTIFICATE OF SERVICE

I, Daniel J. Goettle, hereby certify that on this 30th day of October, 2006, I served the

foregoing TruePosition's Response to Andrew's Requests for Admission:

### *Via Electronic Mail, Return Receipt Requested*

Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

Rachel Pernic Waldron
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

*/s/ Daniel J. Goettle*
Daniel J. Goettle

**C4**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TruePosition, Inc.                          )
                                            )
    Plaintiff/                          )
    Counterclaim-Defendant,             )          C.A. No. 05-747 (SLR)
                                            )
          v.                        )
                                            )
Andrew Corporation,                         )
                                            )
    Defendant/                          )
    Counterclaim-Plaintiff.             )
_____)

EXPERT REPORT OF BRIAN G. AGEE, PH.D., P.E.
RESPONSE TO DR. DAVID GOODMAN'S REPORT ON THE VALIDITY
OF U.S. PATENT NO. 5,327,144  [Corrected]

**C5**

tion, such that the majority of individuals with ordinary skill in the art in the disciplines listed above worked outside of the cellular telephone industry.

### 3.3    Opinions

As noted in Section 1, I disagree with Dr. Goodman's conclusion that Kono anticipates the asserted claims of the 144 Patent. In my expert opinion, Kono fails to teach one having ordinary skill in the art at the time of the invention, either expressly or inherently, numerous limitations in the asserted claims of the 144 Patent. My ultimate conclusion is the same under either of the parties proposed constructions of certain claim terms in the 144 Patent.

In addition, in my expert opinion, Kono is not enabling because its disclosure would not allow a person of ordinary skill in the art at the time the 144 Patent was filed to make and use the inventions in the asserted claims of the 144 Patent without undue experimentation, and with a reasonable expectation of having the systems and methods work. It is also my expert opinion that a person having ordinary skill in the art at the time the 144 Patent was filed could not make and use the system disclosed and described in Kono without undue experimentation, and with a reasonable expectation of having the system work. Moreover, in my expert opinion, Kono contains substantive deficiencies that would prevent it from providing usable position location information in any realistic cellular telephony use scenario.

Lastly, in my expert opinion, the prior art considered during the examination of the 144 patent teaches the same material disclosed in Kono, in much greater detail than Kono, and is therefore just as pertinent to the 144 patent as Kono, if not more pertinent. In particular, three of the patents considered during the 144 Patent prosecution, and one of the patents cited by the U.S. Patent Office in its Office Action during this Prosecution (the Sagey 618 Patent), teach every element of the subject matter disclosed in Kono.

The Sections and Tables below present my opinion in further detail. Section 3.3.1 states my conclusions regarding the relation of Kono to the asserted claims of the 144 Patent. Section 3.3.2 states my opinion of Kono's failure to enable and other deficiencies in Kono. Section 3.3.3 states my opinion of Kono being no more pertinent than the prior art considered during examination of the 144 Patent. Section 3.3.4 discusses other matters pertinent to my opinion.

### 3.3.1    Opinions Relating to Kono and the Asserted Claims of the 144 Patent

A summary of my conclusions regarding the deficiencies in Kono's teachings to one having ordinary skill in the art at the time of the claimed invention and the limitations in the asserted claims of the 144 Patent is provided in Table 3-1 through Table 3-5 below, for asserted Claim 1 (Table 3-1), 2 (Table 3-2), 22 (Table 3-3), 31 (Table 3-4) and 32 (Table 3-5) in the 144 Patent. My detailed opinions supporting these conclusions is provided in Subsection 3.3.1.1 through Subsection 1, for asserted Claim 1 (Subsection 3.3.1.1), 2 (Subsection 3.3.1.2), 22 (Subsection 3.3.1.3), 31 (Subsection 3.3.1.4), and 32 (Subsection 3.3.1.4) in the 144 Patent.

In forming my opinions, I am relying upon the separate Claim Constructions provided by Andrew on 22 November 2006 ("Andrew Claim Constructions"), and provided by TruePosition on 11 December 2006 ("TruePosition Claim Constructions"). Because these Claim Constructions are different, I provide a separate conclusion under each Claim Construction in these Tables. In cases where a specific Claim limitation is not defined by Andrew, but can be constructed from multiple Andrew Claim Constructions, I am assuming that limitation comprises all of those Claim Constructions, e.g., I interpret "reverse control channel" to be constructed from Andrew's Claim Constructions for "reverse" AND "control channel." In cases where neither Andrew nor TruePosition has proposed a Claim Construction, I provide an opinion based on the ordinary and customary meaning for each term. Lastly, in several instances, I disagree with Andrew's Claim Constructions, and/or find that they contain substantive ambiguities that I must resolve in order to make a conclusion about the element addressed by that Claim. A list of these disagreements and ambiguities, and of my interpretation of ambiguities, is provided in Subsection 3.3.4.1 (Table 3-7).

In forming my opinions, I am principally relying on TruePosition's translation of the original (Japanese language) version of the specification of Kono into English (TruePosition Kono Translation), and on the Lexis translation of the abstract of Kono into English (Kono Abstract Translation). This is because (a) I do not understand the Japanese language, in either its written or spoken form, and (b) Andrew's translation of Kono possesses significant deficiencies, most notably in its failure to translate Kono's Figures into English. A listing of differences between these translations that I have currently recognized is provided in Subsection 3.3.4.2 below.

4

**C6**

| | | |
|---|---|---|
| | | a circuit to inform a user at the receiving end that a message is to be sent. *[citations omitted]* |
| | | Using this definition, signaling information is interpreted here as control information that is provided by the telecommunications network, to set up and manage the network, inform user receiver that a message is to be sent, or otherwise control communications of the network. |
| Time stamp bit | Time stamp represent-ing the exact time the frame of data was cre-ated. | **Disagreement:**  The ordinary and customary meaning of this phrase does not include any time of creation limitation; it is simply information indicating a point or points in time that is or are relevant to a particular application.  In the case of the 144 Patent, the claim language immedi-ately following this phrase expressly addresses what point in time the time stamp bits represent.  Thus, there is no need to add a time of creation limitation to this phrase, and doing so renders the claim redun-dant and confusing. |
| | | **Ambiguity:**  The term "created" is not defined.  In particular, since the "frame of data" referred to here contains both data bits and time stamp bits, the "exact time the frame of data was created" could be anywhere from when the data bits within the "frame of data" were created by sampling the received cellular telephone signal, to when the time stamp bits were combined with those data bits to create the final frame of data. |
| | | **Interpretation:**  The "exact time the 'frame of data' was created" is interpreted here to be the exact time that the received cellular tele-phone signal was sampled to create the data bits contained within the "frame of data." |
| Initiating | Causing   or   bringing about | **Disagreement:**  In my expert opinion, there is no special technical meaning for "initiating," "causing," or "bringing about" that a person of ordinary skill in the art might be familiar with; in particular, none of these terms are defined in FS-1037C, and the term "initiating" is never specifically defined in the 144 patent.  I see no justification for replacing a word that employed with its ordinary and customary usage in the 144 patent, with another word or phrase that has ordinary and customary usages that may be potentially different in some contexts. |
| | | **Ambiguity:**  Both "causing" and "bringing about" have differing ordinary and common usages in differing contexts. |
| Timing signal | Signal that is provided to all cell sites to gener-ate a time stamp for each frame of data. | **Disagreement:**  In the 144 Patent claims each cell site possesses a timing signal *receiver*, which provides time stamp bits representing the time at which cellular telephone signals are received.  In the preferred embodiment of the 144 patent, and in Claim 2 of the 144 patent, the timing signal receiver is a GPS receiver, which processes *multiple* GPS emissions (signals generated external to the cellular telephone net-work, from multiple global positioning system satellites) to generate time stamp bits *independently* at each base station. |

### 3.3.4.2  Identified Deficiencies in the Andrew Kono Translation

In my consideration of the Andrew Kono Translation, I encountered a number of differences between the Andrew and True-Position translation.  A partial list of these differences is summarized as follows.

