## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TruePosition, Inc.,            )
                                     )
        **Plaintiff/**            )
        **Counterclaim-Defendant,**    )
                                     )     **Civil Action No. 05-747-SLR**
        **v.**                   )
                                     )
**Andrew Corporation,**        )
                                     )
        **Defendant/**          )
        **Counterclaim-Plaintiff.**    )
_____)

## TRUEPOSITION'S ANSWERING CLAIM CONSTRUCTION BRIEF

**CONNOLLY BOVE LODGE & HUTZ LLP**
James D. Heisman, Esq. (#2746)
Francis DiGiovanni (# 3189)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE. 19899
(302) 658-9141

**WOODCOCK WASHBURN LLP**
Paul B. Milcetic, Esq. (pro hac vice)
David L. Marcus, Esq. (pro hac vice)
Kathleen Milsark, Esq. (pro hac vice)
Daniel Goettle, Esq. (pro hac vice)
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100
Attorneys for Plaintiff TruePosition, Inc.

Dated:  February 28, 2007

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

II.   ANDREW'S *SUMMARY JUDGMENT* CONSTRUCTION OF THE
      PHRASE "REVERSE CONTROL CHANNEL(S)" IS ERRONEOUS ........ 3

      A.    The Phrase "Reverse Control Channel(s)" Encompasses "Two
            Way" Control Channel(s)................................................... 4

            1.    The File History Supports a Construction of the Phrase
                  "Reverse Control Channels" That Encompasses "Two
                  Way" Channels ...................................................... 5

            2.    The Preferred Embodiment Discloses a Network That
                  Uses Only Two Way Control Channels.................................. 6

            3.    Extrinsic Evidence Is Unnecessary and Supports a
                  Construction of the Phrase "Reverse Control Channels"
                  that Encompasses "Two Way" Control Channels
                  Anyway .................................................................. 9

      B.    The Phrase "Reverse Control Channel(s)" Encompasses
            Channels that Carry "User Data" ....................................10

            1.    The Preferred Embodiment Discloses a Control Channel
                  That Carries User Data...........................................11

            2.    Extrinsic Evidence, Although Not Necessary, Shows
                  That Control Channels Can Carry User Data .........................11

      C.    The Phrase "Reverse Control Channel(s)" Is Not Limited to
            "Shared" Channels ...........................................................14

      D.    The Phrase "Reverse Control Channel(s)" is Not Limited to
            "ANSI 553" or "AMPS" Channels....................................14

III.  ANDREW'S *SUMMARY JUDGMENT* CONSTRUCTION OF
      "DATABASE MEANS" AS INDEFINITE IS ERRONEOUS...................17

IV.   THE REMAINING "DISPUTED" TERMS...............................19

A. "Prescribed Set" (Claims 1, 22 and 31) ...............................................19

B. "Reverse" (Claims 1, 22 and 31) ......................................................20

C. "Control Channels" (Claims 1, 22 and 31) .......................................20

D. "Time Stamp Bits Representing the Time at Which Said Cellular Telephone Signals Were Received" (Claim 1) ....................20

E. "Means for processing said frames of data from said cell site systems to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems" (Claim 1) .......................................................................................21

F. "Table Identifying Individual Cellular Telephone Signals" (Claim 1) ...........................................................................................21

G. "Means for Determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals" (Claim 1)...................................22

H. "Subscribers" (Claims 22 and 32) ....................................................22

I. "Locating Means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions" (Claim 22).................................................................24

J. "Data Identifying the Cellular Telephones" (Claims 22 and 32) .......24

K. "Processing Said Frames of Data to Identify Individual Cellular Telephone Signals" (Claims 31).......................................................24

L. "Time Stamp Bits Representing the Time at Which Said Frames Were Produced at Each Cell Site".....................................................25

V. CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
   418 F.3d 1225 (Fed. Cir. 2005) ............................................................20

*DE Technologies, Inc. v. Dell, Inc.*,
   428 F. Supp. 2d 512 (W.D. Va. 2006)...................................................19

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005) ............................................................18

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*,
   257 F.3d 1364, 1373 (Fed. Cir. 2001)  .................................................10

*Finisar Corp. v. The DirecTV Group, Inc.*,
   416 F. Supp. 2d 512 (E.D. Tex. 2006)...................................................19

*Inverness  Medical Switz Gmbh v. Princeton Biomeditech Corp.*,
   309 F.3d 1365 (Fed. Cir. 2002) ............................................................13

