# EXHIBIT A

## CERTIFICATION OF THE TRANSLATION

I, John F. Bukacek, declare that:

1.   I am a certified translator who is knowledgeable in both the Japanese and English languages.

2.   The attached is an independent translation of Japanese Laid-Open (Kokai) Patent Application No. H3-239091 ("Moving Body Radio Communication Apparatus") from the Japanese language into the English language, rendered to the best of my knowledge and ability.

John F. Bukacek
6171 N. Sheridan Road, No. 2212
Chicago, Illinois 60660-5841

Sworn and subscribed before me
This _13_ th day of February 2007.

"OFFICIAL SEAL"
C. Jezwiak
Notary Public, State of Illinois
My Commission Expires May 17, 2010

B 1

**DRAFT TRANSLATION**

**English Translation of Japanese Laid-open Patent Application**

(19) JAPANESE PATENT OFFICE (JP)
(12) Official Gazette for Kokai (Laid-Open) Patent Applications (A)
(11) Japanese Patent Application Kokai (Laid-Open) Publication No.: H3-239091
(43) Kokai (Laid-Open) Publication Date: October 24, 1991

     Number of Claims: 1
     Request for Examination: None submitted
     (Total of 6 pages in the original Japanese)

| (51) Int.Cl.$^5$ | Ident. Symb. | JPO File No. |
|---|---|---|
| H04Q 7/04 | C | 7608-5K |

(54) MOVING BODY RADIO COMMUNICATION APPARATUS

(21) Application Filing No.: H2-36652
(22) Application Filing Date: February 16, 1990
(72) Inventor: Mitsunori KONO, Mitsubishi Electric Corporation, Telecommunications Systems Laboratory, 1-1 Ofuna 5-chome, Kamakura City, Kanagawa Prefecture
(71) Applicant: Mitsubishi Electric Corporation, 2-3 Marunouchi 2-chome, Chiyoda-ku, Tokyo
(74) Agent: Masuo OIWA, Japanese Patent Attorney (and 2 other individuals)

SPECIFICATION

1. Title of the Invention

Moving Body Radio Communication Apparatus

2. Claims

    Moving body radio communication apparatus, characterized in being equipped with control channel transceivers that transmit to and receive from a moving body control signals for controlling radio communication with a moving body having the capacity to transmit and receive using control channels that are specifically allocated, and a traffic channel transceiver means that transmit and receive signals for communication and control with respect to a moving body using traffic channels that are specifically allocated, and a plurality of base stations possessing control means that control the aforementioned means and a shared channel reception means that receives position locating signals from a moving body using shared channels that are specifically allocated, and a switching station that receives data in the aforementioned position locating signals and that transmits and receives communications signals and control signals between the control means, with there being a connection between a telecommunications network and the control means of the above-mentioned bases, and a position locating means that locates the position of a moving body, being connected to the switching station.

1

**B 2**

3.  Detailed Description of the Invention

## Field of Industrial Use

This invention relates to a moving body radio communication apparatus possessing a switching station and a plurality of base stations, and in particular, this invention relates to a moving body radio communication apparatus possessing a moving body position locating function.

## Prior Art

FIG. 4 shows a configuration of a prior art automobile telephone system, as described, for example in *BSTJ*, January 1979, Vol. 58, No. 1, Page 158, Fig. 4, where *1* is a switching station; *3a – 3n* are base stations; *4a – 4n* are base station antennas; *5* is mobile equipment located in an automobile or the like; *8* is an antenna for mobile equipment; *11a – 11n* are control devices for the base stations *3a – 3n*; *12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n*; *13a – 13n* are locator receivers; *14a – 14n* are traffic channel transceivers that transmit and receive signals for traffic channels allotted for each of the base stations *3a – 3n*; *15a – 15n* are antenna-sharing devices; *21* is a junction point between the switching station *1* and the public telecommunications network; *22a – 22n* are telecommunication circuit junction points between the switching station *1* and the base stations *3a – 3n*; *23a – 23n* are data circuit junction points; *25a – 25n* are junction points between the control channel transceivers *12a – 12n* and the control devices *11a – 11n*; *26a – 26n* are junction points between the locator receivers *13a – 13n* and the control devices *11a – 11n*; *27a – 27n* and *28a – 28n* are junction points between the traffic channel transceivers *14a – 14n* and the control devices *11a – 11n*; and *29a – 29n, 30a – 30n*, and *31a – 31n* are junction points between the control channel transceivers *12a – 12n*, the locator receivers *13a – 13n*, and the traffic channel transceivers *14a – 14n*, respectively, and the antenna-sharing devices *15a – 15n*.

Next, the operation is described. The control channel transceivers *12a – 12n* of the base stations *3a – 3n* are modulated by reporting signals that include identifier signals from the base stations *3a – 3n*, and the carrier waves of the respectively differing radio frequencies are continuously transmitted. The mobile equipment *5* scans all of the designated control channels, fixes to the one with the largest reception electrical field, and stands by. At this point, suppose that a call was made to a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network. The switching station *1* issues a command to the base station *3a – 3n* to call the specified mobile equipment *5*, and when this is received, the control device *11a – 11n* radiates a call signal in the space from the antenna *4a – 4n* via the control channel transceivers *12a – 12n* and the antenna-sharing devices *15a – 15n* to call the mobile equipment *5*. The mobile equipment *5* stands by to receive the strongest electrical field, for example, from the base station *3a*, and receives the call signal from the base station *3a*, and immediately transmits a response signal. The base station *3a* which receives the response signal allots an empty traffic channel of the traffic channel transceivers *14a*, establishing a state of voice communication. The switching station *1* establishes a switching connection between the

2

B 3

traffic channel designated by the base station *3a*. If the voice communication quality of the current traffic channel degrades, then the control device *11a* relies on the measurement of the electrical field of the current traffic channel by a nearby base station, e.g., the base station *3b* – *3e*, via the switching station *1*. Measurement of the electrical field is carried out by the locator receiver *13b* – *13e* of the base station *3b* – *3e*, and supposing that the electrical field of the base station *3c* is the largest, then the switching station *1* will issue a command to the mobile equipment *5* via the current traffic channel of the base station *3c*, thereby switching and connecting the circuit of the public telecommunications network to a new traffic channel. Furthermore, if there is a call from the mobile equipment *5*, the operation is the reverse of that described above. If either the public telecommunications network or the mobile equipment *5* terminates, then the switching station *1* and the control device *3c* terminate operation.

## Problems to be Solved by the Invention

The prior art automobile telephone system had a constitution as described above, and was suited for wireless radio analog transmission, and when migrating to digital transmission (TDMA format), the distance between the base station *3a* – *3n* and the mobile equipment *5* had be measured, and equipment was needed for that.

This invention was devised to solve the above-mentioned problem, and has as its object to make it possible to measure the distance between a base station and a moving body, and also to produce a moving body radio communication apparatus that can locate the position of a moving body.

## Means for Solving These Problems

The moving body radio communication apparatus of this invention is provided with a plurality of base stations that possess a shared channel reception means that receives position locating signals from a moving body using shared channels that are allotted jointly, a switching station that receives data in the form of these position locating signals, and a position locating means that is connected to the switching station, inputs the above-mentioned data, and locates the position of a moving body.

## Operation of the Invention

In this invention, a moving body transmits position locating signals using shared channels allotted jointly to the base stations, the shared channel transceivers of the base stations receive these position locating signals and transmit the data to the switching stations, the switching stations transmit this data to a position locating means, and the position locating means locates the position of the moving body.

## Working Examples

A working example of this invention is described below with drawings. **FIG. 1** shows a configuration of a moving body position locating apparatus in accordance with this working

3

**B 4**

example, where reference numeral *2* is a position location calculating device, *16a – 16n* are shared channel receivers provided within the base stations *3a – 3n*, which transmit to and receive from a shared channel *12* allotted jointly to the base stations *3a – 3n*. Reference numeral *24* is a junction point between the switching station *1* and the position location calculating device *2*; *32a – 32n* are junction points between control devices *11a – 11n* and the shared channel receivers *16a – 16n*; *33a – 33n* are junction points between the shared channel receivers *16a – 16n* and antenna-sharing devices *15a – 15n*. The rest of the configuration is identical to that of **FIG. 4**.

Next, the operation is described. The control channel transceivers *12a – 12n* are modulated by announcing signals that contain identifier signals of the base stations *3a – 3n*, and the carrier waves of the respectively differing radio frequencies are continuously transmitted. The mobile equipment *5* scans all of the designated control channels, fixes to the one with the largest reception electrical field, and stands by. For example, if the mobile equipment *5* is positioned within the zone of the base station *3a*, it waits for signals from the control channel transceiver *12a*. At this point, if there is a request to locate the position of a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network, then the exchange station *1* issues a command to the base stations *3a – 3n* to call and locate the position of the mobile equipment *5*. When this is received, the control device *11a – 11n* radiates a call signal in the space from the antenna *4a – 4n* via the control channel transceivers *12a – 12n* and the antenna-sharing devices *15a – 15n* to call the mobile equipment *5*. The mobile equipment *5* stands by to receive the signal with strongest electrical field from among the radiated position locating call signals radiated by the base station *3a*, using the control channel, and when this position locating call signal is received, it immediately transmits a response signal, switching to a shared channel and emitting a position locating signal which is a burst digital signal. The base station *3a* that receives the response signal reports to the switching station *1* that the mobile equipment *5* is within its own zone. Furthermore, when some of the shared channel receivers *16a – 16n* of the base stations *3a – 3n* receive the position locating signal from the mobile equipment *5*, the absolute time or the relative time when the position locating signal arrives is determined by correlation detecting the unique word contained therein, and reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*. The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated. In this case, if there are many [illegible] values of the shared channel receivers *16a – 16n*, and if the density is suitable, the accuracy of the position locating can be quite high.

Next, suppose that a call is made to a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network. In this case, the switching station *1* issues a command to the base station *3a – 3n* to call the specified mobile equipment *5*. When this is received, the control device *11a – 11n* radiates a call signal in the space from the antenna *4a – 4n* via the control channel transceivers *12a – 12n* and the antenna-sharing devices *15a – 15n* to call the mobile equipment *5*. The mobile equipment *5* stands by to receive the signal with the strongest electrical field from among the call signals, for example, standing by with the control channel of the base station *3a*, receives the call signal from the base station *3a*, and immediately transmits a response signal. The base station *3a* which receives the response signal allots an idle traffic channel of the traffic channel transceivers *14a*, establishing a state of voice

4

B 5

communication. The switching station *1* establishes a switching connection between the traffic channel designated by the base station *3a*. At this point, if the voice communication quality of the current traffic channel degrades, then the control device *11a* issues a command to the mobile equipment *5* to transmit a position locating signal using a shared channel via the currently used traffic channel. When this command is received, the mobile equipment *5* switches to a shared channel and transmits a position locating signal, returning to the current traffic channel. When the shared channel receivers *16a – 16n* receives this position locating signal, it determines the arrival time from the unique word therein, and reports these data to the switching station *1* via the control devices *11a – 11n*. The switching station *1* reports these data to the position location calculating device *2*, establishing the position of the mobile equipment *5*. In accordance with these position location results, if, for example, the mobile equipment *5* is within the zone of the base station *3c*, the switching station *1* posts an inquiry to the control device *11c* of the base station *3c* as to an idle traffic channel, and issues a command to the mobile equipment *5* to switch to an idle traffic channel of the base station *3c*, thereby switching and connecting the circuit of the public telecommunications network to a new traffic channel. It should be noted that the junction points *22a – 22n* are used for voice communication signals, and the junction points *23a – 23n* are used for data or control signals. If a call originates from the mobile equipment *5*, the operation is the reverse of that described above. If either the public telecommunications network or the mobile equipment *5* terminates, then the switching station *1* and the control device *11c* terminate operation.

FIG. 2 shows a configuration of the shared channel receivers *16a – 16n*, and *41* is a high-frequency filter, *42* is a high-frequency amp, *43* is a primary mixer, *44* is a synthesizer that generates a primary local frequency, *45* is a primary intermediate frequency filter, *46* is a primary intermediate frequency amp, *47* is a secondary mixer, *48* is a crystal oscillator that generates a secondary local frequency, *49* is a secondary intermediate frequency filter, *50* is a secondary intermediate frequency amp, *51* is a detector/decoder, *52* is a unique word detection circuit, *53* is a time measurement circuit, *54* is a standard clock, and *55* is a control circuit.

