**EXHIBIT A**

**CURRICULUM VITAE OF DR. DAVID GOODMAN**

A51

## I. BIOGRAPHY

Since 1999, David Goodman has been a Professor of Electrical and Computer Engineering at Polytechnic University in Brooklyn, New York. He currently holds a temporary position as Program Director in the Computer and Network Systems Division of the National Science Foundation. Before joining the NSF in February 2006, he was Director of the Wireless Internet Center for Advanced Technology, a National Science Foundation Industry/University Cooperative Research Center at Polytechnic University, Columbia University, and University of Virginia. Until August 2001, he was Head of the Electrical and Computer Engineering Department at Poly.

Prior to joining Poly, Dr. Goodman was a professor at Rutgers University, where he founded the Wireless Information Network Laboratory (WINLAB) in 1989. He was WINLAB Director until he moved to Brooklyn Poly. In 1995, he was a Research Associate at the Program on Information Resources Policy at Harvard University. In 1997, he was Chairman of the National Research Council Committee studying "The Evolution of Untethered Communications." From 1967 to 1988 he was at Bell Laboratories, where he was Department Head in Communications Systems Research. He has made fundamental contributions to digital signal processing, speech coding, and wireless information networks.

Dr. Goodman is a member of the National Academy of Engineering and a foreign member of The Royal Academy of Engineering, a Fellow of the Institute of Electrical and Electronic Engineers, and a Fellow of the Institution of Electrical Engineers. In 1997, he received the ACM/SIGMOBILE Award for "Outstanding Contributions to Research on Mobility of Systems Users, Data, and Computing". In 1999 he won the RCR Gold Award for the best presentation at the Conference on Third Generation Wireless Communications. In 2003, he received the Avant Garde award from the Vehicular Technology Society of the IEEE. Three of his papers on wireless communications have been cited as Paper of the Year by IEEE journals.

Dr. Goodman is a frequent public speaker in a variety of forums on wireless communications. He is author of the books "Wireless Personal Communications Systems", published in 1997 by Addison Wesley and co-author, with Roy Yates, of "Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers", published by Wiley in 1998, with a second edition published in 2004. He is a co-editor of six other books on wireless communications. He received a Bachelor's degree at Rensselaer Polytechnic Institute (1960), a Master's at New York University (1962), and a Ph. D. at Imperial College, University of London (1967), all in Electrical Engineering.

## II. EDUCATION

Doctor of Philosophy (Electrical Engineering), 1967
Imperial College, University of London

Master of Electrical Engineering, 1962
New York University

Bachelor of Electrical Engineering, 1960
Rensselaer Polytechnic Institute

## III. PROFESSIONAL EXPERIENCE

National Science Foundation, 2006 - Present
Program Director
Computer and Network Systems Division
(On leave from Polytechnic University)

Polytechnic University, 1999 - Present
Professor of Electrical and Computer Engineering
Director, NSF Wireless Internet Center for Advanced Technology
Head Of Department, 1999-2001

Rutgers University, 1988 - 1999
Director, Wireless Information Network Laboratory (WINLAB), 1989 - 1999
Chair, Department of Electrical and Computer Engineering, 1988 - 1991

Harvard University, 1995
Research Associate, Program on Information Resources Policy

AT&T Bell Laboratories 1960 - 1962, 1967-1988
Department Head, Communications Systems Research

Imperial College, London, 1983-1988
Visiting Professor of Electrical Engineering

Southampton University, 1987-1990
Visiting Professor of Electronics and Computer Science

## IV. HONORS AND AWARDS

Member, National Academy of Engineering

Foreign Member, Royal Academy of Engineering

Fellow, Institute of Electrical and Electronic Engineers

Fellow, Institution of Electrical Engineers

2003 IEEE Avant Garde Award for Contributions to Speech Coding and Internet-Packet Cellular Networks

1999 RCR Gold Award for Best Talk at Wireless Technology Conference

1997 ACM Award for Outstanding Contributions to Research on Mobility of Systems, Users, Data and Computing

Paper of the Year: IEEE Transactions on Vehicular Technology: 1992

Paper of the Year: IEEE Communications Magazine: 1992

Paper of the Year: IEEE Transactions on Vehicular Technology: 1988

## V. PAPERS SINCE 1988

1. **"Government Regulation and Innovation in Information Technology"**
   D. J. Goodman
   Information Technology: The Public Issues, R. Plant, F. Gregory, and A. Brier, ed., Manchester University Press, Chapter 4, pp 62-78 (1988).

2. **"Packet Data Transmission over Mobile Radio Channels"**
   C.K. Siew and D.J. Goodman
   IEEE Transactions on Vehicular Technology, Vol. 38, No. 2, pp 95-101, (May 1989)

3. **"Packet Reservation Multiple Access for Local Wireless Communications"**
   D.J. Goodman, R.A. Valenzuela, K.T. Gayliard, and B. Ramamurthi
   IEEE Transactions on Communications, Vol. COM-37, No. 8, pp 885-890 (August 1989)

4. **"Cellular Packet Communications"**
   IEEE Transactions on Communications, Vol. COM-38, No. 8, pp 1272-1280 (August 1990)

5. **"Evolution of Wireless Information Networks"**
European Transactions on Telecommunications Special Issue on Major Issues for Telecommunications in the 1990's, Vol. 2, No. 1, pp 10 5-113 (January 1991)

6. **"Efficiency of Packet Reservation Multiple Access"**
D.J. Goodman and S.X. Wei
IEEE Transactions on Vehicular Technology, Vol. 40, No. 1, pp 170-176 (February 1991)

7. **"Second Generation Wireless Information Networks"**
IEEE Transactions on Vehicular Technology, Vol. 40, No. 2, pp 366-374 (May 1991)

8. **"Trends in Cellular and Cordless Communications"**
IEEE Communications Magazine, Vol.29,No. 7, pp 31-40 (June 1991) 1992 Magazine Prize Paper Award

9. **"Performance of PRMA: A Packet Voice Protocol for Cellular Systems"**
S. Nanda, D.J. Goodman and U. Timor
IEEE Transactions on Vehicular Technology, Vol. 40, No. 3,pp 584-598 (August 1991) 1992 Jack Neubauer Award

10. **"A Packet Reservation Multiple Access Protocol for Integrated Speech and Data Transmission"**
W.C. Wong and D.J. Goodman
IEEE Proc.-I, Vol. 139, No. 6 (1992)

11. **"Network Control for Wireless Communications"**
D.J. Goodman, G.P. Pollini and K.M. Meier-Hellstern
IEEE Communications Magazine, Vol. 30, No. 12, pp 116-124 (December 1992)

12. **"Centralized Power Control in Cellular Radio Systems"**
S. A. Grandhi, R. Vijayan, D.J. Goodman, J. Zander
IEEE Transactions on Vehicular Technology, Vol. 42,No. 4, pp. 466-468 (November 1993)

13. **"A Predictive Load-Sharing Scheme in a Microcellular Radio Environment"**
Kuek, S.S., W.-C. Wong, R. Vijayan, D.J. Goodman
IEEE Transactions on Vehicular Technology, Vol.42,No. 4, pp. 519-525 (November 1993)

