22. Dewayne E. Perry. "Low Level Language Features". Using Selected Features of Ada: A Collection of Papers, CENTACS, US Army Communication-Electronics Command, 1981. Reprinted in The Ada Programming Language: A Tutorial, edited by Sabina H. Saib and Robert E. Fritz. IEEE Computer Society Press, 1983. pp. 327-335.

*Refereed Journal Papers*

23. Paul S Grisham, Herb Krasner, and Dewayne E. Perry. "Data Engineering Education with Real-World Projects", SIGCSE Bulletin, 38:2 (June 2006), pp 64-69., June 2006

24. Alexander Egyed, Hausi A Mueller, and Dewayne E Perry. "Integrating COTS into the Development Process", Special Issue: COTS Integration, IEEE Software 22:4 (July/August 2005), 16-18.

25. Ranjith Purushothaman and Dewayne E Perry, "Towards Understanding the Rhetoric of Small Source Code Changes", Special Issue on Mining Software Repositories, IEEE Transactions on Software Engineering TSE 31-6 (June 2005)

26. Marek Leszak, Dewayne E Perry and Dieter Stoll "Classification and Evaluation of Defects in a Project Retrospective", Journal of Systems and Software, 61 (2002), 173-187.

27. J.M. Perpich, D.E. Perry, A.A. Porter, L.G. Votta and M.W.Wade. "Studies of Code Inspection Interval Reduction in Large-Scale Software Development", IEEE Transactions on Software Engineering, 28:7 (July 2002), 684-694.

28. Dewayne E. Perry, Harvey P. Siy and Lawrence G. Votta. "Parallel Changes in Large Scale Software Development: An Observational Case Study" Transactions on Software Engineering and Methodology, 10:3 (July 2001), 308-337.

29. D. E. Perry, A. Romanovsky and A. Tripathi. "Guest Editor's Introduction - Current Trends in Exception Handling - Part II", IEEE Transactions on Software Engineering 26:9 (October 2000)

30. D. E. Perry, A. Romanovsky and A. Tripathi. "Guest Editor's Introduction - Current Trends in Exception Handling", IEEE Transactions on Software Engineering 26:9 (September 2000)

31. P. T. Devanbu, D. E. Perry and J. S. Poulin. "Guest Editor's Introduction - Next Generation Software Reuse", IEEE Transactions on Software Engineering 26:5 (May 2000)

32. Ashok Dandekar, Dewayne E. Perry and Lawrence G. Votta, "A Study in Process Simplification", Software Process: Improvement & Practice, 3:2 (June 1997).

33. Ashok Dandekar and Dewayne E. Perry, "Barriers to Effective Process Architecture" Software Process: Practice and Improvement, 2.1, January 1996.

34. David Garlan and Dewayne E. Perry, "Introduction to the Special Issue on Software Architecture", IEEE Transactions on Software Engineering, 21:4 (April 1995).

35. Dewayne E. Perry and Laawrence G. Votta, "Prototyping a Process Monitoring Experiment", IEEE Transactions on Software Engineering, 20:10, October1994.

36. Dewayne E. Perry, Nancy Standenmayer and Lawrence G. Votta, "People, Organizations, and Process Improvement", IEEE Software, July 1994.

37. Dewayne E. Perry and Gail E. Kaiser. "Models of Software Development Environments". IEEE Transactions on Software Engineering, 17:3 (March 1991).

38. Dewayne E. Perry and Gail E. Kaiser. "Making Progress in Cooperative Transaction Models", IEEE Bulletin on Data Engineering, 14:1 (March 1991).

39. Dewayne E. Perry and Gail E. Kaiser. "Adequate Testing and Object-Oriented Programming" Journal of Object-Oriented Programming, January-February 1990.

40. Dewayne E. Perry. "Guest Editorial — Selected Papers from the 3rd Ada Applications and Environments Conference". In ACM Transactions on Programming Languages and Systems, October 1990.

*Refereed Conference and Workshop Papers*

41. Sutirtha Bhattachary and Dewayne E. Perry. "Predicting Emergent Properties of Component Based Systems", ICCBSS 2006: Sixth International Conference on COTS-Based Software Systems 2007, March 2007.

42. Sutirtha Bhattacharya and Dewayne E. Perry "Architecture Assessment Model for System Evolution", WICSA6: IFIP Working International Conference on Software Architecture 2007, January 2007

43. Charls L. Chen, Paul S. Grisham, Sarfraz Khurshid and Dewayne E. Perry. "Design and Validation of a General Security Model with the Alloy Analyzer", FSB 2006: ACM SIGSOFT Foundations of Software Engineering 2006, Portland OR, November 2006

**A44**

44. Vidya Lakshminarayanan, WenQian Liu, Charles L Chen, Steve Easterbrook, Dewayne E Perry. "Software Architects in Practice: Handling Requirements", CASCON 2006: IBM CAS Conference, Toronto Canada, October 2006

45. Michael Jester, Herb Krasner, and Dewayne E. Perry. "Software Process Definition & Improvement: An Industry Report", 32nd Euromicro Conference on Software Engineering and Advanced Applications - Software Process and Product Improvement (SEAA-SPPI 2006), Cavtat/Dubrovnik, Croatia. August 2005 , August 2006

46. Dewayne E. Perry, Susan Elliott Sim and Steve Easterbrook. "Case Studies for Software Engineers", Proceedings of the 28th International Conference on Software Engineering & Co-Located Workshops, 20-28 May, 2006, Shanghai, China, May 2006

47. Danhua Shao, Sarfraz Khurshid and Dewayne E. Perry. "Mining Change and Version Management Histories to Evaluate an Analysis Tool: Extended Abstract", Mid-Atlantic Student Workshop on Programming Languages and Systems, April 2006. New Brunswick NJ., April 2006

48. G. Lorenzo Thione and Dewayne E. Perry. "Parallel Changes: Detecting Semantic Interferences". The 29th Annual International Computer Software and Applications Conference (COMPSAC 2005), Edinburgh, Scotland, July 2005

49. Mark Grechanik, Dewayne E. Perry, and Don Batory. "Using AOP to Monitor and Administer Software for Grid Computing Environments", The 29th Annual International Computer Software and Applications Conference (COMPSAC 2005), Edinburgh, Scotland, July 2005

50. Divya Jani, Damien Vanderveken and Dewayne E Perry. "Deriving Architectural Specifications from KAOS Specifications: A Research Case Study", European Workshop on Software Architecture 2005, Pisa Italy, June 2005.

51. Rodion M. Podorozhny, Dewayne E. Perry and Leon J. Osterweil. "Automatically Analyzing Software Processes: Experience Report", Software Process Workshop 2005, Beijing China, May 2005.

52. Matthew J. Hawthorne and Dewayne E. Perry. "Software Engineering Education in the Era of Outsourcing, Distributed Development, and Open Source Software: Challenges and Opportunities", International Conference on Software Engineering (ICSE2005), St. Louis MO, May 2005.

53. Paul S. Grisham and Dewayne E Perry. "Customer Relationships and Agile Software Development". Workshop on Human and Social Factors of Software Engineering (HSSE 2005), International Conference on Software Engineering 2005, St Louis MO, May 2005

54. WenQian Liu, Charles L. Chen, Vidya Lakshminarayanan, Dewayne E. Perry. "A Design for Evidence-based Software Architecture Research". Workshop on Realizing Evidence-Based Software Engineering (REBSE'2005), International Conference on Software Engineering 2005, St Louis MO, May 2005.

55. Matthew J. Hawthorne and Dewayne E. Perry. "Exploiting Architectural Prescriptions for Self-Managing, Self-Adaptive Systems: A Position Paper" ACM SIGSOFT Workshop on Self-Managed Systems (WOSS'04), at ACM SIGSOFT Foundations of Software Engineering 2004, Newport Beach CA, November 2004.

56. Matthew J. Hawthorne and Dewayne E. Perry. "Applying Design Diversity to Aspects of System Architectures and Deployment Configurations to Enhance System Dependability." Workshop on Architecting Dependable Systems 2004, 2004 International Conference on Dependable Systems and Networks. Florence IT June 2004, Suplemental Volume, pp 312-316.

57. Dewayne E. Perry, Susan Elliot Sim and Steve Easterbrook. "Case Studies for Software Engineers." International Conference on Software Engineering 2004 (ICSE 2004), May 2004, Edinburgh, Scotland. pp 736-738.

58. Mark Grechanik, Dewayne E. Perry and Don Batory. "Design of Large-Scale Polylingual Systems". International Conference on Software Engineering 2004 (ICSE 2004), May 2004, Edinburgh, Scotland. pp 357-366.

59. Ranjith Purushothaman and Dewayne E Perry, "Towards Understanding the Rhetoric of Small Changes - Extended Abstract" International Workshop on Mining Software Repositories (MSR 2004), International Conference on Software Engineering 2004 (ICSE 2004), May 2004, Edinburgh, Scotland. pp 90-94.

60. Mark Grechanik and Dewayne E. Perry. "Analyzing Software Development as a Noncooperative Game". The 6th International Workshop on Economics-Driven Software Engineering Research (EDSER-6), International Conference on Software Engineering 2004 (ICSE 2004), May 2004, Edinburgh, Scotland.

61. Mark Grechanik and Dewayne E. Perry. "Secure Deployment of Components". 2nd International Conference on Component Deployment 2004. May 2004, Edinburgh, Scotland. Lecture Notes in Computer Science, Springer-Verlag. pp 159-174.

**A45**

62. Mark Grechanik, Dewayne E. Perry and Don Batory. "Reengineering Large-Scale Polylingual Systems – Extended Abstract". International Workshop on Integrating COTS into Software Systems 2004 (IWICCS 2004), February 2004, Redondo Beach CA. pp 22-32.

63. Manuel Brandozzi and Dewayne E Perry. From Goal-Oriented Requirements to Architectural Prescriptions: The Preskriptor Process. International Workshop From Software Requirements to Architectures, May 2003, pp 107-113.

64. Rodion M Podorozhny, Dewayne E Perry, and Leon J Osterweil. Artifact-based functional comparison of software processes. 4th International Workshop on Software Process Simulation and Modeling, May 2003, pp V.29.1-10

65. Mark Grechanik, Don Batory and Dewayne E. Perry, "Integrating and Reusing GUI-Driven Applications", International Conference on Software Reuse, Austin, Texas, April 2002.

66. Marcus Ciolkowski, Oliver Laitenberger, Dieter Rombach, Forrest Shull, and Dewayne Perry, "Software Inspections, Reviews & Walkthroughs", International Conference on Software Engineering 2002, Orlando FL, May 2002

67. Mark Grechanik, Dewayne E. Perry, and Don Batory, "An Approach to Evolving Database Dependent Systems", International Workshop on Principles of Software Evolution, ICSE2002, Orlando FL, May 2002

68. Rodion M. Podorozhny and Dewayne E. Perry, "A Multi-Agent Framework for an Architecting Process", Proceedings of 1st International Workshop on Software Engineering for Large-Scale Multi-Agent Systems 2002, ICSE2002, Orlando FL, May 2002

69. Manuel Brandozzi and Dewayne E Perry, "Architectural Prescriptions for Dependable Systems", International Workshop on Architecting Dependable Systems, ICSE2002, Orlando FL, May 2002

70. Francois Coallier, Linda M. Northrop and Dewayne Perry "Invited Industry Presentations (IIP)" Proceedings of the 23rd International Conference on Software Engineering, 12-19 May 2001. pp 681-4,

71. Manuel Brandozzi and Dewayne E. Perry "Transforming Goal Oriented Requirement Specifications into Architectural Prescriptions" Workshop Proceedings: From Software Requirements to Architectures STRAW 2001, Castro and Kramer, Editors. pp 54-60.

72. Dewayne Perry, Adam Porter, Lawrence Votta. "Empirical Studies and Software Engineering: A Roadmap", The Future of Software Engineering - ICSE2000, Finkelstein, ed. June 2000.

73. Marek Leszak, Dewayne E. Perry and Dieter Stoll. "A Case in Root Cause Defect Analysis", International Conference on Software Engineering 2000, Limerick Ireland, June 2000.

74. Dewayne E. Perry. "A Product Line Architecture for a Network Product", ARES III: Software Architectures for Product Families 2000, Los Palmos, Gran Canaria, Spain, March 2000.

75. Grinter, R. E., Herbsleb, J. D., & Perry, D. E. "The Geography of Coordination: Dealing with Distance in R&D Work", Proceedings, GROUP '99, Phoenix, AZ, November 14-17, 1999

76. Dewayne E. Perry, Gargit S. Gil and Lawrence G. Votta. "A Case Study of Successful Geographically Separated Teamwork" Software Process Improvement 1998 (SPI98), December 1998.

77. M.M. Lehman, D.E. Perry and J.F. Ramil. "Implications of Evolution Metrics on Software Maintenance". ICSM'98, November 1998.

78. M.M. Lehman, D.E. Perry and J.F. Ramil. "On Evidence Supporting the FEAST Hypothesis and the Laws of Software Evolution". Metrics'98, November 1998.

79. Nancy Staudenmayer, Todd Graves, J. Steve Marron, Audris Mockus, Dewayne Perry, Harvey Siy and Lawrence Votta, Adapting to a New Environment: How a Legacy Software Organization Copes with Volatility and Change, 5th International Product Development Management Conference, Como Italy, May 1998

80. Dewayne E. Perry, Harvey P. Siy and Lawrence G. Votta. "Parallel Changes in Large Scale Software Development: An Observational Case Study", 1998 International Software Engineering Conference (ICSE98), Kyoto Japan, April 1998.

81. Harvey P. Siy and Dewayne E. Perry. "Challenges in Evolving a Large Scale Software Product". Principles of Software Evolution Workshop. 1998 International Software Engineering Conference (ICSE98), Kyoto Japan, April 1998

82. Dewayne E. Perry: "Generic Descriptions for Product Line Architectures". ARES II Product Line Architecture Workshop, Los Palmos, Gran Canaria, Spain, February 1998.

83. Dewayne E. Perry. "Using Process Modeling for Process Understanding", Software Process Improvement 1997, Barcelona ES, December 1997.

84. MM Lehman, DE Perry, JCF Ramil, WM Turski and P Wernick. "Metrics and Laws of Software Evolution", Proc. Fourth International Symposium on Software Metrics, Metrics 97, Albuquerque, New Mexico, 5-7 Nov 97, pp 20-3.

85. Dewayne E. Perry and Lawrence G. Votta. "The Tale of Two Projects — Abstract", European Software Engineering Conference/Foundations of Software Engineering 1997, Zurich CH, September 1997.

86. Dewayne E. Perry. "Directions in Process Technology — An Architectural Perspective", Workshop on Research Directions in Process Technology, Nancy France, July 1997.

87. Dewayne E. Perry. "Maintaining Consistent, Minimal Configurations", SCM7, at ICSE97, May 1997

88. J.M. Perpich, D.E. Perry, A.A. Porter, L.G. Votta and M.W.Wade. "Anywhere, Anytime Code Inspections: Using the Web to Remove Inspection Bottlenecks in Large-Scale Software Development". 1997 International Software Engineering Conference (ICSE97), Boston Mass, May 1997.

89. Ashok Dandekar, Dewayne E. Perry and Lawrence G. Votta, "A Study in Process Simplification", 4th International Conference on Software Process, December 1996, Brighton UK.

90. Dewayne E. Perry, Adam Porter and Lawrence G. Votta, "Evaluating Workflow and Process Automation in Wide-Area Software Development" Software Process Technology, Fifth European Workshop — EWSPT'96, Springer-Verlag, October 1996.

91. Dewayne E. Perry, "Practical Issues in Process Reuse", 10th International Software Process Workshop, France, June 1996.

92. Dewayne E. Perry, Adam Porter and Lawrence G. Votta, "Evaluating Workflow and Process Automation in Wide-Area Software Development" NSF Workshop on Workflow and Process Automation, May 1996.

93. David Carr and Ashok Dandekar and Dewayne E. Perry, "Experiments in Process Interface Descriptions, Visualizations and Analyses", Software Process Technology, Fourth European Workshop — EWSPT'95, Springer-Verlag, April 1995.

94. Dewayne E. Perry, "System Compositions and Shared Dependencies", 6th Workshop on Software Configuration Management, ICSE18, Berlin Germany, March 1996.

95. Dewayne E. Perry, "Issues in Process Architecture", 9th International Software Process Workshop, Airlie VA, October 1994.

96. Dewayne E. Perry, "Enactment Control in Interact/Intermediate", in Software Process Technology, Third European Workshop, EWSPT'94, Brian C. Warboys, ed., Springer Verlag, Febrary 1994

97. Dewayne E. Perry and Steven S. Popovich, "Inquire: Predicate Based Use and Reuse", Knowledge-Based Software Engineering Conference, Chicago IL, September 1993.

98. Mark G. Bradac, Dewayne E. Perry and Lawrence G. Votta. "Prototyping a Process Monitoring Experiment", Proceedings of the Fifteenth International Conference on Software Engineering, Baltimore, 1993. Chosen as one of best papers and will be published in the IEEE Transactions on Software Engineering in 1994.

99. Dewayne E. Perry. "Humans in the Process: Architectural Implications", Proceedings of the 8th International Software Process Workshop March 1993, Schloss Dagstuhl, Germany.

100. Dewayne E. Perry. "Policy-Directed Coordination and Cooperation", Proceedings of the 7th International Software Process Workshop, October 1991, Yountville CA.

101. Dewayne E. Perry. "Dimensions of Consistency in Source Versions and System Compositions — A Position Paper" Proceedings of the 3rd Workshop on Software Configuration Management Trondheim, Norway, June 1991.

102. Stephen S. Popovich, William M. Schell, and Dewayne E. Perry. "Experiences with an Environment Generation System", Proceedings of the 13th International Conference on Software Engineering, May 1991, Austin TX.

103. Dewayne E. Perry. "Policy and Product-Directed Process Instantiation" Proceedings of the 6th International Software Process Workshop", 28-31 October 1990, Hakodate, Japan.

104. Dewayne E. Perry. "The Logic of Propagation in The Inscape Environment". Proceedings of SIGSOFT '89: Testing, Analysis and Verification Symposium, Key West FL, December 1989.

105. Gail E. Kaiser and Dewayne E. Perry. "Infuse: Fusing Integration Test Management with Change Management". Proceedings of COMSAC 89, Kissimmee FL, September 1989

106. Dewayne E. Perry. "An Overview of the Inscape Environment". Proceedings of the International Workshop on Environments — Building Environments: Lessons from the Past, Directions for the Future, Chinon, France, September 1989.

107. Dewayne E. Perry. "The Inscape Environment". The Proceedings of the Eleventh International Conference on Software Engineering, May 1989, Pittsburgh, PA.

108. Dewayne E. Perry. "Position Paper for the Software CAD Databases Workshop". Proceedings of the 1989 ACM SIGMOD Workshop on Software CAD Databases, February 1989, Napa, CA. April 1989.

