# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TruePosition, Inc.,    )
    )
    **Plaintiff/**    )
    **Counterclaim-Defendant,**    )
    )    **Civil Action No. 05-747-SLR**
    **v.**    )
    )
Andrew Corporation,    )
    )
    **Defendant/**    )
    **Counterclaim-Plaintiff.**    )
_____)

## APPENDIX B TO TRUEPOSITION'S CONDITIONAL OPPOSITION TO ANDREW CORPORATION'S DAUBERT MOTION FOR A RULING LIMITING THE TESTIMONY OF DR. BRIAN AGEE

CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman, Esq.
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Amanda M. Kessel, Esq. (pro hac vice)
Cira Centre, 12th Floor, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

# TABLE OF CONTENTS

## APPENDIX B TO TRUEPOSITION'S CONDITIONAL OPPOSITION TO ANDREW CORPORATION'S DAUBERT MOTION FOR A RULING LIMITING THE TESTIMONY OF DR. BRIAN AGEE

| | |
|---|---|
| TruePosition's First Set of Interrogatories to Andrew | B1-B12 |
| Andrew's Responses to TruePosition's First Set of Interrogatories | B13-B16 |
| Andrew's Supplemental Responses to TruePosition's First Set of Interrogatories | B17-B22 |
| 9/25/06 Transcript of Discovery Conference | B23-B30 |
| Andrew's Supplemental Responses to TruePosition's Interrogatories Nos. 3 and 7 | B31-B41 |
| Expert report of Dr. David Goodman | B42-B60 |
| Expert report of Dr. Brian Agee | B61-B100 |
| Email to Amanda Kessel from Rachel Pernic Waldron regarding Agee motion | B101-102 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TruePosition Inc. | ) | |
| | ) | |
| Plaintiff/, | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No.  05-00747-SLR |
| | ) | |
| Andrew Corporation, | ) | |
| | ) | |
| Defendant/. | ) | |
| Counterclaim-Plaintiff. | ) | |
| | ) | |

## TRUEPOSITION'S FIRST SET OF
## INTERROGATORIES TO ANDREW CORPORATION (NOS. 1-15)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff TruePosition, Inc.

("TruePosition") requests that Defendant Andrew Corporation ("Andrew"), answer under oath

the following interrogatories within thirty (30) days of the service date hereof.

**B1**

## DEFINITIONS

1.    "Andrew" means defendant Andrew Corporation and shall include each of its predecessors, successors, subsidiaries, divisions, departments, assigns, parent corporations, foreign and domestic affiliates, organizational operating units, and each other person directly or indirectly, wholly or in part, owned or controlled by it, and all present or former partners, principals, employees, officers, directors, agents, legal representatives, consultants or other persons acting for or on its behalf, and each of their respective predecessors, successors, subsidiaries, divisions, departments, assigns, parent corporations, foreign and domestic affiliates, organizational operating units, and each other person directly or indirectly, wholly in part, owned or controlled by the respective entity, and all present or former partners, principals, employees, officers, directors, agents, legal representatives, consultants or other persons acting for or on behalf of the respective entity.

2.    "TruePosition" means the plaintiff TruePosition Inc.

3.    The "144 Patent" means U.S. Patent 5,327,144.

4.    The term "all" shall be construed to include the term "each," and "each" shall be construed to include the term "all."

5.    The singular form of any word appearing herein includes the plural, and the plural form of any word appearing herein includes the singular, except as otherwise expressly stated herein.

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

**B2**

7.    "Cellular Telephone Location System" means any system for determining the location of a mobile telephone or unit, or mobile telephones or units, including but not limited to the "system for determining the location of a mobile phone" referenced at paragraph 21 of the "Counterclaims" section of the "Answer and Counterclaims of Defendant Andrew Corporation," served December 15, 2005 (hereafter "Andrew's Answer").

8.    "STC" refers to Saudi Telecom Company, the "wireless communications service provider located in Saudi Arabia" referenced at paragraph 15 of Andrew's Answer.

9.    "Business entity" means any partnership, corporation, proprietorship, association, subsidiary, division, joint venture, company, or other business or legal entity, including governmental bodies and agencies or any other business organization, whether formal or informal.

10.    "Person" means any individual.

11.    "ETSI" means the "European Telecommunications Standards Institute" referenced at paragraph 14 of the "Counterclaims" section of Andrew's Answer.

12.    "ETSI's IPR Policy" means the ETSI IPR Policy in effect at the time of the alleged "misrepresentation of material fact" referenced at paragraph 24 of the Counterclaims section of Andrew's Answer.

13.    "Essential IPR" has the meaning ascribed to it by Andrew in paragraphs 15, 23, 24, 26 and 28 of the Counterclaims section of Andrew's Answer.

14.    The term "state the factual basis" for an allegation, contention or belief, means to describe every fact, action, statistic, inference, supposition, estimate, consideration, conclusion, study and analysis which Andrew believes to be evidence of the truth or accuracy of the allegation, contention or belief, to identify each document that Andrew believes to support the

- 3 -

**B3**

allegation, contention or belief, and to identify each person having knowledge regarding such allegation, contention or belief.

15.    "Wireless Provider" means any Person or Business Entity that provides wireless communications services, including STC.

## INSTRUCTIONS

If attorney-client privilege, or work product protection under Fed. R. Civ. P. Rule 26, is claimed with respect to a document or oral communication for which information or identification is sought herein, a separate list of all such documents or oral communications shall be served with the answers hereto.  Such separate list shall identify each document or oral communication by author, recipient, and recipients of copies (including such persons' titles and whether or not they are attorneys), the date of such document or oral communication, and a brief summary of the subject matter of the document or oral communication.

Whenever an interrogatory requests the identity of an individual or Person, state, to the extent known, his or her full name; present or last known home address; present or last known business address; present or last known title or occupation; present or last known employer; and if employed by Andrew at any time, the period of time so employed, and the areas of responsibility during such times.

Whenever an interrogatory requests the identity of a company, corporation, or other Business Entity, state, to the extent known: the full name; the address of the principal business; the state of incorporation; the location of divisions, branches or offices which are connected with or handled the matters referred to in the interrogatory; and the identity of the person acting or purporting to act on behalf of the business entity in connection with the matters referred to in the interrogatory.

- 4 -

**B4**

These interrogatories shall be deemed continuing and Andrew shall be obligated to change, supplement and amend its answer thereto as prescribed in F.R.C.P. Rule 26(e) and the Court's Scheduling Order, once entered.

## INTERROGATORIES

### Interrogatory No. 1

Identify by name, trade designation, and/or model number, each line, type, or version of Cellular Telephone Location System, or component thereof, made, used, sold, or offered for sale in or from the United States, or imported into the United States, by Andrew since January 1, 2004, and identify, separately, the Person most knowledgeable at Andrew with respect to such manufacture, use, sale, offer for sale, and/or importation of each identified Cellular Telephone Location System or component, and the Person most knowledgeable at Andrew with respect to the U-TDOA functionality of each identified Cellular Telephone Location System or component.

### Response:

### Interrogatory No. 2

For each Cellular Telephone Location System or component identified in response to Interrogatory No. 1, state the location, including the Person or Entity owning or having control over such location, where each identified Cellular Telephone Location System or component is now, where each identified Cellular Telephone Location System or component has been since January 1, 2004, and the period of time, specified by starting and ending dates, that each identified Cellular Telephone Location System or component has been in each identified location.

### Response:

### Interrogatory No. 3

State the factual basis for the allegation in paragraph 8 of the Counterclaims section of Andrew's Answer that "Andrew has not infringed the 144 Patent, and Andrew's supply of services and/or equipment has not infringed and will not infringe the 144 Patent."

### Response:

**B6**

**Interrogatory No. 4**

     Describe in detail the circumstances under which Andrew first became aware of the 144 Patent, including the exact date of Andrew's first awareness, the Person(s) at Andrew who became aware of the 144 Patent, the manner in which that Person(s) became aware of the 144 Patent, and what that Person(s) did, if anything, upon becoming aware of the 144 Patent, including the name(s) of any other Person(s) told about the 144 Patent and the date(s) such other Person(s) was told about the 144 Patent.

**Response:**

**Interrogatory No. 5**

     State the factual basis for denying, in paragraph 24 of Andrew's Answer, that Andrew has willfully and deliberately infringed the 144 Patent.

**Response:**

**Interrogatory No. 6**

     State whether Andrew received any legal advice, written or oral, relating to the 144 Patent, the date(s) the advice was received, the author(s) of the advice, the recipient(s) of the advice, any Person(s) at Andrew other than the recipient(s) told of or who received a copy of the advice, the date(s) when Person(s) at Andrew other than the recipient(s) were told or received a copy of the advice, whether Andrew relied on such advice to engage in, or refrain from engaging in, any business activity(ies), including whether Andrew relied on the advice in bidding on the RFP issued by STC referred to in Andrew's Answer, the business activity(ies) that Andrew engaged in, or refrained from engaging in, in reliance on the advice, and the substance of all the advice received.

**Response:**

**B7**

**Interrogatory No. 7**

State the factual basis for the allegations in the First Affirmative Defense and paragraph 9 in the Counterclaims section of Andrew's Answer that the "144 Patent and each of its claims are invalid and/or unenforceable under one or more sections of Title 35 of the United States Code, including §§ 101, 102, 103, and/or 112," including the identity of each section of Title 35 of the United States Code under which the 144 Patent and each of its claims are allegedly invalid and/or unenforceable, which claims of the 144 Patent are allegedly invalid and/or unenforceable under each section of Title 35 identified, the prior art, if any, that allegedly renders each claim of the 144 Patent invalid and/or unenforceable under each section of Title 35 identified, and how such prior art allegedly renders each claim of the 144 Patent invalid and/or unenforceable under each section of Title 35 identified.

**Response:**

**Interrogatory No. 8**

State the factual basis for the allegation in the Third Affirmative Defense of Andrew's Answer that "TruePosition is barred from maintaining its claims for infringement by the defense of equitable estoppel."

**Response:**

**Interrogatory No. 9**

Sate the factual basis for the allegation in the Fourth Affirmative Defense of Andrew's Answer that "TruePosition is not entitled to any relief by reason of its coming into this Court with unclean hands."

**Response:**

**B8**

**Interrogatory No. 10**

Describe in detail the circumstances under which "Andrew with others" jointly "submitted proposals to 3GPP requesting the adoption of a standard for locating mobile phones which used Uplink Time Difference of Arrival ('U-TDOA')" as alleged in paragraph 18 of the Counterclaims section of Andrew's Answer, including the title and/or identifier of each alleged proposal jointly submitted to 3GPP, the exact date(s) each alleged proposal was jointly submitted to 3GPP, the exact group(s), subgroup(s), and/or committee(s) within 3GPP that each alleged proposal was jointly submitted to, the Person(s) who were involved with submitting each of the alleged proposals on Andrew's behalf, the Person(s) who were involved in negotiating and/or preparing each of the alleged proposals on Andrew's behalf, the Business Entity(ies) and Person(s), whether or not associated with Andrew, that actually drafted or prepared any portion of each alleged proposal, and the exact date that 3GPP allegedly "adopted" each of the alleged proposals as alleged in paragraph 20 of the Counterclaims section of Andrew's Answer.

