# Exhibit D

Oded Gottesman Report:

0. EXPERT REPORT OF ODED GOTTESMAN, Ph.D.

# EXPERT REPORT OF ODED GOTTESMAN, Ph.D.

My name is Oded Gottesman, and I was asked to write this report by TruePosition, Inc. ("TruePosition"). I was specifically asked to consider whether Andrew Corporation ("Andrew") has infringed U.S. Patent 5,327,144 (the '144 Patent). I understand that TruePosition has sued Andrew for infringement of U.S. Patent 5,327,144 (the '144 Patent). I have been retained by TruePosition because of my expertise in the areas of telecommunications, computer programming, signal processing, speech coding, and transmission over networks, including radio communications in cellular networks.

This report considers the '144 Patent, and my opinion that Andrew infringes the 144 Patent because the 144 Patent claims encompass configurations of Andrew's Mobile Location System product known as the "Geometrix® Wireless Location System."

## I. Summary of My Opinions

Based upon my 19 years of experience in the signal processing and telecommunications industry, I believe that Andrew has infringed Claims 1, 2, 22 , 31, and 32 (the "Asserted Claims") of the '144 Patent by using and offering to sell certain configurations of its Geometrix® Wireless Location System, and by supplying from the United States the components of the Geometrix® Wireless Location System.

More specifically, in December 2004, Andrew infringed Claims 1 and 2 of the 144 Patent by offering for sale within the United States a configuration of the Geometrix® Wireless Location System to Saudi Telecom Company ("STC"), a cellular telephone network operator in Saudi Arabia.

In about August/September 2005, Andrew also infringed Claim 31 of the 144 Patent by using within the United States a configuration of the Geometrix® Wireless Location System at a demonstration at its Ashburn, Virginia, facility.

Between October, 2005 and February, 2006, Andrew again infringed Claims 1 and 2 of the 144 Patent by offering for sale configurations of the Geometrix® Wireless Location System to STC.

After October, 2005, Andrew also repeatedly infringed Claims 1, 2, 22, 31 and 32 of the 144 Patent by supplying from the United States to Saudi Arabia components of a system comprising a combination of Andrew's Geometrix® Wireless Location System and STC's cellular telephone system, and by supplying components of a method performed during the operation of that combination system.

After October, 2005, Andrew also repeatedly infringed Claims 1, 2, 22, 31 and 32 of the 144 Patent by supplying from the United States to Saudi Arabia components of a system comprising a combination of Andrew's Geometrix® Wireless Location System, STC's cellular telephone system and a Location Based Services database owned or operated by STC, and by supplying components of a method performed during operation of that combination system.

1

Oded Gottesman Report:

---

[31] *See* 10/02/06 Deposition Transcript of John Carlson, p. 72, ll. 11-25.

[32] *See* PX-116 at 9.

[33] *See* 10/02/06 Deposition Transcript of John Carlson, p. 67, l. 20 – p. 82, l. 17; p. 120, l. 10 – p. 123, l. 13.

Oded Gottesman Report:

---

<sub>34</sub> *See* 10/02/06 Deposition Transcript of John Carlson, p. 74, ll. 17-23.

<sub>35</sub> *See* PX-63 at 13.

<sub>36</sub> *Id.*


<sub>38</sub> *See* 10/02/06 Deposition Transcript of John Carlson, p. 98, l. 1 – p. 102, l. 6.

Oded Gottesman Report:

---

[39] *See* AND0023010-AND0023088, file *send.c.*

[40] *See* AND0042137, file *geo_defs.h.*

[41] *See* AND0023048- AND0023049.

Oded Gottesman Report:

Oded Gottesman Report:

Oded Gottesman Report:

---

[52] *See* also 10/02/06 Deposition of John Carlson at p. 90, ll. 2-23.

Oded Gottesman Report:

---

[53] *See* AND0007312; AND0006681 – AND0006685.

[54] *See* (AND006687 – AND0006693.

[55] *See* Seymour Stein, "Algorithms for Ambiguity function processing," IEEE Trans. ASSP, Vol. ASSP-28, No. 3, pp.588 - 599 June 1981; 10/02/06 Deposition Transcript of John Carlson at p.106, l. 6 – p. 113, l. 24.

[56] *See* Charles H. Knapp and G. Clifford Carter, "The generalized correlation method for estimation of time delay," IEEE Trans. ASSP, Vol. ASSP-24 No.4 , pp. 320 – 327, August 1976.

Oded Gottesman Report:

**III.** The Bases and Reasons for My Infringement Opinions

(b) the structure of the element in the accused product has to be either the same or equivalent.

## E.1    Analysis of Geometrix® Wireless Location System and the '144 Patent

The following sections explain why I believe Andrew infringes the 144 Patent.

## E.2    Andrew's December 2004 Offer for Sale to STC – Claims 1 and 2

### E.2.1    CLAIM 1 OF THE '144 PATENT

#### E.2.1.1    *Claim 1 Recitation*

A cellular telephone location system for determining the locations of multiple mobile cellular telephones each initiating periodic signal transmission over one of a prescribed set of reverse control channels, comprising:

(a) at least three cell site systems, each cell site system comprising: an elevated ground-based antenna; a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and providing baseband signals derived from the cellular telephone signals; a timing signal receiver for receiving a timing signal common to all cell sites; and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and

(b) a central site system operatively coupled to said cell site systems, comprising: means for processing said frames of data from said cell site systems to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals.

#### E.2.1.2    *GEOMETRIX system does perform all elements of method Claim 1*

The following section describes how the "Geometrix® Wireless Location System" offered to STC operates and how it includes all the elements of system Claim 1 of the '144 Patent.

#### E.2.1.3    *First Clause of Claim 1: "A cellular telephone location system for determining the locations of multiple mobile cellular telephones each initiating periodic signal transmission over one of a prescribed set of reverse control channels, comprising:"*

The first clause of Claim 1 is "A cellular telephone location system for determining the locations of multiple mobile cellular telephones each initiating

Oded Gottesman Report

III. The Bases and Reasons for My Infringement Opinions

**periodic signal transmission over one of a prescribed set of reverse control channels, comprising:"**

In my opinion, the "Geometrix® Wireless Location System" offered to STC, is literally a system for determining the locations of multiple mobile cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels.[70]  The system offered was for determining the locations of multiple mobile cellular telephones because that is the purpose of Andrew's product.[71] The multiple cellular telephones each initiate periodic signal transmissions over a standalone dedicated control channel because STC's network is a GSM network as mentioned earlier in this report.[72]  Phones in GSM cellular networks normally transmit on the SDCCH for call set up, location updates, registration and in other circumstances as well.

I understand that Andrew my claim that this element is not satisfied because SDCCH transmissions are not "periodic" within the meaning of the 144 Patent.  In fact, SDCCH transmissions are transmitted at regular intervals, as exemplified by the recurring 51 frame SDCCH structure illustrated earlier in my report.  In any event, the 144 Patent defines "periodic" as "discontinuous," meaning occurring from time to time, which SDCCH transmissions certainly do.  Col. 2, ll. 19-22.

I also understand that Andrew may claim that this claim element is not satisfied because the 144 patent is limited to "AMPS" control channels, "analog" control channels, or control channels within a particular band.  As fully described earlier, the control channels in an AMPS system are digital, not analog, and the preferred embodiment in Stilp also described digital control channels. The patent cannot be limited to analog control channels.

The patent also specifically states that it is applicable to digital systems that were known at the time (Col. 1, ll. 5-10; Col. 1, ll. 27-30) and since GSM, TDMA and CDMA were known , the patent cannot be limited to control channels that exclude these digital protocols, nor can it be limited to the frequency bands in an AMPS cell phone network. One of ordinary skill would have expected the inventors to describe AMPS more extensively in the patent, or at least mention AMPS, had they intended the patent to be limited  to AMPS. Significantly, based on my review of the deposition transcripts of John Webber and Curtis Knight, it appears that neither Mr. Knight nor Mr. Webber have any expertise in AMPS, which suggests that they did not invent an AMPS-specific invention. Their expertise instead appears to be in the area of radio communications.

If the Court should construe the claims in accordance with Andrew's proposed construction of "reverse control channel" and, further, the court should construe the

---

[70] See, e.g., PX-218 at 2 of 55. "Our offer to STC is to satisfy the UTDOA requirements of the location based service (LBS) network components with our Geometrix® Wireless Location System."

[71] See, e.g., PX-218 at 32-33 of 55, Fig. 2.2.11.

[72] See, e.g., PX-218 at 33 of 55, noting that the offered system will locate the phones "where interaction occurs on the SDCCH [standalone dedicated control channel] (such as an SMS message or a registration)"; 10/16/06 Deposition Transcript of Andrew Corporation by Joe Kennedy [36], p. 39, ll. 18-25.

Oded Gottesman Report

III. The Bases and Reasons for My Infringement Opinions

preamble of this claim as limiting, then I expect to testify that this claim element is met under the doctrine of equivalents. SDCCH transmissions perform substantially the same function as an AMPS control channel transmissions, in substantially the same way to obtain substantially the same result. The function of both the SDCCH and the AMPS control channel transmissions is to convey digital control information. As mentioned earlier in my report, both AMPS and GSM use digital control channels. Furthermore, both the AMPS control channel transmissions and SDCCH transmissions convey such digital information in substantially the same way--over frequency bands, the difference being that the SDCCH is also defined by time slot. Finally the result is also substantially the same. In the context of cellular network, the result is a call being set up or digital control information otherwise being put to use. In the context of a location system like that claimed in the patent (i.e., like Geometrix), the transmission facilitates cell phone location.

Furthermore, having reviewed the file story the inventors did not disclaim coverage of control channels outside of AMPS.

**E.2.1.4**    **Second Clause of Claim 1: "(a) at least three cell site systems, each cell site system comprising: an elevated ground-based antenna; a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and providing baseband signals derived from the cellular telephone signals; a timing signal receiver for receiving a timing signal common to all cell sites; and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and"**

The second clause of Claim 1 is: **"(a) at least three cell site systems, each cell site system comprising: an elevated ground-based antenna; a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said cellular telephones and providing baseband signals derived from the cellular telephone signals; a timing signal receiver for receiving a timing signal common to all cell sites; and a sampling subsystem operatively coupled to said timing signal receiver and said baseband convertor for sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said cellular telephone signals were received; and"**

In my opinion, the "Geometrix® Wireless Location System" offered to STC literally includes all of the elements of this clause. I will now explain element by element how the "Geometrix® Wireless Location System" offered to STC infringes includes all of those elements literally.

32

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

---

[73] See, e.g., PX-218 at 20 of 55, Table 2.1.1.

[74] See, e.g., PX-218 at 10 of 55, noting that the offered LMU's/WLS's are connected "to a combination GPS/downlink antenna."

[75] See, e.g., PX-115 Blocks "RFD" and "DDC"; AND0080260 – AND0080328.

[76] See, e.g., 10/14/06 Deposition Transcript of Alan Li at p. 149, ll.1-13.

[77] See, e.g., PX-115.

[78] See, e.g., PX-218 [6] at 33 of 55, noting that the offered system will locate the phones "where interaction occurs on the SDCCH [standalone dedicated control channel] (such as an SMS message or a registration)."

Oded Gottesman Report

III. The Bases and Reasons for My Infringement Opinions

**E.2.1.5** *Third Clause of Claim 1: "(b) a central site system operatively coupled to said cell site systems, comprising: means for processing said frames of data from said cell site systems to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals."*

The third clause of Claim 1: **"(b) a central site system operatively coupled to said cell site systems, comprising: means for processing said frames of data from said cell site systems to generate a table identifying individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell site systems; and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals."**

In my opinion, the "Geometrix® Wireless Location System" offered to STC literally includes all of the elements of the third clause of claim 1. I will now explain element by element how the "Geometrix® Wireless Location System" offered to STC literally includes all of the elements of the third clause of Claim 1.

---

[86] See, e.g., AND_EF0096141; AND_EF0095938; AND0018865.

[87] See, e.g., PX-218 at 24 of 55, noting that the "TDOA technique works by measuring the exact time of arrival of a radio signal at three or more separate cell sites"; AND_EF0096141; AND_EF0095938; AND0018865.

35

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

- **"(b) a central site system operatively coupled to said cell site systems, comprising:"**

- **"and means for determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals."**

---

[88] See, e.g., PX-218 at 20 of 55, Fig. 2.1.1.

[89] See, e.g., PX-218 at 13 of 55 noting that the GCS "calculates location estimates based on measurements made by LMU's."

[90] See AND0019024 – AND0019038, AND0020896 – AND0021415, AND0021427 – AND0021962, and AND0022177 – AND0023010; 09/22/06 Deposition Transcript of Andrew Beck at p. 62, l. 1 – p. 64, l. 7; p. 216, ll. 17- 24; AND_EF134186 noting that "by calculating the difference in arrival time at pairs of cell sites, it is possible to calculate hyperbolas on which the transmitting device is located."

Oded Gottesman Report

### III. The Bases and Reasons for My Infringement Opinions

that determines, on the basis of the differences in times of arrival, the locations of the cellular telephone responsible for the standalone dedicated control channel signals.[91]

The algorithm in the patent that performs this function is described connection with portions Figures 7, and portions 8C-8D which are nicely summarized in the fifth and sixth blocks of Figure 7. The same or equivalent functionality in the GCS has already

In conclusion, it is my opinion that all the elements of claim 1 are literally included in the Geometrix system offered to STC.

## E.2.2    CLAIM 2 OF THE '144 PATENT

### E.2.2.1    Claim 2 Recitation

A cellular telephone location system as recited in claim 1, wherein said timing signal receiver comprises a global positioning system (GPS) receiver.

