IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TruePosition, Inc., | ) |
| | ) |
|     Plaintiff/ | ) |
|     Counterclaim-Defendant, | ) |
| | )    Civil Action No. 05-747-SLR |
|     v. | ) |
| | ) |
| Andrew Corporation, | ) |
| | ) |
|     Defendant/ | ) |
|     Counterclaim-Plaintiff. | ) |

**APPENDIX C TO TRUEPOSITION'S REPLY MEMORANDUM IN
SUPPORT OF ITS MOTION TO EXCLUDE THE INVALIDITY
TESTIMONY OF DR. DAVID GOODMAN PURSUANT TO FEDERAL
RULE OF EVIDENCE 702**

CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman, Esq. (#2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Amanda M. Kessel, Esq. (pro hac vice)
Cira Centre, 12th Floor, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

# TABLE OF CONTENTS

## APPENDIX C TO TRUEPOSITION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE INVALIDITY TESTIMONY OF DR. DAVID GOODMAN PURSUANT TO FEDERAL RULE OF EVIDENCE 702

| | |
|---|---|
| Excerpts from Brian Agee deposition taken January 24, 2007 | C1-C6 |
| Excerpts from Dr. David Goodman deposition taken January 15, 2007 | C7-C10 |

C1

Brian G. Agee, Ph.D.    January 24, 2007

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

TRUEPOSITION, INC.,          )
  Plaintiff/Counterclaim )
  Defendant, ..          )
                              )
    vs.                     ) C.A. No. 05-00747-SLR
                              )
ANDREW CORPORATION,          )
  Defendant/              )
  Counterclaim Plaintiff.)
_____)

VIDEOTAPED DEPOSITION OF BRIAN G. AGEE, Ph.D., P.E.

Philadelphia, Pennsylvania

Wednesday, January 24, 2007

8:20 a.m.

Job No.: 25500251

Pages: 1 - 191

Reported By: Debra A. Whitehead

Brian G. Agee, Ph.D.    January 24, 2007

Page 146

1  the same thing.
2        So, for instance, in this case "identifying
3  individual cellular telephone signals," and
4  "identifying the cellular telephones," the way you've
5  defined this, it's clear from the context that you
6  want these to be the same thing.
7        And in this case, I would agree, under this
8  definition. And I treated them as the same, when I
9  was developing my claim construction.
10     Q  So it's correct to say that the database
11 claimed in Claim 32 of the '144 patent must identify
12 the actual cellular telephones themselves that are
13 being located; correct?
14        MR. MARCUS: Objection. Vague and
15 confusing.
16     A  Why don't you repeat the question back to
17 me.
18        MR. PARKS: Could you read it back, please.
19 I'm sorry.
20        (The reporter read the record as
21 requested.)
22        MR. MARCUS: Same objection. I also think
23 it calls for a legal conclusion.
24     A  (Continued.) So I say that, under both
25 claims constructions, the database would need to

Page 147

1  contain data identifying the cellular telephones,
2  either the cellular telephones or some number linked
3  only with that mobile cellular telephone, jumping in
4  between the two -- back and forth between the two
5  claim constructions.
6     Q  How do you interpret the word "subscribers"
7  in Claim 32 of the '144 patent?
8     A  As a comment, this isn't something I
9  considered when I was writing my report, so I'm giving
10 an answer that is off the cuff.
11        I would interpret it the same way that I
12 would interpret "subscribers" in -- in Element C of
13 Claim 22.
14     Q  Dr. Agee, if we could mark as the next two
15 exhibits the TruePosition claim construction and
16 Andrew claim construction that you have been referring
17 to as we've gone through that exercise.
18        MR. PARKS: And, actually, I know we have
19 been going for a while. If you -- I don't know how
20 close we are on the videotape. But if you would like
21 to take a break, we can take one now, or we can keep
22 going. It's up to you.
23        THE WITNESS: Why don't we take a short
24 break.
25        MR. MARCUS: Do you want to mark them

