IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-747-SLR |
| | ) |
| ANDREW CORPORATION, | ) |
| | ) |
| Defendant. | ) |

Francis DiGiovanni, Esq. and James D Heisman, Esq. of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Paul B. Milcetic, Esq., Dale M. Heist, Esq., David L. Marcus, Esq., Kathleen A. Milsark, Esq., and Daniel J. Goettle, Esq. of Woodcock Washburn LLP, Philadelphia, Pennsylvania.

Josy W. Ingersoll, Esq. and Andrew A. Lundgren, Esq. of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: John M. Desmarais, Esq. of Kirkland & Ellis LLP, New York, New York, and Michael A. Parks, Esq., Rachel Pernic Waldron, Esq., and Shira J. Kapplin of Kirkland & Ellis LLP, Chicago, Illinois.

**MEMORANDUM OPINION**

Dated: August 23, 2007
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff TruePosition, Inc. ("plaintiff") filed this patent infringement action against Andrew Corporation ("defendant") on October 25, 2005, alleging infringement of plaintiff's U.S. Patent No. 5,327,144 ("the '144 patent"). (D.I. 1) Plaintiff alleges that defendant's system for locating cellular telephones, called the Geometrix® Wireless Location System, infringes claims 1, 2, 22, 31 and 32 of the '144 patent. Pending before the court are plaintiff's motions for summary judgment of validity of the '144 patent (D.I. 134) and on defendant's counterclaims II-VI and third through fifth affirmative defenses (D.I. 137). Also pending before the court are defendant's motions for summary judgment of invalidity of claim 22 of the '144 patent for indefiniteness (D.I. 145) and noninfringement of the '144 patent (D.I. 147). The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1338.

## II. BACKGROUND

### A. Technology at Issue

Cellular telephone networks typically include several antennas mounted on towers, known as "cell sites" or "base stations." ('144 patent, fig. 1C, col. 1, ll. 32-65) These cell cites are assigned a hexagonal-shaped service area, called a "cell." (Id.) Cellular telephones communicate with cell sites using two types of wireless "channels": control channels and voice channels. ('144 patent, col. 2, ll. 3-8) Control channels typically carry information to control the operations of the network, for example, information for establishing a voice communication link between the cellular telephone and the network. ('144 patent, col. 3, ll. 17-40) Voice channels carry user data, or the

voice signals that a user generates during a call. (D.I. 148 at 7; D.I. 162 at 7) Channels that transmit information from a cell site to a cellular telephone are called "forward channels," while channels that transmit information from a cellular telephone to a cell site are called "reverse channels." ('144 patent, col. 2, ll. 15-19) Cellular networks use different protocols for describing how information is transmitted between a cellular telephone and a cell site. In Global System for Mobile Communications ("GSM") cellular networks, control channels are known as stand-alone dedicated control channels ("SDC" channels); voice channels are called traffic channels ("TCH" channels). (D.I. 171 at B97-98, B101)

### B. The '144 Patent

The application leading to the '144 patent was filed May 7, 1993; the '144 patent issued July 5, 1994. The '144 patent generally relates to a cellular telephone location system for automatically recording the location of mobile cellular telephones having several cell site locations. Asserted claims 1, 22, and 31 are independent claims which describe, in most general terms, a location system, a ground-based location system, and a method for determining the location of cellular telephones. Each asserted claim requires that signals be transmitted over a prescribed set of "reverse control channels."

### C. Defendant's Geometrix® Product

Uplink Time Difference of Arrival ("UTDOA") is a network-based means of determining a cellular telephone's position by comparing and calculating the difference in time required for the cellular telephone's signal to reach different cell sites.[1] In the

---

[1]The UTDOA technique uses the known (fixed) speed of the radio waves to calculate the distance in arrival time, and hyperbolas are thereafter constructed that are

mid-1990s, defendant's predecessor, Allen Telecom LLC ("Allen"),[2] began marketing and selling a "TDOA-based" cellular telephone system called "Geometrix" that was used for E-911[3] purposes. Defendant currently markets and sells geolocation products under the Geometrix® brand name for security and law enforcement purposes. Defendant's Geometrix® system comprises a "positioning determining entity" ("PDE") that is overlaid on regular cellular network equipment. Using a UTDOA technique, the Geometrix® PDE locates signals sent over a SDC channel (when a user is not on a call) or a TCH channel (when a user is on a call).[4] (D.I. 199 at 15; D.I. 167 at B538) Plaintiff asserts that the geolocation of cellular telephones using the SDC channel infringes the '144 patent.[5]

## D. 3GPP & "Essential IPRs"

The Third Generation Partnership Project ("3GPP") is an international standardization body in the cellular telephone industry. Both plaintiff and defendant have participated in 3GPP through one of its five recognized organization partners, the

---

used to calculate the location of the transmitting device.

[2]The Geometrix® system was marketed and promoted by a division of Allen called "Grayson Wireless."

[3]"E-911" refers to cellular telephone location applications that communicate a cellular telephone user's location to an emergency dispatcher when a user dials "911" for an emergency. (D.I. 138 at 5 n.3)

[4]Once the Geometrix® system locates a user, it may store the user's location and/or control information in a database. (D.I. 167 at B495)

[5]The location technique used by Geometrix® is called mobile-terminated location request, or "MT-LR." (D.I. 148 at 9; D.I. 150 at A89-90) The MT-LR technique used when a cellular telephone is on but not in use, which uses the SDC channel, is called "idle-mode MT-LR." (Id.)

