<u>EXHIBIT 15</u>

<u>TruePosition, Inc. v. Andrew Corporation, No. 05-747-SLR</u>
<u>TruePosition's Statement of Intended Proofs</u>

I.    **TRUEPOSITION'S CASE IN CHIEF**

    A.    <u>Background</u>

        1.    **The Parties**

TruePosition is a Delaware corporation based in King of Prussia, Pennsylvania. Andrew is also a Delaware corporation, headquartered in Illinois. Both TruePosition and Andrew's Network Solutions Group, based in Virginia, manufacture, market, and sell equipment and software used to locate cellular telephones. TruePosition and Andrew compete directly in both domestic and foreign markets for the products at issue in this lawsuit.

        2.    **TruePosition's 144 Patent**

TruePosition owns the 144 Patent. In the Spring of 1992, TruePosition's founder combined efforts with two other inventors from a company in Virginia called "Interferometrics" to conceive a system and method for determining the location of a cell phone that could locate any cell phone any time. To find the location of a cell phone, the system and method used the control channel signals that any cell phone normally sends. It also used a technique for determining the origination point of the control channel signals called Time Difference of Arrival ("TDOA"). TruePosition's founder and the other inventors built a working version of the invention in 1993, filed its patent application the same year and was awarded the 144 Patent in 1994.

TruePosition's invention was an important advance in the area of cell phone location technology. It allowed a cell phone to be located without requiring that the phone be modified to send or receive any special signals. It therefore represented an advance over technologies that

modify the phones so that it can send or receive a special signal that is specifically designed for signal location.

A good present example of a phone that sends or receives a special signal designed for signal location is a phone with GPS.  Today, GPS technology is commonly used in navigation systems and to determine the location of cars and cell phones.  But for certain applications, GPS is not an optimal cell phone location technology.  GPS cell phone location works by using a special receiver chip that is installed in a phone and that determines the phone's location by receiving signals from the GPS satellite system.  GPS is not optimal for tracking suspect individuals or potential terrorists because the suspect individual may disable the GPS receiver or purchase a phone that has no GPS capability.  By contrast, TruePosition's invention uses the control channel signals that any phone will send so long as the phone is turned on.

TruePosition's invention could also locate a cell phone any time.  Cell phones transmit two types of signals.  Voice channel signals carry a cell phone user's voice information during a phone call. Control channel signals control the operations of a cellular network and provide call set up information to enable a cell phone user to place a call.  TruePosition's invention could locate a cell phone user even when the user was not talking, so long as the phone was turned on, because it used the phone's control channel signals.

When TruePosition was awarded the 144 Patent it was small company with a handful of employees.  TruePosition built its company and business plan around the basic concepts in the 144 Patent.

      **3.**     **Andrew Learns of the 144 Patent in the Prior Litigation Between the Parties**

         a.     <u>Voice Channel Location as Compared with the 144 Patent</u>

After the 144 Patent was awarded, in the 1990's, TruePosition developed other, less fundamental technologies for locating cell phones. Today, TruePosition owns numerous patents. Some of the patents that TruePosition was awarded after the 144 Patent related to voice channel location, *i.e.,* using the cell phone's voice channel signals to determine the location of the phone. These patents facilitated the location of a cell phone user only when the user was on a phone call. Voice channel location is not an optimal location technology for some applications. Again using the example of tracking a suspect or potential terrorist, voice channel location determines the location of a suspect if and when he or she makes a phone call. It cannot locate a suspect when he or she is not on a call and the phone is turned on which, for most cell phone users, is most of the time.

      b.      <u>TruePosition's First Notices Concerning the 144 Patent</u>

During the late 1990's and into 2000, TruePosition and Andrew both sold cellular telephone location equipment. By December, 2000, TruePosition began to suspect Andrew may be infringing some of TruePosition's patents and sent a notification letter to Andrew's Sales Manager, Mr. Joseph Kennedy. This letter: (1) listed several of TruePosition's patents, including the 144 Patent and patents relating to voice channel location; (2) enclosed a copy of the 144 Patent; (3) briefly summarized the technology that the 144 Patent related to; and (4) offered to discuss a license with Andrew. Andrew did not offer to pay for or discuss a license and continued selling its equipment.

