## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION, INC.,<br><br>**Plaintiff and<br>Counterclaim-Defendant,**<br><br>v.<br><br>**ANDREW CORPORATION,**<br><br>**Defendant and<br>Counterclaim Plaintiff.** | Civil Action No. 05-00747-SLR |

### ANDREW CORPORATION'S POST-TRIAL OPENING BRIEF
### IN SUPPORT OF ITS REMAINING EQUITABLE DEFENSES

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (No. 1088) [*jingersoll@ycst.com*]
Andrew A. Lundgren (No. 4429) [*alundgren@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: November 1, 2007

## TABLE OF CONTENTS

I.     **NATURE AND STAGE OF THE PROCEEDINGS** .......................................................1

II.    **SUMMARY OF ARGUMENT** ........................................................1

III.  **STATEMENT OF FACTS**........................................................5

     A.     The Industry's Concern About Standardizing Technology That Only One Vendor Would Be Able To Sell.............................................5

     B.     TruePosition's Assurances To The Industry And Andrew That UTDOA/SDCCH Licenses Would Be Available ....................................7

     C.     TruePosition's Silence Concerning An Unwillingness To Grant UTDOA/SDCCH Licenses ..................................................10

     D.     Andrew's Decision To Develop UTDOA/SDCCH Products And Help TruePosition Standardize UTDOA/SDCCH..........................................14

     E.     TruePosition's Agreement To "Create A Solution That We All Benefit From" ........................................................16

     F.     Andrew's And TruePosition's Joint Efforts To Standardize UTDOA/SDCCH Joint Effort In The UTDOA Study Group...............................18

     G.     TruePosition's Post-Standardization Refusal To Grant UTDOA/SDCCH Licenses To Other Vendors ..................................................24

IV.  **ARGUMENT**........................................................28

     A.     TruePosition's Claims Should Be Barred Under The Doctrine Of Equitable Estoppel ........................................................28

          1.     By Its Affirmative Conduct And Silence, TruePosition Led Andrew Reasonably To Infer That TruePosition Did Not Intend To Enforce Its Patent Against Andrew...........................................31

          2.     Relying On TruePosition's Conduct And Silence, Andrew Joined Forces With TruePosition To Get UTDOA/SDCCH Standardized And Successfully Bid On A Contract To Sell UTDOA/SDCCH Equipment........................................................36

          3.     Due To Its Reliance, Andrew Will Be Materially Prejudiced If TruePosition Is Allowed To Recover Damages On Its Claims And Enjoin Andrew From Practicing UTDOA/SDCCH...................................38

B.     TruePosition's Claims Should Be Barred Under The Doctrine Of Implied License ........................................................................................................39

1.     TruePosition Formed A Relationship With Andrew To Get UTDOA Into The Standard........................................................................40

2.     Within That Relationship, TruePosition Granted Andrew A Right To Use UTDOA/SDCCH .........................................................................42

3.     TruePosition Received Valuable Consideration For The Grant Of The Right To Use UTDOA/SDCCH .........................................................45

4.     TruePosition Denied That Andrew Has An Implied License ...................46

5.     TruePosition's Statements And Conduct Created The Impression That It Consented To Andrew's Use Of UTDOA/SDCCH.......................47

C.     TruePosition's Claims Should Be Barred Under The Doctrine Of Unclean Hands ..........................................................................................................48

V.     CONCLUSION.............................................................................................**50**

## TABLE OF AUTHORITIES

**Cases**

*A.C. Aukerman Co. v. R. L. Chaides Construction Co.,*
    960 F.2d 1020 (Fed. Cir. 1992)................................................................... 29, 37

*Aptix Corp. v. Quickturn Design Sys., Inc.,*
    269 F.3d 1369 (Fed. Cir. 2001)........................................................................ 48

*De Forest Radio Tel. Co. v. United States,*
    273 U.S. 236 (1927).......................................................................................... 42

*Forest Labs., Inc. v. Abbott Labs.,*
    339 F.3d 1324 (Fed. Cir. 2003)........................................................................ 29

*Honeywell Int'l., Inc. v. Universal Avionics Sys. Corp.,*
    398 F. Supp. 2d 305 (D. Del. 2005).................................................................. 29

*Hynix Semiconductor Inc. v. Rambus, Inc.,*
    2006 WL 1867724 (N.D.Cal. 2006) ................................................................ 29

*Keystone Driller Co. v. Gen. Excavator Co.,*
    290 U.S. 240 (1933).................................................................................... 48, 49

*Lukens Steel Co. v. American Locomotive Co.,*
    197 F.2d 939 (2nd Cir. 1952)..................................................................... 30, 43

*Lukens Steel Co. v. American Locomotive Co.,*
    99 F.Supp. 442 (N.D.N.Y. 1951).................................................................... 30

*McKesson Information Solutions LLC v. Trizetto Group, Inc.,*
    426 F.Supp.2d 203 (D. Del. 2006)............................................................. 29, 37

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,*
    324 U.S. 806 (1945).................................................................................... 48, 49

*Scholle Corp. v. Blackhawk Molding Co.,*
    133 F.3d 1469 (Fed. Cir. 1998)........................................................................ 30

*TruePosition Inc. v. Andrew Corp.,*
    2007 WL 2482163 (D.Del. August 23, 2007) ........................................... 5, 6, 7

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.,*
    103 F.3d 1571 (Fed. Cir. 1997)........................................................... 40, 45, 46

All ***bold italics*** emphasis is added, unless otherwise specified.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

TruePosition filed this action on October 25, 2005, alleging infringement of U.S. Patent No. 5,327,144. D.I. 1. Andrew asserted non-infringement, fraud, promissory estoppel, equitable estoppel, implied license, and unclean hands affirmative defenses and counterclaims. D.I. 13; 48. On September 14, 2007, the jury returned a verdict for TruePosition on literal infringement and fraud, made findings on promissory estoppel, and awarded TruePosition $45.3 million in damages. D.I. 292. Andrew's equitable estoppel, implied license, and unclean hands defenses did not go to the jury and are to be decided by the Court. A227:11-A228:16.

## II.    SUMMARY OF ARGUMENT

1.    This is a case in which TruePosition needed Andrew's help to standardize UTDOA/SDCCH, promised to license its patent on UTDOA/SDCCH, never declared to the standards body an unwillingness to license its patent on UTDOA/SDCCH, and joined forces with Andrew to standardize UTDOA/SDCCH. But then -- once UTDOA/SDCCH was standardized -- TruePosition refused to license its patent on UTDOA/SDCCH, demanded that Andrew exit the market for UTDOA/SDCCH, and sued Andrew for selling UTDOA/SDCCH.

2.    **TruePosition's Pre-Standardization Promises To License.** To sell more equipment and make more money, TruePosition wanted to get certain technology -- uplink time difference of arrival ("UTDOA") using the standalone dedicated control channel ("SDCCH") -- added to the GSM standard.[1] But the industry refused to do so initially because it was concerned about standardizing technology that would be proprietary and accessible to only a single vendor.

---

[1]    UTDOA includes two variations -- UTDOA/SDCCH, which TruePosition asserts is covered by the '144 patent, and UTDOA/TCH, which both parties agree is not covered. A105. Unless otherwise specified, references in this brief to "UTDOA" include both versions.

To give the industry the impression that that would not be the case, TruePosition decided to get Andrew involved and assured the industry that a license to UTDOA would be available to anyone who wanted one:[2]

> TruePosition, Incorporated may hold one or more patents or copyrights that cover information contained in this document. *A license will be made available* to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

TruePosition conceded at trial that its promise to license covered the '144 patent.

TruePosition also made a separate license offer to Andrew specifically. The purpose of TruePosition's offer was "to offer Andrew the opportunity to license those patents if they wanted to." TruePosition's offer was intended for the future, given TruePosition's contemporaneous awareness that Andrew was not selling any products that needed a '144 license at the time.

Finally, and consistent with its promises to the industry and Andrew, TruePosition agreed to work on UTDOA with key industry players "to create a solution that *we all benefit from*."

3.     **TruePosition's Failure To Declare Its Patent To ETSI.**  Standardization is a process by which companies in an industry work together in a standards body to develop and agree on technology that they and the public can use in the future. To ensure that a standard will not be blocked by patents, standards bodies have patent policies. The patent policy of ETSI (European Telecommunications Standards Institute), the standards body relevant to this case, requires its members to timely declare whether they are willing or unwilling to license patents they believe are essential to a standard. This gives the standards body the opportunity to steer a standard away from patented technology if the patent holder is unwilling to license the patent.

---

[2]   For convenience, "Andrew" refers to defendant Andrew Corporation and its predecessor Grayson Wireless.

Because the ETSI patent policy expressly defines a standard as "including options therein," a patent that is essential to an option in a standard must be declared. But TruePosition did not declare its unwillingness to license its '144 patent, despite its belief that the patent is essential to practicing the UTDOA/SDCCH option in the GSM standard. TruePosition's sole excuse for not doing so is its theory -- made up for the purposes of this case -- that options are exempt from ETSI's IPR Policy. But ETSI has rejected TruePosition's theory. The Director General of ETSI recently wrote to TruePosition giving TruePosition three months to declare whether it is willing to license the '144 patent to the extent the patent is essential to an "option."

4.    **Andrew's Reliance.**  Relying on TruePosition's promises to license and the absence of a declaration stating an unwillingness to license, Andrew agreed to help standardize UTDOA. Andrew worked closely and extensively with TruePosition to make "major changes" to UTDOA and persuade the standards body to standardize UTDOA. For nearly two years, Andrew and TruePosition standards representatives traveled the world, attending 3GPP meetings together, working on UTDOA technology together, and strategizing together, as part of a collaborative effort to advocate the standardization of UTDOA. Their efforts paid off. Whereas TruePosition could not get 3GPP to approve any of its proposed changes to the GSM standard before it joined forces with Andrew, 3GPP approved the joint submissions of Andrew and TruePosition and added UTDOA to the standard.

Andrew also relied on TruePosition's promises in making product development decisions. Once UTDOA was successfully standardized, Andrew bid on and won a contract to sell its first UTDOA/SDCCH system to Saudi Telecom.

5.    **TruePosition's Post-Standardization Refusal To License.**  But this was a contract that TruePosition wanted very badly -- for itself. When TruePosition discovered it had

lost this "very key" contract to Andrew, the only other UTDOA vendor in the marketplace,

TruePosition announced that it would not grant a license to Andrew or any other vendor after all:

> TruePosition has not licensed the '144 Patent to Andrew, or anyone else. Further, ***TruePosition does not intend to grant a license to Andrew or any third party*** vendor with respect to fulfillment of the RFP.

TruePosition demanded that Andrew "discontinue immediately any offer to supply"

UTDOA/SDCCH equipment, then sued Andrew for allegedly infringing the '144 patent and

moved for a permanent injunction to put Andrew out of the UTDOA/SDCCH business.

TruePosition's reversal thus ensured that TruePosition would have the market all to itself,

once it persuaded the industry to add UTDOA/SDCCH to the standard. This was exactly the

opposite of the "multi-vendor" market that TruePosition had assured the industry it would be

getting as the *quid pro quo* to standardize UTDOA. In the end, TruePosition's actions made one

thing clear -- its previous offers to license the '144 patent remained open only so long as no one

else tried to sell a UTDOA/SDCCH product.

