## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **TRUEPOSITION, INC.,**<br><br>     **Plaintiff and<br>     Counterclaim-Defendant,**<br><br>     **v.**<br><br>**ANDREW CORPORATION,**<br><br>     **Defendant and<br>     Counterclaim Plaintiff.** | **Civil Action No. 05-00747-SLR** |

### ANDREW CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO
### TRUEPOSITION'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (No. 1088) [*jingersoll@ycst.com*]
Andrew A. Lundgren (No. 4429) [*alundgren@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: November 15, 2007

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................... 1

II.   NATURE AND STAGE OF THE PROCEEDINGS. ................................................. 3

III.  SUMMARY OF ARGUMENT.................................................................................. 4

IV.   COUNTERSTATEMENT OF FACTS. ..................................................................... 4

      A.   TRUEPOSITION'S INJUNCTION REQUEST IS AGAINST THE ETSI RULES.................... 4

      B.   TRUEPOSITION ALWAYS KNEW IT COULD NOT PROPOSE A STANDARDIZED
           OPTION AND THEN KEEP IT TO ITSELF................................................................ 6

      C.   TRUEPOSITION BELIEVED ALL ALONG THE '144 PATENT WAS ESSENTIAL
           TO THE UTDOA/SDCCH OPTION, BUT FAILED TO DECLARE THE PATENT. ......... 8

      D.   TRUEPOSITION CREATED THE PUBLIC IMPRESSION THAT IT WAS PLAYING
           BY ETSI'S RULES. ........................................................................................... 8

      E.   ANDREW INVESTED RESOURCES INTO STANDARDIZATION BASED ON
           TRUEPOSITION'S PROMISES TO LICENSE ESSENTIAL IPR. .................................. 10

      F.   TRUEPOSITION'S PLAN WORKED: SDCCH UTDOA WAS STANDARDIZED
           FOR GSM, AND NOW TRUEPOSITION WANTS THE MARKET ALL TO ITSELF. ......... 10

V.    LEGAL STANDARDS. ......................................................................................... 11

      A.   A PERMANENT INJUNCTION IS FAR FROM AUTOMATIC. ....................................... 11

      B.   THE PRACTICE OF STANDARDIZED TECHNOLOGY SHOULD NOT BE
           ENJOINED. ....................................................................................................... 13

           1.   Without Safeguards Such As Required Licensing for Essential
                Patents, Standards May Facilitate Anticompetitive Conduct.................... 15

           2.   TruePosition's "Patent Hold-Up" Is Antithetical to the Purpose of
                Standardization. ...................................................................................... 15

           3.   Standards Bodies Demand FRAND Promises to Avoid Patent
                Hold-Up.................................................................................................. 16

VI.   ARGUMENT ....................................................................................................... 18

      A.   THE EBAY FACTORS WEIGH AGAINST ENTERING A PERMANENT INJUNCTION
           AGAINST ANDREW. .......................................................................................... 18

           1.   TruePosition Will Not Be Irreparably Harmed If An Injunction
                Does Not Issue........................................................................................ 18

                a.   TruePosition Knew All Along That the UTDOA
                     Technology Was Supposed to be Multi-Vendor.......................... 19
                b.   TruePosition Promised to License the '144 Patent. ..................... 20
                c.   TruePosition Did Not Move For A Preliminary Injunction.......... 21
                d.   TruePosition's Arguments Are Unsupported and
                     Untenable. .............................................................................. 21

2.  TruePosition Has An Adequate Remedy at Law.................................... 24

    a.  TruePosition Knew All Along That the Standard Was
        Supposed to be Multi-Vendor...................................................... 24

3.  The Balance of Hardships Favors Andrew. ............................................. 26

    a.  TruePosition Calculated How to Best Eradicate the
        Peception that UTDOA Was Proprietary, and Induced
        Andrew to Rely. ....................................................................... 27

    b.  Andrew Investigated IPR Issues, Was Satisfied There Were
        None, and Invested a Great Deal of Time and Resources. ........... 28

    c.  Andrew Will Be Severely Harmed By An Injunction.................. 28

    d.  TruePosition's Arguments Have No Merit.................................. 29

4.  The Public Interest Weighs Against An Injunction Because An
    Injunction Would Constitute Patent Hold-Up. ....................................... 31

VII.  CONCLUSION ...................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
    486 U.S. 492 (1988) ........................................................... 15

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*
    456 U.S. 556 (1982) ........................................................... 15

*Broadcom Corp. v. Qualcomm Inc.*
    501 F.3d 297 (3d Cir. 2007) ........................................... passim

*Commonwealth Sci. and Indus. Research Org. v. Buffalo Tech. Inc.*
    492 F.Supp.2d 600 (E.D. Tex. 2007) .................................. 22

*Computrol, Inc. v. Lowrance Electronics, Inc.*
    893 F.Supp. 1440 (D. Idaho 1994) ..................................... 29

*Dell Computer Corp.*
    121 F.T.C. at 626 ....................................................15, 30, 33

*eBay Inc. v. MercExchange, L.L.C.*
    126 S.Ct. 1837 (2006) ................................................. 11, 12

*Foster v. American Mach. & Foundry Co.*
    492 F.2d 1317 (2d Cir. 1974) ....................................... 13, 25

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*
    49 F.3d 1551 (Fed. Cir. 1995) .......................................... 24

*IMX, Inc. v. LendingTree*
    LLC, 469 F.Supp.2d 203 (D. Del. 2007) ........................ 12, 20

*Innogenetics, N.V. v. Abbott Labs.*
    No. 05-C-0575-C, 2007 U.S. Dist. LEXIS, *56 (W.D. Wis. Jan. 3, 2007) ......................... 21

*MercExchange, L.L.C. v. eBay, Inc.*
    500 F.Supp.2d 556 (E.D. Va. 2007) ................................... 22

*MercExchange, L.L.C. v. eBay, Inc.*
    C.A. No. 2:01cv736, 2007 WL 2172587, *8-25 (E.D. Va., July 27, 2007).................... 12

*Monsanto Co. v. Scruggs*
    459 F.3d 1328 (Fed. Cir. 2006) ........................................ 11

*Muniauction, Inc. v. Thomson Corp.*
    502 F.Supp.2d 477, 483 (W.D. Pa. 2007) ........................... 21

*Paice LLC v. Toyota Motor Corp.*
    2006 WL 2385139, No. 2:04-CV-211-DF, 2006 WL 2385139, *4-5 (E.D. Tex.,
    Aug. 16, 2006) ............................................................................................... 12

*Praxair, Inc. v. ATMI, Inc.*
    479 F.Supp.2d 440 (D. Del. 2007) ............................................................... 12

*Rambus, Inc.*
    2006-2 Trade Cases P 75364, Docket No. 9302, 2006 WL 2330117 at 1 (F.T.C.,
    Aug. 2, 2006) ......................................................................................... 14, 31

*Rambus, Inc. v. Infineon Techs. AG*
    330 F.Supp.2d 679 (E.D.Va.2004) ............................................................... 32

*Ramp Research and Development, Inc. v. Structural Panels, Inc.*
    977 F.Supp. 1169 (S.D. Fla.,1997) ......................................................... 13, 25

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*
    758 F.2d 613 (Fed. Cir. 1985) ..................................................................... 13

*T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*
    821 F.2d 646, *Paice*, 2006 WL 2385139 at *4 ....................................... 20, 24

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*
    2006 WL 3813778, *5 (S.D. Tex. Dec. 27, 2006) ......................................... 21

*TruePosition Inc. v. Andrew Corp.*
    Civ. No. 05-747, 2007 WL 2482163, *2 (D. Del. Aug. 23, 2007) .................... 9

*United States v. Glaxo Group Ltd.*
    410 U.S. 52 (1973) ................................................................................. 13, 25

*Voda v. Cordis Corp.*
    C.A. 03-1512 WL 2570614, *6 (W.D. Okla. Sept. 5, 2006) ...................... 13, 25

*Windsurfing Int'l. Inc. v. AMF, Inc.*
    782 F.2d 995 (Fed. Cir. 1986) *cert. denied,* 477 U.S. 905 (1986) ................. 29

*z4 Technologies, Inc. v. Microsoft Corp.*
    434 F.Supp.2d 437 (E.D. Tex. 2006) ............................................................ 13

# I.    INTRODUCTION.

The Supreme Court's holding in *eBay* requires a patent owner to prove that it meets a four-part test to demonstrate a permanent injunction should issue in a patent case. No permanent injunction should issue unless the patent owner proves:

1.    irreparable injury;

2.    no adequate remedy at law;

3.    balance of hardships are in the patent owner's favor; and

4.    a permanent injunction will not disserve the public interest.

