# Excerpts of Liberty Capital March 2007 Annual Report







**Annual Report**
**March, 2007**

**B 1**

## CONTENTS

Letter to
    Shareholders    1

Stock Performance    11

Company Profile    14

Financial Information    F-1

Corporate Data    Inside Back Cover

*Certain statements in this Annual Report constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. To the extent that statements in this Annual Report are not recitations of historical fact, such statements constitute forward-looking statements which, by definition, involve risks and uncertainties. In some cases, you can identify these statements by our use of forward-looking words such as "may," "will," "should," "anticipate," "estimate," "expect," "plan," "believe," "predict," "potential," "intend," and other words of similar substance. In particular, statements under "Business," "Risk-Factors," "Properties," "Legal Proceedings," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Quantitative and Qualitative Disclosures About Market Risk" contain forward-looking statements. Where, in any forward-looking statement, we express an expectation or belief as to future results or events, such expectation or belief is expressed in good faith and believed to have a reasonable basis, but there can be no assurance that the expectation or belief will result or be achieved or accomplished. The following include some but not all of the factors that could cause actual results or events to differ materially from those anticipated:*

- *general economic and business conditions and industry trends;*
- *consumer spending levels, including the availability and amount of individual consumer debt;*
- *the regulatory and competitive environment of the industries in which we, and the entities in which we have interests, operate;*
- *continued consolidation of the broadband distribution and movie studio industries;*
- *uncertainties inherent in the development and integration of new business lines and business strategies;*
- *changes in distribution and viewing of television programming, including the expanded deployment of personal video recorders, video on demand and IP television and their impact on home shopping networks;*
- *increased digital TV penetration and the impact on channel positioning of our networks;*
- *rapid technological changes;*
- *capital spending for the acquisition and/or development of telecommunications networks and services;*
- *uncertainties associated with product and service development and market acceptance, including the development and provision of programming for new television and telecommunications technologies;*
- *future financial performance, including availability, terms and deployment of capital;*
- *fluctuations in foreign currency exchange rates and political unrest in international markets;*
- *the ability of suppliers and vendors to deliver products, equipment, software and services;*
- *the outcome of any pending or threatened litigation;*
- *availability of qualified personnel;*
- *changes in, or failure or inability to comply with, government regulations, including, without limitation, regulations of the Federal Communications Commission, and adverse outcomes from regulatory proceedings;*
- *changes in the nature of key strategic relationships with partners and joint venturers;*
- *competitor responses to our products and services, and the products and services of the entities in which we have interests; and*
- *threatened terrorists attacks and ongoing military action in the Middle East and other parts of the world.*

*These forward-looking statements and such risks, uncertainties and other factors speak only as of the date made, and we expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein, to reflect any change in our expectations with regard thereto, or any other change in events, conditions or circumstances on which any such statement is based. When considering such forward-looking statements, you should keep in mind the factors described in "Risk Factors" and other cautionary statements contained in this Annual Report. Such risk factors and statements describe circumstances which could cause actual results to differ materially from those contained in any forward-looking statement. This Annual Report includes information concerning OpenTV Corp. and other public companies that file reports and other information with the SEC in accordance with the Securities Exchange Act of 1934. Information concerning those companies in this Annual Report concerning those companies has been derived from the reports and other information filed by them with the SEC. If you would like further information about these companies, the reports and other information they file with the SEC can be accessed on the Internet website maintained by the SEC at www.sec.gov. Those reports and other information are not incorporated by reference in this Annual Report.*

The following graph compares the percentage change in the cumulative total shareholder return on each of the Liberty Capital Series A and Series B tracking stocks and the Liberty Interactive Series A and Series B tracking stocks from May 10, 2006 through December 31, 2006, in comparison to the S&P 500 Media Index and the S&P 500 Index.



|  | 5/10/2006 | 12/31/2006 |
|---|---|---|
| Liberty Capital Series A | 100.00 | 122.09 |
| Liberty Capital Series B | 100.00 | 121.50 |
| Liberty Interactive Series A | 100.00 | 110.90 |
| Liberty Interactive Series B | 100.00 | 111.76 |
| S&P Media Index | 100.00 | 120.41 |
| S&P 500 Index | 100.00 | 107.03 |

**B 3**

# LIBERTY MEDIA CORPORATION
## COMPANY PROFILE

Liberty Media Corporation is a holding company that owns interests in a broad range of electronic retailing, media, communications and entertainment businesses. Those interests are attributed to two tracking stock groups: Liberty Interactive, which includes Liberty Media's interests in QVC, Provide Commerce, BUYSEASONS, IAC/InterActiveCorp and Expedia, and Liberty Capital, which includes all of Liberty Media's assets that are not attributed to Liberty Interactive, including Liberty Media's interests in Starz Entertainment and News Corporation.

The following table sets forth Liberty Media's assets that are held directly and indirectly through partnerships, joint ventures, common stock investments and instruments convertible into common stock. Ownership percentages in the table are approximate and, where applicable, assume conversion to common stock by Liberty Media and, to the extent known by Liberty Media, other holders. In some cases, Liberty Media's interest may be subject to buy/sell procedures, repurchase rights or, under certain circumstances, dilution.

## LIBERTY CAPITAL

| ENTITY | SUBSCRIBERS AT 12/31/06 (000's) | SUBSCRIBERS AT 12/31/05 (000's) | SUBSCRIBERS AT 12/31/04 (000's) | YEAR LAUNCHED | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|---|---|---|
| **OPERATING BUSINESSES** | | | | | |
| GSN | 60,887 | 57,805 | 56,411 | 1994 | 50% |
| Starz Entertainment LLC | | | | | 100% |
|   Encore | 27,323 | 25,784 | 24,457 | 1991 | |
|   MOVIEplex | 14,696 | 11,892 | 3,925 | 1995 | |
|   Thematic Multiplex (aggregate units)[1] | 150,027 | 140,459 | 130,349 | | |
|     Love Stories | | | | 1994 | |
|     Westerns | | | | 1994 | |
|     Mystery | | | | 1994 | |
|     Action | | | | 1994 | |
|     True Stories | | | | 1994 | |
|     WAM! | | | | 1994 | |
|   Starz | 15,521 | 14,082 | 14,108 | 1994 | |
|     Starz Edge[1] | | | | 1996 | |
|     Starz InBlack[1] | | | | 1997 | |
|     Starz Kids & Family[1] | | | | 1999 | |
|     Starz Cinema[1] | | | | 1999 | |
|     Starz Comedy[1] | | | | | |

**B 4**

## LIBERTY CAPITAL

| ENTITY | BUSINESS DESCRIPTION | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|
| | **OPERATING BUSINESSES** | |
| Hallmark Entertainment Investments Co. | Hallmark Entertainment Investments Co. owns 80.2% of Crown Media Holdings, Inc. Class A common stock and 100% of the Class B common stock, representing 96.1% of the total outstanding voting power of Crown Media Holdings, Inc. Stockholders of Hallmark Entertainment Investments Co. are Hallmark Entertainment Holdings, Inc., Liberty Media Corporation, J.P. Morgan Partners (BHCA), L.P. and National Interfaith Cable Coalition, Inc. ("NICC"). | 11%[2] |
| MacNeil/Lehrer Productions | Produces "NewsHour" with Jim Lehrer and Robert MacNeil in addition to documentaries, Web sites, interactive DVD's, civic engagement projects and educational programs. | 67% |
| News Corporation (NYSE: NWS, NWS.A) | Entertainment company operating in eight industry segments: filmed entertainment; television; cable network programming; direct broadcast satellite television; magazines and inserts; newspapers; book publishing; and other. The activities of News Corporation are conducted principally in the United States, Continental Europe, the United Kingdom, Australia, Asia and the Pacific Basin. | 16%[3] |

**B 5**

## LIBERTY CAPITAL

| ENTITY | BUSINESS DESCRIPTION | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|
| **OPERATING BUSINESSES** | | |
| Current Communications Group | Developing Broadband over Power Line (BPL) technology and solutions through its two subsidiaries, Current Communications and Current Technologies. | 16% |
| FUN Technologies Inc. (TSX/AIM: FUN) | Online and interactive casual games provider. Provides cutting-edge gaming systems to top distribution partners around the world. | 53% |
| GoPets, Ltd. | Virtual community of pets that interact with each other and other users all over the world. Currently in an open beta phase in fifteen languages and eight territories around the world. | 25% |
| On Command Corporation | Provider of in-room interactive entertainment, Internet access, business information and guest services for the lodging industry. | 100%[4] |
| Sling Media | Consumer hardware and application company that turns any Internet-connected PC, Mac, or mobile device into your home television. | 6% |
| TruePosition, Inc. | Provider of wireless location technology and services. | 89% |
| Wildblue Communications, Inc. | Ka-band satellite network focused on providing broadband services to homes and small offices in North America. | 32% |

16

**B 6**

## LIBERTY CAPITAL

| ENTITY | BUSINESS DESCRIPTION | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|
| | **PUBLICLY TRADED INVESTMENTS—FINANCIAL** | |
| CBS Corporation | Mass media company serving audiences and advertisers domestically and internationally. Operates in virtually every field of media and entertainment, including broadcast television, cable television, local television, television production and syndication, radio, advertising on out-of-home media, publishing, digital media and comsumer products. | 1%[6] |
| Embarq Corporation (NYSE: EQ) | Provides a suite of communications services to customers in its local services territories. Offers local and long distance voice, data, high speed internet, wireless and entertainment services. | 3% |
| Motorola, Inc. (NYSE: MOT) | Provider of integrated communications solutions and embedded electronic solutions. | 3% |
| priceline.com, Incorporated (Nasdaq: PCLN) | Provider of e-commerce service allowing consumers to make offers on products and services. | 1% |
| Sprint Nextel (NYSE: S) | Offers a comprehensive range of communications services bringing mobility to consumer, business and government customers. | 3%[6] |
| Time Warner Inc. (NYSE: TWX) | Media and entertainment company whose businesses include filmed entertainment, interactive services, television networks, cable systems, music and publishing. | 4% |
| Viacom Inc. (NYSE: VIA) | Global media company, with positions in broadcast and cable television, radio, outdoor advertising, and online. Brands include CBS, MTV, Nickelodeon, Nick at Nite, VH1, BET, Paramount Pictures, Infinity Broadcasting, Viacom Outdoor, UPN, TV Land, Comedy Central, CMT: Country Music Television, Spike TV, Showtime, Blockbuster, and Simon & Schuster. | 1% |

