## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRUEPOSITION, INC.,

        Plaintiff/
        Counterclaim-Defendant,

   v.

ANDREW CORPORATION,

        Defendant/Counterclaim
        Plaintiff.

Civil Action No. 05-00747(SLR)

## TRUEPOSITION'S OPPOSITION TO ANDREW'S POST-TRIAL BRIEF
## IN SUPPORT OF ITS REMAINING EQUITABLE DEFENSES

CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman, Esq. (#2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
jheisman@cblh.com

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Amanda M. Kessel, Esq. (pro hac vice)
Cira Centre, 12th Floor, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

# TABLE OF CONTENTS

I.     INTRODUCTION........................................................................................ 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ............................... 1

III.   SUMMARY OF ARGUMENT ................................................................. 3

IV.    COUNTERSTATEMENT OF THE FACTS .......................................... 5

    A.    Andrew's Willful Infringement of the 144 Patent ................................ 5

        1.    The 144 Patent ................................................................... 5

        2.    TruePosition's Notices About the 144 Patent and Its Intention to
            Enforce the Patent if Andrew Infringed It .................................. 6

        3.    Andrew's Infringement........................................................ 8

        4.    TruePosition's Additional Notices About the 144 Patent and Its
            Intention to Enforce the Patent if Andrew Infringed ................................. 9

    B.    Andrew's Litigation-Inspired Excuses for Its Willful Patent Infringement
        – The Standards Background.............................................................. 10

    C.    The Jury's Factual Findings............................................................... 12

V.     ARGUMENT............................................................................................ 13

    A.    Andrew's Equitable Defenses Fail as a Matter of Law ......................... 13

        1.    Andrew's Willful Infringement Precludes Andrew's Equitable
            Defenses as a Matter of Law.................................................................. 13

        2.    The Integration Clause in the Parties' February 2004 Settlement
            Agreement Precludes Andrew's Equitable Defenses as a Matter of
            Law ............................................................................................ 15

        3.    Andrew's Equitable Defenses Must Fail For the Same Reasons the
            Jury Found Against Andrew's Fraud and Promissory Estoppel
            Claims ........................................................................................ 16

    B.    Andrew's Equitable Defenses Would Fail Even If They Were Not Barred
        as a Matter of Law ........................................................................... 17

        1.    Andrew Cannot Establish the Defense of Equitable Estoppel.................. 18

            a)    Andrew Could Not Reasonably Believe That TruePosition
                Did Not Intend to Enforce the 144 Patent.................................... 20

b)    Andrew Did Not Reasonably Rely Upon TruePosition's
Conduct ................................................................................... 29

c)    Balancing of the Equities Favors TruePosition ........................... 32

2.    Andrew Cannot Establish the Defense of Implied License ...................... 32

a)    The Parties Had No Relationship Under Which
TruePosition Granted Andrew a Right to Use the 144
Patent ...................................................................................... 33

b)    Nothing TruePosition Did or Did Not Do or Say Could
Reasonably Convey the Impression That It Consented to
Andrew's Use of the 144 Patent .................................................. 35

3.    Andrew's Equitable Defenses Should Be Barred Under the
Doctrine of Unclean Hands ...................................................................... 36

**VI.    CONCLUSION** ............................................................................................. **36**

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,
    960 F.2d 1020 (Fed. Cir. 1992)..............................................................13, 19, 25, 26, 32

*Cedarapids, Inc. v. CMI Corp.*,
    1999 U.S. Dist. LEXIS 23450 (N.D. Iowa Oct. 26, 1999) ..........................................13

*Engineered Products Co. v. Donaldson Co., Inc.*,
    330 F. Supp. 2d 1013 (N.D. Iowa 2004)...................................................................13

*Honeywell International, Inc. v. University Avionics System Corp.*,
    398 F. Supp. 2d 305 (D. Del. 2005).....................................................................19, 28

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240 (1933)...............................................................................................36

*Loral Corp. v. Goodyear Tire & Rubber*,
    1989 U.S. Dist. LEXIS 16865 (S.D. Ohio Jan. 30, 1989) ....................................13, 36

*Lukens Steel Co. v. America Locomotive Co.*,
    99 F. Supp. 442 (N.D.N.Y. 1951)..................................................................19, 20, 34

*PharmaStem Therapeutics, Inc. v. Viacell Inc.*,
    2004 U.S. Dist. LEXIS 18638 (D. Del. Sept. 15, 2004)...............................................17

*Precision Instrument Manufacturing Co. v. Automobile Maint. Machine Co.*,
    324 U.S. 806 (1945)...............................................................................................36

*Rambus Inc. v. Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003).........................................................................25, 27

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003)....................................................................................17

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)................................................................................14

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001)........................................................................13, 15, 36

*Symbol Techs., Inc. v. Proxim Inc.*,
    2004 U.S. Dist. LEXIS 14949 (D. Del. July 28, 2004) ..............................................25

*Tenneco Automotive Operating Co. v. Visteon Corp.*,
     375 F. Supp. 2d 375 (D. Del. 2005)................................................................19, 29, 32, 33

*Therma-Tru Corp. v. Peachtree Doors Inc.*,
     44 F.3d 988 (Fed. Cir. 1995)...........................................................................16, 22, 33

*Tracinda Corp. v. Daimler-Chrysler AG*,
     364 F. Supp. 2d 362 (D. Del. 2005).............................................................................16

*Tristrata Tech., Inc. v. Cardinal Health, Inc.*,
     2004 U.S. Dist. LEXIS 585 (D. Del. Jan. 16, 2004)..................................................15

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,
     103 F.3d 1571 (Fed. Cir. 1997)...................................................................................14

*Wang Laboratories, Inc. v. Mitsubishi Electrics America, Inc.*,
     1994 U.S. Dist. LEXIS 19612 (C.D. Cal. Mar. 7, 1994)............................................13

*Weddingchannel.com, Inc. v. The Knot, Inc.*,
     2004 U.S. Dist. LEXIS 25749 (S.D.N.Y. Dec. 29, 2004) ...........................................13

### STATE CASES

*Great Lakes Chemical Corp. v. Pharmacia Corp.*,
     788 A.2d 544 (Del. Ch. 2001)......................................................................................15

### FEDERAL STATUTES AND RULES

35 U.S.C. § 271(f)(1) .........................................................................................................12, 14

28 U.S.C. § 1498...................................................................................................................2

Fed. R. Civ. P. 6(b) ............................................................................................................17

Fed. R. Civ. P. 50(a) ..........................................................................................................17

Fed. R. Civ. P. 59(e) ..........................................................................................................17

## I.     INTRODUCTION

The jury has already resoundingly rejected the sum and substance of Andrew's equitable defenses. Yet, Andrew disregards the jury's verdict and factual findings and improperly asks the court to do the same. Andrew mentions the jury only in passing as part of its description of the procedural history of the case, acknowledging not at all that this same jury found Andrew to be a willful infringer.

Andrew ignores the maxim that he who seeks equity must himself come into court with clean hands, and thus also ignores that its own egregious and willful disregard for TruePosition's patent – as the jury found on clear and convincing proof – stands as an absolute bar to its defenses. Andrew ignores the adverse jury findings on fraud and promissory estoppel, which findings arise from the same operative facts as Andrew's equitable defenses and thus make it logically impossible for these defenses to be sustained. Andrew further ignores that, having failed to adhere to the Federal Rules of Civil Procedure, it is in no position now to effectively challenge those adverse findings. Andrew ignores the relative status of the patent laws of the United States and workings of a standards body; standards protocols do not subjugate the patent laws, as Andrew suggests, such that any patentee who participates completely relinquishes rights to enforce its patents against those who use the technology without authorization. Finally, Andrew ignores record evidence that tells a much different story from Andrew's – substantial evidence that the jury relied on in finding against Andrew on the related issues in the first instance and that requires Andrew's equitable defenses to be rejected now once and for all.

## II.     NATURE AND STAGE OF THE PROCEEDINGS

TruePosition brought this suit for Andrew's infringement of the 144 patent on October 25, 2005. (D.I. 1). In response, Andrew pled a litany of non-infringement and invalidity defenses. In addition to these boilerplate defenses, Andrew also alleged six affirmative defenses

1

arising out of the parties' work in connection with various organizations that set technological standards: unfair competition under the California Business and Professional Code §§ 17200 *et seq.*, fraud, promissory estoppel, equitable estoppel, implied license, and unclean hands. (D.I. 48 at 9-19).

On August 22, 2007 the parties filed a proposed pre-trial order. (D.I. 255 and 276). In its submissions for the order, Andrew for the first time raised a defense under 28 U.S.C. § 1498, claiming that TruePosition's infringement claim was barred because the U.S. government had authorized Andrew's actions. (D.I. 276, Ex. 4 at 2). Andrew prevailed upon the Court to allow Andrew to assert this defense at trial over TruePosition's objection. (D.I. 272 at 61-69; D.I. 285; Tr.[1] at 13-26).

