IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TruePosition, Inc.,                          )
                                             )
            Plaintiff/                       )
            Counterclaim-Defendant,          )
                                             )        Civil Action No. 05-00747(SLR)
            v.                               )
                                             )
Andrew Corporation,                          )
                                             )
            Defendant/                       )
            Counterclaim-Plaintiff.          )
_____)

## TRUEPOSITION'S REPLY BRIEF IN SUPPORT
## OF ITS MOTION FOR ENHANCED DAMAGES AND ATTORNEYS' FEES

CONNOLLY BOVE LODGE & HUTZ LLP
James D. Heisman, Esq. (#2746)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
jheisman@cblh.com

WOODCOCK WASHBURN LLP
Paul B. Milcetic, Esq. (pro hac vice)
Dale M. Heist, Esq. (pro hac vice)
Kathleen A. Milsark, Esq. (pro hac vice)
Daniel J. Goettle, Esq. (pro hac vice)
Amanda M. Kessel, Esq. (pro hac vice)
Cira Centre, 12th Floor, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Attorneys for Plaintiff, TruePosition, Inc.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ENHANCEMENT BY A FACTOR OF THREE IS APPROPRIATE ............................. 2

     A.    *Seagate* ............................................................................................... 2

     B.    Enhancing Damages Is Appropriate: The *Read* Factors ........................................ 3

          1.    Copying.................................................................................................. 3

          2.    Good-Faith Belief in Noninfringement or Invalidity................................. 4

          3.    Andrew's Litigation Behavior .................................................................. 5

          4.    Andrew's Size and Financial Condition Support Enhancement................................................................................................ 9

          5.    This Case Was Not Close ...................................................................... 10

          6.    Duration of Andrew's Willful Infringement............................................. 11

          7.    No Remedial Action by Andrew.............................................................. 11

          8.    Andrew's Motivation To Harm ............................................................... 12

          9.    Andrew's Concealment of Its Willful Infringement.................................. 12

III.  TRUEPOSITION SHOULD BE AWARDED ITS ATTORNEY FEES, DISBURSEMENTS & EXPERT WITNESS FEES........................................................ 13

IV.   CONCLUSION................................................................................................. 13

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
    967 F. Supp. 861 (E.D. Va. 1997) ........................................................................2

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996)..............................................................................2

*Read Corp. v. Portec*,
    970 F.2d 816 (Fed. Cir. 1992)..............................................................................2

*In re Seagate, LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)..........................................................................2, 3

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000)............................................................................13

*Transclean Corp. v. Bridgewood Services*,
    290 F.3d 1364 (Fed. Cir. 2002)..........................................................................10

## I.    INTRODUCTION

If corporations display Freudian defense mechanisms, then Andrew suffers from at least two of them: denial and projection. Unsurprisingly – given the other Andrew briefs and its litigation tactics as a whole – Andrew's opposition brief can be summed up in one mantra: "We did nothing wrong – if anyone is to blame, it is TruePosition."

But the decisions made by the Court and the jury throughout this case belie Andrew's mantra – both rejected Andrew's litany of after-the-fact excuses for its willful infringement. At summary judgment, the Court rejected Andrew's California unfair competition, anticipation, and indefiniteness defenses. The Court also precluded as unreliable testimony from Andrew's invalidity expert – the same expert whose testimony was disregarded by the jury in its rejection of each and every one of Andrew's noninfringement defenses. The jury also rejected Andrew's defenses of fraud and promissory estoppel. Further, the jury awarded TruePosition its requested compensatory damages in full.

On top of these conclusive decisions by the Court and jury, the jury also found that Andrew proceeded to develop and sell a reverse-control-channel UTDOA system despite an objectively high likelihood that its actions constituted infringement of the 144 patent and despite that it knew (or should have known) of the magnitude of this risk. In other words, the jury also found Andrew to be a willful infringer in this more-stringent, post-*Seagate* era.

And yet, despite the fact that not one issue in the case went its way, Andrew argues that each and every *Read* factor – all nine of them – favor Andrew's conduct and therefore that damages should not be enhanced or attorney fees awarded. But the *Read* factors must be considered in light of the jury's verdict, not in ignorance of it, as Andrew

1

appears to suggest. A proper consideration of these factors demonstrates overwhelmingly that Andrew should be maximally punished.[1] The Court should enhance damages and should award TruePosition its attorney fees, disbursements, and expert witness fees.

