admitted that the "actual start time" field does not represent the time the frame was produced. According to Andrew, Dr. Gottesman admitted that the actual start time field represents the time when the LMU/WLS starts collecting data which, according to Andrew, is earlier than the time the signal arrives at the cell site and, therefore, is necessarily earlier than the time that a frame is produced from that signal. (Br. at 39). But the notion that Geometrix starts collecting data from a signal before that signal actually arrives at the cell site is nonsensical.

Dr. Gottesman never testified that the actual start time field represents a data collection time earlier than the time the signal arrives at the cell site. Andrew purports to find such testimony in Dr. Gottesman's statement that "the WLS start[s] collecting stuff, collecting data, and shortly after, it identifie[s] the time of arrival." (Tr. at 834:25-835:1). But that is not an admission that the actual start time field represents a time earlier than the time the signal arrives at the cell site. Instead, that testimony is an indication that Geometrix starts collecting data from a signal before it *calculates* and *identifies* the time the signal arrived.

In short, a reasonable juror could conclude that Geometrix produces **"frames of data, each frame comprising . . . time stamp bits representing the time at which said frames were produced at each cell site."**

### 2.    The Jury Was Right: Andrew Is a Willful Infringer[9]

The jury rightly found that Andrew's infringement was willful. After the Court instructed the jury consistent with the standard announced in *In re Seagate*, 497 F.3d 1360 (Fed. Cir. 2007), the jury carefully considered 1) whether Andrew was aware of the 144 patent; 2) whether Andrew's pre-complaint actions were taken despite an objectively high likelihood that they constituted infringement; and 3) whether Andrew knew or should have known that its actions

---

[9] Andrew did not properly preserve a JMOL on willfulness. Accordingly, for the reasons already discussed, Andrew's motion should be considered only under the "new trial" standard of Rule 59.

created an objectively high risk of infringement. Andrew's state of mind is not relevant to the second aspect of this test, but is relevant to the third. *In re Seagate*, 497 F.3d at 1370-72.; Tr. at 2133:4-15.

### a)    Andrew Was Aware of the 144 Patent

Andrew does not dispute that it knew about the 144 patent, nor could it. TruePosition sent Andrew four separate warning letters concerning the patent. (PTX 7; PTX 8; PTX 17; PTX 18). Andrew used the 144 patent as prior art in the previous lawsuit between the parties, and the Settlement Agreement in that action expressly excluded rights under the 144 patent. (Tr. at 500:22-501:8; PTX 15R).

### b)    Andrew Acted Despite an Objectively High Likelihood That it Was Infringing

Andrew's pre-complaint actions were taken despite an objectively high likelihood that they constituted patent infringement. Andrew knew of the 144 patent before it ever infringed, and knew, from TruePosition's warning, that it related to "the use of time difference of arrival (TDOA) and the reverse control channel (RCC) to locate cell phones." (PTX 7).

On February 1, 2004, three and a half years after TruePosition's warning, Andrew and TruePosition entered into a Settlement Agreement in which Andrew was again advised of the precise technology covered by the patent. The Agreement stated not only that the patent covered the use of TDOA on the reverse control channel in a GSM network, but also that TruePosition would be free to sue Andrew if Andrew used that technology. TruePosition promised that it would not sue Andrew under its patents only so long as Andrew continued to practice TDOA on the voice or traffic channel ("TCH"):

> TruePosition hereby covenants not to sue Andrew for infringement . . . [for]
> Andrew's existing . . . Geometrix' geolocation system . . . that determine[s] the

latitude and longitude of wireless telephones, by determining TOA, AOA, and/or TDOA of a signal transmitted by a wireless telephone's voice or traffic channel (but not the control channel or access channel signals. . . .

(PTX 15 at ¶ 9 (emphasis added); Trial Tr. at 507:1-512:24). In the Agreement, the parties acknowledged that there were no promises relating to the 144 patent other than those expressly laid out in the Agreement itself:

> The parties agree that no promise, representation, or agreement not herein expressed has been made, and this Settlement Agreement (including the Exhibits hereto) contains the entire agreement between the parties with respect to its subject matter.

(PTX 15R at ¶ 22). The Settlement Agreement therefore clearly put Andrew on notice that the 144 patent covered the use of TDOA on the reverse control channel in a GSM network and that Andrew could be sued if it used that technology.

Nevertheless, eight months after the Settlement Agreement, in December 2004, Andrew offered an infringing control channel system for sale to STC. (PTX 141-176; Tr. at 700:17-701:13). And in August 2005, Andrew used an infringing control channel system in the United States. (Tr. At 713:11-719:1; 724:16-725:10; PTX 304). The jury found that both activities infringed the patent. (D.I. 293).

Andrew continued on its course in disregard of the patent. In September 2005, after TruePosition learned of Andrew's activities, TruePosition's counsel sent Andrew another notice letter, again explaining that the 144 patent covered "locat[ing] mobile telephones using reverse control channel signal data to implement TDOA." (PTX 17 at 1). The letter also noted that Andrew's response to the STC RFP, which specifically solicited a bid for a location system in a GSM network, would likely infringe the 144 patent. (*Id.*) TruePosition's counsel sent another letter to Andrew on October 13, 2005, yet again explaining the patent's coverage and warning that supplying equipment in response to the RFP would infringe it. (PTX 18). With this letter,

TruePosition included a claim chart that compared the system contemplated by the STC RFP with the 144 patent claims. (*Id.* at Attachment A).

Nevertheless, *eleven days* after that letter, on October 24, 2005, in response to the STC RFP, Andrew offered its system for sale to STC. (*See* PTX 216, 219, 220, 232 and 233; Tr. at 1875:6-1877:12; 1878:21-1881:6). The jury found that offer to be pre-complaint act of infringement. (D.I. 293; Tr. 2139:3-8). Once again, despite having been told precisely what the patent covered – in this case the system contemplated by the STC RFP – Andrew used that precise technology. Andrew's consistent disregard of TruePosition's patent rights is clear and convincing evidence that it acted despite an objectively high likelihood that its actions constituted patent infringement.

Andrew's objectively reckless behavior is also evident by what Andrew did *not* do during the relevant time period. Andrew did not seek an opinion of counsel or undertake any investigation or analysis of the 144 patent upon receiving TruePosition's letters. Andrew did not ask for a license to use the patented technology (and in fact specifically ignored offers to negotiate a license), and at no time affirmatively told TruePosition that it had begun work with control-channel technology, the precise technology that the Agreement placed out-of-bounds to Andrew. (Tr. at 337:6-11). Andrew took no steps to design around the patent to avoid infringement, and in fact had no plans to do so. (Tr. at 1159:23-1161:7; 1161:14-22.) Finally, there was no evidence that Andrew arrived at or even thought about any of its non-infringement positions before the Complaint was filed, justifying the conclusion that its positions were purely litigation-inspired. In short, the record as a whole supports no conclusion other than that Andrew recklessly disregarded the high likelihood it was infringing the patent and would be sued.

Evidence that Andrew did offer at trial ironically only strengthens the conclusion that its

non-infringement defenses were objectively baseless and born of desperation. For example, Andrew relied heavily on portions of the patent specification and its file history that played no part in the Court's claim construction (Tr. at 1374-76; 1611-16), and were therefore irrelevant to the true issues. Such a presentation could only mislead a juror into believing that the claims should be interpreted in a way that differs from the Court's claim interpretation. The jury could reasonably have concluded, therefore, that this case was not close, especially when it had been instructed that it is the Court's "duty under the law to define what the patent claims mean" and "you must ignore any different interpretation for a given term by the witnesses or attorneys." (Tr. at 2121:3-6).

### c)     Andrew Knew or Should Have Known that its Actions Created an Objectively High Risk of Infringement

Andrew knew it was infringing the 144 patent. Andrew's lawyers extensively analyzed the patent as possible prior art to be asserted in the earlier litigation. (Tr. at 500:22-501:8). The jury could reasonably infer that Andrew analyzed the patent again during negotiations on the Settlement Agreement, since a number of its provisions specifically relate to it. (PTX 15R at ¶¶ 6, 9).

