IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION, INC., <br><br> Plaintiff and <br> Counterclaim-Defendant, <br><br> v. <br><br> ANDREW CORPORATION, <br><br> Defendant and <br> Counterclaim Plaintiff. | Civil Action No. 05-00747-SLR |

## ANDREW CORPORATION'S REPLY BRIEF
## IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENTS
## AS A MATTER OF LAW, OR ALTERNATIVELY, A NEW TRIAL

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (No. 1088) [*jingersoll@ycst.com*]
Andrew A. Lundgren (No. 4429) [*alundgren@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: December 14, 2007

**TABLE OF CONTENTS**

I.    THE LAW REQUIRES JMOL OF NO OFFER FOR SALE FROM THE
      U.S. ...................................................................................................................1

II.   THE LAW REQUIRES JMOL ON THE ASHBURN DEMONSTRATION.............3

III.  THE LAW REQUIRES JMOL OF NONINFRINGEMENT.........................................3
      A.    AN SDCCH IS NOT LITERALLY "ONE OF A PRESCRIBED SET OF REVERSE
            CONTROL CHANNELS" UNDER THE COURT'S CLAIM CONSTRUCTION....................4
      B.    TP HAS A COMPLETE FAILURE OF PROOF ON THE STRUCTURE REQUIRED
            FOR THE MEANS-PLUS-FUNCTION CLAIM TERMS .......................................................7
      C.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "LOCATING
            MEANS FOR AUTOMATICALLY DETERMINING" ........................................................10
      D.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS A DATABASE
            ACCESSIBLE TO REMOTE "SUBSCRIBERS" ................................................................11
      E.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS A "CENTRAL
            SITE SYSTEM COMPRISING . . . MEANS FOR PROCESSING" ......................................13
      F.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "SAMPLED
            BASEBAND SIGNALS FORMATTED INTO FRAMES OF DIGITAL DATA" ....................14
      G.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "TIME STAMP
            BITS REPRESENTING THE TIME AT WHICH SAID FRAMES WERE PRODUCED
            AT EACH CELL SITE"...................................................................................................15

IV.   *SEAGATE* REQUIRES JMOL OF NO WILLFULNESS ...........................................16
      A.    THERE CAN BE NO FINDING OF WILLFULNESS BASED ON POST-FILING
            ACTS............................................................................................................................16
      B.    NO RECORD EVIDENCE SUPPORTS A FINDING OF PRE-FILING WILLFULNESS .........17

V.    THE LAW DICTATES JMOL ON PROMISSORY ESTOPPEL .............................19
      A.    TP'S REPEATED PROMISES TO LICENSE ................................................................19
      B.    TP INTENDED TO INDUCE ANDREW'S ACTION OR INACTION .................................21
      C.    ANDREW REASONABLY RELIED.............................................................................22
      D.    ANDREW WAS INJURED FROM ITS RELIANCE .......................................................23

VI.   THE LAW DICTATES JMOL ON FRAUD.................................................................23
      A.    TP HAD A DUTY TO DECLARE THE '144 PATENT AS ESSENTIAL.............................24
      B.    TP ACTED WITH AT LEAST A RECKLESS DISREGARD FOR THE TRUTH...................25
      C.    TP HAD AN INTENT TO MISLEAD ANDREW .........................................................26
      D.    ANDREW'S RELIANCE WAS REASONABLE.............................................................27
      E.    ANDREW WAS INJURED FROM ITS RELIANCE .......................................................28

VII.  THE LAW DICTATES JMOL ON TP'S DAMAGES CLAIMS ...............................28
      A.    ACCEPTABLE NON-INFRINGING ALTERNATIVES WERE AVAILABLE......................28
      B.    TP SAID IT WOULD LICENSE THE '144 PATENT TO ALL APPLICANTS...................30
      C.    TP CANNOT GET DAMAGES ON COMPONENTS NOT YET SHIPPED ........................31
      D.    TP CANNOT GET DAMAGES BASED ON THE ENTIRE CONTRACT............................31

VIII.  ANDREW'S JMOLS ARE PRESERVED ................................................................33

      A.      ANDREW DID NOT NEED TO MOVE FOR JMOL ON ITS OWN CLAIMS ...................34

      B.      ANDREW PRESERVED JMOL ON ALL OF TP'S CLAIMS .........................................34

IX.     CONCLUSION ............................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities,*
163 F.3d 780 (3d Cir. 1999).................................................................................. 2

*Advent Sys. Ltd. v. Unisys Corp.,*
925 F.2d 670 (3d Cir. 1991)................................................................................ 33

*Brady v. i2 Technologies Inc.,*
No. 1543-N, 2005 WL 3691286 (Del. Ch., Dec. 14, 2005)............................... 23

*Carlson v. Hallinan,*
925 A.2d 506 (Del. Ch. 2006)............................................................................ 22

*Caterpillar, Inc. v. Deere & Co.*, 224 F.3d 1374 (Fed. Cir. 2000) ................................ 9

*CreditSights, Inc. v. Ciasullo,*
No. 05-345, 2007 WL 943352 (S.D.N.Y., Mar. 29, 2007)................................ 23

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005) .............. 9

*Czarnik v. Illumina, Inc.,*
437 F.Supp.2d 252 (D. Del. 2006)..................................................................... 26

*Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co.,*
632 F.2d 1068 (3d Cir. 1980)............................................................................. 20

*Engalla v. Permanente Medical Group, Inc.,*
15 Cal. 4th 951 (Cal. 1997)................................................................................ 27

*Falkenberg Capital Corp. v. Dakota Cellular, Inc.,*
925 F.Supp. 231 (D. Del. 1996)......................................................................... 24

*Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.,*
03-1431, 2007 WL 518804 (N.D. Cal., Feb. 13, 2007)..................................... 34

*Gagne v. Bertran*, 43 Cal.2d 481 (Cal. 1954)........................................................... 26

*Gatenby v. Altoona Aviation Corp.,*
407 F.2d 443 (3d Cir. 1968)............................................................................... 19

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
185 F.3d 1341 (Fed. Cir. 1999).......................................................................... 28

*Halmar Robison Gp., Inc. v. Toshiba Int'l Corp.,*
1999 U.S.Dist.LEXIS 19869 (W.D. Pa., Nov. 17, 1999) ................................... 2

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co., Inc.,*
    62 F.3d 1512 (Fed. Cir. 1995) ........................................................................ 29

*In re Seagate Tech., LLC,*
    497 F.3d 1360 (Fed. Cir. 2007) ................................................................ 16, 17

*Intel Corp. v. Int'l Trade Commission,*
    946 F.2d 821 (Fed. Cir. 1991) ...................................................................... 13

*Ishida Co., Ltd. v. Taylor,*
    221 F.3d 1310 (Fed. Cir. 2000) ..................................................................... 13

*Jopek v. New York Cent. R. Co.,*
    353 F.2d 778 (3d Cir. 1965) ......................................................................... 25

*Junker v. Eddings,*
    396 F.3d 1359 (Fed. Cir. 2005) ..................................................................... 34

*Linear Tech. Corp. v. Micrel, Inc.,*
    275 F.3d 1040 (Fed. Cir. 2001) ...................................................................... 2

*Litton Sys., Inc. v. Honeywell, Inc.,*
    140 F.3d 1449 (Fed. Cir. 1998) ...................................................................... 3

*Lucent Tech. Inc. v. Newbridge Networks Corp.,*
    168 F. Supp.2d 181 (D. Del. 2001) .............................................................. 10

*Malta v. Schulmerich Carillons, Inc.,*
    952 F.2d 1320 (Fed. Cir. 1991) ..................................................................... 34

*Marino v. Cross Country Bank,*
    No. 02-65, 2007 WL 1810485 (D. Del., June 25, 2007) ................................... 24

*Mytee Prods., Inc. v. H.D. Prods., Inc.,*
    No. 05-2286, 2007 WL 1813765 (S.D. Cal., June 22, 2007) ........................... 23

*Novartis Corp. v. Ben Venue Labs., Inc.,*
    271 F.3d 1043 (Fed. Cir. 2001) ..................................................................... 29

*PODS, Inc. v. Porta Stor,*
    484 F.3d 1359 (Fed. Cir. 2007) ..................................................................... 12

*Rambus Inc. v. Infineon Techs. AG,*
    318 F.3d 1081 (Fed. Cir. 2003) ..................................................................... 24

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001) ..................................................................... 12

*Rotec Indus. Inc v. Mitsubishi Corp.*,
    215 F.3d 1246 (Fed. Cir. 2000)............................................................................ 1, 2

*Shaw v. Strackhouse*,
    920 F.2d 1135 (3d Cir. 1990)....................................................................... 29, 31, 32

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    309 U.S. 390 (1940)................................................................................................ 30

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001).............................................................................. 33

*Standard Havens Prods., Inc. v. Gencor Indus.*,
    953 F.2d 1360 (Fed. Cir. 1991).............................................................................. 33

*Symbol Tech, Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991)......................................................................... 9, 10

*Symbol Technologies, Inc. v. Opticon, Inc.*,
    No. 86-8736, 1990 WL 58887 (S.D.N.Y., May 3, 1990) ................................... 10

*Texas Instruments v. Cypress Semiconductor Corp.*,
    90 F.3d 1558 (Fed. Cir. 1996)............................................................................... 34

*Ty, Inc. v. GMA Accessories, Inc.*,
    132 F.3d 1167 (7th Cir. 1997) ............................................................................... 30

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996)............................................................................... 28

**Statutes**

28 U.S.C. § 1498(a) ........................................................................................................ 3

35 U.S.C. § 271(f)........................................................................................................ 31

Fed. R. Civ. P. 50(a) .................................................................................................... 34

**Other Authorities**

*Broadcom Corp. v. Qualcomm Inc.*,
    05-467-JVS-RNB, Civil Minutes - General (C.D. Cal., Nov. 21, 2007)........................ 17

Fed. R. Civ. P. 50 1991 Amendment Advisory Notes.................................................. 34

*Williston on Contracts*
    § 4:13 (4th ed.1990)................................................................................................. 2

Andrew submits this reply for its renewed motion for judgments as a matter of law:

## I.  THE LAW REQUIRES JMOL OF NO OFFER FOR SALE FROM THE U.S.

TP seeks $45.3 million in "lost profits" damages on the theory Andrew made an offer to

STC from within the United States. But, as explained in Andrew's opening brief, the undisputed

evidence at trial demonstrates Andrew made no offer to STC from within the United States:

- Andrew's December 2004 STC bid was hand-delivered to STC in Saudi Arabia by Al-Misehal, a Saudi-based company partnering with Andrew for the STC project. JA199.

