# Opposing Counsel's Response to E-Mail Request for Emergency Relief

**Opposing Counsel's Response to E-Mail Request for Emergency Relief**

1. Case Number:              05 -cv- 747 -SLR

2. BRIEFLY state your response to the **emergency** request made by opposing counsel:

Andrew is trying to delay resolution of this matter and has misrepresented the parties' discussions. After the Court entered judgment in TP's favor, Andrew, without conferring with TP, filed eleven JMOLs unaccompanied by briefs, only three of which were preserved at trial. It then informed TP that Andrew also intended to file JMOLs relating to its "equitable claims" and would ignore TP's already briefed motions for injunctive relief and enhanced damages until the Court resolved all of Andrew's motions.  Andrew waived most of the motions that it proposes to brief, but to the extent the Court allows briefing, TP has proposed the following schedule: 10/19 for opening briefs; 11/9 for responses; and 11/21 for replies. TP has proposed a parallel schedule for TP's motions: 10/22 for responses and 10/31 for replies.  TP seeks timely resolution of its motions in the interest of efficiency and fairness.

*Any text added to beyond the limits of this space will be disregarded by the court.

3. Name of local counsel submitting this response: James D. Heisman (#2746)

4. Today's Date: 10/11/07

**********************************************************************************************

# C 1

# PTX 142



December 11, 2004

Andrew Network Solutions
19700 Janelia Farm Boulevard
Ashburn, VA 20147

Procurement Department
Saudi Telecom Company
Riyadh
Kingdom of Saudi Arabia

Subject:  Letter of Offer for the GSM VAS Project

Dear Sir:

Andrew Corporation is pleased to offer to Saudi Telecom Company our proposal and
response for the GSM VAS Project.  Andrew has responded to all of the requirements for
UTDOA LBS functionality in a manner where by STC may choose best-in-class
functionality for Enhanced Cell ID/AGPS and UTDOA from different vendors, and yet
maintain a seamless, standards compliant network going forward.  Specifically, Andrew
has proposed a UTDOA solution that operates with our BSS partners both technically and
programmatically.  We are prepared to work as an integrated team with our strategic
partner Ericsson to deliver UTDOA functionality to the Kingdom to support commercial
and security needs.

Included in our offer package is a Commercial Tender Response containing Volumes 1,
2, 3, 4 and 5, as requested in Part A of the Tender.  Also included is a Technical Tender
Response containing Volumes 6 and 7.  These two Tender Responses have been
delivered in separate sealed envelopes.  All response material is provided in both printed
form and on CD ROM.  The format of the documents on the CD ROM is FORMAT.

Andrew is bringing this offer to STC through our partner -AL-MISEHAL GROUP. Al-
Misehal Group excels as a foremost supplier of high technology solution and services
throughout Saudi Arabia, with offices in Riyadh, Jeddah and Dammam. Al-Misehal
Group and their subsidiary NoviaCom is a long contractor and supplier to STC GSM
projects including E4 to E6, the Roads & Villages project, and their knowledge and
installation capabilities in the STC GSM network will give Andrew/Al-Misehal Group an
advantage to STC for a fast technology and implementation program.

**C 2**

**PTX 142**

Plaintiff's
EXHIBIT NO. 189
KY   10/16/06



The points of contact for Andrew on this offer are:  (must be in conformance with Section 2, page 14 of Part A, we're getting all of this for the US contact now)

Kingdom contact:    Vick Khalil Mamlouk, General Manager MENA
                    Andrew Middle East
                    Atrium Building, Suit 228
                    Shiek Zayed Road, P.O.Box 500428
                    Dubai, UAE
                    Tel 00971 4 3433701
                    Fax 00971 4 3433752
                    Mobile 00971 506542331
                    Saudi Tel 00966 1 4647734
                    Saudi Fax 00966 1 4647297
                    Email: vick.mamlouk@andrew.com

Local Partner       Almisehal Group
                    Sheik Adil Almisehal
                    c/o Mr. Rob Wood
                    Tel 00966 1 4610808 ext. 143

US contact          Mohamed Eissa, Director & GM
                    Andrew Network Solutions Group
                    Andrew Corporation
                    10500 W, 153rd Street
                    Orland Park, IL 60462, USA
                    Tel 001 708 3495671
                    Saudi Mobile 00966 500347227
                    US Mobile 001 708 7049447
                    Email: mohamed.eissa@andrew.com

Andrew looks forward to an STC decision on our offer and the opportunity to serve STC and its customers and partners.

Sincerely,


Mohamed Eissa,                          Vick Khalil Mamlouk,
Director & General Manager              General Manager MENA
Andrew Network Solutions Group          Andrew Middle East


# C 3

# PTX 142

Document 2 of 36

```
PRODBEG        =  AND_EF0001193
PRODEND        =
TREATMENT      :  Confidential Information
                  TPI v. Andrew, CA No. 05-00747-SLR
FILENAME       :
ATTACHMENT     :
FILEPATH       :  \\Lpg1\Vol1\Data1\TPI-L8\Confidential\AND002\Nativefiles\AND_EF0001193.doc
FILEPATHNEW    :
EDITINFO       :  20060915 105142 Eas [MA4YDA-11494] calabret;
                  20060909 003857 Eas [J6WG85-11494] calabret;
                  20060909 001508 Eas [RQ2834-11494] calabret;
                  20060516 213931 Eas [CJOLWR-11494] pperdue;
```

**C 4**

**PTX 142**

Document Properties
Title:          Letter of Offer
Author:         Joe Kennedy
Template:       Normal
Last saved by:  Lito Samia
Revision number:      11
Application:    Microsoft Word 9.0
Total editing time:      00:19:00
Created:        2004/12/10 10:57:00
Last saved:     2004/12/10 12:21:00
Company:        Andrew Corporation

**C 5**

**PTX 142**

# PTX 232



Sandi Telecom Company
Riyadh
Kingdom of Saudi Arabia
October 24, 2005 (21/9/1426H)

Attn:
Procurement & Contract Department

Subject:
Confirmation of Receipt of Andrew Corporation's Main
Contract Documents and of GSM VAS Project No.
0447528

Dear Sir:

Please confirm receipt of Andrew
Corporation's Main Contract Documents as
pertaining to the above to the GSM VAS Project
no. 0447528.

These documents are listed as follows:

1. STC Main Contract
2. Andrew ......... Documents .........
   Bond Number 0458 from The Saudi
   British Bank dated October 15th, 2005
3. Andrew Corporation Bank Acceptance
   (Andrew Document No. 1000)
4. Andrew Corporation ................
   Letter for Phase I for Project 0447528
   (Andrew Document No. ........) dated
   9/30/2005
5. Andrew Corporation Terms and
   Conditions (Andrew Document No.
   1002)
6. Andrew Corporation Technical
   Proposal (Andrew Document No.
   1003)
7. Andrew Corporation Response to STC
   VASCommSpecS04 (Andrew
   Document No. 1004)

Please be advised that our signature on the
Main Contract item #(1) is valid based on
acceptance by Saudi Telecom Company of all
submitted contract items (1-7) as listed
above. ....... you have comments or
concerns, please respond within one week.

Very truly yours,

Terry Garner
Group President
Andrew Network Solutions Group
Andrew Corporation

C 6

PTX-232

Document 88 of 96

PRODBEG        = AND_EF135778
PRODEND        =
TREATMENT      : Confidential Information
                 TPI v. Andrew, CA No. 05-00747-LSR
FILENAME       : Letter.AND_EF0000528.jpg
ATTACHMENT     :
FILEPATH       : \\boxavolumagmintelitf\Concordance\AND040\AND_EF00087008\IMGINDEX.EF135778.JPG
FILEPATHNEW    :

# Excerpts of Trial Transcripts

Sheehan - direct                              157

1    ***          (Plaintiff's Exhibit No. 94 was received into

2    evidence.)

3    BY MR. MILCETIC:

4    Q.    Now, when did TruePosition respond to this request for

5    proposal?

6    A.    I believe we responded in late 2004.  I think in the

7    December time frame.

8    Q.    Okay.

9                                  - - -

10   Q.    Is it your understanding that Andrew Corporation also

11   responded?

12   A.    Yes.

13   Q.    And when would that have been?

14   A.    I assume roughly the same time frame.

15   Q.    I'd like you to take a look at Exhibit PX-320 and tell

16   me whether you recognize that document.

17                                 - - -

18

19

20

21

22

23

24

25

**C 8**

1

2   A.    Did you say 320?

3   Q.    Yes.

4   A.    Don't believe I have 320 in this folder.  Can someone

5   provide me again?

6   Q.    All right.  Was the Saudi contract important --

7                 MR. MILCETIC:  May I approach?

8                 THE COURT:  Yes, you may.

9                 (Mr. Milcetic handed documents to the witness.)

10                THE WITNESS:  Thanks, Paul.

11  BY MR. MILCETIC:

12  Q.    Let me step back for a second.  Do you recognize

13  Exhibit 320?

14  A.    Yes, I do.  It's our response to that Saudi Telecom

15  proposal.

16                MR. MILCETIC:  I'd like to offer in evidence

17  Exhibit 320.

18                MR. DESMARAIS:  No objection.

19                (Plaintiff's Exhibit No. 320 was received into

20  evidence.)

21  BY MR. MILCETIC:

22  Q.    Now, was this contract important to TruePosition?

23  A.    Yes.  Yes, it was.  This was -- although not, you

24  know, not as large as the contracts that we already had

25  here in the U.S.  This was kind of a flag -- a flagship

**C 9**

1    opportunity in a key new area of the marketplaces, which

2    I referenced earlier, the area of national security and

3    terrorist tracking, which was obviously very relevant,

4    especially in that part of the world, the Middle East,

5    and Saudi Telecom was viewed as the largest and most

6    prominent operator or wireless carrier in that part of

7    the world.

