# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION, INC.,<br><br>               **Plaintiff and**<br>               **Counterclaim-Defendant,**<br><br>    **v.**<br><br>**ANDREW CORPORATION,**<br><br>               **Defendant and**<br>               **Counterclaim Plaintiff.** | **Civil Action No. 05-00747-SLR** |

## ANDREW CORPORATION'S POST-TRIAL REPLY BRIEF
## IN SUPPORT OF ITS REMAINING EQUITABLE DEFENSES

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (No. 1088) [*jingersoll@ycst.com*]
Andrew A. Lundgren (No. 4429) [*alundgren@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Dated: December 17, 2007

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

II.    ARGUMENT.......................................................................................................4

      A.    Andrew's Equitable Defenses Should Prevail Based On
            TruePosition's Deliberate Decision To Conceal Its Unwillingness To
            License...........................................................................................................4

      B.    Andrew's Equitable Defenses Should Prevail Based On
            TruePosition's Affirmative Conduct.................................................10

            1.    TruePosition Admits That It Offered To License Andrew
                   Under The '144 Patent............................................................10

            2.    TruePosition Attempts To Shift The Blame To Andrew By
                   Failing To Tell The Court About Two Key Facts ...................14

      C.    None Of Andrew's Equitable Defenses Is Precluded.........................16

            1.    The Willfulness Finding Does Not Preclude Any Defenses.................16

            2.    The Fraud and Promissory Estoppel Findings Do Not Preclude
                   Any Defenses...........................................................................19

            3.    The Settlement Agreement And Integration Clause Do Not
                   Preclude Any Defenses ...........................................................21

III.    CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*CreditSights, Inc. v. Ciasullo,*
    No. 05 CV 9345(DAB), 2007 WL 943352 (S.D.N.Y. Mar. 29, 2007)............................ 24

*Encyclopedia Brown Prods. v. Home Box Office, Inc.,*
    No. 91 Civ. 4092(PKL), 1998 WL 734355 (S.D.N.Y. Oct. 15, 1998) ............................ 20

*Engineered Prods. Co. v. Donaldson Co.,*
    330 F. Supp. 2d 1013 (N.D. Iowa 2004) ........................................................................ 18

*In re Yarn Processing,*
    602 F.Supp. 159 (W.D.N.C. 1984) ................................................................................ 17

*Loral Corp. v. B.F. Goodrich Co.,*
    Civil Action No. C-3-86-216, 1989 U.S. Dist. LEXIS 16865 (S.D. Ohio Jan. 30,
    1989) ............................................................................................................................... 18

*Lukens Steel Co. v. Am. Locomotive Co.,*
    99 F. Supp. 442 (N.D.N.Y. 1951), *aff'd* 197 F.2d 939 (2d Cir. 1952) ............................ 13

*Odetics, Inc. v. Storage Tech. Corp.,*
    14 F. Supp. 2d 800 (E.D.Va. 1998) ..................................................................... 16, 17, 18

*Rambus, Inc. v. Infineon Techs.,*
    318 F.3d 1081 (Fed. Cir. 2003)........................................................................................ 7

*Stambler v. Diebold, Inc.,*
    1988 WL 95479 (E.D.N.Y. 1988).................................................................................. 17

*Tristrata Tech., Inc. v. Cardinal Health, Inc.,*
    Civil Action No. 02-1290-JJF, 2004 U.S. Dist. LEXIS 585 (D. Del. Jan. 16, 2004) ....... 18

*W. Elec. Co. v. Piezo Tech., Inc.,*
    No. 81-694-CIV-ORL-19, 1990 WL 126269 (M.D.Fla. Mar. 22, 1990) ........................ 17

*Wang Labs. v. Mitsubishi Elecs. Am.,*
    CV 92-4698 JGD, 1994 U.S. Dist. LEXIS 19612 (C.D.Cal. Mar. 7, 1994).................... 18

*WeddingChannel.com, Inc. v. The Knot,*
    03 Civ. 7369 (RWS), 2004 U.S. Dist. LEXIS 25749 (S.D.N.Y. Dec. 29, 2004) ............. 18

**State Cases**

*Brady v. i2 Techs. Inc.,*
    No. 1543-N, 2005 WL 3691286 (Del. Ch., Dec. 14, 2005)............................................. 24

*Carlson v. Hallinan,*
    925 A.2d 506 (Del. Ch. 2006)....................................................................................... 24

*Mobil Oil Corp. v. Wroten*,
    303 A.2d 698 (Del. Ch. 1973)........................................................................................ 12

All **bold italics** emphasis is added, unless otherwise specified.

Where possible, citations to the record reference prior appendices from Andrew (e.g., A232) and TruePosition (e.g., C115) to avoid duplication.  Documents that have not been cited previously are included in the appendix to this reply and cited "X__" in the text of the brief.

Andrew's Post-Trial Opening Brief In Support Of Its Remaining Equitable Defenses is cited *passim* as "Br."  TruePosition's Opposition To Andrew's Post-Trial Brief In Support Of Its Remaining Equitable Defenses is cited *passim* as "TP Br."

## I.    INTRODUCTION

Nothing in TruePosition's opposition brief overcomes the overwhelming evidence that Andrew should prevail on its defenses of equitable estoppel, implied license, and unclean hands.

Unable to standardize UTDOA on its own, and acutely aware that the industry would not agree to standardize UTDOA unless it was going to be a multi-vendor solution, TruePosition promised the industry that it would grant licenses under any patents that covered UTDOA, and joined forces with Andrew -- the only other UTDOA vendor -- to add UTDOA to the standard. As part of the standardization effort, TruePosition also participated in an industry "Study Group" that worked together on UTDOA and was bound by a set of Ground Rules to work to "create a solution that we all benefit from." Consistent with this affirmative conduct, TruePosition never advised the ETSI standards body that it was unwilling to license the '144 patent, which TruePosition asserts is essential to practicing UTDOA/SDCCH. Instead, TruePosition led the standards body and Andrew to believe it had no patents that it believed to be essential.

Based on these assurances, Andrew worked side-by-side with TruePosition for nearly two years to standardize UTDOA. The hard work paid off, and UTDOA was added to the standard.

But then, everything changed. Once TruePosition had accomplished its goal of getting UTDOA added to the standard, and the moment it realized that it had lost a valuable UTDOA/SDCCH contract to Andrew (the only other UTDOA vendor in the market), TruePosition put an end to the multi-vendor solution it had promised the industry. TruePosition demanded that Andrew exit the UTDOA/SDCCH market, announced that it was unwilling to license Andrew to practice the UTDOA/SDCCH solution that Andrew had helped standardize, and sued Andrew for patent infringement.

