# EXCERPTS OF TRIAL TRANSCRIPTS

9

1          THE COURT:  Now, you can talk about the evidence

2    we'll show, but to actually show the documents absent

3    agreement is not appropriate.  All right?

4          MR. MILCETIC:  All right.

5          THE COURT:  With respect to -- all right.  So

6    we've got the settlement agreement done.  You all need to

7    work on what parts of the agreement will come in.  With

8    respect to -- with respect to these new witnesses, again,

9    it seems to me that at this stage of the game, when Mr.

10   Robinson wasn't necessarily up front with anybody, that --

11   so I've got -- I've got someone who has documents who's

12   not affiliated with the party at this point.  He kind of

13   gives out documents in dribs and drabs.  Now we're on the

14   eve of trial, we've got 15 boxes worth of new documents.

15   I've got plaintiffs saying they are redundant, they're

16   irrelevant, there's nothing critical in them.

17          I've got defendants saying, this is all sorts

18   of new evidence and we are -- we should be allowed to

19   depose people based on these documents.

20          It's hard for me to believe that in a case

21   like this, there's actually new -- documents that have new

22   evidence as opposed to like this brief, it's just another

23   version of the same evidence.

24          So before I allow any further depositions or

25   allow any of these documents to come in, you've got to

# X 1

1  demonstrate, defendant's counsel, that there are -- that

2  the documents that you're concerned about truly introduce

3  critical new evidence, and I will give plaintiff the

4  opportunity to demonstrate that it is not.

5      So you can work on that.  I take it this won't

6  happen until the end of the day or until tomorrow.  But I

7  certainly am not convinced at this point that this record

8  needs to be opened.

9      All right.

10     MR. MILCETIC:  Your Honor --

11     THE COURT:  Yes?

12     MR. MILCETIC:  -- may I make a comment on that?

13     THE COURT:  Yes.

14     MR. MILCETIC:  It sounds as if Mr. Robinson is

15 somebody who's a very key part of defendant's case.  I mean,

16 they have a fraud claim here.  They have unclean hands going

17 on here.  And if, in fact -- I mean, if I -- that would be a

18 dynamite issue if I was a lawyer in their shoes.  Let's make

19 sure he comes live to trial, because right now what they are

20 saying, he's within the subpoena power of the Court.  Let's

21 have them subpoena him and bring him here into Court and hear

22 what he actually has to say.

23     That is my comment on that.

24     MR. DESMARAIS:  Both sides have the subpoena

25 power, your Honor.

# X 2

11

1          MR. MILCETIC:  We're not calling him.  He's not

2    our witness.  He's their witness.  We want to make sure we're

3    not condemned through hearsay witnesses in this case and we

4    want to make sure we're not condemned about what he's saying

5    through us.

6          THE COURT:  It seems to me that we discussed this

7    before.  Where did we end up with this?

8          MR. MILCETIC:  Well, what they said was they were

9    planning on calling him live, but in the pretrial order, it

10   says by deposition.  And they said, well, if -- who knows?

11   He's a true third party and maybe he may end up not

12   consenting.

13         Now, to me, that does not sound like they really

14   made the effort to bring him here.  He's their witness.

15   They're going to rely on him for a lot of things in this

16   case.  Why don't we bring him here and have the jury

17   assess, and have you assess, you're deciding some of the

18   claims in this case, assess his credibility.

19         THE COURT:  I recall reading in one of the

20   most recent missives that he was paid for his time.  Is that

21   the case?

22         MR. DESMARAIS:  He was given $140 for every hour

23   he spent collecting documents and meeting with us, yes, but

24   he's not -- he's not an expert witness.  But just to --

25   just to tell your Honor the lay of the land, it is our

**X 3**

Anderson - direct                394

1   Q.    So what was your understanding of the application there

2   in Saudi Arabia?

3   A.    The primary application of the technology in Saudi

4   Arabia was to help -- help the Saudi Government track

5   terrorists and find terrorists.

6   Q.    And had we bid on that contract?

7   A.    Yes.

8   Q.    When?

9   A.    I believe in 2005.

10  Q.    Was that for a control channel location system?

11  A.    Yes.

12  Q.    Was -- to your knowledge, were there any -- any

13  bidders for that control channel on the TDOA system other

14  than TruePosition and Andrew Corporation?

