# ANDREW CORP (ANDWP)

3 WESTBROOK CORPORATE CENTER, SUITE 900
WESTCHESTER, IL 60154
(708) 236-66

# EX-2.1

**EX-2.1**
**8-K Filed on 06/27/2007 – Period: 06/26/2007**
File Number 001-14617

**B 1**



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 2.1

**AGREEMENT AND PLAN OF MERGER**
**BY AND AMONG**
**COMMSCOPE, INC.,**
**DJROSS, INC.**
**AND**
**ANDREW CORPORATION**
**DATED AS OF JUNE 26, 2007**

**B 2**

## TABLE OF CONTENTS

| Clause | Subject | Page |
|---|---|---|
| Article I | The Merger | 1 |
| 1.1 | The Merger | 1 |
| 1.2 | Closing | 1 |
| 1.3 | Effective Time | 1 |
| 1.4 | Effects of the Merger | 2 |
| 1.5 | Organizational Documents of the Surviving Corporation | 2 |
| 1.6 | Directors and Officers of the Surviving Corporation | 2 |
| 1.7 | Alternative Structure | 2 |
| Article II | Effects of the Merger; Exchange of Certificates | 2 |
| 2.1 | Effect on Capital Stock | 2 |
| 2.2 | Exchange of Shares and Certificates | 5 |
| Article III | Representations and Warranties of Parent and Merger Sub | 7 |
| 3.1 | Corporate Organization | 7 |
| 3.2 | Capital Structure | 8 |
| 3.3 | Authority; Board Approval; Voting Requirements; No Conflict; Required Filings and Consents | 10 |
| 3.4 | SEC Documents; Financial Statements | 11 |
| 3.5 | Information Supplied | 12 |
| 3.6 | Absence of Certain Changes or Events | 12 |
| 3.7 | Compliance with Applicable Laws: Permits; Litigation | 13 |
| 3.8 | State Takeover Statutes | 13 |
| 3.9 | Brokers | 13 |
| 3.10 | Ownership of Andrew Common Stock | 14 |
| 3.11 | Financing | 14 |
| Article IV | Representations and Warranties of Andrew | 14 |
| 4.1 | Corporate Organization | 14 |
| 4.2 | Capital Structure | 15 |
| 4.3 | Authority; Board Approval; Voting Requirements; No Conflict; Required Filings and Consents | 16 |
| 4.4 | SEC Documents; Financial Statements | 17 |
| 4.5 | Information Supplied | 19 |
| 4.6 | Absence of Certain Changes or Events | 19 |
| 4.7 | Compliance with Applicable Laws; Permits; Litigation | 19 |
| 4.8 | Employees | 20 |
| 4.9 | Benefit Plans | 21 |
| 4.10 | Taxes | 22 |
| 4.11 | Environmental Matters | 23 |
| 4.12 | Intellectual Property | 24 |
| 4.13 | State Takeover Statutes | 25 |
| 4.14 | Brokers | 25 |
| 4.15 | Opinion of Financial Advisor | 25 |
| 4.16 | Ownership of Parent Common Stock | 25 |
| 4.17 | Material Contracts | 25 |

i

**B 3**

| Clause | Subject | Page |
|---|---|---|
| 4.18 | Interested Party Transactions | 26 |
| 4.19 | Internal Controls and Disclosure Controls | 26 |
| 4.20 | Real Property | 26 |
| Article V | Covenants Relating to Conduct of Business | 27 |
| 5.1 | Conduct of Business | 27 |
| 5.2 | Solicitation | 30 |
| 5.3 | Board of Directors Recommendation | 32 |
| 5.4 | Control of Other Party's Business | 33 |
| Article VI | Additional Agreements | 33 |
| 6.1 | Preparation of SEC Documents; Stockholders' Meeting | 33 |
| 6.2 | Access to Information; Confidentiality | 34 |
| 6.3 | Commercially Reasonable Efforts | 35 |
| 6.4 | Indemnification and Insurance | 36 |
| 6.5 | Fees and Expenses | 37 |
| 6.6 | Announcements | 37 |
| 6.7 | Listing | 37 |
| 6.8 | Conveyance Taxes | 37 |
| 6.9 | Employee Benefits | 38 |
| 6.10 | Consents of Accountants | 39 |
| 6.11 | Financing | 39 |
| 6.12 | Affiliate Legends | 40 |
| 6.13 | Notification of Certain Matters | 41 |
| 6.14 | Section 16 Matters | 41 |
| 6.15 | State Takeover Laws | 41 |
| 6.16 | Reservation of Parent Common Stock | 41 |
| 6.17 | Further Assurances | 41 |
| 6.18 | Stockholder Litigation | 42 |
| Article VII | Conditions Precedent | 42 |
| 7.1 | Conditions to Each Party's Obligation to Effect The Merger | 42 |
| 7.2 | Conditions to Obligations of Parent and Merger Sub | 43 |
| 7.3 | Conditions to Obligations of Andrew | 43 |
| Article VIII | Termination, Amendment and Waiver | 44 |
| 8.1 | Termination | 44 |
| 8.2 | Effect of Termination | 45 |
| 8.3 | Payments | 45 |
| 8.4 | Amendment | 46 |
| 8.5 | Extension: Waiver | 46 |
| Article IX | General Provisions | 47 |
| 9.1 | Nonsurvival of Representations and Warranties | 47 |
| 9.2 | Notices | 47 |
| 9.3 | Interpretation | 47 |
| 9.4 | Knowledge | 48 |

**B 4**

| Clause | Subject | Page |
|--------|---------|------|
| 9.5 | Disclosure Letters | 48 |
| 9.6 | Counterparts | 48 |
| 9.7 | Entire Agreement; No Third–Party Beneficiaries | 48 |
| 9.8 | Governing Law | 48 |
| 9.9 | Assignment | 48 |
| 9.10 | Consent to Jurisdiction | 48 |
| 9.11 | Headings, etc | 49 |
| 9.12 | Severability | 49 |
| 9.13 | Failure or Indulgence Not a Waiver; Remedies Cumulative | 49 |
| 9.14 | Waiver of Jury Trial | 49 |
| 9.15 | Specific Performance | 49 |

iii

**B 5**

<b>Defined Terms</b>

| | Page |
|---|---|
| Acquisition | 45 |
| Affiliate | 12 |
| Agreement | 1 |
| Alternative Transaction | 31 |
| Alternative Transaction Proposal | 31 |
| Andrew | 1 |
| Andrew Balance Sheet | 19 |
| Andrew Benefit Plans | 21 |
| Andrew By–Laws | 15 |
| Andrew Charter | 15 |
| Andrew Common Stock | 2 |
| Andrew Disclosure Letter | 48 |
| Andrew Domestic Benefit Plan | 21 |
| Andrew ERISA Affiliate | 22 |
| Andrew Foreign Benefit Plan | 22 |
| Andrew Indenture | 5 |
| Andrew Material Contract | 26 |
| Andrew Notes | 5 |
| Andrew Option | 3 |
| Andrew Organizational Documents | 15 |
| Andrew Permits | 20 |
| Andrew Preferred Stock | 15 |
| Andrew SEC Documents | 18 |
| Andrew Stock Plans | 15 |
| Andrew Stockholder Approval | 17 |
| Andrew Stockholders' Meeting | 34 |
| Andrew Warrant | 4 |
| Applicable Law | 13 |
| Applicable Laws | 13 |
| Average Parent Common Stock Price | 3 |
| Cash Merger Consideration | 3 |
| CERCLA | 24 |
| Certificate of Merger | 1 |
| Certificates | 5 |
| Change of Recommendation | 32 |
| Closing | 1 |
| Closing Date | 1 |
| Code | 3 |
| CommScope NC | 7 |
| Confidentiality Agreements | 32 |
| Continuation Period | 38 |
| Continuing Employees | 38 |
| Contract | 25 |
| Debt Financing | 39 |
| DGCL | 1 |
| Dissenting Shares | 5 |
| Effective Time | 2 |
| Election Merger Consideration | 3 |
| ERISA | 21 |
| Exchange Act | 21 |
| Exchange Agent | 10 |
| Exchange Fund | 5 |

iv

<b>B 6</b>

| | |
|---|---:|
| Exchange Ratio | 3 |
| Existing Benefits Commitments | 29 |
| Financing Commitments | 14 |
| Form S–4 | 11 |
| GAAP | 8 |
| Governmental Entity | 11 |
| HSR Act | 11 |
| Indemnified Party | 36 |
| Intellectual Property | 24 |
| IRS | 21 |
| Knowledge | 48 |
| Lease | 27 |
| Leased Real Property | 27 |
| Lien | 27 |
| Liens | 27 |
| Material Adverse Change | 9 |
| Material Adverse Effect | 7 |
| Maximum Premium | 37 |
| Merger | 1 |
| Merger Consideration | 3 |
| Merger Sub | 1 |
| NASDAQ | 16 |
| NYSE | 10 |
| Option Exchange Ratio | 3 |
| Outside Date | 44 |
| Owned Real Property | 27 |
| Parent | 1 |
| Parent Balance Sheet | 12 |
| Parent By–Laws | 8 |
| Parent Charter | 8 |
| Parent Common Stock | 2 |
| Parent Disclosure Letter | 48 |
| Parent Notes | 8 |
| Parent Options | 8 |
| Parent Organizational Documents | 8 |
| Parent Permits | 13 |
| Parent Preferred Stock | 8 |
| Parent SEC Documents | 11 |
| Parent Share Issuance | 10 |
| Parent Stock Plans | 8 |
| Permitted Lien | 27 |
| Person | 48 |
| Proxy Statement | 17 |
| Real Property | 27 |
| Regulatory Agencies | 11 |
| Rule 145 Affiliates | 41 |
| Sarbanes–Oxley Act | 11 |
| SEC | 8 |
| Secretary of State | 1 |
| Securities Act | 11 |
| Subsidiary | 9 |
| Substantial Investment | 9 |
| Superior Proposal | 31 |
| Surviving Corporation | 1 |
| Tax | 23 |
| Tax Return | 23 |

v

**B 7**

Taxes                                                      23
Termination Fee                                            46
Voting Debt                                                 8
Welfare Plan                                               22

**B 8**

### AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "Agreement") is made and entered into as of June 26, 2007, by and among CommScope, Inc., a Delaware corporation ("Parent"), DJRoss, Inc., a Delaware corporation and an indirect wholly owned subsidiary of Parent ("Merger Sub"), and Andrew Corporation, a Delaware corporation ("Andrew").

#### WITNESSETH:

WHEREAS, the respective Boards of Directors of Parent, Merger Sub and Andrew have deemed it advisable and in the best interests of their respective corporations and stockholders that Parent and Andrew enter into a business combination transaction;

WHEREAS, in furtherance thereof, the Board of Directors of each of Parent, Merger Sub and Andrew have approved this Agreement and the merger of Merger Sub with and into Andrew (the "Merger") so that Andrew continues as the surviving corporation in the Merger (sometimes referred to in such capacity as the "Surviving Corporation"), upon the terms of and subject to the conditions set forth in this Agreement and in accordance with the provisions of the Delaware General Corporation Law (the "DGCL");

WHEREAS, the Board of Directors of Andrew has determined to recommend to its stockholders the approval and adoption of this Agreement and the Merger;

WHEREAS, the sole stockholder of Merger Sub has approved this Agreement and the Merger, and

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

#### Article I

#### The Merger

**1.1** **The Merger.** **Upon the terms of and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, at the Effective Time (as defined in Section 1.3), Merger Sub shall be merged with and into Andrew, the separate corporate existence of Merger Sub shall cease and Andrew shall continue as the Surviving Corporation in the Merger and shall succeed to and assume all the property, rights, privileges, powers and franchises of Merger Sub in accordance with the DGCL.**

**1.2** **Closing.** **The closing of the Merger (the "Closing") shall take place at 10:00 a.m., Eastern Time, on the third business day after satisfaction or waiver of all of the conditions set forth in Article VII (other than delivery of items to be delivered at the Closing and other than those conditions that by their nature are to be satisfied at the Closing, it being understood that the occurrence of the Closing shall remain subject to the delivery of such items and the satisfaction or waiver of such conditions at the Closing), but in any event no earlier than August 10, 2007, at the offices of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, unless another time, date or place is agreed to in writing by the parties hereto. The date on which the Closing occurs is referred to herein as the "Closing Date."**

**1.3** **Effective Time.** **Upon the terms of and subject to the conditions of this Agreement, as soon as practicable on the Closing Date, the parties shall cause the Merger to be consummated by filing a certificate of merger executed in accordance with the relevant provisions of the DGCL (the "Certificate of Merger") with the Secretary of State of the State of Delaware (the "Secretary of State") and shall make all other filings or recordings required under the DGCL. The Merger shall become effective at such time as the Certificate of Merger is duly filed**

**B 9**

with the Secretary of State, or at such subsequent date or time as Andrew and Parent shall agree and specify in the Certificate of Merger.  The date and time at which the Merger becomes effective as set forth in the Certificate of Merger is referred to herein as the "Effective Time."

