other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether considered in a proceeding in equity or at law), *except* to the extent that (A) they have previously expired in accordance with their terms or (B) the failure to be in full force and effect or enforceable would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Andrew. Neither Andrew nor any of its Subsidiaries, nor, to Andrew's Knowledge, any counterparty to any Andrew Material Contract, has breached or violated any provision of, or committed or failed to perform any act which, with or without notice, lapse of time or both would constitute a default under the provisions of, any Andrew Material Contract, *except* in each case for those breaches, violations and defaults which would not permit any other party to cancel or terminate such Andrew Material Contract, and would not permit any other party to seek damages or other remedies (for any or all of such breaches, violations or defaults, individually or in the aggregate) which would reasonably be likely to have a Material Adverse Effect on Andrew.

**4.18**    **Interested Party Transactions**.  **Since the date of the Andrew Balance Sheet, no event has occurred that would be required to be reported as a Certain Relationship or Related Transaction pursuant to Statement of Financial Accounting Standards No. 57 or Item 404 of Regulation S−K of the SEC.**

**4.19**    **Internal Controls and Disclosure Controls**.  **Andrew and its Subsidiaries have designed and maintain a system of internal controls over financial reporting (as defined in Rules 13a−15(f) and 15d−15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting.  Andrew (i) has designed and maintains disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) of the Exchange Act) to ensure that material information required to be disclosed by Andrew in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to Andrew's management as appropriate to allow timely decisions regarding required disclosure and (ii) has disclosed, based on its most recent evaluation of such disclosure controls and procedures prior to the date hereof, to Andrew's auditors and the audit committee of Andrew's Board of Directors (A) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect in any material respect Andrew's ability to record, process, summarize and report financial information and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in Andrew's internal controls over financial reporting.**

**4.20**    **Real Property**.

(a)    **The Andrew Disclosure Letter identifies (i) all U.S. real property owned (ii) all material non−U.S. real property owned and (iii) all material property leased, subleased or operated in whole or in part, in each case, by Andrew and its Subsidiaries (the "Real Property").**

(b)    **Andrew and its Subsidiaries have good, valid and marketable fee simple title to all the Real Property that is shown on the Andrew Disclosure Letter as being owned by Andrew and its Subsidiaries (the "Owned Real Property"), free and clear of all Liens, as defined below, other than Permitted Liens, as defined below.  "Lien" means any mortgage, deed of trust, deed to secure debt, other lien, security interests or pledge, escrow, charge, option, easement, covenant, condition, restriction or other encumbrance of any kind or character. "Permitted Lien" means (i) ad valorem taxes not yet due and payable, (ii) easements, covenants, conditions, restrictions and other similar matters of record that do not materially impair the use of the Real Property subject thereto for its present and anticipated uses by Andrew and its Subsidiaries, and (iii) zoning laws and other land use restrictions that are not violated and do not materially impair the present or anticipated uses of the Real Property subject thereto.**

**B 38**

(c)    Andrew and its Subsidiaries have good and valid leasehold title to all the Real Property that is shown on the Andrew Disclosure Letter as being leased or subleased by Andrew and its Subsidiaries (the "Leased Real Property"), free and clear of all Liens other than Permitted Liens. Each lease or sublease of the Leased Real Property (each, as amended, supplemented, extended, renewed or otherwise modified, a "Lease") grants Andrew or a Subsidiary, as applicable, the exclusive right to occupy the premises leased under such Lease, and Andrew and its Subsidiaries enjoy peaceful and undisturbed possession of the Leased Real Property.  All of the

26

Leased Real Property is insurable at regular rates.  Andrew and its Subsidiaries have made available true and correct copies of all of the Leases (including without limitation all amendments, supplements, extensions, renewals, other modifications and recorded memoranda of the Leases (as recorded)) by which Andrew and its Subsidiaries lease the Leased Real Property, any notices of default given under any Lease, any notices of any violation of applicable legal requirements regarding any Leased Real Property.  Neither Andrew, nor its Subsidiaries, nor any other party to any Lease is in material default under any Lease.

### Article V
### Covenants Relating to Conduct of Business

**5.1    Conduct of Business.**

(a)    **Ordinary Course.**  Except as otherwise expressly required by, or provided for, in this Agreement, as set forth in Section 5.1(a) of the Parent Disclosure Letter or Section 5.1(a) of the Andrew Disclosure Letter (as the case may be) or as consented to by the other party in writing, during the period from the date of this Agreement to the Effective Time, each of Parent and Andrew shall, and shall cause each of their respective Subsidiaries to, carry on its business in the ordinary course of such party's business consistent with past practice, maintain its existence in good standing under Applicable Law and use commercially reasonable efforts to (i) preserve intact its current business organization, (ii) keep available the services of its current officers and key employees, and (iii) preserve its relationships with its customers, suppliers and other persons with which it has significant business relations.  Further, during the period from the date of this Agreement to the Effective Time, Andrew will, and will cause its Subsidiaries to, (i) maintain with financially responsible insurance companies, insurance in such amounts and against such risks and losses as are customary for companies of the size and financial condition of Andrew, and which are engaged in businesses similar to that of Andrew and its Subsidiaries and (ii) continue to timely file all reports, registrations, schedules, forms, statements and other documents, together with any amendments required to be made with respect thereto, that they are required to file with the SEC, pay all fees and assessments due and payable in connection therewith, and furnish Parent, if requested, with any work papers and other materials, including those prepared by Andrew's independent auditors (subject to Parent holding such independent auditors harmless for such materials), used in preparation thereof.

(b)    **Required Consent from Parent.**  Without limiting the generality of Section 5.1(a), *except* as otherwise expressly required by, or provided for in, this Agreement, or as set forth in Section 5.1(b) of the Andrew Disclosure Letter, without the prior consent of Parent, during the period from the date of this Agreement to the Effective Time, Andrew shall not do any of the following, and shall not permit any of its Subsidiaries to do any of the following:

(i)    other than dividends and distributions (x) by a direct or indirect wholly owned Subsidiary of Andrew to Andrew, or (y) by a Subsidiary of Andrew that is partially owned by Andrew or any of its Subsidiaries, *provided* that Andrew or such Subsidiary receives or is to receive its proportionate share thereof, (A) declare, set aside or pay any dividends on, make any other distributions in respect of, or enter into any agreement with respect to the voting of, any of its or any of its Subsidiary's capital stock, (B) split, combine or reclassify any of its or any of its Subsidiary's capital stock or issue or authorize the issuance of any other securities as a stock dividend in respect of, in lieu of or in substitution for, shares of its or any of its Subsidiary's capital stock, or (C) purchase, redeem or otherwise acquire any shares of its or any of its Subsidiary's capital stock

**B 39**

or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities (except, in the case of clause (C), for (1) the deemed acceptance of shares upon cashless exercise of Andrew Options or to pay tax withholding thereon or on the vesting of shares of restricted stock outstanding on the date of this Agreement, or (2) the repurchase of shares of capital stock from former employees, directors and consultants in accordance with agreements providing for the repurchase of shares upon any termination of service), notice of which will be delivered to Parent;

(ii)     other than issuances or sales by a direct or indirect wholly owned Subsidiary of Andrew to Andrew, issue, grant, sell, deliver, pledge, or otherwise encumber or subject to any Lien, any shares of Andrew's or any of its Subsidiary's capital stock, any other voting securities or any securities convertible into, or

27

exchangeable for, or any rights, warrants or options to acquire, any such shares, voting securities or convertible or exchangeable securities, *other than* (A) the issuance of Andrew Common Stock upon the exercise or conversion of Andrew Options, the Andrew Warrant or Andrew Notes, in each case outstanding as of the date of this Agreement in accordance with their present terms; (B) the issuance by a wholly owned Subsidiary of Andrew of capital stock to such Subsidiary's parent company; and (C) the issuance of shares of Andrew Common Stock, options to purchase Andrew Common Stock or the issuance of restricted stock units of Andrew, in each case, to participants in the Andrew Stock Plans in the ordinary course of business consistent with past practice; *provided, however*, that no issuance by either party of new options, shares of restricted stock, restricted stock units or similar equity−based awards to such party's directors, officers or employees may be made without the prior consent of Parent;

(iii)     amend any Andrew Organizational Document;

(iv)     acquire or agree to acquire, by merging or consolidating with, or by purchasing any equity interest or any security convertible into or exchangeable for any equity interest in or a portion of the assets of, or by any other manner, any Person that is not an Affiliate of Andrew or any business or division thereof, or otherwise acquire or agree to acquire any assets of a Person that is not an Affiliate of Andrew which are material, individually or in the aggregate, to its and its Subsidiaries' business, taken as a whole, *other than* pursuant to any acquisition transaction (or series of acquisition transactions), (A) which is in the existing line of business of Andrew or any of its Subsidiaries, (B) in which the fair market value of the total consideration (including the value of indebtedness or other obligations assumed or acquired in connection with such transaction(s)) issued by Andrew or their respective Subsidiaries in exchange therefor, does not, when taken together with the fair market value of such total consideration issued by Andrew in previously committed or consummated transactions pursuant to this Section 5.1(b)(iv), exceed $25,000,000 in the aggregate, (C) which does not present a material risk of delaying the Merger or making it more difficult to obtain any required consents or approvals therefor, and (D) which does not require approval of Andrew's stockholders;

(v)     sell, pledge, dispose of, transfer, lease, license or otherwise encumber, or authorize the sale, pledge, disposition, transfer, lease, license or other encumbrance of, any of its or any of its Subsidiary's property or assets, *except* (A) sales, pledges, dispositions, transfers, leases, licenses or encumbrances of such property or assets in the ordinary course of business of such party or its Subsidiaries consistent with past practice but not to exceed an aggregate value of $25,000,000 for all sales, pledges, dispositions, transfers, leases, licenses or encumbrances made by Andrew or its Subsidiaries in reliance upon this clause (A), (B) sales, pledges, dispositions, transfers, leases, licenses of such property or assets by Andrew or its Subsidiary to an Affiliate of Andrew, (C) sales or dispositions of inventory in the ordinary course of business of Andrew or its Subsidiaries consistent with past practice, or (D) licenses granted, or implied, pursuant to customer contracts made in the ordinary course of business of Andrew or its Subsidiaries; provided that no Leased Real Property that is material to the businesses of Andrew or its Subsidiaries, and no Owned Real Property, may be sold, pledged, disposed of, transferred, leased, licensed or otherwise further encumbered, and no Lease or Leased Real Property that is material to the businesses of Andrew or its Subsidiaries may be amended, terminated or otherwise modified;

(vi)     make any loans, advances or capital contributions to, or investments in, any other Person, *other than*: (A) in connection with any transaction permitted pursuant to Section 5.1(b)(iv) above, (B) loans or advances by Andrew or any of its wholly owned Subsidiaries to Andrew or any of its Subsidiaries, (C) investments or capital contributions in any of its wholly owned Subsidiaries, (D) employee advances made in compliance with Applicable Laws and in the ordinary course of business of Andrew consistent with past practice (provided that, in the case of this clause (D), the aggregate amount of all such advances made by Andrew or its Subsidiaries in reliance upon this clause (D), is not more than $1,000,000), (E) as required by binding Contracts in effect as of the date hereof, all of which Contracts are listed on Section 5.1(b)(vi) of the Andrew Disclosure Letter, as applicable, (F) highly liquid investments with an original maturity of three months or less at the date of purchase, made in the ordinary course of business consistent with past practice, or (G) in the ordinary course of business of such party consistent with past practice (provided that, in the case of this clause (G), the aggregate amount of all such loans, advances, capital contributions and investments made by Andrew or its Subsidiaries in reliance upon this clause (G), is not more than $10,000,000, and the transactions

**B 40**

**do not present a material risk of delaying the Merger**

28

---

or making it more difficult to obtain any required consents or approvals therefor, or require approval of Andrew's stockholders);

