## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-747-SLR |
| | ) |
| ANDREW CORPORATION, | ) |
| | ) |
| Defendant. | ) |

James D. Heisman, Esquire of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Paul B. Milcetic, Esquire, Gary H. Levin, Esquire, Lynn B. Morreale, Esquire, Daniel J. Goettle, Esquire, and Amanda M. Kessel, Esquire of Woodcock Washburn LLP, Philadelphia, Pennsylvania.

Josy W. Ingersoll, Esquire, John W. Shaw, Esquire and Andrew A. Lundgren, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: John M. Desmarais, Esquire, Gregory S. Arovas, Esquire and Todd Friedman, Esquire of Kirkland & Ellis LLP, New York, New York, and Avinash S. Lele, Esquire of Kirkland & Ellis LLP, Chicago, Illinois.

## MEMORANDUM OPINION

Dated: April 30, 2009
Wilmington, Delaware


**ROBINSON, District Judge**

## I. INTRODUCTION

This matter comes before the court on plaintiff's motions for an accounting and for entry of a final injunction (D.I. 395) and for relief from the court's August 1, 2008 order pursuant to Rule 60(b) (D.I. 397). Having reviewed the parties' submissions, and having heard oral argument on these issues, the court: (1) grants the motions; (2) orders that defendant shall remit $10,054,753 in additional infringement damages; (3) awards plaintiff $ 9,626,707 in punitive damages; and (4) awards plaintiff its reasonable attorney fees and costs in connection with the motions at bar, as discussed below.

## II. BACKGROUND

TruePosition, Inc. ("plaintiff") filed this patent infringement action against Andrew Corporation ("defendant") on October 25, 2005, alleging infringement of plaintiff's U.S. Patent No. 5,327,144 ("the '144 patent"), whereby plaintiff alleged that defendant's system for locating cellular telephones, called the Geometrix® Wireless Location System, infringes claims 1, 2, 22, 31 and 32 of the '144 patent. (D.I. 1) The technology at issue has been discussed in the court's prior opinions. As relevant to the motions at bar, Geometrix® contains two major components: a central computer, and the "LMU," or the unit installed on the cell tower. LMUs calculate the time difference of arrival ("TDOA") of a signal omitted from the cellular telephone and received on multiple towers. The TDOA values are compared by the central computer to determine the location of a cell phone. The LMUs run operating software that is downloaded from the central computer; the software is loaded on the central computer via the internet. At

2

issue during the trial in this case was defendant's version 2005.2.1000 operating system software. Prior to trial in May 2007, defendant installed version 2006.0.4 software to replace the 2005.2.1000 operating software.

A jury trial was held between September 1 and 14, 2007. On September 14, 2007, a jury found that defendant's Geometrix® system (utilizing version 2005.2.1000 software) directly infringed claims 1 and 31 of the '144 patent and contributed to and induced the infringement of claims 1, 22 and 31 of the '144 patent.[1] (D.I. 293) The jury also found that defendant's infringement was willful, and awarded $45.3 million in damages. (Id.) This was the total lost profits damages award sought by plaintiff, reflecting plaintiff's bid on all phases of a five-phase contract with Saudi Telecom ("STC"), a major customer in Saudi Arabia. As of trial, defendant had been awarded a rollout of sites for phases 1 and 2 of the STC contract, and had received a commitment for phase 3.

At trial, Mr. Hoberlein, defendant's damages expert, stated that "we've just commenced delivery of phase [3]." (D.I. 305 at 1865) He later backpeddled on the issue, stating that "[t]here has been a phase 3 that has been committed . . . . [a]t this point in time, I don't think anyone has any knowledge of what the sites would be or what the equipment is that is going to be shipped in accordance with [phase 3]." (Id. at 1906-

---

[1]As discussed in the court's previous opinions, defendant's Geometrix® system comprises a "positioning determining entity" ("PDE") that is overlaid on regular cellular network equipment. Using an uplink time difference of arrival ("UTDOA") technique, the Geometrix® PDE locates signals sent over a standard dedicated control ("SDC") channel (when a user is not on a call) or a traffic channel ("TCH") channel (when a user is on a call). The jury found that Geometrix®'s location of signals using UTDOA/SDCCH infringes the '144 patent.

