IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUEPOSITION INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-747-SLR |
| | ) |
| ANDREW CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this 4th day of May, 2010, having reviewed plaintiff's motion for relief from the court's April 30, 2009 order pursuant to Federal Rule of Civil Procedure 60(b) and for contempt and the papers submitted in connection therewith, and having conferred with the parties on the same;

IT IS ORDERED that plaintiff's motion (D.I. 451) is denied, as follows:

1. **Background.** The history of this litigation is lengthy and the court references its prior opinions (D.I. 373, 429) for the relevant background.

2. In January 2004, plaintiff and defendant entered into a settlement agreement in connection with litigation then pending before the Honorable Gregory M. Sleet in this district.[1] (Civ. No. 01-823-GMS) That agreement stated as follows:

> TruePosition hereby covenants not to sue Andrew for infringement of U.S. Patents 5,327,144 ("the '144 patent") and 5,608,410 ("the '410 patent") for domestic applications by Andrew relating solely to tasking E-911 geolocation (i.e., determining the latitude and longitude of wireless telephones from which a "911" call has been placed), so long as said applications **do not enable or permit locations to be performed for any task other than E-911**, including

---

[1] Allen Telecom, Inc., defendant's predecessor in interest, was the original named defendant.

without limitation the provision of location related commercial services, **and** so long as all licenses granted by Andrew for such domestic E-911 applications are **limited to use for E-911 geolocation only**.

(PTX-15-R at ¶ 8) (emphasis added)

3. In March 2007, defendant and T-Mobile USA, Inc. ("T-Mobile") entered into an agreement relating to defendant's supply of geolocation systems to that company. An addendum to that agreement provided T-Mobile with a software license, as follows:

> With respect to the software provided pursuant to this Amendment, this license shall **not** include the right to determine the location of a mobile device transmitting on a control channel (as opposed to a traffic channel, for which rights are expressly granted), **except** if the location is determined through the use of a control channel for the purpose of providing emergency services pursuant to an E911 call placed by the mobile device, or as necessary to ensure compliance with E911 reporting and/or accuracy requirements.

(D.I. 457, ex. B at ¶ 13.1) (emphasis added)[2]

4. In September 2007, a jury found that defendant's Geometrix® geolocation product, using a UTDOA[3] technique to locate signals sent over a SDC channel[4] (when a user is not on a call), infringes the '144 patent. (D.I. 293) The verdict was upheld by the court on post-trial motions for judgment as a matter of law by its opinion and order dated August 1, 2008. (D.I. 373; D.I. 374)

5. In October 2008, defendant activated a Geometrix® system at T-Mobile (at

---

[2]The court notes that the agreement has a footer displaying a date of August 25, 2008. It is unclear whether (and what) modifications were made following the March 29, 2007 agreement date.

[3]Uplink time distance of arrival.

[4]A partial acronym for stand-alone dedicated control channel, which the court will hereinafter refer to as "SDCCH."

2

one or more United States locations) that ran Geometrix® software version 2008.1[5] and was capable of performing geolocation using UTDOA on the SDCCH ("UTDOA/SDCCH").

    6. On April 30, 2009, the court entered a permanent injunction stating that

> defendant and its officers, directors, agents, servants, attorneys, representatives, and all other persons acting on behalf of, or in concert or participation with defendant, are enjoined from making, using, selling or offering for sale within the United States, or exporting from the United States, Geometrix® Wireless Location Systems that operate on software versions 2005.2.1000, 2006.0.4 and versions no colorably different.

(D.I. 431) Because plaintiff previously represented to the court that, insofar as this litigation did not concern E-911, and plaintiff has "no intention of asserting a claim against activity that is sanctioned by the settlement agreement whether in future contempt proceedings or otherwise," the injunction did not address that application. (D.I. 433 at 2)

    7. Defendant moved on May 14, 2009 to clarify the injunction. (D.I. 433) On May 19, 2009, the court stated that the injunction "does not cover systems that cannot perform geolocation using the control channel," in contrast to the infringing Geometrix® systems. (D.I. 436) That same date, defendant deactivated the "control channel license key" for T-Mobile, rendering its system incapable of performing geolocation using UTDOA /SDCCH.

    8. Plaintiff now moves under Federal Rule of Civil Procedure 60(b) for a further award of supplemental damages based on "previously undisclosed sales to T-Mobile of

---

[5]The parties appear to refer interchangeably to versions "2008.1" and "2008.1.1." The court will refer to the former.