- Failure to provide translations of the Figures.  This, of course, was the key factor in my decision to principally rely on the TruePosition translation rather than the Andrew translation in my formulation of this report.

**C7**

- Use of term "shared" (Andrew) versus "common" (TruePosition) channels for transmission on position location signals

- Use of term "Solving" (Andrew) versus "Resolved" (TruePosition).

- Use of term "shared channels allotted jointly to the base station" (Andrew) versus "commonly allocated common channel" (TruePosition). Note, the TruePosition interpretation sounds much more like a description of an air interface.

- A key sentence in Kono reads:

   "The mobile equipment 5 stands by to receive the signal with strongest electrical field from among the radiated position locating call signals radiated by the base station 3a, using the control channel, and when this position location call signal is received, it immediately transmits a response signal switching to a shared channel and emitting a position locating signal which is a burst digital signal."

in Andrew's translation, and reads:

   "From among the calls for position location for the mobile unit 5, while standing by on the control channel having the strongest electrical field, which is that from base transceiver station 3a, it immediately transmits a response and switches to the common channel and transmits a position location signal in the form of a digital burst signal."

in TruePosition's translation. The TruePosition translation implies that *two* responses are sent from the mobile: a response to the base station's request for a position location signal, followed by the position location signal itself. I interpreted this first response to be an acknowledgement of the request, which is typically performed on a reverse link control channel, which underscored the point that the system *has* a reverse link control channel that is *not* the common channel used for transmission of the position location signals. In contrast, Andrew's translation implies that a *single* signal is sent: the position location signal.

### 3.3.4.3  Other Disagreements with the 144 Patent Invalidity Report

I disagree with the following additional assertions in Dr. Goodman's 144 Patent Invalidity Expert Report, in addition to those disagreements provided in the previous Sections.

Goodman characterizes AMPS, IS-54, and IS-95 as familiar to persons skilled in the art in 1993. I disagree with this assertion, based on my definition of one skilled in the art in 1993. I would instead say that information on these signals was available in 1993, and could be accessed and learned by persons of ordinary skill in the art.

Discussion of the meaning of "analog control channels" is completely irrelevant. The 144 patent clearly and obviously teaches means for exploiting both analog and digital control channels, specifically refers to digital 10 kbps Manchester encoded channels (used in AMPS reverse control channels, as Goodman shows in Figure 3.10, pg. 9 of his own report), and devotes an entire section (Section 2, column 14, line 45, through column 16, line 2, and Figure 7A) to exploitation of digital reverse control channels. Moreover, the preferred embodiment taught in Figure 6 would work with analog or digital signals. Lastly, the Claims do not refer to digital or analog nature of reverse link control channels

02 January 2007
_____
Dated

_____
Brian G. Agee, Ph.D., P.E.

26

**C8**

Brian G. Agee, Ph.D.    January 24, 2007

Page 2

1    Videotaped Deposition of BRIAN G. AGEE, Ph.D.,
2  P.E., held at the Offices of:
3
4
5
6        WOODCOCK WASHBURN, LLP
7          Cira Centre, 12th Floor
8            2929 Arch Street
9        Philadelphia, Pennsylvania, 19104
10           215-568-3100
11
12
13
14    Pursuant to Notice, before Debra A. Whitehead,
15  an Approved Reporter of the United States District
16  Court and Notary Public.
17
18
19
20
21
22
23
24
25

Page 4

1       CONTENTS
2  EXAMINATION OF BRIAN G. AGEE, Ph.D., P.E.     PAGE
3    By Mr. Parks........................    6
4    By Mr. Marcus........................   169
5
6
7       EXHIBITS
8       (Attached)
9  AGEE EXHIBITS                PAGE

10  1  December Expert Report of Dr. Agee       7
11  2  January Expert Report of Dr. Agee        7
12  3  Kono fails to Disclose of Teach Means for
       Processing Said Data Frames From Cell Site
13     Systems, to Generate a Table         29
14  4  U.S. Patent No. 5,327,144          43
15  5  Handwritten notes of Dr. Agee        111
16  6  Preliminary Claim Construction as of
       November 22, 2006            148
17
     7  TruePosition's Cumulative Identification
18      of Claim Terms and Proposed Constructions   148
19        - - -
20
21
22
23
24
25

Page 3

1     A P P E A R A N C E S
2
3
4  FOR THE PLAINTIFF:
5    WOODCOCK WASHBURN, LLP
6    BY: DAVID L. MARCUS, ESQUIRE
7    Cira Centre, 12th Floor
8    2929 Arch Street
9    Philadelphia, Pennsylvania 19104
10   (215) 564-3100
11
12
13
14  FOR THE DEFENDANT:
15    KIRKLAND & ELLIS, LLP
16    BY: MICHAEL A. PARKS, ESQUIRE
17      RACHEL PERNIC WALDRON, ESQUIRE
18    200 East Randolph Drive
19    Chicago, Illinois 60601
20    (312) 861-2000
21
22        - - -
23
24  ALSO PRESENT:
25    CHRIS WEISS, Video Specialist

Page 5

1
2      VIDEO SPECIALIST:  Here begins Videotape
3  No. 1 of the deposition of Brian G. Agee, Ph.D., P.E.,
4  In the matter of TruePosition, Inc., versus Andrew
5  Corporation; In the United States District Court, for
6  the District of Delaware; Case No. 05-747 (SLR).
7      Today's date is Wednesday, January 24,
8  2007.  The time on the video monitor is 8:20 a.m.  The
9  video operator today is Chris Weiss.  The video
10  deposition is taking place at Woodcock Washburn, 2929
11  Arch Street, Philadelphia, PA.
12      Will the attorneys please identify
13  themselves, for the record.
14      MR. PARKS:  Michael Parks, Kirkland &
15  Ellis, for Andrew Corporation.
16      MS. WALDRON:  Rachel Pernic Waldron of
17  Kirkland & Ellis, for Andrew Corporation.
18      MR. MARCUS:  David Marcus of Woodcock
19  Washburn, for TruePosition.
20      VIDEO SPECIALIST:  The court reporter today
21  is Debra Whitehead of Merrill Legal Solutions, also
22  known as LegaLink, Inc.
23      Would the reporter please administer the
24  oath.
25      BRIAN G. AGEE, Ph.D., P.E., having been

2 (Pages 2 to 5)

071d12b8-ba02-4b38-8165-5a02f8f3b

Brian G. Agee, Ph.D.   January 24, 2007

Page 18

1    A  Excuse me.
2    Q  -- it actually is signed on January 2, but
3  was submitted to us on January 3.
4        So if I refer to Agee Exhibit 2 as your
5  January 2 report, will you understand what I mean and
6  would that be okay with you?
7    A  Yes.
8    Q  Do your December 22 and January 2 reports
9  reflect all of your opinions in this case regarding
10 Kono and the '144 patent?
11   A  No.
12   Q  Did you intentionally leave any of your
13 opinions regarding Kono or the '144 patent out of your
14 report?
15   A  No.
16   Q  What opinions regarding Kono or the '144
17 patent do you have that are not expressed in your
18 expert reports?
19   A  Probably two additional opinions.
20   Q  What are those two additional opinions?
21   A  The first is fairly minor.  In one of the
22 sections on the Kono not being -- in the section on
23 Kono not being enabling, I made one assertion which
24 does not change my ultimate opinion; and, in fact,
25 doesn't change my ultimate opinion on that point.