*MBO Laboratoriess, Inc. v. Becton, Dickinson & Co.*,
   474 F.3d  1323 (Fed. Cir. 2007) .........................................................9, 11

*On-Line Techs, Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
   *386 F.3d 1133, 1138 (Fed. Cir. 2004)*................................................9, 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................24

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
   279 F.3d 1357, 1370 (Fed. Cir. 2002)  .................................................20

*Texas Digital System, Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) ............................................................13

*Vanderlande Industrial Nederalnd BV v. ITC*,
   366 F.3d 1311 (Fed. Cir. 2004)...............................................................9

## I.     INTRODUCTION

Andrew's opening claim construction brief is a textbook example of how *not* to construe patent claims and, at the same time, is downright confusing.  The analysis is confusing because Andrew's goal is not to teach the Court, or to address the issues in a straightforward manner, but rather to sandbag its opponent. Andrew's claim constructions positions set forth in the Joint Claim Construction Statement ("JCCS") (D.I. 130), which overwhelm both TruePosition and the Court with a multitude of "disputed" claim terms supposedly requiring construction, are really an artifice intended to achieve tactical surprise.

With the filing of Andrew's opening claim construction brief, and accompanying summary judgment motions, Andrew reveals what it *really* believes is in dispute.  As it turns out, the Court need only construe the phrase "**reverse control channels**" to resolve Andrew's motion for summary judgment of non-infringement.  The Court need only construe the phrase "**database means for storing location data**" to resolve Andrew's motion for summary judgment that Claim 22 is invalid.  At least as far as summary judgment is concerned, the Court does not have to construe *any other claim term*.

Andrew devotes much of its opening claim construction brief to jamming evidence into the record that it hopes will support a construction of the phrase "**reverse control channel(s)**" that Andrew offers in its motion for summary

judgment of non-infringement, but that it failed to include in its JCCS.  Needless to say, TruePosition did not have the opportunity to brief that construction in its opening claim construction brief.

Andrew's opening claim construction brief also argues that the phrase "**database means for storing location data**" should be construed to be indefinite. But Andrew failed to reveal that contention in its interrogatory responses, expert reports or JCCS constructions.  And again, TruePosition did not have the opportunity to brief Andrew's indefiniteness contention in its opening claim construction brief.

Andrew's efforts to ambush TruePosition have started a collateral set of claim construction briefing.  In TruePosition's opposition to Andrew's motion for summary judgment of non-infringement, TruePosition has demonstrated that the construction of the phrase "**reverse control channel**" that Andrew advances on summary judgment, but not in the JCCS, is wrong as a matter of law (D.I. 162 at 24-30).  In TruePosition's opposition to Andrew's motion for summary judgment of invalidity, TruePosition has demonstrated that the phrase "**database means for storing location data**" should be construed as definite (D.I. 156 at 18-35).

In view of these developments, in this answering brief, TruePosition has addressed the claim phrases "**reverse control channel(s)**" and "**database means**

**for storing location data**" first.  TruePosition addresses the remaining supposedly "disputed" terms in the order set forth in the JCCS.

For the phrase "**reverse control channel(s)**," TruePosition rebuts the arguments and evidence that Andrew has offered in its opening claim construction brief to support its *summary judgment* construction of that phrase, as Andrew appears to have abandoned its JCCS construction.  For the phrase "**database means for storing location data**," TruePosition rebuts Andrew's argument in its opening claim construction brief that the phrase is indefinite.

TruePosition has addressed Andrew's arguments concerning the remaining disputed terms to the extent that it has understood them.

## II.    ANDREW'S *SUMMARY JUDGMENT* CONSTRUCTION OF THE PHRASE "REVERSE CONTROL CHANNEL(S)" IS ERRONEOUS

The table below illustrates the relevant differences between TruePosition's proposed construction of the phrase "**reverse control channel(s)**" and Andrew's construction of the phrase on summary judgment.

| TruePosition's 1/19/06 JCCS Construction | Andrew's 02/02/07 Summary Judgment Construction |
|---|---|
| "A **control channel(s)** from a cellular telephone to a cell site" (D.I. 130 at 2). | [1] "a *one way* channel that communicates information *only* from a cellular telephone to a base station," and that "*cannot* communicate information from a base station to a cellular phone" [and]<br><br>[2] that carries only "signaling |

<table>
<tr>
<td></td>
<td>

information, ***not*** voice or traffic information such as ***user data***," [and]