In the configuration of **FIG. 2**, when a high-frequency signal modulated by a position locating signal is input to the junction point *33* connecting to the antenna-sharing devices *15*, it is selected by the high-frequency filter *41*, amplified by the high-frequency amp *42*, mixed with the output of the synthesizer *44*, using the primary mixer *43*, and converted to a primary intermediate frequency. After that, it is selected by the primary intermediate frequency filter *45*, amplified by the intermediate frequency amp *46*, mixed with the output of the secondary local frequency crystal oscillator *48*, using the secondary mixer *47*, and converted to a secondary intermediate frequency. Moreover, it is selected by the secondary intermediate frequency filter *49*, amplified by the secondary intermediate frequency amp *50*, and decoded to a position locating signal using the detector/decoder *51*. The position locating signal includes a unique word on the order of 14 bits, and the unique word detection circuit *52* detects the correlation with the original unique word, and when the correlation reaches a peak, the time measurement circuit *53* is triggered. The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*. Furthermore, conversely, the time of the standard clock *54* is corrected by the switching station *1*. Since the unique word correlation detection is accurate to a level of 1/50 bit, if the bit rate of the unique

5

word is 50 kbps, then the precision is (1 sec + 50 kbps) x 1/50 = 0.4 [illegible], so the precision in locating the mobile equipment *5* is on the order of 120 m. If the bit rate is 500 kbps, then the location precision is improved by about 12 m.

FIG. 3 shows a configuration of a moving body radio communication apparatus of a second working example of this invention, and *7a – 7k* are position locating stations, *8a – 8k* are antennas thereof, *17a – 17k* are control devices, *18a – 18k* are shared channel receivers, and *34a – 34k* are contact points between the shared channel receivers *18a – 18k* and the antennas *8a – 8k*. The rest of the configuration is identical to that of FIG. 1.

In the configuration of FIG. 3, the position locating stations *7a -7k* are provided to increase the accuracy of locating the position of the mobile equipment *5*, and when the mobile equipment *5* transmits a position locating signal using a shared channel, the arrival time is measured, and the data is reported to the switching station *1*. The switching station *1* transmits the data from the base stations *3a – 3n* and the data from the position locating stations *7a – 7k* to the position location calculating device *2*, causing the position of the mobile equipment *5* to be calculated. The rest of the configuration is identical to that of FIG. 1.

It should be noted that in the above working examples, with regard to the shared channels, only the receivers *16a – 16n* were provided, but even if these were transceivers, the same results would be obtained, and moreover, messages could be left with the mobile equipment *5*.

### Advantageous Effects of the Invention

In accordance with the invention as described above, it is possible to locate the position of a moving body and determine the distance between a base station and a moving body and digitally transmit with a radio circuit by providing a car telephone system with base stations and a shared channel receiving means, and connecting a moving body position location means to a switching station.

4. <u>Detailed Description of the Drawings</u>

FIG. 1 and FIG. 2 are schematic diagrams of a moving body radio communication apparatus of the first working example and of a shared channel receiving means. FIG. 3 is a schematic diagram of working example 2 of this invention. FIG. 4 is a schematic diagram of a prior art device.

*1* …. Switching station
*2* …. Position location calculating device
*3a – 3n* …. Base stations
*4a – 4n, 6* …. Antennas
*5* …. Mobile equipment
*11a – 11n* …. Control devices
*12a – 12n* …. Control channel transceivers
*14a – 14n* …. Traffic channel transceivers
*16a – 16n* …. Shared channel receivers

B 7

It should be noted that the reference numerals in the drawings show identical or corresponding parts.

Agent:  Masuo OIWA

FIG. 1

FIG. 2

FIG. 3

FIG. 4

7

**B 8**

S.KITAMURAPATENTOFFICE Fax:06-4707-2220          2006年 8月 9日(水) 15:16 P043

⑲ 日本国特許庁（JP）                    ⑪ 特許出願公開

⑫ 公開特許公報（A）                     平3－239091

| ⑤Int.Cl. | 識別記号 | 庁内整理番号 | |
|---|---|---|---|
| H 04 Q   7/04 | C | 7608－5K | |

⑬公開　平成3年(1991)10月24日

審査請求　未請求　請求項の数　1　（全6頁）

㉔発明の名称　移動体無線通信装置

㉑特　願　平2－36652

㉒出　願　平2(1990)2月16日

⑦発 明 者　河 野　実 則　　神奈川県鎌倉市大船5丁目1番1号　三菱電機株式会社通
　　　　　　　　　　　　　　　　信システム研究所内

⑦出 願 人　三菱電機株式会社　　東京都千代田区丸の内2丁目2番3号
㉔代 理 人　弁理士　大岩　増雄　　外2名

明 細 書

1. 発明の名称
　移動体無線通信装置

2. 特許請求の範囲
　専用に割当てられた制御チャネルにより�setting
...（以下本文）

3. 発明の詳細な説明
（産業上の利用分野）
　この発明は、交換局及び複数の基地局を有する
移動体無線通信装置に関し、特に移動体位置指定
機能を有する移動体無線通信装置に関するものである。

（従来の技術）

S.KITAMURAPATENTOFFICE Fax:06-6707-2220    2006年 8月 9日(水) 15:16 P044

特開平3-239091 (2)

（本文は低画質のため判読困難）

B 10

S.KITAMURAPATENTOFFICE Fax:06-4707-2220    2006年 8月 9日(水) 15:16 P045
特開平3-239091(3)

以下、この発明の実施例を図面とともに説明する。第1図はこの発明の実施例による移動体位置確定装置の構成を示し、2は位置確定計測装置、15a～16aは位置確定局3a～3d内に設けられた共通チャネル受信機で、各基地局3a～3dに共通に割り当てられた共通チャネル12a より受信する。

2-4は交換局1と位置確定計測装置2との接続点、3-1a～3-1aは制御装置11a～11aと共通チャネル受信機15a～15aとの接続点、3-3a～3-3aは共通チャネル受信機15a～16aとアンテナ共用局15a～15aとの関係点である。他の構成は第2図と同様である。

次に、動作を説明する。各基地局3a～3dの制御チャネル送受信機12a～12aは各基地局3a～3dの個別情報を含んだ制御報知信号で変調され、それぞれ異なった周期期間内の複数局を適時送信している。移動局5は指定された全ての個別チャネルをスキャンし、そのうちの受信電界が最も大なるチャネルに固定し、待受けている。例えば、移動局5が基地局3aのゾーン内に位置して...

...いれば、制御チャネル送受信機12'aからの信号を待受けている。ここで、各交換局間との接続点2-1における特定の移動局5の位置確定の依頼があると、交換局1は基地局3a～3dに対して移動局5の呼び出しと位置確定を指令する。これを受けて、制御装置11a～11aは位置確定呼び出し信号を制御チャネル送受信機12a～12a及びアンテナ共用局15a～15aを介してアンテナ4a～4aから空間に放射する。移動局5は放射された位置確定呼び出し信号のうち最も強く電界が開いた信号を検討した各基地局3aの制御チャネルで待受けており、この位置確定呼び出し信号を受信すると直ちにレスポンス信号を送信するとともに共通チャネルに切換えてバースト状のデジタル信号である位置確定信号を送信する。レスポンス信号を受信した各基地局3aは、交換局1に移動局5が自局のゾーン内にいることを報告する。又、各基地局3a～3dの共通チャネル受信機15a～16aのうちのいくつかは移動局5からの位置確定信号を受信すると、その中に含まれているユニ...

...ークワードを周期検波することにより位置確定信号が到着した絶対時間あるいは相対時間を測定し、位置確定信号の各基地局3a～3dへの到着時間差などのデータを制御装置11a～11aを介して交換局1へ報告する。交換局1はこれらのデータを位置確定計算装置2へ転送し、移動局5の位置を計算する。この場合、共通チャネル受信機15a～15aの位置関係および、固定が測定される。

次に、各交換局間との接続点2-1に対してある特定の移動局5への通話呼び出しが新たにあったとする。この場合、交換局1は基地局3a～3dに対して移動局5を呼び出しを指令する。これを受けて、制御装置11a～11aは移動局5の呼び出し信号を制御チャネル送受信機12a～12a及びアンテナ共用局15a～15aを介してアンテナ4a～4aから空間に放射する。移動局5は呼び出し信号のうち最も強く電界が開いた信号を検討する制御は各基地局3aの制御チャネルで待受ける...

...おり、各基地局5aからの呼び出し信号を受信し、直ちにレスポンス信号を送信する。レスポンス信号を受信した基地局3aはトラフィックチャネル送受信機14aの空きのトラフィックチャネルを割当て、通話状態となる。交換局1は基地局3aが指定したトラフィックチャネルと各通信回線との交換接続を行う。ここで、現在のトラフィックチャネルの回線品質が劣化すると、制御装置11aは現在使用しているトラフィックチャネルを介して移動局1に共通チャネルを用いた位置確定の指令を指令する。この指令を受けて、移動局5は共通チャネルに切換えて位置確定信号を送信し、現在のトラフィックチャネルに復帰する。共通チャネル受信機15a～16aはこの位置確定信号を受信すると、その中のユニークワードを周期検波を測定し、これらのデータを制御装置11a～11aを介して交換局1に報告する。交換局1はこれらのデータを位置確定計算装置2に転送し、移動局5の位置を確認する。この位置確定結果により、例えば移動局5が基地局5の...

B 11

B 12

特開平3-239091 (8)

第 4 図



B 14

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | |
|---|---|
| TRUEPOSITION, INC., ) | |
| ) | |
| PLAINTIFF/ ) | |
| COUNTERCLAIM- DEFENDANT, ) | |
| ) | |
| ) | |
| v. ) | CA NO. 05-00747-SLR |
| ) | |
| ANDREW CORPORATION, ) | |
| ) | |
| DEFENDANT/ ) | |
| COUNTERCLAIM-PLAINTIFF. ) | |


**EXPERT REPORT OF DR. DAVID GOODMAN**
**ON THE INVALIDITY OF U.S. PATENT NO. 5,327,144**


**B 15**

## I.    INTRODUCTION

Andrew Corporation has retained me as a technical expert in this case.  I expect to testify at trial regarding the matters set forth in this report if asked by the Court or the parties' attorneys. I will also be prepared to provide the Court and the jury with a tutorial on the technology involved in this matter, including the evolution of the technology.  I am being compensated for my work associated with the litigation at my customary rate of $600 per hour.  My compensation does not depend on the outcome of this litigation, the opinions I express, or my testimony.

I understand that TruePosition, Inc. has asserted certain claims of United States Patent 5,327,144 against Andrew Geometrix products. I submit this expert report, which contains my opinion regarding the invalidity of the claims of the '144 patent asserted by TruePosition. I have been asked to determine whether claims 1, 2, 22, 31, and 32, of the '144 patent are valid.  For the reasons stated below, it is my opinion that the asserted claims are invalid because they are anticipated by Japanese Patent Application Kokai (Laid-Open) Publication No.: H3-239091, October 24, 1991 ("the Kono application").

## II.    BACKGROUND AND QUALIFICATIONS

### A.    QUALIFICATIONS

I am currently a Program Director at the National Science Foundation in Arlington, Virginia on temporary assignment from my position as a professor of Electrical and Computer Engineering at Polytechnic University in Brooklyn, New York.  Before joining the NSF, I was Director of the Wireless Internet Center for Advanced Technology (WICAT), located at Polytechnic University, Columbia University, and the University of Virginia.   WICAT is a National Science Foundation Industry/University Cooperative Research Center. From August 1999 until August 2001, I was Head of the Department of Electrical and Computer Engineering at Polytechnic University.

Before joining Polytechnic University in 1999, I was a Professor of Electrical and Computer Engineering at Rutgers, the State University of New Jersey. From 1988 until 1991, I was Chairman of the Department of Electrical and Computer Engineering at Rutgers. In 1989, I founded the Wireless Information Network Laboratory (WINLAB) at Rutgers University.

**B 16**

WINLAB was the first center of excellence at a United States university focused on cellular telecommunications.   In 1991, WINLAB was designated the National Science Foundation Industry/University Cooperative Research Center for Wireless Information Networks. I was the Director of WINLAB until 1999, when I joined Polytechnic University.

From 1967 to 1988, I was at Bell Laboratories, where I held the position of Department Head in Communications Systems Research. In 1995, I was a Research Associate at the Program on Information Resources Policy at Harvard University.   In 1997, I was Chairman of the National   Research   Council   Committee   studying   "The   Evolution   of   Untethered Communications."

I have extensive experience performing and managing research in telecommunications and digital signal processing.   My research in cellular telecommunications has produced innovations covering multiple access protocols, network architecture, mobility management, and radio resources management.   In 1986 and 1987, while I was employed by AT&T Bell Laboratories, I had a research assignment in the United Kingdom. As part of this assignment, I had detailed technical discussions with experts in several European countries who were participating in the establishment of the GSM cellular standard. At that time, I acquired a thorough understanding of GSM technology, and I have maintained this expertise ever since through technical discussions, participation in various forums, and in the conduct of my teaching, research, and writing.

I was one of the first professors to teach a college-level course in cellular telecommunications and have taught such courses since January 1989. In the early 1990's, I also presented a three-day short course at many large companies including Bell Atlantic Mobile, Pacific Bell, US West, Ericsson and AT&T. This course introduced corporate students to the operations of several cellular systems including AMPS, TDMA, and GSM.  I have lectured and published widely on the subject of cellular telecommunications.   My publications include approximately 100 papers.  I have also consulted for many corporations in this field, including: Ericsson, Motorola, Lucent Technologies, and Nortel Networks.