14. **"Distributed Power Control in Cellular Radio Systems"**
S.A. Grandhi, R. Vijayan, and D.J. Goodman
IEEE Transactions on Communications, Vol. 42, No.2/3/4, Part I,pp. 226-228 (Feb/March/April 1994)

15. **"Network Protocols for the Cellular Packet Switch"**
K. Meier-Hellstern, G.P. Pollini, and D. J. Goodman
IEEE Transactions on Communications, Vol. 42, No.2/3/4, Part II, pp.1235-1244 (Feb/March/April 1994)

16. **Guest Editorial: "Wireless & Mobile High-Speed Communication Networks: Architecture, Modeling and Analysis"**
H. Ahmadi, D. J. Goodman, K. Sohraby, and R. Steele
IEEE Journal on Selected Areas in Communications, Vol. 12, No. 8, October 1994

17. **"Interworking Between Digital European Cordless Telecommunications and a Distributed Packet Switch"**
S. Rao, D. J. Goodman, G. P. Pollini, K. S. Meier-Hellstern
Wireless Networks, Vol. 1, No. 1, pp. 83-93, February 1995

18. **"Signaling Traffic Volume Generated by Mobile and Personal Communications"**
G. P. Pollini, K. S. Meier-Hellstern, D. J. Goodman
IEEE Communications Magazine, Vol. 33, No. 6, pp. 60-65, June 1995

19. **"Signaling System Performance Evaluation for Personal Communications"**
G. P. Pollini, D. J. Goodman
IEEE Transactions on Vehicular Technology, Vol. 45, No. 1, pp. 131-138, February 1996

20. **"Multi-rate PRMA: A Protocol for Controlled Soft-capacity in TDMA Systems"**
M. Thomas, D. J. Goodman
IEEE Electronics Letters, Vol. 32 (No. 15), pp. 1344-1345, July 1996.

21. **"Minimizing Queuing Delays and Number of Messages in Mobile Phone Location"**
D.J. Goodman, P. Krishnan, B. Sugla
Mobile Networks and Applications, Vol. 1, No. 1, pp. 39-48, August 1996.

22. **"Resource Allocation for Cellular Radio Systems"**
S.A. Grandhi, R.D. Yates, D.J. Goodman
IEEE Transactions on Vehicular Technology, Vol. 46, No. 3, pp. 581-587, August 1997.

23. **"General Packet Radio Service in GSM"**
J. Cai, D. J. Goodman
IEEE Communications Magazine, pp. 122-131, October 1997.

24. **"The Person in PC and PCS"**
D. J. Goodman
ACM Mobile Computing and Communications Review, Vol. 1, No. 1, pp. 1-2, January 1998.

25. **"Standards for Personal Communications in Europe and the United States"**
D. J. Goodman
Program on Information Policy Research, Harvard University, 1998.
http://pirp.harvard.edu/pubs_pdf/goodman/goodman-p98-1.pdf

26. **"A New Framework for Power Control in Wireless Data Networks: Games, Utility, and Pricing"**
D. Famolari, N. Mandayam, D. Goodman, and V. Shah
in Wireless Multimedia Network Technologies, R. Ganesh, et al., editors, Kluwer Academic Publishers, pp. 289-310 (2000).

27. **"Power Control for Wireless Data"**
D.J. Goodman and N. Mandayam
IEEE Personal Communications, Vol. 7, No. 2, pp. 48-54, April 2000.

28. **"The Wireless Internet: Promises and Challenges"**
D.J. Goodman
Computer, Vol. 33, No. 7,pp.36-41, July 2000.

29. **"The Wireless Revolution and the Geography of Information"**
D.J. Goodman
Maintaining Solid Foundations for Hi-Tech Growth, A. L. C. de Cerreno, ed., New York Academy of Sciences,July 2001, pp. 11-25.

30. **"Network Assisted Power Control for Wireless Data"**
D. Goodman and N. Mandayam
Mobile Networks and Applications, Vol. 6, No. 5, pp. 409-418, Sept, 2001

31. **"Pricing and Power Control in a Multicell Wireless Data Network"**
C. U. Saraydar, N. B. Mandayam, and D. J. Goodman
IEEE Journal on Selected Areas in Communications, Vol. 19, No. 10,pp. 1883-1892, Oct. 2001.

32. **"Mobility and Resource Management in Next Generation Wireless Systems"**
I. F. Akyildiz, D. J. Goodman, and L. Kleinrock
Guest Editorial, IEEE Journal on Selected Areas in Communications, Vol. 19, No. 10, pp. 1825-1830, Oct. 2001.

33. **"Efficient power control via pricing in wireless data networks"**
C. U. Saraydar, N. B. Mandayam, and D. J. Goodman
IEEE Transactions on Communications, Vol. No. 2, pp. 291-303,Feb.2002

34. **"Total Power Optimization for Wireless Multimedia Communication"**
E. Erkip, Xiaoan Lu, Yao Wang, D. Goodman
in System-Level Power Optimization for Wireless Multimedia Communication Power Aware Computing, R. Karri and D.J. Goodman editors, Kluwer, 2002

35. **"Wireless Internet > Wireless + Internet"**
S. Tekinay and D. J. Goodman
Chapter 2 in Wireless Internet Handbook, B. Furht and M. Ilyas, ed., CRC Press, 2003.

36. **"Maximizing The Throughput Of CDMA Data Communications"**
D. Goodman, P. Orenstein, Z. Marantz, and V. Rodriguez
IEEE Vehicular Technology Conference, October 2003.

37. **"Power Efficient Multimedia Communication over Wireless Channels"**
X. Lu, E. Erkip, Y. Wang, and D. J. Goodman
IEEE Journal on Selected Areas in Communications, Vol. 21, No. 10, pp.1738-1751, Dec. 2003.

38. **"Effects Of Additive Noise on the Throughput Of CDMA Data Communications"**
P. Orenstein, D. Goodman, Z. Marantz, and V. Rodriguez
IEEE International Conference on Communications,June 2004.

39. **"Power Optimization of Source Encoding and Radio Transmission in Multiuser CDMA Systems"**
X. Lu, Y. Wang, E. Erkip, and D. J. Goodman
Submitted to IEEE International Conference on Communications, June 2004.

40. **"3G Cellular Standards and Patents"**
D. J. Goodman and R. A. Myers
Proceedings of IEEE WirelessCom 2005, June 13-16, 2005

## VI. PATENTS

1. **"Adjusting Filter Coefficients"**
David Goodman, Gurcan Mustafa
patent no. 5,121,415, Jun. 1992

2. **"Telecommunications switching systems"**
David Goodman
patent no. 4,916,691, Apr 1990

3. **"Spread spectrum FH-MFSK receiver"**
David Goodman, Henry Paul S, Prabhu Vasant S
patent no. 4,271,524, Jun. 1981

4. **"Sidetone control circuit for a telephone set"**
David Goodman, Johnston James, Noll Michael
patent no. 4,081,620, Mar. 1978

5. **"Error detection and correction system"**
David Goodman, Steele Raymond
patent no. 4,054,863, Oct. 1977

6. **"Adaptive quantizer apparatus using training model"**
Gersho Allen, David Goodman
patent no. 3,931,596, Jan 1976

7. **"Adaptive delta modulator"**
David Goodman
patent no. 3,652,957, Mar. 1972

8. **"Digital code converter for converting a delta modulation code to a different permutation code"**
David Goodman
patent no. 3,596,267, Jul 1971

VII. BOOKS

1. **Wireless Personal Communications Systems**
   D. J. Goodman
   Addison-Wesley Publishing, 417 pgs. (1997).