109. Dewayne E. Perry. "Problems of Scale and Process Models". The Proceedings of the 4th International Software Process Workshop: Representing and Enacting the Software Process, May 1988, Moretonhampstead, Devon, England.

110. Dewayne E. Perry and Gail E. Kaiser. "Models of Software Development Environments". The Proceedings of the Tenth International Conference on Software Engineering, April 1988, Raffles City, Singapore.

111. Gail E. Kaiser and Dewayne E. Perry. "Workspaces and Experimental Databases: Automated Support for Software Maintenance and Evolution", *Conference on Software Maintenance-1987*, Austin, TX, September 1987. pp 108-114.

112. Dewayne E. Perry. "Software Interconnection Models", *Proceedings of the 9th International Conference on Software Engineering*, Monterey, CA, March 1987. pp 61-69. Best Paper Award.

113. Dewayne E. Perry. "Version Control in the Inscape Environment", This proceedings, Proceedings of the 9th International Conference on Software Engineering, March 30 - April 2, 1987, Monterey CA.

114. Dewayne E. Perry and Gail E. Kaiser. "Infuse: A Tool for Automatically Managing and Coordinating Source Changes in Large Systems", Proceedings of the 1987 ACM Computer Science Conference, February 17-19, 1987, St. Louis MO.

115. Dewayne E. Perry and W. Michael Evangelist. "An Empirical Study of Software Interface Faults — An Update", Proceedings of the Twentieth Annual Hawaii International Conference on Systems Sciences, January 1987, Volume II, pages 113-126.

116. Dewayne E. Perry. "Programmer Productivity in the Inscape Environment", The Proceedings of GLOBECOM '86, December 1986, Houston TX, pages 0428-0434 (12.6.1-12.6.7).

117. Dewayne E. Perry. "The Iteration Mechanism in the Inscape Environment", Proceedings of the 3rd International Software Process Workshop: Iteration in the Software Process, November 1986, Breckenridge CO, pages 49-52.

118. Dewayne E. Perry. "The Inscape Environment: Knowledge-Based Synthesis of Large Systems through the Evolution of Program Interfaces", AAAI Workshop on Automatic Programming, Philadelphia, PA, August 1986.

119. Dewayne E. Perry. "Position Paper: The Constructive Use of Module Interface Specifications", Third International Workshop on Software Specification and Design. IEEE Computer Society, August 26-27, 1985, London, England.

120. Dewayne E. Perry and W. Michael Evangelist. "An Empirical Study of Software Interface Errors", Proceedings of the International Symposium on New Directions in Computing, IEEE Computer Society, August 1985, Trondheim, Norway, pages 32-38.

121. Dewayne E. Perry "Tools for Evolving Software", Proceedings of the 2nd International Workshop on The Software Process and Software Environments, March 1985, Coto De Caza, Trabuco Canyon, CA. Software Engineering Notes 11:4 (August 1986), pages 134-135.

122. A. Nico Habermann and Dewayne E. Perry. "System Composition and Version Control for Ada". Symposium on Software Engineering Environments. Bonn, West Germany. June 16-20, 1980. Published in Software Engineering Environments, edited by H. Huenke, North Holland, 1981, pp. 331-343.

123. William Cave, Dewayne E. Perry and James Wagner. "Decision Aids for Tactical Data Systems." Workshop on Applications of Interactive Cybernetic Systems, October 1975.

*Current Submissions*

*Invited Keynote Papers*

124. Dewayne Perry, and Paul Grisham. "Architecture and Design Intent in Component and COTS Based Systems", International Conference on COTS Based Software Systems, February 2006, Orlando FL., February 2006

125. Dewayne E Perry and Paul Grisham. "Software Architecture: Past, Present and Future", European Workshop on Software Architecture 2005, Pisa Italy, June 2005

126. Dewayne E Perry. "Product Line Architecture: Generic Descriptions & Case Study ", SOFT-PT'04: SOFtware Technologies for Performance and Interoperability, Tulsa OK, June 2005

127. Dewayne E. Perry. "Abstraction – the Hard Core of Software Engineering." ETAPS 2003 Workshop: Structured Programming: The Hard Core of Software Engineering, Warsaw Poland, April 2003.

128. Dewayne E. Perry. "Software Architecture: Leverage for System Evolution", Peoceedings of the Nato Symposium: Technology for Evolutionary Software Development, Bonn Germany, September 2002.

129. Dewayne E. Perry. "Software Architecture and Software Engineering", Proceedings of the International Conference on Software: Theory and Practice 2000, Beijing China, August 2000.

130. Dewayne E. Perry. "Software Evolution and Light Semantics – Extended Abstract", Proceedings of the 21st International Conference on Software Engineering, May 1999, Los Angeles CA.

131. Dewayne E. Perry. "Software Architecture and its Relevance to Software Engineering", Coordination 1997, Berlin DE, September 1997

132. Dewayne E. Perry. State of the Art in Software Architecture - Abstract, 1997 International Software Engineering Conference (ICSE97), Boston Mass, May 1997

133. Meir M. Lehman, Dewayne E. Perry and Wladyslaw M. Turski, "Why is it so hard to find Feedback Control in Software Processes?", pProceedings of the 19th Australasian Computer Science Conference, Melbourne AUS, January 1996

134. [Dewayne E. Perry,] Adam Porter and Lawrence G. Votta, "Experimental Software Engineering: A Report on the State of the Art", Proceedings of the Seventeenth International Conference on Software Engineering, April 1995.

135. Dewayne E. Perry. "Dimensions of Software Evolution" Invited Keynote Paper, International Conference on Software Maintenance, Victoria BC, September 1994

136. Dewayne E. Perry and Carol S.Steig, "Software Faults in Evolving a Large, Real-Time System: a Case Study", 4th European Software Engineering Conference — ESEC93, Garmisch, Germany, September 1993.

137. Dewayne E. Perry. "Industrial Strength Software Development Environments". *Proceedings of IFIP '89 - 11th World Computer Congress*, August 1989, San Francisco, CA. Invited Keynote Paper.

138. Dewayne E. Perry. "Scaling the Process Models". The Proceedings of the 4th International Software Process Workshop: Representing and Enacting the Software Process, May 1988, Moretonhampstead, Devon, England. Invited Keynote Talk.

*Unrefereed Papers*

139. Dewayne E Perry, "Laws and Principles of Evolution", 2002 International Conference on Software Maintenance, Montreal Canada, October 2002

140. Dewayne E. Perry, "Some Holes in the Emperor's Reused Clothes", WISR'9, Austin TX, January 1999

141. Dewayne E. Perry and Takuya Katayama. "Panel: Critical Issues in Software Evolution". 1998 International Software Engineering Conference (ICSE98), Kyoto Japan, April 1998.

142. Bob Balzer, Carlo Ghezzi, Takuya Katayama, Jeff Kramer, David Notkin, Dewayne Perry and Akinori Yonezawa. "Workshop: Principles of Software Evolution" 1998 International Software Engineering Conference (ICSE98), Kyoto Japan, April 1998.

143. Dewayne E. Perry, Adam P. Porter and Lawrence G. Votta, "Tutorial: A Primer on Empirical Studies", Abstract, 1997 International Software Engineering Conference (ICSE97), Boston Mass, May 1997.

144. Dewayne E. Perry, Wilhelm S. Schaefer and Lawrence G. Votta, "Session 2: Product Line Development Experience I", 10th International Software Process Workshop, June 1996, Ventron FR.

145. Dewayne E. Perry, Wilhelm S. Schaefer and Lawrence G. Votta, "Session 3: Product Line Development Experience II" 10th International Software Process Workshop, June 1996, Ventron FR.

146. Dewayne E. Perry, Wilhelm S. Schaefer and Lawrence G. Votta, "Session 4: Day 1 Summary and Issues" 10th International Software Process Workshop, June 1996, Ventron FR.

147. Nancy S. Staudenmayer and Dewayne E. Perry, "Session 5: Key Techniques and Process Aspects for Product Line Development" 10th International Software Process Workshop, June 1996, Ventron FR.

148. Dewayne E. Perry, Session 8: Product Line Implications for Process - Summary 10th International Software Process Workshop, June 1996, Ventron FR.

149. Dewayne E. Perry, "OO and Opportunities for Software Evolution" Invited Panel Position Paper, International Conference on Software Maintenance, Victoria BC, September 1994.

150. David Garlan and Dewayne E. Perry, "Software Architecture: Practice, Pitfalls, and Potential" Panel Introduction, 16th International Conference on Software Engineering, Sorrento IT, May 1994.

151. Dewayne E. Perry and Alexander L. Wolf. "Foundations for the Study of Software Architecture". ACM SIGSOFT Software Engineering Notes, 17:4 (October 1992).

152. Dewayne E. Perry. "Evolution and Interaction -- Position Paper", Invited position paper for the workshop on "Future Directions in Software Engineering", February 1992, Schloss Dagstuhl, Germany.

153. Dewayne E. Perry. "Session Report: Session 5 — Human Aspects of Process Design", Proceedings of the 7th International Software Process Workshop, October 1991, Yountville CA.

154. Dewayne E. Perry. "Panel Position Statement. Future Process Directions." Invited position paper. Proceedings of the 1st International Conference on the Software Process: Manufacturing Complex Systems, October 1991, Redondo Beach CA.

155. Dewayne E. Perry. "Evolving a House -- A Parable for Software Engineering", Software Engineering Notes, 16:2 (April 1991).

156. Kouichi Kishida and Dewayne E. Perry. "Report on Session V: Team Efforts" Proceedings of the 6th International Software Process Workshop", 28-31 October 1990, Hakodate, Japan.

157. Dewayne E. Perry, editor. "Preface and Introduction" Proceedings of the 1st Symposium on Environments and Tools for Ada. Redondo Beach CA, May 1990. SIGAda Letters.

158. Dewayne E. Perry. "Summary Report on the Fifth International Software Process Workshop, Kennebunkport ME, October 1989" Proceedings of the 12th International Conference on Software Engineering Nice France, March 1990.

159. Dewayne E. Perry, Editor. "Preface and Introduction", Proceedings of the Fifth International Software Process Workshop, Kennebunkport ME, October 1989.

160. Dewayne E. Perry. "Summary of Session 5: Control". Proceedings of the Fifth International Software Process Workshop, Kennebunkport ME, October 1989.

161. Dewayne E. Perry. "Session Report: Abstraction and Structure", 5th International Workshop on Software Specification and Design, Pittsburgh PA, May 1989. in "Working Group Summaries from IWSSD '89", ACM SIGSOFT Software Engineering Notes, 14:5 (July 1989), pp 35-42.

162. Dewayne E. Perry. "Session Summary: Conclusions". The Proceedings of the 4th International Software Process Workshop: Representing and Enacting the Software Process, May 1988, Moretonhampstead, Devon, England.

163. Dewayne E. Perry. "Session Summary: Metamodels." Proceedings of the 3rd International Software Process Workshop: Iteration in the Software process. Breckenridge, CO, November 1986. pp 49-52.

164. Dewayne E. Perry. "Session 6: Summary of the Presentations and the Ensuing Discussions." Proceedings of the 2nd International Workshop on The Software Process and Software Environments, March 1985, Coto De Caza, Trabuco Canyon, CA. Software Engineering Notes 11:4 (August 1986), pages 93-96.

165. Tim Standish, et al. "User Interfaces. Report of Working Group 6." Future Ada Environments Workshop, Santa Barbara, CA, September 1984. Software Engineering Notes 10:2 (April 1985).

*Internal Conference Papers*

166. Marek Leszak, Dewayne E. Perry and Dieter Stoll, "A Case Study in Root Cause Defect Analysis", Lucent Software Symposium 1998, October 1998

167. Ashok Dandekar and Dewayne E. Perry. "Barriers to Effective Process Architecture", Extended Abstract, AT&T Software Symposium, October 1994.

168. Dewayne E. Perry, Ashok Dandekar and Larry Votta, "An Experiment in Process Simplification", Extended Abstract, AT&T Software Symposium, October 1994.

169. D.C. Carr, A.V. Dandekar and D. E. Perry. "The Big Picture — Experiments in Process Interface Description, Visualization and Analysis", AT&T Software Symposium, October 1993.

170. D.C. Carr, A.V. Dandekar and D. E. Perry, "Experiments in Process Visualization", AT&T Software Symposium, October 1993.

171. D. E. Perry, M.G.Bradac, N.A. Staudenmayer, L.G.Votta, AT&T Switching Systems Technology Transfer Symposium, December 1993.

172. D. E. Perry, A.V.Dandekar, D.C.Carr, S.C.North, "Experiments in Process Visualization: Interface AT&T Switching Systems Technology Transfer Symposium, December 1993.

173. Dewayne E. Perry and Steven S. Popovich. "Inquire: Predicate-Based Use and Reuse". Specification Driven Tools Conference, AT&T Bell Laboratories, October 1989.

174. Dewayne E. Perry, James T. Krist, and William W. Schell. "The Inscape Environment and the Design of Finite State Machines in SDL". 5ESS Software Development Environment Conference, Naperville IL, November 1988.

175. Dewayne E. Perry. The Construction of Robust, Fault-Tolerant Software in the Inscape Environment. AT&T Fault-Tolerance Symposium, September 1986.

*Technical Reports*

176. Paul S Grisham, Charles L. Chen, Sarfraz Khurshid, and Dewayne E. Perry. "Validation of a Security Model with the Alloy Analyzer", October 2006

177. Rodion Podorozhny, Sarfraz Khurshid, Dewayne Perry, and Xiaoqin Zhang. "Verification of cooperative multi-agent negotiation with the Alloy Analyzer", October 2006

178. Soon-Hyeok Choi, Dewayne E. Perry and Scott M. Nettles. "A Software Architecture for Cross-Layer Wireless Network Adaptations", September 2006

179. Laurent A. Hermoye, Axel van Lamsweerde and Dewayne E. Perry. "Attack Patterns for Security Requirements Engineering", September 2006

180. Danhua Shao, Sarfraz Khurshid and Dewayne E Perry. "Detecting Semantic Interference in Parallel Changes: An Exploratory Case Study". September 2006

181. Mark Grechanik, Kathryn S. McKinley and Dewayne E. Perry. "Recovering Use-Case-Diagram-To-Source-Code Traceability Links", September 2006

182. Vidya Lakshminarayanan, WenQian Liu, Charles L Chen, Dewayne E Perry. "Dealing with Security: A Multiple Case Study on Software Architects", June 2006

183. Rodion Podorozhny, Anne Ngu, Dimitrios Georgakopoulous, Dewayne Perry. "Software architecture for flexible integration of process model synthesis methods", March 2006

184. Harvey P. Siy and Dewayne E Perry. "Analyzing Source Code in Source Control Repositories", February 2006

185. Vidya Lakshminarayanan, WenQian Liu, Charles L Chen, Steve Easterbrook, Dewayne E Perry. "Software Architects in Practice", October 2005

186. Damien Vanderveken, Axel van Lamsweerde, Dewayne E Perry, and Christophe Ponsard. "Deriving Architectural Descriptions from Goal-Oriented Requirements Models", September 2005

187. Mark Grechanik, Kathryn McKinley and Dewayne E Perry. "Automating and Validating Program Annotations", Technical Report TR-05-39. August 2005, 38 pages.

188. Vidya Lakshminarayanan, WenQian Liu, Charles L Chen, Dewayne E Perry. "A Case Study of Architecting Security Requirements in Practice: Initial Analysis", June 2005

189. Sutirtha Bhattacharya and Dewayne E. Perry. "Predicting Architectural Styles from Component Specifications". May 2005

190. Rodion M. Podorozhny, Wuxu Peng and Dewayne E. Perry. "Self-stabilization in cooperative multi-agent systems by a reset: Position Paper", March 2005

191. Danhua Shao, Sarfraz Khurshid and Dewayne E. Perry. "Mining Change and Version Management Histories to Evaluate an Analysis Tool - Extended Abstract -" February 2005.

192. Matthew J. Hawthorne and Dewayne E. Perry "Architectural Styles for Adaptable Self-Healing Dependable Systems" February 2005.

193. Mark Grechanik, Dewayne E. Perry, and Don Batory. "A Scalable Security Mechanism For Large-Scale Component-Based Systems", Revised February 2005.

194. G. Lorenzo Thione and Dewayne E. Perry. Parallel Changes: Detecting Semantic Interference. September 2004.

195. Rodion M. Podorozhny, Dewayne E. Perry, Leon J. Osterweil. "Automatically Analysing Software Processes: Experience Report" September 2003.

**A51**

196. Mark Grechanik, Dewayne E. Perry and Don Batory. An Aspect-Oriented Approach for Engineering Monitoring and Administrative Software. September 2003.

197. Rodion M. Podorozhny, Dewayne E. Perry, Leon J. Osterweil, "Rigorous, automated method for artifact-based functional comparison of software processes", Spring 2003.

198. Mark Grechanik, Dewayne E. Perry, Don Batory, and R. Greg Lavender. XML-based Intermediate Representation (XIR) Spring 2002.

199. Oliver Laitenberger, Dieter Rombach, Marcus Ciolkowski, Dewayne Perry, Forrest Shull Software Inspections, Reviews & Walkthroughs - Extended Abstract Sigsoft/NSF Impact Report, Spring 2002

200. Oliver Laitenberger, Dieter Rombach, Marcus Ciolkowski, Dewayne Perry, Forrest Shull Software Inspections, Reviews & Walkthroughs Sigsoft/NSF Impact Report, Spring 2002

201. Manuel Brandozzi and Dewayne E. Perry "Introduction to Architectural Prescriptions" Summer 2001.

202. Rodion M Podorozhny, Leon J Osterweil and Dewayne E Perry "Comparison of process specification for repeatable comparison of architecting processes", Spring 2001.

203. Dewayne E. Perry and Wladyslaw M. Turski. "Report from the Visiting Fellows for the FEAST/1 Project", April 1999.

204. Dewayne E. Perry, "A Product Line Architecture for a Network Product - A Case Study", March 1999.

205. MM Lehman, DE Perry and JCF Ramil. "A Fresh Look at the Fourth Law of Software Evolution", September 1997.

206. Dewayne E. Perry. "Dimensions of Consistency in Source Versions and System Compositions", September 1997

207. Dewayne E. Perry and Wladyslaw M. Turski. "Report from the Visiting Fellows for the FEAST/1 Project", June 1997

208. The SLG Process Subteam, "SLG Process Subteam Best-In-Class Software Process Requirements; Release 2" December 1995.

209. The SLG Process Subteam, "SLG Process Subteam Best-In-Class Software Process Requirements", December 1994.

210. Mark G. Bradac, Dewayne E. Perry and Lawrence G. Votta. "The Diagnostic Development Process Monitoring Experiment — Progress Report", February 1993.

211. Dewayne E. Perry. "pv — An Experiment in Process Visualization", 1993.

212. Dewayne E. Perry. "Interact and Intermediate: A Process Description Formalism and a Support Environment", 1993

213. John R. Nestor and Dewayne E. Perry. "Interim Report on the TS Language", AT&T Bell Laboratories, April 1992.

214. J. O. Coplien, W. H. Lin, D. E. Perry, L. G. Votta, D. Weiss. "Guidelines for the MITS Based Interval Reduction Study", AT&T Bell Laboratories, April 1992.