**Response:**

**Interrogatory No. 11**

If Andrew's response to either Request No. 47 or Request No. 48 of True Position's First Set of Requests for Admission to Andrew Corporation (Nos. 1-58) is anything other than an unqualified admission, then state whether Andrew contends that the 144 Patent is Essential IPR, under ETSI's IPR Policy, with respect to the "UTDOA standards" referenced in paragraph 21 of the Counterclaims section of Andrew's Answer, and if so, the factual basis for such contention, including the identification, by date or otherwise, of the relevant ETSI IPR Policy, the production numbers of any copy(ies) of ETSI's IPR Policy(ies) produced by Andrew, the specific section(s) of ETSI's IPR Policy that allegedly render the 144 Patent, or the technology claimed by the 144 Patent, Essential IPR, why any identified section(s) of ETSI's IPR Policy(ies) allegedly renders the 144 Patent, or the technology claimed by the 144 Patent, Essential IPR, whether Andrew performed any analyses or studies of whether the 144 Patent, or the technology claimed in the 144 Patent, was Essential IPR under any ETSI IPR Policy prior to the filing of the Complaint in this action, and the production numbers for any such analyses or studies.

**Response:**

**Interrogatory No. 12**

State the factual basis for the allegation in paragraph 25 of the Counterclaims section of Andrew's answer that "at the time that Andrew and TruePosition jointly proposed the U-TDOA standards to 3GPP, TruePosition knew or should have known that it was misrepresenting a material fact."

**Response:**

**Interrogatory No. 13**

State the factual basis for the allegation in paragraph 27 of the Counterclaims section of Andrew's answer that "Andrew justifiably relied on TruePosition's misrepresentation of material fact in jointly submitting the U-TDOA standards, in urging their adoption by the members of ETSI, and in bidding to supply services and/or equipment implementing those standards."

**Response:**

**Interrogatory No. 14**

State the factual basis for the allegation in paragraph 29 of the Counterclaims section of Andrew's answer that "as a result of TruePosition's fraud, Andrew has suffered damages" and provide a detailed a description of such alleged "damages," including whether Andrew is claiming that the attorneys fees, costs, and/or expenses associated with this case comprise all or any part of its alleged damages.

**Response:**

**B10**

**Interrogatory No. 15**

Explain in detail why Andrew decided to participate in the efforts to include Uplink Time Difference of Arrival (U-TDOA) as a means or method of locating mobile telephones or units in 3GPP and/or ETSI technical specifications or other deliverables, including whether Andrew's relationship with any Wireless Provider, including but not limited to AT&T Wireless and Cingular Wireless, and/or any other customer of Andrew, foreign or domestic, influenced or played any role in the decision to initially participate in such efforts, or to continue participating in such efforts, how any such relationship, individually, influenced or played a role in the decisions to initially participate or continue participating in such efforts, and state the substance of any communications between Andrew and such Wireless Provider and/or customer relating to the issue of whether Andrew should initially participate or continue participating in the efforts to include U-TDOA as a means or method of locating mobile telephones or units in 3GPP and/or ETSI technical specifications or other deliverables, including the date(s) on which such communications occurred and the Persons involved in such communications.

**Response:**

Dated: February 6, 2006

**CONNOLLY BOVE LODGE & HUTZ LLP**
Rudolf E. Hutz, Esq. (#484)
James D. Heisman, Esq. (#2746)
Scott G. Wilcox, Esq. (#3882)
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

**WOODCOCK WASHBURN LLP**
Paul B. Milcetic, Esq.
Gary H. Levin, Esq.
David L. Marcus, Esq.
One Liberty Place - 46th Floor
17th and Market Streets
Philadelphia, PA 19103
(215) 568-3100
*Attorneys for Plaintiff, TruePosition Inc.*

- 11 -

**B11**

## CERTIFICATE OF SERVICE

I, Scott G. Wilcox, hereby certify that on this 6th day of February, 2006, I served the foregoing **TruePosition's First Set of Interrogatories to Andrew Corporation (Nos. 1-15)** as indicated below:

*Via Hand-Delivery*
Matt Neiderman, Esquire
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801

*Via Electronic Mail*
Patrick D. McPherson, Esquire
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

John Kiernan, Esquire
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
JSkiernan@debevoise.com

Carl Riehl, Esquire
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022
CRiehl@debevoise.com

Scott G. Wilcox (#3882)

**B12**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TruePosition Inc.     ) | |
|     ) | |
|   **Plaintiff/**     ) | |
|   **Counterclaim-Defendant,**     ) | |
|     ) | |
|     **v.**     ) | Civil Action No. 05-00747-SLR |
|     ) | |
| **Andrew Corporation,**     ) | |
|     ) | |
|   **Defendant/**     ) | |
|   **Counterclaim-Plaintiff.**     ) | |

## ANDREW CORPORATION'S RESPONSES TO TRUEPOSITION'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Andrew Corporation ("Andrew") responds and objects to Plaintiff TruePosition Inc.'s ("TruePosition") First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

1.    Andrew objects to TruePosition's Interrogatories to the extent that they seek information protected from discovery by the attorney-client privilege, attorney work product doctrine, the joint defense privilege or any other applicable privilege or doctrine. Any disclosure of such protected or privileged information is inadvertent and not intended to waive those privileges or protections.

2.    Andrew objects to TruePosition's Interrogatories as overbroad to the extent they seek classified information that United States statutory law prohibits Andrew from producing or identifying or as to which the United States would be entitled to assert the state secrets privilege. Andrew will neither provide nor identify any such information.

**B13**

3.    Andrew objects to the definition of "Andrew" on the grounds that it is overbroad and unduly burdensome to the extent that, in combination with specific Interrogatories using the term, it purports to require Andrew to provide information that is not known by Andrew.

4.    Andrew further objects to the definition of "Andrew" to the extent that it includes persons or entities other than Andrew Corporation and agents acting on its behalf on the grounds that such definition renders the Interrogatories overbroad and unduly burdensome. For purposes of responding to these Interrogatories, Andrew will interpret "Andrew" to mean Andrew Corporation and agents acting on its behalf.

5.    Andrew objects to the definition of "Business Entity" on the grounds that it is circular, vague, and ambiguous. For purposes of responding to these Interrogatories, Andrew will interpret "Business Entity" to mean any partnership, corporation, proprietorship, association, subsidiary, division, joint venture, or company, including governmental bodies and agencies and any other business organizations, whether formal or informal.

6.    Andrew objects to TruePosition's instructions to the extent that they purport to impose obligations in excess of those imposed by Fed. R. Civ. P. 33.

7.    The subject matter of these Interrogatories is under continuing investigation. Andrew will respond to the Interrogatories based on its current knowledge and investigation, but reserves the rights to supplement these responses if additional non-privileged, responsive information is identified at a later time and to make any additional objections that may become apparent.

## RESPONSES TO INTERROGATORIES

Andrew expressly incorporates the above General Objections as though set forth fully in response to each of the following individual Interrogatories, and, to the extent that they are not raised in any particular response, Andrew does not waive those objections.

**Response:**

Subject to and without waiving the foregoing general objections, Andrew states that the

factual basis for Andrew's denial in paragraph 24 of its Answer is that Andrew has not made,

used, sold or offered for sale in the United States or imported into the United States any product

or method that practices every element of any claim of the 144 Patent.

**Interrogatory No. 6**

State whether Andrew received any legal advice, written or oral, relating to the 144
Patent, the date(s) the advice was received, the author(s) of the advice, the recipient(s) of the
advice, any Person(s) at Andrew other than the recipient(s) told of or who received a copy of the
advice, the date(s) when Person(s) at Andrew other than the recipient(s) were told or received a
copy of the advice, whether Andrew relied on such advice to engage in, or refrain from engaging
in, any business activity(ies), including whether Andrew relied on the advice in bidding on the
RFP issued by STC referred to in Andrew's Answer, the business activity(ies) that Andrew
engaged in, or refrained from engaging in, in reliance on the advice, and the substance of all the
advice received.

**Response:**

Subject to and without waiving the foregoing general objections, Andrew states that,

except for advice from in-house attorneys, litigation counsel and its regular outside patent

counsel, it has not received any legal advice relating to the 144 Patent.

**Interrogatory No. 7**

State the factual basis for the allegations in the First Affirmative Defense and paragraph 9
in the Counterclaims section of Andrew's Answer that the "144 Patent and each of its claims are
invalid and/or unenforceable under one or more sections of Title 35 of the United States Code,
including §§ 101, 102, 103, and/or 112," including the identity of each section of Title 35 of the
United States Code under which the 144 Patent and each of its claims are allegedly invalid
and/or unenforceable, which claims of the 144 Patent are allegedly invalid and/or unenforceable
under each section of Title 35 identified, the prior art, if any, that allegedly renders each claim of
the 144 Patent invalid and/or unenforceable under each section of Title 35 identified, and how
such prior art allegedly renders each claim of the 144 Patent invalid and/or unenforceable under
each section of Title 35 identified.

**Response:**

Subject to and without waiving the foregoing general objections, Andrew states that: (i) each claim of the 144 Patent is invalid either as anticipated under 35 U.S.C. § 102 or as obvious under 35 U.S.C. § 103 in light of prior art that will be included in the documents Andrew produces in response to TruePosition's document requests; and (ii) each claim of the 144 Patent is invalid under 35 U.S.C. § 112 due to lack of enabling disclosure.

Andrew is still in the process of conducting its inquiry into the facts and circumstances at issue in the present litigation and reserves the right to continue to supplement its response to this Interrogatory as the litigation progresses.

**Interrogatory No. 8**

State the factual basis for the allegation in the Third Affirmative Defense of Andrew's Answer that "TruePosition is barred from maintaining its claims for infringement by the defense of equitable estoppel."

**Response:**

Subject to and without waiving the foregoing general objections, Andrew states that the factual basis for this allegation is set out in paragraphs 10 through 32 of the Counterclaims section of Andrew's Answer.

Andrew is still in the process of conducting its inquiry into the facts and circumstances at issue in the present litigation and reserves the right to continue to supplement its response to this Interrogatory as the litigation progresses.

**Interrogatory No. 9**

Sate the factual basis for the allegation in the Fourth Affirmative Defense of Andrew's Answer that "TruePosition is not entitled to any relief by reason of its coming into this Court with unclean hands."

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRUEPOSITION INC.,                      )
                                        )
    PLAINTIFF/                      )
    COUNTERCLAIM- DEFENDANT,        )
                                        )
                                        )
v.                                      )     CIVIL ACTION NO. 05-00747-SLR
                                        )
ANDREW CORPORATION,                     )
                                        )
    DEFENDANT/                      )
    COUNTERCLAIM-PLAINTIFF.         )

## ANDREW CORPORATION'S SUPPLEMENTAL RESPONSES TO TRUEPOSITION'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26(e) and 33 of the Federal Rules of Civil Procedure, Andrew Corporation hereby supplements its responses to TruePosition's First Set of Interrogatories. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Andrew expressly reserves the right to supplement these responses further.

### Interrogatory No. 1

Identify by name, trade designation. and/or model number. each line, type, or version of Cellular Telephone Location System, or component thereof, made, used. sold, or offered for sale in or from the United States, or imported into the United States, by Andrew since January 1, 2004, and identify, separately, the Person most knowledgeable at Andrew with respect to such manufacture, use, sale, offer for sale, and/or importation of each identified Cellular Telephone Location System or component, and the Person most knowledgeable at Andrew with respect to the U-TDOA functionality of each identified Cellular Telephone Location System or component.

regardless of how TruePosition tries to interpret the '144 Patent claims, as also explained in Andrew's response to Interrogatory No. 3.

Andrew reserves the right to supplement and/or amend its response to this interrogatory once additional facts are known and as the litigation progresses.

### Interrogatory No. 6

State whether Andrew received any legal advice, written or oral, relating to the '144 Patent, the date(s) the advice was received, the author(s) of the advice, the recipient(s) of the advice, any Person(s) at Andrew other than the recipient(s) told of or who received a copy of the advice, the date(s) when Person(s) at Andrew other than the recipient(s) were told or received a copy of the advice, whether Andrew relied on such advice to engage in, or refrain from engaging in, any business activity(ies), including whether Andrew relied on the advice in bidding on the RFP issued by STC referred to in Andrew's Answer, the business activity(ies) that Andrew engaged in, or refrained from engaging in, in reliance on the advice, and the substance of all the advice received.