---

[91] See AND0021416 – AND0021426, "FixMix()"; PX-218, at 13 of 55 noting that the GCS "calculates location estimates based on measurements made by LMU's"; AND_EF134186, noting that "by calculating the difference in arrival time at pairs of cell sites, it is possible to calculate hyperbolas on which the transmitting device is located"; 10/14/06 Deposition Transcript of Alan Li [37] at p. 70, l. 13 – p. 73, l. 15.

[92] See Ilan Ziskind and Mati Wax, "Maximum likelihood localization of multiple sources by alternating projection," IEEE Trans. ASSP, Vol. 36, No. 10, pp.1553 – 1560, October 1988; Mati Wax and Ilan Ziskind, "On unique localization of multiple sources by passive sensor arrays," IEEE Trans. ASSP, Vol. 37 No. 7, pp. 996-1000, July 1989; Bin Yang, "Projection approximation subspace tracking," IEEE Trans SP, Vol. 43 No. 1, pp. 95-107, January 1995; Michaela C. Vanderveen, et. al., "Joint Angle and Delay Estimation (JADE) for Multipath Signals Arriving at an Antenna Array," IEEE COMMUNICATIONS LETTERS, VOL. 1, NO. 1, pp.12 - 14, JANUARY 1997; Nilesh Agarwal Leena Chandran-Wadia Varsha Apte, "CAPACITY ANALYSIS OF THE GSM SHORT MESSAGE SERVICE," Indian Institute of Technology Bombay, www.cse.iitb.ac.in/~varsha/allpapers/wireless/ncc03cam.pdf , 2003; John D. Bard and Fredric M. Ham,"Time Difference of Arrival Dilution of Precision and Applications," IEEE TRANSACTIONS ON SIGNAL PROCESSING, VOL. 47, NO. 2, p.521-3, FEBRUARY 1999; K. C. Ho, and Wenwei Xu, "An Accurate Algebraic Solution for Moving Source Location Using TDOA and FDOA Measurements", IEEE TRANSACTIONS ON SIGNAL PROCESSING, VOL. 52, NO. 9, SEPTEMBER 2004.

[93] See AND_EF134186 .

37

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

### E.2.2.2    *GEOMETRIX system does perform elements of method Claim 2*

The following section describes how the "Geometrix® Wireless Location System" offered to STC literally includes the elements of Claim 2 of the '144 Patent.

### E.2.2.3    *Claim 2: "A cellular telephone location system as recited in claim 1, wherein said timing signal receiver comprises a global positioning system (GPS) receiver"*

Claim 2 is "A cellular telephone location system as recited in claim 1, wherein said timing signal receiver comprises a global positioning system (GPS) receiver "

In my opinion, the "Geometrix® Wireless Location System" offered to STC satisfies all of the elements of the claim. I will now explain element by element how the "Geometrix® Wireless Location System" offered to STC infringes on Claim 2.

- "A cellular telephone location system as recited in claim 1,"

This element is satisfied by the "Geometrix® Wireless Location System" offered to STC.[94] Since this claim element merely incorporates the elements of claim 1, no analysis is necessary beyond that which I have already explained.

- "wherein said timing signal receiver comprises a global positioning system (GPS) receiver."

This element is satisfied by the GPS receiver in each of the Version 2 WLS's/LMU's offered to STC which comprise a global positioning system (GPS) receiver.[95]

In conclusion, it is my opinion that all the elements of claim 2 are literally included in Andrew's "Geometrix® Wireless Location System" offered to STC.

## E.3    ANDREW'S AUGUST/SEPTEMBER, 2005 DEMONSTRATION IN ASHBURN – CLAIM 31

### E.3.1    CLAIM 31 OF THE '144 PATENT

#### E.3.1.1    *Claim 31 Recitation*

A method for determining the location(s) of one or more mobile cellular telephones periodically transmitting signals over one of a prescribed set of reverse control channels, comprising the steps of:

(a) receiving said reverse control channel signals at least three geographically-separated cell sites;

---

[94] See infringement opinion for Claim 1 in Section A.E.2.1 above.

[95] See, e.g., PX-115, "GPS" Block; 10/2/06 Deposition Transcript of John Carlson, p. 74, ll. 17-23.

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

51 frame SDCCH structure illustrated earlier in my report. In any event, the 144 Patent defines "periodic" as "discontinuous," meaning occurring from time to time, which SDCCH transmissions certainly do. Col. 2, ll. 19-22.

I also understand that Andrew may claim that this claim element is not satisfied because the 144 patent is limited to "AMPS" control channels, "analog" control channels, or control channels within a particular band. As fully described earlier, the control channels in an AMPS system are digital, not analog, and the preferred embodiment in Stilp also described digital control channels. The patent cannot be limited to analog control channels.

The patent also specifically states that it is applicable to digital systems that were known at the time (Col. 1, ll. 5-10; Col. 1, ll. 27-30) and since GSM, TDMA and CDMA were known , the patent cannot be limited to control channels that exclude these digital protocols, nor can it be limited to the frequency bands in an AMPS cell phone network. One of ordinary skill would have expected the inventors to describe AMPS more extensively in the patent, or at least mention AMPS, had they intended the patent to be limited to AMPS. Significantly, based on my review of the deposition transcripts of John Webber and Curtis Knight, it appears that neither Mr. Knight nor Mr. Webber have any expertise in AMPS, which suggests that they did not invent an AMPS-specific invention. Their expertise instead appears to be in the area of radio communications.

If the Court should construe the claims in accordance with Andrew's proposed construction of "reverse control channel" then I expect to testify that this claim element is met under the doctrine of equivalents. SDCCH transmissions perform substantially the same function as an AMPS control channel transmissions, in substantially the same way to obtain substantially the same result. The function of both the SDCCH and the AMPS control channel transmissions is to convey digital control information. As mentioned earlier in my report, both AMPS and GSM use digital control channels. Furthermore, both the AMPS control channel transmissions and SDCCH transmissions convey such digital information in substantially the same way--over frequency bands, the difference being that the SDCCH is also defined by time slot. Finally the result is also substantially the same. In the context of cellular network, the result is a call being set up or digital control information otherwise being put to use. In the context of a location system like that claimed in the patent (i.e., like Geometrix), the transmission facilitates cell phone location.

Furthermore, having reviewed the file story the inventors did not disclaim coverage of control channels outside of AMPS.

**E.5.3.5** *Third Clause of Claim 22: "(b) locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions; and"*

62

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

The third clause of Claim 22 is: **"(b) locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions; and"**

---

[160] See, e.g., AND0019024 – AND0019038, AND0020896 – AND0021962, AND0022177 – AND0023010; PX-63 at 13 of 55 noting that the GCS "calculates location estimates based on measurements made by LMU's."

[161] See Ilan Ziskind and Mati Wax, "Maximum likelihood localization of multiple sources by alternating projection," IEEE Trans. ASSP, Vol. 36, No. 10, pp.1553 – 1560, October 1988; Mati Wax and Ilan Ziskind, "On unique localization of multiple sources by passive sensor arrays," IEEE Trans. ASSP, Vol. 37 No. 7, pp. 996-1000, July 1989; Bin Yang, "Projection approximation subspace tracking," IEEE Trans SP, Vol. 43 No. 1, pp. 95-107, January 1995; Michaela C. Vanderveen, et. al., "Joint Angle and Delay Estimation (JADE) for Multipath Signals Arriving at an Antenna Array," IEEE COMMUNICATIONS LETTERS, VOL. 1, NO. 1, pp.12 - 14, JANUARY 1997; Nilesh Agarwal Leena Chandran-Wadia Varsha Apte, "CAPACITY ANALYSIS OF THE GSM SHORT MESSAGE SERVICE," Indian Institute of Technology Bombay, www.cse.iitb.ac.in/~varsha/allpapers/wireless/ncc03cam.pdf , 2003; John D. Bard and Fredric M. Ham,"Time Difference of Arrival Dilution of Precision and Applications," IEEE TRANSACTIONS ON SIGNAL PROCESSING, VOL. 47, NO. 2, p.521-3, FEBRUARY 1999; K. C. Ho, and Wenwei Xu, "An Accurate Algebraic Solution for Moving Source Location Using TDOA and FDOA Measurements", IEEE TRANSACTIONS ON SIGNAL PROCESSING, VOL. 52, NO. 9, SEPTEMBER 2004.

[162] See AND_EF134186 .

63

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

### E.5.3.6    Fourth Clause of Claim 22: "(c) database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations"

The fourth clause of Claim 22 is: **"(c) database means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations."**

In conclusion, it is my opinion that all the elements of claim 22 are included in the combination of Andrew's "Geometrix® Wireless Location System" supplied to Saudi Arabia and STC's cellular network.

## E.5.4    CLAIM 31 OF THE '144 PATENT

### E.5.4.1    Claim 31 Recitation

A method for determining the location(s) of one or more mobile cellular telephones periodically transmitting signals over one of a prescribed set of reverse control channels, comprising the steps of:

(a)  receiving said reverse control channel signals at least three geographically-separated cell sites;

---

[163] See, e.g., PX-63 at 33 of 55, "Latitude," "Longitude," "Identity"; PX-236 – PX-240.

[164] 11/21/06 Deposition Transcript of Iris Inbar, p. 28, l. 1 – p. 31, l. 24.

Oded Gottesman Report

**III**. The Bases and Reasons for My Infringement Opinions

(b) processing said signals at each cell site to produce frames of data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said frames were produced at each cell site;

(c) processing said frames of data to identify individual cellular telephone signals and the differences in times of arrival of said cellular telephone signals among said cell sites; and

(d) determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals.

### E.5.4.2    GEOMETRIX system does perform all elements of method Claim 31

The following section describes how the Geometrix installed at the STC network operates and how during Andrew's demonstrations and tests in Saudi Arabia it performs all of the steps of method Claim 31 of the '144 Patent.

### E.5.4.3    First Clause of Claim 31: "A method for determining the location(s) of one or more mobile cellular telephones periodically transmitting signals over one of a prescribed set of reverse control channels, comprising the steps of:"

The first clause of Claim 31 is: **"A method for determining the location(s) of one or more cellular telephones each initiating periodic signal transmissions over one of a prescribed set of reverse control channels, comprising the steps of:"**

This element is literally satisfied by Andrew during operation of Geometrix installed at the STC network at the demonstration(s) or tests performed by Andrew Corporation.[165] The method was for determining the location of a cellular telephone.[166] The cellular telephone phone initiated periodic signal transmissions over a standalone dedicated control channel.[167] In fact Andrew specifically tested and demonstrated the SDCCH location functionality in Saudi Arabia.

I understand that Andrew my claim that this element is not satisfied because SDCCH transmissions are not "periodic" within the meaning of the 144 Patent. In fact, SDCCH transmissions are transmitted at regular intervals, as exemplified by the recurring 51 frame SDCCH structure illustrated earlier in my report. In any event, the 144 Patent defines "periodic" as "discontinuous," meaning occurring from time to time, which SDCCH transmissions certainly do. Col. 2, ll. 19-22.

I also understand that Andrew may claim that this claim element is not satisfied because the 144 patent is limited to "AMPS" control channels, "analog" control channels, or control channels within a particular band. As fully described earlier, the control channels in an AMPS system are digital, not analog, and the preferred embodiment in

---

[165] See, e.g., PX-236; PX-238; PX-240.

[166] See, e.g., PX-236; PX-238; PX-240.

[167] See, e.g., 10/17/06 Deposition Transcript of Andrew Corporation by Joseph Kennedy, pp. 224-231; PX-236; PX-238 ; PX-240.

# Exhibit E

## DRAFT TRANSLATION

### English Translation of Japanese Laid-open Patent Application

(19) JAPANESE PATENT OFFICE (JP)
(12) Official Gazette for Kokai (Laid-Open) Patent Applications (A)
(11) Japanese Patent Application Kokai (Laid-Open) Publication No.: H3-239091
(43) Kokai (Laid-Open) Publication Date: October 24, 1991
     Number of Claims: 1
     Request for Examination: None submitted
     (Total of 6 pages in the original Japanese)

| (51) Int.Cl.$^5$ | Ident. Symb. | JPO File No. |
|---|---|---|
| H04Q 7/04 | C | 7608-5K |

---

### (54) MOVING BODY RADIO COMMUNICATION APPARATUS

(21) Application Filing No.: H2-36652
(22) Application Filing Date: February 16, 1990
(72) Inventor: Mitsunori KONO, Mitsubishi Electric Corporation, Telecommunications Systems Laboratory, 1-1 Ofuna 5-chome, Kamakura City, Kanagawa Prefecture
(71) Applicant: Mitsubishi Electric Corporation, 2-3 Marunouchi 2-chome, Chiyoda-ku, Tokyo
(74) Agent: Masuo OIWA, Japanese Patent Attorney (and 2 other individuals)

### SPECIFICATION

1. Title of the Invention

Moving Body Radio Communication Apparatus

2. Claims

Moving body radio communication apparatus, characterized in being equipped with control channel transceivers that transmit to and receive from a moving body control signals for controlling radio communication with a moving body having the capacity to transmit and receive using control channels that are specifically allocated, and a traffic channel transceiver means that transmit and receive signals for communication and control with respect to a moving body using traffic channels that are specifically allocated, and a plurality of base stations possessing control means that control the aforementioned means and a shared channel reception means that receives position locating signals from a moving body using shared channels that are specifically allocated, and a switching station that receives data in the aforementioned position locating signals and that transmits and receives communications signals and control signals between the control means, with there being a connection between a telecommunications network and the control means of the above-mentioned bases, and a position locating means that locates the position of a moving body, being connected to the switching station.