Page 148

1  first?
2        MR. PARKS: Yes, let's mark them as the
3  next two exhibits, so we have them in the record.
4        (Documents marked for identification as
5  Agee Exhibits No. 6 and 7.)
6        (Discussion off the record.)
7        VIDEO SPECIALIST: This is the end of Tape
8  4 at 2:57.
9        Short recess.)
10       VIDEO SPECIALIST: We are on the record at
11 3:13. This is Tape 5 of Brian G. Agee's deposition.
12 BY MR. PARKS:
13     Q  Dr. Agee, is it your opinion that the Kono
14 reference teaches a command response approach for
15 location of a cellular phone occurs only after a
16 command to locate is sent from the cellular network?
17     A  So I guess I'll ask you to clarify that.
18     Q  Can you turn to Page 16 of your December
19 report. It is the one that's been marked as Agee
20 Exhibit 1.
21     A  Right. Oh, got it. Okay.
22     Q  And if I could direct your attention to
23 Subsection 3.3.1.3, where you're distinguishing the
24 Kono reference from the '144 patent claims.
25        And if you could read into the record the

Page 149

1  first bullet point that appears under Section 3.3.1.3
2  of your December report.
3     A  Okay. "Kono fails to disclose or teach any
4  locating means for automatically determining the
5  locations of cellular telephones. Instead, it teaches
6  a command respond approach in which position location
7  only occurs after a command position location call is
8  sent from either the exchange office based on
9  unexplained criteria or the base transceiver station."
10    Q  And, so, my question, Dr. Agee, is, is it
11 your opinion that Kono teaches a command response
12 approach for location of a cellular phone occurs only
13 after a command to locate is sent from the cellular
14 network?
15    A  Yes, that's true.
16    Q  And in rendering the opinions expressed in
17 your December report, you were distinguishing the '144
18 patent from a system like Kono that locates a cellular
19 phone only after a command to locate is sent from the
20 cellular network; correct?
21       MR. MARCUS: I am going to object. That --
22 that is -- assumes facts not in evidence, somewhat
23 misleading.
24    A  No, that was not my opinion. This was an
25 error, that's why I took it out in the January report.

38 (Pages 146 to 149)

Brian G. Agee, Ph.D.   January 24, 2007

### Page 150

1  Q  I want to focus on the opinions you had
2  when you submitted your December report, for the time
3  being. Okay?
4  A  Okay.
5  Q  When you submitted your December report,
6  isn't it correct to say that you were distinguishing
7  the '144 patent from a system like Kono that locates a
8  cellular phone only after receiving a command from the
9  cellular network to locate the phone?
10     MR. MARCUS: Objection. Asked and
11  answered, misstates his testimony.
12  A  Why don't you repeat the question again.
13     MR. PARKS: Could you read the question
14  back, please.
15     (The reporter read the record as
16  requested.)
17  A  (Continued.) No.
18  Q  What, then, was the purpose of including
19  the language that's set forth in the first bullet
20  point of Section 3.3.1.3 of your report that says
21  exactly what I just asked in my prior question?
22  A  At a point prior to submitting this report,
23  well prior to submitting this report, I was of the
24  opinion that you expressed.
25  Q  And what opinion is that?

### Page 151

1  A  That -- that Kono -- that the fact that
2  Kono teaches a command respond approach to -- to do
3  its position location distinguishes it from the '144
4  patent.
5     I had -- actually, can I keep going?
6  Q  Please.
7  A  Okay. So I was of that opinion at an early
8  point in my analysis, and I abandoned that opinion
9  well before this report went out.
10     What happened was that, I simply failed to
11  take this terminology out of the report. It was a
12  simple error on my part. It should have been out of
13  the report when it was submitted in December.
14  Q  When did you, as you just testified,
15  abandon the opinion that's set forth in the first
16  bullet point under Section 3.3.1.3 of your December
17  report?
18  A  After I -- I abandoned that opinion after I
19  came to the realization that I was misunderstanding
20  the word "initialize" in the '144 patent.
21  Q  On what date did you come to the
22  understanding that you were misinterpreting the word
23  "initialize" in the '144 patent?
24  A  Oh, I have no idea. Maybe a week in, a
25  week into the analysis. I can't recall.