3

European Telecommunications Standards Institute ("ETSI"). 3GPP prepares, approves and maintains "Technical Specifications" and "Technical Reports" (known generally as "standards") for various cellular telephone systems. ETSI has an intellectual property rights ("IPR") policy which states that each member must timely inform ETSI of any "essential IPRs"; an IPR is "essential" when it is not technically possible to implement a standard without infringing that intellectual property. (D.I. 140 at A142, A146)

UTDOA was, at one time, part of a 3GPP standard, but was subsequently removed. (D.I. 161 at B21) Plaintiff sought to re-standardize UDTOA in the 3GPP technical specifications, presumably because standardization would result in an increase in sales of its UTDOA products. Plaintiff allocated significant resources to advocating for UTDOA standardization in the 2001-2002 timeframe, including hiring two full-time employee-advocates to attend worldwide 3GPP meetings. (Id., ex. B, D)

Plaintiff formally became an ETSI member in January 2002 (D.I. 161 at B92) and, thereafter, submitted a feasability study on UTDOA in GSM cellular networks (Id. at B94-111). The feasability study submitted by plaintiff to ETSI discussed the location of mobile phones using the SDC channel. (Id. at B103) Defendant, thereafter, joined ETSI and worked extensively with plaintiff to get UTDOA standardized. Plaintiff has never declared the '144 patent essential to any 3GPP standard.

## E. Prior Litigation

On December 21, 2000, plaintiff (and its wholly owned subsidiary, KSI, Inc. ("KSI")) filed an action in this district alleging infringement of the '144 patent and other patents by SigmaOne Communications Corporation ("SigmaOne"). TruePosition Inc., v. SigmaOne Corp., No. Civ. A. 00-1066-GMS (D. Del.). On November 13, 2001, by

4

stipulation of the parties, the court in that action entered a consent judgment and order stating, inter alia, that: (1) the '144 patent is valid; (2) the accused SigmaOne products infringed the '144 patent; (3) SigmaOne and its affiliates are permanently enjoined from making, using, selling, or importing the accused products; and (4) plaintiff will not seek damages arising out of past infringements. Id. (D.I. 50) (available in the case at bar at D.I. 43, ex. 6)

On December 11, 2001, plaintiff and KAI filed an infringement action against Allen (the "Allen suit"), in which plaintiff asserted that the Geometrix® system infringed several of its patents. Plaintiff did not assert the '144 patent against Allen; defendant relied upon the '144 patent as a primary prior art reference in support of its invalidity defenses (D.I. 139 at A33-35). While the Allen suit was pending, defendant acquired Allen and became its successor in interest. The Allen suit settled and was dismissed on February 13, 2004. Thereafter, defendant agreed to supply services and equipment that facilitate the location of cellular telephones to Saudi Telecom Company, a cellular telephone network service provider located in Saudi Arabia that provides services in that country. The present suit ensued. Defendant now asserts that it would never have assisted plaintiff in advocating the UTDOA standard had it known that plaintiff construed the '144 patent to cover UTDOA technology. (D.I. 160 at 14)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears

5

the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Infringement

Defendant moves for summary judgment of noninfringement based on a single limitation – the "reverse control channel" – that is required by each asserted claim. (D.I.

6

183 at 1)

### 1. Claim scope

By its Markman order of the same date, the court has defined a "prescribed set of reverse control channels," as that phrase appears in the '144 patent claims, as "[a] predetermined range of frequencies that transmit information from a cellular telephone to a cell cite." During prosecution, the applicants narrowed their claims from "control channels" to "reverse control channels," and specifically distinguished the prior art's use of forward control channels to locate cellular telephones. (D.I. 144 at A131, A138; D.I. 144 at A145-51; D.I. 185 at C33) In view of this intrinsic record, the court defined "reverse control channel" narrowly, i.e., as a frequency range that is dedicated to the reverse direction at all times. See Festo Corp. v. Shoketsu Kogyo Kabushiki Co., Ltd., 535 U.S. 722 (2002).

### 2. SDC Channels

There is no dispute that defendant's Geometrix® system utilizes the GSM protocol, which includes SDC channels. The issue at bar, therefore, is whether defendant has introduced sufficient evidence to demonstrate that a SDC channel has a predetermined range of frequencies that transmit information in both the forward and reverse directions and, if so, whether plaintiff has identified in response a genuine issue of material fact in this regard.

From the record, the court understands that GSM uses communication channels, consisting of TCH and control channels, which are made up of a combination of a frequency band number and a time slot within that frequency band. (D.I. 150, ex. P at

7

A169-70)  Control channels consist of broadcast control ("BCCH"), common control ("CCCH"), and dedicated control ("DCCH") channels.  (Id.)  DCCH are "bi-directional point-to-point channel[s]."  (Id., ex. Q at A178, ex. S at A192, ex. U at A201)  DCCHs consist of SDC channels and the associated control channel ("ACCH").  (Id., ex. R at A187)

Reverse control channels have been described in the art as "wideband data stream[s] sent from the mobile station to the land station."  (Id., ex. Z at A236)  This description is commensurate with the court's claim construction.  The SDC channel is used for both uplink (reverse) and downlink (forward) transmissions.  (Id.; see also id., ex. R at A188, ex. T at A196 ("The [SDC channel] operates on both the up-link and down-link and the normal burst is always used."), ex. U at A206 (SDC channels are "bi-directional"))  The parties do not dispute this fact.  (D.I. 148 at 13-14, D.I. 199 at 10, 30-31)

Defendant argues that, since a SDC channel is a "two way" channel having downlink capabilities, a SDC channel cannot be a unidirectional "reverse control channel" as required by the claims.  (D.I. 148 at 13-14)  In contrast, plaintiff argues that a SDC channel is a "one way" channel, which necessarily infringes when carrying information in the reverse direction.  In support of its position, plaintiff primarily relies upon the opinion of its expert, Dr. Oded Gottesman, who explains that no frequencies of a SDC channel carry information in both directions; some frequencies carry information in the reverse direction, while other frequencies carry information in the forward direction.  (D.I. 168 at B569)  Each GSM network described by Dr. Gottesman in his report has an associated frequency band (e.g., 900), uplink frequency range (e.g.,

8

890.0-915.0), downlink frequency range (e.g. 935.0-960.0), and respective channel numbers (e.g. 1-124). (Id.) "[C]ontrol channels," using this example, "can assume any of 124 bands of frequencies designated channel numbers 1 through 124." (Id.) Dr. Gottesman's opinion, therefore, is not inconsistent with the defendant's evidence of record, which also indicates that a SDC channel is a band of frequencies, inclusive of uplink and downlink frequency ranges, and not simply a particular frequency and time slot assignment.