By 2001, TruePosition learned, but not from Andrew, that Andrew was doing voice channel cell phone location in a manner that infringed some of TruePosition's patents and therefore filed a suit for patent infringement in this district. TruePosition did not sue Andrew Corporation on the 144 Patent because, at the time, Andrew Corporation was using voice channel

location rather than control channel location to determine the location of a cell phone.  Andrew didn't stop selling its equipment or offer to discuss or pay for a license under any of TruePosition's patents.

In November, 2002, TruePosition sent an e-mail  to Andrew concerning a possible license under its patents, including the 144 Patent.  The e-mail noted that TruePosition was willing to provide Andrew Corporation a copy of the 144 Patent.  Andrew Corporation continued selling its equipment.

        c.     <u>Andrew's Summary Judgment Motion Concerning the 144 Patent</u>

Although Andrew was not yet interested in paying for a license under the 144 Patent, it did assert the 144 Patent as a defense in the prior litigation.  Andrew filed a motion for summary judgment that one of the voice channel location related patents that TruePosition was then asserting was invalid in view of the 144 Patent.  Although the 144 Patent is mainly directed to control channel location, it includes dependent claims that are directed to performing voice channel location in conjunction with control channel location.  Several Andrew Corporation attorneys undersigned the motion and studied the 144 Patent.

        d.     <u>Settlement of the Prior Litigation and the 144 Patent</u>

The parties had no fruitful settlement discussions until late 2003.  Andrew, then represented by Debevoise & Plimpton, and TruePosition, represented by TruePosition's current litigation counsel, agreed to mediate a settlement between the parties.  As result, by January, 2004, the parties executed and entered into a binding master term sheet under which Andrew agreed to pay TruePosition $35 million in exchange for a license under almost all of TruePosition's patents, but not under the 144 Patent.  The parties expressly agreed that Andrew is not licensed under TruePosition's 144 Patent.

In February, 2004, the parties entered into a Settlement Agreement that superseded the master agreement. Under the Settlement Agreement, in exchange for Andrew's $35 million payment, TruePosition again agreed to grant Andrew a license under almost all of TruePosition's patents. Again, the parties expressly agreed to exclude the 144 Patent from the license that TruePosition was granting Andrew.

TruePosition also covenanted not to sue Andrew, so long as Andrew did not use control channel location for finding cellular telephones. The parties also agreed to an integration clause, under which they agreed that neither party made any promises relating to the subject matter of the agreement, including the 144 Patent, except for those expressly set out in the agreement.

### B.    Andrew Infringes the 144 Patent

TruePosition will show that Andrew infringed the 144 Patent soon after the settlement agreement in the prior litigation was executed. More specifically, in December 2004, Andrew infringed Claims 1 and 2 of the 144 Patent by offering for sale within the United States a version of Andrew's Geometrix® Wireless Location System that used control channel location to Saudi Telecom Company ("STC"), a cellular telephone network operator in Saudi Arabia.

In August 2005, Andrew also infringed Claim 31 of the 144 Patent by building and then using within the United States a version of its Geometrix® Wireless Location System that used control channel location at its Ashburn, Virginia, facility.

In February, 2006, Andrew again infringed Claims 1 and 2 of the 144 Patent by offering for sale to STC a version of the Geometrix® Wireless Location System that used control channel location in connection with finalizing its written contract with STC.

After October, 2005, Andrew also repeatedly infringed Claims 1, 2, 22, 31 and 32 of the 144 Patent by supplying from the United States to Saudi Arabia components of a system comprising a combination of the control channel location version of Geometrix® and STC's

cellular telephone network system, and by supplying components of a method performed during the operation of that combination system. Shipment was made pursuant to Andrew's contract with STC.

In May, 2006, Andrew again infringed Claims 1 and 2 of the 144 Patent by offering for sale a version of the Geometrix® Wireless Location System that used control channel location to ICT, a cellular telephone system operator in Qatar.