      6.    **Relief Requested.** This Court should enter judgment for Andrew under the

doctrine of equitable estoppel. For the reasons summarized above and detailed below, a

preponderance of the evidence establishes that (1) TruePosition, through misleading words,

conduct, and silence, led Andrew to reasonably infer that TruePosition did not intend to enforce

its patent against Andrew; (2) Andrew relied on TruePosition's conduct; and (3) due to its

reliance, Andrew will be materially harmed if TruePosition is allowed to proceed with its claim.

      Judgment for Andrew also should be entered under the doctrine of implied license. A

preponderance of the evidence establishes that (1) a relationship existed between Andrew and

TruePosition; (2) within that relationship, TruePosition granted to Andrew a right to use the

patented '144 invention; (3) TruePosition received valuable consideration for that grant of right;

(4) TruePosition denied that Andrew has an implied license; and (5) TruePosition's statements

and conduct created the impression that TruePosition consented to Andrew's making, using, or selling TruePosition's patented inventions.

Finally, judgment for Andrew should be entered under the doctrine of unclean hands. The evidence clearly establishes that TruePosition gained an advantage for itself by unfair means by creating for itself a monopoly position on standardized technology. That constitutes unclean hands, under Supreme Court authority.

TruePosition's claims should be barred under each of these doctrines. In the alternative, TruePosition's recovery should be limited to no more than a fair and reasonable royalty in accordance with what TruePosition promised the industry to get UTDOA standardized.

## III.    STATEMENT OF FACTS

### A.    The Industry's Concern About Standardizing Technology That Only One Vendor Would Be Able To Sell

**UTDOA Technology.** The technology relevant to this lawsuit is Uplink Time Difference Of Arrival or UTDOA, one of several possible techniques for locating a mobile phone. TruePosition did not invent UTDOA, which has been known since the World War II timeframe. A397:15-18. Nor was TruePosition the first to try to standardize UTDOA. "UTDOA was, at one time, part of a 3GPP standard, but was subsequently removed." *TruePosition Inc. v. Andrew Corp.*, Civ. No. 05-747-SLR, 2007 WL 2482163, at *2 (D. Del. Aug. 23, 2007).

As a vendor of UTDOA products, TruePosition "sought to re-standardize UTDOA in the 3GPP technical specifications, presumably because standardization would result in an increase in sales of its UTDOA products." *Id.* at *2. TruePosition was "trying to get U-TDOA into release six" of the GSM standard with the "hope and expectation" that TruePosition "would increase its sales." A292:6-8; A284:10-20; *see also* A347:9-16. TruePosition believed it was "important" to "get it in before the standard moved beyond" release 6. A292:6-8; *see also* A293:2-5.

5

**The Importance Of Having A Multi-Vendor Solution.** TruePosition kicked off its effort to get UTDOA added to the standard by requesting that the standards body, 3GPP, open a "work item." In 3GPP, a work item must be opened to define the scope of the proposed changes to a standard, and until that happens, no changes are permitted. A113-A115; A343:9-A344:7; A424:7-19. But 3GPP members were "skeptical" of TruePosition's proposal and had several "issues of concern." A113. In gauging the temperature of the standards body, TruePosition realized that UTDOA would have to be a "multi-vendor" system before the standards body would accept it into the standard, and realized that it might have to license its patents to allow for a multi-vendor system:

> Significant to note the importance with which *acceptance of U-TDOA into the GERAN specs depends on its being a 'Multi-vendor' system*. This means that *we may need to* cooperatively share the concepts and system designs but *license the higher-value IPRs*, as required *to allow other vendors to produce U-TDOA systems*.

A114; *see also* A287:7-16.

This did not come as a surprise to TruePosition. As its President testified: "multi-vendor was important and that was something that we had known for a long time." A294:19-20. He explained that key industry players:

> *become concerned that, you know, that they won't have the ability to have multiple vendors compete for business.* Specifically, the wireless operators, the carriers, are the end customers who end up buying this type of equipment, would ideally *always like to have multiple vendors* so they can bid them against each other. *They can compete to get the best possible price.*

A328:9-17.[3]

---

[3]    TruePosition understood that "[t]he term multi-vendor system means more than one manufacturer," i.e., where "[m]ore than one person can make it." A287:4-6, 9-16.

That is why TruePosition initially "did not receive approval of [its] Work Item Request."

A114. Instead, the standards body required TruePosition to prepare and submit a feasibility

study before a work item could be opened. As an internal TruePosition document explains, "The

feasibility study will address the issues of concern and hopefully turn the skeptical interest into

broader support." A113. TruePosition was also well aware of the consequences if the feasibility

study were to fall short of what the standards body wanted: "If we fail to get support for our

feasibility study in time for the April 15 meeting we may lose any chance of getting support for

U-TDOA into GSM and GERAN (GPRS) LCS." A117.

### B.   TruePosition's Assurances To The Industry And Andrew That UTDOA/SDCCH Licenses Would Be Available

**TruePosition's Promise To License The Industry.** Consistent with its observation that

UTDOA had to be a multi-vendor solution before it would be allowed into the standard,

TruePosition submitted a Feasibility Study assuring the 3GPP standards body that it was willing

to license the industry under any patents it had on reasonable terms and conditions:

> TruePosition, Incorporated may hold one or more patents or copyrights that cover
> information contained in this document. *A license will be made available* to
> applicants under reasonable terms and conditions that are demonstrably free of
> any unfair discrimination.

A219; *see also* A289:2-14; A254:4-11. As TruePosition explained at trial, this paragraph

"basically said that TruePosition has patents related to TDOA and that, you know, that, if

necessary, *we would be open to licensing them* for fair and reasonable terms." A260:15-24.

TruePosition was well aware of what it meant to license a patent: "A license would mean

effectively the right to utilize that patent." A253:16-23.

TruePosition confirmed at trial that the scope of its promise to license "*would apply to*

any of TruePosition's patents that it had at the time of this document" -- "includ[ing] the patent

in this case, *the '144*." A350:17-24. TruePosition also explained that "U-TDOA on the SDCCH

channel" was "proposed as one of several alternatives in this [feasibility] study." A349:13-20; *see* A216. Because UTDOA/SDCCH was "information contained in" the Feasibility Study document (*see* second line of the block quote above), patents "cover[ing]" UTDOA/SDCCH were subject to TruePosition's license offer.[4]

TruePosition's Feasibility Study was an important document, and it was prepared by none other than the TruePosition senior management. TruePosition's President, Chief Technology Officer, and Standards Manager all participated in its drafting. A248:19-A249:2. It was also widely disseminated to "all of the 3GPPP [*sic*] body." A261:2-3. This was because the document was "an open document." It was "[a]bsolutely not" a "secret." A253:3-4; A260:25-A261:1. "The way it works, these documents are typically put on a document server well in advance of the meetings ...." A252:13-14.

**TruePosition's Promise To License Andrew In The Future.** TruePosition also wrote to Andrew offering a license under the '144 patent. The letter, from TruePosition's outside counsel Woodcock Washburn, identified the '144 patent and several others, and concluded by stating: "If you would like to inquire about a license or need further information, please contact me directly." A189. As TruePosition explained at trial, the purpose of the letter was "to offer [Andrew] the opportunity to license those patents if they wanted to." A364:22-23. This was because TruePosition was not "opposed to giving Andrew Corporation a license under its patents," and was "willing to license the '144 patent to Andrew." A333:18-20; A365:8-13.

---

[4]  This is consistent with TruePosition's repeated statements that the '144 patent is essential to practicing UTDOA/SDCCH. For example: "[I]t's not possible to do U-TDOA using this SDCCH channel without using [the] '144 patent." A321:3-7; *see also* A282:7-13; A320:13-A321:2; A321:21-24.

TruePosition's license offer was intended for products that Andrew might develop in the future. Indeed, there was no point offering Andrew a license under the '144 patent·at the time. As TruePosition's President explained at trial, TruePosition knew that Andrew's "product was not utilizing at that time -- was not utilizing the '144 patent." A268:22-23.[5]   TruePosition's General Counsel testified in accord:  "At this time, there were actually no products on the market of any type.  This is before either of us had secured a customer or deployed any products commercially."  A382:21-A383:2.  That is one reason why TruePosition did not assert the '144 patent in its 2001 lawsuit, and did not include the '144 patent in the 2004 settlement agreement for that lawsuit.  A268:18-24; A368:20-25.  That is also a reason why Andrew did not request a license under the '144 patent at the time.  A246:5-17; *see also* A331:6-11.

**TruePosition's Attempt To Create The "Appearance" Of Multiple Vendors.**  To try to get the industry to believe that UTDOA was not going to be a proprietary, single vendor solution, TruePosition began plotting how it could get Andrew to actively promote and contribute to the standardization of UTDOA.  As TruePosition's Product Manager suggests in an internal email, referring to Andrew's predecessor Grayson:

> You might consider adding a term to the Grayson license agreement that has ***Grayson joining the 3GPP and actively promoting/contributing to the standardization of U-TDOA***. ... While this will not influence the standards bodies to a significant degree, it ***will eliminate a perception/concern that U-TDOA is a proprietary technology***.

A1-A3.  As TruePosition's President explained, there was a "perception or concern at the standards body that TruePosition" "was the only vendor that was providing that technology at

---

[5]   *See also* A371:2-4 ("At the time, their only products were in the United States for 911 and that was a voice channel product."); and A368:22-25 ("[T]heir product was not a control channel product.").  TruePosition asserts that the '144 patent covers UTDOA on the control channel (e.g., SDCCH), not the voice or traffic channel.

that time." A301:19-22. "I think provided by a single vendor … is what they were concerned

about." A301:10-13. The single vendor of concern was TruePosition. A301:14-15.

The suggestion to involve Andrew in the UTDOA standardization effort was met with

enthusiasm inside TruePosition. To the General Counsel, it "sound[ed] like a good idea." A550-

A551. A Product Management team member went further, identifying a number of ways

TruePosition would benefit by having Andrew involved:

> While having them involved in no way guarantees success, ***it does have the
> following benefits***:
>
> 1. ***Reduces/eliminates the perception that U-TDOA is a proprietary technology***.
> 2. Adds additional resources to the U-TDOA standardization effort
> 3. Grayson will (hopefully) leverage additional carrier support and participation
> .

To TruePosition, cultivating the ***appearance*** that UTDOA would not be proprietary was

the important thing. An internal email explains how TruePosition could get others to "believe"

that UTDOA is not proprietary if TruePosition were to report that Andrew is on board (A1-A3):

> Situation is that **it will help our cause in getting U-TDOA standardized** ***if we
> report that we are collaborating with Grayson*** (Because then the major
> infrastructure ***vendors will believe*** that U-TDOA is NOT a proprietary solution).

A86 (non-italics emphasis in original). TruePosition's President agreed that the purpose of the

proposal was to "have the ***appearance*** that, and … make the infrastructure vendors ***believe*** that

U-TDOA is not a proprietary solution." A304:22-A305:5.

### C.    TruePosition's Silence Concerning An Unwillingness To Grant UTDOA/SDCCH Licenses

At the time that it was trying to get UTDOA standardized, TruePosition knew that it was

bound by the ETSI IPR (Intellectual Property Rights) Policy. In an email sent to reassure AT&T

that TruePosition had no blocking IPRs, TruePosition confirmed that "we are bound by ETSI's

IPR Policy." A4; A306:16-19; *see also* A121; A297:8-15; A276:11-15.

The IPR Policy imposes on ETSI members a duty to declare essential IPRs to ETSI:

10

Each MEMBER *shall* use its reasonable endeavours to *timely inform* ETSI of ESSENTIAL IPRs it becomes aware of. In particular, *a MEMBER submitting a technical proposal for a STANDARD or a TECHNICAL SPECIFICATION shall*, on a bona fide basis, *draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL* if that proposal is adopted.