Here, TruePosition seeks to permanently enjoin Andrew from selling products that locate mobile phones using the UTDOA/SDCCH option in the GSM standard. TruePosition falls far short of satisfying the heavy burden required under *eBay*.

There can be no irreparable injury to TruePosition if a permanent injunction does not issue in this case. TruePosition pushed for years to make UTDOA/SDCCH part of the public GSM standard and knew all along that UTDOA/SDCCH was supposed to be a multi-vendor solution if included in the standard. Likewise, TruePosition has an adequate remedy at law if someone infringes the '144 patent by practicing the standardized UTDOA/SDCCH option. In fact, TruePosition promised early in the standardization process that it would license any patents relevant to the proposed standard on reasonable, non-discriminatory terms:

> TruePosition, Incorporated may hold one or more patents or copyrights that cover information contained in this document. A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

JA223 at 3.3.5.[1]  TruePosition's promise covers the '144 patent and the UTDOA/SDCCH option. JA220.

The balance of hardships here favors Andrew, not TruePosition.  Andrew is locked into practicing standardized technology, and the GSM standard now includes UTDOA/SDCCH location.  Andrew helped TruePosition get UTDOA standardized in the first place.  It would be inequitable for Andrew to be shut out of a standard and a market it helped create.  Moreover, the public interest would be disserved by allowing TruePosition to get a technical option into the GSM standard, and then turn around and bar others from practicing the option.  In fact, it is TruePosition's "patent hold-up" that disserves the public interest.  That is why the ETSI rules require TruePosition to license essential patents on reasonable, non-discriminatory terms.[2] EA207.

Enjoining the practice of standardized technology defeats the principles behind standardization.  As the former Chairman of the ETSI Board explains in his sworn declaration: "It is completely inappropriate for an ETSI member to seek an injunction that would prevent another company from using an option in a standard."  B19 at Para. 10.  Similarly, the former ETSI Director-General explains in his sworn declaration that:  "It is completely unacceptable under the ETSI IPR Policy not to notify ETSI of an IPR believed to be essential and then — later when the patented technology has become part of the standard — refuse to grant any licenses, or

---

[1]     All cross references to Andrew's Appendix to its Brief in Support of its Renewed Motions for Judgment as a Matter of Law are listed as "JA###."  All cross-references to Andrew's Appendix to its Brief in Support of its Remaining Equitable Defenses are listed as "EA###."

[2]     ETSI is the European Telecommunications Standards Institute, a standards body based in France. JA257:10-12. ETSI oversees a number of telecommunications standards.  JA265:20-A266:3. ETSI is the standards body TruePosition convinced to standardize UTDOA.

refuse to grant licenses under FRAND terms and conditions." B16 at Para. 12.[3] And, within weeks of TruePosition moving for a permanent injunction against Andrew, the current Director-General of ETSI wrote TruePosition reminding it of its IPR disclosure and licensing obligations, and inquiring into TruePosition's willingness to license the '144 patent in accordance with ETSI's rules. EA231-232.

The UTDOA/SDCCH option is supposed to be a multi-vendor solution. TruePosition's request for a permanent injunction flies in the face of the ETSI rules TruePosition agreed to in order to get the UTDOA/SDCCH option added to the GSM standard. TruePosition cannot satisfy the Supreme Court's *eBay* test, and its request for a permanent injunction should be denied.

## II.    NATURE AND STAGE OF THE PROCEEDINGS.

TruePosition filed this action against Andrew on October 25, 2005, alleging infringement of U.S. Patent No. 5,327,144. D.I. 1. Andrew filed counterclaims and affirmative defenses, including for non-infringement, fraud, promissory estoppel, equitable estoppel and implied license. D.I. 13; D.I. 38. On September 14, 2007, a jury returned a verdict for TruePosition and awarded TruePosition $45.3 million in "lost profits" damages. D.I. 292. Andrew has moved for judgment as a matter of law or, alternatively, a new trial. D.I. 327. The parties currently are briefing Andrew's JMOL motions. The jury did not decide Andrew's claims of equitable estoppel, unclean hands and implied license; those remain to be decided by the Court. JA237:11-238:16. This brief responds to TruePosition's motion for permanent injunctive relief. D.I. 316, 317.

---

[3]    FRAND is an acronym for "fair, reasonable, and non-discriminatory."

### III.     SUMMARY OF ARGUMENT.

TruePosition's motion for a permanent injunction should be denied because all four *eBay*

factors weigh against such relief.  Indeed:

1. TruePosition will not be irreparably harmed if an injunction does not issue, as, *inter alia*, it knew all along that standards are not supposed to be proprietary;

2. TruePosition has an adequate remedy at law, in the form of the license it promised to provide on fair, reasonable, and non-discriminatory terms;

3. the balance of hardships favors Andrew, which is currently locked into practicing standardized technology that includes SDCCH UTDOA, by TruePosition's design; and

4. the public interest against "patent hold-up" weighs against an injunction.

### IV.     COUNTERSTATEMENT OF FACTS.[4]

#### A.     TRUEPOSITION'S INJUNCTION REQUEST IS AGAINST THE ETSI RULES.

On October 19, 2007 — less than three weeks after TruePosition moved for a permanent

injunction — the current Director-General of ETSI wrote TruePosition noting ETSI's

understanding that  TruePosition might have IPR that is essential to an "option" in the standard.

A231-A232.  The Director General specifically asked TruePosition whether it is "prepared to

grant licenses for this/these IPR(s), in accordance with the terms and conditions set out in Clause

6.1 of the ETSI IPR Policy."   EA231-232.  Clause 6.1 provides:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

---

4   The relevant facts are discussed at length in Andrew's "Opening Brief in Support of Its Renewed Motions for Judgment as a Matter of Law or Alternatively, a New Trial" (D.I. 327) and Andrew's "Post-Trial Opening Brief in Support of Its Remaining Equitable Defenses" (D.I. 325).  They are briefly summarized here.

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
- repair, use, or operate EQUIPMENT; and
- use METHODS.

EA207.

In addition, former ETSI officials state in sworn declarations (B15-B20) that a request for a permanent injunction is inconsistent with the ETSI rules. First, the Former Chairman of the ETSI Board states, *inter alia*:

- "it is and has been a fundamental principle of ETSI standardization that anyone can use technology that has been incorporated into an ETSI Standard or an ETSI Technical Specification." (B18 at Para. 5)[5];

- "ETSI has rules to prevent the standardization of patented technology that a patent holder is unwilling to license." (B18 at Para. 6);

- "[i]t does not matter whether the technology is minor or substantial [or] whether the technology is mandatory or optional to the ETSI Standard or ETSI Technical Specification." (B18 at Para. 5); and

- "[n]o part of a public standard may be off-limits to some but accessible to others." (B18 at Para. 5).

The former Chairman also specifically states:

It is against the fundamental principles of standardization for an ETSI member to obtain a monopoly position on an option in the Standard. ***It is completely inappropriate for an ETSI member to seek an injunction that would prevent another company from using an option in a Standard***.

(B19 at Para. 10) (emphasis added).

---

[5] The original copies of the attached declarations from the current and former ETSI Director-General are currently en route by courier, and will be provided to the Court upon arrival from Europe.

Likewise, the former Director-General of ETSI declares, *inter alia*, that a key objective of the ETSI IPR Policy was to "ensure that ETSI standards would be accessible by everyone."  B15 at Para. 8.  More specifically:

> licenses had to be available to everyone (whether or not an ETSI member) to implement any mandatory or optional feature in a standard.  It was a central goal of the ETSI IPR Policy to ensure that IPR owners could not demand excessive license fees or block others from using their IPR once their IPR was included in the standard.

B15 at Para. 8; *see also id.* at Para. 10 (essential IPR should be available to everyone on FRAND terms and conditions); *id.* at Para. 11 (members must notify ETSI of essential IPR and a willingness (or unwillingness) to license that IPR on FRAND terms); *id.* at Paras. 13-14 (the IPR Policy is equally applicable to options).

### B.   TRUEPOSITION ALWAYS KNEW IT COULD NOT PROPOSE A STANDARDIZED OPTION AND THEN KEEP IT TO ITSELF.

At the beginning of each meeting of the standards body, the presiding Chairman makes a "Call for IPRs" and asks the ETSI members to check the latest version of ETSI's IPR policy available on ETSI's web server.  *See* EA95; JA535:1-538:20.  The IPR call is done to remind ETSI members such as TruePosition of their disclosure obligations.  B15-19.  The IPRs are a very serious matter, because no one wants to be blindsided by an undeclared IPR that is later argued to be necessary to practice standardized technology.  EA531:3-532:3; EA519:24-520:22; JA882:1-22.