**B 7**

## LIBERTY INTERACTIVE

| ENTITY | BUSINESS DESCRIPTION | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|
| | **OPERATING BUSINESSES** | |
| BUYSEASONS, Inc. | Online retailer of costumes and accessories | 100% |
| Provide Commerce | E-commerce market place providing a collection of branded websites each offering high quality, perishable products shipped directly from the supplier to the consumer and designed specifically around the way consumers shop. | 100% |
| QVC, Inc. | An electronic retailing leader, marketing a wide variety of brand name products in such categories as home furnishing, licensed products, fashion, beauty, electronics and fine jewelry. | 100% |

18

**B 8**

# LIBERTY INTERACTIVE

| ENTITY | BUSINESS DESCRIPTION | ATTRIBUTED OWNERSHIP AT 12/31/06 |
|---|---|---|
| **PUBLICLY TRADED INVESTMENTS—STRATEGIC** | | |
| Expedia, Inc. (Nasdaq: EXPE) | Empowers business and leisure travelers with the tools and information needed to research, plan, book and experience travel. It also provides wholesale travel to offline retail travel agents. Expedia's main companies include: Expedia.com, Hotels.com, Hotwire, Expedia Corporate Travel, TripAdvisor and Classic Vacations. Expedia's companies operate internationally in Canada, the UK, Germany, France, Italy, the Netherlands and China. | 20%[7] |
| IAC/InteractiveCorp (Nasdaq:IACI) | Operates businesses in sectors being transformed by the internet, online and offline. IAC is comprised of HSN; Cornerstone Brands, Inc.; HSE24; Shoebuy.com; Ticketmaster; Lending Tree; RealEstate.com; ServiceMagic; Match.com; Entertainment Publications; Interval International; Ask.com; Citysearch; Evite; Gifts.com; iBuy; Pronto; and CollegeHumor. | 24%[8] |

(1)  Digital services.

(2)  Liberty Media Corporation owns an approximate indirect 11% economic ownership in Crown Media Holdings, Inc. (NASDAQ: CRWN).

(3)  Liberty's voting interest in News Corp. is approximately 19%. On December 22, 2006 Liberty announced that it entered into a definitive agreement with News Corporation to exchange Liberty's 16.3% stake in News for a News Corp. subsidiary holding a 38.5% stake in DIRECTV Group, Inc., regional sports networks in Denver, Pittsburgh, and Seattle, and cash.

(4)  On December 13, 2006, Liberty entered into an agreement with Lodgenet Entertainment Corporation to sell its ownership of OnCommand Corporation for a combination of stock and cash.

(5)  On February 13, 2007, Liberty announced a transaction in which Liberty will exchange its 7,591,249 CBS common shares for a newly created corporate subsidiary of CBS which holds CBS' Green Bay owned television station and cash.

(6)  Less than 1% of voting power. Liberty beneficially owns shares of Sprint Nextel common stock and instruments convertible into Sprint Nextel common stock.

(7)  Liberty owns approximately 20% of Expedia common stock representing approximately 52% voting interest, however, the Chairman of Expedia currently has the authority to vote these shares.

(8)  Liberty owns approximately 24% of IAC common stock representing approximately 55% voting interest, however, the Chairman and CEO of IAC currently has the authority to vote these shares.

**B 9**

LIBERTY MEDIA CORPORATION AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS (Continued)

December 31, 2006 and 2005

| | 2006 | 2005* |
|---|---|---|
| | (amounts in millions) | |
| **Liabilities and Stockholders' Equity** | | |
| **Current liabilities:** | | |
| Accounts payable | $   508 | 492 |
| Accrued interest | 214 | 153 |
| Other accrued liabilities | 1,035 | 978 |
| Financial instruments (note 7) | 1,484 | 1,939 |
| Current portion of debt (note 9) | 114 | 1,379 |
| Other current liabilities | 113 | 289 |
| Liabilities of discontinued operations (note 5) | 101 | 114 |
| Total current liabilities | 3,569 | 5,344 |
| Long-term debt (note 9) | 8,909 | 6,370 |
| Long-term financial instruments (note 7) | 1,706 | 1,087 |
| Deferred income tax liabilities (note 10) | 9,784 | 8,696 |
| Other liabilities | 1,747 | 1,058 |
| Total liabilities | 25,715 | 22,555 |
| Minority interests in equity of subsidiaries | 290 | 290 |
| **Stockholders' equity (note 11):** | | |
| Preferred stock, $.01 par value. Authorized 50,000,000 shares; no shares issued | — | — |
| Liberty Capital Series A common stock, $.01 par value. Authorized 400,000,000 shares; issued and outstanding 134,503,165 shares at December 31, 2006 | 1 | — |
| Liberty Capital Series B common stock, $.01 par value. Authorized 25,000,000 shares; issued and outstanding 6,014,680 shares at December 31, 2006 | — | — |
| Liberty Interactive Series A common stock, $.01 par value. Authorized 2,000,000,000 shares; issued and outstanding 623,061,760 shares at December 31, 2006 | 6 | — |
| Liberty Interactive Series B common stock, $.01 par value. Authorized 125,000,000 shares; issued and outstanding 29,971,039 shares at December 31, 2006 | — | — |
| Series A common stock $.01 par value. Issued and outstanding 2,681,745,985 shares at December 31, 2005 | — | 27 |
| Series B common stock $.01 par value. Issued 131,062,825 shares at December 31, 2005 | — | 1 |
| Additional paid-in capital | 28,112 | 29,074 |
| Accumulated other comprehensive earnings, net of taxes ("AOCE") (note 15) | 5,943 | 3,412 |
| AOCE of discontinued operations | 9 | 9 |
| Accumulated deficit | (12,438) | (13,278) |
| | 21,633 | 19,245 |
| Series B common stock held in treasury, at cost (10,000,000 shares at December 31, 2005) | — | (125) |
| Total stockholders' equity | 21,633 | 19,120 |
| Commitments and contingencies (note 17) | | |
| Total liabilities and stockholders' equity | $47,638 | 41,965 |

---

\*    See note 5.

See accompanying notes to consolidated financial statements.

**B 10**

LIBERTY MEDIA CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

Years ended December 31, 2006, 2005 and 2004

| | 2006 | 2005* | 2004* |
|---|---|---|---|
| | (amounts in millions, except per share amounts) | | |
| **Revenue:** | | | |
| Net retail sales | $7,326 | 6,501 | 5,687 |
| Communications and programming services | 1,287 | 1,145 | 1,056 |
| | 8,613 | 7,646 | 6,743 |
| **Operating costs and expenses:** | | | |
| Cost of sales | 4,565 | 4,112 | 3,594 |
| Operating | 1,526 | 1,397 | 1,160 |
| Selling, general and administrative, including stock-based compensation (note 3) | 806 | 648 | 696 |
| Litigation settlement | — | — | (42) |
| Depreciation | 119 | 92 | 91 |
| Amortization | 463 | 453 | 456 |
| Impairment of long-lived assets (note 3) | 113 | — | — |
| | 7,592 | 6,702 | 5,955 |
| Operating income | 1,021 | 944 | 788 |
| **Other income (expense):** | | | |
| Interest expense | (680) | (626) | (619) |
| Dividend and interest income | 214 | 143 | 130 |
| Share of earnings of affiliates, net | 91 | 13 | 15 |
| Realized and unrealized gains (losses) on financial instruments, net (note 7) | (279) | 257 | (1,284) |
| Gains (losses) on dispositions, net (notes 6, 11 and 15) | 607 | (361) | 1,411 |
| Nontemporary declines in fair value of investments (note 6) | (4) | (449) | (129) |
| Other, net | 18 | (39) | (26) |
| | (33) | (1,062) | (502) |
| Earnings (loss) from continuing operations before income taxes and minority interest | 988 | (118) | 286 |
| Income tax benefit (expense) (note 10) | (252) | 126 | (159) |
| Minority interests in earnings of subsidiaries | (27) | (51) | (22) |
| Earnings (loss) from continuing operations | 709 | (43) | 105 |
| Earnings (loss) from discontinued operations, net of taxes (note 5) | 220 | 10 | (59) |
| Cumulative effect of accounting change, net of taxes (note 3) | (89) | — | — |
| Net earnings (loss) | $ 840 | (33) | 46 |
| **Net earnings (loss):** | | | |
| Liberty Series A and Series B common stock | $ 94 | (33) | 46 |
| Liberty Capital common stock | 260 | — | — |
| Liberty Interactive common stock | 486 | — | — |
| | $ 840 | (33) | 46 |
| **Basic and diluted earnings (loss) from continuing operations per common share (note 3):** | | | |
| Liberty Series A and Series B common stock | $ .07 | (.02) | .04 |
| Liberty Capital common stock | $ .24 | — | — |
| Liberty Interactive common stock | $ .73 | — | — |
| **Basic and diluted net earnings (loss) per common share (note 3):** | | | |
| Liberty Series A and Series B common stock | $ .03 | (.01) | .02 |
| Liberty Capital common stock | $ 1.86 | — | — |
| Liberty Interactive common stock | $ .73 | — | — |

\*   See note 5.

See accompanying notes to consolidated financial statements.

F-38

**B 11**

LIBERTY MEDIA CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF COMPREHENSIVE EARNINGS (LOSS)

Years ended December 31, 2006, 2005 and 2004

| | 2006 | 2005* | 2004* |
|---|---|---|---|
| | (amounts in millions) | | |
| Net earnings (loss) .......................................... | $ 840 | (33) | 46 |
| Other comprehensive earnings (loss), net of taxes (note 15): | | | |
| Foreign currency translation adjustments ......................... | 111 | (5) | 20 |
| Recognition of previously unrealized foreign currency translation losses ... | — | 312 | — |
| Unrealized holding gains (losses) arising during the period ............. | 2,605 | (1,121) | 1,490 |
| Recognition of previously unrealized losses (gains) on available-for-sale securities, net ................................................ | (185) | 217 | (486) |
| Reclass unrealized gain on available-for-sale security to equity method investment ................................................ | — | (197) | — |
| Other comprehensive earnings (loss) from discontinued operations (note 5) | — | (7) | (54) |
| Other comprehensive earnings (loss) ............................. | 2,531 | (801) | 970 |
| Comprehensive earnings (loss) .................................. | $3,371 | (834) | 1,016 |
| Comprehensive earnings (loss): | | | |
| Liberty Series A and Series B common stock...................... | $ 755 | (834) | 1,016 |
| Liberty Capital common stock ................................. | 1,787 | — | — |
| Liberty Interactive common stock .............................. | 829 | — | — |
| | $3,371 | (834) | 1,016 |

\*   See note 5.