In its pre-trial submissions, Andrew also sought to exclude the parties' Settlement Agreement from a prior litigation, D.I. 276, Ex. 6 at 8-9, presumably because it recognized that the agreement rebutted Andrew's standards-based defenses and constituted strong evidence of its willfulness. At the Court's instruction, the parties ultimately agreed upon a redacted version of this Settlement Agreement for use at trial. (D.I. 272 at 55-61; Tr. at 504:10-13).

On August 23, 2007, the Court granted TruePosition summary judgment that the 144 patent was not invalid as a matter of law. (D.I. 258 at 16-17; D.I. 259). The Court also entered partial summary judgment that Andrew's unfair competition claim failed as a matter of law. (D.I. 258 at 28-30; D.I. 259). In response to Andrew's request that the Court "clarify" its decision that Andrew could not establish invalidity of the 144 patent, D.I. 268, on August 29, 2007, the Court again found that the patent was not invalid as a matter of law. (D.I. 272 at 4-6).

A 9-day jury trial was held beginning on September 4, 2007, resulting in a jury verdict that (1) found that Andrew's activities infringed the patent and rejected Andrew's non-

---

[1]    The trial transcript is docketed at D.I. 298-307.

infringement defenses, including its new section 1498 defense; (2) found that Andrew's infringement was willful; (3) awarded TruePosition $45,300,000 in compensatory damages; and (4) rejected Andrew's fraud and promissory estoppel defenses that were based on the parties' standards-related activities. (D.I. 293). On September 18, 2007, the Court entered judgment in TruePosition's favor "for the reasons stated in the jury verdict." (D.I. 308).

The jury thus found for TruePosition on every issue and completely rejected every one of Andrew's defenses. Yet, in a scattershot approach that disdains the efforts of the jury and the Court, Andrew filed a post-trial motion claiming that each and every one of the jury's findings, without exception, is wrong as a matter of law, or that, in the alternative, Andrew is entitled to a new trial with respect to each and every one of these findings. (D.I. 327). On November 1, 2007, Andrew filed its opening brief in support of that motion.

Andrew also sought leave to brief its equitable defenses of equitable estoppel and implied license. TruePosition opposed Andrew's request. In an email to the parties, the Court allowed Andrew to brief these two equitable issues based on the trial record (see B1),[2] and Andrew filed an opening brief in support of its "equitable claims" on November 1st. (D.I. 325). Andrew has also briefed its defense of unclean hands even though not invited to do so by the Court. Andrew now claims that, even though the jury rejected Andrew's standards-based claims of fraud and promissory estoppel, Andrew's "equitable" standards-based claims, arising out of the same conduct, survived the jury verdict or could be established in spite of it.

## III.    SUMMARY OF ARGUMENT

Andrew's equitable defenses are DOA. Their factual underpinnings are the same as those of issues already decided against Andrew by the jury in its rejection of Andrew's fraud and

---

[2]    B1 is part of the concurrently filed Appendix B to TruePosition's Opp. to Andrew's Post-Trial Br. In Support of Its Remaining Equitable Defenses.

promissory estoppel claims and in its finding that Andrew willfully infringed the TruePosition patent. The jury's finding of willful infringement is particularly significant not only because it establishes that the jury necessarily rejected many of the same factual theories on which its equitable defenses are premised, but also because willfulness sets up a legal barrier to the presentation of those defenses, under the maxim that he who seeks equity must himself come into court with clean hands. The unclean hands of a willful infringer denies the right to equitable relief.

Moreover, even if Andrew were now writing on a clean slate, the record would not support its defenses. At all relevant times, Andrew has been aware of TruePosition's 144 patent and the fact that the 144 patent covers UTDOA location on the control channel in a GSM network. The duty that Andrew alleges TruePosition to have breached by not declaring its 144 patent as essential to the ETSI standard is illusory; there was no duty because each and every option in the standard could be practiced without use of the technology claimed in the 144 patent. For example, Andrew itself practiced non-infringing technology (voice channel UTDOA) until it knowingly switched to control channel UTDOA encompassed by the 144 patent. Nor did any conduct, statement, or omission by TruePosition give Andrew any basis to believe, or mislead it into believing, that it had a right to freely practice the 144 patent. Andrew could not have reasonably relied on any action or inaction by TruePosition to form any belief it had a right to freely practice the 144 patent in view of the earlier Settlement Agreement between the parties, which expressly withheld any license under the 144 patent and expressly reserved to TruePosition the right to sue Andrew for infringement of the 144 patent if it switched from voice channel UTDOA to control channel UTDOA.

Andrew had no basis to believe it would have a free ride under the TruePosition patent, and even if the patent had been subject to availability for licensing under the ETSI policy, Andrew never availed itself of any such licensing opportunity. Andrew never approached TruePosition to request or negotiate a license under the patent, and in fact pointedly ignored several offers to license that TruePosition directed to Andrew. Andrew instead knowingly chose to proceed to operate within the boundaries of the patent. Neither the policy of ETSI nor the tenets of equity permit Andrew to ignore the patent and TruePosition's offers to license it, to willfully infringe, and then, only after being caught and found liable for infringement, to obtain the benefit and royalty rate of a license it intentionally ignored.

## IV.    COUNTERSTATEMENT OF THE FACTS

### A.    Andrew's Willful Infringement of the 144 Patent

#### 1.    The 144 Patent

In 1992 TruePosition developed a revolutionary technology for finding a cell phone. (Tr. at 594-603). Two years later, the U.S. Patent and Trademark Office awarded TruePosition the 144 patent for that invention. (PTX 1).

Prior to TruePosition's invention, cell phones were trackable only when the user was talking or if the phone had a GPS chip, which a user could readily remove or disable. (Tr. at 144:8-17; 609:2-9; 617:20-618:6). TruePosition's invention allows a cell phone user to be found so long as the phone is turned on, even when the cell phone user is not talking. (Tr. at 616:22-618:6; PTX 1 at col. 1, l.68 - col. 2, l.8). The invention uses the "TDOA" or "UTDOA" technique to pinpoint the location of a cell phone using the phone's "control channel" signals rather than its "voice channel" signals. (Tr. at 143:6-9; 397:21-23; PTX 1 at col. 14, ll. 15-21). "Voice channel" signals are active only during a phone call. (Tr. at 143:23-144:3). By contrast,

a cell phone sends "control channel" signals even when the user is not actively on a call. (Tr. at 143:14-23; 397:24-398:6).

The 144 patent is a fundamental, pioneering patent in the area of cell phone location technology. (Tr. at 377:6-10; 385:24-386:6). It has been cited in over 240 patents filed by numerous prominent companies in the cellular industry. (Tr. at 377:6-380:8; 475:6-9).

### 2.   TruePosition's Notices About the 144 Patent and Its Intention to Enforce the Patent if Andrew Infringed It

Since the early 1990s TruePosition and Andrew (then called "Allen Telecom") have been competitors, both companies manufacturing and commercializing equipment for locating cell phones. (Tr. at 146:23-147:16; 362:9-17).

In December 2000, TruePosition, believing Andrew was developing technology to which its patents might be relevant, invited Andrew to apply for a license under its patents, including the 144 patent, and enclosed a copy of the 144 patent. (PTX 7; Tr. at 149:9-150:15; 498:2-499:13). The letter offered that "if you would like to inquire about a license or need further information, please contact me directly." (PTX 7). The letter also stated that the 144 patent related to the "use of time difference of arrival (TDOA) and the reverse control channel" to locate cell phones. (*Id.*) Andrew ignored the letter, never responding to it. (Tr. at 151:3-8; 499:14-22).

TruePosition later learned that, instead of paying any heed to TruePosition's patents, Andrew was busy infringing them. (Tr. at 151:3-25). In December 2001, TruePosition sued Andrew for infringement of several patents covering voice channel location, but not the 144 patent. (Tr. at 151:20-152:7). At the time, Andrew's Geometrix product used technology that located cell phones through their transmissions on the voice channel, but not on the control

channel as claimed in the 144 patent. (Tr. at 152:1-7; 211:18-24; 499:24-500:15). Andrew did not initiate any discussion about a license or seek to negotiate an end to the suit.

In November 2002, TruePosition sent Andrew another communication in which it offered to discuss a license under its patents, even including the 144 patent that was not then in suit:

> Following our conversation yesterday, listed below are the patents [including the 144 patent] that we anticipate the license would cover.
>
> As I mentioned, we would be happy to provide you with copies of any or all of these.

(PTX 8). Again, nothing came of TruePosition's offer. (Tr. at 503:3-504:3).

Finally, in December 2003 and again in January 2004, Andrew sat down at the bargaining table. (*See generally* PTX 15R at ¶22). In exchange for a payment, TruePosition licensed a number of TruePosition's patents to Andrew, primarily patents relating to voice channel location of cell phones. The 144 patent was not included in the license, and in fact the agreement specifically excluded the patent:

> TruePosition hereby grants to Andrew a worldwide non-exclusive license to make, use, offer to sell, sell and import geolocation equipment under the patents and patent applications listed in Exhibit B hereto . . . .
>
> TruePosition represents that the patents and patent applications listed in Exhibit B hereto include all of its patents and patent applications *except for the 144* and 410 patents. . . .