## II.    ENHANCEMENT BY A FACTOR OF THREE IS APPROPRIATE

### A.    *Seagate*

Before turning to the *Read* factors, two items based on *Seagate* bear noting. First, in determining whether, and by how much, to enhance damages, "the paramount determination . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec*, 970 F.2d 816, 826 (Fed. Cir. 1992). It may well be that, given the more-stringent willfulness standard set out in *Seagate* – objective recklessness – willful infringement may automatically constitute egregious conduct under *Read,* warranting enhanced damages. *In re Seagate, LLC*, 497 F.3d 1360, 1371, 1374 (Fed. Cir. 2007) (en banc) ("recklessness must be shown to recover enhanced damages."). To be sure, even before *Seagate*, trial courts were required to provide reasons for refusing to enhance damages after a finding of willful infringement. *See, e.g., Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996); *Applied Med. Resources Corp. v. United States Surgical Corp.*, 967 F. Supp 861, 863 (E.D. Va. 1997). As shown below, however, the conduct underlying the willfulness finding meets the "egregiousness" test of *Read* straight-up, warranting enhanced damages by a factor of three.

Second, Andrew argues that *Seagate* stands for the proposition that, "if a patentee does not move for a preliminary injunction, it cannot be awarded enhanced damages

---

[1]    Even maximum punishment in this case may have no meaningful affect on Andrew, as a one-time treble damage award is only seven percent of a single year of Andrew's revenue generation and only twelve percent more than Andrew spends each year on research and development.

based on the accused infringer's post-filing conduct. . . . TruePosition's claim for enhancement is limited to Andrew's pre-filing acts. . ." (Br. at 7-8).[2]  Andrew misreads *Seagate*, however, by referring to a statement made in an unrelated context.  The portion of *Seagate* from which Andrew quotes was in the context of the scope of waiver of the attorney-client privilege, that a patentee "should not be allowed to accrue enhanced damages based ***solely*** on the infringer's post-filing conduct."  *Seagate*, 497 F.3d at 1374 (emphasis supplied).  But TruePosition is not seeking enhanced damages based ***solely*** on Andrew's post-filing willful infringement.  Instead, TruePosition seeks enhanced damages based on Andrew's numerous acts of willful infringement and knowing disregard of TruePosition's patent rights that started with Andrew's initial offer to STC in December 2004 – more than 10 months before TruePostion filed its complaint – and continued until the eve of trial, with Andrew's announcement of its award of a third phase of the STC contract.  (PTX 479).

### B.      Enhancing Damages Is Appropriate: The *Read* Factors

#### 1.      Copying

TruePosition is not asserting that Andrew copied any TruePosition product when especially adapting Geometrix to perform SDCCH location.  But Andrew's other assertions with regard to this factor are surprising, particularly given the jury findings.  For example, Andrew argues that the "evidence of record also demonstrates that Andrew's products use a different architecture and different algorithms than the system disclosed and claimed in the '144 patent . . ." (Br. at 10).  Andrew's denial of infringement and its other equally baseless assertions stand in marked contradiction to the

---

[2]      Andrew's Answering Brief in Opp. to TruePosition's Mot. For Enhanced Damages is docketed at D.I. 334, 337.

jury's findings of literal – and willful – infringement of all asserted claims of the 144 patent, which findings must be assumed in considering TruePosition's motion. Andrew's other denials with regard to this factor are equally flawed.

### 2.    Good-Faith Belief in Noninfringement or Invalidity

The record does not include any evidence that Andrew ever formed a good-faith belief of invalidity or noninfringement. Instead, the evidence shows the opposite. First, in an uncharacteristic show of restraint, Andrew does not attempt to argue that it formed a good faith belief in the invalidity of the 144 patent. But it bears remembering how hard Andrew worked to keep invalidity in the case. Andrew asserted a number of invalidity defenses based on obviousness, anticipation, and lack of enabling disclosure. (D.I. 224 at B15-B16). At summary judgment, Andrew also asserted indefiniteness for the first time (D.I. 146). But all of these invalidity defenses died before trial, along with the unreliable expert invalidity testimony of Dr. Goodman (D.I. 234 at 1; D.I. 256 at 2-3; & D.I. 258 at 13-17).