The evidence also shows that competitive pressures motivated Andrew to disregard the patent and proceed with its infringing activity. Andrew's domestic business (location for E-911 services using the voice channel) was drying up, and the STC contract provided an important flagship opportunity for the international security business. (Tr. at 158:22-159:7; 210:13-211:7; 520:18-521:17; 1186:10-1188:9). However, the STC contract, unlike Andrew's U.S. business, required location when the user was not talking – that is, on the control rather than the voice channel – because the Saudi government wanted terrorist location services. (PTX 187; Tr. at 1156:14-1157:15).

The number and nature of defenses Andrew asserted in this case to avoid its responsibility for infringement also show Andrew's culpable state of mind. As just one example, the jury found that Andrew wrongly accused TruePosition of fraud, a serious charge, in an effort to interpose yet another supposed defense to patent infringement. (D.I. 293).

### d)    Andrew's Various Attacks on the Willful Infringement Verdict Should Be Rejected

Andrew argues that the notice letters can not be evidence of willfulness because they did not apprise Andrew of TruePosition's interpretation of the 144 patent. (Br. 42-43, 47). But Andrew provides no relevant authority for the proposition that "notice" requires a patentee to provide its claim interpretation, and the letters did state that the patent covers TDOA on the reverse control channel in any event. Further, the Settlement Agreement clearly stated that Andrew was not free to make or sell a system that locates GSM cell phones using the control channel. Andrew's argument that while the agreement excludes "control" channel, it does not refer specifically to stand-alone dedicated control channel (SDCCH) is simply frivolous, as is the notion that lack of reference to the specific control channel would excuse Andrew's willfulness.

Andrew relies on *Cohesive Techs., Inc. v. Waters Corp.*, C.A. No. 98-12308, 99-11528, 01-12307, 2007 U.S. Dist. LEXIS 69464 (D. Mass. Aug. 31, 2007), but that case does not support Andrew's position. In *Cohesive*, the Court found that, although the jury found infringement, the infringer had "engaged in sufficient due diligence in determining whether its product would infringe" and that it "manufactured the accused [product] only after satisfying its obligation to ensure there was not a high likelihood, considered both objectively and subjectively, that its actions would constitute infringement." *Id.* at *53-54. The Court also observed that a willfulness determination requires a court to consider, among other things, "whether the infringer solicited or followed the advice of counsel"; "whether there was

continued infringement after notice of probable infringement was received"; and "whether the infringer took efforts to avoid infringement." *Id.* at *50. Here, Andrew performed no due diligence whatever, and infringed despite notification and knowledge of what the patent covered. Andrew failed even the test of the case it cites to support its cause.

Andrew also argues that its conduct cannot have been objectively reckless as a matter of law because TruePosition did not move for a preliminary injunction. But Andrew has admitted that post-filing activities, which would include preliminary injunction proceedings, are irrelevant to the question of willfulness. Andrew failed to offer any evidence at trial as to whether TruePosition moved for a preliminary injunction and should not now be allowed to attack the jury's decision on the basis of such evidence.

The jury was properly instructed under *Seagate*. There was abundant evidence that Andrew acted with objectively reckless disregard for TruePosition's patent rights, and that Andrew was fully aware of the risk. The jury's verdict of willful infringement is not against the clear weight of the evidence; it is fully supported by the record.

### 3. The Court Correctly Decided That Promissory Estoppel Was a Question for the Jury

Andrew also claims that the Court should reverse the jury's finding that Andrew failed to prove its standards-based promissory estoppel claim. During the summary judgment phase, Andrew argued that promissory estoppel was one of the "most factually intensive claims in the case." (D.I. 160 at 1). The Court agreed with Andrew and submitted the promissory estoppel question to the jury. However, now that the jury has decided each and every fact question against it, Andrew claims that "no reasonable juror could find" that Andrew failed to prove promissory estoppel and that the Court must decide the issue as a matter of law. (Br. at 49).

Putting aside Andrew's shifting position, Andrew's argument should raise a red flag right from the start. For Andrew to prevail on its promissory estoppel defense, the jury had to have erred in four different ways: (1) finding that Andrew failed to prove that TruePosition made a promise to Andrew; (2) finding that Andrew failed to prove that TruePosition intended to induce Andrew's action or inaction based on any such promise; (3) finding that Andrew failed to prove Andrew reasonably relied on the promise; and (4) finding that Andrew failed to prove that it was injured by any such reliance. (D.I. 293). Furthermore, Andrew must show all of this by evidence that the jury would "not be at liberty to disbelieve" and must establish that the "only reasonable conclusion" must be in its favor. *See Honeywell Int'l*, 166 F. Supp. 2d at 1015; *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443, 446 (3d Cir. 1968) (need both "overwhelming effect" and "insufficient evidence for permitting any different finding").

As explained in TruePosition's concurrently filed "Opposition to Andrew's Post-Trial Brief in Support of Its Remaining Equitable Defenses" ("Opp. Equit. Def.") and as reflected by the jury's verdict, Andrew's rehashed arguments that it was inadvertently led down the infringement path by relying on certain "promises" made by TruePosition concerning the 144 patent and merely following a standard are not credible. And these argument were soundly and properly rejected by the jury.

### a)   The Jury Correctly Found That TruePosition Did Not Make Andrew a Promise

The jury made an explicit finding that Andrew failed to prove that TruePosition made Andrew a promise by clear and convincing evidence. Andrew claims that the jury was wrong in relying on three separate alleged promises to license "essential patents related to standardization" (Br. at 50), including the "feasibility study promise," the "study group ground rules promise" and TruePosition's so called "ETSI membership promise."

According to Andrew, the following TruePosition statement in the feasibility study that

TruePosition submitted to 3GPP in April, 2002 supports Andrew's claim:

> TruePosition, Incorporated may hold one or more patents or copyrights that cover
> information contained in this document. A license will be made available to
> applicants under reasonable terms and conditions that are demonstrably free of
> any unfair discrimination.

(PTX 364 at 3.3.5). Yet Andrew did not become a member of ETSI until January 2003 – more

than 8 months after this document was created and presented to the standards body. (Tr. at

308:3-11; 1655:12-20; DTX 154). Andrew did not attend the meeting at which this document

was presented. (Tr. at 364:10-15; 1802:15-1803:1). Just as importantly, the language was not

accepted by ETSI, so whenever Andrew joined ETSI, there was nothing there for Andrew to rely

on. The undisputed fact is that ETSI asked TruePosition to *remove* this language from all future

submissions and ultimately the final version of this document. (Tr. at 226:22-227:7; 228:11-22;

1817:12-1818:13). So, although the April 2002 version – the early non-final version – of the

feasibility study is still available online, *no* later version of the document contains the language

that Andrew identifies. (Tr. at 1804:19-1806:13; 1817:12-1818:13). Finally, even assuming the

statement were an operative promise, it is plainly directed only to "applicants." (PTX 364 at

3.3.5). That is, a license would only be available to those who affirmatively approached

TruePosition about a license. Andrew never did.[10] Instead, the jury found that Andrew took

TruePosition's invention on Andrew's unilaterally imposed unreasonable terms and conditions.

(D.I. 293).

Determining whether a statement is a promise must be done through a reasonable

interpretation of the parties' expressions in light of the surrounding circumstances. *Christiana*

---

[10] The jury was sharp. During trial, a juror sent a written question asking the $64,000 question: "Did
Andrew ask for a license?"