- The bid was submitted on behalf of Andrew Middle East, which is located in Dubai. *See* JA182; JA204; PTX 141 (JA108-198).

- Andrew's division president Terry Garner gave unrebutted testimony that communicating with STC through Al-Misehal and/or Andrew Middle East was the normal course, and that no meetings with STC had *ever* taken place in the U.S. JA946:5-8; JA946:11-12.

- TP presented no evidence at trial that Andrew made an offer to STC from within the U.S.

These undisputed facts require JMOL in Andrew's favor. *See Rotec Indus. Inc v. Mitsubishi

Corp.*, 215 F.3d 1246, 1250 (Fed. Cir. 2000) (no offer for sale where bid presented in China).

TP's arguments do not change these undisputed facts, and none of TP's arguments (even

if accepted as true) has any relevance to the issue of where the offer to STC was made. TP

argues that Andrew is based in the U.S., that the bid lists Ashburn, VA as the return address, and

that the bid was prepared in the U.S. by U.S.-based Andrew employees. TP Br. at 15-18. But

the issue here is not where Andrew is located, where it prepared the bid, or what the bid said.

The only issue is in what country was the offer to STC made. TP also argues that Andrew sealed

the bid in the U.S. and did not intend for the bid contents to change before the bid reached STC

(TP Br. at 17), but TP's single citation to PTX 142 does not support TP's argument, and neither

does anything else in the record.

Here, the offer was made in Saudi Arabia because an offer requires communication to an

offeree, and it is undisputed that the only communication of an offer to STC occurred in Saudi

Arabia. *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (citing, *inter alia*, Richard A. Lord, *Williston on Contracts* § 4:13, at 367 (4th ed. 1990) ("in order for an offer to exist, it must constitute a manifestation ***communicated to the offeree*** so as to justify his understanding that by assenting a bargain will be concluded") (emphasis added)). Andrew's internal communications and activities (*e.g.*, preparing the bid) are irrelevant to where the offer was made. *Linear Tech. Corp*, 275 F.3d at 1050 ("internal communications...***cannot constitute an offer for sale to a customer not privy to the communications***.") (emphasis added).

TP also makes a one-sentence argument that an October 2005 contract between STC and Andrew was an offer made from within the United States. TP Br. at 16. The record is devoid of any evidence regarding when, where, how and by whom this contract was communicated to STC — and TP points to none. *See* TP Br. at 17; *compare with* C46-51. Indeed, the only witness examined on the issue was Terry Garner, and TP never asked him when, where or how the contract was communicated to STC. C46-51. TP has a failure of proof on its offer for sale claim, and JMOL should be granted.[1] Alternatively, a new trial is warranted because the jury verdict was clearly against the weight of the evidence.

---

[1]    TP's cited cases do not support its position. TP cites *Halmar* for the proposition that an offer does not require the physical presence of an offeree. TP Br. at 17. But in *Halmar*, unlike here, the defendant sent a formal offer directly to its Canadian customer from the U.S. *Halmar Robison Gp., Inc. v. Toshiba Int'l Corp.*, 1999 U.S.Dist.LEXIS 19869, *9-10 (W.D. Pa., Nov. 17, 1999). Andrew did not send an offer directly to STC. TP also cites *A.S. Goldmen* as supporting the idea that the location of an offer is the place from which it is sent, not the place where it is received or accepted. But the location of the offeror or place the offer was sent from were not at issue in *A.S. Goldmen*; rather, it held that an offer can be made in one state, and a contract formed in another. *See A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities*, 163 F.3d 780, 787 (3d Cir. 1999) ("contracts formed between citizens in different states implicate the regulatory interests of both states. Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state."). And TP's characterization of the *Rotec* holding is simply wrong. For example, TP argues that the *Rotec* offerors were based outside the United States and the bid did not originate in the U.S. TP Br. at 17. That is not the case. *See Rotec Inc*, 215 F.3d 1246, 1249-1250, 1256 (C.S. Johnson headquartered in Illinois; Tucker headquartered in Oregon; finalized technical design and finances of bid in Illinois and Oregon).

## II.    THE LAW REQUIRES JMOL ON THE ASHBURN DEMONSTRATION

The undisputed testimony at trial is that the August 2005 Ashburn demonstration was for the U.S. government, and accordingly not actionable in district court under 28 U.S.C. § 1498(a). TP cites no evidence in its response brief to demonstrate the Ashburn demonstration was not for the government and no such evidence exists in the record. TP argues in its brief that Mr. Garner testified the government had not authorized infringement. TP Br. at 19. TP misstates the record. Mr. Garner's testimony was that the government did provide consent and authorization for Andrew to perform the demonstration. JA953:16-22. That is all 28 USC § 1498 requires. *See* 28 U.S.C. § 1498(a) ("Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims . . . For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."). JMOL should be granted on this claim too. Alternatively, a new trial is warranted because the jury verdict was clearly against the weight of the evidence.

## III.    THE LAW REQUIRES JMOL OF NONINFRINGEMENT

The jury's verdict was based solely on literal infringement. The verdict cannot stand for any claim unless the record establishes each and every limitation of that claim is <u>exactly</u> present in Andrew's accused products under this Court's claim constructions. *E.g. Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) (affirming JMOL of no literal infringement; "any deviation from the claim precludes a finding of literal infringement").

3

In its opening brief, Andrew showed that there are seven claim limitations for which there is no record evidence of literal presence in Andrew's accused products. *See* Op. Br. at 18-40.[2] Indeed, Andrew cited extensive record evidence, including testimony by TP's infringement expert Oded Gottesman, demonstrating the literal <u>absence</u> of the limitations as a matter of law. TP's response brief does not address Andrew's arguments head-on but instead, like TP did at trial, argues infringement under a claim construction that does not match the Court's. TP's response demonstrates that no reasonable jury could find infringement of any asserted claim under the Court's claim construction.

### A.    AN SDCCH IS NOT LITERALLY "ONE OF A PRESCRIBED SET OF REVERSE CONTROL CHANNELS" UNDER THE COURT'S CLAIM CONSTRUCTION

The jury found three claims literally infringed. Each claim has a common limitation: "one of a prescribed set of reverse control channels." The claimed invention uses signals transmitted over "one of a prescribed set of reverse control channels" to locate the cellular phone transmitting the signals. JA129 at 20:4-34, JA131 at 23:56-23:2; *see also* JA660:8-11. The Court construed "prescribed set of reverse control channels" to mean "[a] predetermined range of frequencies that transmit control information in only one direction, from a cellular telephone to a cell site." D.I. 257 at 1. At trial, TP argued an SDCCH channel in the GSM cellular system satisfies the "one of a prescribed set of reverse control channels" limitation.[3]

---

2    The limitations are "one of a prescribed set of reverse control channels" (all claims), the means limitations having the figure 8 "cell site" structure (claims 1 and 22), locating means for automatically determining (claim 22), database accessible to remote "subscribers" (claim 22), central site processing comprising . . . means for processing (claim 1), sampled baseband signal formatted into frames of digital data (claim 1), and "time stamp bits representing the time at which said frames were produced at each cell site" (claim 31).

3    As Andrew explained in its opening brief, unlike the '144 patent, GSM is based on a fundamentally different architecture for which the SDCCH specifically was invented. JA743:1-744:6, JA746:7-23. GSM abandoned the predetermined control channel architecture of prior cellular systems. JA748:4-749:9; JA752:7-15. GSM uses a variable approach where SDCCHs hop from frequency to frequency thereby reducing frequency-specific dead spots. JA750:4-17. GSM also abandoned the use of a reverse control channel for most purposes in favor of new bi-directional control channels, which are single channels that communicate in both the uplink (reverse) and downlink (forward) directions. JA746:25-747:15; JA743:18-744:4; JA767:8-23.

As discussed in Andrew's opening brief, there are two independent reasons why no reasonable jury could conclude an SDCCH literally satisfies the Court's construction: (1) the undisputed evidence confirms an SDCCH does not have a "predetermined range of frequencies" but instead changes frequencies more than 200 times a second and can float anywhere within the operational range of a product (i.e., the frequency band); and (2) the undisputed evidence confirms an SDCCH does not "transmit control information in only one direction, from a cellular telephone to a cell site" but instead is a bi-directional channel. *See* Op. Br. at 19-25.

### 1.     An SDCCH Does Not Have A "Predetermined Range of Frequencies"

TP does not dispute that an SDCCH changes frequencies over 200 times a second. *See* TP Br. at 22, Op. Br. at 21-22. TP also does not dispute that an SDCCH can transmit anywhere within the GSM frequency band. *See* TP. Br. at 22, Op. Br. at 22-23. Indeed, TP does *not* argue that an SDCCH has a predetermined range of frequencies. Instead, TP applies the Court's "predetermined range of frequencies" construction against the GSM frequency band. TP Br. at 21. TP argues any channel transmitting in the GSM frequency band satisfies the "predetermined range of frequencies" construction — even if the channel changes frequencies 200 times per second and has no predetermined frequency range. *Id.* TP has no other infringement argument based on the Court's construction. If the Court concludes its construction of "predetermined range of frequencies" refers to a channel and not the entire frequency band of a cellular system, TP raises no basis to support the jury's verdict and JMOL should be granted.