8    Q.    Now, you see up there on the screen, it actually says

9    GSM; right?

10   A.    Yes.

11   Q.    So the Saudi network, what kind of network is that

12   cellular network?

13   A.    It is a GSM network.

14   Q.    Okay.  Your -- you mentioned earlier you had patents.

15   Do you remember that?

16   A.    Yes.

17   Q.    How many again?

18   A.    Me, personally?

19   Q.    Yes.

20   A.    I think between 15 and 20.

21   Q.    Do any of your patents talk about control channels?

22   A.    I believe so, although I don't recall for sure.

23   Q.    In a GSM cellular network, is there a control

24   channel?

25   A.    Yes, there is.

**C 10**

1    Q.    What is it?

2    A.    The most prominent one we refer to is the stand-alone

3    dedicated control channel, also known as the DSCCH.

4    Q.    Why else was this, if anything, why else was this

5    contract important to TruePosition?

6    A.    I think it's -- it was our first international

7    opportunity.  Like I said before, it was in a part of the

8    market with a flagship customer that we knew was going to

9    be a big -- big part of the growth of the industry.  And

10   it was an opportunity for us to sell a product targeted at

11   this terrorist -- terrorist tracking application.

12   Q.    When did you first realize that you had lost the Saudi

13   contract?

14   A.    I believe it was the middle of 1995, we had been told

15   by people within Saudi Telecom that we had won the business,

16   we had been evaluated by them to be superior technically.

17   We had seen copies of their score sheets on the RFP that

18   showed that we were ranked superior to everybody, including

19   Andrew, by over ten points.  And we were being told up

20   until that point in time that purchase orders weren't in

21   process and that they were going to be placing the orders

22   with us any moment.

23   Q.    Okay.  When was it that you learned that you weren't

24   going to get the contract?

25   A.    It was -- it was -- I don't remember the exact day or

**C 11**

Anderson - redirect                    470

1    lawsuit; is that right?

2    A.    That's correct.

3    Q.    Okay.  And then it says, over the past few years.  Do

4    you see that?

5    A.    Yes.

6    Q.    Could you read that?

7    A.    Over the past few years, the cellular industry has

8    increased the number of air interface protocols available

9    for use by wireless telephones.

10   Q.    Can you explain what that means?

11   A.    What it means is that over -- over the -- over that

12   several-year period, in addition to having just the old

13   analogue or AMPS cellular telephone standard or method,

14   others -- others had been added, such as the TDMA standard,

15   CDMA, as well as GSM.

16   Q.    Okay.  And then, could you take a look at Column 3

17   of this exhibit, and read the part that begins -- I'm

18   sorry.  Column 3, beginning with, The changes in

19   terminology.

20   A.    The changes in terminology and increases in the

21   number of air interface protocols do not change the basic

22   principles and inventions discovered and enhanced by the

23   assignee of the present invention.

24   Q.    What did you mean by that?

25   A.    It -- it means that the -- the invention, the concepts

**C 12**

Anderson - redirect                471

1   that are described in the invention cover -- cover a

2   multitude of cellular air interfaces.  It's not just --

3   it doesn't just pertain to one.  It doesn't just pertain to

4   AMPS or just TDMA.  It covers all of them.

5   Q.    Is that what you thought in September 2002?

6   A.    Yes.

7   Q.    Is that what you think today?

8   A.    Yes, it is.

9   Q.    Do you believe that there's any difference between

10  doing time difference of arrival in the control channel

11  and the GSM network as opposed to any other network?

12  A.    No.

13  Q.    Now, I'd like to continue with what you said in 2002,

14  three and a half years before the lawsuit was filed.

15          Do you see here in -- in Column 4, you actually

16  talk about GSM, selling their network.

17          Do you see that?

18  A.    Yes, I see that.

19  Q.    And could you read the first sentence?

20  A.    GSM -- this air interface is defined by the

21  international standard global system for mobile

22  communications.

23  Q.    Okay.  And then there are two sentences down, and

24  could you slowly read that sentence, beginning with,

25  Control channels?

C 13

1   A.    Yes.  Control channels are known as stand-alone

2   dedicated control channels, SDCCH, and are transmitted

3   in bursts in time slots assigned for use by SDCCH.

4   Q.    All right.  And then could you read the sentence

5   that begins, Voice channels?

6   A.    Voice channels are known as traffic channels.

7   Q.    Okay.  So in 2002, did you think that a traffic

8   channel and a stand-alone dedicated control channel is the

9   same thing?

10  A.    No.  They are different.

11  Q.    Why?  How are they different?

12  A.    They're different in that the traffic channels are

13  primarily used to send voice data and the -- and the

14  control channels are primarily used to send signalling

15  data.

16  Q.    Okay.  And would you believe in -- and did you

17  believe in 2002 that a stand-alone dedicated control

18  channel is a control channel?

19  A.    Yes.

20  Q.    Do you believe that today?

21  A.    Yes, I believe that today as well.

22  Q.    Have you ever believed otherwise?

23  A.    I have never believed otherwise.

24  Q.    Is the stand-alone dedicated control channel just

25  the name that a GSM gives to the control channel?

**C 14**

1    the particular parts of our patent and said that these

2    are what we're concerned about, please provide us

3    information about these.

4    Q.    Is that PTX-18, should be the last one in your pile?

5    A.    Yes, it is.

6    Q.    And is that also a letter from your attorneys to

7    Andrew?

8    A.    It's to Andrew's attorneys, but, yes, that's correct.

9              MS. MILSARK:  I move the admission of PTX-18 if

10   it's not already in.

11             MR. DESMARAIS:  I believe it's in.

12             MS. MILSARK:  Okay.

13             Can we see the attachment, please?  The next

14   page.

15   BY MS. MILSARK:

16   Q.    Is this what you were referring to when you said

17   compared the RFP to the claims of the patent?

18   A.    Yes, as I recalled, they asked for specific detail

19   and we went through and provided the specific detail they

20   asked for.  It goes on for several pages.

21   Q.    What happened next?

22   A.    Well, they didn't respond to this one.  So ultimately,

23   we filed suit again.

24   Q.    At the time of these letters, do you know whether

25   Andrew was already shipping equipment to STC?

**C 15**

1    A.    No, I don't.  We -- information from -- from Saudi

2    Arabia was difficult and sparse, but we heard that they

3    were in the midst of at least negotiating a contract at

4    the time.

5    Q.    So did you give up on the deal?

6    A.    Oh, no.  No, not at all.

7    Q.    What did you do instead?

8    A.    Well, I -- our salesmen I think kept doing what it

9    is that they do.  There was a time when we were working

10   with -- there's a company called Nour Communications.

11   Nour Communications is a company in Riyad that provides

12   installation services and that sort of thing for STC, and

13   Nour came to our sales guys and asked for more information.

14          So I wrote a couple of letters to Nour.  I

15   think I may have written one to STC explaining this is a

16   lawsuit, this is different than the prior lawsuit, there's

17   no license, that sort of thing.

18   Q.    Was the STC contract important to TruePosition?

19   A.    It's very important, yes.

20   Q.    Why?

21   A.    Well, it was important for a number of reasons.

22          One, for the obvious reason because everyone

23   thought it was a very, very large contract, and so the

24   revenue would have been good to have.

25          Two, up until that time, both Andrew and we

**C 16**

Beckley - direct                                        521

1    had been selling our voice channel product in the United

2    States, to find 911 calls.  But no one had sold any TDOA,

3    which is our technology, TDOA products outside of the

4    United States.

5                So this was going to be not only a very large

6    sale, but the first international sale.

7                So it was, in effect, proving a market.

8                In addition to that, STC, in the Middle East,

9    is a very large and influential telephone company.  And

10   we thought that to make a sale to STC, that would be the

11   lead that other telephone companies would follow when

12   they made their purchasing decision.

13               Finally, I guess you could also say it

14   affected our valuation, because we had the loss of the

15   expected revenue under that contract, and with the loss

16   of the revenue, we were forced to do a little cutback to

17   the company.

18   Q.    Cutbacks.  What do you mean?

19   A.    We had to let a number of people go.

20   Q.    Do you remember how many?

21   A.    Not exactly, but it was in the 25 neighborhood.

22   Q.    Okay.  I think you said the contract lowered the

23   value of your business or losing the contract lowered the

24   value of your business?  Did you ever quantify that?

25   A.    I didn't quantify it personally.  Someone may have

C 17

Beckley - direct                          522

1    quantified it.

2             I know that at the time, Andrew Telecom was

3    talking to our largest shareholder, Liberty Media, about

4    buying our company, and I believe that they indicated

5    that they felt that there's a difference of a hundred

6    million dollars as a result of losing this business in

7    terms of our valuation.  That's from recollection.

8    Q.   Okay.

9             MS. MILSARK:  I don't have any further.

10            Thank you, Mr. Beckley.

11            THE COURT:  All right.  I guess we'll go

12   forward for five minutes on cross.

13            MR. DESMARAIS:  Whatever you'd like, your Honor.

14                      CROSS-EXAMINATION

15   BY MR. DESMARAIS:

16   Q.   Good afternoon, Mr. Beckley.

17   A.   Good afternoon.

18   Q.   Let me just pick up on the agreement, which was

19   PTX-15-R.

20            It says in the first page, whereas the

21   plaintiffs filed a lawsuit, plaintiffs in that case was

22   TruePosition; right?

23   A.   TruePosition and a subsidiary of ours called KSI.

24   Q.   And then it lists the patents that that suit

25   involved; is that right?

**C 18**

Gottesman - direct                     755

1    Q.    Okay.  Now, in this case, you were asked to look at an

2    accused product that belonged to Andrew Corporation; is that

3    right?

4    A.    That is correct.

5    Q.    And is it correct to say that this product is -- has

6    got multiple pieces in it; is that right?