TruePosition uses a series of excuses to try to defend its misconduct and avoid Andrew's equitable defenses. First, TruePosition asserts that it did nothing to give the impression that

Andrew could practice UTDOA/SDCCH. Its promise to license, says TruePosition, was not intended for Andrew. But as TruePosition admits, Andrew was the only other UTDOA vendor in the market and thus was the only vendor that was in a position to enable the multi-vendor solution the industry had required as a precondition for agreeing to standardize UTDOA. If TruePosition's promise was not directed to Andrew, who was it for?

Second, TruePosition asserts that, although the Study Group Ground Rules may have applied to Andrew and everyone else, they did not apply to TruePosition because TruePosition did not draft them and was not a member of the group when they were drafted. That defies common sense. No one would have agreed to work in a group where TruePosition was the only company that was exempt from a Ground Rule specifying that everyone would work together to create a solution from which all would benefit. The Ground Rule made clear that "we all benefit" was a condition of participation, and TruePosition participated without objection.

Ultimately, however, neither of these first two arguments matters, because TruePosition now admits that it did in fact offer to license Andrew to practice SDCCH under the '144 patent.[1]

Third, and in light of that admission, TruePosition asserts that even if it did offer a license to Andrew, Andrew ignored TruePosition's license offers, did not apply for a license, and thus could not reasonably have had the impression that it could practice SDCCH. But there are two key facts that TruePosition never mentions in its brief. TruePosition made every one of its license offers at a time when it knew that Andrew did not need a license -- because it knew that Andrew was selling only UTDOA/TCH equipment and knew that the '144 patent does not cover TCH. Also, TruePosition retracted its licensing offers as soon as it learned that Andrew had

---

[1]    For convenience, references to SDCCH are shorthand for UTDOA/SDCCH unless otherwise specified.

entered the SDCCH market. Thus, far from suggesting that Andrew behaved irresponsibly by not taking a license when it indisputably had no use for one, this pair of key facts spotlights TruePosition's bad faith bait-and-switch tactic that forms the cornerstone of Andrew's defenses.

Fourth, TruePosition asserts that it had no duty to tell the standards body that it was unwilling to license a patent that it believes to be essential to practicing the UTDOA/SDCCH technology that it wanted to have added to the standard. The basis for TruePosition's assertion is that its patent was essential to practicing only one implementation (SDCCH) of one option (UTDOA) of the standard, and therefore does not block other implementations and options in the standard. But the IPR Policy requires the declaration of an unwillingness to license a patent that is believed to be essential to an "option." And consistent with TruePosition's testimony at trial, the Policy makes no distinction between implementations and options. Indeed, no company would ever vote to add a technology feature (whether referred to as an implementation or an option) into a standard knowing that it would be off-limits to everyone but the patent holder.

Finally, TruePosition contends that the jury verdict and a prior settlement agreement between the parties preclude all three of Andrew's equitable defenses. TruePosition is incorrect. The jury verdict on fraud and promissory estoppel does not preclude any of the defenses because the elements are different for both defenses, the standard of proof is different for promissory estoppel, and the jury was not asked to make findings on the individual elements of fraud. The jury's decision on willfulness does not preclude the defenses because the law requires more -- a showing of egregious conduct that goes beyond conduct establishing willfulness. TruePosition does not mention this requirement in its brief, and Andrew did not engage in any such conduct. The settlement agreement does not preclude the defenses because the settled litigation had nothing to do with UTDOA/SDCCH or the '144 patent. Whereas the promises and offers that

form the basis of Andrew's equitable defenses guaranteed the *availability* of a UTDOA (TCH and/or SDCCH) license if and when Andrew needed one, the settlement agreement *conveyed* to Andrew a license to practice UTDOA/TCH.  The settlement agreement thus is perfectly consistent with TruePosition's promises and offers to Andrew.  It did not supersede them.

For these reasons, and as detailed below and in Andrew's opening brief, Andrew should prevail on all three of its equitable defenses.

II.    **ARGUMENT**

A.    **Andrew's Equitable Defenses Should Prevail Based On TruePosition's Deliberate Decision To Conceal Its Unwillingness To License**

As Andrew demonstrated in its opening brief, ETSI's IPR Policy requires ETSI members to declare their willingness or unwillingness to license patents they believe to be essential to practicing a standard.  Because a standard is defined as "including options therein," ETSI members must declare patents believed to be essential to an option in a standard.  Br. 11, 13.

Based on its belief that the '144 patent is essential to the UTDOA/SDCCH option of the GSM Location Services standard, TruePosition had an obligation to declare that patent -- and its willingness or unwillingness to license it -- to ETSI.  But TruePosition overruled the explicit recommendation of its Standards Manager and chose not to.  TruePosition thus deliberately concealed its unwillingness to license the '144 patent until after it used Andrew to get the SDCCH option into the standard, once it realized that it had lost a valuable SDCCH contract to Andrew.  TruePosition's misconduct forms the cornerstone of Andrew's equitable defenses.

TruePosition's responsive arguments fail.  First, TruePosition argues that a patent is not essential to a standard unless it blocks every option in the standard.  In TruePosition's words, "a duty to declare the 144 patent would arise *only if* no option under the standard could be practiced without infringing the 144 patent."  TP Br. 26 (emphasis in original).  On this basis, TruePosition

says it had no duty to declare to ETSI the '144 patent or its (un)willingness to license that patent because UTDOA is just one of several options in the relevant ETSI standard. TP Br. 27-28.

ETSI has rejected TruePosition's theory. In October 2007, the Director-General of ETSI wrote to TruePosition to "ascertain whether you are of the opinion that you hold *essential or potentially essential, IPRs related to* the [ETSI] Technical Specifications [relating to Location Services] or *options therein*." Magnusson Decl. Ex. A. The Director-General gave TruePosition three months to "disclose any essential IPR and indicate if you are prepared to grant licenses for this/these IPR(s)."[2] *Id.* This means TruePosition will finally have to come clean and reveal to ETSI that it is unwilling to license that patent, given its consistent belief that the '144 patent is essential to the UTDOA/SDCCH option of the standard.[3] A191; Br. 12.

To try to avoid this result, TruePosition "peel[s] the onion further" to come up with a fallback position. TP Br. 28. TruePosition manufactures a distinction between "options" and "implementations of an option," and asserts that UTDOA/SDCCH and UTDOA/TCH are not separate options, but rather two implementations of the same (UTDOA) option. On this basis,

---

[2]    Importantly, TruePosition does not take issue with the content of the ETSI letter. Instead, TruePosition asserts that ETSI sent its letter to Andrew and on that basis questions its "impartiality." Br. 29 n. 14. In fact, the letter is addressed and was sent to "True Position, Inc., c/o Rob Anderson," the Chief Technical Officer of ETSI.