15  A.    None that I'm aware of.

16  Q.    Was the application as you understand it for the

17  system that was offered to -- by TruePosition to Saudi

18  Telecom?

19  A.    To find the cell phones of terrorists.

20  Q.    Had we -- had TruePosition actually done -- actually

21  shipped equipment for -- for doing that?

22  A.    Yes, we had.

23  Q.    When was that?

24  A.    We actually shipped equipment in 2004 and deployed

25  it and actually had a small working system in Riyad.

# X 4

Anderson - direct                    395

1   Q.    And when was it that at least you personally learned

2   that TruePosition had lost the Saudi contract?

3   A.    I believe some time in September or August or

4   September of 2005.

5   Q.    Was it your understanding that Andrew Corporation's

6   system was also for finding terrorists?

7   A.    Yes, that's correct.

8   Q.    In your -- in your participation in the standards

9   bodies, did anybody talk about any terrorist location

10  applications?

11  A.    Not that I'm aware of.

12  Q.    Remind me again where -- where is the standards --

13  where is the standards body based, again?

14  A.    It's based in France.

15  Q.    Is that true of both ETSI and 3GPP?

16  A.    That's correct.

17  Q.    Has anybody from ETSI ever told you that TruePosition

18  has done something wrong in the standards body?

19  A.    No.

20  Q.    Has anyone from 3GPP told you that you've done

21  something wrong?

22  A.    No.

23  Q.    How about any of the members of those standards

24  bodies?

25  A.    Only -- only Andrew.

**X 5**

Anderson - direct                    396

1   Q.    I'm kind of jumping around a little bit.  Sorry

2   about that.

3   A.    That's okay.

4   Q.    Could we go back to how TruePosition's product works?

5   A.    Sure.

6   Q.    Actually, have you prepared some slides that you

7   thought would be helpful to show how time difference of

8   arrival works?

9   A.    I have, actually.

10          THE COURT:  You know, it might be helpful to

11   take a lunch break before we jump into that.

12          MR. MILCETIC:  Okay.

13          THE COURT:  And the jury lunches just arrived,

14   so I couldn't have taken a lunch break before anyway.  So

15   we'll take half an hour, ladies and gentlemen.

16          I will just remind you not to discuss anything

17   but the technology, if you want to do that, feel free.

18          (At this point the jury was excused for a

19   luncheon recess.)

20          THE COURT:  All right.

21          (Luncheon recess taken.)

22                    - - -

23

24

25

# X 6

Magnusson - cross                    1821

1   A.    I'm not here to testify on -- on '144 patent, no,

2   as far as I know.

3   Q.    Do --

4   A.    Is there a question?

5   Q.    You are not here to testify on behalf of -- you are

6   not here to testify about the '144 patent, whether it's

7   essential to a standard?

8   A.    I don't think so, no.

9   Q.    Do you have an opinion on that?

10  A.    No.

11  Q.    Okay.  And do you know how Andrew Corporation's

12  product works?

13  A.    The GeoMetrics product?

14  Q.    Yes.

15  A.    Yeah, I have a fairly good understanding of that.

16  Q.    But you are not here to say the patent is

17  essential to a standard or the patent covers a

18  GeoMetrics product; right?

19  A.    No, I'm not here to do that.

20  Q.    Okay.  Now, this is part of the IPR policy; right?

21  A.    Yes.  That's what it looks like.

22  Q.    And it says, IPR holders or third parties should

23  be adequately and fairly rewarded for the use of IPR's?

24  Right?  This is for patents that are essential to the

25  standard; right?

## X 7

1    A.    Yes.

2    Q.    And that probably wouldn't mean zero; right?

3    A.    I'm sorry?  I was just trying to read what you

4    said before.  I'm sorry.  I'm not trying to --

5    Q.    That probably wouldn't mean zero dollars adequately

6    and fairly rewarded; right?  You had said free earlier.

7    A.    Yes.  There are a lot of technologies that are free

8    in the -- in the ETSI standard.

9                   (Pause.)