1.4    **Effects of the Merger**.  At the Effective Time, the Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the properties, rights, privileges, powers and franchises of Andrew and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities and duties of Andrew and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation.

1.5    **Organizational Documents of the Surviving Corporation**.  At the Effective Time, and subject to compliance with Section 6.4(a), the Andrew Charter (as defined in Section 4.1(b)) shall be amended and restated in its entirety to be identical to the certificate of incorporation of Merger Sub in the form attached as Exhibit A hereto, and such amended Andrew Charter shall be the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with the DGCL and as provided in such certificate of incorporation; *provided, however,* that, at the Effective Time, Article 1 of the certificate of incorporation of the Surviving Corporation shall be amended and restated in its entirety to read as follows: "The name of the corporation is Andrew Corporation."  After the Effective Time, the authorized capital stock of the Surviving Corporation shall consist of 1,000 shares of common stock, par value $0.01 per share.  At the Effective Time, the Andrew By−Laws (as defined in Section 4.1(b)) shall be amended and restated in their entirety to be identical to the By−Laws of Merger Sub, as in effect immediately prior to the Effective Time, in the form attached as Exhibit B hereto, and such By−Laws shall be the By−Laws of the Surviving Corporation until thereafter amended in accordance with the DGCL and as provided in such By−Laws.

1.6    **Directors and Officers of the Surviving Corporation**.  The directors of the Merger Sub shall, from and after the Effective Time, be the directors of the Surviving Corporation until their respective successors are duly elected or appointed and qualified.  The officers of the Merger Sub shall, from and after the Effective Time, be the officers of the Surviving Corporation until their respective successors are duly appointed.

1.7    **Alternative Structure**.  Parent and Andrew may mutually agree to revise the structure of the Merger provided for herein at any time prior to receipt of the Andrew Stockholder Approval (as defined in Section 4.3(c)), or at any time thereafter if, with appropriate disclosure, any required further approval of the revised structure is obtained from the stockholders of Andrew.

Article II

Effects of the Merger; Exchange of Certificates

2.1    **Effect on Capital Stock**.  Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any action on the part of Parent, Merger Sub, Andrew or the holders of any shares of common stock, par value $0.01 per share, of Andrew (the "**Andrew**

**B 10**

## Common Stock"):

(a)    **Conversion of Andrew Common Stock**. **Each share of Andrew Common Stock issued and outstanding immediately prior to the Effective Time, *other than* any shares of Andrew Common Stock to be canceled pursuant to Section 2.1(c) and any Dissenting Shares, shall automatically be converted into the right to receive (i) at the election of Parent, in its sole discretion, by written notice to Andrew at least two business days before the Closing Date, either (x) $1.50 in cash, (y) a fraction of a fully paid and nonassessable share of common stock, par value $0.01 per share, of Parent ("Parent Common Stock") equal to (A) $1.50 divided by (B) the volume weighted average of the closing sale prices (calculated to the nearest tenth of a cent) for a share of Parent Common Stock on the NYSE Composite Transactions Tape (as reported by The Wall Street Journal (Northeast Edition), or, if not reported thereby, as reported by any other authoritative source) over the ten (10) consecutive trading days ending two trading days prior to the day on which the Effective Time occurs (the "Average Parent Common Stock Price" and such quotient, the "Exchange Ratio") or (z) a combination of cash and a fraction of a share of Parent Common Stock, determined as provided above, together equaling $1.50 (the form of consideration elected by Parent, the "Election Merger Consideration"), plus (ii) $13.50 in cash (the "Cash Merger Consideration"), upon surrender**

2

of the Certificate (as defined in Section 2.2(b)) which immediately prior to the Effective Time represented such share of Andrew Common Stock, in the manner provided in Section 2.2(b) (or, in the case of a lost, stolen or destroyed Certificate, Section 2.2(h)). The Election Merger Consideration and Cash Merger Consideration to be issued or paid to holders of Andrew Common Stock pursuant to this Agreement, together with any cash in lieu of fractional shares pursuant to Section 2.1(e), are referred to as the "Merger Consideration." As a result of the Merger, at the Effective Time, each holder of a Certificate shall cease to have any rights with respect thereto, *except* the right to receive the Merger Consideration payable in respect of the shares of Andrew Common Stock represented by such Certificate immediately prior to the Effective Time, and any dividends or other distributions payable pursuant to Section 2.2(c), all to be issued or paid, without interest, in consideration therefor upon the surrender of such Certificate in accordance with Section 2.2(b) (or, in the case of a lost, stolen or destroyed Certificate, Section 2.2(h)).

(b)    **Capital Stock of Merger Sub**. **Each issued and outstanding share of common stock, par value $0.01 per share, of Merger Sub shall be converted into one fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.**

(c)    **Cancellation of Treasury Shares**. **Each share of Andrew Common Stock held as treasury stock by Andrew, if any, shall automatically be extinguished without any conversion, and no consideration shall be delivered in respect thereof.**

(d)    **Andrew Options and Other Equity Awards.**

(i)    **Holders of outstanding options to purchase Andrew Common Stock (each, an "Andrew Option") may elect, not less than five (5) days prior to the Effective Time, to have some or all of their options cancelled as of the Effective Time. In exchange for such cancellation, holders of Andrew Options shall be entitled to receive in respect of each share of Andrew Common Stock subject to the cancelled Andrew Option immediately after the Effective Time, an amount equal to the Merger Consideration less the exercise price of the cancelled Andrew Option; provided however, that the exercise price shall be deducted from the sum of the cash portion of the Election Merger Consideration and the Cash Merger Consideration and if the exercise price of the cancelled option is in excess of such sum, the number of Parent Shares issuable shall be reduced by a number having a value (based on the Average Parent Common Stock Price) equal to such excess. As soon as practicable following the date of this Agreement, Andrew's Board of Directors (or, if appropriate, any committee administering the Andrew Stock Plans) shall adopt such resolutions or take such other actions as are required to allow such Andrew Options that were heretofore granted under any Andrew Stock Plan or otherwise that are outstanding immediately prior to the Effective Time to be so cancelled. All amounts payable pursuant to this Section 2.1(d)(i) shall be subject to any required withholding of Taxes and shall be paid without interest. Holders of Andrew Options who do not elect do have all of their options cancelled as of the Effective Time shall have each then issued and outstanding option to purchase Andrew Common Stock under any Andrew Stock Plan not so cancelled converted into an option to acquire a number of shares of Parent Common Stock equal to the product (rounded to the nearest whole number) of (i) the number of shares of Andrew Common Stock subject to the Andrew Option immediately prior to the Effective Time and**

**B 11**

(ii) the Option Exchange Ratio, at an exercise price per share (rounded to the nearest whole cent) equal to (A) the exercise price per share of Andrew Common Stock of that Andrew Option immediately prior to the Effective Time, divided by (B) the Option Exchange Ratio; provided, that the exercise price and the number of shares of Parent Common Stock purchasable pursuant to the Andrew Options will be determined in a manner consistent with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"); and provided, further, that in the case of any Andrew Option to which Section 422 of the Code applies, the exercise price and the number of shares of Parent Common Stock purchasable pursuant to such Andrew Option will be determined in accordance with the foregoing, subject to those adjustments as are necessary in order to satisfy the requirements of Section 424(a) of the Code. "Option Exchange Ratio" means $15.00 divided by the Average Parent Common Stock Price.  As soon as reasonably practicable following the Effective Time, Parent shall file a registration statement under the Securities Act (as defined in Section 3.3(d)(ii)(B)) on Form S-8 or another appropriate form (and use its commercially reasonable efforts to maintain the effectiveness thereof and maintain the current status of the prospectuses contained therein) with respect to Andrew Options assumed by Parent pursuant

3

hereto and shall use its commercially reasonable efforts to cause such registration statement to remain in effect for so long as such assumed Andrew Options shall remain outstanding.

(ii)     At the Effective Time, all restricted stock units (including, to the extent applicable, performance stock units) granted under the Andrew Stock Plans will be assumed by Parent and will be converted into the right to receive, upon the vesting thereof in accordance with the terms of the applicable Andrew Stock Plan or the terms of the applicable award, (A) the number of whole shares of Parent Common Stock equal to the product of the number of shares of Andrew Common Stock to which such restricted stock units (including performance stock units) relate multiplied by the stock portion of the Election Merger Consideration, rounded down to the nearest whole number of shares of Parent Common Stock and (B) that amount of cash equal to the product of the number of shares of Andrew Common Stock to which such restricted stock units (including performance stock units) relate multiplied by the sum of the cash portion of the Election Merger Consideration and the Cash Merger Consideration.  Notwithstanding the foregoing, to the extent as of the date hereof provided in the Andrew Stock Plans or the terms of any restricted stock unit (including performance stock unit) award agreement evidencing an award, each restricted stock unit (including each performance stock unit) shall be cancelled as of the Effective Time in exchange for a cash payment to the holder thereof in an amount equal to the product of (A) the number of shares of Andrew Common Stock subject thereto immediately prior to the Effective Time and (B) $15.00.

(iii)     At the Effective Time, any share of Andrew Common Stock issued under the Andrew Stock Plans with restrictions or limitations on transfer with respect thereto shall be treated in accordance with the terms of the respective Andrew Stock Plan under which such shares were issued, and the shares of Parent Common Stock and cash issued in exchange for such Andrew Common Stock hereunder shall have the same restrictions and limitations, if any, as such shares of Andrew Common Stock exchanged therefor at the Effective Time.

(iv)     Andrew's Board of Directors (or a committee thereof) will adopt amendments to, or make determinations with respect to, the Andrew Stock Plan, individual agreements evidencing the grant of Andrew Options, restricted stock units (including performance stock units), any other awards under the Andrew Stock Plans, and Andrew Benefit Plans (as defined in Section 4.9(a)), if necessary, to implement the provisions of this Section 2.1(d)(iv).

(e)     **Fractional Shares.**  If any Parent Common Stock is included in the Election Merger Consideration, no fraction of a share of Parent Common Stock will be issued by virtue of the Merger, but in lieu thereof each holder of shares of Andrew Common Stock who would otherwise be entitled to receive a fraction of a share of Parent Common Stock (after aggregating all fractional shares of Parent Common Stock that otherwise would be received by such holder) shall, upon surrender of such holder's Certificate(s), receive from Parent an amount of cash (rounded to the nearest whole cent), without interest, equal to the product of: (i) such fraction, multiplied by (ii) the Average Parent Common Stock Price.

(f)     **Adjustments to Exchange Ratio.**  Notwithstanding any provision of this Article II to the contrary (but without in any way limiting the covenants in Section 5.1), the Exchange Ratio shall be adjusted to reflect fully the appropriate effect of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities convertible

**B 12**

into Parent Common Stock or Andrew Common Stock), reorganization, recapitalization, reclassification or other like change with respect to Parent Common Stock or Andrew Common Stock having a record date on or after the date hereof and prior to the Effective Time.