(vii)    other than draws on credit facilities existing on the date hereof permitted pursuant to Section 5.1(b)(viii) below, incur any indebtedness for borrowed money, enter into any letter of credit or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of any Person for borrowed money, *other than* in the ordinary course of business of Andrew consistent with past practice, *provided* that the aggregate amount of all such newly incurred indebtedness for borrowed money, debt securities and obligations outstanding at any time by Andrew and its Subsidiaries is not more than $10,000,000;

(viii)    draw on any credit facilities existing on the date hereof *other than* in the ordinary course of business of Andrew consistent with past practice, *provided* that the aggregate amount outstanding at any time of all such draws by Andrew and its Subsidiaries from such facilities is not more than $175,000,000;

(ix)    pay, discharge, settle or satisfy any claim, liability, obligation or litigation (absolute, accrued, asserted or unasserted, contingent or otherwise) requiring payment by Andrew or its Subsidiaries in excess of $10,000,000 individually, or $25,000,000 in the aggregate (excluding attorneys' fees and expenses), *other than* the payment, discharge, settlement or satisfaction in the ordinary course of business of Andrew consistent with past practice or in accordance with their terms, of liabilities disclosed, reflected or reserved against in the Andrew Balance Sheet, as applicable, or incurred since the date of such financial statements and reserved for in accordance with GAAP in the ordinary course of business of Andrew consistent with past practice;

(x)    make any material Tax election, take any material position with respect to Taxes that is inconsistent with a position taken in a prior period, adopt or change any material accounting method in respect of Taxes, enter into any closing agreement or settle or compromise any material income Tax liability, or enter into any internal restructuring or reorganization that would result in any material Tax liability;

(xi)    except as required by binding Contracts in effect as of the date hereof, all of which are listed on Section 5.1(b)(xi) of the Andrew Disclosure Letter (the "Existing Benefits Commitments"), (A) increase in any manner the compensation (including bonus and incentive compensation) or fringe benefits of any of its officers, directors or employees, except in each case as contemplated by Section 5.1(b)(xii) or Section 6.4(b), or (B) enter into any collective bargaining agreement or make any commitment to provide any pension, retirement or severance benefit to any such officers, directors or employees;

(xii)    (A) commit itself to, or enter into, any employment agreement or arrangement for Andrew's chief executive officer or any executive or management employee who does or would directly report to (1) Andrew's chief executive officer, or (2) a direct report to Andrew's chief executive officer, or (B) adopt or commit itself to any material new benefit, base salary or stock option plan or arrangement, or amend, otherwise supplement or, *except* as required by Existing Benefits Commitments or Applicable Law, accelerate the timing of, or make discretionary determinations that permit, payments or vesting under any existing benefit, stock option or compensation plan or arrangement;

(xiii)    change in any material respect any of their respective methods or principles of accounting unless required by GAAP or any Applicable Laws, rules or regulations, as concurred in by its independent auditors;

(xiv)    enter into, modify or amend in any material respect, or terminate, or waive, release or assign any material benefit or claim under, any Contract, joint venture, strategic partnership, alliance, license or sublicense, *except* with respect to (A) Contracts for the purchase of raw materials or sale of products, in each case in the ordinary course of business of Andrew or its Subsidiaries consistent with past practice or (B) joint ventures, collaborations, strategic partnerships or alliances, which, in the case of each of (A) and (B), (1) do not involve payments by Andrew or their respective Subsidiaries of more than $25,000,000, (2) do not materially impair the conduct of a reporting business segment of Andrew and its Subsidiaries, (3) do not present a material risk of

29

**B 41**

delaying the Merger or making it more difficult to obtain any required consents or approvals therefor, and (4) do not require approval of Andrew's stockholders;

(xv)    enter into any material new line of business;

(xvi)    take any action that would subject Andrew or any of its Subsidiaries to any material non−compete or other similar material restriction on the conduct of any of their respective businesses that would be binding following the Closing;

(xvii)    make or agree to make any new capital expenditure or expenditures, or enter into any agreement or agreements providing for payments by Andrew or its Subsidiaries for capital expenditures which, in the aggregate, are in excess of $50,000,000; or

(xviii)    authorize, or commit or agree to take, any of the foregoing actions.

(c)    **Required Consent from Andrew.  Without limiting the generality of Section 5.1(a), *except* as otherwise expressly required by, or provided for in, this Agreement, or as set forth in Section 5.1(c) of the Parent Disclosure Letter, without the prior consent of Andrew, during the period from the date of this Agreement to the Effective Time, Parent shall not do any of the following, and shall not permit any of its Subsidiaries to do any of the following:**

(i)    amend any Parent Organizational Document in any respect that would reasonably be expected to be materially adverse to Parent's shareholders;

(ii)    acquire or agree to acquire, by merging or consolidating with, or by purchasing any equity interest or any security convertible into or exchangeable for any equity interest in or a portion of the assets of, or by any other manner, any Person, which acquisition, merger, consolidation or purchase would reasonably be expected to materially impede or delay the receipt of any approvals from any Governmental Entities contemplated hereby; or

(iii)    authorize, or commit or agree to take, any of the foregoing actions.

5.2    **Solicitation.**

(a)    **The following terms will have the definitions set forth below:**

(i)    An "Alternative Transaction" shall mean any of the following transactions: (i) any transaction or series of related transactions with one or more third Persons involving: (A) any purchase from Andrew or acquisition by any Person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) of more than a 20% interest in the total outstanding voting securities of Andrew or any tender offer or exchange offer that if consummated would result in any Person or group beneficially owning 20% or more of the total outstanding voting securities of Andrew or any merger, consolidation or business combination involving Andrew as a whole, or (B) any sale, lease (other than in the ordinary course of business consistent with past practice), exchange, transfer, license (other than in the ordinary course of business consistent with past practice), acquisition or disposition of more than 20% of the assets of Andrew (including equity securities of any Subsidiary of such party) on a consolidated basis, or (ii) any liquidation or dissolution of Andrew;

(ii)    An "Alternative Transaction Proposal" shall mean any offer or proposal relating to an Alternative Transaction;

(iii)    A "Superior Proposal" means an unsolicited, bona fide, written Alternative Transaction Proposal made by a third Person to acquire, directly or indirectly, pursuant to a tender offer, exchange offer, merger, consolidation or other business combination, (A) 50% or more of the assets of Andrew on a consolidated basis or (B) 50% or more of the outstanding voting securities of Andrew, and as a result of which, the

30

**B 42**

stockholders of Andrew immediately preceding such transaction would hold less than 50% of the aggregate equity interests in the surviving or resulting entity of such transaction (or its ultimate parent), which the Board of Directors of Andrew has in good faith determined (taking into account, among other things, (1) the advice of its outside legal counsel and its financial adviser, and (2) all terms of such Alternative Transaction Proposal and this Agreement (as it may be proposed to be amended by Parent)), to be more favorable to Andrew's stockholders (in their capacities as stockholders) than the terms of this Agreement (as it may be proposed to be amended by Parent) and to be reasonably capable of being consummated on the terms proposed, taking into account all other legal, financial, regulatory and other aspects of such Alternative Transaction Proposal and the Person making such Alternative Transaction Proposal including, if such Alternative Transaction Proposal involves any financing, the likelihood of obtaining such financing and the terms on which such financing may be secured.

(b)     Andrew shall not, and shall not permit any of its Subsidiaries to, or authorize or permit any of its officers, directors or employees or any investment banker, financial advisor, attorney, accountant or other representative retained by it or any of its Subsidiaries to, directly or indirectly, (i) solicit, initiate or encourage (including by way of furnishing any information), or take any other action intended to facilitate, induce or encourage, any inquiries with respect to, or the making, submission or announcement of, any Alternative Transaction Proposal, (ii) participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, any, or any possible, Alternative Transaction Proposal (except (A) to disclose the existence of the provisions of this Section 5.2, or (B) to the extent specifically permitted pursuant to Section 5.2(d)), (iii) approve, endorse or recommend any Alternative Transaction (except to the extent specifically permitted pursuant to Section 5.3), or (iv) enter into any letter of intent or similar document or any contract, agreement or commitment contemplating or otherwise relating to any possible or proposed Alternative Transaction Proposal. Andrew and each of its Subsidiaries will immediately cease, and will cause their officers, directors and employees and any investment banker, financial adviser, attorney, accountant or other representative retained by it to cease, any and all existing activities, discussions or negotiations with any third Persons conducted heretofore with respect to any possible or proposed Alternative Transaction, and will use its reasonable best efforts to enforce (and not waive any provisions of) any confidentiality agreement (or any similar agreement) relating to any such possible or proposed Alternative Transaction.

(c)     As promptly as practicable (and in any event within 48 hours) after receipt of any Alternative Transaction Proposal or any request for nonpublic information or any inquiry relating to any Alternative Transaction Proposal, Andrew shall provide Parent with oral and written notice of the material terms and conditions of such Alternative Transaction Proposal, request or inquiry, and the identity of the Person or group making any such Alternative Transaction Proposal, request or inquiry. In addition, Andrew shall provide Parent as promptly as practicable with oral and written notice setting forth all such information as is reasonably necessary to keep Parent informed in all material respects of all material developments regarding the status and terms (including material amendments or proposed material amendments) of, any such Alternative Transaction Proposal, request or inquiry, and, without limitation of the other provisions of this Section 5.2, shall promptly provide to Parent a copy of all written materials (including written materials provided by e−mail or otherwise in electronic format) subsequently provided by or to it in connection with such Alternative Transaction Proposal, request or inquiry. Andrew shall provide Parent with 48 hours' prior notice (or such lesser prior notice as is provided to the members of its Board of Directors) of any meeting of its Board of Directors at which its Board of Directors is reasonably likely to consider any such Alternative Transaction Proposal or Alternative Transaction.

(d)     Notwithstanding anything to the contrary contained in Section 5.2(b), in the event that Andrew receives an unsolicited, bona fide Alternative Transaction Proposal which is determined by its Board of Directors to be, or to be reasonably likely to lead to, a Superior Proposal, it may then take the following actions (but only (1) if and to the extent that (x) its Board of Directors concludes in good faith, after receipt of advice of its outside legal counsel, that the failure to do so is reasonably likely to result in a breach of its fiduciary obligations to its stockholders under Applicable Law and (y) Andrew has given Parent at least three business days' prior written notice of its intention to take any of the following actions and of the identity of the Person or group making such Superior Proposal and the material terms and conditions of such Superior Proposal and (2) if it shall not have breached in any material respect any of the provisions of this Section 5.2):

**B 43**

(i)      furnish nonpublic information to the Person or group making such Superior Proposal, *provided* that (A) prior to furnishing any such nonpublic information, it receives from such Person or group an executed confidentiality agreement containing terms at least as restrictive as the terms contained in the Confidentiality Agreement (except that such confidentiality agreement need not include a standstill), dated as of April 3, 2007, between Andrew and Parent (together with the Confidentiality Agreement, dated as of May 17, 2007, between Parent and Andrew, the "Confidentiality Agreements"), and (B) contemporaneously with furnishing any such nonpublic information to such Person or group, it furnishes such nonpublic information to Parent (to the extent such nonpublic information has not been previously so furnished to Parent); and

(ii)     engage in negotiations with such Person or group with respect to such Superior Proposal; *provided, however,* in no event shall Andrew enter into any definitive agreement (other than a confidentiality agreement as permitted hereunder) to effect such Superior Proposal unless the Board of Directors of Andrew approves a Superior Proposal in accordance with Section 5.3 and authorizes Andrew to enter into a binding written agreement with respect to that Superior Proposal and, in connection with the termination of this Agreement and entering into the agreement reflecting the Superior Proposal, pays to Parent in immediately available funds the Termination Fee required to be paid by Section 8.3(a)(v).

(e)      Nothing contained in this Agreement shall prohibit Andrew or its Board of Directors from taking and disclosing to Andrew's stockholders a position contemplated by Rules 14d–9 and 14e–2(a) promulgated under the Exchange Act or making any disclosure required by Applicable Law.