3

07) Mr. Hoberlein further explained that he was "not aware of any knowledge that says what's going to be installed or how many phases will be installed. We do know there's [a dollar] amount. We just don't know what it relates to and whether it will even be infringing." (*Id.* at 1933-34)

Plaintiff's expert, Ms. Mulhern, calculated damages based on 983 sites, 600 for phase 1 and 383 for phase two, or the number of sales to STC defendant completed through February 2006. Prior to trial, however, defendant shipped an additional 21 units in connection with phase 2, bringing the total number of shipped units for phase 2 to 404. Defendant avers that plaintiff was made aware of this additional shipment of 21 units by the disclosure of DTX-811, a non-admitted trial exhibit. DTX-811 is a spreadsheet entitled "Phase II Implementation Budget – UPL," reflecting a total number of 404 units and monetary value for the "year 2007." (D.I. 410 at A10) Apparently opting not to rely on this "budget" as conclusive evidence of additional phase 2 sales, plaintiff's expert testified at trial that "[a]s of the time of my report, I thought that number – the evidence showed that that number was 383. Recent evidence that Andrew provided suggested that number might be 404[.]" (D.I. 303 at 1194)

Plaintiff's position at trial was that, although subject to a multi-part confirmation process, STC was effectively (though not legally) foreclosed from switching vendors between phases of the contract. Plaintiff sought damages of $45.3 million, a number derived from the original award for all five phases, and the jury awarded this amount. In its post-trial papers filed November 1, 2007, defendant argued for a remittur of the $45.3 million verdict as "too speculative to stand," stating that STC had not yet committed to "any particular type of equipment, any number of cell sites, or any other

4

commitment for particular goods or services" in connection with phase 3, and "there is no evidence of what type of equipment STC will actually purchase for phase 3." (D.I. 327 at 10, 72-73) However, defendant had shipped 100 units of phase 3 to STC on or about August 9, 2007. (D.I. 399, ex. 4 at 7; id., ex. 6 at 166; D.I. 404 at 11)

At oral argument before the court on February 29, 2008, defendant repeatedly represented that no phase 3 shipments had been made as of the September 2007 trial. (D.I. 372 at 73 ("[A]s of the date of the jury trial, three of the five phases hadn't – still hadn't been shipped"); 82-83 ("As of the date of trial, how many went out? 983 of the 4300 units have gone out the door. . . [plaintiff] ask[s] for compensatory damages on [products that] still have not gone out the door"); see also D.I. 371, ex. B at 3 (presentation slide showing 983 sites delivered as of trial)) Defendant also took the position, as it had at trial, that practicing the '144 patent is the only way to implement the industry standard, impeding any design-around. (D.I. 372 at 74; D.I. 371)

Defendant shipped the remaining 360 units of phase 3 to STC on June 16, 2008. (D.I. 399 at ex. 4, p.7) On August 1, 2008, the court issued its post-trial opinion in which it remitted the jury award to $18.6 million. The $18.6 million base award represented actual damages from defendant's sales of infringing Geometrix® product to STC. Plaintiff established at trial the defendant had shipped product for implementation at 983 cellular telephone sites, or phases 1 and 2 of the STC contract, through February 2006. The actual damages for these sales was established by plaintiff's expert to be $18.6 million. (D.I. 373 at 40) As the court noted in its post-trial opinion, defendant had been awarded a commitment for phase 3 of the STC contract; the maximum value of this commitment was known, but "the number of sites and precise

5

nature and quantity of the equipment to be supplied were not settled as of trial." (Id.) The court enjoined defendant from making any additional sales to STC (id. at 58), and ordered a more detailed permanent injunction order to be submitted for the court's review by August 27, 2008. (D.I. 374)

The court also increased the damages by 25% to $23,250,000 due to defendant's willful infringement, and awarded prejudgment and post-judgment interest.[2] (D.I. 373, 374) Applying the factors iterated in Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992) (hereinafter, "Read") and taking into account the conduct of the parties, the court's decision to award enhanced damages was based upon the following factors: (1) defendant was aware of (and familiar with) the '144 patent prior to suit; (2) there was no testimony or evidence regarding why defendant believed Geometrix® did not meet the limitations of the '144 patent; (3) defendant is a large and lucrative corporation; (4) defendant's infringement "commenced well after defendant first became aware of the '144 patent (and, in fact, asserted it as a prior art reference in [prior] litigation) and continue[d] despite the instant litigation"; (5) defendant did not stop its supply of infringing product to STC, even after the jury verdict; and (6) the harm to plaintiff caused by infringement by defendant, a direct competitor in a highly competitive two-supplier industry, was obvious and foreseeable. (D.I. 373 at 45-51) The court noted, but did not award sanctions based upon, defendant's "borderline unacceptable" litigation behavior. (Id. at 47-48)

Unbeknownst to the court, at the time of its post-trial opinion, defendant had not

---

[2]The court later amended its order with respect to the calculation of post-judgment interest. (D.I. 389, 390)

only shipped the final 360 phase 3 systems (on June 16, 2008), but had installed (or

begun installation of) 188 of the phase 3 units in Saudi Arabia. (D.I. 399, ex. 6 at 149-

50)

The court's post-trial opinion issued on Friday, August 1, 2008. On Monday,

August 4, 2008, several emails were sent amongst defendant's employees regarding

the implementation of version 2008.1.1 software. The first of these provided by plaintiff

states the following:

> Based on a long discussion this evening, there is significant interest in the 8.1 work around. I need [ ] tomorrow a first pass plan that details how quickly we can download the new version of [software] into 1. The 188 units of phase 3 installed or in the process of installation, and 2. The 272 units in our control in the warehouse. The goal would be to install the updated [software] by [A]ug. 27. Can we do this? What resources would be required? Need to know the [R & D] timeline, required [engineering] support from [A]shburn and local tech[.] support in [S]audi [Arabia]. Will need to be prepared to start this week if possible.