3

a Geometrix® system that [defendant] made capable of using UDTOA on the control channel." (D.I. 452 at 1) Plaintiff requests supplemental damages for pre-injunction activity and an order of contempt against defendant for the post-injunctive activity. (*Id.*)

9. It is defendant's position that, although the Geometrix® system may have been capable of performing geolocation using UTDOA/SDCCH: (1) defendant's license to T-Mobile expressly prohibited such use outside of E-911 applications; (2) despite having been installed with a "SDCCH Enable key," T-Mobile's LMU's[6] were not capable of performing any geolocation using UTDOA/SDCCH after March 19, 2009 when defendant changed the LMU configuration; (3) defendant disabled the "SDCCH Enable key" anyway on May 19, 2009; and (4) recently, defendant has utilized new technology to affirmatively restrict non-E-911 uses of the control channel. (D.I. 457 at 10, ex. O)

10. **Relief from judgment.** Rule 60(b) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding[.]" Rule 60(b)(3) provides for relief from judgment by reason of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or other misconduct by an opposing party." "To prevail, the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case. For example, failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct." *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983). "In order to sustain the burden of proving fraud and misrepresentation under Rule 60(b)(3), the evidence must be clear and convincing."

---

[6]Location measurement unit.

4

*Brown v. Pennsylvania R.R. Co.*, 282 F.2d 522, 527 (3d Cir.1960) (citations omitted).

11. Rule 60(b)(6), the rule's catch-all provision, permits a party to seek relief from a final judgment, and request reopening of his case, "when the movant shows any. . . reason justifying relief from the operation of the judgment other than the more specific circumstances set out in Rules 60(b)(1)-(5)." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). The Third Circuit "has consistently held that the Rule 60(b)(6) ground for relief from judgment provides for extraordinary relief and may only be invoked upon a showing of exceptional circumstances." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 273 (3d Cir. 2002) (internal citations and quotations omitted); *see also Gonzalez*, 545 U.S. at 535 ("[O]ur cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a final judgment.") Rule 60(b)(6) generally requires the movant to make "a more compelling showing of inequity or hardship" than would normally be required to reopen a case under any one of the first five subsections of Rule 60(b). *Project Mgmt. Inst, Inc. v. Ireland*, 144 Fed. Appx. 935 n.1 (3d Cir. Aug.16, 2005).

12. At issue with respect to plaintiff's Rule 60(b) motion is whether defendant disclosed the control channel capability at T-Mobile timely and prior to the accounting phase of this litigation. Put another way, did defendant's conduct foreclose plaintiff from asserting infringement based on its activities vis a vis T-Mobile?

13. On November 20, 2008, defendant answered interrogatories stating that it "ha[d] not made, used, sold or offered for sale any Geometrix® system performing UTDOA using an SDCCH since August 1, 2008, and does not have any pending sales

contracts to do so." (D.I. 457, ex. E (No. 20)) Defendant's responses were supplemented on December 23, 2009, and provided that "[i]mproved Geometrix® units [with source code version 2008.1.1] also were installed for certain domestic customers performing geolocation using UTDOA techniques for E911 services. . . installations in October and November 2008 for T-Mobile markets in Charlotte, Raleigh, and Puerto Rico[.]" (*Id.*, ex. F (No. 2)[7]) On February 20, 2009, defendant's 30(b)(6) witness Arthur Beck ("Beck") was asked about defendant's interrogatory response and testified that he "believe[d] that release 2008.1 was installed for T-Mobile in the October, November 2008 time frame." (D.I. 457, ex. C at 31) Beck stated that defendant's system had to be configured to perform UDTOA/SDCCH. (D.I. 459, ex. 6 at 178, 190) Beck's subsequent testimony was unclear. He stated (in succession) that a customer had obtained a license to obtain this functionality; that he did not believe he could divulge that information; and that there was no customer "to [his] knowledge" (besides Saudi Telecom) having such a license. (*Id.* at 191, 193) Beck did disclose two names of individuals within the program management division of the company who would know the most about its licenses. (*Id.* at 193-94)

14. At the April 2, 2009 pre-injunction hearing in this case, defendant stated that T-Mobile had been provided with the new 2008.1 software and that "[t]he design around code still uses TDOA and still uses the control channel." (D.I. 442 at 69, 71) The court entered the injunction on April 30, 2009 and clarified that order on May 19, 2009.

---

[7]Plaintiff suggests that defendant maintained inaccurate responses insofar as these were answers to separate interrogatories. Because the essential information was disclosed, alleviating any prejudice to plaintiff, the capacity in which this occurred is of secondary importance.