Page 19

1        But I made one assertion that I had -- I
2  felt I needed to do more analysis on.  And, so, I did
3  an estimation analysis and realized that it was
4  technically incorrect.  So there's one paragraph in
5  that that I don't feel is true anymore and I want to
6  remove.
7        And then in the section relating to Claim
8  1, one aspect of the legal terminology that I
9  wasn't -- that I wasn't made familiar with was the
10 concept of equivalence, and the principle of
11 equivalence.
12       And since the January report was submitted,
13 I was made familiar with the concept of equivalence;
14 and, it caused me to change, again, not my ultimate
15 opinion or my opinion on this point, but it caused me
16 to change my argument and my reasons for that opinion
17 for one of the elements of my opinion that Claim 1 is
18 not anticipated by Kono.
19   Q  Which element are you referring to?
20   A  May I refer to my report?
21   Q  You can refer to anything you like, Dr.
22 Agee.
23   A  Okay.
24       In regard the January 2 report, I also have
25 a color copy of that report.  I'd like to refer to

Page 20

1  that.
2    Q  That's fine.
3    A  Okay.
4    So on Page 13 of the January 3 report -- I
5  apologize; I may call this the January 2 or the
6  January 3 report from time to time -- stating -- with
7  a subsection stating, "Kono fails to disclose or teach
8  means for processing said data frames from cell site
9  systems, to generate a table."
10   Q  That's the element?
11   A  Yes.
12   Q  And how has your opinion regarding that
13 element changed?
14   A  Again, my ultimate opinion regarding that
15 element has not changed.  But, once I was familiarized
16 with the principle of equivalence, I needed to go back
17 through that element and interpret both
18 Stilps and Kono in the light of the principle of
19 equivalence.
20       So, I reformulated a new opinion based on
21 that.
22   Q  What prompted you to formulate a new
23 opinion regarding the means for processing limitation
24 in Claim 1 of the '144 patent?
25       MR. MARCUS:  Objection.  Asked and

Page 21

1  answered.
2    A  I'm sorry, could you repeat the question?
3    Q  Sure.  What prompted you to change your
4  opinion regarding the means for processing limitation
5  in Claim 1 of the '144 patent?
6        MR. MARCUS:  Same objection.
7    A  Yeah, again, I did not change my opinion
8  of -- of this element of the '144 patent.
9    Q  You testified that you -- you learned of
10 equivalence subsequent to submitting your January
11 report; correct?
12   A  Could you repeat the question?
13   Q  Sure.  You testified that, after submitting
14 your January report, you then learned of equivalence;
15 is that right?
16   A  That is correct.
17   Q  How did you come to learn of equivalence
18 after submitting your January report?
19   A  David Marcus informed me that he had
20 neglected to inform me of the principle of equivalence
21 and then told me what that was.
22   Q  What did he tell -- what did Mr. Marcus
23 tell you regarding the principle of equivalence?
24   A  Roughly -- and this is in my terms as an
25 engineer, not as a lawyer, so I'm not going to

6  (Pages 18 to 21)

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.    January 24, 2007

**Page 22**

1  guarantee that I got this a hundred percent right --
2  but the gist of it was that two structures which
3  perform equivalent -- which perform an equivalent
4  function are equivalent under a means plus -- a means
5  plus structure claims construction.
6  So if -- if a function can be performed
7  using two different structures, then -- and using two
8  different structures, then you have to assume that
9  they're the same from an anticipation viewpoint.
10  And I think at this point I just diverged
11  from my legal knowledge into some legal -- from my --
12  I think I just -- I think I just overran my legal
13  knowledge.
14  So, from my viewpoint, if two structures
15  were equivalent, then I had to -- two structures were
16  equivalent, then I had to consider them. And I had
17  not been considering them, when I wrote my initial
18  opinion.
19  Q  Did Mr. Marcus tell you anything else about
20  equivalence?
21  A  Not that I can recall.
22  Q  When did you have this conversation with
23  Mr. Marcus regarding equivalence?
24  A  We had an initial conversation about a week
25  before I came out here, where he said that we were

**Page 23**

1  going to have to talk about it, because he had
2  forgotten to take me through that.
3  And then when I got here, we sat down and
4  he took me through that. So I'm going to say Monday
5  of this week.
6  Q  Is it fair to say that Mr. Marcus initiated
7  the conversation with you regarding equivalence?
8  A  Yes.
9  Q  And Marcus initiated that conversation
10  with you regarding equivalence this week that we're
11  currently in; correct?
12  MR. MARCUS: Objection. Mischaracterizes
13  his prior testimony.
14  MR. PARKS: Let me reask the question.
15  BY MR. PARKS:
16  Q  What day exactly did Mr. Marcus initiate
17  this conversation with you regarding equivalence?
18  A  I can't recall what day the initial
19  telephone call came; it was -- it was a 30-second
20  phone call where he just said, "We're going to have to
21  talk about this when you -- when you come out here to
22  make sure you understand it."
23  Q  And when you say, when you came out here,
24  what day are you referring to when you came out here?
25  A  Excuse me. He -- when -- I should have

**Page 24**

1  said, "We're going to have to talk about this when you
2  visit our office." So, to answer your question, I
3  flew out on Sunday.
4  Q  Did you and Mr. Marcus have an in-person
5  conversation regarding equivalence?
6  A  Yes.
7  Q  When did you and Marcus -- when did you and
8  Mr. Marcus have an in-person conversation regarding
9  equivalence?
10  A  On Monday.
11  Q  Monday, January 22, 2007; correct?
12  A  Yes.
13  Q  What did you and Mr. Marcus discuss
14  regarding equivalence in your January 22, 2007,
15  conversation?
16  MR. MARCUS: Objection. Asked and
17  answered.
18  A  Mr. Marcus took me through a high-level
19  definition of equivalence and, if I recall, gave me
20  some simple examples; something like a handle -- a
21  bicycle with a handle bar of two different colors, or
22  something like that. I can't recall the exact -- the
23  exact analogy that he used.
24  And then -- and then asked me if I could
25  re -- if I could look through the report with the