[3] that is a "'***shared*' *channel*'** [that] '***has a many-to-one property in that many mobile phones are simultaneously allocated to and use the same reverse control channel to communicate with one base station***'"

(D.I. 148 at pp. 6-8, ¶¶ 16-17, 19 & 25) (emphasis supplied)

</td>
</tr>
</table>

### A.    The Phrase "Reverse Control Channel(s)" Encompasses "Two Way" Control Channel(s)

The parties agree that the phrase "**reverse control channel**" refers to a channel that transmits information "from a cellular telephone to a cell site" (D.I. 130 at 2; D.I. 148 at p. 6, ¶¶ 16-17), which is also sometimes called a "base station."  The parties also agree that channels are "like streets"; they can be either "two way," carrying traffic in two directions, or "one way," carrying traffic in one direction (D.I. 150 at A279).  A "two way" channel is like Route 95.  Route 95 is a street "from Wilmington to Philadelphia," but at the same time, it is a "two way" street, because it also carries traffic from Philadelphia to Wilmington.

The parties differ on whether the phrase "**reverse control channel**" encompasses a "two way" channel.  TruePosition contends that the phrase "**reverse control channel**" encompasses both "two way" and "one way" control

channels that carry information "from a cellular telephone to a cell site" (D.I. 130 at 2). Andrew contends that the phrase "**reverse control channel**" is limited to a "*one way*" control channel that carries information "*only*" in the reverse direction from a cellular telephone to a cell site and that "*cannot*" carry information from a cell site to a cellular telephone (D.I. 148 at pp. 6-7, ¶¶ 16-18)[1].

> 1.    **The File History Supports a Construction of the Phrase "Reverse Control Channels" That Encompasses "Two Way" Channels**

In its opening claim construction brief, Andrew offers evidence in support of its contention that the phrase "**reverse control channel(s)**" is limited to "one way" channels and does not encompass "two way" channels that carry information in both the forward and reverse directions (D.I. 149 at 3-4).

But the file history shows that when the inventors amended the claims to include the term "**reverse,**" they stated that they did so because they wanted to claim an invention that located cell phones using "**reverse**" transmissions traveling in the reverse direction. The file history therefore suggests that the phrase "**reverse control channels**" encompasses two way channels, since such channels do, in fact, carry reverse transmissions traveling in the reverse direction.

---

[1]Andrew's reply brief on summary judgment frames the issue slightly differently by asserting that a "**reverse control channel**" cannot also be a "forward" channel (D.I. 183 at 3).

In their remarks to the Patent Office, the inventors explained that they amended the claims to specify that their system locates cell phones using *transmissions sent in the reverse direction* from a cellular telephone to a cell site (D.I. 144 at A148).  They asserted:

> With regard to claim 1 . . . the claimed invention is clearly limited to a system employing <u>reverse</u> control channels signals, *i.e.,* control channel signals <u>from the mobile telephones</u>. This limitation is expressed not only in the claim's preamble but also in the body of the claim.

(*Id*.) (emphasis in original).  By contrast, the prior art location system located cell phones using signals that cell site sends to a cellular telephone:

> It should be noted that [the Prior Art] stresses that his system is specifically designed for use in making strength/distance determinations on the basis of forward signals <u>from the base stations</u>, as opposed to reverse signals from the mobile phone….

(D.I. 144 at A147) (emphasis in original).  The file history therefore suggests that the phrase "**reverse control channels**" encompasses two way channels, since such channels carry reverse signals from the mobile phone.

### 2.     The Preferred Embodiment Discloses a Network That Uses Only Two Way Control Channels

Andrew's construction of the phrase "**reverse control channel**" as a "*one way*" channel that is <u>only</u> capable of transmitting information in the reverse direction would also exclude the preferred embodiment in the patent specification.

—

The patent specification uses the phrase "**reverse control channel**" to refer to a "two-way" control channel that is transmitting in the reverse direction.

The preferred embodiment of the patent specification describes a "single" two way control channel that is called the "**reverse control channel**" when it is transmitting one way and that is called the "forward control channel" when it is transmitting in the other way. In a passage that describes how a cellular network operates, and also explicitly defines the phrase "**reverse control channel**," the patent explains:

> Each cell site (or, where a cell site is "sectored" as described below, each sector of that cell site) uses *only a single control channel.* The control channel from a cell site to a mobile unit is called the 'forward' control channel and the control channel from the cellular telephone to the cell site is called the 'reverse' control channel.