**B 17**

I received a Bachelor's degree at Rensselaer Polytechnic Institute in 1960, a Master's degree at New York University in 1962, and a Ph.D. at Imperial College, University of London in 1967, all in electrical engineering.

I am a Member of the National Academy of Engineering, a Foreign Member of The Royal Academy of Engineering, a Fellow of the Institute of Electrical and Electronics Engineers, and a Fellow of the Institution of Electrical Engineers.

In 1997, I received the ACM/SIGMOBILE Award for "Outstanding Contributions to Research on Mobility of Systems Users, Data, and Computing." In 1999, I won the RCR Gold Award for the best presentation at the Conference on Third Generation Wireless Communications. In 2003, I received an IEEE Avant Garde Award for Contributions to Speech Coding and Internet-Packet Cellular Networks. Three of my papers on wireless communications have been cited as Paper of the Year by IEEE journals.

I am a frequent public speaker in a variety of forums on wireless communications. I am author of the books *Wireless Personal Communications Systems*, published in 1997 by Addison Wesley and co-author, with Roy Yates, of *Probability and Stochastic Processes A Friendly Introduction for Electrical and Computer Engineers, Second Edition*, published in 2004 by Wiley. I am co-editor of six other books on wireless communications. I am a named inventor on eight United States patents and have one patent application pending.

**B.    LIST OF AUTHORED PUBLICATIONS**

Attached as Exhibit A to my report is my Curriculum Vitae, which contains a list of publications that I have authored since 1988.

**C.    PRIOR TESTIMONY**

In the past four years I have provided expert testimony in depositions in the following cases: Aerotel, Ltd. v. Verizon Communications Inc. et al. (S.D.N.Y); PowerOasis, Inc. and PowerOasis Networks, LLC, v. T-Mobile USA, Inc., (D. NH); Papyrus Technology Corp. v. New York Stock Exchange, Inc., (S.D.NY); Agere v. Broadcom, (E.D. PA); and Freedom Wireless, Inc. v. Boston Communications Group, Inc. et al. (D. MA). In addition I testified at a Markman hearing and in a tutorial for the Court in Agere v. Broadcom, (E.D. PA).

**B 18**

D.    INFORMATION RELIED ON

Attached as Exhibit B is a list of the materials that I reviewed in connection with my preparation of this report.

## III.    OPINIONS AND BASES FOR THOSE OPINIONS

A.    LEGAL STANDARDS

In conducting my analysis and forming my opinions I have received and relied upon information provided by counsel regarding the applicable legal standards on patent invalidity.

I understand that issued U.S. Patents are presumed valid and that the standard to prove invalidity is clear and convincing evidence.

I understand that for an independent patent claim to be anticipated by the prior art, the prior art reference must disclose each and every limitation of the claim either expressly or inherently.   I also understand for a dependent claim to be anticipated by the prior art, the prior art reference must disclose each and every limitation of both the dependent claim and any claim(s) from which it depends.

I understand that for a patent claim to be invalid for obviousness the differences between the claimed invention as a whole and the prior art would have been obvious to a person of ordinary skill in the art at the time of the invention.   I understand that before an obviousness determination can be made, I must consider the level of ordinary skill in the art, the scope and content of the prior art, and the differences between the claimed invention and the prior art.

I understand that claims are construed according to their plain and ordinary meaning to one of ordinary skill in the art.   I understand that the same claim construction must be used for both an infringement analysis and an invalidity analysis; I understand that claims cannot be construed one way for an infringement analysis and a different way for an invalidity analysis.

I also understand that the Court has not yet construed claim terms in this case, but that the parties have exchanged various preliminary claim interpretations.  Regardless of which

5                    B 19

constructions are adopted it is my opinion that the Kono application will anticipate the '144 patent if its claims are read broadly enough to cover Andrew's Geometrix products.

## B.    ORDINARY SKILL IN THE ART

A person of ordinary skill in the art of the '144 patent would have had a masters degree in electrical and computer engineering or computer science, or the equivalent skills and knowledge, and/or at least two years' experience at a cellular operating company, or a company that designs/produces cellular systems or services, including value added systems or services such as location determination.

## C.    THE '144 PATENT

The '144 patent is titled "Cellular Telephone Location System". Using the system disclosed in the patent, an AMPS cellular telephone network estimates the geographical coordinates of cellular telephones served by the network.

The technique at the heart of the purported invention is referred to as Time Difference of Arrival (TDOA) location determination. TDOA location determination was a well known technique at the time of the invention.

To use this technique in a cellular network, the patent dictates that at least three cell sites must receive the same radio signal from a cellular telephone. Each one converts the radio signal to a baseband signal, digitizes the base band signal and sends the digitized baseband signal, along with a time stamp to a central site. As shown in Figure 7 of the '144 patent, the central site uses correlation techniques to estimate the differences among times of arrival ("TDOA data") at all pairs of reporting cell sites. It uses the TDOA data to estimate the geographical coordinates of the cellphone by comparing the measured delays with a grid of reference delays stored at the central site. Each reference delay is associated with a unique geographical reference location. The central site uses a least squares metric to determine the best reference location. After determining the best reference location, the central site again uses a least squares technique to further refine the location estimate.

All of the claims of the '144 patent pertain to cellular telephone systems. Figures 1A and 1C of the '144 patent display some of the properties of a generic cellular system. Figure 1C

6

**B 20**

shows "the main components and arrangement of cellular telephone system." '144 Pat., Col. 1, ll. 51-52.



**Fig. 1C, '144 Patent**

Figure 2 of the '144 patent shows "a schematic diagram of a cellular telephone location system in accordance with the present invention." '144 Patent, Col. 7, ll. 60-62.



**Fig. 2, '144 Patent**

7

**B 21**

**D.     CLAIM TERMS**

A person of ordinary skill in the art would recognize that the terms of art in the '144 patent were used to describe analog cellular systems in common use when the patent was filed in 1993.

**(1)     Analog Systems and Reverse Control Channels**

In all of the patent claims, the first important limitation is "cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels". A person of ordinary skill in the art in 1993 would recognize reverse control channels as components of the analog cellular and dual-mode telephone systems specified in the United States national standard, ANSI 553, in Interim Standard 54, and Interim Standard 95 published by the Telecommunications Industry Association.

My interpretation is further supported by the following passage of the '144 patent, and the testimony of two named inventors regarding that passage. The '144 patent states:

> In addition, it should be noted that the inventive concepts disclosed herein are applicable to both analog and digital (for example, TDMA) cellular systems that employ analog control channels.

'144 patent, col. 1, lns. 27-31. A person of skill in the art would recognize "digital … systems that employ analog control channels" to refer to cellular systems that carry voice information in a digital format and use the signal formats of the AMPS system for transmitting system control information.

Named inventor Dr. Curtis Knight testified:

**Q:**     What are analog control channels?

**A:**     I'm not sure I know what was meant by that but what we had in mind was AMPS when we were writing this.

Knight October 6, 2006 Page 89 at 25 through Page 90 at 13. Named inventor Dr. John Webber concurred. Webber October 4, 2006 Page 23 at 9-18.

8

**B 22**

There are two types of transmissions disclosed in the '144 patent; one type is a signal transmitted over a "reverse control channel." The analog cellular standards that use the term "reverse control channel" specify that cellular telephones transmit information in a prescribed format that is different than the format specified by GSM. The format specified by analog cellular standards is illustrated in the following diagram that I prepared many years ago to explain the AMPS system to students:



**Fig. 3.10, Wireless Personal Communications Systems**

"Reverse control channels" also have a many-to-one property in that they convey information from many cellular phones to one base station.

In order to assert the '144 patent against cellular systems that use Andrew technology, True Position has to adopt an interpretation of "transmissions over ... reverse control channels" that is significantly more inclusive than the transmissions addressed by the '144 patent. This

**B 23**

inclusion would embrace a wider range of signal formats carried on channels that convey information from many cellular telephones to one base station.

### (2)    The Independent Claims

The independent claims (1, 22, and 31) asserted by True Position address details of: (a) the signal transmitted by a cellphone; (b) signal reception at the cellular cell sites; (c) the way in which the arrival time is determined at each cell site; (d) the nature of the reports transmitted by the cell sites to the location determination device; and (e) how the location determination device uses the reports to calculate the geographical coordinates of the cellphone.

#### a.    *Signals transmitted by a cellphone*

The independent claims state that the signals used for location determination are transmitted periodically "over one of a prescribed set of reverse control channels".

#### b.    *Signal reception at the cell sites*

Claim 1 requires that the signal reception be accomplished by an antenna and a baseband converter coupled to the antenna. In Claim 22, the cell sites are equipped to receive the signals from the cellphone and Claim 31 states that the location determination method receives the signals.

#### c.    *Determining arrival time at cell sites*

Claim 1 requires a timing signal receiver for receiving a timing signal common to all cell sites.

#### d.    *Reports transmitted by the cell sites*

Claim 1 requires that the baseband signal be sampled at a prescribed frequency and that the signal samples and a time stamp be formatted in digital data frames with a prescribed number of data bits. Claim 31 requires the cell site to produce frames of data with a prescribed number of data bits and time stamp bits.

**B 24**

e.    *Using the reports to calculate cellphone location*

Claim 1 requires that the reports arrive at a central site system from the cell sites. The central site system processes the frames of data in the report to produce a table identifying individual signals and associated time differences of arrival at the cell sites. It then determines cellphone locations from the time differences of arrival. Claim 22 requires the system to have a database, accessible from remote locations, containing cellphone identities and locations. Claim 31 states that the system processes the frames of data from the cell sites to identify cellular telephones and differences in times of arrival and that it uses this information to determine cellphone location.

## E.    THE KONO APPLICATION

The title of the Kono application is translated to English as "Moving Body Radio Communication Apparatus". Like the '144 patent, it describes determination of the location of a cellular telephone from information about the arrival times at a plurality of base stations of a position locating signal transmitted by the telephone.

The Kono application states that the signal is transmitted on a shared channel and received at multiple base stations. Each base station determines the time of arrival of the position locating signal and transmits associated data to a switching station that in turn transmits the data to a position location calculating device. This device uses data from the base stations such as time differences of arrival at the multiple base stations to calculate the position of the cellphone.

## F.    RELATION OF THE '144 PATENT TO THE KONO APPLICATION

All of the claims of the '144 patent pertain to cellular telephone systems. As discussed above, Figure 2 of the '144 patent shows a "a schematic diagram of a cellular telephone location system in accordance with the present invention"; similarly, the Kono application places the invention in the context of a generic cellular system illustrated in Figures 1 and 4:

**B 25**



**Fig. 1, Kono Application**



**Fig. 4, Kono Application**

12

**B 26**

Within this system, all of the claims of the '144 patent require periodic transmissions by the cellular telephones over reverse control channels. The Kono application describes "position locating signals from a moving body using shared channels" (page 3, 4th paragraph). It is clear that "moving body" in the Kono application is synonymous with the cellular telephone in the '144 patent.

All of the '144 patent claims require three or more cell site systems that receive the periodic transmissions from the cellular telephones. Similarly the Kono patent refers to *n* base stations (labeled *3a* to *3n* in Figures 1, 3, and 4, each containing a shared channel receiver (*16a – 16n*).

Claim 1 of the '144 patent requires "an elevated ground-based antenna" at each cell site. Figures 1, 3, and 4 of the Kono application also display antennas (labeled *4a – 4n*) at the *n* base stations.

Claim 1 of the '144 patent also includes a "baseband converter" for receiving the periodic transmissions on the reverse control channels. The corresponding device in the Kono application is a shared channel receiver at each base station (*16a – 16n*).

The cell site system in Claim 1 of the '144 patent also includes a "timing signal receiver for receiving a timing signal common to all base stations". The corresponding device in the Kono application is an ultra-high precision clock (labeled *54* in Figure 2) within each of the shared channel receivers. The ultra-high precision clocks at all of the base stations are "corrected by the switching station *1*". Page 5, ¶ 3, l. 16.

The other element of the cell site system in Claim 1 of the '144 patent is a "sampling subsystem" that samples the baseband signal and formats the samples and time stamps in frames of digital data. Each time stamp represents the time of arrival of one locating signal from a cellphone. In the Kono application, the base stations *3a – 3n* receive the position locating signal. A time measurement circuit (*53*) in each base station measures the absolute time of arrival and reports it to the switching station. A person of ordinary skill in the art would recognize that the report would be contained in data frames.

13

**B  27**

Part (b) of Claim 1 of the '144 patent specifies a "central site system operatively coupled to said cell site systems". The corresponding element of the Kono application is the switching station (*1*) in communication with the base stations (*3a – 3n*) through junction points (*23a – 23n*) that convey data or control signals between the switching system and the base stations.

The central site system in Claim 1 of the '144 patent processes the frames of data arriving from the cell site systems and generates a table containing information that identifies the signals arriving from the cell sites and time differences of arrival at the different cell sites. The central site system contains a "means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones." In the Kono application the switching station "receives data in the form of these position locating signals" forwards the data received from the base stations to the position locating device (*2*). The position locating device uses the data to calculate the position of the cellular telephone.