2. **Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers**
   R. D. Yates and D. J. Goodman
   John Wiley & Sons, Inc., 454 pgs. (1998).

3. **Probability and Stochastic Processes: A Friendly Introduction for Electrical and Computer Engineers, 2nd. edition**
   R. D. Yates and D. J. Goodman
   John Wiley & Sons, Inc., 519 pgs. (2004).

4. **Third Generation Wireless Information Networks**
   S. Nanda and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 317 pgs. (1992).

5. **Wireless Communications - Future Directions**
   J. Holtzman and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 339 pgs. (1993).

6. **Wireless and Mobile Communications**
   J. Holtzman and D. J. Goodman, Ed.
   Kluwer Academic Publishers, 286 pgs. (1994).

7. **Mobile Multimedia Communications**
   D. J. Goodman and D. Raychaudhuri, Ed.
   Plenum Press, 321 pgs. (1997).

8. **The Evolution of Untethered Communications, Committee on Evolution of Untethered Communications**
   D. J. Goodman
   Chair, National Academy Press, 189 pgs. (1997).

9. **System-Level Power Optimization for Wireless Multimedia Communication Power Aware Computing**
   R. Karri and D.J. Goodman, Ed.
   Kluwer Academic Publishers, 248 pgs., (2002).

**EXHIBIT B**

**MATERIALS CONSIDERED BY DR. DAVID GOODMAN**

A61

1. U.S. Patent 5,327,144
2. Prosecution History of U.S. Patent 5,327,144
3. Japanese Laid-open Patent Application (JP3239091)
4. English Translation of Japanese Laid-open Patent Application (JP3239091)
5. Andrew's Response to TruePosition's 1st Set of Interrogatories (dated April 7, 2006)
6. Andrew Corporation's Supplemental Responses to TruePosition's First Set of Interrogatories (dated June 23, 2006)
7. Andrew Corporation's Supplemental Responses to TruePosition's Interrogatory Nos. 3 and 7 (dated November 8, 2006)
8. TruePosition's Responses to Defendant's First Interrogatories (dated May 1, 2006)
9. TruePosition's Supplemental Responses to Defendant's First Interrogatories (dated May 22, 2006)
10. TruePosition's Second Supplemental Responses to Defendant's First Interrogatories (dated August 1, 2006)
11. TruePosition's Third Supplemental Responses to Defendant's First Interrogatories (dated August 9, 2006)
12. TruePosition's Seventh Supplemental Responses to Defendant's First Interrogatories (November 6, 2006)
13. Andrew's Preliminary Claim Constructions as of November 22, 2006 (dated November 22, 2006)
14. TruePosition's Identification of Claim Terms and Proposed Constructions (dated November 22, 2006)
15. TruePosition's Proposed Construction of Claim Terms and Phrases That Andrew Believes Required Construction (November 27, 2006)
16. Rob Anderson 30(b)(6) Deposition Transcript (November 14, 2006)
17. Rob Anderson Deposition Transcript (September 21, 2006)
18. Rob Anderson 30(b)(6) Deposition Transcript (October 24, 2006)
19. Curtis Knight Deposition Transcript (October 6, 2006)
20. Joseph Sheehan Deposition Transcript (October 19, 2006)

21. John Webber Deposition Transcript (October 4, 2006)

22. Wikipedia

23. Wireless Personal Communications Systems
D. J. Goodman
Addison-Wesley Publishing, 417 pgs. (1997)

24. Telephone conversation with J Kennedy.

**CERTIFICATE OF SERVICE**

I, Rachel Pernic Waldron, hereby certify that on this 1st day of December, 2006, I served a true and correct copy of the foregoing **EXPERT REPORT OF DR. DAVID GOODMAN ON THE INVALIDITY OF U.S. PATENT NO. 5,327,144** and its accompanying exhibits upon the following individuals in the manner indicated:

VIA ELECTRONIC MAIL

Paul B. Milcetic, Esq.
David L. Marcus, Esq.
Daniel J. Goettle, Esq.
Woodcock Washburn LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104-2891
pbmilcet@woodcock.com
dmarcus@woodcock.com
dgoettle@woodcock.com

James D. Heisman, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
jheisman@cblh.com

Rachel Pernic Waldron

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

        Plaintiff/Counterclaim-Defendant

    vs.                CA No. 05-00747-SLR

ANDREW CORPORATION,

        Defendant/Counterclaim-Plaintiff

VIDEOTAPED DEPOSITION OF DR. DAVID GOODMAN

New York, New York

Monday, January 15, 2007

Reported by:
Adrienne M. Mignano
JOB NO. 190791

Page 78

Goodman

also some in the report.

THE WITNESS: Thanks.

A. For the moment, Mr. Milcetic, Ms. Waldron showed me that I incorporated it in my report, so --

Q. Go ahead.

A. I don't need you to give me Figure I right now. Maybe all of them that I referred to, if you remember that.

What's the question, please?

Q. Referring to page 15 of your report, where in the Kono disclosure is a cellular telephone location system for determining the location of multiple mobile telephones disclosed?

A. Okay.

And my answer is in the sentence in the right-hand column of row 1 that appears on page 3 of the translation, the working example of this invention is described below, and then it says Figure 1 shows a configuration of a moving body position location apparatus.

Q. And it's your interpretation that

Page 79

Goodman

the moving body refers to a cellular telephone?

A. That's my interpretation.

Q. The next block down on page 15 of your report, do you see that?

A. Yes.

Q. The phrase is "each initiating periodic signal transmission over one of a prescribed set of reverse control channels comprising."

Do you see that?

A. Yes.

Q. Where in the Kono disclosure is that claim element disclosed?

A. It says on page 3, at the beginning of the section that's headed operation of the invention, it says, "in this invention, a moving body transmits position locating signals using shared terminals."

Q. Is it your understanding that shared channels are the same as a prescribed set of reverse control channels?

A. It's my understanding that to the extent that Andrew system using a prescribed

Page 80

Goodman

set of reverse control channels, Kono discloses -- in other words, if somebody decides that Andrew equipment is using a prescribed set of reverse control channels, then they would be forced to say that Kono is also using a prescribed set of reverse control channels.

Q. So is it correct that you're not really saying that the '144 patent isn't valid, so much that it may be invalid under some interpretation of the patent?

MS. WALDRON: Objection. Mischaracterizes.