215. M. G. Bradac, D. E. Perry, and L. G. Votta. "Preliminary MITS Data Presentation and Analysis: ISLU2 Diagnostic Software Development", AT&T Bell Laboratories, June 1992.

216. P. Kortum, D. E. Perry, W. Scacchi, L. G. Votta, and M. Wish. "Final Report on Initial Experiments Applying Process Modeling Technology to 5ESS™ International On Line Methodology", AT&T Bell Laboratories, July 1992.

217. Dewayne E. Perry and Carol S. Stieg. "Software Faults in Evolving a Large, Real-Time System: a Case Study". April 1990; Revised August 1992.

218. John R. Nestor and Dewayne E. Perry. "Status Report on the Review of TS", AT&T Bell Laboratories, September 1992.

219. Dewayne E. Perry. "Modular Interconnection Formalism Working Group Report", Washington DC, December 1991.

220. Dewayne E. Perry and Jon Ward. "Modular Interconnection Formalism Working Group Report", Santa Fe NM, August 1991.

221. Dewayne E. Perry. "Modular Interconnection Formalism Working Group Report", Boston MA, May 1991.

222. Dewayne E. Perry and Alexander L. Wolf. "Software Architecture". August 1989. Revised January 1991.

223. Dewayne E. Perry. "Modular Interconnection Formalism Working Group Report", Marina Del Rey CA. December 1990.

224. Dewayne E. Perry. "Modular Interconnection Framework Working Group Report", October 1990.

225. Dewayne E. Perry and Stephen S. Popovich. "Inquire: Predicate-Based Use and Reuse". September 1990.

226. Dewayne E. Perry. "Reuse and Repository Working Group Report", DARPA Technical Community Meeting, June 1990, Washington DC.

227. Pamela Zave, Van E. Kelly, and Dewayne E. Perry. "Living Representations for Industrial Software Development". January 1990.

228. Dewayne E. Perry. "The Inscape Environment: A Practical Approach to Specifications in Large-Scale Software Development. A Position Paper." January 1990.

229. Van E. Kelly, David J. Ahnen, Ronald J. Brachman, Prudence T. Z. Kapauan, Dewayne E. Perry, Pamela Zave. "A Naming Scheme for the TRIAD/SDE Project". Technical Memorandum, AT&T Bell Laboratories, May 1989.

230. Helen Diamontitus and Dewayne E. Perry. "Economic Modeling of the Inscape Environment".

231. Dewayne E. Perry. "The Inscape Program Construction and Evolution Environment". Technical Report. Computing Systems Research Laboratory Technical Report, AT&T Bell Laboratories, August 1986.

232. Dewayne E. Perry. "Program Construction and Evolution based on Interface Specifications: Motivation and Overview". Computing Systems Research Laboratory Technical Report, AT&T Bell Laboratories, May 1985.

233. Dewayne E. Perry and Nam S. Woo. "[S]ome Observations on Prolog Programming." Computer Technology Research Laboratory Technical Report, AT&T Bell Laboratories, November 1984.

234. Dewayne E. Perry. TT: User Interface Design. With R.A.Thompson, B. John, and J. Angelilio-Bent. American Bell ED&D. August 1983.

235. Dewayne E. Perry. TT: Kernel Design and Implementation. Prepared for American Bell ED&D. Pegasus Systems. June 1983.

236. Dewayne E. Perry. TT: Software Architecture. Prepared for American Bell ED&D. Pegasus Systems. July 1983.

237. Dewayne E. Perry. TT: High Level Design of the Operating System. Prepared for American Bell ED&D. Pegasus Systems. July 1983.

238. Dewayne E. Perry. TT: Detailed Design of the Operating System. Prepared for American Bell ED&D. Pegasus Systems. July 1983.

239. Dewayne E. Perry. Functional Specification for the Home Life ESP System. With F. E. Perry. Prepared for Home Life Insurance Co. Pegasus Systems. April 1983.

240. Dewayne E. Perry. File Delivery Design and Implementation. Prepared for American Bell Net 1000. Pegasus Systems. March 1983.

241. Dewayne E. Perry. File Delivery Overview. Prepared for American Bell Net 1000. Pegasus Systems. December 1982.

242. FE Perry and DB Perry. Functional Specification for the Home Life Select Quote System. Prepared for Home Life Insurance Corporation. Pegasus Systems. November 1982.

243. Dewayne E. Perry. Exceptions and Software Quality. Draft. Pegasus Systems. June 1982.

244. Dewayne E. Perry. A Discussion of the Issues for the Demonstration and Performance Monitoring in the Experimental Distributed Processing Facility (EDPF). Prepared for Computer Systems Integration and Operations Division, CENTACS, CORADCOM, Ft Monmouth. Pegasus Systems. December 1981.

245. A. Nico Habermann and Dewayne E. Perry. "Language Issues in Functional Programming". Carnegie-Mellon University. March 1981.

246. Dewayne E. Perry. "A Programmers Taxonomy of I/O Interfaces." Carnegie-Mellon University and Pegasus Systems. February 1981.

247. Dewayne E. Perry. Increased performance in Data Validation. Pegasus Systems. January 1981. Prepared for Dun & Bradstreet, Systems Research and Development.

**A53**

248. A. Nico Habermann and Dewayne E. Perry. "Well Formed System Composition". Carnegie-Mellon University, Technical Report CMU-CS-80-117. March 1980.

249. Dewayne E. Perry. Deadlock and the Quotron 801 Executive. Pegasus Systems. December 1980. Prepared for Dun & Bradstreet, Systems Research and Development.

250. Dewayne E. Perry. Low Level Language Features in Ada. Carnegie-Mellon University and Pegasus Systems. November 1980. Prepared for the Software Engineering Division, CENTACS, Ft. Monmouth, NJ

251. FE Perry and DE Perry. The Implementation Documentation for the HBJ College Sample System. November 1980. Prepared for Harcourt Brace Jovanovich, Inc.

252. Dewayne E. Perry. Teaching Ada by Example and Modification. Pegasus Systems. April 1980. Prepared for the Software Engineering Division, CENTACS, Ft. Monmouth, NJ. Draft. Not for release.

253. FE Perry and DE Perry The Detailed Design Specification for the Harcourt Brace Jovanovich, Inc. College Sample System. February 1980. Prepared for Harcourt Brace Jovanovich, Inc. (Revised November 1980)

254. Dewayne E. Perry. Increased Performance for Report Generation. Pegasus Systems. February 1980. Prepared for Dun & Bradstreet, Systems Research and Development.

255. FE Perry and DE Perry Test Plan for the Harcourt Brace Jovanovich, Inc. College Sample System. Pegasus Systems. January 1980. Prepared for Harcourt Brace Jovanovich, Inc

256. Dewayne E. Perry. Incorporating Mapped Memory into the Quotron 801 Executive. Pegasus Systems. December 1979. Prepared for Dun & Bradstreet, Systems Research and Development.

257. FE Perry and DE Perry Functional Specifications of the Harcourt Brace Jovanovich, Inc. College Sample System. Pegasus Systems. October 1979. Prepared for Harcourt Brace Jovanovich, Inc. (Revised November 1980)

258. AN Habermann, DS Notkin and DE Perry. Ada LIRs. Carnegie-Mellon University. September-October 1979. Prepared for the DoD HOLWG.

259. Dewayne E. Perry. Incorporating Quotron's Buffered Video Controller into the Quotron 801 Systems. Pegasus Systems. August 1979. Prepared for Dun & Bradstreet, Systems Research and Development.

260. Dewayne E. Perry. Measurements of Disc Scheduling Algorithms for the Quotron 801 Call In Center. Pegasus Systems. July 1979. Prepared for Dun & Bradstreet, Systems Research and Development, Berkeley Heights, NJ.

261. A. N. Habermann, D. Notkin, and D. E. Perry. "Report on the Use of Ada for the Design and Implementation of Part of Gandalf." Carnegie-Mellon University, Technical Report CMU-CS-79-135. June 1979.

262. Dewayne E. Perry. "High Level Language Features for Handling I/O Devices in Real Time Systems." Ph.D. Dissertation. Stevens Institute of Technology, Castle Point, Hoboken, NJ. May 1978.

263. Dewayne E. Perry. Software Measurements for System Resource Usage in the Quotron 801 Real Time Executive. Pegasus Systems. May 1979. Prepared for Dun & Bradstreet, Systems Research and Development, Berkeley Heights, NJ.

264. Dewayne E. Perry. Disc Scheduling Policies for the Quotron 801 Real Time Executive. Pegasus Systems. May 1979. Prepared for Dun & Bradstreet, Systems Research and Development, Berkeley Heights, NJ.

265. Dewayne E. Perry. Disc Utilization Measurements for the Quotron 801 Real Time Executive. Pegasus Systems. May 1979. Prepared for Dun & Bradstreet, Systems Research and Development, Berkeley Heights, NJ.

266. The Army Language Review Team. Evaluation of the Red and Green Designs. April 1979. Prepared for the DoD HOLWG and the Software Engineering Division, CENTACS, CORADCOM, Ft. Monmouth, NJ.

267. J. Harler and DE Perry. Natural Language Control. Detailed Design and Implementation. April 1979. Prepared for Vydec, Inc., Florham Park, NJ.

268. Dewayne E. Perry. A Comparison of the Red and Green Languages: A Programming Example. Pegasus Systems. March 1979. Prepared for the Army Language Review Team and the Software Engineering Division, CENTACS, CORADCOM, Ft. Monmouth, NJ.

269. J. Harler and DE Perry. The Descriptions of the Tables Required by NLC and Their Contents. Pegasus Systems. March 1979. Prepared for Vydec, Inc., Florham Park, NJ.

270. Dewayne E. Perry. BNF Syntax Specification of Natural Language Commands. Pegasus Systems. February 1979. Prepared for Vydec, Inc., Florham Park, NJ.

**A54**

271. Dewayne E. Perry. The Relationships Between the Software Development Support System (SDSS) and the Military Computer Family (MCF) Target Machines. Pegasus Systems. January 1979. Prepared for the MCF Project, CENTACS, CORADCOM. Ft. Monmouth, NJ.

272. Dewayne E. Perry. Preliminary Review of the Sesame Cross Assembler. Pegasus Systems. January 1979. Prepared for Dun & Bradstreet, Systems Research and Development.

273. J. Hurler and DE Perry. Natural Language Control Tools Programs: User's Guide, Design and Implementation.Pegasus Systems. September 1978. Prepared for Vydec, Inc., Florham Park, NJ.

274. Dewayne E. Perry. The Functional Requirements Specification, Detailed Design, and Implementation of Changes to Report File Access. Pegasus Systems. August 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

275. Dewayne E. Perry. Task Definition Macros to Generate a Compact Task Table (for the Quotron 801 Executive). User's Guide, Design and Implementation. Pegasus Systems. August 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

276. Dewayne E. Perry. Demand Paging for the Quotron 801 Executive. With Ken Hofer. Pegasus Systems. July 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

277. Dewayne E. Perry. Proposed Disc Performance Measures for the Quotron 801 Executive and the D&B AOS System. Pegasus Systems. July 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

278. Dewayne E. Perry. The Functional Requirements Specification, the Detailed Design, and the Implementation of Changes to Data Validation. Pegasus Systems. June-August 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

279. Dewayne E. Perry. Natural Language Control Functional Specification. Mod III Word Processing System. Section 3. Pegasus Systems. June 1978. (revised February 1979) Prepared for Vydec, Inc., Florham Park, NJ.

280. AN Habermann, DE Perry and D Turner. Notes on the DoD1 Language Host Environment. June 1978.

281. Dewayne E. Perry. The Functional Requirements Specification, The Detailed Design, and the Implementation of Changes to Video Control. Pegasus Systems. May 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

282. Dewayne E. Perry. An Evaluation of Suggested Changes to Improve the Performance of the D&B AOS Minicomputer System. Pegasus Systems. May 1978. Prepared for Dun & Bradstreet, Systems Research and Development.

283. Dewayne E. Perry. The Intrinsic Editor Interface Specification. Mod III Word Processing System. Section 4a. With M. Poulsen. Pegasus Systems. May 1978. Prepared for Vydec Inc., Florham Park, NJ.

284. Dewayne E. Perry. Display Resource Functional Specification. Mod III Word Processing System. Section 4b. With M. Poulsen and L. Narsemhan. April 1978, Revision 1: May 1978. Pegasus Systems. Prepared for Vydec Inc., Florham Park, NJ.

285. Dewayne E. Perry. A Critical Evaluation of Low Level I/O and Machine Dependent Features of the Four Preliminary Language Designs. Pegasus Systems. March 1978. Prepared for the DoD HOLWG.

286. Dewayne E. Perry. FILECOMP Maintenance Manual. CENTACS Report No. 83. Software Engineering Division, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ. September 1977.

287. Dewayne E. Perry. A Simulator for the AN/UGC-74. CENTACS Report No. 76. Software Engineering Division, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ. March 1977.

288. Dewayne E. Perry. Proposed Functional Capabilities for the AN/UGC-74. Pegasus Systems. June 1976. Prepared for System Development Corporation and the Software Engineering Team, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ.

289. Dewayne E. Perry. The Intelligent Communications Terminal Executive Software. A Detailed Design and Implementation Specification. Pegasus Systems. May 1976. Prepared for System Development Corporation and the Software Engineering Team, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ.

290. William Cave, Henry Ledgard, Dewayne E. Perry, D. Steacy, James Wagner and Jeff Yohay. Basic Considerations for Management Control Software System Development. CENTACS Report No. 62. Computer Software Technical Area, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ. April 1976.

291. Dewayne E. Perry. The Functional Specification of the Software for the Intelligent Communications Terminal. CENTACS Report No. 61. Computer Software Technical Area, CENTACS. US Army Electronics Command, Ft. Monmouth, NJ. January 1976.

292. Dewayne E. Perry. A Detailed Design and Implementation Specification of a Prompted Data Entry System for TOS. Pegasus Systems. December 1975. Prepared for the Software Engineering TEAM, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ.

293. Dewayne E. Perry. An Informal Detailed Program Design Specification for TOS2 Prompting. Pegasus Systems. 15 July 1975. Prepared for the Software Engineering Team, CENTACS, US Army Electronics Command, Ft. Monmouth, NJ.

294. Dewayne E. Perry and James Wagner. The Preliminary Design of a Prompted Data Entry System for TOS. CENTACS Software Report No. 41. 2 Vols. CENTACS, US Army Electronics Command, Ft. Monmouth, NJ. May 1975.

295. Dewayne E. Perry. A Preliminary Design for the TOS2 Prompting System. Pegasus Systems. April 28, 1975. Prepared for the Software Engineering Team, CENTACS, US Army Electronics Command, Fort Monmouth, NJ.

296. Dewayne E. Perry. The Detailed Design and Implementation Specification for the Sigma 5 Message Switch Data Collection Tape Post Processor. An informal report. Pegasus Systems. 1975. Prepared for Dun & Bradstreet, Systems Research and Development.

297. Dewayne E. Perry. The Detailed Design and Implementation Specification for the FORTRAN Programs to Collect Information About the AOS Data Base. An informal report. Pegasus Systems. 1975. Prepared for Dun & Bradstreet, Systems Research and Development.

298. Dewayne E. Perry. The Detailed Design and Implementation Specification for the FORTRAN programs for Duns Data Continuous Service Survey. Pegasus Systems. 1975. Prepared for Dun & Bradstreet, Systems Research and Development.

299. Dewayne E. Perry. The Functional Specification for the Sigma 5 Message Switch Data Collection Tape Post Processor. Pegasus Systems. 1975. Prepared for Dun & Bradstreet, Systems Research and Development.

300. Dewayne E. Perry. Enhancements to the Quotron 801 Executive Program. Pegasus Systems. 1974. Prepared for Dun & Bradstreet, Systems Research and Development.

301. Dewayne E. Perry. Generalized Reserve, Release, Read and Write Routines for the Report File. Pegasus Systems. 1974. Prepared for Dun & Bradstreet, Systems Research and Development.

302. Dewayne E. Perry. Report File Access. Extensions of its Capabilities and Requests. Pegasus Systems. 1974. Prepared for Dun & Bradstreet, Systems Research and Development.

303. Dewayne E. Perry. Report File Access. Enhancements and Changes to the File Structure. Pegasus Systems. 1974. Prepared for Dun & Bradstreet, Systems Research and Development.

304. Dewayne E. Perry. Increasing Disc Space Utilization in the RFA Subsystem. Pegasus Systems. 1973. Prepared for Dun & Bradstreet, Systems Research and Development.

305. Dewayne E. Perry. How to Use the Quotron 801 Job Step Handler and Sesame Assembler. For the D&B ALO Staff. QSI. 1973.

306. Dewayne E. Perry. The Dial-Up Controller's Bisynchronous Communications Interrupt Handler. QSI. 1973.

307. Dewayne E. Perry. The Training Mode. The Design and Implementation of an ALO Report Entry Automated Training Program. With Jon Snyder. QSI. 1972.

308. Dewayne E. Perry. The Report Copy Utility. The Design and Implementation Specification. QSI. 1972.

309. Dewayne E. Perry. The Dialog File Structure for the D&B ALO System. QSI. 1972.

310. Dewayne E. Perry. The Dialogs Subsystem. The Design and Implementation of Dialog Programs for the Major ALO Functions. QSI. 1972.

311. Dewayne E. Perry. The Display File Structure and a Method for Generating Display Screens for Man/Machine Interfaces. QSI. 1972.

312. Dewayne E. Perry. Report File Access. The Design and Implementation of a Dynamic Data Base Entry, Retrieval and Update System. QSI. 1972.

313. Dewayne E. Perry. Report File Access File Structure. Dun & Bradstreet's ALO System. Quotron Systems Inc. (QSI). 1972.

314. Dewayne E. Perry. Computer Software Reliability. A Study of Methods to Produce Reliable Software and Their Relationship to Hardware Reliability. PRC. 1971.

315. Dewayne E. Perry. The Production of Real Time Software with an Emphasis on Software Reliability. An Annotated Bibliography. PRC. 1971.

316. Dewayne E. Perry. Various Design and Implementation Documents for TACHIRE: The RSE Major Program, The Nuclear Fire Planning Program, and the Nuclear Casualty Damage Assessment Program. PRC. 1968-1971.

317. Dewayne E. Perry. A Marketing and Technological Study of Computer Peripheral Equipment. With Roger Lowe. PRC. 1968.

318. Dewayne E. Perry. Management of the Production of Real-Time Software. An Annotated Bibliography. Planning Research Corporation (PRC). 1967.