### Response:

Subject to and without waiving its General Objections, Andrew states that, except for advice from in-house attorneys, litigation counsel and its regular outside patent counsel, it has not received any legal advice relating to the '144 Patent. Andrew further states the Scheduling Order sets a date of September 8, 2006 for Andrew to disclose whether it intends to rely on an opinion of counsel defense and produce documents pertaining to that defense.

### Interrogatory No. 7

State the factual basis for the allegations in the First Affirmative Defense and paragraph 9 in the Counterclaims section of Andrew's Answer that the '144 Patent and each of its claims are invalid and/or unenforceable under one or more sections of Title 35 of the United States Code, including §§ 101, 102, 103, and/or 112," including the identity of each section of Title 35 of the United States Code under which the '144 Patent and each of its claims are allegedly invalid and/or unenforceable, which claims of the '144 Patent are allegedly invalid and/or unenforceable under each section of Title 35 identified, the prior art, if any, that allegedly renders each claim of the '144 Patent invalid and/or unenforceable under each section of Title 35 identified, and how such prior art allegedly renders each claim of the '144 Patent invalid and/or unenforceable under each section of Title 35 identified.

10

**B18**

**Response:**

Subject to and without waiving the foregoing general objections, Andrew states that: (i) each claim of the '144 Patent is invalid either as anticipated under 35 U.S.C. § 102 or as obvious under 35 U.S.C. § 103 in light of prior art included in the documents Andrew produces in response to TruePosition's document requests; and (ii) each claim of the '144 Patent is invalid under 35 U.S.C. § 112 due to lack of enabling disclosure.

Andrew is still in the process of conducting its inquiry into the facts and circumstances at issue in the present litigation and reserves the right to continue to supplement its response to this interrogatory as the litigation progresses.

**Interrogatory No. 8**

State the factual basis for the allegation in the Third Affirmative Defense of Andrew's Answer that "TruePosition is barred from maintaining its claims for infringement by the defense of equitable estoppel."

**Response:**

Subject to and without waiving its General Objections, Andrew states:

The European Telecommunications Standards Institute ("ETSI") IPR Policy imposes an obligation for each member to use its reasonable efforts to timely inform ETSI of essential IPR that it becomes aware of. The ETSI IPR Policy imposes an additional obligation on any member who submits a technical proposal for a standard or a technical specification to inform ETSI of its ownership of any IPR which might be an Essential IPR if that proposal is adopted. An IPR is an "Essential IPR" under ETSI's IPR Policy if it is not possible on technical grounds to implement the standard without infringing that IPR.

TruePosition is, and has been at all relevant times, a member of ETSI. Through its membership, TruePosition has agreed to comply with ETSI's IPR Policy.

11

**B19**

## GENERAL OBJECTIONS

1.    Andrew objects to TruePosition's Interrogatories to the extent that they seek information protected from discovery by the attorney-client privilege, attorney work product doctrine, the joint defense privilege or any other applicable privilege or doctrine. Any disclosure of such protected or privileged information is inadvertent and not intended to waive those privileges or protections.

2.    Andrew objects to the definition of "Andrew" on the grounds that it is overbroad and unduly burdensome to the extent that, in combination with specific Interrogatories using the term, it purports to require Andrew to provide information that is not known by Andrew.

3.    Andrew further objects to the definition of "Andrew" to the extent that it includes persons or entities other than Andrew Corporation and agents acting on its behalf on the grounds that such definition renders the Interrogatories overbroad and unduly burdensome. For purposes of responding to these Interrogatories, Andrew will interpret "Andrew" to mean Andrew Corporation and agents acting on its behalf.

4.    Andrew objects to the definition of "Business Entity" on the grounds that it is circular, vague, and ambiguous. For purposes of responding to these Interrogatories, Andrew will interpret "Business Entity" to mean any partnership, corporation, proprietorship, association, subsidiary, division, joint venture, or company, including governmental bodies and agencies and any other business organizations, whether formal or informal.

5.    Andrew objects to TruePosition's instructions to the extent that they purport to impose obligations in excess of those imposed by Fed. R. Civ. P. 33.

**B20**

Dated: June 23, 2006

*Rachel P. Waldron*

**KIRKLAND & ELLIS LLP**
John D. Desmarais
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

**KIRKLAND & ELLIS LLP**
Michael A. Parks
Rachel P. Waldron
Sarah J. Frey
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

**DUANE MORRIS LLP**
Patrick D. McPherson
1667 K Street, N.W., Suite 700
Washington, DC 20006
(202) 776-7800

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Josy Ingersoll
1100 N. Market Street, Suite 1200
Wilmington, DE 19801
(302) 657-4900

*Attorneys for Defendant and Counter-Claim Plaintiff*
*Andrew Corporation*

29

**B21**

## CERTIFICATE OF SERVICE

I, Rachel Pernic Waldron, hereby certify that on this 23rd day of June, 2006, I served a true and correct copy of the foregoing **Andrew Corporation's Supplemental Responses To TruePosition's First Set Of Interrogatories** upon the following individuals in the manner indicated:

**VIA ELECTRONIC MAIL**

Paul B. Milcetic, Esq.
David L. Marcus, Esq.
Daniel J. Goettle, Esq.
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
pbmilcet@woodcock.com
dmarcus@woodcock.com
dgoettle@woodcock.com

James D. Heisman, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
jheisman@cblh.com

**VIA FEDERAL EXPRESS**

Paul B. Milcetic, Esq.
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

*Rachel P. Walsh*

**Rachel Pernic Waldron**

**B22**

```
                                                    1
              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
                        - - -
TRUEPOSITION, INC.,           :    CIVIL ACTION
                              :
        Plaintiff             :
                              :
   vs.                        :
                              :
ANDREW CORPORATION,           :
                              :
        Defendant             :    NO. 05-747 (SLR)
                        - - -
                   Wilmington, Delaware
                   Monday, September 25, 2006
                   4:38 o'clock, p.m.
                        - - -
BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
                        - - -
APPEARANCES:
         CONNOLLY, BOVE, LODGE & HUTZ LLP
         BY:  JAMES D. HEISMAN, ESQ.

              -and-

         WOODCOCK WASHBURN LLP
         BY:  PAUL B. MILCETIC, ESQ.
              (Philadelphia, Pennsylvania)

              Counsel for Plaintiff

                        Valerie J. Gunning
                        Official Court Reporter
```

---

```
APPEARANCES (Continued):


         YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
         BY:  JOHN W. SHAW, ESQ.


              -and-


         KIRKLAND & ELLIS LLP
         BY:  JOHN M. DESMARAIS, ESQ.
              (New York, New York)


              -and-


         KIRKLAND & ELLIS LLP
         BY:  RACHEL PERNIC WALDRON, ESQ.
              (Chicago, Illinois)


              Counsel for Defendant


                        - - -
```

---

1         P R O C E E D I N G S

2

3         (Proceedings commenced in courtroom, beginning at

4    4:38 p.m.)

5

6         THE COURT:  Good afternoon.

7         (Counsel respond "Good afternoon, your Honor.")

8         THE COURT:  Were you on the elevators when we

9    were all running down steps?

10        MR. DESMARAIS:  Unfortunately, we were running

11   down the steps as well, your Honor.

12        THE COURT:  A level playing field.

13        All right.  I assume there are some issues we

14   should address this afternoon, and I will start with

15   plaintiff's counsel.

16        MR. MACETIC:  All right, your Honor.  Thank you.

17        Paul Macetic, from Woodcock Washburn, on behalf

18   of True Position.

19        We did talk a little bit in the elevators.  I

20   suppose that's good.  And I think this conference arose out

21   of a phone call that we had about a month ago, and what I

22   told you at that time was I thought having a conference or

23   having an in-person conference motivated the parties to do

24   the right thing more often, and I definitely think that's

25   true.  Despite our best intentions, when we have a conference

---

1    like this, things tend to happen.

2         We did talk and I think we may have resolved a

3    couple of issues, but let's just get them on the record in

4    any event.

5         The first issue that we have is a privilege log

6    issue, a couple of privilege log issues.  The first issue is

7    that there are over 200 entries on the privilege log that are

8    withheld attorney/client with no attorney either as the

9    sender or the recipient.

10        Now, I know that there are some limited

11   circumstances where an attorney/client communication or

12   something of the attorney/client when there's no attorney

13   either the sender or the recipient, but it just seemed a

14   little odd to me and Andrew did send a letter.  We raised

15   this a few weeks ago and they sent a letter saying we

16   reviewed the documents.  We do believe that they are

17   privileged.  But we just wanted to get a better idea of what

18   exactly is the basis or what sort of is the character of

19   these entries on the log that would cause them to be

20   withheld.  That's the first issue.

21        THE COURT:  Why don't you go through all your

22   issues, at least with respect to the privilege log.

23        MR. MILCETIC:  Sure.  The second issue on the

24   privilege log is there are 600 entries on the log that copy

25   either as a sender or recipient a gentleman by the name of

1  Allan Lee. Now, I don't know if you know. He's a consultant

2  for the defendant Andrew Corporation.

3         I don't know that you necessarily know everything

4  about this case at this stage. It's a patent infringement

5  case. We have not had a lot of opportunity to talk to you

6  about it. But what it primarily is about is the shipment of

7  what we would consider to be infringement equipment,

8  infringing equipment from the United States to a company

9  called Saudi Telecom in Saudi, Arabia.

10        Mr. Lee was hired by Andrew Corporation to -- to

11  perform certain tasks as a consultant in connection with this

12  project, this shipment of this equipment to Saudi Arabia, and

13  as you know, a typical role with respect to privileged

14  communications are that when you disclose them to a third

15  party, which Mr. Lee technically is here, they are no longer

16  privileged.

17        Now, there's an exception to that rule, the

18  community of interest rule.

19        Here, the problem with the community of interest

20  rule is that we have asked for Mr. Lee's contract with Andrew

21  and we, as yet, don't have it.

22        Now, we did ask for this a while ago. Mr.

23  Desmarais told me that he was happy to get us that contract

24  to the extent it still exists, but it just seems to me that

25  the burden is on the defendant here to prove that there's a

1  privilege when communications are disclosed to a third party,

2  and I think it's going to be difficult for them to do it

3  without providing that contract.

4         Now, there may be other evidence that they can

5  give us, but just from where I'm standing right now, it seems

6  to be that there has to be more than what these folks have

7  given us to withhold these documents.

8         The -- that's it for the privilege log.

9         THE COURT: All right. Let's go back to

10  defendant's counsel for those two issues.

11        MS. PERNIC: Yes, your Honor.

12        MR. DESMARAIS: Your Honor, I'd like to introduce

13  Rachel Pernic, who will speak on that. But just to confirm,

14  I did, out in the hallway, discuss with counsel what these

15  issues were and I did represent that that we would look for

16  the contract and find it and produce it as soon as we found

17  it.

18        The substance of the other issues, Ms. Pernic

19  will discuss.

20        THE COURT: Fine. Thank you very much.

21        MS. PERNIC: Good afternoon, your Honor.

22        THE COURT: Good afternoon.

23        MS. PERNIC: With regard to the first issue,

24  your Honor, e-mails and other communications withheld,

25  although no attorney is listed on the privilege log, we

1  have examined those and determined that they are all

2  attorney/client by basis of the fact that they are discussing

3  the specific advice given to an Andrew employee by an

4  in-house lawyer.

5         I've brought a couple of examples for you to

6  examine in camera, if you so desire.