3. <u>Detailed Description of the Invention</u>

### Field of Industrial Use

This invention relates to a moving body radio communication apparatus possessing a switching station and a plurality of base stations, and in particular, this invention relates to a moving body radio communication apparatus possessing a moving body position locating function.

### Prior Art

FIG. 4 shows a configuration of a prior art automobile telephone system, as described, for example in *BSTJ*, January 1979, Vol. 58, No. 1, Page 158, Fig. 4, where *1* is a switching station; *3a − 3n* are base stations; *4a − 4n* are base station antennas; *5* is mobile equipment located in an automobile or the like; *8* is an antenna for mobile equipment; *11a − 11n* are control devices for the base stations *3a − 3n*; *12a − 12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a − 3n*; *13a − 13n* are locator receivers; *14a − 14n* are traffic channel transceivers that transmit and receive signals for traffic channels allotted for each of the base stations *3a − 3n*; *15a − 15n* are antenna-sharing devices; *21* is a junction point between the switching station *1* and the public telecommunications network; *22a − 22n* are telecommunication circuit junction points between the switching station *1* and the base stations *3a − 3n*; *23a − 23n* are data circuit junction points; *25a − 25n* are junction points between the control channel transceivers *12a − 12n* and the control devices *11a − 11n*; *26a − 26n* are junction points between the locator receivers *13a − 13n* and the control devices *11a − 11n*; *27a − 27n* and *28a − 28n* are junction points between the traffic channel transceivers *14a − 14n* and the control devices *11a − 11n*; and *29a − 29n, 30a − 30n,* and *31a − 31n* are junction points between the control channel transceivers *12a − 12n,* the locator receivers *13a − 13n,* and the traffic channel transceivers *14a − 14n,* respectively, and the antenna-sharing devices *15a − 15n.*

Next, the operation is described. The control channel transceivers *12a − 12n* of the base stations *3a − 3n* are modulated by reporting signals that include identifier signals from the base stations *3a − 3n,* and the carrier waves of the respectively differing radio frequencies are continuously transmitted. The mobile equipment *5* scans all of the designated control channels, fixes to the one with the largest reception electrical field, and stands by. At this point, suppose that a call was made to a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network. The switching station *1* issues a command to the base station *3a − 3n* to call the specified mobile equipment *5,* and when this is received, the control device *11a − 11n* radiates a call signal in the space from the antenna *4a − 4n* via the control channel transceivers *12a − 12n* and the antenna-sharing devices *15a − 15n* to call the mobile equipment *5.* The mobile equipment *5* stands by to receive the strongest electrical field, for example, from the base station *3a,* and receives the call signal from the base station *3a,* and immediately transmits a response signal. The base station *3a* which receives the response signal allots an empty traffic channel of the traffic channel transceivers *14a,* establishing a state of voice communication. The switching station *1* establishes a switching connection between the

2

traffic channel designated by the base station *3a*. If the voice communication quality of the current traffic channel degrades, then the control device *11a* relies on the measurement of the electrical field of the current traffic channel by a nearby base station, e.g., the base station *3b* – *3e*, via the switching station *1*. Measurement of the electrical field is carried out by the locator receiver *13b* – *13e* of the base station *3b* – *3e*, and supposing that the electrical field of the base station *3c* is the largest, then the switching station *1* will issue a command to the mobile equipment *5* via the current traffic channel to switch to an idle traffic channel of the base station *3c*, thereby switching and connecting the circuit of the public telecommunications network to a new traffic channel. Furthermore, if there is a call from the mobile equipment *5*, the operation is the reverse of that described above. If either the public telecommunications network or the mobile equipment *5* terminates, then the switching station *1* and the control device *3c* terminate operation.

## Problems to be Solved by the Invention

The prior art automobile telephone system had a constitution as described above, and was suited for wireless radio analog transmission, and when migrating to digital transmission (TDMA format), the distance between the base station *3a* – *3n* and the mobile equipment *5* had be measured, and equipment was needed for that.

This invention was devised to solve the above-mentioned problem, and has as its object to make it possible to measure the distance between a base station and a moving body, and also to produce a moving body radio communication apparatus that can locate the position of a moving body.

## Means for Solving These Problems

The moving body radio communication apparatus of this invention is provided with a plurality of base stations that possess a shared channel reception means that receives position locating signals from a moving body using shared channels that are allotted jointly, a switching station that receives data in the form of these position locating signals, and a position locating means that is connected to the switching station, inputs the above-mentioned data, and locates the position of a moving body.

## Operation of the Invention

In this invention, a moving body transmits position locating signals using shared channels allotted jointly to the base stations, the shared channel transceivers of the base stations receive these position locating signals and transmit the data to the switching stations, the switching stations transmit this data to a position locating means, and the position locating means locates the position of the moving body.

## Working Examples

A working example of this invention is described below with drawings. **FIG. 1** shows a configuration of a moving body position locating apparatus in accordance with this working

example, where reference numeral *2* is a position location calculating device, *16a – 16n* are shared channel receivers provided within the base stations *3a – 3n*, which transmit to and receive from a shared channel *12* allotted jointly to the base stations *3a – 3n*. Reference numeral *24* is a junction point between the switching station *1* and the position location calculating device *2*; *32a – 32n* are junction points between control devices *11a – 11n* and the shared channel receivers *16a – 16n*; *33a – 33n* are junction points between the shared channel receivers *16a – 16n* and antenna-sharing devices *15a – 15n*. The rest of the configuration is identical to that of **FIG. 4**.

Next, the operation is described. The control channel transceivers *12a – 12n* are modulated by announcing signals that contain identifier signals of the base stations *3a – 3n*, and the carrier waves of the respectively differing radio frequencies are continuously transmitted. The mobile equipment *5* scans all of the designated control channels, fixes to the one with the largest reception electrical field, and stands by. For example, if the mobile equipment *5* is positioned within the zone of the base station *3a*, it waits for signals from the control channel transceiver *12a*. At this point, if there is a request to locate the position of a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network, then the exchange station *1* issues a command to the base stations *3a – 3n* to call and locate the position of the mobile equipment *5*. When this is received, the control device *11a – 11n* radiates a call signal in the space from the antenna *4a – 4n* via the control channel transceivers *12a – 12n* and the antenna-sharing devices *15a – 15n* to call the mobile equipment *5*. The mobile equipment *5* stands by to receive the signal with strongest electrical field from among the radiated position locating call signals radiated by the base station *3a*, using the control channel, and when this position locating call signal is received, it immediately transmits a response signal, switching to a shared channel and emitting a position locating signal which is a burst digital signal. The base station *3a* that receives the response signal reports to the switching station *1* that the mobile equipment *5* is within its own zone. Furthermore, when some of the shared channel receivers *16a – 16n* of the base stations *3a – 3n* receive the position locating signal from the mobile equipment *5*, the absolute time or the relative time when the position locating signal arrives is determined by correlation detecting the unique word contained therein, and reports to the switching station *1* via the control devices *11a – 11n* data such as the difference in arrival time of position locating signals with respect to the various base stations *3a – 3n*. The base station *1* forwards these data to the position location calculating device *2*, and the position of the mobile equipment *5* is calculated. In this case, if there are many [illegible] values of the shared channel receivers *16a – 16n*, and if the density is suitable, the accuracy of the position locating can be quite high.

Next, suppose that a call is made to a specific mobile equipment *5* at the junction point *21* connecting to the public telecommunications network. In this case, the switching station *1* issues a command to the base station *3a – 3n* to call the specified mobile equipment *5*. When this is received, the control device *11a – 11n* radiates a call signal in the space from the antenna *4a – 4n* via the control channel transceivers *12a – 12n* and the antenna-sharing devices *15a – 15n* to call the mobile equipment *5*. The mobile equipment *5* stands by to receive the signal with the strongest electrical field from among the call signals, for example, standing by with the control channel of the base station *3a*, receives the call signal from the base station *3a*, and immediately transmits a response signal. The base station *3a* which receives the response signal allots an idle traffic channel of the traffic channel transceivers *14a*, establishing a state of voice

4

communication. The switching station *1* establishes a switching connection between the traffic channel designated by the base station *3a*. At this point, if the voice communication quality of the current traffic channel degrades, then the control device *11a* issues a command to the mobile equipment *5* to transmit a position locating signal using a shared channel via the currently used traffic channel. When this command is received, the mobile equipment *5* switches to a shared channel and transmits a position locating signal, returning to the current traffic channel. When the shared channel receivers *16a – 16n* receives this position locating signal, it determines the arrival time from the unique word therein, and reports these data to the switching station *1* via the control devices *11a – 11n*. The switching station *1* reports these data to the position location calculating device *2*, establishing the position of the mobile equipment *5*. In accordance with these position location results, if, for example, the mobile equipment *5* is within the zone of the base station *3c*, the switching station *1* posts an inquiry to the control device *11c* of the base station *3c* as to an idle traffic channel, and issues a command to the mobile equipment *5* to switch to an idle traffic channel of the base station *3c*, thereby switching and connecting the circuit of the public telecommunications network to a new traffic channel. It should be noted that the junction points *22a – 22n* are used for voice communication signals, and the junction points *23a – 23n* are used for data or control signals. If a call originates from the mobile equipment *5*, the operation is the reverse of that described above. If either the public telecommunications network or the mobile equipment *5* terminates, then the switching station *1* and the control device *11c* terminate operation.

FIG. 2 shows a configuration of the shared channel receivers *16a – 16n*, and *41* is a high-frequency filter, *42* is a high-frequency amp, *43* is a primary mixer, *44* is a synthesizer that generates a primary local frequency, *45* is a primary intermediate frequency filter, *46* is a primary intermediate frequency amp, *47* is a secondary mixer, *48* is a crystal oscillator that generates a secondary local frequency, *49* is a secondary intermediate frequency filter, *50* is a secondary intermediate frequency amp, *51* is a detector/decoder, *52* is a unique word detection circuit, *53* is a time measurement circuit, *54* is a standard clock, and *55* is a control circuit.

In the configuration of FIG. 2, when a high-frequency signal modulated by a position locating signal is input to the junction point *33* connecting to the antenna-sharing devices *15*, it is selected by the high-frequency filter *41*, amplified by the high-frequency amp *42*, mixed with the output of the synthesizer *44*, using the primary mixer *43*, and converted to a primary intermediate frequency. After that, it is selected by the primary intermediate frequency filter *45*, amplified by the intermediate frequency amp *46*, mixed with the output of the secondary local frequency crystal oscillator *48*, using the secondary mixer *47*, and converted to a secondary intermediate frequency. Moreover, it is selected by the secondary intermediate frequency filter *49*, amplified by the secondary intermediate frequency amp *50*, and decoded to a position locating signal using the detector/decoder *51*. The position locating signal includes a unique word on the order of 14 bits, and the unique word detection circuit *52* detects the correlation with the original unique word, and when the correlation reaches a peak, the time measurement circuit *53* is triggered. The standard clock *54* is an ultra-high precision clock, and the time measurement circuit *53* measures the absolute time of the above-mentioned trigger, and reports it to the switching station *1* from the control circuit *55* via the control device *11*. Furthermore, conversely, the time of the standard clock *54* is corrected by the switching station *1*. Since the unique word correlation detection is accurate to a level of 1/50 bit, if the bit rate of the unique

word is 50 kbps, then the precision is (1 sec + 50 kbps) x 1/50 = 0.4 [illegible], so the precision in locating the mobile equipment *5* is on the order of 120 m.  If the bit rate is 500 kbps, then the location precision is improved by about 12 m.

FIG. 3 shows a configuration of a moving body radio communication apparatus of a second working example of this invention, and *7a – 7k* are position locating stations, *8a – 8k* are antennas thereof, *17a – 17k* are control devices, *18a – 18k* are shared channel receivers, and *34a – 34k* are contact points between the shared channel receivers *18a – 18k* and the antennas *8a – 8k*.  The rest of the configuration is identical to that of **FIG. 1**.

In the configuration of **FIG. 3**, the position locating stations *7a -7k* are provided to increase the accuracy of locating the position of the mobile equipment *5*, and when the mobile equipment *5* transmits a position locating signal using a shared channel, the arrival time is measured, and the data is reported to the switching station *1*.  The switching station *1* transmits the data from the base stations *3a – 3n* and the data from the position locating stations *7a – 7k* to the position location calculating device *2*, causing the position of the mobile equipment *5* to be calculated.  The rest of the configuration is identical to that of **FIG. 1**.

It should be noted that in the above working examples, with regard to the shared channels, only the receivers *16a – 16n* were provided, but even if these were transceivers, the same results would be obtained, and moreover, messages could be left with the mobile equipment *5*.

## Advantageous Effects of the Invention

In accordance with the invention as described above, it is possible to locate the position of a moving body and determine the distance between a base station and a moving body and digitally transmit with a radio circuit by providing a car telephone system with base stations and a shared channel receiving means, and connecting a moving body position location means to a switching station.