### Page 152

1  Q  Do you recall what month?
2  A  Yes; it was in December.
3  Q  Was it after December 22?
4  A  No.
5  Q  Was it after December 15?
6  A  Possibly; probably.
7  Q  How did you, as you testified, come to the
8  realization that you made an error in your December
9  report by including the language in the first bullet
10  point under Section 3.3.1.3?
11  A  So you're asking the process by which I
12  came to that realization?
13  Q  I'm trying to find out, yeah, how -- you
14  testified that you made an error. How did the error
15  come to your attention?
16  A  The error came to my attention by
17  continually -- by my continuous rereading of the Stilp
18  patent and the patent wrapper.
19  Q  In terms of the language itself in your
20  report that appears in the first bullet point of your
21  December report under Section 3.3.1.3, did counsel for
22  TruePosition first suggest to you that you change that
23  language, that the language might be in error?
24  A  No.
25  Q  Was that a suggestion that you made on your

### Page 153

1  own, independent of counsel for TruePosition?
2     MR. MARCUS: I am going to object. The
3  question is vague. I think -- I am having a hard time
4  understanding it.
5  A  I think it was. It's -- I think it was.
6     It certainly wasn't a position that -- that
7  I was -- that I was asked to take; that never -- no
8  conversations of that sort ever occurred.
9     That's all I'll say right now. That's all
10  I think I can say right now.
11  Q  Before submitting your January report in
12  which you deleted the language in the first bullet
13  point of Section 3.1.3 of your December report, did
14  you discuss with TruePosition's counsel deleting that
15  language?
16     MR. MARCUS: I'm just going to make an
17  objection. Just, you keep saying, "the bullet." I
18  don't think he deleted everything. But that's...
19  A  Okay. Can you read the question back to
20  me.
21     (The reporter read the record as
22  requested.)
23  A  (Continued.) No.
24  Q  After you submitted your December report,
25  did you read through your December report?

39 (Pages 150 to 153)

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061  (312) 263-3524

071d12b8-ba02-4b38-8165-5a02f8f3badc

C3

Brian G. Agee, Ph.D.   January 24, 2007

Page 154

1  A  No, I didn't.
2  Q  If you didn't read your December report
3  after submitting it, how did it come to your attention
4  that you, as you testified, made an error in the first
5  bullet point that appears under Section 3.3.1.3 of
6  your December report?
7  A  David Marcus called me up on January the
8  2nd and said, "Brian, I'm reading through your report,
9  and you made an error, I think. Why don't you go take
10 a look at this and tell me if you agree."
11 Q  And how did you respond to Mr. Marcus'
12 statement?
13 A  I said, "I'll look at the report," and I
14 did.
15    And as soon as I saw this, I realized this
16 was an error and called him back and said, "I made a
17 mistake. What should I do?"
18 Q  And how did Mr. Marcus respond?
19 A  He said, "Correct the mistake and send me a
20 corrected copy of the report." I did; within a half
21 an hour gave him a corrected copy of the report, which
22 was then sent on to you.
23 Q  When you spoke with Mr. Marcus on January
24 2, did he suggest to you the alleged error in your
25 report under Section 3.3.1.3?

Page 155

1     MR. MARCUS: I am going to object to the
2  phrasing of that as misleading and mischaracterizing
3  his testimony. He didn't say it was an alleged error;
4  he said it was.
5  A  Yes, I stated it was an error.
6  Q  When you spoke with Mr. Marcus on January
7  2, did he suggest to you that you made an error in the
8  first bullet point under Section 3.3.1.3 of your
9  report?
10 A  I can't recall if he suggested to me that
11 he made an error or if he said, "Brian, you made an
12 error. Go take a look at it."
13    It was a fairly -- it was fairly clearly an
14 error. And -- and I -- and I could see that it was an
15 error as soon as I saw it. So, I don't know if the
16 term -- if the term "suggestion" is relevant here.
17 Q  Prior to the January 2 conversation with
18 Mr. Marcus, is it fair to say that you did not believe
19 that you made an error in your report by including the
20 language that appears in the first bullet point under
21 Section 3.3.1.3 of your December report?
22    MR. MARCUS: Objection. Mischaracterizes
23 his testimony.
24 A  Prior to January 2, I was not aware that I
25 had made an error in my report. I had not looked at