The court notes that the term "channel" appears to be used in two distinct ways in the art; in a broad sense, "channel" may denote a range of frequencies and, in a narrow sense, to denote the actual combination of frequency assignment and time slot assignment utilized to transmit information. Just as the parties did not facilitate the court's understanding of the interrelation of control channels, frequencies, time slots, and the flow of information, however, neither party presented infringement arguments on this level of detail. Because it is unclear to the court whether the accused SDC channel is comprised of frequencies dedicated to reverse control signals, there remain genuine issues of material fact and the court denies defendant's motion for summary judgment of noninfringement on this ground. (D.I. 147)

### 3. Additional Arguments

#### a. Communication of text message data

SDC channels carry text message data.[6] (D.I. 148 at 14; D.I. 199 at 9, 32) It is

_____

[6]Text messaging, or "texting," is the common term for sending messages of about 160 characters or fewer from cellular telephones using the Short Message Service (or "SMS"). Text messaging service or SMS is available on most digital cellular telephones. The individual messages which are sent are called text messages.

9

not disputed that control channels generally communicate information to help control
the operations of the network, such as signaling information, while traffic or voice
channels generally carry user data. Defendant asserts that a SDC channel cannot be a
"reverse control channel" because SDC channels carry text messages, which it
assimilates with user (or traffic) information. (D.I. 148 at 14-15)

The '144 patent specification clearly distinguishes between voice channels,
which transmit voice signals continuously when a cellular telephone is turned on and in
use, and control channels, which are used to transmit data only periodically when the
cellular telephone is turned on, irrespective of the phone's use.[7] (col. 4, ll. 24-58) The
court has mirrored this distinction in its claim construction. The specification further
provides that, while "[s]ignals are continuously broadcast over a forward channel by
each cell site," "signals are discontinuously (periodically) broadcast" by a cellular
telephone over reverse control channels. ('144 patent, col. 2, ll.15-23) Although the
applicants did not specifically define the type of information conveyed over control
channels, the evidence of record indicates that control channels "are intended to carry
signaling or synchronization data." (D.I. 150, ex. R at A184) Certain types of the
signals sent over reverse control channels are described in the '144 patent.[8]

_____

[7]The invention of the '144 patent is described as advantageous over the prior art
because voice channels, which are "expensive and [a] relatively scarce resource," do
not need to be utilized in order to locate a cellular telephone. ('144 patent, col. 4, ll. 24-
62) More specifically, while utilizing voice transmissions to locate a cellular telephone is
a "time consuming" process which would complicate a customer's bills for phone usage
time, "[reverse] control channel transmissions already occur periodically in cellular
systems." (Id.)

[8]When the reverse control channel becomes free, the cellular telephone registers
and re-registers itself at a predetermined rate by transmitting digital registration

10

The specification does not contain terms of exclusion with respect to the type of signals carried. The court found no occasion, therefore, to further limit the term "reverse control channels" to a control channel carrying any particular type of "control information."

SDC channels are "not tied to the existence of a TCH," and are used for communicating signaling information. (Id., ex. U at A201) SDC channels are "used to provide authentication to the [mobile user], for voice call setup and location updates, and assignments of TCHs." (Id., ex. P at A169; see also id., ex. R at A188) When no transfer of voice or user data is in progress, i.e., when the cellular telephone is not in use, text messages are sent over the SDC channels. (Id., ex. P at A169)

The parties have not specifically addressed the nature of SMS or text message transmissions. In support for its motion, defendant cites to the testimony of plaintiff's chief technology officer, Robert Anderson, who testified that control channels carry only signaling information, and that only TCH carry both types of information. (D.I. 148 at 14-15, citing D.I. 150 at A92-93, A211) In response, plaintiff points to the testimony of its expert, Dr. Gottesman, and its former director of software development and chief technology officer, Joseph Sheehan, who both opine that a control channel can carry text messages. (D.I. 167 at B444, p. 91; D.I. 171 at B142, p. 36) On this record, the court finds that genuine issues of material fact exist with respect to whether a SDC

---

parameters over the channel. ('144 patent, col. 2, l. 59-col. 3, l. 8) The specification also provides that, in addition to registration data, cellular telephones transmit information in response to pages by the cellular system. ('144 patent, col. 3, ll. 8-13) Another type of data carried over the reverse control channel is the telephone number to which a cellular telephone user seeks to connect when placing a call. ('144 patent, col. 3, ll. 36-38)

channel's text messaging capability removes that channel from the court's definition of a "reverse control channel." Because a reasonable jury could conclude, in view of the evidence presented by plaintiff, that a channel carrying both control information and text messages is a "reverse control channel," the court defendant's motion for summary judgment of noninfringement on this ground. (D.I. 147)

### b. "Shared" versus "dedicated" channel

Defendant's expert, Dr. David J. Goodman, has submitted a declaration in which he states that a "'reverse control channel' is a 'shared' channel; it has a many-to-one property in that many mobile phones are allocated to the same reverse control channel to communicate with the base station." (D.I. 150 at A279, ¶(l)) In contrast, Dr. Goodman declares that a SDC channel is a "dedicated" channel, meaning that "only one mobile station at a time can use the [SDC channel] to communicate with the base station." (Id., ¶(m)) Dr. Goodman points to no evidence, of record or otherwise, in support for these characterizations.[9] (Id.) Relying on Dr. Goodman's statement, defendant asserts that a SDC cannot literally meet the "reverse control channel" limitation of the asserted claims. (D.I. 148 at 15)

The specification of the '144 patent provides that cellular telephones scan forward control channels for messages concerning the availability of reverse control channels, and will seize an open reverse control channel to send registration

___

[9]"[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc). Plaintiff puts forward no expert testimony of its own on the issue; nor does it specifically contest Dr. Goodman's characterization of a SDC channel. (D.I. 199 at 29-30) Plaintiff was not required to put forward evidence in response to what, effectually, was a proffer of attorney argument by defendant.