TruePosition's expert, Dr. Oded Gottesman, will show, in accordance with his expert report, that Andrew, has literally infringed (directly under section 271(a) and indirectly under sections 271(f)(1) & (2)) claims 1, 22 and 31 of the 144 Patent in connection with each of the above commercial activities. Dr. Gottesman will explain how many of the limitations in the asserted claims follow directly and necessarily from Andrew's use of Time Difference of Arrival ("TDOA") to determine the origination of the cell phone's control channel signals. Dr. Gottesman will explain the remaining limitations with reference to Andrew's documents and source code,[1] including Andrew's minimization of a least squares distortion measure that reduces the errors associated with unpredictable signal paths. Dr. Gottesman did a thorough job of analyzing Andrew's product.

The STC and ICT networks that Andrew has installed Geometrix in are GSM cellular networks. Dr. Gottesman will testify that in GSM cellular networks control channels are called "Standalone Dedicated Control Channels." He will testify that that Andrew's Location

---

[1] In addition to the proofs described in Dr. Gottesman's expert report, Dr. Gottesman will rely upon a database schema document and his inspection of a physical sample of the accused product, both of which Andrew withheld until after Dr. Gottesman's expert report was due under the Court's Scheduling Order. Dr. Gottesman's physical inspection resulted in a set of color photographs of the accused product that Dr. Gottesman will also rely upon. Dr. Gottesman testified concerning the database schema document, his inspection of the accused product and the color photos at his deposition.

Measurement Units (also called Wireless Location Sensors) that are installed in those networks are the "cell site systems" in the 144 Patent claims. They determine the cell phone control channel signal's time of arrival at a cell site. He will testify that the Geolocation Control System is the "central site system" in the 144 Patent claims. It determines the Time Difference of Arrival of the cell phone signals after receiving the signal's times of arrival at various cell sites from the Location Measurement Units. It also determines the location of the phone on the basis of the time difference of arrival.

One of Andrew's primary non-infringement defenses is that a "Standalone Dedicated *Control Channel*" is not a "*control channel*" within the meaning of the 144 Patent claims. Andrew's argument runs contrary to that of the developers of GSM and also runs contrary to basic common sense.

Andrew's other primary non-infringement defense is that when it uses a "Standalone Dedicated *Control Channel*," it is not using a "reverse control channel," since the 144 Patent claims recite the phrase "reverse control channel" in addition to the phrase "control channel." But speaking on behalf of Andrew Corporation, Andrew's VP of sales admitted that when Andrew's Saudi Geometrix system uses the "Standalone Dedicated *Control Channel*," it is also using a "*reverse* channel" (D.I. 168 at B428 (99:9-13)). Andrew's admission that it is using a "*reverse* channel," and a "*control channel*," runs contrary to its claim that it is not using a "*reverse control channel*."

In addition to Andrew's "control channel" and "reverse control channel" arguments, Andrew expert's report purports to assert eighteen other non-infringement defenses, few of which are easily understood or articulated. TruePosition will address whichever of those arguments Andrew may offer at trial. Andrew's non-infringement expert, Dr. Goodman, based

his opinion largely upon second hand knowledge of the accused product and that opinion is therefore not credible.

### C.   **Andrew Willfully Infringes the 144 Patent**

TruePosition will show that Andrew willfully infringed the 144 Patent.

Three months after the parties signed the Settlement Agreement from the prior litigation, Andrew began development of a control channel location system to secure a contract for providing cellular telephone location equipment to Saudi Telecom, a Saudi based cellular telephone network carrier.  Seven months after that, in December 2004, Andrew made an infringing offer to sell a control channel location system in response to an RFP issued by STC. Andrew infringed (a) despite knowing about the 144 Patent, (b) after its attorneys studied it, (c) without an opinion of counsel, (d) after agreeing it was not licensed, (e) without telling TruePosition, (f) without asking for a license from TruePosition and (g) without offering to pay for a license.  Andrew has since continued to willfully infringe the 144 Patent.

### a.    The Competitive Pressures that Andrew Faced

Andrew's decision to willfully infringe the 144 Patent, despite clear indications from TruePosition in the Settlement Agreement that Andrew would be sued if it did so, can be understood in the context of the competitive and market pressure that Andrew faced and continues to face.  After the settlement, TruePosition, which is a smaller company than Andrew, was now funded because of the settlement proceeds and was better able to compete with Andrew.