A206. An IPR is defined to be "essential" if it is not possible to comply with the "standard"

without infringing the IPR:

*"ESSENTIAL" as applied to IPR means that it is not possible* on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, *to make*, sell, lease, otherwise dispose of, repair, use or operate *EQUIPMENT* or METHODS *which comply with a STANDARD without infringing that IPR.*

A211. The IPR Policy makes clear that "standard" includes "options" in the standard:

"STANDARD" shall mean any standard adopted by ETSI *including options therein* or amended versions....

A211-A212. Likewise, a "technical specification" includes "options therein." A212. Thus, a

patent is essential under the ETSI IPR Rules if it is impossible to practice a standard -- or the

options in the standard -- without infringing the patent.

TruePosition ignores this explicit reference to "options" in the IPR Policy to justify its

position in this lawsuit that options are exempt from the Policy. According to TruePosition

witnesses -- who repeated the same mantra at trial -- TruePosition was under no obligation to

declare its IPR because other options in the GSM standard (other than UTDOA/SDCCH) could

be practiced without infringing the '144 patent. *E.g.*, A337:9-24; A358:13-20; A361:10-15. But

none of those witnesses ever explained how such a position was tenable in view of the explicit

reference to "options" in the IPR Policy's definition of "standard."[6]

---

[6]    Indeed, there was not a shred of evidence at trial to suggest that TruePosition even had this position before it initiated this lawsuit against Andrew. For example, TruePosition did not point to a single document to show that TruePosition actually had its "options are exempt"

(Continued...)

In fact, it is untenable -- according to ETSI itself. Barely a month after trial, the Director General of ETSI wrote to TruePosition confirming that a patent that is essential to an "option" is subject to the declaration and licensing policies of ETSI. Referring to "TruePosition's U.S. Patent No. 5,327,144" and the six ETSI Technical Specifications that include UTDOA/SDCCH as an option, the Director General wrote:

> Under the ETSI IPR Policy, *I am obliged to bring this matter to your attention* to ascertain whether you are of the opinion that you hold *essential or potentially essential, IPRs related to* the abovementioned Technical Specifications or *options therein*.

> If this were the case, *we would ask you to disclose any essential IPR and indicate if you are prepared to grant licenses for this/these IPR(s)*, in accordance with the terms and conditions set out in Clause 6.1 of the ETSI IPR Policy.

A231-A232. This letter makes clear that options in a standard are not exempt from the ETSI IPR Policy. A patent that is essential or even potentially essential to the *option* must be declared.[7]

And that is exactly how TruePosition views its '144 patent -- essential to the UTDOA/SDCCH option in the GSM standard. As TruePosition explained at trial, "it's not possible to do U-TDOA using this SDCCH channel without using [the] '144 patent." A321:3-7; *see also* A282:11-13 (Q: "And you believe your '144 patent is essential to that implementation of that option? Right?" A: "Yes."); A320:13-A321:2, A321:21-24; A272:7-11.

---

theory in mind when it decided to overrule the recommendation of its Standards Manager to declare the '144 patent to ETSI (*see* last paragraph in this Section III.C).

[7] The Director General of ETSI sent this letter to TruePosition following the jury's verdict of infringement of a patent that is alleged to be essential to an option in an ETSI technical specification and thus subject to the declaration and licensing requirements of the IPR Policy. The letter directly refutes TruePosition's assertion at trial that ETSI has never challenged its interpretation of the IPR Policy. *E.g.,* A257:11-14 ("Q. Has the Director-General of ETSI ever written you a letter and said something TruePosition did here was wrong? A. No.").

Based on TruePosition's belief that the '144 patent is essential to the UTDOA/SDCCH option of the standard, it should have been declared to ETSI. And in connection with that declaration, the IPR Policy required TruePosition to state whether it was willing to license the patent on "fair, reasonable and non-discriminatory terms and conditions" (A207) or not (A208). In the latter case, work on the standard must "cease" to give the standards body the opportunity to steer the standard away from the patent. *Id.*

But TruePosition did not declare its patent to ETSI. Its President admitted that "TruePosition made an affirmative decision not to declare the '144 patent to ETSI," and further that "the decision not to declare was made on purpose. It wasn't an accident." A271:8-11; A276:16-20. Indeed, it was he who made the decision not to declare. A273:21-23.

TruePosition ignored the explicit recommendation of its Standards Manager in deciding not to declare the '144 patent.[8] In June 2004, when the standards body was still deciding whether to add UTDOA to the GSM/GPRS standard, TruePosition's Standards Manager Rhys Robinson sent an email to TruePosition's General Counsel stating his intention to declare the '144 patent "unless I hear a strong opinion otherwise." A125. Having received no response, Robinson sent a reminder email a week later listing the '144 and other patents: "Would like to declare these this week, but want your OK first." A122. Once again, the General Counsel did not respond. Two months later, Robinson sent him a third email, this time emphasizing his recommendation in bold and warning him that TruePosition risked being categorized as playing an "IPR shell-game" if it did not timely declare its patents in compliance with the ETSI IPR Policy:

---

[8]    Unlike Andrew, TruePosition did not bring either of its standards representatives (Rhys Robinson or Bob Gross) to trial.

**My recommendation:**

IPR declaration is a normal activity that the vendors do all the time. … If we wait until the work item is approved to declare this IPR, we risk being categorized as playing "The IPR shell-game".

A128 (emphasis in original). Despite this explicit recommendation, TruePosition never declared the '144 patent, or its unwillingness to license it, to ETSI.

### D.   Andrew's Decision To Develop UTDOA/SDCCH Products And Help TruePosition Standardize UTDOA/SDCCH

Shortly after TruePosition's internal discussions to try to get Andrew involved in order to create the perception that UTDOA would be a multi-vendor solution (*see* last part of § III.B above), TruePosition got its wish. Andrew "joined ETSI and worked extensively with [TruePosition] to get UTDOA standardized." *TruePosition*, 2007 WL 2482163, at *2.

Specifically, in January 2003, Andrew applied to become an ETSI member. A79-A85; A440:21-A441:2; A298:18-21. Becoming an ETSI member gave Andrew the right to participate in 3GPP standardization activities, including the right to vote for or against proposed changes to a standard, because ETSI is an organizational partner of 3GPP. A442:10-12; A442:22-25. Terry Garner, the President of Andrew's Network Solutions group, approved the decision to help TruePosition standardize UTDOA, because "we expected to benefit from the effort that we put forth in the standards work." A541:17-A542:1.[9] As Andrew's standards representative testified, TruePosition's President "said he was very happy to have us here because it would definitely help the effort to get UTDOA into GSM." A511:9-16.

TruePosition needed Andrew's support because it had gotten nowhere with its own UTDOA standardization efforts. As of the time Andrew decided to help TruePosition,

---

[9]    Hereafter, we refer to Mr. Garner as "Andrew's President" for brevity.

TruePosition had attended a half-dozen 3GPP meetings around the world to persuade the standards body to standardize UTDOA. But the standards body did not approve any of TruePosition's change requests. A133; A427:11-A428:11.

Before submitting Andrew's ETSI membership application, Andrew's standards representative Oskar Magnusson undertook the task of coming up to speed on the UTDOA standardization efforts to date. To this end, Magnusson downloaded relevant documents from the 3GPP website and reviewed them. A428:17-A429:2. One of those documents was TruePosition's April 2002 Feasibility Study, which included TruePosition's promise to license in section 3.3.5 and which is still available on the 3GPP website for any 3GPP member (or anyone else, for that matter) to review. A429:10-A430:5; A435:20-A438:10; A279:13-14. TruePosition never submitted anything to 3GPP revoking its promise. A435:13-19.

Because Andrew was then involved in a lawsuit with TruePosition -- albeit on other technology -- Andrew was sensitive to patent issues at the time. As such, TruePosition's promise to license caught Magnusson's eye as information that "definitely was of interest." A430:17-25; A431:14-A432:12. Magnusson reported TruePosition's promise up the chain to Andrew's Vice President of Engineering and Vice President of Business Development. A432:23-A433:9. TruePosition's promise was important to the VP of Engineering because "it was one of the things to check up as far as a green light regarding introducing our technology into GSM." A433:10-15. It was also important to the VP of Business Development because "[h]e was looking at our -- into our business interests and to make a strategic decision and this definitely played a role in that decision-making." A433:16-21.

Andrew made decisions based on TruePosition's promise. A433:24-A434:3. These decisions related to Andrew's products from both a "standardization perspective" and a "product development perspective":

> Well, at that time, we were looking into if we wanted to introduce UTDOA in the GSM, if we want to participate in that work, and [TruePosition's promise] was definitely a very positive sign for us.

A434:10-19. And the end result of these decisions was to proceed with UTDOA:

> The end result was that we moved ahead and that we introduce[d] UTDOA into GSM and we now have a GSM product for UTDOA.

A434:25-A435:2.

Magnusson also confirmed that Andrew would not have "invested in UTDOA and participated in these standards efforts that you are talking about if TruePosition had told [the] truth at the time, that it had a patent covering UTDOA that [it] intended not to license to anyone." A435:3-8. This was because "[i]t would have been a wasted effort and plus we would have been helping our competition with a great advantage at our cost, by the way." A435:9-12. Andrew's President agreed: "Certainly, no way would I have committed resources for this effort if we weren't going to be able to take advantage of the standard work, no." A542:2-7.

### E.    TruePosition's Agreement To "Create A Solution That We All Benefit From"

Witnessing the futility of TruePosition's standardization efforts, in February 2003 a number of key industry players formed a "TDOA System Study" group to help jump start the standardization effort. TruePosition's President described all of the members of the study group, including itself and Andrew, as important participants: "We were one of the participants. I think everybody in it was important. They all played an important role." A309:4-7.

Despite recognizing that they were competitors in the marketplace, the study group members agreed to put their differences aside to focus on achieving their goal of UTDOA

16

standardization. A444:7-A445:13; A449:23-A450:1. The "participating companies were jointly

going to work towards the goal of getting -- obtaining or getting UTDOA into the GSM

standard." A444:1-6. To this end, *all* of the participants agreed to live by a set of Ground Rules

to ensure "openness," "information sharing," and "no hidden agendas and no stalling tactics,"

which otherwise "often happens in a competitive environment." A447:21-A448:3. One of the

ground rules was to create a solution that *all* of the participants would benefit from:

> In order to focus on the result and to simplify the teamwork we have agreed on
> the following ground rules for the system study project. That means that *we have*
> *all agreed to live by these rules* and honor them.
> …
> We understand that we all come from different companies that to some extent are
> competitors and to some extent are customers and suppliers. *We all work with*
> *the understanding that what we do here is create a solution that we all benefit*
> *from.*

A104-A105; *see also* A313:2-7; A512:23-A513:4.

> Referring to this Ground Rule, Magnusson explained:

> This is basically the underlying spirit of the standards body, is that whatever we
> create there is meant to be there to benefit everybody equally. … *As soon as we*
> *got it into the standards, everybody got to use it.*

A450:2-16. TruePosition was aware of the Ground Rules document -- its President downloaded

it off the Internet -- and was bound by the Ground Rules just like every other member of the

group. A101-A106 (*see* reference to "sheehan" in document footer); A310:14-21; A447:4-12.

Andrew's senior management was also aware of the Ground Rules. A476:19-A477:5.