When TruePosition began to lobby for UTDOA standardization in approximately 2000, ETSI members were "skeptical" of TruePosition's proposal.  EA113.  They were concerned that UTDOA was a "proprietary" technology — *i.e.,* that TruePosition was the only vendor.  EA114; EA287:7-16; EA301:10-22; EA304:22-305:5; EA133.  This perception was a problem because wireless operators, the carriers, and end customers always want to have multiple vendors for the

same technology. EA328:9-17; *see also* EA294:19-20. TruePosition admitted multiple vendors are preferred because it provides choices and fosters competition. EA328:9-17.

The desire for multi-vendor technology is a requirement embodied in the fundamental ETSI IPR tenet that a party participating in the standardization process must be willing to license its essential IPR on "fair, reasonable and non-discriminatory terms and conditions." EA207. This is so important that if a party is unwilling to license essential IPR, all work on the standard at issue must "cease" to give the standards body the opportunity to steer the standard away from that IPR. EA208.

Not surprisingly, therefore, the requirement to declare essential IPR extends to "options within a standard." EA211-EA212; *see also* B18-19 at Para. 8-11; B16 at Para. 13-14. An option is a choice within the standard as to how to implement a particular technology. *Id.* ETSI's IPR Policy is triggered every time a technical proposal is submitted, including for an option. EA206.

TruePosition's internal documents introduced at trial show that it believed both that: (a) it needed to eliminate the perception that UTDOA is a proprietary technology; and (b) working with Andrew (and creating the impression that Andrew also would be a UTDOA vendor) would help persuade the standards body to standardize UTDOA. EA86; JA91-93; JA1-3; JA4-6; *see also* EA510:9-18 (Andrew's standards representative's trial testimony regarding why standardization goes more smoothly when more than one vendor is advocating the technology); *see also* EA129 (TruePosition's standards manager: "Andrew's support is key to our continued standards progress moving forward"). TruePosition was correct. The joint work between TruePosition and Andrew assured ETSI that TruePosition and Andrew "stood together in the

standard body" and that the technology would be multi-vendor.   EA459:23-460:7; EA465:2-10; EA467:4-10.

### C.     TRUEPOSITION BELIEVED ALL ALONG THE '144 PATENT WAS ESSENTIAL TO THE UTDOA/SDCCH OPTION, BUT FAILED TO DECLARE THE PATENT.

From the time it began the standardization process, TruePosition always interpreted the '144 patent to cover the UTDOA/SDCCH option it was trying to standardize.   JA289:7-11; JA335:21-24; JA277:23-278:1; JA286:9-17; JA269:18-21.  Indeed, TruePosition admitted at trial that "it is…TruePosition's position, that the '144 is essential to that option in the standard." JA289:7-11;   *see also*   JA1;   JA416:11-25;   EA321:3-7;   EA282:11-13;   EA320:13-EA321:2, EA321:21-24; EA272:7-11.  It is uncontested that TruePosition intentionally never declared the '144 patent as essential to the standard, or informed anyone about its interpretation of the patent. JA451:18- JA452:3; EA271:8-11; EA276:16-20; EA273:21-23.

### D.     TRUEPOSITION CREATED THE PUBLIC IMPRESSION THAT IT WAS PLAYING BY ETSI'S RULES.

TruePosition bent over backwards to eliminate the perception that UTDOA is proprietary technology.  At the outset, TruePosition's senior management prepared a "UTDOA in GSM and GPRS Feasibility Study" that included UTDOA/SDCCH location.   EA213-219;  *see also* EA248:19-249:2; EA349:13-20.  TruePosition knew the Feasibility Study was crucial to the success of its standardization efforts.  EA117.  TruePosition expressly promised in the Feasibility Study to license the industry under any relevant patents it had, on reasonable terms and conditions demonstrably free of unfair discrimination.  *See* EA219 ("TruePosition, Incorporated may hold one or more patents or copyrights that cover information contained in this document. A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.");  *see also* EA289:2-14; EA254:4-11; EA260:15-24; EA253:16-23; EA350:17-24.   TruePosition circulated the Feasibility Study

widely, to "all of the 3GPPP [*sic*] body."   EA261:2-3; *see also* EA253:3-4; EA260:25-261:1; EA252:13-14.[6]

TruePosition also participated in a "study group."  The "participating companies were jointly going to work towards the goal of getting — obtaining or getting UTDOA into the GSM standard." EA444:1-6.  The study group had the same IPR goals and policies as ETSI — indeed, the study group participants, including TruePosition, operated under a set of Ground Rules to ensure several things, including "openness" and "information sharing."   EA447:21-448:3.  One of the Ground Rules was to create a solution that ***all*** of the participants would benefit from. EA104-105; *see also* EA313:2-7.  TruePosition admits it knew the Ground Rules.  EA310:14-21; EA447:4-12.

Furthermore, because it needed Andrew to eliminate the perception that UTDOA is a proprietary technology, TruePosition never revealed to Andrew that Andrew would get sued for practicing  UTDOA/SDCCH.     Instead,  TruePosition  worked  closely  with  Andrew  for approximately a year and a half to get UTDOA standardized for GSM, saying nothing about any intentions to assert the '144 patent.   *See* JA332:1-333:10; JA453:21-454:2; JA409:21-410:22; JA884:14-888:21.   *See also TruePosition Inc. v. Andrew Corp.*, Civ. No. 05-747, 2007 WL 2482163, *2 (D. Del. Aug. 23, 2007).

All the while, TruePosition ignored the explicit recommendation of its standards manager (Rhys Robinson) to declare the '144 patent.  *E.g.,* EA122-124; EA125-127.  Mr. Robinson urged TruePosition to disclose its essential IPR and not play an "IPR shell-game."  EA128.

---

[6]     3GPP is a partner in ETSI and is responsible for overseeing GSM standards.  JA265:15-19.

E.    ANDREW INVESTED RESOURCES INTO STANDARDIZATION BASED ON TRUEPOSITION'S PROMISES TO LICENSE ESSENTIAL IPR.

Andrew joined forces with TruePosition and worked hard to get UTDOA standardized. EA79-85; EA298:18-21; EA435:3-12; EA440:21-441:2; EA541:17-542: 7. Andrew did this for a reason — so it could benefit from UTDOA.

But Andrew did not just blithely walk into the standardization process. Rather, Andrew investigated potential IP issues, and relied on, *inter alia*, TruePosition's promise to license in the Feasibility Study and the Study Group Ground Rules to conclude it was safe to proceed. *See* EA428:17-429:2; EA429:10-430:25; EA435:20-438:10; EA279:13-14; EA431:14-432:12; EA476:19-477:5; EA450.1:14-18; EA432:23-434:3.

It is uncontested that the end result of Andrew's investigation was to agree to invest resources in UTDOA standardization. EA434:25-435:2. Indeed, the evidence is overwhelming that Andrew and TruePosition developed the standard together. They strategized constantly, traveled all over the world, attended meeting after meeting of the standards body, and submitted multiple change requests as co-sponsors. EA133, EA456:15-EA458:16; EA353:24-EA354:13; EA316:22-25; EA355:13-18; EA459:14-22; EA317:1-5; EA461:3-25; EA471:19-EA473:5; EA134-EA186; EA494:14-EA507:5; EA389:1-4; EA392:19-22; EA393:18-EA394:3. Andrew even shared ideas generated by its engineers with TruePosition. EA460:8-17.

TruePosition never told Andrew during the standardization process that it would not license its '144 patent or that it would object to Andrew practicing UTDOA on an SDCCH. EA531:3-7.

F.    TRUEPOSITION'S PLAN WORKED: SDCCH UTDOA WAS STANDARDIZED FOR GSM, AND NOW TRUEPOSITION WANTS THE MARKET ALL TO ITSELF.

It is uncontested that UTDOA was standardized for GSM and GPRS on November 12, 2004. EA6-7; EA134-186; EA316:5-13; EA507:6-7. It is also uncontested that this occurred due to TruePosition's and Andrew's joint efforts. EA318:7-10.

After UTDOA using an SDCCH channel was successfully incorporated into the standard, TruePosition took action to eliminate Andrew from the competition to ensure there would be no multi-vendor UTDOA solution — the one thing it knew the industry had demanded as a prerequisite to standardizing UTDOA.

It is uncontested that TruePosition filed this lawsuit to stop Andrew from "doing U-TDOA on the SDCCH channel." EA322:12-14; *see also* EA322:19-24; EA336:2-5; EA349:17-24. The suit hugely disrupted Andrew's business, harmed Andrew's reputation, and caused Andrew to have to pay substantial attorneys' fees.

And TruePosition now seeks a permanent injunction to stop Andrew from ***ever*** selling standardized idle-mode UTDOA products. D.I. 316. Indeed, TruePosition has made it clear that it will not offer any other vendor a license — and that if it has its way, there will be no multiple vendor UTDOA solution. EA191-192; *see also* EA241:11-18; EA196-197; EA282:19-23.