See accompanying notes to consolidated financial statements.

**B 12**

# Declaration of Gary Brown

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

                Plaintiff and
                Counterclaim-Defendant,

    v.

ANDREW CORPORATION,

                Defendant and
                Counterclaim Plaintiff.

Civil Action No. 05-00747-SLR

## DECLARATION OF GARY BROWN

Gary C. Brown declares as follows:

1. I am the Group Finance Director of Defendant Andrew Corporation's Network Solutions Group. I submit this declaration in connection with Andrew Corporation's Brief in Opposition to TruePosition's Motion for Enhanced Damages. I make this declaration upon personal knowledge based on investigation and, if called upon to testify, I could and would testify to the facts herein.

REDACTED

**B 13**

I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 14, 2007

_Gary C Brown_
Gary C. Brown

**B 14**

# Declaration of Karl Heinz Rosenbrock

Vallauris, 15th November 2007

## Statement of Karl Heinz Rosenbrock

## Director-General of ETSI (1990-2006)

1. I am Karl Heinz Rosenbrock, born in Hermannsburg/Germany in 1941. After my study of electrical and communications engineering at the Technische Hochschule in Braunschweig, I joined the Deutsche Bundespost (DBP) in 1967.

2. From 1969 until 1980 I was active in international standardization at the International Telecommunications Union (ITU) and from 1970 until 1980 at the European Conference of Postal and Telecommunications Administrations (CEPT).

3. From 1972 until 1980 I was chairman of the CCITT Working Group XI/1 dealing with "Interworking of Signalling Systems". CCITT was a sector of ITU responsible for standardization of telecommunications.

4. In the period from 1980 until 1988 I acted as Project Leader in the Ministry of Posts and Telecommunications in Bonn responsible for the digitalization of the telephone network of the DBP and for the introduction of the Integrated Services Digital Network (ISDN) in Germany. In that position I had to oversee the standardization in ITU and CEPT from a different point of view.

5. On 1st November 1990 I began my service as Director of ETSI, the European Telecommunications Standards Institute. Later the post was named Director-General. I served as the Director(-General) of ETSI for more than 15 years, and retired from that post on 30th June 2006.

6. At about the time I started within ETSI, ETSI set up an IPR Committee to study the IPR issues and to propose an IPR policy. It was necessary to consult with the European Commission to ensure the proposed policy complied with competition law and international obligations such as GATT. It took ETSI more than five years to develop its IPR Policy.

7. A key objective was to have an ETSI IPR Policy which avoided the Technical Committees – who were developing the standards – becoming involved in commercial "horse-trading" about license terms.

8. Another key objective was to ensure that ETSI standards would be accessible by everyone. That is, licenses had to be available to everyone (whether or not an ETSI member) to implement any mandatory or optional feature in a standard. It was a central goal of the ETSI IPR Policy to ensure that IPR owners could not

**B 15**



demand excessive license fees or block others from using their IPR once their IPR was included in the standard.

9. It was realized early that the IPR Policy would need to rely on members themselves to identify essential IPR and notify that IPR to ETSI in a timely manner (see article 4.1 of the ETSI IPR Policy). There was no way that ETSI could check whether or not such notifications were correct because this would have been too difficult and costly.

10. It was also appreciated that licenses to essential IPR should be available to everyone on FRAND terms and conditions, i.e. under fair, reasonable and non-discriminatory terms and conditions.

11. Therefore, under the ETSI IPR Policy, if an ETSI member submits a contribution accepted by ETSI for the standardization of a mandatory or optional technical feature and owns an IPR that the member believes to be essential to practicing the feature, the member must notify ETSI of the IPR and its willingness (or unwillingness) to license that IPR on FRAND terms. Not notifying ETSI of the IPR is a serious violation of article 4.1 of the ETSI IPR Policy.

12. It is completely unacceptable under the ETSI IPR Policy not to notify an IPR believed to be essential and then – later when the patented technology has become part of the standard - refuse to grant any licenses, or refuse to grant licenses under FRAND terms and conditions. Not notifying ETSI of the essential IPR is a serious violation of the ETSI IPR Policy and is a behaviour that is fundamentally in conflict with the principles and objectives of standardization.

13. The IPR Policy of ETSI applies equally to options within the standard. Articles 15.11 and 15.12 of the Policy were intentionally drafted to be clear about it. It is common that a standard has many options. Each of the options in the standard must be accessible to everybody.

14. Even if there are multiple options related to a general feature or functionality in the standard, one cannot - as holder of an IPR believed to be essential to a particular one of these options - refer to the presence of other options to deny/ignore the essentiality of that IPR.

I, herewith, swear under oath that the statements made here are true and correct.

Signed on 15th November 2007

**B 16**

Karl Heinz Rosenbrock
Vallauris, France

Je soussignée Mᵉ C. WINCKLER-AZOULAY
Notaire associé à GOLFE-JUAN
CERTIFIE ʄᵃ signature ci-contre de
Monsieur Karl ROSENBROCK .
GOLFE JUAN, le 15 novembre 2007

C. WINCKLER-AZOULAY
NOTAIRE
GOLFE-JUAN - VALLAURIS



**B 17**

# Declaration of Deiter Kaiser

Munich, 14th November 2007

### Declaration of Dieter Kaiser
### former Chairman of the ETSI Board

I am Dieter Kaiser.

1. I was born in Cologne/Germany in 1940. After study of electrical and communications engineering including industrial management at the Technische Universität München, I started my business career at the SIEMENS AG in 1965.

2. From 1983 till 2003 I have been active in international telecommunications standardization matters at the International Telecommunications Union (ITU-T) and since 1988 at the European Telecommunications Standards Institut (ETSI). Among others, I have been Vice Chairman and Chairman of the ETSI Technical Committee SPS (Signalling Protokolls and Switching) from 1988 to 1999 and Chairman of the Technical Assembly of ETSI from 1996 to 1999.

3. I have been Vice Chairman and elected Chairman of the ETSI Board during the decisive period for ETSI from 1996 until 2002, with the establishment of the international 3rd Generation Mobility Standardizations Activity.

4. From my all in all twenty years of intimate knowledge of international standardization matters and its principles , my experience as Chairman and Vice Chairman of the ETSI Board, eleven years experience as Vice Chairman and Chairman of ETSI SPS, twenty years as delegate in ETSI and at the ITU-T, I state the following:

5. It is and has been a fundamental principle of standardization used in ETSI that anyone may use technology that has been incorporated into an ETSI Standard or an ETSI Technical Specification. It does not matter whether the technology is minor or substantial and no matter whether the technology is mandatory or optional to the ETSI Standard or ETSI Technical Specification. No part of a public standard may be off-limits to some but accessible to others.

6. ETSI has rules to prevent the standardization of patented technology that a patent holder is unwilling to license. Patented technology that an ETSI member or associate member is unwilling to license must be declared to ETSI in a timely manner, and may not be added to the standard if the ETSI member remains unwilling to license its patent.

7. The requirement to declare essential patents is set forth in the ETSI IPR Policy. Section 4.1 of the ETSI IPR Policy requires patents that are believed to be essential to a Standard or Technical Specification to be declared to ETSI in a timely fashion.

8. Options in the Standard are not exempt from the IPR Policy. To the contrary, the IPR Policy explicitly defines essentiality with reference to whether a Standard can be

**B 18**

practiced without infringing a patent, and defines a Standard as "including options therein" (see Sections 15.6 and 15.11). If a Standard including its options (not merely some of them, but *any choice* of them) can be practiced without infringing a patent, the patent is not essential to the Standard. If not, the patent is essential to the Standard.

9.    In my experience, no company would agree to introduce into a Standard, and certainly would not promote and encourage the standardization of, an option that it would not be permitted to practice in the future.

10.    It is against the fundamental principles of standardization for an ETSI member to obtain a monopoly position on an option in the Standard. It is completely inappropriate for an ETSI member to seek an injunction that would prevent another company from using an option in a Standard.

11.    The idea that the ETSI IPR Policy does not apply to options is absurd:

–  Standards are typically optional as a whole;

–  Within a Standard, many and typically most features are optional;

–  For alternative options for a feature, each alternative could be blocked with the argument that it is optional. This would leave the public unable to practice any of the options, and thus unable to practice the Standard.

12.    The points that are stated for a Standard in paragraphs 8-11 apply equally to a Technical Specification (see Sections 15.6 and 15.12 of the ETSI IPR Policy).


I swear under oath that the foregoing is true and correct.

Signed on 14th November 2007.


*Dieter Kaiser.*
Dieter Kaiser
Munich, Germany

2

**B 19**

URNr. 8368 / 2007

S/yp

| | |
|---|---|
| I hereby certify that the above is the true signature, signed in my presence, of | Ich beglaubige hiermit die Echtheit der vorstehenden, vor mir vollzogenen Unterschrift von |
| Mr. **Dieter Kaiser,** | Herrn **Dieter Kaiser,** |
| born September 26, 1940, | geboren am 26.09.1940, |
| residing at Bichler Straße 46, 81479 Munich, | wohnhaft Bichler Straße 46, 81479 München, |
| identified by his Identity Card No. 8016577480. | ausgewiesen durch seinen Personalausweis Nr. 8016577480. |
| Place Munich/ Date 14th November 2007 | Ort München/ Datum 14. November 2007 |



Dr. Bernhard Schaub,
Notar in München

Notary Public in Munich, Germany

**B 20**

# TruePosition Press Release

Home  |  Register

 **Global Wireless Location Solutions.**

Positioning Technology  |  Applications  |  End-to-End  |  Location Resource Center  |  News & Events  |  About Us  |  Careers  |  T

## News & Events  |  Press Releases

**Press Releases**
 - Archive

**Events**

**Press Kit**

**e-Newsletter**

### TruePosition Wins Patent Infringement Litigation Against Andrew Corporation

*Jury Finds for TruePosition on All Counts; Awards TruePosition $45.3 million; Determines Willful Infringement Exists*

**Berwyn, PA, September 17, 2007** — TruePosition, Inc., a leading provider of wireless location technologies and solutions and a subsidiary of Liberty Media Corporation, today announced that TruePosition has won a patent infringement suit against Andrew Corporation in the United States District Court in the District of Delaware, TruePosition, Inc. v. Andrew Corporation (Civ. No. 05-747-SLR).