(PTX 15R at ¶ 6) (emphasis added). Although the 144 patent was excluded from the license, Andrew was well aware of the disclosures and scope of the 144 patent having extensively cited it as prior art against some of the patents asserted in the litigation. (Tr. at 500:22-501:8).

As part of the agreement, and reiterating the point that the license was to voice channel technology, not control channel technology as in the 144 patent, TruePosition also gave a covenant against further suit, limited to location on the voice channel and again specifically excluding the control channel:

> TruePosition hereby covenants not to sue Andrew for infringement of any patents whatsoever [for the] sale of Andrew's existing wireless network overlay "Geometrix" geolocation system.
>
> *   *   *
>
> For purposes of the covenant not to sue set forth in this paragraph, "Andrew's existing wireless network overlay 'Geometrix' geolocation system" refers to a system...that determine[s] the latitude and longitude of wireless telephones, by determining TOA, AOA, and/or *TDOA* of a signal transmitted by a wireless telephone's *voice or traffic channel (but not the control channel* or access channel signals)....

(PTX 15R at ¶¶ 9, 9(a)) (emphasis added).

Andrew agreed that there were no other outstanding promises by TruePosition relating to enforcement of its 144 patent, either in the Settlement Agreement or before:

> The parties agree that no promise, representation or agreement not herein expressed has been made, and this Settlement Agreement (including Exhibits thereto) contains the entire agreement between the parties with respect to its subject matter, superseding all other prior agreements, written or oral, including without limitation the term sheet dated January 16, 2004.

(PTX 15R at ¶ 22). In essence, the Settlement Agreement provided that TruePosition could pursue Andrew for infringement under the 144 patent *if* Andrew began locating cell phones using the control channel in a GSM network. (PTX 15R at ¶¶9, 9(a); Tr. at 506:22-507:8; 512:14-24).

### 3.    Andrew's Infringement

Almost immediately, Andrew ignored the caution that the plain language of the Settlement Agreement reasonably dictated: just nine months after the Settlement Agreement was signed, in December 2004, Andrew offered to sell a control channel location system to Saudi Telecom. (PTX 141-176; Tr. at 700:17-701:13). It can be reasonably inferred that for the offer to have been made within nine months of the agreement, the system, which fell within the 144 patent, had to have been in development even earlier. In August 2005, Andrew infringed the 144 patent again by building its first control channel location system in the U.S. and demonstrating its operation. (Tr. at 713:11-719:1; 724:16-725:10; PTX 304). Again, Andrew did not notify

8

TruePosition of its infringing activity or offer to discuss or pay a license fee to TruePosition, Tr.

at 337:6-11, despite the fact that the Settlement Agreement made it crystal clear to Andrew that it

had no rights of any sort under the 144 patent.

Andrew's infringement was driven by competitive pressures. Andrew had lost a

domestic contract with Cingular for the sale of cell phone location equipment to TruePosition.

(Tr. at 154:5-15; 390:6-393:15). As U.S. business dried up, control channel technology

increased in importance in view of a global demand for terrorist location technologies in the

post-September 11th environment. (Tr. at 158:22-159:7; 210:13-211:7; 520:18-521:17; 612:14-

17; 1187:19-24).

### 4.    TruePosition's Additional Notices About the 144 Patent and Its Intention to Enforce the Patent if Andrew Infringed

TruePosition first learned of Andrew's infringing activity from its employees in Saudi

Arabia around this same time, August of 2005. (Tr. at 516:5-517:8). TruePosition then sent yet

another letter to Andrew concerning the 144 patent:

> TruePosition is concerned that Andrew is or may in the future be supplying
> geolocation equipment from the United States to Saudi Arabia or elsewhere in
> violation of the 144 Patent.

(PTX 17; Tr. at 162:8-163:11 and 518:2-21).

Andrew offered no assurance that it would cease its infringing activity. (Tr. at 518:19-

21). TruePosition sent a final letter to Andrew concerning the 144 patent:

> Please confirm, in writing, by October 18, that Andrew will discontinue any effort
> to supply equipment from the United States that locates mobile telephones using
> reverse control channel signal data to implement TDOA.

(PTX 18; Tr. 164:15-165:15; 518:22-519:23). Andrew ignored the deadline and TruePosition

was forced to bring this suit. (Tr. at 519:21-23).

To this day, Andrew has not approached TruePosition to discuss a license under the 144 patent.

### B.    Andrew's Litigation-Inspired Excuses for Its Willful Patent Infringement – The Standards Background

Even as late as October 2005, Andrew could have turned back. At that time, Andrew had not yet signed a contract with Saudi Telecom ("STC") or shipped any product to Saudi Arabia. Furthermore, Andrew was on notice of the 144 patent and TruePosition's belief that the geolocation equipment it planned to supply to STC infringed the patent.

But Andrew disregarded the notice and the patent and proceeded with its infringing activity. Andrew signed the contract with STC in February 2006, Tr. at 722:13-20, and started shipping components of an infringing control channel system.

Andrew instead chose to contrive defenses to TruePosition's infringement suit based on the parties' activities with the standards organizations. (D.I. 48 at 9-19). Disregarding the inherent inconsistencies in its position, Andrew asserted that the patent was essential to the standard and should have been disclosed by TruePosition to the standards organization, but at the same time asserted that it was not infringing the patent, even though it was following the standard for its STC contract.

The relevant standards bodies are the European Telecommunications Standards Institute ("ETSI") and the Third Generation Partnership Project ("3GPP"). ETSI has hundreds of members, ranging from those that build cellular network equipment such as Ericsson, Nokia and Siemens to the network operators or carriers such as Cingular and AT&T. (Tr. at 196:16-197:2). Of these hundreds of members, Andrew is TruePosition's only competitor with respect to TDOA technology. (Tr. at 197:7-11).

Andrew joined ETSI in January 2003 at the request of its customer AT&T Wireless, not at the request of TruePosition. (Tr. at 315:8-14; 354:2-5; DTX 154). At this time, Andrew already had notice of the 144 patent and the fact that it covered UTDOA on the control channel in a GSM network. (PTX 7; Tr. at 149:9-150:15; 498:2-499:13). Also at this time and from as early as 1995, Andrew had a commercial product that utilized UTDOA on the voice channel to locate cellular telephones. (Tr. at 317:19-24; 322:18-323:1; 352:17-353:1; 353:17-354:1). Andrew's participation in ETSI was motivated by a desire to promote the location capability of its own products – UTDOA on the voice channel. (Tr. at 354:2-8).

Standards bodies typically do not invent or create new technology. (Tr. at 193:17-19; 310:22-24; 363:1-3). Instead, the focus of standards bodies is to define or standardize how pieces of equipment within a particular technology "fit together, communicate and operate together." (Tr. at 193:20-194:10; 363:4-11; 1815:20-1816:10).

The relevant standard is titled "Functional stage 2 description of Location Services (LCS) in GERAN" and defines how the different pieces in the GSM cellular network fit together and communicate in order to locate a cellular telephone, using any of the options described within. (DTX 846; DTX 846A; Tr. at 194:11-21; 365:23-366:5). The standard contains a total of four location options (Timing Advance, Enhanced Observed Time Difference, Global Positioning System, and Uplink Time Difference of Arrival), including alternative implementations for these options, but does not define how these location options are practiced. (DTX 846; Tr. at 194:21-24). TruePosition and Andrew submitted technical proposals to add UTDOA – location on the voice channel and location on the control channel – as another location technology to be defined for use in a GSM system. (Tr. at 217:9-25). Andrew sought to benefit from adoption of these

11

technical proposals because it was, at that time, practicing UTDOA on the voice channel. (Tr. at 352:17-22; 353:17-354:1).

The standard was adopted in November 2004, well after execution of the February 2004 Settlement Agreement and well after TruePosition explicitly notified Andrew that it would pursue Andrew for infringement under the 144 patent if Andrew began locating cell phones using the control channel in a GSM network. (PTX 15R at ¶¶ 9, 9(a); Tr. at 506:22-507:8; 512:14-24).

### C.    The Jury's Factual Findings

Following a nine day trial, the jury returned a verdict of willful infringement and rejected Andrew's defenses of fraud and promissory estoppel. (D.I. 293). Implicit in the finding of willful infringement are the subsidiary facts that: 1) Andrew was aware of the 144 patent; 2) Andrew infringed despite an objectively high likelihood that its actions constituted infringement of the 144 patent; and 3) Andrew knew or should have known that its actions created an objectively high risk of infringement. (Tr. at 2133:23-2134:14). Further implicit in the jury's finding of infringement under 35 U.S.C. § 271(f)(1) is the fact that "Andrew specifically intended for the infringement to occur." (Tr. at 2128:21-22).