Andrew argues that it had a good faith belief that it did not infringe because it "mounted a good faith and substantial challenge to the existence of infringement" and because it was only "offering standardized GSM technology." (Br. at 11-12). But at this juncture, those arguments must be taken as empty because the jury has already found willful infringement, awarded full compensatory damages, and rejected all of Andrew's defenses. Certainly, it cannot be that a defense based on volume, rather than quality, somehow demonstrates a good faith and substantial challenge.

Further, Andrew admits that it extensively reviewed the 144 patent before the suit was filed, Br. at 11, but (obviously) reviewing the patent is not enough. Andrew never compared the 144 patent claims to its SDCCH-locating product to form a good faith

- 4 -

noninfringement belief. Andrew obtained no opinion of counsel. And Andrew studiously ignores the settlement agreement from the previous litigation, which states that TruePosition could sue Andrew under the 144 patent if Andrew develops a product that performs control channel location in a GSM network. (PTX 15 at ¶¶ 6 & 9). These three failures – just three of many – show that Andrew knew its actions created an objectively high risk of infringement. As the jury found, instead of forming a good-faith noninfringement belief, Andrew chose to run the objectively high risk. (D.I. 293).

3.    <strong>Andrew's Litigation Behavior</strong>

Andrew asserts, "Everything about Andrew's litigation behavior weighs against enhancing damages." (Br. at 13). But to the contrary, Andrew's litigation behavior, taken in the best light, is a neutral factor, and taken in the true light of day is a factor that weighs in favor of enhancement.

There may be a gray area between zealous advocacy and litigation misbehavior. But certainly the Court can draw its own conclusions regarding Andrew's litigation conduct. If taken individually, some of the following facts could, in a vacuum, reflect only zealous advocacy. Others reflect a lack of a good faith belief in noninfringement, and still others reflect careful, calculated misbehavior. But taken as a whole, Andrew's overall conduct in conjunction with its last-minute trial-by-ambush tactics, including the barrage of over 42,000 pages of discovery documents and belated attempt to add a new fact witness, belie Andrew's assertion that everything about its conduct weighs against enhancement.

One of Andrew's litigation tactics has been to assert, reassert, and re-reassert every possible defense for as long as the Court allows, no matter the stage of proceeding, the strength of the defense or the last-minute nature. During discovery, for example,

- 5 -

Andrew asserted invalidity based on obviousness and anticipation (D.I. 224 at B15-B16). Yet, although Dr. Goodman's invalidity report addressed only anticipation, Andrew refused to concede that it was not pursuing an obviousness defense until its *Daubert* reply brief. (D.I. 234 at 1). Further, despite opportunities to identify its defenses in response to numerous of TruePosition's contention interrogatories, Andrew raised an entirely new invalidity defense – indefiniteness – for the first time at summary judgment. (D.I. 224 at B15-B16; D.I. 146). Then, upon the Court's holding that none of Andrew's invalidity defenses warranted the jury's time, Andrew moved for, and was denied, "clarification" of this already clear decision. (D.I. 268; D.I. 272 at 5-6).

Andrew asserted that TruePosition's actions violated a California unfair competition code. But, as the Court found, Andrew failed to present any evidence linking TruePosition's conduct to California, and the Court granted TruePosition summary judgment. (D.I. 257 at 28-29).

Andrew proposed definitions for seventeen claim terms purportedly requiring construction. (D.I. 130). In the end, the Court adopted none of Andrew's constructions, instead largely adopting TruePostion's proposed constructions. (D.I. 257).

Even through summary judgment, Andrew had not identified all of its defenses. On the eve of trial, Andrew raised for the first time the argument that it was not liable for the Ashburn demonstration because the demonstration was pursuant to a government contract. (D.I. 272 at 61-67). The Court allowed Andrew to present this defense at trial, and the best evidence Andrew could come up with was a two-page excerpt from a purportedly classified 2003 contract that is labeled "unclassified" at the top and bottom (DTX 1108). On its face, it is as likely to be for the supply of t-shirts, antennas, or

ashtrays as it is for geolocation equipment. In addition to failing to specify the subject matter of the so-called contract, Andrew presented no evidence that the government authorized and consented to its infringement. Andrew did not even attempt to call a single government witness to corroborate its claim, instead offering just ten transcript lines of testimony from Mr. Garner. (Tr. at 1862:3-13).[3] And, of course, despite this weak evidence and despite that it failed to move for judgment as a matter of law at trial, Andrew asserts in its post-trial briefing that "the unrebutted evidence of record is that the Ashburn demonstration was for the government . . ." and therefore "Andrew cannot be liable for" the Ashburn demonstration. (D.I. 327 at 17-18).