*Marine Service Corp. v. Texaco Fuel*, 2004 Del. Super. LEXIS 3, *10 (Del. Super. Ct. Jan. 18, 2004) (citing CORBIN ON CONTRACTS at §8.9). The promise must be definite and certain. *Fini v. Remington Arms Co.*, 1998 U.S. Dist. LEXIS 8261, *31 (D. Del. May 27, 1998). The evidence must be viewed in the light most favorable to TruePosition. *IMX, Inc.*, 469 F. Supp. 2d at 208. A reasonable juror could conclude no promise existed because the statement in question was never made to Andrew (Andrew was not a member of the standards body at the time it was published in the ETSI draft), was never accepted by Andrew (Andrew never inquired or approached TruePosition about a license), and, even if made, was withdrawn when the statement allegedly embodying it was removed, at ETSI's request, from later versions of the document.

Andrew next argues that the following language in the UTDOA study group ground rules (DTX 844A) constituted a promise by TruePosition:

> "we have agreed on the following ground rules for the system study project. That means we have all agreed to live by these rules and honor them…
>
> ****
>
> We all work with the understanding that what we do here is to create a solution that we all benefit from.

(DTX 844A, at A80-81). But the document indicates that it was drafted by Ericsson; on its face it shows that TruePosition was *not* a part of the group as of its purported drafting date of February 2003 and could not have been involved in the drafting of the document: "The aim is to include also Cingular and TruePosition in the work." (DTX 844A at A102; Tr. at 1810:17-21). A reasonable juror could conclude that, since TruePosition did not author this document, TruePosition could not have made any promises allegedly contained in the document.

In fact, a reasonable juror could conclude that the Ericsson "ground rules" document has no bearing on this case whatsoever. No one from Ericsson testified about it. The document is unsigned. It contains no discussion of intellectual property, patents or licenses, let alone a

promise to license any patent to Andrew or anyone else for that matter. At best, the document evidences that some companies – including Andrew but excluding TruePosition – agreed that they would benefit from compatibility of UTDOA technology between different vendors because such compatibility reduces costs and in turn increases profits. (Tr. at 1829:22-1830:3). To the extent that Andrew worked in this group, it no doubt did benefit and increase its profits. The "study group" apparently focused on UTDOA, including UTDOA using voice channel transmissions, DTX 844A at TPI00042666, which the Geometrix standards-compliant product used at the time. (*Id.*; Tr. at 352:17-22; 353:17-354:1).

Andrew also claims that by signing the Associate Membership Agreement with ETSI (DTX 62), TruePosition agreed to abide by the ETSI IPR policy and therefore agreed to compulsorily license Andrew under the 144 patent for UTDOA on the SDCCH under "reasonable non-discriminatory terms." But there was substantial evidence at trial that TruePosition did not have any obligation to declare the 144 patent under the ETSI IPR policy because the 144 patent was not "essential" under the Policy's interpretation of that term. That evidence is discussed below.

Moreover Andrew's claims that the feasibility study, "ground rules" and ESTI IPR Policy statements are "promises" conflict with the evidence from the Settlement Agreement. (PTX 15R). Andrew never explained to the jury why, if Andrew already had a license under the 144 patent to practice UTDOA, it nevertheless saw fit to negotiate a covenant not to sue that applied to UTDOA only on the voice channel, but not on the SDCCH in GSM. Furthermore, Andrew agreed that "no promises" were made other than those in the Settlement Agreement. (PTX 15R at ¶ 22). A reasonable juror could conclude that statements from Swedish phone makers, statements made outside of Andrew's presence, and statements implied from complicated IPR

Policies are not "promises" in view of that agreement. Andrew also never explained why, if it had a license to practice UTDOA in GSM, it never communicated the existence of that license in response to TruePosition's September and October 2005 warning letters. Both of those letters related to Andrew's response to the STC RFP, which Andrew knew was a solicitation for a standards-compliant GSM system. (PTX 17-18). It was entirely reasonable for the jury to conclude that Andrew did not prove by clear and convincing evidence that TruePosition made a promise.

### b)    The Jury Correctly Found that TruePosition Did Not Intend to Induce Andrew's Action or Inaction

Andrew points to TruePosition's collaboration with Andrew's predecessor in the ETSI standards body and its related activities as proof that TruePosition somehow "intended to lull…Andrew…into a false security by promising it had no essential patents." (Br. at 54). Andrew also relies on certain emails for its claim that TruePosition intended to get Andrew involved in the standardization of UTDOA in order to cultivate the appearance that UTDOA was not a "proprietary" technology. (Br. at 54-55). But from 2001 to 2003, which is the time of the ETSI related events upon which Andrew relies, Andrew was practicing cell phone location technology only on the voice channel. (Tr. at 317:19-24; 353:17-384:1). Andrew participated in the standards work to benefit its own UTDOA voice channel technology. (Tr. at 317:19-24; 322:18-323:1; 352:17-353:1; 353:17-354:8). A reasonable juror could conclude that, in fact, "UTDOA" is not proprietary because the 144 patent does not cover the kind of UTDOA that Andrew was doing at the time.

Also there is absolutely no evidence that TruePosition ever attempted to conceal the 144 patent, which issued years before the April 2002 GSM feasibility study that Andrew relies on. (Tr. at 202:11-13; 306:8-307:21). To the contrary, it is undisputed that, as of December 2000,

TruePosition had informed Andrew about the 144 patent and its scope. (PTX 7). A reasonable juror could conclude that TruePosition was not trying to induce any false belief on Andrew's part about whether the 144 patent was "essential" or not.

c) <strong>The Jury Correctly Found that Andrew Did Not Reasonably Rely on Anything TruePosition Did</strong>

Promissory estoppel requires that the promisee's reliance be either "reasonable or justifiable." *Fini*, 1998 U.S. Dist. LEXIS 8261, at *32 n.10. Yet Andrew presented no believable testimony at trial that it acted in reasonable reliance upon TruePosition's conduct. In fact, the evidence at trial actually demonstrated that Andrew unequivocally acted in willful disregard of the 144 patent. (D.I. 293).

The Settlement Agreement made clear that TruePosition would pursue Andrew for infringement of the 144 patent if Andrew began locating cell phones using the control channel in a GSM network. (PTX 15R at ¶¶ 6, 9; Tr. at 337:19-338:6; 507:1-512:24). The Agreement also included an integration clause that expressly limited the parties' rights, obligations, and expectancies to the Agreement's four corners. (PTX 15R at ¶ 22). It was executed in February 2004, *after* the conduct that Andrew advances as the basis for its equitable estoppel argument. In view of the Agreement's express provisions, and in particular the integration clause, a reasonable juror could find that Andrew did not reasonably rely on TruePosition's pre-Agreement conduct.

Andrew's assertion of reliance on the feasibility study strains credulity. Andrew failed to persuade the jury, yet now asks this Court to believe, that a sophisticated 2-billion-dollar-a-year company would stake millions of dollars on research and development activity and on the commercialization of a new technology on the basis of a statement found on an internet web site, a statement that appeared only in a *non-final draft* of a submission to an organization to which it did not belong at the time, made at a meeting that it did not attend, and that was stricken, at the

request of the organization itself, from all subsequent versions of the document as submitted. (Tr. at 226:22-227:7; 1806:10-1807:10). And, in any event, Andrew never once approached TruePosition for a license under the 144 patent as the "promise" in the feasibility study would have required. (Tr. 337:6-11).

Andrew's argument based on the Ericsson UTDOA study group is similarly unbelievable. Andrew again asks the court to believe that a sophisticated company would rely on an unsigned document created by Ericsson that makes no mention of intellectual property for the belief that TruePosition would not assert the 144 patent against it.

Andrew's final reliance argument, that its participation in ETSI and work on standardization of UTDOA were based on the belief that TruePosition would not assert the 144 patent, conveniently omits record facts that belie its argument and reveal its true motivation: Andrew was (and still is) locating cell phones using voice channel UTDOA. (Tr. at 353:17-354:1). Andrew independently wanted to standardize UTDOA because it was already utilizing that technology on the voice channel and its standardization would benefit Andrew and its customers. (Tr. at 354:2-8). Andrew's voice channel product complied with the standard. Given the parties' background, and in particular the Settlement Agreement, it should have come as no surprise to Andrew that TruePosition sued for infringement when Andrew switched its protocol for locating cell phones from the voice channel to the control channel.