The Court's *Markman* ruling specifies "range of frequencies" refers to a channel. D.I. 257 at 2 ("the phrase 'range of frequencies' is an accurate and helpful description of what a 'channel' is."). TP therefore had to prove Andrew's accused products use a channel that has a predetermined range of frequencies — TP was not permitted to rewrite the Court's construction to argue the "predetermined range of frequencies" refers to the GSM cellular system's entire

frequency band.   Because it is undisputed that an SDCCH channel itself does <u>not</u> have a predetermined range of frequencies (*see, e.g.,* JA683:10-23; JA741:14-742:22, JA748:20-749:7, JA752:7-15, JA778:11-780:5, JA783:1-6, JA847:9-848:11; JA85, JA102; JA530-31), there is nothing in the record to support the jury's verdict for infringement of any claim.[4]

TP's fall-back argument is that the Court should ignore its claim construction — which held that "the phrase 'range of frequencies' is an accurate and helpful description of what a 'channel' is" — because the Court's holding refers to "channel" in the singular and the claims refer to "channel<u>s</u>" in the plural.   TP Br. at 23.   TP cannot disregard the Court's holding because it is phrased in the singular and not the plural.   The Court's holding specifically addresses the threshold definitional question of what "channel" and "range of frequencies" mean in the context of the '144 patent claims.   Contrary to TP's assertions, Andrew is not suggesting the Court's construction excludes a plural number of channels.   TP Br. at 23.   A plural number of channels may fall within the Court's construction, so long as each of them satisfies the Court's construction.   Because the SDCCH does not satisfy the Court's construction as a matter of law, JMOL should be granted.

## 2.    An SDCCH Does Not Transmit In Only The Uplink Direction

The Court's claim construction also requires the "one of a prescribed set of reverse control channels" to "transmit <u>in only one direction,</u> from a cellular telephone to a cell site." D.I. 257 at 1 (emphasis added).   In light of the Court's claim construction, TP had to prove an SDCCH literally transmits in only one direction, from a cellular telephone to a cell site.

---

4    TP makes a passing argument that an SDCCH is a "predetermined range of frequencies" because it is somewhere among 1 of 124 different channels. TP Br. at 24. TP's infringement expert, Dr. Oded Gottesman, admitted each of those 124 different channels has a different frequency range. JA683:10-23; JA102. That is not a predetermined range of frequencies.

TP did not meet its burden of proof. It is undisputed (*see* TP Br. at 24) that an SDCCH is bi-directional — it transmits information from a cellular telephone to a cell site <u>and</u> also from a cell site to a cell phone. Thus, an SDCCH cannot literally satisfy the Court's claim construction, as Andrew explained in its opening brief. Op. Br. at 24-25.

To get around this fatal flaw, TP attempts to argue that the issue is not whether the SDCCH is bi-directional, but rather whether the SDCCH uses the GSM uplink frequency band. *Id.* This is nothing more than another example of TP's attempts to support the verdict with arguments the Court already has rejected. Indeed, the Court rejected this argument in its *Markman* opinion, stating: "[t]he Court declines to embrace plaintiff's implied suggestion that it is the signal that defines the channel at any given time; i.e., there are no 'prescribed sets' of reverse control channels." D.I. 257 at 2. TP cannot reargue claim construction issues it lost to try to justify the verdict.

Accordingly, because the undisputed record is that an SDCCH does not literally satisfy the Court's claim construction, which requires transmitting only from a cell phone to a cell site, the Court should grant JMOL on all three asserted claims.

### B.    TP HAS A COMPLETE FAILURE OF PROOF ON THE STRUCTURE REQUIRED FOR THE MEANS-PLUS-FUNCTION CLAIM TERMS

As patentee, it is TP's burden to show Andrew's accused products have structure that is the same or equivalent to what the Court's claim construction requires for the means-plus-function terms of claims 1 and 22. Here, TP completely failed to compare the required means-plus-function structure with Andrew's accused products. As Andrew explained in its opening brief, the Court specified in detail the structure required for the means-plus-function claim terms in claims 1 and 22, providing meticulous detail down to the level of which specific columns,

lines and words from the specification text and figures are included and excluded from the Court's construction. Op. Br. at 26-27.

The Court's construction for the required structure includes specific portions of Figures 7 and 8 (8A-8D) of the '144 patent. D.I. 257 at 4; *see* Op. Br. at 26. The distinction between the structure in Figure 7 and Figures 8A-8D is important, because Figure 7 addresses only a high-level overview of the processing performed by the central site system. JA126 at 13:33-34. Figure 7 not only omits significant structure contained in the central site, but does not address any processing at the cell sites required by each claim. TP's trial arguments relied on, and required, processing at the cell sites to make out a claim of infringement. *See* JA517:2-6, JA517:22-518:1, JA520:5-16, JA522:9-11, JA572:20-573:1. Yet TP did not introduce any evidence comparing any of the Figure 8 structure to Andrew's accused products, which as Andrew explained in its JMOL brief is a failure of proof of infringement for both claims 1 and 22. Op. Br. 26-29.

In response to Andrew's JMOL, TP does not and cannot point to anywhere in the record where it compared the Figure 8 structure with Andrew's accused products. In all the transcript pages TP cites in its brief, not a single line or word compares the Figure 8 structure with Andrew's accused products. Each of TP's citations, to the extent it relates to comparison of any structure, relates only to the Figure 7 structure. *See* C13:1-11, C20:20-21:8, C24:18-25:6, C28:14-29:10, C29:23-31:8, C30:13-32:8, JA582:12-22, JA587:15-589:20, JA606:19-608:16, JA629:25-633:1, JA656:16-657:16; C57:7-25, C55:24-56:15, C56:16-57:6.

TP tries to excuse its failure of proof by arguing its infringement expert Dr. Gottesman testified he "considered the entirety of the Court's construction." TP Br. 31. The issue is not what Dr. Gottesman considered, but what he or anyone else testified to in the record. Neither Dr.

Gottesman nor any other TP witness compared the Figure 8 structure to Andrew's accused products. The only comparison in the record is from Andrew's expert Dr. David Goodman, who testified at length as to why the Figure 8 structure is not present literally or equivalently in Andrew's accused products. JA840:18-841:19, JA808:13-841:19.

The Federal Circuit has made clear that there is a failure of proof if a patentee does not compare the required structure with the accused product on the record. *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005) (reversing jury verdict and holding patentee "failed to present substantial evidence of infringement" by failing to compare the required structure for a "temperature controller means" to the structure of the accused device). TP did not do so here, and it thus has a failure of proof for claims 1 and 22.

TP does not cite any case that supports its position. TP continues to cite *Caterpillar, Inc. v. Deere & Co.*, 224 F.3d 1374 (Fed. Cir. 2000), but as Andrew explained in its opening brief, *Caterpillar* is inapplicable. The issue in *Caterpillar* was whether the district court erred in granting summary judgment of no equivalence infringement of a means-plus-function limitation. The Federal Circuit held the district court erred in ruling there could be no equivalence just because the accused structure lacked portions of the structure disclosed in the specification. *Id.* at 1380 ("the district court conducted an impermissible component-by-component analysis to determine that no reasonable jury could find structural equivalence."). *Caterpillar* did not present the issue raised here of whether the structural comparison must be done in the first place. Indeed, in *Caterpillar* that comparison was in fact conducted. *Id.*

TP's other cited cases do not support its position either. In *Symbol Tech, Inc. v. Opticon, Inc.*, 935 F.2d 1569 (Fed. Cir. 1991), the defendant expressly consented at trial to the opposing expert conducting his infringement analysis without "explaining with each infringing device how

he found that each element was infringed." *Symbol*, 935 F.2d at 1575. Andrew gave no such consent here. Moreover, *Symbol* is a pre-*Markman* decision tried to the bench and the claims were not construed prior to trial. *Symbol Technologies, Inc. v. Opticon, Inc.,* No. 86-8736, 1990 WL 58887, at *16-20 (S.D.N.Y., May 3, 1990). Thus, at trial the parties were free to offer their varying claim interpretations. *Id.*; *see also Symbol*, 935 F.2d at 1576. In contrast, here the Court construed the claims prior to trial, the Court went to painstaking detail to define the structure required to satisfy the means-plus-function claim terms, and the parties were required to base their cases on the Court's construction. *Lucent Tech. Inc. v. Newbridge Networks Corp.*, 168 F. Supp.2d 181 (D. Del. 2001), is equally unhelpful to TP. There, unlike here, the patentee's expert compared the required means plus function structure to the accused product. *Id.* at 210.

### C.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "LOCATING MEANS FOR AUTOMATICALLY DETERMINING"

In construing the "locating means" limitation in its *Markman* Order, the Court held "the function of the disclosed structure is to determine, <u>without a specific request to do so</u>, the locations of cellular telephones by receiving and analyzing the signals that the cellular telephones broadcast periodically over the reverse control channel." D.I. 257 at 4 (emphasis added). Andrew demonstrated in its opening brief that no reasonable jury could find this limitation literally infringed because the evidence of record is undisputed that Andrew's accused Geometrix system will <u>not</u> locate a phone <u>unless</u> it is specifically requested to do so — the opposite of what the claim requires. Op. Br. at 29-32.