7    A.    Yes.

8    Q.    And those multiple pieces, to understand how they

9    work, you would have to understand how the hardware in

10   those computer pieces work; is that right?

11   A.    That's part of what you need, yes.

12   Q.    Is that part of what you need?

13   A.    Yes.

14   Q.    And would you also need to understand the software

15   of -- of -- that's inside these -- these pieces as well?

16   A.    Yes, that is correct.

17   Q.    And then, even if you understood the software, and

18   you understood the computer instructions, you would then

19   have to understand what type of signal processing was

20   really going on once you interpreted those languages to

21   really understand what's going on; is that right?

22   A.    Yes.  The -- the software is actually showing you

23   line by line exactly the recipe, the operation, that the

24   computer does, the machine does.

25   Q.    But let's assume -- let's assume that you knew how to

**C 19**

Gottesman - direct                    756

1    read the computer languages, but you didn't understand

2    signal processing.

3            Would you be able to understand what this

4    accused product is doing?

5    A.    Only partially, I would say.

6    Q.    Why is that?

7    A.    Because you need also to understand what -- the signal

8    processing that is going on there, because some of the

9    operation are related to operations that are within the area

10   of signal processing, and you need to understand what is the

11   purpose of them, how they're done, and there are many --

12   sometimes different ways of doing that.  So that is the

13   reason you need that.

14   Q.    Okay.  All right.

15           MR. MILCETIC:  Your Honor, may I approach the

16   witness?

17           THE COURT:  Yes.

18           (Mr. Paul handed documents to the witness.)

19   BY MR. MILCETIC:

20   Q.    Now, Dr. Gottesman, actually, I was going to get into

21   the details of your opinion, but, first, I want to sort of go

22   high level.

23           So to -- to come to your opinion that Andrew

24   Corporation infringes, what, from a high-level standpoint,

25   did you do?

**C 20**

Gottesman - direct                    757

1   A.    I first extensively read and analyzed the patent.  I

2   read and understood the Court's claim construction.  And I

3   analyzed the software that runs on the GeoMetrics system.

4   I reviewed a lot of internal documents by Andrew

5   Corporation that included user guides and schematic diagrams

6   and description of the hardware and the software.  And I

7   listened to depositions, transcript -- actually, I read

8   deposition transcripts by Andrew employees.

9   Q.    Did you also physically look at the pieces of the

10  accused product?

11  A.    Yes.  I had one visit to Andrew Corporation facility,

12  where I was able to visually inspect the GeoMetrics,

13  component of the GeoMetrics system.

14  Q.    And what did you do?  Just look at the outside of it?

15  A.    I looked at -- there were two -- two boxes, two

16  computers, two WLS units, two different versions, Version 2,

17  Version 3, that their cover was removed, and I could look

18  at them, and I wanted to look more, but I was not allowed to

19  remove.  I asked for, but they didn't allow me to remove any

20  portion of that.

21         So I could inspect that visually, look at the

22  boards, look at the components, look at how it looks, and

23  identify a lot of the components and I also looked at the

24  so-called GCS, the geolocation control server or system,

25  which is several machines that were located in another

**C 21**

Gottesman - direct                    758

1   room.

2   Q.    Let me just get back to the components.

3          So do you actually look inside these things that

4   you called WLSs?

5   A.    Yes.

6   Q.    Okay.  And did you actually look at the chips and the

7   boards in those WLSs?

8   A.    Yes, I did.

9   Q.    And did you actually review the code that runs on those

10  chips and boards?

11  A.    Not at the same time.  I reviewed the code, the source

12  code, you mean?

13  Q.    Yes.

14  A.    Source code is the program.  I reviewed that before.

15  Q.    Separately?

16  A.    Yes.

17  Q.    All right.

18  A.    When I was there, I just visually inspect the machine,

19  just the hardware.

20  Q.    Okay.  And did you, at some point, also review the code

21  on what you referred to as the GCS?

22  A.    The GCS?

23  Q.    Yes.

24  A.    Yes.

25  Q.    Okay.  What is the -- what does the GCS stand for?

C 22

908

1           THE COURT:  Let's bring the jury in.

2                        - - -

3           (Pause.)

4           (At this point the jury entered the courtroom and

5  took their seats in the box.)

6           THE COURT:  Good morning, ladies and gentlemen.

7           And you all may be seated.  I apologize about

8  the temperature in this building.  In order to change it,

9  we have to call New Jersey, and if you change it from one

10  extreme, you'll simply get the next extreme, so if you

11  want to decide whether you'd rather be cold or hot, let us

12  know.

13           A JUROR:  Cold.

14           THE COURT:  Otherwise it's one way or another.

15           All right.  Mr. Milcetic.

16           MR. MILCETIC:  Thank you, your Honor.

17                        - - -

18

19

20

21

22

23

24

25

**C 23**

Gottesman - direct                          909

1

2                           PLAINTIFF'S TESTIMONY

3                               CONTINUED

4

5                   ... ODED GOTTESMAN, having been

6               previously duly sworn as a witness,

7               was resumed and testified further as

8               follows ...

9                         DIRECT EXAMINATION

10                              CONTINUED

11   BY MR. MILCETIC:

12   Q.    Dr. Gottesman.  Good morning.

13   A.    Good morning.

14   Q.    Do you mind if we just go over real quick some of

15   what we went over on Friday, because I think some of it

16   may not be entirely clear on the record.

17   A.    Please.

18   Q.    Okay.  You said you had a Bachelor of Science,

19   Master of Science and Ph.D.

20               Do you remember that?

21   A.    Yes.

22   Q.    In what discipline?

23   A.    It's in electrical and computer engineering, all

24   three.

25               MR. MILCETIC:  Your Honor, actually, I'd like

**C 24**

1    to tender Dr. Gottesman as an area in the expert of cell

2    phone location, signal processing and computer programming

3    and hardware.

4                THE COURT:  Any objection?

5                MR. AROVAS:  No objection.

6                THE COURT:  Thank you.

7    BY MR. MILCETIC:

8    Q.    On Friday we talked about source code that you

9    reviewed as the basis for your infringement claim.  Do you

10   remember that?

11   A.    Yes.

12   Q.    And did you review versions of the source code at

13   Iron Mountain facility?

14   A.    Yes, I reviewed nine versions of the source code at

15   Iron Mountain.

16   Q.    What did that amount to in terms of an equivalent

17   paper source code?

18   A.    I can guess, you know.  One version took 21 boxes,

19   so I would say 189 boxes of -- each 3,300 pages, something

20   like that.

21   Q.    And over what period of time did you do that source

22   code review?

23   A.    That was between August and November of 2006.

24   Q.    How many visits do you think you made to the Iron

25   Mountain facility?

**C 25**

Gottesman - direct                          911

1    A.    About five.

2    Q.    And did you -- you did, in fact, prepare an expert

3    report in this case; is that right?

4    A.    That is correct, yes.

5    Q.    How -- how in depth or how long was that expert

6    report?

7    A.    112 pages long.

8    Q.    Did that describe the source code in some detail?

9    A.    Yes.  It provides some introduction and later on it

10   focuses on the claims.

11   Q.    Now, the slides that the jury saw last week say

12   Compandent on them.  What is Compandent?

13   A.    Compandent is my company.

14   Q.    I believe you testified the version of the source

15   code, although there were a number of the versions on the

16   Iron Mountain laptop, the version you focused on was

17   2005.2.1000; is that correct?

18   A.    That is correct.

19   Q.    Do you see PTX-393 in your binder?

20   A.    I don't have a binder.

21   Q.    So I guess you don't.

22            MR. MILCETIC:  May I approach the witness?

23            THE COURT:  You certainly may.

24            (Mr. Paul handed a binder to the witness.)

25            THE WITNESS:  Thank you.

**C 26**

1  Q.    All right.  Could we put up, again, the slide
2  showing the different frequencies in the GSM network?
3            Could you tell us, again, what that slide is
4  showing, Dr. Gottesman?
5  A.    That slide shows -- it's a table showing four
6  different networks.  Each network has a row in this table.
7  And it's showing, for each network, for example, the range
8  of frequencies for the up link or the reverse direction
9  and in the down link range of frequencies in the down link
10 column.
11           So, for example, it was, I believe, the network
12 in Saudi Arabia was described as -- I believe it was 1900,
13 for example.  One of them was the 1900.  I will refer back.
14           No.  I think it was the 1800.  Yes.  DCS1800.
15           So, for example, in that network, the DCS1800,
16 then, the range on that particular network would be the
17 range for the reverse control channel, between 1710
18 megahertz to 1785 megahertz.
19 Q.    And would a stand-alone dedicated control channel be
20 assigned one of those when it's carrying information in
21 the reverse direction?
22 A.    Pardon?
23 Q.    Would a stand-alone dedicated control channel signal
24 be assigned to one of those frequencies when it's carrying
25 information in the reverse direction?

**C 27**

Gottesman - direct                    927

1   A.    Yes.

2   Q.    Could we go back to the slide showing Claim 31?  And

3   then periodic, what was that again?

4   A.    Discontinuously.

5   Q.    And did the stand-alone dedicated control channel

6   transmissions from a cell phone, were they sent on and off

7   or all the time?

8   A.    They're sent once in a while, so it's transmitted

9   discontinuously.

10  Q.    Could you remind us again, for what purpose are they

11  sent once in a while?

12  A.    For example, to give the registration of the user

13  within the network and to set up a phone call.

14  Q.    Okay.  Could we go to the next element, please?

15         Do you think that Step B of Claim 22 is in the

16  GeoMetrics system that's shipped and contracted for and

17  installed in the Saudi Telecom network?

18  A.    Yes.

19  Q.    All right.

20  A.    These are locating means for automatically determining

21  the locations of said cellular telephones by receiving and

22  processing signals emitted during said periodic reverse

23  control channel transmissions.