TruePosition also asserts that "trial record is closed." Br. at 29 n. 14. Not so. At the pretrial conference, Andrew expressly reserved the right to introduce further evidence on its equitable defenses "in very minor instances" following the jury trial, and TruePosition did not object. A228:6-16. However, should the Court deem the record closed on all issues, Andrew is willing to file a motion to re-open the record to include evidence of how ETSI and its officials interpret the ETSI IPR policy. Moreover, TruePosition cannot be heard to complain about the ETSI letter after having repeatedly opened the door at trial by asking Rob Anderson and other witnesses whether ETSI had ever expressed its view on the matter. *See* Tr. at A247:22-248:10, X5:17-22, X8:13-X9:6.

[3]    Last month, the highest body within ETSI -- the ETSI General Assembly -- rejected TruePosition's theory as well. The GA issued a statement reminding its members that their obligation to declare essential patents applies to options as well. "ETSI members are reminded of their obligations to declare IPR under the ETSI IPR Policy, *including its existing provisions relating to options*." Magnusson Decl. Ex. B.

TruePosition argues that Andrew is free to use the UTDOA "option," just not the SDCCH "implementation" of that option, which makes the '144 patent essential to the implementation but not the option. TP Br. 28. In TruePosition's view, this translates to no duty to declare, because the UTDOA option (as well as the other options, Timing Advance, E-OTD, and GPS) can be practiced without infringing the patent (even if the SDCCH "implementation" cannot be):

> The duty that Andrew alleges TruePosition to have breached by not declaring its patent as essential to the ETSI standard is illusory; there was no duty because *each and every option in the standard could be practiced without use of the technology claimed in the 144 patent*.

TP Br. 4.

TruePosition's "options versus implementations" distinction was manufactured for this case, as is clear from TruePosition's trial admissions and opposition brief. TruePosition's President Joe Sheehan testified on direct that the '144 patent covers the SDCCH "option":

> Q:    … In the standard, the location services standard, is time difference of arrival on the voice channel, is that one of the *options*?
>
> A:    Yes, it is.
>
> Q:    And would the '144 patent cover that *option*?
>
> A:    No, it would not.
>
> Q:    Would it cover the time difference of arrival on the control channel *option*?
>
> A:    Yes it would.

A269:9-17. Likewise, at page 35 of its opposition brief, TruePosition describes UTDOA/SDCCH as being an "option" for practicing UTDOA:

> [T]he 144 patent is directed to a specific aspect of *one option* for practicing UTDOA -- the "inner workings of *TDOA on the control channel* …."

TruePosition's admissions confirm that there is no difference between an option and an implementation of an option. UTDOA/SDCCH is an option in the standard. A269:9-17,

A272:7-11, TP Br. 35. Because TruePosition contends the '144 patent is essential to practicing that option, TruePosition had a duty to reveal to ETSI its unwillingness to license that patent.[4]

Ultimately, TruePosition's "options vs. implementation" argument is nothing more than semantics. According to the standard, Timing Advance, E-OTD, GPS, UTDOA/SDCCH, and UTDOA/TCH are five ways to locate a cell phone. It makes no difference whether they are called five options or four options with two alternative implementations. Either way, an option or implementation added to a standard cannot be off limits to some but accessible to others.

Thus, once the semantics are disposed of, the relevant inquiry for essentiality is not whether every option in the standard is blocked, as TruePosition asserts. TP Br. 27. The test is whether *any* of the options is blocked. This makes sense for the reasons set forth at p. 35 of Andrew's opening brief, and TruePosition does not dispute any of them in its opposition.

Specifically, TruePosition never explains why Andrew or any other company would ever vote to standardize technology that only TruePosition would be able to use in the future. This is particularly the case where, as TruePosition admits, "Andrew submitted technical proposals to add *UTDOA* -- location on the voice channel and location *on the control channel*." TP Br. 11.

---

[4]    TruePosition's criticism that Andrew has taken inconsistent positions on essentiality misses the point. TP Br. 10, 17-18. First, Andrew has never asserted that the patent is essential. It is TruePosition that believes the patent is essential. *See* Br. at 12. That *belief* is what triggered the duty to declare the patent. *See* Magnusson Decl. Ex. A ("I am obliged to bring this matter to your attention to ascertain whether you are of the *opinion* that you hold essential or potentially essential, IPRs."); *see also* Nov. 30 Appendix to TP's Reply re Permanent Injunction at C115 (D.I. 346) ("The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it *believes* that the IPRs may be considered essential to the Standards listed above."). Thus, Andrew did not have to "prove that the 144 patent was, in fact, essential," as TruePosition asserts. TP Br. 25. Moreover, TruePosition's reliance on *Rambus, Inc. v. Infineon Techs.*, 318 F.3d 1081 (Fed. Cir. 2003) is unavailing because the *Rambus* decision was not concerned with ETSI declarations, which are based on a patent holder's belief of essentiality.

Second, TruePosition misstates Andrew's position. Either there is no infringement (and therefore the patent does not cover the SDCCH standard as Andrew has consistently said), or the patent is essential in view of TruePosition's infringement assertions and should have been declared to ETSI.

Why would Andrew propose to add the UTDOA/SDCCH option to the standard knowing that its competitor TruePosition would be able to sell UTDOA/SDCCH equipment but block Andrew from doing so? As the former Chairman of the ETSI Board explains (X18 ¶ 9):

> In my experience, *no company would agree* to introduce into a Standard, and certainly would not promote and encourage the standardization of, an option that it would not be permitted to practice in the future.

TruePosition also never explains how any member of the public could practice *any* option in a standard if every patent holder that held a patent on an option in a standard refused to license anyone else. *See* Br. at 35. As the former Chairman of the ETSI Board explains, if the ETSI IPR Policy did not apply to options as TruePosition asserts (X18 ¶ 11):

> *[E]ach alternative could be blocked with the argument that it is optional*. This would leave the public unable to practice any of the options, and thus unable to practice the Standard.[5]

That is why ETSI imposes on its members a duty to declare their willingness or unwillingness to license their essential patents on fair and reasonable terms, regardless of whether a patent is essential to a standard or to an option in the standard.[6] If an ETSI member declares that it is willing to license its patent on fair and reasonable terms, the public knows that it can implement the standard, or the option in the standard, in the future. But if the member declares during the standardization process that it is unwilling to license its patent on such terms (or at all), the standards body will not add the patented technology to the standard.

---

[5]    These points apply equally to "implementations of an option." Why would any company propose to standardize even an implementation of an option that only its competitor can practice in the future?

[6]    TruePosition is incorrect that "[t]he jury already rejected the policy interpretation that Andrew advances here . . . . " TP Br. 29. The jury did no such thing. In finding that Andrew had not proved fraud, the jury merely found that one or more unidentified elements had not been established. The jury did not find that a particular element (*e.g.*, the first element directed to TruePosition's duty to declare) had not been established. *See* § II.C.2 below.