10                  MR. MILCETIC:  Could we turn to page --

11   Section 14 of the ETSI IPR policy?

12   BY MR. MILCETIC:

13   Q.    Now, Mr. Magnusson, it sounds as if TruePosition has

14   done something wrong here, somebody at Andrew Corporation

15   would have contacted the ETSI general assembly, right,

16   about what had happened here in the standards body?

17   A.    Yes.  I'm assuming that you're referring to if

18   TruePosition has done something wrong and I think that's

19   yet to be defined by this outcome of this Court.

20   Q.    But you think that TruePosition did something

21   wrong, don't you?  Isn't that -- am I wrong about that?

22   A.    Yes.  I sincerely feel you have done something

23   wrong.

24   Q.    Okay.  But you did not contact anyone in the ETSI

25   general assembly; right?

**X 8**

Magnusson - cross                     1823

1   A.    Yes, actually,, I did call the former Director-

2   General, Mr. Rosenblock, and -- Rosenbrock, and asked

3   him what Andrew could do, because we feel that our

4   technology, we've been blocked from using it.  And he

5   said that we should bring it up with the General

6   Assembly.

7              THE COURT:  Mr. Milcetic, I wouldn't go too

8   much further on this issue.

9              MR. MILCETIC:  Okay.

10             THE COURT:  All right.

11             MR. MILCETIC:  Fair enough.

12             Can we put it back on the Elmo, please?

13  BY MR. MILCETIC:

14  Q.    After TruePosition made the -- this promise that

15  you were talking about, a license on reasonable

16  nondiscriminatory terms; right?

17  A.    Yes.

18  Q.    I assume the next thing that you did was to send

19  a letter to TruePosition, asking about whether -- what

20  reasonable terms would be?  Would it be 45 million or a

21  hundred million or 10 million; right?

22  A.    No.  That's not the process in my company.  Being

23  that the standards representative -- being the standards

24  representative, I just made my management aware of what

25  was going on and in reality, there was nothing out of

**X 9**

Magnusson - cross                    1824

1   the ordinary, meaning I did not detect a red flag, so

2   then, if people want to pay licensing or any of those

3   issues, those are not handled by me.

4                            - - -

5   Q.    Now, throughout this entire timeline, one thing

6   that you didn't include -- do you know anything about

7   the settlement of the prior litigation between the

8   parties?

9   A.    Just what I read in the papers, actually.

10                           - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**X 10**

1    either by inducing infringement or by contributing to

2    the infringement of the '144 patent, then you must find

3    infringement of that claim.

4            If you find, on the basis of the evidence

5    and the law as I have explained it, that Andrew directly

6    or indirectly infringed at least one claim of the '144

7    patent, you must then decide whether or not that

8    infringement was willful.  The fact that you may have

9    determined that Andrew infringed the '144 patent does

10   not mean that the infringement was willful.

11   Willfulness requires you to determine whether Andrew's

12   actions before suit was filed were objectively reckless

13   with regard to the '144 patent.

14           The issue of willful infringement is

15   relevant, not to your decision of whether or not there

16   is infringement, but rather to the amount of damages

17   to which TruePosition may be entitled, if you find

18   infringement.  A finding of willful infringement may, in

19   certain circumstances, entitle the patent owner to

20   increased damages for infringing acts.  It is my job to

21   decide whether or not to award increased damages to

22   TruePosition should you find willful infringement.

23           To establish willful infringement,

24   TruePosition must prove three things by clear and

25   convincing evidence:

# X 11

2134

1          First, TruePosition must prove that Andrew

2    was aware of the '144 patent.

3          Second, TruePosition must prove that Andrew's

4    actions before this suit was filed on October 25, 2005,

5    constituted infringement of the '144 patent, and that

6    Andrew took those actions despite an objectively high

7    likelihood that they constituted infringement of the

8    '144 patent.  Andrew's subjective state of mind is not

9    relevant to this objective inquiry.

10          Finally, TruePosition must prove that Andrew

11   knew or should have known that its actions taken before

12   October 25, 2005 created an objectively high risk of

13   infringement.  Andrew's state of mind is relevant to

14   this inquiry.  If you find that TruePosition has not

15   proved any of these three elements, then you must find

16   that any infringement of the '144 patent was not willful.