(g)    **Andrew Warrant and Andrew Notes**.  At the Effective Time, (i) the warrant, dated January 16, 2004, to purchase 1,000,000 shares of Andrew Common Stock issued to TruePosition, Inc. (the "<u>Andrew Warrant</u>") shall become exercisable for the Merger Consideration in accordance with its terms and (ii) all issued and outstanding 3 1/4% Convertible Subordinated Notes Due 2013 (the "<u>Andrew Notes</u>"), subject to the indenture, dated August 8, 2003, between Andrew and BNY Midwest Trust Company (the "<u>Andrew Indenture</u>"), shall become convertible into the Merger Consideration in accordance with the terms of the Andrew Indenture.

4

(h)    **Dissenting Shares**.

(i)    Shares of Andrew Common Stock that are issued and outstanding immediately prior to the Effective Time and which are held by holders of Andrew Common Stock who have not voted in favor of or consented to the Merger and who have properly demanded and perfected their rights to be paid the fair value of such shares of Andrew Common Stock in accordance with Section 262 of the DGCL (the "<u>Dissenting Shares</u>") shall not be converted into the right to receive the Merger Consideration, and the holders thereof shall be entitled to only such rights as are granted by Section 262 of the DGCL; provided, however, that if any such stockholder of Andrew shall fail to perfect or shall effectively waive, withdraw or lose such stockholder's rights under Section 262 of the DGCL, such stockholder's shares of Andrew Common Stock in respect of which the stockholder would otherwise be entitled to receive fair value under Section 262 of the DGCL shall thereupon be deemed to have been converted, at the Effective Time, into the right to receive the Merger Consideration without any interest thereon.

(ii)    Andrew will give Parent (x) prompt notice of any notice received by Andrew of intent to demand the fair value of any shares of Andrew Common Stock, withdrawals of such notices and any other instruments served pursuant to Section 262 of the DGCL and received by Andrew and (y) the opportunity to direct all negotiations and proceedings with respect to the exercise of dissenters' rights under Section 262 of the DGCL.  Andrew shall not, except with the prior written consent of Parent, make any payment with respect to any such exercise of dissenters' rights or offer to settle or settle any such rights.

2.2    **Exchange of Shares and Certificates**.

(a)    **Exchange Agent**.  At or prior to the Effective Time, Parent shall engage Mellon Investor Services, L.L.C. (or such other institution reasonably satisfactory to Parent and Andrew) to act as exchange agent in connection with the Merger (the "<u>Exchange Agent</u>"), pursuant to an agreement reasonably satisfactory to Parent and Andrew.  Immediately prior to the Effective Time, Parent shall deposit with the Exchange Agent, in trust for the benefit of the holders of shares of Andrew Common Stock, the aggregate number of shares of Parent Common Stock issuable pursuant to Section 2.1(a), if any Parent Common Stock is included in the Election Merger Consideration, and an amount of cash sufficient to pay the aggregate Cash Merger Consideration and cash portion of the Election Merger Consideration payable pursuant to Section 2.1(a).  In addition, Parent shall make available by depositing with the Exchange Agent, as necessary from time to time after the Effective Time as needed, cash in an amount sufficient to make the payments in lieu of fractional shares pursuant to Section 2.1(e) and any dividends or distributions to which holders of shares of Andrew Common Stock may be entitled pursuant to Section 2.2(c).  All shares of Parent Common Stock and cash deposited with the Exchange Agent shall hereinafter be referred to as the "<u>Exchange Fund</u>."

**B 13**

(b)    **Exchange Procedures.** Promptly after the Effective Time, Parent shall cause the Exchange Agent to mail to each holder of record of a certificate or certificates that immediately prior to the Effective Time represented outstanding shares of Andrew Common Stock and that at the Effective Time were converted into the right to receive the Merger Consideration pursuant to Section 2.1 (the "Certificates"), (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration and any dividends or other distributions payable pursuant to Section 2.2(c).  Upon surrender of Certificates for cancellation to the Exchange Agent, together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Exchange Agent, the holder of such Certificates shall be entitled to receive in exchange therefor the number of whole shares of Parent Common Stock, if any, to which such holder is entitled pursuant to Section 2.1, the cash portion, if any, of the Election Merger Consideration to which such holder is entitled to pursuant to Section 2.1, the Cash Merger Consideration to which such holder is entitled pursuant to Section 2.1, payment in lieu of fractional shares which such holder is entitled to receive pursuant to Section 2.1(e) and any dividends or distributions payable pursuant to Section 2.2(c), and the Certificates so surrendered shall forthwith be canceled.  In the event of a transfer of ownership of Andrew Common Stock which is not registered in the transfer records of Andrew, the proper number of shares of Parent Common Stock, if any, may be issued to, and the cash portion, if any, of the Election Merger Consideration, the Cash Merger Consideration,

5

payment in lieu of fractional shares and any dividends or distributions payable may be paid to, a Person other than the Person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such issuance shall pay any transfer or other taxes required by reason of the issuance of shares of Parent Common Stock, payment of the cash portion of the Election Merger Consideration and payment of the Cash Merger Consideration, payment in lieu of fractional shares and any dividends or distributions payable to a Person other than the registered holder of such Certificate or establish to the reasonable satisfaction of Parent that such tax has been paid or is not applicable.  Until surrendered as contemplated by this Section 2.2(b), each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive the Merger Consideration (and any amounts to be paid pursuant to Section 2.2(c)) upon such surrender.  No interest shall be paid or shall accrue on any amount payable pursuant to Section 2.1(e) or Section 2.2(c).

(c)    __Distributions with Respect to Unexchanged Shares.__  No dividends or other distributions with respect to Parent Common Stock with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Parent Common Stock, if any, represented thereby, and no cash payment in lieu of fractional shares shall be paid to any such holder pursuant to Section 2.1(e), until such Certificate has been surrendered in accordance with this Article II.  Subject to Applicable Law (as defined in Section 3.7(a)), following surrender of any such Certificate, there shall be paid to the recordholder thereof, without interest, (i) promptly after such surrender, the Merger Consideration in exchange therefor pursuant to this Article II, together with the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to the whole shares of Parent Common Stock, if any, included in such Merger Consideration, and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time and a payment date subsequent to such surrender payable with respect to whole shares of Parent Common Stock, if any, included in such Merger Consideration.

(d)    __No Further Ownership Rights in Andrew Common Stock.__  All Merger Consideration issued and paid upon the surrender for exchange of Certificates in accordance with the terms of this Article II and any cash paid pursuant to Section 2.1(e) or Section 2.2(c) shall be deemed to have been issued (and paid) in full satisfaction of all rights pertaining to the shares of Andrew Common Stock previously represented by such Certificates.  At the Effective Time, the stock transfer books of Andrew shall be closed and there shall be no

**B 14**

further registration of transfers on the stock transfer books of the Surviving Corporation of the shares of Andrew Common Stock which were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or the Exchange Agent for any reason, they shall be canceled and exchanged as provided in this Article II.

(e)     **Termination of Exchange Fund.**  Any portion of the Exchange Fund which remains undistributed to the holders of Certificates six months after the Effective Time shall be delivered to Parent, upon demand, and any holders of Certificates who have not theretofore complied with this Article II shall thereafter look only to Parent for payment of their claim for the Merger Consideration, and any dividends or distributions pursuant to Section 2.2(c).

(f)     **No Liability.**  None of Parent, Merger Sub, Surviving Corporation or the Exchange Agent shall be liable to any Person in respect of any shares of Parent Common Stock (or dividends or distributions with respect thereto) or cash from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. If any Certificate shall not have been surrendered prior to seven years after the Effective Time, or immediately prior to such earlier date on which any shares of Parent Common Stock, any cash or any dividends or distributions with respect to Parent Common Stock issuable in respect of such Certificate would otherwise escheat to or become the property of any Governmental Entity (as defined in Section 3.3(d)), any such shares, cash, dividends or distributions in respect of such Certificate shall, to the extent permitted by Applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(g)     **Withholding Rights.**  Parent or the Exchange Agent shall be entitled to deduct and withhold from any consideration payable pursuant to this Agreement to any Person who was a holder of Andrew

6

---

Common Stock, options or other securities or rights immediately prior to the Effective Time such amounts as Parent or the Exchange Agent may be required to deduct and withhold with respect to the making of such payment under the Code, or any provision of federal, state, local or foreign tax law.  To the extent that amounts are so withheld by Parent or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom such consideration would otherwise have been paid.

(h)     **Lost, Stolen or Destroyed Certificates.**  In the event any Certificates shall have been lost, stolen or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof, such Merger Consideration as may be required pursuant to Section 2.1 and any dividends or distributions payable pursuant to Section 2.2(c); *provided, however,* that Parent may, in its reasonable discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed Certificates to deliver an agreement of indemnification in form reasonably satisfactory to Parent, or a bond in such sum as Parent may reasonably direct as indemnity, against any claim that may be made against Parent or the Exchange Agent in respect of the Certificates alleged to have been lost, stolen or destroyed.

(i)     **Investment of Exchange Fund.**  The Exchange Agent shall invest any cash included in the Exchange Fund as directed by Parent on a daily basis *provided* that no such investment or loss thereon shall affect the amounts payable to former stockholders of Andrew after the Effective Time pursuant to this Article II.  Any interest and other income resulting from such investment shall become a part of the Exchange Fund and any amounts in excess of the amounts payable pursuant to this Article II shall promptly be paid to Parent.

Article III

**B 15**

**Representations and Warranties of Parent and Merger Sub**

Except as disclosed in (x) a Parent SEC Document (as defined in Section 3.4(a)), but excluding any risk factor disclosure contained in any such Parent SEC Document under the heading "Risk Factors" or "Forward-Looking Information," or (y) the Parent Disclosure Letter (as defined in Section 9.5), Parent and Merger Sub jointly and severally represent and warrant to Andrew as follows:

### 3.1 Corporate Organization.

(a)    **Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. CommScope, Inc. of North Carolina, a North Carolina corporation ("CommScope NC"), is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina. Each of Parent, CommScope NC and Merger Sub has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary,** *except* **where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Parent.**

As used in this Agreement, the terms "Material Adverse Change" or "Material Adverse Effect" mean, with respect to Parent or Andrew, as the case may be, any change, effect, event, occurrence or state of facts that has or has had a material adverse effect (i) on the business, results of operations (other than short-term effects on results of operations) or financial condition of such party and its Subsidiaries, taken as a whole, *provided, however,* that a Material Adverse Effect/Material Adverse Change will be deemed not to include effects to the extent resulting from: (A) any change, after the date hereof, in U.S. generally accepted accounting principles ("GAAP") or the accounting rules and regulations of the Securities and Exchange Commission (the "SEC"), (B) any change in the market price or trading volume of Parent Common Stock or Andrew Common Stock (it being understood that any change, effect, event, occurrence or state of facts that is an underlying cause of such change in price or trading volume shall not be excluded by virtue of this exception), (C) any change in the market price of copper or any short-term adverse effects to such party or its Subsidiaries directly resulting from such change, (D) any change, effect, event, occurrence or state of facts exclusively relating to any acts of terrorism, sabotage, military action or war, (E) any change in or relating to the United States economy or United States financial, credit or securities markets in

7

general, (F) any change in or relating to the industry in which such party operates or the markets for any of such party's products or services in general, which change in the case of clauses (D), (E) and (F) does not affect such party to a materially disproportionate degree relative to other entities operating in such markets or industries or serving such markets, or (G) any change, effect, event, occurrence or state of facts arising directly or indirectly out of the execution, delivery, performance or disclosure of this Agreement or the transactions contemplated hereby, including any impact thereof on relationships, contractual or otherwise, with customers, suppliers, distributors, partners or employees; or (ii) the ability of such party to consummate the transactions contemplated by this Agreement in the manner contemplated hereby.