## 5.3    Board of Directors Recommendation.

(a)      In response to the receipt of an unsolicited, bona fide Alternative Transaction Proposal which is determined by the Board of Directors of Andrew to be a Superior Proposal, Andrew's Board of Directors may withhold, withdraw, amend or modify its recommendation in favor of approval and adoption of this Agreement and the Merger and may approve or recommend to its shareholders any Superior Proposal (any of the foregoing actions, whether by a Board of Directors or a committee thereof, a "Change of Recommendation") if the Board of Directors of Andrew has concluded in good faith, after receipt of advice of its outside legal counsel, that, in light of such Superior Proposal, the failure of the Board of Directors to effect a Change of Recommendation is reasonably likely to result in a breach of its fiduciary obligations to its stockholders under Applicable Law.

(b)      Prior to announcing any Change of Recommendation pursuant to Section 5.3(a), Andrew shall (A) provide to Parent three business days' prior written notice which shall (x) state expressly that it intends to effect a Change of Recommendation and (y) describe any modifications to the material terms and conditions of the Superior Proposal and the identity of the Person or group making the Superior Proposal from the description of such terms and conditions and such Person contained in the notice required under Section 5.2(d), (B) make available to Parent all materials and information made available to the Person or group making the Superior Proposal in connection with such Superior Proposal, and (C) during the three business–day period commencing upon receipt of the notice described in Section 5.3(b)(A), if requested by Parent, engage in good faith negotiations to amend this Agreement in such a manner that the Alternative Transaction Proposal which was determined to be a Superior Proposal no longer is a Superior Proposal.

(c)      In addition to the circumstances set forth in Section 5.3(a), the Board of Directors of Andrew may effect a Change of Recommendation (but only insofar as the same involves withholding, withdrawing, amending or modifying its recommendation in favor of the approval and adoption of this Agreement and the Merger) if there shall have occurred and be continuing any other event, occurrence or circumstance as a result of which, in the good faith judgment of the Board of Directors of Andrew, after consultation with outside counsel of Andrew, the failure to effect a Change in Recommendation would violate the fiduciary duties of the Andrew Board of Directors to Andrew's stockholders under Applicable Law.

**B 44**

(d)      If the Board of Directors of Andrew has effected a Change of Recommendation, Andrew shall promptly notify Parent in writing of such Change in Recommendation, including the specific subparagraph, but not more than one subparagraph, of Section 5.3 in reliance upon which such Change in Recommendation is made.

32

---

If Parent thereafter terminates this Agreement in accordance with Section 8.1 based upon such notice, then the termination effects with respect to the specific subparagraph identified in such notice that are set forth in Section 8.3 shall apply.

5.4      **Control of Other Party's Business.** Nothing contained in this Agreement shall be construed to give Parent, directly or indirectly, the right to control or direct Andrew's operations or give Andrew, directly or indirectly, the right to control or direct Parent's operations, in each case, prior to the Effective Time. Prior to the Effective Time, each of Parent and Andrew shall exercise, on the terms and subject to the conditions of this Agreement, complete control and supervision over its respective operations.

Article VI<br>Additional Agreements

6.1      **Preparation of SEC Documents; Stockholders' Meeting.**

(a)      As soon as practicable following the date of this Agreement, Andrew and Parent shall agree upon the terms of, prepare and file with the SEC the Proxy Statement, and Parent shall prepare and file with the SEC the Form S−4, in which the Proxy Statement will be included as a prospectus. Each of Andrew and Parent shall use commercially reasonable efforts to have the Form S−4 declared effective under the Securities Act as promptly as practicable after such filing. Andrew will use commercially reasonable efforts to cause the Proxy Statement to be mailed to Andrew's stockholders as promptly as practicable after the Form S−4 is declared effective under the Securities Act. Parent shall also take any action (other than qualifying to do business in any jurisdiction in which it is not now so qualified or to file a general consent to service of process) reasonably required to be taken under any applicable state securities laws in connection with the Parent Share Issuance, and Andrew shall furnish all information concerning Andrew and the holders of Andrew Common Stock as may be reasonably requested in connection with any such action. Each party shall cooperate and provide the other party with a reasonable opportunity to review and comment on any amendment or supplement to the Form S−4 or the Proxy Statement or any filing with the SEC incorporated by reference in the Form S−4 or the Proxy Statement, in each case prior to filing such with the SEC, except where doing so would cause the filing to not be filed timely, without regard to any extension pursuant to Rule 12b−25 of the Exchange Act; *provided, however*, that each party shall be deemed to have consented to the inclusion in the Form S−4, the Proxy Statement or any filing with the SEC incorporated by reference in the Form S−4 or the Proxy Statement of any information, language or content specifically agreed to by such party or its counsel on or prior to the date hereof for inclusion therein. Parent will advise Andrew promptly after it receives notice of (i) the time when the Form S−4 has become effective or any supplement or amendment has been filed, (ii) the issuance or threat of any stop order, (iii) the suspension of the qualification of the Parent Common Stock issuable in connection with this Agreement for offering or sale in any jurisdiction, or (iv) any request by the SEC for amendment of the Proxy Statement or the Form S−4 or comments thereon and responses thereto or requests by the SEC for additional information. If at any time prior to the Effective Time any information (including any Change of Recommendation) relating to Andrew or Parent, or any of their respective Affiliates, officers or directors, should be discovered by Andrew or Parent which should be

**B 45**

set forth in an amendment or supplement to any of the Form S−4 or the Proxy Statement, so that any of such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement, including, where appropriate, a filing pursuant to Rules 165 and 425 of the Securities Act, describing such information shall promptly be filed with the SEC and, to the extent required by law, disseminated to the stockholders of Andrew.

(b)     Andrew shall, as promptly as practicable after the Form S−4 is declared effective under the Securities Act, take all action necessary in accordance with Applicable Law and the Andrew Organizational Documents to duly give notice of, convene and hold a meeting of its stockholders to be held as promptly as practicable to consider the approval and adoption of this Agreement and the Merger (the "Andrew Stockholders' Meeting").  Except in the case of a Change of Recommendation in accordance with Section 5.3, Andrew will use commercially reasonable efforts to solicit from its stockholders proxies in favor of the approval and adoption of this Agreement and the Merger and will take all other action reasonably necessary or advisable to secure the vote or

33

consent of its stockholders required by the rules of NASDAQ or Applicable Law to obtain such approvals.  Notwithstanding anything to the contrary contained in this Agreement, Andrew may adjourn or postpone the Andrew Stockholders' Meeting to the extent necessary to ensure that any necessary supplement or amendment to the Proxy Statement is provided to its stockholders in advance of a vote on the adoption and approval of this Agreement and the Merger or, if, as of the time for which the Andrew Stockholders' Meeting is originally scheduled, there are insufficient shares of Andrew Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of such meeting.  Andrew shall use commercially reasonable efforts such that the Andrew Stockholders' Meeting is called, noticed, convened, held and conducted, and that all proxies solicited in connection with the Andrew Stockholders' Meeting are solicited in compliance with Applicable Law, the rules of the NASDAQ and the Andrew Organizational Documents.  Without the prior written consent of Parent, the approval and adoption of this Agreement and the Merger is the only matter which Andrew shall propose to be acted on by Andrew's stockholders at the Andrew Stockholders' Meeting.

(c)     Andrew will use commercially reasonable efforts to hold the Andrew Stockholders' Meeting as soon as reasonably practicable after the date of this Agreement, subject to the requirements of Instruction D.3 to Schedule 14A (Rule 14a−101) promulgated under the Exchange Act.

(d)     Except to the extent expressly permitted by Section 5.3: (i) the Board of Directors of Andrew shall recommend that its stockholders vote in favor of the approval and adoption of this Agreement and the Merger at the Andrew Stockholders' Meeting, (ii) the Proxy Statement shall include a statement to the effect that the Board of Directors of Andrew has recommended that Andrew's stockholders vote in favor of approval and adoption of this Agreement and the Merger at the Andrew Stockholders' Meeting, and (iii) neither the Board of Directors of Andrew nor any committee thereof shall withdraw, amend or modify, or propose or resolve to withdraw, amend or modify in a manner adverse to the other party, the recommendation of its respective Board of Directors that the stockholders of Andrew vote in favor of the approval and adoption of this Agreement and the Merger.

(e)     Notwithstanding anything to the contrary in this Agreement, if Parent shall have determined, by irrevocable written notice to Andrew, not to include any Parent Common Stock in the Election Merger Consideration, Parent shall have no obligation to file or have declared effective the Form S−4 with the SEC.

6.2     **Access to Information; Confidentiality**.

(a)     Subject to the Confidentiality Agreements and Applicable Law, each of Andrew and Parent shall, and shall cause each of its respective Subsidiaries to, afford to the other party and to the officers, employees, accountants, counsel, financial advisors and other

representatives of such other party, reasonable access during normal business hours during the period prior to the Effective Time to all their respective properties, books, contracts, commitments, personnel and records (provided that such access shall not interfere with the business or operations of such party) and, during such period, each of Andrew and Parent shall, and shall cause each of its respective Subsidiaries to, furnish promptly to the other party (a) a copy of each report, schedule, registration statement and other document filed by it during such period pursuant to the requirements of federal or state securities laws and (b) all other information concerning its business, properties and personnel as such other party may reasonably request.  No review pursuant to this Section 6.2 shall affect or be deemed to modify any representation or warranty contained herein, the covenants or agreements of the parties hereto or the conditions to the obligations of the parties hereto under this Agreement.  Between the date hereof and Closing, Andrew and its Subsidiaries shall afford Parent and its authorized representatives reasonable access, during normal business hours and upon reasonable notice, to the Real Property to conduct such activities as are necessary to consummate the Merger (including to satisfy requirements of lenders that will provide financing for the Merger) only, and for no other purposes, provided that any such investigations shall be conducted in such a manner as not to interfere unreasonably with the normal operations of Andrew and its Subsidiaries.

(b)     Andrew agrees to deliver to Parent as soon as is reasonably practicable, to the extent in the possession or control of Andrew or its Subsidiaries, true and correct copies of the most recent title insurance policy (or if none, title opinion, title certificate or other equivalent evidence of title) and most recent survey for each Owned Real Property and any lease agreements regarding the Real Property to which it is a party.

34

(c)     Each of Andrew and Parent will hold, and will cause its respective officers, employees, accountants, counsel, financial advisors and other representatives and Affiliates to hold, any nonpublic information received from the other party in confidence in accordance with the terms of the Confidentiality Agreements.

(d)     If, on the date that is five business days before the date that the parties' obligations under the Confidentiality Agreements terminate, (i) the Effective Time has not occurred and (ii) this Agreement has not been terminated pursuant to Section 8.1, then the parties shall amend the Confidentiality Agreements to extend the term of each party's obligations under the Confidentiality Agreements to the earlier of (A) the Effective Time and (B) the date on which this Agreement is terminated pursuant to Section 8.1.