(D.I. 422, ex. 26) A responsive email indicates that "the [paperwork] has not been

submitted to STC to even start the approval process. I think we have the desperation

factor now to drive the in-country team to submit it now, so let's work to make that

happen." (Id.) Three "scenarios" were later discussed:

1. Scenario 1 – complete the phase 3 deployment.
   a. Assumes the product is not differen[t], so incorporates the increase in the judgment to be paid[.]
   b. Assumes we can install the design alternatives, but the sites installed to date would be subject to the penalties associated with the old product[.]
   c. Assumes all of phase 3 can take advantage of the design alternatives[.]

2. Scenario 2 – stop the phase 3 deployment and remove any uninstalled equipment and return the LMU's[.]

3. Scenario 3 – stop the phase 3 delopyment and remove all LMU's in the network[.]
   a. Assumes STC would try to apply pressure for us to uninstall and return

7

> the money for phase 1 and 2[.]
> b. Assumes STC would not be able to ask for the phase 1 and 2 money
> back and would pay for uninstall services[.]

(Id., ex. 27)

Apparently, defendant opted for "scenario 1." Defendant uploaded version

2008.1.1 to the central computer on August 15, 2008. (D.I. 410 at A141-42) It appears

that version 2008.1.1 was upgraded on the Nokia LMUs on August 16, 2008, while the

remainder of the LMUs were upgraded by August 27, 2008. (Id. at A144, A164)

Defendant concedes that its version 2006.0.4 software is **not** more than

colorably different from its infringing version 2005.2.1000 software. (D.I. 404 at 7) The

2006.0.4 software was the version in place when all 460 phase 3 units were shipped to

STC.[3] (Id. at 5) Defendant also admits that 125 units were installed in Saudi Arabia at

a time when infringing 2006.0.4 software was being utilized. (4/2/09 Tr. at 55) It

contends, however, that 335 units of phase 3 were installed at a time when they would

automatically download 2008-version software. (Id.) That is, these 335 units never

actually operated using the version 2006.0.4 software.[4] The 360 phase 3 systems

shipped on June 16, 2008 were pre-loaded[5] with older software, characterized as

---

[3]The 2006.0.4 operating software was in use, therefore, from May 2007 to
August 27, 2008. (D.I. 399, ex. 6 at 169) Version 2008.1.2 was introduced in January
2009. (Id.)

[4]Certain units installed on towers having Nokia equipment were not capable of
performing control channel location with any operating software version until an
interoperability issue was resolved.

[5]Preloading software enables the unit to communicate with the system when it is
turned on, at which point the central computer automatically updates the unit with the
version of software then running on the system.

8

version 2005.2.1 software.[6] (D.I. 404 at 11)

A teleconference was held with the court on September 5, 2008 to discuss the proposed permanent injunction language. During the teleconference, defendant's counsel indicated to the court that defendant had shipped product under phase 3 of the contract to STC between the time of trial and the date of the court's order. (D.I. 399, ex. 18 at 3) Defendant suggested that the product shipped for phase 3 was non-infringing.[7] (*Id.* at 4) Additional discovery was permitted and the parties entered into a briefing schedule regarding a post-trial accounting and damages. (*Id.* at 9; D.I. 386) Plaintiff filed its motion for an accounting and for entry of a final injunction (D.I. 395) and motion under Rule 60(b) for relief from the court's August 1, 2008 order (D.I. 397) pursuant to that schedule.

The court heard oral argument on the motions at bar on April 2, 2009. At the hearing, the court ordered that the parties provide, for the court's review, the parties' communications regarding phase 3 and their post-trial discovery. Specifically, the court sought substantiation of defendant's claim that plaintiff was aware of, or should have been aware of, defendant's shipment of phase 3.

The documents provided to the court indicate that plaintiff was "surprised to

[6]The trial testimony defendant cites on this point does not clearly indicate what version was preloaded on the phase 3 units. (D.I. 404 at 11, citing D.I. 301 at 767 & 846) On February 20, 2009, Andrew Beck, Director of Product Development for defendant's successor company CommScope, Inc., testified (in connection with the current motions) that version 2005.2.1 was the version preloaded onto the last 360 units of phase 3. (D.I. 411 at A506, p. 22-23) Plaintiff does not dispute this point in its reply brief. (D.I. 421)

[7]Whether defendant's 2008.1.1 or 2008.1.2 infringes is ultimately an issue to be decided in future proceedings.