15. Plaintiff sent a letter to defendant on August 20, 2009 inquiring about T-Mobile's compliance with the court's injunction. (D.I. 457, ex. G) Defendant responded that "T-Mobile cannot perform geolocation of a cellular phone using TDOA on a control channel;" plaintiff asked defendant to confirm that this had always been the case. (D.I. 459, ex. 4)

16. On September 11, 2009, defendant informed plaintiff that its license to T-Mobile permits T-Mobile to perform UDTOA/SDCCH only for E-911 purposes and, on April 20, 2009, defendant activated the source code allowing such geolocation. (D.I. 457, ex. I) Plaintiff subsequently inquired whether the T-Mobile system was able to perform UDTOA/SDCCH prior to April. (*Id.* at J) On September 23, 2009, defendant clarified that T-Mobile previously utilized an earlier generation of software that was, from its installation in October 2008, capable of performing control channel geolocation. (*Id.*, ex. K) Defendant stated that it previously understood plaintiff's inquiry as relating only to the permanent injunction (entered in May 2009). (*Id.*)

17. On the foregoing record, the court finds that plaintiff has not provided clear and convincing evidence of fraud or other misconduct on the part of defendant that prevented plaintiff from fully and fairly presenting its case. Although the record is not altogether clear about whether (and when) T-Mobile had the capability of performing UDTOA/SDCCH, its installation at T-Mobile was timely disclosed. There is no indication that plaintiff either asked Beck specifically about T-Mobile or subsequently deposed either of the two program management employees identified by Beck as knowledgeable on the topic of licenses to perform UDTOA/SDCCH.

18. Defendant contracted with T-Mobile after the court's August 2008 opinion in

this case and, in doing so, defendant specifically carved out the E-911 application that was the subject of the 2004 covenant not to sue by plaintiff and that was repeatedly emphasized by plaintiff's counsel as being outside the scope of this litigation. The crux of plaintiff's argument is that defendant's conduct was outside of the prior covenant because its 2008.1 software "enable[d] or permit[ted]" T-Mobile to perform UDTOA/SDCCH. The newer software undisputably enabled UTDOA/SDCCH, however, there is no evidence that T-Mobile actually used defendant's software for a prohibited purpose.[8] Defendant complied with the covenant's provision to restrict its licensees' use of such capabilities to E-911 purposes. On the record at bar, the court does not find defendant's conduct to be sufficiently culpable such as to justify relief from the court's prior judgment.

19. **Contempt.** Generally, three elements must be proven to establish liability for civil contempt: (1) that a valid order of the court exists; (2) defendant has knowledge of the order; and (3) defendant disobeyed the order. *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir. 1995). These "elements must be proven by clear and convincing evidence, and ambiguities must be resolved in favor of the party charged with

---

[8]With its reply papers, plaintiff attached a declaration by T-Mobile's Senior Director of North American Products, executed on December 21, 2009. (D.I. 459, ex. 2) That declaration states that, since October 2009, T-Mobile used defendant's product to determine locations for over 430,000 calls transmitting on the SDCCH using TDOA. A portion of these calls were E-911 calls, while other uses were for "lawful intercept purposes (i.e., working with domestic law enforcement to lawfully generate the latitude and longitude of cellular telephones for security purposes)." (*Id.*) Defendant did not have an opportunity to reply to this submission. The court does not delve into whether these "lawful intercept" purposes were outside of the T-Mobile agreement (or whether they infringe the '144 patent) on the present motion. Whether T-Mobile breached its agreement with defendant is also not an issue properly resolved on the motion at bar.

8

contempt." *John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003) (citations and quotations omitted).

20. In the patent context, the Federal Circuit has stated that before entering a judgment of contempt, a district court must address two separate questions. First, the court must determine whether a contempt hearing is an appropriate forum for adjudging whether an allegedly redesigned product is infringing. *See Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1380 (Fed. Cir. 2007) (citing *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1531 (Fed. Cir. 1985)). At this step, the court compares the accused product with the original infringing product; if there is "more than a colorable difference" between the two such that "substantial open issues with respect to infringement to be tried" exist, contempt proceedings are inappropriate.[9] *Id.* (citing *KSM Fastening*, 776 F.2d at 1532). Only if contempt proceedings are deemed appropriate does the court then proceed to determine whether the accused product infringes the claims of the asserted patent. *See id.* at 1381 (citing *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1349 (Fed. Cir. 1998)). "To show infringement, the patentee must prove by clear and convincing evidence that the modified device falls within the admitted or adjudicated scope of the claims." *Id.* (citations and internal quotations omitted).