**Page 25**

1  principle of equivalence in mind, look through my
2  report with the principle of equivalence in mind.
3  Q  Anything else?
4  A  I'm sorry. What do you mean by, "anything
5  else"?
6  Q  Did Mr. Marcus tell you anything else in
7  this conversation?
8  A  You mean did he impart any information to
9  me, besides the principle of equivalence?
10  Q  My question is, in addition to what you
11  have already testified that you and Mr. Marcus
12  discussed in the January 22, 2007, conversation, did
13  the two of you discuss anything else during that
14  conversation?
15  MR. MARCUS: Objection. Vague and
16  ambiguous.
17  A  Anything besides equivalence?
18  Q  Yes.
19  A  Oh. Well, yes.
20  Q  What else did you and Mr. Marcus discuss
21  during this January 22, 2007, conversation?
22  MR. MARCUS: I am just going to sort of --
23  you know, I know that everybody has given each other
24  some leeway, but we do have an agreement here in place
25  about communications with experts and --

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061 (312) 263-3524

**C11**

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

Page 26

1    MR. PARKS: I completely disagree that we
2  have an agreement of the kind that you are referring
3  to.
4    MR. MARCUS: I think it's in writing, and
5  we've already had a discussion about it.
6    I mean, I will give you some leeway. You
7  can ask some stuff. But I think if you go too far, I
8  am going to have to, you know, kind of ask that we
9  actually honor the agreement. So...
10 BY MR. PARKS:
11   Q  You can answer the question.
12   A  Okay. Could you repeat the question.
13   MR. PARKS: Could you read the question
14 back, please.
15   MR. MARCUS: So I guess just before you
16 read the question, I would like some clarification.
17   Are you saying you are not bound by any
18 agreements made by Andrew's prior counsel?
19   MR. PARKS: What I am telling you is that I
20 am not aware of any agreement in this case or anything
21 under the Federal Rules that allows you to communicate
22 as counsel with experts regarding changes and whatnot
23 to expert reports, and not have those discussed during
24 depositions.
25   MR. MARCUS: Well, I don't -- that, I

Page 27

1  wouldn't disagree with you with. But I think that
2  you're now going beyond that, is my point. And that's
3  what I think we have an agreement on, and I think you
4  are well aware of the letter. That's my only point.
5    MR. PARKS: Okay.
6    Could you read the question back, please.
7    (The reporter read the record as
8  requested.)
9    A  (Continued.) Okay. And I'm going to ask
10 you if you could clarify what you mean by what else
11 did we discuss.
12   Q  You testified that you and Mr. Marcus
13 discussed equivalence on January 22, 2007; correct?
14   A  Correct.
15   Q  In addition to equivalence, did you and Mr.
16 Marcus discuss anything else on January 22, 2007?
17   A  I believe all of our conversations involved
18 the concept of equivalence as it was applied to my
19 report.
20   Q  You testified that Mr. Marcus suggested
21 that you take a look at your report in light of your
22 conversation with him regarding equivalence; correct?
23   A  Correct.
24   Q  Did you in fact follow Mr. Marcus'
25 instruction and take another look at your report in

Page 28

1  light of your conversation with Mr. Marcus regarding
2  equivalence?
3    A  Yes.
4    Q  Did the other look you took at your report
5  in light of your conversation with Mr. Marcus
6  regarding equivalence cause you to change any aspect
7  of your analysis?
8    A  Yes.
9    Q  What aspect of your analysis was changed by
10 virtue of you looking at your report again, at Mr.
11 Marcus' instruction, after a conversation regarding
12 equivalence?
13   A  Again, on Page 13 of my report, the section
14 entitled "Kono fails to disclose or teach means for
15 processing said data frames from cell site systems, to
16 generate a table," the discussion of equivalence
17 caused me to change my analysis -- change the analysis
18 underlying this opinion.
19   Q  Do you now have a revised analysis
20 regarding the opinions set forth on Page 13 of your
21 January report?
22   A  Yes, I do.
23   Q  What is your revised analysis of the
24 opinions set forth on Page 13 of your January report
25 regarding Kono allegedly failing to disclose or teach

Page 29

1  means for processing said data frames from said cell
2  site systems?
3    A  May I refer to my documents here?
4    Q  Yes.
5    A  Okay.
6    So I developed a revised document, a
7  revised opinion -- a revised analysis for this
8  opinion, which I'd like to give you at this point.
9    THE WITNESS: You know, I think that was my
10 only copy.
11   MR. MARCUS: That's all right. I think I
12 have it.
13   MR. PARKS: Could you please mark this as
14 the next exhibit, please.
15   (Document marked for identification as Agee
16 Exhibit No. 3.)
17 BY MR. PARKS:
18   Q  Dr. Agee, you just handed me a three-page
19 document that's been marked as Exhibit 3.
20   The first page of this document has a
21 heading that says, "Kono fails to disclose and teach
22 means for processing said data frames from said" --
23 "from cell site systems, to generate a table";
24 correct?
25   A  Actually, it is a four-page document. But,

8  (Pages 26 to 29)

Brian G. Agee, Ph.D.   January 24, 2007

**Page 30**

1  yes, correct.
2      Q  Is it your testimony that the four-page
3  document that's been marked as Exhibit 3 replaces a
4  portion of either your December report or your January
5  report?
6      A  Yes; this replaces the equivalent section
7  in either report.
8      Q  What are the changes as compared with
9  what's been marked as Exhibit 3 and the analysis set
10  forth in your December and January reports?
11     A  The primary change is that, in my original
12  analysis, I was focusing primarily on the fact that
13  Kono taught the correlation operation at the base
14  stations.
15        They were performing the correlation
16  against a unique word in the position location signal
17  at the -- at the base stations.
18        Whereas, both Figure 6 and, as I was
19  interpreting it minus the principle of equivalence,
20  Figure 7 in the Andrew's and the TruePosition's claim
21  constructions were, in my opinion at that time,
22  teaching processing at the base -- at the central
23  site.
24        So at that point in time I was focusing on
25  that as the primary difference.  It was the first or

**Page 31**

1  second block in either of these figures.
2        If you looked at the first or second block
3  in either of the figures that were -- that were cited
4  in the Andrew's or the TruePosition claim
5  constructions, they immediately diverge from what Kono
6  was doing.  So, I was focusing on that.
7        Once I understood the principle of
8  equivalence, then it really had two consequences.  One
9  was that I felt, under the principle of equivalence,
10  that -- that it wasn't enough for me to make a
11  determination that Kono didn't anticipate based on the
12  fact it was -- it was processing at the base stations
13  because you could pull that processing into the
14  central site, you could pull that processing into the
15  central site.
16        And, because of that, I had to look deeper
17  into the figures in order -- and focus on the other
18  aspect of the -- of the -- of Kono and Stilps that was
19  differentiating.  So, I put more emphasis on that.
20        The other aspect being that Kono, it -- in
21  Kono, they correlate against the original unique word
22  that was transmitted within the position location
23  signal; whereas, in Stilps -- the '144 patent, excuse
24  me -- I may refer to it as "Stilps," rather than "the
25  '144 patent," from time to time.  In both cases I mean

**Page 32**

1  the same patent.
2        Whereas, Stilps either correlated against
3  the data that was received at the other cell sites or
4  correlated against what they called an ideal
5  reconstructed signal, the demodulated and remodulated
6  control channel signal, reverse control channel
7  signal, that was -- that was received on the strongest
8  base station.
9      Q  Was it Mr. Marcus who told you that the
10  processing could be moved from the base station to the
11  central site?
12     A  No.
13     Q  What is the basis for your more recent
14  understanding that -- strike that.
15        What's the basis for your most recent
16  opinion that the processing could be moved from the
17  base station to the central site?
18     A  Just to clarify, in -- in Stilps or Kono or
19  both?
20     Q  Both.
21     A  My reasoning for that is that -- is that
22  you get the same result if you perform the processing
23  at the central site or at the base station.  One, you
24  get the same result.
25        Two, the primary reason to do it one place