 (D.I. 143 at A17 (col. 2, ll. 8-19)) (emphasis supplied). Andrew's proposed construction of the phrase "**reverse control channel**" as a "one way" channel that necessarily differs from a "forward control channel" (D.I. 150 at A278-279, ¶ 11(f) & (g)) would render this passage nonsensical. Under Andrew's construction, each cell site in a cellular network would be assigned "only a single" one-way reverse control channel that was incapable of transmitting to cell phones (*id.* at ¶¶ 11(i)) or, in the alternative, "only a single" one-way forward control channel that was incapable of transmitting to the cell site <u>from</u> cell phones (D.I. 143 at A20 (col. 8,

ll. 53-54) ("there is *only one control channel used per cellular sector* or omni cell site") (emphasis supplied)).



It makes no sense that each cell would use only a single one-way channel, because then the cell phones could not exchange control information with the network. In some "cells" in the network, a phone could send, but not receive, control channel information, since each phone is served by only a single cell site (*id.* at A17 (col. 1, ll. 60-64)). In other cells, a phone could receive, but not send, control channel information. The cellular network of the preferred embodiment could not operate if Andrew's "one way" reverse control channel were used (*id.* at A17 (col. 2, ll. 44-62)).

The Court should not construe "**reverse control channel**" to mean a one way channel, since the patent specification uses the phrase "**reverse control**

**channel**" to refer to the direction in which a single two-way channel is transmitting. "'A claim interpretation that excludes a preferred embodiment from the scope of the claims is rarely, if ever, correct.'" *MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (reversing district Court's grant of summary judgment of non-infringement) (quoting *On-Line Techs, Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)). The Court should adopt TruePosition's proposed construction, which encompasses both "one way" and "two way" channels that transmit in the reverse direction from a cellular telephone to a cell site.

### 3. Extrinsic Evidence Is Unnecessary and Supports a Construction of the Phrase "Reverse Control Channels" that Encompasses "Two Way" Control Channels Anyway

Andrew also offers the declaration of its expert, Dr. Goodman, in support of its construction that a "**reverse control channel**" carries information "*only*" from a cellular telephone (D.I. 149 at 3; D.I. 150 at A278-279, ¶ 11(i)).[2] But the Court doesn't need to look to extrinsic evidence, since the phrase "**reverse control channel(s)**" is explicitly defined in the patent specification (B17 (col. 2, ll. 13-20)). *See Vanderlande Indus. Nederalnd BV v. ITC,* 366 F.3d 1311, 1318 (Fed.

---

[2] It should be noted that, while Andrew asserts that a "**reverse control channel**" carries information *only* from a cellular telephone, at at least one point in his report, Dr. Goodman seemed to assert that reverse control channels are two-way channels (B124 ("'Reverse control channels' also are two-way….")).

Cir. 2004) ("[A] 'court should look first to the intrinsic evidence of record'… to

determine if the patentee 'expressly defined terms used in the claims….") (quoting

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd*., 257 F.3d 1364, 1373 (Fed. Cir.

2001)).

Furthermore, Dr. Goodman's declaration is wholly conclusory.  To the

extent that the Court is inclined to consider that declaration, TruePosition notes

that Dr. Brian Agee testified that he agreed with TruePosition's proposed

construction of the phrase "**reverse control channel**" (B22 (170:20-171:4)).

**B.     The Phrase "Reverse Control Channel(s)" Encompasses Channels that Carry "User Data"**

The parties agree that the phrase "**reverse control channel**" is a channel that

does not transmit the voice signals that a user generates during a call.

The parties differ on the issue whether a "**reverse control channel**"

encompasses channels that carry "user data" that may be sent to users of a cellular

network (D.I. 148 at p. 7, ¶ 19), for example in text messages.  TruePosition

contends that the phrase encompasses channels that carry "user data."  Andrew

contends that that the phrase "**reverse control channel**" is limited to channels that

cannot carry "user data" sent in text messages (D.I. 148 at p. 14).