Claim 2 of the '144 patent depends on Claim 1 and states that the timing signal receiver is a Global Position System receiver. In the Kono patent the timing signal common to all base stations exists at the switching station (*1*): "...the time of the standard clock *54* is corrected by the switching station *1*." Page 5, ¶ 3, l. 16.  Since at least as early as 1993, some cellular networks have had GPS receivers at every base station.  The GPS receivers receive a timing signal common to all base stations. The location systems disclosed in the Kono reference work in conjunction with cellular networks.  When those cellular networks have GPS receivers, they can be used with the location system disclosed.

Claim 22 of the '144 patent is less specific than Claim 1. In addition to base stations and reverse control channels Claim 22 requires simply a means of determining the locations of the cellular telephones "by receiving and processing signals emitted during said periodic reverse control channel transmissions". The elements of the Kono application that perform this function are the shared channel receivers in the base stations, the ultra-high precision clocks, the time measurement circuit, the switching station and the position locating device.

The remainder of Claim 22 specifies a "database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations".  Since their inception in the early 1990s, GSM

networks have had Home Location Registers ("HLRs") and Visitor Location Registers ("VLRs"). Because Andrew's products do not have a database, if TruePosition argues for an interpretation of "database means" that is broad enough to encompass Andrew's products, this element is anticipated by the HLR and VLR inherent in the cellular systems taught by the Kono application.

Claim 31 describes the same operations as Claim 1 without referring to the antenna, the baseband converter, the timing signal receiver, and the sampling subsystem at each cell site. It requires frames of data that are processed to identify individual telephones and time differences of arrival and using the time differences to determine the locations of the cellular telephones. The corresponding operations in the Kono application are described above in the comparison of Claim 1 of the '144 patent with the Kono application.

Claim 32 depends on Claim 31. It is identical to the final Claim element of Claim 22.

(1)    **Summary Chart Reflecting Opinions**

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 1. A cellular telephone location system for determining the locations of multiple mobile cellular telephones | Yes | "FIG. 1 shows a configuration of a moving body position locating apparatus" Page 3 ¶ 6, ll. 12. |
| each initiating periodic signal transmission over one of a prescribed set of reverse control channels, comprising: | Yes | "a moving body transmits position locating signals using shared channels" Page 3 ¶ 5, l. 1. |
| (a) at least three cell site systems, each cell site system comprising: | Yes | Base stations 3a-3n. |
| an elevated ground-based antenna; | Yes | Antennas 4a-4n. |
| a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and | Yes | Control channel transceivers 12a-12n. |

15

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| providing baseband signals derived from the cellular telephone signals; | | |
| a timing signal receiver for receiving a timing signal common to all cell sites; | Yes | "…the time of the standard clock *54* is corrected by the switching station *1*." Page 5, ¶ 3, l. 16. |
| and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and | Yes | Kono teaches software and processors in control circuit *55* that determine and format time of arrival information. Time stamp bits: "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*." Page 5, ¶ 3. ll. 13-15. Data bits: "It should be noted that the junction points *22a – 22n* are used for voice communication signals, and the junction points *23a – 23n* are used for data or control signals." Page 5, ¶ 1, ll.15-17. |
| (b) a central site system operatively coupled to said cell site systems, comprising: | Yes | Switching station *1* and position location calculating device *2*. |
| means for processing said frames of data from said cell site systems | Yes | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll.23-25. |
| to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; | Yes | "reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |
| and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | Yes | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

16

**B 30**

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 2. A cellular telephone location system as recited in claim 1, | Yes | See the above claim chart for claim 1. |
| wherein said timing signal receiver comprises a global positioning system (GPS) receiver. | Yes | Since at least as early as 1993, some cellular networks have had GPS receivers at every base station. The location systems disclosed in the Kono reference and the '144 patent work in conjunction with cellular networks. When those cellular networks have GPS receivers, they can be used by the location system. |

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 22. A ground-based cellular telephone system serving a plurality of subscribers possessing mobile cellular telephones, comprising: | Yes | "FIG. 1 shows a configuration of a moving body position locating apparatus" Page 3 ¶ 6, ll. 12. |
| (a) at least three cell sites; | Yes | Base stations 3a-3n. |
| equipped to receive signals sent by multiple mobile cellular telephones | Yes | Control channel transceivers *12a-12n*. |
| each initiating periodic signal transmissions | Yes | "a moving body transmits position locating signals using shared channels" Page 3 ¶ 5, l. 1. |
| over one of a prescribed set of reverse control channels | Yes | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n.*" Page 2, ¶ 2, ll. 5-6. |
| (b) locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions; and | Yes | Kono teaches software and processors in control unit *55* that determine and format time of arrival information. "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11.*" Page 5, ¶ 3. ll. 13-15. "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

17

B 31

| (c) database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations. | Yes | Since their inception in the early 1990s, GSM networks have had Home Location Registers ("HLRs") and Visitor Location Registers ("VLRs"). Because Andrew's products do not have a database, if TruePosition argues for an interpretation of "database means" that is broad enough to encompass Andrew's products, this element is anticipated by the HLR and VLR inherent in the cellular systems taught by the Kono application. |
|---|---|---|

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 31.  A method for determining the location(s) of one or more cellular telephones | Yes | "FIG. 1 shows a configuration of a moving body position locating apparatus" Page 3 ¶ 6, ll. 12. |
| each initiating periodic signal transmissions over one of a prescribed set of reverse control channels, comprising the steps of: | Yes | "a moving body transmits position locating signals using shared channels" Page 3 ¶ 5, l. 1. |
| (a)  receiving said reverse control channel signals at least three geographically separated cell sites; | Yes | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n.*" Page 2, ¶ 2, ll. 5-6. |
| (b)  processing said signals at each cell site to produce frames of data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said frames were produced at each cell site; | Yes | Kono teaches software and processors in hardware unit *55* that determine and format time of arrival information.<br>Time stamp bits: "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11.* " Page 5, ¶ 3. ll. 13-15.<br>Data bits: "It should be noted that the junction points *22a – 22n* are used for voice communication signals, and the junction points *23a – 23n* are used for data or control signals." Page 5, ¶ 1, ll.15-17. |

| | | |
|---|---|---|
| (c) processing said frames of data to identify individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell sites; and | Yes | "reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |
| determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | Yes | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 32. A method as recited in claim 31, | Yes | See the above claim chart for claim 31. |
| further comprising the steps of storing, in a database, location data identifying the cellular telephones and their respective locations, and providing access to said database to subscribers at remote locations. | Yes | Since their inception in the early 1990s, GSM networks have had Home Location Registers ("HLRs") and Visitor Location Registers ("VLRs"). Because Andrew's products do not have a database, if TruePosition argues for an interpretation of "database means" that is broad enough to encompass Andrew's products, this element is anticipated by the HLR and VLR inherent in the cellular systems taught by the Kono application. |

## IV.    RESERVATION OF RIGHTS

This report presents my opinions to date regarding the matters set forth above. As additional data, information, or testimony becomes available to me or is provided to me, I intend to consider this information. I thus reserve the right to modify or supplement this report or the opinions contained herein if I find it appropriate to do so in light of any additional information. I may also be called upon to, and intend to if asked, provide expert testimony in rebuttal to any proofs put forth by TruePosition or any opinions expressed in expert reports on behalf of TruePosition.

***

Dated: December 1, 2006

Dr. David J. Goodman

19

**B 33**

# EXHIBIT A

# CURRICULUM VITAE OF DR. DAVID GOODMAN

## I.    BIOGRAPHY

Since 1999, David Goodman has been a Professor of Electrical and Computer Engineering at Polytechnic University in Brooklyn, New York. He currently holds a temporary position as Program Director in the Computer and Network Systems Division of the National Science Foundation. Before joining the NSF in February 2006, he was Director of the Wireless Internet Center for Advanced Technology, a National Science Foundation Industry/University Cooperative Research Center at Polytechnic University, Columbia University, and University of Virginia. Until August 2001, he was Head of the Electrical and Computer Engineering Department at Poly.

Prior to joining Poly, Dr. Goodman was a professor at Rutgers University, where he founded the Wireless Information Network Laboratory (WINLAB) in 1989. He was WINLAB Director until he moved to Brooklyn Poly. In 1995, he was a Research Associate at the Program on Information Resources Policy at Harvard University. In 1997, he was Chairman of the National Research Council Committee studying "The Evolution of Untethered Communications." From 1967 to 1988 he was at Bell Laboratories, where he was Department Head in Communications Systems Research. He has made fundamental contributions to digital signal processing, speech coding, and wireless information networks.

Dr. Goodman is a member of the National Academy of Engineering and a foreign member of The Royal Academy of Engineering, a Fellow of the Institute of Electrical and Electronic Engineers, and a Fellow of the Institution of Electrical Engineers. In 1997, he received the ACM/SIGMOBILE Award for "Outstanding Contributions to Research on Mobility of Systems Users, Data, and Computing". In 1999 he won the RCR Gold Award for the best presentation at the Conference on Third Generation Wireless Communications. In 2003, he received the Avant Garde award from the Vehicular Technology Society of the IEEE. Three of his papers on wireless communications have been cited as Paper of the Year by IEEE journals.

Dr. Goodman is a frequent public speaker in a variety of forums on wireless communications. He is author of the books "Wireless Personal Communications Systems", published in 1997 by Addison Wesley and co-author, with Roy Yates, of "Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers", published by Wiley in 1998, with a second edition published in 2004. He is a co-editor of six other books on wireless communications. He received a Bachelor's degree at Rensselaer Polytechnic Institute (1960), a Master's at New York University (1962), and a Ph. D. at Imperial College, University of London (1967), all in Electrical Engineering.

B 35

## II.  EDUCATION

Doctor of Philosophy (Electrical Engineering), 1967
Imperial College, University of London

Master of Electrical Engineering, 1962
New York University

Bachelor of Electrical Engineering, 1960
Rensselaer Polytechnic Institute

## III.  PROFESSIONAL EXPERIENCE

National Science Foundation, 2006 - Present
Program Director
Computer and Network Systems Division
(On leave from Polytechnic University)

Polytechnic University, 1999 - Present
Professor of Electrical and Computer Engineering
Director, NSF Wireless Internet Center for Advanced Technology
Head Of Department, 1999-2001

Rutgers University, 1988 - 1999
Director, Wireless Information Network Laboratory (WINLAB), 1989 - 1999
Chair, Department of Electrical and Computer Engineering, 1988 - 1991

Harvard University, 1995
Research Associate, Program on Information Resources Policy

AT&T Bell Laboratories 1960 - 1962, 1967-1988
Department Head, Communications Systems Research

Imperial College, London, 1983-1988
Visiting Professor of Electrical Engineering

Southampton University, 1987-1990
Visiting Professor of Electronics and Computer Science

**B 36**

IV.    **HONORS AND AWARDS**

Member, National Academy of Engineering

Foreign Member, Royal Academy of Engineering

Fellow, Institute of Electrical and Electronic Engineers

Fellow, Institution of Electrical Engineers

2003 IEEE Avant Garde Award for Contributions to Speech Coding and Internet-Packet Cellular Networks

1999 RCR Gold Award for Best Talk at Wireless Technology Conference

1997 ACM Award for Outstanding Contributions to Research on Mobility of Systems, Users, Data and Computing

Paper of the Year: IEEE Transactions on Vehicular Technology: 1992

Paper of the Year: IEEE Communications Magazine: 1992

Paper of the Year: IEEE Transactions on Vehicular Technology: 1988

V.    **PAPERS SINCE 1988**

1.    **"Government Regulation and Innovation in Information Technology"**
      D. J. Goodman
      Information Technology: The Public Issues, R. Plant, F. Gregory, and A. Brier, ed., Manchester University Press, Chapter 4, pp 62-78 (1988).