A. What am I supposed to say yes or no to?

Q. Let me ask a different question.

A. You're putting words into my -- that I didn't write into this report. Maybe I should read how I described the situation.

Q. The question I have is: Is it your opinion that the '144 patent is invalid?

A. Yes.

Q. Is it your opinion that the '144 patent is invalid even if Andrew's product is

Page 81

Goodman

not encompassed -- is not encompassed within the '144 patent claims?

MS. WALDRON: Object to the form.

Q. Let me repeat it.

Is it your opinion that the '144 patent is invalid even if Andrew's geometrics is not encompassed within the '144 patent claims?

MS. WALDRON: Objection.

A. I don't have an opinion about that.

Q. As to whether under that set of circumstances, the '144 patent is invalid?

A. I haven't done that analysis at all.

Q. What is it about the phrase shared channels in Kono that makes you believe that it is similar or that it corresponds to anything in Andrew's product?

MS. WALDRON: Object to the form. Compound.

A. I think these channels are carrying information in two directions, as a way that the channels used in the Andrew's product.

Q. Specifically stand-alone dedicated

Goodman
channels you mean?
A. Yes.
Q. In Andrew's product?
A. Yes.
Q. What makes you think that in Kono, the shared channels are being transmitted in two directions?
A. Well, because Kono disclosing a transceiver at the cell site, or whatever he calls the cell site, and transceiver includes transmitter and receiver.
Also, it seems that Kono technology allocates this shared channel to one cell phone at a time. Just as Andrew -- just as a stand-alone dedicated control channel carries in any particular time interval information from between one cell phone and one base station.
Q. Is it your understanding that the shared channels in Kono are channels that are emitted as part of the normal operation as part of at telephone location system?
MS. WALDRON: Objection. Vague.
A. I think they are emitted. The

Goodman
shared channels are emitted.
Would you read the question again?
(Record read)
Q. Actually, I'll rephrase it.
Is it your understanding that the position locating signals transmitted over the shared channels are signals that are sent in the context of a normal cellular telephone system?
MS. WALDRON: Objection. Vague.
A. I suppose normal -- I'm not sure what normal means in this question. If you could explain it further, I can answer it certainly.
Q. Is it your understanding that the position locating signals in Kono are part of the signals that are sent in any cellular telephone system as part of its everyday operation.
MS. WALDRON: Objection. Vague.
A. Yes.
MS. WALDRON: While there is no question pending, are we still breaking for lunch at 12:30?

Goodman
THE WITNESS: If it is fine with you. We just said that. I could stop now.
THE VIDEOGRAPHER: We're off the video record at 12:29 p.m.
(Thereupon, a recess was taken, and then the proceedings continued as follows:)
THE VIDEOGRAPHER: We're back on the video record at 1:34 p.m.
AFTERNOON SESSION
DAVID GOODMAN, resumed and testified as follows:
EXAMINATION BY (Cont'd.)
MR. MILCETIC:
Q. Dr. Goodman, when we left we were talking about a page of your invalidity report.
Do you remember that?
A. I think so. Yes, okay, now, I remember.
Q. And we were discussing the summary chart, and in particular the second row of the summary chart on page 15.

Goodman
Do you remember that?
A. Yes, I recall.
Q. Is it your view that the claim phrase prescribe set of a reverse control -- let me step back.
Let me redo that one, if that's okay with you.
A. Oh, of course.
Q. Is it your opinion that the phrase "prescribed set of reversed control channels" is disclosed in Kono under the construction that you provided this morning?
A. To the extent that it is practiced by Andrew, so if it is interpreted in such a way that you can find it in Andrew's technology, you would be compelled to say that Andrew has it as well.
Q. When you say that it is interpreted, you mean to the extent that your construction is interpreted?
A. Yes.
Q. I believe your construction this morning of reverse control channel included the requirement of a particular signal format

7b3958b0-9d46-4d36-bbfc-5c2a24462dd7

Page 86

Goodman

according to certain cellular telephone standards; is that right?

A. Yes.

Q. Does Kono disclose that signal format?

A. I think to the same extent that Andrew does, yes. To the same extent that Andrew uses that format, I think Kono uses it the same way Andrew does.

Q. Is it fair to say that both Kono and Andrew do not use that signal format?

MS. WALDRON: Objection. Form.

A. I guess depending on the context, somebody might say that.

Q. Well, do you believe that Andrew uses that signal format?

A. No.

Q. Then does it follow that Kono doesn't use that signal format as well?

MS. WALDRON: Objection to the form.

A. I think I answered that as well. In the same way that Andrew uses it or doesn't use it, Kono -- I think I explained

Page 87

Goodman

that before lunch.

Q. But you testified that Andrew doesn't use that signal format, right, the signal format in the cellular telephone standards that define reverse control channel in a way that you are interpreting it, right?

A. Yes.

Q. And you also testified that Kono discloses that element to the same extent as Andrew practices that element, correct?

A. Yes.

MS. WALDRON: Objection.

Q. Doesn't it follow then that Kono doesn't then disclose that element?

A. I think to give a complete opinion, I'd have to say that somebody who would find that element in Andrew would have to find it in Kono. So if somebody doesn't find it in Andrew, I don't know, but -- I think that's -- that sentence is my opinion.

Q. And what is the basis for that opinion?

A. The basis for that opinion is that the shared channel in the Kono application

Page 88

Goodman

has similar properties to the stand-alone dedicated control channel that I understand is TruePosition's. It conforms to the prescribed set of reverse control channels, because, as you know, I have done the infringement analysis as well as the invalidity analysis, so I'm aware of how TruePosition interprets this and I think they are compelled to say. I know you have had different experts for the two things. I think if you ask Dr. Gottesman, he would have to say, oh, yeah, it's in Kono too because of the way he found it in Andrew. I don't agree with him.

Q. When did you first learn how TruePosition contends that Geometrix infringes the patent?

A. I suppose it was in the summer when Mr. Parks told me about the lawsuit.

Q. When did you start learning about how Geometrix works in terms of its operation?

A. I think it was in October, towards the middle or end of October.

Page 89

Goodman

Q. Do you know when you first formed an opinion that the '144 patent was invalid if the claims are construed to cover Geometrix?

A. Yes.

Q. When?

A. I think the first week in November. Within that time frame.

Q. Do you remember when you first came to the opinion that Geometrix doesn't infringe the '144 patent?

A. I'm trying to synchronize these dates here, but I think early in December I came to the opinion that Dr. Gottesman didn't prove that Geometrix infringes the '144 patent, so that's the opinion I want to offer to the court.

I was asked by Kirkland & Ellis to find out whether Dr. Gottesman proved it, and it's my opinion that he did not.

Q. Is it your understanding that the Kono disclosure discloses an AMPS cellular telephone system?

A. Sorry, I haven't been asked for

Page 102

Goodman

Q. I noticed in your invalidity report, Exhibit 300, at the end of the report, there is a listing of material to be considered in forming your opinion relating to the invalidity of the '144 patent, correct?

A. Yes.

Q. And I also noticed that nothing in that report, the invalidity report, none of those materials seem to relate to the operations of Geometrix.