319. Dewayne E. Perry. The Computer Automated Secretary Program. System Development Corporation. 1967.

320. Dewayne E. Perry. The ANFS-Q32 Timesharing System Help Program. 1966.

*In Preparation*

321. Rodion Podorozhny, Lee Osterweil, and Dewayne E Perry "Artifact Based Functional Comparison of Software Processes"

322. Mark Grechanik, Dewayne E Perry and Don S Batory, "TML: Engineering a Domain Specific Language."

323. Mark Grechanik, Dewayne E Perry and Don S Batory, recruiting"Reification of Disparate System Type Schemas."

324. Rodion M Podorozhny, Leon J Osterweil and Dewayne E Perry "Comparison process specifications for repeatable comparisons of software design methods"

**Selected Invited Presentations**

*Academic:*
    Flinders University,
    Carnegie-Mellon University,
    Columbia University,
    Georgia Institute of Technology,
    Hartford Graduate Center,
    IFIP 2.4 Working Group, Queens University,
    Rutgers University,
    Syracuse University,
    University of California at Irvine,
    University of Maryland at College Park,
    University of Massachusetts at Amherst.
    University of Texas, Austin
    Westmont College.

*Industrial:*
    Bell Communications Research,
    Centre de recherche informatique de Montreal,
    Kestrel Institute,
    Lockheed,
    Massachusetts Computer Associates,
    Micro-Electronics Consortium (MCC),
    Nokia
    Scimens Corporate Research,
    Software Engineering Institute,
    Software Productivity Consortium,
    Schlumberger Computer Science Laboratory,
    Sun Micro-Systems,
    Unisys Paoli Research Center,
    USC - Information Sciences Institute.

**Teaching Experience**

- Westmont College, Santa Barbara, CA
    Teaching Assistant in Music
    Music Theory

- University of California, Los Angeles, CA
    Teaching Assistant in Philosophy
    Discussion sections in Introductory Philosophy

- Fairleigh Dickinson University, Madison, NJ
  Introduction to Computer Science
  Programming in Fortran

- Stevens Institute of Technology, Hoboken, NJ
  MA188/189 - Programming Methodology

- Carnegie-Mellon University, Pittsburgh, PA
  15-412 Operating Systems
  15-711 Systems Programming (the Operating Systems/Database part)

## The University of Texas at Austin - Courses

EE322C, Data Structures in C++
EE360R, Introduction to Software Engineering
ESE382C, Introduction to Software Engineering
EE316, Digital Systems Engineering I
EE382C, Empirical Studies in Software Engineering
ESE382C, Empirical Studies in Software Engineering
EE382V, Architecture and Design Intent
EE398R, Master's Reports
EE397K, Summer Research Projects

## The University of Texas at Austin - Administrative

Director, UT ARISE - Center for Advanced Research In Software Engineering,
  Spring 2002 - Spring 2004
Chair, SWE Undergraduate Curriculum Committee,
  Spring 2002 - present
Director, Executive Software Engineering Masters Program,
  Spring 2000 - present
CE Curriculum Redesign Committee,
  Spring-Fall 2000

## The University of Texas at Austin

*Completed Masters Theses*

Vidya Lakshmi, Fall 2006
Laurent Hermoye, Spring 2006
Michael Jester, Summer 2005
Damian Vandervelzen, SPring 2004
Divya Jana, Spring 2004
Gianlorenzo Thione, Fall 2003
Ranjith Purushothaman, Spring 2002
Jerry Yang, Spring 2002
Manuel Brandozzi, Fall 2002

*Current Masters Students*

*Completed PhD Theses*

Rodion Podorozhy, Summer 2004 (Now at Texas State University, San Marcos TX)
Mark Grechanik, Fall 2006 (Now at Accenture Research Labs, Chicago IL)
Sutrifha Bhattacharya, Fall 2006 (at Intel Corp, Portland OR)

*Current PhD Students*

Paul Grisham
Matthew Hawthorne
Divya Jani
Vidya Lakshmi
Barhat Sajnani
Danhua Shao

*Current PhD Committees*

Dung Lam
Thomas Wahl

**A58**

*Completed PhD Committees*

    Ibrahim Ibr, Fall 2006
    Fei Xie, Summer 2004
    Richard Cardone, Fall 2002
    Thomas Graser, Spring 2001
    James Carrell Holt, Spring 2000

**Other PhD. Committees**

Wendy Liu, University of Toronto, Toronto CANADA

Catherine Jaktman, University of Technology, Sydney
External Examiner. 2001

Atte Kinnula, University of Oulu, Oulu, Finland.
Reviewer and Opponent. Summer 1999.

Bradley Schmerl, Flinders University, Adelaide, Australia.
External Examiner. 1997

# EXHIBIT B

## MATERIALS CONSIDERED BY DR. DEWAYNE E. PERRY

1. U.S. Pat. No. 5,327,144

2. TruePosition Source Code: Releases 7, 8, 9, 10

3. TruePosition's Second Amended Complaint (Dated May 30, 2006)

4. Expert Report of Carla S. Mulhern (Dated December 1, 2006)

5. Expert Report Of Oded Gottesman, Ph.D. (Dated December 1, 2006)

6. November 14, 2005 Deposition of Rob Anderson

**A61**

Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3

4    TRUEPOSITION, INC.,              )

5                   Plaintiff,        )   C.A. No.

6         -vs-                        )   04-0757-SLR

7    ANDREW CORPORATION,              )

8                   Defendant.        )

9

10      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

12              The videotaped deposition of

13   DEWAYNE E. PERRY, called as a witness herein for

14   examination, taken pursuant to the Federal Rules of

15   Civil Procedure of the United States District

16   Courts pertaining to the taking of depositions,

17   taken before ROSANNE M. NUZZO, a Notary Public

18   within and for the County of Will, State of

19   Illinois, and a Certified Shorthand Reporter of

20   said state, at 5900 Aon Center, 200 East Randolph

21   Drive, Chicago, Illinois, on the 22nd day of

22   January, A.D. 2007, at approximately 9:09 a.m.

23

24

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 2

1   PRESENT:
2       WOODCOCK WASHBURN LLP,
3       (Cira Centre, 12th Floor,
4       2929 Arch Street,
5       Philadelphia, Pennsylvania  19104-2891,
6       215-568-3100), by:
7       MR. DANIEL J. GOETTLE,
8       dgoettle@woodcock.com,
9           appeared on behalf of the Plaintiff;
10
11      KIRKLAND & ELLIS LLP,
12      (Aon Center, 200 East Randolph Drive,
13      Chicago, Illinois  60601,
14      312-861-2000), by:
15      MS. SHIRA J. KAPPLIN,
16      skapplin@kirkland.com, and
17      MS. REGAN A. SMITH,
18      rasmith@kirkland.com,
19          appeared on behalf of the Defendant.
20
21  VIDEOTAPED BY:  JOE M. ELSEY,
22          Esquire Deposition Services.
23  REPORTED BY:    ROSANNE M. NUZZO, CRR, RPR,
24          CSR License No. 84-1388.

Page 3

1       THE VIDEOGRAPHER:  Good morning.  We are
2   going on the video record at 9:09 a.m.
3       My name is Joe Elsey.  I am a legal
4   videographer with Esquire Deposition Services.
5   Our address is 155 North Wacker Drive, Chicago,
6   Illinois.
7       The court reporter today is Rosanne
8   Nuzzo of Esquire Deposition Services.
9       Here begins the videotaped deposition
10  of Dewayne Perry, taking place in Chicago,
11  Illinois.
12      Today's date is January 22nd, 2007.
13  This deposition is being taken in the matter of
14  TruePosition, Incorporated v. Andrew -- Andrew
15  Corporation.
16      Will counsel please state their names
17  for the record.
18      MR. GOETTLE:  Dan Goettle of Woodcock
19  Washburn for Plaintiff, TruePosition.
20      MS. KAPPLIN:  Shira Kapplin of Kirkland &
21  Ellis for the Defendant, Andrew Corporation; and
22  with me is Regan Smith.
23      THE VIDEOGRAPHER:  Will the reporter now
24  swear in the witness, please.

Page 4

1           (WHEREUPON, the witness was duly
2           sworn.)
3       THE COURT REPORTER:  Thank you.
4           DEWAYNE E. PERRY,
5   called as a witness herein, having been first duly
6   sworn, was examined and testified as follows:
7           EXAMINATION
8   BY MR. GOETTLE:
9       Q.   Good morning, Dr. Perry.
10      A.   Good morning.
11      Q.   Would you please state your full name
12  for the record.
13      A.   Dewayne E. Perry, or do you want my
14  middle name as well?
15      Q.   No, that is fine.
16      A.   That's fine?  Thank you.
17      Q.   Dr. Perry, you're aware of a civil
18  suit, a patent lawsuit, between TruePosition and
19  Andrew?
20      A.   Yes.
21      Q.   How did you first become aware of that
22  lawsuit?
23      A.   I was approached by Rachel Waldron to
24  see if I would -- was interested in being retained

Page 5

1   for Andrew Corporation.
2       Q.   "Approached."  Did she call you on the
3   telephone?
4       A.   Called me on the telephone.
5       Q.   Do you have a recollection of when,
6   about, that was?
7       A.   Somewhere early to mid part of
8   September.
9       Q.   What did Rachel -- oh, excuse me.
10      What did Ms. Waldron tell you about the
11  lawsuit?
12      A.   She just mentioned that there -- she
13  was interested -- wanted to know if I was
14  interested in looking at code to determine whether
15  or not the TruePosition code represented the
16  algorithms in the -- in the patent.
17      Q.   Did she explain what the patent was
18  about?
19      A.   I don't really remember.  I suspect,
20  but I don't remember.
21      Q.   Did she tell you why it was important
22  to her for you to look at the code and make the
23  determination of whether TruePosition rep --
24  whether TruePosition code represented the

2 (Pages 2 to 5)

A63

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

1  algorithms in the patent?
2      A.  I don't remember whether she said why
3  they wanted me to do that.
4      Q.  Did you have any further conversations
5  before -- with Ms. Waldron before you started
6  working on behalf of Andrew Corporation?
7      A.  Not that I recall.
8          Well, other than to -- to get the
9  agreement and so forth, I don't -- I don't re- --
10  recall that I did.
11      Q.  So you say you had a first conversation
12  with Ms. Waldron and then, basically, then, you
13  signed an agreement?
14      A.  Yes.
15      MR. GOETTLE:  I'd like to mark this.  It's
16  going to be Exhibit 493.
17          (WHEREUPON, said document was
18          marked Plaintiff's Deposition
19          Exhibit No. 493, for
20          identification, as of 1/22/07.)
21  BY MR. GOETTLE:
22      Q.  Dr. Perry, I'm handing you what's been
23  marked as Exhibit 493.  Do you recognize
24  Exhibit 493?

Page 7

1      A.  Yes.  This is the -- the patent that
2  I was to look at and compare against the code.
3      Q.  And this is the only patent that you
4  were asked to look at?
5      A.  Yes.
6      Q.  So when do you -- do you recall when
7  you first started working on this project?
8      MS. KAPPLIN:  Objection, vague.
9  BY THE WITNESS:
10      A.  If you mean when did I first go look
11  at the code, that would have --
12  BY MR. GOETTLE:
13      Q.  Sure.
14      A.  -- that would have been mid October.
15      Q.  Did you do any research before going to
16  look at the code the first time?
17      MS. KAPPLIN:  Objection, vague.
18  BY THE WITNESS:
19      A.  What do you mean by "research"?
20  BY MR. GOETTLE:
21      Q.  Did you read the patent?
22      A.  Yes.
23      Q.  Did you read the claims of the patent?
24      A.  No.  I looked primarily at the

Page 8

1  algorithm.
2      Q.  The algorithms --
3      A.  The algorithms as represented in the --
4  in the figures and as explained in the -- in the
5  preferred embodiment.
6      Q.  Did you do any research on
7  TruePosition?
8      A.  No.
9      Q.  Did you do any research on Andrew
10  Corporation?
11      A.  No.
12      Q.  So you went and looked at the code the
13  first time in mid October?  That's correct?
14      A.  Yes.
15      Q.  And when you came back from looking at
16  the code the first time in mid October, what did
17  you do to help prepare your report or to aid you
18  in preparing your report?
19      A.  I'm -- I'm not sure I understand what
20  you mean.
21      Q.  Presumably, you went and looked at the
22  code in mid October and then looked at the code
23  again later?
24      A.  Yes.

Page 9

1      Q.  Did you do anything in between -- in
2  between that time frame?
3      MS. KAPPLIN:  Objection, vague.
4  BY THE WITNESS:
5      A.  I'm not sure what you mean by
6  "do anything."
7  BY MR. GOETTLE:
8      Q.  Sure.  Sorry.
9      A.  Could you be more specific?
10      Q.  After you looked at the code in mid
11  October, did you read the patent again?
12      A.  I actually don't recall.
13      Q.  Did you do any research on
14  TruePosition?
15      A.  No.
16      Q.  Did you do any research on Andrew
17  Corporation?
18      A.  No.
19      Q.  Did you do any research on Andrew
20  Corporation products?
21      A.  No.
22      Q.  Did you do any research on TruePosition
23  Corporation products?
24      A.  No.

3 (Pages 6 to 9)

A64

DEWAYNE E. PERRY, JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 10

1     (WHEREUPON, a certain document was
2     marked Plaintiff's Deposition
3     Exhibit No. 494, for
4     identification, as of 1/22/07.)
5  BY MR. GOETTLE:
6     Q.   Dr. Perry, the court reporter just
7  handed you what's been marked as Exhibit 494. Do
8  you recognize Exhibit 494?
9     A.   Yes. It's my rebuttal report -- or,
10  more specifically, Rebuttal Expert Report. Sorry.
11     Q.   Were there any drafts of this report
12  that culminated into this final report?
13     A.   I was -- I took notes along the way
14  that were -- were preparatory for making this
15  report, yes.
16     Q.   When you made this report, were
17  there drafts of this report, or did you make the
18  final report at one time?
19     A.   I made the final report at one time.
20     Q.   And what did you do with the final
21  report after you had made it?
22     A.   I sent it to Kirkland & Ellis.
23     Q.   And did Kirkland & Ellis edit the
24  report --

Page 11

1     A.   They --
2     Q.   -- or provide you --
3     A.   They added some of the legal -- some of
4  the legal things to it that -- that I, as an
5  expert, did not have.
6     Q.   Could you tell me what legal things
7  you're referring to?
8     A.   I had -- it was basically the
9  paragraph 6 of -- about the exhibits and my
10  compensation and so forth and my -- my testimony.
11     Q.   Dr. Perry, when you were taking notes
12  along the way in developing your report, did you
13  talk with Ms. Waldron?
14     A.   Yes. I did.
15     Q.   Did you talk with any other attorneys
16  here at Kirkland & Ellis?
17     A.   I don't think so.
18     Q.   Did you talk with any employees of
19  Andrew Corporation?
20     A.   No.
21     Q.   Do you know who Dr. David Goodman is?
22     A.   No.
23     Q.   So you had no conversations with
24  Dr. Goodman?

Page 12

1     A.   No.
2     Q.   Do you know who Mr. Wayne Hoeberlein
3  is?
4     A.   No.
5     Q.   Did you have any conversations with
6  Mr. Wayne Hoeberlein?
7     A.   No.
8     Q.   Are you aware that Dr. Goodman
9  submitted a non-infringement expert report in this
10  matter?
11     A.   No.
12     Q.   Are you aware that Dr. Goodman
13  submitted an invalidity report in this matter?
14     A.   I know that they had an expert witness
15  that did do those things, but I didn't -- I don't
16  know who it was.
17     Q.   Did you read --
18     A.   No.
19     Q.   -- Dr. Goodman's invalidity report?
20     A.   No.
21     Q.   And you didn't read Dr. Goodman's
22  non-infringement report?
23     A.   No.
24     Q.   Sir, if I could, can I direct your

Page 13

1  attention to Exhibit B of your report.
2     A.   Um-hum. Okay.
3     Q.   And these are materials that you
4  considered in drafting and writing your report?
5     A.   Yes. They were materials that were
6  made available to me that I did look at.
7     Q.   In forming your opinion, did you rely
8  on any materials that aren't listed in Exhibit B?
9     A.   No.
10     Q.   Did Andrew Corporation ever -- or.
11  excuse me.
12        Did Andrew Corporation or Kirkland &
13  Ellis attorneys ever give you a budget or a target
14  time frame in which to complete your report?
15     A.   No.
16     Q.   How much time would you say you've
17  spent?
18     MS. KAPPLIN: Objection, vague.
19  BY THE WITNESS:
20     A.   I should be able to remember what the
21  bill was, but I don't. I spent six days plus
22  other time. I just don't remember.
23  BY MR. GOETTLE:
24     Q.   About a hundred hours? Does that sound

4 (Pages 10 to 13)

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

1   about right?
2       A.   Something like that.
3       Q.   And you personally drafted the report?
4       A.   Yes.
5       Q.   That's correct?
6            Did you have any staff helping you in
7   your study of the source code or in drafting the
8   report?
9       A.   No.
10      Q.   Does the report provide a complete
11  basis for your opinion?
12      A.   Yes.
13      Q.   So you consider that -- the report as
14  complete?
15      A.   I'm not sure what you mean by
16  "complete."
17      Q.   Well, sure.  If I could direct your
18  attention to paragraph 1, the last sentence,
19  you indicate that it's your opinion "that
20  TruePosition's commercial products do not practice
21  the algorithms claimed."  Correct?
22      A.   Yes.
23      Q.   Is there anything in the report that
24  you would want to add to show fully your opinion

Page 16

1   and I apologize if I'm repeating -- but you didn't
2   talk to any employees of Andrew Corporation while
3   you were developing your opinion?
4       A.   No.
5       Q.   Do you know of any Andrew employees?
6       MS. KAPPLIN:  Objection --
7   BY THE WITNESS:
8       A.   Not --
9       MS. KAPPLIN:  -- vague.
10      THE WITNESS:  Sorry.
11  BY THE WITNESS:
12      A.   Not that I know of.
13  BY MR. GOETTLE:
14      Q.   Do you know Dr. Oded Gottesman?
15      A.   I know the name.  I don't know him.
16      Q.   Are you aware that -- it appears
17  that Dr. Gottesman and you were at the Bell
18  Laboratories in Murray Hill for an about an
19  overlapping year or two.
20      A.   I was not aware of that.
21      Q.   Did you read Dr. Gottesman's report?
22      A.   Yes, I did.  Sorry.  Yes, I did.
23      Q.   Does Dr. Gottesman's report address how
24  TruePosition's commercial products practice the

Page 15

1   that True -- TruePosition's commercial products do
2   not practice the algorithms of the patent?
3       A.   I'm not sure what you mean by -- well,
4   I'm not sure about the term "fully."
5       Q.   I see.  All right.
6       A.   So, I mean, can we repeat --
7       Q.   Let me try it a different way.
8       A.   Okay.
9       Q.   Are you happy with the report?
10      A.   Yes.
11      Q.   Does it set out everything that you
12  think it needs to set out in order to show that
13  TruePosition's commercial products do not practice
14  the algorithms of the patent?
15      A.   Yes.
16      Q.   Is there anything in the report that
17  you would like to change?
18      A.   No.
19      Q.   Is there anything you'd like to delete?
20      A.   No, not that I -- not that I know of.
21      Q.   Is there anything you would like to
22  add?
23      A.   Not that I know of.
24      Q.   Okay.  I believe I asked you this --

Page 17

1   algorithms claimed in the '144 patent?
2       A.   I believe he does make those claims,
3   yes.
4       Q.   Do you have an understanding one way or
5   the other of whether Andrew's Geometrix products
6   infringe any claims of the '144 patent?
7       MS. KAPPLIN:  Objection.
8   BY THE WITNESS:
9       A.   I have --
10      MS. KAPPLIN:  Calls for a legal conclusion.
11      THE WITNESS:  Sorry.
12      MS. KAPPLIN:  Vague.
13  BY THE WITNESS:
14      A.   I have no understanding about Andrew at
15  all.
16  BY MR. GOETTLE:
17      Q.   Have you ever heard of an entity called
18  Saudi Telecom?
19      A.   I believe it was mentioned in -- in one
20  of the -- one of the reports I looked at.  I think
21  it was probably the expert report of -- of Carla
22  Mulhern.
23      Q.   Other than the mention in Ms. Mulhern's
24  report, have you ever heard of Saudi Telecom?