7         With regard to the second issue, as my -- as

8  Mr. Desmarais said, we are willing to produce the contract.

9  We are searching for it so as to be able to prove to True

10  Position the nature of the relationship between Andrew and

11  Alan Lee.

12        In the interim, the evidence I can offer today

13  are, say, an organization chart listing Alan Lee as the

14  program manager for STC. I can show you that he had an

15  e-mail account, Allan Lee, at Andrew.com and that he was held

16  out as an Andrew employee. Therefore, he's the functional

17  equivalent an employee and all his work was done on a

18  confidential basis with the understanding that he was

19  functioning as an employee. Everything was confidential and

20  attorney/client privileged.

21        THE COURT: All right. Thank you very much.

22        Plaintiff's position?

23        MR. MILCETIC: Plaintiff's position?

24        THE COURT: Yes. I mean, are you satisfied or is

25  there something else that you want to do or have the Court do

1  in connection with the representations made by the

2  defendant?

3         MR. MILCETIC: Well, I guess that's fine with us,

4  your Honor. I don't know whether -- it seems to me that with

5  respect to Mr. Lee, I don't know whether the plaintiffs

6  have -- the defendants, excuse me, have shown a community of

7  interest with Mr. Lee. I think you have to do more than what

8  we just heard.

9         THE COURT: Well, I am not sure community

10  of interest would be the right analysis if he is --

11  obviously -- I take it the 600 entries have to have something

12  to do with legal advice in the first instance, and if he is

13  simply another employee, it really wouldn't be different in

14  terms of, assuming the facts are correct, it wouldn't be a

15  different analysis than the first 200 entries that you object

16  to, because we are talking about legal advice and discussion

17  among employees of legal advice.

18        So it seems to me as though we have two choices.

19  The one choice is to accept the representations by

20  defendant's. Counsel with respect to the 600 entries

21  involving Mr. Lee, having that representation backed up by

22  some kind of record about his treatment as an employee, and

23  if counsel for plaintiff for some reason believes that the

24  Court needs to test those representations, then, generally,

25  the way it's done is to have the plaintiff choose a select

9/25/2006 Discovery Conf of Sep 25

1  limited number of documents for me to look at in camera.

2        So I don't know whether we need to go that way at

3  the moment.

4        MR. MACETIC: I hate to make you do that. I hate

5  to make you review documents in camera. Based on what you've

6  said, we will leave it at Mr. Desmarais represented that he's

7  going to give us the contract. The contract is going to give

8  us more insight in terms of the relationship between Mr. Lee

9  and the defendant, and we will leave it at that.

10       THE COURT: All right.

11       MR. DESMARAIS: May I make one correction?

12       THE COURT: Yes.

13       MR. DESMARAIS: Just so my comments are not

14  misunderstood. I don't actually have the contract. What I

15  agreed to do is go back and get it if I can find it. So why

16  don't I propose we'll go back, upon leaving here, in a couple

17  of days try to put our hands on it. If we can't find it, we

18  will prepare a declaration about it and send it over to

19  them. Either we will find the contract and produce it or

20  we'll submit a declaration explaining the relationship of the

21  employee to the company. I'm pretty sure that should satisfy

22  our burden of keeping the documents privileged.

23       THE COURT: Is Mr. Lee still around someplace?

24       MS. PERNIC: Your Honor, he has moved on as it

25  were. He is consulting for another company and lives in

9/25/2006 Discovery Conf of Sep 25

1  California, in the Bay area, to be exact.

2        THE COURT: Well, I mean, it seems to me as

3  though -- I guess there is no jurisdiction here to depose him

4  if there's still a question about his role, but we will take

5  things one step at a time and, again, if there is some real

6  discomfort with the representations, then I will take a look

7  at a limited number of documents to make sure they are

8  consistent with the representations. All right?

9        All right. Privilege log issues. What is next?

10       MR. MILCETIC: I think we -- I just want to make

11  a quick record.

12       We agreed before we came here outside, I think,

13  in the elevator, or outside in the hall, that Andrew would

14  include the most recent version of the source code of the

15  accused product, which is version 2006.1. That's a version

16  of the source code that disables the allegedly infringing

17  functionality in this case that's going to be included on a

18  laptop that our expert can review.

19       The other thing that we agreed to, there is a

20  witness that's the primary witness to Andrew with respect to

21  Andrew's counterclaims in this case, which are mostly

22  standards based. In other words, the argument is that True

23  Position didn't disclose a patent of standards body. As a

24  result, Andrew was allegedly infringing. With respect to

25  that witness, apparently, he's not available during fact

9/25/2006 Discovery Conf of Sep 25

1  discovery in the United States.

2        Andrew agreed, and we agreed to have him be

3  produced in the first two weeks of November so long as we can

4  supplement our expert reports, to the extent that any

5  supplement needs to be tied to his deposition, because as of

6  right now he's not going to be made available by the

7  defendant during fact discovery.

8        So I just want to make a record that we've agreed

9  that we can supplement our expert reports to the extent

10  there's a supplement that needs to be based upon

11  Mr. Magnason's testimony, the witness.

12       MR. DESMARAIS: Counsel has correctly summarized

13  our two agreements that were made before the hearing.

14       MR. MILCETIC: I guess there is one other issue

15  generally that I would raise, and that is I think that having

16  these conferences really does help.

17       I don't know what your Honor's perspective or

18  perception is, but in the last -- in the last few weeks, and

19  I don't know if this is through anyone's fault, but we

20  received like 14,000 documents that are very releveant in

21  this case and I don't think it's anyone's fault, but I think,

22  without the conference, that may not have happened.

23       My sense is, for both parties, despite both of

24  our best intentions, having a conference, I think, is

25  helpful. We probably would request another conference before

9/25/2006 Discovery Conf of Sep 25

1  the end of fact discovery, October 25th.

2        My last issue, your Honor, and I want to mention

3  I have one more issue that I might want to discuss off the

4  record. It might be a little more prudent to do so.

5        THE COURT: All right. What issues, if any, does

6  defendant have?

7        MS. PERNIC: There are three issues, your Honor:

8        One, we request that True Position supplement its

9  response to Andrew's Interrogatory No. 6, which is our

10  interrogatory that asks True Position for its infringement

11  contentions.

12       Second, we are requesting confirmation that

13  True Position has destroyed an inadvertently produced

14  document.

15       And the third issue is an issue with regard

16  to documents withheld, or, I'm sorry, listed on True

17  Position's privilege log that appeared to have gone to

18  a third party that works for a different company than True

19  Position.

20       THE COURT: All right. So with respect to the

21  first issue of the infringement contention interrogatory,

22  there has been some initial response, but --

23       MS. PERNIC: Yes, your Honor, but it is still

24  deficient.

25       The interrogatory response does contain an

1 Attachment A, which purports to be a claim, a claim
2 infringement chart. However, I do have a copy for your
3 Honor, if you wish to look at it.
4         The listing of where elements, where patent
5 elements can be found in Andrew's product are, frankly,
6 woefully general. Rather than explain where, say, the term
7 locating means is found in Andrew's product, the claim chart
8 says over and over, software and processors in said LMU's
9 that determine and format time arrival information. Software
10 and processors, software and processors. That's given over
11 and over.
12         In addition, for even the more, say, physical
13 components of Andrew's system, those are not broken out. For
14 for example, there's a claim, Claim 1, breaks out an antenna
15 system, if you will, and explains how the antenna relates to
16 the cell site system. And rather than showing that in its
17 claim chart, True Position just says, three or more geometric
18 location measurement units.
19         And so even on a very broad physical level,
20 we are not able to see where specifically in our
21 products they are purporting to find these physical
22 components.
23         THE COURT: With respect to the software,
24 is that a function of the push and shove that always goes
25 on in connection with the source code? I mean, does

1 locating, those limitations have to do with access to the
2 source code?
3         MS. PERNIC: Well, your Honor, I suspect that is
4 what True Position would say. However, as your Honor will
5 recall, True Position has had electronic access to Andrew's
6 source code since, I think it was -- I'm sorry -- August
7 25th. So they've had access to the source code for a month
8 now. They've had access to the paper version since June --
9 I'm sorry -- since March 30th, 2006. And they have had the
10 source code for a while and we still have not gotten adequate
11 supplementation.
12         Second of all is with regard to the more, say,
13 generic or physical components, source code should not be
14 required.
15         THE COURT: Right. I understand.
16         All right. Let's hear from plaintiff's --
17 well, why don't you go ahead and give me your explanation
18 for all three issues and then we will hear from plaintiff's
19 counsel.
20         MS. PERNIC: Yes, your Honor.
21         With regard to the inadvertently produced
22 document, on September 11th, we received a letter from
23 True Position informing us that, in an abundance of caution,
24 it was notifying us that potentially privileged documents had
25 been produced. They identified three.

1         We looked at the three documents and determined
2 that of the three, one was, in fact, attorney/client, and we
3 demanded that -- we asked True Position to destroy it and
4 confirm the destruction.
5         True Position did not do so, citing, I think,
6 factual background in the case, the way produced documents
7 have been handled in the past.
8         We wrote back again, explaining why we believe
9 this document is privileged and why it is properly destroyed,
10 and we have not yet received confirmation from them that it
11 has been destroyed, so we are seeking that confirmation
12 today.
13         THE COURT: All right. And with respect to
14 plaintiff's privilege log?
15         MS. PERNIC: With respect to plaintiff's
16 privilege log, your Honor, there are approximately --
17 there are many documents that are listed on the privilege
18 log as far as going to a man named Caleed Amyra (phonetic).
19 Mr. Amyra works for a company called Knorr Communications.
20         Knorr Communications' relationship to True
21 Position is that of a third party. Knorr communications is a
22 separate entity, a separate company, that True Position was
23 working with in order to secure the STC bid over in Saudi
24 Arabia. A local company, if you will, somebody on the
25 ground.

1         Therefore, Mr. Amyra is an employee of Knorr
2 Communications and anything disclosed to him would waive any
3 existing attorney/client privilege.
4         THE COURT: Taking it into the community of
5 interest rule, that's still defendant's position?
6         MS. PERNIC: Yes, your Honor.
7         We would also note that we have not seen the
8 final contract of Knorr Communications, so perhaps there's
9 something in there that would shed some light on this.
10 However, at this time it appears to us that the situation is
11 distinguishable from that of Allan Lee because Allan Lee, as
12 I said, had an Andrew e-mail address. He was held as an
13 Andrew employee. He was the functional equivalent of an
14 employee whereas Knorr Communications is a wholly separate
15 third entity, a separate company.
16         THE COURT: All right. Thank you.
17         Let's hear plaintiff's response to those three
18 issues.
19         MR. MILCETIC: In what order, your Honor? Any
20 particular order?
21         I think the third one is probably the easiest.
22 I disagree with defendant's counsel's characterization of the
23 privilege entries in our -- in our privilege log, but we sent
24 them a letter today saying we're producing those documents.
25 We don't care much about those documents. This issue was

1  raised three business days before this conference.  We looked
2  at our log and we produced them.
3          THE COURT:  All right.
4          MR. MILCETIC:  It's done.
5          The -- the first issue, I believe, was the
6  infringement contention interrogatory.
7          First of all, the characterization of the
8  interrogatory response is inaccurate.  There are three
9  separate claim charts attached to our interrogatory response,
10  not just Attachment A.  There's Attachment A, there's
11  Attachment B, there's Attachment C.
12          Those attachments -- I'm happy to give this to
13  you and have you take a look at it.  Those attachments I will
14  warn you are about as detailed as they can conceivably be
15  without making specific source code references, which is what
16  she was talking about earlier.
17          Now, you might remember that we waited five
18  months in this case, two months before the close of fact
19  discovery, before getting source code that could reasonably
20  be analyzed by anyone.
21          The paper source code that Andrew gave us to
22  begin with in discovery in this case, I think you should
23  probably understand the background.
24          THE COURT:  Well, I do know --
25          MR. MILCETIC:  Yes.