4.  Detailed Description of the Drawings

**FIG. 1** and **FIG. 2** are schematic diagrams of a moving body radio communication apparatus of the first working example and of a shared channel receiving means.  **FIG. 3** is a schematic diagram of working example 2 of this invention.  **FIG. 4** is a schematic diagram of a prior art device.

| | |
|---|---|
| *1* | …. Switching station |
| *2* | …. Position location calculating device |
| *3a – 3n* | …. Base stations |
| *4a – 4n, 6* | …. Antennas |
| *5* | …. Mobile equipment |
| *11a – 11n* | …. Control devices |
| *12a – 12n* | …. Control channel transceivers |
| *14a – 14n* | …. Traffic channel transceivers |
| *16a – 16n* | …. Shared channel receivers |

6

# Exhibit F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TruePosition, Inc. | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counterclaim-Defendant, | ) | C.A. No. 05-747 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Andrew Corporation, | ) | |
| | ) | |
| Defendant/ | ) | |
| Counterclaim-Plaintiff. | ) | |

**EXPERT REPORT OF BRIAN G. AGEE, PH.D., P.E.
RESPONSE TO DR. DAVID GOODMAN'S REPORT ON THE VALIDITY
OF U.S. PATENT NO. 5,327,144**

| Claim 22 Language | Missing in Kono Under | | |
|---|---|---|---|
| | Andrew Claim Constructions | TruePosition Claim Con-structions | Ordinary & Customary Meaning |
| (c)   database means for storing location data by identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations. | Missing | Missing | |

Table 3-4:  Summary of Opinions Related to Kono and Claim 31 of the 144 Patent (Detailed Opinion in Subsection 3.3.1.4)

| Claim 31 Language | Missing in Kono Under | | |
|---|---|---|---|
| | Andrew Claim Constructions | True-Position Claim Con-structions | Ordinary & Customary Meaning |
| 31.  A method for determining the location(s) of one or more mobile cellular telephones | | | |
|      periodically transmitting signals | | | |
|      over one of a prescribed set of | | | |
|      reverse control channels, | | | |
| comprising the steps of: | | | |
| (a)   receiving said reverse control channel signals at at least three geographically-separated cell sites; | Missing | Missing | |
| (b)   processing said signals at each cell site to produce | | | Missing |
|        frames of data | | | |
|        each frame comprising a prescribed number of | | | |
|          data bits | | | |
|        and | | | |
|          time stamp bits, | | | |
|        said time stamp bits representing the time at which said frames were produced at each cell site. | | | |
| (c)   processing said frames of data | | | Missing |
|        to identify | | | |
|          individual cellular telephones | | | |
|          and | | | |
|          the difference in times of arrival of said cellular telephone signals among said cell sites; | | | |
|        and | | | |
| (d)   determining, on the basis of said times of arrival differences, the locations of the cellular telephones responsible for said cellular telephone signals. | Missing | Missing | |

Table 3-5:  Summary of Opinions Related to Kono and Claim 32 of the 144 Patent (Detailed Opinion in Subsection 1)

| Claim 32 Language | Missing in Kono Under | | |
|---|---|---|---|
| | Andrew Claim Constructions | TruePosition Claim Con-structions | Ordinary & Customary Meaning |
| 32.  A method as recited in claim 31, further comprising the steps of | | | |
|      storing, in a database, location data identifying | Missing | Missing | |
|        the cellular telephones | | | |
|        and | | | |

| Claim 32 Language | Missing in Kono Under | | |
|---|---|---|---|
| | Andrew Claim Constructions | TruePosition Claim Con-structions | Ordinary & Customary Meaning |
| their respective locations, | | | |
| and | | | |
| providing access to said database to subscribers at remote lo-cations. | Missing | Missing | |

### 3.3.1.1  Detailed Opinions Relating to Kono and Claim 1 of the 144 Patent

A summary of my teachings regarding the teachings of Kono to one having ordinary skill in the art at the time and the limita-tions in Claim 1 of the 144 Patent is set forth in Table 3-1 above.  My opinions can be summarized as follows:

- Kono fails to teach reception and provision of reverse control channel cellular telephone baseband signals as part of its invention.  The "common channel receiver" that performs this function in Kono instead receives and provides the [baseband] position location signal transmitted from the mobile over the "common channel" defined in Kono.  This common channel is not a control channel under both the Andrew Claim Constructions and the TruePosition Claim Constructions.

- Kono fails to teach mobile initiation of signals used for position location.  Instead, position location signals are always transmitted in response to a call from the base station transceiver.

- Kono fails to teach a timing signal receiver receiving a timing signal common to all cell sites.

- Kono fails to disclose or teach "a sampling subsystem … for sampling [a] baseband signal" of any sort.  Figure 2 of Kono instead presents a subblock 51, referred to as a Wave detector in the Figure, and a detector/decoder in the text, that does not implement a sampling function.

- Kono fails to disclose or teach "formatting of the sampled baseband signal … into frames of digital data comprising data bits" and time stamp bits.  Kono only teaches reporting of the mobile unit zone location from the nearest (strong-est) base station, and reporting of timing data derived from the position location to the exchange office.

- Kono fails to disclose or teach means for processing said data frames from cell site systems (base station transceiv-ers in Kono) to generate a table of any sort, much less the processing means defined by both the Andrew Claim Con-structions and the TruePosition Claim Constructions.

- Kono fails to disclose or teach any means for determining, on the basis of times of arrival differences, the locations of cellular telephones, much less the specific locating means defined by both the Andrew Claim Constructions and the TruePosition Claim Constructions.

My detailed opinions supporting these conclusions are provided below.

<u>Kono fails to teach reception and provision of reverse control channel cellular telephone baseband signals</u>

Kono fails to teach reception and provision of reverse control channel cellular telephone baseband signals, i.e.,

> "… a baseband convertor operatively coupled to said antenna for receiving cellular telephone signals transmitted over a reverse control channel by said telephones and providing baseband signals derived from the cellular tele-phone signals;" (144 Patent, Col 20, ll 10-14)

as an expresss or inherent part of its invention.  Dr. Goodman and I both agree that the corresponding device to the "base-band convertor …" in the Kono application would be contained within the common channel receiver 16a-16n in Figure 1 (first embodiment) and Figure 4 (second embodiment) of Kono, specifically, the processing steps comprising blocks 41-50 in Figure 2 of Kono, and possibly comprising block 51 of Kono (denoted a "Wave detector" in Figure 2, and a "detector/decoder" in the text describing that block).  In particular, on page 13 of his report, Dr. Goodman writes (highlights mine):

> "Claim 1 of the '144 patent also includes a 'baseband converter' for receiving the periodic transmissions on the re-verse control channels.  The corresponding device in the Kono application is a shared channel receiver at each base station (*16a-16n*)

Comparison of Figure 1 and Figure 4 (prior art) in Kono reveals that the only differences between the prior art and the invention in Kono is the replacement of the "Locator Receiver 13a-13n" in Figure 4 with the "Common Channel Receiver 16a-16n" in Figure 1. Moreover, in the second embodiment of Kono's invention (Figure 3), position location bureaus that comprise only common channel receivers are taught, i.e., the control channel (and voice channel) transceivers are dropped.

Moreover, the position location signals in Kono are not expressly or inherently control signals, under either Andrew's or True-Positions Claim Constructions. The only attribute of the position location signals that are taught by Kono is the 14-bit Unique Word (UW). Neither the structure of the Unique Word (bit sequence, relationship of bit sequence to channel, or relationship of bit sequence to individual users), nor the modulation format of the Unique Word, nor any other component of the position location signal, is taught in Kono. In fact, Kono fails to state whether the Unique Word is unique to the user, or unique to the common channel, i.e., if the position location signal is identical for every user that accesses the channel.

Based on definitions of "Unique Word" (UW) bit sequences encountered in other cellular air interfaces, the UW is likely meant to be a bit pattern that is unique to the channel. For example, the Personal Handy Phone System (PHS), a microcellular telephone system developed in 1989 principally by NTT Laboratories and standardized by the Association of Radio Industries and Businesses (ARIB) as RCR STD-28, defines 16 bit and 32 bit Unique Words for traffic-bearing communication physical slots, synchronization bursts (defined as communication physical slots in RCR STD-28) and control physical slots, on both the PHS downlink (reverse link) and uplink (forward link) (see for example, PHS Association of Radio Industries and Businesses Standard version 2, RCR STD-28, Figure 4.2.23.7, page 88, 1995). Given that Mistubishi Electric, Ltd. (the assignee for Kono) was a member of ARIB and was actively involved in the development and deployment of PHS in the mid-1990's, it is likely that Kono was using the Unique Word in the same sense employed in PHS.

At the same time, the Unique Word does not constitute "signaling information" in any customary and ordinary sense. In particular, the Telecommunications: Glossary of Telecommunication Terms Federal Standard 1037C ("FS-1037C"), published 23 August 1996, provides the following definition of signaling:

> **signaling: 1**. The use of signals for controlling communications. **2.** In a telecommunications network, the information exchange concerning the establishment and control of a connection and the management of the network, in contrast to user information transfer. **3.** The sending of a signal from the transmitting end of a circuit to inform a user at the receiving end that a message is to be sent. *[citations omitted]*

Using this definition, the customary and ordinary definition of signaling information would be control information that is provided by the telecommunications network, to set up and manage the network, inform user receiver that a message is to be sent, or otherwise control communications of the network.

The Unique Word meets none of these criteria. The UW is not used for controlling communications in Kono; any commands sent from the base transceiver station due to analysis of the UW are sent over the prior art control channel using the control channel transceiver 12a-12n. The UW is never used to establish and control communications. The UW does not constitute "user information" of any sort; it is a known sequence. And the UW is never used to inform the base transceiver station that a message is to be sent — in the one instance taught in Kono in which such a message is sent (TruePosition Kono Translation, pg.TPI0067421, Col. 1, ll 40-47), Kono teaches that the message is sent on a separate channel from the position location signal

> "… it [the mobile unit] immediately transmits a response and switches to the common channel and transmits a position location signal …" (TruePosition Kono Translation, pg.TPI0067421, Col. 1, ll 44-46)

Lastly, because there is ample precedent for incorporation of Unique Words' into synchronization bursts, traffic (voice) channels, etc., as seen in the PHS standard, and because Kono teaches no other aspect of the position location signal, the position location signal is not inherently a control channel signal.

Dr. Goodman makes no attempt to argue that the common channel is a control channel, other than providing a tortuous (and incorrect) argument that they possess a "many-to-one" property that is also possessed by control channels. In fact, any reverse wireless channel theoretically possesses a "many-to-one" property, as multiple mobile units that are designed to operate in the cellular network could use that channel to simultaneously transmit to a single base transceiver station if not prevented from doing so. Among other features, the signaling information transmitted over the control channel is generally designed to prevent that from happening. In any event, Dr. Goodman's argument fails to satisfy (or even address) the definition of "control channel" proposed under the Andrew or TruePosition Claim Constructions.

"… when the common channel receivers *16a-16n* receive this position location signal, the arrival time of a unique word therein is measured, and this data is reported to the exchange office *1* via the control devices *11a-11n*. ==The exchange office *1* in turn sends this data to the position location computer *2*, which locates the position of the mobile unit *5*.== (TruePosition Kono Translation, pg. TPI067421, Col. 2, ll 46-48)

At the end of the description of the second embodiment (shown in TruePosition Kono Translation, Figure 3), Kono teaches (==highlighting== mine):

"When the mobile unit *5* transmits a position location signal on the common channel, its arrival time is measured and that data is reported to the exchange office *1*. ==The exchange office *1* transfers the data from the base transceiver stations *3a-3n* and the data from the position location bureaus *7a-7k* to the position location computer device *2*, where the position of the mobile unit *5* is computed.==" (TruePosition Kono Translation, pg. TPI0067422, Col 2, ll 25-32)

These are the only passages in Kono in which "means for determining location" are discussed.

Kono is mute on the algorithm used to compute that location. In particular, the "method of least squares" is not inherent to position location; less computationally complex location methods based on non-least-squares metrics (e.g., "taxicab" metric) can be used and may have advantages in applications of clear interest to Kono, e.g., identification of changes in base station zones occupied by mobile units. Consequently, Kono fails to expressly or inherently anticipate these means under the Andrews Claim Constructions.

Similarly, neither the fifth and sixth blocks of Figure 7, nor the top four elements of Figure 8D, nor the text accompanying those blocks in TruePosition's Claim Constructions, are taught by Kono. Moreover, the "filtering" operation shown in the fifth block of Figure 7 and taught in Col 13, ll 58-59 of the 144 Patent, the linearized weight least-squares technique shown in the first element of Figure 8D and taught in Col 18, ll 17-18 and line 31 of the 144 Patent, or the alternating LAT-LON search method shown in the last other three of the top four elements of 8D and taught in Col 18, ll 13-34 of the 144 Patent are not inherent to a position location algorithm based on times of arrival differences. Consequently, Kono fails to expressly or inherently anticipate these means under the TruePosition Claim Constructions.

Dr. Goodman completely fails to provide any argument teaching how the "means for location" taught by Kono are related to Andrew's (or TruePosition's) proposed Claim Constructions.

### 3.3.1.2   Detailed Opinions Relating to Kono and Claim 2 of the 144 Patent

A summary of my conclusions regarding the teachings of Kono to one having ordinary skill in the art at the time and the limitations in Claim 1 of the 144 Patent is set forth in Table 3-2 above. My opinions supporting these conclusions are provided below.

First, as discussed in the passage in Subsection 3.3.1.1 entitled "Kono fails to teach a timing signal receiver receiving a timing signal common to all cell sites," Kono fails to teach a timing signal receiver of any sort, much less a timing signal common to all cell sites, much less a GPS receiver. In particular, the method for timing control taught by Kono is not inherently implemented using a GPS disciplined clock. Nothing in Kono teaches a similar receiver, nor does any sort of correction applied from an exchange office inherently teach such a receiver.