Page 156

1  my report since I turned it in on the 22nd of
2  December.
3  Q  Do you know who Louise Stilp is, Dr. Agee?
4  A  Yes.
5  Q  Who is Louise Stilp?
6  A  He is one of the inventors of the '144
7  patent.
8  Q  Have you ever spoken with Mr. Stilp?
9  A  No, I haven't.
10 Q  Do you know who Curtis Knight is?
11 A  Yes, I do.
12 Q  Who is Curtis Knight?
13 A  He is one of the inventors of the '144
14 patent.
15 Q  Have you ever spoken with Mr. Knight?
16 A  No, I have not.
17 Q  Who is John Webber?
18 A  Just make sure.
19    It is a trick question; right?
20 Q  Didn't mean for it to be a trick question.
21 I apologize.
22    Let me ask it this way: John Webber is a
23 named inventor on the '144 patent; right?
24 A  That's correct.
25 Q  Have you ever spoken with Mr. Webber?

Page 157

1  A  No, I have not.
2  Q  Can you please turn to Page 10 of your
3  December report.
4     And I'll tell you what my question is, I
5  will give you a chance to read it.
6  A  Okay.
7  Q  The third paragraph from the bottom that
8  begins with, "From this passage" --
9  A  Okay.
10 Q  -- appears to be purporting to distinguish
11 the timing taught by Kono with the way GPS signals are
12 used in the '144 patent.
13    And my question is, can you explain to me
14 how the language you have in the third paragraph from
15 the bottom on Page 10 of your December report differs
16 from the way GPS signals are used in the '144 patent?
17    MR. MARCUS: Can you read that whole thing
18 back to me.
19    (The reporter read the record as
20 requested.)
21    MR. MARCUS: I object that that's a --
22 assumes facts not in evidence, is vague and ambiguous,
23 somewhat confusing.
24 A  So this passage is addressing the ways --
25 the way timing information is generated in Kono. And,

40 (Pages 154 to 157)

Brian G. Agee, Ph.D.   January 24, 2007

Page 170

1   Q  Oh, if you look at Page 5.
2   A  Oh, I was looking at Page 6. My apologies.
3      Yes, it is dated November 11, 2006. The
4   Certificate of Service was dated December 11, 2006.
5   Q  Okay. But do you recognize this document
6   as the document giving the TruePosition's proposed
7   claim constructions that you used to formulate in
8   coming to your opinions?
9   A  Yes, I do.
10  Q  And when you -- you referred to this today
11  throughout the deposition, when you were talking about
12  the proposed claim constructions.
13     Is -- these are the two documents you were
14  referring to; is that correct?
15  A  Yes; yes, they were.
16  Q  In forming the opinions that you expressed
17  in your report, did you consider the prosecution
18  history or file wrapper of the '144 patent?
19  A  Oh, yes.
20  Q  Referring again to Agee Exhibit 7, which
21  was TruePosition's Cumulative Identification of Claim
22  Terms and Proposed Constructions.
23     When you were given this document, did you
24  read through the claim constructions?
25  A  Yes, I did.

Page 171

1   Q  And did you agree with the claim
2   constructions?
3   A  After I went through them and fully
4   understood them, yes, I did agree with them.
5   Q  Okay. When you were given Agee Exhibit 6,
6   which is Preliminary Claim Constructions As of
7   November 22, 2006, for Andrew, did you read through
8   those claim constructions before formulating your
9   opinions?
10  A  Yes, I did.
11  Q  And did you agree with their claim
12  constructions?
13  A  On several counts, no, I didn't.
14  Q  Okay. And in your report did you express
15  some of your disagreements?
16  A  Yes, I did.
17  Q  Okay.
18  A  Disagreements and ambiguities.
19  Q  Okay. I think earlier today you testified
20  that I provided you with, I believe you used the word,
21  a draft of your report.
22     Do you recall that?
23  A  Yes.
24  Q  Okay. In the -- in the draft that you
25  testified that I provided you, did it have any text