12

information. ('144 patent, col. 2, ll. 57-62) The specification does not clearly describe reverse control channels in terms of their connectivity capabilities, i.e., whether more than one cellular telephone at a time actually uses a reverse control channel for this purpose. Defendant provides no evidence regarding the state of the art in 1993, from which the court could possibly determine whether reverse control channels were known to have "shared" connectivity characteristics. Absent such guidance, and any exclusionary or otherwise limiting language in the intrinsic record, the court found no occasion to construe a "reverse control channel" as a "shared" channel as defendant suggests. Further, defendant has provided no evidence regarding the purported "dedicated" nature of SDC channels, which could provide the comparison required for an infringement analysis. Because defendant has not demonstrated the absence of any material fact regarding infringement, summary judgment is inappropriate on this ground. (D.I. 147)

## B. Validity

### 1. Claim 22 (Indefiniteness)

Defendant seeks a judgment that claim 22 of the '144 patent is invalid as a matter of law. (D.I. 145) Claim 22 contains the following means-plus-function[10] limitation:

> [D]atabase means for storing location data identifying the cellular telephones and their respective locations, and for providing access to said database to subscribers at remote locations

In its Markman order of the same date, the court has identified the function of this

---

[10]35 U.S.C. § 112, ¶ 6.

13

limitation (storing data that identifies each cellular telephone and its respective location,

and for providing access to said data to subscribers at remote locations), and the

corresponding structure for that function in the specification ("database 20").

> [I]n order for a means-plus-function claim to be valid under [35 U.S.C.] § 112 [¶
> 2], the corresponding structure of the limitation must be disclosed in the written
> description in such a manner that one skilled in the art will know and understand
> what structure corresponds to the means limitation.

Biomedino, LLC v. Waters Technologies Corp., No. Civ. A. 2006-1350, 2007 WL

1732121, *3 (Fed. Cir. 2007) (citation and internal quotations omitted). The remaining

issue at bar, therefore, is whether the "database 20" structure is described in a

sufficient manner.

On this point, plaintiff offers the testimony of its expert, Dr. Brian Agee.[11]  Dr.

Agee is prepared to testify that a person of skill in the art would readily recognize that

the '144 patent specification links and associates "database 20" with the storage

function recited in claim 22. (D.I. 169 at B39)  Plaintiff points to several pieces of

evidence which Dr. Agee may rely upon in support for his assertion that the recitation

and discussion of "database 20" is sufficient to render claim 22 definite:  (1) Dr. Agee is

aware of at least three database software programs available in 1993;[12] (2) inventor

John Webber stated that no mathematical calculations are needed to store data (id. at

B42-43, B55); (3) dictionary definitions of "database" existing in 1993 (id. at B43-44,

B58-60, B62-64, B66-68); (4) several prior art patents listed on the face of the '144

---

[11]Dr. Agee has M.S. and Ph.D. degrees in electrical engineering.

[12]Specifically, the programs that Dr. Agee asserts were available and known to
persons working in the field when the '144 patent was filed are dBase, Microsoft Works
and Microsoft FoxPro. (D.I. 169 at B42)

patent disclose uses of databases for similar purposes (id. at B44-45); (5) the '144 patent specification states that the inventors intended to rely on the knowledge of one of skill in the art regarding several elements of their system (id. at B44, citing '144 patent, col. 8, l. 63-col. 9, l. 25 ("It should be noted that this figure, as well as other figures, is simplified[.]")).  (D.I. 156 at 29-32)

Defendant argues that, because a "database" is implemented by a computer, the disclosure of an algorithm, formula, and/or series of steps performed by a computer to perform the data storage function is required.[13]  (D.I. 184 at 8-9)  Defendant argues that plaintiff's evidence cannot "fill the gap" in the '144 patent specification, which discloses no algorithm corresponding to the computer-implemented "database means" function. (D.I. 184 at 8-9); Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("[T]he testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification.").

In the case at bar, the court concludes that a "database" means is not so complex as to necessitate the disclosure of software code, steps, formulae or procedures for the simple function of "storing data."  Compare Finistar Corp. v. The DirecTV Group, Inc., 416 F. Supp. 2d 512, 518-19 (E.D. Tex. 2006) (requiring that the disclosure of an "algorithm to be performed by the computer to accomplish the recited function" of "generating a hierarchically arranged set of indices, and embedding those

_____

[13]In its opening brief, defendant did not specifically articulate its algorithm argument (D.I. 146 at 8-9); plaintiff argues that defendant should not be entitled to put forward new arguments in its reply brief (D.I. 156 at 32).  Because defendant is essentially arguing the **absence** of evidence relating to the means-plus-function limitation, the court does not deem the consideration of defendant's argument that an algorithm is also not disclosed to be prejudicial to plaintiff.

15

indices in the information database," or, in the alternative, "steps, formula, or procedures to be performed . . . expressed textually, or shown in a flow chart") (citing WMS Gaming Inc., v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999)), and DE Techs., Inc. v. Dell, Inc., 428 F. Supp. 2d 512, 522 (W.D. Va. 2006) (claim was held invalid as indefinite where plaintiff failed to identify "any portion of the written specification that discloses the steps for integrating the [computer] processes" claimed) (cited by defendant at D.I. 184 at 8-9).

Dr. Agee will offer testimony that the "database" structure disclosed in the specification had a specific meaning in the art at the time the '144 patent was filed, an opinion confirmed by the description of databases in dictionaries and patent applications filed prior to the '144 patent. On this record, summary judgment that the '144 patent is invalid as indefinite is inappropriate. See Personalized Media Communications, LLC v. International Trade Com'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.") (citing Miles Lab., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed. Cir. 1993)).