Andrew also soon lost an important U.S. customer.  TruePosition secured an agreement with Cingular, a large U.S. network carrier, to buy cellular telephone location equipment from TruePosition and to replace Andrew's equipment with TruePosition's in Cingular's cellular networks.

The Cingular contract related to a cellular telephone location application called "Location Services."  Examples of such "Location Services" include allowing a cell phone user to find where he or she has dialed 911 and is in distress or in relation to the nearest restaurant or theatre. Such "location services" can be implemented using a variety of technologies, including GPS.  By definition, consumers who are interested in such location services do not mind being located and have no motivation to disable a GPS receiver.

At the same time that Andrew was losing an important U.S. customer, the aftermath of the September 11th terrorist attack on America was improving the prospects of TruePosition. Market demand for the control channel location technology of the 144 Patent was increasing, since TruePosition's technology is especially suited to locating suspected terrorists.  It can locate such individuals even when they do not want to be located, and can locate them even if they are not talking.  Not long after the settlement, TruePosition began installing a control channel location system in Saudi Telecom's cellular network for the purpose of locating suspected terrorists.

Although the Saudi opportunity arose from a Request for Proposal issued by STC for a cellular telephone location system, the Saudi government viewed itself as the true owner of the location system that was the subject of the STC RFP.  The system's purpose was national security and the tracking of potential terrorists.  The Saudi government was therefore a driver of the sale and the entity that would select the vendor that would service the Saudi government's needs.  The invention of the 144 Patent, and TruePosition's expertise in the area of control channel location technology, was therefore particularly suited to the needs of the Saudi government and initially gave TruePosition the inside track on securing a contract for providing a control channel location system.

b.   How Andrew Secured the Saudi Contract

Andrew's desperation in the face of the market pressures that were bearing down on it are best evidenced by the circumstances that led Andrew to ultimately displace TruePosition from the Saudi opportunity and infringe the 144 Patent. To secure the Saudi opportunity for Andrew, Andrew's sales people, including Mr. Joseph Kennedy, dispensed with Andrew's normal business practices. They arranged to hire a local Saudi agent, Sheikh Adil Al-Misehal, and agreed to pay his company a 20% commission on "net revenue" resulting from the Saudi contract. In exchange, Al-Misehal would use his contacts in the Saudi government to help ensure that STC chose Andrew over TruePosition.

The arrangement between Al-Misehal and Andrew prompted some Andrew personnel to ask Mr. Kennedy and his colleagues to write a memorandum justifying the commission to Al-Misehal insofar as it might be "above what might be normal and customary." In the memorandum, Kennedy justified the arrangement by explaining: (1) demand for Andrew's cellular telephone location product, Geometrix, had reached maturity in the U.S.; (2) the Saudi opportunity could be worth nearly $170 million in revenue; (3) a contract to sell location equipment to Saudi Arabia could be a flagship contract that would have domino effect and lead to sales to governments around the world; (4) Al-Misehal had contacts in the Saudi government; (5) the Saudi government would view itself as the owner of the cellular location as system that was the subject of the Saudi Telecom RFP; and (6) Andrew's competition, TruePosition, had a head start in securing the Saudi opportunity in that it had already installed a trial location system in the Saudi Telecom network.

By mid 2005, Andrew's arrangement with Al-Misehal gave Andrew an advantage over TruePosition in a two-supplier race to secure the Saudi contract to provide a control channel

location system.  Without that advantage, Andrew would not have made the investment

necessary to build a control channel location version of its Geometrix system because, unlike

TruePosition, Andrew had never before built a control channel location system.

Andrew built its first infringing control channel location system in August 2005 and

tested the system at that time.  Again, Andrew did not inform TruePosition, discuss a license or

offer to pay TruePosition for its invention.

c.     <u>TruePosition's Final Notices Concerning the 144 Patent</u>

By this time however,  TruePosition received solid information from its employees in

Saudi Arabia that Andrew was infringing or was about to infringe TruePosition's 144 Patent.