As Magnusson explained, it was "very important" to Andrew "to have a ground rule that

prevented one joint venture member from being able to block another joint venture member from

practicing the technology that was developed in this group." A450.1:14-18. Andrew "had no

interest in participating in and helping something that would put us at a competitive

disadvantage" (A450.1:19-22), and thus relied on the Ground Rules in its business decisions:

I think these ground rules were very much in line with what we had established earlier, in reading the feasibility study ... so *this was just another green light for the go-ahead to introduce our technology into the GSM standard.*

A477:6-16.

### F.    Andrew's And TruePosition's Joint Efforts To Standardize UTDOA/SDCCH Joint Effort In The UTDOA Study Group.

Adhering to these Ground Rules, the participants met for several months in face-to-face meetings, had conference calls nearly every week, and exchanged close to a thousand emails as part of the effort. Andrew and TruePosition -- and specifically Andrew's standards representative Oskar Magnusson and TruePosition's standards representatives Rhys Robinson and Bob Gross -- worked together in the joint venture:

We -- we looked out for UTDOA technology. We -- we had discussions on the technology. *We shared our ideas regarding how we wanted to get UTDOA into the study as well as into the standard.* We shared e-mails, conference calls, direct calls, and things of that nature.

A450.2:14-A451:12.

The result of the joint effort was the creation of a UTDOA solution described in a document titled "U-TDOA System Study, Architecture," which reflected "major changes" to the UTDOA positioning procedure that TruePosition initially had tried to get added to the standard on its own. A14; A25-A41; A46 (item 6); A451:13-A454:19. With these major changes, the participants agreed that their solution was ready to be submitted to the 3GPP standards body to be considered for incorporation into the GSM standard. A455:5-10.

**Joint Effort To Standardize UTDOA In 3GPP.** Between April 2003 and November 2004, Andrew and TruePosition traveled the world, attending 3GPP standards meetings in Germany, Fort Lauderdale, New York, Hungary, Iceland, Mexico, Spain, Canada, and South Africa in a joint effort to persuade the standards body to add UTDOA to the GSM standard. A133, A456:15-A458:2; A458:11-16. As TruePosition admitted, "Oskar Magnusson from

18

Andrew, Rhys Robinson and Bob Gross from TruePosition, attended meeting after meeting after meeting for two years together to build a standard." A353:24-A354:3; *see also* A316:22-25. "[O]ver a two-year period they worked together, they worked collaboratively, they traveled together, they ate together, all for the unified goal of presenting these contributions, technical contributions to the third-generation partnership project." A355:13-18.

The two companies' joint efforts paid off. In November 2004, UTDOA was added to the standard based on 3GPP's approval of a large number of change requests jointly authored and submitted by Andrew and TruePosition. A6-A7; A134-A186; A316:5-13; A507:6-7.

Drafting, revising, and submitting change requests to the standards body was a process that involved research and development effort by each company, as well as a considerable amount of coordination between the two companies on technology and strategy. During the nearly two years the two companies worked together, Andrew's engineers worked on "ideas and solutions to get UTDOA into the GSM standard" and "would have meetings and then do designs and testing and things of that nature." A459:14-22. Andrew's standards representative Magnusson then took the ideas generated by Andrew's engineers, as well as his own ideas, and introduced them to Bob Gross, one of his counterparts at TruePosition. A460:8-17.

Prior to each 3GPP meeting, the two companies' standards representatives discussed their ideas and strategized through phone calls and emails. A317:1-5. They called each other "a few times a week" -- to discuss "technology issues" and "strategy issues." A467:20-A468:12. And they exchanged hundreds of emails. A468:24-A469:4. For example, in one chain of emails discussed at trial, Magnusson talks to his engineers about a technology proposal, drafts a change request, sends it to Gross to get his feedback, receives Gross's positive feedback, tells Gross of his plan to submit the change request at the next 3GPP meeting, and asks Gross if he has any

19

changes of his own that he would like to include as part of Magnusson's change request -- all in

the span of about an hour and a half.  A111-A112; A462:1-A468:12.  This email chain was

"representative" of the emails that Magnusson and Gross exchanged on UTDOA standardization

between April 2003 and November 2004.   A468:13-A469:4.

An important reason for the frequent telephone calls and emails was to ensure that the

two companies coordinated their positions to present a united front.  TruePosition's CTO

admitted that TruePosition and Andrew standards representatives "met before the standards

meetings to unify their strategy that they would present together at the meetings."  A354:14-17.

Likewise, Magnusson explained:

> *It was very important that the two UTDOA companies, TruePosition and Andrew, that we stood together in the standard body.*  It was hard enough against all the other big players.
>
> So what we did was to *make sure that what we introduced, that we were both in agreement*, and then try to build a consensus around that.

A459:23- A460:7.[10]

The two companies' close collaboration continued at the week-long meetings.  A461:3-

25.  As soon as they arrived at the meeting location, both companies' standards representatives

---

[10]   *See also* A465:2-10:

> *[I]t was important to have consensus with TruePosition on this particular technology* and this particular process. ... Because, again, we were -- we were up against big companies in the -- in the standard community and it was not appropriate to have the UTDOA companies fighting internally.  Then nothing would have progressed in the community.

and A467:4-10:

> Again, *it goes back to the need to help us to be unified or together on this* as opposed to submitting individual CRs [change requests].  And secondly, of course, if we were submitting individual CRs without talking to each other, we could have conflicts, which, again, was not a smart thing to do within the standard community.

(Oskar Magnusson from Andrew, and Bob Gross and Rhys Robinson from TruePosition) sought

each other out to strategize:

> **So initially when I came on Sunday evenings, I would usually get in touch with**
> **Bob. We were a very close team**, or Rhys, to see where things stood, if the CRs
> had been submitted and if they were in place. And where we were on the agenda
> was very important to know. …. It was important in case anything was rejected,
> then we can change it and resubmit it before the week was over and make better
> use of our time.

A461:12-25; *see also* A471:19-23. Magnusson and Gross also coordinated to make sure that,

between the two of them, they had the individual working group meetings covered:

> We looked at the -- what CRs had been submitted. We looked at the agenda for
> the different days and *we looked at what particular working groups we had to*
> *focus on* and we decided we should attend them together or *[if] they were*
> *happening at the same time, then Bob would attend one and I would attend the*
> *other* and then Rhys might assist as well.

A471:24- A472:6.

The coordination between Andrew and TruePosition standards representatives did not

stop in the meeting room. Magnusson and Gross frequently spoke to each other while meetings

were in progress by exchanging instant messages if they were not sitting next to each other in the

meeting. A472:17- A473:5.

Thus, before and during 3GPP meetings, for more than a year and a half, Andrew and

TruePosition standards representatives worked together. They strategized together. They talked

about UTDOA technology together. They sat next to each other in 3GPP meetings. They

discussed issues between themselves in the back of the room during meetings. They exchanged

instant messages during meetings. And on occasion, they even flew together to meetings.

A490:16-A492:9; A353:24-A354:5, A354:11-13, A355:13-18; A316:22-25.

The result of this close collaboration between Andrew and TruePosition was the drafting

and submission of change requests that got UTDOA added to the GSM standard. At trial,

Magnusson showed a collection of more than fifty change requests that had been discussed at 3GPP meetings. Every one of them related to UTDOA. Every one of them listed Andrew and TruePosition as co-sponsors. And every one of them was jointly submitted by Andrew and TruePosition. A134-A186; A494:14-A507:5; A389:1-4; A392:19-22; A393:18-A394:3.

Indeed, there was not a single 3GPP meeting from April 2003 to November 2004 in which Andrew and TruePosition did *not* jointly submit a co-sponsored change request directed to adding UTDOA to the GSM standard. A506:20-A507:5.[11] Under the IPR Policy, every one of these change requests triggered TruePosition's obligation to declare its '144 patent to ETSI:

> In particular, *a MEMBER submitting a technical proposal* for a STANDARD or a TECHNICAL SPECIFICATION *shall*, on a bona fide basis, *draw the attention of ETSI to any of that MEMBER's IPR* which might be ESSENTIAL if that proposal is adopted.

A206. TruePosition was reminded of this obligation at every meeting, when the Chairman made a "Call for IPRs" to remind members of their "obligation under the IPR Policies of their respective Organizational Partners" (*e.g.*, ETSI) to "inform their respective Organizational Partners of Essential IPRs they become aware of." A95; A535:1-A536:6; A538:14-20 ("that's actually part of the meeting ceremony ... they open the meeting that way").[12]

Both companies knew that Andrew's collaboration in the UTDOA standardization effort was key to the success of that effort. Magnusson echoed what TruePosition knew (*see* § III.A. above) -- that having multiple UTDOA vendors was important to the industry:

---

[11]  Magnusson showed examples of jointly submitted UTDOA change requests that he had personally authored and presented at 3GPP meetings. A479:7-A484:8; A488:8-A489:17; *see also* A515:1-3.

[12]  To this end, the Chairman invited members to "investigate ... whether their company does own IPRs which are, or are likely to become Essential." The Chairman even told members where to obtain the declaration form. A95; A536:7-A538:13.

> *So to have just one company representing a technology that only that company can offer, the other standard members become skeptical.* So they want to have companies that are working on the same technology to work on the same standard.
>
> *So it was important to have Andrew and TruePosition, the two companies, that do manufacture and make UTDOA technology.* It was much easier to push that through the standard, having those companies working together, rather than just one of them doing that.

A511:9-18. Thus, once the joint standardization efforts were underway, TruePosition did everything it could to ensure Andrew's continued participation. For example, on one occasion, Andrew objected to including certain material in the standard. Concerned that the standards community might perceive a rift between TruePosition and Andrew, TruePosition's Standards Manager recommended that TruePosition remove the offending material:

> *[T]he risk to us* from not removing the questionable latency sentence that Oskar suggested we remove … *is that we officially are diverging from Andrew in the standards and opening a rift. My recommendation is that we stick together* officially by going ahead and removing this sentence, because *Andrew's support is key to our continued standards progress* moving forward ….

A129 ("officially" emphasized in original). TruePosition's senior management followed the recommendation and agreed to "remove the statement." *Id.*

TruePosition's strategy of ensuring Andrew's involvement in the UTDOA standardization effort paid off handsomely. TruePosition's President agreed that "this joint effort of Andrew and TruePosition was, in fact, successful in November 2004. U-TDOA was accepted by the entire industry worldwide for GSM and GPRS." A318:7-10. That success was rooted in Andrew's participation. Unlike the pre-February 2003 time period, when TruePosition was going it alone and could not manage to get any of its change requests approved by 3GPP, change requests that both companies jointly sponsored and submitted were approved in spades. A428:1-11; A458:11-25, A507:6-7; A133 (*compare* left and right halves).

23

### G.    TruePosition's Post-Standardization Refusal To Grant UTDOA/SDCCH Licenses To Other Vendors

After UTDOA/SDCCH was successfully incorporated into the standard, TruePosition did an about-face. TruePosition took steps to eliminate its only UTDOA competition to ensure there would be no multi-vendor solution -- the one thing it knew the industry had wanted as a prerequisite for standardizing UTDOA.

**Saudi Telecom's RFP To Multiple UTDOA Vendors.** In 2004, Saudi Telecom Company issued a request for proposal for a new cellular network to be built in Saudi Arabia. *See* (A203-A205). As TruePosition's President described it, this was a "flagship opportunity in a key new area of the marketplaces." A237:25- A238:1. "Saudi Telecom was viewed as the largest and most prominent operator or wireless carrier in that part of the world," and TruePosition saw Saudi Arabia as being "one of the new growth markets for our business" and this RFP as representing TruePosition's "first international opportunity." A238:5-7; A234:16-17; A239:6-7. TruePosition, of course, was thinking about the effect a Saudi Telecom contract would have on its bottom line: "I think over a five year period, we were estimating that it would be worth about $75 million in profit to us, ball park." A264:1- A267:12.