## V.    LEGAL STANDARDS.

### A.    A PERMANENT INJUNCTION IS FAR FROM AUTOMATIC.

The Supreme Court's holding in *eBay Inc. v. MercExchange, L.L.C.* "requires courts to consider the standard four part test for permanent injunctions in patent cases and reverses [the Federal Circuit's] traditional rule that 'courts will issue permanent injunctions against patent infringement absent exceptional circumstances.'" *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1342 (Fed. Cir. 2006). When a patent owner seeks a permanent injunction, the patent owner must now "demonstrate:

      1.     that it has suffered an irreparable injury;

2.    that remedies available by law, such as monetary damages, are inadequate to compensate for that injury;

3.    that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

4.    that the public interest would not be disserved by a permanent injunction."

*eBay Inc. v. MercExchange, L.L.C.,* 126 S.Ct. 1837, 1839 (2006).

There no longer is a "presumption that a patent holder is irreparably harmed upon a finding of infringement." *IMX, Inc. v. LendingTree*, LLC, 469 F.Supp.2d 203, 224-35 (D. Del. 2007) (discussing the "now-overturned presumption that a patent holder is irreparably harmed upon a finding of infringement" and denying plaintiff's motion for a permanent injunction without prejudice to renew); *see also Praxair, Inc. v. ATMI, Inc.*, 479 F.Supp.2d 440, 443 (D. Del. 2007) (C. J. Robinson) (denying motion for permanent injunction and holding: "Under *eBay*, a plaintiff must prove that it is entitled to its statutory right to exclude by demonstrating, *inter alia*, irreparable injury and the inadequacy of legal remedies."); *see also MercExchange, L.L.C. v. eBay, Inc*., C.A. No. 2:01cv736, 2007 WL 2172587, *8-25 (E.D. Va., July 27, 2007) (denying permanent injunction on remand despite jury verdict of willful infringement) (citing and discussing *Praxair*); *Paice LLC v. Toyota Motor Corp.*, 2006 WL 2385139, No. 2:04-CV-211-DF, 2006 WL 2385139, *4-5 (E.D. Tex., Aug. 16, 2006) (denying permanent injunction where patentee failed to "establish that it will be irreparably harmed absent an injunction"), *aff'd* 2007 WL 3024994 (Fed. Cir., Oct. 18, 2007).

The Federal Circuit has held that an ongoing royalty typically suffices to make the patentee whole, especially where anti-competitive conduct is involved. *Paice*, 2007 WL 3024994 at *16 ("Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."). For example, "[i]n the context of an antitrust violation, 'mandatory sales and reasonable-royalty licensing' of relevant patents are

12

'well-established forms of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation.'" *Id*. (*citing United States v. Glaxo Group Ltd.*, 410 U.S. 52, 59 (1973)). Indeed, "there [i]s no dispute as to the district court's authority to craft such a remedy." *Paice*, WL 3024994 at *16; *see also Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 627 (Fed. Cir. 1985) (affirming award of a royalty for "continuing operations"); *Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974) (affirming decision to deny permanent injunction and award prevailing patentee "a compulsory license with royalties"); *Ramp Research and Development, Inc. v. Structural Panels, Inc.*, 977 F.Supp. 1169, 1179 (S.D. Fla.,1997) (denying permanent injunction because "a compulsory license would be more equitable); *Voda v. Cordis Corp.*, C.A. 03-1512, 2006 WL 2570614, *6 (W.D. Okla. Sept. 5, 2006) (denying permanent injunction and ordering defendant to perform quarterly reporting in light of jury award of reasonable royalty); *z4 Technologies, Inc. v. Microsoft Corp.*, 434 F.Supp.2d 437 (E.D. Tex. 2006) (denying permanent injunction and finding that future infringements can be based on reasonable royalty calculation).

## B.   THE PRACTICE OF STANDARDIZED TECHNOLOGY SHOULD NOT BE ENJOINED.

In a decision issued September 4, 2007, the Third Circuit explored the policies behind standard-setting and the ramifications of proprietary technology making its way into an industry standard. *See Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297 (3d Cir. 2007). The Third Circuit held that: "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with a [standards body's] reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." *Id.* at 314; *see also In re Rambus, Inc.*, 2006-2 Trade Cases P 75364,

13

Docket No. 9302, 2006 WL 2330117 at 1 (F.T.C., Aug. 2, 2006) ("Standard setting occurs in many industries and can be highly beneficial to consumers.").

The Third Circuit emphasized that "in the end-consumer market, standards that ensure the interoperability of products facilitate the sharing of information among purchasers of products from competing manufacturers, thereby enhancing the utility of all products and enlarging the overall consumer market." *Broadcom,* 501 F.3d at 308;[7] *see also Rambus*, 2006 WL 2330117 at 4 ("Standards can facilitate interoperability…which typically increases the chances of market acceptance, makes the products more valuable to consumers, and stimulates output.").

The Third Circuit further noted in *Broadcom* that "[e]ach [standards-body] has policies in place to require competing firms to disclose all relevant patents and licensing commitments. Such policies facilitate an informed comparison of the firms and their technologies, and are part of an effort to preserve the competitive benefits of *ex ante* technology competition."[8] *Broadcom,* 501 F.3d at 309 (quotation omitted). As the *Broadcom* Court pointed out, standards bodies want

---

7  To support its analysis, the Third Circuit cited to Supreme Court caselaw and Department of Justice submissions, including *Allied Tube*, 486 U.S. at 501, 506-07, 108 S.Ct. 1931 (noting the procompetitive benefits of private standard setting); AREEDA & HOVENKAMP, (referring to the foregoing benefits as "network externalities"); LETTER FROM THOMAS O. BARNETT, ASSISTANT ATTORNEY GEN., ANTITRUST DIV., DEP'T OF JUSTICE, TO ROBERT A. SKITOL, ESQ. (Oct. 30, 2006), available at 2006 WL 3326742; DEBORAH PLATT MAJORAS, CHAIRMAN, FED. TRADE COMM'N, RECOGNIZING THE PROCOMPETITIVE POTENTIAL OF ROYALTY DISCUSSIONS IN STANDARD SETTING, REMARKS (Sept. 23, 2005), available at 2005 WL 2406107, at *1; GERALD F. MASOUDI, DEPUTY ASSISTANT ATTORNEY GEN., ADDRESS AT THE HIGH-LEVEL WORKSHOP ON STANDARDIZATION, IP LICENSING, AND ANTITRUST, TILBURG LAW & ECONOMICS CENTER, TILBERG UNIVERSITY (Jan. 18, 2007), available at 2007 WL 969967, at *3; BR. OF AMICI CURIAE AMERICAN ANTITRUST INSTITUTE AND CONSUMER FEDERATION OF AMERICA at 18; BR. OF AMICI CURIAE THE INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INC. ET AL. at 17-18.

8  The Third Circuit cited standards-body amici — IEEE Br. 10 (IEEE Standards Association) and 12 (VITA Standards Organization) and 16 (OASIS Open (Organization for the Advancement of Structured Information Standards) — who explained the competition that occurs between firms in the telecommunications standard-setting process).

to "make an objective comparison between competing technologies, patent positions, and licensing terms *before* an industry becomes locked in to a standard." *Id*.[9] (emphasis added).

### 1.    Without Safeguards Such As Required Licensing for Essential Patents, Standards May Facilitate Anticompetitive Conduct.

"[P]rivate standard-setting…is permitted…only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits." *Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492, 506-507 (1988). This is because "a standard-setting organization…can be rife with opportunities for anticompetitive activity." *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp*., 456 U.S. 556, 571 (1982); *see also In re Dell Computer Corp.*, 121 F.T.C. 616, 626 (F.T.C. 1996) ("a standard setting organization may provide a vehicle for a firm to undermine the standard-setting process in a way that harms competition and consumers."); *Rambus*, 2006 WL 2330117 at 4 ("[W]hen a firm engages in exclusionary conduct that subverts the standard-setting process and leads to the acquisition of monopoly power, the procompetitive benefits of standard setting cannot be fully realized."). There must be "meaningful safeguards" that "prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Allied Tube,* 486 U.S. at 501; *Am. Soc. of Mech. Eng'rs, Inc.*, 456 U.S. at 572.