On September 14, after a trial lasting two weeks, the jury found for TruePosition on all counts and awarded it $45.3 million for Andrew Corporation's willful infringement of its intellectual property.

This is the second time that TruePosition has successfully defended its intellectual property rights against Andrew Corporation. In this case, TruePosition sued Andrew Corporation for infringing a patent dealing with the location of wireless phones using the wireless network control channel, known as the "144" or "control channel" patent, which is particularly important for safety and security applications. This suit focused primarily on infringement related to contracts that Andrew Corporation entered into with a customer in Saudi Arabia.

"TruePosition is extremely pleased with the jury's decisive verdict in a case that deals with such advanced technology. This verdict is testament to the value – and the importance – of the intellectual property that TruePosition creates," said Frederic Beckley, Senior Vice President and General Counsel of TruePosition.

TruePosition previously sued Andrew Corporation for infringing other patents. In a 2004 settlement, Andrew agreed to pay TruePosition total compensation amounting to $42 million. In 2001, TruePosition also prevailed in an infringement suit against SigmaOne Communications Corp. in a case that involved the same patent at issue in the most recent suit against Andrew Corporation. TruePosition was represented by Woodcock Washburn LLP in all three actions.

**Related Info**

✉ Press Conta

**Downloads**

TruePosition
Overview Fa

Public Safety
Brochure

TruePosition
Overview Fla

**B 21**

"We will continue to vigorously enforce and protect TruePosition's exceptional innovations in wireless location technology," said Stephen Stuut, CEO of TruePosition. "This win illustrates our obligation to continuously deliver pioneering next generation safety solutions and other wireless location solutions to wireless providers and their customers."

**TruePosition – Market Leader for E-911**

With more than 15 years of experience and unrivaled technical expertise, TruePosition leads the US market in terms of wireless location systems deployed for Enhanced 911 service. TruePosition has successfully deployed over 75,000 location measurement units that cover more than 270 million people, and locates the majority of the 100 million wireless 911 calls made annually.

**About TruePosition**

TruePosition is dedicated to the development and implementation of advanced wireless location products, services and devices, providing complete solutions to support the wireless location needs of the global marketplace. In addition to providing industry leading core location technologies, TruePosition supports all levels of the wireless location value chain to offer turnkey solutions.

TruePosition's foundation was built on the development of advanced location systems, which include handset, network and hybrid location solutions. Today, TruePosition can offer hybrid location systems that incorporate Cell ID, Enhanced Cell ID, Uplink Time Difference of Arrival, Angle of Arrival, and Assisted GPS to power the next generation of location-based services. TruePosition is a subsidiary of Liberty Media Corporation that is attributed to its Liberty Capital Group (NASDAQ: LINTA, LINTB, LCAPA, LCAPB). For more information, visit www.trueposition.com

**For more information on TruePosition, please contact:**

Robin Kelman
Account Supervisor
Garfield Group Public Relations
Tel: +1 215 867 8600 ext. 244
**tppr@garfieldgroup.com**

**B 22**

# PTX 237

```
PRODBEG        = AND_EF0017136
TREATMENT      : Confidential Information
                 TPI v. Andrew, CA No. 05-00747-SLR
FILENAME       : 1365.htm
ATTACHMENT     :
FILEPATH       : \\Lpg1\Vol1\Data1\TPI-L3\Concordance\EAND005\010\AND_EF0017136.HTM
FILEPATHNEW    : \\Lpg1\VOL1\Data1\TPI-L3\Concordance\Integratede\AND_EF06282006\010\AND_EF0017136.MSG
OCR            : From: Davis, Jennifer <Jennifer.Davis@andrew.com>
                 Sent: Thursday, November 17, 2005 10:22 AM
                 To: Barker, Pete <pebarker@andrew.com>; Wynn, Randy <rawynn@andrew.com>; Freemire, Lowell
                 <lofreemire@andrew.com>; Li, Alan <alali@andrew.com>; McDaniel, Jim <jimcdaniel@andrew.com>; Bell,
                 Kent <kebell@andrew.com>; Cushman, Dave <dacushman@andrew.com>
                 Subject:  FW: shipment to Saudi Arabia
                 Attach:  SAUDI TELECOM_001.pdf
```

FYI – STC shipment scheduled to be in Saudi tomorrow.


Flight Details:


Master Airline Waybill ID: 065-8019 9991


Exel Package ID : CLT01 060731


Flight Information:


Booked on SV34

17-Nov-2005

from: IAD

to: RUH


Scheduled to

leave 17-Nov-2005

at 18:00


Scheduled to

arrive 18-Nov-2005

at 18:00


Freight Movement:

05


Consolidation documents printed

**PTX-237**



EXHIBIT
107
9-29-06

**B 23**

16-Nov-2005

18:00



04

Documents completed

16-Nov-2005

17:16



03

Freight delivered to Exel

11-Nov-2005

11:00



02

Freight picked up from customer

11-Nov-2005

08:00



01

Shipment booked

11-Nov-2005

**PTX-237**

**B 24**

12:45


Freight Details:


Total Number of Pieces

3


Total Charge Weight

909.5 KGM


Total Volume

5.455 MTQ


Jennifer Davis

434.386.5127 Phone

434.386.5320 FAX

-----Original Message-----
From: Omar Kazzaz [mailto:Omar.Kazzaz@US.Exel.Com]
Sent: Thursday, November 17, 2005 10:52 AM
To: Davis, Jennifer
Cc: Hessah Almoqati; Wade Thompson; Snyder, Susan Contact (EXEL.COM); Denise Palmer; Adriana Rios;
Ron Blandford
Subject: Re: shipment to Saudi Arabia


Good day Jennifer:

Here are the flight details and copies of legalized export docs for the

Saudi Telecom shpt.


As for Todd's shpt, I am still waiting for the legalized docs which we are

told we will rcv today or tomorrow as the consulate is in the process of

legalizing the customs letter for the temporary import into Saudi Arabia.


# PTX-237

**B 25**

Regards,

(See attached file: SAUDI TELECOM_001.pdf)

Omar Kazzaz

Export Manager

Exel

Freight Management, US

Email: omar.kazzaz@us.exel.com

Office:  (704) 357 0117

Mobile: (704) 578 0932

Fax:     (704) 357 0468

Address:

Exel Global Logistics, Inc.

4325 Beam Rd

Suite 105

Charlotte, NC 28217


"Davis, Jennifer"

<Jennifer.Davis@a    To:    "Omar Kazzaz" <Omar.Kazzaz@US.Exel.Com>

ndrew.com>          cc:

Subject:  shipment to Saudi Arabia

11/17/2005 08:44

AM

**PTX-237**                                              **B 26**

Omar,

Are flight details available yet for the shipment? I was in hopes the paperwork got finalized yesterday. Please let me know.

Thanks,
Jennifer

---

This message is for the designated recipient only and may contain privileged, proprietary, or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any unauthorized use of this email is prohibited.

---

[mf2]

**PTX-237**                                                          **B 27**

Important Email Information

The information in this email is confidential and may be legally privileged.

It is intended solely for the addressee. Access to this email by anyone else

is unauthorized. If you are not the intended recipient, any disclosure, copying,

distribution or any action taken or omitted to be taken in reliance on it,

is prohibited and may be unlawful. If you are not the intended addressee please

contact the sender and dispose of this e-mail.

**PTX-237**                                             **B 28**

House Air Waybill No.

CLT01  060731

| Shipper's Name and Address | Shipper's account Number 1000104900 | Not Negotiable **Air Waybill** (Air consignment note) Issued by | **exel** |
|---|---|---|---|

ANDREW CORPORATION
10500 WEST 153RD STREET
ORLAND PARK
IL
60462                    US        US

**Exel Global Logistics Inc**
4120 Point Eden Way - Suite 200, Hayward, CA 94545

Copies 1, 2 and 3 of this Air Waybill are originals and have the same validity.

| Consignee's Name and Address | Consignee's account Number 0000029735 |
|---|---|

SAUDI TELECOM COMPANY
ATTN: MOUTAZ ALHARBI
011966503251791 2ND AL AKHARIA
BLDG OLAYA ST.
RIYADH          SAUDI ARABIA     SA

It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) and SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF. ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD, RAIL, MOTOR OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE CARRIED VIA INTERMEDIATE STOPPING PLACES WHICH THE CARRIER DEEMS APPROPRIATE. THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

Issuing Carrier's Agent Name and City

MAWB NO.    065-8019 9991

Accounting Information

Factory Order No. ANDREW DELIVERY
ORDE, P.O.NBR: ANDREW SALES ORDER N

Agent's IATA Code                    Account No.

Airport of Departure (Addr. of first Carrier) and requested Routing

WASHINGTON DULLES INTL

| By first Carrier | Routing and Destination | to | by | to | by | Currency | CHGS Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RUH  SV | | | | | | USD | | X | X | NVD | SAR 1767949.00 |

| Airport of Destination | Flight/Date | For Carrier Use only | Flight/Date | Amount of Insurance | INSURANCE - If carrier offers insurance and such insurance is requested in accordance with conditions on reverse hereof, indicate amount to be insured in figures in box marked amount of insurance. |
|---|---|---|---|---|---|
| RIYADH | SV34/17 | | | XXX | |

Handling Information

DOCS ATTACHED: COMM INV. 8110944
KNOWN/VERIFIED,  NDR/AES/EIN132622043,  -1007821116

These commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. Law Prohibited.

| No. of Pieces RCP | Gross Weight | Rate Class Commodity Item No. | Chargeable Weight | Rate Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|
| 3 | 705.0 KN | 9999 | 909.5 | 2227.05 | 2227.05 | TELECOMMUNICATION EQUIPMENT ** LETTER OF CREDIT ** |
| | | | | | | |
| | | | | CMT | | |

VOL & DIMS CONTD: CMT
EXEL INDIRECT AIR CARRIER SECURITY PROGRAM APPROVAL
NUMBER: WP-93-11-002.

VOL:5.455MTQ  DIMS:
3 @ 121.9x106.7x139.7

| 3 | 705.0 | | | | 2227.05 | |
|---|---|---|---|---|---|---|

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| 2227.05 | | | |

Valuation Charge

Tax

Total other Charges Due Agent

Total other Charges Due Carrier

1025.83

Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations.