As to promissory estoppel, the jury found that 1) TruePosition did not make a promise; 2) TruePosition did not intend to induce Andrew's action or inaction based on the promise; 3) Andrew did not reasonably rely on the promise; and 4) Andrew was not injured by any reliance. (D.I. 293). The jury also found that TruePosition did not defraud Andrew. (D.I. 293).

## V.    ARGUMENT

### A.    Andrew's Equitable Defenses Fail as a Matter of Law

Andrew's equitable defenses cannot be sustained in light of the jury's findings on willful infringement, fraud, and promissory estoppel, and the existence of the Settlement Agreement that extinguished any "promises," even *if* there had been any, on which Andrew claims to have relied.

### 1.    Andrew's Willful Infringement Precludes Andrew's Equitable Defenses as a Matter of Law

The finding that Andrew's infringement of the 144 patent was willful is, in itself, sufficient basis to dismiss Andrew's equitable defenses. The guiding principle is equity. An infringer with the "unclean hands" of willfulness cannot ask the Court to "exercise its equitable powers" on the infringer's behalf. *See Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001); *Loral Corp. v. Goodyear Tire & Rubber*, 1989 U.S. Dist. LEXIS 16865, *134 (S.D. Ohio Jan. 30, 1989) ("Equity will not help those with unclean hands."). Thus, courts have long recognized that willfulness may preclude an infringer from sustaining equitable defenses or obtaining any equitable relief on its own counterclaims. *See Engineered Products Co. v. Donaldson Co., Inc.*, 330 F. Supp. 2d 1013, 1026-27 (N.D. Iowa 2004) ("equity considerations would not have allowed the defense to bar" the infringement suit); *Wang Labs. v. Mitsubishi Elecs. Am.*, 1994 U.S. Dist. LEXIS 19612, *5 (C.D. Cal. Mar. 7, 1994) ("Willful infringement may preclude the alleged infringer from obtaining equitable estoppel."); *Loral Corp.*, 1989 U.S. Dist. LEXIS 16865 at *133 ("willful and deliberate infringement precludes [defendant] from relying on the equitable defense of estoppel"). *See also Weddingchannel.com, Inc. v. The Knot, Inc.*, 2004 U.S. Dist. LEXIS 25749, *7 (S.D.N.Y. Dec. 29, 2004) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) (en banc)) (same); *Cedarapids, Inc. v. CMI Corp.*, 1999 U.S. Dist. LEXIS 23450, *7-*8 (N.D. Iowa Oct. 26, 1999) (same).

13

At the time of these decisions, willful infringement was *measured* against what the Federal Circuit had established as an "affirmative duty of due care" imposed on one who became aware of the patent rights of another. The rigor of proof necessary to establish willful infringement changed with *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007), under which the standard now requires clear and convincing proof of objective recklessness, which the Court defines as acting "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 1371-72. The Court characterized the previous standard of due care as "a lower threshold for willful infringement." *Id.* at 1371.

Importantly, the jury here was charged under the new, tougher *Seagate* standard. Its determination of willful infringement means that Andrew's conduct is at least as egregious, and likely more so, than that which has always prevented the infringer from pursuing its own equitable defenses or counterclaims.

Implicit in the jury's finding of willful infringement here are the following factual determinations:

> Andrew was aware of the 144 patent;
>
> Andrew infringed despite an objectively high likelihood that its actions constituted infringement of the 144 patent; and
>
> Andrew knew or should have known that its actions created an objectively high risk of infringement.

(Tr. at 2133:22-2134:16). *See also Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571, 1579 (Fed. Cir. 1997) ("jury instructions serve as our most direct guide to what the jury decided"). The jury also found that Andrew induced infringement under 35 U.S.C. § 271(f)(1). Implicit in that finding is the fact that "Andrew *specifically intended* for the infringement to occur." (Tr. at 2128:21-22) (emphasis added). The findings that Andrew's actions were objectively reckless and its ultimate infringement intentional demonstrate that its

conduct was egregious under even the most rigorous standard, barring its right to any equitable relief. *Tristrata Tech., Inc. v. Cardinal Health, Inc.*, 2004 U.S. Dist. LEXIS 585, *7 (D. Del. Jan. 16, 2004) ("Egregious conduct by the alleged infringer can prevent a finding of laches by demonstrating the equities of the case favor the plaintiff."); *see Shockley*, 248 F.3d at 1361 ("The record, with its finding of willful infringement, amply supports the district court's discretion to deny [defendant] access to equity.").

Thus, even if Andrew could otherwise prove its equitable defenses – and the record here, as explained below, shows that it most certainly could not – Andrew's willful infringement necessarily bars it from being awarded any equitable relief.

2.    **The Integration Clause in the Parties' February 2004 Settlement Agreement Precludes Andrew's Equitable Defenses as a Matter of Law**

The Settlement Agreement ending the first litigation, executed in February 2004, included an integration clause providing that:

> no promise, representation or agreement not herein expressed has been made, and this Settlement Agreement . . . contains the entire agreement between the parties with respect to its subject matter, superseding all other prior agreements, written or oral, including without limitation the term sheet dated January 16, 2004.

(PTX 15R at ¶22). It is undisputed that the asserted conduct on which Andrew's defenses of equitable estoppel and implied license are based preceded the date of execution of the Settlement Agreement. Even if an implied agreement or promise had been made, it could not survive the integration clause. It could not supplement the express terms and licenses of the Settlement Agreement, which the integration clause established as the exclusive statement of the parties' rights, obligations, and expectancies. The integration clause thus precludes Andrew's defenses as a matter of law. *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001) (permitting defendant to assert "claims that are explicitly precluded by contract, would

15

defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility

of written contractual agreements").[3]

### 3.   Andrew's Equitable Defenses Must Fail For the Same Reasons the Jury Found Against Andrew's Fraud and Promissory Estoppel Claims

Andrew's brief ignores the jury's verdict and improperly asks the Court to do the same.

The jury found against Andrew on its fraud and promissory estoppel claims, which, as Andrew

has admitted, rested on the "same evidence" and "required all the same proof" as its equitable

estoppel and implied license defenses. (D.I. 272 at 13:6-14). Thus, Andrew can prevail on its

equitable defenses only if the court makes separate findings that are inconsistent with the

findings the jury already made on the related issues properly before it. The court, however, is

not free to disregard the jury findings as Andrew asks. *See Therma-Tru Corp. v. Peachtree*

*Doors Inc.*, 44 F.3d 988, 995 (Fed. Cir. 1995) ("In this case the determinations by the jury and

judge were simultaneous. However, this does not authorize judicial findings independent of and

contrary to the facts found by the jury in reaching its verdict.").

The jury here specifically found that there was no fraud and that TruePosition made no

promise to Andrew, that it did not intend to induce action or inaction by Andrew on the basis of

any such promise, that Andrew did not reasonably rely on any promise, and that Andrew was not

injured by any reliance. (D.I. 293).

Those jury findings are virtually unassailable. As shown in TruePosition's concurrently-

filed "Opposition to Andrew's Motion for Judgments as a Matter of Law or for New Trial,"

---

[3]     In a related vein, the integration clause makes any reliance by Andrew on pre-Agreement conduct unreasonable. In the face of that clause, reliance on any pre-Agreement "promise" by TruePosition, even if there had been one, could not have been reasonable. *See Tracinda Corp. v. Daimler-Chrysler AG*, 364 F. Supp. 2d 362, 402 (D. Del. 2005) ("Such clear language included in business agreements between sophisticated business entities certainly weighs in favor of a conclusion that Tracinda's alleged reliance was unreasonable"). Because reasonable reliance is an element of at least equitable estoppel and implied license, those defenses are precluded for this additional related reason.

Andrew failed to make any pre-verdict challenge under Rule 50(a) to the evidence on the fraud and promissory estoppel issues. Therefore, Andrew is not entitled to even ask for JMOL on those issues now. Even if Andrew's motion for new trial on the fraud and promissory estoppel issues were procedurally viable, the record still does not warrant that relief. In view of Andrew's inability to prove any of the underlying facts by clear and convincing evidence, Andrew could not show – as it must for a new trial – that the clear weight of evidence was on its side on every issue. *See PharmaStem Therapeutics, Inc. v. Viacell Inc.*, 2004 U.S. Dist. LEXIS 18638 (D. Del. Sept. 15, 2004), finding that where defendant failed to prove a defense by the requisite standard of clear and convincing evidence, it likewise failed to establish a right to a new trial:

> The defendants also argue that the jury's finding that PharmaStem did not engage in inequitable conduct before the PTO in the procurement of the '681 and '553 Patents is against the great weight of the evidence. The court, however, is not persuaded that the jury's finding on this issue warrants a new trial. The burden is on the party seeking to invalidate the patents to prove inequitable conduct by clear and convincing evidence. *In view of the defendants' burden*, the jury's verdict was not against the great weight of the evidence.