Also throughout trial – as well as post-trial – Andrew maintained two inconsistent defenses. On the one hand, Andrew asserts that TruePosition's patent is essential to a standard and, therefore, TruePosition committed fraud and other misbehaviors. But on the other hand, Andrew asserts that even though its SDCCH-locating product practices the standard, it does not infringe the 144 patent. As Andrew admits, both of these assertions cannot be true. (Tr. at 2072). And although the jury rejected Andrew's inconsistent excuses, Andrew raises virtually all of the same defenses in its motions for JMOL and a new trial. (D.I. 327).

At trial, Andrew also ignored the Court's *Markman* ruling and attempted to reargue claim construction. (Tr. at 1374-1376). But claim construction had already been settled – in TruePosition's favor – by the Court. (D.I. 257). And Andrew read excerpts from TruePosition's admissions into the record, prompting the Court, *sua sponte*, to warn Andrew's counsel:

---

[3]     The trial transcript is docketed at D.I. 298-307.

> I have some real concerns about how you are using some of those
> admissions. . . . It sounded to me like some of them could only be used
> for a validity argument or to argue claim construction that I already
> rejected. So I just wanted to let you know that I am aware of the mischief
> that could come from those admissions and I will publicly correct you if
> you step over the line that I've drawn in this case.

(Tr. at 1611-1616).

On top of that, despite that the parties agreed upon, and the Court subsequently

ordered, a pretrial fact and expert discovery schedule, D.I. 22, on the eve of trial, Andrew

decided to call a new fact witness, a Dr. Rosenbrock. (Tr. at 542-543; 665-666). Andrew

never explained the reason for not having identified Dr. Rosenbrock during discovery,

and the Court then precluded his testimony. (Tr. at 666).

And, finally, just minutes before the pretrial conference, Andrew informed

TruePosition that a former TruePosition employee, Mr. Rhys Robinson, had possession

of documents that he had not produced pursuant to TruePosition's subpoena. (D.I. 272 at

7-9; Tr. at 9). And just three days before trial, Andrew provided electronic copies of the

documents to TruePosition amounting to over 42,000 pages – the equivalent of 15 boxes

(Tr. at 9). Andrew also asserted that TruePosition somehow shirked its discovery duties

and demanded to depose certain TruePosition employees in light of the documents. (D.I.

272 at 7-9; Tr. at 9). Despite these accusations and demands, Andrew failed to identify

any document that was not "just another version of the same evidence" (Tr. 9).

Despite that Mr. Robinson was on Andrew's witness list, D.I. 255, despite that

Andrew portrayed him throughout trial as a whistle-blower in support of Andrew's fraud

allegations (*see, e.g.,* Tr. at 214, 253-7, 262-5, 274-279, 555-565), and despite that

Andrew continued to assert that TruePosition knew about the documents, Andrew did not

call or subpoena Mr. Robinson to testify. (Tr. at 1413). Since Andrew was

- 8 -

communicating with Mr. Robinson, D.I. 272 at 7, it was part of Andrew's game to hide

behind Mr. Robinson's absence in its attempts to disparage TruePosition with regard to

these documents. When it was becoming apparent that Andrew was not going to call or

subpoena Mr. Robinson, despite the fact that he was central to Andrew's defense,

TruePosition subpoenaed his presence at trial. (Tr. at 1412-1413). Through counsel, Mr.

Robinson indicated his unavailability because of the late notice. (*Id.*). Certainly, had

Andrew ever intended to call Mr. Robinson to support its allegations regarding the

documents or its fraud claim, Mr. Robinson would have had plenty of notice.