Andrew was intimately familiar with the 144 patent, its coverage, and its express exclusion from the Settlement Agreement. The jury was right to find that any alleged reliance on TruePosition's conduct related to standards or study group activities is not reasonable.

### d)    The Jury Correctly Found Andrew Was Not Injured

Finally, the jury had more than enough evidence to find that Andrew failed to meet its burden of showing reasonable reliance on TruePosition's alleged "promises." Therefore, the jury

was also well within reason to conclude that Andrew could not have been injured by its non-existent reliance.

### 4.    The Court Correctly Decided Fraud Is a Question for the Jury

Andrew claims that the Court should reverse the jury's finding that Andrew failed to prove its standards-based fraud claim.  During summary judgment, Andrew argued that fraud was "one of the most factually intensive claims in the case." (D.I. 160 at 1.)  The Court agreed and submitted the claim to the jury.  However, now unhappy with the jury's decision, Andrew claims that "no reasonable jury could have found" that Andrew failed to prove fraud and that the Court must now decide this issue as a matter of law. (Br. at 58).

To reject Andrew's fraud defense, the jury needed to find a failure of proof of *only one* of the five elements of fraud; either:

1.    TruePosition did not misrepresent or omit a material fact;
2.    TruePosition did not knowingly misrepresent or omit a material fact;
3.    TruePosition did not intend to induce Andrew to act or to refrain from acting;
4.    Andrew's action or inaction was not taken in justifiable reliance upon the representation or omission; or
5.    Andrew was not damaged as a result of such reliance.

*See, e.g., Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 259 (D. Del. 2006).

### a)    The Jury Correctly Found That TruePosition Did Not Misrepresent a Material Fact or Do So Knowingly

Because Andrew based its fraud claim on TruePosition's alleged "failure to declare its 144 patent as a patent essential to an ETSI standard," Andrew had to show that TruePosition had a legal duty under the ETSI IPR policy to declare its 144 patent as essential to an ETSI standard. *See Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1096 (Fed. Cir. 2003) (defendant must prove by clear and convincing evidence the existence of an "omission in the face of a duty to disclose"); (D.I. 48 at 11-15).  To show that TruePosition had such a duty, Andrew had to prove that the 144 patent was, in fact, essential to an ETSI standard. *See Rambus*, 318 F.3d at 1096,

1104 (describing the "disclosure duty" under the IPR policy as "objective"); (Tr. at 2135:8-17).

Only if the 144 patent were in fact essential as defined by the ETSI IPR policy would

TruePosition have had a duty to declare it; and only under such circumstances could it have

defrauded Andrew. *See Rambus*, 318 F.3d at 1096 ("silence or withholding of information does

not constitute fraud in the absence of a duty to disclose."), *id.* at 1102-05; *see also Stephenson v.*

*Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); Tr. at 2135:11-17.

The jury was right to decide that Andrew failed to prove that the 144 patent was essential

to an ETSI standard. Article 4.1 of ETSI's IPR Policy specifies obligations of its members with

respect to the disclosure of "Intellectual Property Rights (IPR)":

> 4.1      Each MEMBER shall use its reasonable endeavours to timely inform ETSI
> of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting
> a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall,
> on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR
> which might be ESSENTIAL if that proposal is adopted.

(PTX 363 at ¶ 4.1). And "Essential" is further defined as:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but
> not commercial) grounds, taking into account normal technical practice and the
> state of the art generally available at the time of standardization, to make, sell,
> lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS
> which comply with a STANDARD without infringing that IPR. For the
> avoidance of doubt in exceptional cases where a STANDARD can only be
> implemented by technical solutions, all of which are infringements of IPRs, all
> such IPRs shall be considered ESSENTIAL.

(PTX 363 at ¶ 15.6). Finally, "Standard" is defined as "any standard adopted by ETSI including

options therein. . . ." (*Id.* at ¶ 15.11).

The ETSI IPR Policy requires the disclosure only of true blocking patents. (Tr. at 183:4-

13; 189:9-190:5; 198:25-199:9; 375:7-19). That is, a duty to declare the 144 patent would arise

*only if* no option under the standard could be practiced without infringing the 144 patent.

TruePosition witnesses testified that no such standard exists. (Tr. at 376:10-13).

This interpretation is also consistent with the Federal Circuit's interpretation of the IPR Policy at issue in *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081 (Fed. Cir. 2003). In that case, the relevant IPR policy required members to disclose patents and patent applications "related to" the standardization work of the committee. *Rambus*, 318 F.3d at 1085, 1098 (policy requires disclosure when standard is "covered by the patent or pending patent"). Thus, the policy in *Rambus* was even broader than the ETSI IPR Policy. However, the Federal Circuit interpreted the policy to require disclosure only of blocking patents or "claims in patents or applications that reasonably might be necessary to practice the standard." *Id*. at 1100. The Federal Circuit reasoned that:

> To hold otherwise would contradict the record evidence and render the JEDEC disclosure duty unbounded. Under such an amorphous duty, any patent or application having a vague relationship to the standard would have to be disclosed. JEDEC members would be required to disclose improvement patents, implementation patents, and patents directed to the testing of standard-compliant devices – even though the standard itself could be practiced without licenses under such patents.

318 F.3d at 1101. Andrew did not cite the *Rambus* decision in its opening brief.[11]

It is undisputed that the ETSI standard relevant here includes four general options for the location of cell phones: Timing Advance, Enhanced Observed Time Difference (E-OTD), Global Positioning System (GPS) and Uplink Time Difference of Arrival (UTDOA). (DTX 846A at 11). Thus, even assuming the 144 patent covered the entire UTDOA option, it would not be "essential" to the standard as a whole. TruePosition's witnesses testified accordingly at trial, and the jury was entitled to credit this testimony. (Tr. at 190:7-191:20; 199:19-22; 200:15-201:4; 203:20-204:18; 339:19-341:10; 349:21-352:16).

---

[11]  Andrew's failure to cite *Rambus* is interesting, considering that its attorneys also were involved in the *Rambus* case and are advancing here the same broad unsupported interpretation of the IPR policy as they did there. The Federal Circuit reversed the jury's finding of fraud in *Rambus* and rejected this broad interpretation of the IPR policy. *Rambus*, 318 F.3d at 1105.

But even within the UTDOA option, the standard outlines two alternative implementations of UTDOA: location on the voice channel and location on the control channel. (DTX 846A at 11). It is undisputed that the 144 patent covers only UTDOA on the control channel. (Tr. at 184:14-21). In other words, the 144 patent only covers one implementation of the UTDOA option. (PTX 473). Thus, even assuming that the ETSI IPR Policy requires the declaration of patents that block options contained in a standard, the 144 patent is still not "essential." TruePosition's witnesses testified accordingly at trial, and the jury was entitled to rely on this testimony. (Tr. at 201:4-7; 204:11-15; 221:1-8; 340:19-22).

A reasonable juror could agree with both TruePosition and the U.S. Court of Appeals for the Federal Circuit and find that the ETSI IPR Policy only requires declaration of blocking patents. The jury is entitled to discredit the testimony of Andrew's witnesses on their alternate interpretation of policy. See *IMX, Inc.*, 469 F. Supp. 2d at 214 ("The court will not substitute its own resolution of the conflicting evidence for that of the jury.") (citing *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1377 (Fed. Cir. 1988)).