In response, TP does not dispute that Geometrix will not locate a phone unless specifically requested to do so. TP's sole argument is that the issue is not whether Geometrix locates a phone without a specific request to do so, but whether the accused structure corresponding to the "locating means" locates a phone without a specific request to do so. TP

Br. at 33. Even under TP's framing of the issue, there is a failure of proof in the record. Claim 22, unlike claims 1 and 31, is broader than a location system. It relates to "[a] ground-based cellular telephone system" that includes a "locating means." The "locating means" is the only limitation in the claim that relates to the process of locating a cell phone. JA131 at 23:56-24:2 ("locating means for automatically determining the locations of said cellular telephones by receiving and processing signals emitted during said periodic reverse control channel transmissions"). The other claim limitations relate to cell site equipment and a database accessible to remote subscribers. Thus, to infringe, the accused structure corresponding to the "locating means" must perform the entire location process and must do so without a specific request to locate. Dr. Gottesman admitted that Geometrix's location processes will not operate unless there is a specific request to locate a phone:

> **Q:**   Without a request, there's going to be no collection of times, no calculation of times of arrival, no calculation of time differences of arrival and no calculation of a location of the phone without that specific request; is that right?
>
> **A:**   That is correct.

JA669:25-670:5. Accordingly, because TP cannot rewrite the claims to remove the automatic limitation from claim 22, no reasonable jury could have found infringement of claim 22, even under TP's framing of the issue.

## D.   NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS A DATABASE ACCESSIBLE TO REMOTE "SUBSCRIBERS"

The term "subscribers" appears twice in claim 22. It appears in the first line of the claim which specifies "[a] ground-based cellular telephone system serving a plurality of *subscribers* possessing mobile cellular telephones." JA131 at 23:56-59 (emphasis added). It appears again in the last line of the claim as follows: "database means for storing location data identifying the

11

cellular telephones and their respective locations, and for providing access to said database to *subscribers* at remote locations." JA131 at 23:67-24:2 (emphasis added).

The issue here is whether "subscriber" should have the same meaning both times it is used in the same claim. TP asserts the Court decided this issue adverse to Andrew at the *Markman* stage, and therefore "subscriber" should be given its plain and ordinary meaning. TP Br. at 34. TP misstates the procedural history — the Court did not construe "subscriber" in its *Markman* ruling and did not address the parties' arguments on the term. More fundamentally, however, Andrew did not argue at the *Markman* stage, and does not argue now, for a construction of "subscriber" that is outside its plain and ordinary meaning. Andrew simply argues "subscriber" should have the same meaning each time it is used in the same claim.

And as explained in Andrew's opening brief, there is nothing in the '144 patent specification or prosecution history to indicate "subscriber" should be construed two different ways in the same claim. Op. Br. at 34. TP does not dispute this. Moreover, TP does not address or attempt to distinguish the Federal Circuit case law Andrew cited, which expressly holds there is "a presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." *PODS, Inc. v. Porta Stor*, 484 F.3d 1359, 1366 (Fed. Cir. 2007); *see Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

Indeed, Dr. Gottesman, TP's only witness on the issue, admitted "subscriber" means cell phone subscriber the first time it is used in claim 22. *See* Op. Br. at 33. Dr. Gottesman also admitted Andrew cannot infringe claim 22 if "subscriber" has the same meaning the second time it is used in the claim. *Id.* The second time it is used in the claim is where the claim requires

12

"providing access to said database [means] to subscribers at remote locations." JA131 at 24:1-2.

Dr. Gottesman admitted there is no evidence Geometrix provides access to any database to

subscribers at remote locations. JA679:8-9. And since there is no evidence Geometrix performs

the claimed function of "providing access to said database to subscribers at remote locations,"

JMOL should be granted. *Ishida Co., Ltd. v. Taylor*, 221 F.3d 1310 (Fed. Cir. 2000) ("Literal

infringement of a claim with a means-plus-function clause requires that the accused device

perform a function identical to that identified in the means clause.").[5]

### E. NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS A "CENTRAL SITE SYSTEM COMPRISING . . . MEANS FOR PROCESSING"

In its opening brief, Andrew explained to infringe claim 1 literally requires a "central site

system" that has the structure corresponding to the "means for processing":

> a central site system operatively coupled to said cell site systems, comprising:
> means for processing said frames of data from said cell site systems to generate a
> table identifying individual cellular telephone signals and the differences in times
> of arrival of said cellular telephone signals among said cell site systems.

JA129 at 20:25-31 (emphases added). If the "means for processing" structure does not reside at

the central site system, there can be no literal infringement. The issue here has nothing to do

with whether Andrew's accused structure is the same or equivalent to the structure required for

the "means for processing." The sole issue is whether the structure TP identifies as the "means

for processing" resides at the structure TP identifies for the "central site system." As Andrew

explained in its opening brief, TP argues the central site system is Andrew's GCS and that the

"means for processing" relates to Andrew's "ambiguity function." Op. Br. at 35-36. It is

---

[5] TP cites *Intel Corp. v. Int'l Trade Commission*, 946 F.2d 821 (Fed. Cir. 1991), to argue it did not have to prove Andrew performed the function required by the claim. TP Br. at 36. TP misstates the law. *Intel* did not hold the claimed function does not need to be performed. In *Intel*, due to the wording of the claim, the claimed function <u>was</u> performed if a device were capable of operating in a particular mode. 946 F.2d at 832. That is not the case here.

undisputed that the ambiguity function in Geometrix is not performed or calculated at the GCS but at another component called the WLS. JA517:2-6; JA522:9-11; JA583:23-584:2; JA524:2-7; JA572:20-573:1. By TP's own admission, the "means for processing" in Andrew's system resides at the wrong place for TP to find literal infringement.

In response, TP tries to defend its position by arguing it does not have to prove Andrew's accused products have an "ambiguity function." TP misses the point. The issue here is that, for the claim to be literally infringed, whatever TP pointed to as the "means for processing" must reside at the GCS. Because TP argued Andrew's "ambiguity function" is included in the "means for processing," TP was required to prove the ambiguity function resides at the GCS. TP did not meet that burden of proof and TP does not dispute it. JMOL should be granted.

### F.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "SAMPLED BASEBAND SIGNALS FORMATTED INTO FRAMES OF DIGITAL DATA"

Claim 1 has a limitation that reads: "sampling said baseband signal at a prescribed sampling frequency and formatting the sample signal into frames of digital data." JA129 at 20:18-21. The issue here is whether Andrew's "df_results_msg" — a particular computer message used in the cell phone location process — contains sampled baseband signals. Andrew demonstrated in its JMOL brief that there is no evidence in the record that the df_results_msg contains sampled baseband signals, and that the df_results_msg frame structure is completely absent of any baseband signal field. Op. Br. at 36-37.

In response, TP does not dispute that it needs to prove the df_results_msg contains sampled baseband signals to satisfy this limitation. But TP cites no evidence that the df_results_msg contains sampled baseband signals. The transcript pages and exhibits TP cites do not address the issue of whether the df_results_msg has sampled baseband signals, and thus

14

cannot support the jury's verdict.    There is a failure of proof on this point for a good reason:  no proof exists in the record.

### G.    NO REASONABLE JURY COULD CONCLUDE GEOMETRIX HAS "TIME STAMP BITS REPRESENTING THE TIME AT WHICH SAID FRAMES WERE PRODUCED AT EACH CELL SITE"

Claim 31 requires "frames of data, each frame comprising a prescribed number of data bits and time stamp bits, said time stamp bits representing the time at which said frames were produced at each cell site."  JA131 at 24:58-61.  This claim limitation requires a very precise measurement:  the exact time "frames of data" "<u>were produced</u> at each cell site."  *Id.* (emphasis added).

TP does not dispute that to prove literal infringement, it was required to prove the Geometrix "df_results_msg" contains a field that literally represents the time the "df_results_msg" was produced at each cell site.  TP Br. at 40-41.  TP's only argument is that the "actual start time" field in the df_results_msg literally represents the time the df_results_msg was produced.  *Id.*  TP does not dispute that "actual start time" represents the time the Geometrix WLS component began collecting signals.  *See* JA800:16-24; JA555:16-21.

TP also does not dispute there is no infringement if the time of arrival of cell phone signals, or TOA, is after the "actual start time."  TP Br. 40-41.  TP's sole argument is that its expert Dr. Gottesman did not testify that the time of signal arrival, or TOA, is after "actual start time."  *Id.* at 41 ("Dr. Gottesman never testified that the actual start time field represents a data collection time earlier than the time the signal arrives at the cell site").  But on direct examination Dr. Gottesman defined the TOA field as being <u>after</u> the "actual start time" -- "[a]nd that TOA field tells, with respect to that, **what is the time of arrival of the signal that came slightly after the actual reception start[ed] being performed within the WLS**."  JA551:19-24

(emphasis added).    Accordingly, for this and all of the other reasons set forth in Andrew's opening JMOL brief, JMOL for claim 31 should be granted.

In sum, no reasonable jury could find that Andrew's products infringe each and every limitation of any asserted claim; thus, JMOL should be granted.    Alternatively, a new trial is warranted because the jury verdict was clearly against the weight of the evidence.

## IV.    *SEAGATE* REQUIRES JMOL OF NO WILLFULNESS

Andrew's opening brief showed that *Seagate* requires JMOL of no willful infringement. TP's response misstates the *Seagate* law regarding both post-filing and pre-filing activities. Indeed, TP tries to support the jury's verdict with what amounts to nothing more than a claim that Andrew had notice of the '144 patent before TP filed suit.    This is insufficient to constitute willful infringement under *Seagate*.    Andrew's JMOL for no willfulness should be granted.

### A.    THERE CAN BE NO FINDING OF WILLFULNESS BASED ON POST-FILING ACTS

As Andrew explained in its opening brief, TP's failure to move for a preliminary injunction means that under *Seagate*,  Andrew's post-filing conduct cannot be willful as a matter of law.  Op. Br. at 46.  The Federal Circuit expressly stated that a "when an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement.  *A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.*"   *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) (internal citations omitted).

In response, TP ignores *Seagate* and argues "post-filing activities, which would include preliminary injunction proceedings, are irrelevant to the question of willfulness" and that "Andrew failed to offer any evidence at trial as to whether TP moved for a preliminary injunction and should not now be allowed to attack the jury's decision based on such evidence."