24         So we are talking here about the software that

25  is in the central computer that is used to locate, to

**C 28**

Gottesman - direct                                    928

1    determine the location of the cell phone, so the software

2    that's running on the central computer is the locating

3    means.  For automatically determining the location of

4    cellular telephones.  That's what it does.  So the

5    software are the means for automatically determining the

6    location of that cell phone.

7             And once they receive the transmission from

8    the cell sites, with the results of the time of arrival,

9    they automatically determine the location.  And maybe we

10   can refer to the Court order to construe this step.

11   Q.   Sure.  Go ahead.

12             (Pause.)

13             THE WITNESS:  It should be PTX-2.

14   BY MR. MILCETIC:

15   Q.   It's not going ton an exhibit.  I think it is at

16   the beginning of your binder.

17   A.   I'm not sure if I have it.

18             (Pause.)

19             MR. MILCETIC:  May I approach the witness, your

20   Honor?

21             THE COURT:  Yes, you certainly may.

22             (Mr. Paul handed an exhibit to the witness.)

23             THE WITNESS:  Okay.  There is a court order,

24   Court construction, for this type of -- it's called

25   means-plus-function claim because it includes not only

**C 29**

1  the function, but also means to perform the function.

2          And the Court construction in a nutshell refers

3  to Figure 7, the first six blocks in Figure 7.  And some

4  sections -- and also Figure 8A to -- 8A to 8D, and the

5  corresponding sections within the specification, the

6  patent specification.

7          That's how I understand -- well, the Court

8  interpreted the meaning of that step and that's how I

9  understood it and that is what I relied on in order to

10  determine infringement in this -- perform this step within

11  the system in Saudi Arabia.

12  BY MR. MILCETIC:

13  Q.    Just for the sake of the record, could you read the

14  Court's construction into the record?

15  A.    On Page 4, Section No. 7:  Locating means for

16  automatically determining the locations of said cellular

17  telephones by receiving and processing signals emitted

18  during periodic reverse control channel transmissions.

19          112.  The function of the disclosed structure

20  is to determine without a specific request to do so the

21  locations of cellular telephones by receiving and

22  analyzing the signals that the cellular telephones --

23  periodically over the reverse control channel.  The means

24  of the disclosed structures is a computer processor

25  programmed to perform the algorithm disclosed at Column

**C 30**

Gottesman - direct                    930

1    13, Line 32 to 62, ending with the letter capital C.

2              Figure 7 at the first six blocks and table,

3    Column 17, Line 26 to Column 18, Line 34, ending with

4    0.0001, but minus any reference to frequency difference data

5    frequency difference results or frequencies.  And Figure

6    8A through the top four elements of Figure 8D, minus any

7    reference to frequency differences or frequencies, or

8    equivalent to such computer processor.

9    Q.     Okay.  Let's just take that in some small bytes.

10             First of all, did you say that this is a

11   means-plus-function claim element?

12   A.     Yes.

13   Q.     And can you tell me what your understanding of how

14   you literally prove, based on what your understanding was

15   when you were rendering this report, how one would

16   literally prove infringement of a means-plus-function

17   claim element?

18   A.     Okay.  So this -- this is a means-plus-function

19   claim.  It's a different type than the claim we had before

20   that was a method claim.

21             In order for a means-plus-function element to

22   be literally in the accused product, the accused product

23   has to perform the identical function.  There is a

24   function here that we'll go through, so it -- to have the

25   identical function, and the structure that is the same

**C 31**

Gottesman - direct                        931

1   or equivalent to the structure in the patent that is

2   corresponding to that particular means-plus-function

3   element.

4   Q.    In this case, is the structure that you are talking

5   about a set of computer steps?

6   A.    Yes.  It's computer software.

7   Q.    Algorithm is another name for it?

8   A.    It's a fancier name, yes.

9   Q.    All right.  Let's take this in small bytes.  Step B

10  of Claim 31:  Locating means for automatically determining

11  the locations.

12           Is that at the GCS -- owe is that satisfied by

13  the processing at the GCS central computer that you were

14  talking about on Friday?

15  A.    Yes.

16  Q.    What function of the source code was that in, again?

17  A.    The location is determined within the function called

18  fix mix.

19  Q.    And receiving and processing signals emitted during

20  said periodic reverse control channel transmissions.  The

21  reverse control channel transmissions, I guess we probably

22  said this a million times, but that is stand-alone

23  dedicated control channel transmissions?

24  A.    Yes.

25  Q.    And receiving and processing signals, is that --

**C 32**

1  would that be the process of receiving the signals at the

2  cell antennas and then returning the DF results messages

3  to the central computer for location calculation?

4  A.    That is correct.

5  Q.    Okay.  And -- now, you said that in order for the

6  element to be literal represent in the accused product,

7  first, the identical function had to be performed; is that

8  right?

9  A.    Yes.

10  Q.    In this case, the Court has interpreted the function

11  to be determining without a specific request to do so.

12  Those are the first words?

13  A.    Yes.

14  Q.    Okay.  Now, let me ask you this:  The determining

15  without a specific request to do so, this overall process

16  that's going on in GeoMetrics, is that the overall

17  process -- is that as a result of a request or not?

18  A.    The overall process starts by some request that

19  comes from the user of some software that sends some

20  request for determining location of -- targeting certain

21  phone.

22  Q.    All right.

23  A.    That's at the very beginning, before the system starts

24  operating.

25  Q.    All right.  So the GeoMetrics system does, in fact,

Mulhern - direct                              1185

1   million.

2   Q.    Is it your opinion that the 20 million for the

3   phases one and two would be adequate to compensate

4   TruePosition for Andrew's infringement?

5   A.    No, I don't believe so.  I think the evidence I've

6   reviewed makes it pretty clear that these systems are

7   not interchangeable -- not readily interchangeable.  That

8   is, mixing and matching equipment from different vendors

9   would not work easily or cost less.

10           This means that the fact that STC has chosen

11   to begin its rollout with Andrew equipment makes it very

12   likely that it will continue its rollout with Andrew

13   equipment, thereby displacing TruePosition from the

14   entire sale.

15           My job is to calculate damages that are

16   sufficient to compensate TruePosition's losses here,

17   and I believe the evidence is clear that TruePosition

18   is likely to be displaced from the entire sale.

19   Q.    Could you look at PTX-389?  This was admitted

20   yesterday.  It's a redacted copy of Andrew's answers

21   to TruePosition's second set of interrogatories.

22           MS. MILSARK:  And could we have Page 4?

23   BY MS. MILSARK:

24   Q.    Did this document support your view that Andrew has

25   won an entire contract?

C 34

Mulhern - direct                                      1186

1  A.    Yes, it does.  In interrogatory 18, this is Andrew's

2  answers to TruePosition's questions.   Interrogatory is a

3  fancy name for questions.

4           It's talking about Andrew's efforts to displace

5  TruePosition.  And in the second paragraph there, it says,

6  Andrew won the STC contract through the tender process.

7  So it appears that Andrew is agreeing that it won the STC

8  contract.

9  Q.    Have you seen public statements that corroborate

10 this view?

11 A.    Yes.  When Andrew was awarded the first phase of the

12 STC contract, the press release that it issued made it

13 very clear that it expected this to be part of a much

14 larger sale and it referred to, I think, multi phases,

15 and it referred to a network that was expected to have

16 thousands of sites.

17 Q.    Do Andrew internal documents reflect this view?

18 A.    Yes, they do.  The Andrew revenue forecasts,

19 revenue projections I looked at, showed that Andrew was

20 projecting revenues not only from phase one and phase

21 two of the STC contract, but phase three and phase four

22 as well.

23 Q.    And was there testimony to that effect?

24 A.    Yes, there was.  Andrew's financial witnesses

25 testified that they expected to earn revenues from the

**C 35**

Mulhern - direct                                    1187

1   STC deal in future phases.

2   Q.    Have you seen any additional recent evidence to

3   this effect?

4   A.    Yes.  Just a couple of weeks ago, before coming to

5   trial here, Andrew issued another press release that it

6   had been awarded phase three of this contract and, again,

7   in that language supported the idea that this was

8   expected to be a multi-phase contract covering, I think

9   they used the phrase, many thousands of cell sites.

10  Q.    You've said a couple of times that you have been

11  conservative in your calculations.  Are there any other

12  ways you've been conservative or any other sources or

13  potential harm to TruePosition that are not captured in

14  your $45 million number?

15  A.    Yes.  I think there are two other potential sources

16  of harm to TruePosition here that I have not attempted to

17  quantify and are not included in my $45 million lost-

18  profits estimate.

19          The first is really that both parties

20  expected the STC sale to be to follow-on work in the

21  Middle East.  They both expected, I think I saw reference

22  to it as a flagship sale.  They both expected there to

23  be lots of Middle East follow on work in the security

24  applications area.

25          Given, again, that these parties compete head

1    to head, it seems likely that the fact that Andrew has

2    won the STC contract through its infringing conduct, it

3    seems likely that TruePosition will be displaced in future

4    or at least possible that TruePosition could be displaced

5    in future from some of this Middle East business.  And I

6    have not attempted to quantify that.

7               There is some evidence with respect to an

8    operator in Cutter, it's called Q-Tel, that suggested

9    this might actually be happening.

10              The second source that seems of potential

11   injury that I have observed, as I mentioned, there has

12   been a lot of price competition between TruePosition

13   and Andrew with respect to this STC sale and I think

14   that likely is depressing the price at which these

15   systems are sold.  It has an effect on the market price.

16   And so to the extent that TruePosition is able to get

17   this business in the future, I think it's quite possible

18   that the business will come at depressed prices.  That

19   is another source of potential injury to TruePosition

20   that I have not attempted to quantify.

21   Q.    Would it be appropriate for the jury to split the

22   difference and take a number somewhere between your 45

23   million and somewhere between a number that I expect

24   Andrew will proffer?

25   A.    No.  For the reasons I described, I have attempted

**C 37**

Mulhern - direct                          1189

1   to give Andrew the benefit of the doubt where possible

2   and I think that $45.3 million represents a conservative

3   estimate of the financial injury to TruePosition in this

4   case.