The public thus is entitled to infer that whatever technology makes it into the standard either is not patented at all (in which case it can be used for free), or is patented but is the subject of a declaration of a willingness to license (in which case it can be used on fair and reasonable terms). The only way any technology that is blocked by a patent can make it into the standard is if a patent holder who is unwilling to license its essential patent breaches its duty under the ETSI IPR Policy and hides its unwillingness to license during the standardization process. In that case, the public is misled into reasonably inferring that it can practice the standardized technology.

By remaining silent and breaching its duty under the ETSI IPR Policy -- and also by affirmatively offering to license Andrew under the '144 patent (*see* § II.B.1 below), TruePosition misled Andrew into reasonably inferring that TruePosition did not intend to enforce its patent and sue Andrew for patent infringement. That is the first element of equitable estoppel. In addition, Andrew reasonably relied on TruePosition's offer (the second element) for the reasons stated in § IV.A.2 of Andrew's opening brief. TruePosition does not offer any rebuttal to the reliance evidence independent of its above arguments concerning options and essentiality. Nor does TruePosition dispute Andrew's proof of material prejudice (the third element) set forth in § IV.A.3 of Andrew's opening brief. This establishes the defense of equitable estoppel.

The defense of implied license is established as well. TruePosition asserts that "[t]he last element of implied license -- whether TruePosition's statements or conduct created the impression that it consented to Andrew's use of the '144 patent -- completely overlaps with the first element of equitable estoppel." TP Br. 35-36. Thus, the last element of implied license is satisfied for the reasons discussed above. As for the first element of implied license, TruePosition admits that "Andrew and TruePosition did work together to standardize UTDOA" (TP Br. 34), which establishes the requisite relationship for an implied license. Within that

9

relationship, TruePosition granted Andrew the right to use UTDOA/SDCCH by virtue of being an ETSI member but not communicating an unwillingness to license the '144 patent during standardization. Because TruePosition's brief does not dispute the two other elements of implied license (that TruePosition received valuable consideration for the grant, and that TruePosition denies that Andrew has an implied license), the defense of implied license is established.

Finally, because TruePosition's only argument against unclean hands fails (*see* § II.C.1), unclean hands is established by the unrebutted evidence in § IV.C of Andrew's opening brief.

**B.    Andrew's Equitable Defenses Should Prevail Based On TruePosition's Affirmative Conduct**

**1.    TruePosition Admits That It Offered To License Andrew Under The '144 Patent**

TruePosition attacks the first element of equitable estoppel by arguing that "Andrew Could Not Reasonably Believe That TruePosition Did Not Intend to Enforce the 144 Patent." TP Br. 20. TruePosition does this by using a series of excuses to try to avoid the trial evidence.

As to the promise to license in the Feasibility Study, TruePosition asserts that it was not an offer made to Andrew -- despite the fact that Andrew was the only other UTDOA vendor in the marketplace, and thus the only vendor that was in a position to effectuate the multivendor solution the industry wanted. TruePosition also asserts that the promise in any event was ineffective because it was not made over and over again in future documents. TP Br. 21-22, 30.[7]

---

[7]    The Feasibility Study promise was not limited to meeting attendees or then-3GPP members. It is limited to "applicants" -- but as discussed above in § II.B.2, TruePosition apparently was accepting applications only when licenses were not needed. Its post-standardization letter to Andrew makes clear that it refused to take applications later, making it futile for Andrew to "apply" for a license as TruePosition now says Andrew should have done. TP Br. 22. Furthermore, not repeating the promise in later versions of the Feasibility Study did not operate to revoke the promise. It became effective as soon as it was made, and became ineffective when it was revoked post-standardization, once TruePosition learned of Andrew's winning STC bid. Finally, TruePosition misstates Andrew's position -- Andrew has never asserted that the offered license would grant "free rights" in the patent. TP Br. 30. The promise expressly specifies a reasonable, non-discriminatory royalty.

As to its December 2000 promise to license, TruePosition argues that the letter was really just a warning letter that at best offered a license at the time the offer was made. The license offer was not, according to TruePosition, intended for the future when Andrew might actually need it. TP Br. 24-25.[8] And as to the TDOA Study Group ground rule that all participants would benefit from the solutions the group created, TruePosition asserts that it was not bound by the ground rules like all the other participants were because it did not draft those ground rules and was not a member of the study group when they were drafted. TP Br. 22-24.[9]

But one admission cuts through all of these excuses. TruePosition has now finally admitted that it offered to license the '144 patent to Andrew:

> Even though TruePosition's *offer to license* did not arise from a belief that the *144 patent* had to have been declared, *TruePosition did nevertheless make the offer*, and therefore any obligation TruePosition would have had through the standards body was effectively discharged.

Br. 18 n. 5.

Because this offer was not revoked until September 30, 2005, when TruePosition issued written notice to Andrew that it "does not intend to grant a license to Andrew" (A191), it was effective until that point in time. Thus, it was effective throughout the time period when Andrew was working with TruePosition to standardize UTDOA/SDCCH. It was likewise effective when Andrew made its proposal and won the contract to sell UTDOA/SDCCH equipment to Saudi

---

[8]  TruePosition could not have intended in good faith that its December 2000 license offer was ineffective after the time frame in which it was made. TruePosition knew at the time that Andrew was not in the SDCCH market, and thus any need for a license would have arisen in the future. TruePosition also misstates Andrew's position -- Andrew has never asserted that the offered license was "royalty-free," but rather that TruePosition could not block Andrew from practicing the patent in view of the license offer. TP Br. 25.

[9]  The Study Group document did not bind only its drafter. To the contrary, the undisputed testimony was that the agreement and ground rules served as the basis for any company to participate. TruePosition had a copy of the agreement and ground rules, and was bound by its contents just like every other member by participating in the group. *See* Br. § III.E. The "we all benefit" ground rule would be useless if only one of the participating companies could use UTDOA/SDCCH and use its patent to block everyone else from using it.

Telecom, as both events occurred prior to September 30, 2005. *Mobil Oil Corp. v. Wroten*, 303

A.2d 698, 700 (Del. Ch. 1973) ("a gratuitous option ... constitutes a continuing offer to the

optionee unless and until it is revoked."), *aff'd* 317 A.2d 728 (Del. 1973).

There is no question that TruePosition made its license offer purposefully, because

TruePosition needed to address industry concern about a solution that would be proprietary and

accessible to only one vendor. *See* Br. § III.A. TruePosition wanted to get, and got, Andrew

involved in the standardization effort to reassure the industry that there would be multiple

vendors. And Andrew agreed to participate based on TruePosition's offer to license. This is not,

as TruePosition puts it, "Andrew's world." TP Br. 33. This was the marketplace reality that

TruePosition faced when its own standardization efforts initially failed. *See* Br. at § III.A.