17          Andrew contends that TruePosition committed

18   fraud by failing to declare its '144 patent as a patent

19   essential to an ETSI standard.  In order to prove fraud,

20   Andrew must prove by a preponderance of the evidence

21   that:

22          One, TruePosition made a misrepresentation

23   or omission of a material fact.

24          Two, TruePosition made that misrepresentation

25   or omission knowingly or with reckless disregard for the

# X 12

1    truth.

2          Third, TruePosition made the misrepresentation

3    or omission with the intent to mislead Andrew.

4          Four, Andrew reasonably relied on the

5    misrepresentation or omission.

6          And, five, Andrew was damaged as a result of

7    relying on the misrepresentation or omission.

8          In this case, Andrew contends that

9    TruePosition omitted a material fact by failing to

10   declare its '144 patent as a patent essential to an

11   ETSI standard.  To satisfy this element, Andrew must

12   prove by a preponderance of the evidence that

13   TruePosition had a duty to declare its '144 patent as

14   a patent essential to an ETSI standard.  In order to

15   prove that TruePosition had such a duty, Andrew must

16   prove that the '144 patent was in fact essential to

17   an identified ETSI standard.

18         If you find that Andrew has proven that

19   TruePosition had a legal duty to declare the '144

20   patent as essential to an ETSI standard, then you go

21   on to consider whether Andrew has satisfied its

22   burden of proof in establishing the remaining elements

23   of fraud.  If you find that Andrew has not proven that

24   TruePosition had a legal duty to declare the '144

25   patent as essential to an ETSI standard, then you

**X 13**

1   should not consider the remaining elements of fraud.

2          To satisfy this element, Andrew must prove

3   that TruePosition knew or should have known that the

4   '144 patent was required to be disclosed to ETSI under

5   TruePosition's interpretation of the patent, but that

6   TruePosition knowingly failed to declare the '144

7   patent to ETSI.  Or, Andrew must prove that

8   TruePosition's alleged failure to declare the '144

9   patent to ETSI was done with a reckless disregard for

10   the truth.  Reckless disregard for the truth means

11   less than a knowing lie, but more than negligently

12   forgetting to tell.

13          To satisfy this element, Andrew must prove

14   that TruePosition intended to mislead Andrew by not

15   declaring the '144 patent to ETSI as a patent essential

16   to an ETSI standard.

17          Andrew must prove that it did, in fact,

18   rely on TruePosition's omission or misrepresentation,

19   and that Andrew's reliance was reasonable.  Andrew's

20   reliance may be a belief in the misrepresentation or

21   omission that either causes Andrew to take actions it

22   would otherwise not have taken, or causes Andrew to

23   not take an action it would have otherwise taken.

24          Andrew must prove that it was damaged in

25   some way as a result of its reliance.  These damages

**X 14**

2137

1  can include, but are not limited to, economic harm.

2      Andrew's next defense is promissory estoppel.

3      Estoppel means barring or preventing someone

4  from taking a position that is inconsistent with an

5  earlier position, where doing so would be unfair.

6  Promissory estoppel would arise if TruePosition made

7  a promise to Andrew, Andrew reasonably relied on this

8  promise, and TruePosition expected the promise to

9  induce certain action or inaction by Andrew.

10      To prove promissory estoppel, Andrew must

11  establish the following four things by clear and

12  convincing evidence:

13      One, TruePosition made a promise.

14      Two, TruePosition intended to induce

15  Andrew's action or inaction based on the promise.

16      Three, Andrew reasonably relied on the

17  promise.

18      And, four, Andrew was injured by its

19  reliance.

20      Although the question of whether promissory

21  estoppel applies in this case is one that I will

22  ultimately decide, I will ask for your findings of fact

23  so that I can consider them in making that decision.