(b)    **True and complete copies of the Amended and Restated Articles of Incorporation of Parent, as amended through, and as in effect as of, the date of this Agreement (the "Parent Charter") and the Amended and Restated By-Laws of Parent, as amended through, and as in effect as of, the date of this Agreement (the "Parent By-Laws", and, together with the Parent Charter, the "Parent Organizational Documents") have previously been made available to Andrew.**

### 3.2 Capital Structure.

(a)    **The authorized capital stock of Parent consists of 300,000,000 shares of Parent Common Stock, and 20,000,000 shares of preferred stock, $0.01 par value per share ("Parent Preferred Stock"). At the close of business on June 15, 2007: (i) 61,575,192 shares of Parent Common Stock were issued and outstanding; (ii) no shares of Parent Preferred Stock were issued and outstanding; (iii) an aggregate of 5,716,506 shares of Parent Common Stock were reserved for issuance pursuant to Parent's 1997 Long Term Incentive Plan and 2006 Long Term Incentive Plan (such plans, as amended to date, are collectively referred to herein as the "Parent Stock Plans"); (iv) 11,494,250 shares of Parent Common Stock were reserved for issuance upon the conversion of Parent's 1% Convertible Unsecured Subordinated Notes Due 2004 (collectively, the "Parent Notes") and (v) 400,000 shares of Parent Preferred Stock were designated as Series A Junior Preferred Stock, par value $0.01 per share. All of the outstanding shares of capital stock of, or other equity interests in, Parent have been validly issued and are fully paid and nonassessable.**

**B 16**

(b)      As of the close of business on June 15, 2007: (i) 2,898,635 shares of Parent Common Stock were subject to issuance pursuant to outstanding options to acquire shares of Parent Common Stock ("Parent Options") under the Parent Stock Plans; (ii) 1,025,653 shares of Parent Common Stock were subject to issuance pursuant to outstanding restricted stock units and outstanding performance stock units issued under the Parent Stock Plans and (iii) 11,494,250 shares of Parent Common Stock were subject to issuance upon the conversion of the Parent Notes.  All shares of Parent Common Stock subject to issuance under the Parent Stock Plans, upon issuance upon the terms and subject to the conditions set forth in the instruments pursuant to which they are issuable, will be duly authorized, validly issued, fully paid and nonassessable.  There are no commitments or agreements of any character to which Parent is bound obligating Parent to accelerate the vesting of any Parent Option as a result of the Merger.  Except as set forth in this Section 3.2, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to Parent.

(c)      No bonds, debentures, notes or other evidences of indebtedness having the right to vote on any matters on which stockholders of Parent may vote ("Voting Debt") are issued or outstanding.

(d)      Except as otherwise set forth in this Section 3.2, as of the date of this Agreement, there are no securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Parent or any of its Subsidiaries is a party or by which any of them is bound obligating Parent or any of its Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock, Voting Debt or other voting securities of Parent or any of its Subsidiaries, or obligating Parent or any of its Subsidiaries to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking.  All outstanding shares of Parent Common Stock, all outstanding Parent Options, and all outstanding shares of capital stock of each Subsidiary of Parent have been issued and granted (as applicable) in compliance in all material respects with all applicable securities laws and all other Applicable Laws.

8

B 17

(e)      Since June 15, 2007, and through the date of this Agreement, *except* for issuances of Parent Common Stock pursuant to the exercise of Parent Options and the conversion of Parent Notes outstanding as of June 15, 2007, there has been no change in (x) the outstanding capital stock of Parent, (y) the number of Parent Options outstanding, or (z) the number of other options, warrants or other rights to purchase Parent Common Stock.

(f)      As of the date of this Agreement, neither Parent nor any Subsidiary of Parent is a party to any agreement, arrangement or understanding restricting the purchase or transfer of, relating to the voting of, requiring registration of, or granting any preemptive or antidilutive rights with respect to, any capital stock of Parent or any of its Subsidiaries or any securities of the type referred to in Section 3.2(d) hereof.

(g)      As of the date of this Agreement, all of the issued and outstanding shares of capital stock or other equity ownership interests of each "significant subsidiary" (as such term is defined under Regulation S−X of the SEC) of Parent are owned by Parent, directly or indirectly, free and clear of any material liens, pledges, charges and security interests and similar encumbrances, *other than* for Taxes that are not yet due ("Liens"), and free of any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity ownership interest (other than restrictions under applicable securities laws), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights.  As of the date of this Agreement, no such significant subsidiary is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such significant subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such significant subsidiary.  Except for the capital stock or other equity ownership interests of its Subsidiaries, as of the date of this Agreement, Parent does not beneficially own directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person that constitutes a Substantial Investment.  As used in this Agreement, (i) "Subsidiary", when used with respect to either party, means any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, including any branches or representative offices thereof, (x) of which such party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interests in such partnership) or (y) a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such party and/or by any one or more of its Subsidiaries, and (ii) "Substantial Investment", when used with respect to either party, means a stock or other equity investment having a fair market value or book value in excess of $10,000,000, directly or indirectly, in any Person.

(h)      The authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, all of which shares are issued and outstanding.  Parent is the legal and beneficial owner of all of the issued and outstanding shares of CommScope NC, which is the legal and beneficial owner of all the issued and outstanding shares of Merger Sub.  Merger Sub was formed at the direction of Parent on June 19, 2007, solely for the purposes of effecting the Merger and the other transactions contemplated hereby.  Except as required by or provided for in this Agreement, Merger Sub (A) does not hold, nor has it held, any assets, (B) does not have, nor has it incurred, any liabilities and (C) has not carried on any business activities *other than* in connection with the Merger and the transactions contemplated hereby.  All of the outstanding shares of capital stock of Merger Sub have been duly authorized and validly issued, and are fully paid and nonassessable and not subject to any preemptive rights.

**B 18**

(i)      Each grant of a Parent Option was duly authorized no later than the grant date thereof by all necessary corporate action, including, as applicable, approval by the Board of Directors of Parent (or a duly constituted and authorized committee thereof) and any required stockholder approval by the necessary number of votes or written consents, and the award agreement governing such grant (if any) was duly executed and delivered by each party thereto, (B) each such grant was made in accordance with the terms of the applicable compensation plan or arrangement of Parent, the Securities Exchange Act of 1934, as amended (the "Exchange Act") , and all other Applicable Laws and regulatory rules or requirements, including the rules of the New York Stock Exchange ("NYSE") , (C) the per share exercise price of each Parent Option was equal to the fair market value (as defined in the applicable compensation plan or arrangement of Parent) of a share of Parent Common Stock on the applicable

9

grant date and (D) each such grant was properly accounted for in accordance with GAAP in the financial statements (including the related notes) of Parent and disclosed in the Parent SEC Documents in accordance with the Exchange Act and all other Applicable Laws.

### 3.3    Authority; Board Approval; Voting Requirements; No Conflict; Required Filings and Consents.

(a)      Authority.  Each of Parent and Merger Sub has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Parent and Merger Sub, and the consummation by Parent and Merger Sub of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Parent, CommScope NC and Merger Sub, and no other corporate proceedings on the part of Parent, CommScope NC or Merger Sub and no shareholder votes are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Parent and Merger Sub.  Assuming the due authorization, execution and delivery of this Agreement by Andrew, this Agreement constitutes the legal, valid and binding obligation of each of Parent and Merger Sub, enforceable against Parent and Merger Sub in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(b)      Board Approval.  The Board of Directors of Parent has (A) determined that this Agreement, the Merger and the issuance of shares of Parent Common Stock in connection with this Agreement (the "Parent Share Issuance") are advisable and fair to and in the best interest of Parent and its shareholders and (B) approved and adopted this Agreement, the Merger, the Parent Share Issuance and the other transactions contemplated hereby, which adoption has not been rescinded or modified.

(c)      No Conflict.  The execution and delivery of this Agreement by Parent and Merger Sub do not, and the consummation by Parent and Merger Sub of the transactions contemplated hereby and compliance by Parent and Merger Sub with the provisions of this Agreement will not, conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, require any consent, waiver or approval under, give rise to any right of termination or other right, or the cancellation or acceleration of any right or obligation or loss of a benefit under, or result in the creation of any Lien upon any of the properties or assets of Parent or any of its Subsidiaries or any restriction on the conduct of Parent's or any of its Subsidiaries' business or operations under, (A) the Parent Organizational Documents, (B) any Contract, permit, concession, franchise, license or authorization applicable to Parent or any of its Subsidiaries or their respective properties or assets, (C)

**B 19**

any judgment, order or decree, or (D) subject to the governmental filings and other matters referred to in Section 3.3(d), any statute, law, ordinance, rule or regulation applicable to Parent or any of its Subsidiaries or their respective properties or assets, *other than*, in the case of clauses (B), (C) and (D), any such conflicts, violations, defaults, rights, losses, restrictions or Liens, or failure to obtain consents, waivers or approvals, which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Parent.

(d)    <u>Required Filings or Consents</u>.  No consent, approval, order or authorization of, action by or in respect of, or registration, declaration or filing with, any federal, state, local or foreign government, any court, administrative, regulatory or other governmental agency, commission or authority or any non−governmental self−regulatory agency, commission or authority (a "<u>Governmental Entity</u>") is required to be made or obtained by or with respect to Parent or any of its Subsidiaries in connection with the execution and delivery of this Agreement by Parent or Merger Sub, the approval of the Parent Share Issuance or the consummation by Parent or Merger Sub of the transactions contemplated hereby, *except for:*

(i)    the filing of a pre−merger notification and report form by Parent and Merger Sub under the Hart−Scott−Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and any applicable filings or notifications under the antitrust, competition or similar laws of any foreign jurisdiction;

(ii)    the filing with the SEC of:

10

(A)    the registration statement on Form S−4 to be filed with the SEC by Parent in connection with the issuance of Parent Common Stock, if any, in the Merger (including any amendments or supplements, the "<u>Form S−4</u>");

(B)    such reports under the Exchange Act and the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in each case as may be required in connection with this Agreement and the transactions contemplated hereby;

(iii)    the filing of a Notification Form: Listing of Additional Shares with the NYSE in connection with the Parent Share Issuance;

(iv)    the filing of the Certificate of Merger with the Secretary of State and appropriate documents with the relevant authorities of other states in which Parent or Merger Sub is qualified to do business;

(v)    filings required by state securities laws or other "blue sky" laws, if any; and

(vi)    other consents, approvals, orders or authorizations, the failure of which to be made or obtained, would not reasonably be likely to have a Material Adverse Effect on Parent.

3.4    **SEC Documents; Financial Statements.**

(a)    Parent and each of its Subsidiaries has timely filed all reports, registrations, schedules, forms, statements and other documents, together with any amendments required to be made with respect thereto, that they were required to file since January 1, 2004, with (i) the SEC, (ii) any state or other federal regulatory authority  and (iii) any foreign regulatory authority  (collectively, "<u>Regulatory Agencies</u>"), and have paid all fees and assessments due and payable in connection therewith, *except* in each case where the failure to file such report, registration, schedule, form, statement or other document, or to pay such fees and assessments, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Parent.  No publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement filed since January 1, 2004, and prior to the close of business on June 25, 2007 by Parent with the SEC pursuant to the Securities Act or the Exchange Act (collectively, the "<u>Parent SEC Documents</u>"), as of their respective dates or, if amended prior to the date of this Agreement, as of the date of such amendment, contained any untrue statement of a

**B 20**

material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading, *except that* information contained in any subsequent Parent SEC Document filed as of a later date (but before the date of this Agreement) will be deemed to modify information contained in any Parent SEC Document filed as of an earlier date.  As of their respective filing dates, all Parent SEC Documents complied as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act.  None of Parent's Subsidiaries is required to file any reports with the SEC.