6.3     **Commercially Reasonable Efforts.**

(a)     Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Merger and the other transactions contemplated by this Agreement, including commercially reasonable efforts to accomplish the following: (i) the taking of all acts necessary to cause the conditions to the Closing to be satisfied (but in no event shall a party be required to waive any such condition) as promptly as practicable, (ii) the obtaining of all necessary actions or nonactions, waivers, consents, clearances and approvals from Governmental Entities and the making of all necessary registrations and filings, including all filings required by the HSR Act (the initial filing required by the HSR Act to be filed as soon as reasonably practicable, but in any event within 15 days, following the execution of this Agreement) and any applicable antitrust, competition or similar laws of any foreign jurisdiction, and the taking of all steps

**B 47**

as may be necessary to obtain an approval, clearance or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (iii) the obtaining of all necessary consents, approvals or waivers from third parties, (iv) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed, and (v) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement. In furtherance of the covenants contained in Sections 6.3(a)(ii) and 6.3(a)(iv), Parent and Andrew shall, if required by one or more Governmental Entities acting pursuant to any applicable antitrust, competition or similar laws to obtain any of the actions or nonactions, waivers, consents, clearances, approvals, or avoidance of actions or proceedings referred to in Sections 6.3(a)(ii), or pursuant to Section 6.3(a)(iv) or if required by a federal, state or foreign court, agree to the divestiture by Parent, Andrew or any of their respective Subsidiaries of shares of capital stock or of any business, assets or property of Parent or its Subsidiaries or Andrew or its Subsidiaries and the imposition of any limitation on the ability of Parent or its Subsidiaries or Andrew or its Subsidiaries to conduct their respective businesses or to own or exercise control of their respective assets, properties and stock (including licenses, hold separate agreements, covenants affecting business operating practices or similar matters) if such divestitures and limitations, individually or in the aggregate, would not be reasonably expected to result in the loss of annualized revenue of Parent and Andrew on a combined consolidated basis of more than $225,000,000. Subject to Applicable Laws relating to the exchange of information and in addition to Section 6.3(b), Parent and Andrew, or their respective counsel, shall have the right to review in advance, and to the extent practicable each will consult the other on, all the information relating to Parent and its Subsidiaries or Andrew and its Subsidiaries, as the case may be, that appears in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the Merger and the other transactions contemplated by this Agreement.

(b)    Subject to Applicable Laws relating to the exchange of information, each of Andrew and Parent shall keep the other reasonably apprised of the status of matters relating to the completion of the transactions contemplated hereby and work cooperatively in connection with obtaining all required approvals, consents or clearances of any Governmental Entity (whether domestic, foreign or supranational). In that regard, each party shall use commercially reasonable efforts to: (i) promptly notify the other of, and if in writing, furnish the other with copies of (or, in the case of material oral communications, advise the other orally of) any communications from or with any Governmental Entity (whether domestic, foreign or supranational) with respect to the Merger or any of the

35

other transactions contemplated by this Agreement, (ii) permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written (or any material proposed oral) communication with any such Governmental Entity, (iii) not participate in any meeting with any such Governmental Entity unless it consults with the other in advance and to the extent permitted by such Governmental Entity gives the other the opportunity to attend and participate thereat, (iv) furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and any such Governmental Entity with respect to this Agreement and the Merger, and (v) furnish the other with such necessary information and reasonable assistance as Andrew or Parent may reasonably request in connection with its preparation of necessary filings or submissions of information to any such Governmental Entity. Each of Andrew and Parent shall designate any competitively sensitive material provided to the other under this Section 6.3 as "outside counsel only." Such material and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient unless express permission is obtained in advance from the source of the materials (Andrew or Parent, as the case may be) or its legal counsel.

(c)    In connection with and without limiting the foregoing, Andrew and Parent shall (i) take all action necessary to ensure that no state takeover statute or similar statute or regulation is or becomes applicable to this Agreement or any of the transactions contemplated hereby and (ii) if any state takeover statute or similar statute or regulation becomes applicable to

**B 48**

this Agreement or any of the transactions contemplated hereby, take all action necessary to ensure that such transactions may be consummated as promptly as practicable on the terms required by, or provided for, in this Agreement and otherwise to minimize the effect of such statute or regulation on the Merger and the other transactions contemplated by this Agreement.

6.4     **Indemnification and Insurance.**

(a)      Immediately after the Effective Time, the certificate of incorporation and by–laws of the Surviving Corporation will contain provisions with respect to exculpation and indemnification that are at least as favorable to the present and former officers and directors of Andrew and its Subsidiaries (each an "Indemnified Party") as those contained in the Andrew Charter and the Andrew By–laws as in effect on the date hereof, which provisions will not be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would adversely affect the rights thereunder of individuals who, immediately prior to the Effective Time, were directors, officers, employees or agents of Andrew, unless such modification is required by law.  Parent shall cause the Surviving Corporation to indemnify and hold harmless each Indemnified Party against all claims, losses, liabilities, damages, judgments, inquiries, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of actions taken by them in their capacity as officers or directors at or prior to the Effective Time (including in connection with this Agreement and the transactions contemplated hereby), or taken by them at the request of Andrew, Parent, the Surviving Corporation or any of their respective Subsidiaries, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent permitted under Applicable Law for a period of six years after the Effective Time.  Each Indemnified Party shall be entitled to advancement of expenses incurred in the defense of any claim, action, suit, proceeding or investigation from the Surviving Corporation within ten Business Days of receipt by the Surviving Corporation from the Indemnified Party of a request therefor; *provided, however,* that any Indemnified Party to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such person is not entitled to indemnification.  Neither Parent nor the Surviving Corporation shall settle, compromise or consent to the entry of any judgment in any proceeding or threatened action, suit, proceeding, investigation or claim in which indemnification could be sought by such Indemnified Party hereunder, without the consent of such Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed, unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such action, suit, proceeding, investigation or claim.

(b)      Prior to the Effective Time, Parent shall purchase a directors' and officers' and fiduciary liability insurance policy providing coverage for a period of at least six years following the Effective Time for persons who were officers and/or directors of Andrew prior to the Effective Time for claims arising after the

Effective Time from facts or events which occurred at or prior to the Effective Time, and in each case, which policy shall provide for at least the same coverage and amounts containing terms and conditions that are not less advantageous than the respective policies of Andrew, as in place at the Effective Time; *provided, however,* that in no event will Parent be required to expend in any year an amount in excess of 250% of the annual aggregate premiums currently paid by Andrew for such insurance (the "Maximum Premium").  If such insurance coverage cannot be obtained at all, or can only be obtained at an annual premium in excess of the Maximum Premium, Parent will cause to be maintained the most advantageous policies of directors' and officers' insurance obtainable for an annual premium equal to the Maximum Premium.

**B 49**

(c)    In the event that Parent or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision will be made so that the successors and assigns of Parent assume the obligations set forth in this Section 6.4.

(d)    The provisions of this Section 6.4 are intended for the benefit of, and will be enforceable by, each Indemnified Party and his or her heirs and representatives, and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Indemnified Party may have had by contract or otherwise.

6.5    <u>Fees and Expenses</u>.  Except as otherwise set forth in this Section 6.5 and in Section 8.3, all fees and expenses incurred in connection with the Merger, this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such fees or expenses (including Andrew's fees and expenses incurred in connection with the printing and mailing of the Proxy Statement to its shareholders), whether or not the Merger is consummated, *provided* that Andrew shall pay any foreign, state or local real estate transfer or similar taxes imposed on the stockholders of Andrew as a result of the transactions contemplated in this Agreement.  Parent and Andrew shall each bear one−half of the filing fees required by the HSR Act and any antitrust, competition or similar laws of any foreign jurisdiction.  Parent shall bear the fee to the SEC for the Form S−4 (including any amendments thereto).

6.6    <u>Announcements</u>.  Parent and Andrew will consult with each other before issuing, and will provide each other the opportunity to review, comment upon and concur with, and use commercially reasonable efforts to agree on, any press release, public statements or other announcements with respect to the transactions contemplated by this Agreement, including any announcement to employees, customers, suppliers or others having dealings with Parent or Andrew, respectively, or similar publicity with respect to this Agreement or the transactions contemplated by this Agreement, and shall not issue any such press release or make any such public statement or other announcement prior to such consultation, *except* as either party may determine is required by Applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or stock market.

6.7    <u>Listing</u>.  Parent shall use all reasonable best efforts to cause the Parent Common Stock issuable under Article II and those shares of Parent Common Stock required to be reserved for issuance under the Andrew Stock Plans, the Andrew Warrant and the Andrew Indenture to be authorized for listing on the NYSE, upon notice of issuance, exercise or conversion, as applicable.

6.8    <u>Conveyance Taxes</u>.  Parent and Andrew shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding any real property transfer, sales, use, transfer, value added, stock transfer and stamp taxes, any transfer, recording, registration and other fees or any similar taxes which become payable in connection with the transactions contemplated by this

**B 50**

**Agreement that are required or permitted to be filed on or before the Effective Time, and any such taxes shall be paid one−half by Parent and one−half by Andrew.**

---

**6.9     Employee Benefits.**

(a)     For one year following the Effective Time (the "Continuation Period"), with respect to each country in which Andrew has an employee workforce, Parent shall provide or cause to be provided to the employee workforce of the Surviving Corporation and the other members of the employee workforce of any other Affiliate of Parent who were employees of Andrew or any of its Subsidiaries immediately prior to the Effective Time ("Continuing Employees"), employee benefits package that, in the aggregate, are no less favorable than the employee benefits package provided by Andrew to the Continuing Employees in such country by Andrew or any of its Subsidiaries; *provided, however,* that, subject to Applicable Law, if Parent has an employee workforce in such country, Parent may, in lieu thereof, provide to the Continuing Employees the benefits package offered to Parent's employee workforce in such country immediately prior to the execution of this Agreement; and, *provided, further,* that with respect to equity based compensation, Parent shall have no obligation to provide equity awards to the Continuing Employees during the Continuation Period covering a number of shares of Parent Common Stock in excess of the number of shares of Andrew Common Stock available under the 2000 Management Incentive Program and/or 2005 Long Term Incentive Plan of Andrew as in effect immediately prior to the Effective Time (as appropriately adjusted to reflect the Merger). Notwithstanding anything in this Section 6.9(a) to the contrary, each employee of Andrew or any of its Subsidiaries, other than any director or officer of Andrew, who is covered and eligible for benefits under an Andrew Domestic Benefit Plan that provides for payment of cash severance benefits upon certain employment termination shall, upon termination of employment within one year following the Effective Time, receive the severance benefits provided by the Andrew Domestic Benefit Plans applicable to non−officer and non−director employees (including, without limitation, the Allen Telecom, Inc. Key Employee Severance Policy and the Andrew Employee Severance Plan effective May 1, 2007) or, if the cash severance payments would be higher under a severance plan maintained by Parent or its Affiliates (other than Andrew and its Subsidiaries) applicable to non−officer and non−director employees, such plan of Parent or its Affiliates.  From and after the Effective Time, Parent and its Affiliates shall continue, and shall cause the Surviving Entity to continue, the Allen Telecom, Inc. Key Employee Severance Policy in accordance with its terms in effect on the date hereof until it is amended or terminated in accordance with the provisions of the policy, including (without limitation) the consent requirement described in Section II of the policy.

(b)     Following the Effective Time, Parent shall recognize (or cause to be recognized) the service of each Continuing Employee with Andrew or any of its Subsidiaries for purposes of (i) eligibility and vesting under any Parent Benefit Plan, (ii) determination of benefits levels under any vacation or severance Parent Benefit Plan and (iii) determination of "retiree" status under any Parent Benefit Plan, for which the Continuing Employee is otherwise eligible and in which the Continuing Employee is offered participation, in each case *except* where such crediting would result in a duplication of benefits or such service would not be recognized for a similarly situated employee of Parent or one of its subsidiaries.  To the extent Parent establishes or designates a Parent Benefit Plan to provide group health benefits to Continuing Employees, (x) Parent shall, with respect to each such Parent Benefit Plan, waive pre−existing condition limitations with respect to Continuing Employees to the same extent waived or no longer applicable under the

**B 51**

applicable group health plan of Andrew and (y) each Continuing Employee shall be given credit under the applicable Parent Benefit Plan for amounts paid under the corresponding group health plan of Andrew or an Affiliate during the plan year in which the Effective Time occurs for purposes of applying deductibles, co−payments and out−of−pocket maximums for such plan year.

(c)    As of the Effective Time, the Surviving Corporation  shall assume all rights (including the rights to modify in accordance with their terms) under and agree to perform in accordance with their terms (i) all employment, severance and other compensation agreements and arrangements existing as of the date hereof (and provided to Parent by Andrew prior to the date hereof) between Andrew or any of its Subsidiaries and any director, officer or employee thereof, and (ii) any such agreements or arrangements entered into after the date hereof and prior to the Effective Time by Andrew or any of its Subsidiaries in compliance with the terms of this Agreement.