9

learn" on August 25, 2008 that phase 3 had shipped. (D.I. 426, ex. 5, 7) Plaintiff
propounded interrogatories and document requests during the court-ordered
supplemental discovery period relating to defendant's shipments and contentions.
Following several extensions of time (*id.*, ex. 19, 21), responses were provided in
November 2008. On November 21, 2008, plaintiff expressed concern that defendant's
responses omitted "the specifics of its alleged redesign and the number of units it had
shipped since the jury's verdict." (*Id.*, ex. 26) Upon reviewing the discovery, plaintiff
subsequently asked defendant to confirm that at least 188 phase 3 shipments had been
installed. (*Id.* at 27) Defendant maintained that plaintiff's discovery requests were
overbroad, resulting in the delays in production (*id.*, ex. 29) and confirmed, on
December 12, 2008, that 188 phase 3 systems had shipped but stated that the units
"contained different software than the adjudicated units" (*id.*, ex. 31). Defendant
produced 200,000 pages of discovery pertaining to its alleged design-around (software
version 2008.1.1) on December 16, 2008[8] and supplemental interrogatory responses
shortly thereafter. (*Id.*, ex. 33, 34, 36 (December 2008), ex. 39 (January 2009), ex. 80
(February 2009)) Following several requests, defendant declined to indicate whether it
would rely on an advice of counsel defense with respect to willful infringement in
connection with its phase 3 shipments. (*See, e.g., id.*, ex. 75)

## III. STANDARD

Federal Rule of Civil Procedure Rule 60(b) provides that a party may file a

---

[8]A 135-page privilege log followed in January 2009. (D.I. 426, ex. 64) Plaintiff
objected on the basis that attorneys were not consistently identified and several subject
descriptions were omitted.

10

motion for relief from a final judgment for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence by which due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. Fed.R.Civ.P. 60(b). A motion filed pursuant to Rule 60(b) is addressed to the sound discretion of the trial court guided by accepted legal principles applied in light of all relevant circumstances. *Pierce Assoc. Inc., v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1988).

## IV. DISCUSSION

### A. Quantification of Additional Infringing Systems

#### 1. Phase 2 systems

The parties ultimately agree that the proper measure of damages in this case relates to 404 phase 2 systems and should be assessed at $428,046 (inclusive of interest) for the 21 additional systems. (D.I. 426) The parties' arguments regarding phase 2 focus on whether defendant disclosed this additional shipment to plaintiff prior to trial.

There is an indication that plaintiff's damages expert saw, prior to trial, documents relating to STC's purchase of additional phase 2 Geometrix® systems. Ms.

11

Mulhern testified that the total number of phase 2 systems "might be 404," and also confirmed that defendant's total revenue for phase two was about "$10.7 million,"[9] a total reflected on DTX-808 as including 380 systems plus 25 components described only as "not released on GPA." DTX-808 is a non-admitted trial exhibit entitled "STC Committments – Phase 2." Defendant states that the entry of 25 "not released on GPA" components represents 24 systems and a spare parts and maintenance component, bringing the total number to 404 (380 + 24) phase 2 systems. Again, Ms. Mulhern based her testimony on a base total of 383 shipped phase 2 systems.

Defendant points to no document that, on its face, affirmatively informs plaintiff that 21 additional phase 2 systems had shipped prior to trail. Defendant did not directly communicate this development to plaintiff. On this record, Ms. Mulhern's failure to use 404 systems as her base number for phase 2 damages is understandable. In fact, had Ms. Mulhern proffered a damages figure based on 404 phase 2 systems, defendant could have objected that her opinion was not based on proper foundation.

In view of the foregoing, and the parties' agreement in principal, the court awards plaintiff additional lost profits damages for the 21 additional infringing phase 2 systems shipped to STC.[10]

_____

[9](D.I. 303 at 1194-95)

[10]In its papers, plaintiff focuses on Rules 60(b)(2) and 60(b)(3). Plaintiff brings its motion generally under Rule 60(b) (D.I. 397), and the court exercises its broad authority under Rule 60(b)(6) to award additional infringement damages in this case. The court need not, therefore, engage in the exercise in determining whether the evidence regarding defendant's additional shipments "would probably have changed the outcome of the trial" or whether defendant's conduct prevented plaintiff from "fully and fairly" presenting its case. See Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F. 3d 302, 309 (3d Cir. 2001) (iterating Rule 60(b)(2) standard) (citation omitted); Stridiron v. Stridiron,

12

## 2. Phase 3 systems

The parties seek resolution of whether 335 phase 3 Geometrix® systems –

shipped while version 2006.0.4 software was operative but installed when version

2008.1.1 software was operative – infringes and, if so, whether plaintiff is due punitive

damages for defendant's infringing shipment. As indicated previously, defendant

shipped a total of 460 systems in connection with phase 3. Defendant concedes that

125 units of phase 3 are infringing; that is, they were shipped and installed for use at a

time when the Geometrix® central computer was operating with version 2006.0.4

software, which is not colorably different than the 2005.2.1000 version software

adjudicated to be infringing. (4/2/09 Tr. at 55) Defendant asserts that, regardless of

the date it shipped the systems, the remaining 335 phase 3 systems were intended to

be used only with version 2008.1.1 software, which it asserts is noninfringing.