21. Plaintiff's contempt motion concerns the 19-day period from April 30, 2009, the date of the court's injunction, through May 19, 2009, the date defendant deactivated T-Mobile's "SDCCH Enable key." The threshold issue is whether plaintiff has clearly

---

[9]The court's injunction order explicitly included this threshold standard.

and convincingly demonstrated that Geometrix® systems using version 2008.1 software are "no colorably different" than the adjudicated versions 2005.2.1000 and 2006.0.4.

22. Plaintiff admits that its expert (Dr. Oded Gottesman ("Gottesman")) and defendant's expert (Dr. Nathan Polish ("Polish")) have submitted declarations evidencing disagreements regarding version 2008.1. (D.I. 452 at 12) It is Gottesman's opinion that "[t]he 2008 Release software versions **mostly** include the features of the earlier version 2005.2.1000 software that I focused on at trial as well as the features of the 2006 Release software. . . While there are differences between 2008 Release versions and the version 2006 Release, those changes do not take Version 2008 Geometrix® outside the scope of claims 22 and 31 of the '144 patent." (D.I. 452, ex. 17 at 6) Notably, plaintiff does not assert that version 2008.1 infringes claim 1 of the '144 patent, which it asserted against the 2005 and 2006 versions at trial.

23. Several differences between the adjudicated products and version 2008.1 are readily apparent from Gottesman's declaration. For example, with respect to the "prescribed number of . . . time stamp bits" limitation of claim 31, Gottesman identified the "actual_start_time" data field included in "DF_RESULTS" message frames for previous Geometrix® software versions. Version 2008.1 produces an "ENHANCED_DF_RESULTS" message having a "collection_start_time" data field. Gottesman opines that the "collection_start_time" has an identical value to the "actual_start_time" only "**if** that value is offset by the value in the 'offset_time' field, which has a fixed length[.]" (D.I. 452, ex. 17 at 9) Gottesman identified at trial the performance manager database of the 2005 and 2006 software versions as satisfying

the "database means" limitation of claim 22, which is not contained in version 2008.1. Gottesman now asserts that "version 2008 Geometrix® does include log files that store these latitudes and longitudes and, since the log files store data in an organize[d] manner, they qualify as the 'database' referenced in the court's construction." (*Id.* at 17) New infringement theories are indicative of new infringement defenses. *See Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1380 n.3 (Fed. Cir. 2007) ("Requiring disputed issues to be tried through full litigation rather than summary proceedings eliminates due process concerns for the defendant accused of violating an injunction.") (citing *KSM Fastening*, 776 F.2d at 1532).

24. Whether to proceed via a contempt hearing is an issue within the discretion of the trial court and, as such, the court's decision is reviewed only for abuse of discretion. *See, e.g., TiVo, Inc. v. EchoStar Corp.*, 597 F.3d 1247, 1253 (Fed. Cir. 2010); *Abbott Labs.*, 503 F.3d at 1380. This case involves a complicated technology area (software) and presents disagreements between experts in the field.[10] The record at bar demonstrates that there are substantial open issues on continuing infringement of the asserted claims. *Cf. TiVo*, 597 F.3d at 1254 ("Given that EchoStar's modification impacted only one limitation, one that it had already conceded was infringed by another software component, the court concluded that the adjudicated and modified products were not more than colorably different.") (affirming finding of contempt). Courts must

---

[10]For example, location data in the version 2008.1 data files is encrypted (necessitating defendant's giving to T-Mobile the decryption key in the first instance). While Polish has opined that a subscriber cannot be "provided access" to this data as required by claim 22 when the data is encrypted, Gottesman disagrees. (D.I. 452, ex. 17 at 17)

11

exercise restraint in affording the patent owner the benefit of contempt proceedings to litigate what are essentially new patent infringement claims. See *KSM Fastening*, 776 F.2d at 1525 (citing *MAC Corp. of America v. Williams Patent Crusher & Pulverizer Co.*, 767 F.2d 882 (Fed. Cir. 1985)). Plaintiff's request for a contempt order for a 19-day window in which a violation might have occurred (even assuming for purposes of this proceeding that the newer 2008.1 software is not colorably different from the adjudicated 2005 or 2006-version software) is an exercise that, at best, strains the limited resources of the court. The motion is denied.

25. **Costs**. The court apprised plaintiff's counsel that it would impose costs if it found that the matters at hand are not substantially worthy of a contempt motion. Having determined that to be the case,

IT IS FURTHER ORDERED that defendant shall, by **May 18, 2010**, remit to the court and opposing counsel an itemization of its costs in defending the present motion. The court will order costs by separate order.

_____
United States District Judge