**Page 33**

1  or another that was cited in the -- in the
2  specification, which was cost, in the '144 patent is
3  not covered by the claims.
4        The claims are mute as to where the
5  processing occurs.
6      Q  When you and Mr. Marcus discussed
7  equivalence, did Mr. Marcus suggest to you that you
8  look at any particular limitation in your report in
9  light of your discussion regarding equivalence?
10     A  Yes.
11     Q  Which limitation did Mr. Marcus suggest you
12  look at following your discussion regarding
13  equivalence?
14     A  I'm sorry, I'm not sure what you mean by
15  the term "limitation."
16     Q  Claim element.
17     A  Oh, okay.
18        He asked me -- he didn't ask -- he asked me
19  to look at my report, not at the claim elements.
20     Q  Did Mr. Marcus identify any particular
21  claim element that he suggested you take a look at?
22     A  No.
23     Q  Did Mr. Marcus suggest any particular claim
24  for you to take a look at?
25     A  No.

MERRILL LEGAL SOLUTIONS
Tel:  (800) 868-0061  (312) 263-3524

C13

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

## Page 146

1  the same thing.
2      So, for instance, in this case "identifying
3  individual cellular telephone signals," and
4  "identifying the cellular telephones," the way you've
5  defined this, it's clear from the context that you
6  want these to be the same thing.
7      And in this case, I would agree, under this
8  definition. And I treated them as the same, when I
9  was developing my claim construction.
10     Q  So it's correct to say that the database
11 claimed in Claim 32 of the '144 patent must identify
12 the actual cellular telephones themselves that are
13 being located; correct?
14     MR. MARCUS: Objection. Vague and
15 confusing.
16     A  Why don't you repeat the question back to
17 me.
18     MR. PARKS: Could you read it back, please.
19 I'm sorry.
20     (The reporter read the record as
21 requested.)
22     MR. MARCUS: Same objection. I also think
23 it calls for a legal conclusion.
24     A  (Continued.) So I say that, under both
25 claims constructions, the database would need to

## Page 147

1  contain data identifying the cellular telephones,
2  either the cellular telephones or some number linked
3  only with that mobile cellular telephone, jumping in
4  between the two -- back and forth between the two
5  claim constructions.
6      Q  How do you interpret the word "subscribers"
7  in Claim 32 of the '144 patent?
8      A  As a comment, this isn't something I
9  considered when I was writing my report, so I'm giving
10 an answer that is off the cuff.
11     I would interpret it the same way that I
12 would interpret "subscribers" in -- in Element C of
13 Claim 22.
14     Q  Dr. Agee, if we could mark as the next two
15 exhibits the TruePosition claim construction and
16 Andrew claim construction that you have been referring
17 to as we've gone through that exercise.
18     MR. PARKS: And, actually, I know we have
19 been going for a while. If you -- I don't know how
20 close we are on the videotape. But if you would like
21 to take a break, we can take one now, or we can keep
22 going. It's up to you.
23     THE WITNESS: Why don't we take a short
24 break.
25     MR. MARCUS: Do you want to mark them

## Page 148

1  first?
2      MR. PARKS: Yes, let's mark them as the
3  next two exhibits, so we have them in the record.
4      (Documents marked for identification as
5  Agee Exhibits No. 6 and 7.)
6      (Discussion off the record.)
7      VIDEO SPECIALIST: This is the end of Tape
8  4 at 2:57.
9      Short recess.)
10     VIDEO SPECIALIST: We are on the record at
11 3:13. This is Tape 5 of Brian G. Agee's deposition.
12 BY MR. PARKS:
13     Q  Dr. Agee, is it your opinion that the Kono
14 reference teaches a command response approach for
15 location of a cellular phone occurs only after a
16 command to locate is sent from the cellular network?
17     A  So I guess I'll ask you to clarify that.
18     Q  Can you turn to Page 16 of your December
19 report. It is the one that's been marked as Agee
20 Exhibit 1.
21     A  Right. Oh, got it. Okay.
22     Q  And if I could direct your attention to
23 Subsection 3.3.1.3, where you're distinguishing the
24 Kono reference from the '144 patent claims.
25     And if you could read into the record the

## Page 149

1  first bullet point that appears under Section 3.3.1.3
2  of your December report.
3      A  Okay. "Kono fails to disclose or teach any
4  locating means for automatically determining the
5  locations of cellular telephones. Instead, it teaches
6  a command respond approach in which position location
7  only occurs after a command position location call is
8  sent from either the exchange office based on
9  unexplained criteria or the base transceiver station."
10     Q  And, so, my question, Dr. Agee, is, is it
11 your opinion that Kono teaches a command response
12 approach for location of a cellular phone occurs only
13 after a command to locate is sent from the cellular
14 network?
15     A  Yes, that's true.
16     Q  And in rendering the opinions expressed in
17 your December report, you were distinguishing the '144
18 patent from a system like Kono that locates a cellular
19 phone only after a command to locate is sent from the
20 cellular network; correct?
21     MR. MARCUS: I am going to object. That --
22 that is -- assumes facts not in evidence, somewhat
23 misleading.
24     A  No, that was not my opinion. This was an
25 error, that's why I took it out in the January report.

38 (Pages 146 to 149)

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

Page 150

1    Q  I want to focus on the opinions you had
2  when you submitted your December report, for the time
3  being. Okay?
4    A  Okay.
5    Q  When you submitted your December report,
6  isn't it correct to say that you were distinguishing
7  the '144 patent from a system like Kono that locates a
8  cellular phone only after receiving a command from the
9  cellular network to locate the phone?
10      MR. MARCUS: Objection. Asked and
11 answered, misstates his testimony.
12     A  Why don't you repeat the question again.
13      MR. PARKS: Could you read the question
14 back, please.
15      (The reporter read the record as
16 requested.)
17     A  (Continued.) No.
18     Q  What, then, was the purpose of including
19 the language that's set forth in the first bullet
20 point of Section 3.3.1.3 of your report that says
21 exactly what I just asked in my prior question?
22     A  At a point prior to submitting this report,
23 well prior to submitting this report, I was of the
24 opinion that you expressed.
25     Q  And what opinion is that?

Page 151

1    A  That -- that Kono -- that the fact that
2  Kono teaches a command respond approach to -- to do
3  its position location distinguishes it from the '144
4  patent.
5      I had -- actually, can I keep going?
6    Q  Please.
7    A  Okay. So I was of that opinion at an early
8  point in my analysis, and I abandoned that opinion
9  well before this report went out.
10     What happened was that, I simply failed to
11 take this terminology out of the report. It was a
12 simple error on my part. It should have been out of
13 the report when it was submitted in December.
14     Q  When did you, as you just testified,
15 abandon the opinion that's set forth in the first
16 bullet point under Section 3.3.1.3 of your December
17 report?
18     A  After I -- I abandoned that opinion after I
19 came to the realization that I was misunderstanding
20 the word "initialize" in the '144 patent.
21     Q  On what date did you come to the
22 understanding that you were misinterpreting the word
23 "initialize" in the '144 patent?
24     A  Oh, I have no idea. Maybe a week in, a
25 week into the analysis. I can't recall.