### 1.     The Preferred Embodiment Discloses a Control Channel That Carries User Data

In its opening brief, Andrew offers evidence from the patent specification purporting to show that a "**reverse control channel**" cannot carry user data, such as text messages, and that only voice channels can carry user data in packets (D.I. 149 at 15).  But the preferred embodiment of the patent specification teaches control channels that carry data that can be provided to users in coded messages. In the preferred embodiment, the cellular telephone location invention locates a cell phone user.  Once the cell phone user is located, the system writes the user's location, as well as information that was transmitted over the control channel, such as the located cell phone's telephone number, to a database (D.I. 143 at A23 (col. 13, l. 63 – col. 14, l. 5), A18 (col. 3, ll. 33-40), & A20 (col. 8, ll. 36-41)).  The system then sends this information that the control channel transmitted, such as the cell phone's telephone number, to a user of the system in a "coded message" (*id.* at A23 (col. 13, l. 65 – col. 14, l. 15)).  "'A claim interpretation that excludes a preferred embodiment from the scope of the claims is rarely, if ever, correct.'" *MBO Labs*, 474 F.3d at 1333 (quoting *On-Line Techs*, 386 F.3d at 1138).

### 2.     Extrinsic Evidence, Although Not Necessary, Shows That Control Channels Can Carry User Data

To support its proposed construction of the phrase "**reverse control channel**" to mean a channel that cannot carry user data, Andrew offers the

testimony of Robert Anderson that "**control channels**" do not carry "anything other than signaling information" (D.I. 148 at 7). But, again, the Court need not look to extrinsic evidence. Andrew doesn't explain why, if the phrase "**reverse control channels**" must supposedly be construed as a unitary phrase, Mr. Anderson's testimony relating to "**control channels**" is relevant.

More importantly, Mr. Anderson was not even talking about the patent. Mr. Anderson merely testified that the "control channels" that *TruePosition's product* uses for cell phone location carry "only signaling" information (B5-B6 (40:2-42:7)). Andrew's counsel did not ask Mr. Anderson about the meaning of the patent (*id.*) To the extent that the Court is inclined to consider Mr. Anderson's testimony on the issue of claim construction, it should consider his testimony concerning the 144 patent, not his testimony about TruePosition's product.

In the relevant context, Mr. Anderson testified that channels that can carry text messages, such as Standalone Dedicated Control Channels in a GSM network, are "**control channels**" within the meaning of the patent (B7-B8 (209:18-211:24)). Dr. Gottesman, TruePosition's expert, also explained that "**control channels**" can be ideal for carrying limited forms of user messaging since they transmit at much lower bit rates than voice channels that carry large amounts of voice data (D.I. 150 at A51-A52 (90:13-91:11)).

Andrew also offers a definition of the phrase "**control channel**" in "Newton's Telecom Dictionary," published in 2006, that defines that phrase to be a channel "carrying network information other than actual voice *or data messages*" (D.I. 149 at 19; D.I. 150 at A259-A260).  But patent claims are interpreted as of the time of patent is filed, or at latest, when it was issued.  *See, e.g., Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202-03 (Fed. Cir. 2002); *Inverness Med. Switz Gmbh v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1369-70 (Fed. Cir. 2002).

An earlier, 1998 version, of the very same dictionary contains a definition of the phrase "**control channel**" that supports TruePosition's proposed construction, not Andrew's:

> Within a cellular telephone system, several of the channels are assigned as 'control' channels.  *Instead of supporting voice communications*, these channels allow the base station to broadcast information to the cellular phones in its area.

(B11**)**.  This definition of "**control channel(s)** excludes only channels that carry voice signals, not channels that carry "user data."  A version of the same dictionary available when the patent was filed contains no definition of "**control channel**" (B14-B15).

## C.    The Phrase "Reverse Control Channel(s)" Is Not Limited to "Shared" Channels

Andrew contends that a "**reverse control channel**" is a "'shared' channel [that] has a many-to-one property in that many mobile phones are simultaneously allocated to and use the same reverse control channel to communicate with one base station" (D.I. 148 at p. 8, ¶ 25). TruePosition disagrees that the phrase "**reverse control channel**" is limited to "shared" channels.

In its opening claim construction appendix, Andrew offers a conclusion from its expert that "**reverse control channel**(s)" are "shared" channels (D.I. 150 at A279, ¶ 11(l)). But again, the Court does not need to consider such extrinsic evidence because the patent specification expressly defines "**reverse control channel**." To the extent that the Court is inclined to consider such evidence, it should also consider the deposition testimony of Dr. Brian Agee, who agreed that TruePosition's proposed construction was correct (B22 (170:20-171:4); B23-B26).