2.    **"Packet Data Transmission over Mobile Radio Channels"**
      C.K. Siew and D.J. Goodman
      IEEE Transactions on Vehicular Technology, Vol. 38, No. 2, pp 95-101, (May 1989)

3.    **"Packet Reservation Multiple Access for Local Wireless Communications"**
      D.J. Goodman, R.A. Valenzuela, K.T. Gayliard, and B. Ramamurthi
      IEEE Transactions on Communications, Vol. COM-37, No. 8, pp 885-890 (August 1989)

4.    **"Cellular Packet Communications"**
      IEEE Transactions on Communications, Vol. COM-38, No. 8, pp 1272-1280 (August 1990)

4

**B 37**

5. **"Evolution of Wireless Information Networks"**
    European Transactions on Telecommunications Special Issue on Major Issues for
    Telecommunications in the 1990's, Vol. 2, No. 1, pp 10 5-113 (January 1991)

6. **"Efficiency of Packet Reservation Multiple Access"**
    D.J. Goodman and S.X. Wei
    IEEE Transactions on Vehicular Technology, Vol. 40, No. 1, pp 170-176
    (February 1991)

7. **"Second Generation Wireless Information Networks"**
    IEEE Transactions on Vehicular Technology, Vol. 40, No. 2, pp 366-374 (May
    1991)

8. **"Trends in Cellular and Cordless Communications"**
    IEEE Communications Magazine, Vol.29,No. 7, pp 31-40 (June 1991) 1992
    Magazine Prize Paper Award

9. **"Performance of PRMA: A Packet Voice Protocol for Cellular Systems"**
    S. Nanda, D.J. Goodman and U. Timor
    IEEE Transactions on Vehicular Technology, Vol. 40, No. 3,pp 584-598 (August
    1991) 1992 Jack Neubauer Award

10. **"A Packet Reservation Multiple Access Protocol for Integrated Speech and Data
    Transmission"**
    W.C. Wong and D.J. Goodman
    IEEE Proc.-I, Vol. 139, No. 6 (1992)

11. **"Network Control for Wireless Communications"**
    D.J. Goodman, G.P. Pollini and K.M. Meier-Hellstern
    IEEE Communications Magazine, Vol. 30, No. 12, pp 116-124 (December 1992)

12. **"Centralized Power Control in Cellular Radio Systems"**
    S. A. Grandhi, R. Vijayan, D.J. Goodman, J. Zander
    IEEE Transactions on Vehicular Technology, Vol. 42,No. 4, pp. 466-468
    (November 1993)

13. **"A Predictive Load-Sharing Scheme in a Microcellular Radio Environment"**
    Kuek, S.S., W.-C. Wong, R. Vijayan, D.J. Goodman
    IEEE Transactions on Vehicular Technology, Vol.42,No. 4, pp. 519-525
    (November 1993)

**B 38**

14. **"Distributed Power Control in Cellular Radio Systems"**
    S.A. Grandhi, R. Vijayan, and D.J. Goodman
    IEEE Transactions on Communications, Vol. 42, No.2/3/4, Part I, pp. 226-228
    (Feb/March/April 1994)

15. **"Network Protocols for the Cellular Packet Switch"**
    K. Meier-Hellstern, G.P. Pollini, and D. J. Goodman
    IEEE Transactions on Communications, Vol. 42, No.2/3/4, Part II, pp.1235-1244
    (Feb/March/April 1994)

16. **Guest Editorial: "Wireless & Mobile High-Speed Communication Networks: Architecture, Modeling and Analysis"**
    H. Ahmadi, D. J. Goodman, K. Sohraby, and R. Steele
    IEEE Journal on Selected Areas in Communications, Vol. 12, No. 8, October 1994

17. **"Interworking Between Digital European Cordless Telecommunications and a Distributed Packet Switch"**
    S. Rao, D. J. Goodman, G. P. Pollini, K. S. Meier-Hellstern
    Wireless Networks, Vol. 1, No. 1, pp. 83-93, February 1995

18. **"Signaling Traffic Volume Generated by Mobile and Personal Communications"**
    G. P. Pollini, K. S. Meier-Hellstern, D. J. Goodman
    IEEE Communications Magazine, Vol. 33, No. 6, pp. 60-65, June 1995

19. **"Signaling System Performance Evaluation for Personal Communications"**
    G. P. Pollini, D. J. Goodman
    IEEE Transactions on Vehicular Technology, Vol. 45, No. 1, pp. 131-138, February 1996

20. **"Multi-rate PRMA: A Protocol for Controlled Soft-capacity in TDMA Systems"**
    M. Thomas, D. J. Goodman
    IEEE Electronics Letters, Vol. 32 (No. 15), pp. 1344-1345, July 1996.

21. **"Minimizing Queuing Delays and Number of Messages in Mobile Phone Location"**
    D.J. Goodman, P. Krishnan, B. Sugla
    Mobile Networks and Applications, Vol. 1, No. 1, pp. 39-48, August 1996.

**B 39**

22. "Resource Allocation for Cellular Radio Systems"
    S.A. Grandhi, R.D. Yates, D.J. Goodman
    IEEE Transactions on Vehicular Technology, Vol. 46, No. 3, pp. 581-587, August
    1997.

23. "General Packet Radio Service in GSM"
    J. Cai, D. J. Goodman
    IEEE Communications Magazine, pp. 122-131, October 1997.

24. "The Person in PC and PCS"
    D. J. Goodman
    ACM Mobile Computing and Communications Review, Vol. 1, No. 1, pp. 1-2,
    January 1998.

25. "Standards for Personal Communications in Europe and the United States"
    D. J. Goodman
    Program on Information Policy Research, Harvard University, 1998.
    http://pirp.harvard.edu/pubs_pdf/goodman/goodman-p98-1.pdf

26. "A New Framework for Power Control in Wireless Data Networks: Games,
    Utility, and Pricing"
    D. Famolari, N. Mandayam, D. Goodman, and V. Shah
    in Wireless Multimedia Network Technologies, R. Ganesh, et al., editors, Kluwer
    Academic Publishers, pp. 289-310 (2000).

27. "Power Control for Wireless Data"
    D.J. Goodman and N. Mandayam
    IEEE Personal Communications, Vol. 7, No. 2, pp. 48-54, April 2000.

28. "The Wireless Internet: Promises and Challenges"
    D.J. Goodman
    Computer, Vol. 33, No. 7,pp.36-41, July 2000.

29. "The Wireless Revolution and the Geography of Information"
    D.J. Goodman
    Maintaining Solid Foundations for Hi-Tech Growth, A. L. C. de Cerreno, ed.,
    New York Academy of Sciences,July 2001, pp. 11-25.

30. "Network Assisted Power Control for Wireless Data"
    D. Goodman and N. Mandayam
    Mobile Networks and Applications, Vol. 6, No. 5, pp. 409-418, Sept, 2001

B 40

31. "Pricing and Power Control in a Multicell Wireless Data Network"
    C. U. Saraydar, N. B. Mandayam, and D. J. Goodman
    IEEE Journal on Selected Areas in Communications, Vol. 19, No. 10,pp. 1883-
    1892, Oct. 2001.

32. "Mobility and Resource Management in Next Generation Wireless Systems"
    I. F. Akyildiz, D. J. Goodman, and L. Kleinrock
    Guest Editorial, IEEE Journal on Selected Areas in Communications, Vol. 19, No.
    10, pp. 1825-1830, Oct. 2001.

33. "Efficient power control via pricing in wireless data networks"
    C. U. Saraydar, N. B. Mandayam, and D. J. Goodman
    IEEE Transactions on Communications, Vol. No. 2, pp. 291-303,Feb.2002

34. "Total Power Optimization for Wireless Multimedia Communication"
    E. Erkip, Xiaoan Lu, Yao Wang, D. Goodman
    in System-Level Power Optimization for Wireless Multimedia Communication
    Power Aware Computing, R. Karri and D.J. Goodman editors, Kluwer, 2002

35. "Wireless Internet > Wireless + Internet"
    S. Tekinay and D. J. Goodman
    Chapter 2 in Wireless Internet Handbook, B. Furht and M. Ilyas, ed., CRC Press,
    2003.

36. "Maximizing The Throughput Of CDMA Data Communications"
    D. Goodman, P. Orenstein, Z. Marantz, and V. Rodriguez
    IEEE Vehicular Technology Conference, October 2003.

37. "Power Efficient Multimedia Communication over Wireless Channels"
    X. Lu, E. Erkip, Y. Wang, and D. J. Goodman
    IEEE Journal on Selected Areas in Communications, Vol. 21, No. 10, pp.1738-
    1751, Dec. 2003.

38. "Effects Of Additive Noise on the Throughput Of CDMA Data
    Communications"
    P. Orenstein, D. Goodman, Z. Marantz, and V. Rodriguez
    IEEE International Conference on Communications,June 2004.

39. "Power Optimization of Source Encoding and Radio Transmission in Multiuser
    CDMA Systems"
    X. Lu, Y. Wang, E. Erkip, and D. J. Goodman
    Submitted to IEEE International Conference on Communications, June 2004.

B 41

40. "3G Cellular Standards and Patents"
   D. J. Goodman and R. A. Myers
   Proceedings of IEEE WirelessCom 2005, June 13-16, 2005

## VI.    PATENTS

1. **"Adjusting Filter Coefficients"**
   David Goodman, Gurcan Mustafa
   patent no. 5,121,415, Jun. 1992

2. **"Telecommunications switching systems"**
   David Goodman
   patent no. 4,916,691, Apr 1990

3. **"Spread spectrum FH-MFSK receiver"**
   David Goodman, Henry Paul S, Prabhu Vasant S
   patent no. 4,271,524, Jun. 1981

4. **"Sidetone control circuit for a telephone set"**
   David Goodman, Johnston James, Noll Michael
   patent no. 4,081,620, Mar. 1978

5. **"Error detection and correction system"**
   David Goodman, Steele Raymond
   patent no. 4,054,863, Oct. 1977

6. **"Adaptive quantizer apparatus using training model"**
   Gersho Allen, David Goodman
   patent no. 3,931,596, Jan 1976

7. **"Adaptive delta modulator"**
   David Goodman
   patent no. 3,652,957, Mar. 1972

8. **"Digital code converter for converting a delta modulation code to a different permutation code"**
   David Goodman
   patent no. 3,596,267, Jul 1971

9

**B 42**

## VII.    BOOKS

1. **Wireless Personal Communications Systems**
   D. J. Goodman
   Addison-Wesley Publishing, 417 pgs. (1997).

2. **Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers**
   R. D. Yates and D. J. Goodman
   John Wiley & Sons, Inc., 454 pgs. (1998).

3. **Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers, 2nd. edition**
   R. D. Yates and D. J. Goodman
   John Wiley & Sons, Inc., 519 pgs. (2004).

4. **Third Generation Wireless Information Networks**
   S. Nanda and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 317 pgs. (1992).

5. **Wireless Communications - Future Directions**
   J. Holtzman and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 339 pgs. (1993).

6. **Wireless and Mobile Communications**
   J. Holtzman and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 286 pgs. (1994).

7. **Mobile Multimedia Communications**
   D. J. Goodman and D. Raychaudhuri, Ed.
   Plenum Press, 321 pgs. (1997).

8. **The Evolution of Untethered Communications, Committee on Evolution of Untethered Communications**
   D. J. Goodman
   Chair, National Academy Press, 189 pgs. (1997).

9. **System-Level Power Optimization for Wireless Multimedia Communication Power Aware Computing**
   R. Karri and D.J. Goodman, Ed.
   Kluwer Academic Publishers, 248 pgs., (2002).

**B 43**

**EXHIBIT B**

**MATERIALS CONSIDERED BY DR. DAVID GOODMAN**

1. U.S. Patent 5,327,144

2. Prosecution History of U.S. Patent 5,327,144

3. Japanese Laid-open Patent Application (JP3239091)

4. English Translation of Japanese Laid-open Patent Application (JP3239091)

5. Andrew's Response to TruePosition's 1st Set of Interrogatories (dated April 7, 2006)

6. Andrew Corporation's Supplemental Responses to TruePosition's First Set of Interrogatories (dated June 23, 2006)

7. Andrew Corporation's Supplemental Responses to TruePosition's Interrogatory Nos. 3 and 7 (dated November 8, 2006)

8. TruePosition's Responses to Defendant's First Interrogatories (dated May 1, 2006)

9. TruePosition's Supplemental Responses to Defendant's First Interrogatories (dated May 22, 2006)

10. TruePosition's Second Supplemental Responses to Defendant's First Interrogatories (dated August 1, 2006)

11. TruePosition's Third Supplemental Responses to Defendant's First Interrogatories (dated August 9, 2006)

12. TruePosition's Seventh Supplemental Responses to Defendant's First Interrogatories (November 6, 2006)

13. Andrew's Preliminary Claim Constructions as of November 22, 2006 (dated November 22, 2006)

14. TruePosition's Identification of Claim Terms and Proposed Constructions (dated November 22, 2006)

15. TruePosition's Proposed Construction of Claim Terms and Phrases That Andrew Believes Required Construction (November 27, 2006)

16. Rob Anderson 30(b)(6) Deposition Transcript (November 14, 2006)

17. Rob Anderson Deposition Transcript (September 21, 2006)

18. Rob Anderson 30(b)(6) Deposition Transcript (October 24, 2006)

19. Curtis Knight Deposition Transcript (October 6, 2006)

20. Joseph Sheehan Deposition Transcript (October 19, 2006)

**B 45**

21. John Webber Deposition Transcript (October 4, 2006)

22. Wikipedia

23. Wireless Personal Communications Systems
    D. J. Goodman
    Addison-Wesley Publishing, 417 pgs. (1997)

**B 46**

## CERTIFICATE OF SERVICE

I, Rachel Pernic Waldron, hereby certify that on this 1st day of December, 2006, I served a true and correct copy of the foregoing **EXPERT REPORT OF DR. DAVID GOODMAN ON THE INVALIDITY OF U.S. PATENT NO. 5,327,144** and its accompanying exhibits upon the following individuals in the manner indicated:

<u>VIA ELECTRONIC MAIL</u>

Paul B. Milcetic, Esq.
David L. Marcus, Esq.
Daniel J. Goettle, Esq.
Woodcock Washburn LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104-2891
pbmilcet@woodcock.com
dmarcus@woodcock.com
dgoettle@woodcock.com

James D. Heisman, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
jheisman@cblh.com

**Rachel Pernic Waldron**

**B 47**

# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
_____

TRUEPOSITION, INC.,

        Plaintiff/Counterclaim-Defendant

    vs.             CA No. 05-00747-SLR

ANDREW CORPORATION,

        Defendant/Counterclaim-Plaintiff
_____

VIDEOTAPED DEPOSITION OF DR. DAVID GOODMAN

New York, New York

Monday, January 15, 2007

Reported by:
Adrienne M. Mignano
JOB NO. 190791

B 48

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman

2        Q.      Your opinion?

3        A.      Yes, with the opinion expressed in

4    the text.