Am I right about that?

MS. WALDRON: Objection. Form. Assumes a fact.

A. I agree with you about -- well, I'd like to see. I just don't remember what's in references 5, 6 and 7 in Andrew, documents prepared by Andrew Corporation. Those are, I think, the only ones that might say something about how their Geometrix system works. I don't remember what's in them.

Q. Did you, for purposes of rendering your invalidity report, did you consider the operation of Geometrix?

Page 103

Goodman

A. Yes.

Q. What were the sources that you used?

A. To my recollection, there is one source that I didn't list here, and that was a phone conversation with Mr. Kennedy, who is an employee of Andrew.

Q. When was the phone conversation?

A. If I recall correctly, I spoke to him before I wrote the invalidity report. I just don't know.

Q. Do you think to make your invalidity report accurate, it would be worth correcting it to add the Joseph Kennedy conversation?

A. I think so. If that's true, I would like to ask Ms. Waldron because she participated in the phone conversation if it actually occurred.

MS. WALDRON: I'm not allowed to testify right now.

A. As I recall now, I think that would improve the report to say that I had a phone conversation with Mr. Kennedy.

Page 104

Goodman

Q. Would you prefer to make that change?

A. Yes.

Q. Please go ahead since we're keeping a master copy of what the report is reflecting your opinions today.

A. Yes.

Q. Just for the record, you're writing on Exhibit 300, correct?

A. That's correct. I'm writing on page 3 of Exhibit B.

Q. Apart from Ms. Waldron and Mr. Kennedy, was there anyone else on the conversation?

A. I don't remember. There might have been another Kirkland attorney, but I don't know.

Q. What exactly did you discuss?

MS. WALDRON: Objection. Vague.

A. As best as I can recall about that particular conversation, I think he kind of talked me through the -- talked me -- explained step by step how Geometrix system finds out where a mobile phone is. Finds the

Page 105

Goodman

location of a mobile phone.

Q. Apart from -- let me step back.

What did Ms. Waldron say on the conversation?

MS. WALDRON: Objection. Vague. Overbroad.

A. I don't recall that she said anything. I was visiting Kirkland & Ellis' office at the time, and as I said, Ms. Waldron was there, maybe Mr. Parks.

Q. Where were you exactly?

A. At the Kirkland & Ellis office in Chicago.

Q. About when did the conversation take place?

A. Early November.

Q. Other than the early November conversation between yourself, Joe Kennedy and Ms. Waldron, did you have any other source of understanding of how Geometrix works at the time that you rendered your invalidity report?

A. I don't recall any other sources.

Q. At that time, had you looked at any

Page 106

Goodman

Geometrix source code?

A. No.

Q. At that time, had you looked at any technical documentation relating to the operation of Geometrix?

A. I don't think so.

Q. Let me explain where I'm going with this.

As I understand it, correct me if I'm wrong, you were -- your opinion in your invalidity report in summary is that the Kono disclosure discloses each element of the claims and corresponds to each element of the '144 patent claims to the same extent that Geometrix does, correct?

A. Yes, almost correct.

Maybe not to the same extent, but if Geometrix conforms to the claims, then Kono conforms to the claims, and I don't know how to measure extent. It seems like a binary thing, it either conforms or it doesn't.

Q. It follows then at the time that you rendered your invalidity opinion, you

Page 107

Goodman

must have had some working knowledge of the Geometrix product, correct?

A. Yes.

Q. To render that opinion?

A. Yes.

Q. And that understanding of the Geometrix product at the time that you rendered your invalidity report would have been based, at least in part, on the conversation between you and Mr. Kennedy in early November, correct?

A. Yes.

Q. And thus far, you haven't been able to recall any other sources of information, right?

MS. WALDRON: Objection. Misstates.

A. At the moment, I don't recall.

Q. Do you want to think about it and think of some other potential sources?

A. Well, I was just going to explain my answer a little more. That I have, by now I have a pile of documents relating to the Geometrix system, and I have read a lot of

Page 108

Goodman

them, and I just don't remember when I received them and when I read them relative to preparing this report. But I think the information that I used was what I heard Mr. Kennedy tell me about.

Q. When Mr. Kennedy explained the operation of the Geometrix system to you, did he go through each element of the claims and discuss how Geometrix relates to those elements?

MS. WALDRON: Objection. Vague. Assumes a fact.

A. As best as I can recall from two, two-and-a-half months ago from a phone conversation, he really didn't analyze the '144 patent. You know, I asked him questions, tell me how it works, he told me how it worked, and we didn't get very far into the patent claims. I just wanted to know how does your stuff find out where a cell phone is located.

Q. Next claim element on page 16 of your invalidity report is timing signal receiver.

Page 109

Goodman

Do you see that?

A. Yes.

Q. It's your opinion that the timing signal receiver limitation in claim 1, the second row of the chart on claim 16, is disclosed in Kono?

A. Yes.

Q. What's the basis of that understanding?

A. My basis for that understanding is that there is a high precision clock within each of the shared channel receivers labeled 54 in the Kono patent, and that this -- the high precision clocks at all of the base stations are corrected by the switching station.

Q. Is it your understanding that the Kono disclosure discloses a GPS clock?

A. That's not my understanding. I don't subscribe to that.

Q. Is it your belief that Kono discloses a GPS receiver?

A. It's my belief that Kono does not say anything about a GPS receiver. Sorry,

Goodman

Q. Are any of the documents that one would look to in 1993 for the GPS receiver disclosure mentioned in your report?

A. Not explicitly.

Q. If you go back to page five of your invalidity report, please.

A. Five?

Q. Yes.

A. Yes, I'm there.

Q. There is a legal standard on page 5 relating to obviousness that you read earlier, correct?

A. Yes.

Q. Is that essentially what the attorneys explained to you about how you go about showing whether something is obvious?

A. Yes.

Q. Did they use any kind of terminology relating to motivations to combined prior art references?

A. I have heard that expression, and I don't remember if I heard it in my discussion of this patent, but I have heard it in other context. So I know that that is a

Goodman

consideration.

Q. Turning back to page 17, the claim element wherein said timing receiver comprising a global positioning system receiver.

A. Yes.

Q. Do you believe your report is accurate as it is written in that -- under the question present in Kono, it says yes?

A. I'm having a problem with that word inherently.

Q. You're not sure --

A. In my instruction. So it's my opinion if -- so I was informed by Kirkland & Ellis that it has to be there either expressly or inherently, and I certainly don't have the opinion that it is there expressly, and sitting here I forgot what they told me about inherently. I'm sure we discussed it. I think that's why I wrote yes at the time.

If you would give me a definition of inherently, I would tell you whether sitting here I think it fits your definition.

Goodman

But it is the sort of thing that's a little obscure to an engineer.

Q. Reading Kono, the Kono disclosure, will you conclude that what's disclosed there must be implemented using a GPS receiver?

A. No.

Q. Can we go back to claim 15 of your report now?

A. Of course.

Q. Back to the earlier claim elements. Actually it's page 60.

A. Page 60.

Q. Yes.

This all started with the timing signal receiver?