5 (Pages 14 to 17)

**A66**

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 18

1      A.   No.
2      Q.   Have you ever heard of an entity called
3    Q-Tel?
4      A.   No.
5      Q.   Do you know why Andrew Corporation
6    wanted you to proffer an opinion regarding whether
7    TruePosition's commercial products practice the
8    '144 patent?
9         MS. KAPPLIN:  Objection, calls for
10    speculation.
11    BY THE WITNESS:
12      A.   Sorry. No, I don't.
13    BY MR. GOETTLE:
14      Q.   So what -- what is your understanding
15    of the purpose of your report?
16      A.   Well, as it -- as it mentions in the
17    first paragraph, it's a -- it's submitted as a
18    rebuttal -- well, sorry, not -- maybe not the
19    first paragraph.  Yes.  As a rebuttal, "expressed
20    in Carla Mulhern's report that TruePosition is
21    practicing the '144 patent."
22      Q.   Did you read Ms. Mulhern's report?
23      A.   Yes, I did.
24      Q.   Do you have an understanding of why

Page 19

1    Andrew believes it's relevant that TruePosition's
2    commercial products do not practice the algorithms
3    claimed in the '144 patent?
4      A.   Do you mean do I have a belief of it or
5    do I know?
6      Q.   Do you know?
7      A.   I don't know.
8      Q.   Do you have a belief?
9      A.   Yes.
10      Q.   Could you tell me what that is, sir?
11      A.   That if they're not -- if TruePosition
12    is not practicing its own patent, then that is
13    probably not in their favor in terms of a damage
14    report -- I mean damages.
15      Q.   What forms the basis for that belief?
16      A.   Just intuition.
17      Q.   Did Ms. Waldron say anything that may
18    have led you to that belief?
19      A.   No.
20      Q.   Did you do any research into that
21    issue?
22      A.   No.
23      Q.   Do you know whether that belief is
24    correct?

Page 20

1      A.   I have no way of knowing.
2      Q.   Do you consider your -- yourself an
3    expert on patent damages?
4      A.   "Patent damages"?  No, I don't think
5    so.
6      Q.   Do you have a working knowledge of
7    patent damages?
8         MS. KAPPLIN:  Objection, vague.
9    BY THE WITNESS:
10      A.   I don't know what you mean by "working
11    knowledge."
12    BY MR. GOETTLE:
13      Q.   Well, I had asked you if you thought
14    your -- you were an expert, but that's probably
15    not a great question.
16         And so I'm trying to get out if you
17    have some sort of lesser degree of familiarity
18    with patent damages.
19      A.   That's very, very broad.  I mean, for
20    instance, I don't RIMM stock, and I'm very familiar
21    with patent damages relative to RIMM because it
22    sunk the stock for a while, so...
23      Q.   Yes.  Good.
24         Do you -- do you have a familiarity

Page 21

1    with how patent damages are calculated?
2         MS. KAPPLIN:  Objection, overbroad, vague.
3    BY THE WITNESS:
4      A.   No.
5    BY MR. GOETTLE:
6      Q.   Do you -- do you have a familiarity for
7    how a reasonable royalty as patent damages will be
8    calculated?
9      A.   No.
10      Q.   Do you have a familiarity on how lost
11    profits for patent damages will be calculated?
12         MS. KAPPLIN:  Objection, vague.
13    BY THE WITNESS:
14      A.   No.
15    BY MR. GOETTLE:
16      Q.   Have you ever heard of the case,
17    Panduit Corp. v. Stahlin Brothers?
18      A.   No.
19      Q.   Do you -- do you have any familiarity
20    with factors that might be used in calculat- --
21    calculating lost profits?
22         MS. KAPPLIN:  Objection, vague, overbroad.
23    BY THE WITNESS:
24      A.   No.

6 (Pages 18 to 21)

A67

DEWAYNE E. PERRY, JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 22

BY MR. GOETTLE:
2    Q.    Do you have any familiarity with the
3  test for calculating damages in a two-supplier
4  market?
5        MS. KAPPLIN:  Objection, vague.
6        BY THE WITNESS:
7        A.    No.
8  BY MR. GOETTLE:
9        Q.    Have you ever heard or read of a case
10  called Micro Chemical v. Lextron?
11        MS. KAPPLIN:  Objection, vague, and compound.
12  BY THE WITNESS:
13        A.    No.
14  BY MR. GOETTLE:
15        Q.    Is it your belief that TruePosition
16  must practice the algorithms of the patent in
17  order to be entitled to damages?
18        MS. KAPPLIN:  Objection, vague.  It calls for
19  a legal conclusion.
20  BY THE WITNESS:
21        A.    I have no belief at all about that.
22  BY MR. GOETTLE:
23        Q.    Have you ever heard of a case called
24  Rite-Hite v. Kelley Company?

Page 23

1        A.    No.
2        Q.    And never read the case?
3        A.    No.
4        Q.    So you haven't formed an opinion on
5  whether your report is actually relevant to the
6  case of TruePosition v. Andrew?
7        MS. KAPPLIN:  Objection, vague, overbroad,
8  calls for a legal conclusion.
9  BY THE WITNESS:
10        A.    How do I answer that?  On the one hand,
11  no.
12  BY MR. GOETTLE:
13        Q.    Sir, could I direct your attention to
14  paragraph 6 of your report --
15        A.    Um-hum.
16        Q.    -- which is your -- particularly to the
17  first sentence, where it talks about prior expert
18  testimony.
19        A.    Yes.
20        Q.    Do you think you could just generally
21  tell me what your opinion or testimony in DBD v.
22  MLBAM was about?
23        A.    It was about infringement of MLBAM onto
24  DBD's -- DBD -- DDB's patents, the rebuttal to

Page 24

1  invalidity, rebuttals to non-infringement.
2        Q.    I take it you were retained, then, by
3  DDB?
4        A.    Yes.  Sorry.
5        Q.    Oh, that's okay.
6        A.    The Touchcom/Hollidge litigation, I was
7  for -- retained by Dresser, the defendant, and
8  argued for the invalidity of the patent,
9  successfully.
10        Q.    And that patent -- or strike that.
11            The claims in that patent on which your
12  opinion would address -- was addressed were means
13  plus function claims, is that correct?
14        A.    Yes.
15            LM -- sorry.
16        Q.    No, no, that's okay.  I actually --
17        A.    Right.
18        Q.    -- think I hadn't actually specifically
19  asked you the question, but --
20        A.    Right.
21        Q.    -- please.  LML?
22        A.    Okay.  LML v. TeleCheck, there were
23  actually two cases there.
24            One was LML v. TeleCheck, in which I was

Page 25

1  retained by TeleCheck to show that their code did
2  not -- as -- as a rebuttal to LML's claim of
3  infringement, to show that the code did not
4  infringe, according to their expert's opinion.
5            And then, in the -- in the countersuit
6  of TeleCheck v. LML, to look at LML's code to show
7  that -- to find out and show where it did infringe
8  on TeleCheck's patents.
9        Q.    I see.  Am I correct, then, that both
10  parties had infringement claims against the other
11  party?
12        A.    Yes.
13        Q.    Do you know which states that -- that
14  suit is in?
15        A.    Oh, it was -- it was settled shortly
16  after I finished looking at the code.  It was
17  settled out of court.
18        Q.    Did you write an opinion in that case?
19        A.    I wrote an opinion for the first suit,
20  and -- but before I could write an opinion for the
21  second suit, it was settled.
22        Q.    And did you write an opinion in DDB --
23  DDB v. Major League Baseball?
24        A.    Yes.

7 (Pages 22 to 25)

A68

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 26

1    Q.    And who is Hollidge?
2    A.    I think Hollidge was the person who had
3  the patent.
4    Q.    He was the inventor?
5    A.    Yes. Ironically, he was working for
6  Dresser at the time he filed the suit.
7    Q.    Are there any other cases in which
8  you've been an expert that aren't listed in
9  paragraph 6?
10    A.    Yes.
11    Q.    Involving -- any of those cases
12  involving patent litigation?
13    A.    Yes.
14    Q.    Do you know why they're not listed in
15  paragraph 6?
16    A.    I did not -- have not done any
17  depositions in those cases.
18    Q.    Did you write any reports in those
19  cases?
20    A.    Not yet.
21    Q.    But you anticipate writing reports in
22  those cases?
23    A.    Yes.
24    Q.    How many cases are there?

Page 27

1    A.    I think three. It's -- one -- one is
2  not clear. There -- a long time, nothing has
3  happened, so I don't know what the state of the
4  case is.
5    Q.    Do you know how Ms. Waldron had your
6  name to call you initially in this matter?
7    MS. KAPPLIN: Objection, speculation.
8  BY THE WITNESS:
9    A.    I -- I don't know.
10  BY MR. GOETTLE:
11    Q.    Have you been an expert in other cases
12  where Kirkland is representing a party?
13    A.    Yes. It was in the LML v.TeleCheck.
14  Kirkland & Ellis represented TeleCheck -- I mean,
15  represented LML, sorry. Fish & Richardson
16  represented TeleCheck.
17    Q.    Okay. Are any of the three cases that
18  aren't listed in paragraph 6, do they have
19  Kirkland & Ellis attorneys on -- representing a
20  party?
21    A.    Not that I know of.
22    Q.    In the cases that are listed on
23  paragraph 6 --
24    A.    Um-hum.

Page 28

1    Q.    -- have you been asked to proffer your
2  opinion regarding whether a party is practicing
3  the patent -- the party that owns the patent is
4  practicing the patent?
5    Did you understand my question? It
6  wasn't very good.
7    A.    Yeah. Try -- try -- please try again.
8    Q.    Sure. In any of the three cases --
9  scratch that.
10    In any of the six cases, the three that
11  are listed in paragraph 6 and the three others
12  that aren't listed in paragraph 6, have you been
13  asked to proffer an opinion regarding whether the
14  assignee of the patent is practicing the patent?
15    A.    No.
16    Wait a minute. Re- -- please repeat
17  the question again.
18    Q.    Sure.
19    A.    Sorry.
20    Q.    I guess, first of all, I'm trying to
21  narrow in the boxes. I don't want to talk about
22  people infringing a patent.
23    A.    Okay. So --
24    Q.    Certainly --

Page 29

1    A.    So you're --
2    Q.    -- those people would be practicing the
3  patent.
4    A.    Right. That's --
5    Q.    But they wouldn't be the assignees of
6  the patent.
7    A.    Okay. Sorry. That -- that -- that was
8  what -- all of a sudden, afterwards, I thought,
9  "Oops." Okay. Yes.
10    Q.    I'm not trying to --
11    A.    So you're not trying to -- you're not
12  talking about the infringing --
13    Q.    Exactly.
14    A.    Okay. Yes.
15    Q.    And so your answer is the same?
16    A.    The answer is the same.
17    Q.    Have you ever had any of your reports
18  or testimony excluded by a court?
19    MS. KAPPLIN: Objection, compound.
20  BY THE WITNESS:
21    A.    Not that I know of.
22  BY MR. GOETTLE:
23    Q.    Have -- has any of your testimony been
24  discredited by a court -- a court?

8 (Pages 26 to 29)

A69

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1     A.   No.
2     Q.   Have you ever worked on behalf of
3   Andrew Corporation previously?
4     A.   Not to my knowledge.
5     Q.   So it was mid October, 2006, was the
6   first time you went out to look at TruePosition's
7   source code, right?
8     A.   Yes.
9     Q.   And I believe you indicated there were
10   about a half a dozen trips altogether out to --
11     A.   There were four trips, about half a
12   dozen days.
13     Q.   Oh, I see.  Some of those days were
14   more than -- some of those trips were more than
15   one day?
16     A.   Yes.
17     Q.   Okay.  Did you rely on anything besides
18   the source code in forming your opinion?
19     MS. KAPPLIN:  Objection, vague and overbroad.
20   BY THE WITNESS:
21     A.   Part of that depends on what you mean
22   by "source code."
23   BY MR. GOETTLE:
24     Q.   Okay.  Did -- did you rely on anything

Page 31

1   besides the code on the computer in escrow at
2   Iron Mountain in forming your opinion?
3     MS. KAPPLIN:  Objection, vague and overbroad.
4   BY THE WITNESS:
5     A.   The -- the two things I relied on were
6   the algorithm described in the patent and the
7   files found in the TruePosition releases at
8   Iron Mountain.
9   BY MR. GOETTLE:
10     Q.   Oh, I see.  The files that were on the
11   computer but weren't source code?
12     A.   Right.
13     Q.   Right.
14          I noticed in Exhibit B that you
15   reference Mr. Anderson's testimony in November
16   2006.  Back -- sorry.  Why don't we turn to
17   Exhibit B.
18          If I could direct your attention to
19   paragraph 6 of Exhibit B --
20     A.   Yes.
21     Q.   -- it says "November 14, 2005
22   Deposition of Rob Anderson."
23     A.   Right.
24     MS. KAPPLIN:  It should probably read

Page 32

1   "November 14, 2006" --
2     MR. GOETTLE:  Yeah.  I was --
3     MS. KAPPLIN:  -- "Deposition of Rob
4   Anderson."
5     MR. GOETTLE:  I was kind of pausing there
6   because I thought --
7     THE WITNESS:  I have a time warp machine..
8     MR. GOETTLE:  Although it could be 2005,
9   right?  It feels like it's been going on forever.
10     MS. KAPPLIN:  I believe it's a November 14,
11   2006 deposition of Rob Anderson.
12     THE WITNESS:  That -- that may be true for
13   you, but not for me.
14   BY MR. GOETTLE:
15     Q.   So I had asked you if you relied on
16   anything aside from the source code, and you had
17   said, well, you've relied on the algorithms of the
18   patent and the source code on the
19   computer that's in escrow.
20     A.   Yes.
21     Q.   Did you also rely on the deposition
22   testimony of Mr. Anderson?
23     A.   What do you mean by "rely on"?
24     Q.   Maybe I can tell you what I mean by

Page 33

1   "rely on" --
2     A.   Okay.
3     Q.   -- by just answering --
4     A.   Okay.
5     Q.   -- asking you a more specific question.
6     A.   Okay. .
7     Q.   For example, Mr. Anderson testified and
8   was asked to write down his understanding of a
9   correlation function.
10     A.   Okay.
11     Q.   So my question is:  Did you compare the
12   files or the source code on the computer that's at
13   Iron Mountain with his exhibit that shows the
14   correlation function that he drafted?
15     A.   No, I didn't.
16     Q.   Did you review his testimony as a way
17   to understand the files or the source code on the
18   computer at Iron Mountain?
19     A.   I did read his report.  I don't recall
20   them providing me a better understanding than
21   I already had.
22     Q.   When you say "his report," we mean his
23   testimony --
24     A.   The deposition.  Sorry.

9 (Pages 30 to 33)

A70

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 34

1    Q.   Okay.  No, I figured that's what you
2    meant.  Okay.
3         Dr. Perry, do you know what claims of
4    the '144 patent TruePosition is alleging that
5    Andrew infringes?
6    A.   Excuse me.  No.
7    Q.   Sir, if I could direct your attention
8    to Exhibit 474, which is your report.
9    A.   Um-hum.
10   THE COURT REPORTER:  494.
11   MR. GOETTLE:  I'm sorry?
12   THE COURT REPORTER:  494.
13   MR. GOETTLE:  494.
14   BY MR. GOETTLE:
15   Q.   494, excuse me.  Exhibit 494 --
16   A.   Right.
17   Q.   -- which is your report.
18        Paragraph 1 at the last sentence says:
19        "Based on my review of TruePosition's
20        source code, it is my opinion that
21        TruePosition's commercial products do not
22        practice the algorithms claimed in the
23        '144 patent."
24   A.   Yes.

Page 35

1    Q.   Now, if I could get you to re- --
2    refer to Exhibit 493, which is the '144 patent --
3    A.   Um-hum.
4    Q.   -- I would like to know which claims
5    claim the algorithms in the '144 patent.
6    MS. KAPPLIN:  Objection, calls for a legal
7    conclusion.
8    BY THE WITNESS:
9    A.   I don't know.  I didn't pay attention
10   to the claims.  It was -- it was not my job to pay
11   attention to the claims.
12   BY MR. GOETTLE:
13   Q.   I'm a little confused.  Don't you need
14   to know what algorithms are claimed in order to
15   render an opinion regarding whether TruePosition's
16   products practice those algorithms that are
17   claimed?
18   MS. KAPPLIN:  Objection, confusing.
19   BY MR. GOETTLE:
20   Q.   Was that a confusing sentence --
21   question?  Because I'll rephrase it if it is.
22   A.   Yes, it was confusing.
23   Q.   Okay.  It's your opinion that
24   TruePosition's commercial products do not practice

Page 36

1    algorithms claimed in the '144 patent, correct?
2    A.   Yes.
3    Q.   So don't you need to know what
4    algorithms are claimed in order to render that
5    opinion?
6    A.   I -- it's my understanding that what
7    I need to understand are the algorithms disclosed
8    in the patent, say, in Figures 7 through 8, and
9    their discussion of them in the preferred
10   embodiment.
11   Q.   Okay.
12   A.   Presumably, they're there because
13   they're claimed.
14   Q.   In the Dresser case, you -- you offered
15   expert testimony regarding means plus function
16   claims.
17   A.   Yes.
18   Q.   Do you have an understanding of how to
19   construe means plus function claims?
20   MS. KAPPLIN:  Objection, overbroad, vague,
21   and calls for a legal conclusion.
22   BY THE WITNESS:
23   A.   It's my understanding that for --
24   for the means claimed there, there has to be a

Page 37

1    function corresponding to that means.
2    BY MR. GOETTLE:
3    Q.   And where is that function?
4    MS. KAPPLIN:  Objection, calls for a legal
5    conclusion.
6    BY THE WITNESS:
7    A.   That function is in the patent, in the
8    algorithms.
9    BY MR. GOETTLE:
10   Q.   Did you ever read the claims of the
11   '144 patent?
12   A.   I think I did read the claims.
13   Q.   Did anybody tell you that the
14   algorithms of the patent are claimed --
15   MS. KAPPLIN:  Objection, vague.
16   BY MR. GOETTLE:
17   Q.   (Continuing) -- by one or more claims
18   of the '144 patent?
19   A.   I'm sorry.  Would you please repeat the
20   question.
21   Q.   Yes.  Did anybody ever tell you that
22   the algorithms of the patent are claimed in the
23   patent?
24   A.   Nobody told me that, no.