1          THE COURT:  -- that there isn't a case where I'm
2  not told that a paper version of source code is a waste of
3  trees, and so it is not so much the source code I am
4  concerned about, since you've had it for basically a month.
5  I do want a date certain by which you will supplement having
6  had the source code now for a month.  And I guess the other
7  aspect of this is the infringement chart that relates to the
8  physical components.
9          MR. MILCETIC:  Well, I can show you what we
10  already have.  You can judge whether it is or is not
11  sufficient.
12          In terms of the source code references, in terms
13  of a date certain, I have to tell you that my inclination on
14  that is the end of fact discovery in this case is October
15  25th and that's my inclination.
16          The source code that Andrew produced and I
17  think the background on this accused product would be
18  helpful.  The accused infringing product is a product
19  that locates cell phones and triangulates their location
20  based upon signals that are emitted from the cell phones.
21  You locate the cell phone based upon signals that are
22  normally received at a cell tower.  The equipment is
23  distributed in the network.  There are different components.
24  There's a component that sits on the cell tower and does some
25  signal processing and there's equipment in a main computer in

1  software that does a software calculation and there are a few
2  other components as well.
3          When Andrew produced, of course, the paper
4  version, it was impossible to even tell what portion of the
5  source code corresponded to which component of the accused
6  product.  Right now we have an expert analyzing the source
7  code that was made available electronically August 23rd.
8  That expert has got the equivalent.  For each version, 20
9  boxes of source code.  I mean, if the original paper version
10  is any indication, 20 boxes of source code per version to go
11  through.  So it is a tremendous undertaking to provide the
12  specific source code references, and so my sense would be by
13  October 25th.
14          We did not get the electronic version of the
15  source code until August 23rd.  We really had been asking
16  for that for months and I don't think it's too much to
17  ask to give us two months to provide those specific
18  references.
19          THE COURT:  All right.  The last issue was
20  the destruction issue.
21          MR. MILCETIC:  Well, as I told both Mr. Desmarais
22  and Ms. Waldron in the hallway earlier, I don't care what the
23  protocol in this case is for destruction of documents with
24  respect -- excuse me -- with respect to inadvertently
25  produced documents.  I do not care so long as it's applied

1  across the board.
2          Two months ago, the fellows that work with me at
3  the Woodcock Washburn produced the equivalent of an entire
4  box of inadvertently produced documents.  I would say we've
5  probably produced 150 privileged documents to Kirkland &
6  Ellis and we requested that they be returned and they were
7  not.
8          And now there is a single document, a couple of
9  documents that they've produced to us and they've asked
10  that we destroy them.
11          I have no problem destroying them.  Destroy
12  the documents that we produced to you and have the same
13  rules apply or, in the alternative, what we did with the
14  documents that we inadvertently produced to Andrew was we
15  agreed, rather than taking this issue to you, because I
16  don't want to come to you every single time that there's
17  an issue.  Rather than coming to you, we made an agreement
18  with them that at least there's no subject matter waiver
19  based upon our inadvertent production of documents and at
20  least those documents can be used in discovery, but the
21  discovery is strictly limited to the contents of the
22  documents.
23          Now, I have a problem with Andrew coming around
24  now and saying we're going to apply a different set of rules
25  now.  I don't care what the rules are so long as they are

**B27**

1   applied equally.

2       THE COURT:  And just before I go back to counsel

3   for defendant, with respect to the physical components,

4   you believe that there is no supplementation that's needed,

5   that your initial response is detailed enough, as detailed

6   as you can make it, whatever that standard is that you are

7   using?

8       MR. MACETIC:  That's my sense and your Honor can

9   judge.

10      THE COURT:  All right.  Let's hear from

11  defendant's counsel.  Ms. Pernic?

12      MS. PERNIC:  Thank you, your Honor.

13      Your Honor, we -- the day of October 25th is not

14  acceptable to Andrew.  Your Honor, as we've discussed, True

15  Position has had the source code for over a month.  Their

16  expert has actually only been there to review it one time.

17      Andrew was concerned that it will suffer

18  prejudice if it does not get these contentions before October

19  25th as expert reports are due shortly thereafter.

20      In addition, having some more information about

21  how True Position is construing the claims will aid Andrew in

22  its invalidity arguments.

23      There are reasons that we need the infringement

24  contentions before October 25th.

25      THE COURT:  All right.

1       MR. MILCETIC:  Your Honor --

2       THE COURT:  Well, I'm just letting Ms. Pernic

3   respond to the other issue.

4       MS. PERNIC:  Yes, your Honor.  With regard to the

5   inadvertently produced -- I should say, your Honor, that if

6   this Court finds that October 25th is an acceptable date,

7   that we would ask that potentially as for Mr. Magnason, that

8   additional discovery would take place based on what we would

9   or would not learn on October 25th.

10      With regard to the inadvertent production, your

11  Honor, this case is distinguishable from what Mr. Milcetic

12  was referring to.

13      Andrew has produced literally 100, almost 137,000

14  files of documents, and there has been one document

15  inadvertently produced.  As soon as True Position notified us

16  about the production, we immediately asked for its return and

17  explained that we found that particular document to be

18  attorney/client privileged.

19      The issue with regard to True Position's

20  production was that on July 21st, True Position informed

21  Andrew that it had produced over 1300 documents that were

22  either irrelevant or duplicative or privileged.

23      On July 25th, we asked True Position to

24  specifically identify which documents were privileged and the

25  specific bases therefore, and three days later, rather than

1   identify the specific documents that were privileged and the

2   bases therefore, True Position offered that we keep the

3   documents.

4       So we never came to this point, if you will.

5   True Position said, okay, you can keep the documents.  We do

6   not agree.  We would like our one sole document back.

7       THE COURT:  All right.  Thank you.

8       MR. MILCETIC:  Your Honor, may I respond to

9   that?

10      THE COURT:  Yes.

11      MR. MILCETIC:  Ms. Waldron left out one pertinent

12  fact with respect to our request to return privileged

13  documents.  They've always -- it also was as a result of

14  Andrew informing us.  She left out that fact.  They informed

15  us, then two days later we asked for everything back.  Not

16  only that, we did something that they did not do:  We

17  explained in detail how a vendor error had taken place, that

18  essentially I can tell you what happened.

19      We had a bunch of documents in electronic

20  discovery that were tagged privileged and/or irrelevant.  We

21  sold them out to the vendor.  We told the vendor to remove

22  these documents.  They didn't remove them.  They sent them

23  back with a disk and somewhere in our office didn't

24  sufficiently check the disk and it went out to Andrew and we

25  explained that in great detail how that happened.

1       When we did that, they came back and said, we'll

2   identify which ones are privileged and which ones are

3   irrelevant.

4       It seems to me, and I think I've seen this issue

5   before, when you produce a box of documents to someone and

6   it's got tons of privilege.  I mean, there are documents in

7   there that there's no doubt say privileged communication

8   right in the subject matter of the heading.  To, from

9   attorneys, very clearly inadvertent.  When that happens, the

10  other party returns the documents.

11      Again, rather than come to you, I said, look.

12  You can keep them.  I mean, we have nothing to hide in this

13  case so long as we don't waive some kind of more broad

14  subject matter privilege.  We don't have anything to hide, so

15  you can keep the documents.  And ultimately the resolution

16  that the parties came to was that we would have no subject

17  matter waiver, they could use them in discovery.

18      They've already been using them in discovery

19  and showing them to our witnesses.  Now when we point out

20  one document that they inadvertently produce, they want it

21  back.

22      Look, I mean, it's not -- I don't have really all

23  that strong feelings about this issue one way or the other.

24  If the protocol in this case is to return documents, I will

25  return documents.  If the protocol in this case is to -- is

9/25/2006 Discovery Conf of Sep 25

1  finders keepers, which is the way that Andrew treated our
2  documents, and if the protocol is that there's just no
3  subject matter waiver, that's fine with me as well. It's
4  fine either way.
5       With respect to the -- I confess that I
6  forgot the issues with respect to the infringement
7  interrogatory.
8       THE COURT: Well, I think it's just a question
9  of whether you all should take the rest of the discovery
10 period to supplement.
11      MR. MILCETIC: Right. On that score, I think
12 it's important to go back to something in your scheduling
13 order. Your scheduling order has a provision in it that I
14 think is very helpful and I think is very appropriate in
15 terms of what happens in litigations. It says that if you
16 want lots of detail in your interrogatory responses, your
17 contentions, you should give lots of detail in your
18 contention interrogatory responses.
19      From the beginning of this lawsuit, Andrew has
20 asserted that this patent is invalid, and despite what Ms.
21 Waldron just said, that patent, that contention, does not
22 depend in any way on our infringement contentions.
23      Just to give you an idea, I can show you what our
24 infringement contentions look like. Their contention on
25 validity is the patent is invalid in view of prior art that

6/1/2007 2:03 PM                                              25

9/25/2006 Discovery Conf of Sep 25

1  we are going to produce to you, and that's where it stands
2  today. That's their contention on invalidity.
3       Now, I have to tell you that compared to that,
4  we are light years ahead. We identified the accused product
5  before the case began. We have three different sets of
6  infringement charts. They identify physical components.
7  They do not identify some source code references, but that is
8  a huge task.
9       Again, now, we spent a lot of time trying to get
10 that source code. It would have been much easier for them to
11 give it to us than it is for us to go through it now. And
12 all I'm asking for two months -- Andrew has had five months
13 to produce it. I will represent to you that the request for
14 the electronic version of the source code was the subject of
15 more than a dozen e-mail requests to Andrew, which they
16 refused before we came to you a month or so ago.
17      So, you know, again, you know, it just seems that
18 there's an imbalance here, really, on all these issues, and
19 the fact that Andrew is coming to you does not seem
20 appropriate.
21      THE COURT: All right. With respect to the
22 supplementation, I guess to some extent I am a little
23 confused. There is basically less than 30 days before the
24 end of fact discovery, which means there's actually no time
25 at this point to pursue additional discovery, and so I am

6/1/2007 2:03 PM                                              26

9/25/2006 Discovery Conf of Sep 25

1  curious as to how, even if I said it is due tomorrow, what
2  follow-up you could pursue anyway.
3       So the question is: Which are you more
4  interested in? Well, theoretically, a more helpful
5  supplementation, since you can't really technically pursue
6  discovery anyway, or whether we should be pushing this
7  forward. I don't know.
8       MR. DESMARAIS: I think the real concern here,
9  your Honor, at least from my point of view, is our
10 contentions might depend on their contentions. If they give
11 us their infringement contentions on the last day of
12 discovery, we can't update our infringement contentions until
13 after the last -- you know, we have noninfringement
14 contentions. We have validity contentions. And if we get
15 theirs on the last day, ours can't be tailored to how they're
16 interpreting their own claims.
17      So, you know, what I think we need is if -- I
18 don't really care if they wait until October 25th, but then
19 I've got to be able to respond to those allegations in
20 supplemental interrogatory responses that we would like to
21 serve that play off of what they say the allegations are. So
22 if they wait until the end, we just need a little relief in
23 our response to that.
24      THE COURT: In my summary of the schedule in this
25 case, I do not really have when expert discovery, when expert

6/1/2007 2:03 PM                                              27

9/25/2006 Discovery Conf of Sep 25

1  reports are due.
2       When are they due?
3       MR. MILCETIC: It's November 8th. November 8th
4  they are due.
5       And this is Paul Milcetic again on behalf of True
6  Position.
7       You know, we keep talking about we didn't give
8  them our contentions. I would like you to take a look at
9  this.
10      It's true, I agree that claim construction is
11 absent here. In other words, there is no construction of the
12 claims. I understand in your scheduling order that on
13 November 1st, we're supposed to exchange a list of terms
14 and then subsequently we're supposed to provide our
15 construction. And, frankly, you know, based on my sense
16 of the issues that Andrew has raised thus far in this case,
17 it does not seem to me that many of the issues are really
18 going to be issues for claim construction at the end of
19 the day. In other words, even under Eric Andrews'
20 narrow construction of the claims, there's going to be
21 infringement here, so it really does not matter. But we
22 will get to that.
23      THE COURT: All right. Well, this is what we're
24 going to do.
25      Number one, with respect to the one document