My opinion is consistent with opinions expressed by the 144 patent inventors. In ll 1,377-1,388 of Dr. Webber's deposition, Dr. Webber provides the following additional information at the end of the exchange listed abover on analog-to-digital conversion (==highlighting== mine):

Dr. Webber:     "… So, another additional piece of equipment required in the overall conversion process from our radio frequency to a lower frequency band and then subsequently converting to digits is an accurate clock, an accurate time reference. ==So an ancillary piece of equipment for this project was a disciplined GPS oscillator, which provided signals with the required phase and time stability for both the down-conversion and the digitization. It's not strictly necessary. It's just convenient and relatively inexpensive to achieve the required performance.=="

In ll 2,404-2,417 of Dr. Webber's deposition, Dr. Webber and Andrew's counsel have the following additional exchange on this matter (==highlighting== mine):

Ms. Waldron:   *"Could you describe exactly what a timing signal receiver does?"*

Dr. Webber:    "A timing signal receiver provides, in some fashion, a relative time reference in order to identify the exact time at which the signal was received at each cell telephone site. That — in the system it was

GPS receivers at each site.  ==One could use some other synchronizing signal that's widely dissemi-nated, such as a LORAN signal, or one could put rubidium clocks at each site, which keep accurate time to a microsecond per month.==  But some means must be provided of identifying exactly the time at each cell telephone tower and relating those times to each other."

Dr. Goodman fails to address inherency of the timing signal receiver in his report.  Instead, on page 14 of his report, he states that correction of the clock using a GPS clock was known in 1993.  However, this observation fails to satisfy the criteria for inherency of a GPS receiver given Kono, since Kono mentions nothing about a GPS clock and timing correction could be provided without a GPS receiver, as noted by Dr. Webber above.

### 3.3.1.3   Detailed Opinions Relating to Kono and Claim 22 of the 144 Patent

A summary of my conclusions regarding the teachings of Kono to one having ordinary skill in the art at the time and the limitations in Claim 22 of the 144 Patent is set forth in Table 3-3 above.  My opinions supporting these conclusions are provided below.

- Kono fails to disclose or teach any locating means for automatically determining the locations of cellular telephones.  Instead, it teaches a "command-respond" approach in which position location only occurs after a command (position location call) is sent from either the exchange office (based on unexplained criteria) or the base transceiver station.

- Kono fails to disclose or teach location by receiving and processing signals emitted during reverse control channel transmissions.  Instead, it locates the telephones using signals emitter received and processed on common channel that is not a control channel under either Andrew's or TruePosition's Claim Constructions.

- Kono fails to disclose or teach any database means for storing location data, much less the specific database means defined by both the Andrew Claim Constructions and the TruePosition Claim Constructions.

My detailed opinions supporting these conclusions are provided below.

<u>Kono fails to disclose or teach any locating means for automatically determining the locations of cellular telephones.</u>
Kono fails to disclose or teach any locating means for automatically determining the locations of cellular telephones, under either the Andrew or TruePosition Claim Constructions. Instead, it teaches a "command-respond" approach in which position location only occurs after a command (position location call) is sent from either the exchange office (based on unexplained criteria) or the base transceiver station (based on degradation of the mobile signal quality on the mobile traffic channel, as taught in the TruePosition Kono Translation, pg. TPI0067421, ll 34-38).

Andrew's Claim Construction for "locating means …" directs me to "automatically determine the location of cellular telephones (function) … using a general purpose computer programmed with the algorithm disclosed in the 144 patent using least squares."  As explained in the passage in Subsection 3.3.1.1 entitled "Kono fails to disclose or teach any means for determining the locations of cellular telephones," Kono fails to expressly or inherently disclose or teach any structure or algorithms for determining the location of the cellular telephones.  Thus, Kono also fails to teach a "least squares algorithm" of any sort, such as the algorithm taught in the 144 Patent.  As this passage also explains, the least squares algorithm taught in the 144 Patent is not inherent to position location, and can be replaced by other algorithms, e.g., algorithms based on non-least-squares metrics, or least-squares algorithms that do not employ linearized-weight-least-squares iterations in their formulation, based on other implementation requirements such as processor complexity. Consequently, Kono fails to expressly or inherently antici-pate locating means under the Andrews Claim Constructions.

Similarly, TruePosition's Claim Construction for "locating means …" directs me to evaluate this element of Claim 22 based on Kono's teaching of the first six blocks in Figure 7, Figures 8A-8C, and the top four elements of Figure 8D of the 144 Patent, and the text accompanying those Figures.  As is also explained in the passage in Subsection 3.3.1.1 entitled "Kono fails to disclose or teach any means for determining the locations of cellular telephones," Kono fails to expressly or inherently antici-pate "locating means …" under this Claim Construction, for the same reasons given in that passage.

Dr. Goodman fails to address either of these Claim Constructions in rendering his opinion.  Moreover, since the "shared [common] channel receiver and its associated blocks are not part of the exchange office, and (as explained in the passage above) Kono fails to teach any operations in the position locating device, his argument cannot be interpreted in light of these Claim Constructions.

<u>Kono fails to disclose or teach location by receiving and processing signals emitted during reverse control channel transmissions</u>

As explained in the passage in Subsection 3.3.1.1 entitled "Kono fails to teach reception and provision of reverse control channel cellular telephone baseband signals," Kono does not process "periodic reverse control channel transmissions" in the common channel receiver in any event, but instead processes the position location signals, which are (as explained in that passage) not control channel transmissions under either Andrew's or TruePosition's Claim Constructions.

Dr. Goodman again provides contradictory information in his report, by attempting to imply that

"the elements of the Kono application that perform this function [receiving and processing signals emitter during said periodic reverse control channel transmissions]

are

"the shared [common] channel receivers in the base stations"

in the fourth paragraph on page 14 of his report, and then, in his applicable summary table on page 17 of his report, he states (highlighting mine):

| Claim Language | Present in Kono | Kono Disclosure |
|---|---|---|
| … | | |
| equipped to receive signals sent by multiple mobile cellular telephones | Yes | Control channel transceivers *12a-12n* |
| each initiating periodic signal transmission | Yes | "a moving body transmits position locating signals using shared channels," |
| over one of a prescribed set of reverse control channels | Yes | "*12a-12n* are control channel transceivers that transmit and receive signals for the control channels allotted for each of the base stations *3a-3n*." |
| … | | |

That is, Dr. Goodman appears to acknowledge that the "reverse control channels" are the channels connected to the control channel transceivers 12a-12n in Kono, but then appears to imply that the signals sent over these control channels, and received and processed by the control channel transceivers 12a-12n, are the position locating signals. However, on page 14 of his report, he also acknowledges that these signals are both (a) sent over the shared [common] channels and (b) processed by the shared [common] channel receiver at the base transceiver station.

Again, given his contradictory statements here, I can not ascertain his true opinion is on this matter. However, he advances no argument anywhere in his report explicitly stating an opinion that the position location signals are control signals, or that the shared [common] channel is a control channel.

<u>Kono fails to disclose or teach any database means for storing location data</u>

Kono fails to disclose or teach any database means for storing location data, much less the specific database means defined by both the Andrew Claim Constructions and the TruePosition Claim Constructions.

In regards "database means for storing location data …", Andrew's Claim Constructions direct me to consider only whether Kono teaches (highlighting mine):

"storing location data identifying the cellular telephones and their respective locations, and for providing access to the database to subscribers at remote locations"

using

"a database or local disk storage device containing the telephone number corresponding to each cellular telephone and a terminal coupled to the database via (1) modem and telephone line, or (2) radio communication providing access to the database and user."

However, as I explain in the passage in Subsection 3.3.1.1 entitled "Kono fails to disclose or teach means for processing said data frames from cell site systems, to generate a table," Kono fails to teach either a table of individual cellular telephone sig-

# Exhibit G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

─────────────────────────────────

TRUEPOSITION, INC.,

      Plaintiff/Counterclaim-Defendant

   vs.               CA No. 05-00747-SLR

ANDREW CORPORATION,

      Defendant/Counterclaim-Plaintiff

─────────────────────────────────

VIDEOTAPED DEPOSITION OF DR. DAVID GOODMAN

New York, New York

Monday, January 15, 2007

Reported by:
Adrienne M. Mignano
JOB NO. 190791

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 11

1                           Goodman
2      invalidity report; is that correct?
3           A.    That's correct.
4           Q.    When did you first come to believe
5      that the '144 patent is invalid?
6           A.    I think early in November.
7           Q.    Sitting here right now, do you, in
8      fact, believe that the '144 patent is
9      invalid?
10          A.    Yes.
11          Q.    Based on what?
12          A.    Based on my understanding of the
13     patent and based on my analysis of a prior
14     art reference that I referred to in my expert
15     report.
16          Q.    Did you come to an understanding of
17     what the claims of the '144 patent meant in
18     connection with your opinion that the patent
19     is invalid?
20               MS. WALDRON:   Objection.  Legal
21          conclusion.
22          A.    Yes.
23          Q.    For each one of the claim elements
24     of the claims of the '144 patent?
25          A.    Of the asserted claims, yes.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1            Goodman
2      Q.    Do you have an understanding of how
3  patent claims are interpreted from a legal
4  standpoint?
5            MS. WALDRON:  Objection.  Legal
6        conclusion.
7      A.    It's been explained to me.  So I
8  have an engineer's understanding, perhaps not
9  a lawyer's understanding.  It's been
10  explained to me by lawyers.
11      Q.    What's your engineer's
12  understanding of how the patent claims are
13  interpreted?
14      A.    My understanding is that they are
15  interpreted as they would have been
16  understood by someone of skill in the art at
17  the time that the patent application was
18  filed.  And that the person of skill in the
19  art would gain this understanding by reading
20  the claims, and referring to their meaning
21  within the context, technical context of the
22  patent, and that, in some cases, that would
23  be insufficient to gain an understanding, and
24  that there would be other considerations,
25  particularly what the inventors said in the

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 13

Goodman

2  remainder of the patent, and also what the

3  inventors told the patent office when they

4  were trying to get the patent office to issue

5  the patent.

6      Q.     Did you apply your understanding of

7  how patent claims are construed in rendering

8  your invalidity opinion?

9      A.     Yes.

10     Q.     Dr. Goodman, I would like to show

11 you what I suppose we should mark, just to be

12 safe, Exhibit 300.

13          It's an expert report of Dr. David

14 Goodman on the invalidity of 5,237,144.  Let

15 me know when the court reporter has shown you

16 Plaintiff's Exhibit 300.

17          (Plaintiff's Exhibit 300, Expert

18     Report of Dr. David Goodman of the

19     Invalidity of 5,237,144, marked for

20     identification, as of this date.)

21     A.     I have Exhibit 300.

22     Q.     Do you recognize Exhibit 300?

23     A.     Yes, it's a copy of the invalidity

24 report that we've been speaking about.

25     Q.     Could you turn to page 5 of the

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman

2      invalidity report, Exhibit 300, and let me

3      know when you're there?

4           A.    I have page 5.

5           Q.    Do you see the last full paragraph

6      of page 5 where it says "I understand the

7      claims are construed"?

8           A.    Yes.

9           Q.    Could you read that paragraph into

10     the record?

11          A.    Of course.

12               "I also understand that court has

13     not yet construed claims, claim terms in this

14     case --

15          Q.    I'm sorry, Dr. Goodman --

16          A.    The last full paragraph?

17          Q.    Yes, please.

18          A.    I beg your pardon.

19               "I understand the claims are

20     construed according to their plain and

21     ordinary meaning to one of ordinary skill in

22     the art.  I understand the same claim

23     construction must be used for both an

24     infringement analysis and an invalidity

25     analysis.  I understand claims cannot be

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                       Goodman
2        A.    Excuse me, Mr. Milcetic, before I
3    answer your question, I want to point out
4    that figures in the patent application aren't
5    included in Exhibit 466.
6        Q.    Were they included in the version
7    that you prepared in rendering your report?
8        A.    Yes.
9        Q.    I believe this is the only version
10   that we have.
11           MS. WALDRON:  Do you mean that
12        there were figures in that or that you
13        also relied on the original Japanese
14        figures?
15           THE WITNESS:  That's true.  I
16        relied on the figures.  Anyway, I
17        had -- it says Figure 1, and I had a
18        copy of Figure 1 that I attached to
19        this, and I suppose maybe the
20        translator didn't attach it.
21       Q.    Would it be helpful if I gave you
22   the figures in the original Japanese
23   translation?
24       A.    Yes, please.
25           MS. WALDRON:  I believe there are

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman
2        also some in the report.
3            THE WITNESS:  Thanks.
4        A.    For the moment, Mr. Milcetic, Ms.
5    Waldron showed me that I incorporated it in
6    my report, so --
7        Q.    Go ahead.
8        A.    I don't need you to give me Figure
9    1 right now.  Maybe all of them that I
10    referred to, if you remember that.
11            What's the question, please?
12        Q.    Referring to page 15 of your
13    report, where in the Kono disclosure is a
14    cellular telephone location system for
15    determining the location of multiple mobile
16    telephones disclosed?
17        A.    Okay.
18            And my answer is in the sentence in
19    the right-hand column of row 1 that appears
20    on page 3 of the translation, the working
21    example of this invention is described below,
22    and then it says Figure 1 shows a
23    configuration of a moving body position
24    location apparatus.
25        Q.    And it's your interpretation that

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                          Goodman
2     the moving body refers to a cellular
3     telephone?
4          A.     That's my interpretation.
5          Q.     The next block down on page 15 of
6     your report, do you see that?
7          A.     Yes.
8          Q.     The phrase is "each initiating
9     periodic signal transmission over one of a
10    prescribed set of reverse control channels
11    comprising."
12               Do you see that?
13         A.     Yes.
14         Q.     Where in the Kono disclosure is
15    that claim element disclosed?
16         A.     It says on page 3, at the beginning
17    of the section that's headed operation of the
18    invention, it says, "in this invention, a
19    moving body transmits position locating
20    signals using shared terminals."
21         Q.     Is it your understanding that
22    shared channels are the same as a prescribed
23    set of reverse control channels?
24
25

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                          Goodman

2

3

4

5

6

7

8

9          Q.    So is it correct that you're not

10   really saying that the '144 patent isn't

11   valid, so much that it may be invalid under

12   some interpretation of the patent?