Page 172

1   filled in other than the introduction and the section
2   on legal summaries, or legal standards?
3   A  No, it did not.
4   Q  Would it be fair to characterize it as just
5   a proposed outline for the way you would go through
6   the report?
7      MR. PARKS: Objection to the form of the
8   question. Leading.
9   A  I -- with the exception of -- of the
10  section on legal -- on -- with the exception of
11  Section 3.1.
12  Q  On legal standards?
13  A  Which was fairly complete; and which I was
14  expected to understand, and not modify.
15  Q  Okay.
16  A  Yes.
17  Q  So with the exception of that particular --
18  A  Yes.
19  Q  And then you also did make changes to the
20  introduction section; is that correct?
21  A  Yes, I did.
22     Just for what it's worth, I might add that,
23  in Section 3.1 I did reformat some of it. Because you
24  lawyers like really long run-on sentences, and I was
25  having a really hard time parsing one or two of them.

Page 173

1   Q  Okay.
2   A  So some of the nonlawyerly organization in
3   there was actually added by me.
4   Q  If I could just have you look at Agee
5   Exhibit 1 and Agee Exhibit 2.
6      And Agee Exhibit 1, I believe, has been
7   referred to today as your December report; is that
8   correct?
9   A  Yes.
10  Q  And Agee Exhibit 2, I think, has been kind
11  of referred to today at your January report; is that
12  correct?
13  A  Yes.
14  Q  Okay.
15  A  My January 3 report.
16  Q  January 3 report.
17     And I also believe, sort of, earlier today
18  there was a question about whether the -- the report
19  marked as Agee-2 was a supplement to your Agee Exhibit
20  1.
21     Do you recall that?
22  A  I recall that.
23  Q  Okay. In the report that you served on
24  January 2, marked as Agee Exhibit 2, you didn't add
25  anything to the report; is that correct?

44 (Pages 170 to 173)

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061  (312) 263-3524

071d12b8-ba02-4b38-8165-5a02f8f3badc

C5

Brian G. Agee, Ph.D.    January 24, 2007

**Page 174**

1    A    That's correct.
2    Q    Okay. You only deleted a few sentences; is
3  that correct?
4    A    Yes.
5    Q    Okay. And that's because -- is it because
6  you never intended to include those sentences to begin
7  with --
8        MR. PARKS: Objection to the form of the
9  question. Leading.
10       MR. MARCUS: Well, let me rephrase it.
11  BY MR. MARCUS:
12    Q    The deletions, the sentences that were
13  deleted out of the report marked as Agee Exhibit 2,
14  was the reason that you took those out that you never
15  intended them to be in there, when you served Agee
16  Exhibit 1?
17       MR. PARKS: Objection to the form of the
18  question. Leading.
19    A    The section -- the sentences that I had
20  removed were not intended to be in the document; they
21  were erroneous, they did not reflect my opinion.
22    Q    And that's at the time -- they didn't
23  reflect your opinions at the time you served your
24  December report; is that correct?
25    A    That's correct.

**Page 175**

1        MR. PARKS: Objection. Leading.
2    A    (Continued.) That's correct.
3    Q    Okay. I would like to look at what's
4  marked as Agee Exhibit 3.
5        I believe you testified that you drafted
6  what has been marked as Agee Exhibit 3 last evening
7  and then partially this morning; is that correct?
8    A    Yes, that's correct.
9    Q    When was the first time you showed what's
10  been marked as Agee Exhibit 3 to me?
11    A    At -- somewhere between 7:30 and 8 o'clock
12  a.m. this morning.
13    Q    So is it fair to say it was a couple of
14  minutes before we walked into your deposition?
15    A    That's correct.
16    Q    Had I asked you to write anything regarding
17  the section in your report titled "Kono fails to
18  disclose or teach means for processing said data
19  frames from cell sites, to generate a table"?
20    A    You had asked me to look through that
21  section and ask myself what was -- what would
22  change -- well, you had asked me to look through the
23  report. And, once I identified that section as being
24  where the -- where the issues were -- sorry. Let me
25  back up.