## 2. Anticipation

Plaintiff moves for summary judgment on defendant's affirmative defense and counterclaim that the '144 patent is invalid as anticipated by a published Japanese patent application identified as "the Kono reference."[14] (D.I. 134) By its memorandum

---

[14]Defendant's pleadings generally allege that the '144 patent is invalid "under one or more sections of Title 35 of the United States Code, including sections §§ 101, 102, 103, and/or 112." (D.I. 48 at p. 9, 11) Defendant served on plaintiff a report from its expert Dr. Goodman on December 1, 2006, purporting to show that the '144 patent

16

order of the same date, the court has granted plaintiff's motion to exclude the invalidity testimony of Dr. Goodman as unreliable and not helpful to the trier of fact. The '144 patent (and the asserted prior art) is not so easily understandable such that expert testimony would not be required to demonstrate anticipation. See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1152 n.4 (Fed. Cir. 2004); see also Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) ("Typically, testimony concerning anticipation must be testimony from one skilled in the art[.]"). Defendant does has not put forward any other expert testimony in support of its invalidity case. (D.I. 154) Because there is no indication that defendant can demonstrate anticipation at trial, plaintiff's motion is granted.[15] (D.I. 134)

## C. Defendant's Standards-Based Counterclaims

Plaintiff challenges five of defendant's counterclaims on summary judgment: (1) fraud (counterclaim II); (2) unfair competition under the California Business and Professional Code (counterclaim III); (3) equitable and promissory estoppel (counterclaims IV and VI); and (4) implied license (counterclaim V) (collectively, the "standards-based counterclaims"). (D.I. 137; D.I. 138 at 11) The court addresses plaintiff's arguments in turn.

### 1. Preemption

Plaintiff argues that defendant's fraud, unfair competition, and promissory

is invalid as anticipated. (D.I. 136 at A31-63)

[15]In view of the court's decision, the court need not reach the parties' arguments regarding the admissibility of the translation of the Kono reference proffered by defendants. (D.I. 174 at 9-11)

17

estoppel counterclaims are preempted by federal patent law. (D.I. 138 at 13)
Specifically, plaintiff asserts that defendant's "counterclaims assert at root [that plaintiff]
is improperly maintaining this patent infringement action against [defendant] when it
should have provided a license instead." (Id.) Defendant responds that its
counterclaims do not relate to pre-suit communications between itself and plaintiff but
are, instead, based on plaintiff's "deceit throughout the UTDOA standardization
process," which constitutes tortious conduct that is not preempted by federal patent law.
(D.I. 160 at 16)

The court agrees that the conduct at the heart of defendant's claims, as pled, is
plaintiff's failure to inform ETSI that it considered the '144 patent to be essential IPR,
not plaintiff's enforcement of the '144 patent against defendant prior to or in this
litigation. Plaintiff's decision not to disclose the '144 patent to ETSI is the purported
misrepresentation of fact upon which defendant relies for its fraud counterclaim. (D.I.
48 at ¶ 26) Similarly, defendant asserts that plaintiff's inaction, "coupled with [its]
statements that it would declare any potentially blocking intellectual property and that
[defendant] already had access to such intellectual property," constituted a promise that
plaintiff would not assert the '144 patent against defendant. (Id. at ¶ 52) Plaintiff's
failure to disclose the '144 patent at three 3GPP meetings held in California forms the
basis of defendant's unfair competition counterclaim. (Id. at ¶¶ 36, 38, 40) Defendant
asserts that plaintiff's inaction conveyed to it that the '144 patent was not essential IPR
and, in reliance on this understanding, defendant cooperated with plaintiff in advocating
for UTDOA standards and marketing its UTDOA-based product. (Id. at ¶¶ 28, 53)

The preemption doctrine is premised on the notion that a patentee with a good

18

faith belief that its patents are being infringed must be allowed to make its rights known to a potential infringer; this notification violates no protected right. See Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1374 (Fed. Cir. 2004); Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 869 (Fed. Cir. 1997). The federal patent laws, therefore, bar state law liability for communications concerning alleged infringement so long as those communications are not made in bad faith. Id. at 1374-75 (citation omitted). Federal laws do not bar state law claims that address different wrongs than those proscribed by the patent laws and that also provide for different forms of relief. See Dow Chemical Co. v. Exxon Corp., 139 F.3d 1470, 1477 (Fed. Cir. 1998) (holding that state tortious interference with contractual relations claims were not preempted by the patent laws where "the tort claim at issue [was] not premised upon bad faith misconduct in the PTO [governed by the patent laws], but rather is premised upon bad faith misconduct in the marketplace."). Because defendant's claims relate to "tortious conduct [i.e., omissions] before standards bodies" and are not, as plaintiff argues, premised upon whether plaintiff asserted its patent rights against defendant in good faith, defendant's claims are not preempted.[16]

---

[16]Plaintiff's cited caselaw does not demonstrate otherwise. See Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1374-75 (Fed. Cir. 2004) (We have held that federal patent law preempts state-law tort liability for a patentholder's good faith conduct in **communications asserting infringement** of its patent and warning about potential litigation.") (citation omitted) (emphasis added) (affirming grant of summary judgment for plaintiff on defendant's state-law claims of tortious interference with prospective economic advantage and unfair competition); Zenith Electronics Corp. v. Exzec, Inc., 182 F.3d 1340, 1355 (Fed. Cir. 1999) ("[W]e hold that bad faith is a prerequisite to Exzec's state-law tortious interference claim; without it, the claim is preempted by patent law.").

Plaintiff also relies on the Federal Circuit's decision in Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318 (Fed. Cir. 1998), overruled in part on other

19

## 2. Fraud

### a. Standards

To establish common law fraud under Delaware law, defendant must ultimately demonstrate the following: (1) a false representation, usually one of fact, made by plaintiff; (2) plaintiff's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce defendant to act or to refrain from acting; (4) defendant's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the defendant as the result of such reliance. See Royal Indemnity Co. v. Pepper Hamilton LLP, 479 F. Supp. 2d 419, 430 (D. Del. 2007) (citing Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del. 1992)). Alternatively on the first factor, defendant may demonstrate common law fraud "through deliberate concealment of material facts, or by silence in the face of a duty to speak." Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1074 (Del. 1983). That is, "one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." Id. Such a duty to disclose may arise out of the specific policy of a standards-making organization such as

grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1361 (Fed. Cir. 1999). The Court in Zenith described this precedent as follows:

> In Hunter Douglas, we concluded that state tort claims, including tortious interference claims, based on publicizing a patent in the marketplace are not preempted by the patent laws if the claimant can show that the patentholder acted in bad faith in its publication of the patent. . . Thus, under the Hunter Douglas analysis, to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim.