TruePosition sent two additional notices to Andrew concerning the 144 Patent and what it

covered in September and October of 2005 and, after TruePosition's final notice was ignored,

brought this suit for patent infringement.

d.     <u>Andrew's Post-Complaint Willful Infringement</u>

Even after this suit was filed, in October 2005, Andrew could have stopped infringing.  It

had no contractual obligation to Saudi Telecom or the Saudi government at that time.

Furthermore, about the time this law suit was filed, Saudi Telecom learned of the legal

dispute between TruePosition and Andrew and began to wonder whether Andrew was the right

choice.  A determination of infringement could leave Saudi Telecom with product from a vendor

that could no longer ship without moving its manufacturing from the United States.  Andrew was

therefore asked by Saudi Telecom to provide assurances that Andrew would prevail in this

lawsuit.  Instead of ceasing its infringing activity, Andrew responded by concocting the

standards-based "fraud" counterclaim that it is now asserting against TruePosition.

Andrew's communications to STC concerning its "fraud" counterclaim, coupled with Al-Misehal's Saudi government contacts, helped to ultimately secure Andrew the lucrative Saudi contract. Andrew signed its contract with Saudi Telecom in February, 2006, and has been shipping components of an infringing control channel location system ever since.

### D.     TruePosition Is Entitled to Lost Profits

TruePosition will show that it is entitled to lost profits as a result of Andrew's sale to STC and another middle east carrier in Qatar in an amount of approximately $50 million, before enhancement for Andrew's willful infringement. TruePosition's lost profit from Andrew's infringement in connection with the STC opportunity is approximately $45,000,000 while its lost profit in connection with the Qatar opportunity is approximately $5,000,000.

TruePosition and Andrew were the only bidders for the STC and Qatar location system sales. TruePosition will show that, had Andrew not received the contracts for the STC and Qatar sales, TruePosition would have done so. Indeed, TruePosition had successfully completed a field trial on STC's network.

Based on TruePosition's proposed pricing to STC, coupled with TruePosition's projected margins on the STC contract, TruePosition's expert has concluded that the present value of the STC contract to TruePosition, assuming implementation over a five-year period, including spare parts and ongoing software maintenance in addition to the initial equipment, is $45,292,445. A similar calculation shows that the present value of the Qatar opportunity to TruePosition was $5,078,711.[2]

---

[2]     As of the close of discovery, Andrew had shipped only the first two phases of the STC project and had installed only the first phase. Although Andrew continued to include completion of the entire contract in its projections, TruePosition's damage expert nevertheless provided an alternative calculation of lost profits attributable only to Phases I and II of $18,618,869.

In addition, because TruePosition will prove that Andrew's infringement was willful, TruePosition is entitled to treble damages and attorneys' fees.

### E.    TruePosition Is Entitled to an Injunction Barring Future Sales

TruePosition and Andrew are the only direct competitors for control channel location systems using TDOA.  TruePosition is facing continuing unquantifiable damages in countries all over the world as a result of Andrew's infringement in connection with the Saudi Telecom contract.  Both companies are competing for safety and security location products in countries all over the world and the Saudi Contract is considered by both parties to be a flagship contract that is having, and will continue to have, a domino effect on security contracts around the world. Andrew's ability to secure an opportunity to sell cell phone location equipment for security purposes in Qatar is a good example.  Furthermore, while Andrew is a large corporation with a diversified line of products, TruePosition is smaller company whose only business is cell phone location technology.  Furthermore, Andrew's product mimics the patent claims, and does not merely incorporate the patented invention as a minor component.

An injunction would not negatively impact safety or security because TruePosition is as capable as Andrew, and in fact is more capable than Andrew, at providing control channel location technology.

## II.    TRUEPOSITION'S RESPONSE TO ANDREW'S CASE IN CHIEF

### A.    The 144 Patent Is Valid

Andrew's only invalidity defense is an assertion that the 144 patent is anticipated in view of a Japanese Patent Publication to Mitsunori Kono (the "Kono reference").   In the event that Andrew should make out a prima facie case of invalidity,[3] TruePosition's expert, Dr. Brian

---

[3]    TruePosition has filed a motion for summary judgment on Andrew's invalidity defense, arguing that Andrew's expert failed to set forth a proper analysis in his report.  TruePosition has

Agee, will show that the Kono reference does not disclose performing location on a cell phone's control channel transmissions. Dr. Agee will testify that the Kono reference does not anticipate the 144 patent. For example, he will point out that Kono does not even mention any flowcharts, source code, software or algorithms.