TruePosition's General Counsel echoed the sentiments of the President, cataloguing a number of reasons why this was such an important contract for TruePosition:

> One, for the obvious reason because everyone thought *it was a very, very large contract, and so the revenue would have been good to have*.

> Two, up until that time, … no one had sold any TDOA … products outside of the United States. So this was going to be not only a very large sale, but *the first international sale. So it was, in effect, proving a market*.

> In addition to that, STC, in the Middle East, is a very large and influential telephone company. And we thought that to make a sale to STC, *that would be the lead that other telephone companies would follow* when they made their purchasing decision.

Finally, I guess you could also say it *affected our valuation*, because we had the
loss of the expected revenue under that contract, and with the loss of the revenue,
we were forced to do a little cutback to the company. ... We had to let a number
of people go.

A377:21- A379:7.

Consistent with the industry's strong view that multiple vendors should be able to bid for

UTDOA business, both Andrew and TruePosition submitted bids in response to the Saudi

Telecom RFP. A236:4-14. Indeed, Andrew was TruePosition's only competitor for the "TDOA

portion" of the Saudi Telecom contract. A240:5-10; *see also* A260:7-11; A340:15-17.

**Saudi Telecom Contract Awarded To Andrew, Not TruePosition.** To TruePosition's

surprise, it was Andrew that won the Saudi Telecom business. A234:9-12. As TruePosition's

President testified, "[L]ike overnight, suddenly, like a light switch, things changed, and we were

told that Andrew was going to be getting the business and we weren't." A240:2-4. Losing the

Saudi Telecom contract to Andrew was not something TruePosition believed it could afford,

especially taking into account the potential loss of future opportunities:

> [T]his was a very key one. It's a flagship account. It was something that was
> very important and *to not win that and to allow our competition to*, you know, to
> be able to say to those potential additional sales opportunities that they want it and
> their equipment is being deployed by that -- by Saudi Telecom and use that as a
> reference *was problematic for us*. Hurt us in our ability to win that other
> business.

A267:25- A268:7.

**TruePosition's Refusal To License Any Other UTDOA Vendor.** TruePosition reacted

swiftly to its having lost a big UTDOA contract to the only other UTDOA vendor in the industry.

Upon finding out about Andrew's winning bid, TruePosition did not offer Andrew a license in

accordance with its pre-standardization promises. Instead, TruePosition immediately sent

Andrew a cease and desist letter:

> ***TruePosition asks that Andrew discontinue immediately*** any offer to supply
> equipment from the United States that will locate mobile telephones using reverse
> ***control channel*** signal data to implement the ***TDOA*** ....

A192; A358:7-9. TruePosition made clear that -- contrary to its pre-standardization assurances

to the industry and license offer to Andrew -- it would not offer any other vendor a license to the

subject matter of the RFP:

> ***TruePosition has not licensed*** the '144 Patent to Andrew, or anyone else.
> ***Further, TruePosition does not intend to grant a license*** to Andrew or any third
> party vendor with respect to fulfillment of the RFP.

A191.

TruePosition's refusal to license any third party vendor "with respect to fulfillment of the

RFP" was none other than an outright refusal to license the '144 patent. This is because

TruePosition asserted that it was not possible to bid on the RFP without infringing the '144

patent. As TruePosition's President explained with respect to the cease and desist letter:

> [I]t's another notice that we sent to Andrew Corporation, identifying that we were
> aware -- we were aware that they had bid on the -- the Saudi Telecom business,
> and that ***that RFP required that the -- they -- the product be able to offer a
> control channel TDOA capability***, and we were notifying them that, you know,
> that that was likely and ***those products would be infringing on the '144 patent***.

A241:11-18; *see also* A240:17-18 ("[T]his proposal ... really requires a control channel

location capability . . . .").

Two weeks later, TruePosition reiterated its demand that Andrew stop using the

UTDOA/SDCCH technology:

> ***Please confirm, in writing, by October 18, that Andrew will discontinue*** any
> offer to supply equipment from the United States that will locate mobile
> telephones using reverse ***control channel*** signal data to implement ***TDOA***.

A197. This time, TruePosition attached claim charts mapping the '144 claims to the Saudi

Telecom RFP to establish that bidding on the RFP amounted to infringing the '144 patent:

> TruePosition has set forth in Attachment A its *comparison between* the inventions
> of Claims 22, 23, 25, 26, 28, and 30 of *the 144 Patent, on the one hand, and*
> Andrew's apparent or contemplated activities with STC, as indicated by *the STC*
> *RFP, on the other*.

A196.

Thus, the letters that TruePosition sent to Andrew before and after Andrew agreed to help

standardize UTDOA all mention the '144 patent, TDOA, and reverse control channels.   A242:3-

A243:1; A244:7-15.  But there is one critical difference.   Whereas the pre-standardization letter

(PTX 7 (A188-A190)) expressly offers a license to Andrew under the '144 patent, the post-

standardization letters (PTX 17 (A191-A195) and PTX 18 (A196-A202)) expressly refuse to.  In

the post-standardization letters, TruePosition made clear that one and only one vendor would be

able to bid on the Saudi Telecom RFP -- and that there would be no multiple vendor solution:

> Q:     *And you told [Andrew]* on September 30th of 2005 *that they're not*
>        *getting a license* to the '144 for that implementation of that option, no
>        way, no how, *and you're not giving one to anybody, right?*
>
> A:     With respect to this RFP, *yes, that's correct.*

A282:19-23.

This marked the first time that TruePosition had ever told Andrew that it would not

license its '144 patent or allow Andrew to use UTDOA/SDCCH.  It never said so during the time

the two companies were jointly advocating UTDOA standardization.  A531:3-7.  Indeed, the

thought that TruePosition would ever do such a thing had never crossed Andrew's mind:

> Q:     When you were participating in the joint venture and then in the
>        standardization meetings, *did you ever think that Andrew would be*
>        *blocked from using the very technology that it helped standardize* and
>        helped get into the GSM standard?
>
> A:     *No.  I have to say it never even crossed my mind.*
>
> Q:     And this was technology that Andrew helped to create and standardize; is
>        that correct?

A:    Yes.  This is what we call our technology.

Q    ***Was that belief based on any promises that TruePosition had made along the way*** while it was trying to get UTDOA standardized on its own?

A:    Yes.  I think we have established that throughout this discussion, all the way from the ***feasibility study*** through the ***joint venture documents*** and through the standards work and, of course, through ***all the close cooperation*** that it was very much against the nature of this to ever even think that we were blocked from using our own technology.

A514:24- A515:17.

**TruePosition's Lawsuit Against Andrew.**  Less than two weeks after sending the second cease-and-desist letter, TruePosition sued Andrew for allegedly infringing the '144 patent.  D.I. 1.  As TruePosition's President testified: "What Andrew has been sued for in this case by TruePosition is doing U-TDOA on the SDCCH channel."  A322:12-14; *see also* A322:19-24; A336:2-5; A349:17-24.  In this lawsuit, TruePosition sought and won $45.3 million in damages, massively disrupted Andrew's business, and forced Andrew to defend itself and pay lawyers fees.  Now -- to ensure that the industry will never have the multi-vendor solution that TruePosition originally promised -- TruePosition seeks a permanent injunction to keep Andrew out of the UTDOA/SDCCH market for years to come.  D.I. 316.

## IV.    ARGUMENT

### A.    TruePosition's Claims Should Be Barred Under The Doctrine Of Equitable Estoppel

"Equitable estoppel may be imposed in a patent case where a patentee induces another party to believe that it will not sue that party for infringement."  *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003).  Quoting the Federal Circuit, this Court has specified the test for equitable estoppel as follows:

In order to establish equitable estoppel, defendant must show: (1) plaintiff, through misleading words, conduct, or silence, led defendant to reasonably infer that plaintiff did not intend to enforce its patent against it; (2) defendant relied on

28

that conduct; and (3) due to its reliance, defendant will be materially prejudiced if plaintiff is allowed to proceed with its claim.

*TruePosition*, 2007 WL 2482163, at *13 (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)); *accord McKesson Info. Solutions LLC v. Trizetto Group, Inc.*, 426 F. Supp. 2d 203, 210-11 (D. Del. 2006) (denying summary judgment of no equitable estoppel). This showing must be made by a preponderance of the evidence. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 314-15 (D. Del. 2005).

"The purpose behind equitable estoppel is to protect a party from a claim of infringement by a patentee who had earlier communicated to that party that it would not disturb the party in the activities in which it was then engaged." *Hynix Semiconductor Inc. v. Rambus, Inc.*, No. CV-00-20905 RMW, 2006 WL 1867724, at *3 (N.D. Cal. July 6, 2006). "Equitable estoppel is neither limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *McKesson*, 426 F. Supp. 2d at 210 (*citing Aukerman*, 960 F.2d at 1041).

"Equitable estoppel ...may serve as an absolute bar to a patentee's claim of infringement." *Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998) (affirming summary judgment of equitable estoppel). *Accord Aukerman*, 960 F.2d at 1041 ("Where equitable estoppel is established, all relief on a claim may be barred.").

It is well settled that equitable estoppel applies to bar opportunistic behavior such as that exhibited by TruePosition in this case. In *Lukens Steel Co. v. Am. Locomotive Co.*, 197 F.2d 939 (2d Cir. 1952), plaintiff Lukens agreed to work with its customer, defendant Alco, to come up with a new engineering design for a spline-type block used in the manufacture of railroad locomotives. Following Lukens's representation that it would be "very glad to undertake this proposition *without any cost to your good Company*," the "engineering departments of both

companies … worked together in a sincere effort to develop a satisfactory engine design."

*Lukens*, 197 F.2d at 940.  As the District Court described:

> ***Then followed the actual efforts of the executive and engineering personnel of
> both Lukens and Alco***, with Chapman's help and guidance, ***to solve the problem***.
> The Auburn branch was visited and inspected; the efforts of Alco's engineers
> were examined and appraised; blueprints thereof were placed in Luken's [sic,
> Lukens's] possession for study; and problems and methods of manufacture were
> observed and discussed.  Lukens' Coatesville plant was visited and inspected.  ***In
> short, there was a genuine, sincere effort to supply the engine design which was
> the objective of the parties***, accompanied by a complete disclosure of mechanical
> or engineering theories, designs and accomplishments.

*Lukens Steel Co. v. Am. Locomotive Co.*, 99 F. Supp. 442, 445 (N.D.N.Y. 1951).

After Alco adopted the joint design, however, Lukens disclosed that it had a patent that

covered the design and sued Alco for patent infringement, seeking an injunction and damages.

The Second Circuit affirmed the District Court's judgment of equitable estoppel and barred

Lukens's infringement claims, despite evidence that Alco had known about the patent:

> Nevertheless, we think the ***doctrine of estoppel was properly applicable*** even if
> Alco knew of the existence of the patent and the assignment of it to Lukens,
> ***because Lukens' conduct was such as to lead Alco reasonably to believe that the
> patent would not be used against it***.  In early August 1943 when the design
> embodying the patent spline was submitted to Alco, ***nothing was said about the
> patent, although Lukens knew that Alco intended to manufacture frames in
> accordance with the design***. … [Y]et for more than four and a half years Lukens
> did nothing to suggest that it might assert its patent rights against Alco. … In
> these circumstances we think Alco could reasonably infer that Lukens had given
> its consent to manufacture of the frame without restriction, particularly in view of
> the substantial amount of business given Lukens by Alco.  The district court's
> finding that ***the parties were engaged in 'a business relationship involving
> mutual confidence and mutual effort in which each party hoped to profit'*** is
> well justified.