### 2.    TruePosition's "Patent Hold-Up" Is Antithetical to the Purpose of Standardization.

When a patented technology is incorporated into a standard, adoption of the standard eliminates alternatives to the patented technology. *Broadcom,* 501 F.3d at 314. When a patent becomes necessary to practice a standard, the patent's value becomes significantly enhanced

---

9    Citing AAI/CFA Br. 19.

because companies are then locked into a standard requiring the use of a competitor's patented technology. *Id.* at 309. This is called 'patent hold-up," and the *Broadcom* Court summarized some of the problems it causes:

> An SDO [standards-determining organization] may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. ***When this occurs, the patent holder is in a position to "hold up" industry participants from implementing the standard.*** Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard.

*Id.* at 310[10] (emphasis added). *See also Rambus*, 2006 WL 2330117 at 23 ("[E]arly disclosure of intellectual property helped to identify potential hold-up situations while there still was time to avoid the problem.").

### 3.     Standards Bodies Demand FRAND Promises to Avoid Patent Hold-Up.

To avoid hold-up, many standards bodies prefer to have standards that incorporate non-proprietary technology. *See, e.g., In re Dell*, 121 F.T.C. at 623-24 (policy requiring disclosure of IPR is "designed to further VESA's strong preference for adopting standards that do not include proprietary technology"; "had VESA known of the Dell patent, it could have chosen an equally effective, non-proprietary standard."). In addition, "most [standards bodies] require firms supplying essential technologies for inclusion in a prospective standard to commit to

---

10   *Citing Rambus,* 2006 WL 2330117 at 4; SKITOL LETTER, supra, at 8; MAJORAS at *1; MASOUDI at *3; *Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451, 476 (1992) (describing the lock-in that causes purchasers of expensive office equipment to tolerate supracompetitive service prices before changing brands); *Qualcomm Inc. v. Broadcom Corp*., No. 05-CV-1958-B, 2007 WL 2296441 at *34 (S.D. Cal. Aug. 7, 2007) (characterizing such conduct as an attempt at "holding hostage the entire industry desiring to practice the ... standard").

licensing their technologies on FRAND terms." *Broadcom,* 501 F.3d at 313;[11] *see also Rambus*, 2006 WL 2330117 at 4 ("Many SSOs have taken steps to mitigate the risk of hold-up…requir[ing] their members to reveal any patents and/or patent applications that relate to the standard…requir[ing] members to commit to license their patented technologies on reasonable and nondiscriminatory ([F]RAND) terms"); *see also* B18 at Para 6.

A company's FRAND commitment is an important factor that a standards body considers when "evaluating the suitability of a given proprietary technology vis-a-vis competing technologies." *Broadcom,* 501 F.3d at 313; s*ee also Rambus*, 2006 WL 2330117 at 4 (a commitment to license on FRAND terms may further "inform SSO members' analysis of the costs and benefits of standardizing patented technologies."). Indeed, a FRAND commitment, or lack thereof, is a key indicator of the cost of implementing a potential technology. *Broadcom,* 501 F.3d at 313*; Rambus,* 2006 WL 2330117 at 16 (noting that predisclosure of IPRs enables standards bodies "to make their choices with more complete knowledge of the consequences").

ETSI has a FRAND requirement for its members. EA207 at Para. 6; B18 at Para. 6 ("ETSI has rules to prevent the standardization of patented technology that a patent holder is unwilling to license. Patented technology that an ETSI member or associate member is unwilling to license must be declared to ETSI in a timely manner, and may not be added to the standard if the ETSI member remains unwilling to license its patent."); B16 at 11-12; EA231-232; s*ee also Broadcom.,* 501 F.3d at 304 ("[g]iven the potential for owners of IPRs…to exert undue control over the implementation of industry-wide standards, the ETSI requires a

---

11  Citing "E.g., IEEE Br. 9 & n. 13 (stating that under IEEE bylaws, the absence of irrevocable FRAND assurances will preclude approval of standards known to incorporate essential, proprietary technologies)".

commitment from vendors whose technologies are included in standards to license their technologies on fair, reasonable, and non-discriminatory ("FRAND") terms.").

Andrew requests that TruePosition be required to follow the ETSI rules and not be allowed to forbid others from practicing technology TruePosition deems essential to an option in the GSM standard.

## VI.    ARGUMENT

### A.    THE *EBAY* FACTORS WEIGH AGAINST ENTERING A PERMANENT INJUNCTION AGAINST ANDREW.

An injunction barring Andrew from practicing any part of the GSM standard is not warranted.  First, TruePosition's lobbying for the world-wide standardization of UTDOA and its promise to license any implicated patents shows that TruePosition will not be irreparably harmed if Andrew is allowed to practice standardized UTDOA, including SDCCH UTDOA.  Second, TruePosition's standardization activities and its promise to license show that monetary damages are adequate to compensate it.  Third, TruePosition's standards-related conduct, its inducement of Andrew to help standardize UTDOA, and Andrew's reliance and expenditure of resources show that the balance of hardships weighs in Andrew's favor.  Fourth, an injunction is against the public interest because it would be fundamentally inconsistent with the purpose of standardization, and will have anticompetitive effects.  Indeed, the inequitable nature of a permanent injunction is further demonstrated by the sworn declarations of former ETSI officials and the fact that ETSI has requested that TruePosition disclose its willingness to license the '144 patent on FRAND terms.

### 1.    TruePosition Will Not Be Irreparably Harmed If An Injunction Does Not Issue.

There will be no irreparable harm to TruePosition if this Court does not enter an injunction. This is shown by several undisputed facts: (a) TruePosition's voluntary push to make SDCCH UTDOA part of the public GSM standard; and (b) TruePosition's promise to license any applicable patents; and (c) TruePosition's failure to move for a preliminary injunction. TruePosition has no valid argument in favor of granting an injunction.

        *a.*    *TruePosition Knew All Along That the UTDOA Technology Was Supposed to be Multi-Vendor.*

The record is undisputed that TruePosition knew all along that the GSM UTDOA standardized technology was supposed to be accessible to multiple vendors. Indeed, TruePosition internal documents introduced at trial are unequivocal that it needed UTDOA to be perceived as multi-vendor to get it added to the GSM standard:

- DTX 901 (JA91-93) ("acceptance of U-TDOA into the GERAN specs depends on it being a 'Multi-vendor' system");

- DTX 224 (JA52-55) ("it will help our cause in getting U-TDOA standardized if we report that we are collaborating with Grayson (Because then the major infrastructure vendors will believe that U-TDOA is NOT a proprietary solution");

- DTX 44 (JA2-3) and DTX 45 (JA4-6) ("You might consider adding a term to the Grayson license agreement that has Grayson joining the 3GPP and actively promoting/contributing to the standardization of U-TDOA….it will eliminate a perception/concern that U-TDOA is a proprietary technology….").

*See also* EA113-115; EA287:7-16; EA301:3-22; EA304:22-305:5; EA133; EA427:11-428:11.

In sum, TruePosition lobbied ETSI for years to include UTDOA into a world-wide public standard with the full knowledge that standardized technology is supposed to be multi-vendor. TruePosition cannot now be heard to complain it will be irreparably harmed if other vendors are allowed to practice the standardized technology. Indeed, if TruePosition did not want others to practice standardized UTDOA, it should not have pushed for its inclusion into the world-wide GSM standard.

19

b.     *TruePosition Promised to License the '144 Patent.*

At the outset, to eliminate the perception it would try to keep the standardized technology

for itself, TruePosition explicitly promised to license any applicable patents on FRAND terms:

> TruePosition, Incorporated may hold one or more patents or copyrights that cover
> information contained in this document. **A license will be made available** to
> applicants under reasonable terms and conditions that are demonstrably free of
> any unfair discrimination.

EA219 (emphasis added); *see also* EA289:2-14; EA254:4-11. TruePosition never retracted its

promise during the standardization process. TruePosition's willingness[12] to promise a license

under its patents confirms it will not be irreparably harmed if Andrew is not enjoined from

practicing technology covered by the standard it helped create. *See IMX, Inc.,* 469 F.Supp.2d at

225 ("Plaintiff's willingness to forego its patent rights for compensation…is one factor to

consider with respect to whether plaintiff will suffer irreparable harm."); *see also T.J. Smith &*

*Nephew Ltd. v. Consol. Med. Equip., Inc.,* 821 F.2d 646, 648 (Fed. Cir. 1987) (licensing is

"incompatible with the emphasis on the right to exclude that is the basis for the presumption in a

proper case"); *Paice,* 2006 WL 2385139 at *4 (rejecting plaintiff's argument that it was

irreparably harmed by defendant's infringement in the marketplace where "plaintiff's evidence ...

[did] not prove the current litigation or the absence of an injunction have resulted in its ability to

successfully license its technology") (denying permanent injunction on multiple grounds).