EXEL GLOBAL LOGISTICS INC
FOR ANDREW CORPORATION

Signature of Shipper or his Agent

| Total prepaid | Total collect |
|---|---|
| 3252.88 | |

Carrier certifies that the goods described hereon were received for carriage subject to the Conditions of Contract on the reverse hereof the goods are being in apparent good order and condition except as may be noted hereon.

16Nov05          CLT  EXEL GLOBAL LOGISTICS INC
Executed on     (Date)          (Place)    Signature of Issuing Carrier or its Agent

| Currency Conversion Rates | cc charges in Dest. Currency |
|---|---|

| For Carrier's Use only at Destination | Charges at Destination | Total collect Charges |
|---|---|---|

E-226-C (4/05)

**PTX-237**

Original 3 – For Shipper     CLT01  060731     ORIGIN SET

**B 29**

**ANDREW**

## ANDREW CORPORATION
10500 WEST 153RD STREET ORLAND PARK IL 60462 US
Phone 1-708-349-3300 Fax 1-708-349-5699

| COMMERCIAL INVOICE NO: 8110944 | SALES ORDER NO: 1219769 | COMMERCIAL INVOICE DATE: 25 Oct 2005 |
|---|---|---|

| SOLD TO | SHIP TO | FORWARDER | SHIPPED FROM |
|---|---|---|---|
| SAUDI TELECOM COMPANY | SAUDI TELECOM COMPANY | | Andrew Forest |
| THE MANAGER, EXPENDITURE DEPT | ATTN: MOUTAZ ALHARBI | | 140 Vista Centre Drive |
| STC HEADQUARTERS | 011-966-50-325-1731 | | FOREST VA 24551 |
| KING ABDUL AZIZ COMPLEX, RIYADH | 2ND AL AKHARIA BLDG, OLAYA ST, | | UNITED STATES |
| KINGDOM OF SAUDI ARABIA | RIYADH | | CREATED BY: MIHARE |
| SAUDI ARABIA | SAUDI ARABIA | | |

These commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited.

On behalf of Andrew Corporation, I hereby swear that the prices stated in this invoice are the correct export market prices for the merchandise described herein and that the origin of these goods is as mentioned below. I accept full responsibility for any inaccuracies or errors herein. United States law prohibits dispositions of these commodities to Libya, Cuba, North Korea, Iran, and Iran unless otherwise authorized by the United States.

SHIP C/O EXEL FREIGHT MANAGEMENT- CHARLOTTE, NC
ALL ITEMS WITH $0.00 ARE INCLUDED IN THE PACKAGE PRICE ABOVE THAT ITEM

| Item No /Desc | Customer PO | Commodity Code | Origin | Quantity | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|
| GEO-LMU2E | LOI FIELD TRIAL | 9031.80.8085 | US | 28 | EA | 41,006.00 | 1,148,168.00 |
| Location Measurement Unit | | | | | | | |
| LMU2E | LOI FIELD TRIAL | 9031.80.8085 | US | 28 | EA | 0.00 | 0.00 |
| WLS V3, 2 CH,EUROPEAN | | | | | | | |
| A003126.G1 | LOI FIELD TRIAL | 8529.10.9000 | US | 28 | EA | 0.00 | 0.00 |
| ASSY,KIT,V3 MOUNTING BRACKET,19" | | | | | | | |
| G21AA035-1 | LOI FIELD TRIAL | 8529.10.7000 | US | 28 | EA | 0.00 | 0.00 |
| ANTENNA,GPS,35 Db GAIN,TNC CONNECTOR | | | | | | | |
| G71A0065-2 | LOI FIELD TRIAL | 7306.30.5032 | US | 28 | EA | 0.00 | 0.00 |
| PIPE,3/4"GALV SS,LNGTH 2FT,THREA BOTH EN | | | | | | | |
| G20A0022-1 | LOI FIELD TRIAL | 7318.15.2095 | US | 56 | EA | 0.00 / 100 | 0.00 |
| U-BOLT,3/4"PIPE,1/4-20THD,1 1/4 D,2 1/4L | | | | | | | |
| G14A0803-2 | LOI FIELD TRIAL | 8536.69.4010 | US | 350 | EA | 0.00 | 0.00 |
| CONN, EZ, QMA-M, RA, LMR-240 | | | | | | | |
| G14A0726-1 | LOI FIELD TRIAL | 8536.69.4010 | US | 280 | EA | 0.00 | 0.00 |
| TNC,STR,MCRIMP,LMR-240 CX,NONSLDRCNTRPIN | | | | | | | |
| G18A0016-1 | LOI FIELD TRIAL | 8544.20.0000 | US | 20 | EA | 0.00 | 0.00 |
| WIRE,CX,LMR-240,FOILSH,PLY FOAM,500F SPL | | | | | | | |
| G46A0002-2 | LOI FIELD TRIAL | 8536.30.8000 | US | 28 | EA | 0.00 | 0.00 |
| LGHTNG ARSTR,TNCFOC-1.75G,30A 1KV 15 MIN | | | | | | | |
| G15A0789-1 | LOI FIELD TRIAL | 8544.49.8000 | US | 28 | EA | 0.00 | 0.00 |
| CABLE,ASSY,ALARM | | | | | | | |
| G21AA043-2 | LOI FIELD TRIAL | 8529.10.7000 | US | 28 | EA | 0.00 | 0.00 |
| ANTENNA,800 / 1900 MHZ,3DB,QMA,MAG MOUNT | | | | | | | |

| | TERMS AND CONDITIONS | | | | TOTALS | |
|---|---|---|---|---|---|---|
| Total Pieces | 3 | Cubic IN3 | 307200.000 | Gross LB 1550.000 | Total SAR | 1,767,949.00 |
| | | Cubic M3 | 5.034 | Gross KG 702.948 | | |

Payment Terms  TO BE DETERMINED
Shipping Terms  PPB
Trade Terms  FOB DESTINATION

The Humble Area Chamber of Commerce recognized under the laws of the State of Texas Certifies in reliance of representation of the exporter and not on the basis of independent verification that to the best, of its knowledge and belief the above information is true and correct.

*Mary B. Martinez*

JULIE A. CASTORENA
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires
DECEMBER 10, 2005

**PTX-237**

**B 30**

**ANDREW.**

# ANDREW CORPORATION
## 10500 WEST 153RD STREET ORLAND PARK IL 60462 US
### Phone 1-708-349-3300 Fax 1-708-349-5699

| COMMERCIAL INVOICE NO: 8110944 | SALES ORDER NO: 1219769 | COMMERCIAL INVOICE DATE: 25 Oct 2005 |
|---|---|---|

| SOLD TO | SHIP TO | FORWARDER | SHIPPED FROM |
|---|---|---|---|
| SAUDI TELECOM COMPANY | SAUDI TELECOM COMPANY | | Andrew Forest |
| THE MANAGER, EXPENDITURE DEPT | ATTN: MOUTAZ ALHARBI | | 140 Vista Centre Drive |
| STC HEADQUARTERS | 011-966-50-325-1791 | | FOREST VA 24551 |
| KING ABDUL AZIZ COMPLEX, RIYADH | 2ND AL AKHARIA BLDG. OLAYA ST, | | UNITED STATES |
| KINGDOM OF SAUDI ARABIA | RIYADH | | CREATED BY: MIHARE |
| SAUDI ARABIA | SAUDI ARABIA | | |

| Item No /Desc | Customer PO | Commodity Code | Origin | Quantity | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|
| A002689.G1 | LOI FIELD TRIAL | 8529.10.9000 | US | 10 | EA | 0.00 | 0.00 |
| ASSY,KIT 500 EA., 14 1/2" TIE WRAPS | | | | | | | |
| G15A0535-4 | LOI FIELD TRIAL | 8544.20.0000 | US | 27 | EA | 0.00 | 0.00 |
| CABL,CAT5,20FT,RJ45 TO RJ45 STRAIGHT,SHL | | | | | | | |
| G18A0021-5 | LOI FIELD TRIAL | 8544.20.0000 | US | 2 | EA | 0.00 | 0.00 |
| WIRE,2 COND.,12 GA BELDEN 9412,1000FT | | | | | | | |
| G75A0259-1 | LOI FIELD TRIAL | 8536.69.4050 | US | 26 | EA | 0.00 | 0.00 |
| ADAPTER,RF45F TO DB15M,CUSTOM | | | | | | | |
| G14A0804-2 | LOI FIELD TRIAL | 8536.69.4010 | US | 100 | EA | 0.00 | 0.00 |
| RING TERMINAL, #6, 12-10 GA, BRAZED | | | | | | | |
| GEO-SMLC-ANS | LOI FIELD TRIAL | 8543.89.9695 | US | 1 | EA | 215,265.00 | 215,265.00 |
| Andrew SMLC Hardware | | | | | | | |
| A002979.G3 | LOI FIELD TRIAL | 8517.50.5000 | US | 1 | EA | 0.00 | 0.00 |
| SUBASSEMBLY TEMPLATE | | | | | | | |
| A002838.G2 | LOI FIELD TRIAL | 8517.50.5000 | US | 1 | EA | 0.00 | 0.00 |
| CISCO7206 RUTER,DC DUAL PWR,CHASSIS ONLY | | | | | | | |
| G15A0586-1 | LOI FIELD TRIAL | 8544.49.8000 | US | 1 | EA | 0.00 | 0.00 |
| CBL,DB25M/DB25M,6 FT,25CONDU,STAT THRU | | | | | | | |
| G71A0099-1 | LOI FIELD TRIAL | 8529.10.9000 | US | 1 | EA | 0.00 | 0.00 |
| GCS, ETH. SW 23" RK MT KIT | | | | | | | |
| G75A0128-2 | LOI FIELD TRIAL | 8524.91.0070 | US | 1 | EA | 0.00 | 0.00 |
| GCS, 16 PORT ETHER SW., -48VDC, RK MT | | | | | | | |
| G75A0148-1 | LOI FIELD TRIAL | 8529.10.9000 | US | 1 | EA | 0.00 | 0.00 |
| MODEM,EXTERNAL,DATA / FAX,USR5686E | | | | | | | |