*Id.* at *28 (emphasis added). Thus, because the proofs required for Andrew's equitable defenses are, as Andrew admits, the same as for the fraud and promissory estoppel issues that it has already lost before the jury, the defenses are not viable.[4]

### B.   Andrew's Equitable Defenses Would Fail Even If They Were Not Barred as a Matter of Law

"I don't believe their patent covers the standard." (Andrew's closing argument; Tr. at 2071:13-14).

---

[4]    This may already have been recognized by the Court, since the judgment of September 18, 2007, was final as to the entire case, and therefore disposed of those defenses against Andrew. If Andrew believed the judgment should have been partial, leaving its equitable defenses still to be adjudicated, it could have moved pursuant to Fed. R. Civ. P. 59(e) for relief from the judgment as entered. Andrew did not, and may not do so at this late date. *See* Fed. R. Civ. P. 6(b) (court "may not extend the time for taking any actions under Rules 50(b) . . . 59(b), (d) and (e)"); *Schneider v. Fried*, 320 F.3d 396, 402 (3d Cir. 2003) (The 10 days "may not be extended" because "a district court lacks jurisdiction to grant an untimely motion.").

Nothing better points up the inconsistencies of Andrew's positions at trial and in its opening brief here than this statement, which belies the volume of brief space Andrew spends now arguing that the 144 patent *was* essential to the standard and that Andrew reasonably believed that to be so. At bottom, it is indeed true, as Andrew finally admitted after 9 days of trial, and despite its brief's apparent renege on that admission, that the patent did not cover the standard and therefore did not cover every implementation of the standard – it was not "essential" to the standard. The simple fact is that Andrew *chose* a path through the standard – out of many possible paths – that *was* covered by the 144 patent. The simple fact is that Andrew ignored repeated notices and offers to license from TruePosition and instead *chose* to infringe the patent – knowingly, with its eyes wide open, and with disdain. The jury already recognized the inherent inconsistency in Andrew's positions and has rejected Andrew's defenses of fraud and promissory estoppel. Andrew's defenses of equitable estoppel and implied license should similarly be rejected.[5]

### 1.    Andrew Cannot Establish the Defense of Equitable Estoppel

To establish a defense of equitable estoppel, Andrew must, as a threshold, prove by a preponderance of the evidence that: (1) TruePosition, through misleading words, conduct, or silence, led Andrew to reasonably infer that TruePosition did not intend to enforce its patent

---

[5]      Even if one accepts Andrew's apparent argument now that a patent is "essential" so long as it covers any aspect of an option within the standard, even if not the standard as a whole, it does not excuse Andrew's conduct. Even *if* Andrew's interpretation of "essential" were correct, it would mean only that TruePosition would have had to make the patent available for license on fair and reasonable terms. Andrew ignores that TruePosition *did* offer to discuss licensing with Andrew – several times – but Andrew turned its back, thumbing its nose at the patent and TruePosition's offer. Even though TruePosition's offer to license did not arise from a belief that the 144 patent had to have been declared, TruePosition did nevertheless make the offer, and therefore, any obligation TruePosition would have had through the standards body was effectively discharged. The standards policies do not trump the patent laws; the standards body does not set up a "heads-I-win; tails-you-lose" scenario for infringers like Andrew. Andrew cannot have it both ways – ignore the patent and offers to license it (whether through the standards body or otherwise), but then, after it has been found to have willfully infringed and been assessed lost profits, claim it should only be liable, if at all, for a reasonable royalty.

against Andrew; (2) Andrew reasonably relied on TruePosition's conduct; and (3) due to

Andrew's reliance, Andrew will be materially harmed if TruePosition is allowed to proceed with

its infringement claim. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041

(Fed. Cir. 1992) (en banc); *Honeywell Int'l, Inc. v. Univ. Avionics Sys. Corp.*, 398 F. Supp. 2d

305, 314-15 (D. Del. 2005).

Although Andrew's recitation of the law lays out these three elements, Br. at 28-29,[6] it

fails to consider a further critical element of the legal framework for equitable estoppel:

> [T]he trial court must, even where the three elements of equitable estoppel are
> established, take into consideration any other evidence and facts respecting the
> equities of the parties in exercising its discretion and deciding whether to allow
> the defense of equitable estoppel to bar the suit.

*Tenneco Automotive Operating Co. v. Visteon Corp.*, 375 F. Supp. 2d 375, 383 (D. Del. 2005)

(citing *Aukerman*, 960 F.2d at 1043). Andrew's own conduct here makes this a crucial part of

the equitable equation: As an adjudged willful infringer, Andrew can not prevail on this defense.

Andrew relies heavily on *Lukens Steel Co. v. Am. Locomotive Co.*, 99 F. Supp. 442

(N.D.N.Y. 1951) in support of its equitable estoppel defense. (Br. at 29-30). Andrew argues that

*Lukens* is factually similar and compels a finding of equitable estoppel. However, *Lukens* is

distinguishable on at least two grounds, and thus irrelevant to this analysis.

First, in *Lukens*, the patentee and the accused infringer worked together on the *accused*

*product*. 99 F. Supp. at 444-45. Here, there is no evidence that TruePosition and Andrew

worked together to develop Andrew's Geometrix product or any aspect of the claimed

invention.[7] Instead, TruePosition and Andrew worked together only on vendor compatibility

---

[6]     Andrew's Post-Trial Opening Br. ISO Its Remaining Equitable Defenses is docketed at D.I. 325.

[7]     Although Andrew's standard representative Mr. Magnusson testified that in standardizing
UTDOA the companies came up with what he termed "inventions," (Tr. at 1810:25-1811:12) the jury
necessarily discounted his testimony in reaching its verdict.

issues for UTDOA technology. (Tr. at 193:17-194:24). Andrew consistently and misleadingly conflates the issue of its knowing infringement of TruePosition's patent with the parties' activities for the standards body.

Second, in *Lukens*, the infringing party "had no knowledge concerning the existence or ownership of the patent." 99 F. Supp. at 448. In contrast, Andrew knew of the 144 patent and its scope at all relevant times. It analyzed the 144 patent as prior art in the first suit, Tr. at 500:22-501:8, and the Settlement Agreement could not have been more clear in confirming that: (1) Andrew had no license under the 144 patent; (2) any forbearance to sue Andrew for infringement of any TruePosition patent (including, but not specific to, the 144 patent) would apply only so long as Andrew did no more than what it was currently doing (*domestic* use of voice channel technology for *E-911 purposes*); and (3) TruePosition was not providing a license for location using the control channel. (PTX 15R at ¶¶ 6, 9, 9(a)). For these reasons, Andrew's reliance on *Lukens* is misplaced.

In any event, Andrew cannot prove any of the three basic elements of equitable estoppel, and since it is a willful infringer, the required balancing of the equities would tilt steeply against it.

**a)     Andrew Could Not Reasonably Believe That TruePosition Did Not Intend to Enforce the 144 Patent**

Andrew argues that the first element of equitable estoppel is satisfied by three instances of affirmative misleading conduct and one instance of silence in the face of a duty to speak. This is, however, the very same conduct Andrew relied on as a basis for its promissory estoppel defense, which the jury rejected. Thus, the jury has already explicitly found that this conduct did not constitute a promise to not assert the 144 patent against Andrew. (D.I. 293 at 4). The jury had good reason to reject each and every one of Andrew's arguments.

<u>April 2002 U-TDOA in GSM and GPRS Feasibility Study (PTX 364)</u>

Andrew argues that the first instance of TruePosition's misleading conduct is the "promise" made in one version of a feasibility study submitted to 3GPP in 2002. (PTX 364). The purpose of the study document was to show the feasibility of applying U-TDOA (on both the voice and control channels) to locate cell phones in a GSM network. (Tr. at 170:14-18). Specifically, Andrew relies on the following statement:

> TruePosition, Incorporated may hold one or more patents or copyrights that cover information contained in this document. A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

(PTX 364 at 3.3.5).

Yet, Andrew did not become a member of ETSI until January 2003 – more than 8 months after this document was created and presented to the standards body. (Tr. at 308:3-11; 1655:12-20; DTX 154). Andrew did not attend the meeting at which this document was presented. (Tr. at 364:10-15; 1802:15-1803:1). Thus, the feasibility study (with any alleged "promise" that it contained) was neither presented to nor directed at Andrew, nor was it anything Andrew could have relied on, because Andrew was not even a member of ETSI at the time. (Tr. at 308:12-309:16; DTX 154).

Just as importantly, the language was not accepted by ETSI, so whenever Andrew joined ETSI, there was nothing there for Andrew to rely on. The undisputed fact is that ETSI asked TruePosition to *remove* this language from all future submissions and ultimately the final version of this document. (Tr. at 226:22-227:7; 228:11-22; 1817:12-1818:13). So, although the April 2002 version – the early non-final version – of the feasibility study is still available online, *no* later version of the document contains the language that Andrew identifies. (Tr. at 1804:-19-1806:13; 1817:12-1818:13).