Given all of the foregoing – the late and dubious invalidity and government

contract defenses, the weak invalidity assertions, the inconsistent defenses, repeating all

of the inconsistent defenses on post-trial briefing despite the jury verdict, the attempt to

call a witness not identified until the eve of trial, and the dubiousness surrounding the

42,000 pages of documents – Andrew's assertion that there was nothing regarding its

litigation conduct warranting enhancement is false.

### 4.    Andrew's Size and Financial Condition Support Enhancement

TruePosition agrees with Andrew that damages should not be enhanced only

because Andrew is a large company. But certainly Andrew can withstand enhancement

by a factor of three without severely affecting its financial condition. Indeed this is

implied by the "Declaration of Gary Brown" that Andrew included with its opposition

brief. (B13-B14).[4] Mr. Brown's declaration inexplicably refers to the financial condition

of only one group within the defendant corporation, namely Andrew's Network Solutions

---

[4]    B13-14 is part of the Appendix of Exhibits to Andrew's Answering Br. In Opp. to TruePosition's Mot. For Enhanced Damages and Mot. For Permanent Injunctive Relief. (D.I. 336, 338).

Group. Mr. Brown's declaration tellingly does not refer whatsoever to the financial condition of the defendant. Had TruePosition not enforced its property rights or had the jury not been so utterly convinced of Andrew's wrong-doing, Andrew Corporation, not just its Network Solutions Group, stood to gain a windfall from its willful infringement. This windfall would not only encompass the value of the STC contract but also all of the other contracts from other Middle Eastern entities who would follow STC's lead and award Andrew their business. (Tr. at 1187-1189). Therefore, it is Andrew Corporation, and not the Network Solutions Group, that is to be punished for its willful infringement.

Andrew's failure to describe its financial state as a whole implies acceptance of the reality that treble damages will not severely affect its financial condition.[5] And the evidence affirmatively shows that Andrew not only can withstand treble damages, but that without trebling damages, Andrew's willfulness will go unpunished. This is because Andrew will not be meaningfully affected by a lesser punishment. Indeed, a one-time treble damage award is only about twelve percent more than the $120 million Andrew spends *each and every year* for research and development, Tr. at 1850, and is just seven percent of one year's revenue generation of $1.84 billion. (PTX 154).

### 5.    This Case Was Not Close

Much of Andrew's opposition brief addresses the closeness of the case. The case was not close. *See* D.I. 293 (Jury's Verdict Form); *see also* TruePosition's other post-trial briefs.

---

[5]    Of course, at its discretion, the Court may enhance damages by any degree up to a factor of three. *See Transclean Corp. v. Bridgewood Servs.*, 290 F.3d 1364, 1378 (Fed. Cir. 2002).

### 6.    Duration of Andrew's Willful Infringement

Andrew's willful infringement commenced in December 2004 when it initially

bid on the STC contract. (PTX 139). It continued through the shipments to Saudi

Arabia, PTX 237, and through the signing of a contract with STC in February 2006 (Tr.

at 722). Andrew's infringement was anything but short and certainly was long enough

for Andrew to win – and TruePosition to lose – this flagship opportunity in the Middle

East.

### 7.    No Remedial Action by Andrew

At the bottom of page 20 of its brief, Andrew asserts, "by actively participating in

the standardization process, and thoroughly investigating IPR issues, Andrew went

beyond remedial measures – it took *proactive* measures" (emphasis in original). Like a

good novel, such a bold statement piques the reader's interest – the statement is vague

and unexpected, a twist you never see coming. So, we turn the page, thinking "how is the

author going to tie this little piece of foreshadowing to the plot – how's the author going

to make it seem plausible, make it stick?" When we turn the page to find out, we begin

to read at the top of page 21. But there's nothing there. Instead of reading a clever piece

of advocacy on how being "proactive" is somehow better than *avoiding* infringement, we

are confronted with the next *Read* factor. Andrew also never explains how it "thoroughly

investigated IPR issues." Indeed, there is nothing in the record that even suggests

Andrew ever determined, prior to this suit, that TruePosition had not declared the 144

patent.