Thus, the evidence Andrew cites does not constitute evidence that the jury would not be at liberty to disbelieve, and certainly does not render the jury's finding of no misrepresentation or omission against the great weight of the evidence. On this element alone, Andrew has failed to establish JMOL or the grounds for a new trial. See *Honeywell Int'l*, 166 F. Supp. 2d at 1015; *IMX, Inc.*, 469 F. Supp. 2d at 208 (new trial only granted to prevent "miscarriage of justice").

b)    **The Jury Correctly Found That TruePosition Did Not Mislead Andrew**

Joseph Sheehan and Rob Anderson – the individuals at TruePosition with sufficient authority and technical knowledge to evaluate whether a patent should or should not be declared

as essential under the ETSI IPR Policy – both testified that they firmly believed, and still believe, that the 144 patent is not essential. (Tr. at 203:9-19; 376:10-13; 441:17-20). Indeed, TruePosition specifically considered the issue and concluded that the 144 patent should not be declared to ETSI because it was not essential under the ETSI IPR Policy. (Tr. at 200:15-201:11; 346:19-347:2). The jury was entitled to believe this testimony and conclude that TruePosition did not intend to mislead Andrew. *See IMX*, 469 F. Supp. 2d at 214 (jury's credibility determination should not be disturbed) (citing *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891) ("There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury is to be guided in determining the weight and credibility his testimony. This part of every case . . . belongs to the jury . . . [S]o long as we have jury trials they should not be disturbed in their possession of it.")).

The evidence cited by Andrew does not mandate a different result.[12]  As allegedly demonstrating TruePosition's intent to mislead Andrew, Andrew points to four TruePosition documents that discuss the benefits of multi-vendor vs. single vendor. (DTX 901 (A91-A92); DTX 44 (A2); DTX 45 (A4-A5); DTX 224 (A52)). The jury was entitled to credit the testimony of TruePosition's witnesses that such documents did not reflect any intent to mislead Andrew or to induce Andrew to join a standards body, but rather simply discussed the fact that more than one vendor was using time difference of arrival (on either the voice channel or control channel) to locate cell phones. (Tr. at 272:2-274:1; 313:24-316:23; 320:17-323:6; 552:8-553:24). If more

---

[12]The *Engalla* case cited by Andrew is inapplicable as it does not address the adequacy of a jury finding of no intent to mislead. *See Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 976 (Cal. 1997). *Engalla* evaluates whether a court's finding is "*plausibly*" supported by the record evidence, and not whether a jury was *compelled* to find an intent to mislead as required for Andrew's motion to succeed. *See id.*

than one vendor was using a particular technology (and in this case both Andrew and TruePosition were using UTDOA – Andrew on the voice channel), the wireless operators or carriers would be more likely to support standardization efforts because multiple vendors result in price competition. (Tr. at 321:9-17). Andrew's evidence in no way suggests that TruePosition somehow was dishonest in the way it interpreted the ETSI IPR Policy.

The evidence Andrew cites was evidence that the jury was at liberty to disbelieve, and certainly does not render the jury's finding of no intent to mislead against the great weight of the evidence. Accordingly, on this element alone, Andrew has failed to establish JMOL or the grounds for a new trial. *See Honeywell Int'l*, 166 F. Supp. 2d at 1015; *IMX, Inc.*, 469 F. Supp. 2d at 208 (new trial only granted to prevent "miscarriage of justice").

### c)  The Jury Correctly Found That Andrew Did Not Reasonably Rely on Any Misrepresentation or Omission

The jury also had ample evidence upon which to conclude that Andrew failed to establish that it reasonably relied upon TruePosition's non-declaration of the 144 patent.

As an initial matter, the Settlement Agreement clearly articulated that TruePosition would pursue Andrew for infringement of the 144 patent if Andrew began locating cell phones using the control channel in a GSM network. (PTX 15R at ¶¶ 6, 9; Tr. at 507:1-512:24). In view of the Agreement's express provisions, Andrew cannot contend that it reasonably relied on TruePosition's alleged failure to declare the 144 patent as essential to ETSI. Further. TruePosition witnesses also testified that the 144 patent was publicly available, Tr. at 376:18-377:25, and that the 144 patent had been cited over 240 times in the patents or patent applications of other ETSI members. (Tr. at 379:10-380:8). The jury had ample evidence to conclude that Andrew's claim of reliance was not credible.

The evidence cited by Andrew does not compel a different result. First, Andrew argues that it "reasonably relied" on the feasibility study, Ericsson study group and TruePosition's ETSI membership. (Br. at 64-65). On this point, Andrew's argument is essentially a repeat of the reliance argument it made in support of its promissory estoppel defense and should be dismissed for the same reasons set forth above. Notably, Andrew's post-trial fraud theory differs from the fraud theory that was described in the jury instructions. At trial, Andrew based its fraud claim exclusively on TruePosition's alleged failure to declare the 144 patent under the ETSI IPR Policy. (Tr. at 2134-36). Andrew now faults the jury because it did not find for Andrew on a theory that Andrew never presented to the jury.

In addition to its new post-trial theory, Andrew argues, as did it trial, that it engaged in the standardization process relying on TruePosition's supposed omissions, and that it would be "economically irrational for Andrew to help its competitor TP and work together without expectation of economic reward." (Br. at 65).[13] However, the evidence overwhelmingly supports the opposite conclusion. Andrew joined ETSI and the Ericsson study group, not at the request of TruePosition, but at the urging of its customer AT&T Wireless. (Tr. at 315:8-14; 354:2-5). Standardization of location technologies, such as UTDOA, would benefit AT&T, Andrew, and any other vendors using compliant technologies, because standardization is directed to ensuring that pieces of equipment within a particular technology "fit together, communicate and operate together." (Tr. at 193:20-194:10; 363:4-11; 1815:20-1816:10). Interoperability between the equipment of different vendors, carriers, and end users reduces costs and, in turn, benefits all involved by increasing profits. (Tr. at 1829:22-1830:3). Moreover, wireless

---

[13] Andrew also claims to rely upon an email stating that TruePosition has no "IPs related to" UMTS. (Br. at 65; DTX 48). However, the jury easily could have rejected this argument based on the unequivocal testimony of Andrew's own witness that UMTS is a completely different technology or cellular network than the GSM technology utilized by Andrew's Geometrix product. (Tr. at 1826:15-20; 1827:1-6).

operators and carriers would be more likely to support standardization if more than one vendor were using a particular technology (and in this case both Andrew and TruePosition were using UTDOA) because of the generally-resulting price competition. (Tr. at 321:9-17).

As TruePosition witnesses testified, TruePosition did not have any "scheme" to get Andrew involved in the standards group, nor was TruePosition trying to give the impression that the 144 patent did not cover UTDOA on the control channel. (Tr. at 320:12-16). Andrew itself used UTDOA on the voice channel, and its standardization directly benefited Andrew. (Tr. at 317:19-24; 322:18-323:1; 352:17-353:1; 353:17-354:1).

In sum, Andrew has not established its fraud defense "by evidence that the jury would not be at liberty to disbelieve" and has not established that the "only reasonable conclusion" must be in its favor. *See Gatenby*, 407 F.2d at 446.

### 5.    The Jury's Damage Award is Fully Supported

Andrew asserts four bases for its motion attacking the jury's damage award, but only one of them – relating to damages under 35 U.S.C. § 271(f) for equipment not yet shipped – was preserved at trial.[14] As to the other three, Andrew's pre-deliberation statement was "I don't believe that plaintiff has made out their case for lost profits, which is the only relief they asked for on damages." (Tr. at 1388). As discussed at Section V.A. above, that bare statement is insufficient to preserve a JMOL motion under Rule 50. The remaining three issues must therefore be considered under the standards governing new trials under Rule 59.