TP Br. at 47.  These arguments should be rejected because *Seagate* has a clear legal requirement that a patentee must move for a preliminary injunction as a prerequisite to receiving to a finding of post-filing willful infringement.  The record is undisputed that TP did not move for a preliminary injunction, so there can be no finding of post-filing willful infringement as a matter of law.

**B.    NO RECORD EVIDENCE SUPPORTS A FINDING OF PRE-FILING WILLFULNESS**

The Federal Circuit could not be more clear regarding the requirement for pre-filing willfulness -- under *Seagate*, for TP to prove willful infringement, there must be substantial evidence in the record demonstrating by clear and convincing evidence that there was: (1) "an objectively high likelihood that [Andrew's] actions constituted infringement of a valid patent;" and (2) "that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to [Andrew]."  *Seagate*, 497 F.3d at 1371.[6]  Indeed, the Federal Circuit has unequivocally raised the bar for a finding of willful infringement.  *See Broadcom Corp. v. Qualcomm Inc.*, 05-467-JVS-RNB, Civil Minutes - General at 1 (C.D. Cal., Nov. 21, 2007) (C59-67) ("It would be an understatement to say that the Federal Circuit rewrote decades of case law interpreting the requirements for demonstrating willful infringement in a patent case.").

In its opening brief, Andrew showed that PTX 7 (JA135-137), 8 (JA138-140),[7] 17 (JA158-162), 18 (JA163-169),[8] and 15R (JA141-157) do not show an objectively high likelihood

---

6    TP incorrectly argues that Seagate promulgates a three-prong test, the first prong of which is: "whether Andrew was aware of the '144 patent." TP Br. at 41-42.  This is not the *Seagate* test, which has two prongs, neither of which is notice of the patent.  *Seagate*, 497 F.3d at 1371.  Moreover, the Federal Circuit also specifically held the alleged infringer's state of mind is not relevant to the first prong.  *Id.*

7    Notably, TP did not even address PTX 8, and thus admits it cannot be used to support the jury's verdict.

8    TP does not even attempt to address the fact that PTX 17 and 18 were sent long after Andrew bid on the STC deal and conducted the Ashburn demonstration.  *See* JA158-159; JA163-166; *compare with* JA488:17-20;

of infringement because they are devoid of information that could show such a likelihood. TP's response does not — because it cannot — point to any additional evidence. Rather, TP only argues the four documents are sufficient because they allegedly apprise Andrew that the '144 patent covers the use of UTDOA and a reverse control channel to locate cell phones. *See, e.g.,* TP Br. at 42  (PTX 7 warned "that [the '144 patent] related to 'the use of time difference of arrival (TDOA) and the reverse control channel (RCC) to locate cell phones.'") (quoting PTX 7).

But even if TP's arguments are accepted as true -- that Andrew was on notice that the '144 patent covered the use of UTDOA and a reverse control channel to locate cell phones  -- TP still has no evidence to support the jury's finding of willfulness as a matter of law.  This is because, *by TP's own admission*, the '144 patent requires much more than UTDOA and control channels.  Indeed, it is undisputed that the ETSI standard covers UTDOA using an SDCCH, which TP argues is a reverse control channel.  In its Reply Brief for its Motion for Permanent Injunctive Relief, TP expressly says that "the teachings of [the '144 patent] are not found in any standard" (DI 342 at p. 2).  TP's position that the standard is insufficient to demonstrate the teachings of the '144 patent shows that knowing the '144 patent covers UTDOA with "reverse control channels" is insufficient to know (or have reason to know) of an objectively high likelihood of infringement.[9]

---

JA526:7-12.  Thus, PTX 17 and 18 cannot be used to show an objective likelihood of infringement of those acts.

[9]  TP's remaining arguments, even if accepted as true, are irrelevant to the *Seagate* test of whether Andrew knew or should have known there was an objectively high likelihood of infringement. First, TP argues Andrew used the '144 patent as prior art. TP Br. 45. But TP's record cites amount to nothing more than notice of the patent; e.g., there is nothing in the record as to how the patent allegedly was used as prior art, or what (if anything) Andrew's attorneys allegedly knew about the patent at the time. Second, TP argues that Andrew was motivated by competitive pressures.  But that too is irrelevant to a likelihood of infringement.  (Notably, the only testimony cited regarding Andrew's allegedly dire predicament was TP's own testimony.  JA284:13-285:7; C9:22-10:7, C16:18-17:17, C35:10-37:9).  Third, TP asserts that Andrew's defenses and counterclaims show its "culpable state of mind" (TP Br. at 46), but bringing its standards claims against TP cannot amount to knowledge of an objective likelihood of infringement.

No reasonable jury could have found willful infringement under *Seagate*, because none of the record evidence satisfies the high bar *Seagate* set. Thus, JMOL should be granted. Alternatively, a new trial is warranted because the jury verdict was clearly against the weight of the evidence.

## V.    THE LAW DICTATES JMOL ON PROMISSORY ESTOPPEL

Andrew's opening brief showed that TP is estopped from asserting the '144 patent because it intentionally made a promise to induce Andrew's action, and Andrew reasonably relied upon that promise, resulting in this lawsuit. TP's opposition raises a variety of irrelevant arguments and issues that, even if true, have no impact on fundamental undisputed facts that justify JMOL. Indeed, TP says little in response to the intention element, and says absolutely nothing about injury, thus essentially conceding half the elements of the claim. TP Br. at 52, 54. And as TP's own cases teach, JMOL is required where "there is insufficient evidence for permitting any different finding." *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443, 446 (3d Cir. 1968) (affirming grant of JMOL to party with burden of proof).

### A.    TP's REPEATED PROMISES TO LICENSE

TP repeatedly made written promises relating to its patents and standardization in the Feasibility Study, the Study Group Ground Rules, and the ETSI Membership Agreement. These documents provide independent bases for promissory estoppel. Indeed, TP *admits* it offered to license the '144 patent in its Opposition to Andrew's Post-Trial Brief in Support of Its Remaining Equitable Defenses. D.I. 340 at 18, n. 5 ("Andrew ignores that TP did offer to discuss licensing with Andrew…;" "TruePosition's offer to license did not arise….").

**Feasibility Study.** TP does not dispute that it published the Feasibility Study, nor that the language is definite and certain enough to be a promise. *See* JA223 at 3.3.5. TP also admits the Study remains available (TP Br. at 49, *see also* EA429:10-430:5; EA43520-438:10;

EA279:13-14), and that it did not revoke the promise.  EA435:13-19.  And the arguments TP

does make regarding the Study are not supported by the evidence.

First, TP argues that subsequent versions erased the promise, but the record does not

support that argument. *See* C43:5-13 (3GPP simply asked TP to formalize document); *see also*

C43:21-24 (ETSI did not tell TP to withdraw promise); JA925:13-20  (uncontroverted that it was

unnecessary to repeat the Feasibility Study promise in subsequent drafts).    Moreover, the

promise remains part of TP's submissions to ETSI, which TP made no effort to disavow.

EA435:13-19.    Second, TP says Andrew never asked for a license.  This argument is irrelevant

because even TruePosition admits that Andrew did not make a UTDOA-SDCCH product until

well after UTDOA was standardized in November, 2004.   DTX 50 (JA9-10); C2-5.   No

reasonable jury could conclude that Andrew should have asked for a license to the '144 patent

when it was not even making a control channel product.  Furthermore, given the undisputed fact

that TP did not declare the '144 patent as essential, no reasonable jury could conclude that

Andrew had an obligation to ask for a license to support its practice of standardized technology

— or that it should have even thought to inquire about a license.

**Study Group Ground Rules.**  TP promised not to assert blocking IP by joining the ETSI

U-TDOA Study Group.    The Study Group's Ground Rules state "[w]e all work with the

understanding that what we do here is create a solution that we all benefit from." JA81.  TP's

assertion that the jury was at liberty to disbelieve the Ground Rules implicate "intellectual

property, patents or licenses" (TP Br. at 50) is impermissible speculation and conjecture. *See*

*Brennan v. Norton*, 350 F.3d 399, 415 (3d Cir. 2003); *Eastern Associated Coal Corp. v. Aetna*

*Cas. & Sur. Co.*, 632 F.2d 1068, 1074-1075 (3d Cir. 1980).

TP's arguments regarding its role in the Study Group are also without support in the record. Just as TP assumed ETSI membership obligations, it also explicitly joined the Study Group and agreed to its terms. *See* JA373:12-21; JA24; JA28. Indeed, Joe Sheehan testified that TP was an "important" member, and that he accessed the Ground Rules. JA328:16-329:18; *see also* DTX 844A (JA71-82); JA327:14-A328:14. Further proof is found in the Study Group's output. *See also* JA17-18 at 1, 5. None of TP's arguments does anything to show that the jury could reasonably conclude anything other than that TP was a full Study Group participant, and that its promise was binding.

**ETSI Membership Agreement.** Upon joining ETSI, TP became bound by the ETSI IPR Policy, which obligated TP to declare its willingness or unwillingness to license any essential IP. JA70. TP advances no argument that it did not have an obligation to make this declaration.

Thus, substantial evidence shows that TP promised to license, and TP admits as much.

## B.    TP INTENDED TO INDUCE ANDREW'S ACTION OR INACTION

The record evidence shows TP calculated that ETSI (and Andrew, as member and partner), would rely upon its promises. *See* DTX 44 (JA2); DTX 45 (JA4-5); DTX 224 (JA52); DTX 901 (JA91-92). TP does not — because it cannot — point to any evidence to the contrary. Rather, it makes several arguments having no evidentiary support. *See Brennan,* 350 F.3d at 415.