5   Q.    So let's say one more time.  What is your

6   conclusion with respect to damages in this case?

7   A.    My conclusion is that TruePosition was harmed in

8   the amount of $45.3 million.

9              MS. MILSARK:  I have no further questions.

10             THE COURT:  All right.  Why don't we take our

11  15-minute morning break before we start cross?

12             15 minutes, ladies and gentlemen.

13             (At this point the jury was excused for a short

14  recess.)

15             THE COURT:  All right.

16             (Short recess taken.)

17                        - - -

18

19

20

21

22

23

24

25

**C 38**

Mulhern - redirect                    1241

1   Q.    There was discussion of the Anderson testimony and

2   the Gross testimony, about the possibility that you

3   could do, I don't know, location on a traffic channel.

4                Do you recall that?

5   A.    I do.

6   Q.    Do you have an understanding about what would be

7   involved in order to do that?

8                        - - -

9   A.    Yes.   In the cross-examination after submitting my

10  expert report in this case and reviewing the opposition

11  expert report.   I wanted to look into it more, to

12  investigate it.

13               It does appear that Mr. Gross and Mr. Anderson

14  testified that there may be, from a technical perspective,

15  a way to achieve idle mode location using a traffic channel.

16                        - - -

17

18

19

20

21

22

23

24

25

**C 39**

Mulhern - redirect                     1242

1

2   A.    (Continuing)   My understanding is that that would

3   avoid the patent.  But my further understanding is that

4   in order to implement this solution, it would require

5   some change in configuration to the way the GSM networks

6   typically operate.

7            Now, in other words, it would require the

8   Ericsson's or Nokias or Siemens of the world to change the

9   way they do things.

10           When I learned about this, I looked in the

11  evidence to find whether Andrew had presented any evidence

12  that suggested that these RAN vendors would be able to --

13  willing to effect such a change, and I have seen no

14  evidence to that effect.

15           And my understanding in further conversations

16  with Mr. Anderson is that his expectation is that this

17  would be costly for them to implement it and that it would

18  require changes in their software.  And I have not seen

19  any -- as an economist, I can see I don't see what their

20  incentive would be to make this change so that Andrew to

21  avoid infringing this patent.  I don't see the incentive

22  there.

23  Q.    Did you see any evidence of how long it would take

24  to do it?

25  A.    No, I didn't, and that would be important to the

**C 40**

1    inquiry.  As I mentioned, we are talking about

2    alternatives that could be available at the relevant

3    period of time.  That is, at this time it would be at the

4    beginning of this sale, early 2006.  I have not seen any

5    evidence that such a change could have been implemented

6    in time to make this sale.

7    Q.    You were shown the feasibility study, the draft

8    feasibility study that TruePosition submitted to ETSI.

9              Do you recall that?

10   A.    Yes.

11   Q.    And you were shown a paragraph that said something

12   about whether -- about licensing a patent; is that right?

13   A.    Yes.

14   Q.    Did you -- did that affect your analysis?

15   A.    No.  Again, Mr. Friedman suggested, as I testified,

16   I had not seen that prior to my expert report, but it was

17   brought to my attention in the opposing expert's report

18   and so, of course, I wanted to look at it and see if it

19   affected my opinions in any way.  I concluded that it

20   didn't.

21             In looking that over, I didn't -- I didn't see

22   that that particular statement referred specifically to

23   the '144 patent at all.  And I understood, as consistent

24   with how Mr. Sheehan testified, that TruePosition was of

25   the view that they were not -- there was no need for them

**C 41**

Magnusson - cross                    1817

1    A.    If the question is if it all fits into the standard

2    the same way, no, that's not correct, because they're all

3    fundamentally different, how to implement them in the

4    standard.  So they are not exactly the same sockets.  I

5    wouldn't say so.

6    Q.    Well, the basic idea, though, is the way that it

7    communicates, this equipment with the cellular network,

8    and that really has nothing to do with the patent in

9    this case; right?  The patent in this case is about

10   finding cell phones?

11   A.    I don't know.  I'm sorry.

12   Q.    Now, you've put up this -- you have put up this

13   feasibility study.  We've seen this a number of times;

14   is that right?  Which had the statement about reasonable

15   nondiscriminatory terms; right?

16   A.    Yes.

17   Q.    And then we have the very next one.  This is

18   Helsinki, Finland.  In fact, you have this on your -- on

19   your timeline, I think.  Finland.  That's the very next

20   meeting (indicating).

21   A.    Yes.

22   Q.    And in that one, I assume you've had a chance to

23   review this document, since you were able to put

24   together this timeline?

25   A.    Yes.  I'm sure at some time I reviewed that

**C 42**

1  document.

2  Q.    And this document does not contain any statement

3  about licenses on reasonable nondiscriminatory terms; is

4  that right?

5  A.    The difference between this document and the other

6  document was that when the first document was presented

7  in the standard committee, TruePosition was told that it

8  was not the place holder to put their patent declaration

9  to this document.  They have other protocol to do that

10 in the standards.  It was explained before.  So they

11 were kindly requested to remove this from the document

12 along with the logo and other things, just to make it

13 more adaptable to the templates we have in 3GPP.

14 Q.    So let me just get this straight.  The promise,

15 the promise, the first promise you're relying on to

16 make standards-compliant products that you told your

17 superiors about is a promise, again, that your company

18 wasn't at the meeting, and a promise that TruePosition

19 was told not to make again; right?  By the standards

20 body, by 3GPP?

21 A.    I'm sorry.  I think you are putting words in my

22 mouth.

23        The committee did not tell them not to make

24 that promise.  They said it's nice of you to make that

25 promise, but this document is not going to be making

**C 43**

1   that promise.  We have another place holder for that

2   promise.

3   Q.    And could we put up, I guess it's PTX-363?

4              You talk a lot about what you are supposed

5   to do under the ETSI policy.  Now we're talking about

6   what you are supposed to do in the other standards body:

7   European Telecommunications Standards Institute; right?

8   That's the name of ETSI.

9   A.    Correct.

10  Q.    Okay.  They are based in France; right?

11  A.    Yes.

12  Q.    Okay.

13  A.    As far as I recall.

14  Q.    And actually, we've heard a lot at this trial about

15  the third-generation partnership project.  That is what

16  3GPP stands for; right?

17  A.    Correct.

18  Q.    Strictly speaking, though, Andrew and TruePosition

19  aren't partners in the third-generation partnership

20  project; right?

21  A.    Again, now you're asking me to give some legal

22  interpretation and I'm not really the right person to do

23  that.

24  Q.    Actually, on direct, you testified that ETSI was

25  the organizational partner in 3GPP.  Strictly speaking,

Garner - cross                              1874

1

2    A.    I don't know for certain that that is who he --

3    Q.    Well, isn't Al-Misehal Group your local agent in

4    Saudi Arabia and isn't Rob the Manager?

5    A.    Yes.  We do use Al-Misehal and there is a

6    gentleman by the name of Rob Wood who's part of that

7    organization.

8    Q.    In fact, that is how you -- who helped you get

9    the contract in Saudi Arabia; right?

10   A.    Our agent for our business in Saudi Telecom is the

11   Al-Misehal Group, yes, that's correct.

12   Q.    So what you're talking about is passing information

13   to Saudi Telecom about the fraud counterclaim in this

14   case; right?

15   A.    Well, it doesn't -- I don't see where it says

16   anything about STC here.

17   Q.    Well, if you are passing along the information to

18   your agent in Saudi Arabia, wouldn't the assumption be

19   that it would then be conveyed to STC?

20   A.    Perhaps we could make that assumption.  I don't

21   see that -- that clearly spelled out in this e-mail

22   between two of our employees.

23   Q.    I would like to -- unfortunately, there's no

24   stipulation in this case about what the actual contract

25   is with STC, so I'm going to have to go through with

**C 45**

Garner - cross                                    1875

1   you right now what the -- if you can tell me what --

2   whether some documents really are, in fact, a contract

3   with STC, between Andrew Corporation and STC. Is that

4   all right with you?

5   A.    That is all right with me. Yes.

6   Q.    All right. Could you turn to Plaintiff's Exhibit

7   232?

8   A.    Yes.

9   Q.    This is a letter from you to Saudi Telecom?

10          MR. DESMARAIS: Your Honor, I'm going to

11  object just until we get copies. We're not being

12  provided copies.

13          THE COURT: You need to provide copies.

14          MS. MILSARK: We did, your Honor.

15          (Pause.)

16  BY MR. MILCETIC:

17  Q.    Is that correct, Mr. Garner?

18  A.    This is a letter to Saudi Telecom signed by me.

19  Yes.

20  Q.    And it's dated October 24, 2005; right?

21  A.    Yes.

22  Q.    And it lifts some -- some bullet points, including

23  some enclosures; correct?

24  A.    Yes, that's correct.

25          MR. MILCETIC: I'd like to offer into

**C 46**

Garner - cross                          1876

1  evidence Plaintiff's Exhibit 232.

2              MR. DESMARAIS:  No objection.

3              THE COURT:  Thank you.

4              DEPUTY CLERK:  So marked.

5  ***        (Plaintiff's Trial Exhibit No. 232 was received

6  into evidence.)

7  BY MR. MILCETIC:

8  Q.    And then the next document, can you turn to

9  Plaintiff's Exhibit 216, please?

10             (Pause.)

11             THE WITNESS:  Yes, sir.

12 BY MR. MILCETIC:

13 Q.    Do you recognize that document?

14 A.    Yes.

15 Q.    This is a contract that's between Andrew Corporation

16 and Saudi Telecom; is that right?  Signed by you, Terry

17 Garner; is that correct?

18 A.    I believe this -- this is part of the contract with

19 STC.  Yes, it is signed by me, that's correct.

20             MR. MILCETIC:  I'd like to offer into

21 evidence Plaintiff's Exhibit 216.