Furthermore, by "multi-vendor" solution the industry did not mean a divided UTDOA

market in which Andrew sold only TCH and TruePosition sold only SDCCH. As TruePosition

acknowledges, the reason for the industry concern about a proprietary solution was that:

> [W]ireless operators and carriers would be more likely to support standardization
> if *more than one vendor were using a particular technology* (and in this case
> both Andrew and TruePosition were using UTDOA) *because of the generally-
> resulting price competition*.[10]

TP Br. 34. Because that price competition does not result when only one vendor can sell a

particular solution (e.g., UTDOA/SDCCH), the industry plainly wanted any particular solution to

be accessible to multiple vendors. TruePosition's pre-standardization offer to license the '144

patent accomplished that. TruePosition's post-standardization refusal to license the '144 and

SDCCH did the exact opposite, giving rise to the very circumstance the industry had feared.

---

[10] AT&T was one such wireless carrier. Before UTDOA was standardized, TruePosition assured AT&T that there
was "No Essential IPR in TruePosition's U-TDOA proposal." A4.

TruePosition's admitted pre-standardization offer to license the '144 thus established a reasonable belief on the part of Andrew that TruePosition did not intend to enforce that patent -- the first element of equitable estoppel. *See, e.g.*, Br. 31-33. How else could the UTDOA/SDCCH solution be multi-vendor so as to dispel industry concern? In addition, Andrew reasonably relied on TruePosition's offer (the second element) for the reasons stated in § IV.A.2 of Andrew's opening brief, and TruePosition does not dispute Andrew's proof of material prejudice (the third element) set forth in § IV.A.3 of Andrew's opening brief. Thus TruePosition's admission that it offered to license Andrew under the '144 establishes equitable estoppel.[11]

Implied license is also established, for reasons similar to those discussed at the end of § II.A. In view of TruePosition's assertion that "[t]he last element of implied license … completely overlaps with the first element of equitable estoppel" (TP Br. 35-36), the last element of implied license is satisfied for the reasons discussed immediately above. Also, TruePosition admits that "Andrew and TruePosition did work together to standardize UTDOA" (TP Br. 34), which establishes the first element of an implied license. Within that relationship, TruePosition

---

[11]   The *Lukens Steel Co. v. Am. Locomotive Co.*, 99 F. Supp. 442, 445 (N.D.N.Y. 1951), *aff'd* 197 F.2d 939 (2d Cir. 1952) case cited by Andrew in its opening brief likewise establishes why equitable estoppel applies here. TruePosition's two attempts to distinguish Lukens are unavailing. TP Br. 19-20.

First, TruePosition argues that the parties in *Lukens* worked together on the accused product, whereas the parties here did not work together on Andrew's Geometrix product. TP Br. 19-20. But just as in *Lukens*, Andrew and TruePosition worked together on a standard that all products -- including Geometrix -- must comply with. And that work involved "major changes to U-TDOA positioning," not just to the text of the standard. A77.

Second, TruePosition notes that the infringing party in *Lukens* "had no knowledge concerning the existence or ownership of the patent," whereas Andrew knew of the '144 patent. But the relevance was that the infringing party had no way of knowing that it would be blocked from selling the accused product. Likewise, although Andrew knew about the patent, Andrew had no knowledge of TruePosition's unwillingness to license it, and thus had no way of knowing that it would be blocked from selling the accused product. To the contrary, TruePosition had earlier offered to license Andrew, as TruePosition now admits. TP Br. 18, n. 5.

13

granted Andrew the right to use UTDOA/SDCCH (on reasonable and non-discriminatory terms)

based on its admitted offer to license the '144 patent. This establishes the defense of implied

license, because TruePosition's brief does not dispute the two remaining elements.

Finally, unclean hands is established for the reasons set forth at the end of § II.A above.

### 2. TruePosition Attempts To Shift The Blame To Andrew By Failing To Tell The Court About Two Key Facts

Throughout its brief, TruePosition criticizes Andrew for supposedly ignoring

TruePosition's offers to license the '144 patent. For example:

- "Andrew ignores that TruePosition *did* offer to discuss licensing with Andrew -- several times -- but Andrew turned its back, ***thumbing its nose at the patent*** and TruePosition's offer." TP Br. 18, n. 5.

- "Andrew ... in fact ***pointedly ignored*** several offers to license that TruePosition directed to Andrew." TP Br. 5.

TruePosition also criticizes Andrew for not applying for a license before this lawsuit was filed:

- "[E]ven if the patent had been subject to availability for licensing under the ETSI policy, Andrew ***never availed itself*** of any such licensing opportunity." TP Br. 5.

- "That is, [under the Feasibility Study] a license would only be available to those who affirmatively approached TruePosition about a license. Andrew never did. ... It is undisputed that ***Andrew never approached TruePosition to inquire about a license*** under *any* of TruePosition's patents ***prior to the filing of this lawsuit*** ...." TP Br. 22.

- "Even if the statement [the Feasibility Study promise] had been operative, it was for "*applicants*" -- members of the organization who *applied* for a license. ... ***If Andrew had 'relied,' it would have applied. It did not.***" TP Br. 30-31.

But TruePosition neglects to tell the Court the half of the story that is inconvenient for its

position. TruePosition does not reveal that it made every one of these offers before

UTDOA/SDCCH was standardized, at a time when it knew that Andrew had no use for a license

under the '144 patent. TruePosition knew that Andrew had no need for a license then because it

knew that Andrew was selling only UTDOA/TCH and because it also knew that the '144 patent

does not cover UTDOA/TCH. This is undisputed. *See* Br. 8-9, 12, 33-34.

TruePosition also does not tell the Court that it revoked its offers to license after SDCCH

was standardized, when it realized that Andrew had won a contract to sell SDCCH that

TruePosition had wanted for itself. TruePosition demanded that Andrew stop selling SDCCH

and announced that it was not going to offer a license to Andrew (or anyone else):

> ***TruePosition has not licensed*** the '144 Patent to Andrew, or anyone else.
> ***Further, TruePosition does not intend to grant a license*** to Andrew or any third
> party vendor with respect to fulfillment of the RFP.
> . . . .
> ***TruePosition asks that Andrew discontinue immediately*** any offer to supply
> equipment from the United States that will locate mobile telephones using reverse
> ***control channel*** signal data to implement the ***TDOA*** ....[12]

A191-92. A month later, TruePosition sued Andrew for selling UTDOA/SDCCH.