24      A promise is a declaration by which one

25  party agrees to perform or refrain from performing a

**X 15**

2138

1  specified act.  TruePosition's promise can be oral or
2  it can be made in writing.  Further, the sum of
3  TruePosition's conduct can give rise to the promise.
4  TruePosition's representations must be reasonably
5  definite and certain so that the intentions of the
6  parties can be ascertained.  Distinguishing a promise
7  from a non-promise must be done through a reasonable
8  interpretation of both parties conduct in light of
9  the surrounding circumstances.  Mere expressions of
10 opinion, expectation, or assumptions are not promises.
11           Andrew contends that the Ashburn
12 demonstration is not an act of infringement because
13 it was organized for an agency of the United States
14 and with the authorization and consent of the United
15 States.  Andrew has the burden of proving this fact by
16 a preponderance of the evidence.
17           I have now instructed you on the law
18 governing TruePosition's claims of patent infringement
19 and Andrew's claims of fraud and promissory estoppel.
20 We turn now to damages.  If, after considering all of
21 the evidence and the law as I have stated it, you
22 find that at least one claim of the '144 patent is
23 infringed by Andrew, then you must determine what
24 damages Andrew must pay to TruePosition to compensate
25 for that infringement.

# X 16

# DECLARATION OF DIETER KAISER, FORMER CHAIRMAN OF THE ETSI BOARD

Munich, 14th November 2007

### Declaration of Dieter Kaiser
### former Chairman of the ETSI Board

I am Dieter Kaiser.

1. I was born in Cologne/Germany in 1940. After study of electrical and communications engineering including industrial management at the Technische Universität München, I started my business career at the SIEMENS AG in 1965.

2. From 1983 till 2003 I have been active in international telecommunications standardization matters at the International Telecommunications Union (ITU-T) and since 1988 at the European Telecommunications Standards Institut (ETSI). Among others, I have been Vice Chairman and Chairman of the ETSI Technical Committee SPS (Signalling Protokolls and Switching) from 1988 to 1999 and Chairman of the Technical Assembly of ETSI from 1996 to 1999.

3. I have been Vice Chairman and elected Chairman of the ETSI Board during the decisive periode for ETSI from 1996 until 2002, with the establishment of the international 3rd Generation Mobility Standardizations Activity.

4. From my all in all twenty years of intimate knowledge of international standardization matters and its principles , my experience as Chairman and Vice Chairman of the ETSI Board, eleven years experience as Vice Chairman and Chairman of ETSI SPS, twenty years as delegate in ETSI and at the ITU-T, I state the following:

5.     It is and has been a fundamental principle of standardization used in ETSI that anyone may use technology that has been incorporated into an ETSI Standard or an ETSI Technical Specification. It does not matter whether the technology is minor or substantial and no matter whether the technology is mandatory or optional to the ETSI Standard or ETSI Technical Specification. No part of a public standard may be off-limits to some but accessible to others.

6.     ETSI has rules to prevent the standardization of patented technology that a patent holder is unwilling to license. Patented technology that an ETSI member or associate member is unwilling to license must be declared to ETSI in a timely manner, and may not be added to the standard if the ETSI member remains unwilling to license its patent.

7.     The requirement to declare essential patents is set forth in the ETSI IPR Policy. Section 4.1 of the ETSI IPR Policy requires patents that are believed to be essential to a Standard or Technical Specification to be declared to ETSI in a timely fashion.

8.     Options in the Standard are not exempt from the IPR Policy. To the contrary, the IPR Policy explicitly defines essentiality with reference to whether a Standard can be

# X 17

practiced without infringing a patent, and defines a Standard as "including options therein" (see Sections 15.6 and 15.11). If a Standard including its options (not merely some of them, but *any choice* of them) can be practiced without infringing a patent, the patent is not essential to the Standard. If not, the patent is essential to the Standard.

9.      In my experience, no company would agree to introduce into a Standard, and certainly would not promote and encourage the standardization of, an option that it would not be permitted to practice in the future.

10.     It is against the fundamental principles of standardization for an ETSI member to obtain a monopoly position on an option in the Standard. It is completely inappropriate for an ETSI member to seek an injunction that would prevent another company from using an option in a Standard.

11.     The idea that the ETSI IPR Policy does not apply to options is absurd:

–   Standards are typically optional as a whole;

–   Within a Standard, many and typically most features are optional;

–   For alternative options for a feature, each alternative could be blocked with the argument that it is optional. This would leave the public unable to practice any of the options, and thus unable to practice the Standard.