(b)      The principal executive officer and principal financial officer of Parent have made all certifications required by the Sarbanes−Oxley Act of 2002 (the "Sarbanes−Oxley Act") and any related rules and regulations promulgated thereunder by the SEC, and the statements contained in all such certifications were complete and correct in all material respects as of the respective dates made.  Neither Parent nor any of its officers has received notice from the SEC or the NYSE questioning or challenging the accuracy, completeness, content, form or manner of filing or submission of such certifications.  Parent is, and through the Closing Date will be, otherwise in material compliance with all applicable effective provisions of the Sarbanes−Oxley Act and the applicable listing and corporate governance rules of the NYSE.

(c)      The financial statements of Parent included in the Parent SEC Documents complied, as of their respective dates of filing with the SEC, in all material respects with accounting requirements and the published rules and regulations of the SEC applicable with respect thereto, have been prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the instructions and applicable rules of Form 10−Q or Form 8−K of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the

11

---

notes thereto) and fairly present the consolidated financial position of Parent and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year−end audit adjustments which are not, individually or in the aggregate, material).

(d)      The financial statements of Parent included in each publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement to be filed with the SEC pursuant to the Securities Act or Exchange Act after the date hereof until the Effective Time will comply, as of their respective dates of filing with the SEC, in all material respects with accounting requirements and the published rules and regulations of the SEC applicable with respect thereto, will be prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the instructions or other applicable rules of Form 10−Q or Form 8−K of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and will fairly present the consolidated financial position of Parent and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year−end audit adjustments which are not, individually or in the aggregate, expected to be material).

(e)      Except as reflected or reserved against in the balance sheet of Parent dated March 31, 2007 included in the Form 10−Q filed by Parent with the SEC on May 1, 2007 (including the notes thereto, the "Parent Balance Sheet"), as of the date of this Agreement, neither Parent nor any of its Subsidiaries has any liabilities (absolute, accrued, contingent or otherwise) which are required by GAAP to be set forth on a consolidated balance sheet of Parent and its consolidated Subsidiaries or in the notes thereto, *other than* (A) liabilities and obligations incurred since March 31, 2007, in the ordinary course of business which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect

**B 21**

on Parent, or (B) liabilities and obligations incurred in connection with this Agreement or the transactions contemplated hereby.

(f)    Neither Parent nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any contract, agreement, arrangement or understanding (including any contract or arrangement relating to any transaction or relationship between or among Parent and any of its Subsidiaries, on the one hand, and any unconsolidated affiliate (as such term is defined Rule 12b−2 under the Exchange Act (an "Affiliate")), including any structured finance, special purpose or limited purpose entity or Person, on the other hand), where the result, purpose or intended effect of such contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, Parent or any of its Subsidiaries in Parent's or its Subsidiaries' published financial statements.

3.5    **Information Supplied.**  None of the information supplied or to be supplied by or on behalf of Parent, Merger Sub or any of their respective Subsidiaries for inclusion or incorporation by reference in (i) the Form S−4 will, at the time the Form S−4 becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading or (ii) the Proxy Statement will, at the date it is first mailed to Andrew's shareholders or at the time of the Andrew Shareholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.  The Proxy Statement and the Form S−4 will comply as to form in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations thereunder, *except that* no representation or warranty is made by Parent with respect to information or statements with respect to Andrew or its Subsidiaries made or incorporated by reference therein or otherwise supplied by or on behalf of Andrew for inclusion or incorporation by reference in the Proxy Statement or the Form S−4.

3.6    **Absence of Certain Changes or Events.**

(a)    Since March 31, 2007, through the date hereof, *except* as and to the extent (i) disclosed in Parent's quarterly report for the fiscal quarter ended March 31, 2007, and filed on Form 10−Q with the SEC on May 1, 2007, or (ii) expressly contemplated by this Agreement:

(i)    Parent and its Subsidiaries have conducted their business only in the ordinary course consistent with past practice in all material respects;

(ii)    there has not been any split, combination or reclassification of any of Parent's capital stock or any declaration, setting aside or payment of any dividend on, or other distribution (whether in cash, stock or property) in respect of, in lieu of, or in substitution for, shares of Parent's capital stock;

**B 22**

(iii)     except as required by a change in GAAP, there has not been any material change in accounting methods, principles or practices by Parent; and

(iv)     there has not been any action taken by Parent or any of its Subsidiaries that, if taken during the period from the date of this Agreement through the Effective Time, would constitute a breach of Section 5.1(c), *other than* actions in connection with entering into this Agreement.

(b)     Since December 31, 2006, through the date hereof, there have not been any changes, circumstances or events that, individually or in the aggregate, have had, or would reasonably be likely to have, a Material Adverse Effect on Parent.

3.7     <u>Compliance with Applicable Laws; Permits; Litigation</u>.

(a)     Parent, its Subsidiaries and employees hold all permits, licenses, easements, variances, exemptions, orders, consents, registrations and approvals of all Governmental Entities which are required for the operation of the businesses of Parent and its Subsidiaries in the manner described in the Parent SEC Documents filed prior to the date hereof and as they are being conducted as of the date hereof (the "<u>Parent Permits</u>"), and all Parent Permits are in full force and effect, and all required filings and applications (including renewals) with respect to the Parent Permits have been made in a timely basis, *except* where the failure to have, or the suspension or cancellation of, or the failure to be valid or in full force and effect of, any such Parent Permit would not reasonably be likely to have a Material Adverse Effect on Parent.  Parent and its Subsidiaries are in compliance with and have no unresolved liability under the terms of the Parent Permits and all applicable laws, statutes, orders, rules, regulations, policies or guidelines promulgated, or judgments, decisions or orders entered by any Governmental Entity (all such laws, statutes, orders, rules, regulations, policies, guidelines, judgments, decisions and orders, collectively, "<u>Applicable Laws</u>" or "<u>Applicable Law</u>") relating to Parent and its Subsidiaries or their respective business or properties, *except* where the failure to be in compliance with the terms of the Parent Permits or such Applicable Laws would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Parent.  To the Knowledge of Parent, there are no facts or circumstances that are reasonably likely to prevent or increase the cost of compliance with the Parent Permits or Applicable Laws, *except* where the increased costs would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Parent.

(b)     As of the date hereof, *except* as and to the extent disclosed in the Parent SEC Documents filed prior to the date of this Agreement, no action, demand, suit, proceeding, mediation, arbitration, requirement or investigation by any Governmental Entity or action, demand, suit, proceeding, mediation or arbitration by any Person, against or affecting Parent or any of its Subsidiaries or any of their respective businesses or properties, including Intellectual Property, is pending or, to the Knowledge of Parent, threatened which, individually or in the aggregate, has had, or is reasonably likely to have, a Material Adverse Effect on Parent.

(c)     As of the date hereof, neither Parent nor any of its Subsidiaries is subject to any material outstanding order, injunction or decree.

3.8     <u>State Takeover Statutes</u>.  To the Knowledge of Parent, *other than* Section 203 of the DGCL, no state takeover statute is applicable to the Merger or the other transactions contemplated hereby.

3.9     <u>Brokers</u>.  Except for fees payable to Banc of America Securities LLC and Duff & Phelps, LLC, no broker, investment banker, financial advisor or other Person, is entitled to any broker's, finder's, financial advisor's

**B 23**

or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent or Merger Sub.

**3.10** **Ownership of Andrew Common Stock. None of Parent, Merger Sub, their respective Subsidiaries, nor the executive officers or directors of Parent or Merger Sub nor, to the Knowledge of Parent without independent investigation, any of their respective Affiliates beneficially owns (as defined in Rule 13d−3 under the Exchange Act) directly, or is party to any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of, shares of capital stock of Andrew.**

**3.11** **Financing. Parent has delivered to Andrew a true and complete copy of each of the commitment letters, dated as of the date of this Agreement, between Parent and each of Bank of America, N.A. and Wachovia Bank, N.A. (the "Financing Commitments"), pursuant to which Financing Commitments the lenders party thereto have committed, subject to the terms thereof, to lend the amounts set forth therein. Prior to the date of this Agreement, the respective commitments contained in the Financing Commitments have not been withdrawn or rescinded in any respect. Each of the Financing Commitments, in the form so delivered, is in full force and effect as of the date of this Agreement and is a legal, valid and binding obligation of Parent and, to the knowledge of Parent, the other parties thereto. As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent under any term or condition of the Financing Commitments. As of the date of this Agreement, Parent has no reason to believe that it will be unable to satisfy on a timely basis any term or condition of closing to be satisfied by it contained in the Financing Commitments. Parent and Merger Sub will have, as of the Closing, sufficient funds available to them to make the deposit into the Exchange Fund required by Section 2.2 and pay any expenses required to be incurred by Parent or Merger Sub in connection with the transactions contemplated by this Agreement.**

Article IV<br>Representations and Warranties of Andrew

Except as disclosed in (x) an Andrew SEC Document (as defined in Section 4.4(a)), but excluding any risk factor disclosure contained in any such Andrew SEC Document under the heading "Risk Factors" or "Forward−Looking Information," or (y) the Andrew Disclosure Letter (as defined in Section 9.5), Andrew represents and warrants to Parent and Merger Sub as follows:

**4.1** **Corporate Organization.**

**(a)** **Andrew is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Andrew has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, *except* where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew.**

**(b)** **True and complete copies of the Restated Certificate of Incorporation of Andrew, as amended through, and as in effect as of, the date of this Agreement (the "Andrew Charter") and the By−laws of Andrew, as amended through, and as in effect as of, the date of this Agreement (the "Andrew By−Laws", and, together with the Andrew Charter, the "Andrew Organizational Documents") have previously been made available to Parent.**

**B 24**

(c)    Each Subsidiary of Andrew (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) is duly qualified to do business and, where applicable, in good standing in all jurisdictions (whether federal, state, local or foreign) where its ownership or leasing of property or the conduct of its business requires it to be so qualified, and (iii) has all requisite corporate power and authority to own or lease its properties and assets and to carry on its business as now conducted, *except for* such variances from the matters set

14

forth in any of clauses (i), (ii) or (iii) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew.

4.2    **Capital Structure.**

(a)    The authorized capital stock of Andrew consists of 400,000,000 shares of Andrew Common Stock and 1,000,000 shares of Series A 7.75% Convertible Preferred Stock, no par value per share ("Andrew Preferred Stock").  At the close of business on June 15, 2007: (i) 155,888,606 shares of Andrew Common Stock were issued and outstanding; (ii) 6,587,908 shares of Andrew Common Stock were held by Andrew in its treasury; (iii) no shares of Andrew Preferred Stock were issued and outstanding; (iv) an aggregate of 14,057,931 shares of Andrew Common Stock were reserved for issuance pursuant to Andrew's Management Incentive Plan, Non−Employee Directors' Stock Option Plan, 2005 Long−Term Incentive Plan, and Allen Telecom Inc. Amended and Restated 1992 Stock Plan (such plans, as amended to date, are collectively referred to herein as the "Andrew Stock Plans"); (v) 1,000,000 shares of Andrew Common Stock were reserved for issuance upon the exercise of the Andrew Warrant; and (vi) 17,531,568 shares of Andrew Common Stock were reserved for issuance upon the conversion of the Andrew Notes.  All the outstanding shares of capital stock of, or other equity interests in, Andrew have been validly issued and are fully paid and nonassessable.