(d)    For a period not less than one year following the Effective Time, Parent and its Affiliates shall maintain, and shall cause the Surviving Corporation to maintain, each Andrew Domestic Benefit Plan that is a Welfare Plan providing benefits to retirees and other current and future former employees of Andrew (and their respective spouses and dependents) in accordance with the terms of each such plan (including cost sharing feature) as in effect immediately prior to the date hereof.

38

---

(e)    Andrew shall, if requested to do so by Parent and if permitted by Applicable Law, take any action required to terminate its defined contribution 401(k) plan, such termination to be effective immediately prior to and conditioned upon the Effective Time; provided, however, that Andrew shall be permitted to authorize a profit sharing contribution to such plan for 2007 for allocation to eligible employees in an amount equal to the lesser of (x) 3.5% of the adjusted pre−tax income of Andrew and its Subsidiaries on a consolidated basis and (y) $5,400,000 and further provided that nothing in this Section 6.9(e) shall be construed as requiring Andrew to make plan termination distributions or otherwise wind up its 401(k) plan prior to the Effective Time.  Parent shall provide, or shall cause the Surviving Corporation to provide, that each Continuing Employee who is a participant in Andrew's 401(k) plan shall be given the opportunity to "roll over" his or her account balance (including any promissory note evidencing an outstanding loan) from the terminated plan to a tax−qualified defined contribution plan maintained by Parent or the Surviving Corporation.

(f)    Without limiting the generality of Section 9.7, nothing in this Agreement will be construed to create a right in any employee of Andrew or any Subsidiary to employment with Parent, the Surviving Corporation or any other Subsidiary of Parent or grant or create any right in any employee or beneficiary of such employee under an Parent Benefit Plan or an Andrew Benefit Plan, nor shall anything is this Agreement be deemed to constitute an amendment of any Andrew Benefit Plan.

6.10    **Consents of Accountants**.  Andrew and Parent will each use commercially reasonable efforts to cause to be delivered to each other consents from their respective independent auditors, dated the date on which the Form S−4 is filed with the SEC, is amended or supplemented, and becomes effective or a date not more than two days prior to each such date, in form reasonably satisfactory to the recipient and customary in scope and substance for consents delivered by independent public accountants in

**B 52**

connection with registration statements on Form S−4 under the Securities Act.

### 6.11    Financing.

(a)    Parent shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange debt financing for the purpose of funding the transactions contemplated by this Agreement (the "Debt Financing") so as to close within the time period provided in Section 1.2 hereof. Parent shall keep Andrew informed on a reasonably current basis of the status of its efforts to arrange the Debt Financing.

(b)    Andrew shall provide to Parent all cooperation reasonably requested by Parent that is reasonably necessary and customary in connection with the Debt Financing (provided that such requested cooperation shall not unreasonably interfere with the operation of the business of Andrew or require Andrew to take any action Andrew reasonably believes to be inconsistent with Applicable Laws and provided further that Andrew shall not be required to pay any commitment or other similar fee or incur any other cost, expense or liability that is not simultaneously reimbursed by Parent in connection with the Debt Financing or any of the actions contemplated by this Section 6.11 prior to the Closing), including:

(i)    participating in a reasonable number of customary meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies;

(ii)    assisting Parent with the preparation of materials for rating agency presentations and offering documents (including private placement memoranda, bank information memoranda, prospectuses and similar documents) necessary and customary in connection with the Debt Financing; provided, that any private placement memoranda or prospectuses in relation to high yield debt securities need not be issued by Andrew or any of its Subsidiaries; provided further, that any such memoranda or prospectuses shall contain disclosure and financial statements with respect to Andrew or the Surviving Corporation reflecting the Surviving Corporation and/or its Subsidiaries as the obligor;

(iii)    assisting Parent with the preparation of all financial statements and financial data of the type required by Regulation S−X (provided that information required by Rule 3−10 of Regulation S−X

39

may be in summary form) and Regulation S−K under the Securities Act (without giving effect to the executive compensation and related person disclosure rules related to SEC Release Nos. 33−8732A; 34−54302A; IC−27444A);

(iv)    furnishing Parent with financial and other pertinent information regarding Andrew as may be reasonably requested by Parent to consummate the Debt Financing, including all financial statements and financial data reasonably required to consummate the Debt Financing if such offering were registered under the Securities Act and of the type and form customarily included in private placements under Rule 144A of the Securities Act and the financial data required by Item 3−01 of Regulation S−K under the Securities Act;

(v)    using reasonable best efforts to assist Parent in procuring accountants' comfort letters and consents, payoff letters, lien releases, legal opinions, surveys and title insurance as reasonably requested by Parent;

(vi)    providing and executing customary officer's certificates and other similar documents as may be reasonably requested by Parent so long as no such document is effective until the occurrence of the Closing;

(vii)    using reasonable best efforts to cooperate with the marketing efforts of Parent and its financing sources for any Debt Financing to be raised by Parent to complete the transactions contemplated hereby;

(viii)    executing and delivering definitive financing documentation and delivering collateral for the Debt Financing, all effective at the Effective Time; and

**B 53**

(ix)    taking all corporate actions, subject to the occurrence of the Closing, reasonably requested by Parent in connection with the consummation of the Debt Financing.

(c)    The parties acknowledge that the active participation and assistance of appropriate members of management of Andrew will be necessary in order to enable Parent to create an offering memorandum or bank memorandum for any bond offering or bank credit facility that is part of the Debt Financing. Andrew will endeavor to make such individuals reasonably available to Parent for the purpose described in the preceding sentence to an extent generally consistent with the availability that would reasonably be expected in other comparable companies operating under a similar timetable.

(d)    All non–public or otherwise confidential information regarding Andrew obtained by Parent pursuant to this Section 6.11 shall be kept confidential in accordance with the Confidentiality Agreements.

(e)    Parent shall, promptly upon request by Andrew, reimburse Andrew for all reasonable and documented out–of–pocket costs incurred by Andrew or its Subsidiaries in connection with their respective cooperation pursuant to this Section 6.11 and shall indemnify and hold harmless Andrew, its Subsidiaries and their respective representatives for and against any and all losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith (other than in respect of any actions or omissions of Andrew, its Subsidiaries and its Affiliates which constitute willful misconduct or gross negligence or any information provided by Andrew or its Subsidiaries).

(f)    Parent acknowledges and agrees that consummation of the transactions contemplated by this Agreement is not conditional upon the receipt by Parent of the proceeds of the Financing Commitments and that any failure by Parent to consummate the Merger on the Closing Date, provided, that at such time the conditions to Closing set forth in Sections 7.1 and 7.2 are satisfied, shall constitute a breach by Parent of this Agreement.

6.12    **Affiliate Legends**. Section 6.12 of the Andrew Disclosure Letter sets forth a list of those Persons who are, in Andrew's reasonable judgment, "affiliates" of Andrew within the meaning of Rule 145 promulgated under the Securities Act ("Rule 145 Affiliates"). Andrew shall notify Parent in writing regarding any change in the identity of its Rule 145 Affiliates prior to the Closing Date. Parent shall be entitled to issue appropriate stop transfer

---

instructions to the transfer agent for Parent Common Stock (provided that such legends or stop transfer instructions shall be removed one year after the Effective Time upon the request of any holder of shares of Parent Common Stock issued in the Merger if such holder is not then a Rule 145 Affiliate).

6.13    **Notification of Certain Matters**. Andrew shall give prompt notice to Parent, and Parent shall give prompt notice to Andrew, of the occurrence, or failure to occur, of any event, which is in Andrew's or Parent's Knowledge, as applicable, and as to which the occurrence or failure to occur would reasonably be likely to result in the failure of any of the conditions set forth in Article VII to be satisfied. Each of the parties shall give prompt written notice to the other party of any material correction to any of the Parent SEC Documents or the Andrew SEC Documents, as the case may be, from and after the date hereof. Notwithstanding the above, the delivery of any notice

**B 54**

pursuant to this Section 6.13 will not limit or otherwise affect the remedies available hereunder to the party receiving such notice or the conditions to such party's obligation to consummate the Merger.

### 6.14    Section 16 Matters.

(a)    Prior to the Effective Time, Andrew's Board of Directors, or an appropriate committee of non−employee directors of Andrew, shall, if necessary, adopt a resolution consistent with the SEC's interpretive guidance to approve the disposition by any officer or director of Andrew who is a "covered person" of Andrew for the purposes of Section 16 of the Exchange Act of Andrew Common Stock or Andrew Stock Options pursuant to this Agreement and the Merger for the purposes of qualifying the disposition as an exempt transaction under Section 16 of the Exchange Act.

(b)    Prior to the Effective Time, Parent's Board of Directors, or an appropriate committee of non−employee directors of Parent, shall, if necessary, adopt a resolution consistent with the SEC's interpretive guidance to approve the acquisition by any officer or director of Andrew who will become a "covered person" of Parent for the purposes of Section 16 of the Exchange Act of Parent Common Stock or Parent Stock Options pursuant to this Agreement and the Merger for the purposes of qualifying the acquisition as an exempt transaction under Section 16 of the Exchange Act.

### 6.15    State Takeover Laws.

(a)    Prior to the Effective Time, Andrew shall not take any action to render inapplicable, or to exempt any third Person from, any state takeover law or state law that purports to limit or restrict business combinations or the ability to acquire or vote shares of capital stock unless (i) required to do so by order of a court of competent jurisdiction or (ii) Andrew's Board of Directors has concluded in good faith, after receipt of advice of its outside legal counsel, that, in light of a Superior Proposal with respect to it, the failure to take such action is reasonably likely to result in a breach of its Board of Directors' fiduciary obligations to its stockholders under Applicable Law.

### 6.16    Reservation of Parent Common Stock.  Effective at or prior to the Effective Time, Parent shall reserve out of its reserved but unissued shares of Parent Common Stock sufficient shares of Parent Common Stock to provide for (i) the issuance of Parent Common Stock as part of the Election Merger Consideration, if applicable, (ii) the issuance of Parent Common Stock upon the exercise of the Andrew Options, (iii) the issuance of Parent Common Stock upon the exercise of the Andrew Warrant and (iv) the issuance of Parent Common Stock upon the conversion of Andrew Notes.

### 6.17    Further Assurances.  At and after the Effective Time, the officers and directors of the Surviving Corporation will be authorized to execute and deliver, in the name and on behalf of Andrew, any deeds, bills of sale, assignments or assurances and to take any other actions and do any other things, in the name and on behalf of Andrew, reasonably necessary to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets of Andrew acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger.

6.18     **Stockholder Litigation**.  Andrew shall give Parent the opportunity to participate in the defense and settlement of any stockholder litigation against Andrew and/or its directors relating to the transactions contemplated by this Agreement; provided, however, nothing herein shall require either party to take any action that its counsel reasonably concludes would jeopardize the work product privilege or the attorney–client privilege. Neither Parent nor Andrew shall enter any settlement of such litigation without the other party's prior written consent (such consent not to be unreasonably withheld or delayed).

Article VII

Conditions Precedent

7.1     **Conditions to Each Party's Obligation to Effect The Merger**.  The obligation of each party to effect the Merger is subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     **Stockholder Approval**.  The Andrew Stockholder Approval shall have been obtained.

(b)     **Antitrust/Competition**.  The waiting periods (and any extensions thereof) applicable to the Merger under the HSR Act and under the foreign antitrust or competition laws, rules or regulations for the jurisdictions listed on Section 7.1(b) of the Parent Disclosure Letter shall have been terminated or shall have expired.  In addition, all of the authorizations, consents, orders or approvals of, or declarations or filings with, any Governmental Entity required under the foreign antitrust or competition laws, rules or regulations for the jurisdictions listed on Section 7.1(b) of the Parent Disclosure Letter shall have been filed, have occurred, or have been obtained and shall be in full force and effect.