35 U.S.C. § 271(f)(2) provides:

Whoever without authority supplies or causes to be supplied in or from the
United States any component of a patented invention that is especially made or
especially adapted for use in the invention and not a staple article or commodity
of commerce suitable for substantial noninfringing use, where such component is
uncombined in whole or in part, knowing that such component is so made or
adapted and intending that such component will be combined outside of the
United States in a manner that would infringe the patent if such combination
occurred within the United States, shall be liable as an infringer.

"On its face, 271(f)(2) requires that the infringer only intend[ ] that such component will

be combined. At no point does the statutory language require or suggest that the

infringer must actually combine or assemble the components. A party can intend that a

shipped component will ultimately be included in an assembled product even if the

698 F. 2d 204, 207 (3d Cir. 1983) (iterating Rule 60(b)(3) standard).

combination never occurs." *Waymark Corp. v. Porta Systems Corp.*, 245 F.3d 1364, 1367-68 (Fed. Cir. 2001).

The determination of whether defendant infringed the '144 patent by shipping the Geometrix® systems for phase 3 hinges upon whether defendant intended, when it shipped the 360 phase 3 Geometrix® systems on June 16, 2008, for those systems to run the 2006.0.4 software in place on June 16, 2008 or intended them to run 2008.1.1 software not yet in place.[11] The following is a synopsis of defendant's evidence in this regard: (1) on December 7, 2007, one of defendant's employees emailed another asking "when is the expected target date for the 2008.1 release" and "[w]hen will it be available for STC?" (D.I. 410 at A75); (2) a "2008.1 Preliminary Project Plan," dated January 23, 2008, indicates that the coding of version 2008.1 began in January or February 2008 (*id.* at A96); (3) on March 16, 2008, STC was listed in an internal email as a "forecast[ed]" "initial customer" for version 2008.1 and capitalization and revenue projections were still being completed at that time (*id.* at A54-55); (4) a "Release 2008.1 software capitalization" memorandum listed the "[d]evelopment period" for the program as "March 5, 2008 – June 6, 2008" while not providing a release date (*id.* at A21-23); (5) an April 2008 presentation states that "[d]esign alternatives" are "scheduled for completion in May" (*id.* at A25); (6) Andrew Beck wanted "testing of 2008.1" to be the "highest priority" as of May 20, 2008 (*id.* at A168); (7) on this same date, defendant's emails also reflected that"[a] decision has been made recently to deliver 2008.1 to all of our customers, including STC" and "[t]he plan is to deploy 2008.1 everywhere, including

[11]The court notes that the parties have focused their arguments on intent, and have not substantially addressed any other requirements of § 271(f).

STC" (*id.* at A166; A98); and (8) a "July 2008" presentation identified as a "key issue[ ]" "STC Phase 3," noting that an "[u]pgrade of installed software to 2008.1 [was] planned," "includ[ing] design alternatives," and that a "[d]ecision [was] on [the] way forward with senior management" (*id.* at A33). (D.I. 404 at 23) As noted previously, version 2008.1.1 was uploaded August 15, 2008. (D.I. 410 at A144)

Defendant points to no document preceding its June 16, 2008 shipment (or even the August 15, 2008 upload of version 2008.1.1) containing a date certain for the implementation of version 2008.1.1. Defendant certainly had "priorit[ies] and "plan[s]" to implement version 2008.1.1, but there is no evidence of record that defendant could predict, as of June 16, 2008, when version 2008.1.1 would actually operate on STC's LMUs. There is no indication that defendant directed that the 360 Geometrix® systems be "held" or not installed until version 2008.1.1 was up and running. To the contrary, prior to the August 15, 2008 upload, 188 phase 3 systems were already "installed or in the process of installation." (*Id.* at A65) One hundred (100) of these systems had been shipped in August 2007, 88 in June 2008. Defendant cannot feasibly claim that it intended these 188 systems to run anything other than the version 2006.0.4 software in place at the time.[12] Defendant does not dispute that 125 systems were actually combined in an infringing system. Even if such a finding were justified on this record, which it is not, it is not plausible to believe that defendant had one set of intentions for part of its shipment of 360 units and another set of intentions for the balance. Shipment with a "hope" not to infringe at some (unspecified) later date is insufficient under these

[12]Because version 2008.1.1 was inoperable at the time, there was no "substantial noninfringing use" for these Geometrix® systems. 35 U.S.C. § 271(f).