Page 152

1    Q  Do you recall what month?
2    A  Yes; it was in December.
3    Q  Was it after December 22?
4    A  No.
5    Q  Was it after December 15?
6    A  Possibly; probably.
7    Q  How did you, as you testified, come to the
8  realization that you made an error in your December
9  report by including the language in the first bullet
10 point under Section 3.3.1.3?
11     A  So you're asking the process by which I
12 came to that realization?
13     Q  I'm trying to find out, yeah, how -- you
14 testified that you made an error. How did the error
15 come to your attention?
16     A  The error came to my attention by
17 continually -- by my continuous rereading of the Stilp
18 patent and the patent wrapper.
19     Q  In terms of the language itself in your
20 report that appears in the first bullet point of your
21 December report under Section 3.3.1.3, did counsel for
22 TruePosition first suggest to you that you change that
23 language, that the language might be in error?
24     A  No.
25     Q  Was that a suggestion that you made on your

Page 153

1  own, independent of counsel for TruePosition?
2      MR. MARCUS: I am going to object. The
3  question is vague. I think -- I am having a hard time
4  understanding it.
5    A  I think it was. It's -- I think it was.
6      It certainly wasn't a position that -- that
7  I was -- that I was asked to take; that never -- no
8  conversations of that sort ever occurred.
9      That's all I'll say right now. That's all
10 I think I can say right now.
11     Q  Before submitting your January report in
12 which you deleted the language in the first bullet
13 point of Section 3.1.3 of your December report, did
14 you discuss with TruePosition's counsel deleting that
15 language?
16      MR. MARCUS: I'm just going to make an
17 objection. Just, you keep saying, "the bullet." I
18 don't think he deleted everything. But that's...
19     A  Okay. Can you read the question back to
20 me.
21      (The reporter read the record as
22 requested.)
23     A  (Continued.) No.
24     Q  After you submitted your December report,
25 did you read through your December report?

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061 (312) 263-3524

C15

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.    January 24, 2007

Page 154

1    A  No, I didn't.
2    Q  If you didn't read your December report
3  after submitting it, how did it come to your attention
4  that you, as you testified, made an error in the first
5  bullet point that appears under Section 3.3.1.3 of
6  your December report?
7    A  David Marcus called me up on January the
8  2nd and said, "Brian, I'm reading through your report,
9  and you made an error, I think.  Why don't you go take
10  a look at this and tell me if you agree."
11    Q  And how did you respond to Mr. Marcus'
12  statement?
13    A  I said, "I'll look at the report," and I
14  did.
15        And as soon as I saw this, I realized this
16  was an error and called him back and said, "I made a
17  mistake.  What should I do?"
18    Q  And how did Mr. Marcus respond?
19    A  He said, "Correct the mistake and send me a
20  corrected copy of the report."  I did; within a half
21  an hour gave him a corrected copy of the report, which
22  was then sent on to you.
23    Q  When you spoke with Mr. Marcus on January
24  2, did he suggest to you the alleged error in your
25  report under Section 3.3.1.3?

Page 155

1        MR. MARCUS:  I am going to object to the
2  phrasing of that as misleading and mischaracterizing
3  his testimony.  He didn't say it was an alleged error;
4  he said it was.
5    A  Yes, I stated it was an error.
6    Q  When you spoke with Mr. Marcus on January
7  2, did he suggest to you that you made an error in the
8  first bullet point under Section 3.3.1.3 of your
9  report?
10    A  I can't recall if he suggested to me that
11  he made an error or if he said, "Brian, you made an
12  error.  Go take a look at it."
13        It was a fairly -- it was fairly clearly an
14  error.  And -- and I -- and I could see that it was an
15  error as soon as I saw it.  So, I don't know if the
16  term -- if the term "suggestion" is relevant here.
17    Q  Prior to the January 2 conversation with
18  Mr. Marcus, is it fair to say that you did not believe
19  that you made an error in your report by including the
20  language that appears in the first bullet point under
21  Section 3.3.1.3 of your December report?
22        MR. MARCUS:  Objection.  Mischaracterizes
23  his testimony.
24    A  Prior to January 2, I was not aware that I
25  had made an error in my report.  I had not looked at

Page 156

1  my report since I turned it in on the 22nd of
2  December.
3    Q  Do you know who Louise Stilp is, Dr. Agee?
4    A  Yes.
5    Q  Who is Louise Stilp?
6    A  He is one of the inventors of the '144
7  patent.
8    Q  Have you ever spoken with Mr. Stilp?
9    A  No, I haven't.
10    Q  Do you know who Curtis Knight is?
11    A  Yes, I do.
12    Q  Who is Curtis Knight?
13    A  He is one of the inventors of the '144
14  patent.
15    Q  Have you ever spoken with Mr. Knight?
16    A  No, I have not.
17    Q  Who is John Webber?
18    A  Just make sure.
19        It is a trick question; right?
20    Q  Didn't mean for it to be a trick question.
21  I apologize.
22        Let me ask it this way:  John Webber is a
23  named inventor on the '144 patent; right?
24    A  That's correct.
25    Q  Have you ever spoken with Mr. Webber?

Page 157

1    A  No, I have not.
2    Q  Can you please turn to Page 10 of your
3  December report.
4        And I'll tell you what my question is, I
5  will give you a chance to read it.
6    A  Okay.
7    Q  The third paragraph from the bottom that
8  begins with, "From this passage" --
9    A  Okay.
10    Q  -- appears to be purporting to distinguish
11  the timing taught by Kono with the way GPS signals are
12  used in the '144 patent.
13        And my question is, can you explain to me
14  how the language you have in the third paragraph from
15  the bottom on Page 10 of your December report differs
16  from the way GPS signals are used in the '144 patent?
17        MR. MARCUS:  Can you read that whole thing
18  back to me.
19        (The reporter read the record as
20  requested.)
21        MR. MARCUS:  I object that that's a --
22  assumes facts not in evidence, is vague and ambiguous,
23  somewhat confusing.
24    A  So this passage is addressing the ways --
25  the way timing information is generated in Kono.  And,

40  (Pages 154 to 157)

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.    January 24, 2007

Page 170

1    Q  Oh, if you look at Page 5.
2    A  Oh, I was looking at Page 6. My apologies.
3        Yes, it is dated November 11, 2006. The
4  Certificate of Service was dated December 11, 2006.
5    Q  Okay. But do you recognize this document
6  as the document giving the TruePosition's proposed
7  claim constructions that you used to formulate in
8  coming to your opinions?
9    A  Yes, I do.
10   Q  And when you -- you referred to this today
11 throughout the deposition, when you were talking about
12 the proposed claim constructions.
13       Is -- these are the two documents you were
14 referring to; is that correct?
15   A  Yes; yes, they were.
16   Q  In forming the opinions that you expressed
17 in your report, did you consider the prosecution
18 history or file wrapper of the '144 patent?
19   A  Oh, yes.
20   Q  Referring again to Agee Exhibit 7, which
21 was TruePosition's Cumulative Identification of Claim
22 Terms and Proposed Constructions.
23       When you were given this document, did you
24 read through the claim constructions?
25   A  Yes, I did.