## D.    The Phrase "Reverse Control Channel(s)" is Not Limited to "ANSI 553" or "AMPS" Channels

In its opening brief, Andrew attempts to prove that a "**reverse control channel**" is an "AMPS" channel (D.I. 149 at 15-17), which Andrew equates with an "ANSI 553" channel. Andrew also equates an "ANSI 553" channel with the three "characteristics" of "**reverse control channel(s)**" that it relies upon in its summary judgment construction (D.I. 148 at pp. 6-8, ¶¶ 15-17, 19 & 25). But

"ANSI 553" should not be read into the claims, and even if its definitions were read into the claims, those definitions, paradoxically, would support TruePosition's proposed constructions, not Andrew's.

"ANSI 553" is not a part of the intrinsic patent record. The only cellular telephone protocol expressly mentioned in the patent specification is "TDMA," not "ANSI 553" (D.I. 143 at A17 (col. 1, ll. 25-31; *see also* col. 1, ll. 5-7)).[3] There is no evidence that any inventor ever read "ANSI 553," excerpts of which Andrew produced for the first time with its opening claim construction brief.

But even if the Court were to read the phrase "**reverse control channel**" to equate with "ANSI 553," the Court would still have to adopt TruePosition's proposed construction, not Andrew's. TruePosition has now obtained its own complete copy of "ANSI 553" which, as it turns out, tells a very different story from the story – based on Andrew's excerpts -- that Andrew has offered to the Court (B29-B110).

"ANSI 553" expressly defines the phrase "**reverse control channel**" in a way that very closely tracks TruePosition's proposed construction as "the control

---

[3] Of relevance to Andrew's pending motion for summary judgment of non-infringement, GSM is a TDMA based cellular telephone protocol. All GSM "radio channels are based on a TDMA structure that is implemented on multiple frequency subbands…." A252 (Moe Rahnema, "*Overview of the GSM System and Protocol Architecture,*" IEEE Communications Magazine (April 1993) at 94).

channel used from a mobile station to a land station" (B41).[4]  It also defines the

phrase "**control channel**" in a way that very closely tracks TruePosition's

construction as "a channel used for the transmission of digital control information

from a land station to a mobile station or from a mobile station to a land station"

(B38).  There is no exclusion of "user data" in these definitions, nor is there any

recitation of "shared" channels (*id.*)[5]

Nor do the definitions recite "one way" channels (*id.*)  The standard states

that it is flexible and that, for example, two different channel functions can be

combined in one channel, or, in the alternative, implemented as two different

channels:

> Since it is the intention of these requirements to permit
> great latitude of system configurations and the
> implementation of system features, only those items
> required for compatibility have strict definitions.  Other
> items may be interpreted to fit the needs of manufacturers
> and system operators.  For example, control channels
> may be implemented with either combined paging/access
> functions, or as separate paging and access channels.

(B35).

---

[4] The patent claims recite one of a "prescribed set" of "**reverse control channels**,"
meaning that there is more than one control channel used "from a mobile station to
a land station."  Applying the ANSI 553 definition in the context of the claims, a
"**reverse control channel**" means one of multiple control channels used from a
mobile station to a land station.

[5] Having now had the opportunity to look through the "ANSI 553" standard,
TruePosition cannot find the supposed "characteristics" of **reverse control
channels** that Andrew relies upon on summary judgment.

Andrew also offers the testimony of inventors Dr. John Webber and Dr. Curtis Knight to support its claim that "**reverse control channels**" are "AMPS" channels. But Dr. Webber repeatedly testified that he did not know what "AMPS" is (B115 (18:12-19:4) & B116 (28:3-22)) and Dr. Knight testified that he had no expertise in "AMPS" (B121 (17:11-25) & B122 (19:4-25)).

Whatever claim construction approach the Court adopts, all roads lead towards TruePosition's proposed constructions and away from Andrew's proposed constructions.

## III. ANDREW'S *SUMMARY JUDGMENT* CONSTRUCTION OF "DATABASE MEANS" AS INDEFINITE IS ERRONEOUS

In its opening claim construction brief, Andrew wrongly argues that claim 22 should be held invalid. Andrew's opening claim construction argument notably fails to even mention that Andrew has the burden of proving invalidity by clear and convincing evidence.

Andrew claims that there is no structure in the patent specification corresponding to the phrase "**database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations**" (D.I. 149 at 38) But TruePosition has amply demonstrated in its opposition to Andrew's motion for summary judgment that the patent specification *does* disclose corresponding structure (D.I. 156 at 18-35).