5        Q.      Now I'm going to give you the

6    opportunity to talk about the typographical

7    errors that you mentioned at the very

8    beginning of your deposition.

9        A.      Okay.

10       Q.      Do you want to go ahead and do

11   that?

12       A.      Well, it's one error in two places.

13       Q.      All right.

14       A.      So if we go to the page 15, the

15   bottom row, it says control channel

16   transceivers 12A to 12N, and that should

17   really be shared channel transceivers,

18   16A-16N.

19              And then it's the same situation,

20   if you go to page 17, and there is a part of

21   the table that covers -- pertains to claim

22   22, and the third row of that requires the

23   same adjustment.

24       Q.      So on page 17 of your invalidity

25   report, the phrase controlled channel

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman
2    transceivers 12A to 12N should read shared
3    channel receivers 16A through 16N?
4         A.    Correct.
5         Q.    Is it your understanding if we look
6    at page 17, just two rows down where it says
7    control channel transceivers, do you see
8    that?
9         A.    Yes.
10        Q.    Is that still accurate in your
11   view?
12        A.    Yes.
13        Q.    If we look at the claim phrase
14   "equipped to receive signals sent by multiple
15   mobile cellular telephones," in that same
16   page 17 of your report, do you see that in
17   block 3 of claim 22?
18        A.    Yes.
19        Q.    Doesn't that equipment refer to the
20   same equipment that's received in the reverse
21   control channels in the claim?
22             MS. WALDRON:  Object to the form.
23        Vague.
24        Q.    Let me tell you what I'm trying to
25   get at.  I want to make sure --

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1    Goodman

2  appreciate your help.  I really do.

3    Q.    If you look on page 18 of this

4  report under claim 31, you see again claim

5  phrase receiving said reverse claim signals,

6  and then again you refer to the control

7  channel transceivers 12A through 12N.

8    I still want to make sure that's

9  still your opinion?

10    A.    Let's me think about it, please.

11    Q.    Certainly.

12    A.    To accurately reflect my -- to

13  accurately convey my opinion, we have to make

14  the same adjustment here as well.

15    Q.    Just so --

16    A.    Should I say exactly --

17    Q.    I think the clearest way to make

18  this record is to allow you to mark up your

19  version of the report, which is an exhibit.

20  And make the changes there, wherever you

21  think it is appropriate.

22    A.    I have been doing that without

23  asking you beforehand.

24    Q.    So go ahead and mark the change

25  that you think would make your report

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1              Goodman

2    accurate on Exhibit 301.

3       A.    Thank you very much for the

4    opportunity.

5              MS. WALDRON:  Just so the record

6          is clear, we're talking about Exhibit

7          300, right?

8              MR. MILCETIC:  Excuse me, Exhibit

9          300, the invalidity report.

10   BY MR. MILCETIC:

11      Q.    Are there any other changes that

12   you know of at the moment that you would like

13   to make to Exhibit 300 to correct your

14   report?

15      A.    I don't know of any others in

16   Exhibit 300.

17      Q.    The court reporter is about to hand

18   you what's been marked already as Exhibit

19   466.  It's a document titled Draft

20   Translation of Japanese Patent Application.

21   It's AND0080497 to AND00503.

22              (Plaintiff's Exhibit 466, Draft

23          Translation of Japanese Patent

24          Application, Bates Stamped AND0080497

25          to AND00503, marked for identification,

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 74

1                          Goodman
2          as of this date.)
3          A.     I have that.
4          Q.     Do you recognize Exhibit 466?
5          A.     Yes.
6          Q.     What is it?
7          A.      It's an English translation of
8   Japanese laid open patent application.  It's
9   a draft translation.
10         Q.     Did you rely on this Exhibit 466 in
11  rendering your invalidity report?
12         A.     Yes.
13         Q.     Do you speak Japanese yourself?
14         A.     No, I don't.
15         Q.     Without the translation, would you
16  be able to understand the Japanese reference?
17         A.     No.
18         Q.     Now, what I would like to do, and
19  I'm going to tell you what I'm going to do.
20  You have got Exhibit 466 in front of you,
21  correct, the Japanese translation?
22         A.      Yes.
23         Q.      And you have got in front of you
24  your invalidity report, which is Exhibit 300,
25  which you have now made some corrections to,

1                    Goodman

2    correct?

3         A.    Yes.

4         Q.    Feel free to refer to that.  And

5    there is also, I believe you also have the

6    patent in front of you?

7         A.    I do.

8         Q.    Which is --

9         A.    462.

10        Q.    What I'm going to ask you now is a

11   series of questions, and I'm going to go down

12   the summary chart reflecting your opinions

13   for various elements in that chart, I'm going

14   to ask you where you found those elements in

15   the draft translation and why you believe

16   those elements are disclosed in the draft

17   translation of Kono.  Is that all right with

18   you?

19             So we'll go through your report in

20   a little more detail essentially.

21        A.    Of course.

22        Q.    Now, let's start with page 15 of

23   your invalidity report.  The first row.

24        A.    I have that.

25        Q.    The phrase is "a cellular location

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Goodman

1

2   that before lunch.

3       Q.     But you testified that Andrew

4   doesn't use that signal format, right, the

5   signal format in the cellular telephone

6   standards that define reverse control channel

7   in a way that you are interpreting it, right?

8       A.     Yes.

9       Q.     And you also testified that Kono

10  discloses that element to the same extent as

11  Andrew practices that element, correct?

12      A.     Yes.

13             MS. WALDRON:   Objection.

14      Q.     Doesn't it follow then that Kono

15  doesn't then disclose that element?

16      A.     I think to give a complete opinion,

17  I'd have to say that somebody who would find

18  that element in Andrew would have to find it

19  in Kono.  So if somebody doesn't find it in

20  Andrew, I don't know, but -- I think

21  that's -- that sentence is my opinion.

22      Q.     And what is the basis for that

23  opinion?

24      A.     The basis for that opinion is that

25  the shared channel in the Kono application

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 88

1              Goodman

2     has similar properties to the stand-alone

3     dedicated control channel that I understand

4     is TruePosition's.  It conforms to the

5     prescribed set of reverse control channels,

6     because, as you know, I have done the

7     infringement analysis as well as the

8     invalidity analysis, so I'm aware of how

9     TruePosition interprets this and I think they

10    are compelled to say.  I know you have had

11    different experts for the two things.  I

12    think if you ask Dr. Gottesman, he would have

13    to say, oh, yeah, it's in Kono too because of

14    the way he found it in Andrew.  I don't agree

15    with him.

16         Q.    When did you first learn how

17    TruePosition contends that Geometrix

18    infringes the patent?

19         A.    I suppose it was in the summer when

20    Mr. Parks told me about the lawsuit.

21         Q.    When did you start learning about

22    how Geometrix works in terms of its

23    operation?

24         A.    I think it was in October, towards

25    the middle or end of October.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 124

1                        Goodman
2          A.      May I look at my claims
3     construction that are in these exhibits?
4          Q.      Certainly.  I believe your claim
5     construction is Exhibit --
6          A.      So somewhere I defined means for
7     processing.  So it might help me to --
8          Q.      Yes.  I think it is 463 or 464 that
9     you did that.
10         A.      Yes, I see something on 463.  I'd
11    like also to look at one of the other
12    exhibits, which was Andrew's proposed claim
13    construction from November 22nd.
14         Q.      That's Exhibit 301.
15         A.      301.  Thank you.  I'm going to
16    refer to Exhibit 301.
17              Just to be absolutely certain,
18    would you read the question, please, just so
19    I know what I'm answering.
20              (Record read)
21         Q.      I can clarify if you like.
22         A.      I want to make sure I'm answering
23    the right question.  It wasn't that it was
24    unclear.
25         Q.      Under your construction today, you

1              Goodman

2    just looked it up --

3         A.    It's actually 465, I think.

4         Q.    In Exhibit 465.  Does Kono disclose

5    the means for processing limitation?

6         A.    It's --

7              MS. WALDRON:  Objection.  Vague.

8         Calls for legal conclusion.

9         A.    It's my opinion that someone of

10   skill in the art who finds that claim element

11   in Geometrix equipment would be compelled to

12   say that it also exists in Kono.

13        Q.    What's the basis for your opinion?

14        A.    The basis for my opinion is this

15   statement in Exhibit 466 that something

16   reports to the switching station data such as

17   the difference in arrival time of position

18   locating signals with respect to the

19   different base stations.

20        Q.    The construction that you laid out

21   this morning for means for processing

22   encompassed Figure 6A and Figure 7, correct?

23        A.    Yes.

24        Q.    If I went through those figures on

25   a block by block basis, would you be able to

1               Goodman

2      A.    My opinion is that if somebody

3 finds that disclosed -- if somebody finds the

4 Geometrix is receiving signals from multiple

5 mobile cellular telephones, they would have

6 to admit that Kono technology is also

7 receiving signals sent by multiple mobile

8 cellular telephones.

9      Q.    How would one have to interpret the

10 claims to say that Geometrix has equipment

11 for receiving signals sent by multiple mobile

12 cellular telephones?

13      MS. WALDRON:  Objection.  Legal

14    conclusion.  Speculation.

15      A.    It's a very difficult question to

16 answer because I think it is impossible.  I

17 can try to stretch my mind to think of some

18 weird interpretation.

19      Q.    So it's impossible to or very

20 difficult to say that this claim limitation

21 equipped to receive signals encompasses

22 Geometrix, correct?

23      A.    I really haven't done that

24 analysis.  I suppose I could.

25      Q.    Well, let me ask you this.  Let's

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 160

Goodman

1
2  get back to basics here for a moment.

3          Your position here is that if

4  Geometrix is encompassed by the claims, then

5  Kono invalidates the '144 patent, right?

6      A.    Yes, that's right.  If someone puts

7  Geometrix in the '144 circle, they are really

8  stuck with Kono.

9      Q.    Can you give me any interpretation

10  under which of the claims, under which

11  Geometrix infringes the '144 patent?

12          MS. WALDRON:  Objection.  Legal

13      conclusion.  Speculation.

14      A.    I can't do this sitting here.  I

15  don't know how much time Dr. Gottesman

16  tried -- spent trying to do that and he

17  completely failed, so I think that even if I

18  went off for a month, if TruePosition hired

19  me, I would be hard pressed to do any better

20  than Dr. Gottesman did.

21      Q.    So you don't know of any

22  construction sitting here right now under

23  which Geometrix infringes the '144 patent; am

24  I correct?

25          MS. WALDRON:  Same objection.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1           Goodman
2       Compound.  Overbroad.  Legal
3       conclusion.
4       Q.    Is there an easier claim that you
5   can deal with more simply?
6       A.    I'm not trying to save work.  So if
7   you prefer claim 1, I'll work on that one.  I
8   think it is more detailed than some of the
9   others.
10      Q.    Why don't we do claim 22.
11      A.    Okay, that might take less time.
12          MS. WALDRON:  Same objections for
13      the record.  Compound.  Overbroad.
14      Legal conclusion.
15      A.    Essentially you're asking me to do
16  Dr. Gottesman's job, so can I refer to his
17  report, because I assume that's what he was
18  asked to do by TruePosition?
19      Q.    You rendered an invalidity report,
20  and each time that I asked you for the basis
21  for why it is that you think it is invalid,
22  you keep telling me, well, if the claims
23  encompass Geometrix, then the patent is
24  invalid.
25      A.    Right.

Goodman

1 you think that's inaccurate.

3      A.      If you don't mind, I'll draw a line
through it and I'll state for the record that
it doesn't represent the response to your
request.

      Q.      Okay, fair enough.

      A.      So I'm crossing out 469 and 470.
And I'm submitting 471 and 472.

      Q.      How would you characterize what you
have written on 471 and 472, Exhibits?

                MS. WALDRON:   Objection.   Calls
        for a narrative.

      A.      Oh, what I have written on my
exhibit is what the claim construction that
TruePosition would need to get to prove
infringement of the Geometrix band.