A. Yes.

Q. Next claim element is a sampling subsystem.

Do you see that?

A. Yes, I do.

Q. It's in the third row of the chart on page 16 of your invalidity report.

Do you see that?

A. Yes.

Goodman

Q. Since that's a long one, can you read that limitation into the record?

A. "And a sampling sub, system operatively coupled to set timing signal receiver and said baseband converter for sampling baseband converter at a prescribed frequency and formatting the sample signal into frames of digital data each frame comprising of a prescribed number of data bits, said time stamp bits representing the time which said cellular telephone signals were received."

Q. Is it your opinion that Kono discloses that claim limitation?

A. It's my opinion that if someone asserted that Andrew Geometrix product has a sampling subsystem as described here, that same person would be compelled to say that Kono also has it.

Q. Why do you say that?

MS. WALDRON: Objection. Vague. Form.

A. It's based on my understanding of the patent and my understanding of Kono's



Page 118

Goodman
application and my understanding of how the Geometrix system works.
Q. Would you agree that the Kono disclosure discloses no particular algorithm of any kind?
MS. WALDRON: Objection. Vague. Ambiguous.
A. Would you read the question, please?
(Record read)
A. I disagree.
Q. Where does Kono disclose an algorithm?
A. On page 4, there is a long middle paragraph of this translation. There is a mistake, I assume it is a mistake in the translation or typo here, but I'll tell you.
I just have to narrow it down.
So if we say the word reports, which is -- it's about six lines, maybe the seventh line from the bottom of that long paragraph, at the end of the line, it says and reports to, and I think the thing that's doing the reporting is the base stations.

Page 119

Goodman
But anyway, reports to the switching stations data such as difference in arrival time position locating signals. And then the base station forwards these data to the position location calculating device.
And I think to make sense, this would have to be the switching station because one is a reference to switching station. So -- and then it says the position of the mobile equipment is calculated, and I think someone of skill in the art would know that there are many algorithms that would use time difference of arrival to calculate position.
Q. Is it your view that Kono then discloses each one of those algorithms?
A. Yes. I'm not a lawyer, but I think so. I mean, if Kono is valid, then anyone using -- I just think so. As an engineer.
MS. WALDRON: Is this an okay time for a break?
MR. MILCETIC: Any time.
THE WITNESS: We're running out of tape.

Page 120

Goodman
THE VIDEOGRAPHER: We're off the video record at 2:43 p.m.
(Thereupon, a recess was taken, and then the proceedings continued as follows:)
THE VIDEOGRAPHER: We're back on the video record at 3:01 p.m.
BY MR. MILCETIC:
Q. Dr. Goodman, when we left, we were talking about page 16 of your invalidity report, and particularly the sampling subsystem limitation.
A. Yes.
Q. What is a sampling subsystem?
MS. WALDRON: Objection. Calls for a legal conclusion.
A. I think for someone to understand the meaning of sampling subsystem in this patent, they would read the entire claim limitation, and say a sampling subsystem is the thing that does all of the stuff that is in all of the -- performs all of the operations.
I withdraw my answer for the

Page 121

Goodman
moment. Let me think about it.
I'll reinstate my answer. It's some sort of apparatus that works in connection with a timing signal receiver and a baseband converter, and the things that it does in these operations is sample the baseband signal in a certain way. It formats the sample signal into claims of data, and these frames have particular properties as described here. And the frames consist of data bits and time stamp bits. And each of those bits have prescribed properties.
Q. Before you ever read the '144 patent, have you ever seen a sampling subsystem before?
MS. WALDRON: Objection. Overbroad.
A. I don't remember.
Q. Would you say that the phrase sampling subsystem is a term of art in your field?
MS. WALDRON: Objection. Vague.
A. No, I wouldn't.
Q. Let's move on to the next element

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Goodman

now on page 16.

Do you see the central site system element?

A. Yes.

Q. So on page 16 of your report at the fourth row of the chart, there is a central site system limitation cited, correct?

A. Yes.

Q. That's in claim 1 of the '144 patent claims?

A. Yes.

Q. It's your opinion that that is disclosed by the switching station and position location calculating device?

A. Yes.

Q. Are you saying both of them together disclose a central site system.

Is your understanding that the position location calculating device is just a computer in Kono?

A. I think someone of skill in the art would recognize that it could be realized -- I'm not sure what a computer means, but it could be realized by a microprocessor or a

Goodman

digital microprocessor. There are all forms of computers. I don't know about a laptop or a desktop.

So that would be part of it, and the remainder of it would be some sort of communication resources for transferring information to and from the switching station.

Q. The next claim element on page 16 is "means for processing said frames of data from said cell site systems."

Do you see that?

A. Yes.

Q. Is it your opinion that that claim term is disclosed in Kono?

A. It's my opinion that if somebody found it in the Geometrix equipment, they would be compelled to say that it is also in Kono.

Q. In your view, does Kono disclose a means for processing that's in some way similar to a means for processing in Geometrix?

MS. WALDRON: Objection. Vague.

Goodman

A. May I look at my claims construction that are in these exhibits?

Q. Certainly. I believe your claim construction is Exhibit --

A. So somewhere I defined means for processing. So it might help me to --

Q. Yes. I think it is 463 or 464 that you did that.

A. Yes, I see something on 463. I'd like also to look at one of the other exhibits, which was Andrew's proposed claim construction from November 22nd.

Q. That's Exhibit 301.

A. 301. Thank you. I'm going to refer to Exhibit 301.

Just to be absolutely certain, would you read the question, please, just so I know what I'm answering.

(Record read)

Q. I can clarify if you like.

A. I want to make sure I'm answering the right question. It wasn't that it was unclear.

Q. Under your construction today, you

Goodman

just looked it up --

A. It's actually 465, I think.

Q. In Exhibit 465. Does Kono disclose the means for processing limitation?

A. It's --

MS. WALDRON: Objection. Vague. Calls for legal conclusion.

A. It's my opinion that someone of skill in the art who finds that claim element in Geometrix equipment would be compelled to say that it also exists in Kono.

Q. What's the basis for your opinion?

A. The basis for my opinion is this statement in Exhibit 466 that something reports to the switching station data such as the difference in arrival time of position locating signals with respect to the different base stations.

Q. The construction that you laid out this morning for means for processing encompassed Figure 6A and Figure 7, correct?

A. Yes.

Q. If I went through those figures on a block by block basis, would you be able to

Page 126

Goodman

find a disclosure in Kono that corresponds to those figures?

MS. WALDRON: Objection. Compound. Overbroad.

A. It's my opinion that if somebody performed this exercise with respect to the Geometrix equipment, and came to the conclusion that you suggest, that all of those things exist in the Geometrix equipment, they would also have to say that it exists in Kono.

Q. Is the disclosure in Kono, does that essentially describe in your view the Geometrix equipment?

MS. WALDRON: Objection. Vague. Ambiguous.

A. I haven't performed this analysis, but I'll just stop there. I haven't advised anyone whether Geometrix has to pay royalties to Kono if that's what you're asking me. That might be another infringement.