10 (Pages 34 to 37)

A71

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1    Q.    That was your understanding?
2    A.    That would be my understanding, yes.
3    Q.    Could we turn our attention to
4   paragraph 3 of Exhibit 494.
5    A.    Okay.
6    Q.    Could you read the first sentence of
7   paragraph 3 into the record.
8    A.    "I understand that TruePosition's
9         technical expert witness Oded Gottesman
10        refers to Figures 7 and 8A through 8D
11        of the '144 patent as representing the
12        patent's algorithm for processing data
13        to identify individual cellular
14        telephone signals."
15   Q.    Did you -- have you read
16  Dr. Gottesman's report?
17   A.    Yes.
18        (WHEREUPON, a certain document was
19             marked Plaintiff's Deposition
20             Exhibit No. 495, for
21             identification, as of 1/22/07.)
22  BY MR. GOETTLE:
23   Q.    Dr. Perry, the court reporter has just
24  handed you Exhibit 495.  Do you recognize

Page 39

1   Exhibit 495?
2    A.    Yes.
3    Q.    What is it?
4    A.    The Expert Report of Oded Gottesman.
5    Q.    Do you know where in Exhibit 495
6   Dr. Gottesman refers to Figures 7 and 8A through
7   8D as representing the '144 patent's algorithm for
8   processing data to identify individual cellular
9   telephone signals?
10   A.    I don't remember where it is.
11   Q.    Sir, could I direct your attention to
12  page 30 of Exhibit 495.
13        What I'd like to do is just -- just to
14  make sure that you and I are on the same
15  page about what pages 30 and some pages following
16  that are, I just wanted to compare Exhibit 495 at
17  page 30 for the next few pages with the patent
18  claims so that you can -- just so you can follow
19  my questioning.
20        What I would like to show you is that
21  Dr. Gottesman is quoting particular portions of
22  Claim 1 of the '144 patent.
23   A.    Um-hum.
24   Q.    So if you look at paragraph E.2.1.3 --

Page 40

1    A.    Right.
2    Q.    -- and compare that to Exhibit 493,
3   which is the patent, at column 20, which is
4   Claim 1 --
5    A.    Okay.
6    Q.    -- would you agree that Dr. Gottesman's
7   paragraph at E.2.1.3 in boldface where it begins,
8   "First Clause of Claim 1, colon," that what
9   follows that colon that's quoted is the same as
10  what's in the patent at column 20, lines 4 through
11  7?
12   A.    Yes.
13   Q.    So, in other words, Dr. Gottesman is
14  quoting the claim --
15   A.    Yes.
16   Q.    -- or a portion of the claim?
17        And then, if I can get you to flip to
18  the next page -- excuse me -- to page 32, at
19  E.2.1.4.
20   A.    Yes.
21   Q.    Okay.  There's a quotation of Claim 1,
22  subparagraph (a).  Do you agree with that?
23   A.    Yes.
24   Q.    Okay.  Since I know that you get the

Page 41

1   gist of what I'm trying to do, we can just skip to
2   the punch.
3    A.    Okay.
4    Q.    If you could flip to page 36.
5        Do you see at the second bullet where
6   it begins -- the second bullet where there's
7   boldface type and a quotation that begins "means
8   for processing"?
9    A.    Yes.
10   Q.    And that corresponds to the '144
11  patent's Claim 1 under subparagraph (b) at about
12  line 26.  Do you see that?
13   A.    Yes.
14   Q.    Okay.  Would you please read that
15  paragraph into the record that begins "means for
16  processing."
17   A.    "Means for processing said frames
18        of data from said cell site systems to
19        generate a table identifying individual
20        cellular telephone signals and the
21        differences in times of arrival of said
22        cellular telephone signals among said
23        cell...systems."
24   Q.    Now, in what can only be called a

11 (Pages 38 to 41)

A72

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1  confusing juggling match, would you please refer
2  to page -- or to paragraph 3 of your report,
3  Exhibit 494.
4          You state that Dr. Gottesman refers to
5  Figures 7 and 8A to 8D "as representing the
6  patent's algorithm for processing data to identify
7  individual cellular telephone signals."
8      A.   Yes.
9      Q.   Right?
10          In that portion that you just read into
11  the record, where does it say "processing data to
12  identify individual cellular telephone signals"?
13     A.   Well, it doesn't say it directly.  It
14  says it in the context as part of the -- the --
15  that claim.
16     Q.   Would you agree with me that that
17  portion that you read into the record is more
18  narrow than "processing data to identify
19  individual cellular telephone signals"?
20     MS. KAPPLIN:  Objection, calls for a legal
21  conclusion, vague.
22  BY THE WITNESS:
23     A.   I have -- I don't have an opinion on
24  that.

Page 43

1  BY MR. GOETTLE:
2      Q.   You don't?
3      A.   No.
4      Q.   What's your understanding of the
5  meaning of "processing data to identify individual
6  cellular telephone signals"?
7      A.   There is an algorithm that uses that
8  data, and it uses it to identify individual
9  telephone signals.
10     Q.   What algorithms are those?
11     A.   Those are the ones that are referred to
12  in Figures 7 and 8A through 8D and then -- and
13  then described in detail in the preferred
14  embodiment.
15     Q.   In your report, Exhibit 494,
16  paragraph 3, you state that it's your
17  understanding -- excuse me.
18          It's your understanding "that
19  TruePosition's technical expert witness Oded
20  Gottesman refers to Figures 7 and 8A to 8D of the
21  '144 patent."
22     A.   Yes.
23     Q.   And I presume that that understanding
24  comes from Dr. Gottesman's expert report?

Page 44

1      A.   Yes.  In fact, here on page 36, it
2  talks about "Figures 7, and portions 8A and 8B,"
3  for instance, specifically.
4      Q.   Actually, would you mind reading that
5  sentence that you were just referring to into the
6  record that begins "The algorithm."
7      A.   Okay.
8          "The algorithm in the patent that
9      performs this function is described
10     connection with" -- sorry.
11     Q.   Start from the beginning.
12     A.   There's something missing there, yes.
13  Let me start over.
14     Q.   Sure.
15     A.   "The algorithm in the patent that
16     performs this function is described
17     connection with portions of Figures 7,
18     and portions of 8A and 8B which are
19     nicely summarized in the portion" 7 --
20     "of Figure 7 through" the "TDOA
21     calculations."
22     Q.   What portions of Figure 7 and portions
23  of 8A and 8B does Dr. Gottesman believe represent
24  the algorithms in the patent performing the

Page 45

1  function?
2      A.   It would be the first four elements on
3  Figure 7, up through where it says "Calculate TDOA
4  Data."  I assume that's what he meant.
5      Q.   Is that it -- is that what you assumed
6  he meant when you wrote your opinion?
7      A.   Well, he goes on -- yes.  Sorry.  Yes.
8      Q.   Am I correct that --that this means for
9  processing limitation that you read into the
10  record, am I correct that this is the function
11  that -- strike that.
12          Am I correct that this means for
13  processing limitation that you read into the
14  record is the function that you're referring to in
15  paragraph 3 where you state that -- state "the
16  patent's algorithm for processing data to identify
17  individual cellular telephone signals"?
18     A.   I'm sorry.  Would you repeat that?
19     Q.   Sure.  That was -- as I was saying it,
20  I realized it wasn't well articulated.
21          Okay.  So in paragraph 3 of your
22  report, you refer to some figures in the patent
23  "as representing the patent's algorithm for
24  processing data to identify individual cellular

12 (Pages 42 to 45)

A73

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1  telephone signals."  Okay?
2      A.   Yes.
3      Q.   Okay.  And then, in paragraph 1, you
4  state that it's your opinion "that TruePosition's
5  commercial products do not practice the algorithms
6  claimed."
7          So I'm trying to figure out what claim
8  or what claim element you're referring to in your
9  report, and my -- so my question is:  Is this
10  means for processing the claim element that you're
11  referring to in your report?
12      MS. KAPPLIN:  Objection, misstates the
13  report.
14  BY THE WITNESS:
15      A.   I think what I meant there was, I was
16  looking at the algorithms in the report.
17  BY MR. GOETTLE:
18      Q.   Yes.
19      A.   Okay?  Comparing that against the code.
20      Q.   Yes.
21      A.   Okay?  The algorithms in the patent are
22  there, obviously, because they're claimed.
23  Otherwise, they wouldn't be in the patent unless
24  I -- I mean, at least that's my understanding of

Page 47

1  the construction of a patent.  From my own
2  experience with a -- with my own patent, that was
3  certainly the case.
4      Q.   Will you agree with me that patents
5  have more than one claim?
6      A.   Yes.
7      Q.   That patents have independent claims
8  and dependent claims?
9      MS. KAPPLIN:  Objection, overbroad.
10  BY THE WITNESS:
11      A.   That's been my experience, yes.
12  BY MR. GOETTLE:
13      Q.   And that different claims in a patent
14  can have different scopes?
15      MS. KAPPLIN:  Objection, overbroad, and calls
16  for a legal conclusion.
17  BY THE WITNESS:
18      A.   I assume so.
19  BY MR. GOETTLE:
20      Q.   Would you agree that -- let me strike
21  that.
22          Taking your assumption that algorithms
23  in a patent are what are claimed, presumably, that
24  would mean that all of -- somehow, all of the

Page 48

1  claims of the patent cover all of the algorithms
2  of the patent?
3      MS. KAPPLIN:  Objection, confusing, misstates
4  the testimony.
5  BY MR. GOETTLE:
6      Q.   Would you agree with that?
7      A.   I'm sorry.  Would you repeat that,
8  please?
9      Q.   Sure.  Your -- taking the as- -- your
10  assumption that algorithms that are in a patent
11  are also claimed by that patent, would you agree,
12  then, that you look at all of the claims, and all
13  of those claims together would be claiming all of
14  the algorithms of the patent?
15      MS. KAPPLIN:  Objection, confusing, misstates
16  the testimony, and calls for a legal conclusion.
17  BY THE WITNESS:
18      A.   I suspect that depends on individual
19  patents.  I don't know that I would make it that
20  broad of --
21  BY MR. GOETTLE:
22      Q.   So there could be some algorithms in a
23  patent that aren't claimed?
24      MS. KAPPLIN:  Objection, overbroad and vague.

Page 49

1  BY THE WITNESS:
2      A.   I don't know.
3  BY MR. GOETTLE:
4      Q.   Are you aware -- strike that.
5          How many claims are in the '144 patent?
6      A.   A total of 45, it looks like.
7      Q.   And I believe you've testified that
8  you're not aware of what claims in this patent are
9  being asserted by TruePosition against Andrew
10  Corporation?
11      A.   Well, I mean, obviously, they're in
12  here (indicating), but I did not take that into
13  account in preparing my report.
14      Q.   I'll submit to you, sir, that it's
15  Claims 1, 2, 22, 31 and 32.
16      A.   Okay.
17      Q.   So five of the total claims are being
18  asserted against Andrew Corporation.
19      A.   Right.
20      Q.   Is it possible that the claims that are
21  being asserted against Andrew Corporation do not
22  cover all of the algorithms of the patent?
23      A.   I don't know.
24      Q.   Is it possible?

13 (Pages 46 to 49)

A74

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1    MS. KAPPLIN:  Objection, speculation, calls
2  for a legal conclusion.
3    THE WITNESS:  Right.
4  BY THE WITNESS:
5    A.  Everything is possible.
6  BY MR. GOETTLE:
7    Q.  Okay.  You're not aware of what claims
8  in the '144 patent include an element for
9  processing data to identify individual cellular
10  telephone signals?
11    A.  No.
12    Q.  You don't know if the asserted claims
13  include the element, processing data to identify
14  cellular telephone signals?
15    A.  In -- in the sense that I've -- was not
16  tasked to pay attention to the -- the claims, no.
17    Q.  Sure.  Did anybody tell you -- tell you
18  that you shouldn't pay attention to the claims?
19    A.  No.
20    Q.  Was that implied in any of your
21  conversations with anybody?
22    A.  No.
23    Q.  If I could refer to your report, which
24  is Exhibit -- Exhibit 494, would you agree with me

Page 51

1  that paragraphs 3, 4 and 5 are the only paragraphs
2  in your report that are addressing the algorithms
3  of the patent specifically?
4    A.  Yes.
5    Q.  Are paragraphs 3, 4 and 5 all
6  addressing algorithms for processing data to
7  identify individual cellular telephone signals?
8    MS. KAPPLIN:  Objection, misstates the
9  report.
10  BY THE WITNESS:
11    A.  It's my understanding from looking
12  at -- just now, looking at Gottesman's report,
13  that they refer to part of the algorithm for --
14  I mean, they -- they refer to part of the
15  algorithms represented in Figures 7 through 8F,
16  but not all of it.
17  BY MR. GOETTLE:
18    Q.  I'm sorry.  I didn't understand your --
19  your answer.  You said they refer to algorithms.
20  What do you mean by "they"?  Well, the paragraphs
21  of the report?
22    A.  The paragraphs of the report.  Sorry.
23    Q.  I'm sorry.
24    But those three paragraphs,

Page 52

1  paragraphs 3, 4 and 5 --
2    A.  Yes.
3    Q.  -- are addressing or are discussing
4  algorithms for processing data to identify
5  individual cellular telephone signals?
6    MS. KAPPLIN:  Objection, misstates the
7  report.
8  BY THE WITNESS:
9    A.  Claims 1 -- Claims 2, 3 -- 2 -- sorry.
10  Yeah.  2 -- sorry.  3, 4 and -- and 5 --
11  BY MR. GOETTLE:
12    Q.  Paragraphs 3, 4 and 5?
13    A.  Yes.  3, 4 and 5 address the entirety
14  of the algorithm for locating -- for the -- for
15  TruePosition's algorithm for locating cellular
16  telephones.
17    Q.  Where does your report say that you're
18  addressing algorithms for locating telephones?
19    A.  Well, locating cellular -- cellular
20  phones, sorry.  Cell -- or --
21    Q.  Sure.  Where in your report do you
22  state that you're addressing the algorithms for
23  locating cellular telephones?
24    A.  I don't explicitly state it, but given

Page 53

1  that the patent is calling -- is called "Cellular
2  Telephone Location System," it was my assumption
3  that that's why they -- that's what the algorithms
4  are there for, for locating telephones.  So I had
5  assumed that.
6    Q.  I see.
7    A.  It was the -- the context in which this
8  report was to be taken.
9    Q.  I see.  Paragraph 3, where you state
10  that Dr. Gottesman refers to, you know, the
11  figures of the '144 patent "as representing the
12  patent's algorithm for processing data to identify
13  individual cellular telephone signals," where you
14  state that, "processing data to identify
15  individual cellular telephone signals," you are
16  not trying to identify a function of a claim, are
17  you?
18    A.  I don't know whether I am or not.
19    Q.  You may have been identifying a
20  function of a claim?
21    A.  I -- I don't know.
22    Q.  Was it your intention to identify a
23  function of a claim when you wrote that paragraph?
24    A.  No.  My intention was to report that,

14 (Pages 50 to 53)

**A75**

DEWAYNE E. PERRY, JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 54

1  here's the algorithms that are represented in the
2  patent (indicating), here's the code (indicating),
3  and here -- how -- here's the ways in which it
4  does not represent -- the ways it's different from
5  and the ways that it is not -- and both different
6  from and more complex than what I see in --
7  described in the patent.
8      Q.   Did you have an assumption before you
9  started reviewing the code that the algorithms
10  that you were going to find on -- or, excuse me --
11  that the code in the files on the laptop in
12  Iron -- at Iron Mountain would be different from
13  or more complex than those described in the
14  patent?
15      A.   I had no idea whatsoever of what the
16  code would be like.
17      Q.   It's your understanding that
18  Dr. Gottesman refers to Figures 7 and 8A to 8D of
19  the patent as representing the patent's algorithms
20  for processing data to identify individual
21  cellular telephone signals, is that correct?
22      A.   Yes.
23      Q.   Where does that understanding come
24  from?

Page 55

1      A.   From his expert report.
2      Q.   Where in Dr. Gottesman's expert report
3  does he refer to Figures 7 and 8A through 8D as
4  representing the patent's algorithms for
5  processing data to identify individual cellular
6  telephone signals?
7      A.   Well, there's part of it here, and I --
8  on page 36, and I don't --
9      Q.   Okay.
10      A.   -- I don't remember where the -- oh,
11  sorry. Page 37. He then refers to "Figures 7,
12  and portions 8C through 8D."
13          8F is actually a con- -- sorry. Yes.
14  And --
15      Q.   Well, let's --
16      A.   8D. 8E is a continuation, actually, of
17  8D.
18      Q.   Okay. You refer to page 36. Where on
19  page 36 is Dr. Gottesman addressing a function for
20  processing data to identify individual cellular
21  telephone signals?
22      A.   I don't know whether he's identifying a
23  function -- well, no. He does say "this
24  function." Sorry.

Page 56

1      Q.   That's okay.
2      A.   Yeah. "The algorithm in the patent
3  that performs this function is described in
4  connection with portions of Figures 7, and
5  portions 8A and 8B."
6      Q.   What function is he referring to when
7  he says "this function"?
8      A.   It's the -- the part of the algorithm
9  up through the TDOA calculation on Figure 7.
10      Q.   Well, he's saying that some function
11  that he calls "this function" is described in
12  connection with those figures, but what is "this
13  function"?
14      A.   He hasn't stated what "this function"
15  is.
16      Q.   You don't think it's the quoted
17  portion in the second bullet down, where it starts
18  "means for processing"? You don't think that's
19  "this function"?
20      MS. KAPPLIN:   Objection, vague, calls for
21  legal conclusion.
22  BY THE WITNESS:
23      A.   It could be, but I don't know.
24  BY MR. GOETTLE:

Page 57

1      Q.   You don't know.
2      MS. KAPPLIN:   Can we think about a break
3  sometime soon?
4      MR. GOETTLE:   Oh, I'm sorry. I should have
5  said that.
6      MS. KAPPLIN:   That's okay.
7      MR. GOETTLE:   Whenever you -- this is a good
8  stopping point.
9      MS. KAPPLIN:   Okay.
10      THE WITNESS:   Okay.
11      THE VIDEOGRAPHER:   Going off the video record
12  at 10:24 a.m.
13          (WHEREUPON, a recess was had from
14          10:24 a.m. until 10:37 a.m.)
15      THE VIDEOGRAPHER:   And we are going back on
16  the video record at 10:37 a.m. This is Tape 2.
17  BY MR. GOETTLE:
18      Q.   Dr. Perry, did you -- did you approach
19  your analysis, in determining whether or not
20  TruePosition practiced -- practices the algorithms
21  of the patent, was your approach the same as it
22  would be if you were trying to figure out if
23  TruePosition infringed the patent?
24      A.   No.