8/1/2007 2:03 PM                          **B29**              28

9/25/2006 Discovery Conf of Sep 25

1  versus the box of documents, that is a hard call in terms
2  of whether it is fair or not, but it seems to me that
3  without agreement by the parties, that the protocol kind
4  of, or the practice established by plaintiff's experience
5  is going to be what everyone proceeds on: That I'm going
6  to require the destruction of the one inadvertently
7  produced document.
8          With respect to the contention interrogatories,
9  I'm going to give the plaintiff until October 18 to
10  supplement their infringement contentions. If they choose to
11  on the physical components, I am certainly -- I am just not
12  going to get into whether it's sufficient now. If they
13  choose to do it, they can. If they don't, they don't, but
14  certainly the software limitations need to be supplemented
15  based on access to the source code.
16          That means that defendant needs to supplement
17  its infringement and validity, noninfringement and validity
18  contentions on or before November -- well, actually, on
19  or before October 25, so that everyone has everything in
20  hand before the claim construction is due on November 1.
21  All right?
22          All right. Are there any other issues aside from
23  the prospect of another meeting if there are any outstanding
24  issues?
25          MR. MILCETIC: I just wanted a point of

9/25/2006 Discovery Conf of Sep 25

1  material. All right?
2          All right. Thank you very much, counsel.
3          MR. MILCETIC: Your Honor, I thought we
4  would go off the record and there would be one potential
5  other issue.
6          THE COURT: Sure.
7          (Discussion held off the record.)
8          THE COURT: All right. I will, I guess, await
9  to hear from you via e-mail if another meeting is
10  appropriate.
11          Thank you very much. It will take me a few
12  minutes to get out of my computer, but you can go.
13          (Counsel respond, "Thank you, your Honor.")
14          (Court recessed at 5:27 p.m.)
15              - - -
16
17
18
19
20
21
22
23
24
25

9/25/2006 Discovery Conf of Sep 25

1  clarification, your Honor: So you ordered the destruction of
2  the one document?
3          THE COURT: Yes.
4          MS. PERNIC: Yes, your Honor. I don't believe
5  we've come to an agreement with regard to the listing of
6  Mr. Amyra of Knorr Communications.
7          THE COURT: I said I believe they have
8  represented they were going to just produce those
9  documents.
10          MR. MILCETIC: As I understand it, they are
11  being produced today.
12          MS. PERNIC: I'm sorry.
13          THE COURT: That's okay.
14          MS. PERNIC: Thank you.
15          THE COURT: It is hard to talk and listen at the
16  same time.
17          I certainly have time on my calendar. Judge
18  Thynge has been doing a tremendous job in settling my
19  cases, so I find myself with more time than I usually
20  have.
21          I can either set some time today or you all
22  can let me know some if some time is needed, but it
23  certainly won't be a problem to schedule something else
24  towards the end of discovery if anyone feels that that
25  would be helpful in bringing to closure your discovery

**B30**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,                    )
                                       )
        PLAINTIFF/                     )
        COUNTERCLAIM- DEFENDANT,       )
                                       )
                                       )
v.                                     )        CIVIL ACTION NO. O5-OO747-SLR
                                       )
ANDREW CORPORATION,                    )
                                       )
        DEFENDANT/                     )
        COUNTERCLAIM-PLAINTIFF.        )

### ANDREW CORPORATION'S SUPPLEMENTAL RESPONSES TO TRUEPOSITION'S INTERROGATORY NOS. 3 AND 7

Pursuant to Rules 26(e) and 33 of the Federal Rules of Civil Procedure, Andrew Corporation hereby supplements its responses to TruePosition's Interrogatory Nos. 3 and 7. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Andrew expressly reserves the right to supplement these responses further.

#### Interrogatory No. 3

State the factual basis for the allegation in paragraph 8 of the Counterclaims section of Andrew's Answer that "Andrew has not infringed the '144 Patent, and Andrew's supply of services and/or equipment has not infringed and will not infringe the '144 Patent."

#### Response:

Subject to and without waiving its General Objections, Andrew responds as follows:

TruePosition accuses Andrew of infringing only claims 1, 2, 22, 31 and 32 of the '144 Patent. *See* Plaintiff's Seventh Supplemental Responses to Defendants' First Interrogatories.

**Interrogatory No. 7**

State the factual basis for the allegations in the First Affirmative Defense and paragraph 9 in the Counterclaims section of Andrew's Answer that the '144 Patent and each of its claims are invalid and/or unenforceable under one or more sections of Title 35 of the United States Code, including §§ 101, 102, 103, and/or 112," including the identity of each section of Title 35 of the United States Code under which the '144 Patent and each of its claims are allegedly invalid and/or unenforceable, which claims of the '144 Patent are allegedly invalid and/or unenforceable under each section of Title 35 identified, the prior art, if any, that allegedly renders each claim of the '144 Patent invalid and/or unenforceable under each section of Title 35 identified, and how such prior art allegedly renders each claim of the '144 Patent invalid and/or unenforceable under each section of Title 35 identified.

**Response:**

Subject to and without waiving its General Objections, Andrew responds that the '144

Patent is invalid for at least the following reasons:

Japanese Laid-Open Patent Application Publication No. H3-239091, named inventor

Mitsunori Kono (the "Kono reference"), anticipates each claim of the '144 Patent under 35

U.S.C. § 102 and/or renders each claim of the '144 Patent obvious under 35 U.S.C. § 103. The

Kono reference was filed February 16, 1990 and published October 24, 1991 -- over a year

before the May 7, 1993 filing date of the application for the '144 Patent.

The Kono reference states, "[t]his invention . . . has as its object to make it possible to

measure the distance between a base station and a moving body, and also to produce a moving

body radio communication apparatus that can locate the position of a moving body." (Kono

reference, p. 3). The Kono reference teaches, "[t]he moving body radio communication

apparatus of this invention is provided with a plurality of base stations that possess a shared

channel reception means that receives position locating signals from a moving body using shared

channels that are allotted jointly, a switching station that receives data in the form of these

position locating signals, and a position locating means that is connected to the switching station,

inputs the above-mentioned data, and locates the position of a moving body." (*Id.*)

8

**B32**

The Kono reference also teaches at page 4 (reference numerals omitted):

The control channel transceivers are modulated by announcing signals that contain identifier signals of the base stations, and the carrier waves of the respectively differing radio frequencies are continuously transmitted. The mobile equipment scans all of the designated control channels, fixes to the one with the largest reception electrical field, and stands by. . . . At this point, if there is a request to locate the position of a specific mobile equipment at the junction point connecting to the public telecommunications network, then the exchange station issues a command to the base stations to call and locate the position of the mobile equipment. When this is received, the control device radiates a call signal in the space from the antenna via the control channel transceivers and the antenna-sharing devices to call the mobile equipment. The mobile equipment stands by to receive the signal with strongest electrical field from among the radiated position locating call signals radiated by the base station, using the control channel, and when this position locating call signal is received, it [the mobile station] immediately transmits a response signal, switching to a shared channel and emitting a position locating signal which is a burst digital station.

In addition, the Kono reference teaches that (reference numerals omitted): "[f]urthermore, when some of the shared channel receivers of the base stations receive the position locating signal from the mobile equipment, the absolute time or the relative time when the position locating signal arrives is determined by correlation detecting the unique word contained therein, and reports to the switching station via the control devices data such as the difference in arrival time of position locating signals with respect to the various base stations. The base station forwards these data to the position location calculating device, and the position of the mobile equipment is calculated." (*Id.*)

The Kono reference also teaches (reference numerals omitted): "position location stations [that] are provided to increase the accuracy of locating the position of the mobile equipment, and when the mobile equipment transmits a position locating signal using a shared channel, the arrival time is measured, and the data is reported to the switching station. The switching station transmits the data from the base stations and the data from the position locating

9

stations to the position locating calculating device, causing the position of the mobile equipment to be calculated." (*Id.*)

Andrew also refers TruePosition to the claim charts below, which further demonstrate that the Kono reference invalidates each claim of the '144 Patent, particularly if TruePosition tries to read the '144 Patent claims on Andrew's geolocation products.

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| 1. A cellular telephone location system for determining the locations of multiple mobile cellular telephones | All of figure 1 and the accompanying description. *See also* page 2, ¶ 2-Page 3, ¶ 1 ("FIG. 4 shows…control device 3c terminate operation."). |
| each initiating periodic signal transmission over one of a prescribed set of reverse control channels, comprising: | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n.*" Page 2, ¶ 2, ll. 5-6.  The mobile cellular telephones taught by Kono each initiate periodic signal transmissions. |
| (a) at least three cell site systems, each cell site system comprising: | Base stations 3a-3n. |
| an elevated ground-based antenna; | Antennas 4a-4n. |
| a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and providing baseband signals derived from the cellular telephone signals; | Control channel transceivers 12a-12n. |
| a timing signal receiver for receiving a timing signal common to all cell sites; | "…the time of the standard clock *54* is corrected by the switching station *1.*" Page 5, ¶ 3, l. 16. |
| and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of | Kono teaches software and processors in hardware unit 55 that determine and format time of arrival information.

Time stamp bits representing the time at which |

10

**B34**

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and | the cellular telephone signals are received: "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*." Page 5, ¶ 3. ll. 13-15. |
| (b) a central site system operatively coupled to said cell site systems, comprising: | Kono teaches a central site system operatively coupled to the cell site systems. |
| means for processing said frames of data from said cell site systems | "where reference numeral *2* is a position location calculating device" Page 4, ¶ 1, l. 1. |
| to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; | Kono teaches software and processors in hardware unit 54 that determine and format time of arrival information.<br><br>"reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |
| and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| 2. A cellular telephone location system as recited in claim 1, | See the above claim chart for claim 1. |
| wherein said timing signal receiver comprises a global positioning system (GPS) receiver. | Kono teaches software and processors in hardware unit 54 that determine and format time of arrival information.<br><br>"reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations |

11

**B35**

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| | *3a – 3n.*" Page 4, ¶ 2, ll. 21-23. |

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| 22. A ground-based cellular telephone system serving a plurality of subscribers possessing mobile cellular telephones, comprising: | All of figure 1 and the accompanying description. *See also* page 2, ¶ 2-Page 3, ¶ 1 ("FIG. 4 shows…control device 3c terminate operation."). |
| (a) at least three cell sites ; | Base stations 3a-3n. |
| equipped to receive signals sent by multiple mobile cellular telephones | Control channel transceivers 12a-12n. |
| each initiating periodic signal transmissions | The mobile cellular telephones taught by Kono each initiate periodic signal transmissions. |
| over one of a prescribed set of reverse control channels | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n.*" Page 2, ¶ 2, ll. 5-6. |
| (b) locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions; and | Kono teaches software and processors in hardware unit 55 that determine and format time of arrival information. "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11.*" Page 5, ¶ 3. ll. 13-15. "reference numeral *2* is a position location calculating device" Page 4, ¶ 1, l. 1. "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

12

**B36**

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| (c) database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations. | "reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| 31. A method for determining the location(s) of one or more cellular telephones each | All of figure 1 and the accompanying description. *See also* page 2, ¶ 2-Page 3, ¶ 1 ("FIG. 4 shows...control device 3c terminate operation."). |
| initiating periodic signal transmissions over one of a prescribed set of reverse control channels, comprising the steps of: | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n*." Page 2, ¶ 2, ll. 5-6. The mobile cellular telephones taught by Kono each initiate periodic signal transmissions. |
| (a)  receiving said reverse control channel signals at least three geographically separated cell sites; | "*12a – 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a – 3n*." Page 2, ¶ 2, ll. 5-6. |
| (b) processing said signals at each cell site to produce frames of data, | Kono teaches software and processors in hardware unit 55 that determine and format time of arrival information.<br><br>"where reference numeral *2* is a position location calculating device" Page 4, ¶ 1, l. 1. |
| each frame comprising a prescribed number of data bits and time stamp bits, | Kono teaches software and processors in hardware unit 55 that determine and format time of arrival information.<br><br>"The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*. " Page 5, ¶ 3. ll. 13-15. |
| said time stamp bits representing the time at which said frames were produced at each cell site; | "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the |

13

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| | switching station *1* from the control circuit *55* via the control device *11*. " Page 5, ¶ 3. ll. 13-15. |
| (c)  processing said frames of data to identify individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell sites; and | Kono teaches software and processors in hardware unit 54 that determine and format time of arrival information.<br><br>"reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |
| determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

| Claim Language | Kono Invalidates the Asserted Claim |
|---|---|
| 32.  A method as recited in claim 31, | See the above claim chart for claim 31. |
| further comprising the steps of storing, in a database, location data identifying the cellular telephones and their respective locations, and providing access to said database to subscribers at remote locations. | "reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |

\*   \*   \*

Andrew reserves the right to supplement, modify and/or amend its answer to this interrogatory.