13              MS. WALDRON:  Objection.

14         Mischaracterizes.

15         A.    What am I supposed to say yes or no

16   to?

17         Q.    Let me ask a different question.

18         A.    You're putting words into my --

19   that I didn't write into this report.  Maybe

20   I should read how I described the situation.

21         Q.    The question I have is:  Is it your

22   opinion that the '144 patent is invalid?

23         A.    Yes.

24         Q.    Is it your opinion that the '144

25   patent is invalid even if Andrew's product is

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 81

Goodman

1
2      not encompassed -- is not encompassed within

3      the '144 patent claims?

4              MS. WALDRON:  Object to the form.

5      Q.     Let me repeat it.

6              Is it your opinion that the '144

7      patent is invalid even if Andrew's geometrics

8      is not encompassed within the '144 patent

9      claims?

10             MS. WALDRON:  Objection.

11     A.     I don't have an opinion about that.

12     Q.     As to whether under that set of

13     circumstances, the '144 patent is invalid?

14     A.     I haven't done that analysis at

15     all.

16     Q.     What is it about the phrase shared

17     channels in Kono that makes you believe that

18     it is similar or that it corresponds to

19     anything in Andrew's product?

20             MS. WALDRON:  Object to the form.

21         Compound.

22

23

24

25     Q.     Specifically stand-alone dedicated

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                          Goodman

2    channels you mean?

3         A.    Yes.

4         Q.    In Andrew's product?

5         A.    Yes.

6         Q.    What makes you think that in Kono,

7    the shared channels are being transmitted in

8    two directions?

9         A.    Well, because Kono disclosing a

10   transceiver at the cell site, or whatever he

11   calls the cell site, and transceiver includes

12   transmitter and receiver.

13              Also, it seems that Kono technology

14   allocates this shared channel to one cell

15   phone at a time.  Just as Andrew -- just as a

16

17

18

19

20        Q.    Is it your understanding that the

21   shared channels in Kono are channels that are

22   emitted as part of the normal operation as

23   part of at telephone location system?

24              MS. WALDRON:  Objection.  Vague.

25        A.    I think they are emitted.  The

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                           Goodman
2      shared channels are emitted.
3                  Would you read the question again?
4                  (Record read)
5         Q.    Actually, I'll rephrase it.
6                  Is it your understanding that the
7      position locating signals transmitted over
8      the shared channels are signals that are sent
9      in the context of a normal cellular telephone
10     system?
11                 MS. WALDRON:  Objection.  Vague.
12        A.    I suppose normal -- I'm not sure
13     what normal means in this question.  If you
14     could explain it further, I can answer it
15     certainly.
16        Q.    Is it your understanding that the
17     position locating signals in Kono are part of
18     the signals that are sent in any cellular
19     telephone system as part of its everyday
20     operation.
21                 MS. WALDRON:  Objection.  Vague.
22     A.    Yes.
23                 MS. WALDRON:  While there is no
24        question pending, are we still
25        breaking for lunch at 12:30?

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 86

1                          Goodman

2      according to certain cellular telephone

3      standards; is that right?

4           A.    Yes.

5           Q.    Does Kono disclose that signal

6      format?

7

8

9

10

11          Q.    Is it fair to say that both Kono

12     and Andrew do not use that signal format?

13               MS. WALDRON:  Objection.  Form.

14

15

16

17

18

19          Q.    Then does it follow that Kono

20     doesn't use that signal format as well?

21               MS. WALDRON:  Objection to the

22          form.

23          A.    I think I answered that as well.

24     In the same way that Andrew uses it or

25     doesn't use it, Kono -- I think I explained

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman

2      that before lunch.

3

4

5

6

7

8

9          Q.    And you also testified that Kono

10     discloses that element to the same extent as

11     Andrew practices that element, correct?

12         A.    Yes.

13              MS. WALDRON:   Objection.

14         Q.    Doesn't it follow then that Kono

15     doesn't then disclose that element?

16

17

18

19

20

21

22         Q.    And what is the basis for that

23     opinion?

24         A.    The basis for that opinion is that

25     the shared channel in the Kono application

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 88

                    Goodman

1
2    has similar properties to the stand-alone
3    dedicated control channel that I understand
4    is TruePosition's.  It conforms to the
5    prescribed set of reverse control channels,
6    because, as you know, I have done the
7    infringement analysis as well as the
8    invalidity analysis, so I'm aware of how
9    TruePosition interprets this and I think they
10   are compelled to say.  I know you have had
11   different experts for the two things.  I
12   think if you ask Dr. Gottesman, he would have
13   to say, oh, yeah, it's in Kono too because of
14   the way he found it in Andrew.  I don't agree
15   with him.
16        Q.    When did you first learn how
17   TruePosition contends that Geometrix
18   infringes the patent?
19        A.    I suppose it was in the summer when
20   Mr. Parks told me about the lawsuit.
21        Q.    When did you start learning about
22   how Geometrix works in terms of its
23   operation?
24        A.    I think it was in October, towards
25   the middle or end of October.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 89

Goodman

1

2     Q.    Do you know when you first formed

3  an opinion that the '144 patent was invalid

4  if the claims are construed to cover

5  Geometrix?

6     A.    Yes.

7     Q.    When?

8     A.    I think the first week in November.

9  Within that time frame.

10     Q.    Do you remember when you first came

11  to the opinion that Geometrix doesn't

12  infringe the '144 patent?

13     A.    I'm trying to synchronize these

14  dates here, but I think early in December I

15  came to the opinion that Dr. Gottesman didn't

16  prove that Geometrix infringes the '144

17  patent, so that's the opinion I want to offer

18  to the court.

19          I was asked by Kirkland & Ellis to

20  find out whether Dr. Gottesman proved it, and

21  it's my opinion that he did not.

22     Q.    Is it your understanding that the

23  Kono disclosure discloses an AMPS cellular

24  telephone system?

25     A.    Sorry, I haven't been asked for

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 102

1                          Goodman
2          Q.    I noticed in your invalidity
3    report, Exhibit 300, at the end of the
4    report, there is a listing of material to be
5    considered in forming your opinion relating
6    to the invalidity of the '144 patent,
7    correct?
8          A.    Yes.
9          Q.    And I also noticed that nothing in
10   that report, the invalidity report, none of
11   those materials seem to relate to the
12   operations of Geometrix.
13               Am I right about that?
14               MS. WALDRON:  Objection.  Form.
15          Assumes a fact.
16          A.    I agree with you about -- well, I'd
17   like to see.  I just don't remember what's in
18   references 5, 6 and 7 in Andrew, documents
19   prepared by Andrew Corporation.  Those are, I
20   think, the only ones that might say something
21   about how their Geometrix system works.  I
22   don't remember what's in them.
23          Q.    Did you, for purposes of rendering
24   your invalidity report, did you consider the
25   operation of Geometrix?

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 103

Goodman

1

2     A.     Yes.

3     Q.     What were the sources that you

4  used?

5     A.     To my recollection, there is one

6  source that I didn't list here, and that was

7  a phone conversation with Mr. Kennedy, who is

8  an employee of Andrew.

9     Q.     When was the phone conversation?

10    A.     If I recall correctly, I spoke to

11 him before I wrote the invalidity report.  I

12 just don't know.

13    Q.     Do you think to make your

14 invalidity report accurate, it would be worth

15 correcting it to add the Joseph Kennedy

16 conversation?

17    A.     I think so.  If that's true, I

18 would like to ask Ms. Waldron because she

19 participated in the phone conversation if it

20 actually occurred.

21       MS. WALDRON:  I'm not allowed to

22    testify right now.

23    A.     As I recall now, I think that would

24 improve the report to say that I had a phone

25 conversation with Mr. Kennedy.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 104

1                          Goodman
2          Q.     Would you prefer to make that
3    change?
4          A.     Yes.
5          Q.     Please go ahead since we're keeping
6    a master copy of what the report is
7    reflecting your opinions today.
8          A.     Yes.
9          Q.     Just for the record, you're writing
10   on Exhibit 300, correct?
11         A.     That's correct.  I'm writing on
12   page 3 of Exhibit B.
13         Q.     Apart from Ms. Waldron and
14   Mr. Kennedy, was there anyone else on the
15   conversation?
16         A.     I don't remember.  There might have
17   been another Kirkland attorney, but I don't
18   know.
19         Q.     What exactly did you discuss?
20         MS. WALDRON:  Objection.  Vague.
21         A.     As best as I can recall about that
22   particular conversation, I think he kind of
23   talked me through the -- talked me --
24   explained step by step how Geometrix system
25   finds out where a mobile phone is.  Finds the

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                          Goodman
2      location of a mobile phone.
3           Q.     Apart from -- let me step back.
4                  What did Ms. Waldron say on the
5      conversation?
6                  MS. WALDRON:  Objection.  Vague.
7             Overbroad.
8           A.     I don't recall that she said
9      anything.  I was visiting Kirkland & Ellis'
10     office at the time, and as I said, Ms.
11     Waldron was there, maybe Mr. Parks.
12          Q.     Where were you exactly?
13          A.     At the Kirkland & Ellis office in
14     Chicago.
15          Q.     About when did the conversation
16     take place?
17          A.     Early November.
18          Q.     Other than the early November
19     conversation between yourself, Joe Kennedy
20     and Ms. Waldron, did you have any other
21     source of understanding of how Geometrix
22     works at the time that you rendered your
23     invalidity report?
24          A.     I don't recall any other sources.
25          Q.     At that time, had you looked at any

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman
2    Geometrix source code?
3         A.    No.
4         Q.    At that time, had you looked at any
5    technical documentation relating to the
6    operation of Geometrix?
7         A.    I don't think so.
8         Q.    Let me explain where I'm going with
9    this.
10             As I understand it, correct me if
11   I'm wrong, you were -- your opinion in your
12   invalidity report in summary is that the Kono
13   disclosure discloses each element of the
14   claims and corresponds to each element of the
15   '144 patent claims to the same extent that
16   Geometrix does, correct?
17        A.    Yes, almost correct.
18             Maybe not to the same extent, but
19   if Geometrix conforms to the claims, then
20   Kono conforms to the claims, and I don't know
21   how to measure extent.  It seems like a
22   binary thing, it either conforms or it
23   doesn't.
24        Q.    It follows then at the time that
25   you rendered your invalidity opinion, you

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                    Goodman

2   must have had some working knowledge of the

3   Geometrix product, correct?

4        A.    Yes.

5        Q.    To render that opinion?

6        A.    Yes.

7        Q.    And that understanding of the

8   Geometrix product at the time that you

9   rendered your invalidity report would have

10  been based, at least in part, on the

11  conversation between you and Mr. Kennedy in

12  early November, correct?

13       A.    Yes.

14       Q.    And thus far, you haven't been able

15  to recall any other sources of information,

16  right?

17            MS. WALDRON:  Objection.

18        Misstates.

19       A.    At the moment, I don't recall.

20       Q.    Do you want to think about it and

21  think of some other potential sources?

22       A.    Well, I was just going to explain

23  my answer a little more.  That I have, by now

24  I have a pile of documents relating to the

25  Geometrix system, and I have read a lot of

Page 108

Goodman

1
2  them, and I just don't remember when I
3  received them and when I read them relative
4  to preparing this report.  But I think the
5  information that I used was what I heard
6  Mr. Kennedy tell me about.
7      Q.    When Mr. Kennedy explained the
8  operation of the Geometrix system to you, did
9  he go through each element of the claims and
10 discuss how Geometrix relates to those
11 elements?
12         MS. WALDRON:  Objection.  Vague.
13     Assumes a fact.
14     A.    As best as I can recall from two,
15 two-and-a-half months ago from a phone
16 conversation, he really didn't analyze the
17 '144 patent.  You know, I asked him
18 questions, tell me how it works, he told me
19 how it worked, and we didn't get very far
20 into the patent claims.  I just wanted to
21 know how does your stuff find out where a
22 cell phone is located.
23     Q.    Next claim element on page 16 of
24 your invalidity report is timing signal
25 receiver.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1              Goodman

2         Do you see that?

3    A.    Yes.

4    Q.    It's your opinion that the timing

5 signal receiver limitation in claim 1, the

6 second row of the chart on claim 16, is

7 disclosed in Kono?

8    A.    Yes.

9    Q.    What's the basis of that

10 understanding?

11   A.    My basis for that understanding is

12 that there is a high precision clock within

13 each of the shared channel receivers labeled

14 54 in the Kono patent, and that this -- the

15 high precision clocks at all of the base

16 stations are corrected by the switching

17 station.

18   Q.    Is it your understanding that the

19 Kono disclosure discloses a GPS clock?

20   A.    That's not my understanding.  I

21 don't subscribe to that.

22   Q.    Is it your belief that Kono

23 discloses a GPS receiver?

24   A.    It's my belief that Kono does not

25 say anything about a GPS receiver.  Sorry,

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 123

1                     Goodman

2       digital microprocessor.  There are all forms

3       of computers.  I don't know about a laptop or

4       a desktop.

5               So that would be part of it, and

6       the remainder of it would be some sort of

7       communication resources for transferring

8       information to and from the switching

9       station.

10          Q.    The next claim element on page 16

11      is "means for processing said frames of data

12      from said cell site systems."

13              Do you see that?

14          A.    Yes.

15          Q.    Is it your opinion that that claim

16      term is disclosed in Kono?