**Page 176**

1.       You had asked me to look through the report
2  and identify where -- where my -- my understanding of
3  equivalence would have affected my analysis or my
4  opinions.
5        And I looked through the entire report, and
6  this was the only section where there was -- where
7  there were -- where there were substantive
8  differences, or where my analysis would have been
9  substantively changed.
10       And I found, as I read it, that -- that my
11  analysis was -- was so dependent on my
12  misunderstanding of equivalence, that the only way I
13  could -- I could -- I could express to this group the
14  changes was to just rewrite the section.
15       So I decided late last night that that's
16  what I had to do.
17    Q    Okay.
18    A    And that's when I went and did this.
19    Q    So did I ask you to write what's been
20  marked as Agee Exhibit 3?
21    A    No, you did not.
22    Q    Had you told me that you were going to be
23  writing what's been marked as Agee Exhibit 3?
24    A    Not when -- not when I left the building
25  last night.

**Page 177**

1        I didn't know I was going to be writing
2  this, when I left the building last night.
3    Q    And I just want to be clear, because I
4  think there has been a lot of discussion today about
5  claim construction. And I just want to make sure
6  we're clear about what happened.
7        When you formulated the opinions that you
8  expressed in your reports today, or explained, where
9  the parties provided claim constructions for specific
10  terms in the '144 patent, or asserted claims of the
11  '144 patent, is it correct that you always just used
12  those proposed claim constructions to formulate your
13  opinions?
14       MR. PARKS: Objection to the form of the
15  question.
16    A    Once I saw the claim constructions and once
17  I understood the claim constructions, then from that
18  point on I always used those claim constructions in
19  formulating my opinions.
20       So in some early drafts, before I saw the
21  claims construction, I was -- I was doing it just
22  based on common, ordinary usage; and probably within
23  two or three days of starting the analysis, I was
24  using the claims constructions.
25    Q    But when you reached your final opinions

45 (Pages 174 to 177)

MERRILL LEGAL SOLUTIONS
Tel: (800) 868-0061  (312) 263-3524

071d12b8-ba02-4b38-8165-5a02f8f3badc

C6

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

    Plaintiff/Counterclaim-Defendant

vs.              CA No. 05-00747-SLR

ANDREW CORPORATION,

    Defendant/Counterclaim-Plaintiff

VIDEOTAPED DEPOSITION OF DR. DAVID GOODMAN

New York, New York

Monday, January 15, 2007

Reported by:
Adrienne M. Mignano
JOB NO. 190791

Page 138

```
 1         Goodman
 2  essentially the last six or seven lines in
 3  the middle paragraph, and my statement to you
 4  a few minutes ago rearranged the words in
 5  those, in there, but essentially I think I
 6  conveyed the same information that they did,
 7  that this does, but changing base station one
 8  to switching station one.
 9     Q.  And just to be clear, which part
10  of -- could you read into the record for me
11  which part of page 4 of the Kono translation
12  that you're relying on discloses the lease
13  square difference algorithm?
14     A.  Of course.
15         Would you like me to read what Kono
16  wrote or would you like me to paraphrase it
17  in a way that seems more --
18     Q.  Go ahead and paraphrase it.
19     A.  -- better suited to answering your
20  question.
21     Q.  Go ahead.
22     A.  Okay.
23         So first of all, I'm going to have
24  to change base station to switching station.
25  So the next to last sentence in the middle
```

Page 139

```
 1         Goodman
 2  paragraph of page 4, which says the switching
 3  station 1 forwards these data to the position
 4  locating device 2. And then I would go up
 5  and say that these data is data such as
 6  difference in arrival time of position
 7  locating signals with respect to the various
 8  base stations and the position of the mobile
 9  equipment is calculated. So cut and past,
10  but I'm just reading words.
11     Q.  And it's really in particular the
12  phrase of the position of the mobile
13  equipment is calculated that you contend
14  disclosed the lease square difference
15  algorithm?
16     A.  Well, the whole sentence as I have
17  rearranged it, so.
18     Q.  Is it your understanding that when
19  a reference discloses a general genus, a
20  general way of doing something, that every
21  specific implementation of that way is also
22  disclosed in the prior art reference?
23         MS. WALDRON: Objection. Vague.
24     A.  I think -- so I'm sure this is a
25  legal issue, but as an engineer, I would
```