Zenith, 182 F.3d at 1355 (internal citation omitted).

3GPP. See Rambus Inc. v. Infineon Tech. AG, 318 F.3d 1081, 1036-102 (Fed. Cir.

2003). In such a case, the scope of the duty is defined by the language of the policy

statement. Id. at 1102.

### b. The ETSI policy at issue

The ETSI IPR policy states that

[e]ach MEMBER shall use its reasonable endeavors to timely inform ETSI of
ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a
technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on
a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR
which might be ESSENTIAL if that proposal is adopted.

(D.I. 140 at A142, ¶ 4.1)  Additionally,

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but
not commercial) grounds, taking into account normal technical practice and the
state of the art generally available at the time of standardization, to make, sell,
lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS
which comply with a STANDARD without infringing that IPR. For the avoidance
of doubt in exceptional cases where a STANDARD can only be implemented by
technical solutions, all of which are infringements of IPRs, all such IPRs shall be
considered ESSENTIAL.

(Id. at A146, ¶ 15(6))

### c. Duty to disclose

The ETSI policy imposed a duty on plaintiff to disclose any patent which would

unavoidably be infringed by utilizing 3GPP standards, including the UTDOA standard

which plaintiff and defendant jointly advocated.[17]  Plaintiff argues that the evidence

demonstrates that it had no duty to disclose the '144 patent as essential IPR to

3GPP/ETSI. Specifically, plaintiff argues that defendant cannot demonstrate that the

---

[17]The details regarding this standard have not been made clear to the court; no
copy appears of record. The court cannot, therefore, evaluate plaintiff's statements
regarding what the UTDOA standard requires.

'144 patent meets the definition of "essential," i.e., that it "is not possible on technical" grounds to implement the standard without infringing the '144 patent, because it has not completed a technical analysis ("involving the equivalent of a showing of infringement"). (D.I. 138 at 16-18) Plaintiff generally asserts that several other (older) location methods may be used under 3GPP standards besides UTDOA, and GSM specifications state that a company implementing UTDOA may do so on either the TCH channel or a SDC channel, only the latter of which is arguably encompassed by the '144 patent. (Id. at 18-19, citing D.I. 140 at A172) Thus, according to plaintiff, no 3GPP standard requires that cell phone location be performed using the UTDOA and the control channel option of that method. (Id.)

Defendant argues that, under plaintiff's theory of this litigation, it is not possible to perform UTDOA without infringing the '144 patent. (D.I. 160 at 10) It also argues that, if plaintiff's arguments were correct, it would mean a UTDOA-technology patent "could never be essential to any standard unless the patent claims every location technology available or used with the standard." (Id. at 14)

Notably, plaintiff seeks lost profits damages in this case based on the absence of commercially available non-infringing alternatives to the UTDOA technology claimed in the '144 patent. (D.I. 161 at B59-60, B161) Plaintiff cannot have its cake and eat it too. That is, plaintiff cannot simultaneously assert that no non-infringing alternatives exist in the market and that no question of fact remains as to whether it had a duty to disclose the '144 patent to 3GPP/ETSI as "essential IPR." If, in fact, the absence of non-infringing alternatives is due to the fact that plaintiff and defendant are the only two market competitors, plaintiff was required to put forward evidence in support of its

22

motion from which the court could glean that, in contrast to the means employed by defendant, other technical means exist for practicing the 3GPP/ETSI UTDOA standard without infringing the '144 patent. Plaintiff has provided no such evidence. In fact, when questioned about one possible technical alternative at her deposition, plaintiff's damages expert, Carla S. Mulhern, stated that it is "[her] understanding that for that technical solution to be implemented there would need to be changes to the cellular network as currently employed by most operators." (Id.)

Even assuming, as plaintiff asserts, that no 3GPP standard requires that cell phone location be performed using the control channel option of UTDOA, plaintiff was required, on summary judgment, to demonstrate the absence of genuine issues of material fact with respect to whether this combination (presumably included within the UTDOA standard at issue) can be practiced without infringing the '144 patent.[18]   For the aforementioned reasons, the court finds that plaintiff has not satisfied this burden and, possibly, could not have satisfied this burden while maintaining its theory on lost profits damages. Because a reasonable jury could find that plaintiff had a duty to disclose the '144 patent, plaintiff's motion is denied on this ground.

### d. Intent

---

[18]Plaintiff's chief technical officer, Joseph Sheehan, and president, Robert Anderson, each testified at their depositions that the '144 patent is not essential to the practice of locating cellular telephones using the UTDOA technique because the phones can be located using voice channels. (D.I. 141 at A279 (60:22-61:13), A282 (46:21-47:11))  This testimony, however, does address the availability of other technical options for locating cellular telephones using UTDOA and control channels. Mr. Anderson's testimony that he is not aware of any other alternatives to voice channels further supports the court's conclusion that plaintiff has not demonstrated the absence of material fact. (Id. at A282 (47:10-11))

23

Plaintiff argues that "the fact that [plaintiff] may have believed that using the reverse control channel to perform [U]TDOA locations infringed the '144 patent does not lead to the conclusion or even imply that [it] believed the '144 patent was essential to any 3GPP standard." (D.I. 138 at 21)  Plaintiff asserts that neither its president nor chief technical officer believed that the '144 patent was essential IPR. (Id. at 20, citing D.I. 141 at A279 (58:22-60:25), A281-82 (45:8-19))