Dr. Goodman, Andrew's invalidity expert will assert a "conditional" invalidity opinion based upon the features of a product that he knew little or nothing about at the time he rendered his opinion. TruePosition will show that Dr. Goodman's ability to render such an opinion again runs contrary to common sense.

### B.    Andrew's Counterclaims Have No Merit

Andrew has filed five separate standards-based counterclaims: (1) Fraud; (2) Unfair Competition under the California Business and Professional Code; (3) Promissory Estoppel; (4) Equitable Estoppel; and (5) Implied License.  In the event Andrew's counterclaims are allowed to go to a jury, and that Andrew is able to make out a *prima facie* case,[4] TruePosition will show that all of Andrew's counterclaims are without merit.

Andrew's counterclaim contentions are so vague and meritless that it is difficult to describe Andrew's assertions and, therefore, TruePosition's response. Andrew does not claim that TruePosition made any misrepresentations. Therefore, to prove its fraud counterclaim, Andrew must show that TruePosition had a duty to disclose some fact that it withheld, that TruePosition intended to mislead Andrew; and that Andrew relied upon, or somehow changed its position, based upon TruePosition's non-disclosure of that fact.

---

also filed a *Daubert* motion seeking to exclude Andrew's expert's improper analysis under F.R.E. 702.

[4]    TruePosition has filed a motion for summary judgment on Andrew's counterclaims.

Andrew has been vague concerning the precise "fact" that TruePosition supposedly withheld. Andrew cannot claim that TruePosition concealed its patent from Andrew. TruePosition was upfront about its Patent with Andrew. TruePosition disclosed the 144 Patent and what it covered repeatedly to Andrew before Andrew infringed. The 144 Patent is also a public document. Andrew analyzed the 144 Patent. And at all relevant times TruePosition knew that Andrew had analyzed that Patent.

Andrew has also suggested that TruePosition withheld its patent from 3GPP or that it concealed the patent at 3GPP meetings that Andrew never even attended. TruePosition will show that 3GPP is a standards organization that mandates that no intellectual property be discussed between it members and that has no procedure for disclosing IP. Nevertheless, TruePosition will show that it *did* actually disclose to 3GPP that it had patents relevant to TDOA and was told by 3GPP to avoid such disclosures in the future.

Andrew has suggested that the "fact" that TruePosition withheld is *TruePosition's opinion* about what the 144 patent covers. But Andrew's "opinion" theory does not comport with the legal requirements to make out a fraud claim. And even if it did, TruePosition will show that it informed Andrew about the 144 Patent and what TruePosition believed it covered in December 2001 and repeatedly thereafter. The parties' January, 2004 Settlement Agreement clearly implied that Andrew could be sued if it switched to control channel location.

Andrew also suggests that the concealed "fact" is the proper construction of the claims. Andrew asserts that *if* the 144 patent is construed broadly enough that it covers its Geometrix product, *then* Andrew was misled by TruePosition's actions in connection with certain standards-making activity. But TruePosition could not have concealed a "fact," such as the Court's

construction of the claims, that TruePosition never knew, and will not know, until the Court actually construes the patent claims.

In short, each of Andrew's counterclaims is in some way premised on a duty to disclose some vague "fact." Faced with a series of counterclaims that are utterly without merit, Andrew will be forced to argue to the jury in a way that misleadingly frames the issue concerning TruePosition's duty to disclose that fact. Andrew will argue to the jury, for example, that the question of whether TruePosition had a duty to disclose some "fact" boils down to whether TruePosition has a "*duty to disclose the 144 patent" to* "*ETSI*," a standards body based in France. Andrew will attempt to deflect the jury from the question of whether TruePosition had a "duty to disclose the 144 Patent" to *Andrew*, since TruePosition will show that it did disclose the 144 patent to Andrew at least four times. Furthermore, TruePosition will show that the *only* ETSI procedure for disclosing "the 144 patent" to *ETSI*, as opposed to Andrew, is to make a *declaration* that the 144 patent is *essential to an ETSI "Standard."*