*Lukens*, 197 F.2d at 940-41.

The same is true here.  Just as patentee Lukens told Alco that the proposed solution

would be "without any cost" to Alco, patentee TruePosition told the industry and Andrew that a

UTDOA solution would be for the benefit of all and offered licenses under the '144 patent on

"fair and reasonable" terms. Then, just as Lukens and Alco worked together to develop a joint

design that "Lukens knew … Alco intended to manufacture frames in accordance with,"

TruePosition and Andrew worked together to develop a UTDOA standard in accordance with

which TruePosition knew Andrew would sell standards-compliant products. Indeed, having

multiple UTDOA vendors such as Andrew was the whole point of the standardization effort, as

TruePosition knew from the very beginning. TruePosition thus should be estopped from suing

Andrew for using, and enjoining Andrew from using, UTDOA/SDCCH.

The following sections address the individual elements of equitable estoppel and further

establish why that defense applies here.

### 1. By Its Affirmative Conduct And Silence, TruePosition Led Andrew Reasonably To Infer That TruePosition Did Not Intend To Enforce Its Patent Against Andrew

There are two independent bases for establishing the first element of estoppel:

(1) TruePosition's affirmative conduct in assuring Andrew that it would license its '144 patent;

and (2) TruePosition's silence in the face of its duty to notify the standards community of its

eventual refusal to license the '144 patent. Together, they leave no doubt that TruePosition led

Andrew reasonably to infer that TruePosition did not intend to enforce its patent against Andrew.

**TruePosition's Affirmative Conduct.** The Federal Circuit has explained that equitable

estoppel requires a showing that the patentee communicated that the accused infringer will not be

disturbed in the activities in which the accused infringer is currently engaged:

> The first element of equitable estoppel concerns the statements or conduct of the
> patentee which must "***communicate something in a misleading way.***" ***The***
> ***"something"*** with which this case, as well as the vast majority of equitable
> estoppel cases in the patent field is concerned, ***is that the accused infringer will***
> ***not be disturbed by the plaintiff patentee in the activities in which the former is***
> ***currently engaged***. The patentee's conduct must have supported an inference that
> the patentee did not intend to press an infringement claim against the alleged
> infringer.

*Aukerman*, 960 F.2d at 1042. Here, TruePosition made three assurances that led Andrew reasonably to infer that TruePosition did not intend to enforce the '144 patent and seek an injunction that would disturb Andrew's activities in selling UTDOA/SDCCH equipment.

First, TruePosition promised the industry that "[a] license *will be made available* to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination." TruePosition admitted at trial that this promise covers the '144 patent. TruePosition admitted that the promise was broadly directed to all of 3GPP. And far from ever being revoked in any subsequent submission to 3GPP, TruePosition's promise is still outstanding, available on the Internet for anyone to see. *See* § III.B.

TruePosition's promise was premeditated and deliberate. TruePosition knew the industry would not standardize UTDOA unless it had assurances that multiple vendors would be able to sell UTDOA in the future. Accordingly, TruePosition assured the industry that licenses under the '144 and any other patents needed for UTDOA would be made available, paving the way for multiple vendors to sell UTDOA. TruePosition's promise thus was made for one and only one reason -- to further TruePosition's agenda of getting UTDOA standardized. It led Andrew to infer that it would not be sued for selling standardized equipment. Indeed, promising someone a patent license is the very definition of saying that you will *not* enforce your patent against them.

Second, TruePosition made a license offer to Andrew. In particular, TruePosition sent a letter inviting Andrew to "inquire about a license" under the '144 and several other patents. TruePosition admitted at trial that the purpose of the letter was "to offer Andrew the opportunity to license those patents if they wanted to." *See* § III.B. Because TruePosition knew Andrew did not need a license under the '144 patent at the time, TruePosition's offer to Andrew was plainly intended for the future, to the extent Andrew later decided to sell UTDOA/SDCCH products.

32

The third basis for Andrew to infer that it would not be sued for an injunction and lost profits was TruePosition agreement to work on UTDOA jointly with Andrew and others to "create a solution that we all benefit from." *See* § III.E. Being sued and enjoined for selling UTDOA product is the antithesis of benefiting from the UTDOA solution that Andrew helped create by working side-by-side with TruePosition.

Given these assurances by TruePosition, the only reasonable inference was that TruePosition did not intend to sue Andrew -- much less demand lost profits and an injunction and demand that Andrew exit the UTDOA/SDCCH business. "The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim against the alleged infringer." *Aukerman*, 960 F.2d at 1042. To the contrary, TruePosition's statements made clear that "all" would "benefit from" the UTDOA solution that the industry worked together to create, and that anyone who wanted a license under the '144 patent could have one by paying at most a fair and reasonable royalty. A105.

At trial, TruePosition tried to confuse the issue by pointing to a January 2004 settlement agreement that resolved pending litigation between Andrew and TruePosition involving other patents. TruePosition argued that Andrew could not have reasonably inferred that it would not be sued under the '144 patent because that patent was specifically excluded from the license in the settlement agreement. A548:2-11.

The '144 patent was excluded from the license in the settlement agreement for a number of reasons, but not for any of the reasons TruePosition suggests. For example, as both sides agreed at trial, Andrew was not practicing the '144 patent at the time and therefore had no use for a license under that patent. *E.g.*, A246:5-17; A268:18-24; A368:20-25; A385:7-12. That is:

- Andrew did not need a license because what TruePosition asserts is covered by the '144 patent -- UTDOA/SDCCH -- was not being sold by Andrew at the time.

- Conversely, Andrew did not need a license because what it was selling at the time -- UTDOA/TCH -- indisputably is not covered by the '144 patent.[13]

If Andrew ever did need a license in the future -- in the event the joint efforts to standardize UTDOA eventually succeeded and Andrew entered the UTDOA/SDCCH business -- Andrew had comfort that one would be available based on TruePosition's assurances.

**TruePosition's Silence Where There Was An Obligation To Speak.** TruePosition ultimately refused to license its '144 to Andrew or anyone else -- but it had the duty to say so during the standardization process, not wait to reveal that critical piece of information until after the industry had agreed to add UTDOA/SDCCH to the standard. That is what the ETSI IPR Policy requires for essential patents, and it has been TruePosition's steadfast belief that the '144 patent is essential to practicing UTDOA/SDCCH.

Furthermore, ETSI members like Andrew are entitled to rely on the ETSI IPR Policy and make appropriate inferences. If technology makes it into the standard, anyone may use it. A518:6-23; A187; A521:2-A522:14. That is because technology that an ETSI member refuses to license is supposed to be declared to ETSI, and is not added to the standard. A519:23-A520:22; A187; A522:20-A533:17. Thus, when UTDOA/SDCCH made it into the standard due to TruePosition's failure to declare the '144 patent, it was reasonable for Andrew to infer that it could sell UTDOA/SDCCH without fear of being sued by TruePosition. A523:19- A524:7.

---

[13] Indeed, TruePosition inserted in the settlement agreement a covenant not to sue for UTDOA/TCH that TruePosition knew Andrew did not need. As TruePosition's General Counsel explained: "We felt the voice control product they were licensing [*sic*, selling] at the time didn't cross our '144 patent, so we agreed to" give them the covenant not to sue. A374:14-24.

TruePosition's sole excuse at trial for not declaring its patent was that it covered only an option in the standard, not the standard as a whole. TruePosition's President and CTO testified that Andrew and the rest of the public were free to practice the other options in the standard -- only UTDOA/SDCCH was off-limits. *E.g.*, A109; A337:9-24; A357:13-20; A361:10-15.

TruePosition's position defies the text of the ETSI IPR Policy. The Policy explicitly defines essentiality with reference to whether a standard can be practiced without infringing a patent, and defines a standard as "including options therein." If a standard including its options -- not some or most of them, but ***all*** of them -- can be practiced without infringing a patent, the patent is not essential. If not, the patent is essential. At trial, TruePosition completely ignored the explicit reference to options in the ETSI IPR Policy. Not one witness said a word about it.

TruePosition's position also defies common sense. If, during standardization, TruePosition had revealed its position that only it would be able to practice UTDOA/SDCCH, and that everyone else should be content to practice the other options in the standard, why would any of the other companies have voted to standardize the UTDOA/SDCCH option? Indeed, as Andrew's standards representative Magnusson explained at trial, if everyone were to ignore the ETSI rules as TruePosition did, standardization would grind to a halt. For example, consider the situation where, as here, there are multiple technology options in the standard (*e.g.*, T1, T2, T3, and T4) covered by patents owned by four ETSI members (such that member 1 owns the patent on T1, member 2 owns the patent on T2, etc.). If each of the four members refuses to license its patent on the grounds that there are three other options that are not covered by that member's patent, the entire standard would be inaccessible to the public. A527:12- A529:18.

Tellingly, there was not a shred of evidence at trial that corroborated TruePosition's theory of essentiality for options. No internal memoranda saying that TruePosition did not have

35

to declare the '144 patent because UTDOA/SDCCH was just one option among others. No internal emails. Not even a response from anyone at TruePosition telling the Standards Manager he did not have to worry about an "IPR shell game" because the '144 patent would cover merely an option in the standard. There was no such evidence because TruePosition's position was created from whole cloth after this litigation began (and after Andrew filed its counterclaims) for the sole purpose of explaining away TruePosition's inequitable behavior.

The baselessness of TruePosition's "options are exempt" theory was confirmed beyond a shadow of a doubt by the letter the ETSI Director General sent to TruePosition following trial. A231-A232. The Director General confirmed that a patent that is "essential or potentially essential" to "options" must be declared to ETSI and is subject to the licensing requirements of ETSI. On that basis, the Director General gave TruePosition a three month deadline by which to state its preparedness to license the '144 patent if it believes that patent is essential to an option in the standard -- which belief TruePosition cannot now deny in view of its positions in this case.

The bottom line is that TruePosition had a duty to declare its '144 patent to ETSI during standardization, and had the duty to tell ETSI that it was not going to license that patent. But TruePosition stayed silent about its refusal to license, and instead assured the industry of the exact opposite -- that UTDOA would be for the benefit of all, and the '144 would be licensable by all. Andrew thus was reasonably led to infer that it would not be sued by TruePosition.

### 2. Relying On TruePosition's Conduct And Silence, Andrew Joined Forces With TruePosition To Get UTDOA/SDCCH Standardized And Successfully Bid On A Contract To Sell UTDOA/SDCCH Equipment

Quoting the Federal Circuit, this Court has explained what must be shown to establish reliance, the second element of equitable estoppel:

> "To show reliance, the infringer must have had a relationship or communication with the plaintiff which *lulls the infringer into a sense of security* in going ahead with" his or her activity.

36

*McKesson*, 426 F. Supp. 2d at 211 (*quoting Aukerman*, 960 F.2d at 1043). The evidence at trial established conclusively that TruePosition's statements and conduct gave Andrew the sense of security it needed to go ahead with its standardization and product development activities. Andrew knew about the TruePosition's statements and conduct, relied on them, and ultimately submitted a bid in response to the Saudi Telecom Request For Proposal.