The Feasibility Study is not the only document establishing TruePosition's willingness to

license the '144 patent. For example, PTX 7 and PTX 8 — both written by TruePosition's

---

12  Even if this Court finds the Feasibility Study reflects only a ***purported*** willingness to license — rather than a
***true*** willingness to license — that would still weigh against an injunction. Indeed, such a finding would further
bolster all of Andrew's standards-related claims and defenses. Thus, no matter which way the Feasibility Study
promise is regarded, it weighs against an injunction — either TruePosition was willing to license the '144
patent, or it was lying.

counsel and sent to Andrew before trial — show an express willingness to do so.  *See* PTX 7 (JA135-137) ("If you would like to inquire about a license…"); PTX 8 (JA138-140) ("listed below are the patents we anticipate the license would cover"); *see also* EA104-105.[13]

### c.   *TruePosition Did Not Move For A Preliminary Injunction.*

When TruePosition filed this case, Andrew had not yet shipped any equipment to STC. However, TruePosition made no effort to seek a preliminary injunction or other expedited relief to block any shipments.  Rather, TruePosition was content to go through years of litigation to have its claims heard.  Were there any irreparable harm here, TruePosition would — and should — have moved for a preliminary injunction when it filed this case in October 2005.  Thus, TruePosition cannot be heard to argue now — two years later — that it will be irreparably harmed if Andrew is allowed to continue to sell the standardized technology it helped create.

### d.   *TruePosition's Arguments Are Unsupported and Untenable.*

TruePosition makes four specific arguments regarding irreparable harm.  None has merit.

First, TruePosition argues the STC deal was viewed as "flagship sale," and that TruePosition will continue to lose sales to Andrew due to the STC deal.  *See* TP Br. at 9.

---

13  TruePosition argues its prior licensing offers are irrelevant to an irreparable harm analysis.  Although a willingness to license may not completely negate a finding that the patentee has suffered irreparable harm, TruePosition's cited cases are inapposite because they involved licensing offers made only as an attempt to avoid litigation.  None of TruePosition's cited cases involved the situation here, where the licensing promises were made to convince a standards body to adopt technology as a standard.  *See e.g., Muniauction, Inc. v. Thomson Corp.*, 502 F.Supp.2d 477, 483 (W.D. Pa. 2007) (noting that the trial record lacked any evidence of significant, relevant pre-trial licensing activity); *Innogenetics, N.V. v. Abbott Labs.*, No. 05-C-0575-C, 2007 U.S. Dist. LEXIS, *56 (W.D. Wis. Jan. 3, 2007) (noting that evidence of discussions about parties' willingness to license patents to avoid litigation was "not enough to carry the day"); *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 2006 WL 3813778, *5 (S.D. Tex. Dec. 27, 2006) (noting that a willingness to license patent post-trial was not sufficient to defeat a request for injunction and considering the fact that the plaintiff had elected to pursue a reasonable royalty because of the difficulty quantifying the lost profits).

TruePosition offers no evidence of any additional lost sales.[14] Equally fundamental, the whole point of standardized technology — as TruePosition recognized during the standardization process — is for there to be multi-vendor technologies. If TruePosition wanted to keep UTDOA for itself, it never should have pushed for its inclusion into the GSM standard.

Second, TruePosition suggests an injunction is automatic in a two-supplier market. *See* TP Br. at 8. This is incorrect. Indeed, "the *potential* for loss of market share is insufficient to establish [irreparable] harm; otherwise, a scenario would never arise where an injunction did not issue." *MercExchange, L.L.C. v. eBay, Inc*., 500 F.Supp.2d 556, 577 (E.D. Va. 2007) (emphasis in original); *see also id.* ("district court decisions subsequent to the Supreme Court's opinion have rejected the broad classification that direct competitors always suffer irreparable harm from infringement whereas non-competitors never suffer irreparable harm."); *Commonwealth Sci. and Indus. Research Org. v. Buffalo Tech. Inc*., 492 F.Supp.2d 600, 602-04 (E.D. Tex. 2007) (rejecting the defendant's claim that "since *eBay* district courts have typically granted injunctive relief in favor of competitors but denied injunctive relief to non-competing licensors"); *Praxair*, 479 F.Supp.2d at 444 (denying an injunction to a direct competitor because the plaintiff failed to carry its burden to "iterate specific reasons why [the defendant's] infringement can not [sic] be compensated for with a money award").[15]

---

[14] TruePosition tacitly admits that there is no proof of additional lost sales by citing to Ms. Mulhern's trial testimony at Tr. 1187-88. Ms. Mulhern simply made general and unsupported statements about the market and the possibility of price erosion. Indeed, there is no record evidence whatsoever of any other idle-mode SDCCH sales. TruePosition tacitly confirms this in it own brief. *See* TP Br. at 20, n. 9 ("**Anecdoctal evidence** by TruePosition sales personnel post-trial indicates that Andrew continues to bid on control channel products around the world.") (emphasis added).

[15] Moreover, TruePosition's "two-supplier" arguments are inconsistent with the ones TruePosition advances when it wears its standards hat — in that arena, TruePosition argues that noninfringing alternatives are available. JA299:13-300:4; JA363:12-22; JA957:6-958:6; JA958:11-19; JA722:3-12. And TruePosition's assertion that the "evidence established that TruePosition was fully capable of making Andrew's sales" is supported only by the evidence that it had conducted a trial at *STC*, and that it had the marketing and manufacturing capability to

(Continued…)

Third, TruePosition argues "a competitor has a right…not to assist its rival with use of proprietary technology" (TP. Br. at 10, citation omitted), but this argument is without merit under the circumstances here. TruePosition ignores the basic fact that standards are not supposed to be proprietary. *See* EA207-209; EA231-232; B18 at Paras. 5, 6; *Broadcom,* 501 F.3d at 317 (the district court's "conclusion failed to recognize that Qualcomm's FRAND commitment was an essential part of its competitive effort to win inclusion of its patented technology in the UMTS standard" and that "ignore[d] the possibility of a standard comprised of nonproprietary technologies"); *Rambus,* 2006 WL 2330117 at 37 ("If Rambus had refused to provide the requisite [F]RAND assurances, [the standards body] would have been bound by its rules to avoid Rambus's patented technologies."). And the evidence is clear that TruePosition <u>knew</u> the standardized technology was not supposed to be proprietary, yet still knowingly and voluntarily elected to propose UTDOA SDCCH for inclusion in the standard. *See, e.g.*, EA114; EA287:7-16; EA301:10-15; EA301:19-22; EA304:22-305:5; EA133; EA427:11-428:11. Furthermore, TruePosition did not create the standard alone — Andrew helped build the standard it now seeks to practice. EA354:14-17; EA459:23-460:7; EA465:2-10; EA467:4-10; EA511:9-16; EA129; EA6-7; EA134-186; EA316:5-13; EA507:6-7; EA318:7-10.

Fourth, TruePosition argues it will suffer reputational harm if Andrew is allowed to practice the standard. This argument ignores the factual circumstances here. Regardless of whether it considers itself a "market innovator," as TruePosition alleges in its brief, it is undisputed that TruePosition voluntarily proposed technology for a worldwide standard,

---

make the *STC* sale. There is absolutely no evidence in the record regarding how big the idle-mode UTDOA location market is, nor is there any evidence that TruePosition can meet the full market demand (whatever it may be).

knowing the standardized technology was not supposed to be proprietary.  It is incorrect to suggest that harm to reputation flows to TruePosition if it is not the only one who can practice standardized technology.  Not surprisingly, TruePosition offers no evidence to support its reputational harm argument.  There is no proof of irreparable harm.

### 2.    TruePosition Has An Adequate Remedy at Law.

Assuming a third party practices the '144 patent when it practices the UTDOA standardized technology, TruePosition has an adequate remedy that it set forth in the Feasibility Study: a fair and reasonable, non-discriminatory royalty.

### a.    *TruePosition Knew All Along That the Standard Was Supposed to be Multi-Vendor.*

A fair and reasonable, non-discriminatory licensing rate is more than fair to TruePosition because TruePosition knew all along that standardized technology is of necessity multi-vendor, and with that knowledge voluntarily proposed UTDOA SDCCH for inclusion in the standard. *See, e.g.*, EA114; EA287:7-16; EA301:19-22; EA301:10-15; EA304:22-305:5; EA133; EA427:11-428:11.  Indeed, the multi-vendor aspect of standardized technology is codified in the ETSI IPR Policy.  EA207-208.  TruePosition's lobbying to get UTDOA into the world-wide standard, its knowledge that the standard is supposed to be multi-vendor, and its promise to license its applicable patents on FRAND terms, all confirm no injunction is necessary to make TruePosition whole.  *See* EA219; *see also* EA289:2-14; EA254:4-11; *eBay*, 126 S.Ct. at 1840; *IMX, Inc.,* 469 F.Supp.2d at 225; *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648; *Paice*, 2006 WL 2385139 at *4; *High Tech Med. Instrumentation*, *Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("To the contrary, the evidence shows that HTMI offered a license to New Image, so it is clear that HTMI is willing to forgo its patent

rights for compensation. That evidence suggests that any injury suffered by HTMI would be compensable in damages assessed as part of the final judgment in the case.").