# PTX-237

## B 31

**ANDREW.**

# ANDREW CORPORATION
### 10500 WEST 153RD STREET ORLAND PARK IL 60462 US
### Phone 1-708-349-3300 Fax 1-708-349-5699

| COMMERCIAL INVOICE NO: 8110944 | SALES ORDER NO: 1219769 | COMMERCIAL INVOICE DATE: 25 Oct 2005 |
|---|---|---|

| SOLD TO | SHIP TO | FORWARDER | SHIPPED FROM |
|---|---|---|---|
| SAUDI TELECOM COMPANY | SAUDI TELECOM COMPANY | | Andrew Forest |
| THE MANAGER, EXPENDITURE DEPT | ATTN: MOUTAZ ALHARBI | | 140 Vista Centre Drive |
| STC HEADQUARTERS | 011-966-50-325-1791 | | FOREST VA 24551 |
| KING ABDUL AZIZ COMPLEX, RIYADH | 2ND AL AKHARIA BLDG. OLAYA ST, | | UNITED STATES |
| KINGDOM OF SAUDI ARABIA | RIYADH | | CREATED BY: MIHARE |
| SAUDI ARABIA | SAUDI ARABIA | | |

| Item No /Desc | Customer PO | Commodity Code | Origin | Quantity | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|
| G75A0174-1 | LOI FIELD TRIAL | 8517.50.5000 | US | 1 | EA | 0.00 | 0.00 |
| RTR,CISCO7200,8PRTT1 (8E1)ADPT W/CSU/DSU | | | | | | | |
| GEO-SMLCSW-ANS | LOI FIELD TRIAL | 8524.91.0070 | US | 28 | EA | 3,061.00 | 85,708.00 |
| SMLC Software | | | | | | | |
| GEO-LMU2E-SW | LOI FIELD TRIAL | 8524.91.0070 | US | 28 | EA | 8,937.00 | 250,236.00 |
| LMU Software | | | | | | | |
| GEO-AMU-SW | LOI FIELD TRIAL | 8524.91.0070 | US | 28 | EA | 2,449.00 | 68,572.00 |
| AMU Software | | | | | | | |

|  | |
|---|---|
| NET VALUE | 1,767,949.00 |
| SALES TAX | 0.00 |
| TOTAL SAR | 1,767,949.00 |

# PTX-237

# B 32

# CERTIFICATE OF ORIGIN

The Undersigned _____ EXEL 4325 BEAM ROAD SUITE 105 CHARLOTTE, NC _____

(Owner or Agent, &c)

for _____ ANDREW CORPORATION 10500 WEST 153RD STREET ORLAND, FL 60462 US _____ declares

that the following mentioned goods shipped on S/S _____ EXEL _____

Name of Ship

on the date of __ NOVEMBER 10, 2005 ___    consigned to: __ SAUDI TELECOM COMPANY 2ND AL AKHARIA BLDG OLAYA ST. __

_____ RIYADH SAUDI ARABIA _____    are the products of UNITED STATES OF AMERICA.

| MARKS AND NUMBERS | NO. OF PKGS, BOXES OR CASES | WEIGHT IN KILOS GROSS | NET | DESCRIPTION |
|---|---|---|---|---|
| AS ADDRESSED | 4 PCS | 727.90 | | TELECOMMUNICATION EQUIPMENT |
| | | | | POL: NC |
| | | | | POD: SAUDI ARABIA |

Sworn to before me

this ____ 10 ____ day of ____        HOUSTON    on the 10 day of NOVEMBER 20 05

JULIE A. CASTORENA
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires
DECEMBER 10, 2005

Signature of Owner or Agent

The HUMBLE AREA CHAMBER OF COMMERCE _____, a recognized Chamber of Commerce under the laws of the State of TX ,
has examined the manufacturer's invoice or shipper's affidavit concerning the origin of the merchandise and, according to the best of its
knowledge and beliefs, finds the information to be true and correct.

The Humble Area Chamber of Commerce recognized under
the laws of the State of Texas Certifies in reliance of
representation of the exporter and not on the basis of
Secretary _____ independent verification that to the best, of its knowledge
and belief the above information is true and correct.

*Mary E. Martinez*

# PTX-237

# B 33

# Excerpts of April 10, 2007 Hearing Transcript

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    TRUEPOSITION, INC.,              :        CIVIL ACTION
                                      :
5              Plaintiff             :
                                      :
6         vs.                        :
                                      :
7    ANDREW CORPORATION,              :
                                      :
8              Defendant             :        NO. 05-747 (SLR)

9                        - - -

10                              Wilmington, Delaware
                                Tuesday, April 10, 2007
11                              8:30 o'clock, a.m.

12                       - - -

13   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

14                       - - -

15   APPEARANCES:

16           CONNOLLY, BOVE, LODGE & HUTZ LLP
             BY:  JAMES D. HEISMAN, ESQ.
17
                        -and-
18
             WOODCOCK WASHBURN LLP
19           BY:  PAUL B. MILCETIC, ESQ.,
                  KATHLEEN MILSARK, ESQ. and
20                DANIEL J. GOETTLE, ESQ.
                  (Philadelphia, Pennsylvania)
21

22                       Counsel for Plaintiff

23                              Valerie J. Gunning,
                                Official Court Reporter
24

25

**B 34**

1    patent.  The other cross-hatched piece of U-TDOA is not.

2             THE COURT:  All right.  So you say the '144

3    patent covers that whole section, but that it isn't, it

4    wasn't -- you weren't required to disclose it because it

5    is technically possible to implement the standard without

6    infringing the '144 patent?

7             MS. MILSARK:  You can do it with cell I.D.

8    You can do it with enhanced cell I.D.  You can do it with

9    assisted GPS, you can do it with U-TDOA.

10            THE COURT:  Is there any way to do U-TDOA

11   without infringing the '144 patent?

12            MS. MILSARK:  You can do U-TDOA on the voice

13   channel without infringing the '144 patent.

14            THE COURT:  Let's be real specific.  Is there

15   any way of doing the yellow without infringing the '144

16   patent?

17            MS. MILSARK:  You can move it over to the

18   voice channel.  You can do idle mode location on the voice

19   channel if you get the cooperation of the RAM vendor.

20   It's technically possible.  This is where you get into the

21   damage expert testimony where she's saying it may not be

22   commercially feasible.

23            THE COURT:  Well, tell me something.  Your

24   company, with the help of Grayson, took the yellow sliver,

25   the U-TDOA, and took it to the standards committee and

**B 35**

1   proposed it, but yet you're saying, because it's policy to

2   use other technology, that your patent isn't essential?

3                   MS. MILSARK:  We took the whole wedge.

4                   THE COURT:  You took the whole wedge?

5                   MS. MILSARK:  The whole wedge is U-TDOA.  The

6   whole wedge is what is covered by the U-TDOA location

7   finding mechanism in what we understand to be the standard.

8                   THE COURT:  And the fact -- but the fact that

9   the '144 patent only covers part of that -- I mean, it

10  just strikes me that you weren't being completely honest.

11                  MS. MILSARK:  Something that's going on in

12  the background here I think is what is the purpose of a

13  standards body and what kind of concerns are going on

14  there.

15                  I think it's fair to say that there are always

16  antitrust concerns whenever you have competitors getting

17  together and talking about their technology and one of

18  the concerns that is always lurking in the background is

19  that you don't want a company to be able to extract a

20  license stream that it's not really entitled to.

21                  So a lot of times you have companies coming

22  in and saying, Oh, this is ours.  Let's put this in the

23  standard and then you'll have to pay us gobs and gobs of

24  money.

25                  And so there's intention, and the intention

**B 36**

1  is reflected in the ETSI policy, which is in our appendix,

2  which says that you want to weigh the balance between

3  patent holders and/or I.P. holders and open access to

4  technology.

5          THE COURT:  But you did not let them weigh the

6  balance.  You weigh the balance yourself?

7          MS. MILSARK:  Well, because we looked at the

8  definition of essential and we said is it essential?  No.

9  Within the definition of essential always we understand

10 the definition, it is not, because voice channel is the

11 way that it's typically done and it's done everywhere to

12 answer 911.  That was the technology at the time.

13         And looking at the essential definition, our

14 people, and you can see it from their testimony which is

15 in the appendix, didn't believe it to be essential.

16         THE COURT:  All right.  Let's move on to

17 something else.

18         Thank you.

19         MR. MILCETIC:  Your Honor, Paul Milcetic on

20 behalf of TruePosition.  I really, really apologize for

21 this, but could you give me 90 seconds?  I have a health

22 issue to take care of.  Be back immediately.

23         THE COURT:  Yes.  We'll take five minutes.

24         MR. MILCETIC:  Thank you.

25         THE COURT:  All right.

**B 37**

# Excerpts from Trial Transcipts

92

1   therefore, we won't be going as long as 4:30 in the
2   afternoon.  And we'll try very hard to stick to the schedule
3   that we've given you.
4           All right.  I'm done with my preliminary
5   instructions and I think we're ready to start with our
6   opening statement from plaintiff's counsel.
7           MR. MILCETIC:  Thank you, your Honor.
8           As you've just seen in the video, this case is
9   really about inventions and it's really about a company whose
10  patented inventions have been taken by a corporation that's
11  now trying to invent an excuse for taking those patented
12  inventions.
13          My name is Paul Milcetic and I represent the
14  company that made the invention, TruePosition.  In fact, I
15  and the people sitting at this table represent TruePosition.
16          And the corporation that took the inventions in
17  this case is the defendant, Andrew Corporation.
18          Over the next few days, you're going to hear
19  from some people that made the invention in this case and
20  people that worked at TruePosition since the time that it
21  began.
22          The gentleman that worked on the invention and
23  made it was John Webber.  You're going to hear from him, and
24  you're also going to hear from people at TruePosition that
25  have been with TruePosition almost since the time the company

**B 38**

1  began.

2          You're going to hear from the former President.

3  He's going to be our first witness who was the President

4  of the company until just a few days ago.  His name is Joe

5  Sheehan.  Joe is actually in the courtroom.

6          Stand up, Joe.

7          Joe lives with his family just outside

8  Philadelphia and he was with the company since 1995.  The

9  company began in 1992.  He was the second employee and

10  today has between 300 and 400 employees.

11          Back in 1992, TruePosition came up with a new

12  and revolutionary idea for finding where a cell phone is.

13  There -- and the basic idea was they came up with the idea

14  in 1992.  They filed for a patent in 1993, and in 1994,

15  the patent was issued, and this is it, the '144 patent

16  (indicating).  It's the patent that's at the center of the

17  case.  And it's an idea that launched the company, so that

18  back then, the company built its -- its concepts and its

19  principles around this patent and it went from two

20  employees to 350 to 400 employees today.