Finally, even assuming the statement were an operative promise, it is plainly directed only to "applicants." (PTX 364 at 3.3.5). That is, a license would only be available to those who affirmatively approached TruePosition about a license. Andrew never did. Nothing in the statement contemplates that an ETSI member would automatically be licensed under the patent, or that a company could, rather than apply for and be granted a license, simply forge ahead with infringing activity with the insurance that if it got caught, it could expect the same license anyway. It is undisputed that Andrew never approached TruePosition to inquire about a license under *any* of TruePosition's patents prior to the filing of this lawsuit (Tr. at 337:6-11), and in fact Andrew ignored TruePosition even when *TruePosition offered* to negotiate a license with Andrew. (PTX 7; Tr. at 149:9-150:15; 151:3-8; 498:2-499:22).

In sum, Andrew attempts to hold TruePosition to a "promise" that was never made to Andrew (as Andrew was not a member of the standards body at the time it was published in the ETSI draft), was never accepted by Andrew (as Andrew never inquired or approached TruePosition about a license), and, even if made, was withdrawn when the statement allegedly embodying it was removed, at ETSI's request, from subsequent versions of the same document. As the jury found, the feasibility study provides no reasonable basis to infer that TruePosition would forego enforcing the 144 patent against Andrew if Andrew chose to operate under it without prior authorization. There is no basis for this Court to find otherwise in evaluating Andrew's related equitable defense. *See Therma-Tru Corp.*, 44 F.3d at 995 (judicial findings must be consistent with facts found by the jury in reaching its verdict).

### Ericsson's Project Specification TDOA System Study Group (DTX 844A)

Andrew next argues that TruePosition misled Andrew in engaging in a UTDOA study group, Br. at 16-18, which was formed in response to a mandate from the Federal

Communications Commission ("FCC") that cellular networks deploy a technology to locate 911 callers. (Tr. at 285:8-21). The goal of the UTDOA study group was to evaluate whether UTDOA location technology could satisfy the FCC's mandate, and if so, the best way to implement that technology. (Tr. at 287:2-5). The UTDOA study group was not chartered to create new inventions or new technology, but rather only to evaluate compatibility of UTDOA technology between different vendors. (Tr. at 310:10-21; 321:18-322:9). The group focused on UTDOA location on both the voice channel and the control channel. (DTX 844A at TPI00042666 (study group formed because "AT&T Wireless has decided to purchase and deploy a TDOA solution [voice channel location] from Grayson Wireless [Andrew]")).

It is difficult to see how this document establishes Andrew's case. In the first place, the document indicates that it was drafted by Ericsson; on its face it shows that TruePosition was *not* a part of the group as of its purported drafting date of February 2003 and could not have been involved in the drafting of the document: "The aim is to include also Cingular and TruePosition in the work." (DTX 844A at A102; Tr. at 1810:17-21). The document is unsigned and contains no discussion of intellectual property, patents or licenses, but even if it had, Andrew presented no evidence that TruePosition adopted its contents in any way.

In support of its obtuse argument, Andrew points to the "project ground rule" in the document that the study group seeks "to create a solution that we all benefit from." (Br. at 17, citing A105). But because patents or IP are nowhere discussed in the document, no reasonable reading of this language leads to Andrew's suggested inference that TruePosition will not enforce the 144 patent. Instead, since the avowed purpose of the study is compatibility of technologies, the reasonable inference is that the "benefit" will come from compatibility of UTDOA technology between different vendors because such compatibility reduces costs and in

turn increases profits. Indeed, Andrew's own witness admitted as much at trial. (Tr. at 1829:22-1830:3). Further, the study group focused on UTDOA generally, including UTDOA using voice channel transmissions. (DTX 844A at TPI00042666). As Andrew's Geometrix product located cell phones using the voice channel at the time, work on UTDOA generally would, in fact, "benefit" Andrew and all others involved. (*Id.*; Tr. at 352:17-22; 353:17-354:1).

As the jury found, this unsigned, informal document, which makes no mention of intellectual property rights and which TruePosition neither authored nor adopted in any event, provides no basis to infer that TruePosition was giving up its right to enforce its 144 patent. Andrew's argument that this document can be read as a representation by TruePosition not to enforce its patent is simply absurd, and this Court should reject it just as the jury did.

### December 2000 Warning Letter from TruePosition to Andrew (PTX 7)

Equally absurd is Andrew's argument, Br. at 8-9, 32-33, that what was essentially a warning letter sent to Andrew in December 2000 was somehow an open-ended offer by TruePosition to license Andrew at any time – even after Andrew ignored the offer and simply infringed the 144 patent.

The letter on which this argument is based identifies several TruePosition patents, including the 144 patent, and states that Andrew "may be in need of a license with respect to [its] Geometrix E911 Wireless Location System." (PTX 7). The letter further states that if Andrew "would like to inquire about a license or need further information," it should contact TruePosition's outside counsel. (*Id.*).

Once again, Andrew strains to interpret a document contrary to its plain language. TruePosition's letter could not be more clear: Andrew's actions would infringe one or more of the cited patents, yet TruePosition was willing to allow Andrew to proceed with otherwise

proscribed activity if it took a license. It is undisputed, however, that Andrew did not respond; it never contacted TruePosition to discuss or pay for a license under the 144 patent. (Tr. at 151:3-8; 337:6-11; 499:14-22). No reasonable reading of the December 2000 letter comports with Andrew's view that it constituted a present grant of a license that would automatically take effect, royalty-free, simply upon Andrew's commencing the accused conduct.

And again, there is no authority for Andrew's suggestion that a party may completely ignore an offer to negotiate a license, infringe the patent, and then, only when caught, attempt to get the same deal it could have gotten had it not infringed. Andrew gambled. Andrew lost.[8]

### TruePosition's Alleged Failure to Declare the 144 Patent as Essential to ETSI

Andrew's final allegation of misleading conduct by TruePosition is the fact that TruePosition did not declare the 144 patent as "essential" to an ETSI standard when, per Andrew (Br. at 34), the underlying circumstances imposed on TruePosition a duty to do so. However, a failure to speak cannot serve as the basis for equitable estoppel unless there was a duty to do so. *Symbol Techs., Inc. v. Proxim Inc.*, 2004 U.S. Dist. LEXIS 14949, *25 (D. Del. July 28, 2004) (in the absence of a duty to speak, "silence cannot constitute the basis for a charge of equitable estoppel as a matter of law") (citing *Aukerman*, 960 F.2d at 1042).

At the threshold, to prove that the ETSI IPR Policy imposed a legal obligation on TruePosition to declare the 144 patent as essential to an ETSI standard, Andrew had to prove that the 144 patent was, in fact, essential. *See Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1096, 1104 (Fed. Cir. 2003) (describing the "disclosure duty" under an IPR policy as "objective'

---

[8]      The December 2000 letter further proves Andrew's objectively reckless disregard of the 144 patent. The letter explicitly provides notice to Andrew that the 144 patent covers "the use of *time difference of arrival (TDOA)* and the *reverse control channel* (RCC) to locate cell phones." (PTX 7) (emphasis added). Yet once Andrew switched its Geometrix product to location on the reverse control channel, Andrew never bothered to inquire about a license under the 144 patent. (Tr. at 337:6-11).

and holding that defendant must prove the existence of an "omission in the face of a duty to disclose."). Only if the 144 patent were in fact essential as defined by the Policy would TruePosition have had a duty to declare it to ETSI; and only under such circumstances could non-disclosure form the basis for equitable estoppel. *See id.* at 1102-05; *see also A.C. Aukerman*, 960 F.2d at 1042. Andrew cannot carry its burden of proof here.[9]

Article 4.1 of ETSI's IPR Policy specifies obligations of its members with respect to the disclosure of "Intellectual Property Rights (IPR)":

> Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(PTX 363 at ¶ 4.1). And "Essential" is further defined as:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(PTX 363 at ¶ 15.6). Finally, "Standard" is defined as "any standard adopted by ETSI including options therein. . . ." (*Id.* at ¶ 15.11).

The ETSI IPR Policy requires the disclosure only of true blocking patents. (Tr. at 183:4-13; 189:9-190:5; 198:25-199:9; 375:7-19). That is, a duty to declare the 144 patent would arise *only if* no option under the standard could be practiced without infringing the 144 patent. This reading of the policy is consistent with its plain language and a common-sense interpretation.

---

[9] The jury was instructed as to this same threshold element of proof in the charge on Andrew's fraud defense. (Tr. at 2135:7-16). As a correct statement of the law, it was not objected to by Andrew, and therefore Andrew cannot argue that the threshold is any different for its equitable estoppel defense.

The words "essential" and "optional" have opposite meanings in ordinary usage. Thus, a common sense interpretation of the policy dictates that a patent covering only one option in a standard is not essential to practicing that standard. As ETSI defines a Standard as including the associated options (PTX 363 at ¶ 15.11), a patent can only block (be "essential" to) a standard if it blocks every option within the standard.