And while Andrew may be correct that the market requires standardized

technology, Andrew forgets that it has made products covered by the GSM standards that

do not infringe the 144 patent – its voice-channel location equipment. (Tr. at 152; 352-

353; PTX 287 at 5). So, in sum, Andrew did the opposite of taking remedial action. It added SDCCH location to its product line of existing, standardized equipment, with full knowledge of the 144 patent, its lack of rights under it, and the risks involved in doing it. (Tr. at 352-353; PTX 7, 8, & 15R).

### 8.      Andrew's Motivation To Harm

Andrew argues that there is no evidence that its actions were designed to injure TruePosition. But Andrew fails to acknowledge that the relevant market is a two-supplier market. (Tr. at 1148-1151, 1921-22). Because a sale by Andrew necessarily is a sale lost to TruePostion, a sale by Andrew automatically injures TruePosition. So, even if there is no smoking-gun evidence that Andrew executives plotted to win the STC bid just to injure TruePosition, there is plenty of evidence that Andrew willfully infringed the 144 patent, D.I. 292, in a two supplier market, Tr. at 1148-1151, 1921-22, and that TruePosition and Andrew are fierce competitors in this two-supplier market. (Tr. at 362). These factors support a conclusion that Andrew was motivated to harm TruePosition.

### 9.      Andrew's Concealment of Its Willful Infringement

TruePosition sent four notices to Andrew regarding the 144 patent. (PTX 7, 8, 17, & 18). Andrew ignored them all. (Tr. at 343; 503-504; 518-19). Andrew also signed a settlement agreement with TruePosition in February 2004 that specifically stated that TruePosition would be free to sue Andrew if it sold a product that located cell phones using control channel transmissions in a GSM system. (PTX 15 at ¶¶ 6 & 9). And yet just 10 months later, Andrew made its first offer to STC. (PTX 139). While perhaps this is not concealment, it certainly is equally deceptive and dubious.

- 12 -

**III.    TRUEPOSITION SHOULD BE AWARDED ITS ATTORNEY FEES, DISBURSEMENTS & EXPERT WITNESS FEES**

Even under the pre-*Seagate* willfulness standard, denying an award of attorney fees after a finding of willful infringement is the exception rather than the rule.  *See Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 972 (Fed. Cir. 2000).  In this more-stringent, post-*Seagate* era – after a finding that the defendant infringed despite an objectively high likelihood that its actions constituted infringement and despite that it knew (or should have) of the magnitude of the risk – it follows that denying an award of attorney fees should be an even more rare occurrence.  As Andrew admits, the *Read* factors form a helpful guide in determining exceptionality.  (Br. at 25).  As the foregoing *Read* analysis shows, this is not a case that warrants a rare deviation from the norm. Andrew's tactics forced TruePosition to spend substantially on attorney fees, and at least because of that and its willful infringement, TruePosition should be awarded its attorney fees, disbursements, and expert witness fees.

**IV.    CONCLUSION**

For the foregoing reasons, TruePosition respectfully requests that the Court enhance the jury's compensatory damages award by a factor of three and that the Court classify this case as exceptional and award TruePosition its attorney fees, disbursements, and expert witness fees.

Respectfully submitted,

DATED: November 30, 2007          By:          /s/ James D. Heisman
                                               CONNOLLY BOVE LODGE & HUTZ LLP
                                               James D. Heisman, Esq. (#2746)
                                               1007 N. Orange Street
                                               P.O. Box 2207
                                               Wilmington, DE 19899
                                               Telephone: (302) 658-9141
                                               Facsimile: (302) 658-5614
                                               jheisman@cblh.com

                                               WOODCOCK WASHBURN LLP
                                               Paul B. Milcetic, Esq. (pro hac vice)
                                               Dale M. Heist, Esq. (pro hac vice)
                                               Kathleen A. Milsark, Esq. (pro hac vice)
                                               Daniel J. Goettle, Esq. (pro hac vice)
                                               Amanda M. Kessel, Esq. (pro hac vice)
                                               Cira Centre, 12th Floor
                                               2929 Arch Street
                                               Philadelphia, PA 19104
                                               Telephone: (215) 568-3100
                                               Facsimile: (215) 568-3439

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 30th day of November, 2007, I caused a true and correct copy of the foregoing **TRUEPOSITION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR ENHANCED DAMAGES AND ATTORNEYS' FEES** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

*/s/ James D. Heisman*          .
James D. Heisman, Esq. (#2746)

578947

- 15 -