Sufficient evidence supports the jury's lost profits award under the standards of either rule. The underlying question is what harm TruePosition suffered as a result of Andrew's

---

[14] That motion is moot, for the jury's verdict under 271(a) is fully supported by the evidence, as is discussed above.

infringement. The appropriate inquiry for lost profit damages is the familiar "but for" test for causation of damages – "but for" Andrew's infringing conduct, would TruePosition have made the sales at issue? *See, e.g., Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544-45 (Fed. Cir. 1995) (*en banc*); *Lam, Inc. v. Johns-Manville Corp.*, 718 F. 2d 1056, 1065 (Fed. Cir. 1983); (Tr. 1146:22-1147:10; 1919:24-1920:4). Damages need not be proved with absolute or mathematical certainty, but only with reasonable probability. *See, e.g., Paper Converting Machine Co. v. Magna-Graphics*, 745 F.2d 11, 21 (Fed. Cir. 1994). Fundamental principles of justice require that any doubts regarding the amount be resolved against the infringer. *Lam*, 718 F.2d at 1065 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

Typically, courts assess lost profits by looking to the familiar 4-factor test first enunciated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156-58 (6th Cir. 1978): a) demand for the patented product; b) absence of non-infringing alternatives; c) manufacturing and marketing capacity to meet the demand; and d) calculation of damages. In a two-supplier market, however, as here, the first two factors collapse; once a two-supplier market has been proved the only remaining inquiries are capacity (conceded here, Tr. 1162:23-1163:9; 2141:22-24), and amount. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003).

At trial, TruePosition sought damages for the loss of a single sale, to Saudi Telecom ("STC"). The evidence was undisputed that Andrew and TruePosition were the only bidders for the UTDOA portion of that sale. (Tr. 1150:1-9; 1922:5-23). TruePosition's damages expert, Carla Mulhern, testified at length about the basis for and calculation of TruePosition's damages arising from loss of the STC contract, and the jury awarded TruePosition damages in the amount she had testified was necessary to compensate TruePosition for that lost sale. Her testimony was

detailed, well-founded, and complete.  The jury was entitled to credit her testimony and reject

that of Andrew's damage expert, Mr. Hoberlein.

> **a)     The Evidence Supports the Jury's Finding Regarding
> Noninfringing Alternatives**

Andrew's first argument on non-infringing alternatives – essentially claiming that the

very system that was the subject of TruePosition's infringement suit was non-infringing – is

simply ludicrous.  (Br. at 68).  Andrew's argument is fundamentally inconsistent with the very

nature of the damage inquiry, which necessarily assumes that there was infringement.  Thus,

because the inquiry necessarily presumes that the accused system infringed, it makes no sense

for Andrew to argue that its system already implements a noninfringing alternative.

In any event, Andrew's argument would have required the jury to 1) swallow an incorrect

theory of law; 2) believe that a couple of isolated snippets of highly technical and unexplained

deposition testimony taken out of context say what Andrew's non-technical damage expert says

they say; 3) ignore the testimony of Andrew's own corporate representative acknowledging that

Andrew has not implemented a noninfringing alternative and has no plans to do so; 4) ignore the

testimony of TruePosition's damage expert, based on her analysis of the marketplace, review of

the complete deposition transcripts from which Andrew's snippets were taken, and discussions

with participants in that marketplace, that no such alternative was available in the market; and 5)

accept uncritically the opinion of Andrew's damage expert based on the same technical out-of-

context excerpts.  But the jury's function is to evaluate *all* the evidence.  That evidence fully

supports the jury's verdict with respect to noninfringing alternatives.

First, the *Panduit* inquiry into the existence of noninfringing alternatives is subsumed

into the determination that this is a two-supplier market.  *See Micro Chem.,* 318 F.3d at 1124.

Because it was not disputed at trial that this is a two-supplier market, *see, e.g.,* Tr. at 1922:12-23,

the burden was on Andrew, not TruePosition, to prove that noninfringing alternatives existed. *Micro Chem.*, 318 F.3d at 1125. The jury could easily and correctly have found that Andrew failed to meet that burden.

To be an acceptable noninfringing alternative, a substitute must have been both available and acceptable to the market, and the jury was so instructed. *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1350-55 (Fed. Cir. 1999); *Micro Chem.*, 318 F.3d at 1122-24; Tr. 2143:2-14.[15] A product lacking the beneficial characteristics of the patented product is not an acceptable alternative. *See, e.g., TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). Since the underlying inquiry is whether there was some noninfringing product that STC might have purchased instead of buying Andrew's infringing control channel system or buying from TruePosition, and since the parties agree that this is a two-supplier market, the only question for noninfringing alternatives purposes is whether *Andrew* could have supplied a noninfringing product to STC.

There was substantial evidence from which a reasonable jury could conclude that Andrew would not have done so. Ms. Mulhern provided an economic analysis of noninfringing alternatives, concluding that there were none available in the market. (Tr. at 1157:21-1162:19). Her analysis was based on Andrew's actual marketplace behavior. She found no evidence that Andrew had developed a non-infringing alternative. Indeed, to the contrary, Andrew's corporate representative, Mr. Kennedy, had testified that Andrew had not done so and had no plans to do so. (Tr. at 1159:18-1161:22). Further, Ms. Mulhern testified that as an economic matter, if a non-infringing alternative were in fact readily available, one would expect to see evidence of

---

[15] The "noninfringing substitutes" factor is not a strict requirement for an award of lost profits. To the contrary, there are many situations in which an award of lost profits is made under a market share theory, even when there *are* non-infringing alternatives from third parties. (Tr. at 1158:10-19; 1206:12-23). *See, e.g., State Industries, Ind. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1577-79 (Fed. Cir. 1989).

such an alternative being developed to avoid the cost and risk of litigation. (Tr. 1161:23-1162:9). She observed no such evidence. *Id.*[16]

Andrew points to technical testimony by certain TruePosition witnesses which, Andrew argues, conclusively establishes the existence of a non-infringing alternative. Per Andrew: 1) the STC contract required the ability to locate phones in "idle mode," when the user is not talking; 2) the 144 patent claims location using the control channel; 3) "idle mode" location can also be done in a noninfringing manner using the traffic channel; 4) therefore using the traffic channel to make locations is an available noninfringing alternative. But Andrew has misconstrued the evidence. A reasonable jury could rationally find to the contrary.

First, Andrew points to testimony by TruePosition's Joseph Sheehan to the effect that it might be *possible* to perform idle mode location on the traffic channel instead of the control channel. But the fact that something is *possible* does not necessarily mean that it has been done or is *available* to the market. *See Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1571 (Fed. Cir. 1996) ("It is axiomatic, however, that if a device is not available for purchase, a defendant cannot argue that the device is an acceptable noninfringing alternative for the purposes of avoiding a lost profits award. A lost profits award reflects the realities of sales actually lost, *not the possibilities of a hypothetical market which the infringer might have created.*") (emphasis added). As Mr. Sheehan testified, in the very passage Andrew cites, "The network *could* do that

---

[16] Ms. Mulhern actually first presented her conclusion that no third parties provided an acceptable alternative. She looked at the possibility that technologies other than the UTDOA product supplied by Andrew and TruePosition existed as candidates, but concluded that the optimum technology for security applications – the application central to the STC contract – was UTDOA, as is evidenced by Andrew's own web site. (Tr. 1159:9-14). She further observed that control channel technology, the subject of the patent, was the only technology available that met STC's requirements. (Tr. 1159:18-1160:2). Further, she noted that TruePosition and Andrew are the only suppliers of UTDOA. (Tr. 1159:15-17). Only after ruling out third-party products as possible alternatives did she turn to Andrew's market behavior.

*if* they chose to implement UTDOA that way. " (Tr. at 1896:22-23). A big "if." And Ms. Mulhern testified that, based on her review of the depositions and conversations with Mr. Sheehan and others, Mr. Sheehan's suggested alternative had never been implemented, it would be costly to do so, and it would require the cooperation of third parties. (Tr. at 1217:13-1218:7; 1242:3-18).[17]

Andrew goes on to mischaracterize Mr. Sheehan's testimony, claiming he said that Andrew "is currently using this alternative implementation of UTDOA idle mode location without infringing the '144 patent." (Br. at 67). But that is not what Mr. Sheehan said. The context of the discussion was that TDOA is one of numerous methods that could be used to provide a standards-compliant location system, and the particular testimony Andrew cites plainly referred to Andrew's use of a voice channel product in its existing U.S. E-911 installations. (Tr. 350:17-353:1). Neither the question put to Mr. Sheehan nor the answer refers to finding phones in "idle mode." *Id.* Mr. Sheehan neither said nor implied that Andrew had implemented a non-infringing system that locates phones using the voice channel when the user is not talking.