First, TP generally argues "[a] reasonable juror could conclude that, in fact, "UTDOA" is not proprietary because the '144 patent does not cover the kind of UTDOA that Andrew was doing at the time." TP Br. at 52. But even assuming this is true, TP does not — because it cannot — explain how this is relevant to inducement. Second, TP argues that Andrew participated in the standards work to benefit its "UTDOA voice channel technology." But Andrew also participated in standardizing UTDOA control channel technology, which it never

would have done if only TruePosition could practice that technology in the future.  Third, TP

argues that it did not conceal the existence of the '144 patent, but that argument is irrelevant too.

What is relevant is that TruePosition never disclosed its intent to assert (i.e., its intent not to

license) the '144 patent against Andrew for practicing the standardized technology Andrew

helped create.

### C.   ANDREW REASONABLY RELIED

As explained in Andrew's opening brief, the record demonstrates reasonable reliance.  TP

gave Andrew "no indication that there were any problems toward developing the standards."

JA942:14-16.   TP also told Andrew it had no "TruePosition IPs related" to UTDOA (JA7).

Andrew's employees read the Feasibility Study, participated in the Study Group, and attended

ETSI Meetings where the IPR Policy was regularly repeated.   JA865:13-867:8; JA 867:11-17;

JA914:9-18.  Mr. Garner reasonably thought "if it's a standard, then, certainly, we expect to have

the ability to practice that… standard" because "the basic concept of standards is that… anyone

that participates in the standard is able to practice."  JA940:5-13; JA942:5-7; *cf. Broadcom*, 501

F.3d at 314.  Mr. Garner also testified there was "no way" he "would have committed resources

for this effort if we weren't going to be able to take advantage of the standard work." JA942:5-7.

TP's opposition consists only of attorney argument.  TP argues that Andrew could not

have reasonably relied due to the timing of the Settlement Agreement, the covenant not to sue,

and the integration clause.  But these arguments have no support in the record.  The timing of the

Agreement actually supports Andrew's reliance because it was signed after the standards work

had begun.  PTX15R (JA141-157).  And, as a matter of law, the covenant not to sue did not

forbid anything.  *Id.* at ¶ ¶  8, 9.  Furthermore, the integration clause cannot legally be stretched

to supersede the separate promises made by TP.  *See Carlson v. Hallinan,* 925 A.2d 506, 516,

522-23 (Del. Ch. 2006) (stockholder agreement that "constitutes the entire understanding

between the parties with respect to the subject matter" did not extend to unaddressed compensation and profits issue); *Brady v. i2 Technologies Inc.*, No. 1543-N, 2005 WL 3691286, *3 (Del. Ch., Dec. 14, 2005) ("the plain and ordinary meaning of 'subject matter' is sufficiently narrow in its scope so as not to conflate" topics); *Mytee Prods., Inc. v. H.D. Prods., Inc.*, No. 05-2286, 2007 WL 1813765, *6 (S.D. Cal., June 22, 2007) ("the court concludes that although the written agreement is fully integrated with respect to 'the subject matter contained in it,' the parties did not by this integration clause intend to preclude an oral agreement involving a different subject matter"); *CreditSights, Inc. v. Ciasullo*, No. 05-345, 2007 WL 943352, *5 (S.D.N.Y., Mar. 29, 2007) ("a subsequent contract not pertaining to "precisely the same subject matter" will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract"); *see also* JA453:10-14 (TP admits "[t]wo companies could be in litigation on one issue today, but also today be working on a joint venture or partnership or joint effort on something else."). Moreover, nothing in the Agreement hinted that TP interpreted the patent to apply to the UTDOA standard, or that TP would assert the patent against standardized technology.

### D.     ANDREW WAS INJURED FROM ITS RELIANCE

TP makes no opposition to the injury element.

Because the undisputed record evidence demonstrated that Andrew has proven its promissory estoppel claim, TP should be promissorily estopped as a matter of law. At minimum, a new trial is warranted on the issue.

## VI.     THE LAW DICTATES JMOL ON FRAUD

As shown in Andrew's opening brief, the overwhelming weight of the evidence supports a finding that TP committed fraud. TP's arguments to the contrary are unsupported by the record. Andrew's motion should be granted.

### A.    TP HAD A DUTY TO DECLARE THE '144 PATENT AS ESSENTIAL

TP concedes that: (a) a misrepresentation arose if it had a duty to disclose the '144 patent

to ETSI; and (b) in turn, a duty to disclose arose if the '144 patent is essential to the ETSI

standard. TP Br. at 55. TP instead argues the '144 patent is not essential, and cites the ETSI IPR

Policy. But TP tellingly redacts from its quote the language relating to options, which reads:

> Section 15.11. "STANDARD" shall mean any standard adopted
> by ETSI <u>including options therein</u> or amended versions...
>
> Section 15.12. "TECHNICAL SPECIFICATION" shall mean any
> Technical Specification (TS) adopted by ETSI <u>including options
> therein</u>...

JA215-216 at 15.11-15.12 (emphasis added).

The meaning of the Policy is "plain and unambiguous," and thus "binding effect should

be given to its evident meaning." *Marino v. Cross Country Bank*, No. 02-65, 2007 WL 1810485,

*2 (D. Del., June 25, 2007) (quotation omitted). The jury could not make a finding inconsistent

with the plain meaning of the Policy; the only legally correct conclusion is that there was a duty

to declare the '144 patent to ETSI as essential, and that TP misrepresented a material fact.[10]

TP's argument that the jury could choose between conflicting evidence here is simply wrong.

TP Br. at 58.[11]

---

[10]  Interpretation of the contract is not an inference to be made for the nonmovant. *See Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F.Supp. 231, 236 (D. Del. 1996) (despite the fact that "[a] court ruling on a Rule 12(b)(6) motion must take as true the well-pleaded facts as alleged in the plaintiff's complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff," a Court need not "accept as true the construction of the contract proffered by the plaintiff.").

[11]  TP's citation to *Rambus* is unavailing. *See* TP Br. at 57 (citing *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081 (Fed. Cir. 2003)). In *Rambus*, the Federal Circuit analyzed the Joint Electron Device Engineering Council's ("JEDEC's") IPR policy because it required "disclosure of patents *related to* the standardization work of the committee" (*id.* at 1098-1099) (emphasis added); at issue was whether Rambus had any patents or applications relevant to any part of the standard at the time Rambus was a member. The Federal Circuit found that the policy required disclosure of patents that were "reasonably...necessary to practice the standard" (*id.* at 1100) and that Rambus did not have a duty to disclose because its patent claims were not incorporated into the standard at the time Rambus was a member. *Id.* at 1104. Here, the ETSI IPR policy is clear (*see* above at § VI(A)), and TP itself repeatedly testified that the '144 patent is essential to the control channel "option." *See*

### 1.    TP's "Implementation" Argument Is Not Supported

In order to escape the clear language of the ETSI IPR Policy, TP makes a new argument

that control channel UTDOA is an "implementation" of an option.  TP Br. at 58.  However, this

was not the evidence TP presented at trial, even on direct examination:

> Q.    Would [the '144 patent] cover the time difference of arrival
> on the control channel option?
>
> A.    Yes it would.
>
> ***
>
> Q.    If you do U-TDOA on the control channel as, which is an
> option in the GSM standard, it is your position, TP's
> position, that the '144 patent is essential to the option in the
> standard, is that right?
>
> A.    I believe so, yes.

JA286:15-17; JA289:7-11; *see also* JA335:21-24; JA277:23-278:1.  TP's "implementation"

argument should be rejected.  There is no dispute as to these facts, and there can be no dispute as

to the proper inferences to be drawn; the legal effect is thus a question of law and the jury cannot

be permitted to find to the contrary.  *Jopek v. New York Cent. R. Co.*, 353 F.2d 778, 783-84 (3d

Cir. 1965).

### B.    TP Acted With At Least a Reckless Disregard for the Truth

Andrew's opening brief showed that TP was aware of its obligations, and that a

reasonable jury should have concluded that TP had at least reckless disregard for the truth when

it failed to declare its unwillingness to license the '144 patent.  *See, e.g.*, JA288:8-20 (TP was

aware of disclosure requirements and made an affirmative decision not to declare); DTX 1065

(JA94-96); DTX 1066 (JA97-99); DTX 1069 (JA100) (all showing TP's own standards manager

---

JA289:7-11, JA335:21-24, JA277:23-278:1, JA416:11-25.  If *Rambus* is relevant at all, it confirms the validity of ETSI's policy because it held blocking patents should be disclosed.  Notably, the Federal Circuit stated "the disclosure duty operates when a reasonable competitor would not expect to practice the standard without a license under the undisclosed claims."  *Rambus*, 318 F.3d at 1100-01.  Here, TP promised to license.  *See* § V.

25

urged TP to declare patents as essential). Each piece of evidence demonstrates that TP had "no reasonable ground for believing" it did not have to declare the '144 patent if it interpreted it as covering the standards it put forth. *Gagne v. Bertran*, 43 Cal.2d 481, 487-88 (Cal. 1954).

TP points to no record evidence that would allow the jury to conclude that TP was not at least reckless; instead TP makes legally erroneous arguments. *See* TP Br. at 55-58. TP first argues that this state-of-mind element requires knowledge of falsity, but even according to the case cited by TP, the element is satisfied if recklessness is shown. *Czarnik v. Illumina, Inc.*, 437 F.Supp.2d 252, 259 (D. Del. 2006); *compare with* TP Br. at 55. TP also again argues that the '144 patent did not need to be declared because control channel UTDOA is an "implementation." *See* TP Br. at 55-58. But as shown above at pp. 24-25, this is legally incorrect because the ETSI IPR Policy defines essentiality and dictates that options are included in the inquiry. JA215-216. TP itself repeatedly testified that the '144 patent is essential to the control channel "option." JA289:7-11, JA335:21-24, JA277:23-278:1, JA416:11-25. The only reasonable conclusion is that TP was at least reckless in its failure to declare.