22             MR. DESMARAIS:  No objection.

23             THE COURT:  All right.

24             DEPUTY CLERK:  So marked.

25 ***        (Plaintiff's Trial Exhibit No. 216 was received

**C 47**

1    into evidence.)

2    BY MR. MILCETIC:

3    Q.    By the way, Mr. Garner, I notice on this contract,

4    this Plaintiff's Exhibit 216, it also dated September 30th,

5    2005; right?

6    A.    Yes.  That's what's written on the -- the document.

7    Q.    But you actually signed this contract in February

8    of 2006; right?

9    A.    I don't recall the date I signed the agreement, no.

10   Q.    You have no idea when you signed either the

11   agreement with Saudi Telecom?

12   A.    Not -- not detailed, no, sir, I don't.

13   Q.    Other than Saudi Telecom, Mr. Garner, what other

14   contracts does your network solution have right now in

15   terms of major tier one carriers, selling equipment to

16   major tier one carriers?

17   A.    We have contracts with Cingular and -- well, now

18   known as AT&T Wireless, and Team Mobile in the U.S.

19   Those are our other major carriers.

20   Q.    In fact, didn't you lose the Cingular contract

21   to TruePosition and isn't your equipment being replaced

22   at Cingular?

23   A.    For the UTDOA equipment, yes, that's correct.

24   Q.    Okay.  And, in fact, this Saudi Telecom contract

25   is the major asset in terms of contracts with the

## C 48

1   networks solutions division at Andrew; isn't that right?

2   A.    We -- we have -- have contracts with a number of

3   network -- network operators.

4   Q.    I'm asking you, is this the biggest?

5   A.    I'm sorry?

6   Q.    Is this the biggest, the largest asset?

7   A.    Let's see.  The -- the last phase that -- that we

8   won was, I believe, $9 million.  That's -- that's

9   roughly equivalent to some of the contracts we have with

10  U.S. operators.

11  Q.    So it's essentially the -- it is roughly equivalent,

12  then; is that correct?

13  A.    Yes.

14  Q.    In fact, didn't you present a power point

15  presentation where you said that if Andrew Corporation

16  didn't get this STC contract, that it would be

17  questionable whether this division within Andrew

18  Corporation would even survive?

19  A.    I don't recall that particular presentation.  It

20  may exist.

21  Q.    Now, as far as signing this STC contract, Exhibit

22  216, you said you don't -- you don't remember when you

23  signed it.

24  A.    Yes, sir.  I do not recall the specific date I

25  signed this -- this particular part of the contract.

**C 49**

Garner - cross                            1879

1   Q.    Where were you when you signed it?

2   A.    I believe I was -- would have been either in my

3   office in Ashburn or my office in Forest, Virginia.

4   Q.    Were you alone when you signed this?

5   A.    I don't know specifically whether I was alone at

6   the time or not.

7   Q.    I would like to turn -- you to turn to Plaintiff's

8   Exhibit 233.

9   A.    Yes, I see it.

10  Q.    This is a document that also contains your

11  signature, right, to Saudi Telecom?

12  A.    That's correct.  It's a document to Saudi Telecom

13  with my signature on it.

14  Q.    This is also part of the STC Saudi Telecom contract?

15  A.    I believe this is part of the Saudi Telecom

16  contract, yes.

17  Q.    Could you turn --

18          MR. MILCETIC:  I would like to offer into

19  evidence Plaintiff's Exhibit 233.

20          MR. DESMARAIS:  No objection.

21          THE COURT:  Thank you.

22          DEPUTY CLERK:  So marked.

23  ***       (Plaintiff's Trial Exhibit No. 233 was received

24  into evidence.)

25

**C 50**

Garner - cross                                    1880

1  BY MR. MILCETIC:

2  Q.    I would like you to turn to Plaintiff's Exhibit 220,

3  please.

4            (Pause.)

5  BY MR. MILCETIC:

6  Q.    Do you recognize that document?

7  A.    I believe, I can't be for certain, that this document

8  is also part of the Saudi contract.

9  Q.    You believe it may be or --

10  A.    I believe -- I believe it may be part of the Saudi

11  contract, yes.

12            MR. MILCETIC:  All right.  I would like to

13  offer into evidence Plaintiff's Exhibit 220.

14            MR. DESMARAIS:  No objection.

15            DEPUTY CLERK:  So marked.

16  ***        (Plaintiff's Trial Exhibit No. 220 was received

17  into evidence.)

18  BY MR. MILCETIC:

19  Q.    And could you turn to Plaintiff's Exhibit 219?

20  A.    Yes.

21  Q.    Is that also part of the Saudi contract?

22  A.    This -- this is a letter sent to Saudi Telecom,

23  signed by me.  I don't know whether it's part of the

24  contract or was part of the -- the contract process.

25  Q.    But it is a letter from you to Saudi Telecom; is

**C 51**

Garner - cross                                    1881

1   that right?

2   A.    That is correct.

3         MR. MILCETIC:  I would like to offer into

4   evidence Plaintiff's Exhibit 219.

5         MR. DESMARAIS:  No objection.

6         DEPUTY CLERK:  So marked.

7   ***        (Plaintiff's Trial Exhibit No. 219 was received

8   into evidence.)

9   BY MR. MILCETIC:

10  Q.    So just to be clear so we don't make any mistakes,

11  we're offering in evidence Plaintiff's Exhibit 216, 232,

12  233, 220 and 219.

13        Mr. Garner, do you think -- I mean, you were

14  in the courtroom, right, when we saw a deposition clip

15  from Jim McDaniel about how the contract was signed in

16  February of 2006.  That was on Friday of last week.

17        Do you remember that?

18  A.    I recall seeing the clip.  I don't recall that

19  specific date.

20  Q.    Well, when you saw the clip, did you think, well,

21  he nailed it on the head.  That is when I signed the

22  contract?

23  A.    No.  That thought didn't go through my mind.  I

24  don't know whether that was the date I signed part of

25  this agreement or not.  It could have been or it could

**C 52**

1   not have been.  I just don't know.

2   Q.    Where do you think Mr. McDaniel got that idea from?

3   A.    I don't know.

4   Q.    See, because the date of this contract is September

5   30th, the one that you just looked at; right?

6   A.    Yes.

7   Q.    And that's the same date as the September 30th

8   letter to Andrew Corporation about how you may be

9   infringing if you keep doing what you are doing with

10  respect to Saudi Arabia, that first September 30th, 2005

11  letter; is that right?

12  A.    Have I seen that today?

13  Q.    Yes.  Certainly, you've seen it during the trial.

14  A.    I don't deny that I've seen it.  I just don't

15  recall the date on it.  I'm sorry.

16          MR. MILCETIC:  Nothing further.  Thanks.

17          MR. DESMARAIS:  Nothing further, your Honor.

18          THE COURT:  All right.  You may step down,

19  sir.  Thank you.

20              (Witness excused)

21                  - - -

22          MR. DESMARAIS:  We now would like to play a

23  short deposition clip, your Honor, from TruePosition

24  employee Mr. Gross, and it's very short.

25          THE COURT:  All right.

# C 53

1    rather than reciting the glue itself.

2        When a claim limitation is in

3    means-plus-function form, it covers the structures

4    described in the patent specification for performing

5    the function stated in the claim, and also any structure

6    that is equivalent to the described structures.  The fact

7    that the accused structure performs the claimed function

8    using components different from those used by the

9    structure described in the patent specification does not

10   matter, so long as the overall structures are equivalent.

11       The beginning, or preamble, portion of

12   a claim often uses the word comprising.  In the patent

13   context comprising means including or containing.  A

14   product claim that uses the word comprising or comprises

15   is not limited to products that have only the limitations

16   recited in the claim, but can also cover products that

17   have more limitations than what is included in the

18   claims.  Likewise, a method claim that uses the term

19   comprising or comprises can cover methods that include

20   more steps than what is listed in the claim.

21       Let's take our example of the claim that

22   covers a table.  If the claim recites a table comprising

23   a table top, legs and glue, the claim will cover any

24   table that contains these structures, even if the table

25   also contains other structures, such as a leaf or wheels

**C 54**

1    on the legs.

2            To decide the question of infringement,

3    you must first understand what the claims of the patent

4    cover.  It is my duty under the law to define what the

5    patent claims mean.

6            You must ignore any different interpretation

7    given to these terms by the witnesses or attorneys.

8            If I have not provided a specific

9    definition for a given term, you are to use the ordinary

10   meaning of that term.  I instruct you that the following

11   claim limitations have the following definitions.

12           Prescribed set of reverse control channels:

13   A predetermined range of frequencies that transmit

14   control information in only one direction, a cellular

15   telephone to a cell site.

16           Periodic and periodically means

17   discontinuously.

18           Timing signal.  A signal that conveys timing

19   information.

20           Time stamp bits representing the time at

21   which said cellular telephone signals were received:

22   Binary units representing the time when cellular

23   telephone signals were received at the cell site.

24           Means for processing said frames of data

25   from said cell site systems to generate a table

**C 55**

2122

1   identifying cellular telephone signals and the

2   differences in times of arrival of said cellular

3   telephone signals among said cell site systems:  The

4   function of the disclosed structure is to analyze the

5   cellular telephone signals in order to generate a

6   table that identifies the differences in times of

7   arrival of said signals:  The means of the disclosed

8   structure is a computer processor programmed to perform

9   the algorithm disclosed at Column 13, Lines 33 to 56,

10  ending with the acronym TDA; Figure 7 at the first four

11  blocks and table; Column 17, Lines 26 to 68, minus any

12  reference to frequency difference data or frequency

13  difference results; and Figures 8A to 8B minus any

14  reference to frequency differences, or equivalents of

15  such as a computer processor.