TruePosition's criticisms thus are completely off base. To paraphrase TruePosition's

argument with respect to the pre-standardization time frame, "We offered you a license, but you

ignored us." But the reason is clear: Andrew had no need for a license then. Likewise, to

paraphrase TruePosition's argument for the time frame after TruePosition had used Andrew to

get UTDOA/SDCCH standardized, "You never applied for a license -- so why were we obligated

to give you one?" Again, the reason is clear: TruePosition told Andrew it was not going to grant

a license. There was no point in Andrew's applying for a license if it was going to be denied.[13]

---

[12]  As explained in Andrew's opening brief, TruePosition's refusal to license any other vendor "with respect to
fulfillment of the RFP" was none other than a refusal to license the '144 patent, in light of TruePosition's
assertion that it was not possible to bid on the RFP without infringing the '144 patent. Br. 26.

[13]  Indeed, because TruePosition did not declare the patent to be essential, there was no way for Andrew to know
that TruePosition believed Andrew needed a license. Andrew has consistently believed in good faith that the
'144 patent does not cover SDCCH for the reasons discussed at, *e.g.*, pp. 18-25 of Andrew's JMOL brief.

The bottom line is that in TruePosition's world, you are apparently supposed to sign up for a license even if you do not need one, because you never know -- the patent holder might go back on its promise and refuse to issue licenses once it thinks you need one. And, once the patent owner makes clear that no license is forthcoming, you must request one anyway. Andrew's equitable defenses bar misconduct like this.[14]

### C.    None Of Andrew's Equitable Defenses Is Precluded

#### 1.    The Willfulness Finding Does Not Preclude Any Defenses

TruePosition's lead argument is that the jury's finding of willfulness automatically bars Andrew from asserting any equitable defenses: "The finding that Andrew's infringement of the 144 patent was *willful is, in itself, sufficient basis to dismiss* Andrew's equitable defenses." TP Br. 13. This argument is a linchpin of TruePosition's brief. It is made throughout the brief (TP Br. 1, 4, 13-15, 19, 20, 32, 36), including as part of an overarching attempt to defeat all three of Andrew's equitable defenses. TP Br. 13-15.

TruePosition misstates the law. Courts have made clear that a finding of willfulness is not enough to preclude equitable defenses. The defendant's conduct must also have been so egregious as to shift the equities significantly in the plaintiff's favor. In *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 800 (E.D.Va. 1998), *aff'd* 185 F.3d 1259 (Fed. Cir. 1999) the Court explained that a willfulness finding did not foreclose the equitable defense of laches:

> [A]lthough it is true that there are circumstances in which one who has unclean
> hands cannot invoke a laches defense, STK's willfulness does not constitute the

---

[14]  This defeats TruePosition "Balancing of the Equities" analysis for equitable estoppel. That analysis is premised on TruePosition's assertion that "there was the opportunity to negotiate a fair and reasonable license. Andrew ignored the opportunities." TP Br. 32. But those opportunities were made available only when Andrew did not need them, and did not know that TruePosition believed its patent to be essential to practicing SDCCH. TruePosition's prompt withdrawal of those opportunities as soon as it learned that Andrew had entered the UTDOA/SDCCH market means that the balance of equities favors Andrew, not TruePosition.

type of inequitable conduct that would foreclose it from asserting the defense here.

....

Instead, the *patentee must prove that "the infringer has engaged in particularly egregious conduct* [that] would change the equities *significantly* in plaintiff's favor."* Thus, many of the cases in which the laches defense was not allowed involved inequitable conduct *far more egregious than the willful infringement found here.* And in this regard, several courts have specifically held that *willful infringement, by itself, is insufficient to preclude* application of the laches defense.

*Id.* at 805-06. The Court then identified examples of particularly egregious conduct:

The existing record provides no evidence of STK's inequitable conduct beyond its willfulness. . . . . Unlike the case in *Bott* and *Aukerman,* here there was no copying, no acceleration of infringing sales, and no construction of additional infringing products after the litigation began.

*Id.* at 807.[15]

This principle applies to equitable estoppel. As the Court explained in *W. Elec. Co. v. Piezo Tech., Inc.,* No. 81-694-CIV-ORL-19, 1990 WL 126269 (M.D.Fla. Mar. 22, 1990):

Although a showing of egregious conduct may persuade a court that the equities do not lie with the defendant, *a plaintiff's allegations of "willful infringement" do not automatically bar* the alleged infringer from asserting the laches and *estoppel* defenses; this is a matter for the court to determine in its equitable discretion.

*Id.* at *10. Likewise, in granting summary judgment of equitable estoppel, the Court explained in *In re Yarn Processing,* 602 F.Supp. 159, 173 (W.D.N.C. 1984) (citations omitted):

*Even if Barmag's infringement were "wilful," that would not deprive Barmag of equitable defenses.* The applicable rule is that the *conduct in question must be compared with that of Lex Tex* in light of the entire history of relations between the parties. ... The conclusion is inescapable that any alleged "wilful" infringement on the part of Barmag was *insignificant* compared to the overall demeanor of Lex Tex.

---

[15]    *See also Stambler v. Diebold, Inc.,* No. 85 CV 3014, 1988 WL 95479, at *5 (E.D.N.Y. 1988) ("It should be noted that *the Court is aware of no case* that stands for the proposition that willful infringement, without proof of deliberate, calculated plagiarism, constitutes such egregious conduct as to defeat a laches defense.").

Even TruePosition's cases say that willfulness does not automatically bar equitable relief:

- *Wang Labs. v. Mitsubishi Elecs. Am.*, CV 92-4698 JGD, 1994 U.S. Dist. LEXIS 19612, at *5 (C.D.Cal. Mar. 7, 1994) ("[W]illful infringement *may* preclude the alleged infringer from obtaining equitable estoppel.") (TP Br. 13)

- *WeddingChannel.com v. The Knot*, 03 Civ. 7369 (RWS), 2004 U.S. Dist. LEXIS 25749, at *7 (S.D.N.Y. Dec. 29, 2004) ("[T]he infringer's state of mind *can* support a finding of egregious conduct, thereby defeating equitable defenses such as laches.") (TP Br. 13).

As TruePosition's cases further explain, egregious conduct beyond mere willfulness is needed, and even that might not be enough to preclude unless it is sufficiently egregious:

- *Engineered Prods. Co. v. Donaldson Co.*, 330 F. Supp. 2d 1013, 1027 (N.D. Iowa 2004) ("*[W]illful infringement and egregious conduct* of the accused infringer *may* preclude a determination of estoppel.") (giving examples of non-preclusive conduct) (TP Br. 13)

- *Tristrata Tech., Inc. v. Cardinal Health, Inc.*, Civil Action No. 02-1290-JJF, 2004 U.S. Dist. LEXIS 585, at *7 (D. Del. Jan. 16, 2004) ("*Egregious conduct* by the alleged infringer *can* prevent a finding of laches by demonstrating the equities of the case favor the plaintiff.") (TP Br. 15)

- *Loral Corp. v. B.F. Goodrich Co.*, Civil Action No. C-3-86-216, 1989 U.S. Dist. LEXIS 16865, at *134 (S.D. Ohio Jan. 30, 1989) (defendant's conduct "constitute[d] willful infringement of a *sufficiently egregious* nature") (TP Br. 13)

Andrew's conduct does not come close to being egregious, let alone so egregious as to warrant the preclusion of equitable relief. As in *Odetics*, here there was no copying, no acceleration of infringing sales, and no construction of additional infringing products after the litigation began. *Compare* 14 F. Supp. 2d at 807. Indeed, the allegedly infringing conduct in this case consisted of Andrew's making, using, and selling technology that it participated in developing and standardizing. *See* Br. § III.F. There is nothing egregious about that.