12.     The points that are stated for a Standard in paragraphs 8-11 apply equally to a Technical Specification (see Sections 15.6 and 15.12 of the ETSI IPR Policy).


I swear under oath that the foregoing is true and correct.

Signed on 14th November 2007.


Dieter Kaiser
Munich, Germany


2

**X 18**

URNr. 8368 / 2007

S/yp

| | |
|---|---|
| I hereby certify that the above is the true signature, signed in my presence, of | Ich beglaubige hiermit die Echtheit der vorstehenden, vor mir vollzogenen Unterschrift von |
| Mr. **Dieter Kaiser**, | Herrn **Dieter Kaiser**, |
| born September 26, 1940, | geboren am 26.09.1940, |
| residing at Bichler Straße 46, 81479 Munich, | wohnhaft Bichler Straße 46, 81479 München, |
| identified by his Identity Card No. 8016577480. | ausgewiesen durch seinen Personalausweis Nr. 8016577480. |
| Place Munich/ Date 14th November 2007 | Ort München/ Datum 14. November 2007 |



Dr. Bernhard Schaub,
Notar in München

Notary Public in Munich, Germany

**X 19**

# PTX-15R

Nov-20-06    08:58am    From-WoodcockWashburn                    +2155693439              T-430    P.002/036    F-092

## SETTLEMENT AGREEMENT

This Settlement Agreement is made as of January 16, 2004, by and among TruePosition, Inc. ("TruePosition"), KSI, Inc. ("KSI"), Allen Telecom L.L.C. ("Allen"), and Andrew Corporation ("Andrew"). TruePosition and KSI are referred to herein collectively as "TruePosition" or "the plaintiffs." Allen and Andrew are referred to herein collectively as "Andrew" or "the defendant."

WHEREAS the plaintiffs filed a lawsuit entitled TruePosition, Inc. and KSI, Inc. v. Allen Telecom Inc., Civil Action No. 01-0823 GMS, in the United States District Court for the District of Delaware ("the Action") against Allen Telecom Inc., the predecessor to Allen Telecom, L.L.C., alleging infringement of U.S. Patents 4,728,959; 6,108,555; 6,119,013; 6,047,192; 6,184,829; 6,281,834; and 6,317,081;

WHEREAS the defendant filed counterclaims seeking a declaratory judgment that TruePosition's patents are invalid, unenforceable, and/or not infringed; alleging infringement of Andrew's U.S. Patent 5,317,323; and asserting antitrust and state law tort claims;

WHEREAS Allen Telecom, Inc. subsequently merged with and into Allen Telecom L.L.C., a wholly-owned subsidiary of Andrew Corporation;

WHEREAS the parties hereto desire to settle and resolve the Action;

WHEREAS the parties agreed to memorialize their settlement agreement in this formal Settlement Agreement;

EXHIBIT
PX
421
11/20/06

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035395

**PTX-15R**

**X 20**

21)    All notices under this Settlement Agreement shall be in writing and shall be deemed to have been given when received by the intended recipient at the following address (or at such other address as the intended recipient shall have specified in a written notice given to the other party):

To TruePosition and KSI:

Frederic Beckley
Senior Vice President and General Counsel
TruePosition, Inc.
780 Fifth Avenue
King of Prussia, Pa 19406
Fax:  610-680-1074

To Allen and Andrew:

James F. Petelle, Esq.
Vice President, Law & Secretary
Andrew Corporation
10500 West 153rd Street
Orland Park, IL 60462
Fax:  708-873-2571

22)    The parties agree that no promise, representation or agreement not herein expressed has been made, and this Settlement Agreement (including the Exhibits hereto) contains the entire agreement between the parties with respect to its subject matter, superseding all other prior agreements, written or oral, including without limitation the term sheet dated January 16, 2004.

23)    If for any reason any provision of this Settlement Agreement is held invalid, illegal, or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement, all of which shall remain in full force and effect and be binding upon the parties hereto.

- 14 -

CONFIDENTIAL
TruePosition, Inc. V. Andrew Corp.
Civil Action No. 05-00747-SLR

TPI0035408



**PTX-15R**

**X 21**