(b)    As of the close of business on June 15, 2007: (i) no shares of Andrew Common Stock were subject to issuance pursuant to outstanding Andrew Options under the Andrew 2005 Long−Term Incentive Plan; (ii) 6,675,787 shares of Andrew Common Stock were subject to issuance pursuant to outstanding Andrew Options under the Andrew Stock Plans other than the Andrew 2005 Long−Term Incentive Plan; (iii) 2,147,399 shares of Andrew Common Stock were subject to issuance pursuant to outstanding restricted stock units issued under the Andrew Stock Plans; (iv) 1,000,000 shares were subject to issuance upon the exercise of the Andrew Warrant; and (v) 17,531,568 shares were subject to issuance upon the conversion of the Andrew Notes.  All shares of Andrew Common Stock subject to issuance under the Andrew Stock Plans, upon issuance upon the terms and subject to the conditions set forth in the instruments pursuant to which they are issuable, will be duly authorized, validly issued, fully paid and nonassessable.  Except as contemplated by this Agreement, there are no commitments or agreements of any character to which Andrew is bound obligating Andrew to accelerate the vesting of any Andrew Option as a result of the Merger.  Except as set forth in this Section 4.2, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to Andrew.

(c)    No Voting Debt of Andrew is issued or outstanding.

(d)    Except as otherwise set forth in this Section 4.2, there are no securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Andrew or any of its Subsidiaries is a party or by which any of them is bound obligating Andrew or any of its Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock, Voting Debt or other voting securities

**B 25**

of Andrew or any of its Subsidiaries, or obligating Andrew or any of its Subsidiaries to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking. All outstanding shares of Andrew Common Stock, all outstanding Andrew Options, the Andrew Warrant, the Andrew Notes and all outstanding shares of capital stock of each Subsidiary of Andrew have been issued and granted (as applicable) in compliance in all material respects with (A) all applicable securities laws and all other Applicable Law and (B) all requirements set forth in applicable material Contracts.

(e)     Since June 15, 2007, and through the date hereof, *except* for issuances of Andrew Common Stock pursuant to the exercise of Andrew Options granted and outstanding as of June 15, 2007, there has been no change in (x) the outstanding capital stock of Andrew, (y) the number of Andrew Options outstanding, or (z) the number of other options, warrants or other rights to purchase Andrew capital stock.

(f)     Neither Andrew nor any Subsidiary of Andrew is a party to any agreement, arrangement or understanding restricting the purchase or transfer of, relating to the voting of, requiring registration of, or granting any preemptive or antidilutive rights with respect to, any capital stock of Andrew or any of its Subsidiaries or any securities of the type referred to in Section 4.2(d) hereof.

15

(g)     All of the issued and outstanding shares of capital stock or other equity ownership interests of each "significant subsidiary" (as such term is defined under Regulation S−X of the SEC) of Andrew are owned by Andrew, directly or indirectly, free and clear of any Liens and free of any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity ownership interest (other than restrictions under applicable securities laws), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights. No such significant subsidiary is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such significant subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such significant subsidiary. Except for the capital stock or other equity ownership interests of its Subsidiaries, as of the date of this Agreement, Andrew does not beneficially own directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person that constitutes a Substantial Investment.

(h)     Andrew terminated its Amended and Restated Employee Stock Purchase Plan, as amended to date, effective prior to the date hereof.

(i)     Each grant of an Andrew Option was duly authorized no later than the grant date thereof by all necessary corporate action, including, as applicable, approval by the Board of Directors of Andrew (or a duly constituted and authorized committee thereof) and any required stockholder approval by the necessary number of votes or written consents, and the award agreement governing such grant (if any) was duly executed and delivered by each party thereto, (B) each such grant was made in accordance with the terms of the applicable compensation plan or arrangement of Andrew, the Exchange Act and all other Applicable Laws and regulatory rules or requirements, including the rules of the NASDAQ National Market ("NASDAQ"), (C) the per share exercise price of each Andrew Option was equal to the fair market value (as defined in the applicable compensation plan or arrangement of Andrew) of a share of Andrew Common Stock on the applicable grant date, and (D) each such grant was properly accounted for in accordance with GAAP in the

**B 26**

financial statements (including the related notes) of Andrew and disclosed in the Andrew SEC Documents in accordance with the Exchange Act and all other Applicable Laws.

### 4.3    Authority; Board Approval; Voting Requirements; No Conflict; Required Filings and Consents.

(a)    **Authority.**  Subject to obtaining the Andrew Stockholder Approval, Andrew has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Andrew, and the consummation by Andrew of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Andrew, and no other corporate proceedings on the part of Andrew and no stockholder votes are necessary to authorize this Agreement or to consummate the transactions contemplated hereby, *other than* with respect to approval of this Agreement, the Merger and the other transactions contemplated hereby, the Andrew Stockholder Approval.  This Agreement has been duly executed and delivered by Andrew.  Assuming the due authorization, execution and delivery of this Agreement by Parent and Merger Sub, this Agreement constitutes the legal, valid and binding obligation of Andrew enforceable against Andrew in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(b)    **Board Approval.**  Subject to Section 5.3, the Board of Directors of Andrew has (A) determined that this Agreement and the Merger are advisable and fair to and in the best interest of Andrew and its stockholders, (B) approved and declared advisable this Agreement, the Merger and the other transactions contemplated hereby, which approval and declaration have not been rescinded or modified, (C) resolved to recommend this Agreement and the Merger to its stockholders for approval, and (D) directed that this Agreement and the Merger be submitted to its stockholders for consideration in accordance with this Agreement.

16

(c)    **Voting Requirements.**  The affirmative vote in favor of approval of this Agreement and the Merger by the holders of a majority of the outstanding shares of Andrew Common Stock entitled to vote thereon (the "Andrew Stockholder Approval") at a duly convened and held Andrew Stockholders' Meeting (as defined in Section 6.1(b)) at which a quorum is present is the only vote of the holders of any class or series of Andrew's capital stock necessary to approve and adopt this Agreement, the Merger and the other transactions contemplated hereby.

(d)    **No Conflict.**  The execution and delivery of this Agreement by Andrew does not, and the consummation by Andrew of the transactions contemplated hereby and compliance by Andrew with the provisions of this Agreement will not, conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, require any consent, waiver or approval under, give rise to any right of termination or other right, or the cancellation or acceleration of any right or obligation or loss of a benefit under, or result in the creation of any Lien upon any of the properties or assets of Andrew or any of its Subsidiaries or any restriction on the conduct of Andrew's or any of its Subsidiaries' business or operations under, (A) the Andrew Organizational Documents, (B) any Contract, permit, concession, franchise, license or authorization applicable to Andrew or any of its Subsidiaries or their respective properties or assets, (C) any judgment, order or decree, or (D) subject to the governmental filings and other matters referred to in Section 4.3(e), any statute, law, ordinance, rule or regulation applicable to Andrew or any of its Subsidiaries or their respective properties or assets, *other than*, in the case of clauses (B), (C) and (D), any

such conflicts, violations, defaults, rights, losses, restrictions or Liens, or failure to obtain consents, waivers or approvals, which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew.

(e)    **Required Filings or Consents**.  No consent, approval, order or authorization of, action by or in respect of, or registration, declaration or filing with, any Governmental Entity is required to be made or obtained by or with respect to Andrew or any of its Subsidiaries in connection with the execution and delivery of this Agreement by Andrew or the consummation by Andrew of the transactions contemplated hereby, *except for*:

(i)    the filing of a pre−merger notification and report form by Andrew under the HSR Act, and any applicable filings or notifications under the antitrust, competition or similar laws of any foreign jurisdiction;

(ii)    the filing with the SEC of:

(A)    a proxy statement relating to the Andrew Stockholders' Meeting (the "Proxy Statement");

(B)    such reports under the Exchange Act and the Securities Act, in each case, as may be required in connection with this Agreement and the transactions contemplated hereby;

(iii)    the filing of the Certificate of Merger with the Secretary of State and appropriate documents with the relevant authorities of other states in which Andrew is qualified to do business;

(iv)    filings required by state securities laws or other "blue sky" laws; and

(v)    other consents, approvals, orders or authorizations, the failure of which to be made or obtained would not reasonably be likely to have a Material Adverse Effect on Andrew.

4.4    **SEC Documents; Financial Statements**.

(a)    Andrew and each of its Subsidiaries has timely filed all reports, registrations, schedules, forms, statements and other documents, together with any amendments required to be made with respect thereto, that they were required to file since October 1, 2003, with Regulatory Agencies, and have paid all fees and assessments due and payable in connection therewith, *except* in each case where the failure to file such report, registration, schedule, form, statement or other document, or to pay such fees and assessments, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew.  No publicly available final

17

registration statement, prospectus, report, form, schedule or definitive proxy statement filed since October 1, 2003, and prior to the close of business on June 25, 2007 by Andrew with the SEC pursuant to the Securities Act or the Exchange Act (collectively, the "Andrew SEC Documents"), as of their respective dates or, if amended prior to the date of this Agreement, as of the date of such amendment, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading, *except that* information contained in any subsequent Andrew SEC Document filed as of a later date (but before the date of this Agreement) will be deemed to modify information contained in any Andrew SEC Document filed as of an earlier date.  As of their respective filing dates, all Andrew SEC Documents complied as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act.  None of Andrew's Subsidiaries is required to file any reports with the SEC.

(b)    The principal executive officer and principal financial officer of Andrew have made all certifications required by the Sarbanes−Oxley Act and any related rules and regulations promulgated thereunder by the SEC, and the statements contained in all such certifications were complete and correct in all material respects as of the respective dates made.  Neither Andrew nor any of its officers has received notice from the SEC or the NASDAQ questioning or challenging the accuracy, completeness, content, form or manner of filing or submission of such certifications.  Andrew is, and through the Closing Date will be, otherwise in material compliance with all applicable effective provisions of the Sarbanes−Oxley Act and the applicable listing and corporate governance rules of the NASDAQ.

**B 28**

(c)      The financial statements of Andrew included in the Andrew SEC Documents complied, as of their respective dates of filing with the SEC, in all material respects with accounting requirements and the published rules and regulations of the SEC applicable with respect thereto, have been prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the instructions and applicable rules of Form 10–Q or Form 8–K of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present the consolidated financial position of Andrew and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year–end audit adjustments which are not, individually or in the aggregate, material).

(d)      The financial statements of Andrew included in each publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement to be filed with the SEC pursuant to the Securities Act or Exchange Act after the date hereof until the Effective Time will comply, as of their respective dates of filing with the SEC, in all material respects with accounting requirements and the published rules and regulations of the SEC applicable with respect thereto, will be prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the instructions or other applicable rules of Form 10–Q or Form 8–K of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and will fairly present the consolidated financial position of Andrew and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year–end audit adjustments which are not, individually or in the aggregate, expected to be material).

(e)      Except as reflected or reserved against in the balance sheet of Andrew dated March 31, 2007, included in the Form 10–Q filed by Andrew with the SEC on May 10, 2007 (including the notes thereto, the "Andrew Balance Sheet"), neither Andrew nor any of its Subsidiaries has any liabilities (absolute, accrued, contingent or otherwise) which are required by GAAP to be set forth on a consolidated balance sheet of Andrew and its consolidated Subsidiaries or in the notes thereto, *other than* (A) liabilities and obligations incurred since March 31, 2007, in the ordinary course of business which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew, or (B) liabilities and obligations incurred in connection with this Agreement or the transactions contemplated hereby.

(f)      Neither Andrew nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any contract, agreement, arrangement or understanding (including any contract or arrangement

18

relating to any transaction or relationship between or among Andrew and any of its Subsidiaries, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand), where the result, purpose or intended effect of such contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, Andrew or any of its Subsidiaries in Andrew's or its Subsidiaries' published financial statements.

(g)      There are no outstanding loans or other extensions of credit made by Andrew or any of its Subsidiaries to any executive officer (as defined in Rule 3b–7 under the Exchange Act) or director of Andrew.  Andrew has not, since the enactment of the Sarbanes–Oxley Act, taken any action prohibited by Section 402 of the Sarbanes–Oxley Act.