(c)     **Governmental Consents and Approvals**.  Except for the matters covered by Section 7.1(b), all filings with, and all consents, approvals and authorizations of, any Governmental Entity required to be made or obtained by Andrew, Parent or any of their Subsidiaries to consummate the Merger shall have been made or obtained, other than those that if not made or obtained would not, individually or in the aggregate, have a Material Adverse Effect on Parent and its Subsidiaries (determined, for purposes of this clause, after giving effect to the Merger) on a combined basis.

(d)     **No Injunctions or Restraints**.  No judgment, order, decree, statute, law, ordinance, rule or regulation, or other legal restraint or prohibition, entered, enacted, promulgated, enforced or issued by any court or other Governmental Entity of competent jurisdiction shall be in effect which prohibits, materially restricts, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.

(e)     **Governmental Action**.  No action or proceeding shall be instituted or pending by any Governmental Entity challenging or seeking to prevent or delay consummation of or seeking to render unenforceable the Merger, asserting the illegality of the Merger or any material provision of this Agreement or seeking material damages in connection with the transactions contemplated hereby which continues to be outstanding.

(f)     **Form S–4**.  If any Parent Common Stock is included in the Election Merger Consideration, the Form S–4 shall have become effective under the Securities Act, and no stop order or proceedings seeking a stop order shall have been initiated or, to the Knowledge of Andrew or Parent, threatened by the SEC.

**B 56**

(g)    **Listing**. If any Parent Common Stock is included in the Election Merger Consideration, the shares of Parent Common Stock issuable to the stockholders of Andrew as provided for in Article II shall have been authorized for listing on the NYSE, upon official notice of issuance.

(h)    **The Andrew Indenture**. Parent and Andrew, together with the trustee under the Andrew Indenture, shall have entered into a supplemental indenture to the Andrew Indenture providing for modification of the conversion rights of the holders of Andrew Notes, as contemplated by Section 15.06 of the Andrew Indenture.

42

---

7.2    **Conditions to Obligations of Parent and Merger Sub**. The obligation of Parent and Merger Sub to effect the Merger is further subject to satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    Except as a result of action expressly permitted or expressly consented to in writing by Parent pursuant to Section 5.1, (i) the representations and warranties of Andrew contained in this Agreement (other than the representations and warranties of Andrew contained in Sections 4.2, 4.3(a), 4.3(b), 4.3(c), 4.13 and 4.15) shall be true both when made and as of the Closing Date, as if made as of such time (*except* to the extent such representations and warranties are expressly made as of a certain date, in which case such representations and warranties shall be true in all respects, as of such date), *except* where the failure of such representations and warranties to be so true (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) does not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Andrew and (ii) the representations and warranties of Andrew contained in Sections 4.2, 4.3(a), 4.3(b), 4.3(c), 4.13, and 4.15 shall be true in all material respects both when made and as of the Closing Date, as if made as of such time (*except*, to the extent such representations and warranties are expressly made as of a certain date, in which case such representations and warranties shall be true in all material respects, as of such date).

(b)    Andrew shall have performed, or complied with, in all material respects, all obligations required to be performed or complied with by it under this Agreement at or prior to the Closing Date.

(c)    No Material Adverse Change of Andrew shall have occurred since the date of this Agreement and be continuing.

(d)    Parent shall have received an officer's certificate duly executed by each of the Chief Executive Officer and Chief Financial Officer of Andrew to the effect that the conditions set forth in Sections 7.2(a), (b), and (c) have been satisfied.

7.3    **Conditions to Obligations of Andrew**. The obligations of Andrew to effect the Merger are further subject to satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    Except as a result of action expressly permitted or expressly consented to in writing by Andrew pursuant to Section 5.1, (i) the representations and warranties of Parent contained in this Agreement (other than the representations and warranties of Parent contained in Sections 3.2, 3.3(a), 3.3(b) and 3.8) shall be true both when made and as of the Closing Date, as if made as of such time (*except* to the extent such representations and warranties are expressly made as of a certain date, in which case such representations and warranties shall be true in all respects, as of such date), *except* where the failure of such

**B 57**

representations and warranties to be so true (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) does not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Parent and (ii) the representations and warranties of Parent contained in Sections 3.2, 3.3(a), 3.3(b) and 3.8 shall be true in all material respects both when made and as of the Closing Date, as if made as of such time (*except*, to the extent such representations and warranties are expressly made as of a certain date, in which case such representations and warranties shall be true in all material respects, as of such date).

(b)    Each of Parent and Merger Sub shall have performed, or complied with, in all material respects all obligations required to be performed or complied with by it under this Agreement at or prior to the Closing Date.

(c)    Andrew shall have received an officer's certificate duly executed by each of the Chief Executive Officer and Chief Financial Officer of Parent to the effect that the conditions set forth in Sections 7.3(a) and (b) have been satisfied.

43

---

### Article VIII
### Termination, Amendment and Waiver

8.1    **Termination.  This Agreement may be terminated at any time prior to the Effective Time by action taken or authorized by the Board of Directors of the terminating party or parties, and (except in the case of Sections 8.1(b)(iii), 8.1(e), or 8.1(f)) whether before or after the Andrew Stockholder Approval:**

(a)    by mutual written consent of Parent and Andrew, if the Board of Directors of each so determines;

(b)    by written notice of either Parent or Andrew (as authorized by the Board of Directors of Parent or Andrew, as applicable):

(i)    if the Merger shall not have been consummated by December 31, 2007 (the "Outside Date"), *provided, however*, that if (x) the Effective Time has not occurred by such date by reason of nonsatisfaction of any of the conditions set forth in Section 7.1(b), Section 7.1(c), Section 7.1(d) or Section 7.1(e) and (y) all other conditions set forth in Article VII have been satisfied or waived or are then capable of being satisfied, then such date shall automatically be extended to March 31, 2008 (which shall then be the Outside Date); *provided, further* that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to any party whose failure to fulfill in any material respect any obligation of such party, or satisfy any condition to be satisfied by such party, under this Agreement has caused or resulted in the failure of the Effective Time to occur on or before the Outside Date;

(ii)    if a Governmental Entity of competent jurisdiction shall have issued an order, decree or ruling or taken any other action (including the failure to have taken an action), in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Merger, which order, decree, ruling or other action is final and nonappealable;

(iii)    if the Andrew Stockholder Approval shall not have been obtained at the Andrew Stockholders' Meeting, or at any adjournment or postponement thereof, at which the vote was taken; *provided, however*, that the right to terminate this Agreement under this Section 8.1(b)(iii) shall not be available to Andrew if the failure to obtain the Andrew Stockholder Approval shall have been caused by the action or failure to act of Andrew and such action or failure to act constitutes a breach by Andrew of this Agreement;

(c)    by Parent (as authorized by its Board of Directors) upon (i) a breach of any representation or warranty on the part of Andrew set forth in this Agreement, or if any representation or warranty of Andrew shall have become untrue, in either case such that the conditions set forth in Section 7.2(a) would not be satisfied as of the time of such

**B 58**

breach or as of the time such representation or warranty shall have become untrue and such inaccuracy in Andrew's representations and warranties has not been or is incapable of being cured by Andrew within 30 calendar days after its receipt of written notice thereof from Parent or (ii) a failure to perform, or comply with, in all material respects any covenant or agreement of Andrew set forth in this Agreement such that the conditions set forth in Section 7.2(b) would not be satisfied and such failure by Andrew has not been or is incapable of being cured by Andrew within 30 calendar days after its receipt of written notice thereof from Parent;

(d)    by Andrew (as authorized by its Board of Directors) upon (i) a breach of any representation or warranty on the part of Parent set forth in this Agreement, or if any representation or warranty of Parent shall have become untrue, in either case such that the conditions set forth in Section 7.3(a) would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue and such inaccuracy in Parent's representations and warranties has not been or is incapable of being cured by Parent within 30 calendar days after its receipt of written notice thereof from Andrew or (ii) a failure to perform, or comply with, in all material respects any covenant or agreement of Parent set forth in this Agreement such that the conditions set forth in Section 7.3(b) would not be satisfied and such breach by Parent has not been or is incapable of being cured by Parent within 30 calendar days after its receipt of written notice thereof from Andrew;

44

**B 59**

(e)     by Parent (as authorized by its Board of Directors), at any time prior to the Andrew Stockholder Approval, if (i) Andrew shall have failed to hold the Andrew Stockholders' Meeting in accordance with Section 6.1(b) (A) on or before the date which is 75 calendar days after the date on which the SEC declared the Form S−4 effective or (B) in the event Andrew adjourns or postpones the Andrew Stockholder Meeting in accordance with the terms of Section 6.1(b), on or before the date that is five business days after the date that is 75 calendar days after the date on which the SEC declared the Form S−4 effective, (ii) Andrew shall have failed to include in the Proxy Statement distributed to the stockholders of Andrew its Board of Directors' recommendation that such stockholders approve and adopt this Agreement and approve the Merger, (iii) Andrew's Board of Directors shall have withdrawn, amended, modified or qualified such recommendation in a manner adverse to the interests of Parent, (iv) Andrew's Board of Directors shall have failed to reconfirm such recommendation within five business days of receipt of a written request from Parent to do so, (v) Andrew, Andrew's Board of Directors or any committee thereof shall have approved or recommended any Alternative Transaction, or (vi) Andrew or Andrew's Board of Directors shall have failed, within ten business days after any tender or exchange offer relating to Andrew Common Stock commenced by any third party shall have been first published, sent or given, to have sent to Andrew's security holders a statement disclosing that the Board of Directors of Andrew recommends rejection of such tender offer or exchange offer; or

(f)     by Andrew, at any time prior to the Andrew Stockholder Approval, if the Board of Directors of Andrew approves a Superior Proposal in accordance with Section 5.3 and authorizes Andrew to enter into a binding written agreement with respect to that Superior Proposal and, in connection with the termination of this Agreement and entering into the agreement reflecting the Superior Proposal, pays to Parent in immediately available funds the Termination Fee required to be paid by Section 8.3(a)(v).

8.2     <u>Effect of Termination</u>.  In the event of termination of this Agreement as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no liability on the part of any of the parties, *except that* (i) Section 6.2(c), Section 6.5, Section 6.11(e), this Section 8.2, Section 8.3, the second sentence of Section 8.4 and Section 8.5, as well as Article IX (other than Section 9.1) shall survive termination of this Agreement and continue in full force and effect, and (ii) that nothing herein, including any payment of a Termination Fee pursuant to Section 8.3, shall relieve any party from liability for any willful breach of any representation or warranty of such party contained herein or any willful breach of any covenant or agreement of such party contained herein.  No termination of this Agreement shall affect the obligations of the parties contained in the Confidentiality Agreements, all of which obligations shall survive termination of this Agreement in accordance with their terms.

8.3     <u>Payments</u>.

(a)     <u>Payment by Andrew</u>.

(i)     In the event that (A) this Agreement is terminated by Andrew or Parent pursuant to Section 8.1(b)(i) or 8.1(b)(iii), (B) following the date hereof and prior to such termination, any Person shall have made to Andrew or its stockholders, or publicly announced, a proposal, offer or indication of interest relating to any "<u>Acquisition</u>" ("Acquisition" shall have the same meaning as the defined term "Alternative Transaction" *except that* "50%" shall be substituted for "20%" in each instance where "20%" appears in such definition) with respect to Andrew, and (C) within 12 months following termination of this Agreement, an Acquisition of Andrew is consummated, then Andrew shall pay Parent a fee equal to $75,000,000.00 (the "<u>Termination Fee</u>") in immediately available funds; such fee payment to be made concurrently upon such consummation.