15

circumstances.

In view of the foregoing, the court finds that defendant shipped 360 Geometrix®

systems on June 16, 2008 with the intent to combine them into an infringing system.

The court awards plaintiff an additional $9,626,707 in actual lost profits damages, the

amount stipulated by the parties (D.I. 426), pursuant to Rule 60(b)(6).[13] The court will

proceed to review plaintiff's arguments for punitive damages.

## B. Punitive Damages

Plaintiff seeks enhanced damages for defendant's phase 3 infringement.

Pursuant to 35 U.S.C. § 284, the court "may increase the damages up to three times

the amount found or assessed" "[w]hen the damages are not found by a jury."

> Although Section 284 does not state a basis upon which a district court may
> increase damages, it is well established that enhancement of damages may be
> premised upon a finding of willful infringement. However, a finding of willful
> infringement does not mandate that the district court enhance damages; it
> merely authorizes the court to do so at its discretion. In exercising this
> discretion, the trial court considers the weight of the evidence of the infringer's
> culpability, . . . , in light of the factors included in *Read*.

*Johns Hopkins University v. CellPro, Inc.*, 152 F.3d 1342, 1364-65 (Fed. Cir. 1998)

(internal citations omitted).

### 1. Willfulness

The parties have submitted the determination of willfulness with respect to

defendant's phase 3 shipments to the court.[14]

_____

[13]*See supra* n.10.

[14]35 U.S.C. § 284 expressly contemplates the award of exemplary damages
based upon a bench finding of willfulness. *See also Lexion Medical, LLC v. Northgate
Tech., Inc.*, 292 Fed Appx. 42, 50-51 (Fed. Cir. 2008) (unpublished) (reviewing district
court's post-trial no willfulness determination with respect to post-verdict liquidation of

[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.

In re Seagate Tech., LLC, 497 F. 3d 1360, 1371 (Fed. Cir. 2007) (citation omitted).

The court finds that plaintiff has met its high burden on this record.

As an initial matter, the jury found (in September 2007) that defendant's infringement of the '144 patent was willful. The court did not consider defendant's post-trial motion for judgment as a matter of law ("JMOL") on willfulness insofar as counsel did not make a proper Rule 50(a) motion on that issue. (D.I. 373 at 15-19) Because it is now relevant to the issue at bar, the court notes that it would have been inclined to deny defendant's JMOL motion. Defendant had knowledge of the '144 patent prior to its infringement. The '144 patent was at issue in prior litigation between the parties, and was actually asserted by defendant as prior art against another of plaintiff's patents. The '144 patent was not included in the license agreement arising from that litigation. Further, defendant did not seek (or in any event, did not rely upon) an opinion of counsel that it did not infringe the '144 patent. Plaintiff established all of these facts at trial which, in their totality, support the jury's finding that defendant did not form a reasonable belief that it did not infringe or the '144 patent was invalid so as to abdicate its duty to avoid infringement.

As discussed previously, 21 additional phase 2 systems and 100 phase 3

inventory).

systems were shipped prior to the verdict; this conduct is considered willful in accordance with the jury verdict. There is no exculpating evidence regarding defendant's post-trial shipments. The court disagrees with defendant that its software version 2008.1.1 "redesign" mitigates against objective recklessness. (D.I. 404 at 33-34) As discussed previously, although version 2008.1.1 was certainly in development prior to the shipment of the remaining phase 3 Geometrix® systems, defendant points to no evidence indicating that it intended for those systems to run only version 2008.1.1. There is no indication that defendant "held" the installation of the phase 3 systems until version 2008.1.1 was operational, or that it had a definite idea, when it shipped the phase 3 systems, that they would be installed at a time when version 2008.1.1 was operational. Defendant had not even started the approval process with STC for the upgrade as of August 4, 2008, over a month after the final phase 3 shipment. (D.I. 422, ex. 26) Many phase 3 systems were installed while version 2006.0.4 was running, further demonstrating defendant's lack of regard for what software was in place at the time of shipment.

After the verdict, defendant continued its phase 3 activities unabated, apparently relying on the possible "scenarios" that the court would overturn the jury verdict on its post-trial motions, find in favor of its then-pending equitable defenses, and/or find that defendant would complete and upload version 2008.1.1 in sufficient time to divorce its post-trial shipments from those adjudicated to be infringing. (*Id.*, ex. 27) Defendant lost its gamble.

As the adjudicated infringer, defendant had a duty to inform plaintiff of its shipments of infringing product and, at a minimum, to propound a position (whether by

18

an opinion of counsel or otherwise) as to why its phase 3 post-verdict shipments were non-infringing. Instead, defendant shipped phase 3 under a veil of secrecy. Viewed in their totality, the facts clearly demonstrate an objectively high likelihood that defendant's actions constituted (continued) infringement of the '144 patent.