Page 171

1    Q  And did you agree with the claim
2  constructions?
3    A  After I went through them and fully
4  understood them, yes, I did agree with them.
5    Q  Okay. When you were given Agee Exhibit 6,
6  which is Preliminary Claim Constructions As of
7  November 22, 2006, for Andrew, did you read through
8  those claim constructions before formulating your
9  opinions?
10   A  Yes, I did.
11   Q  And did you agree with their claim
12 constructions?
13   A  On several counts, no, I didn't.
14   Q  Okay. And in your report did you express
15 some of your disagreements?
16   A  Yes, I did.
17   Q  Okay.
18   A  Disagreements and ambiguities.
19   Q  Okay. I think earlier today you testified
20 that I provided you with, I believe you used the word,
21 a draft of your report.
22       Do you recall that?
23   A  Yes.
24   Q  Okay. In the -- in the draft that you
25 testified that I provided you, did it have any text

Page 172

1  filled in other than the introduction and the section
2  on legal summaries, or legal standards?
3    A  No, it did not.
4    Q  Would it be fair to characterize it as just
5  a proposed outline for the way you would go through
6  the report?
7        MR. PARKS: Objection to the form of the
8  question. Leading.
9    A  I -- with the exception of -- of the
10 section on legal -- on -- with the exception of
11 Section 3.1.
12   Q  On legal standards?
13   A  Which was fairly complete; and which I was
14 expected to understand, and not modify.
15   Q  Okay.
16   A  Yes.
17   Q  So with the exception of that particular --
18   A  Yes.
19   Q  And then you also did make changes to the
20 introduction section; is that correct?
21   A  Yes, I did.
22       Just for what it's worth, I might add that,
23 in Section 3.1 I did reformat some of it. Because you
24 lawyers like really long run-on sentences, and I was
25 having a really hard time parsing one or two of them.

Page 173

1    Q  Okay.
2    A  So some of the nonlawyerly organization in
3  there was actually added by me.
4    Q  If I could just have you look at Agee
5  Exhibit 1 and Agee Exhibit 2.
6        And Agee Exhibit 1, I believe, has been
7  referred to today as your December report; is that
8  correct?
9    A  Yes.
10   Q  And Agee Exhibit 2, I think, has been kind
11 of referred to today at your January report; is that
12 correct?
13   A  Yes.
14   Q  Okay.
15   A  My January 3 report.
16   Q  January 3 report.
17       And I also believe, sort of, earlier today
18 there was a question about whether the -- the report
19 marked as Agee-2 was a supplement to your Agee Exhibit
20 1.
21       Do you recall that?
22   A  I recall that.
23   Q  Okay. In the report that you served on
24 January 2, marked as Agee Exhibit 2, you didn't add
25 anything to the report; is that correct?

44  (Pages 170 to 173)

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.    January 24, 2007

Page 174

1    A   That's correct.
2    Q   Okay. You only deleted a few sentences; is
3  that correct?
4    A   Yes.
5    Q   Okay. And that's because — is it because
6  you never intended to include those sentences to begin
7  with —
8        MR. PARKS: Objection to the form of the
9  question. Leading.
10       MR. MARCUS: Well, let me rephrase it.
11 BY MR. MARCUS:
12   Q   The deletions, the sentences that were
13 deleted out of the report marked as Agee Exhibit 2,
14 was the reason that you took those out that you never
15 intended them to be in there, when you served Agee
16 Exhibit 1?
17       MR. PARKS: Objection to the form of the
18 question. Leading.
19   A   The section -- the sentences that I had
20 removed were not intended to be in the document; they
21 were erroneous, they did not reflect my opinion.
22   Q   And that's at the time -- they didn't
23 reflect your opinions at the time you served your
24 December report; is that correct?
25   A   That's correct.

Page 175

1        MR. PARKS: Objection. Leading.
2    A   (Continued.) That's correct.
3    Q   Okay. I would like to look at what's
4  marked as Agee Exhibit 3.
5        I believe you testified that you drafted
6  what has been marked as Agee Exhibit 3 last evening
7  and then partially this morning; is that correct?
8    A   Yes, that's correct.
9    Q   When was the first time you showed what's
10 been marked as Agee Exhibit 3 to me?
11   A   At -- somewhere between 7:30 and 8 o'clock
12 a.m. this morning.
13   Q   So is it fair to say it was a couple of
14 minutes before we walked into your deposition?
15   A   That's correct.
16   Q   Had I asked you to write anything regarding
17 the section in your report titled "Kono fails to
18 disclose or teach means for processing said data
19 frames from cell sites, to generate a table"?
20   A   You had asked me to look through that
21 section and ask myself what was -- what would
22 change — well, you had asked me to look through the
23 report. And, once I identified that section as being
24 where the -- where the issues were -- sorry. Let me
25 back up.

Page 176

1        You had asked me to look through the report
2  and identify where — where my -- my understanding of
3  equivalence would have affected my analysis or my
4  opinions.
5        And I looked through the entire report, and
6  this was the only section where there was — where
7  there were — where there were substantive
8  differences, or where my analysis would have been
9  substantively changed.
10       And I found, as I read it, that — that my
11 analysis was -- was so dependent on my
12 misunderstanding of equivalence, that the only way I
13 could -- I could -- I could express to this group the
14 changes was to just rewrite the section.
15       So I decided late last night that that's
16 what I had to do.
17   Q   Okay.
18   A   And that's when I went and did this.
19   Q   So did I ask you to write what's been
20 marked as Agee Exhibit 3?
21   A   No, you did not.
22   Q   Had you told me that you were going to be
23 writing what's been marked as Agee Exhibit 3?
24   A   Not when -- not when I left the building
25 last night.

Page 177

1        I didn't know I was going to be writing
2  this, when I left the building last night.
3    Q   And I just want to be clear, because I
4  think there has been a lot of discussion today about
5  claim construction. And I just want to make sure
6  we're clear about what happened.
7        When you formulated the opinions that you
8  expressed in your reports today, or explained, where
9  the parties provided claim constructions for specific
10 terms in the '144 patent, or asserted claims of the
11 '144 patent, is it correct that you always just used
12 those proposed claim constructions to formulate your
13 opinions?
14       MR. PARKS: Objection to the form of the
15 question.
16   A   Once I saw the claim constructions and once
17 I understood the claim constructions, then from that
18 point on I always used those claim constructions in
19 formulating my opinions.
20       So in some early drafts, before I saw the
21 claims construction, I was -- I was doing it just
22 based on common, ordinary usage; and probably within
23 two or three days of starting the analysis, I was
24 using the claims constructions.
25   Q   But when you reached your final opinions

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061 (312) 263-3524

**C18**

071d12b8-ba02-4b38-8165-5a02f8f3badc

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| TRUEPOSITION, INC.,<br><br>      Plaintiff and<br>      Counterclaim-Defendant,<br><br>  v.<br><br>ANDREW CORPORATION,<br><br>      Defendant and Counterclaim<br>      Plaintiff. | C.A. No. 05-00747-SLR |