-17-

Andrew asserts that a 'database' disclosed in the patent specification is somehow not sufficient structure for performing the function of "storing location data identifying the cellular telephones and their respective locations" (D.I. 149 at 38). But the telecommunications dictionary that Andrew offers as an authoritative source in its opening claim construction brief (D.I. 149 at 19) says otherwise. According to a version of that dictionary that was available at the time the patent was filed, a "data base" is:

> A collection of data structured and organized in a disciplined fashion so that access is possible to information of interest. There are many ways of organizing data bases.

(B16). Andrew does not explain why a "collection of data structured and organized in a disciplined fashion" is insufficient structure for performing the function of "storing location data" that identifies cell phones and cell phone locations.

Andrew cites *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.* 412 F.3d 1291 (Fed. Cir. 2005) and suggests that the Federal Circuit held a "means-for-dispensing" claim invalid because the recitation of a "dispenser" in the specification was insufficient (D.I. 149 at 38). But Andrew's characterization of the holding in *Default Proof Credit* is misleading. In that case, the patentee never argued that the "dispenser" was corresponding structure, and the Federal Circuit made no findings regarding the "dispenser" whatsoever. *Default Proof,* 412 F.3d

at 1302-3.  The patentee argued only that a "Point-of-Sale (POS) terminal" was corresponding structure, and the Federal Circuit found the argument at odds with the structure of the claim at issue and the language in the specification.  *Id.*

Andrew claims that two other cases somehow support its claim of invalidity: *DE Technologies, Inc. v. Dell, Inc.*, 428 F. Supp. 2d 512 (W.D. Va. 2006) and *Finisar Corp. v. The DirecTV Group, Inc.*, 416 F. Supp. 2d 512 (E.D. Tex. 2006). But these cases stand for the unremarkable proposition that in order for a claim with means-plus-function claim elements to be valid, the patent specification must disclose structure that corresponds to the function recited in the claim.  Here, the patent does disclose a structure, a database, that is perfectly capable of performing the recited function of storing location data identifying cell phones and cell phone locations.

Andrew's specious attorney argument is no evidence, much less clear and convincing evidence, of invalidity.

## IV.    THE REMAINING "DISPUTED" TERMS

### A.    "Prescribed Set" (Claims 1, 22 and 31)

Andrew claims that the phrase "**prescribed set**" should be construed to mean a "specific set of frequency bands taught in the specification" (D.I. 149 at 21).  But in the claim, the phrase "**prescribed set**" is preceded by the indefinite article "**a**," meaning "one or more" prescribed sets, rather than a specific or

particular prescribed set. *CollegeNet, Inc. v. ApplyYourself, Inc.,* 418 F.3d 1225, 1232 (Fed. Cir. 2005) ("'It is well settled that the term 'a' or 'an' ordinarily means one or more'") (quoting *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002)). Andrew's proposed construction conflicts with the claim language.

Andrew nevertheless insists that the phrase "prescribed set" should be construed to mean a "specific set of frequency bands taught in the specification" because the named inventors testified that they used a specific set of frequency bands when they implemented a prototype of the invention (D.I. 149 at 20-21). But Andrew cites no authority for the proposition that an inventor's testimony about a prototype that later led to a patent can be read into the claims.

**B.    "Reverse" (Claims 1, 22 and 31)**

TruePosition has addressed Andrew's argument with respect to this claim term in part II, D above.

**C.    "Control Channels" (Claims 1, 22 and 31)**

TruePosition has addressed Andrew's argument with respect to this phrase in part II, B, 2 above.

**D.    "Time Stamp Bits Representing the Time at Which Said Cellular Telephone Signals Were Received" (Claim 1)**

Andrew argues that that the phrase "**time stamp bits representing the time at which said cellular telephone signals were received**" should be limited to bits

-20-

that represent "time" in a specific format, "calendar date and clock time" (D.I. 149

at 22).  Andrew provides no evidence in support of its proposed construction,

arguing instead that it is merely trying to "sufficiently clarify the term."  But a

layperson can discern what time is without further clarification.

### E.    "Means for processing said frames of data from said cell site systems to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems" (Claim 1)

Andrew's proposed construction of this phrase is wrong for the reasons set

forth in TruePosition's opening brief claim construction brief, part IV, F (D.I. 142

at 18-21).  TruePosition's proposed construction should be adopted.

### F.    "Table Identifying Individual Cellular Telephone Signals" (Claim 1)

Andrew claims that this phrase should be construed to mean a "table

containing a code uniquely associated with the cellular telephone that transmitted

the signals."  But a table identifying cellular telephone *signals* and a table

identifying *cellular telephones* are two different things.