      Q.      Is it also the claim construction
that you used to render your invalidity
opinion?

      A.      Yes.

      Q.      Just so the record is clear, you do
not agree with the construction written on
Exhibit 471 and 472, correct?

      A.      That's correct.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TruePosition, Inc. | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counterclaim-Defendant, | ) | C.A. No. 05-747 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Andrew Corporation, | ) | |
| | ) | |
| Defendant/ | ) | |
| Counterclaim-Plaintiff. | ) | |
| | ) | |

## EXPERT REPORT OF BRIAN G. AGEE, PH.D., P.E.
## RESPONSE TO DR. DAVID GOODMAN'S REPORT ON THE VALIDITY
## OF U.S. PATENT NO. 5,327,144

**B 63**

**B 64**

**B 65**

**B  66**

# EXHIBIT E

Brian G. Agee, Ph.D.  January 24, 2007

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

TRUEPOSITION, INC.,            )
  Plaintiff/Counterclaim )
  Defendant,                   )
                               )
        vs.                    ) C.A. No. 05-00747-SLR
                               )
ANDREW CORPORATION,            )
  Defendant/                   )
  Counterclaim Plaintiff.)
_____)


VIDEOTAPED DEPOSITION OF BRIAN G. AGEE, Ph.D., P.E.

Philadelphia, Pennsylvania

Wednesday, January 24, 2007

8:20 a.m.


Job No.:  25500251

Pages:  1 - 191

Reported By:  Debra A. Whitehead

**B 67**

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061 (312) 263-3524

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.    January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.  January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.  January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

Brian G. Agee, Ph.D.   January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

Brian G. Agee, Ph.D.   January 24, 2007

Brian G. Agee, Ph.D.  January 24, 2007

071d12b8-ba02-4b38-8165-5a02f8f3badc

# EXHIBIT F

Oded Gottesman Report:

**B 79**

Oded Gottesman Report:

**B 80**

Oded Gottesman Report

**B 81**

Oded Gottesman Report

**B 82**

Oded Gottesman Report

**B 83**

Oded Gottesman Report

**B 84**

Oded Gottesman Report

**B 85**

Oded Gottesman Report

**B 86**

Oded Gottesman Report

**B 87**

Oded Gottesman Report

**B 88**

Oded Gottesman Report

B 89

Oded Gottesman Report

**B 90**

Oded Gottesman Report

**B 91**

Oded Gottesman Report

**B 92**

Oded Gottesman Report

**B 93**

# EXHIBIT G

Oded Gottesman, Ph.D.    January 11, 2007

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

TRUEPOSITION, INC.,              )
    Plaintiff/Counterclaim       )
    Defendant,                   )
                                 )
        vs.                      ) C.A. No. 05-00747-SLR
                                 )
ANDREW CORPORATION,              )
    Defendant/                   )
    Counterclaim Plaintiff.)
_____)

VIDEOTAPED DEPOSITION OF ODED GOTTESMAN, Ph.D.

VOLUME I

Philadelphia, Pennsylvania

Thursday, January 11, 2007

8:52 a.m.

Job No.: 25500247

Pages:  1 - 284

Reported By:  Debra A. Whitehead

**B 94**

6f3bb311-a516-49bb-9616-a0f382ebac82

Oded Gottesman, Ph.D.     January 11, 2007

Oded Gottesman, Ph.D.    January 11, 2007

Oded Gottesman, Ph.D.    January 11, 2007

Oded Gottesman, Ph.D.    January 11, 2007

Oded Gottesman, Ph.D.   January 12, 2007 - Vol. II

Page 285

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

TRUEPOSITION, INC.,          )
  Plaintiff/Counterclaim )
  Defendant,              )
                          )
        vs.               ) C.A. No. 05-00747-SLR
                          )
ANDREW CORPORATION,       )
  Defendant/              )
  Counterclaim Plaintiff.)
_____ )

VIDEOTAPED DEPOSITION OF ODED GOTTESMAN, Ph.D.

VOLUME II

Philadelphia, Pennsylvania

Friday, January 12, 2007

9:12 a.m.

Job No.:  25500261

Pages:  285 - 451

Reported By:  Debra A. Whitehead

15335646-34da-47ca-916b-e2cde1192533

Oded Gottesman, Ph.D.   January 12, 2007 - Vol. II

15335646-34da-47ca-916b-e2cde1192533

Oded Gottesman, Ph.D.   January 12, 2007 - Vol. II

15335646-34da-47ca-916b-e2cde1192533

# EXHIBIT H

Page 181

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    ─────────────────────────────────────

4    TRUEPOSITION, INC.,

5              Plaintiff/Counterclaim-Defendant

6         vs.                    CA No. 05-00747-SLR

7    ANDREW CORPORATION,

8              Defendant/Counterclaim-Plaintiff

9    ─────────────────────────────────────

10

11

12            CONTINUED VIDEOTAPED DEPOSITION

13               OF DR. DAVID GOODMAN

14               New York, New York

15            Tuesday, January 16, 2007

16

17

18

19

20

21

22

23

24   Reported by:
     Adrienne M. Mignano
25   JOB NO. 190793                    **B 102**

Page 360

1                       Goodman

2    a few of them, and even in those references,

3    he wasn't very specific.  He just said it's

4    in there somewhere.  Essentially he said,

5    well, this claim limitation is met by a

6    certain function and he gave production

7    numbers for where that function appears in

8    the source code, but that was about all he

9    said without going into the -- without really

10   identifying where in the source code the

11   claim limitation is met or how the source

12   code meets the limitation, just that it is

13   there somewhere.  And I didn't find it there.

14   I looked at it.

15       Q.    You also mentioned conversations

16   with Andrew employees.

17             Did you talk to Andrew employees on

18   one occasion, multiple occasions, how many

19   times?

20             MR. MILCETIC:  Objection.

21       A.    I --

22       Q.    Let me rephrase that.

23             Approximately how many times did

24   you talk to Andrew employees?

25       A.    I would say five or six.

**B 103**

Page 361

1                          Goodman

2        Q.     What was the purpose of those

3    discussions?

4        A.     Well, generally speaking, the

5    purpose was to find out from them how

6    their -- what's happening in their Geometrix

7    system, and then as I absorbed and

8    interpreted what they told me and I looked at

9    other material, particularly that written

10   document that says something about -- has

11   Grayson in the title.  I wanted to make sure

12   that that is really what's in the equipment

13   that they sent to Saudi Arabia.  So I don't

14   know if Mr. Carlson got annoyed with me, but

15   I must have asked him three or four times is

16   that what you're doing, and as I interpreted,

17   I didn't read him this report, maybe he had

18   access to the report, but I just asked him

19   over and over again, is this what you -- is

20   that what you have done -- part of it was to

21   educate me, and then the later conversations

22   were just to make absolutely sure that they

23   confirmed that that's what is in their

24   equipment because I expected to -- well,

25   first of all, submit this report and then

**B 104**

Page 362

1                         Goodman

2    testify about it.

3         Q.    About how much time total would you

4    say you spent talking to Andrew employees?

5         A.    Maybe five or six hours.  I

6    suppose.  I was there for three hours.  I

7    guess I had a few hour long conversations, so

8    my first guess is six hours.  Maybe seven.

9         Q.    Did you also review --

10              MS. WALDRON:  Strike that.

11        Q.    What else, if anything, did you

12   review --

13              MS. WALDRON:  Strike that.

14        Q.    What else did you do to form the

15   basis of your opinions in addition to talking

16   with Andrew employees?

17              MR. MILCETIC:  Objection.  Go

18        ahead.

19        A.    I read the patent carefully and

20   several times I suppose, and I read

21   Dr. Gottesman's report endless times.

22   Certainly that -- something we haven't

23   mentioned is that I have my position, printed

24   copies of these Geometrix release notes that

25   are listed here.  And I looked at them, they                    **B 105**

Page 363

1        Goodman

2   gave me kind of a general idea of what's

3   happening, but I didn't find sufficient

4   detail to be able to come to the opinion that

5   I'm expressing now.  So it was somewhat

6   helpful.  I read some of the documents that

7   the two parties to the lawsuit exchanged.

8   That was sent to me.

9        Q.    So you did --

10       A.    Obviously I studied, you know, I --

11  I have a strong background in cellular

12  communications.  I used to have a strong -- I

13  used to do a lot of research in digital

14  signal processing.  In fact, I'm a fellow of

15  the IEEE, and that was for my research in

16  signal processing before I got into

17  communications.  But I kind of needed a

18  refresher course, and I read some of the

19  references that are listed here, particularly

20  on ambiguity functions and time of arrival

21  estimation.

22       Q.    So you did review documents in

23  connection with your report?

24       A.    Oh, of course, yes.

25       Q.    Did you also review some source

**B 106**

1                          Goodman

2    code?

3         A.     I looked at the source code, yes,

4    and tried to find in there the evidence that

5    Dr. Gottesman said he found.  But he wasn't

6    specific and I couldn't find it either.

7         Q.     Did anything you reviewed cause you

8    to doubt the accuracy of information given to

9    you by Andrew employees?

10         A.     I never doubted the accuracy, but

11    it took me a while to really be confident

12    that I understood what they told me.  So I

13    interpreted it and then went back and asked

14    them again and again.  And sometimes I really

15    needed, I don't know what, construction

16    reinforcement.  I wasn't quite sure I

17    remembered what they told me or interpreted

18    it.  So I don't know if they think I'm thick

19    asking the same questions over and over

20    again.  When I got the same answer two or

21    three times, I was willing to put my name on

22    it and testify in this deposition about it.

23         Q.     Dr. Goodman, could you please turn

24    to page 25 of Dr. Gottesman's report, which I

25    believe has been marked as Exhibit 477.

# EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
                              )
TRUEPOSITION, INC.            )    Civil Action
                              )
        Plaintiff,            )    No. 05-747
                              )
vs.                           )
                              )
ANDREW CORPORATION,           )
                              )
        Defendant.            )
                              )
```

VIDEOTAPED DEPOSITION OF

ANDREW BECK

Reston, Virginia

Friday, September 22, 2006

9:05 a.m.

Job No.:  22-87165

Pages 1 through 318

Reported by:  John L. Harmonson, RPR, CCR

Page 181

| | | |
|---|---|---|
| 14:40:49 | 1 | ANDREW BECK, 9/22/06                        181 |
| 14:40:53 | 2 | on a stand-alone dedicated control channel, how |
| 14:40:58 | 3 | will the WLSs know how to listen to that |
| 14:41:03 | 4 | information transmitted on that channel? |
| 14:41:06 | 5 | A.    The GCS is tasked with a location |
| 14:41:12 | 6 | request, and in that location request it's given |
| 14:41:16 | 7 | the RF information that are needed by the WLSs. |
| 14:41:18 | 8 | Q.    Where does the RF information come |
| 14:41:19 | 9 | from? |
| 14:41:22 | 10 | A.    A source external to the Geometrix PDE. |
| 14:41:25 | 11 | Q.    That's an MT-LR, correct? |
| 14:41:26 | 12 | A.    As one example. |
| 14:41:28 | 13 | Q.    When you're using an Abis monitoring |
| 14:41:31 | 14 | unit, however, doesn't the RF information come |
| 14:41:33 | 15 | from the Abis monitoring unit? |
| 14:41:36 | 16 | A.    The Abis monitoring unit could be used |
| 14:41:40 | 17 | as a source of RF information, yes. |
| 14:41:42 | 18 | Q.    Would you consider an implementation of |
| 14:41:46 | 19 | the Geometrix PDE that includes an AMU to be |
| 14:41:50 | 20 | standards compliant? |
| 14:41:55 | 21 | A.    We need to clarify what standards we're |
| 14:41:56 | 22 | compliant with. |
| 14:41:59 | 23 | Q.    Well, let's talk about GSM standards |
| 14:42:02 | 24 | that you were referring to earlier. |
| | 25 | A.    Uh-huh. |

Page 178

| | |
|---|---|
| 14:36:37 | 1 |

ANDREW BECK, 9/22/06                    178

14:36:42  2  slave -- a slave system that works on transaction

14:36:47  3  basis.  In order to locate, we have to be told

14:36:52  4  that there is a location event that we need to

14:36:58  5  perform location on.  So the system, external to

14:37:02  6  the Andrew PDE, would alert us that a condition

14:37:06  7  exists that it would like us to perform a location

14:37:11  8  has to be installed, configured and set up to do

14:37:12  9  such messaging.

14:37:16  10      Q.    Anything else?

14:37:19  11      A.    In addition, the Andrew PDE has to be

14:37:22  12  capable of performing that as well and properly

14:37:24  13  licensed to do so.

14:37:27  14      Q.    You referred to the Andrew PDE in this

14:37:30  15  context as a slave system, correct?

14:37:30  16      A.    Correct.

14:37:35  17      Q.    Earlier, we were talking about an Abis

14:37:37  18  monitoring unit.  Do you remember when we talked

14:37:38  19  about that?

14:37:40  20      A.    Yes.

14:37:44  21      Q.    When Andrew is using an Abis monitoring

14:37:47  22  unit, let's say for testing, would you still

14:37:51  23  characterize the system as a slave system?

14:37:54  24      A.    Yes, I would.

25      Q.    What is the function of the Abis

732268a4-6d34-4003-8423-8b4f402c5102

Page 179

| | | |
|---|---|---|
| 14:37:56 | 1 | ANDREW BECK, 9/22/06                    179 |
| 14:38:00 | 2 | monitoring unit, as best you know? |
| 14:38:05 | 3 | A.    The Abis monitoring unit has a |
| 14:38:11 | 4 | connection into Abis interfaces in the GSM network |
| 14:38:17 | 5 | and basically extracts and reads messages across |
| 14:38:19 | 6 | Abis links. |
| 14:38:24 | 7 | Q.    Under the right conditions and |
| 14:38:30 | 8 | installations, the planets aligned, assuming all |
| 14:38:38 | 9 | that, can the -- can any product do location of a |
| 14:38:42 | 10 | mobile transmitting on a stand-alone dedicated |
| 14:38:53 | 11 | control channel when it is not doing MT-LR? |
| 14:38:54 | 12 | MS. WALDRON:  Objection; vague and |
| 14:38:55 | 13 | compound. |
| 14:38:57 | 14 | THE WITNESS:  Can you clarify "in any |
| 14:38:57 | 15 | product"? |
| 14:38:58 | 16 | BY MR. MILCETIC: |
| 14:39:01 | 17 | Q.    Well, the Andrew PDE. |
| 14:39:04 | 18 | A.    So the question is:  Can the Andrew PDE |
| 14:39:07 | 19 | perform a location on a stand-alone dedicated |
| 14:39:12 | 20 | control channel exclusive of the MT-LR mode? |
| 14:39:14 | 21 | Q.    Right. |
| 14:39:17 | 22 | A.    Yes, it can. |
| 14:39:24 | 23 | Q.    Could you describe that circumstance? |
| 14:39:27 | 24 | A.    If the Andrew PDE were externally |
| | 25 | tasked by an AMU, it could be told to perform a |

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

          **Plaintiff and**
          **Counterclaim-Defendant,**

    **v.**

ANDREW CORPORATION,

          **Defendant and**
          **Counterclaim Plaintiff.**

Civil Action No. 05-00747-SLR

**DECLARATION OF DR. DAVID J. GOODMAN IN SUPPORT OF ANDREW'S OPPOSITION TO TRUEPOSITION'S MOTION FOR SUMMARY JUDGMENT THAT ANDREW CANNOT PROVE ITS CLAIMS OF INVALIDITY**

**B 110**

1.   I, Dr. David J. Goodman, make this declaration upon personal knowledge, and if called to testify, could and would testify hereto.

2.   I am currently a professor of Electrical and Computer Engineering at Polytechnic University in Brooklyn, New York. From February 2006 to February 2007, I was a Program Director at the National Science Foundation in Arlington, Virginia on temporary assignment from Polytechnic University.   Before joining the NSF, I was Director of the Wireless Internet Center for Advanced Technology (WICAT), located at Polytechnic University, Columbia University, and the University of Virginia.   WICAT is a National Science Foundation Industry/University Cooperative Research Center. From August 1999 until August 2001, I was Head of the Department of Electrical and Computer Engineering at Polytechnic University.

3.   Before joining Polytechnic University in 1999, I was a Professor of Electrical and Computer Engineering at Rutgers, the State University of New Jersey. From 1988 until 1991, I was Chairman of the Department of Electrical and Computer Engineering at Rutgers. In 1989, I founded the Wireless Information Network Laboratory (WINLAB) at Rutgers University.   WINLAB was the first center of excellence at a United States university focused on cellular telecommunications.   In 1991, WINLAB was designated the National Science Foundation Industry/University Cooperative Research Center for Wireless Information Networks. I was the Director of WINLAB until 1999, when I joined Polytechnic University.

4.   From 1967 to 1988, I was at Bell Laboratories, where I held the position of Department Head in Communications Systems Research. In 1995, I was a Research Associate at the Program on Information Resources Policy at Harvard University.   In

**B 111**

1997, I was Chairman of the National Research Council Committee studying "The Evolution of Untethered Communications."

5. I have extensive experience performing and managing research in telecommunications and digital signal processing. My research in cellular telecommunications has produced innovations covering multiple access protocols, network architecture, mobility management, and radio resources management. In 1986 and 1987, while I was employed by AT&T Bell Laboratories, I had a research assignment in the United Kingdom. As part of this assignment, I had detailed technical discussions with experts in several European countries who were participating in the establishment of the GSM cellular standard. At that time, I acquired a thorough understanding of GSM technology, and I have maintained this expertise ever since through technical discussions, participation in various forums, and in the conduct of my teaching, research, and writing.

6. I was one of the first professors to teach a college-level course in cellular telecommunications and have taught such courses since January 1989. In the early 1990's, I also presented a three-day short course at many large companies including Bell Atlantic Mobile, Pacific Bell, US West, Ericsson and AT&T. This course introduced corporate students to the operations of several cellular systems including AMPS, TDMA, and GSM. I have lectured and published widely on the subject of cellular telecommunications. My publications include approximately 100 papers. I have also consulted for many corporations in this field, including: Ericsson, Motorola, Lucent Technologies, and Nortel Networks.

**B 112**

7. I received a Bachelor's degree at Rensselaer Polytechnic Institute in 1960, a Master's degree at New York University in 1962, and a Ph.D. at Imperial College, University of London in 1967, all in electrical engineering.

8. I am a Member of the National Academy of Engineering, a Foreign Member of The Royal Academy of Engineering, a Fellow of the Institute of Electrical and Electronics Engineers, and a Fellow of the Institution of Electrical Engineers.

9. In 1997, I received the ACM/SIGMOBILE Award for "Outstanding Contributions to Research on Mobility of Systems Users, Data, and Computing." In 1999, I won the RCR Gold Award for the best presentation at the Conference on Third Generation Wireless Communications. In 2003, I received an IEEE Avant Garde Award for Contributions to Speech Coding and Internet-Packet Cellular Networks. Three of my papers on wireless communications have been cited as Paper of the Year by IEEE journals.

10. I am a frequent public speaker in a variety of forums on wireless communications. I am author of the books *Wireless Personal Communications Systems*, published in 1997 by Addison Wesley and co-author, with Roy Yates, of *Probability and Stochastic Processes A Friendly Introduction for Electrical and Computer Engineers, Second Edition*, published in 2004 by Wiley. I am co-editor of six other books on wireless communications. I am a named inventor on eight United States patents and have one patent application pending.

11. I have reviewed both Andrew's translation of the Kono reference (attached to this declaration as Exhibit A) and TruePosition's translation of the Kono reference (attached as Exhibit B).

4

**B 113**

12. In my opinion, there are no substantive differences between the Andrew and TruePosition translations of the Kono reference.

13. My opinion regarding the invalidity of the '144 patent remains the same regardless of which translation is used.

14. If TruePosition continues to object to the translation procured by Andrew, I am willing to use the translation TruePosition provided.

**I declare under penalty of perjury that to the best of my knowledge, the foregoing is true and correct.**

_David J. Goodman_

Dr. David J. Goodman

**B 114**

5

# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -*

TRUEPOSITION, INC.,              *

                Plaintiff,       *

        vs.                      *  C.A. No. 05-0747-SLR

ANDREW CORPORATION,              *

                Defendant.       *

- - - - - - - - - - - - - - - -*

Videotaped Deposition of ANDREW CORPORATION, through

        its representative, JOHN CARLSON

                Reston, Virginia

            Monday, October 16, 2006

                9:11 a.m.

Job No. 22-87715

Pages 1 - 59

Reported by:  Karen Young

Videographer:  Richard Fazio

**B 115**

c646c235-f2ca-44c5-acdd-74e2ef3bdd6d

Page 21

| | |
|---|---|
| | 1 |

JOHN CARLSON

09:47:11  2    MS. PERNIC WALDRON:  Actually, I believe --

09:47:12  3    well, should we go off the record?  I mean, I can't

09:47:15  4    testify as to this.

09:47:17  5    MR. MILCETIC:  I just want to know what

09:47:19  6    version of the CD you gave us.  Actually, I'd like it

09:47:23  7    on the record.  That's all.

09:47:25  8    MS. PERNIC WALDRON:  I cannot testify as to

09:47:26  9    whether it's 2005.0.1 or point 2.  I am under the

09:47:30  10   impression that it is point 2.

09:47:35  11   THE WITNESS:  2005.2.2.

09:47:38  12   MS. PERNIC WALDRON:  Dot 2 dot 2.

09:47:42  13   THE WITNESS:  That's what you're referring

09:47:43  14   to?

09:47:43  15   MS. PERNIC WALDRON:  Yes.

09:47:44  16   MR. MILCETIC:  So as best you understand, it

09:47:46  17   was 2005.2.2.

09:47:48  18   MS. PERNIC WALDRON:  I cannot testify to

09:47:50  19   this.  That is my general understanding.

09:48:03  20   MR. MILCETIC:  Well, the witness should be

09:48:04  21   here today prepared to tell us what version of the

09:48:08  22   source code was printed out and given to us,

09:48:11  23   irrespective whoever actually gave it to us, and I

09:48:14  24   don't care whether you testify or Mr. Carlson

09:48:16  25   testifies or Mr. Kennedy testifies, but especially

Page 22

|   |   |
|---|---|
| 1 | JOHN CARLSON |
| 09:48:19 | 2 | having waited nine or ten months for that tiny |
| 09:48:24 | 3 | infinitesimally small piece of information, I want an |
| 09:48:27 | 4 | answer to that question. |
| 09:48:28 | 5 | MS. PERNIC WALDRON:  Well, like I said, I |
| 09:48:31 | 6 | represented to you last week the information that I |
| 09:48:33 | 7 | had.  Mr. Carlson is here to testify to the best of |
| 09:48:37 | 8 | his ability as to what AND1 through 72979 is, and he |
| 09:48:44 | 9 | is prepared to do so. |
| 09:48:47 | 10 | BY MR. MILCETIC: |
| 09:48:47 | 11 | Q.   Okay, Mr. Carlson, to the best of your |
| 09:48:50 | 12 | knowledge, what version of the source code was |
| 09:48:53 | 13 | produced as AND000001 through AND0072979? |
| 09:49:02 | 14 | A.   My understanding is that that -- those |
| 09:49:05 | 15 | printouts correspond to software version 2005.2.2. |
| 09:49:10 | 16 | Q.   I understood you to testify earlier that you |
| 09:49:32 | 17 | were also here testifying on behalf of Andrew |
| 09:49:35 | 18 | Corporation concerning topic 11 of Exhibit 180. |
| 09:49:42 | 19 | MS. PERNIC WALDRON:  Objection, |
| 09:49:43 | 20 | mischaracterizes.  The topic's been amended. |
| 09:49:48 | 21 | BY MR. MILCETIC: |
| 09:49:48 | 22 | Q.   With respect to the amended topic that |
| 09:49:50 | 23 | Ms. Waldron read into the record; is that correct? |
| 09:49:59 | 24 | A.   I'm sorry.  Could you repeat the amended |
| 09:50:02 | 25 | topic please?                  B 117 |

c646c235-f2ca-44c5-acdd-74e2ef3bdd6d

Page 23

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | JOHN CARLSON                                         |
| 09:50:09 | 2  | MS. PERNIC WALDRON:  My impression of the            |
| 09:50:10 | 3  | topic that has been agreed to is the versions of the |
| 09:50:13 | 4  | Geometrix source code put on the escrow computer,    |
| 09:50:17 | 5  | whether the included source code versions are complete |
| 09:50:19 | 6  | or partial, and the location of the source code before |
| 09:50:21 | 7  | it was copied to the escrow computer.                |
| 09:50:24 | 8  | A.    Yes.                                           |
| 09:50:25 | 9  | Q.    What versions of Geometrix source code are    |
| 09:50:34 | 10 | on the laptop computer in escrow at the Iron Mountain |
| 09:50:41 | 11 | facility?                                            |
| 09:50:42 | 12 | MS. PERNIC WALDRON:  Counsel, objection.             |
| 09:50:43 | 13 | This isn't supposed to be a memory test.  You have a |
| 09:50:46 | 14 | list of the versions you requested?                  |
| 09:50:49 | 15 | BY MR. MILCETIC:                                     |
| 09:50:49 | 16 | Q.    Well, the -- you've read some release notes   |
| 09:50:55 | 17 | today, correct?                                      |
| 09:50:56 | 18 | A.    Yes.                                           |
| 09:50:58 | 19 | Q.    Does that refresh your recollection as to     |
| 09:51:00 | 20 | what versions are in the laptop at Iron Mountain?    |
| 09:51:09 | 21 | A.    My recollection of the versions that are on   |
| 09:51:12 | 22 | the laptop are that it contained everything that was |
| 09:51:20 | 23 | on the initial CD that was provided to the Woodcock  |
| 09:51:24 | 24 | Washburn attorneys, so those five revisions, in      |
| 09:51:29 | 25 | addition to -- in addition to various bug fix minor  |

c646c235-f2ca-44c5-acdd-74e2ef3bdd6d