Q. When you were rendering your invalidity report, did anyone explain to you how means plus function claims elements were

Page 127

Goodman

construed?

A. I think so. I have heard explanations before I got involved in this lawsuit, and I assume -- I would imagine that I heard the same explanations, but I don't remember specifically.

Q. What is your understanding about means plus function claim elements are construed?

A. My understanding is that in order to construe the claims, you have to read the claim itself and find out what function is being claimed, and then read the patent specification to find out the structure that performs that function.

Q. Is it your understanding that the structure can be found in the prior art if an equivalent of the structure is disclosed?

MS. WALDRON: Objection. Legal conclusion. Compound.

A. I have no understanding of whether that's true or not.

Q. How about with respect to infringement?

Page 128

Goodman

MS. WALDRON: Objection. Form. Legal conclusion.

A. Would you state a complete question about infringement?

Q. With respect to infringement, is it your understanding that means plus function elements are construed to cover the corresponding structure plus equivalents?

MS. WALDRON: Objection. Calls for a legal conclusion.

A. I understand that the claim may be drafted in means plus function format. I understand that for an accused product to literally meet a means plus function claim limitation, an element in the accused product must, one, perform the same function recited in the means plus function claim limitation, and, two, use the same structure disclosed in the patent specification or its equivalent structure to perform the recited function.

I understand that an accused structure may be equivalent to the disclosed structure in the patent specification if it performs the same function in the same way to

Page 129

Goodman

achieve the same result.

Q. When you were doing your validity analysis for Kono, did you also understand that means plus function claim elements encompass corresponding structure and equivalent structure?

MS. WALDRON: Objection. Legal conclusion. Assumes a fact.

A. Would you read the question again?

(Record read)

A. I didn't use that legal rule in my validity analysis. I understood what it meant in terms of infringement, but I didn't use it in my validity analysis.

Q. Correct me if I'm wrong, your testimony is that this means for processing limitation is disclosed in Kono to the same extent that one would claim it's found in Geometrix; is that correct?

A. Again, I won't subscribe to same extent, either it's found there or not. I don't know what an extent of finding it. So it's my opinion that if somebody were to analyze the Geometrix technology and apply



Goodman

this claim construction and then find in the Geometrix technology that the claim limitation is met, that same person would be compelled to say that it is also met in Kono. Or that Kono discloses it.

Q. But that's not necessarily because the algorithms in Kono and in Geometrix are the same; is that right?

MS. WALDRON: Objection. Vague. Form.

A. As I've said before, Geometrix -- sorry, as I've said before, Kono discloses a large universe of algorithms, and it is my opinion that those algorithms are included in the patent and also in Geometrix.

Q. Are there any flow charts in Kono?

A. I don't remember seeing any flow charts.

Q. Is there any code appended to the Kono disclosure?

A. I don't remember seeing that either.

Q. Do you know whether the word software is mentioned in Kono?

Goodman

A. I don't recall seeing the word software in Kono.

Q. Is the word algorithm mentioned in Kono?

A. I don't recall seeing that.

Q. How do you know that if the means for processing limitation is found in Kono, then it must also be --

MR. MILCETIC: Scratch that.

Q. How do you know that if the means for processing limitation is found in Geometrix, then it must also be found in Kono?

MS. WALDRON: Objection. It assumes a fact.

A. I know that because Kono discloses using data such as the difference in arrival time in order to calculate location, and the means for processing limitation also requires the same words for virtually differences in times of arrival. So that is the basis of -- and then someone recognized that there are a lot of algorithms for using differences of times of arrival for determining location.

Goodman

Q. I believe for this means for processing element, you construed it to include some structure that included Figure 7 of the patent; is that right?

A. Yes.

Q. Could we turn to Figure 7 of the patent. I believe that's Exhibit 462. And let me know when you're there.

A. Exhibit 462, yes. And anyplace in particular? I found the patent.

Q. Yes, Figure 7. Let me know when you're there.

A. Thanks.

I have Figure 7.

Q. This is part of the means for processing in your view, right?

A. Yes.

Q. The first block, do you see what it says?

A. Yes.

Q. Can you read that into the record?

A. Yes. The first block says, "Receive one frame of data from all cell sites."

Goodman

Q. Does Kono disclose receiving a frame of data from all cell sites?

A. Yes.

Q. It does?

A. Yes.

Q. Does did happen in Geometrix?

MS. WALDRON: Objection. Vague. Calls for a legal conclusion.

A. In my opinion, it doesn't happen in Geometrix.

Q. So this is one instance where Kono might disclose something that is present in Kono irrespective of whether one would construe the claim to cover Geometrix, right?

A. Would you read that question? I didn't understand it.

(Record read)

A. I'm sorry, I have to hear that again.

Are you saying that something is present or a claim limitation?

Q. Well, I believe that you said that receiving one frame of data from all the cell sites is in Kono, right?

Goodman

It's argumentative and compound. Dr. Goodman has been explaining his positions to you all day.

Q. Can you go ahead and write on the exhibits?

A. Sure.

Q. The court reporter is going to show you what's been going to be marked as Exhibits 471 and 472. Two blank pieces of paper.

(Plaintiff's Exhibit 471, Blank Piece of Paper, marked for identification, as of this date.)

(Plaintiff's Exhibit 472, Blank Piece of Paper, marked for identification, as of this date.)

MS. WALDRON: I don't understand if there is a question pending. I think that this whole exercise is compound, calls for speculation, calls for a legal conclusion. It's an improper hypothetical, and I don't understand how he is supposed to do this on the fly sitting at this

Goodman

deposition.

Q. Dr. Goodman, just recall the construction that you used to render your invalidity report. Write that down for us.

A. Okay.

MS. WALDRON: Just so it's clear, Andrew Corporation still has all the same objections.

This whole line of questioning is improper. You're asking him to assume that Andrew infringes.

MR. MILCETIC: Coaching.

Q. You can continue.

MR. MILCETIC: Why don't we go off the record and change the tape while Dr. Goodman is working.

THE VIDEOGRAPHER: We're off the video record at 5:09 p.m.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

THE VIDEOGRAPHER: We're back on the video record at 5:21 p.m.

MS. WALDRON: I also on that,

Goodman

Dr. Goodman is here as a technical expert and is not being put up as a claim construction expert.

MR. MILCETIC: Andrew will be using Dr. Goodman to support its construction claims.

MS. WALDRON: Is that a question?

MR. MILCETIC: A question to you.

MS. WALDRON: As you know, Dr. Goodman submitted an infringement report and an invalidity report, not an expert report on claim construction.

A. May I have one more sheet of paper, please?

Q. This sheet of paper is going to be marked as --

A. I beg your pardon. I have it already.

Mr. Milcetic, what would you like me to do with Exhibit 469 and 470, can I just write down that I changed my mind or --

Q. In fact, since that was an effort that didn't work out, you can cross it out if

Goodman

you think that's inaccurate.

A. If you don't mind, I'll draw a line through it and I'll state for the record that it doesn't represent the response to your request.