15 (Pages 54 to 57)

**A76**

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 58

1    Q.    What's different?  What was different
2    about it?
3    A.    Oh, if -- if I were working on
4    infringement, I would be paying very, very close
5    attention to the claims.
6          And -- and in this case, it -- I was
7    asked to look at the code and basically compare
8    the code against the algorithms of the patent.  So
9    I had a very narrow scope.
10    Q.    I see.  So you were directed by
11    Ms. Waldron to only look at the algorithms as
12    disclosed in the figures of the patent and compare
13    those algorithms against the code?
14    A.    I don't know that I would say I was
15    "directed."  I was hired to look at the code and
16    see what the code does relative to the description
17    of the -- the description of the algorithms in the
18    patent.
19    Q.    I guess where I get confused -- maybe
20    I put too much emphasis on the word, but where
21    I get confused is in your report where you state
22    that it's your opinion that TruePosition's
23    commercial products do not practice algorithms
24    claimed in the '144 patent.

Page 59

1          And if I understand, your testimony is,
2    it's probab- -- if the algorithm is in the patent,
3    then it's probably claimed?
4    A.    Yes.
5    Q.    And, therefore, you didn't do a direct
6    one-on-one correlation between the claims of the
7    patent and the algorithms of the patent to
8    actually see if they were claimed or not?
9    A.    That's right.
10    Q.    So am I correct in saying that your
11    assumption, going into performing your analysis,
12    was that if it was an algorithm in the patent, it
13    was also claimed in the patent?
14    A.    That's right.
15    Q.    Okay.  If -- if we could go back to my
16    hypothetical question about infringement, let's
17    just say TruePosition is not the assignee of the
18    patent, and you're trying to figure out if
19    TruePosition infringes the patent.
20    A.    Yes.
21    Q.    Do you have a system you would use in
22    determining whether means plus function elements
23    of the claim are being infringed?
24    MS. KAPPLIN;  Objection, overbroad, and

Page 60

1    improper hypothetical, calls for legal conclusion.
2    BY THE WITNESS:
3    A.    I -- I really don't know.
4    BY MR. GOETTLE:
5    Q.    Do you know what a means plus function
6    claim is?
7    A.    I -- I have some understanding.
8    Q.    What's your understanding?
9    A.    Well, it's that -- that for a means
10    claimed, there has to be a function that -- that
11    provides that means.
12          Well, for a means described, there has
13    to be a function someplace.
14    Q.    I see.  So could I direct your
15    attention to the '144 patent, which we marked as
16    Exhibit 493, to Figure 7.
17    A.    Um-hum.  Yes.
18    Q.    The very last block in Figure 7 is
19    "Send to User, Generate Billing Data."
20    A.    Yes.
21    Q.    Right?
22          And I believe in your report in
23    paragraph 3, which is Exhibit 494, paragraph 3 --
24    A.    Um-hum.

Page 61

1    Q.    -- the second-to-last sentence, I think
2    that you're referring to that last block of ·
3    Figure 7 as step 9.
4    A.    Yes.
5    Q.    So it's your opinion that there was
6    nothing in TruePosition's source code or files
7    that indicate that there's any sending to user,
8    generate billing data?
9    A.    That's overly broad.
10    Q.    Okay.
11    A.    I -- as I say in the report, I found
12    nothing in the location code" that I inspected
13    that disclosed either steps 7, 8 or 9.
14    Q.    What is "location code"?
15    A.    There is a body of code in each
16    release, which is in the folder -- either in the
17    folder location or something related to location
18    that defines the -- the -- the code that defines
19    the algorithm that -- in -- in the TruePosition's
20    product.
21    Q.    What do you mean by "body of code"?
22    You said the location code was in body of code.
23    A.    Well, there are -- there are
24    directories, subdirectories, files of various

16 (Pages 58 to 61)

A77

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1   sorts. So there's a portion of the system -- of
2   the -- of the source that specifically focuses on
3   location.
4       Q.   Location. And is the directory called
5   "location"?
6       A.   In Releases 7, 8 and 10 -- well, in all
7   releases, there is a lo- -- a directory called
8   location.
9       Q.   I understand.
10      A.   In Release 9, it was empty.
11      Q.   Right.
12      A.   There was -- but, yes, in the -- in the
13  other releases, there -- they're not empty.
14      Q.   So in Release 7, there's a directory
15  called "location"?
16      A.   Yes.
17      Q.   In Release 8, there's a directory
18  called "location"?
19      A.   Yes.
20      Q.   And Release 10, there's a directory
21  called "location"?
22      A.   Yes.
23      Q.   Okay.
24      A.   And -- and in 9 as well.

Page 63

1       Q.   And in 9, but --
2       A.   But there's nothing in it.
3       Q.   Nothing in it, okay.
4           And it was that location directory that
5   you primarily focused on in determining whether or
6   not the algorithms of the patent were being
7   practiced?
8       A.   That was the location -- that was the
9   portion of the source that I found by doing
10  various sorts of searches and looking that had the
11  location-related code.
12      Q.   If I refer to this last block of
13  Figure 7 as "step 9," will you understand what I'm
14  referring to?
15      A.   Yes.
16      Q.   Is -- couldn't step 9 have been in
17  another portion of the code?
18      A.   It could have been. I tried looking
19  for it. I did not find it.
20      Q.   And how did -- what methodology did you
21  use to search for it?
22      A.   The only thing possible, given the
23  system they gave me, and that is the Microsoft
24  search command. Apart from inspecting every line

Page 64

1   of code, which you'll appreciate the fact that
2   1. gig of -- 1.5 gigabytes of --
3       Q.   Right.
4       A.   -- of space --
5       Q.   This deposition would be next year if
6   you --
7       A.   Possibly further out than that.
8       Q.   So you base your opinion that step 9 is
9   not practiced in the code based on your review of
10  the location directory and based on searches of
11  the code --
12      A.   Yes.
13      Q.   -- using keyword searching?
14      A.   Keyword searching and -- yes. I guess
15  that would be -- I mean, that's the only kind
16  of -- well, the search thing has two types of
17  searches.
18          Well, the two main searches I used were
19  searching for file names, so you can search for
20  keyword and file names, or you can search for
21  keywords in -- a keyword or contiguous keywords in
22  the body of the -- of the code -- the body of the
23  files.
24      Q.   What do you think the best way of

Page 65

1   determining whether TruePosition's products
2   practice the algorithm of the patents is? Do you
3   think reviewing source code is the best way?
4       MS. KAPPLIN: Objection, compound.
5   BY THE WITNESS:
6       A.   It's certainly the most concrete way.
7   BY MR. GOETTLE:
8       Q.   The most concrete way.
9           Do you think talking to TruePosition's
10  software people is a good way of determining
11  whether TruePosition's products practice the
12  claims of the '144 patent?
13      MS. KAPPLIN: Objection, vague.
14  BY MR. GOETTLE:
15      Q.   I -- I actually misspoke. Would you
16  mind --
17      A.   Okay.
18      Q.   -- if I re- -- redo my question?
19      A.   Sure. I mean, no, I wouldn't mind.
20      Q.   Do you think talking to TruePosition's
21  software people is a good way of determining
22  whether TruePosition's products practice the
23  algorithms of the '144 patent?
24      MS. KAPPLIN: Objection, vague.

17 (Pages 62 to 65)

**A78**

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 66

1   BY THE WITNESS:
2       A.   I don't know.  It might be.  It might
3   not.
4   BY MR. GOETTLE:
5       Q.   Why might it not?
6       A.   If it's a large system, one person may
7   only know a part of the system and may not know
8   everything about what's going on.
9       Q.   So you'd have to talk to a lot of
10  people if that was how you were going to base your
11  opinion on?
12      A.   Probably.
13      Q.   Would you agree that what they tell you
14  might be incorrect as well?
15      MS. KAPPLIN:  Objection, speculation.
16  BY THE WITNESS:
17      A.   I suppose it's possible.
18  BY MR. GOETTLE:
19      Q.   What would your preference be?  Would
20  you prefer to talk to people at TruePosition
21  regarding the code, or would you prefer to review
22  the source code to determine whether TruePosition
23  products practice the algorithms of the patent?
24      A.   Well, as I said, the -- the code is the

Page 67

1   most concrete representation.  And so I -- I found
2   it satisfactory, looking at the code, to be able
3   to determine what I needed to determine.
4       Q.   What functions are performed by the
5   location code?
6       MS. KAPPLIN:  Objection, overbroad.
7   BY THE WITNESS:
8       A.   I'm not sure what you mean by
9   "function."
10  BY MR. GOETTLE:
11      Q.   Okay.  Does the location code perform a
12  correlation function?
13      MS. KAPPLIN:  Objection, vague.
14  BY THE WITNESS:
15      A.   In looking at the code, there is code
16  that does perform correlations.  Whether that's
17  considered a function, I don't know.
18  BY MR. GOETTLE:
19      Q.   Oh, I see.
20      A.   And I'm assuming you meaning "function"
21  in the patent sense, not "function" in the code
22  sense?
23      Q.   Let me try this a different way.  In
24  your report, in paragraph 3, the last sentence --

Page 68

1       A.   Um-hum.
2       Q.   -- you state that you "found no
3   presence of a phone number in any of the data
4   structures used in the location code."
5       A.   Yes.
6       Q.   Okay.  So what do you mean by
7   "phone number"?
8       A.   Well, in step 7 of Figure 7, it says
9   "Decode Phone Number For Each Signal, Using
10  Strongest Sample."  Okay?
11      Q.   But -- excuse me.  I didn't mean to
12  interrupt you.  You're -- you're not done?
13      A.   I'm not done.
14      Q.   Okay.
15      A.   So -- so here, it says "Decode Phone
16  Number."
17      Q.   Um-hum.
18      A.   Okay?  I looked at the data structures
19  that are used by the code that -- that does these
20  various parts of -- of the location in the
21  location code, and none of the data structures had
22  a -- an element of the data structure that was the
23  phone number.
24      Q.   I thought that you had testified

Page 69

1   earlier that processing data to identify
2   individual cellular telephone signals was the
3   function that was represented by the first four
4   steps of Figure 7.
5       A.   According to Mr. Gottesman's claim --
6   or his report, he's the one that said it would be
7   these first four steps.
8       Q.   And you don't agree?
9       A.   The -- the -- that is independent of
10  whether or not there's a phone number there to be
11  decoded.  I -- what I'm saying is that there is no
12  phone number in the data structures that were used
13  by these steps in Figure 7.
14      Q.   Any of the steps in Figure 7?
15      A.   In any of the steps.
16      Q.   So -- so to process data to identify
17  individual cellular telephone signals, you looked
18  at whether every step, steps 1 through 9 of
19  Figure 7, was in the code?
20      A.   I looked at the code and then compared
21  what I found in the code with what's in Figure 7,
22  and the answer is --
23      Q.   Okay.
24      A.   -- 7 through 9 aren't there.

18 (Pages 66 to 69)

**A79**

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 70

1    Q.   Okay.  Did you consider whether there
2  was any equivalent to a phone number in the data
3  structures?
4    MS. KAPPLIN:  Objection, calls for legal
5  conclusion, vague.
6  BY THE WITNESS:
7    A.   No.  I didn't see anything -- I mean,
8  no.
9  BY MR. GOETTLE:
10   Q.   When you were reviewing the code, were
11 you determining whether the steps of the algorithm
12 of Figure 7 were in the code or whether any step
13 equivalent to the steps of the algorithm in
14 Figure 7 were in the code?
15   MS. KAPPLIN:  Objection, calls for legal
16 conclusion, vague.
17 BY THE WITNESS:
18   A.   Would you please repeat?
19 BY MR. GOETTLE:
20   Q.   Sure.  My impression is -- and correct
21 me if I'm wrong -- my impression is that you
22 looked at the code to determine whether each of
23 the nine steps of Figure 7 was represented in the
24 location code.

Page 71

1    A.   Yes.
2    Q.   And you determined that some steps were
3  not in the location code?
4    A.   That's right.
5    Q.   Did you also consider whether there
6  were any equivalent steps to any of the steps in
7  Figure 7 in the code?
8    MS. KAPPLIN:  Objection, calls for legal
9  conclusion, and vague.
10 BY THE WITNESS:
11   A.   I did not find anything that I would
12 have considered equivalent, either.
13 BY MR. GOETTLE:
14   Q.   So you did search for equivalents when
15 you were reviewing the code?
16   A.   I -- I searched for everything I could
17 think of that was related to those steps, yes.
18   Q.   Did you search for IMSIs in the data
19 structures?
20   A.   "IMSIs"?
21   Q.   You're not familiar with the term
22 "IMSI"?
23   A.   No.
24   Q.   Did you --

Page 72

1    MR. GOETTLE:  That's I-M-S-I, by the way.
2  BY MR. GOETTLE:
3    Q.   Did you look in the data structure to
4  determine whether there was any international
5  mobile subscriber identity?
6    A.   I do not recall finding an identifier
7  in any of the data structures.
8    Q.   Did you look for any transaction ID --
9    MS. KAPPLIN:  Objection.
10 BY MR. GOETTLE:
11   Q.   (Continuing) -- in the data structures?
12   MS. KAPPLIN:  Objection, vague.
13 BY THE WITNESS:
14   A.   As I said, I didn't find anything that
15 was -- I don't recall finding anything that was of
16 the form of an identifier.
17 BY MR. GOETTLE:
18   Q.   When I say "transaction ID," do you
19 know what -- to what I'm referring?
20   A.   There are a wide variety of things it
21 might be, but I get the general drift.
22   Q.   In a GSM network, what's your
23 understanding of "transaction ID"?
24   A.   I have no understanding of "transaction

Page 73

1  ID" in a GSM network.
2    Q.   Do you have an understanding of an
3  internal mobile subscriber identity?
4    A.   I have a -- a vague understanding that
5  a mobile telephone has some form of identity, yes.
6    Q.   Do you have an understanding of a -- of
7  what a temporary mobile subscriber identity is?
8    A.   Well, from -- from -- from your
9  description, it's an identifier that's temporary.
10 But beyond that, no.
11   Q.   Do you have any understanding of an
12 international mobile equipment identity?
13   A.   Other than what one would intuitively
14 understand from the name, no.
15   Q.   How about an MSISDN?
16   A.   Well, I -- I know what ISDN was, but
17 no.
18   Q.   Is it possible that one of -- one of --
19 let me back up.
20        Is it possible that one of those data
21 structures in the location code included an
22 international mobile equipment identity?
23   A.   If it did, I would have noticed it, and
24 I would remember that there was some form of

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087 FAX: 312.704.4950

A80

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

1    identification with -- in the data structure.
2        Q.    So your answer is "no"?
3        A.    Yes.
4        Q.    Is it possible that other portions of
5    the code that was in escrow include data
6    structures containing phone numbers or other
7    identi- -- identifying information?
8        A.    Yes, it is.
9        Q.    And if there were in other places in
10   the code such a data structure, would that change
11   your opinion?
12       A.    I tried --
13   MS. KAPPLIN:  Objection.
14   THE WITNESS:  I'm sorry.
15   MS. KAPPLIN:  Objection, overbroad.
16   BY THE WITNESS:
17       A.    I did try to find such data structures,
18   and I was not successful.
19   BY MR. GOETTLE:
20       Q.    Do you recall whether you looked in the
21   class C:/wlg/sg/src/lib manager for a data
22   structure containing a telephone number or mobile
23   identifier?
24       A.    I don't remember.  I do remember

Page 75

1    generally looking -- looking in that area.
2    I don't remember that specific file name.  There
3    were a lot of file names.
4        Q.    I can imagine.
5              Do you recall looking in a -- in a
6    class called C:/wlg/common?
7        A.    I did look in -- in wlg/common, yes.
8        Q.    You did.  Did you look in a
9    subdirectory called "src"?
10       A.    Yes.
11       Q.    Did you look in a subdirectory of src
12   called bssMapPerformLocation request?
13       A.    I don't remember.
14       Q.    Did you look in a subdirectory
15   of src; again, that's
16   wlg/common/lib/src/bssMapPerformLocation response?
17       A.    It sounds vaguely familiar, but I don't
18   honestly remember.
19       Q.    How about a subdirectory of src called
20   UTDOA request?
21       A.    I did look there.
22       Q.    And you didn't see a data structure
23   with a phone number or other mobile identifier?
24       A.    Not that I remember.

Page 76

1        Q.    How about a subdirectory of src called
2    UTDOA response?
3        A.    I did take a look at that.
4        Q.    And no data structure there?
5        A.    I don't remember.
6        Q.    Is it possible it had a data structure
7    that included --
8        A.    It -- it's possible.  There was a lot
9    of code.
10       Q.    So there -- I guess there is the
11   possibility that the code did include a data
12   structure with a phone number or other identifier?
13       A.    I -- yes, it is possible that there is
14   a data structure someplace with a phone number.
15       Q.    Are you familiar with the term "SCOUT"?
16       A.    Yes.  SCOUT was one of the major
17   directories.
18       Q.    And you looked in the directory SCOUT?
19       A.    I searched through the directory SCOUT
20   for various things.
21             But my understanding is -- of SCOUT is
22   that it's an operation support system, an OSS, and
23   that would not -- my understanding of what OSS is,
24   is that that would not be a place that would

Page 77

1    provide interactive processing for location --
2    locating.  It's a support system, not a part of
3    the -- the system itself.
4        Q.    Is it your understanding that SCOUT is
5    an interface for forwarding locations back out to
6    the network?
7        A.    I have no understanding of SCOUT beyond
8    my understanding that it's a -- an operation
9    support system.
10       Q.    Is it possible that there's a data
11   structure in SCOUT that contains a phone number or
12   an identifier for a mobile?
13       A.    Yes.  It's possible that SCOUT would
14   have.  But as I said, SCOUT would not be the place
15   for the location algorithms because it's a support
16   system.  It's not the system itself.
17       Q.    What do you mean by "location
18   algorithms"?
19       A.    The algorithms found in the code that
20   I looked at in the -- in the location directory.
21       Q.    Do you have an understanding of how the
22   Finder System, TruePosition's Finder System, would
23   receive a request to do a location and then would
24   report a location back out to the requester?