14

**B38**

## GENERAL OBJECTIONS

1.     Andrew incorporates by reference its prior General Objections to the above interrogatories.

**B39**

Dated: November 8, 2006

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
*alundgren@ycst.com*

**KIRKLAND & ELLIS LLP**
John D. Desmarais
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

**KIRKLAND & ELLIS LLP**
Michael A. Parks
Rachel P. Waldron
Shira J. Kapplin
Sarah J. Frey
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

**DUANE MORRIS LLP**
Patrick D. McPherson
1667 K Street, N.W., Suite 700
Washington, DC 20006
(202) 776-7800

*Attorneys for Defendant and Counter-Claim Plaintiff*
*Andrew Corporation*

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on November 8, 2006, copies of the

foregoing document were served on the following counsel of record in the manner indicated:

**BY HAND DELIVERY**

James D. Heisman, Esquire
The Nemours Building
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
Wilmington, DE  19801

**BY E-MAIL**

David L. Marcus, Esquire
Paul B. Milcetic, Esquire
Daniel J. Goettle, Esquire
Woodcock Washburn
One Liberty Place, 46th Floor
Philadelphia, PA  19103

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com
*Attorneys for Defendant Andrew Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRUEPOSITION, INC., | ) | |
| | ) | |
| PLAINTIFF/ | ) | |
| COUNTERCLAIM- DEFENDANT, | ) | |
| | ) | |
| | ) | |
| v. | ) | CA NO. 05-00747-SLR |
| | ) | |
| ANDREW CORPORATION, | ) | |
| | ) | |
| DEFENDANT/ | ) | |
| COUNTERCLAIM-PLAINTIFF. | ) | |

**EXPERT REPORT OF DR. DAVID GOODMAN**
**ON THE INVALIDITY OF U.S. PATENT NO. 5,327,144**

# I.    INTRODUCTION

Andrew Corporation has retained me as a technical expert in this case. I expect to testify at trial regarding the matters set forth in this report if asked by the Court or the parties' attorneys. I will also be prepared to provide the Court and the jury with a tutorial on the technology involved in this matter, including the evolution of the technology. I am being compensated for my work associated with the litigation at my customary rate of $600 per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or my testimony.

I understand that TruePosition, Inc. has asserted certain claims of United States Patent 5,327,144 against Andrew Geometrix products. I submit this expert report, which contains my opinion regarding the invalidity of the claims of the '144 patent asserted by TruePosition. I have been asked to determine whether claims 1, 2, 22, 31, and 32, of the '144 patent are valid. For the reasons stated below, it is my opinion that the asserted claims are invalid because they are anticipated by Japanese Patent Application Kokai (Laid-Open) Publication No.: H3-239091, October 24, 1991 ("the Kono application").

# II.    BACKGROUND AND QUALIFICATIONS

## A.    QUALIFICATIONS

I am currently a Program Director at the National Science Foundation in Arlington, Virginia on temporary assignment from my position as a professor of Electrical and Computer Engineering at Polytechnic University in Brooklyn, New York. Before joining the NSF, I was Director of the Wireless Internet Center for Advanced Technology (WICAT), located at Polytechnic University, Columbia University, and the University of Virginia. WICAT is a National Science Foundation Industry/University Cooperative Research Center. From August 1999 until August 2001, I was Head of the Department of Electrical and Computer Engineering at Polytechnic University.

Before joining Polytechnic University in 1999, I was a Professor of Electrical and Computer Engineering at Rutgers, the State University of New Jersey. From 1988 until 1991, I was Chairman of the Department of Electrical and Computer Engineering at Rutgers. In 1989, I founded the Wireless Information Network Laboratory (WINLAB) at Rutgers University.

WINLAB was the first center of excellence at a United States university focused on cellular telecommunications.  In 1991, WINLAB was designated the National Science Foundation Industry/University Cooperative Research Center for Wireless Information Networks. I was the Director of WINLAB until 1999, when I joined Polytechnic University.

From 1967 to 1988, I was at Bell Laboratories, where I held the position of Department Head in Communications Systems Research. In 1995, I was a Research Associate at the Program on Information Resources Policy at Harvard University.  In 1997, I was Chairman of the National Research Council Committee studying "The Evolution of Untethered Communications."

I have extensive experience performing and managing research in telecommunications and digital signal processing.  My research in cellular telecommunications has produced innovations covering multiple access protocols, network architecture, mobility management, and radio resources management.  In 1986 and 1987, while I was employed by AT&T Bell Laboratories, I had a research assignment in the United Kingdom. As part of this assignment, I had detailed technical discussions with experts in several European countries who were participating in the establishment of the GSM cellular standard. At that time, I acquired a thorough understanding of GSM technology, and I have maintained this expertise ever since through technical discussions, participation in various forums, and in the conduct of my teaching, research, and writing.

I was one of the first professors to teach a college-level course in cellular telecommunications and have taught such courses since January 1989. In the early 1990's, I also presented a three-day short course at many large companies including Bell Atlantic Mobile, Pacific Bell, US West, Ericsson and AT&T. This course introduced corporate students to the operations of several cellular systems including AMPS, TDMA, and GSM.  I have lectured and published widely on the subject of cellular telecommunications.  My publications include approximately 100 papers.  I have also consulted for many corporations in this field, including: Ericsson, Motorola, Lucent Technologies, and Nortel Networks.

**B44**

I received a Bachelor's degree at Rensselaer Polytechnic Institute in 1960, a Master's degree at New York University in 1962, and a Ph.D. at Imperial College, University of London in 1967, all in electrical engineering.

I am a Member of the National Academy of Engineering, a Foreign Member of The Royal Academy of Engineering, a Fellow of the Institute of Electrical and Electronics Engineers, and a Fellow of the Institution of Electrical Engineers.

In 1997, I received the ACM/SIGMOBILE Award for "Outstanding Contributions to Research on Mobility of Systems Users, Data, and Computing." In 1999, I won the RCR Gold Award for the best presentation at the Conference on Third Generation Wireless Communications. In 2003, I received an IEEE Avant Garde Award for Contributions to Speech Coding and Internet-Packet Cellular Networks. Three of my papers on wireless communications have been cited as Paper of the Year by IEEE journals.

I am a frequent public speaker in a variety of forums on wireless communications. I am author of the books *Wireless Personal Communications Systems*, published in 1997 by Addison Wesley and co-author, with Roy Yates, of *Probability and Stochastic Processes A Friendly Introduction for Electrical and Computer Engineers, Second Edition*, published in 2004 by Wiley. I am co-editor of six other books on wireless communications. I am a named inventor on eight United States patents and have one patent application pending.

**B.    LIST OF AUTHORED PUBLICATIONS**

Attached as Exhibit A to my report is my Curriculum Vitae, which contains a list of publications that I have authored since 1988.

**C.    PRIOR TESTIMONY**

In the past four years I have provided expert testimony in depositions in the following cases: Aerotel, Ltd. v. Verizon Communications Inc. et al. (S.D.N.Y); PowerOasis, Inc. and PowerOasis Networks, LLC, v. T-Mobile USA, Inc., (D. NH); Papyrus Technology Corp. v. New York Stock Exchange, Inc., (S.D.NY); Agere v. Broadcom, (E.D. PA); and Freedom Wireless, Inc. v. Boston Communications Group, Inc. et al. (D. MA). In addition I testified at a Markman hearing and in a tutorial for the Court in Agere v. Broadcom, (E.D. PA).

**D.    INFORMATION RELIED ON**

Attached as Exhibit B is a list of the materials that I reviewed in connection with my preparation of this report.

## III.    OPINIONS AND BASES FOR THOSE OPINIONS

### A.    LEGAL STANDARDS

In conducting my analysis and forming my opinions I have received and relied upon information provided by counsel regarding the applicable legal standards on patent invalidity.

I understand that issued U.S. Patents are presumed valid and that the standard to prove invalidity is clear and convincing evidence.

I understand that for an independent patent claim to be anticipated by the prior art, the prior art reference must disclose each and every limitation of the claim either expressly or inherently. I also understand for a dependent claim to be anticipated by the prior art, the prior art reference must disclose each and every limitation of both the dependent claim and any claim(s) from which it depends.

I understand that for a patent claim to be invalid for obviousness the differences between the claimed invention as a whole and the prior art would have been obvious to a person of ordinary skill in the art at the time of the invention. I understand that before an obviousness determination can be made, I must consider the level of ordinary skill in the art, the scope and content of the prior art, and the differences between the claimed invention and the prior art.

I understand that claims are construed according to their plain and ordinary meaning to one of ordinary skill in the art. I understand that the same claim construction must be used for both an infringement analysis and an invalidity analysis; I understand that claims cannot be construed one way for an infringement analysis and a different way for an invalidity analysis.

I also understand that the Court has not yet construed claim terms in this case, but that the parties have exchanged various preliminary claim interpretations. Regardless of which

constructions are adopted it is my opinion that the Kono application will anticipate the '144 patent if its claims are read broadly enough to cover Andrew's Geometrix products.

### B.    ORDINARY SKILL IN THE ART

A person of ordinary skill in the art of the '144 patent would have had a masters degree in electrical and computer engineering or computer science, or the equivalent skills and knowledge, and/or at least two years' experience at a cellular operating company, or a company that designs/produces cellular systems or services, including value added systems or services such as location determination.

### C.    THE '144 PATENT

The '144 patent is titled "Cellular Telephone Location System". Using the system disclosed in the patent, an AMPS cellular telephone network estimates the geographical coordinates of cellular telephones served by the network.

The technique at the heart of the purported invention is referred to as Time Difference of Arrival (TDOA) location determination. TDOA location determination was a well known technique at the time of the invention.

To use this technique in a cellular network, the patent dictates that at least three cell sites must receive the same radio signal from a cellular telephone. Each one converts the radio signal to a baseband signal, digitizes the base band signal and sends the digitized baseband signal, along with a time stamp to a central site. As shown in Figure 7 of the '144 patent, the central site uses correlation techniques to estimate the differences among times of arrival ("TDOA data") at all pairs of reporting cell sites. It uses the TDOA data to estimate the geographical coordinates of the cellphone by comparing the measured delays with a grid of reference delays stored at the central site. Each reference delay is associated with a unique geographical reference location. The central site uses a least squares metric to determine the best reference location. After determining the best reference location, the central site again uses a least squares technique to further refine the location estimate.