17          A.    It's my opinion that if somebody

18      found it in the Geometrix equipment, they

19      would be compelled to say that it is also in

20      Kono.

21          Q.    In your view, does Kono disclose a

22      means for processing that's in some way

23      similar to a means for processing in

24      Geometrix?

25              MS. WALDRON:  Objection.  Vague.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 124

1                          Goodman
2          A.    May I look at my claims
3    construction that are in these exhibits?
4          Q.    Certainly.  I believe your claim
5    construction is Exhibit --
6          A.    So somewhere I defined means for
7    processing.  So it might help me to --
8          Q.    Yes.  I think it is 463 or 464 that
9    you did that.
10         A.    Yes, I see something on 463.  I'd
11   like also to look at one of the other
12   exhibits, which was Andrew's proposed claim
13   construction from November 22nd.
14         Q.    That's Exhibit 301.
15         A.    301.  Thank you.  I'm going to
16   refer to Exhibit 301.
17               Just to be absolutely certain,
18   would you read the question, please, just so
19   I know what I'm answering.
20               (Record read)
21         Q.    I can clarify if you like.
22         A.    I want to make sure I'm answering
23   the right question.  It wasn't that it was
24   unclear.
25         Q.    Under your construction today, you

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                       Goodman
2    just looked it up --
3         A.    It's actually 465, I think.
4         Q.    In Exhibit 465.  Does Kono disclose
5    the means for processing limitation?
6         A.    It's --
7              MS. WALDRON:  Objection.  Vague.
8         Calls for legal conclusion.
9         A.    It's my opinion that someone of
10   skill in the art who finds that claim element
11   in Geometrix equipment would be compelled to
12   say that it also exists in Kono.
13        Q.    What's the basis for your opinion?
14        A.    The basis for my opinion is this
15   statement in Exhibit 466 that something
16   reports to the switching station data such as
17   the difference in arrival time of position
18   locating signals with respect to the
19   different base stations.
20        Q.    The construction that you laid out
21   this morning for means for processing
22   encompassed Figure 6A and Figure 7, correct?
23        A.    Yes.
24        Q.    If I went through those figures on
25   a block by block basis, would you be able to

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 126

Goodman

1

2  find a disclosure in Kono that corresponds to
3  those figures?
4        MS. WALDRON:  Objection.
5     Compound.  Overbroad.
6     A.    It's my opinion that if somebody
7  performed this exercise with respect to the
8  Geometrix equipment, and came to the
9  conclusion that you suggest, that all of
10 those things exist in the Geometrix
11 equipment, they would also have to say that
12 it exists in Kono.
13    Q.    Is the disclosure in Kono, does
14 that essentially describe in your view the
15 Geometrix equipment?
16       MS. WALDRON:  Objection.  Vague.
17    Ambiguous.
18    A.    I haven't performed this analysis,
19 but I'll just stop there.  I haven't advised
20 anyone whether Geometrix has to pay royalties
21 to Kono if that's what you're asking me.
22 That might be another infringement.
23    Q.    When you were rendering your
24 invalidity report, did anyone explain to you
25 how means plus function claims elements were

Page 127

1                          Goodman
2    construed?
3         A.    I think so.  I have heard
4    explanations before I got involved in this
5    lawsuit, and I assume -- I would imagine that
6    I heard the same explanations, but I don't
7    remember specifically.
8         Q.    What is your understanding about
9    means plus function claim elements are
10   construed?
11        A.    My understanding is that in order
12   to construe the claims, you have to read the
13   claim itself and find out what function is
14   being claimed, and then read the patent
15   specification to find out the structure that
16   performs that function.
17        Q.    Is it your understanding that the
18   structure can be found in the prior art if an
19   equivalent of the structure is disclosed?
20             MS. WALDRON:  Objection.  Legal
21        conclusion.  Compound.
22        A.    I have no understanding of whether
23   that's true or not.
24        Q.    How about with respect to
25   infringement?

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 128

1                     Goodman

2          MS. WALDRON:  Objection.  Form.

3      Legal conclusion.

4      A.     Would you state a complete question

5  about infringement?

6      Q.     With respect to infringement, is it

7  your understanding that means plus function

8  elements are construed to cover the

9  corresponding structure plus equivalents?

10         MS. WALDRON:  Objection.  Calls

11     for a legal conclusion.

12     A.     I understand that the claim may be

13 drafted in means plus function format.  I

14 understand that for an accused product to

15 literally meet a means plus function claim

16 limitation, an element in the accused product

17 must, one, perform the same function recited

18 in the means plus function claim limitation,

19 and, two, use the same structure disclosed in

20 the patent specification or its equivalent

21 structure to perform the recited function.

22         I understand that an accused

23 structure may be equivalent to the disclosed

24 structure in the patent specification if it

25 performs the same function in the same way to

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1            Goodman
2  achieve the same result.
3      Q.    When you were doing your validity
4  analysis for Kono, did you also understand
5  that means plus function claim elements
6  encompass corresponding structure and
7  equivalent structure?
8           MS. WALDRON:  Objection.  Legal
9       conclusion.  Assumes a fact.
10     A.    Would you read the question again?
11          (Record read)
12     A.    I didn't use that legal rule in my
13  validity analysis.  I understood what it
14  meant in terms of infringement, but I didn't
15  use it in my validity analysis.
16     Q.    Correct me if I'm wrong, your
17  testimony is that this means for processing
18  limitation is disclosed in Kono to the same
19  extent that one would claim it's found in
20  Geometrix; is that correct?
21     A.    Again, I won't subscribe to same
22  extent, either it's found there or not.  I
23  don't know what an extent of finding it.  So
24  it's my opinion that if somebody were to
25  analyze the Geometrix technology and apply

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 130

Goodman

this claim construction and then find in the
Geometrix technology that the claim
limitation is met, that same person would be
compelled to say that it is also met in Kono.
Or that Kono discloses it.

Q.    But that's not necessarily because
the algorithms in Kono and in Geometrix are
the same; is that right?

        MS. WALDRON:  Objection.  Vague.
     Form.

A.    As I've said before, Geometrix --
sorry, as I've said before, Kono discloses a
large universe of algorithms, and it is my
opinion that those algorithms are included in
the patent and also in Geometrix.

Q.    Are there any flow charts in Kono?

A.    I don't remember seeing any flow
charts.

Q.    Is there any code appended to the
Kono disclosure?

A.    I don't remember seeing that
either.

Q.    Do you know whether the word
software is mentioned in Kono?

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 131

1                           Goodman
2        A.    I don't recall seeing the word
3    software in Kono.
4        Q.     Is the word algorithm mentioned in
5    Kono?
6        A.     I don't recall seeing that.
7        Q.    How do you know that if the means
8    for processing limitation is found in Kono,
9    then it must also be --
10               MR. MILCETIC:   Scratch that.
11        Q.    How do you know that if the means
12    for processing limitation is found in
13    Geometrix, then it must also be found in
14    Kono?
15               MS. WALDRON:   Objection.   It
16          assumes a fact.
17        A.     I know that because Kono discloses
18    using data such as the difference in arrival
19    time in order to calculate location, and the
20    means for processing limitation also requires
21    the same words for virtually differences in
22    times of arrival.   So that is the basis of --
23    and then someone recognized that there are a
24    lot of algorithms for using differences of
25    times of arrival for determining location.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 132

1                          Goodman

2          Q.    I believe for this means for

3     processing element, you construed it to

4     include some structure that included Figure 7

5     of the patent; is that right?

6          A.    Yes.

7          Q.    Could we turn to Figure 7 of the

8     patent.  I believe that's Exhibit 462.  And

9     let me know when you're there.

10         A.    Exhibit 462, yes.  And anyplace in

11    particular?  I found the patent.

12         Q.    Yes, Figure 7.  Let me know when

13    you're there.

14         A.    Thanks.

15               I have Figure 7.

16         Q.    This is part of the means for

17    processing in your view, right?

18         A.    Yes.

19         Q.    The first block, do you see what it

20    says?

21         A.    Yes.

22         Q.    Can you read that into the record?

23         A.    Yes.  The first block says,

24    "Receive one frame of data from all cell

25    sites."

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 136

1                              Goodman
2     to provide a construction of that claim
3     limitation as well, right?
4          A.    Yes.
5          Q.    Is it your opinion that the means
6     for determining limitation is disclosed in
7     Kono?
8          A.    It's my opinion that if somebody
9     finds this means for determining limitation
10    in Geometrix technology, that person would be
11    compelled to say that it also exists in Kono.
12         Q.    I believe this morning your
13    construction of the means for determining
14    limitation included some aspects of figure 8A
15    through 8B, right?
16         A.    I'll have to check.
17              The construction I had to offer
18    this morning had to do with the structure for
19    that claim element, was found in the location
20    calculation section of the '144 patent, which
21    spans three columns, column 16, 17 and 18,
22    and excludes two lines in 19, and excludes
23    two lines in column 16.
24         Q.    And column 16 through 18 of the
25    '144 patent include a description of a lease

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 137

1                    Goodman

2    square difference algorithm; is that right?

3              MS. WALDRON:  Objection.

4         Overbroad.

5    A.    That's correct.

6    Q.    Does Kono disclose a lease square

7    difference algorithm?

8    A.    I would say so, yes.

9    Q.    Where?

10   A.    Essentially Kono says on page 4, he

11   should say the switching station forwards

12   difference in arrival time of position

13   locating signals to the position locating

14   device and the position of the mobile

15   equipment is calculated.  So I think there

16   are many techniques for performing this

17   calculation at the time that the application

18   for the '144 patent was filed, and that would

19   include these square difference techniques.

20   Q.    Tell me where you're reading that.

21   A.    From the Kono patent?

22   Q.    Yes.

23   A.    Yes, of course.  I'm sorry.

24         Looking at page 4, and I'm looking

25   at the middle paragraph, and I'm looking at

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 138

1                          Goodman
2     essentially the last six or seven lines in
3     the middle paragraph, and my statement to you
4     a few minutes ago rearranged the words in
5     those, in there, but essentially I think I
6     conveyed the same information that they did,
7     that this does, but changing base station one
8     to switching station one.
9          Q.    And just to be clear, which part
10    of -- could you read into the record for me
11    which part of page 4 of the Kono translation
12    that you're relying on discloses the lease
13    square difference algorithm?
14         A.    Of course.
15               Would you like me to read what Kono
16    wrote or would you like me to paraphrase it
17    in a way that seems more --
18         Q.    Go ahead and paraphrase it.
19         A.    -- better suited to answering your
20    question.
21         Q.    Go ahead.
22         A.    Okay.
23               So first of all, I'm going to have
24    to change base station to switching station.
25    So the next to last sentence in the middle

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 142

1                          Goodman
2     that somebody practicing the technology in
3     the patent performs a complex algorithm that
4     includes lease squares difference
5     computation, and it's my opinion that it
6     doesn't perform the algorithm that includes
7     lease square difference estimation, but I
8     can't state that it does everything else
9     except the lease square difference, because I
10    really don't think that's true.  I think
11    that's what you're asking me to do.  If it
12    didn't say lease squares difference would
13    everything else be there, and I don't agree
14    with that.
15         Q.    What I'm getting at more,
16    Dr. Goodman, is a double standard in my mind.
17    Correct me if I'm wrong.  What you're sitting
18    here telling me is the Kono disclosure
19    disclosing this locating means element based
20    upon a statement that locations are
21    calculated and that's it?
22         A.    Yes.
23         Q.    And then when we go to
24    infringement, you're telling me that
25    Geometrix doesn't perform the locating means

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 143

1                      Goodman
2    calculation because it has to have lease
3    square difference and everything else within
4    the four corners of three columns of what the
5    patent discloses.  Correct?
6         A.    Yes.
7         Q.    Do you see where the disconnect is,
8    where there may be a double standard here?
9              MS. WALDRON:  Objection to the
10         form.  Calls for a narrative.
11         A.    I really want to draw a picture.
12         Q.    Go ahead.
13         A.    Can I have a sheet of paper?
14         Q.    This is going to be marked as
15    Exhibit 468.  It's a blank piece of paper.
16    Let me know when the court reporter has shown
17    you Exhibit 467.
18              (Plaintiff's Exhibit 468, Blank
19         Piece of Paper, marked for
20         identification, as of this date.)
21         A.    So what I'm trying to say is that
22    Kono discloses a lot of things.  All of them
23    are included in the '144 patent.  If somebody
24    thinks that Geometrix is -- I don't think
25    Geometrix is at all included in the '144

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 144

                        Goodman

1
2   patent.  But if somebody did say that
3   Geometrix was included in the '144 patent, I
4   would have to say the '144 patent is
5   included in Kono.  So it's a picture that
6   keeps coming into my mind.
7           I think in order to show that the
8   '144 patent infringes Kono, it's not
9   necessary that Kono just be limited to the
10  things within the '144 patent.  It could have
11  a lot of other things too.
12          So I don't think that's a double
13  standard.  I think it's -- it seems logical
14  to me, and completely fair.
15      Q.    Well, I think perhaps the
16  assumption --
17      A.    And I put these dotted lines
18  because I haven't formed an opinion as to
19  whether Geometrix infringes Kono.  I'm just
20  sure that it is separate from the '144
21  patent.
22      Q.    If I understand your position
23  correctly, one of the assumptions that you're
24  making is when Kono discloses position
25  location calculating device, it's disclosing

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                        Goodman

2      every possible algorithm that there may have

3      been at that time for doing a positions

4      calculation?

5           A.    Yes.

6           Q.    Just by simply saying that; is that

7      correct?

8           A.    Yes.

9           Q.    And then I take it you would agree

10     if there was a piece of evidence in this case

11     among the hundreds of thousands of documents

12     that have been exchanged that Geometrix

13     calculates it too would be included and be

14     encompassed by the location means in the

15     patent?