Page 140

```
 1         Goodman
 2  think that every genus that was known at the
 3  time that somebody wrote the prior art
 4  reference would be included. If somebody
 5  invented something later on, it might be hard
 6  to collect royalties from somebody using
 7  something that wasn't known to Kono, wasn't
 8  known. But somehow I think that somebody of
 9  skill in the art reading this, there is a lot
10  of ways using time difference of arrival to
11  calculate location, and that means square, at
12  least square difference is one of them.
```

141

36 (Pages 138 to 141)

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

C8

Page 158

1    Goodman
2 we talked about reuse, where you can have the
3 same physical channels used by different
4 people in different parts of the metropolitan
5 area.
6    Q. The next limitation on page 17 is
7 at least three cell sites?
8    A. Yes.
9    Q. Your opinion is that that's
10 disclosed in Kono, correct?
11    A. Yes.
12    Q. Because Kono discloses base
13 stations, correct?
14    A. Yes.
15    Q. And in your view, cell sites
16 encompass base stations?
17    A. Yes.
18    Q. Well, the next claim limitation on
19 page 17 is equipped to receive signals sent
20 by multiple mobile cellular telephones. This
21 is still claim 22.
22        Do you see that?
23    A. Yes.
24    Q. Your opinion is that that's
25 disclosed in Kono, right?

Page 159

1    Goodman
2    A. My opinion is that if somebody
3 finds that disclosed -- if somebody finds the
4 Geometrix is receiving signals from multiple
5 mobile cellular telephones, they would have
6 to admit that Kono technology is also
7 receiving signals sent by multiple mobile
8 cellular telephones.
9    Q. How would one have to interpret the
10 claims to say that Geometrix has equipment
11 for receiving signals sent by multiple mobile
12 cellular telephones?
13        MS. WALDRON: Objection. Legal
14    conclusion. Speculation.
15    A. It's a very difficult question to
16 answer because I think it is impossible. I
17 can try to stretch my mind to think of some
18 weird interpretation.
19    Q. So it's impossible to or very
20 difficult to say that this claim limitation
21 equipped to receive signals encompasses
22 Geometrix, correct?
23    A. I really haven't done that
24 analysis. I suppose I could.
25    Q. Well, let me ask you this. Let's

Page 160

1    Goodman
2 get back to basics here for a moment.
3        Your position here is that if
4 Geometrix is encompassed by the claims, then
5 Kono invalidates the '144 patent, right?
6    A. Yes, that's right. If someone puts
7 Geometrix in the '144 circle, they are really
8 stuck with Kono.
9    Q. Can you give me any interpretation
10 under which of the claims, under which
11 Geometrix infringes the '144 patent?
12        MS. WALDRON: Objection. Legal
13    conclusion. Speculation.
14    A. I can't do this sitting here. I
15 don't know how much time Dr. Gottesman
16 tried -- spent trying to do that and he
17 completely failed, so I think that even if I
18 went off for a month, if TruePosition hired
19 me, I would be hard pressed to do any better
20 than Dr. Gottesman did.
21    Q. So you don't know of any
22 construction sitting here right now under
23 which Geometrix infringes the '144 patent; am
24 I correct?
25        MS. WALDRON: Same objection.

Page 161

1    Goodman
2    Legal conclusion. Misstates.
3    A. Right, absolutely correct.
4    Q. Doesn't it follow then that there
5 is no construction then of the '144 patent
6 that you can envision under which Kono
7 validates the '144 patent?
8        MS. WALDRON: Objection. Legal
9    conclusion. Confusing.
10    A. I disagree with that. I keep going
11 back to my picture that says just because
12 it's impossible to put Geometrix in this '144
13 circle, doesn't mean that it is impossible to
14 put Kono outside the '144 circle.
15    Q. When you rendered your report on
16 invalidity, did you compare the claims of the
17 '144 patent to Kono?
18    A. Yes.
19    Q. Did you compare the claims of the
20 '144 patent interpreted so as to include
21 Geometrix in the scope to Kono in rendering
22 that opinion?
23        MS. WALDRON: Objection. Vague.
24    Legal conclusion.
25    A. Formed an opinion as to how