Defendant has offered specific facts that call into question the credibility of this (arguably self-serving) testimony. Compare TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("Summary judgment should not be denied simply because the opposing party asserts that the movant's witnesses are not to be believed.") (cited at D.I. 180 at 13). Mr. Anderson, testifying as plaintiff's Rule 30(b)(6) witness, stated that plaintiff believed that the '144 patent covered locating cellular telephones using a control channel as early as 2002. (D.I. 160 at 22, citing D.I. 161 at B25)  Plaintiff sought defendant's cooperation in its effort to standardize UTDOA. (Id., citing D.I. 161 at B115-17)  Rhys Robinson, a former employee of plaintiff who was involved in several meetings relating to standards-setting, testified that he thought plaintiff should have declared the '144 patent to ETSI as essential IPR. (D.I. 161 at B286-87)  Though Mr. Robinson's opinion may ultimately be an unqualified one (D.I. 141 at A285-86 (201:2-206:14)), a reasonable jury could find, in view of the circumstantial evidence, the requisite proof of scienter required for defendant's fraud claim. See Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983) (noting that circumstantial evidence may adequately constitute proof of intent in fraud cases). The court, therefore, declines to grant summary judgment for plaintiff on this ground.

24

#### e. Reasonable reliance

Defendant asserts that it relied on plaintiff's: (1) failure to disclose the '144 patent to 3GPP/ETSI; and (2) failure to inform defendant of its interpretation of the '144 patent and its intent to sue based upon that interpretation.  According to defendant, it would not have cooperated with plaintiff in plaintiff's standardization efforts had defendant known that a complaint would be brought against it related to products that were in compliance with those standards.[19]  (D.I. 160 at 24, citing D.I. 161 at B174-75, B178)

At the conclusion of the Allen suit,[20] the parties entered into a settlement agreement whereby plaintiff covenanted not to sue defendant for infringement of the '144 patent "for domestic applications by [defendant] relating solely to tasking E-911 geolocation," including defendant's Geometrix® system equipment for determining the time difference of arrival of a signal "transmitted by a wireless telephone's voice or traffic channel) but not the control channel or access control channels)[.]"  (D.I. 139 at A41-42)  Plaintiff asserts that this settlement agreement, which contained a standard integration clause, precludes defendant from asserting that it believed that it was free to perform control channel locations.  (D.I. 138 at 25-26)  In the present litigation, however, plaintiff asserts that the SDC channels used by Geometrix® are akin to voice or traffic channels because they carry text messaging data.  Once again, plaintiff cannot

---

[19]In support, defendant relies on the testimony of Joseph P. Kennedy, Jr..  (D.I. 161 at B174-75, B178)  Mr. Kennedy's position with defendant is unclear, and the transcript pages of record do not indicate whether Mr. Kennedy testified as defendant's Rule 30(b)(6) witness.  (Id.)

[20]Supra p. 5.

25

have it both ways. Its current litigation position demonstrates that a genuine issue of fact remains as to whether defendant's reliance was reasonable under the Third Circuit precedent.[21]

### f. Damages

It is clear that, in order to succeed in an allegation of common law fraud, a claimant must demonstrate, inter alia, actual damages. See Czarnick v. Illumnia, Inc., 437 F. Supp. 2d 252, 259 (D. Del. 2006); Kosachuk v. Harper, No. Civ. A. 17928, 2002 WL 1767542, *5 (Del. Ch. 2002). Plaintiff at bar asserts that defendant's counterclaims must fail because it has neither quantified nor provided proof of its alleged actual damages. (D.I. 138 at 33-35) Defendant responds that it need only iterate the "fact of damages" and need not, before trial, quantify such damages. (D.I. 160 at 39)

In this regard, defendant has identified multiple injuries it has allegedly sustained as a result of plaintiff's fraudulent conduct, including: (1) its litigation expenses; (2) any damages awarded plaintiff for infringement in this case; (3) "[t]he award of the STC contract was delayed"; (4) "[b]usiness development and executive management staff have had to undertake letter-writing campaigns and trips to STC to respond to [plaintiff's] actions"; and (5) defendant must routinely discuss plaintiff's conduct with customers. (D.I. 160 at 38) With respect to the damages already sustained as a result

---

[21] In Straub v. Vaisman and Co., Inc., 540 F.2d 591, 598 (3d Cir. 1976), the Third Circuit "identified a non-exclusive set of factors to aid in determining whether a party's reliance was reasonable under all of the circumstances," which include: "(1) whether a fiduciary relationship existed between the parties; (2) whether the [claimant] had the opportunity to detect the fraud; (3) the sophistication of the [claimant]; (4) the existence of long standing business or personal relationships; and (5) the [claimant's] access to the relevant information." AES Corp. v. Dow Chem. Co., 325 F.3d 174, 178-79 (3d Cir. 2003) (citing Straub, 540 F.2d at 598).

of having to defend the instant litigation (i.e., defendant's litigation expenses and any adverse damage award), such damages cannot be quantified until after trial has concluded and, therefore, will not be presented to the jury at trial but will be considered by the court. The remaining alleged damages are too speculative (particularly in the absence of expert evidence) to submit to a jury and, therefore, defendant cannot move forward with those theories at trial.

### 3. Equitable Estoppel and Implied License

In order to establish equitable estoppel,[22] defendant must show: (1) plaintiff, through misleading words, conduct, or silence, led defendant to reasonably infer that plaintiff did not intend to enforce its patent against it; (2) defendant relied on that conduct; and (3) due to its reliance, defendant will be materially prejudiced if plaintiff is allowed to proceed with its claim. A.C. Aukerman CO. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992). "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence" that defendant can continue its allegedly infringing activities. Id. at 1043-44.

Since the court has concluded that a reasonable jury could find that plaintiff had a duty to disclose the '144 patent tp 3GPP/ETSI, and that evidence exists from which a jury could reasonably infer that defendant justifiably relied on plaintiff's silence and inaction with respect to the '144 patent as an indication that its activities were non-infringing, triable issues exist with respect to defendant's equitable estoppel claim. The

---

[22]Defendant's third affirmative defense and counterclaim IV. (D.I. 48 at 9, 17)

court, therefore, declines to grant summary judgment for plaintiff on this ground.