Yet, Andrew's argument to the jury will also try to deflect the jury from the issue of whether the 144 Patent is, in fact, essential to any ETSI standard, because Andrew claims that it is not infringing the 144 patent while and also that it complies with the relevant location services standards. Moreover, TruePosition will present evidence from witnesses on both sides that the 144 patent is *not* "essential," as defined by ETSI, *to those standards*. To this day, neither Andrew nor TruePosition have declared the 144 patent "essential," as defined by ETSI, to the location services standards. To the extent that Andrew's counterclaims are based on some vague duty to disclose the existence of the 144 Patent to ETSI, TruePosition did disclose the 144 Patent to ETSI.

TruePosition will show that the 144 Patent is not "essential," as defined by ETSI,  to the location services standards, because those standards include numerous technologies, including voice channel location with TDOA, control channel location with TDOA, GPS, EOT-D and TA. TruePosition will offer evidence showing the purpose of these standards, the players involved and why declaring a patent "essential" to the location services standards, when they are not "essential" to those standards, would be misleading.

In short, by  avoiding the issues actually raised by the law and the indisputable facts, Andrew's argument will try to confuse the jury into conflating the issue of Andrew's infringement with the issue of whether the 144 Patent is "essential," as defined by ETSI, to the location services standards.  TruePosition will present evidence that clears up that confusion.

Each of Andrew's counterclaims is also premised in one way or another on the notion that Andrew somehow relied or changed position based on something that TruePosition did in a standards body.

But Andrew is a large corporation and is unlikely to have been duped.  To secure the Saudi contract, Andrew touted to STC that it was a $1.8 billion a year company and therefore much larger than TruePosition.

Andrew claims that it somehow relied upon TruePosition's non-declaration of the 144 patent as "essential" to ETSI.  But TruePosition will show that while Andrew's witness, Mr. Kennedy, conclusorily testified that he relied on TruePosition's non-declaration of the 144 Patent to ETSI, on deposition, he didn't know where he was when he found out about the non-declaration, when that was, who he told, how he found out or specifically how he relied.

Andrew also claims that it was duped into joining the standards body.  But TruePosition will show that it notified Andrew twice concerning the 144 Patent before Andrew ever became a member of the standards body, in early 2003.

Andrew may suggest that it was duped into infringing the patent.  But TruePosition will show that it sued Andrew because Andrew switched from voice channel location to control channel location and that Andrew made that switch to take advantage of the Saudi opportunity. And Andrew should have known that making that switch would have resulted in being sued. TruePosition did not sue Andrew for following a standard.

Nor can Andrew claim that it included TDOA in Geometrix, or that it promoted U-TDOA in any standards body, or elsewhere, in reliance upon TruePosition's standards-related activities.  It is undisputed that Andrew included TDOA in Geometrix and began promoting it in the mid-1990's, years before TruePosition's involvement in any standards body.  Furthermore, in December 2004, at the time of its original offer for sale to STC, Andrew understood that its local Saudi agent would be lobbying Saudi government officials to mandate U-TDOA as a requirement in cellular networks in the Kingdom of Saudi Arabia.

Even if there were evidence that Andrew relied on TruePosition's standards-based activities, Andrew's reliance would be wholly unreasonable in view of the express promises of the February 2004 Settlement Agreement.  Together with the integration clause, those promises created a detailed understanding that make it abundantly clear that Andrew was free to continue selling its Geometrix system using the voice channel, but could be sued if it used the control channel.  Any alleged reliance by Andrew on TruePosition's non-disclosure of the patent to the standards body simply could not have been reasonable.

TruePosition will also show that Andrew's *implied* license counterclaim has no merit by showing that Andrew *expressly* agreed in 2003 that it was not licensed under the 144 Patent in the master term sheet. TruePosition may present other rebuttal evidence depending on what form Andrew's counterclaims actually take at trial.