Andrew's President and Standards Representative both testified that Andrew's reliance was the basis for Andrew's decision to help standardize UTDOA and invest in UTDOA products. They also confirmed the opposite -- that Andrew never would have helped standardize UTDOA if it had known that TruePosition would later try to block Andrew from selling what it had helped standardize. *See* § III.D above.

Andrew's decision to rely on TruePosition's statements and conduct resulted in a massive amount of joint activity and close collaboration between Andrew and TruePosition. Andrew expended enormous amounts of time and money to make technical contributions, lobby standards members around the world, and get UTDOA standardized. *See* § III.F above. In addition, Andrew contributed its good name, which appeared prominently on page one of numerous change requests to remind the industry at every 3GPP meeting that UTDOA was going to be a multi-vendor solution. A134-A186.[14]

The trial evidence also established that TruePosition needed Andrew's help to get UTDOA standardized. Working alone, TruePosition was unable to get the standards body to approve any changes to the standard. TruePosition also knew that getting Andrew involved

---

[14]    The evidence at trial dovetailed with this Court's findings on the pretrial record -- that Andrew "joined ETSI and worked extensively with plaintiff to get UTDOA standardized." *TruePosition*, 2007 WL 2482163, at *2.

would look good to the standards community and address its concern that UTDOA would be a single vendor solution.  Thus, when Andrew and TruePosition joined forces and their joint change requests started being approved, TruePosition did whatever it had to to keep Andrew in the fold.  *E.g.*, A129-A131.

Finally, "for equitable estoppel the alleged infringer cannot be unaware--as is possible under laches-- of the patentee and/or its patent."  *Aukerman*, 960 F.2d at 1042.  That is not disputed here.  Andrew knew about TruePosition and the '144 patent when it was deciding to help standardize UTDOA and develop UTDOA products.  *Compare* PTX 7 (A188-A190) (dated December 2000) *with* the decisions described in § III.D above (January 2003 and thereafter).

### 3.    Due To Its Reliance, Andrew Will Be Materially Prejudiced If TruePosition Is Allowed To Recover Damages On Its Claims And Enjoin Andrew From Practicing UTDOA/SDCCH

"Finally, the accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed.  As with laches, the prejudice may be a change of economic position or loss of evidence."  *Aukerman*, 960 F.2d at 1043.

Andrew agreed to help standardize UTDOA and undertook the massive effort to do so with one basic expectation -- that it would get to use the technology that it was helping to standardize.  If TruePosition is permitted to proceed with its infringement claim and injunction request, TruePosition will be able to sell equipment that uses the UTDOA/SDCCH technology that Andrew and TruePosition worked on together to standardize, but Andrew will not be able to do the same.  Helping to standardize technology that only its competitor can use does not benefit

Andrew in any way, shape, or form.  It represents a drastic change in economic position, and is

nothing but prejudicial to Andrew.[15]

On the other hand, if TruePosition is held to its pre-standardization representations --

namely, that everyone will benefit from the UTDOA solution that is created and that anyone can

have a license under the '144 patent on fair and reasonable terms -- TruePosition should receive

no more than a fair and reasonable royalty on sales of equipment found to infringe the '144

patent.  Based on the trial record, this amounts to $708,225, based on an application of the "25%

rule" that TruePosition's damages expert conceded as being "a method I have used, among

others, in calculating reasonable royalty."  A404:25- A405:6; A132; *see generally* A402:3-

A405:6.  According to TruePosition's expert, the 25% rule is a "valuable rule" that "suggests

that the licensee pay a royalty rate equivalent of 25 percent of its expected profits for the product

that incorporates the IP at issue."  A400:24-A401:4, A401:8.

### B.  TruePosition's Claims Should Be Barred Under The Doctrine Of Implied License

The Federal Circuit has recognized "different categories of conduct which lead to the

same conclusion:  an implied license." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d

1571, 1580 (Fed. Cir. 1997).  Specifically, "implied licenses arise by acquiescence, by conduct,

by equitable estoppel (estoppel in pais), or by legal estoppel." *Id.*

To establish an implied license by conduct, Andrew must prove by a preponderance of

the evidence that (1) a relationship existed between Andrew and TruePosition;  (2) within that

---

[15]  There is significant additional prejudice to Andrew that has been incurred, particularly the disruption to its business since TruePosition issued its cease and desist letters to Andrew, sued Andrew, and interfered with Andrew's business relationships in the marketplace. Andrew has also incurred attorneys fees and expenses in having to defend this lawsuit.

relationship, TruePosition granted to Andrew a right to use the patented '144 invention; (3) TruePosition received valuable consideration for that grant of right; (4) TruePosition denied that Andrew has an implied license; and (5) TruePosition's statements and conduct created the impression that TruePosition consented to Andrew's making, using, or selling TruePosition's patented inventions, including sales to customers other than TruePosition. *Id.* at 1579.

### 1. TruePosition Formed A Relationship With Andrew To Get UTDOA Into The Standard

The evidence at trial established that TruePosition and Andrew joined forces to advocate UTDOA standardization. Their multi-faceted relationship manifested itself in several ways.

First, both companies joined and participated in the TDOA System Study Group, a close collaboration of key industry players that worked on UTDOA technology with the goal of standardizing it such that they could all benefit from it. "Teamwork" was the foundation of the effort. A104. To that end, the Study Group members agreed to a set of Ground Rules specifying that they would "ask [one another] for help," "discuss with open minds," "say what we think," "share the overall responsibility by helping each other," and be "hard on the problem and soft on the people." A105. Thus, despite their recognition that they "to some extent are competitors," the members agreed to "all work with the understanding that what we do here is to create a solution that we all benefit from." *Id.*

TruePosition's President confirmed at trial that both Andrew and TruePosition "played an important role" in the Study Group. A309:4-7. In addition, the two companies enjoyed a collaborative relationship. Their standards representatives "shared our ideas regarding how we wanted to get UTDOA into the study as well as into the standard. We shared e-mails, conference calls, direct calls, and things of that nature." A450:14-A451:12.

The two companies' status as ETSI members also established a relationship between them. A8-A13, A79-A85. Upon signing and submitting the ETSI membership application form, a member establishes "a long-term partnership" with ETSI by which the member enjoys "all the rights and obligations laid down for Associate Members in the ETSI Statutes and Rules of Procedure …." A8. Some of the most important rights and obligations of ETSI membership are with regard to members' compliance with the IPR rules. See § III.C above. As a member of ETSI, Andrew had a right to expect other members of ETSI to live up to their obligations, including to declare any IPR that was or "might be" essential, on a good faith basis. A206.

Finally, as detailed in § III.F above, the two companies shared a close working relationship with the goal of standardizing UTDOA in 3GPP. From April 2003 to November 2004, TruePosition and Andrew worked on UTDOA technology and strategy together, attended 3GPP meetings together, and drafted and sponsored more than fifty change requests together. All of these efforts were based on the parties' intense and close cooperation and coordination by email, telephone, in-person meetings, and even instant messages during 3GPP meetings.

It was TruePosition's idea to have a close relationship with Andrew. TruePosition plotted internally on how to get Andrew involved in UTDOA standardization because it knew the industry was worried about a single-vendor UTDOA solution. See III.B above. Once it joined forces with Andrew, TruePosition cultivated their relationship and did what it had to in order to maintain the relationship and avoid any perception of a rift between them. A129-A131.

Their close relationship enabled the two companies to present a united front to the rest of the standards body, and TruePosition cannot seriously dispute this. TruePosition's Chief Technology Officer agreed that the two companies' standards representatives "met before the

standards meetings to unify their strategy that they would present together at the meetings."

A354:14-17. Likewise, Andrew's standards representative Magnusson explained:

> ***It was very important that the two UTDOA companies, TruePosition and Andrew, that we stood together in the standard body.*** ... So what we did was to make sure that what we introduced, that we were both in agreement, and then try to build a consensus around that.

A459:23- A460:7. The two companies' relationship thus exemplified, in Magnusson's words,

the very "definition of coordination."  A467:11-14.

## 2.    Within That Relationship, TruePosition Granted Andrew A Right To Use UTDOA/SDCCH

The second element of estoppel is that, within its relationship with the defendant, the

patentee must have granted the defendant a right to use the patented technology.  As the Supreme

Court made clear in *De Forest Radio Tel. Co. v. United States*, "[n]o formal granting of a license

is necessary in order to give it effect." 273 U.S. 236, 241 (1927).  Instead, "[a]ny language used

by the owner of the patent or any conduct on his part exhibited to another, ***from which that other***

***may properly infer that the owner consents*** to his use of the patent" gives rise to an implied

license. *Id.*

Two companies jointly working on technology is one type of conduct from which one

company can reasonably infer the consent of the other company to use a patent.  In *Lukens*, 197

F.2d at 940, Lukens agreed to design an engine structure for its customer Alco.  As it turned out,

"the engineering departments of both companies [Lukens and Alco] ... worked together in a

sincere effort to develop a satisfactory engine design." *Id.*  After the joint work was finished and

a successful engine block had been designed, Lukens revealed that it had a patent on the joint

design and sued Alco for infringing the patent. *Id.*

Citing the Supreme Court's decision in *De Forest*, the Second Circuit affirmed the

District Court's judgment "on the ground of implied license":

42

Lukens' presentation of the design to Alco for its acceptance and use *carried with it the intention* to make the grant effective and *to permit Alco to enjoy the full use* thereof. A grant necessarily carries with it that without which the thing granted cannot be enjoyed.

*Id.* at 941.

The situation here is at least as compelling as in *Lukens*. TruePosition and Andrew worked together in a sincere effort to develop a satisfactory UTDOA solution in the Study Group and again in 3GPP. They shared ideas, exchanged emails, participated in calls, and engaged in detailed discussions to develop the technology that they sought to standardize together, all in an atmosphere and with the expectation that they would both benefit. *See* § III.F above.

But here, the Study Group members went further than Lukens and Alco did. They entered into a mutual and explicit agreement to "create a solution that we all benefit from." A104-A105. Thus, like every other member of the Study Group, TruePosition agreed that Andrew (and every other Study Group member) would "enjoy the full use" of the jointly designed UTDOA solution. *Lukens*, 197 F.2d at 941. The Study Group was very much "a business relationship involving mutual confidence and mutual effort in which each party hoped to profit." *Lukens*, 99 F. Supp at 446. And the joint work "carried with it the intention" to permit Andrew to use the UTDOA technology to be standardized. *Lukens*, 197 F.2d at 941. As Andrew's President testified, "Certainly, no way would I have committed resources for this effort if we weren't going to be able to take advantage of the standard work, no." A542:2-7.

Likewise, the two companies' standardization efforts in 3GPP were made in the context of IPR rules that promote the use of the standardized technology by everyone. As discussed in Section III.E above and as explained by Andrew's standards representative Magnusson at trial, if technology that is added to a standard is not covered by a patent, it is available to everyone free of charge. And if it is covered by a patent, it is available to everyone on "fair and reasonable"

43

terms. On the other hand, if it is covered by a patent that the patent holder refuses to license on

fair and reasonable terms (or at all), the patent holder must declare to ETSI its unwillingness to

license pursuant to Section 8.1 of the ETSI IPR Policy -- in which case work on the standard

must "cease," so that the standard may be steered away from the blocked technology.

Andrew thus properly inferred that, because the UTDOA/SDCCH technology was added

to the standard without an "unwillingness to license" declaration from TruePosition, Andrew had

the right to use that technology by paying at most a fair and reasonable royalty rate. A530:19-

A532:18. It was also Andrew's expectation that it would be allowed to use what it had helped

standardize. A532:19-A533:3; A435:3-12; A542:2-7.