TruePosition's specific arguments that it has no adequate remedy at law are baseless. First, TruePosition argues the possibility of continued infringement weighs in favor of a finding that monetary damages are inadequate. That is not the law. *See Shatterproof Glass Corp.*, 758 F.2d at 627 (Fed. Cir. 1985) (affirming award of a royalty for "continuing operations"); *Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974) (affirming decision to deny permanent injunction and award prevailing patentee "a compulsory license with royalties"); *Ramp Research and Development, Inc. v. Structural Panels, Inc.*, 977 F.Supp. 1169, 1179 (S.D. Fla. 1997) (denying permanent injunction because "a compulsory license would be more equitable"); *Voda v. Cordis Corp.*, C.A. 03-1512, 2006 WL 2570614, *6 (W.D. Okla., Sept. 5, 2006) (denying permanent injunction and ordering defendant to perform quarterly reporting in light of jury award of reasonable royalty); *z4 Technologies, Inc. v. Microsoft Corp.*, 434 F.Supp.2d 437 (E.D. Tex. 2006) (denying permanent injunction and finding that future infringements can be based on reasonable royalty calculation jury used at trial). An injunction "is not intended as a club to be wielded by a patentee to enhance his negotiating stance;" instead the Court should assess "relative equities" and may award a compulsory license. *Foster*, 492 F.2d at 1324; *see also Ramp Research,* 977 F.Supp. at 1179. This is particularly true in light of TruePosition's standards conduct. *Paice*, 2007 WL 3024994 at *16 ("'mandatory sales and reasonable-royalty licensing' of relevant patents are 'well-established forms of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation.'") (*citing United States v. Glaxo Group Ltd.*, 410 U.S. 52, 59 (1973)).

Second, TruePosition references the parties' prior litigation and argues Andrew will practice the '144 patent if not enjoined. *See* TP Br. at 13.   Here again, TruePosition ignores the multi-vendor aspect of standardized technology and the promises it made to get UTDOA standardized in the first place.  Moreover, if anything, the parties' prior settlement (PTX 15R (JA141-157)) actually confirms that money damages are adequate to compensate TruePosition because under the terms of the agreement, TruePosition licensed almost all of its patents in perpetuity to Andrew for money.

As it does in the portion of its brief concerning irreparable harm, TruePosition makes a conclusory argument that the existence of a two-supplier market shows it has no adequate remedy at law. *See, e.g.,* TP Br. at 15.  This is incorrect. *See, e.g., Praxair*, 479 F.Supp.2d at 444 (denying an injunction to a direct competitor because the plaintiff failed to carry its burden to "iterate specific reasons why [the defendant's] infringement can not [sic] be compensated for with a money award").

### 3.    The Balance of Hardships Favors Andrew.

The balance of hardships weighs strongly in Andrew's favor because Andrew — and everyone else — is currently locked into practicing standardized technology, and the standard includes SDCCH UTDOA technology by TruePosition's design.  In addition, Andrew helped TruePosition get UTDOA standardized in the first place.  It is the epitome of imbalance for Andrew to be shut out of a standard and a market it helped create.  Furthermore, the effect of an injunction on Andrew is not an unlucky accident — TruePosition actually targeted Andrew and plotted to drive it out of the market.  Thus, the hardships that Andrew will face if an injunction issues are both severe and unfair, and the balance of hardships weighs in Andrew's favor.

a.    *TruePosition Calculated How to Best Eradicate the Peception that UTDOA Was Proprietary, and Induced Andrew to Rely.*

At all relevant times, TruePosition has interpreted the '144 patent to cover the UTDOA technology it pushed to standardize. *See* JA289:7-11; JA335:21-24; JA277:23-278:1; JA286:9-17; JA269:18-21; JA1; JA416:11-25; EA321:3-7; EA282:11-13; EA320:13-321:2. However, TruePosition also understood that standardized technology must be multi-vendor. *See, e.g.*, EA114; EA287:7-16; EA301:19-22; EA301:10-15; EA304:22-305:5; EA133; EA427:11-428:11; EA328:9-17;  EA294:19-20;  EA206-208;  EA211-212;  EA95;  EA535:1-538:20.    Thus, TruePosition worked hard to eradicate the perception that UTDOA was proprietary.  For example:

(a)    TruePosition submitted the UTDOA Feasibility Study promising to license any implicated patents.  *See* EA113; EA117; EA248:19-249:2; EA349:13-20; EA216; EA219.

(b)    TruePosition joined the study group, agreeing to create a solution that was for the benefit of all.  *See* EA444:1-6; EA447:21-448:3; EA104-EA105; EA313:2-7; EA310:14-21; EA447:4-12.

But TruePosition did not stop there — it went further and specifically **targeted** Andrew. Indeed, the record unequivocally shows that TruePosition strategized internally on how to best eradicate the perception that UTDOA was proprietary, decided that partnering in standardization with Andrew would do the trick, considered contractually binding Andrew to assist in the standardization process, solicited Andrew's assistance, and worked closely with Andrew for years to get UTDOA standardized.  *See* EA1-3; EA550-A551; EA86; JA91-93; *see also* EA511:9-16; JA226 at 4.2; JA332:1-333:10; JA453:21-454:2; JA409:21-410:22; JA884:14-888:21; *see also TruePosition*, 2007 WL 2482163 at *2.  TruePosition's plan was cold and calculated.  TruePosition then turned around and sued Andrew for practicing the standard, and is now seeking a permanent injunction.

b.     *Andrew Investigated IPR Issues, Was Satisfied There Were None,*
       *and Invested a Great Deal of Time and Resources.*

Andrew had no idea it was being set up by TruePosition to further the ruse that UTDOA was multi-vendor.  Indeed, Andrew investigated IPR issues thoroughly, and was misled into believing none existed.  *See* EA428:17-429:2;  EA429:10-430:5; EA435:20-438:10; EA279:13-14;  EA430:17-25;  EA431:14-432:12;  EA476:19-477:5;  EA450.1:14-18;  EA477:6-16; EA432:23-433:21;  EA433:24-434:3.  The end result was that Andrew and TruePosition developed the standard together through constant contact and collaboration for years.  *See, e.g.*, JA409:21-410:22.

c.     *Andrew Will Be Severely Harmed By An Injunction.*

It is uncontested that Andrew and TruePosition were successful in getting UTDOA standardized for GSM.  EA318:7-10.  Now that Andrew — and other industry participants — are "locked into" the standard, they should not be enjoined from practicing it.  *See Broadcom,* 501 F.3d at 303 ("Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard."); *Rambus,* 2006 WL 2330117 at 4 ("members may find themselves 'locked in' to the standardized technology once switching costs become prohibitive. Once lock-in occurs, the owner of the standardized technology may be able to 'hold up' the industry…."); *Eastman Kodak Co.*, 504 U.S. at 476 (1992) (describing the lock-in that causes purchasers of expensive office equipment to tolerate supracompetitive service prices before changing brands).  As Terry Garner, president of Andrew's network solutions division, testified at trial, Andrew's products must be standards-compliant, including for options, or Andrew will not be able to sell them. JA939:8-940:1; JA941:3-16.  This is undisputed in the record; TruePosition did not even cross

Mr. Garner on the point.  It is simply inequitable, not to mention against the ETSI rules, for TruePosition to try to drive Andrew out of the market by seeking an injunction to  prevent Andrew from practicing the standard it helped create.

Naturally, Andrew would not have invested all of this time and money into something that would only benefit TruePosition, and Andrew never dreamed it would be precluded from practicing any part of the UTDOA standard.  *See* EA541:17-542:7; EA435:3-12; EA450.1:14-22. *See also* B19 at Para. 9 ("In my experience, no company would agree to introduce into a standard, — and certainly would not promote and encourage the standardization of, an option that it would not be permitted to practice in the future.").

### d.      *TruePosition's Arguments Have No Merit.*

Each of TruePosition's arguments on the balance of hardships lacks merit.