21          The basic idea is for finding a cell phone and

22  there's a lot of reasons why you'd want to find a cell

23  phone.  One is if someone is dialing 911, let's say, and

24  they're in distress.  They're having a heart attack, you

25  want to be able to send an ambulance to that person and to

1  find where they are.  That's one reason you want to find a

2  cell phone.

3          Another reason for finding a cell phone would

4  be tracking terrorists, tracking someone who doesn't want to

5  be found.  Tracking elderly people, children, lost children

6  that are carrying cell phones.  So back in 1992, TruePosition

7  had an idea for finding a cell phone and that idea was to use

8  the cell phone's control channel signals to find where the

9  cell phone is.

10          So I'm going to explain a little bit to you

11  and we're going to get into more detail in this case, but

12  basically the idea is that in a cellular network, there

13  are two kinds of signals that a cell phone sends:  Voice

14  channel signals and control channel signals.

15          Voice channel signals are signals that a cell

16  phone sends when you are talking, and they are called voice

17  channel signals because -- because they're carrying your

18  voice.  That is why they call them voice channel signals.

19  And what you just saw in the animation there was that your

20  voice is carried to a cell to your, and when I say cell

21  tower, they're basically just big antennas.  You see them

22  on the road.  They're part of a cellular network.  When I

23  say cellular network, I mean like AT&T wireless, Verizon,

24  Cingular, that kind of thing.

25          Those signals are carried to a cell tower and

**B 40**

Sheehan - direct                           148

1    Telecom.  And I think they were acquired by Andrew

2    Corporation.

3                        - - -

4    A.    (Continuing)  and then I think Allen Telecom was

5    acquired by Andrew Corporation.

6    Q.    When you -- when the Andrew Corporation that is

7    competing with you today was part of Allen Telecom, were

8    you competitors?

9    A.    Yes, we were.

10   Q.    How do you know?

11   A.    I guess, among other reasons, we were competing for

12   the same business at -- several cellular operators, the

13   likes of AT&T Wireless, Cingular Wireless, Team Mobile, a

14   few others.

15   Q.    When did Andrew Corporation acquire those prior

16   entities?

17   A.    I'm trying to remember the exact time frame, but

18   probably back in the 2002 time frame or late 2001, early

19   2002, I think, as I recall.

20   Q.    All right.  And since that time, has Andrew

21   Corporation and TruePosition, have they been competitors?

22   A.    Yes, we have.

23   Q.    During any point in that time, were Andrew Corporation

24   and TruePosition not competitors?

25   A.    No.

**B 41**

Sheehan - direct                    149

1  Q.    What do you understand to be the relative size of

2  Andrew Corporation versus TruePosition?

3  A.    I think Andrew Corporation is a lot bigger than

4  TruePosition.  I think they're -- the last published

5  revenues I saw from them were over $2 billion per year.

6  I think TruePosition's revenues are on the order of $225

7  million a year.  So roughly ten -- more than ten times

8  the size of TruePosition.

9  Q.    I'd like to put into evidence -- I would like to,

10 before I do that, ask you to turn to Exhibit PX-7 in your

11 binder.

12 A.    Yes.

13 Q.    Do you recognize that document?

14 A.    Yes, I do.

15 Q.    What is it?

16 A.    It's -- it's a letter from our attorneys,

17 TruePosition's attorneys, to Allen Telecom, informing them

18 of several patents, including the '144 patent.

19 Q.    Okay.

20 A.    And we were asking as to whether or not they, you

21 know, they were utilizing these.

22 Q.    Okay.

23 A.    And would require a license or not.

24         MR. MILCETIC:  I would like to offer into

25 evidence Exhibit PX-7.

**B 42**

Sheehan - direct                     150

1        MR. DESMARAIS:  No objection.

2        THE COURT:  Thank you.

3        DEPUTY CLERK:  So marked.

4   ***        (Plaintiff's Exhibit No. 7 was received into

5   evidence.)

6   BY MR. MILCETIC:

7   Q.    Now, around the time that this letter was sent, did

8   you know it at the time?

9   A.    Yes.

10  Q.    You mentioned a license.  What does the letter say

11  about a license?

12  A.    Effectively, the last sentence of the letter asks --

13  inquires as to whether they're interested in licensing or

14  would need further information regarding any of these

15  patents, including the '144 patent.  That's the sentence.

16  Q.    After -- well, who was this sent to again?

17  A.    This was sent to Allen Telecom, but directly to Joe

18  Kennedy, I believe, it's titled.

19  Q.    Is it your understanding that he's still with Andrew

20  Corporation?

21  A.    I'm not sure if he's still directly with them.  Maybe

22  affiliated with them.  I'm not sure.

23  Q.    Is it your understanding that he was with them until

24  recently?

25  A.    Yes.

**B 43**

Beckley - direct                                    499

1   BY MS. MILSARK:

2   Q.    You are referring to the last paragraph, where it

3   says --

4   A.    That's right.

5   Q.    If you would like to inquire about a license or need

6   further information, please contact me directly.

7   A.    That's right.

8   Q.    At the time of this letter, was TruePosition willing

9   to license the '144 patent to Andrew?

10  A.    Yes, we were.  It's actually -- it's in the second

11  paragraph.  Actually -- yeah.  The page before.

12  Q.    Is that the '144 patent that's mentioned?

13  A.    Yes.

14  Q.    I didn't ask you before, and I should have.  In

15  your role as General Counsel, were you involved in

16  licensing intellectual property for the company?

17  A.    Yes, I am.

18  Q.    So if a license had been requested or granted, you

19  would have been involved in that?

20  A.    Yes, certainly.

21  Q.    What happened as a result of this lettered?

22  A.    Really, nothing.  We didn't get a response.

23  Q.    All right.

24  A.    So eventually, in the course of things, we actually

25  filed suit.

**B 44**

Beckley - direct                    500

1   Q.    Do you remember when that was?

2   A.    Yes.  We filed suit at the end of -- near the end of

3   2001.

4   Q.    Okay.

5   A.    I believe.

6   Q.    And did you include the '144 patent in this suit that

7   you filed at that time?

8   A.    No, we didn't.

9   Q.    Why not?

10  A.    At that time, Andrew's product was a voice-generated

11  product.  They were in the market of providing location

12  services for 911 calls.  When someone calls 911 from the

13  cell phone, by definition, you're talking, you're on the

14  voice channel, they weren't using the control channel, so

15  therefore they didn't need a license to the patent.

16  Q.    Now, you are involved in overseeing litigation; is

17  that right?

18  A.    Yes, I am.

19  Q.    So you oversaw that litigation, paid attention to

20  what the outside lawyers were doing?

21  A.    Mostly.

22  Q.    Do you remember whether Andrew used that '144 patent

23  at all in connection with the last litigation?

24  A.    Yes, they did.  They used -- they tried to use it

25  against us to say that it constituted prior art against

**B 45**

Beckley - direct                    501

1    another one of our GSM patents that was involved in the

2    suit.  I think it was our '192 patent, and they actually

3    filed it with the Court, with a brief or a motion, or

4    something in the patent itself.

5    Q.    In your experience, when a lawyer files a brief or

6    a motion like you just discussed that cites certain

7    documents, does he typically review them, analyze them?

8    A.    I would expect so.

9    Q.    You hope your lawyers do?

10   A.    I hope they do.

11   Q.    Once the prior litigation was under way, were there

12   ever any discussions about licensing?

13   A.    Yes.  During the course of the litigation, there were

14   a few, a few discussions.

15   Q.    Did any of those discussions involve the '144 patent

16   or did they just discuss -- involve the discussions of the

17   patents that were at issue in that case?

18   A.    There were two separate sets of discussions, I should

19   say, both of which involved the '144 patent during that

20   case.

21   Q.    Let's take the first one.  What was that all about?

22   A.    The first one at the time Andrew's primary customer

23   was AT&T Wireless, and AT&T Wireless became nervous about

24   their supply of their product.

25              So they sort of tried to intervene in the

**B 46**

Beckley - direct                    502

1   lawsuit and tried to force a settlement between the parties.

2   Q.    Could you look at PTX-8 in your book, please?

3         Do you recognize this?

4   A.    Yes, I do.

5   Q.    Can you tell me what it is?

6   A.    This is an e-mail that I wrote to two attorneys at

7   Andrew and an attorney at AT&T.

8         MS. MILSARK:  Your Honor, I move the admission

9   of PTX-8.

10        MR. DESMARAIS:  No objection.

11        THE COURT:  Thank you.

12        DEPUTY CLERK:  So marked.

13  ***       (Plaintiff's Trial Exhibit No. 8 was received

14  into evidence.)

15        MS. MILSARK:  Can we get that a little less

16  fuzzy?

17  BY MS. MILSARK:

18  Q.    So you say this is an e-mail from you to who?

19  A.    Yes.  The individual is Pat McPherson, who was at the

20  time -- he was Andrew's outside attorney.  I think he has

21  been replaced.  Laura Meagher I believe was the President

22  of Allen Telecom.  I believe she has been replaced.  Glen

23  Blumstein is an intellectual property lawyer at AT&T.  I

24  believe he's still there.

25  Q.    What was the purpose of the e-mail?

**B 47**

1    A.    That section is describing the time difference of

2    arrival method for locating the cell phone, TDOA, and says

3    the TDOA technique works by measuring the exact time of

4    arrival of a radio signal, that's the RF signal, at three

5    or more separate cell sites, just like in the patent.

6              Do you want me to continue reading?

7    Q.    Sure.

8    A.    Because radio waves travel at a fixed and known

9    rate, the speed of light, by calculating the difference

10   in arrival time at pairs of cell sites, it is possible to

11   calculate hyperbolas on which the transmitting device is

12   located.

13             Hyperbolas, that's a fancy name to those

14   curves that we saw earlier, so it can calculate those

15   curves, hyperbolas, on which the transmitting device, that

16   is the cell phone transmitting on the reverse control

17   channel, is located.

18             And as then if Figure 222 -- as seen in

19   Figure 2.2.1, measurements at two pairs of cell sites.

20             MR. MILCETIC:  Could we highlight the whole

21   top of that picture?

22             THE WITNESS:  Create two intersecting

23   hyperbolas, those curves, indicating the location of the

24   transmitting device.  That's the cell phone.  The TDOA

25   technique uses the existing receive antennas already

**B 48**

1    present at a cell site.

2    BY MR. MILCETIC:

3    Q.    Okay.  So would Andrew -- what Andrew Corporation is

4    showing in your mind, is that similar to what you've been

5    showing the jury today in terms of tutorial and how time

6    difference of arrival works?