This interpretation is also in accord with the Federal Circuit's interpretation of the IPR policy at issue in the *Rambus* case. In that case, the relevant IPR policy required members to disclose patents and patent applications "related to" the standardization work of the committee. *Rambus*, 318 F.3d at 1085, 1098. Thus, the policy in *Rambus* was even broader than the ETSI IPR Policy at issue here. However, the Federal Circuit interpreted the policy in *Rambus* to require disclosure only of true blocking patents or "claims in patents or applications that reasonably might be necessary to practice the standard." *Id.* at 1100. The Federal Circuit reasoned that:

> To hold otherwise would contradict the record evidence and render the JEDEC disclosure duty unbounded. Under such an amorphous duty, any patent or application having a vague relationship to the standard would have to be disclosed. JEDEC members would be required to disclose improvement patents, implementation patents, and patents directed to the testing of standard-compliant devices – even though the standard itself could be practiced without licenses under such patents.

318 F.3d at 1101. Here, too, the standard could be practiced with options other than the one to which the 144 patent relates, and therefore could be practiced "without licenses under [the 144] patent[]."[10]

---

[10]    Andrew's failure to cite the *Rambus* decision in its opening brief is, in the best light, curious. In that case, the defendant, also represented by Andrew's counsel here, urged a similar interpretation of the relevant IPR policy that would require declaration of patents that were simply "related to" the standard. The Federal Circuit rejected this broad interpretation of the IPR policy and reversed the jury's finding of fraud.

It is undisputed that the ETSI standard relevant here includes four general options for the location of cell phones: Timing Advance, Enhanced Observed Time Difference (E-OTD), Global Positioning System (GPS) and Uplink Time Difference of Arrival (U-TDOA). (DTX 846A at 11). Thus, even assuming the 144 patent covered the entire U-TDOA option, it is not "essential" to the standard as a whole. TruePosition's witnesses testified accordingly at trial. (Tr. at 190:7-191:20; 199:19-22; 200:15-201:4; 203:20-204:18; 339:19-341:10; 349:21-352:16).[12] See *Honeywell Int'l*, 398 F. Supp. 2d at 317 (finding insufficient evidence to support equitable estoppel where it was possible to comply with standard without infringing).

But, peeling the onion further, even within the U-TDOA option, the standard outlines two alternative implementations of U-TDOA: location on the voice channel and location on the control channel. (DTX 846A at 11). The 144 patent covers only the latter. (Tr. at 184:14-21). Thus, the 144 patent covers only one implementation of one option of the standard; even assuming that the Policy required a declaration of patents that do nothing more than block any one option, the 144 patent still would not fall within the requirement. TruePosition's witnesses testified accordingly at trial. (Tr. at 201:4-7; 204:11-15; 221:1-8; 340:19-22).

Andrew's interpretation of the ETSI IPR Policy, requiring declaration of patents that cover *any* "implementation" of the standard, does not hold up to scrutiny. The policy does not say that, but easily could have if it were meant. As the Federal Circuit stated in the *Rambus* decision, an IPR policy that does not clearly define what must be disclosed (or when, how, or to

---

[12]     Andrew's assertion that TruePosition introduced not a "shred" of evidence supporting its interpretation of the ETSI IPR Policy (Br. at 35) is therefore flat out wrong. Besides, Andrew ignores that it is Andrew's burden to establish an interpretation of the policy that supports its position.

whom) "does not provide a firm basis for the disclosure duty . . . ." 318 F.3d at 1102. Thus, TruePosition's interpretation of the policy was at least reasonable, if not absolutely correct, so the fact that TruePosition did not declare the patent could not be the basis for any charge of fraudulent or misleading intent.[13]

The jury already rejected the policy interpretation that Andrew advances here in finding that TruePosition had not defrauded Andrew in connection with the standards-related activities. Andrew presents nothing to justify this Court's making findings inconsistent with the jury's.[14]

### b)    Andrew Did Not Reasonably Rely Upon TruePosition's Conduct

"Reliance . . . is essential to equitable estoppel." *Tenneco*, 375 F. Supp. 2d at 383. Yet, Andrew presented no credible testimony that it relied at all, certainly not reasonably, on TruePosition's conduct. To the contrary, the evidence at trial showed that Andrew ignored the patent issues entirely and acted in willful disregard of the patent. (D.I. 293). Andrew relied on nothing other than its own arrogance.

As an initial matter, the Settlement Agreement made clear that TruePosition would pursue Andrew for infringement of the 144 patent if Andrew began locating cell phones using

---

[13]    Of course, if one takes Andrew's closing argument on its face – the expressed belief that the patent does not cover the standard – then TruePosition's not declaring the patent could not, in fact or law, have defrauded Andrew, no matter what the reason for not doing so, since there would have been no duty to declare. In any event, the jury found that TruePosition had no fraudulent or misleading intent.

[14]    In support of its interpretation, Andrew encloses with its post-trial briefing a copy of a letter sent to Andrew by ETSI on October 19, 2007, more than one month after the verdict in this case, alleging that this letter somehow calls into question the interpretation of the ETSI policy that was adopted at trial. (Br. at 36). The trial record is closed, however, and the claims must be decided based on that record. (Oct. 17, 2007 Email from Court at B1 (equitable issues should be briefed "based on the factual record created at trial")). Andrew offers no rationale for why the Court should consider evidence that was not in existence at the time of trial. *See* 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil § 2808 (1995 ed.) ("Newly discovered evidence must be of facts existing at the time of trial."). Moreover, the impartiality of the letter is suspect on its face, as it suggests that ETSI's action was initiated at Andrew's request.

the control channel in a GSM network. (PTX 15R at ¶¶ 6, 9; Tr. at 337:19-338:6; 507:1-512:24).

The Agreement also included an integration clause that expressly limited the parties' rights,

obligations, and expectancies to the Agreement's four corners. (PTX 15R at ¶ 22). It was

executed in February 2004, *after* the conduct that Andrew advances as the basis for its equitable

estoppel argument. In view of the Agreement's express provisions, and in particular the

integration clause, Andrew cannot, as a matter of law, base its defenses on pre-Agreement

conduct. Indeed, reliance on pre-Agreement conduct, if Andrew relied on the conduct at all – a

big "if" on this record – would have been very clearly *not* reasonable. Indeed, it would have

been irresponsible.

Andrew's assertion of reliance on the feasibility study strains credulity. Andrew failed to

persuade the jury, yet now asks this Court to believe, that a sophisticated 2-billion dollar

company like itself would stake millions of dollars on research and development activity, and on

the commercialization of a new technology, on the basis of a statement found on an internet web

site, a statement that appeared only in a *non-final draft* of a submission to an organization to

which Andrew did not belong at the time, made at a meeting that Andrew did not attend, and that

was stricken, at the request of the organization itself, from all subsequent versions of the

document as submitted. (Tr. at 226:22-227:7; 1806:10-1807:10). Andrew's claimed reliance on

this statement for the belief it had free rights in the patent would have again gone well beyond

mere unreasonableness; it would have been downright reckless.

But the fact is there was no reliance on this statement at all. Even if the statement had

been operative, it was for "*applicants*" – members of the organization who *applied* for a license.

It was not an automatic grant. And the record is undisputed that even when Andrew became a

member, it did not inquire about a license, Tr. at 337:6-11; it did not offer to pay any kind of

royalty, mandated by the organizational protocol, which Andrew claims to have followed and relied on. (PTX 363 at ¶ 3.2 ("IPR holders . . . should be adequately and fairly rewarded for the use of their IPRs"); Tr. at 182:12-19). If Andrew had "relied," it would have applied. It did not. It simply infringed.

Andrew's argument based on the Ericsson UTDOA study group is just nonsense. The document it claims to have relied on for its belief that TruePosition would not assert its patent was not created by TruePosition but by a third party (Ericsson), who is not even alleged to have the authority to speak on behalf of TruePosition, and does not even mention intellectual property. The obvious question is what could Andrew possibly have relied on that document for? The more obvious answer is nothing.

Andrew's final reliance argument, that its participation in ETSI and work on standardization of UTDOA were based on the belief that TruePosition would not assert the 144 patent, omits significant record facts that reveal its true motivation: Andrew was (and still is) locating cell phones using voice channel UTDOA. (Tr. at 353:17-354:1). Andrew independently wanted to standardize UTDOA because it was already utilizing that technology on the voice channel and its standardization would benefit Andrew and its customers. (Tr. at 354:2-8). But given the parties' background here, and in particular given the Settlement Agreement, it should have come as no surprise to Andrew that TruePosition sued for infringement when Andrew switched its protocol for locating cell phones from the voice channel to the control channel.