Andrew also relies on a snippet of deposition testimony by TruePosition's standards representative, Robert Gross, relating to a concept he referred to as "direct assignment." Andrew characterizes the testimony as an "admission" that "all GSM systems perform UTDOA locations" using the traffic channel, even when a user is not on the phone. (Br. at 67). Again, Andrew misrepresents the testimony and strips it from its context.

Mr. Gross was asked whether he was "aware of any GSM system that actually in practice uses the traffic channel *for call setup* instead of the SDCCH." (Tr. at 1884:11-13) (emphasis

---

[17] The Anderson testimony Andrew cites is not actually in the record, but is a paraphrase contained in a cross-examination question to Ms. Mulhern. Even as posed in counsel's question, however, that testimony likewise speaks in terms of possibilities, and does not suggest that any such possibility has been implemented or is available in the market. (Tr. at 1214:3-12).

added).  The answer that such a practice was "normal GSM operation" plainly referred to *call*

*setup, not* to *location tracking*.  The jury was entitled to disregard the irrelevant Gross testimony.

On cross-examination, Andrew explored the non-infringing alternative notion at length

with Ms. Mulhern, pointing to the same testimony it now relies upon.  (Tr. at 1206:12-1209:9;

1212:24-1226:25).  Ms Mulhern testified repeatedly that while she was aware of evidence such

as that relied on by Andrew that it *might* be technically possible to perform idle mode location on

the traffic channel, she had seen no evidence that such an alternative was commercially viable or

available.  To the contrary, she testified to her understanding that implementation of such an

alternative would require changes to the typical network configuration and would require the

cooperation of the infrastructure provider (the "RAN vendor").  (Tr. at 1217:13-1218:7).  She

repeated that point on redirect, noting as well that it was her understanding that implementing

such a solution would be costly and would require software changes.  (Tr. at 1242:3-18).

Further, as an economist, she saw no incentive for the RAN vendors to make such a change

simply to assist Andrew in avoiding the patent.  (Tr. at 1242:18-22).  Nor did she see evidence of

how long it would have taken to implement the change, or whether it would have been possible

to accomplish such a change in time to affect the STC sale.  (Tr. at 1242:23-1243:6).  In short,

her extensive testimony is more than ample support for the verdict that that there were no non-

infringing alternatives then on the market or reasonably available to be implemented, by Andrew

or anyone else.

Andrew attempts to discount Ms. Mulhern's testimony by arguing that she lacks technical

expertise.  But the economic inquiry she made was whether an alternative was available in the

market, which is precisely the kind of market-based inquiry that economists routinely make.  Ms.

Mulhern's testimony was based on the kind of information economists routinely use, Tr.

1145:13-16; 1212:24-1213:10, and Andrew had ample opportunity to explore that testimony on cross-examination. *See DeSaracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 879-80 (9th Cir. 2000) (upholding jury decision to credit expert accountant testimony regarding loan fees where testimony was based on expert's review of loan agreements reasonably relied on by accountants and defendant failed to cast doubt on expert's testimony).

Andrew's expert, Mr. Hoeberlein, on the other hand, who lacked technical expertise, Tr. at 1930:9, 21-24, parroted Andrew's theory of what its cited technical excerpts mean. But the jury was entitled to disregard that testimony and reach its own independent conclusion. Mr. Hoeberlein, who is not an economist but an accountant, Tr. at 1855:16-20, made no attempt to explore what would be involved in actually implementing the possible alternative in the true "but-for market. He did not know whether the cooperation of a third party would be required to implement his alternative, or how long it would take, or what it would cost. (Tr. at 1926:22-1927:10). All of these are pertinent factors under the caselaw. *See, e.g., Micro Chem.*, 318 F.3d at 1122-24. Nor did Andrew's attorneys ever ask either Mr. Sheehan or Mr. Anderson, both of whom were present throughout trial and both of whom were cross-examined extensively on other topics, to explain the snippets of their testimony on which it relies here. Ms. Mulhern, on the other hand, discussed the issues with them.

Andrew also entirely ignores the testimony of its own corporate representative, Mr. Kennedy, that Andrew had not developed an alternative and had no plans to do so. (Tr. 1160:3-1161:5). Andrew makes no effort to reconcile that testimony with its argument that its system already implements such an alternative. Mr. Hoeberlein certainly could not do so. (Tr. 1927:22-1928:8). The jury could rationally believe that Andrew had no alternative, and none planned.

Ms. Mulhern based her opinion on what she, as an economist, saw in the marketplace. She reviewed the same testimony that Andrew now relies on, but in its full context, and concluded that it did not suggest the existence of noninfringing alternatives for the reasons she stated. The jury was not required to accept Andrew's interpretation of the evidence. The jury's finding is certainly not "against the clear weight of the evidence."

### b) The Evidence Supports the Verdict that TruePosition Did Not Promise to License the 144 Patent to Andrew

Andrew's second damages argument is based entirely on the notion that TruePosition promised to license the 144 patent to Andrew and that it is therefore precluded from recovering lost profits. But the jury specifically found that TruePosition did not make a promise to Andrew. This evidence is discussed in detail above with respect to Andrew's motion relating to promissory estoppel. Because the jury's finding is fully supported by the evidence, this "promise" basis for Andrew's argument regarding lost profits is meritless.

Furthermore, even if one assumes that there were some "promise," on its face the promise was nothing more than an offer to license "applicants" on reasonable terms. It is undisputed that Andrew never sought a license from TruePosition. There is simply no legal basis for the notion that a patentee's offer to license – an offer that is rejected by the infringer – precludes it from being awarded damages measured by its lost profits. If one were to accept Andrew's theory, it would mean that a party could always ignore a patentee's suggestion that it needs a license, infringe instead, and when caught never have to pay anything more than it would have if it had taken the license earlier. Andrew cites no law for this novel – and absurd – proposition, and there is none. TruePosition is entitled to lost profits for Andrew's willful infringement.[18]

---

[18] Andrew calculates an alternative amount that it contends would constitute a reasonable royalty, based on the so-called "25% rule" that is sometimes used in estimating a reasonable royalty. However, Ms. Mulhern testified at some length that the 25% rule is only a starting point and is not an appropriate royalty

c)    **TruePosition Is Entitled to Damages Based on Loss of
the Entire STC Contract**

Andrew argues that TruePosition is not entitled to damages based on the entire value of

the contract. Its argument is meritless.

It is undisputed that as of the time of trial, Andrew had shipped two phases of the STC

contract and had received a formal commitment for a third. (Br. at 72). Andrew argues that the

award of future phases by STC was uncertain, and that any damages based on future phases are

necessarily speculative. The only evidence it proffers is the testimony of its president, Mr.

Garner, to the effect that future phases are "competitive" and that Andrew has not received

commitments on future phases, coupled with the fact that TruePosition continued to attempt to

win back the STC contract. (Br. 72-73).

But Ms. Mulhern addressed that argument. (Tr. 1185:2-1187:9). She testified that the

evidence she had reviewed indicated that Andrew *had* won the entire STC contract, that it was

being rolled out in phases, and that TruePosition would not be fully compensated if damages

were confined to only the equipment that had already been shipped. (Tr. 1185:2-18). As an

example, Ms. Mulhern pointed to Andrew's own press releases indicating they had won a "multi

phase" contract covering "thousands of sites." (Tr. 1186:9-16, 1187:2-9). She also pointed to

Andrew's Answer to TruePosition's Interrogatory 18, which declared that "Andrew won the

contract through the tender process." (PTX 389 at 4; Tr. 1185:19-1186:8). Further, she noted

that Andrew's revenue forecasts include projections for additional phases, and that Andrew's

deposition witnesses had acknowledged that Andrew expected to make those sales. (Tr. at

---

measure without detailed further analysis. She also testified that Andrew's calculation was not an
appropriate measure on the facts of this case, in part because Andrew's skewed cost structure for the STC
contract created an artificially depressed profit margin to which to apply the 25%. (Tr. at 1244:13-
1248:11). In any event, the record supports TruePosition's lost profits award.