## C.  TP HAD AN INTENT TO MISLEAD ANDREW

Andrew's opening brief also showed that TP had an intention to mislead because standardization would be impossible unless UTDOA was perceived as "multi-vendor." *See, e.g.,* JA91-92; JA2; JA4-5; JA52. TP cites no contrary evidence, but only offers impermissible conjecture. *Brennan*, 350 F.3d at 425. Moreover, TP's importation of its essentiality argument into this element is erroneous — the relevant inquiry is whether TP intended to mislead Andrew. TP did not tell Andrew it would sue Andrew for practicing control channel UTDOA location when inducing Andrew's standards participation. *Compare with* TP Br. at 59-60. Moreover, TP undercuts its position on intent (and its motion for a permanent injunction) by admitting that standardization support was based on perceived future "price competition" because price

26

competition requires two vendors. TP Br. at 45. In sum, the record evidence is clear; the only reasonable conclusion is that TP intended to mislead Andrew.

### D.     ANDREW'S RELIANCE WAS REASONABLE

Andrew's opening brief also showed that its reliance on the Feasibility Study, the Study Group Rules, and TP's explicit representations was reasonable. The record is undisputed that Andrew would not have joined the standards work if it would not "be able to take advantage" of it because Andrew had no interest in putting itself at a "competitive disadvantage." JA941:20-942:7; JA882:14-22. It is also undisputed that Andrew "would not, in all reasonable probability, have entered into" standardization save for TP's misrepresentations and nondisclosures, making JMOL appropriate. *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 976 (Cal. 1997) (outlining element of actual reliance).[12]

Each of TP's arguments is legally wrong or irrelevant. <u>First</u>, TP argues that the Settlement Agreement negates reliance, but that is legally erroneous for the reasons set out on pp. 22-23. <u>Second</u>, TP argues that the patent was publicly available, but that is irrelevant because notice of the patent's existence gave Andrew no information about TP's unwillingness to license the '144 patent. <u>Third</u>, TP argues that Andrew joined the standards effort at the behest of AT&T, but that too is irrelevant; TP's speculations about Andrew's motivations do not detract from the fundamental uncontroverted evidence that because of TP's failure to declare, Andrew believed there was no blocking IP, and worked to help standardize that technology because of that belief. <u>Fourth</u>, TP argues that Andrew benefited from the voice channel portion of standardization, but that ignores that Andrew was not permitted to benefit from the control channel option of the technology it helped standardize.

---

12  Despite TP's protestations, *Engalla* is perfectly applicable, as the elements of fraud do not change depending upon whether an appeal or motion for judgment as a matter of law are at issue. *See* TP. Br. at 59, fn. 12.

### E.   ANDREW WAS INJURED FROM ITS RELIANCE

TP does not address Andrew's injury, which is self-evident from this lawsuit. Thus, TP concedes this element.

Because the undisputed record evidence demonstrated that Andrew has proven its fraud claim, it should be found, as a matter of law, that TP committed fraud. At minimum, a new trial is warranted on the issue.

## VII.   THE LAW DICTATES JMOL ON TP'S DAMAGES CLAIMS

In its opening brief, Andrew showed that JMOL is warranted because TP's $45.3 million lost profits award is not based on substantial evidence. TP's opposition shows that there is no reasonable basis for the award because it simply cites unsupported conclusions and assumptions advanced by its damages expert, which is legally inadequate.

### A.   ACCEPTABLE NON-INFRINGING ALTERNATIVES WERE AVAILABLE

TP does not dispute that a GSM system that accomplishes idle mode location using the TCH would be an acceptable non-infringing alternative; it only disputes whether it was "available."[13] TP Br. at 64-70. The record evidence establishes that it was.

**Fact Witness Admissions.** Joe Sheehan, TP's President, repeatedly testified at trial that an acceptable non-infringing alternative was available. JA299:13-25; JA363:12-364:1. TP's arguments to the contrary are not supported by the record. Mr. Sheehan's testimony plainly referred to Andrew's ability to use the TCH to "locate" a phone when "a person isn't talking on"

---

13   TP cites *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996), for the proposition that a non-infringing alternative must actually be on the market to be available. TP Br. at 66, 67 n.17. But the Federal Circuit rejected the *Zygo* language as dicta and expressly limited *Zygo's* holding to its facts. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1352 (Fed. Cir. 1999). See *also id.* at 1349 (emphasizing "'to be an acceptable non-infringing substitute, the product or process must have been available or on the market at the time of infringement;'" further noting that the "court's precedent . . . permits available alternatives—including but not limited to products on the market—to preclude lost profits damages"). Here, the evidence shows that an acceptable non-infringing GSM system was feasible, and thus available.

it. JA363:12-16; *see also* JA360:14-362:9; JA299:23-25. Similarly, Robert Gross, TP's former standards representative, gave the same testimony (*see* Op. Br. at 67), and TP's assertion assertions to the contrary are not supported by the record. *Compare* TP Br. at 67-68 *with* JA957:6-9; JA958:2-19.

**Expert Witness Not Technically Qualified.** TP cites its damages expert, Carla Mulhern, but this is legally insufficient. TP Br. at 68. Ms. Mulhern, by her own admission, is not qualified to provide opinions on these technical issues (JA706:24-707:6), and she relied upon others' representations. JA725:1-3; C40:3-18. Her assumptions are thus given no deference; "where an expert's opinion is predicated on factual assumptions... those assumptions must also find some support in the record." *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (quotation omitted).[14] Yet TP offered no evidence to support Ms. Mulhern's assumptions that the software and network changes she described would be necessary, let alone that they would be prohibitive of implementing the non-infringing alternative.[15] Thus, as a matter of law, her conclusory assertions cannot constitute substantial evidence to support the damages award.

**Design-Around Not Co-Extensive.** TP also argues that Andrew has not developed a non-infringing alternative (TP Br. at 64, 69), but this is legally irrelevant. A design-around is a potential type of non-infringing alternative[16], but the two concepts are not coextensive. Whether

---

14 "[S]ince the factual foundation necessary to support an expert's opinion is not a matter peculiar to patent law," the Federal Circuit looks to regional circuit law to determine whether expert opinions have a sufficient factual basis. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) (citation omitted).

15 Ms. Mulhern herself admitted that she had "seen no evidence" to support her conclusion regarding whether the specific RAN vendor in this case would participate in making any required changes. JA724:25-725:6.

16 *See, e.g., Hilton Davis Chem. Co. v. Warner-Jenkinson Co., Inc.*, 62 F.3d 1512, 1520 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) (a design-around is an attempt "to use the patent disclosure to design a product or process that does not infringe, but like the claimed invention, is an improvement over the prior art").

Andrew tried to create a design-around is irrelevant to whether such an alternative *already* was available, as multiple witnesses testified it was.

In sum, the only competent record evidence established that an acceptable non-infringing alternative was available.

### B.     TP SAID IT WOULD LICENSE THE '144 PATENT TO ALL APPLICANTS

As discussed above and in Andrew's opening brief, TP promised to license the '144 patent on reasonable, non-discriminatory terms. *See* Br. at 50; *see also* § V, *supra*. In light of this promise, the jury's lost profits award is unreasonable and should be overturned. Indeed, even short of a finding of promissory estoppel, the promise TP made in the Feasibility Study sets the standard for determining reasonable compensation for using the '144 patent. JA223 at 3.3.5; *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1173 (7th Cir. 1997) ("if Ty [had] licensed all who want to make Beanie Babies, appropriate compensatory relief in this case would be to make GMA pay for the license at Ty's standard rate...").[17] Because TP was willing to license the '144 patent to any applicant at a "reasonable, non-discriminatory" rate, the lost profits award is not a fair measure of compensation. Thus, even if this Court does not grant JMOL on promissory estoppel, TP's damages should be remitted to a reasonable royalty.[18]

---

[17]  Ty is a copyright case, but the Supreme Court has noted that the Copyright Act's damages provisions are modeled on the Patent Act's. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399-401 (1940). Moreover, given TP's representation in the Feasibility Study that it was willing to license the '144 patent to all applicants, the Seventh Circuit's reasoning directly applies to this case.

[18]  In its opening brief, Andrew suggested 25% as a reasonable rate given TP's failure to offer any evidence at all regarding a reasonable royalty. This suggestion is based on the "25% rule" advocated and previously employed by TP's damages expert. JA728:4-730:4; JA733:25-734:6. TP argues that applying the rule in this case would be inappropriate "without detailed further analysis." (TP Br. at 71 n.18.) But TP itself refrained from offering any further analysis at trial.

### C. TP CANNOT GET DAMAGES ON COMPONENTS NOT YET SHIPPED

TP does not dispute that it can only get damages under 35 U.S.C. § 271(f) on components that Andrew already has shipped from the United States. *See* Op. Br. at 70-71. TP also does not dispute that the jury's damages award is based on TP's *entire* bid to STC and that Ms. Mulhern's lost-profits testimony corresponded to the entire bid. *Id.* at 71. TP also does not dispute that Ms. Mulhern failed to adequately support her conclusion regarding damages associated with just the actual number of sites to which Andrew has shipped equipment. *Id.* at 71-72. Rather, TP conclusorily says the § 271(f) issue is "moot" because "the jury's verdict under 271(a) is fully supported by the evidence." TP Br. at 62 n.14. But if this Court finds that Andrew is not liable under § 271(a), then the jury's verdict should be set aside, and a new trial on damages ordered under § 271(f). Alternatively, the award should be remitted to the amount corresponding to the alleged infringement associated with Andrew's shipments to date. *See* Op. Br. at 72.