16          Means for determining, on the basis of said

17  times of arrival differences, the locations of the

18  cellular telephones responsible for said cellular

19  telephone signals:  The function of the disclosed

20  structure is to determine, on the basis of time of

21  arrival differences, the location of the cellular

22  telephones whose signals are received.  The means of

23  the disclosed structure is a computer processor

24  programmed to perform the algorithm disclosed at Column

25  13, Line 58, beginning with the word this, through

# C 56

2123

1    Column 13, Line 62, ending with the letter C; Figure 7

2    at the fifth and sixth blocks, Column 18, Lines 1

3    through 34, ending with 0.00001, but minus any

4    references to frequencies; and Figure 8C through top

5    four elements of Figure 8D, minus any reference to

6    frequencies; or equivalents of such a computer processor.

7            Locating means for automatically determining

8    the locations of said cellular telephones by receiving

9    and processing signals emitted during said periodic

10   reverse control channel transmissions:  The function

11   of the disclosed structure is to determine, without a

12   specific request to do so, the locations of cellular

13   telephones by receiving and analyzing the signals that

14   the cellular telephones broadcast periodically over

15   the reverse control channel.  The means of the disclosed

16   structure is a computer processor programmed to perform

17   the algorithm disclosed at Column 13, Lines 33 to 62,

18   ending with the letter C; Figure 7 at the first six

19   blocks and table; Column 17, Lines 26 to Column 18,

20   Line 34, ending with 0.00001, but minus any reference

21   to frequency difference data, frequency difference

22   results or frequencies; and Figures 8A through the

23   top four elements of Figure 8D, minus any reference to

24   frequency differences or frequencies, or equivalents

25   of such a computer processor.

# C 57

2124

1    Database means for storing location data

2    identifying the cellular telephone and their respective

3    location, and for providing means to said database to

4    subscribers at remote locations:  The function of the

5    disclosed structure is to store data that identifies

6    each cellular telephone and its respective location, and

7    for providing access to said data to subscribers at

8    remote locations.  The means of the proposed structure

9    is the combination of the database 20 and, A, the first

10   terminal 22 coupled via a modem and telephone line to

11   the database 20, Column 9, Lines 25 to 27, Figure 2 at

12   blocks 20, 22; or B, the second terminal 24 in radio

13   communication with the database, Column 9, Lines 27 to

14   29, Figure 2 at blocks 20, 24, or, C, the third hand-

15   held terminal 26, which is carried by a user who also

16   has a cellular telephone 10B, in radio communications

17   with the database, Column 9, Lines 29 to 31, Figure

18   2, at blocks 20, 26, or equivalents at any such

19   combination.

20        A patent owner has the right to stop others

21   from using the invention covered by its patent claims

22   during the life of the patent.  If any person makes,

23   uses, sells within the United States, offers to sell

24   from within the United States, or imports what is

25   covered by the patent claims without the patent owner's

**C 58**

# Civil Meeting Minutes for Broadcom Corp. v. Quacomm, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 05-467-JVS(RNBx)                               Date   November 21, 2007

Title      Broadcom Corp. V. Qualcomm Inc.

---

Present: The    James V. Selna
Honorable

| Karla J. Tunis | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                                  Not Present

**Proceedings:**   (In Chambers) Order Granting Defendant's Motion for Reconsideration
(Filed 9/7/07)

        In the wake of In re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007), the
Court invited reconsideration of portions of its post-trial rulings.  (Minute Order, Aug.
22, 2007.)  In response, Qualcomm Incorporated ("Qualcomm")  has filed a broad-based
motion seeking the following relief:

    • A new trial on all infringement claims and all wilfulness issues.

    • Judgment as a matter of law on the issue of wilfulness.

    • Vacation of the Court' Order of August 10, 2007 granting enhanced
      damages and attorney's fees.

Seagate constitutes a change–indeed, a substantial change–in the applicable law.  (Local
Rule 7-18(b).)  Reconsideration is clearly warranted here, and this portion of
Qualcomm's motion is granted.

I.      The Effect of Seagate.

        It would be an understatement to say that the Federal Circuit rewrote
decades of case law interpreting the requirements for demonstrating wilful infringement
in a patent case.  Proof of wilfulness now requires clear and convincing evidence which
meets a two-step test:

**C 59**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    SACV 05-467-JVS(RNBx)                    Date    November 21, 2007

Title    Broadcom Corp. V. Qualcomm Inc.

> Accordingly, to establish willful infringement, a patentee must show by
> clear and convincing evidence that the infringer acted despite an objectively
> high likelihood that its actions constituted infringement of a valid patent.
> The state of mind of the accused infringer is not relevant to this objective
> inquiry. If this threshold objective standard is satisfied, the patentee must
> also demonstrate that this objectively-defined risk (determined by the record
> developed in the infringement proceeding) was either known or so obvious
> that it should have been known to the accused infringer. We leave it to
> future cases to further develop the application of this standard.

Seagate, 497 F.3d at 1371 (citations deleted; emphasis supplied). At the same time, the
Federal Circuit abandoned the notion that a would-be infringer has an affirmative duty of
care to ensure that he does not infringe. (Id.) In this context, the court "reemphasize[d]
that there is no affirmative obligation to obtain [sic] opinion of counsel." (Id.)

The implications of Seagate for this case are far reaching, but some are less
obvious than others.

II.    The Obvious Implications of Seagate.

Certain aspects of the present motions require very little discussion. First,
the standard for wilfulness embodied in Court's Instruction No. 25 does not expressly or
impliedly embody the Seagate standard. The instruction was drawn from a now-
discredited line of authority. In light of Seagate, the Court's instruction was error.
Notwithstanding Broadcom's vigorous advocacy (Broadcom Opposition, pp. 3-5), the
concepts on which Instruction 25 is based do not square with Seagate.[1] Qualcomm is
entitled to a new trial on the jury's finding of wilfulness with respect to each of the three

---

[1]For example, while a jury might find as a matter of fact
that the absence of a reasonable belief of non-infringement or
the invalidity on the patent in suit might on some records lead
to a conclusion of disregard of an objectively high likelihood of
infringement, that conclusion is hardly compelled. The two
standards are not identical even if there might be some
theoretical overlap.

**C 60**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 05-467-JVS(RNBx) | Date | November 21, 2007 |
| Title | Broadcom Corp. V. Qualcomm Inc. | | |

patents in suit.[2]

      Second, absent a finding of wilfulness, the Court's award of enhanced damages cannot stand.  State Indus., Inc. v. Mor-Flo Indus. Inc., 948 F.2d 1573, 1576 (Fed. Cir. 1991).

      Third, given that the jury's finding of wilfulness was the cornerstone for finding this case exceptional and awarding attorney's fees, Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH, 408 F.3d 1374, 1379 (Fed. Cir. 2005); Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1339-40 (Fed. Cir. 2004), the award of attorney's fees under 35 U.S.C. § 285 cannot stand.

      Thus, the Court grants a new trial on the wilfulness issues, and the Court vacates its order of August 10, 2007.

III.   The Less Obvious Implications of _Seagate._

      The Court proceeds to the remaining issues which Qualcomm raises.

    A.  Error in Inducement Instructions.

      Consistent with the notion that the presence or absence of an attorney opinion remained relevant within limited bounds following Knorr-Bremse Systeme Fuer Nutzhahrzeuge v. Dana, 383 F.3d 1337, 1344 (Fed. Cir. 2004), the Court told the jury in Court's Instruction No. 23 that in determining whether Qualcomm had the requisite intent to induce infringement it could "consider all of the circumstances, including whether or not Qualcomm obtained the advice of a competent lawyer." (Court's Instruction No. 23; emphasis supplied.) The Court referred the jury to Court's Instruction No. 25 which provided further guidance with regard to the failure to obtain an opinion. In relevant part, Court's Instruction No. 25 states:

---

    [2]Given the structural error in the instruction, the Court need not decide now whether the Federal Circuit's elimination of any duty to obtain an opinion rules out consideration of a failure to obtain an opinion entirely.  Seagate, 497 F.3d at 1471.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 05-467-JVS(RNBx)                    Date   November 21, 2007

Title   Broadcom Corp. V. Qualcomm Inc.

> In considering whether QUALCOMM acted in good faith, you should
> consider all of the circumstances, including whether or not QUALCOMM
> obtained and followed the advice of a competent lawyer with regard to
> infringement.  The absence of a lawyer's opinion, by itself, is insufficient to
> support a finding of willfulness, and you may not assume that merely
> because a party did not obtain an opinion of counsel, the opinion would have
> been unfavorable.  However, you may consider whether QUALCOMM
> sought a legal opinion as one factor in assessing whether, under the totality
> of the circumstances, any infringement by QUALCOMM was willful.

(Court's Instruction No. 25; emphasis supplied.)  The instruction does not expressly
advise the jury that there is any duty to obtain an opinion.

     Broadcom argues that the failure to obtain an opinion is part of the
circumstantial evidence which a jury may consider in determining whether there was
knowing inducement.  DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1304, 1304 (Fed.
Cir. 2006.)  As Broadcom points out, there was direct evidence of opinions of counsel
offered in DSU Medical, and the Federal Circuit found nothing improper about the
evidence.  (Id. at 1307.)  However, offering an opinion was not proscribed before
Seagate, and nothing in Seagate precludes offering such evidence.  Moreover, that is not
the same as evidence of a failure to obtain an opinion.  DSU Medical's guidance with
regard to the scope of permissible circumstantial evidence only takes the present analysis
so far.