TruePosition's only argument on the merits against unclean hands is that willfulness precludes equitable relief.[16] TP Br. 36. Because that is not the law, Andrew's unclean hands defense should prevail based on the unrebutted arguments in § IV.C of Andrew's opening brief.

### 2.    The Fraud and Promissory Estoppel Findings Do Not Preclude Any Defenses

TruePosition asserts that the jury verdict on two of Andrew's equitable defenses (fraud and promissory estoppel) compels the Court to decide for TruePosition on the rest of Andrew's equitable defenses (equitable estoppel, implied license, and unclean hands):

> Andrew ignores the adverse jury findings on fraud and promissory estoppel, which findings arise from the same operative facts as Andrew's equitable defenses and thus make it *logically impossible for these defenses to be sustained*.

TP Br. 1. This ignores key differences in the elements and burdens for those defenses.[17]

To prevail on its fraud defense, Andrew had to establish five separate elements:  (1) TruePosition made a misrepresentation or omission of a material fact, (2) TruePosition did so knowingly or with reckless disregard for the truth, (3) TruePosition did so with the intent to mislead Andrew, (4) Andrew reasonably relied on the misrepresentation or omission, and (5) Andrew was damaged as a result of relying on the misrepresentation or omission. *See* X12:17-X13:7. Because the verdict form did not ask the jury to decide each element individually, there is no way to know which elements the jury found for Andrew and which elements the jury found

---

[16]  TruePosition's only other argument against unclean hands is that the Court, by not specifically mentioning unclean hands in its order setting a briefing schedule for Andrew's equitable defenses, must have denied leave for Andrew to brief the unclean hands defense. TP Br. 36. But the unclean hands defense has never been decided, either by the Court or the jury, or dismissed. As TruePosition's lead counsel stated in open Court on the first day of trial, "I mean, they have a fraud claim here. *They have unclean hands going on here.* And if, in fact -- I mean, if I -- *that would be a dynamite issue if I was a lawyer in their shoes.*" X2:15-18.

[17]  In yet another attempt to avoid Andrew's equitable defenses, TruePosition also asserts that the Court "may already have" disposed of those defenses when it entered judgment on the jury verdict. TP Br. 17, n.4. But the Court set a briefing schedule for those defenses after it entered judgment on the jury verdict. D.I. 324.

for TruePosition. All that can be determined from the jury verdict is that the jury found for TruePosition on at least one (unidentified) element.

Thus, the jury may well have decided that Andrew proved every element of fraud except the third element -- that "TruePosition made the misrepresentation or omission with the *intent* to mislead Andrew." Because that is not an element of any of the three equitable defenses at issue here, the fraud verdict does not foreclose judgment for Andrew on any of those defenses.

Likewise, to prevail on promissory estoppel before the jury, Andrew had to establish each of four elements by clear and convincing evidence: TruePosition made a promise, TruePosition intended to induce Andrew's action or inaction based on the promise, Andrew reasonably relied on the promise, and Andrew was injured by its reliance. *See* X15:10-19. The jury may have found for Andrew on some or even all four elements by a preponderance, but not by clear and convincing evidence -- including, for example, the element that "TruePosition made a promise."

Although that would not have been good enough for promissory estoppel (for which the standard is clear and convincing evidence), it would be perfectly adequate for equitable estoppel, implied license, and unclean hands (preponderance standard). Accordingly, the jury's verdict on promissory estoppel based on the higher clear and convincing standard does not preclude the equitable defenses at issue here. *See Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 Civ. 4092(PKL), 1998 WL 734355, at *13 (S.D.N.Y. Oct. 15, 1998) ("[D]efendant has failed to make an adequate showing that *promissory estoppel* is applicable. …. However, the Court finds that plaintiffs are *equitably estopped* from asserting their rights under copyright. Furthermore, the Court finds that *plaintiffs' actions granted to HBO a nonexclusive license*.").

Thus, there is no basis for TruePosition's assertion that "the jury has already found that TruePosition's conduct did not amount to a promise to license the 144 patent" -- an assertion

TruePosition deems "[i]mportant" to its arguments against implied license. TP Br. 33. Nor is there any basis for its identical argument for equitable estoppel, that "the jury has already explicitly found that this conduct did not constitute a promise to not assert the 144 patent against Andrew." TP Br. 20. The jury did not make either finding under a preponderance standard. TruePosition thus is also incorrect that "Andrew can prevail on its equitable defenses only if the court makes separate findings that are inconsistent with the findings the jury already made on the related issues properly before it." TP Br. 16. Findings in Andrew's favor on the equitable defenses at issue here would be perfectly consistent with the jury's findings.

### 3.    The Settlement Agreement And Integration Clause Do Not Preclude Any Defenses

**The Settlement Agreement.** TruePosition contends that Andrew could not have reasonably inferred that it would be able to practice UTDOA/SDCCH in view of the January 2004 Settlement Agreement between the parties. TP Br. at 4, 29-30. TruePosition is incorrect.

The litigation that the Settlement Agreement resolved had nothing to do with UTDOA/SDCCH. SDCCH was not accused in that lawsuit. That is because, as even TruePosition was aware, Andrew was not making or selling an SDCCH product at the time. Thus, because the lawsuit had only to do with TCH (voice channel) products, which the '144 indisputably does not cover, the Settlement Agreement was directed to Andrew's right to practice any patents that covered TCH as well as TruePosition's obligations in that regard.

Conversely, the Settlement Agreement did not address the parties' rights and obligations for SDCCH or the '144 patent. It did not "ma[k]e clear that TruePosition would pursue Andrew for infringement of the 144 patent if Andrew began locating cell phones using the control channel" -- it says nothing of the sort. TP Br. 29-30. Nor did it address Andrew's entitlement to

21

a '144 license as a result of some other promise or agreement by TruePosition. The Settlement

Agreement merely said that *it* was not conveying a license under the '144 patent.[18]

As a result, the Settlement Agreement and TruePosition's prior promises to license the

'144 patent are perfectly consistent with each another:

- The Feasibility Study promise assured Andrew that it *could* obtain a license on reasonable and non-discriminatory terms under any TruePosition patents needed to practice either form of UTDOA (TCH or SDCCH). That is, it guaranteed the *availability* of a license to practice TCH and/or SDCCH if and when Andrew needed one.[19]

- The Settlement Agreement actually *gave* Andrew a license to practice UTDOA/TCH.