4.5      **Information Supplied.  None of the information supplied or to be supplied by or on behalf of Andrew or its Subsidiaries for inclusion or incorporation by reference in (i) the Form S–4 will, at the time the Form S–4**

becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading or (ii) the Proxy Statement will, at the date it is first mailed to Andrew's stockholders or at the time of the Andrew Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.  The Proxy Statement and the Form S−4 will comply as to form in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations thereunder, *except that* no representation or warranty is made by Andrew with respect to information or statements with respect to Parent or its Subsidiaries made or incorporated by reference therein or otherwise supplied by or on behalf of Parent for inclusion or incorporation by reference in the Proxy Statement or the Form S−4.

**4.6    Absence of Certain Changes or Events.**

(a)    Since March 31, 2007, through the date hereof, *except* as and to the extent (i) disclosed in Andrew's quarterly report for the fiscal quarter ended March 31, 2007, and filed on Form 10−Q with the SEC on May 10, 2007, or (ii) expressly contemplated by this Agreement:

(i)    Andrew and its Subsidiaries have conducted their business only in the ordinary course consistent with past practice in all material respects;

(ii)    there has not been any split, combination or reclassification of any of Andrew's capital stock or any declaration, setting aside or payment of any dividend on, or other distribution (whether in cash, stock or property) in respect of, in lieu of, or in substitution for, shares of Andrew's capital stock;

(iii)    except as required by a change in GAAP, there has not been any material change in accounting methods, principles or practices by Andrew; and

(iv)    there has not been any action taken by Andrew or any of its Subsidiaries that, if taken during the period from the date of this Agreement through the Effective Time, would constitute a breach of any of clauses (iii), (iv), (vii), (x), (xi) or (xii) of Section 5.1(b), *other than* actions in connection with entering into this Agreement.

(b)    Since December 31, 2006 through the date hereof, there have not been any changes, circumstances or events that, individually or in the aggregate, have had, or would reasonably be likely to have, a Material Adverse Effect on Andrew.

**4.7    Compliance with Applicable Laws; Permits; Litigation.**

(a)    Andrew, its Subsidiaries and employees hold all permits, licenses, easements, variances, exemptions, orders, consents, registrations and approvals of all Governmental Entities which are required for the

19

---

operation of the businesses of Andrew and its Subsidiaries in the manner described in the Andrew SEC Documents filed prior to the date hereof and as they are being conducted as of the date hereof (the "Andrew Permits"), and all Andrew Permits are in full force and effect, and all required filings and applications (including renewals) with respect to Andrew Permits have been made in a timely basis, *except* where the failure to have, or the suspension or cancellation of, or the failure to be valid or in full force and effect of, any such Andrew Permit would not reasonably be likely to have a Material Adverse Effect on Andrew.  Andrew and its Subsidiaries are in compliance with and have no unresolved liability under the terms

**B 30**

of the Andrew Permits and all Applicable Laws relating to Andrew and its Subsidiaries or their respective business or properties, *except* where the failure to be in compliance with the terms of the Andrew Permits or such Applicable Laws would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew.  To the Knowledge of Andrew, there are no facts or circumstances that are reasonably likely to prevent or increase the cost of compliance with the Andrew Permits or Applicable Laws, *except* where the increased costs would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew.

(b)      As of the date hereof, *except* as and to the extent disclosed in the Andrew SEC Documents filed prior to the date of this Agreement, no action, demand, suit, proceeding, mediation, arbitration, requirement or investigation by any Governmental Entity or action, demand, suit, proceeding, mediation or arbitration by any Person, against or affecting Andrew or any of its Subsidiaries or any of their respective businesses or properties, including Intellectual Property, is pending or, to the Knowledge of Andrew, threatened which, individually or in the aggregate, has had, or is reasonably likely to have, a Material Adverse Effect on Andrew.

(c)      As of the date hereof and except with respect to environmental matters which are covered by Section 4.11, neither Andrew nor any of its Subsidiaries is subject to any material outstanding order, injunction or decree.

### 4.8      Employees.

(a)      Except as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew, (i) no work stoppage, slowdown, lockout, labor strike, material arbitrations, request for representation or other labor disputes against Andrew or any of its Subsidiaries are pending or, to the Knowledge of Andrew, threatened, (ii) no unfair labor practice charges, grievances or complaints are pending or, to the Knowledge of Andrew, threatened against Andrew or any of its Subsidiaries, (iii) neither Andrew nor any of its Subsidiaries is delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for it or amounts required to be reimbursed to such employees, (iv) Andrew and each of its Subsidiaries are in compliance with all Applicable Laws respecting labor and employment, including terms and conditions of employment, workers' compensation, occupational safety and health requirements, plant closings, wages and hours, employment discrimination, disability rights or benefits, equal opportunity, affirmative action, labor relations, employee leave issues and unemployment insurance and related matters, (v) there are no complaints, charges or claims against Andrew or any of its Subsidiaries pending with or, to the Knowledge of Andrew, threatened by any Governmental Entity or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment of any employees by Andrew and or any of its Subsidiaries, other than those occurring in the ordinary course of business, such as claims for workers' compensation or unemployment benefits, (vi) Andrew and each of its Subsidiaries have withheld all amounts required by Applicable Law to be withheld from the wages, salaries, benefits and other compensation to employees, and are not liable for any arrears of wages or any Taxes or any penalty for failure to comply with any of the foregoing, and (vii) neither Andrew nor any of its Subsidiaries is liable for any payment to any trust or other fund or to any Governmental Entity, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the ordinary course of business consistent with past practice).

(b)      As of the date hereof:

(i)      other than as required by Applicable Law, neither Andrew nor any of its Subsidiaries is a party to, or otherwise bound by, any material collective bargaining agreement or any other material

20

**B 31**

agreement with a labor union, works council or labor organization, nor is any such agreement presently being negotiated;

(ii)    no labor organization or group of employees of Andrew or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Andrew, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority; and

(iii)    to the Knowledge of Andrew, no labor union or works council is seeking to organize any employees of Andrew or any of its Subsidiaries.

### 4.9    Benefit Plans.

(a)    As of the date of this Agreement, the Andrew Disclosure Letter sets forth a true and complete list of each material benefit or compensation plan, program, fund, contract, arrangement or agreement, including any material bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, employment, golden parachute, retention, salary continuation, change of control, retirement, pension, profit sharing, healthcare, disability, life insurance or fringe benefit plan, program, fund, contract, arrangement or agreement of any kind (whether written or oral, tax−qualified or non−tax qualified, funded or unfunded, foreign or domestic, active, frozen or terminated) and any related trust, insurance contract, escrow account or similar funding arrangement, that is maintained or contributed to by Andrew or any Subsidiary (or required to be maintained or contributed to by Andrew or any Subsidiary) for the benefit of current or former directors, officers or employees of, or consultants to, Andrew and its Subsidiaries or with respect to which Andrew or any of its Subsidiaries may, directly or indirectly, have any liability, as of the date of this Agreement (the "Andrew Benefit Plans").

(b)    Andrew has heretofore made available to Parent true and complete copies of (i) each written Andrew Benefit Plan, (ii) the actuarial report for each Andrew Benefit Plan (if applicable) for each of the last three years, (iii) the most recent determination letter from the Internal Revenue Service ("IRS") (if applicable) for each Andrew Benefit Plan, (iv) the current summary plan description of each Andrew Benefit Plan that is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (v) a copy of the description of each Andrew Benefit Plan not subject to ERISA that is currently provided to participants in such plan, (vi) a summary of the material terms of each unwritten Andrew Benefit Plan, and (vii) the annual report for each Andrew Benefit Plan (if applicable) for each of the last three years.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew, with respect to each Andrew Benefit Plan subject to United States law (each, an "Andrew Domestic Benefit Plan"), (i) each of the Andrew Domestic Benefit Plans has been operated and administered in compliance with its terms and Applicable Law, including ERISA and the Code, (ii) each of the Andrew Domestic Benefit Plans intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified, and there are no existing circumstances or any events that have occurred that would reasonably be expected to adversely affect the qualified status of any such Andrew Domestic Benefit Plan, and each such plan has a favorable determination letter from the IRS to the effect that it is so qualified or the applicable remedial amendment period has not expired and, if the letter for such plan is not current, such plan is the subject of a timely request for a current favorable determination letter or the applicable remedial amendment period has not expired, (iii) with respect to each Andrew Domestic Benefit Plan that is subject to Title IV of ERISA, the present value (as defined under Section 3(27) of ERISA) of accumulated benefit obligations under such Andrew Domestic Benefit Plan, based upon the actuarial assumptions used for funding purposes in the most recent actuarial report prepared by such Andrew Domestic Benefit Plan's actuary with respect to such Andrew Domestic Benefit Plan, did not, as of its latest valuation date, exceed the then current value (as defined under Section 3(26) of ERISA) of the assets of such Andrew Domestic Benefit Plan allocable to such accrued benefits, (iv) no Andrew Domestic Benefit Plan that is an employee welfare benefit plan (including any plan described in Section 3(1) of ERISA) (a "Welfare Plan") provides benefits coverage, including death or medical benefits coverage (whether or not insured), with respect to current or former employees or directors of

**B 32**

**Andrew or its Subsidiaries beyond their retirement or other termination**

21

of service, *other than* (A) coverage mandated by Applicable Law, (B) benefits the full cost of which is borne by such current or former employee or director (or his or her beneficiary), (C) coverage through the last day of the calendar month in which retirement or other termination of service occurs, or (D) medical expense reimbursement accounts, (v) no liability under Title IV of ERISA has been incurred by Andrew, its Subsidiaries or any trade or business, whether or not incorporated, all of which together with Andrew would be deemed a "single employer" within the meaning of Section 414(b), 414(c) or 414(m) of the Code or Section 4001(b) of ERISA (an "<u>Andrew ERISA Affiliate</u>"), that has not been satisfied in full, and no condition exists that presents a material risk to Andrew, its Subsidiaries or any Andrew ERISA Affiliate of incurring a liability thereunder, (vi) no Andrew Domestic Benefit Plan is a "multiemployer plan" (as such term is defined in Section 3(37) of ERISA), (vii) none of Andrew or its Subsidiaries or, to the Knowledge of Andrew, any other Person, including any fiduciary, has engaged in a transaction in connection with which Andrew, its Subsidiaries or any Andrew Domestic Benefit Plan would reasonably be expected to be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a Tax imposed pursuant to Section 4975 or 4976 of the Code, (viii) to the Knowledge of Andrew, there are no pending, threatened or anticipated claims (other than routine claims for benefits) by, on behalf of or against any of the Andrew Domestic Benefit Plans or any trusts, insurance contracts, escrow accounts or similar funding arrangements related thereto, (ix) all contributions or other amounts required to be paid by Andrew or its Subsidiaries as of the Effective Time with respect to each Andrew Domestic Benefit Plan in respect of current or former plan years have been paid in accordance with Section 412 of the Code or accrued in accordance with GAAP (as applicable), and (x) since January 1, 2005, no Andrew Domestic Benefit Plan has been amended or modified in a manner that increases in any material amount the benefits payable pursuant to such Andrew Domestic Benefit Plan.

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew, with respect to each Andrew Benefit Plan not subject to United States law (each, an "<u>Andrew Foreign Benefit Plan</u>"), (i) the fair market value of the assets of each funded Andrew Foreign Benefit Plan, the liability of each insurer for any Andrew Foreign Benefit Plan funded through insurance or the reserve shown on the consolidated financial statements of Andrew included in the Andrew SEC Documents for any unfunded Andrew Foreign Benefit Plan, together with any accrued contributions, is sufficient to provide for the projected benefit obligations, as of the Effective Time, with respect to all current and former participants in such plan based on reasonable, country–specific actuarial assumptions and valuations and no transaction contemplated by this Agreement shall cause such assets or insurance obligations or book reserve to be less than such projected benefit obligations, (ii) each Andrew Foreign Benefit Plan has been operated and administered in compliance with its terms and Applicable Law and (iii) each Andrew Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with the appropriate regulatory authorities, (iv) to the Knowledge of Andrew, there are no pending, threatened or anticipated claims (other than routine claims for benefits) by, on behalf of or against any of the Andrew Foreign Benefit Plans or any trusts, insurance contracts, escrow accounts or similar funding arrangements related thereto, and (v) since January 1, 2005, no Andrew Foreign Benefit Plan has been amended or modified in a manner that increases in any material amount the benefits payable pursuant to such Andrew Foreign Benefit Plan.