**B 60**

(ii)    In the event that (A) this Agreement is terminated by Parent pursuant to Section 8.1(c)(ii), (B) following the date hereof and prior to such termination, any Person shall have made to Andrew or its stockholders, or publicly announced, a proposal, offer or indication of interest relating to an Alternative Transaction with respect to Andrew and (C) Andrew's breach is willful or intentional and intended to facilitate, assist or otherwise benefit, or such breach has the effect of facilitating or assisting or otherwise benefiting, an Alternative Transaction or the Person making such Alternative Transaction, then Andrew shall pay Parent the Termination Fee in immediately available funds, such payment to be made within two business days of such termination.  Any breach

45

of the covenants contained in Section 5.2 shall be considered willful, intentional and intended to facilitate, assist or otherwise benefit an Alternative Transaction.

(iii)    In the event that (A) this Agreement is terminated by Parent pursuant to Section 8.1(e) and (B) the Board of Directors of Andrew has effected a Change of Recommendation as permitted by and in compliance with Section 5.3(a) or 5.3(c), then Andrew shall pay Parent the Termination Fee in immediately available funds; such fee payment to be made within one business day after such Change in Recommendation has been effected.

(iv)    In the event that (A) this Agreement is terminated by Parent pursuant to Section 8.1(e) and the Board of Directors of Andrew has not effected a Change of Recommendation as permitted by and in compliance with Sections 5.3(a) or 5.3(c), (B) following the date hereof and prior to such termination, any Person shall have made to Andrew or its stockholders, or publicly announced, a proposal, offer or indication of interest relating to any Acquisition with respect to Andrew, and (C) within 12 months following termination of this Agreement, an Acquisition of Andrew is consummated, then Andrew shall pay Parent the Termination Fee in immediately available funds; such fee payment to be made concurrently upon such consummation.

(v)    In the event that this Agreement is terminated by Andrew pursuant to Section 8.1(f) with respect to a Superior Proposal, then Andrew shall pay Parent the Termination Fee in immediately available funds and concurrently with such termination.

(b)    **Interest and Costs; Other Remedies**.  All payments under this Section 8.3 shall be made by wire transfer of immediately available funds to an account designated by Parent.  Each of Andrew and Parent acknowledges that the agreements contained in this Section 8.3 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other party hereto would not enter into this Agreement; accordingly, if Andrew fails to pay in a timely manner the amounts due pursuant to this Section 8.3 and, in order to obtain such payment, Parent makes a claim that results in a judgment against Andrew, Andrew shall pay to Parent its reasonable costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amounts set forth in this Section 8.3 at the rate of interest per annum publicly announced by Bank of America, N.A. as its prime rate at its principal office in New York, New York, as in effect on the date such payment was required to be made.  This entire Section 8.3 shall survive any termination of this Agreement.

8.4    **Amendment**.  Subject to compliance with Applicable Law, this Agreement may be amended by the parties in writing at any time before or after the Andrew Stockholder Approval; *provided, however,* that after the Andrew Stockholder Approval, there may not be, without further approval of the stockholders of Andrew, any amendment of this Agreement that changes the amount or the form of the consideration to be delivered to the holders of Andrew Common Stock hereunder, or which by law or NASDAQ rule otherwise expressly requires the further approval of such stockholders.  This Agreement may not be amended *except* by an instrument in writing signed on behalf of each of the parties hereto and duly approved by the parties' respective Boards of Directors or a duly

**B 61**

designated committee thereof.

8.5    **Extension; Waiver**.  At any time prior to the Effective Time, a party may, subject to the proviso of Section 8.4 (and for this purpose treating any waiver referred to below as an amendment), (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) waive any inaccuracies in the representations and warranties of the other parties contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance by the other party with any of the agreements or conditions contained in this Agreement.  Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  Any extension or waiver given in compliance with this Section 8.5 or failure to insist on strict compliance with an obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

46

Article IX
General Provisions

9.1    **Nonsurvival of Representations and Warranties**.  None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time.  This Section 9.1 shall not limit the survival of any covenant or agreement of the parties in this Agreement which by its terms contemplates performance after the Effective Time.

9.2    **Notices**.  All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed given if delivered personally, sent via facsimile (receipt confirmed) or sent by a nationally recognized overnight courier (providing proof of delivery) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    **if to Andrew to:**

Andrew Corporation
3 Westbrook Corporate Center
Westchester, IL 60154
Fax No: (708) 492−3823
Attention: Justin Choi, Senior Vice President and General Counsel
with a copy to:
Mayer, Brown, Rowe & Maw LLP
71 S. Wacker Drive
Chicago, IL 60606
Fax No: (312) 706−8164
Attention:    James T. Lidbury

(b)    **if to Parent or Merger Sub, to:**

CommScope, Inc.
1100 CommScope Place SE
Hickory, North Carolina 28603
Fax No: (828) 431−2520
Attention: Frank B. Wyatt, II, Senior Vice President and General Counsel
with a copy to:
Fried, Frank Harris, Shriver & Jacobson LLP
One New York Plaza

**B 62**

New York, NY 10004
Fax No: (212) 859−8000
Attention: Lois Herzeca

**9.3      Interpretation.   When a reference is made in this Agreement to an Article, Section or Exhibit, such reference shall be to an Article or Section of, or an Exhibit to, this Agreement unless otherwise indicated.   Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."   The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   References to a "Person" shall include references to an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.   All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.   The definitions contained in this Agreement are applicable to the**

47

**B 63**

singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.  All references to dollar amounts shall be to lawful currency of the United States.

9.4    **Knowledge**.  References to the "**Knowledge**" of a party to this Agreement shall mean, (i) in the case of Andrew, the actual knowledge of the Persons listed in Section 9.4 of the Andrew Disclosure Letter, and (ii) in the case of Parent and Merger Sub, the actual knowledge of the Persons listed in Section 9.4 of the Parent Disclosure Letter after due inquiry.

9.5    **Disclosure Letters**.  On or prior to the date of this Agreement, Parent has delivered to Andrew a disclosure letter (the "**Parent Disclosure Letter**") and Andrew has delivered to Parent a disclosure letter (the "**Andrew Disclosure Letter**").  Each Disclosure Letter sets forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in such Disclosure Letter relates; *provided, however*, that any information set forth in one section of a Disclosure Letter will be deemed to apply to each other Section or subsection of this Agreement to which its relevance is reasonably apparent; *provided*, further, that, notwithstanding anything in this Agreement to the contrary, the inclusion of an item in such section of the Disclosure Letter as an exception to a representation or warranty will not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would reasonably be expected to have a Material Adverse Effect on Parent or Andrew, as appropriate.

9.6    **Counterparts**.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

9.7    **Entire Agreement; No Third−Party Beneficiaries**.  This Agreement (including the Confidentiality Agreements and the documents and instruments referred to herein) (a) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement and (b) *except for* the provisions of Article II (which are intended to benefit the holders of Andrew Common Stock) and Section 6.4 (which are intended to benefit the Indemnified Parties, including Indemnified Parties who or which are not parties hereto), is not intended to confer upon any Person *other than* the parties any rights or remedies.

9.8    **Governing Law**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof.

**B 64**

9.9    **Assignment**.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by either of the parties hereto without the prior written consent of the other party.  Any assignment in violation of the preceding sentence shall be void.  Subject to the preceding two sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

9.10    **Consent to Jurisdiction**.  Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Delaware or any Delaware state court in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court *other than* a federal court sitting in the State of Delaware or a Delaware state court.

48

9.11    **Headings, etc**.  The headings and table of contents contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.12    **Severability**.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect, insofar as the foregoing can be accomplished without materially affecting the economic benefits anticipated by the parties to this Agreement.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by Applicable Law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

9.13    **Failure or Indulgence Not a Waiver; Remedies Cumulative**.  No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or of any other right.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

B 65

**9.14**     **Waiver of Jury Trial**.  EACH OF PARENT, MERGER SUB AND ANDREW HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HERBY OR THE ACTIONS OF PARENT, MERGER SUB OR ANDREW IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT.

**9.15**     **Specific Performance**.  The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any federal court located in the State of Delaware or in Delaware state court, this being in addition to any other remedy to which they are entitled at law or in equity.

*(Remainder of Page Intentionally Left Blank)*

49

IN WITNESS WHEREOF, Parent, Merger Sub and Andrew have caused this Agreement and Plan of Merger to be executed by their respective officers thereunto duly authorized, all as of the date first written above.

COMMSCOPE, INC.

By:     /s/ Frank M. Drendel
        Name: Frank M. Drendel
        Title: Chairman and Chief Executive Officer

DJROSS, INC.

By:     /s/ Jearld L. Leonhardt
        Name: Jearld L. Leonhardt
        Title: Executive Vice President

ANDREW CORPORATION

By:     /s/ Ralph E. Faison
        Name: Ralph E. Faison
        Title: President and Chief Executive Officer

S–1

**B 66**

EXHIBIT A

**CERTIFICATE OF INCORPORATION**
**OF**
**DJROSS, INC.**

1.    Name.  The name of the corporation is DJRoss, Inc..

2.    Registered Office and Registered Agent.  The address of the registered office of the corporation in Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, County of New Castle, and the name of its registered agent at that address is The Corporation Trust Company.

3.    Purpose.  The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

4.    Capital Stock.  The total number of shares that the corporation is authorized to issue is 1,000, par value $0.01 per share, all of which shares are designated as common stock.

5.    Incorporator.  The name the incorporator of the corporation is John Newsom and his mailing address is Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York, 10004.

6.    Bylaws.  The board of directors of the corporation is expressly authorized to adopt, amend or repeal bylaws of the corporation.

7.    Indemnification.

    *Section 1 Elimination of Certain Liability of Directors.*  A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

    *Section 2 Indemnification and Insurance.*

        (a)        Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the corporation or, if a director or officer of the corporation, is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the corporation to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than said law permitted the corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that except as provided in paragraph (b) hereof, the corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors

A–1

**B 67**

of the corporation. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the corporation the expenses incurred in defending any such proceeding in advance of its final disposition; provided, however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Section or otherwise. The corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the corporation with the same scope and effect as the foregoing indemnification of directors and officers.

      (b)     <u>Right of Claimant to Bring Suit</u>. If a claim under paragraph (a) of this Section is not paid in full by the corporation within thirty days after a written claim has been received by the corporation, the claimant may at any time thereafter bring suit against the corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the corporation. Neither the failure of the corporation (including its Board of Directors, stockholders or independent legal counsel) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the corporation (including its Board of Directors, stockholders or independent legal counsel) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

      (c)     <u>Non-Exclusivity of Rights</u>. The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, Bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

      (d)     <u>Insurance</u>. The corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law. Neither the amendment, modification or repeal of this article nor the adoption of any provision in this certificate of incorporation inconsistent with this article shall adversely affect any right or protection of a director or officer of the corporation with respect to any act or omission that occurred prior to the time of such amendment, modification, repeal or adoption.

8.    <u>Elections of Directors</u>. Elections of directors need not be by written ballot unless the bylaws of the corporation shall so provide.