## 2. Enhanced damages

As the Federal Circuit has explained,

[t]he principal considerations in enhancement of damages are the same as those of the willfulness determination, but in greater nuance as may affect the degree of enhancement. Thus egregiousness of the infringer's conduct may receive greater emphasis, as may any mitigating factors.

*SRI Intern., Inc. v. Advanced Technology Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997) (citing *Read*, 970 F. 2d at 826-27).

The court notes at the outset that several of the *Read* factors, discussed in the court's post-trial opinion, remain unchanged: there remains no evidence of copying, the parties maintain the same size and financial condition, and the trial was sufficiently close. Of these, only the lack of copying tips against enhancing damages.

The facts at bar bear upon the remaining *Read* factors. Plaintiff emphasizes that defendant: (1) continued to ship its infringing Geometrix® product after the jury found that defendant willfully infringed the '144 patent; (2) did not redesign its software until after the court's August 1, 2008 opinion; (3) committed discovery abuse by failing to disclose its pre-trial shipment of 21 additional phase 2 systems and 100 phase 3 systems; (4) allowed its damages expert to falsely testify that phase 3 was too speculative to award damages on; and (5) allowed its litigation counsel to incorrectly represent to the court that no phase 3 shipments had been completed as of trial. (D.I.

19

396 at 20-24) Plaintiff represents that defendant's tactics forced it to "slog through five months of discovery," including "500,000 pages of documents," and incur additional counsel fees in connection with these proceedings. (*Id.* at 24-25) The court will briefly address the *Read* factors with these arguments in mind.

### i. Knowledge of and beliefs regarding the '144 patent

The court formerly found, based on the record at the time, that this factor tipped slightly in favor of enhanced damages. (D.I. 373 at 47) This factor now weighs heavily in favor of enhanced damages. In addition to its prior history of knowledge regarding the '144 patent, noted in the court's prior opinion, defendant was an adjudicated infringer of the '144 patent when it shipped 335 phase 3 systems to STC. Defendant's assertion that it had a good faith belief that its version software 2008.1.1 would not infringe is not persuasive in view of the fact that there was no indication that these shipped systems would run that software to the exclusion of version 2006.0.4 and, in fact, many systems did run the infringing 2006.0.4 software upon their installation.

### ii. Litigation behavior

The court previously noted some evidence of less than desirable litigation behavior by defendant, but assessed this evidence as not "sufficiently deplorable" to warrant finding that this factor favored enhancement. This is no longer the case. As an initial matter, defendant's counsel falsely represented to the court on several occasions that phase 3 had not shipped as of trial. Counsel (and Mr. Hoberlein) also argued the same to the jury. Defendant now stipulates that it did ship 100 phase 3 systems prior to trial. Defendant did not alert the court (or plaintiff) to its June 16, 2008 shipment prior to

20

the court's issuance of its post-trial opinion. As indicated above, defendant, the adjudicated infringer, had a duty to inform plaintiff of its continuing and post-trial shipments. Defendant has consistently acted in disregard of the verdict in this respect. Defendant's lack of candor with the court, the jury, and plaintiff tips this factor heavily in favor of enhanced damages.

### iii. Duration of the infringement and remedial measures

The duration of infringement weighed in favor of enhanced damages in August 2008, insofar as defendant's infringement commenced in December 2004. (D.I. 373 at 49) Insofar as defendant's infringement has never ceased, this factor now tips heavily in favor of enhancement.

With respect to remedial measures, the court formerly noted that, as of August 1, 2008, there was "no indication that defendant has stopped its supply to STC in response to the present suit (or jury verdict)," which favored enhancement. (Id. at 50) Defendant's documents indicate that it was the court's post-trial opinion, and nothing sooner, that spurred its completion and implementation of version 2008.1.1 operating software. While the development and testing period was scheduled initially to end by June 2008 (D.I. 410 at A21-23, A25, A168), and a "[d]ecision [was] on [the] way forward with senior management" in July (id. at A33), it was not until August 2008 that defendant took affirmative action on the project. Specifically, it was still unknown as of August 4, 2008 whether the upgrade could be completed by August 27, 2008, and the approval process with STC had not started as of that date. (D.I. 422, ex. 26) Defendant clearly had a "desperation factor now to drive the in-country team to submit

21

[the paperwork]" after the post-trial opinion issued. (*Id.*) Based on the foregoing, defendant's lack of remedial measures weigh heavily in favor of enhancement.