<u>**ANDREW CORPORATION'S FIRST SUPPLEMENTAL
RULE 26(a)(1) INITIAL DISCLOSURES**</u>

Pursuant to Fed. R. Civ. P. 26(a)(1), defendant Andrew Corporation supplements its

initial disclosures as follows:

**.I.     26(a)(1)(A) Individuals**

| | |
|---|---|
| Khalid Al-Mufti<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Content and workings of certain components of Andrew's U-TDOA location system. |
| Andrew Beck<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Content and workings of Andrew's U-TDOA location system. |
| Gary Brown<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Financial and accounting information relating to Andrew's dealing with ETSI, 3GPP, Saudi Telecom Company and other potential customers. |
| John Carlson<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Content and workings of Andrew's U-TDOA location system. |

| | |
|---|---|
| David Cushman<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Financial and accounting information relating to Andrew's dealing with Saudi Telecom Company and other potential customers. |
| Mohamed Eissa<br>Andrew Corporation<br>3 Westbrook Corporate Center<br>Suite 900<br>Westchester, IL 60154<br>708-236-6600 | Andrew's dealings with Saudi Telecom Company. |
| Mazin Fagiri<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Content and workings of certain components of Andrew's U-TDOA location system. |
| Terry N. Garner<br>Andrew Corporation<br>3 Westbrook Corporate Center<br>Suite 900<br>Westchester, IL 60154<br>708-236-6600 | Content and workings of Andrew's U-TDOA location system. |
| Doug Hall<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Content and workings of Andrew's U-TDOA location system. |
| Iris Inbar<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Content and workings of certain components of Andrew's U-TDOA location system. |
| Stuart Katz<br>Andrew Corporation<br>140 Vista Centre Drive<br>Forest, VA 24551<br>434-386-5300 | Content and workings of certain components of Andrew's U-TDOA location system. |
| Joseph Kennedy<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Development of Andrew's U-TDOA location system, content and workings of Andrew's U-TDOA location system, Andrew's dealings with Saudi Telecom Company. |

**C20**

DB02:5730605.1

065217.1001

| | |
|---|---|
| Alan Li<br>c/o Rachel P. Waldron<br>Kirkland & Ellis LLP<br>200 E. Randolph Dr.<br>Chicago, IL 60601 | Andrew's dealings with Saudi Telecom Company. |
| James T. McDaniel<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Content and workings of Andrew's U-TDOA location system. |
| Oskar Magnusson<br>Andrew Corporation<br>19700 Janelia Farm Blvd.<br>Ashburn, VA 20147<br>703-726-5900 | Andrew's and TruePosition's dealings with 3GPP and ETSI. |
| Jim Petelle<br>c/o Rachel P. Waldron<br>Kirkland & Ellis LLP<br>200 E. Randolph Dr.<br>Chicago, IL 60601 | Prior settlement between Allen and TruePosition. |
| Randy Wynn<br>5329 Glade Lane<br>Grapevine, TX | Andrew's dealings with Saudi Telecom Company. |
| Robert J. Anderson<br>TruePosition, Inc.<br>1000 Chesterbrook Blvd., Suite 200<br>Berwyn, PA 19312 | Information regarding the development, construction and operation of TruePosition wireless location systems; |
| Frederic Beckley<br>TruePosition, Inc.<br>1000 Chesterbrook Blvd., Suite 200<br>Berwyn, PA 19312 | Information regarding TruePosition's participation in ETSI, 3GPP, the TDOA System Study Group, and the UUAC. |
| Michael Hoppman<br>TruePosition, Inc.<br>1000 Chesterbrook Blvd., Suite 200<br>Berwyn, PA 19312 | Financial and accounting information relating to TruePosition and its products. |
| Joseph W. Sheehan<br>TruePosition, Inc.<br>1000 Chesterbrook Blvd., Suite 200<br>Berwyn, PA 19312 | Financial and accounting information relating to TruePosition's dealings with Saudi Telecom Company and other potential customers; information regarding the development, construction and/or operation of TruePosition wireless location systems; information regarding TruePosition's membership and participation in ETSI, 3GPP, and UUAC. |

# C21

DB02:5730605.1

065217.1001

| Robert L. Gross<br>567 Gramercy Lane<br>Downington, PA 19335-4839 | Information regarding TruePosition's and Andrew's membership and participation in ETSI, 3GPP, the TDOA System Study Group, and the UUAC. |
| Curtis Knight<br>151478 23rd Avenue<br>Keaau, HI | U.S. Patent No. 5,327,144 and the nature, invention, development, and patenting of the invention claimed therein. |
| Rhys Robinson<br>127 Fennerton Road<br>Paoli, PA 19301 | Information regarding TruePosition's and Andrew's membership and participation in ETSI, 3GPP, the TDOA System Study Group, and the UUAC. |
| Michael D. Stein, Esq.<br>Woodcock Washburn LLP<br>Wells Fargo Center<br>999 Third Avenue, Suite 1606<br>Seattle, WA 98104<br>206-332-1380 | U.S. Patent No. 5,327,144 and the nature, invention, development, and patenting of the invention claimed therein. |
| Louis A. Stilp<br>1435 Byrd Drive<br>Berwyn, PA 19312 | U.S. Patent No. 5,327,144 and the nature, invention, development, and patenting of the invention claimed therein. |
| John C. Webber<br>3360 Brookside Drive<br>Charlottesville, VA 22901 | U.S. Patent No. 5,327,144 and the nature, invention, development, and patenting of the invention claimed therein. |
| Stuart C. Schwartz<br>Department of Electrical Engineering<br>Engineering Quadrangle, Olden Street<br>Princeton, NJ 08544 | Mr. Schwartz's prior expert report and previous positions taken on behalf of TruePosition regarding the scope of U.S. Patent No. 5,327,144. |

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
Andrew A. Lundgren (No. 4429)
*alundgren@ycst.com*
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

*Attorneys for Defendant Andrew Corporation*

**C22**

4

OF COUNSEL:

John M. Desmarais
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Patrick D. McPherson
DUANE MORRIS LLP
1667 K Street, N.W., Suite 700
Washington, DC 20006

Dated: January 24, 2007

**C23**

065217.1001

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on January 24, 2007, I caused copies

of the foregoing document to be served upon the following counsel in the manner indicated:

### BY HAND DELIVERY and E-MAIL

James D. Heisman, Esq.
Connolly, Bove, Lodge & Hutz
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*jheisman@cblh.com*

### BY E-MAIL and FEDERAL EXPRESS

Paul B. Milcetic, Esq.
David L. Marcus, Esq.
Daniel J. Goettle, Esq.
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
*pbmilcet@woodcock.com*
*dmarcus@woodcock.com*
*dgoettle@woodcock.com*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com
*Attorneys for Defendant Andrew Corporation*

**C24**

<u>**CERTIFICATE OF SERVICE**</u>

I, Francis DiGiovanni, hereby certify that on this 26th day of February, 2007, I caused a

true and correct copy of the foregoing **APPENDIX C TO TRUEPOSITION'S REPLY**

**MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL**

**SUMMARY JUDGMENT THAT ANDREW CANNOT PROVIDE ITS**

**CLAIMS OF INVALIDITY C1-C24** to be served upon the following individuals in the

manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

                    */s/ Francis DiGiovanni*                    .
                    Francis DiGiovanni (# 3189)