To support its proposed construction, Andrew offers the testimony of

inventor Dr. John Webber (D.I. 149 at 26).  But that testimony merely explains and

amplifies the purpose of various operations in the patent **specification** (D.I. 150 at

A256 (112:3-17), A247 (33:21-24), A248 (34:21-35:13), A249 (35:18-22)).

Andrew's counsel did not ask Mr. Webber about the patent **claims.**  Andrew has

cited no authority for the proposition that the Court should read an inventor's

testimony about embodiments in the patent specification into the claims.

### G. "Means for Determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals" (Claim 1)

Andrew's proposed construction of this phrase, and the argument that it

makes in support of that construction in its opening brief (D.I. 149 at 34), is wrong

for the reasons set forth in TruePosition's opening claim construction brief, part

IV, H (D.I. 142 at 22-25).  TruePosition's proposed construction should be

adopted.

### H. "Subscribers" (Claims 22 and 32)

Andrew wrongly claims that the word "**subscribers**" should be construed to

mean "users of mobile cellular telephones who receive and pay for cellular

telephone service."  In support of its construction, Andrew offers various portions

of the patent specification that refer to cellular telephone subscribers (D.I. 149 at

24-25).  But the patent specification shows that "**subscribers**" can be people who

pay for computer terminal access to a database of cellular telephone locations,

rather than people who pay for cell phone service.



The patent explains:

> The central site 16 is further coupled to a database 20, which may be remotely located from the central site and made available to *subscribers. For example, Fig. 2 depicts a first terminal 22 coupled via a modem (not shown) and telephone line to the database 20; a second terminal 24 in radio communication with the database 20*; and a third, handheld terminal 26, which is carried by a user who also has a cellular telephone 10b, in radio communication with the database.

(D.I. 143 at A21 (col. 9, ll. 23-31)) (emphasis supplied).  The patent specification

therefore teaches that  "**subscribers**" may be computer terminal users (Fig. 2,

Blocks 22, 24 (*id*. at A3)) or cell phone users (Fig. 2, Blocks 10b (*id*.)).  The Court

should therefore not limit its construction of the phrase "**subscribers**" to "users of

the mobile cellular telephones who receive and pay for cellular telephone service."

**I.**   **"Locating Means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions" (Claim 22)**

Andrew's proposed construction of this phrase is wrong for the reasons set

forth in TruePosition's opening brief claim construction brief, part IV, H (D.I. 142

at 28-30). TruePosition's proposed construction should be adopted.

**J.**   **"Data Identifying the Cellular Telephones" (Claims 22 and 32)**

Andrew claims that this phrase should be construed to mean "the code

uniquely associated with the cellular telephone" (D.I. 149 at 28). The Court need

not explicitly construe this phrase because a layperson can understand what "data

identifying cellular telephones" means. In some cases, the ordinary meaning of

claim language is apparent and claim construction involves "little more than the

application of the widely accepted meaning of commonly understood words."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

**K.**   **"Processing Said Frames of Data to Identify Individual Cellular Telephone Signals" (Claims 31)**

Andrew asserts that this phrase should be construed to mean "extracting

from the data frames a code uniquely associated with the cellular telephone that

transmitted the signals" (D.I. 149 at 29).  Andrew's proposed construction is wrong

for the reasons set forth in part IV, F above.

**L.  "Time Stamp Bits Representing the Time at Which Said Frames Were Produced at Each Cell Site"**

Andrew argues that that the phrase "**time stamp bits representing the time at which said frames were produced at each cell site**" should be limited to bits that represent "time" in a specific format, "calendar date and clock time" (D.I. 149 at 23).  Andrew provides no evidence in support of its construction, arguing instead that its construction is needed to clarify the claim term (*id.*).  But a layperson can discern the meaning of "time" without further clarification.

**V.  CONCLUSION**

For these reasons, TruePosition respectfully requests that the Court adopt the claim construction proposals that TruePosition has set forth in the parties' Joint Claim Construction Statement.

Dated: February 28, 2007

__/s/ James D Heisman_____
CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman (# 2746)
Francis DiGiovanni (# 3189)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 252-4208


Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
David L. Marcus, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
WOODCOCK WASHBURN LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100

*Attorneys for Plaintiff*
*TruePosition, Inc*

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 28th day of February, 2007, I caused a true and correct copy of the foregoing **TRUEPOSITION'S ANSWERING CLAIM CONSTRUCTION BRIEF** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

_____ */s/  James D. Heisman* _____.
James D. Heisman (# 2746)