Q. Okay, fair enough.

A. So I'm crossing out 469 and 470. And I'm submitting 471 and 472.

Q. How would you characterize what you have written on 471 and 472, Exhibits?

MS. WALDRON: Objection. Calls for a narrative.

A. Oh, what I have written on my exhibit is what the claim construction that TruePosition would need to get to prove infringement of the Geometrix band.

Q. Is it also the claim construction that you used to render your invalidity opinion?

A. Yes.

Q. Just so the record is clear, you do not agree with the construction written on Exhibit 471 and 472, correct?

A. That's correct.

Goodman

Q. Do you mind telling me what you wrote, reading it for me?

A. Okay. I'll start with Exhibit 471.

It says, "Claim construction that would be used to improve the infringement of the '144 patent by Andrew Geometrix technology."

Q. Just to be clear, that's also the construction that you used for rendering your invalidity report, correct?

A. Yes.

Q. Go ahead.

A. "Claim 22, a ground based ... possessing multiple cellular telephones equals any cellular telephone system."

Q. And you disagree with that construction, correct?

A. Yes.

Q. Go on.

A. Then there is a line, kind of a squiggly line separating that from the next claim element. And the next claim element is represented by these words, "At least three cell sites equipped with ... channels

Goodman

equals", and then it says, "the cellular system has at least three base stations that receive signals from cell phones."

And then there is a squiggly line, "locating means ... transmissions equals", and it says "the cellular system estimates the locations of subscribers. And" -- should I continue?

Q. And you disagree with that construction as well, correct?

A. Yes. It's quite different from the construction I think is correct that you asked me for before.

Q. Fair enough. You can continue.

A. It says "database means ... locations. The cell phone system has the location information in its memory. It also has a code in memory that is specific to one instance of performing the locating means. If it performs locating means again for the same cell phone, it will have a different code in its memory."

Q. You disagree with that construction?

Goodman

A. Yes.

Q. Is there any reasonable -- first of all, thanks for going through that exercise with me.

Is there any reasonable interpretation of the claims that you are aware of under which Geometrix would infringe the '144 patent?

MS. WALDRON: Objection. Improper hypothetical. Legal conclusion.

A. I haven't done that analysis, but I'm certainly not -- the answer is no.

Q. You're not aware of any?

A. I'm not aware of any.

Q. Reasonable interpretation?

A. That's correct.

Q. Are you aware of any reasonable interpretation of the '144 patent claims under which Kono would invalidate the '144 patent?

A. I think --

MS. WALDRON: Same objections.

A. I did this on the fly, but I think

Goodman

this interpretation would -- the interpretation of the claims that I just read.

Q. Which would be in Exhibit 47 --

A. 471 and 472.

Q. Do you consider that a reasonable interpretation of the claims, 471 and 472?

A. Oh, a reasonable interpretation of the claims under which -- I think it is the interpretation -- I didn't -- I performed my validity analysis using this interpretation of the claims, and I really don't agree with it, so maybe I can say anything I don't agree with is unreasonable. I don't know.

(Continued on the following page to include the jurat.)

793958b0-9d48-4d38-bbfc-5c2a24482dd7



Page 181

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

TRUEPOSITION, INC.,

Plaintiff/Counterclaim-Defendant

vs. CA No. 05-00747-SLR

ANDREW CORPORATION,

Defendant/Counterclaim-Plaintiff

---

CONTINUED VIDEOTAPED DEPOSITION

OF DR. DAVID GOODMAN

New York, New York

Tuesday, January 16, 2007

Reported by:
Adrienne M. Mignano
JOB NO. 190793

Esquire Deposition Services
216 E. 45th STREET . NEW YORK, NY 10017 . 1-800-944-9454

A78

January 16, 2007
9:45 a.m.

Continued Deposition of DR. DAVID GOODMAN, held at the offices of Kirkland & Ellis, 153 E. 53rd Street, New York, New York, pursuant to Notice, before Adrienne M. Mignano, a Notary Public of the State of New York.

APPEARANCES:

WOODCOCK WASHBURN
Attorneys for Plaintiff
Circa Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104-2891
BY: PAUL B. MILCETIC, ESQ.

KIRKLAND & ELLIS
Attorneys for Defendants and The Witness
200 east Randolph Drive
Chicago, Ill 60601

BY: RACHEL PERNIC WALDRON, ESQ.

ALSO PRESENT:
PAUL JANSEN, Videographer

Goodman

THE VIDEOGRAPHER: Good morning. Here begins videotape number five in the continuing deposition of Dr. David Goodman in the matter of TruePosition Incorporated versus Andrew Corporation.

Today's date is January the 16th, 2007. The time is 9:45 a.m. You may proceed.

D A V I D G O O D M A N, resumed as a witness, having been previously sworn by the Notary Public, was examined and testified further as follows:

EXAMINATION BY
MR. MILCETIC:

Q. Dr. Goodman, yesterday we were talking about your invalidity report and I'd like to move on to your non-infringement rebuttal report, if you don't mind.

Before we do, I would like to sort of ask some questions that I think might recap yesterday.

Is that all right with you?

A. Of course.

Goodman

Q. If I understand you correctly, your opinion is that claim 1 of the '144 patent is invalid if that claim is construed to cover Geometrix, correct?

A. Yes.

Q. But you haven't formed an opinion as to whether claim 1 is invalid if Geometrix is not encompassed by claim 1?

A. That's correct.

Q. Is that also true for claim 2 of the '144 patent?

A. Yes.

Q. Claim 22?

A. Yes.

Q. Claim 31?

A. Yes.

Q. Claim 32?

A. Yes.

Q. Let's move on to your rebuttal report. Is that all right with you?

A. Yes.

Q. I believe it's Exhibit 467.

A. I'll park these documents.

Q. Yesterday I think you mentioned

EXHIBIT 471 1-15-07

CLAIM CONSTRUCTION THAT WOULD BE USED TO PROVE INFRINGEMENT OF THE '144 PATENT BY ANDREW GEOMETRIX TECHNOLOGY

CLAIM 22

A ground-based ... possessing mobile cellular telephones =

Any cellular telephone system

At least three cell sites equipped .... channels =

The cellular system has at least 3 base stations that receive signals from cellphones

Locating means ... transmissions =

The cellular system estimates the locations of subscribers

database means ... locations

EXHIBIT 472 1-15-07

the cellphone system has the location information in its memory. It also has a code in memory that is specific to one ~~location estimation procedu~~ instance of performing the locating means. If it performs the locating means again for the same cellphone it will ~~stor~~ have a different code in its memory.

# CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 17th day of May 2007, I caused a true and correct copy of the foregoing **Appendix A to Memorandum in Support of TruePosition's Motion to Exclude the Invalidity Testimony of Dr. David Goodman Pursuant to Federal Rule of Evidence 702** to be served upon the following individuals via CM/ECF and as indicated below:

***Via e-mail and hand-delivery***
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

***Via e-mail only***
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

***Via e-mail only***
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

***/s/ James D. Heisman***
James D. Heisman (# 2746)