20 (Pages 74 to 77)

A81

DEWAYNE E. PERRY, JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 78

1    MS. KAPPLIN: Objection, compound, vague.
2    BY THE WITNESS:
3        A.    I did not have any documentation on the
4    Finder System. All I had was the source files in
5    the system.
6    BY MR. GOETTLE:
7        Q.    What's your understanding of the
8    purpose of -- of the source file and the systems
9    files? The source files -- excuse me -- the
10   source files and the source code?
11       MS. KAPPLIN: Objection, vague.
12   BY THE WITNESS:
13       A.    I'm not sure I know what you mean.
14   BY MR. GOETTLE:
15       Q.    Well, you understand that that --
16   the source code and the source files are a
17   TruePosition product?
18       A.    In some sense of "product," yes.
19       Q.    Well, I don't want to be obtuse.
20   You understand that TruePosition sells
21   a product called "Finder"?
22       A.    Yes, but -- okay. What I mean by that
23   is, what you get is an executable version of the
24   system. You don't get the source files

Page 79

1    themselves.
2        Q.    Oh, I see. So your understanding is
3    that TruePosition does -- does market the exec- --
4    executable portions of the source code that you
5    reviewed in accomplishing the files?
6        A.    Yes. That was one of the basic
7    assumptions.
8        Q.    Okay. And so that -- those executable
9    files that TruePosition sells serve a purpose?
10       A.    Yes.
11       Q.    So I'm just curious. What's your
12   understanding of the purpose?
13       MS. KAPPLIN: Objection, vague and overbroad.
14   BY MR. GOETTLE:
15       Q.    Why would somebody buy that executable
16   code?
17       MS. KAPPLIN: Objection, speculation, vague,
18   and overbroad.
19   BY THE WITNESS:
20       A.    Presumably, because they want a
21   telephone location service as part of their
22   offerings.
23   BY MR. GOETTLE:
24       Q.    What -- how would you characterize a

Page 80

1    "telephone location service"?
2        MS. KAPPLIN: Objection, overbroad.
3    BY THE WITNESS:
4        A.    In -- in general terms, I guess it
5    would be the fact that somebody -- if I -- is
6    that, for instance, if there's a 911 call, you can
7    locate where that cell phone -- where the -- where
8    the call is from.
9    BY MR. GOETTLE:
10       Q.    Okay. So you would agree with me,
11   then, that somebody -- outside of the system that
12   TruePosition sells, somebody makes a request to
13   locate a phone. Do you agree with that?
14       MS. KAPPLIN: Objection, speculation, and
15   vague.
16   BY THE WITNESS:
17       A.    Possibly somebody, possibly a system.
18   I don't know.
19   BY MR. GOETTLE:
20       Q.    Okay. So a system or somebody makes
21   the request, and that goes into, somehow gets
22   accepted by TruePosition's executable code?
23       MS. KAPPLIN: Objection, overbroad, and
24   speculation.

Page 81

1    BY THE WITNESS:
2        A.    Probably, yes.
3    BY MR. GOETTLE:
4        Q.    And then, TruePosition's executable
5    code satisfies the request by determining the
6    location of the cell phone?
7        MS. KAPPLIN: Objection, speculation, vague
8    and overbroad.
9    BY THE WITNESS:
10       A.    At -- at a general level, you know,
11   I mean, independent of the fact -- I mean, that --
12   that -- yeah, I assume that's -- that's the case.
13       I mean, my -- my job here was not to
14   investigate these things, but just to look at the
15   code to find out where the location was
16   determined.
17   BY MR. GOETTLE:
18       Q.    I think that you and I are converging
19   on the same point, if you'll just bear with me.
20   Okay?
21       A.    Okay.
22       Q.    So after TruePosition's system receives
23   that request and determines the location, it sends
24   a response back out --

21 (Pages 78 to 81)

A82

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 82

1      MS. KAPPLIN:  Objection, speculation.
2  BY MR. GOETTLE:
3      Q.    (Continuing) -- that includes the
4  location, that includes the results?
5      MS. KAPPLIN:  Objection, speculation,
6  overbroad and vague.
7  BY THE WITNESS:
8      A.    As far as I understand -- or my
9  assumption would be that if it can determine the
10  location, yes, it would probably send it out.
11  BY MR. GOETTLE:
12      Q.    And I guess where I get confused is
13  that it seems that you're saying and your report
14  is saying that everything in -- everything that
15  the system needs to do to determine that location
16  that's embodied in the figures of the patent has
17  to be in what you call the location code that's in
18  escrow?
19      MS. KAPPLIN:  Objection, overbroad, and
20  misstates the report.
21  BY THE WITNESS:
22      A.    No.  I haven't said it has to be there.
23      I've -- what I said is that the code
24  that I did find there has certain characteristics

Page 83

1  about it and that the code that is there, the
2  algorithms embodied in that code or represented by
3  the code, are not the algorithm -- the algorithm
4  described in Figure 7 -- I mean 8A through 8E, for
5  instance.
6  BY MR. GOETTLE:
7      Q.    But you give specific reasons for that.
8  Oh, I'm sorry.
9      A.    Yes.
10      Q.    I interrupted you.
11      A.    Well, there -- the thing is that you --
12  we were discussing a very broad general version
13  of --
14      Q.    Right.
15      A.    -- location systems.  Okay.  There are
16  a gazillion different ways you can implement
17  those.
18      Q.    Right.
19      A:    This is one way.
20      Q.    Right.
21      A.    Okay?  So my job was to look at the
22  code, and is the code doing it this way, the way
23  that's represented in the figures in the patent.
24      Q.    But couldn't it be that some steps that

Page 84

1  are in the patent are being performed in portions
2  of the code that are not the location code?
3      A.    Yes.  Some of them could be.
4      Q.    And based on your word searches, you've
5  determined that that's not the case?
6      A.    Based on --
7      MS. KAPPLIN:  Objection.
8      THE WITNESS:  Sorry.
9      MS. KAPPLIN:  Objection, misstates the
10  testimony.
11  BY THE WITNESS:
12      A.    Based on what I did, I was not able to
13  find them.
14      MR. GOETTLE:  Shira, would it -- would it be
15  okay with you to take a lunch break now, with the
16  idea that we will come back from lunch, and I'll
17  probably have a few more questions, and then we'll
18  wrap up --
19      MS. KAPPLIN:  Sure.
20      MR. GOETTLE:  -- shortly after that?
21      MS. KAPPLIN:  Do you want to take a whole
22  lunch break, or do you want to take maybe a
23  shorter break, and then we'll --
24      MR. GOETTLE:  Maybe just a half hour.  Even

Page 85

1  if you just wanted to take a half hour, would that
2  be fine?
3      THE WITNESS:  That's fine.
4      MS. KAPPLIN:  That will be fine.
5      MR. GOETTLE:  That's all right with you, sir?
6      THE WITNESS:  Sure.  I'm amenable.  I'm also
7  thirsty right now, so it's a good time.
8      THE VIDEOGRAPHER:  All right.  We are going
9  off the video record at 11:15 a.m.
10      (WHEREUPON, at 11:15 a.m., the
11      videotaped deposition of
12      DEWAYNE E. PERRY was recessed
13      until 11:45 a.m., this date,
14      January 22, 2007.)
15
16
17
18
19
20
21
22
23
24

22 (Pages 82 to 85)

A83

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF DELAWARE
3
4    TRUEPOSITION, INC.,           )
5         Plaintiff,          ) C.A. No.
6    -vs-                     ) 04-0757-SLR
7    ANDREW CORPORATION,            )
8         Defendant.          )
9
10
11    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12
13
14           January 22, 2007
15           11:57 a.m.
16
17
18        The videotaped deposition of
19   DEWAYNE E. PERRY, resumed pursuant to recess, at
20   5900 Aon Center, 200 East Randolph Drive, Chicago,
21   Illinois.
22
23
24

Page 87

1    PRESENT:
2        WOODCOCK WASHBURN LLP,
3        (Cira Centre, 12th Floor,
4        2929 Arch Street,
5        Philadelphia, Pennsylvania 19104-2891,
6        215-568-3100), by:
7        MR. DANIEL J. GOETTLE,
8           appeared on behalf of the Plaintiff;
9
10       KIRKLAND & ELLIS LLP,
11       (Aon Center, 200 East Randolph Drive,
12       Chicago, Illinois 60601,
13       312-861-2000), by:
14       MS. SHIRA J. KAPPLIN and
15       MS. REGAN A. SMITH,
16          appeared on behalf of the Defendant.
17
18
19   VIDEOTAPED BY:  JOE M. ELSEY,
20       Esquire Deposition Services.
21   REPORTED BY:   ROSANNE M. NUZZO, CRR, RPR,
22          CSR License No. 84-1388.
23
24

Page 88

1        THE VIDEOGRAPHER:  And we are back on the
2    video record at 11:57 a.m.
3            DEWAYNE E. PERRY,
4    called as a witness herein, having been previously
5    duly sworn and having testified, was examined and
6    testified further as follows:
7        EXAMINATION (Resumed)
8    BY MR. GOETTLE:
9        Q.   Dr. Perry, we talked earlier today
10   about the claims of the patent and whether you had
11   reviewed the claims in conjunction with the
12   figures.  And it's my understanding that -- and
13   correct me if I'm wrong -- that if -- that the
14   algorithms that you reviewed were claimed?
15       A.   In -- in a broad sense, yes.
16       Q.   But you didn't do a match-up of the
17   claims to the algorithms?
18       A.   No.
19       Q.   And by "algorithms," I mean Figure 7 or
20   Figures 8A through 8D.
21       A.   Well, technically, 8E.
22       Q.   Yeah.
23       A.   Yes.
24       Q.   You didn't do it?

Page 89

1        A.   I didn't, right.  Sorry.
2        Q.   Did you review TruePosition's claim
3    constructions?
4        A.   No, I have not seen those.
5        Q.   And did you review Andrew's claim
6    constructions?
7        A.   No.
8        Q.   And I guess our conversation has been a
9    little bit centered around means plus function
10   claims.  But Claim 31, which is one of the
11   asserted claims I mentioned earlier today, is a
12   method claim.  It's not a means plus function
13   claim.
14           Did you review Claim 31 in
15   determining -- and determine that TruePosition's
16   source code did not practice the steps of
17   Claim 31?
18       A.   I -- I did not look at any of the
19   claims with -- with, in mind, comparing the codes
20   against the claims.
21       Q.   Okay.  If TruePosition employees told
22   you that they are practicing the algorithms of
23   Figures 7 and 8A through 8E, would that change
24   your opinion?

23 (Pages 86 to 89)

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1    A.  No.
2    Q.  Why not?
3    A.  Because the algorithms that I found
4  represented in the code are, as I stated in my
5  report, both different; i.e., there are things
6  that are missing as well as things that are
7  present that aren't in this -- in the description
8  here (indicating).
9        And -- and the parts that are present
10  in the code that aren't here are more complex than
11  the algorithms defined here.
12    Q.  So is it -- is it fair to say that the
13  best way to know whether TruePositioning --
14  TruePosition is practicing the algorithms of
15  Figures 7 or 8A through 8E is by looking at the
16  source code?
17    MS. KAPPLIN:  Objection, asked and answered.
18  BY THE WITNESS:
19    A.  As I said earlier, that -- that is
20  certainly the most concrete way.  There may be
21  other ways, but -- but that certainly is where --
22  that -- that -- as it were, that's where the
23  rubber meets the road, and so that's where --
24  now -- yes.

Page 91

1  BY MR. GOETTLE:
2    Q.  So is looking at the code the most
3  accurate way of determining whether True --
4        (WHEREUPON, there was a short
5        interruption.)
6    MS. KAPPLIN:  Let's go off the record.
7    THE VIDEOGRAPHER:  Okay.  We are going off
8  the record at 12:01 p.m.
9        (WHEREUPON, discussion was had off
10        the record.)
11    THE VIDEOGRAPHER:  Going back on the video
12  record at 12:01 p.m.
13  BY MR. GOETTLE:
14    Q.  Dr. Perry, would you agree that looking
15  at the source code is the most accurate way of
16  determining whether TruePosition is practicing the
17  algorithms of claims -- or --
18    MS. KAPPLIN:  Object --
19  BY MR. GOETTLE:
20    Q.  (Continuing) -- Figures 7 and 8A
21  through 8E?
22    MS. KAPPLIN:  Objection, vague.
23  BY THE WITNESS:
24    A.  It is -- it is certainly one of the

Page 92

1  most accurate.
2  BY MR. GOETTLE:
3    Q.  What's another way that's accurate?
4    A.  Executing the code and monitoring it.
5    Q.  Any other ways that are as -- as
6  accurate?
7    A.  I would say those two are the most
8  concrete, that that's where reality is.
9    Q.  By "concrete," do you mean -- I'm
10  trying to figure out what that means.  You mean
11  accurate --
12    A.  Well, okay.
13    Q.  -- reliable?
14    A.  Let me -- let me give you an example.
15  David Korn wrote a system called the KornShell.
16  In fact, some of the -- some of the code in the
17  system is, in fact, KornShell code.
18        I had a -- an algorithm that
19  reconstructed the architecture of the system from
20  his code, took it to him, and said, "Is this an
21  accurate representation of your system?"  And he
22  said, "No.  This part over here is wrong."  Okay?
23        So we went back and looked at the code.
24  No.  We were right, he was wrong.  This is the

Page 93

1  author of the code himself.  And so there are
2  times when even the author of a piece of code has
3  misrecollections, misremembering, forgetting
4  things, and so forth.  So -- so that's even
5  talking to the person who coded it yesterday, it
6  may be that they have not -- just forgotten
7  something.
8        So code is where the -- you know, at
9  least a static representation of the system.
10  Executing is what it does when it ex- -- you know,
11  dynamically.
12        And those would be your two primary
13  concrete sources.
14    Q.  And those two sources are more reliable
15  than talking to individuals involved in the code?
16    A.  Yes --
17    MS. KAPPLIN:  Objection --
18  BY THE WITNESS:
19    A.  (Continuing) -- for the -- for the
20  reason that I --
21    THE COURT REPORTER:  Was there an objection?
22  BY THE WITNESS:
23    A.  For the example -- yes.  Sorry.
24    MS. KAPPLIN:  Objection, vague.

24 (Pages 90 to 93)

**A85**

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1    THE WITNESS:  Right.
2      MS. KAPPLIN:  Thanks.
3    BY THE WITNESS:
4      A.    (Continuing) -- for -- for the example
5    that I just gave, where even the author didn't
6    agree with the code.
7    BY MR. GOETTLE:
8      Q.    In the six cases that you have been
9    involved with, the three that are in your report
10    and the three others that are not in your report,
11    have you ever had to rely on an individual
12    involved and their explanations in forming your
13    opinion?
14      MS. KAPPLIN:  Objection, vague, overbroad.
15    BY THE WITNESS:
16      A.    No.
17    BY MR. GOETTLE:
18      Q.    And you've always relied on what in
19    those cases --
20      MS. KAPPLIN:  Objection.
21    BY MR. GOETTLE:
22      Q.    (Continuing) -- in forming your
23    opinion?
24      MS. KAPPLIN:  Objection, vague and overbroad.

Page 95

1    BY THE WITNESS:
2      A.    I've relied in some cases on source
3    code; in other cases, on documents, various kinds
4    of documents associated with -- with the
5    litigation.
6    BY MR. GOETTLE:
7      Q.    Are you aware that TruePosition made
8    requests for documents of you in this case?
9      A.    I think there was something about
10    requesting all my papers.  There -- most of them
11    were available on the Web.
12      Q.    Did you --
13      A.    That's the only thing I know about.
14      Q.    Did you -- did you provide any
15    documents to Andrew or to Kirkland & Ellis
16    attorneys in response to the requests?
17      A.    No.  There -- no request was made of
18    me.
19      Q.    Kirkland & Ellis attorneys never
20    relayed a request from TruePosition for documents
21    from you?
22      A.    No.
23      Q.    Did you give any documents to
24    Kirkland & Ellis attorneys to give to

Page 96

1    TruePosition?
2      A.    The -- my report (indicating).
3      Q.    Anything besides your report?
4      A.    Well, the attachment.
5      Q.    The attachment.  Nothing besides the
6    attachment?
7      A.    Nothing -- nothing besides that.
8      MR. GOETTLE:  Okay.  I have no further
9    questions.
10      MS. KAPPLIN:  I have no questions for the
11    witness.
12      THE VIDEOGRAPHER:  Okay.  Going off the video
13    record at 12:06 p.m.
14
15      FURTHER DEPONENT SAITH NAUGHT.
16
17      (Time noted:  12:06 p.m.)
18
19
20
21
22
23
24

Page 97

1      UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3
4    TRUEPOSITION, INC.,          )
5        Plaintiff,      ) C.A. No.
6      -vs-            ) 04-0757-SLR
7    ANDREW CORPORATION,          )
8        Defendant.      )
9
10      I hereby certify that I have read the
11    foregoing transcript of my deposition given at the
12    time and place aforesaid, consisting of Pages 1 to
13    96, inclusive, and I do again subscribe and make
14    oath that the same is a true, correct and complete
15    transcript of my deposition so given as aforesaid,
16    and includes changes, if any, so made by me.
17
18        DEWAYNE E. PERRY
19    SUBSCRIBED AND SWORN TO
20    before me this      day
21    of    , A.D. 200 .
22
23    Notary Public
24

25 (Pages 94 to 97)

DEWAYNE E. PERRY,  JANUARY 22, 2007
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 98

1   STATE OF ILLINOIS )
2               ) SS:
3   COUNTY OF W I L L )
4          I, ROSANNE M. NUZZO, a Notary Public
5   within and for the County of Will, State of
6   Illinois, and a Certified Shorthand Reporter,
7   CSR No. 84-1388, of said state, do hereby certify:
8          That previous to the commencement of
9   the examination of the witness, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12         That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction, and constitutes a true record
16  of the testimony given and the proceedings had;
17         That the said deposition was taken
18  before me at the time and place specified;
19         That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24         IN WITNESS WHEREOF, I do hereunto set

Page 99

1   my hand and affix my seal of office at Chicago,
2   Illinois, this 23rd day of January, 2007.
3
4
5          Notary Public, Will County, Illinois.
6          My commission expires May 16, 2009.
7
8
9   C.S.R. Certificate No. 84-1388.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 100

1              I N D E X
2
3   WITNESS:                    PAGE:
4   DEWAYNE E. PERRY
5      BY MR. GOETTLE.....................   4
6
7
8
9
10
11
12
13          E X H I B I T S
14  EXHIBIT NUMBER           MARKED FOR ID
15  PLAINTIFF'S DEPOSITION EXHIBITS
16  No. 493...............................   6
17  No. 494...............................  10
18  No. 495...............................  38
19
20
21
22
23
24

26 (Pages 98 to 100)

## **CERTIFICATE OF SERVICE**

I, James D. Heisman, hereby certify that on this 17th day of May 2007, I caused a true and correct copy of the foregoing **Appendix A1-87 to Motion to Exclude the Testimony of Dr. Dewayne E. Perry Pursuant to Federal Rules of Evidence 702** to be served upon the following individuals via CM/ECF and in the manner indicated below:

*Via e-mail and hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail only*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail only*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

_*/s/ James D. Heisman*_
James D. Heisman (# 2746)