All of the claims of the '144 patent pertain to cellular telephone systems. Figures 1A and 1C of the '144 patent display some of the properties of a generic cellular system. Figure 1C

6

shows "the main components and arrangement of cellular telephone system." '144 Pat., Col. 1, ll. 51-52.



**Fig. 1C, '144 Patent**

Figure 2 of the '144 patent shows "a schematic diagram of a cellular telephone location system in accordance with the present invention." '144 Patent, Col. 7, ll. 60-62.



**Fig. 2, '144 Patent**

7

**B48**

### D.    CLAIM TERMS

A person of ordinary skill in the art would recognize that the terms of art in the '144 patent were used to describe analog cellular systems in common use when the patent was filed in 1993.

### (1)    Analog Systems and Reverse Control Channels

In all of the patent claims, the first important limitation is "cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels". A person of ordinary skill in the art in 1993 would recognize reverse control channels as components of the analog cellular and dual-mode telephone systems specified in the United States national standard, ANSI 553, in Interim Standard 54, and Interim Standard 95 published by the Telecommunications Industry Association.

My interpretation is further supported by the following passage of the '144 patent, and the testimony of two named inventors regarding that passage. The '144 patent states:

> In addition, it should be noted that the inventive concepts disclosed herein are applicable to both analog and digital (for example, TDMA) cellular systems that employ analog control channels.

'144 patent, col. 1, lns. 27-31. A person of skill in the art would recognize "digital ... systems that employ analog control channels" to refer to cellular systems that carry voice information in a digital format and use the signal formats of the AMPS system for transmitting system control information.

Named inventor Dr. Curtis Knight testified:

**Q:**   What are analog control channels?

**A:**   I'm not sure I know what was meant by that but what we had in mind was AMPS when we were writing this.

Knight October 6, 2006 Page 89 at 25 through Page 90 at 13.  Named inventor Dr. John Webber concurred.  Webber October 4, 2006 Page 23 at 9-18.

8

There are two types of transmissions disclosed in the '144 patent; one type is a signal transmitted over a "reverse control channel." The analog cellular standards that use the term "reverse control channel" specify that cellular telephones transmit information in a prescribed format that is different than the format specified by GSM. The format specified by analog cellular standards is illustrated in the following diagram that I prepared many years ago to explain the AMPS system to students:



**Fig. 3.10, Wireless Personal Communications Systems**

"Reverse control channels" also have a many-to-one property in that they convey information from many cellular phones to one base station.

In order to assert the '144 patent against cellular systems that use Andrew technology, True Position has to adopt an interpretation of "transmissions over ... reverse control channels" that is significantly more inclusive than the transmissions addressed by the '144 patent. This

9

**B50**

inclusion would embrace a wider range of signal formats carried on channels that convey information from many cellular telephones to one base station.

### (2)    The Independent Claims

The independent claims (1, 22, and 31) asserted by True Position address details of: (a) the signal transmitted by a cellphone; (b) signal reception at the cellular cell sites; (c) the way in which the arrival time is determined at each cell site; (d) the nature of the reports transmitted by the cell sites to the location determination device; and (e) how the location determination device uses the reports to calculate the geographical coordinates of the cellphone.

#### a.    *Signals transmitted by a cellphone*

The independent claims state that the signals used for location determination are transmitted periodically "over one of a prescribed set of reverse control channels".

#### b.    *Signal reception at the cell sites*

Claim 1 requires that the signal reception be accomplished by an antenna and a baseband converter coupled to the antenna. In Claim 22, the cell sites are equipped to receive the signals from the cellphone and Claim 31 states that the location determination method receives the signals.

#### c.    *Determining arrival time at cell sites*

Claim 1 requires a timing signal receiver for receiving a timing signal common to all cell sites.

#### d.    *Reports transmitted by the cell sites*

Claim 1 requires that the baseband signal be sampled at a prescribed frequency and that the signal samples and a time stamp be formatted in digital data frames with a prescribed number of data bits. Claim 31 requires the cell site to produce frames of data with a prescribed number of data bits and time stamp bits.

10

*e.    Using the reports to calculate cellphone location*

Claim 1 requires that the reports arrive at a central site system from the cell sites. The central site system processes the frames of data in the report to produce a table identifying individual signals and associated time differences of arrival at the cell sites. It then determines cellphone locations from the time differences of arrival. Claim 22 requires the system to have a database, accessible from remote locations, containing cellphone identities and locations. Claim 31 states that the system processes the frames of data from the cell sites to identify cellular telephones and differences in times of arrival and that it uses this information to determine cellphone location.

### E.    THE KONO APPLICATION

The title of the Kono application is translated to English as "Moving Body Radio Communication Apparatus". Like the '144 patent, it describes determination of the location of a cellular telephone from information about the arrival times at a plurality of base stations of a position locating signal transmitted by the telephone.

The Kono application states that the signal is transmitted on a shared channel and received at multiple base stations. Each base station determines the time of arrival of the position locating signal and transmits associated data to a switching station that in turn transmits the data to a position location calculating device. This device uses data from the base stations such as time differences of arrival at the multiple base stations to calculate the position of the cellphone.

### F.    RELATION OF THE '144 PATENT TO THE KONO APPLICATION

All of the claims of the '144 patent pertain to cellular telephone systems. As discussed above, Figure 2 of the '144 patent shows a "a schematic diagram of a cellular telephone location system in accordance with the present invention"; similarly, the Kono application places the invention in the context of a generic cellular system illustrated in Figures 1 and 4:

11



**Fig. 1, Kono Application**



**Fig. 4, Kono Application**

Within this system, all of the claims of the '144 patent require periodic transmissions by the cellular telephones over reverse control channels. The Kono application describes "position locating signals from a moving body using shared channels" (page 3, 4th paragraph). It is clear that "moving body" in the Kono application is synonymous with the cellular telephone in the '144 patent.

All of the '144 patent claims require three or more cell site systems that receive the periodic transmissions from the cellular telephones. Similarly the Kono patent refers to $n$ base stations (labeled $3a$ to $3n$ in Figures 1, 3, and 4, each containing a shared channel receiver ($16a$ – $16n$).

Claim 1 of the '144 patent requires "an elevated ground-based antenna" at each cell site. Figures 1, 3, and 4 of the Kono application also display antennas (labeled $4a$ – $4n$) at the $n$ base stations.

Claim 1 of the '144 patent also includes a "baseband converter" for receiving the periodic transmissions on the reverse control channels. The corresponding device in the Kono application is a shared channel receiver at each base station (*$16a$ – $16n$*).

The cell site system in Claim 1 of the '144 patent also includes a "timing signal receiver for receiving a timing signal common to all base stations". The corresponding device in the Kono application is an ultra-high precision clock (labeled *$54$* in Figure 2) within each of the shared channel receivers. The ultra-high precision clocks at all of the base stations are "corrected by the switching station *$1$*". Page 5, ¶ 3, l. 16.

The other element of the cell site system in Claim 1 of the '144 patent is a "sampling subsystem" that samples the baseband signal and formats the samples and time stamps in frames of digital data. Each time stamp represents the time of arrival of one locating signal from a cellphone. In the Kono application, the base stations $3a$ – $3n$ receive the position locating signal. A time measurement circuit (*$53$*) in each base station measures the absolute time of arrival and reports it to the switching station. A person of ordinary skill in the art would recognize that the report would be contained in data frames.

13

**B54**

Part (b) of Claim 1 of the '144 patent specifies a "central site system operatively coupled to said cell site systems". The corresponding element of the Kono application is the switching station (*1*) in communication with the base stations (*3a – 3n*) through junction points (*23a – 23n*) that convey data or control signals between the switching system and the base stations.

The central site system in Claim 1 of the '144 patent processes the frames of data arriving from the cell site systems and generates a table containing information that identifies the signals arriving from the cell sites and time differences of arrival at the different cell sites. The central site system contains a "means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones." In the Kono application the switching station "receives data in the form of these position locating signals" forwards the data received from the base stations to the position locating device (*2*). The position locating device uses the data to calculate the position of the cellular telephone.

Claim 2 of the '144 patent depends on Claim 1 and states that the timing signal receiver is a Global Position System receiver. In the Kono patent the timing signal common to all base stations exists at the switching station (*1*): "...the time of the standard clock *54* is corrected by the switching station *1*." Page 5, ¶ 3, 1. 16. Since at least as early as 1993, some cellular networks have had GPS receivers at every base station. The GPS receivers receive a timing signal common to all base stations. The location systems disclosed in the Kono reference work in conjunction with cellular networks. When those cellular networks have GPS receivers, they can be used with the location system disclosed.

Claim 22 of the '144 patent is less specific than Claim 1. In addition to base stations and reverse control channels Claim 22 requires simply a means of determining the locations of the cellular telephones "by receiving and processing signals emitted during said periodic reverse control channel transmissions". The elements of the Kono application that perform this function are the shared channel receivers in the base stations, the ultra-high precision clocks, the time measurement circuit, the switching station and the position locating device.

The remainder of Claim 22 specifies a "database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations". Since their inception in the early 1990s, GSM

14

networks have had Home Location Registers ("HLRs") and Visitor Location Registers ("VLRs"). Because Andrew's products do not have a database, if TruePosition argues for an interpretation of "database means" that is broad enough to encompass Andrew's products, this element is anticipated by the HLR and VLR inherent in the cellular systems taught by the Kono application.

Claim 31 describes the same operations as Claim 1 without referring to the antenna, the baseband converter, the timing signal receiver, and the sampling subsystem at each cell site. It requires frames of data that are processed to identify individual telephones and time differences of arrival and using the time differences to determine the locations of the cellular telephones. The corresponding operations in the Kono application are described above in the comparison of Claim 1 of the '144 patent with the Kono application.

Claim 32 depends on Claim 31. It is identical to the final Claim element of Claim 22.

### (1)    Summary Chart Reflecting Opinions

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| 1. A cellular telephone location system for determining the locations of multiple mobile cellular telephones | Yes | "FIG. 1 shows a configuration of a moving body position locating apparatus" Page 3 ¶ 6, ll. 12. |
| each initiating periodic signal transmission over one of a prescribed set of reverse control channels, comprising: | Yes | "a moving body transmits position locating signals using shared channels" Page 3 ¶ 5, l. 1. |
| (a) at least three cell site systems, each cell site system comprising: | Yes | Base stations 3a-3n. |
| an elevated ground-based antenna; | Yes | Antennas 4a-4n. |
| a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and | Yes | Control channel transceivers 12a-12n. |

15

**B56**

| Claim Language | Present In Kono? | Kono Disclosure |
|---|---|---|
| providing baseband signals derived from the cellular telephone signals; | | |
| a timing signal receiver for receiving a timing signal common to all cell sites; | Yes | "…the time of the standard clock *54* is corrected by the switching station *1*." Page 5, ¶ 3, l. 16. |
| and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and | Yes | Kono teaches software and processors in control circuit *55* that determine and format time of arrival information.<br>Time stamp bits: "The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*. " Page 5, ¶ 3. ll. 13-15.<br>Data bits: "It should be noted that the junction points *22a – 22n* are used for voice communication signals, and the junction points *23a – 23n* are used for data or control signals." Page 5, ¶ 1, ll.15-17. |
| (b) a central site system operatively coupled to said cell site systems, comprising: | Yes | Switching station *1* and position location calculating device *2*. |
| means for processing said frames of data from said cell site systems | Yes | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll.23-25. |
| to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; | Yes | "reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*." Page 4, ¶ 2, ll. 21-23. |
| and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | Yes | "The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated." Page 4, ¶ 2, ll. 23-25. |

16

**B57**