16               MS. WALDRON:   Objection.  Legal

17          conclusion.  Misstates.

18          A.     I think -- it's very hypothetical,

19     and I haven't performed an analysis as to

20     whether Geometrix infringes Kono.  But I

21     think it is possible under your hypothesis

22     that someone would find that Geometrix

23     infringes Kono after doing that type of

24     analysis that you're requiring.

25          Q.    What I'm asking is very simply, if

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 155

1                    Goodman
2   patent is valid.
3           MS. WALDRON:  I was going to ask
4       if we can take a break soon.
5       Q.    Is it your impression that Kono is
6   a patent?
7       A.    Well, Kono is a patent application,
8   and somehow I'm looking for all of the -- I
9   wouldn't -- my opinion wouldn't change if it
10  was a published paper or an equipment manual.
11  But somehow I'm just using the language of
12  patent infringement because it's more
13  immediate in my mind, so it's just a document
14  that was available to someone of skill in the
15  art when the '144 patent application was
16  filed.
17          MR. MILCETIC:  We can take a
18      break.
19          THE VIDEOGRAPHER:  We're off the
20      video record at 4:10 p.m.
21          (Thereupon, a recess was taken,
22      and then the proceedings continued as
23      follows:)
24          THE VIDEOGRAPHER:  Back on the
25      video record at 4:22 p.m.

Esquire Deposition Services
(215) 988-9191

Page 156

1                      Goodman

2    BY MR. MILCETIC:

3         Q.    Dr. Goodman, when we left we were

4    talking about the claim charts at pages 16,

5    17 -- actually page 16, and now I would like

6    you to turn to page 17 of claim 22 of your

7    invalidity report.

8         A.    Yes.

9         Q.    It's Exhibit 300.

10        A.    Yes.

11        Q.     It's a ground base cellular

12   telephone system serving a plurality of

13   subscribers possessing mobile cellular

14   telephones propriety.

15        A.    Yes, I see that.

16        Q.    That's present in Kono; is that

17   right?

18        A.    Yes.

19        Q.    How do you know?

20        A.     In the prior art of the Kono patent

21   on pages 2 and 3, he describes what I might

22   call generic cellular telephone system, and

23   the location technology is embedded in that.

24        Q.    How do you know that the cellular

25   telephone system in Kono serves a plurality

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 157

1                        Goodman

2    of subscribers?

3         A.    We're talking about -- so the

4    telephone system that's described as an

5    example, it says BSTJ January 1979, and I

6    think anyone of skill in the art would

7    recognize that the reason for using cellular

8    technology and dividing a service area into

9    cells is in order to be able to provide

10   telephone service to a large population.

11        Q.    That's what cell telephone systems

12   are for?

13        A.    Yes, it's distinguished over prior

14   mobile communications systems.

15        Q.    What would the prior mobile

16   communications systems have been?

17        A.    Oh, there were cartel phones that

18   are a bit like police radios or things like

19   that, where there is a big tower,

20   transmission tower on the rooftop or

21   something, and it communicates with all of

22   the phones.  It has a certain numbers of

23   channels and the number of people who can use

24   the system is restricted to the number of

25   physical channels.  In the cellular system,

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 158

Goodman

we talked about reuse, where you can have the
same physical channels used by different
people in different parts of the metropolitan
area.

    Q.    The next limitation on page 17 is
at least three cell sites?

    A.    Yes.

    Q.    Your opinion is that that's
disclosed in Kono, correct?

    A.    Yes.

    Q.    Because Kono discloses base
stations, correct?

    A.    Yes.

    Q.    And in your view, cell sites
encompass base stations?

    A.    Yes.

    Q.    Well, the next claim limitation on
page 17 is equipped to receive signals sent
by multiple mobile cellular telephones.  This
is still claim 22.

    Do you see that?

    A.    Yes.

    Q.    Your opinion is that that's
disclosed in Kono, right?

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 159

1                         Goodman
2        A.     My opinion is that if somebody
3    finds that disclosed -- if somebody finds the
4    Geometrix is receiving signals from multiple
5    mobile cellular telephones, they would have
6    to admit that Kono technology is also
7    receiving signals sent by multiple mobile
8    cellular telephones.
9        Q.     How would one have to interpret the
10   claims to say that Geometrix has equipment
11   for receiving signals sent by multiple mobile
12   cellular telephones?
13             MS. WALDRON:  Objection.  Legal
14         conclusion.  Speculation.
15       A.     It's a very difficult question to
16   answer because I think it is impossible.  I
17   can try to stretch my mind to think of some
18   weird interpretation.
19       Q.     So it's impossible to or very
20   difficult to say that this claim limitation
21   equipped to receive signals encompasses
22   Geometrix, correct?
23       A.     I really haven't done that
24   analysis.  I suppose I could.
25       Q.     Well, let me ask you this.  Let's

793958b0-9d46-4d36-bbfc-5c2a24482dd7

1                         Goodman

2     get back to basics here for a moment.

3              Your position here is that if

4     Geometrix is encompassed by the claims, then

5     Kono invalidates the '144 patent, right?

6         A.    Yes, that's right.  If someone puts

7     Geometrix in the '144 circle, they are really

8     stuck with Kono.

9         Q.    Can you give me any interpretation

10    under which of the claims, under which

11    Geometrix infringes the '144 patent?

12             MS. WALDRON:  Objection.  Legal

13         conclusion.  Speculation.

14        A.    I can't do this sitting here.  I

15    don't know how much time Dr. Gottesman

16    tried -- spent trying to do that and he

17    completely failed, so I think that even if I

18    went off for a month, if TruePosition hired

19    me, I would be hard pressed to do any better

20    than Dr. Gottesman did.

21        Q.    So you don't know of any

22    construction sitting here right now under

23    which Geometrix infringes the '144 patent; am

24    I correct?

25             MS. WALDRON:  Same objection.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 161

Goodman

2          Legal conclusion.  Misstates.

3    A.   Right, absolutely correct.

4    Q.   Doesn't it follow then that there
is no construction then of the '144 patent
that you can envision under which Kono
validates the '144 patent?

8          MS. WALDRON:  Objection.  Legal
conclusion.  Confusing.

10    A.   I disagree with that.  I keep going
back to my picture that says just because
it's impossible to put Geometrix in this '144
circle, doesn't mean that it is impossible to
put Kono outside the '144 circle.

15    Q.   When you rendered your report on
invalidity, did you compare the claims of the
'144 patent to Kono?

18    A.   Yes.

19    Q.   Did you compare the claims of the
'144 patent interpreted so as to include
Geometrix in the scope to Kono in rendering
that opinion?

23          MS. WALDRON:  Objection.  Vague.
Legal conclusion.

25    A.   Formed an opinion as to how

Esquire Deposition Services<br>(215) 988-9191

Page 163

Goodman

1

2    Q.    Why don't you write out --

3    A.    Write out the answer to the

4    question.  Can I ask the reporter to read it

5    to me slowly and I'll write down what I said.

6    Do I need another exhibit?

7    Q.    Yes, why don't we give you an

8    exhibit.

9         (Plaintiff's Exhibit 469, Blank

10        Piece of Paper, marked for

11        identification, as of this date.)

12    Q.    The court reporter has just handed

13    you a blank sheet of paper labeled 469, and

14    I'd like to you write down the interpretation

15    of the patent that you disagree with that

16    would encompass Geometrix and at the same

17    time show that Kono invalidates the '144

18    patent under that interpretation.

19        MS. WALDRON:  Objection.

20        Compound.  Overbroad.  Legal

21        conclusion.

22    A.    Any particular claim or all of the

23    asserted claims?

24    Q.    Claim one.

25        MS. WALDRON:  Objection.

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 164

1                    Goodman

2        Compound.  Overbroad.  Legal

3        conclusion.

4        Q.    Is there an easier claim that you

5    can deal with more simply?

6        A.    I'm not trying to save work.  So if

7    you prefer claim 1, I'll work on that one.  I

8    think it is more detailed than some of the

9    others.

10       Q.    Why don't we do claim 22.

11       A.    Okay, that might take less time.

12            MS. WALDRON:  Same objections for

13       the record.  Compound.  Overbroad.

14       Legal conclusion.

15       A.    Essentially you're asking me to do

16    Dr. Gottesman's job, so can I refer to his

17    report, because I assume that's what he was

18    asked to do by TruePosition?

19       Q.    You rendered an invalidity report,

20    and each time that I asked you for the basis

21    for why it is that you think it is invalid,

22    you keep telling me, well, if the claims

23    encompass Geometrix, then the patent is

24    invalid.

25       A.    Right.

793958b0-9d46-4d36-bbfc-5c2a24482dd7

Page 165

Goodman

1

2      Q.    What I want to know is the precise
3  assumptions that you're making, the precise
4  construction under which that invalidity
5  opinion becomes relevant to this case.
6          MS. WALDRON:   Objection.
7      Argumentative.
8      A.    Is your answer that I consult
9  Gottesman since he probably spent a long time
10 doing that?
11     Q.    Sure, you can.
12     A.    Can I have a copy of his report?
13     Q.    Sure.
14          What if I gave you TruePosition's
15 constructions, would that be what you're
16 looking for?
17     A.    I think you're asking me to find
18 some way of proving -- find some claims
19 construction in which I can prove Geometrix
20 infringes the '144 patent.
21     Q.    And that Kono invalidates the '144
22 patent.
23     A.    Yes.
24     Q.    I'm just simply trying to find out
25 the basis for your opinion in the invalidity

793958b0-9d46-4d36-bbfc-5c2a24482dd7

# Exhibit H



KONO

'144
Patent

Geometrix ?


PENGAD 800-631-6989

EXHIBIT
468
1-15-09

# Exhibit I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

<table>
<tr><td>TRUEPOSITION, INC.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>PLAINTIFF/</td><td>)</td><td></td></tr>
<tr><td>COUNTERCLAIM- DEFENDANT,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>CA NO. 05-00747-SLR</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>ANDREW CORPORATION,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>DEFENDANT/</td><td>)</td><td></td></tr>
<tr><td>COUNTERCLAIM-PLAINTIFF.</td><td>)</td><td></td></tr>
</table>

**REBUTTAL EXPERT REPORT OF DR. DAVID J. GOODMAN ON THE NONINFRINGEMENT OF U.S. PATENT NO. 5,327,144**

### C.    THE ASSERTED DEPENDENT CLAIMS

Claim 2 states that the timing signal receiver in Claim 1 is a global positioning system receiver.

Claim 32 states that the method in Claim 31 further comprises storing in a database cellphone identifiers and locations and providing access to the database to subscribers at remote locations.

## V.    THE ANDREW TECHNOLOGY IS SUBSTANTIALLY DIFFERENT FROM THE TECHNOLOGY IN THE '144 PATENT

Although the technology claimed in the '144 patent and the Andrew Geometrix system both use transmissions from cellphones to determine the geographical coordinates of the cellphones, they differ in many fundamental ways as described in the following paragraphs. Section VI contains a detailed response to Dr. Gottesman's infringement analysis.

### A.    GSM SYSTEM PROPERTIES

The GSM system does not include a "prescribed set of reverse control channels" as required by each claim of the patent. Reverse control channels are logical channels in an AMPS analog cellular system. In every AMPS system there is a prescribed set of physical channels that are used for reverse control channels. A reverse control channel carries information in one direction (from cellphone to base station). It is shared by many cellphones.

The GSM system also has one-way logical channels shared by many cellphones. They are referred to as Random Access Channels (RACH). *See also* WIRELESS PERSONAL COMMUNICATIONS, p. 276 ("AMPS reverse control channel" is a "counterpart" to RACH channel in GSM). However, they are not used by Andrew products to locate cellphones. Transmissions on the GSM SDCCH (stand alone dedicated control channels) differ fundamentally from the transmissions on reverse control channels required by the patent. They do not use a prescribed set of physical channels. They carry information in both

directions between cellphones and base stations and as the name implies a SDCCH is *dedicated* to a single cellphone while it is in use.

      **B.**      **LOCATING INDIVIDUAL OR MULTIPLE CELLPHONES**

By contrast, the technology in the '144 patent monitors a reverse control channel and thus receives information from several cellphones. It uses information in messages transmitted on the AMPS reverse control channel (see page 104 of my textbook) to identify the cellphone that transmitted the message. This information is essential to the location procedures in the patent, which require the central site system to process information received from three or more cell site systems, each transmitting information about multiple cellphones to the central site system.

      **C.**      **SIGNAL INFORMATION SENT FROM BASE STATION TRANSCEIVERS**

    **D.**      **TIMING INFORMATION**

        The cell site system in the patent transmits timing information to the base station as a time of arrival obtained from the timing signal receiver.

    **E.**      **CALCULATING CELLPHONE LOCATION FROM TIME DIFFERENCE OF ARRIVAL**

        By contrast the central site system in the '144 patent stores ideal time difference of arrival information for a set of reference locations. It then computes the squared difference between the calculated time difference of arrival for each cellphone that it monitors. It uses the squared difference calculations to determine an approximate cellphone location and proceeds to use a method of linearized-weighted-least-squares iterations to arrive at its final location estimate.

**VI.**    **INFRINGEMENT ANALYSIS**

    **A.**      **SUMMARY OF OPINIONS**

        In my opinion, Dr. Gottesman has not proved that the Andrew Geometrix System infringes any asserted independent claim of the '144 patent (1, 22, and 31). Therefore, he has not proved that the Andrew System infringes any asserted dependent claim either. Additionally, Claim 32 (like claim 22) is not infringed for the additional, independent reason that Dr. Gottesman has not proved that Andrew's Geometrix product has a