Page 162

```
 1        Goodman
 2  somebody would have to interpret the claims
 3  to find these elements in Geometrix, and then
 4  I tried to find out if under that
 5  interpretation the claims would be covered by
 6  Kono.
 7     Q.  Would you be able to write that
 8  interpretation out for us the way that you
 9  provided us with your own construction this
10  morning?
11        MS. WALDRON: Objection.
12     Compound.
13     A.  What would you like me to write?
14     Q.  The interpretation.
15     A.  Just write down what I said?
16     Q.  Yes.
17     A.  Okay, sure.
18     Q.  Just so we're clear, this is a
19  construction that you believe not to be
20  correct?
21     A.  Yes, that's true. I don't think
22  that a correct construction would -- I
23  certainly don't think that Dr. Gottesman has
24  found that a correct construction would prove
25  that Geometrix infringes the '144 patent.
```

Page 163

```
 1        Goodman
 2     Q.  Why don't you write out --
 3     A.  Write out the answer to the
 4  question. Can I ask the reporter to read it
 5  to me slowly and I'll write down what I said.
 6  Do I need another exhibit?
 7     Q.  Yes, why don't we give you an
 8  exhibit.
 9        (Plaintiff's Exhibit 469, Blank
10     Piece of Paper, marked for
11     identification, as of this date.)
12     Q.  The court reporter has just handed
13  you a blank sheet of paper labeled 469, and
14  I'd like to you write down the interpretation
15  of the patent that you disagree with that
16  would encompass Geometrix and at the same
17  time show that Kono invalidates the '144
18  patent under that interpretation.
19        MS. WALDRON: Objection.
20     Compound. Overbroad. Legal
21     conclusion.
22     A.  Any particular claim or all of the
23  asserted claims?
24     Q.  Claim one.
25        MS. WALDRON: Objection.
```

Page 164

```
 1        Goodman
 2     Compound. Overbroad. Legal
 3     conclusion.
 4     Q.  Is there an easier claim that you
 5  can deal with more simply?
 6     A.  I'm not trying to save work. So if
 7  you prefer claim 1, I'll work on that one. I
 8  think it is more detailed than some of the
 9  others.
10     Q.  Why don't we do claim 22.
11     A.  Okay, that might take less time.
12        MS. WALDRON: Same objections for
13     the record. Compound. Overbroad.
14     Legal conclusion.
15     A.  Essentially you're asking me to do
16  Dr. Gottesman's job, so can I refer to his
17  report, because I assume that's what he was
18  asked to do by TruePosition?
19     Q.  You rendered an invalidity report,
20  and each time that I asked you for the basis
21  for why it is that you think it is invalid,
22  you keep telling me, well, if the claims
23  encompass Geometrix, then the patent is
24  invalid.
25     A.  Right.
```

Page 165

```
 1        Goodman
 2     Q.  What I want to know is the precise
 3  assumptions that you're making, the precise
 4  construction under which that invalidity
 5  opinion becomes relevant to this case.
 6        MS. WALDRON: Objection.
 7     Argumentative.
 8     A.  Is your answer that I consult
 9  Gottesman since he probably spent a long time
10  doing that?
11     Q.  Sure, you can.
12     A.  Can I have a copy of his report?
13     Q.  Sure.
14        What if I gave you TruePosition's
15  constructions, would that be what you're
16  looking for?
17     A.  I think you're asking me to find
18  some way of proving -- find some claims
19  construction in which I can prove Geometrix
20  infringes the '144 patent.
21     Q.  And that Kono invalidates the '144
22  patent.
23     A.  Yes.
24     Q.  I'm just simply trying to find out
25  the basis for your opinion in the invalidity
```

42 (Pages 162 to 165)

Esquire Deposition Services
(215) 988-9191

793958b0-9d46-4d36-bbfc-5c2a24482dd7

C10

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 11th day of June, 2007, I caused a true and correct copy of the foregoing **APPENDIX C TO TRUEPOSITION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE INVALIDITY TESTIMONY OF DR. DAVID GOODMAN PURSUANT TO FEDERAL RULE OF EVIDENCE 702** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

*[signature]* (#4512)
James D. Heisman (# 2746)