## 4. Unfair Competition

Defendant asserts that plaintiff engaged in unfair competition, as defined by Cal.

Bus. & Prof. Code §§ 17200 et seq. (the "California Code"), when its representatives

attended three 3GPP meetings in California regarding UTDOA standardization and

failed to disclose either the existence of the '144 patent or that plaintiff considered the

'144 patent to be essential IPR. (D.I. 48 at ¶¶ 33-40) Defendant seeks an order

enjoining plaintiff from asserting the '144 patent. (Id. at ¶ 43)

> The California Code provides that
>
> unfair competition shall mean and include any unlawful, unfair[23] or fraudulent
> business act or practice and unfair, deceptive, untrue or misleading advertising .
> . . .

Cal. Bus. & Prof. Code § 17200 (2007). The scope of section 17200 is broad, and

encompasses "anything that can properly be called a business practice and that at the

same time is forbidden by law." Cel-Tech Comm., 973 P.2d at 539 (citation omitted).

"In order to have standing under § 17200, [a plaintiff] must plead both that it suffered an

injury in fact and that it lost money or property as a result of unfair competition."

Chip-Mender, Inc. v. Sherwin-Williams Co., No. Civ. A. 05-3465, 2006 WL 13058, *10

(N.D. Cal. Jan. 3, 2006). To state a claim under the California Code, a plaintiff must

---

[23]"When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Comm., Inc. v. Los Angeles Cellular Telephone Co., 973 P.2d 527, 544 (Cal. 1999).

28

show only that "members of the public are likely to be deceived."[24] In re HP Inkjet Printer Litigation, No. Civ. A. 05-3580, 2006 WL 563048, *4 (N.D. Cal. Mar. 7, 2006) (citing Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)) (citations and internal quotation omitted). Allegations "must state with reasonable particularity the facts supporting the statutory elements" of the alleged violation. Id. (citation omitted). "Because [the California Code] is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." Cel-Tech, 973 P.2d at 540 (citation and internal quotation omitted).

Since defendant could demonstrate at trial that there was a duty to disclose the '144 patent as "essential IPR" pursuant to ETSI policy, it follows that defendant could, potentially, demonstrate that this duty existed at any of the named 3GPP/ETSI meetings in California. Defendant does not, however, contest the evidence of record (cited by plaintiff) that delegates are not permitted to discuss intellectual property at 3GPP meetings.[25] (D.I. 141 at A247, p. 196, A211-62, p. 30, 34, A263, p. 43, A265, pp. 74-75) (cited at D.I. 138 at 32) Without any indication that there could ever have been a disclosure in California, the court has no basis from which to conclude that California's unfair competition statute applies to the facts at bar. Although what constitutes an "unfair" practice under the California code is generally a question of fact,

---

[24]In the case at bar, defendant asserts that the relevant public "is made up of technology manufacturers, including [defendant], and other entities involved in standardization." (D.I. 160 at 30-31)

[25]In its reply brief, defendant states that "the procedure for declaring essential IP is to submit forms to ETSI in Sophia-Antipolis, France." (D.I. 180 at 17, citing D.I. 138 at 32-33 and 20 n.10)

29

Cambridge Electronics Corp. v. MGA Electronics, Inc., 227 F.R.D. 313, 337 (C.D. Cal.
2004), the court finds no occasion to  analyze the facts at bar under the California Code
absent evidence of a nexus between plaintiff's conduct and that forum.  The court
grants plaintiff's motion with respect to defendant's unfair competition claims
(counterclaim III).

### 5. Promissory Estoppel

To succeed on its promissory estoppel claims,[26] defendant must prove:  the
making of a promise; the intent to induce action or forbearance based on the promise;
reasonable reliance; and injury.  Zechman v. Christiana Care Health Systems, No. Civ.
A. 05-159, 2007 WL 1891123, *8 (D. Del. 2007) (citation omitted).  "[Defendant] must
be able to prove the elements of promissory estoppel by clear and convincing evidence.
Moreover, the promise, in such a case, must be definite and certain."  Id. (quoting
Continental Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1233 (Del. Ch. 2000))
(internal brackets omitted).

In response to plaintiff's general assertion that it made no "definite and certain"
promise to defendant (D.I. 138 at 29-30), defendant points to plaintiff's UTDOA 2002
feasability study, which stated that

[plaintiff] may hold one or more patents or copyrights that **cover information**
contained in this document.  A license **will** be made available to applicants under
reasonable terms and conditions that are demonstrably free of any unfair
competition.

(D.I. 161 at B106) (emphasis added)  Defendant also points out that plaintiff's 2002
feasability study specifically discussed locating cellular phones using a SDC channel.

_____

[26]Defendant's fifth affirmative defense and counterclaim VI.  (D.I. 48 at 10, 18)

30

(Id. at B103) ("As an alternative, the energy associated with call setup signaling activity on the [SDC channel] can be used to locate an idle [cellular telephone].") Plaintiff did not address this evidence in its reply brief, nor supplement its general assertions that defendant cannot prove intent and reasonable reliance at trial. (D.I. 180) The court is satisfied that a reasonable jury could interpret the aforementioned statements as a promise by plaintiff to license the technology at issue. Plaintiff has not carried its burden with respect to intent and reasonable reliance. For these reasons, plaintiff's motion for summary judgment is denied on this ground; defendant's promissory estoppel counterclaim will proceed to trial.

### 6. Conclusion

Plaintiff's motion for summary judgment (D.I. 137) is granted with respect to defendant's unfair competition claim, and denied with respect to defendant's fraud, equitable estoppel, implied license, and promissory estoppel claims.

## V. CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment of noninfringement (D.I. 147) is denied; defendant's motion of invalidity of claim 22 of the '144 patent for indefiniteness (D.I. 145) is denied; plaintiff's motion for partial summary judgment that defendant cannot prove its invalidity claims (D.I. 134) is granted; and plaintiff's motion for summary judgment on defendant's counterclaims II-VI and affirmative defenses III-V (D.I. 137) is granted in part and denied in part. An appropriate order shall issue.