It was perfectly reasonable for Andrew to infer that it could use the UTDOA technology

because that was exactly the impression that TruePosition was trying to convey to the industry

by entering into its collaborative relationship with Andrew. As described in Sections III.A and

B, the whole point of involving Andrew was to give the industry the impression that there would

be multiple UTDOA vendors from whom they would be able to shop for equipment. Because

Andrew and TruePosition were the only two UTDOA vendors (A545:19-23), the only reasonable

inference is that both Andrew and TruePosition would be able to use the standardized

technology. Otherwise, there would be only one vendor for UTDOA/SDCCH -- the very

situation that TruePosition tried to assure the industry would not result.

Conduct like this, where TruePosition coaxed Andrew into helping it standardize

UTDOA and agreed that the Study Group's UTDOA solution would be for the benefit of all --

but then sued Andrew for infringing its UTDOA patent -- gives rise to an implied license. In

*Wang*, patentee Wang "tried to coax Mitsubishi into the SIMM market" to make SIMMs for

Wang based on technical designs provided by Wang. 103 F.3d at 1582. Wang tried to persuade

44

a standards body "to designate Wang's design a standard" and represented that "SIMM makers

could sell their products to third parties." *Id.* at 1575. But "Wang never informed Mitsubishi of

its patent applications, patents, or of any intent to execute a license or receive royalties until a

December 22, 1989 letter accusing Mitsubishi of infringing [its] patents." *Id.* at 1575-76.

The Federal Circuit affirmed the jury's verdict that the parties' course of conduct had led

Mitsubishi to infer consent to make and sell patented products, and in turn that Wang's conduct

had given rise to an implied license:

> Mitsubishi proved that the ***"entire course of conduct" between the parties over a***
> ***six-year period led Mitsubishi to infer consent to manufacture*** and sell the
> patented products.
> …
> The findings that Wang bestowed a "right to use the SIMM invention" and that
> Mitsubishi supplied valuable consideration to Wang, support our holding that
> ***Wang's conduct created a license***.

*Id.* at 1581-82. In so holding, the Federal Circuit relied on the "level of interaction between the

parties while Mitsubishi designed and made" the accused products, and concluded that:

> ***In sum, Wang consented to Mitsubishi's use of the invention***, granted the right
> to make, use, or sell the patented SIMMs without interference from Wang, and
> received consideration. Therefore, we agree with the district court's
> determination … that ***Mitsubishi possesses an irrevocable royalty-free license***
> under the '513 patent.

*Id.* at 1582. For the same reasons, Andrew properly inferred that it could use UTDOA/SDCCH.

### 3. TruePosition Received Valuable Consideration For The Grant Of The Right To Use UTDOA/SDCCH

As a vendor of UTDOA equipment, TruePosition valued having UTDOA standardized,

so it could make more money. As TruePosition's President testified:

> Q:    … ***It was TruePosition's desire to standardize U-TDOA into the ETSI***
> ***standard***, starting back in the beginning; is that right?
>
> A:    ***Yes.***

Q:    And TruePosition did, in fact, submit proposals to ETSI to standardize U-TDOA; right?

A:    Yes, we did.

Q:    And at the time, it was your hope that *by getting U-TDOA standardized, TruePosition would increase its sales; right?  That was your hope and expectation?*

A:    *Yes.*

A284:10-20.  TruePosition's Chief Technology Officer testified in accord.  A347:9-16.

But TruePosition was not able to achieve its goal without the various forms of valuable consideration that Andrew provided when it joined forces with TruePosition.  First, whereas TruePosition could not persuade 3GPP to approve a single one of its change requests when it was working alone, 3GPP approved many of the change requests that Andrew and TruePosition jointly sponsored and submitted.  *See* § III.F above.  Second, these change requests were based on the considerable engineering and other resources that Andrew expended to work on UTDOA.  *Id.*  Third, Andrew's agreement to be involved in the standardization effort dispelled the concerns of the industry, which was not interested in establishing a market where only one vendor could sell UTDOA in the future.  *See* § III.A above.

Thanks to the companies' joint efforts, TruePosition got what it wanted and UTDOA was standardized.  *Wang*, 103 F.3d at 1582 ("Wang received exactly the renumeration it desired ....").

#### 4.    TruePosition Denied That Andrew Has An Implied License

Paragraph 50 of Andrew's Answer And Counterclaim To TruePosition's Second Amended Complaint states:

> Andrew has an implied license under the 144 Patent and/or a right to license the 144 Patent under reasonable terms that are demonstrably free of any unfair discrimination.

(D.I. 48 at ¶ 50).  TruePosition pled an unqualified denial in response.  D.I. 53 at ¶ 50.

### 5. TruePosition's Statements And Conduct Created The Impression That It Consented To Andrew's Use Of UTDOA/SDCCH

The most direct evidence that TruePosition created the impression of consenting to Andrew's use of UTDOA/SDCCH is its desire to involve Andrew in the standardization effort to "have the *appearance* that, and … make the infrastructure vendors *believe* that U-TDOA is not a proprietary solution." A304:22-A305:5; *see also* A1-A3.

Moreover, the fifth element of implied license has been viewed as a factor that may be considered in determining whether the other four elements have been established:

> *In deciding* whether [Mitsubishi has] proved the existence of an implied license, *you may consider* statements and conduct of Wang from which one would reasonably infer Wang's consent to Mitsubishi's making, using, or selling products to persons other than Wang under the patents.

*Wang*, 103 F.3d at 1576 (brackets in original). Here, the proof for the fifth element overlaps considerably with the proof for the second element. The same statements and conduct of TruePosition that permitted Andrew to properly infer that TruePosition consented to its use of UTDOA/SDCCH in lieu of a "formal granting of a license," *De Forest*, 273 U.S. at 241 (what element 2 requires) *also* created the impression that TruePosition consented to that use (what element 5 requires). This is not surprising -- it is the creation of the impression by one party that allows the inference to be drawn by the other party.

Thus, the joint work of TruePosition and Andrew on UTDOA in the Study Group and in 3GPP, their mutual agreement to "create a solution that we all benefit from," the absence of a declaration of unwillingness to license the '144 patent per the ETSI IPR Policy, TruePosition's promises to the industry and Andrew, and -- as noted above -- TruePosition's attempts to create the "appearance" that a multi-vendor solution would result, all created the impression that Andrew would be able to use UTDOA once it was standardized.

47

**C.    TruePosition's Claims Should Be Barred Under The Doctrine Of Unclean Hands**

The Supreme Court has made clear that a plaintiff must come to Court with clean hands:

> "It is one of the fundamental principles upon which equity jurisprudence is founded, that *before a complainant can have a standing in court* he must first show that not only has he a good and meritorious cause of action, but *he must come into court with clean hands*."

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933) (citation omitted). "'The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or *who by deceit or any unfair means has gained an advantage*. To aid a party in such a case would make this court the abetter of iniquity.'" *Id.* at 245 (citation omitted).

The doctrine of unclean hands "is far more than a mere banality. It . . . closes the doors of a court of equity to one tainted with *inequitableness* or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "[W]hile equity does not demand that its suitors shall have led blameless lives . . . *it does require that they shall have acted fairly* and without fraud or deceit as to the controversy in issue." *Id.* at 814-15 (citations omitted). As a result, district courts have "wide discretion" to find a patent holder "remediless," and to dismiss a claim "for want of equity." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001).

Under these authorities, TruePosition's claims should be barred under the doctrine of unclean hands. By promising licenses to UTDOA/SDCCH when it was trying to get the industry to standardize that technology, but then refusing to license anyone once the industry agreed to standardize UTDOA/SDCCH, TruePosition used "unfair means" to "gain[] an advantage" in the marketplace. *Keystone Driller*, 290 U.S. at 245. TruePosition's gain is the public's loss. The

48

marketplace has deprived of the multi-vendor solution that it sought for agreeing to standardize technology covered by TruePosition's patent.

TruePosition also used unfair means in making a deliberate decision not to tell the standards body about its unwillingness to license the very UTDOA/SDCCH technology that it was advocating to be standardized. In particular, TruePosition ignored the command of the ETSI IPR Policy that patent essentiality is to be determined with respect to standards "including options therein." Make no mistake -- TruePosition simply ignores those words of the Policy. Instead, TruePosition substitutes its self-serving, litigation-inspired misreading of the IPR Policy to justify its deliberate decision not to declare its unwillingness to license. ETSI's recent letter to TruePosition is a categorical rejection of TruePosition's position that "options" are exempt from the IPR Policy. ETSI's Director General has given TruePosition three months to declare its willingness to license if TruePosition asserts, as it did repeatedly in this lawsuit, that its patent is essential to an "option" of the ETSI standard. A231-A232.

TruePosition's misconduct thus has given rise to a public standard with a land mine in it. Part of the standard is off-limits to everyone except TruePosition. In orchestrating this result, TruePosition has "gained an advantage" -- a monopoly position on UTDOA/SDCCH -- to the detriment of everyone else in the industry. *Keystone Driller*, 290 U.S. at 245. The fact that the public is harmed, and not just Andrew, makes unclean hands a particularly suitable remedy here:

> Moreover, *where a suit in equity concerns the public interest* as well as the private interests of the litigants *this doctrine [of unclean hands] assumes even wider and more significant proportions*. For if an equity court properly uses the maxim to withhold its assistance in such a case it *not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public*. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance.

*Precision Instrument*, 324 U.S. at 815 (citations omitted).

49

This Court should not enforce the patent-based monopoly on standardized technology that TruePosition has created for itself. Standards bodies like ETSI have rules to prevent the standardization of patented technology that a patent holder is unwilling to license. But the effectiveness of these policies depends on the good faith of the members who agree to abide by them. As an ETSI member, TruePosition has agreed to abide by the ETSI IPR Policy. It knew that it was bound by the IPR Policy. And the rest of the standards community, including Andrew, was entitled to rely on the absence of a declaration of an unwillingness to license, and the presence of TruePosition's promise to license in the Feasibility Study.

But the instant that Andrew -- the very company that TruePosition had used to give the industry the impression that a multi-vendor market would result -- won a UTDOA/SDCCH contract that TruePosition wanted for itself, TruePosition reversed course, filed this lawsuit, and revealed its intention to monopolize the market for UTDOA/SDCCH. TruePosition's unclean hands preclude its infringement claims against Andrew.

## V.    **CONCLUSION**

For the foregoing reasons, this Court should enter judgment for Andrew under the doctrines of equitable estoppel, implied license, and unclean hands. TruePosition should be barred from asserting any infringement claim against Andrew. In the alternative, TruePosition's recovery from Andrew should be limited to a fair and reasonable royalty, consistent with TruePosition's promise to license the industry on fair and reasonable terms at the time it sought industry support to standardize UTDOA.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ *Andrew A. Lundgren*
Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600
*alundgren@ycst.com*

*Attorneys for Defendant Andrew Corporation*

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: November 1, 2007

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on November 1, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

James D. Heisman, Esquire
Connolly, Bove, Lodge & Hutz
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
Email: jheisman@cblh.com

I further certify that on November 1, 2007, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY ELECTRONIC MAIL ON NOVEMBER 1, 2007
AND FEDERAL EXPRESS ON NOVEMBER 2, 2007**

Paul B. Milcetic, Esq. [pmbilcet@woodcock.com]
Daniel J. Goettle, Esq. [dgoettle@woodcock.com]
Woodcock Washburn LLP
Circa Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19103


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Andrew A. Lundgren*
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
alundgren@ycst.com
*Attorneys for Defendant Andrew Corporation*