TruePosition first argues Andrew is the larger, more diversified company, and that TruePosition will continue to lose market share if Andrew is not enjoined.  According to TruePosition, this causes the balance of hardships to tip in TruePosition's favor.  TP Br. at 16. This argument is wrong on two levels.  First, the alleged loss of market share is irrelevant as Andrew explained above at Section A(1)(d).  Second, size alone does not tip the balance of hardships.  *See Windsurfing Int'l. Inc. v. AMF, Inc*., 782 F.2d 995, 1003 (Fed. Cir. 1986) *cert. denied,* 477 U.S. 905 (1986) (the "relative size … should not alone serve as a basis for enjoining continued infringement"); *Computrol, Inc. v. Lowrance Electronics, Inc.*, 893 F.Supp. 1440, 1462 (D. Idaho 1994) (same).  And in any event, as a practical matter, Andrew is not larger and

more diversified than the TruePosition empire, which has the $9 billion Liberty Media as the parent.  *See* LIBERTY MEDIA 2006 ANNUAL REPORT (B11).[16]

TruePosition next argues that because it is the patent owner, the balance of hardships tips in its favor, and further argues that "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  TP Br. at 16-17.  TruePosition's argument is fundamentally flawed. Andrew did not build a business on an infringing product.  It simply practiced the standardized technology it helped create.

TruePosition's argument is particularly egregious because if TruePosition had revealed its true intentions from the beginning, this whole situation could have been avoided.  If Andrew — or ETSI — had known that TruePosition was going to assert the '144 patent against standardized UTDOA technology, UTDOA never would have made it into the standard, as an option or otherwise.  *See* B18 at Para. 6 ("Patented technology that an ETSI member or associate member is unwilling to license must be declared to ETSI in a timely manner, and may not be added to the standard if the ETSI member remains unwilling to license its patent.").  *See also In re Dell Computer Corp.*, 121 F.T.C. at 626 ("had VESA known of the Dell patent, it could have chosen an equally effective, non-proprietary standard."); *Broadcom,* 501 F.3d at 309 (standards bodies "make an objective comparison between competing technologies, patent positions, and licensing terms before an industry becomes locked in to a standard").  In sum, the balance of hardships weighs heavily in Andrew's favor.

---

[16] TruePosition has "350 to 400 employees today," (B39) whereas Andrew's Network Solutions Group has "[c]urrently, about 200 employees."  JA933:9-20.

4.     **The Public Interest Weighs Against An Injunction Because An Injunction Would Constitute Patent Hold-Up.**

As discussed above at pp. 13-17, standardization serves several important societal functions, including "maximizing consumer welfare by promoting competition among firms" on "several levels." *Broadcom,* 501 F.3d at 303.  Standards bodies "make an objective comparison between competing technologies, patent positions, and licensing terms before an industry becomes locked in to a standard."  *Id.*

However, "[i]nefficiency may be injected into the standard-setting process by what is known as 'patent hold-up.'"  *Id.* at 310.  Patent hold up occurs when a standards body implements a "new standard, only to discover that certain technologies essential to implementing the standard are patented.  When this occurs, the patent holder is in a position to 'hold up' industry participants from implementing the standard."  *Id.*[17] (emphasis added).

Patent hold-up can occur because standardization eliminates alternatives and increases the value of a patent.  *Am. Soc. of Mech. Engineers,,* 456 U.S. at 559*; Broadcom,* 501 F.3d at 314.  As the United States District Court for the Eastern District of Virginia has explained, even one bad actor can effectuate anticompetitive effects on the market, which is against the public interest:

> antitrust law historically has been concerned with the risk of one or a small number of participants capturing the economic power of an industry-wide standard and turning the [standards body] into a source of exclusionary power. Simply put, by hijacking or capturing an [standards body], a single industry player

---

17   *Citing In re Rambus, Inc*., No. 9302, 2006 WL 2330117 at 4 (F.T.C., Aug. 2, 2006); Skitol Letter, supra, at 8; Majoras at *1; Masoudi at *3; *Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451, 476 (1992) (describing the lock-in that causes purchasers of expensive office equipment to tolerate supracompetitive service prices before changing brands); *Qualcomm Inc. v. Broadcom Corp*., No. 05-CV-1958-B, 2007 WL 2296441 at *34 (S.D. Cal. Aug. 7, 2007) (characterizing such conduct as an attempt at "holding hostage the entire industry desiring to practice the ... standard").

can magnify its power and effectuate anticompetitive effects on the market in question.

*Rambus, Inc. v. Infineon Techs. AG*, 330 F.Supp.2d 679, 696-97 (E.D. Va. 2004).

To ensure that hold up does not occur, standards bodies put safeguards in place to avoid "patent hold-up." *Broadcom*, 501 F.3d at 310*; see also Rambus*, 2006 WL 2330117 at 4. Indeed, a company's FRAND commitment, or lack thereof, is a key indicator of the cost of implementing a potential technology. *Broadcom*, 501 F.3d at 313*; Rambus*, 2006 WL 2330117 at 16 (noting that predisclosure of IPRs enables standards bodies "to make their choices with more complete knowledge of the consequences"). Thus, ETSI requires a FRAND commitment from those proposing technical standards. *See* B15-16 at 8-11. *See also Broadcom*, 501 F.3d at 304 ("[g]iven the potential for owners of IPRs...to exert undue control over the implementation of industry-wide standards, the ETSI requires a commitment from vendors whose technologies are included in standards to license their technologies on fair, reasonable, and non-discriminatory ("FRAND") terms.").

But despite ETSI's safeguards, patent hold-up is exactly what is taking place here. Indeed, as has been discussed at length above, TruePosition hid its true intentions, inserted its proprietary technology into the standard (thus eliminating alternatives), promised to license its patents to get acceptance for the technology, and is now trying to use its '144 patent to eliminate the competition. *See* D.I. 327 at 58-65; D.I. 325 at 31-39. Former ETSI officials agree that an injunction is inappropriate with respect to standardized technology. *See* B19 at Para. 10 (**"*It is completely inappropriate for an ETSI member to seek an injunction that would prevent another company from using an option in a standard.*"**) (emphasis added); B16 at Para. 12 ("It is completely unacceptable under the ETSI IPR Policy to not notify ETSI of an IPR believed to

be essential and then – later when the patented technology has become part of the standard - refuse to grant any licenses, or refuse to grant licenses under FRAND terms and conditions.").

The courts hold the same view. *See In re Dell Computer Corp.*, 121 F.T.C. 616 (Dell could not enforce its patents where it certified it had no IPR and then tried to enforce the IPR); *Rambus,* 2006 WL 2330117 at *4 (finding that Rambus had engaged in hold-up that had "grave implications for competition;" inviting parties to brief reasonable royalty issues); *see also Broadcom,* 501 F.3d at 305 (reversing district court's granting of Qualcomm's motion to dismiss where "the Court did not discuss the possibility that the FRAND commitments that [standards bodies] required of vendors were intended as a bulwark against unlawful monopoly, nor did it consider the possibility that the [standards bodies] might have chosen nonproprietary technologies for inclusion in the standard."); *Qualcomm Inc.*, 2007 WL 2296441 at *34 (holding that Qualcomm waived the right to enforce its patents where "the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the [standards body] so that the [standards body] would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the development of the H.264 standard. Broadcom, ignorant of the existence of the •104 and •767 patents, designed and is in the process of manufacturing numerous H.264-compliant products.").

Indeed, the public interest weighs heavily in favor of rejecting TruePosition's attempt to conduct a patent hold-up.[18]

---

18 Notably, the thrust of TruePosition's trial strategy was to focus on the '144 patent's applicability to locating terrorists and fighting terrorism. The public interest weighs in favor of not enjoining the production of products designed to fight terrorism. This is particularly true given the fact that there is no evidence that TruePosition can meet world-wide demand. *See above* at pp. 22-23.

## VII.    CONCLUSION

For all of the reasons discussed above, Andrew respectfully requests that the Court deny

TruePosition's motion for a permanent injunction.

Respectfully submitted,

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP


/s/ *Andrew A. Lundgren*
Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600
*alundgren@ycst.com*

*Attorneys for Defendant Andrew Corporation*

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: November 15, 2007

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on November 15, 2007, I caused to

be electronically filed a true and correct copy of the foregoing document with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

> James D. Heisman, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE 19899
> (302) 658-9141
> Email: jheisman@cblh.com

I further certify that on November 15, 2007, I caused a copy of the foregoing document to

be served by e-mail and hand delivery on the above-listed counsel of record and on the following

in the manner indicated:

> **BY ELECTRONIC MAIL ON NOVEMBER 15, 2007**
> **AND FEDERAL EXPRESS ON NOVEMBER 16, 2007**
>
> Paul B. Milcetic, Esq. [pmbilcet@woodcock.com]
> Daniel J. Goettle, Esq. [dgoettle@woodcock.com]
> Woodcock Washburn LLP
> Circa Centre, 12th Floor
> 2929 Arch Street
> Philadelphia, PA  19103

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> /s/ *Andrew A. Lundgren*
> Andrew A. Lundgren (No. 4429)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> alundgren@ycst.com
> *Attorneys for Defendant Andrew Corporation*