7    A.    Yeah, in a nutshell, yeah.

8    Q.    So the little circles coming from the phone, what

9    are they?

10   A.    These are the hyperbolas, the curves, that were

11   described that determined based on time difference of

12   arrival between pair of cell sites.

13   Q.    What about the circles?  The circles?

14   A.    The circles show the transmission of the radio

15   frequency, the control channel on the reverse control

16   channel signal, transmitting from the phone to those

17   antennas.

18   Q.    And the three, what are the three things around?

19   A.    These are three antennas, three cell sites.

20   Q.    All right.  Now, did you rely in part on this

21   document, PX-171, to form your opinion?

22   A.    Yes.

23   Q.    Did you rely on any other documents to show that

24   Andrew Corporation actually shipped some of this equipment

25   to Saudi Arabia?

**B 49**

Gottesman - direct                877

1  A.    Yes.

2  Q.    Will you turn to PTX-237?

3             (Pause.)

4             THE WITNESS:  Yes.

5  BY MR. MILCETIC:

6  Q.    Do you have a sense of what this document is?

7  A.    This document contained a shipment -- shipment

8  information by Andrew Corporation, where the shipment

9  included LMU units, WLS units.  The shipment is from

10 Andrew Corporation to Saudi Telecom Company, STC.

11            So they included LMU WLS units, and they

12 also included a GCS.  Here it's referred to as SMLC, but

13 it's the same -- it's just a different name they use for

14 GCS, the central computer.

15            So this is a shipment slip from Andrew to

16 STC, Saudi Telecom, by carrier called Excel.

17 Q.    Okay.

18            MR. MILCETIC:  We'd like to move into evidence

19 Exhibit 237.

20            THE WITNESS:  Yes.

21            MR. AROVAS:  No objection.

22            THE COURT:  Thank you.

23            DEPUTY CLERK:  So marked.

24 ***       (Plaintiff's Trial Exhibit No. 237 was received

25 into evidence.)

**B 50**

Gottesman - direct                    878

1    BY MR. MILCETIC:

2    Q.    Do you think this is worth going through, Dr.

3    Gottesman?

4    A.    Please, yes.

5    Q.    Okay.  Where is the listing of the GCS or the WLS?

6    A.    If you refer to -- there's no page number here, but

7    I would say Page 8, perhaps.

8              If you can enlarge the first item, the first

9    row, item -- okay.  So there is item number and some

10   codes and prices for that.  And the first item is

11   GEO-LMU 2E.  And the cost of shipping those units, unit

12   price is 41,000.  The extended price is one million 148

13   and 158 dollars (sic).

14   Q.    Did you see, apart from this document, other

15   documents like this that showed shipment?

16   A.    There is another page here that shows more shipment,

17   more items have been shipped, yes.

18             If you move to the next page, and, again,

19   there is listing items here, so there is one item.

20   GOS-SMLC-ANS.  There's a comment here saying Andrew SMLC

21   hardware.  SMLS is another name for the central computer.

22   So one of these units was shipped at a cost of $215,265.

23   Q.    All right.  Now, could we go back to your view about

24   infringement for a moment?

25   A.    Yes.

**B 51**

Magnusson - direct                    1781

1   Q.    Right?

2   A.    Yes.

3   Q.    This technology option, which has a patent on it,

4   which the patent owner, in his mind, is not willing to

5   license to anybody, made it in because it was not

6   declared to ETSI; is that correct?

7   A.    Yes.  Correct.

8   Q.    In other words, if it had been declared to ETSI,

9   what would have happened?

10  A.    It would never have become part of the standard.

11  Q.    So if you're in the industry and you make products

12  that are supposed to be standards compliant and you pick

13  up this standard and you see four technology options

14  listed in that standard, what are you thinking to

15  yourself?  Which ones can you use?

16  A.    All four.

17  Q.    All right.

18  A.    Would be my assumption.

19  Q.    You mean you don't have any idea that you might be

20  sued on technology option four?

21  A.    No.  The only idea I might have is that any one of

22  these technologies might be covered by a license -- a

23  patent that I can license under reasonable terms, but

24  that's the only thing that I would keep in mind.  But

25  other than that, they all look the same to me.

**B 52**

Magnusson - direct                1782

1   Q.   So everything in there, you know and you believe

2   that you're free to use; is that correct?

3   A.   That's correct.

4   Q.   And it might be completely free of charge or you

5   might have to pay a reasonable licensing fee; is that

6   correct?

7   A.   That's correct.

8   Q.   And you cannot be blocked from practicing any of

9   those four technology standards, can you?

10  A.    No.  That's totally against the nature of the

11  standard, the spirit of the standards.

12  Q.    Now, what if the patent holder says the patent

13  holder of -- of the patent on T4, what if he says the

14  following?  What if he says, you're not blocked from

15  practicing this.  Go practice T1 to T3.  Take your pick,

16  from T1 to T3.  Do any of those.  Okay?

17  A.    Yes.

18  Q.    Does that make it all better?  Is that a

19  satisfactory result for you?

20  A.    No.  Again, it doesn't really matter if it's -- if

21  it's a small or big or whatever the definition is.  I

22  should have access to all these options.

23  Q.    So in this case, who gets to use the standard?

24  A.    Well, if somebody was able to enforce this, which

25  would be very much against the spirit of the standards,

**B 53**

1   then the company or the owner of T4 would be the only

2   company that can actually use the standard.

3   Q.    And this standard includes options in it; is that

4   right?  T1 to T4?

5   A.    Yes, it does.  Everything that's in the standard,

6   yes, it includes that.

7   Q.    How much of the standard can everyone else practice?

8   A.    Well, of the standard, really, nobody can practice

9   it except the T4 patent owner, but if we -- just to put

10  some -- if we assume that all these options are on equal

11  terms, you could say that everybody else gets to implement

12  three-fourths of the standard while the patent owner gets

13  to implement or study or use the whole standard.

14  Q.    Okay.  Now let's consider the situation where

15  everyone ignores the ETSI rules and no one tells ETSI

16  about patents that they're unwilling to license.  Okay?

17          And let's say there's a company called

18  Company One that owns a patent on T1 and is unwilling to

19  license that patent.  Okay?

20  A.    Okay.

21                        - - -

22  Q.    The same thing for T2, Company 2 is unwilling to

23  license their patent.

24          Do you understand that?

25  A.    Yes.

**B 54**

Garner - cross                                  1871

1  unclassified cover page, so that wouldn't be

2  discussed on this page, no, sir.

3  Q.    Oh, so that would be classified, if the

4  Government authorized something.  Is that what you are

5  telling us?

6  A.    I don't know all the rules of -- of classification.

7  I'm sorry.

8  Q.    So who told you that it was classified?

9  A.    The Government customer told me it was classified.

10  Q.    And when was that?

11  A.    It was some years ago.

12  Q.    When?

13  A.    I don't have the exact date.

14  Q.    No idea at all when?

15  A.    Not the exact date.  No, sir.  Sorry.

16  Q.    Well, you said some years ago.  That sounds like

17  before May 2003?

18  A.    I -- I simply can't say when -- when the date was.

19  Q.    And you had spoken earlier about a -- about some

20  communications that TruePosition had in this case with

21  STC.  Is that what you said?  The litigation was for

22  getting your business at STC; is that right?

23  A.    Yes.  That -- I believe I made that statement, yes.

24  Q.    But it's true that Andrew Corporation had

25  communications with STC about this lawsuit as well; is

**B 55**

Garner - cross                    1872

1  that right?
2  A.    Yes.  We -- I did respond to -- to certain
3  allegations made by TruePosition to the customer.  That's
4  correct.
5  Q.    Well, didn't Andrew Corporation tell STC about
6  this fraud counterclaim that Andrew had come up with in
7  this case in order to convince it to give you the STC
8  contract?
9  A.    I don't know with certainty whether that -- the
10 fraud aspects were conveyed to STC or not.
11 Q.    I'd like to show you what is marked as Plaintiff's
12 Exhibit 102 (handing exhibit to the witness).
13         (Pause.)
14 BY MR. MILCETIC:
15 Q.    That is an e-mail from two of your employees;
16 right?  Between two of your employees; right?
17 A.    Yes.  That's correct.
18 Q.    And it's talking about how Andrew Corporation could
19 get some mileage out of this fraud counterclaim with the
20 client, STC, on the day that you answered our Complaint
21 in this case; right?
22 A.    I don't know with accuracy what day we answered
23 your complaint.  What this e-mail says from Jim McDaniel
24 is he thinks we can get some mileage out of the
25 counterclaim.

**B 56**

Garner - cross                                    1873

1   Q.    That's mileage with your customer, STC; correct?

2   A.    I don't know specifically what he had in mind, but

3   this e-mail wasn't addressed or discussed with me, to my

4   knowledge.

5                              - - -

6   Q.    Well, the e-mail says passed along to Rob; right?

7              This information would be passed to Rob;

8   right?

9   A.    It says, So I am anxious to get the info to Rob.

10  Q.    And Rob would be Rob Wood of Al-Misehal Group;

11  right?

12  A.    I don't know.

13                             - - -

14

15

16

17

18

19

20

21

22

23

24

25

**B 57**

Garner - cross                                        1874

1

2    A.    I don't know for certain that that is who he --

3    Q.    Well, isn't Al-Misehal Group your local agent in

4    Saudi Arabia and isn't Rob the Manager?

5    A.    Yes.  We do use Al-Misehal and there is a

6    gentleman by the name of Rob Wood who's part of that

7    organization.

8    Q.    In fact, that is how you -- who helped you get

9    the contract in Saudi Arabia; right?

10   A.    Our agent for our business in Saudi Telecom is the

11   Al-Misehal Group, yes, that's correct.

12   Q.    So what you're talking about is passing information

13   to Saudi Telecom about the fraud counterclaim in this

14   case; right?

15   A.    Well, it doesn't -- I don't see where it says

16   anything about STC here.

17   Q.    Well, if you are passing along the information to

18   your agent in Saudi Arabia, wouldn't the assumption be

19   that it would then be conveyed to STC?

20   A.    Perhaps we could make that assumption.  I don't

21   see that -- that clearly spelled out in this e-mail

22   between two of our employees.

23   Q.    I would like to -- unfortunately, there's no

24   stipulation in this case about what the actual contract

25   is with STC, so I'm going to have to go through with

**B 58**