Andrew was intimately familiar with the coverage of the 144 patent – control channel, as opposed to voice channel – and knew that a license under it was expressly excluded by the Settlement Agreement. No action or inaction by TruePosition "lulled" Andrew into a sense of

security that TruePosition did not intend to enforce this patent. The only reasonable conclusion from all the evidence is that TruePosition always intended to enforce its patent (by suit or license) against Andrew if Andrew located via the control channel within the coverage of the patent. And Andrew knew it.

### c)    Balancing of the Equities Favors TruePosition

Finally, the ultimate determination of whether equitable estoppel applies requires a "fairness" balancing of all the facts and circumstances of a particular case. *See Tenneco*, 375 F. Supp. 2d at 383 (citing *Aukerman*, 960 F.2d at 1043). As set forth in Section V.A.1 above, balancing the factors here strongly favors TruePosition.

Andrew was found to have willfully infringed the patent. The finding is firmly supported by clear and convincing evidence. The signal fact is that Andrew never even pretended to follow the standards protocol it claims TruePosition violated. Under any reading of the feasibility study or ETSI policies, there was no entitlement to a royalty-free license under another member's patent; there was the opportunity to negotiate a fair and reasonable license. Andrew ignored the opportunities. It never approached TruePosition, and even ignored the opportunity to negotiate a license when TruePosition expressly offered it. It simply adopted a technology it knew from the earlier Settlement Agreement it had no right to. Its argument that it somehow believed it had a license or some free-ride under the patent is disingenuous at best.

### 2.    Andrew Cannot Establish the Defense of Implied License

An implied license is a patentee's waiver of its statutory right to sue for patent infringement. *Tenneco*, 375 F. Supp. 2d at 383-84. "The Federal Circuit has recognized implied licenses through: (1) equitable estoppel; (2) legal estoppel; (3) acquiescence; and (4) conduct." *Id.* at 384. These are not different types of implied licenses, but different categories of conduct that can give rise to an implied license. *Id.*

Equitable estoppel has been addressed above. Andrew does not assert legal estoppel. Its last attempt to establish an implied license, through conduct or acquiescence, requires it to prove that (1) a relationship existed between Andrew and TruePosition; (2) within that relationship, TruePosition granted Andrew a right to use the 144 patent; (3) TruePosition received valuable consideration for the license; and (4) TruePosition's statements and conduct created the impression that it consented to Andrew's use of the 144 patent. *Tenneco*, 375 F. Supp. 2d at 383-84. In addition, a finding of implied license requires a nexus between TruePosition's purported waiver of its right to enforce the 144 patent against Andrew and Andrew's infringing action. *Id.*

Andrew's implied license defense is based largely on a re-presentation of the same arguments advanced for equitable estoppel. The arguments fare no better in the framework of implied license. Andrew cannot establish that TruePosition granted Andrew a right to use the 144 patent or that TruePosition's conduct created the impression that it consented to Andrew's use of the 144 patent. Importantly, the jury has already found that TruePosition's conduct did not amount to a promise to license the 144 patent. (D.I. 293). There is no basis for the Court to make any different finding here. *Therma-Tru Corp.*, 44 F.3d at 995.

      a)      **The Parties Had No Relationship Under Which TruePosition Granted Andrew a Right to Use the 144 Patent**

Andrew describes a relationship between the parties that simply does not exist. (Br. at 40-45; 47). In Andrew's world, TruePosition "plotted" to get Andrew involved in the standardization of UTDOA – both at ETSI and in the Ericsson study group – in order to cultivate the appearance that UTDOA was not a "proprietary" technology and to work with Andrew to jointly "develop" UTDOA technology. (*See id.*).

33

The real world of the record, however, is different. Andrew joined ETSI and the Ericsson study group at the urging of its customer AT&T Wireless, *not* at the request of TruePosition. (Tr. at 315:8-14; 354:2-5). The circumstances were driven by a mandate that had been issued by the Federal Communications Commission ("FCC") requiring that cellular networks deploy a technology to locate 911 callers. (Tr. at 285:8-21). Standardization of location technologies, such as UTDOA, would benefit AT&T, Andrew, and any other vendors using compliant technologies, because standardization is all about defining how pieces of equipment within a particular technology "fit together, communicate and operate together." (Tr. at 193:20-194:10; 287:2-5; 363:4-11; 1815:20-1816:10). Ensuring interoperability between the equipment of different vendors, carriers, and end users reduces costs and, in turn, benefits all involved by increasing profits. (Tr. at 1829:22-1830:3). Moreover, wireless operators and carriers would be more likely to support standardization if more than one vendor were using a particular technology (and in this case both Andrew and TruePosition were using UTDOA) because of the generally-resulting price competition. (Tr. at 321:9-17). At that time (and now as well), Andrew itself used UTDOA on the voice channel to locate cellular phones. (Tr. at 317:19-24; 322:18-323:1; 352:17-353:1; 353:17-354:1). For these reasons, Andrew was motivated to join the Ericsson UTDOA study group and ETSI at the urging of its customer AT&T and by a desire to promote the location capability of its own products – UTDOA on the voice channel – not at the coaxing of TruePosition. (Tr. at 315:8-14; 354:2-8).

Although Andrew and TruePosition did work together to standardize UTDOA, this effort did not result in the creation of any new technology. (Tr. at 193:17-19; 310:22-24; 363:1-3). Andrew's reliance on the *Lukens* case, Br. at 42-43, is thus misplaced. Unlike that case, the parties here did not jointly develop the product that later is the subject of an infringement suit. It

is also undisputed that Andrew played no role in the development of the invention claimed in the 144 patent.

The inventions of the 144 patent have nothing to do with standardization of UTDOA, which concerns interoperability of all equipment, from whatever source, that uses UTDOA. (Tr. at 330:21-333:18). Rather, the 144 patent is directed to a specific aspect of one option for practicing UTDOA – the "inner workings of TDOA on the control channel" or how one would "take a control channel signal and turn it into an estimate of a cellular telephone's location." (Tr. at 333:19-23). Accordingly, Andrew's joining ETSI and its work on UTDOA in general could give no reasonable expectation that it would have the right to freely practice any specific patent, covering only a single implementation of one of the UTDOA options.

Finally, Andrew's argument omits any mention of the most critical aspect of whatever relationship did exist between itself and TruePosition – that the parties were engaged in other litigation throughout the relevant time period, which culminated in a Settlement Agreement that *expressly* stated that Andrew was *not* licensed under the 144 patent (Tr. at 153:9-11) and that TruePosition would pursue Andrew for infringement of the 144 patent if Andrew began locating cell phones using the control channel in a GSM network. (PTX 15R at ¶¶ 6, 9; Tr. at 507:1-512:24). The litigation and the Settlement Agreement characterize the parties' relationship through this period. Andrew's attempt to ignore the Settlement Agreement does not change its legal effect: The *express* exclusion of any rights under the 144 patent is fatal to Andrew's argument that rights could instead be implied.

> **b)**  **Nothing TruePosition Did or Did Not Do or Say Could Reasonably Convey the Impression That It Consented to Andrew's Use of the 144 Patent**

The last element of implied license – whether TruePosition's statements or conduct created the impression that it consented to Andrew's use of the 144 patent – completely overlaps

with the first element of equitable estoppel. As exhaustively detailed in the above section, no reasonable evaluation of TruePosition's conduct, statements, or omissions could create a belief that TruePosition consented to or would simply forgive infringing use of its patent.

### 3. Andrew's Equitable Defenses Should Be Barred Under the Doctrine of Unclean Hands

Finally, in a defense not independent of its other failed theories, Andrew vaguely argues that TruePosition's infringement claims should be barred under the doctrine of unclean hands. (Br. at 48-50). Although no leave was granted to Andrew to brief this defense (B1), Andrew's arguments only confirm that it is Andrew – not TruePosition – whom equity should bar.

As the cases cited by Andrew make clear, a party who has acted fraudulently or in bad faith is not entitled to the aid of the court's equitable powers on its behalf. *See Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933). As set forth in detail in Section V.A.1 above, Andrew, as an infringer with the "unclean hands" of willfulness, cannot now ask the Court for equitable relief. *See Shockley*, 248 F.3d at 1361; *Loral Corp.*, 1989 U.S. Dist. LEXIS 16865 at *133-34.

## VI.    CONCLUSION

Andrew's equitable defenses have been rejected in related substance by the jury and deserve no better fare before the Court. TruePosition respectfully requests that the Court confirm its judgment for TruePosition and against Andrew on the equitable defenses of equitable estoppel, implied license, and unclean hands.

Respectfully submitted,

DATED: November 30, 2007        By:        /s/ James D. Heisman
                                               CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman, Esq. (#2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
jheisman@cblh.com

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Amanda M. Kessel, Esq. (pro hac vice)
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

37

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 30th day of November, 2007, I caused a true and correct copy of the foregoing **TRUEPOSITION'S OPPOSITION TO ANDREW'S POST-TRIAL BRIEF IN SUPPORT OF ITS REMAINING EQUITABLE DEFENSES** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

 /s/ James D. Heisman .
James D. Heisman, Esq. (#2746)

578970