118:17-1187:2).[19] In addition, she testified that the TruePosition and Andrew systems are not

readily interchangeable, that it would be a costly and difficult proposition to "mix and match"

equipment from different vendors, and that it was therefore likely that STC would continue with

its rollout using Andrew equipment. (Tr. at 1185:5-14).[20] Finally, she testified that, by

spreading TruePosition's damages out into the future and discounting to present value, her

calculations already took future uncertainty into account. (Tr. at 1177:3-18).

In a two-supplier market, as here, a lost profits award based on projected lost sales "is

neither remote nor speculative" in appropriate circumstances. *Lam,* 718 F.2d at 1068. There

was abundant evidence from which the jury could conclude that TruePosition was damaged in

the amount of the entire STC contract. The only alternative would be to leave TruePosition

uncompensated and force future lawsuits for each phase as Andrew continues to fulfill its

contract.[21] That result makes no sense.

Andrew also argues that TruePosition's damage calculations are too speculative because

1) there is no "guarantee" as to what specific equipment STC will order from Andrew to

---

[19] Ms. Mulhern also pointed out that the evidence suggested that this lawsuit may well have affected the pace of the rollout, in that STC might be being cautious, waiting to make sure there would be continued availability of equipment. (Tr. at 1176:4-1177:2).

[20] Mr. Garner disputed that interoperability issues would lead STC to continue to use Andrew, pointing to the example of the Cingular network after Cingular's merger with AT&T Wireless that had been the subject of earlier testimony. (Tr. at 1865:13-20). Andrew had supplied AT&T's E-911 equipment, while TruePosition had supplied Cingular's. But, while it might have been *possible* for the two sides of the newly merged network to co-exist with different equipment, in fact Cingular chose to replace all of the Andrew equipment with TruePosition equipment. (Tr. at 153:14-154:15; 389:7-391:24; 1877:17-23). A reasonable jury could believe that STC would not willingly choose to complicate its system by introducing a second type of equipment.

[21] In its motion for permanent injunction, TruePosition did not seek an injunction with respect to the remainder of the STC contract, recognizing that the jury's award compensates it for the entire contract. If the Court were to consider overturning that award, TruePosition would seek to amend its injunction motion to pursue relief for the remaining phases of the contract. Andrew cannot escape both damages and injunction: TruePosition is entitled to one or the other.

complete its contract; 2) TruePosition's prices are too high; and 3) TruePosition's calculations

for operations, maintenance, and spare parts are overstated. Andrew's arguments, however, are

rooted in its own experience, which is not relevant to the damage inquiry because it does not

consider the "but-for" world in which the infringement is removed from the analysis. *See, e.g.,*

*Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 475, 506-07 (1964). The proper

inquiry is *not* what Andrew did (or would have done), but the value (to TruePosition) of the

opportunity that it lost. *Id.* at 507 (damages are "compensation for the pecuniary loss [the

patentee] has suffered from the infringement, *without regard to the question whether the*

*defendant has gained or lost by his unlawful acts*") (emphasis added); *Pall Corp. v. Micron*

*Separations, Inc.,* 66 F.3d 1211, 1223 (Fed. Cir. 1995) ("an infringer's sales at a lower price do

not defeat the patentee's recovery of its losses at the patentee's price, for the principle of patent

damages is to return the patentee to the pecuniary position it would have been in but for the

infringement," *citing Aro Mfg.,* 377 U.S. at 507). Andrew ignores this "but for" construct, which

its own expert acknowledged was the proper framework for analysis. (Tr. at 1919:24-1920:4).

Ms. Mulhern addressed these arguments at trial. Her calculations were based on

*TruePosition's* bid, thus reflecting the equipment *TruePosition* would have shipped had it been

awarded the contract. As she indicated, TruePosition's bid was for fewer sites than was

Andrew's, in part because of efficiencies in the system, so that a "site by site" price comparison

would be inappropriate. (Tr. at 1171:6-14; 1238:4-22). She testified that the prices STC paid

Andrew reflected the intense head-to-head competition between the parties, but that an

economist would expect higher prices (for TruePosition's equipment) in a "but for" world in

which Andrew's infringing competition was absent. (Tr. at 1171:22-1173:7; 1236:21-1238:22).

She accounted for the possibility that STC might have budgetary constraints as to particular

phases (what Andrew refers to as a "cap") by spreading the damages out over a number of years. (Tr. at 1237:9-1238:3). With respect to maintenance and spare parts, she testified that, in her experience, particularly in the software industry, buyers customarily protect themselves with maintenance contracts. (Tr. 1166:23-1167:6). Although STC's maintenance purchases have been small to date, that is to be expected in the early days of a contract, when the system is not yet fully operational.

Ms. Mulhern's conclusion on the harm to TruePosition caused by loss of the STC contract to Andrew's infringement was conservative. (Tr. at 1187:10-1189:4). The jury's verdict is certainly not against the substantial weight of the evidence.[22]

## VI.    CONCLUSION

For the foregoing reasons, TruePosition respectfully requests that the Court deny Andrew's Motion for Judgments as a Matter of Law and, in the Alternative, for a New Trial.

---

[22] In arguments scattered throughout the damage sections of its brief, Andrew argues in the alternative that the Court should enter remittitur capping damages at the amount its own expert deemed appropriate. (*E.g.*, Br. at 70, 72, 76). This is simply a variation on its argument that damages should be based on Andrew's "real world" experience. Remittitur is appropriate only where the verdict is so large as to "shock the conscience." *See, e.g., Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230-32 (3d Cir. 1989). The court may not reduce the award simply because it would have awarded a lesser amount. *Id.* In any event, for the same reasons already discussed, the evidence fully supports the jury's verdict. The Court should reject Andrew's remittitur request.

Respectfully submitted,

DATED: November 30, 2007          By:          */s/ James D. Heisman*
                                           CONNOLLY BOVE LODGE & HUTZ LLP
                                           James D. Heisman, Esq. (#2746)
                                           1007 N. Orange Street
                                           P.O. Box 2207
                                           Wilmington, DE 19899
                                           Telephone: (302) 658-9141
                                           Facsimile: (302) 658-5614
                                           *jheisman@cblh.com*

                                           WOODCOCK WASHBURN LLP
                                           Paul B. Milcetic, Esq. (pro hac vice)
                                           Dale M. Heist, Esq. (pro hac vice)
                                           Kathleen A. Milsark, Esq. (pro hac vice)
                                           Daniel J. Goettle, Esq. (pro hac vice)
                                           Amanda M. Kessel, Esq. (pro hac vice)
                                           Cira Centre, 12th Floor
                                           2929 Arch Street
                                           Philadelphia, PA 19104
                                           Telephone: (215) 568-3100
                                           Facsimile: (215) 568-3439

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 30th day of November, 2007, I caused a true and correct copy of the foregoing **TRUEPOSITION'S OPPOSITION TO ANDREW'S MOTION FOR JUDGMENTS AS A MATTER OF LAW, OR ALTERNATIVELY, A NEW TRIAL** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor, LLP
100 West Street, 17th Floor
Wilmington, DE 19801
jingersoll@ycst.com

*Via e-mail*
Patrick D. McPherson, Esq.
Duane Morris LLP
1667 K Street, N.W.
Washington, DC 20006-1608
PDMcPherson@duanemorris.com

*Via e-mail*
Rachel Pernic Waldron, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rpernicwaldron@kirkland.com

_____*/s/ James D. Heisman*_____.
James D. Heisman, Esq. (#2746)

578985