### D. TP CANNOT GET DAMAGES BASED ON THE ENTIRE CONTRACT

Given the record evidence, it is unreasonable to conclude STC will award all phases of the project to Andrew; indeed Andrew has only received commitments for the first three phases of a multi-part rollout. *See* Op. Br. at 73-74. TP argues that Andrew has received the entire contract, and again relies on the unsupported testimony of Ms. Mulhern.[19] But as explained above, at p. 29, her assumptions are given no deference because "where an expert's opinion is predicated on factual assumptions... those assumptions must also find some support in the record." *Shaw*, 920 F.2d at 1142. TP's own witnesses show that Andrew has not been awarded the entire contract. *See* JA703:10-14 (uncertain whether STC will award additional portions of

---

19  Tellingly, TP asserts a fallback position — that Andrew is likely to receive the rest of the contracts for the project. TP Br. at 72. TP again cites Ms. Mulhern's unreliable testimony. *Id.* Again, there is no record evidence supporting this assumption of Ms. Mulhern's. Rather, substantial evidence establishes that the systems are interoperable. JA948:6-20; JA341:21-342:20.

"the entire sale" to Andrew); JA341:21-342:20 (TP has continued to bid the STC deal; "optimistic" that TP still would "get a deal."). Indeed, TP admits that Ms. Mulhern had to account for "future uncertainty" regarding STC's decisions.[20]  TP Br. at 72.

It is also unreasonable to conclude STC will buy the exact equipment Andrew proposed for all phases. Indeed, TP does not dispute the uncertainty. Ms. Mulhern admits that she has not seen any "actual evidence" regarding how many additional sites, if any, STC will order, and she agreed that future sales may exclude the accused products. JA717:19-21; JA718:10-13; JA718:23-719:19. Thus, a conclusion that future phases of the rollout will happen as envisioned in the 2004 bids is pure speculation.

It is also unreasonable to conclude STC would award all phases as per TP's bid. TP argues that but for Andrew's allegedly infringing competition, STC would have paid a higher price than it has been willing to pay Andrew, but offers only Ms. Mulhern's testimony, which is unsupported and given no deference. *Shaw*, 920 F.2d at 1142.

Moreover, Ms. Mulhern's opinion is not just unsupported, but she also testified to the contrary — she admitted purchasers such as STC often face budgetary restrictions. *See* JA735:9-11.  To get around this fact, Ms. Mulhern engaged in improper speculation and conjecture — she simply added years to her estimate of the project's total completion time, which she stated would allow STC to spread out its expenses over time to meet TP's price. JA735:12-736:3. Ms. Mulhern did not, however, explain how this added cost and completion time might influence STC's initial incentives to undertake the project, let alone to complete it. Her assumption that STC would agree to accept the proposed price and timing, even in a one-supplier market, again is

---

20  TP does not explain, however, how the "discount rate" Ms. Mulhern used purportedly corrects for the possibility that Andrew will not make future sales to STC. JA696:3-18. TP argues that she used this figure to "discount[] to present value," but such adjustments typically are made to account for inflation and the time-value of money, which are separate considerations. TP Br. at 72.

impermissible conjecture.[21]  *See Brennan*, 350 F.3d at 415.  Indeed, TP provided no basis for the

jury to conclude that STC would act any differently in a relationship with TP than it does with

Andrew now.[22]

In sum, TP's damages award based on its full asking price for a kingdom-wide rollout is

thus impermissibly speculative, and JMOL should be granted.  *See, e.g., Shockley v. Arcan, Inc.*,

248 F.3d 1349, 1363-64 (Fed. Cir. 2001) (vacating lost profits award "based on evidence derived

from speculative assumptions").  Alternatively, the Court should grant Andrew a new trial on

damages or enter remittitur capping TP's damages at an amount reflecting STC's actual

commitments to Andrew.  *See* JA968:10-977:10; Op. Br. at 76.

## VIII.  ANDREW'S JMOLS ARE PRESERVED

TP makes a procedural argument that Andrew has waived its right to move for JMOL on

basically every claim and defense in this case.  TP Br. at 11.  TP is wrong.  TP already made this

argument in response to Andrew's October 10, 2007 E-Mail Request for Emergency Relief,

when TP stated that Andrew had only preserved three of the eleven bases for its JMOL motion.

C1.  Despite TP's argument, the Court issued a scheduling order recognizing that Andrew had

"set[] forth 11 grounds for granting JMOL," and allowed briefing to proceed on all eleven

---

21  Indeed, as described in Andrew's opening brief, the evidence regarding STC's actual behavior in its contracts
with Andrew suggests that it would not simply accede to TP's terms.  *See* Op. Br. at 74-75.  Notably, the
Federal Circuit has stated the "but for" analysis used to determine lost profits in patent infringement cases is the
same as in contract cases.  *Standard Havens Prods., Inc. v. Gencor Indus.*, 953 F.2d 1360, 1375 (Fed. Cir.
1991).  And the Third Circuit has expressed "serious reservations about the validity of expert testimony
[regarding lost profits] based on prior predictions of sales for a given period when actual performance data for
that same time span are available."  *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991).

22  By TP's own arguments, STC's post-bid behavior shows how it would, in fact, behave in the hypothetical one-
supplier market.  As described above, TP asserts that Andrew has actually or de facto already won the contract
for the entire rollout.  In that case, TP must concede that STC's present dealings with Andrew demonstrate how
STC behaves in the absence of competition among its suppliers.  As described in Andrew's opening brief, the
evidence at trial established that STC has instituted price caps at each phase of the project, has so far only
purchased equipment for a limited rollout, and has refused to purchase ongoing maintenance or spare equipment
at any level near what the parties included in their original bids—all this, TP claims, when STC has already
committed to dealing exclusively with Andrew.  *See* Op. Br. at 74-75.

grounds. D.I. 320 at 1. TP's assertion that Andrew did not properly preserve its right to bring a Rule 50(b) motion on all eleven grounds is both incorrect and moot in light of the Court's Order.

###### A.    ANDREW DID NOT NEED TO MOVE FOR JMOL ON ITS OWN CLAIMS

Without citation to any legal authority, TP argues Rule 50 required Andrew to move for JMOL on its own claims. TP Br. at 12-13. TP is wrong. Rule 50 addresses granting JMOL <u>against</u> a party; it does not permit a party to move for JMOL on its own claims. Fed. R. Civ. P. 50(a). This is because the purpose of Rule 50 is to give the party against whom the motion is made an opportunity to correct deficiencies in its case, if possible. Fed. R. Civ. P. 50 1991 Amendment Advisory Notes. Andrew had no obligation to move for JMOL on its own claims.

###### B.    ANDREW PRESERVED JMOL ON ALL OF TP'S CLAIMS

TP argues Andrew waived almost all of its JMOLs on TP's claims because Andrew's pre-verdict motions allegedly were too general. TP Br. at 11-14. But the Federal Circuit, whose law governs here,[23] has rejected TP's argument that general pre-verdict JMOLs are insufficient to preserve post-verdict JMOLs. *See, e.g., Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1324-25 (Fed. Cir. 1991) (holding defendant could advance a post-trial JMOL based on a pre-verdict oral motion that "very briefly we move for a directed verdict on the issue of noninfringement of claims 2 and 31 of the 082 patent on the grounds that the evidence is insufficient."), *cert. denied*, 504 U.S. 974 (1992); *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996) (general, oral pre-verdict JMOL motion sufficient to preserve post-verdict JMOL). Here, all of Andrew's JMOLs are preserved because Andrew made its general motions, explained exemplar theories in detail, and made clear that it had other

---

23  "Federal Circuit law governs whether arguments made in pre-verdict JMOLs are sufficient enough to preserve specific patent law issues for a post-verdict JMOL." *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, 03-1431, 2007 WL 518804, *4 (N.D. Cal., Feb. 13, 2007) (citing *Junker v. Eddings*, 396 F.3d 1359, 1363 (Fed. Cir. 2005)); *Malta*, 952 F.2d at 1324-25.

specific arguments. *See* JA784-796; *e.g., id.* at JA784 (Andrew's counsel moving for JMOL of

noninfringement of all claims); *id.* (Andrew's counsel discussing DOE); *id.* (Andrew's counsel

moving for JMOL on lost profits); *id.* at JA785-787 (Andrew's counsel discussing offer for sale);

*id.* at JA788:9-11 ("I would like the opportunity to address the damages case…"); JA788-792

(discussing TP's failure to compare  required means-plus-function structure for claims 1 and 22).

## IX.    CONCLUSION

For all of the above reasons, Andrew respectfully requests judgment as a matter of law in

its favor, or alternatively, a new trial on the issues presented above.

> Respectfully submitted,
>
> YOUNG CONAWAY STARGATT
> & TAYLOR, LLP
>
> Josy W. Ingersoll (No. 1088)
> Andrew A. Lundgren (No. 4429)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> 302-571-6600
> *alundgren@ycst.com*
>
> *Attorneys for Defendant Andrew Corporation*

OF COUNSEL:

John M. Desmarais, P.C.          Michael A. Parks
Gregory S. Arovas, P.C.          Rachel Pernic Waldron
Avinash S. Lele                  Shira J. Kapplin
Todd M. Friedman                 Regan A. Smith
Jason Choy                       KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS LLP             200 East Randolph Drive
153 East 53rd Street             Chicago, Illinois  60601
New York, New York 10022         (312) 861-2000
(212) 446-4800

Dated:  December 14, 2007

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on December 14, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> James D. Heisman, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE 19899
> (302) 658-9141
> Email: jheisman@cblh.com

I further certify that on December 14, 2007, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

### BY ELECTRONIC MAIL

> Paul B. Milcetic, Esq. [pmbilcet@woodcock.com]
> Daniel J. Goettle, Esq. [dgoettle@woodcock.com]
> Woodcock Washburn LLP
> Circa Centre, 12th Floor
> 2929 Arch Street
> Philadelphia, PA  19103

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> _Andrew A. Lundgren_

> Andrew A. Lundgren (No. 4429)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> alundgren@ycst.com
> *Attorneys for Defendant Andrew Corporation*