     In ACCO Brands, Inc. v. ABA Locks Manufacturer Co., Ltd., 501 F.3d 1307
(Fed. Cir. 2007), which followed Seagate by less than a month, the Federal Circuit was
asked to review a jury verdict of inducement as well as wilfulness.  The court found that
"ACCO failed to prove the threshold requirement of direct infringement." (Id. at 1312.)
But in the record before it was evidence that the alleged infringer, Belkin, had failed to
obtain a non-infringement opinion.  (Id.)  While not necessary to the result, one might
have expected the Federal Circuit to have commented on the evidence if Seagate in fact
precludes all evidence of the failure to obtain an opinion.

     The Court's conclusion is that the absence of an opinion is one factor the
jury may consider in reviewing the totality of circumstances in determining whether the
alleged inducement was knowing.  If this is correct, the question remains whether the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 05-467-JVS(RNBx) | Date | November 21, 2007 |
|---|---|---|---|

| Title | Broadcom Corp. V. Qualcomm Inc. |
|---|---|

particular instructions given here were prejudicial. The Court does not believe it was.

If the Court had had the benefit of <u>Seagate</u>, it would likely have instructed the jury on the inducement claim that there is no duty to obtain an opinion. However, the Court cannot say that taking Court's Instruction 23 and 25 together, the jury was likely to infer such a duty. Both instructions direct the jury to consider "all of the circumstances." Moreover, in the language from Court's Instruction No. 25 quoted above, the Court clearly told the jury that the absence of an opinion was just part of the mix in making its wilfulness determination, and by implication its knowing inducement determination. Taking Court's Instructions 23 and 25 as whole, the Court does not believe that the instructions "clearly misled the jury" on the significance of the absence of an opinion. <u>DSU</u> <u>Medical</u>, 471 F.3d at 1304 (internal quotation marks deleted); <u>Seguin v. Eide</u>, 720 F.2d 1046, 1048 (9th Cir. 1983) (instruction not prejudicial where jury permitted to consider all circumstances even though factors enumerated subsequently by the Supreme Court were not expressly included). If there was error, it was more likely than not harmless. <u>Caballero v. City of Concord</u>, 956 F.2d 204, 206 (9th Cir. 1992).[3]

The Court declines to grant a new trial on the induced infringement claim on the basis of instructional error.

    B. <u>Damages.</u>

       1. <u>Direct Infringement.</u>

At oral argument, Qualcomm argued that the jury's damage award was exclusively attributable to the induced infringement claims. The jury awarded damages under each patent in issue, and was not asked to parse the infringement theory or theories under which the award was made. From this, Qualcomm asserts that in view of the fact the it is entitled to a new trial on the induced infringement claim, the direct infringement verdict could not stand for a lack of damages.

---

[3]Qualcomm points to language in Court's Instruction No. 25 to the effect that Qualcomm had a "duty to respect [Broadcom's patent] rights." (Qualcomm's Memorandum in Reply, p. 7.) This says nothing about a duty to obtain an opinion, but rather expresses the core of a wilfulness claim.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 05-467-JVS(RNBx) | Date | November 21, 2007 |
| Title | Broadcom Corp. V. Qualcomm Inc. | | |

There are two difficulties with this view.  First, after additional briefing, the Court has concluded that the induced infringement verdicts need not be set aside for instructional error.  Second, the Court does not believe that it is proper to presume the correctness of Qualcomm's allocation of the damages by theory where the jury made none.  See Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d 1356, 1366 (9th Cir. 1986).[4]

2.  '686 Damages.

At oral argument, Qualcomm focused on the fact that the jury returned verdicts on the '686 claim for direct and induced infringement, but not contributory infringement.  Qualcomm assumed that the jury predicated its contributory infringement verdict on a finding that there were substantial non-infringing uses for the infringing Qualcomm products.  Qualcomm assert that this creates an inconsistency with the direct infringement verdict which cannot stand.  Qualcomm conceded at oral argument that a failure to return an a verdict on a contributory infringement does not necessarily invalidate the direct infringement verdict: "[But] [i]t happens to be the case here. . . . I'm not arguing for all cases in all places, . . .."  (Tompros Decl., Ex. A, pp. 19-20.)

While both Qualcomm and Broadcom offer competing versions of what the jury might have thought, no one knows.  The jury's verdict in favor of Qualcomm on the '686 contributory infringement claim could have turned on the presence of substantial non-infringing uses, or a failure of proof on one of the prima facie elements, or the want of credibility of a witness, or a simple failure by Broadcom to meet its burden by a preponderance of the evidence.  Speculation is not a basis for relief.

C.  Judgment as a Matter of Law on Wilfulness Claims.

Both Broadcom and Qualcomm argue that under the Seagate standard, the evidence permits the Court to grant judgment as a matter of law in each party's favor on

---

[4]The recent Federal Circuit case of  Verizon Services Corp. v. Vonage Holdings Corp., 503 F.3d 1295 at Section IV (Fed. Cir. 2007) (present Westlaw version not paginated), is not instructive.  There the jury has returned a single damage award covering three patents.  Here, the jury made separate awards under each patent in suit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    SACV 05-467-JVS(RNBx)                          Date    November 21, 2007

Title    Broadcom Corp. V. Qualcomm Inc.

the wilfulness issue. (Broadcom Opposition, pp. 8-9; Qualcomm Motion, pp. 7-10.) The Court declines to grant such relief to either party.

Although Broadcom placed heavy emphasis on post-filing conduct, the record was not devoid of pre-filing conduct of the same nature, such as working with customers to bring infringing devices to the marketplace. While post-filing conduct may be of reduced benefit in the absence of a request for an injunction,[5] it is not clear that such conduct is irrelevant, particularly if it supports a pre-existing pattern of wilful conduct (e.g., aiding customers in the development of infringing devices). The evidence taken as a whole is sufficient to resist a motion for judgment as a matter of law under Seagate.

But of greater concern to the Court is the fact that there is a particular unfairness in entertaining a motion for a judgment as a matter of law under a standard which was not in effect when the parties made their trial record. The point is underscored by Qualcomm's observation that the Court's denial of judgment as a matter of law on the wilfulness issues on post-trial motions was "based entirely on pre-*Seagate* law." (Qualcomm Memorandum, p. 15.) So was Broadcom's presentation. Broadcom might well have changed the emphasis of the evidence it presented or presented additional evidence that it did not in light of its perception of the force of post-filing conduct evidence.[6]

-----

[5]The precise parameters of permissible post-filing evidence are unclear under Seagate, but it is plain the Federal Circuit did not expressly exempt this, or any other, holding from retroactive application. Harper v. Va. Dept. of Taxation, 509 U.S. 86, 96-97 (1993). Whether the Court should distinguish the situation where a litigant was aware of the rule in Seagate and failed to seek an injunction from the situation of the present plaintiff which could not have divined the rule prior to trial is a question for another day. (Id. at 94-95.)

[6]Although it is a question which the Court need not presently resolve, Broadcom believes that limited additional discovery would produce additional evidence of pre-filing activities to support wilfulness. Just as the applicable standard likely affected Broadcom's presentation, so to would it have affected Broadcom's focus in discovery. Indeed, the grant of some limited additional discovery may be responsive to Broadcom's claim that retroactive application of Seagate is unfair. (See Broadcom Opposition, p. 18.)

**C 65**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 05-467-JVS(RNBx) | Date | November 21, 2007 |
|---|---|---|---|
| Title | Broadcom Corp. V. Qualcomm Inc. | | |

   D.  New Trial on Infringement Liability.

   Qualcomm advances two independent theories for the grant of a new trial on the jury's basic liability determinations.

   First, Qualcomm relies on venerable but still fully valid Supreme Court authority for the proposition that where trial of an issue such as wilfulness is necessarily bound up with the basic liability determination, a new trial on all issues should be granted. (Qualcomm Memorandum, p. 19, citing, Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931) ("the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial").)  Here, it is difficult to see how the jury could assess wilfulness without taking stock of the evidence, and the strength of the evidence, concerning liability.  That is the very evidence from which "an objectively high likelihood [of] infringement" would flow.  Seagate, 497 F.3d at 1371.  Retrial of wilfulness necessitates a retrial of liability.

   Second, Qualcomm asserts that the evidence of Qualcomm's failure to seek an opinion of counsel tainted the liability verdicts.  For a number of reasons, the Court finds that it is "more probably than not [that the liability verdicts were] untainted by the error."  Haddad v. Lockheed California Corp., 720 F.2d 1454, 1459 (9th Cir. 1983).  First, and perhaps foremost, "patent infringement is a strict liability offense."  Seagate, 497 F.3d at 1369.  Second, the *sturm und drang* upon which Qualcomm focuses very clearly relates mostly to Broadcom's counsel's remarks wilfulness in the opening statement and closing argument.  (Qualcomm Memorandum, pp. 24-25.)  The Court simply cannot say that those remarks overtook, on an emotional or any other level, the jury's factual analysis of the basic infringement issues, which the Court found supported by the evidence in ruling on post-trial motions.  (Minute Order, Aug. 10, 2007, pp. 6-7, 11, 15-16.)

IV.   Conclusion.

   The Court grants a new trial on the wilfulness issues.  Because of the grant of a new trial on the wilfulness issues, and solely for that reason, the Court grants a new

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 05-467-JVS(RNBx) | Date | November 21, 2007 |
|---|---|---|---|
| Title | Broadcom Corp. V. Qualcomm Inc. | | |

trial on all infringement issues.

The Court denies both parties' request for judgment as a matter of law on the wilfulness issues.

The Court vacates its order of August 10, 2007.

The combined effect of the Court's rulings results in a new trial only if Broadcom wishes to pursue its claims for wilfulness. In view of the fact that the Court has found that the liability verdicts were not infected by the instructional errors flowing from Seagate nor by receipt of evidence of a failure to obtain an opinion, those verdicts would stand in the absence of a parallel claims for wilfulness.

Broadcom is directed to file an election with the Court within ten days indicating whether it wishes to accept the liability and damage verdicts or proceed to a new trial on all issues, including wilfulness.

Initials of Preparer  _____ : _____
                                    kjt

# C 67