Thus, based on the combination of the Feasibility Study and the Settlement Agreement,

Andrew reasonably inferred that: (a) it *had* a paid up license on the TCH products it was then

selling; and (b) it *could have* a license to practice SDCCH if it ever began selling SDCCH

products and ever needed such a license. Andrew knew that it could never be blocked from

practicing the technology it was then working with TruePosition to standardize.

TruePosition, at least in good faith, could not have intended for the Settlement

Agreement to have extinguished its prior promises and offers to license the '144 patent and

SDCCH. TruePosition, after all, had represented to the industry that it would not use its patents

to block a multi-vendor solution, but instead would license anyone who wanted one. Because

UTDOA had not been standardized by the time the Settlement Agreement was executed,

---

[18]  TruePosition knew at the time that the '144/TCH covenant not to sue was illusory. There was no need for a covenant because that patent indisputably does not apply to TCH products. Thus, the covenant merely purported to provide protection to Andrew. And it certainly did not forbid anything. *See* Br. 34 n. 13.

[19]  The same is true of Andrew's December 2000 letter -- it made clear that a license under the '144 patent was *available* to Andrew. And because even TruePosition knew that Andrew was not making a SDCCH product at the time, TruePosition's offer could not have been only for that point in time. Rather, it had to have been directed to the future, if and when Andrew needed a '144 license. *See* Br. 8-9.

TruePosition's representations to the industry (and its corresponding promise to license) had to have survived the Settlement Agreement if the promised multi-vendor solution was to obtain.

All of this conclusively establishes two of the three elements of equitable estoppel (*see* Br. 28-29) -- that TruePosition led Andrew reasonably to infer that TruePosition did not intend to enforce the '144 patent against Andrew or other potential vendors, and that Andrew reasonably relied on TruePosition's conduct.  Because TruePosition's brief does not dispute the only remaining element of equitable estoppel (whether Andrew's reliance caused material prejudice), the defense of equitable estoppel is established.

The defense of implied license is established as well.  As for the first element of implied license (*see* Br. 39-40), it is undisputed that Andrew and TruePosition entered a cooperative relationship to get UTDOA standardized.  TP Br. 34 ("Andrew and TruePosition did work together to standardize UTDOA").  And their decision in January 2004 to settle their dispute relating to TCH products is consistent with that cooperative relationship.

Given that relationship, three of the four remaining elements of implied license are also established based on the above discussion of TruePosition's promises and the Settlement Agreement.  Within its relationship with Andrew, TruePosition granted Andrew the right to use UTDOA/SDCCH (on reasonable and non-discriminatory terms) and its statements and conduct created the impression that it consented to Andrew's use of UTDOA/SDCCH.  Because TruePosition's brief does not dispute the two remaining elements of implied license (that TruePosition received valuable consideration for the grant, and that TruePosition denies that Andrew has an implied license), the defense of implied license is established.

**The Integration Clause.**  TruePosition is incorrect that the integration clause in the Settlement Agreement extinguishes all prior agreements between the parties.  TP Br. 15-16.

The "intent of the parties always controls" whether an integration clause applies to prior agreements. *Carlson v. Hallinan*, 925 A.2d 506, 523 (Del. Ch. 2006). TruePosition's intent was to reassure the industry that it would be able to purchase UTDOA from multiple vendors. Since "Andrew is [and was at all relevant times] TruePosition's only competitor with respect to TDOA technology," (TP Br. 10) TruePosition must have intended to make a license under the '144 patent available to Andrew. That intent remained the same during the entire standardization period, which extended from 2003 to November 2004 when UTDOA was standardized and thus includes January 2004 when the parties entered into their Settlement Agreement.

Moreover, the integration clause states that it applies only to prior agreements that fall within the same "subject matter" as the Settlement Agreement. *See* X21 ¶ 22. The Feasibility Study promise and Andrew's December 2000 promise to license are both directed to different subject matter because both relate to whether Andrew may obtain a license under the '144 patent, whereas the Settlement Agreement does not. Because, as discussed on p. 22 above, the prior promises are "not inconsistent with, and do not vary," the terms of the later Settlement Agreement, the integration clause does not apply to the prior promises. *See Brady v. i2 Techs. Inc.*, No. Civ. A. 1543-N, 2005 WL 3691286, at *3, *4 (Del. Ch. Dec. 14, 2005) ("[T]he plain and ordinary meaning of 'subject matter' is sufficiently narrow in its scope . . . .").[20]

The same is true of the "we all benefit" ground rule that TruePosition was bound by when it participated in the TDOA study group. That ground rule addresses whether the members of

---

[20] *See also CreditSights, Inc. v. Ciasullo*, No. 05 CV 9345(DAB), 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007) ("[A] subsequent contract *not pertaining to "precisely the same subject matter" will not supersede an earlier contract* unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract.").

the study group would be able to practice the UTDOA/SDCCH solutions they were working on. Because the Settlement Agreement does not, the integration clause does not apply.

It makes sense that the integration clause applies only to prior agreements directed to the same subject matter as the Settlement Agreement. Parties entering into a contract that has an integration clause often have numerous preexisting agreements and outstanding representations, warranties, and promises that are directed to different subject matter than the contract containing the integration clause. Those preexisting writings and statements are not extinguished just because another contract is signed. Otherwise, there would always be only one writing between parties that was effective at any given time. Everything prior would always be superseded.

## III.    CONCLUSION

For the foregoing reasons and those in Andrew's opening brief, this Court should enter judgment for Andrew on its equitable estoppel, implied license, and unclean hands defenses.

Dated: December 17, 2007

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

_____
Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600
*alundgren@ycst.com*

OF COUNSEL:

John M. Desmarais, P.C.
Gregory S. Arovas, P.C.
Avinash S. Lele
Todd M. Friedman
Jason Choy
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Michael A. Parks
Rachel Pernic Waldron
Shira J. Kapplin
Regan A. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Attorneys for Defendant Andrew Corporation*

25

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on December 17, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> James D. Heisman, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE 19899
> (302) 658-9141
> Email: jheisman@cblh.com

I further certify that on December 17, 2007, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

### BY ELECTRONIC MAIL

> Paul B. Milcetic, Esq. [pmbilcet@woodcock.com]
> Daniel J. Goettle, Esq. [dgoettle@woodcock.com]
> Woodcock Washburn LLP
> Circa Centre, 12th Floor
> 2929 Arch Street
> Philadelphia, PA 19103

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> Andrew A. Lundgren (No. 4429)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> (302) 571-6600
> alundgren@ycst.com
> *Attorneys for Defendant Andrew Corporation*