(e)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in conjunction with any other event) (i) provide for the payment of any amounts or benefits, or increase in any amounts or benefits otherwise payable or due, to any such Person under any Andrew Benefit Plan or otherwise, or (ii) result in any acceleration of the time of payment or vesting of, or any requirement to fund or secure, any such amounts or benefits (including any Andrew Stock Option) or result in any breach of or default under or restriction on the ability to terminate any Andrew Benefit Plan.  No payment or benefit that will or may be made by Andrew with respect to any employee under any Andrew Benefit Plan or otherwise in connection with the transactions contemplated by this Agreement will be characterized as an "excess parachute payment" within the meaning of Section 280G(b)(1) of the Code.

4.10    <u>Taxes</u>.

**B 33**

(a)      As used in this Agreement, the term "Tax" or "Taxes" means (i) all federal, state, local and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, duties, intangibles, franchise, backup withholding and other

22

taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon and (ii) any liability for Taxes described in clause (i) under Treasury Regulation Section 1.1502−6 (or any similar provision of state, local or foreign law), and the term "Tax Return" means any return, filing, report, questionnaire, information statement or other document required to be filed, including any amendments that may be filed, for any taxable period with any taxing authority (whether or not a payment is required to be made with respect to such filing).

(b)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew: (i) Andrew and its Subsidiaries have timely filed all Tax Returns required to be filed by them on or prior to the date of this Agreement (all such returns being accurate and complete in all material respects) and have paid all Taxes required to be paid by them (whether or not shown as due on any Tax Return) *other than* Taxes that are not yet due; (ii) there are no Liens for Taxes on any assets of Andrew or its Subsidiaries; (iii) no deficiency for any Tax has been asserted or assessed by a taxing authority against Andrew or any of its Subsidiaries which deficiency has not been paid; (iv) Andrew and its Subsidiaries have provided adequate reserves in their financial statements for any Taxes that have not been paid; (v) neither Andrew nor any of its Subsidiaries is a party to or is bound by any Tax sharing, allocation or indemnification agreement or arrangement (other than such an agreement or arrangement exclusively between or among Andrew and any of its Subsidiaries); and (vi) Andrew and its Subsidiaries have withheld, collected and paid over to the appropriate governmental authority all material Taxes required to be collected or withheld.

(c)      Within the past five years, neither Andrew nor any of its Subsidiaries has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify for tax−free treatment under Section 355 of the Code.

(d)      Neither Andrew nor any of its Subsidiaries has been a party to a transaction that, as of the date of this Agreement, constitutes a "listed transaction" for purposes of Section 6011 of the Code and applicable Treasury Regulations thereunder (or a similar provision of state law).  To the Knowledge of Andrew, Andrew has disclosed to Parent all "reportable transactions" within the meaning of Treasury Regulation Section 1.6011−4(b) (or a similar provision of state law) to which it or any of its Subsidiaries has been a party.

(e)      Neither Andrew nor any of its Subsidiaries has any liability for the Taxes of any other person (other than any such liability which is solely a liability of Andrew or any of its Subsidiaries) under Treasury Regulation Section 1.1502−6 or any similar provision of state, local law or foreign law.

4.11      **Environmental Matters**.  There are no pending or, to the Knowledge of Andrew, threatened legal, administrative, arbitral or other proceedings, claims, actions, causes of action, private environmental investigations or remediation activities, or governmental investigations, requests for information or notices of violation of any nature seeking to impose, or that are reasonably likely to result in the imposition, on Andrew or any of its Subsidiaries, of any liability or obligation arising under common law or under any local, state, federal or foreign environmental statute, regulation, permit or ordinance including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), and the

**B 34**

Waste of Electronic and Electrical Equipment and Reduction of Hazardous Substances Directives of the European Union, which liability or obligation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew.  Neither Andrew nor any of its Subsidiaries is subject to any agreement, order, judgment, decree, directive or Lien by or with any Governmental Entity or third party with respect to any environmental liability or obligation that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Andrew.  Neither Andrew nor any of its Subsidiaries owns, operates or has arranged for the disposal of any substances at any real property that has been placed on the National Priorities List under CERCLA, or any similar list of contaminated sites maintained by a Governmental Entity.  To the Knowledge of Andrew, neither Andrew nor any Subsidiary has manufactured, sold, marketed, installed or distributed products containing asbestos or mercury.

23

---

4.12  **<u>Intellectual Property</u>.**

(a)  "<u>Intellectual Property</u>" shall mean trademarks, service marks, brand names, certification marks, logos and slogans, commercial symbols, business name registrations, domain names, trade dress and other indications of origin, the goodwill associated with the foregoing and registrations in any domestic or foreign jurisdiction of, and applications in any such jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries, whether patentable or reduced to practice or not, in any domestic or foreign jurisdiction; patents, applications for patents (including provisionals, divisions, continuations, continuations in part and renewal applications), and any renewals, extensions, supplementary protection certificates or reissues or reexams thereof, in any such jurisdiction; research and development data, formulae, know-how, technical information, designs, mask works, procedures, customer and supplier lists, trade secrets and confidential information and rights in any domestic or foreign jurisdiction to limit the use or disclosure thereof by any Person; copyrights, writings and other works, whether copyrightable or not, in any such jurisdiction; computer software; and registrations or applications for registration of copyrights in any domestic or foreign jurisdiction, and any renewals or extensions thereof; rights in data or databases; and any similar intellectual property or proprietary rights.

(b)  (i) Andrew and each of its Subsidiaries owns or has a legally enforceable right to use (in each case, free and clear of any material Liens) all material Intellectual Property used in or necessary for the conduct of its business as currently conducted, including all material patents and patent applications and all material trademark registrations and trademark applications; (ii) to the Knowledge of Andrew, the conduct of the business of Andrew and its Subsidiaries as currently conducted does not infringe on or misappropriate the Intellectual Property rights of any Person, and Andrew and its Subsidiaries are not in breach of any applicable grant, license, agreement, instrument or other arrangement pursuant to which Andrew or any Affiliate acquired the right to use such Intellectual Property, *except* as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew; (iii) to the Knowledge of Andrew, no Person is materially misappropriating, infringing, diluting or otherwise violating any right of Andrew or any of its Subsidiaries with respect to any material Intellectual Property owned or used

**B 35**

by Andrew or any of its Subsidiaries; (iv) within the three−year period prior to the date hereof, neither Andrew nor any of its Subsidiaries has received written notice of any pending or threatened material claim, order or proceeding with respect to the ownership, validity, enforcement, infringement, misappropriation or maintenance of any material Intellectual Property owned or used by Andrew or any of its Subsidiaries or with respect to the infringement, misappropriation, or licensing of any material Intellectual Property of any Person in connection with the conduct of the business of Andrew or any of its Subsidiaries as currently conducted, and no such material claim, order or proceeding was actually asserted more than three years ago and is still, to the Knowledge of Andrew, unresolved; (v) Andrew and each of its Subsidiaries have implemented commercially reasonable measures to maintain the confidentiality of the material Intellectual Property used in the business of Andrew or any of its Subsidiaries as currently conducted; (vi) immediately following the Closing, Andrew and each of its Subsidiaries shall own or have a legally enforceable right to use all material Intellectual Property on terms and conditions substantially identical to those under which Andrew or its Subsidiaries owned or used such Intellectual Property immediately prior to the Closing; (vii) to the Knowledge of Andrew, Andrew and each of its Subsidiaries have executed written agreements with all former and current employees, consultants, contractors and any and all other third parties who participated materially in the design or creation of material Intellectual Property which assign to Andrew or such Subsidiary any and all rights to such material Intellectual Property including material inventions, improvements, or discoveries of information, whether patentable or not, made by them during their service to Andrew or such Subsidiary and works of authorship that are not considered a work made for hire, *except* as would not, individually or in the aggregate, be reasonably be likely to have a Material Adverse Effect on Andrew; (viii) Andrew, together with its Subsidiaries, solely owns all material Intellectual Property that was conceived, made, discovered, reduced to practice or developed (in whole or in part, either alone or jointly with others) by any third parties performing any development, engineering, or manufacturing services on behalf of Andrew or any other services that have created any material Intellectual Property (such third parties including but not limited to all contract manufacturers, consultants providing contract engineering services, joint venture partners and providers of maquiladora services) *except* with respect to such material Intellectual Property the lack of sole ownership of which would not, individually or in the aggregate, be reasonably be likely to have a Material Adverse Effect on Andrew; and (ix) no Person has any right, title, or interest of any kind in or to any material Intellectual Property owned by Andrew or any of its Subsidiaries other than a non−exclusive license granted to customers of Andrew or any of its Subsidiaries, either directly or through a chain of distribution, to use any

24

software of Andrew or any of its Subsidiaries that is embedded in products sold by Andrew or any of its Subsidiaries.

**4.13** **State Takeover Statutes.** The Board of Directors of Andrew has adopted a resolution or resolutions approving this Agreement, the Merger and the other transactions contemplated hereby, and, assuming the accuracy of Parent's representation and warranty contained in Section 3.10 (without giving effect to the Knowledge qualification contained therein), such approval constitutes approval of the Merger and the other transactions contemplated hereby by the Board of Directors of Andrew under the provisions of Section 203 of the DGCL such that Section 203 does not apply to this Agreement and the other transactions contemplated hereby. To the Knowledge of Andrew, no state takeover statute *other than* Section 203 of the DGCL (which has been rendered inapplicable) is applicable to the

**B 36**

Merger or the other transactions contemplated hereby.

4.14   **Brokers.**  Except for fees payable to Citigroup Global Markets Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Andrew.

4.15   **Opinion of Financial Advisor.**  Andrew has received the opinion of its financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as of the date of this Agreement, to the effect that subject to the limitations set forth in the opinion, as of such date, the Merger Consideration is fair, from a financial point of view, to the holders of Andrew Common Stock.

4.16   **Ownership of Parent Common Stock.**  None of Andrew, its Subsidiaries, nor the officers or directors of Andrew nor, to the Knowledge of Andrew without independent investigation, any of their respective Affiliates beneficially owns (as defined in Rule 13d−3 under the Exchange Act) directly, or is party to any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of, shares of capital stock of Parent.

4.17   **Material Contracts**.

(a)   For the purposes of this Agreement, a "Contract" shall mean any written or oral agreement, contract, subcontract, settlement agreement, lease, binding understanding, instrument, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, warranty, purchase order, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature, as in effect as of the date hereof or as may hereinafter be in effect.

(b)   For purposes of this Agreement, "Andrew Material Contract" shall mean:

(i)   any Contract to which Andrew or any of its Subsidiaries is a party, that would need to be filed as an exhibit to a SEC filing made by Andrew in which exhibits were required to be filed with the SEC in response to Item 601(b)(10) of Regulation S−K promulgated under the Securities Act and the Exchange Act;

(ii)   any Contract to which Andrew or any of its Subsidiaries is a party, which is material to Andrew and its Subsidiaries, taken as a whole, and which contains any covenant limiting or restricting the right of Andrew or any of its Subsidiaries, or that would, after the Effective Time, limit or restrict Andrew or any of its Subsidiaries (including the Surviving Corporation and its Subsidiaries), from engaging or competing in any material line of business or in any geographic area or with any Person in any material line of business; or

(iii)   any Contract or group of Contracts with a Person (or group of affiliated Persons) to which Andrew or any of its Subsidiaries is a party, the termination or breach of which would reasonably be likely to have a Material Adverse Effect on Andrew.

(c)   All Andrew Material Contracts are valid and in full force and effect and enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or