A–2

**B 68**

**AMENDED AND RESTATED**
**BY–LAWS**
**OF**
**DJROSS, INC.**
ADOPTED
ON
June 25, 2007


B–1

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Article I. | Stockholders' Meetings | 1 |
| 1.1 | Place of Meetings | 1 |
| 1.2 | Annual Meeting | 1 |
| 1.3 | Special Meetings | 1 |
| 1.4 | Notice of Meetings | 1 |
| 1.5 | Quorum | 1 |
| 1.6 | Adjournment of Meetings | 1 |
| 1.7 | Voting List | 1 |
| 1.8 | Vote Required | 1 |
| 1.9 | President; Secretary | 2 |
| 1.10 | Record Date | 2 |
| 1.11 | Written Consent | 2 |
| Article II. | Directors | 2 |
| 2.1 | Number and Qualifications | 2 |
| 2.2 | Term of Office | 2 |
| 2.3 | Resignation | 2 |
| 2.4 | Vacancies | 2 |
| 2.5 | Regular Meetings | 2 |
| 2.6 | Special Meetings | 2 |
| 2.7 | Notice | 2 |
| 2.8 | Quorum | 2 |
| 2.9 | Vote Required | 3 |
| 2.10 | Action Without a Meeting | 3 |
| 2.11 | Use of Communications Equipment | 3 |
| Article III. | Officers | 3 |
| 3.1 | Offices Created; Qualifications; Election | 3 |
| 3.2 | Term of Office | 3 |
| 3.3 | Removal of Officers | 3 |
| 3.4 | Resignation | 3 |
| 3.5 | Vacancies | 3 |
| 3.6 | Powers | 3 |
| 3.7 | President | 3 |
| 3.8 | Secretary | 3 |
| Article IV. | Capital Stock | 3 |
| 4.1 | Uncertificated Stock | 3 |
| 4.2 | Registration | 4 |
| 4.3 | Transfer of Shares | 4 |
| Article V. | General Provisions | 4 |
| 5.1 | Fiscal Year | 4 |
| 5.2 | Corporate Seal | 4 |
| 5.3 | Amendment of Bylaws | 4 |

i

**B 70**

**AMENDED AND RESTATED**
**BY−LAWS**
**OF**
**DJROSS, INC.**
**Article I.  Stockholders' Meetings**

1.1 _Place of Meetings_. Meetings of the stockholders shall be held at such place, either within or without the State of Delaware, as the board of directors shall determine.

1.2 _Annual Meeting_. The annual meeting of the stockholders for the election of the directors and the transaction of such other business as may properly be brought before the meeting shall be held on the date and at the time designated by the board of directors.

1.3 _Special Meetings_. Special meetings of the stockholders for any purpose or purposes may be called only by the board of directors.  The business to be transacted at any special meeting shall be limited to the purposes stated in the notice.

1.4 _Notice of Meetings_. Notice of the place, if any, date and hour of any stockholders' meeting shall be given to each stockholder entitled to vote.  Notice of a special meeting shall also state the purpose or purposes for which the meeting has been called.  Unless otherwise provided in the General Corporation Law of the State of Delaware (the "_General Corporation Law_"), notice shall be given at least 10 days but not more than 60 days before the date of the meeting.

1.5 _Quorum_. The presence, in person or by proxy, of the holders of a majority of the voting power of the stock entitled to vote at a meeting shall constitute a quorum.  In the absence of a quorum, either the president or the holders of a majority of the voting power of the stock present, in person or by proxy, and entitled to vote at the meeting may adjourn the meeting in the manner provided in Section 1.6 until a quorum shall be present.  A quorum, once established at a meeting, shall not be broken by the withdrawal of the holders of enough voting power to leave less than a quorum.  If a quorum is present at an original meeting, a quorum need not be present at an adjourned session of that meeting.

1.6 _Adjournment of Meetings_. Either the president or the holders of a majority of the voting power of the stock present, in person or by proxy, and entitled to vote at the meeting may adjourn any meeting of stockholders from time to time.  At any adjourned meeting the stockholders may transact any business that they might have transacted at the original meeting.  Notice of an adjourned meeting need not be given if the time and place, if any, are announced at the meeting so adjourned, except that notice of the adjourned meeting shall be required if the adjournment is for more than 30 days or if after the adjournment a new record date is fixed for the adjourned meeting.

1.7 _Voting List_. At least 10 days before every meeting of the stockholders, the secretary of the corporation shall prepare a complete alphabetical list of the stockholders entitled to vote at the meeting showing each stockholder's address and number of shares.  For a period of at least 10 days before the meeting, the voting list shall be open to the examination of any stockholder for any purpose germane to the meeting during ordinary business hours at the corporation's principal place of business.  The voting list shall be produced and kept at the place of meeting during the whole time of the meeting, and any stockholder may inspect the voting list at any time during the meeting.

1.8 _Vote Required_. Subject to the provisions of the General Corporation Law requiring a higher level of votes to take certain specified actions, the stockholders shall take action on all matters other than the election of directors by a majority of the voting power of the stock present, in person or by proxy, at the meeting and entitled to

**B 71**

vote on the matter. The stockholders shall elect directors by a plurality of the voting power of the stock present, in person or by proxy, at the meeting and entitled to vote on the matter.

1.9     President; Secretary. The president shall preside over any meeting of the stockholders, and the secretary shall keep official records of all such meetings. In the absence of the secretary, the president may appoint any person to act as secretary of the meeting.

1.10     Record Date. If the corporation proposes to take any action for which the General Corporation Law would permit it to set a record date, the board of directors may set such a record date as provided under the General Corporation Law.

1.11     Written Consent. Any action required or permitted to be taken at a meeting of the stockholders may be taken without a meeting, without prior notice and without a vote by means of a stockholder written consent meeting the requirements of the General Corporation Law. Prompt notice of the taking of action without a meeting by less than a unanimous written consent shall be given to those stockholders who have not consented as required by the General Corporation Law.

## Article II. Directors

2.1     Number and Qualifications. The board of directors shall consist of such number as may be fixed from time to time by resolution of the board of directors. Directors need not be stockholders.

2.2     Term of Office. Each director shall hold office until his or her successor is elected or until his or her earlier death, resignation or removal.

2.3     Resignation. A director may resign at any time by giving notice in writing to the corporation addressed to the board of directors, the president or the secretary. A resignation will be effective upon its receipt by the corporation unless the resignation specifies that it is to be effective at some later time or upon the occurrence of some specified later event.

2.4     Vacancies. Any vacancy in the board of directors, including a vacancy resulting from an enlargement of the board of directors, may be filled by a vote of the majority of the remaining directors, although less than a quorum, or by a sole remaining director. A director appointed by the board of directors shall hold office for the remainder of the term of the director he or she is replacing.

2.5     Regular Meetings. The board of directors may hold regular meetings without notice at such times and places as it may from time to time determine.

2.6     Special Meetings. Special meetings of the board of directors may be called by the president or by any director. Notice of any special meeting shall be given to each director and shall state the time and place for the special meeting.

2.7     Notice. Any time it is necessary to give notice of a board of directors' meeting, notice shall be given (i) in person or by telephone to the director at least 24 hours in advance of the meeting or (ii) by personally delivering written notice to the director's last known business or home address at least 48 hours in advance of the meeting. Notice of a meeting need not be given to any director who attends a meeting without protesting prior to the meeting or at its commencement the lack of notice to that director. A notice of meeting need not specify the purposes of the meeting.

2.8     Quorum. A majority of the directors in office at the time shall constitute a quorum. Thereafter, a quorum shall be deemed present for purposes of conducting business and determining the vote required to take action for so long as at least a third of the total number of directors are present. In the absence of a quorum, the directors present may adjourn the meeting without notice until a quorum shall be present, at which point the meeting may be held.

2

**B 72**

2.9     <u>Vote Required</u>.  The board of directors shall act by the vote of a majority of the directors present at a meeting at which a quorum is present.

2.10     <u>Action Without a Meeting</u>.  Any action required or permitted to be taken at any meeting of the board of directors may be taken without a meeting if all of the directors consent to the action in writing.  The writing or writings shall be filed with the minutes of the proceedings of the board of directors.

2.11     <u>Use of Communications Equipment</u>.  Directors may participate in meetings of the board of directors by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting in this manner shall constitute presence in person at the meeting.

### Article III.  Officers

3.1     <u>Offices Created; Qualifications; Election</u>.  The corporation shall have a president, a secretary and such other officers, if any, as the board of directors from time to time may appoint.  Any officer may be, but need not be, a director or stockholder.  The same person may hold any two or more offices.  The board of directors may elect officers at any time.

3.2     <u>Term of Office</u>.  Each officer shall hold office until his or her successor has been elected, unless a different term is specified in the resolution electing the officer, or until his or her earlier death, resignation or removal.

3.3     <u>Removal of Officers</u>.  Any officer may be removed from office at any time, with or without cause, by the board of directors.

3.4     <u>Resignation</u>.  An officer may resign at any time by giving notice in writing to the corporation addressed to the board of directors, the chairperson of the board of directors, the president or the secretary.  A resignation will be effective upon its receipt by the corporation unless the resignation specifies that it is to be effective at some later time or upon the occurrence of some specified later event.

3.5     <u>Vacancies</u>.  A vacancy in any office may be filled by the board of directors.

3.6     <u>Powers</u>.  Unless otherwise specified by the board of directors, each officer shall have those powers and shall perform those duties that are (i) set forth in these bylaws, (ii) set forth in the resolution of the board of directors electing that officer or any subsequent resolution of the board of directors with respect to that officer's duties or (iii) commonly incident to the office held.

3.7     <u>President</u>.  The president shall be subject to the direction and control of the board of directors and shall have general active management of the business, affairs and policies of the corporation.  The president shall preside at all meetings of the stockholders and directors.  The president shall have the power to sign all certificates, contracts and other instruments on behalf of the corporation.  If the board of directors has not elected a chief executive officer, the president shall be the chief executive officer.

3.8     <u>Secretary</u>.  The secretary shall, to the extent practicable, attend all meetings of the stockholders and the board of directors.  The secretary shall record the proceedings of the stockholders and the board of directors, including all actions by written consent, in a book or series of books to be kept for that purpose.  The secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors.  The secretary shall keep or cause to be kept the stock and transfer records of the corporation.  The secretary shall have such other powers and duties as the board of directors or the president may determine.

### Article IV.  Capital Stock

4.1     <u>Uncertificated Stock</u>.  All shares of the corporation's common stock shall be uncertificated.

3

**B 73**

4.2     <u>Registration</u>.  The name of each person owning a share of the corporation's capital stock shall be entered on the books of the corporation together with the number of shares owned and the dates of issue.  The corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes regardless of any transfer, pledge or other disposition of such stock until the shares have been properly transferred on the books of the corporation.

4.3     <u>Transfer of Shares</u>.  Registration of transfer of shares of the corporation's stock shall be made only on the books of the corporation at the request of the registered holder.  The board of directors may make further rules and regulations concerning the transfer and registration of shares of stock.

**Article V.  General Provisions**

5.1     <u>Fiscal Year</u>.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

5.2     <u>Corporate Seal</u>.  The corporation shall have no seal.

5.3     <u>Amendment of Bylaws</u>.  These bylaws, including any bylaws adopted or amended by the stockholders, may be amended or repealed by the board of directors.

4

**B 74**

10/16/2007 02:24 PM
To
                    <slr_civil@ded.uscourts.gov>
cc
                    "Ingersoll, Josy" <jingersoll@ycst.com>, "Michael Parks"
<mparks@kirkland.com>, "Jason Choy" <JChoy@kirkland.com>,
<kmilsark@woodcock.com>, "Lundgren, Andrew" <alundgren@ycst.com>
Subject
                    RE: TruePosition v. Andrew, C.A. No. 05-747-SLR



Dear Judge Robinson:

This email is in response to Andrew's request that the Court reconsider
Andrew's equitable defenses and allow additional briefing concerning
those defenses. The Court should reject that request.

A jury has rendered a verdict in favor of TruePosition, and against
Andrew, on all counts, including factual findings that resolve both the
legal and equitable issues between the parties. Based on those findings,
the Court entered judgment in TruePosition's favor in the amount of
$45,300,000.00, and, since then, the Court has entered a briefing
schedule that gives the parties a fair opportunity to brief any timely
filed post-trial motions. The Court should not allow additional
post-trial briefing that seeks to overturn the Court's judgment based
upon "equitable" issues that Andrew has now raised for the first time
after the expiration of the ten day post-judgment window for filing
JMOLs. Nor does the Court need to reconsider the exercise of its
equitable discretion in favor of Andrew, a party that the jury has found
to have repeatedly acted inequitably.

Respectfully,
James D. Heisman (2746)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
Tel: 302.888.6216
Fax: 302.252-4209
Email: jdh@cblhlaw.com


**B 75**