### iv. Motivation to harm

As noted in the court's prior opinion, plaintiff and defendant are direct competitors in a two-supplier market for cellular telephone location technology; infringement by a direct competitor in such a market mitigates in favor of enhanced damages. (*Id.*, citing *nCUBE Corp. v. SeaChange Intern., Inc.*, 313 F. Supp. 2d 361, 381 (D. Del. 2004), 313 F. Supp. 2d 361, 390 (D. Del. 2004)) The STC contract consists of five phases. Defendant argued at trial that it would not necessarily be awarded all five phases and that each phase is awarded independently. Plaintiff asserted that, although STC is not contractually obligated to use the same vendor for all phases, it is impracticable to suggest that STC will switch vendors in the middle of the deal. The jury ultimately agreed with plaintiff that defendant won the entire STC contract, which was being rolled out in phases. Defendant's shipment of phase 3 to STC indicates the soundness of the verdict.

Defendant had clear motivation to ship phase 3, notwithstanding the verdict, in order to further secure its position vis-a-vis phases 4 and 5. In other words, the possibility for STC to switch vendors (to plaintiff) with two phases remaining is even more foreclosed at this juncture. Further, each of defendant's post-trial "scenarios" contemplating stopping the phase 3 deployment included the removal of LMUs (either uninstalled LMUs, or installed LMUs, in which case STC would have sought compensation and the return of the money it spent on phases 1 and 2). (D.I. 422, ex. 27) Defendant had additional motivation to continue its shipments rather than risk the

unraveling of the entire STC deal. This factor now heavily favors enhancement.

### v. Attempt to conceal infringement

Previously, the court found that this factor tipped in favor of no enhanced

damages. As noted above, however, defendant made no attempt to inform plaintiff of

the shipment of 100 phase 3 systems on or about August 9, 2007 or 360 phase 3 units

on June 16, 2008. Instead, defendant shipped phase 3 under a veil of secrecy.

Defendant did freely inform the court (and opposing counsel) of its shipment after the

fact. Notwithstanding, this factor tips in favor of enhancing damages.

### vi. Discussion

In total, one *Read* factor (lack of copying) tips against enhancing damages, two

factors (party size and finances and closeness of the case) are neutral, one factor

(concealment) generally weighs in favor of enhancement, and the remaining five factors

weigh heavily in favor of enhancement. Defendant's willful infringement and the

aggravating factors discussed above support the imposition of enhanced damages in

this case. The court finds that plaintiff is entitled to an enhancement of 100% on

defendant's phase 3 sales, or $9,626,707. Post-judgment interest shall not be

assessed on the punitive damages award.[15]

### 3. Attorney fees and costs

Plaintiff also argues that defendant's willful infringement, lack of a good faith

_____

[15]As noted in the court's prior memorandum order, 28 U.S.C. § 1961 permits, but does not compel, the application of post-judgment interest on punitive damages. The court in its discretion declines to award post-judgment interest on the enhanced damages award. Because the enhancement is not designed to compensate plaintiff for its injuries, plaintiff bears no loss for any delay in defendant's satisfying the judgment.

belief that it did not infringe, and litigation tactics, discussed *supra*, support a finding that this case is exceptional pursuant to 35 U.S.C. § 285. In deciding whether to award attorney fees, the court must undertake a two-step inquiry. *See Interspiro USA, Inc. v. Figgie Intern. Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994). First, the court "must determine whether there is clear and convincing evidence that the case is 'exceptional.'" *Id.* Second, the court must determine whether "an award of attorney fees to the prevailing party is warranted." *Id.* Exceptional cases include: "[i]nequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).

The court finds this case exceptional. Defendant has been very familiar with the '144 patent for many years and prior to its infringement. Defendant did not obtain an opinion of counsel on the '144 patent. It has willfully infringed plaintiff's patent since 2004. Notwithstanding an adverse jury verdict, defendant continued to ship infringing product in an effort to maintain its position vis-a-vis its major overseas purchaser. Defendant made numerous misrepresentations to the court and jury in this case regarding its phase 3 shipments. Only after those shipments were overseas, and this court denied defendant's post-trial motions and equitable defenses, did defendant actually disclose its phase 3 shipments and implement its newest (version 2008.1.1) software. Defendant's lack of candor forced a post-trial discovery period, delayed plaintiff's recovery by over eight months, and cost plaintiff additional attorney fees. All the while, defendant has been able to continue its relationship with STC, which can only

aid it with respect to the eventual award of phases 4 and 5 (and the associated maintenance of those units). The court finds the foregoing to be clear and convincing evidence of the type of vexatious litigation precluded by § 285, and awards plaintiff its attorney fees and costs in connection with its motions at bar. Plaintiff shall submit for the court's review an accounting of its reasonable attorney fees and costs in accordance with this opinion.

## IV. CONCLUSION

For the foregoing reasons, the court grants plaintiff's motions for an accounting and for entry of a final injunction (D.I. 395) and for relief from the court's August 1, 2008 order pursuant to Rule 60(b) (D.I. 397). An appropriate order shall issue. The court shall also issue an appropriate permanent injunction order.